**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | |
| | **:** | **Case No: 21-MJ-195 (ZMF)** |
| | **:** | |
| **ETHAN NORDEAN,** | **:** | |
| also known as "Rufio Panman," | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

## OPPOSITION TO DEFENDANT'S MOTION TO LIFT STAY ON RELEASE ORDER

The United States of America, by and through the United States Attorney for the District of Columbia, respectfully opposes Defendant's "Motion to Lift Stay on Release Order." (Docket Entry 13) (hereinafter "Def. Motion"). For the reasons stated below, Defendant's motion should be DENIED.

## FACTS

On February 3, 2021, Defendant was arrested in his home state of Washington on an arrest warrant issued from the United States District Court for the District of Columbia by Magistrate Judge Zia M. Faruqui in connection with a Criminal Complaint charging the defendant with Aiding and Abetting an Injury or Depredation Against Government Property, in violation of 18 U.S.C. §§ 1361 and 2; Obstructing or Impeding an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2); Knowingly Entering or Remaining in any Restricted Building or Grounds Without Lawful Authority, in violation of 18 U.S.C. §§ 1752(a)(1), (a)(2); and Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 18 U.S.C. §§ 5104(e)(2)(D), and (e)(2)(G).

1

At his initial appearance in the Western District of Washington on February 3, 2021, the United States moved to detain the defendant pursuant to 18 U.S.C. § 3142(f)(1)(A), because Defendant is charged with a crime of violence. The United States also sought detention pursuant to 18 U.S.C. § 3142(e)(3)(C), which provides a rebuttable presumption of detention if there is probable cause to believe that the defendant committed "an offense listed in section 2332b(g)(5)(B) of title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed." The United States also sought detention pending trial pursuant to 18 U.S.C. § 3142(f)(2)(A), because Defendant poses a serious risk of flight. The Presiding United States Magistrate set a detention hearing for February 8, 2021.

After hearing argument at the detention hearing on February 8, 2021, the Magistrate issued an order releasing the Defendant. The United States orally moved to stay Defendant's release pending its appeal, which was denied, and the Magistrate ordered that Defendant would be released from custody unless this Court issued a stay by 6pm on February 8, 2021. This Court issued an Order Staying the Release Order for Review by this Court, as well as a separate Order directing the United States Marshals to transport Defendant to this District forthwith. (Docket Entries 8, 9). On February 23, 2021, Defendant filed the instant motion, and this opposition follows.

## **ARGUMENT**

1. ## **Defendant is Subject to a Rebuttable Presumption in Favor of Detention**

Defendant contends that he is not subject to the rebuttable presumption in favor of detention pursuant to 18 U.S.C. § 3142(e)(3)(C). <u>Def. Motion</u>, at 10-11. Defendant is incorrect.

This court has already determined that the presumption applies in this context. <u>United States v. Powell</u>, Case No. 21-mj-197 (C.J. Howell, February 11, 2021); <u>see</u> <u>also</u> <u>United States v.</u>

Watkins, Case No. 21-cr-28-3 (J. Mehta February 26, 2021); United States v. Bisgnano, Case No.

21-CR-36 (J. Nichols, February 26, 2021).  As this Court noted during the Powell hearing,

> Once the presumption is triggered it imposes on the defendant, at a minimum, a burden of production to offer some credible evidence that rebuts it.  Importantly, the burden of persuasion remains with the Government throughout.  In assessing whether a defendant has successfully rebutted the presumption, the Court must take into account the available information concerning the four factors set out in 18 U.S.C. Section 3142(g).

 (Tr. at 43, 16-19). Notably, in Powell the Court did not analyze if a detention hearing was available

under § 3142(f), including whether § 1361 qualified as a crime of violence.

This approach is axiomatic given the burden shift to the defendant that would necessitate

a hearing to rebut the presumption.  The question of whether a detention hearing is necessary under

§ 3142(f), therefore, need not be reached where a rebuttable presumption arises, as will always be

the case where, like this one, there is a probable cause finding that a defendant violated § 1361

while causing damage in excess of $1,000.

2.   As Charged in the Complaint, Destruction of Property in Violation of 18 U.S.C. § 1361 is a Crime of Violence[1]

Defendant also contends that Destruction of Property is not a "crime of violence" such that

it qualifies for detention pursuant to 18 U.S.C. § 3142(f)(1)(A). Def. Motion, at 7-10. Defendant

is, again, incorrect.

Faced with an identical argument posed by another Capitol rioter—albeit one affiliated

with the Oath Keepers, rather than the Proud Boys—Judge Mehta ruled from the Bench that

---

[1] The government submits that detention is also warranted under § 3142(f)(2)(A), as previously argued (Docket Entry 6), as well as under § 3142(f)(2)(B) because Defendant's brazen attempt to obstruct a congressional proceeding, in violation of 18 U.S.C. § 1512(c)(2), evinces a serious risk of obstructive conduct in the underlying criminal investigation.

Destruction of Property, in violation of 18 U.S.C. § 1361 is a crime of violence. United States v. Watkins, Case No. 21-cr-28-3 (J. Mehta February 26, 2021).

As relevant here, a "crime of violence" under § 3156(a)(4)(A), the "elements clause," is "an offense that has an element of the offense the use, attempted use, or threatened use of physical force against the person or property of another."  A defendant may commit or aid and abet the commission of a crime of violence.  See, e.g., United States v. Richardson, 948 F.3d 733, 741-42 (6th Cir. 2020) (finding "no distinction" between aiding and abetting and committing the substantive crime, and concluding that a defendant's conviction for aiding and abetting Hobbs Act robbery "satisfies the elements clause"); Steiner v. United States, 940 F.3d 1282, 1293 (11th Cir. 2019).

Focusing on this Court's inquiry as to whether the second prong of § 1361—committing a depredation against property of the United States—requires the use of force[2], the Supreme Court in Johnson v. United States, 559 U.S. 133 (2010), held that "in the context of a statutory definition of 'violent felony,' the phrase 'physical force' means violent force—that is, force capable of causing physical pain or injury to another person." Id. at 140.  For that reason, the force inherent in common-law-battery, which could include "the merest touch," was not sufficient.  Id. at 143. In Stokeling v. United States, 139 S. Ct. 544 (2019), the Supreme Court returned to the meaning of "violence force" and held that the force required to commit common-law robbery satisfies Johnson's definition.  That is because the force necessary to effectuate a robbery "must overpower

---

[2] The first prong that contemplates a violation that "willfully injures" property has been held to necessarily require the use or threatened use of force under the reasoning in United States v. Abu Khatallah, 316 F.Supp.3d 207, 213-15 (D.D.C. 2018)

a victim's will" and is thus "capable of causing physical pain or injury." (quoting Johnson, 559 U.S. at 140). Stokeling expressly rejected the argument that "physical force" means "force that is 'reasonably expected to cause pain or injury.'" Id. at 554. Instead, it concluded that "Johnson ... does not require any particular degree of likelihood or probability that the force used will cause physical pain or injury; only potentiality." Id.

Furthermore, the Sixth Circuit has explained, a "depredation" under § 1361 is "the act or an instance of robbing, plundering, or laying waste." United States v. Jenkins, 554 F.2d 783, 8786 (6th Cir. 1977). The Sixth Circuit adapted this definition from Deal v. United States, 274 U.S. 277 (1927), which interpreted the meaning of "depredation in a post-office regulation. In doing so, the Supreme Court defined "depredation" to mean "the act of plundering; a robbing; a pillaging." Id. at 283 (quoting Century Dictionary).

Insofar as criminal statutes are interpreted in light of "the ordinary meaning of [a] term... at the time Congress enacted the statutes," Perrin v. United States, 444 U.S. 37, 42 (1979), it is significant that Congress added the "willfully injure" and "commit any depredation" language to § 1361's predecessor statute in 1934. See Act of June 18, 1934, Pub. L. No. 73-394, 48 Stat. 996. At this time, "depredation" was understood to have the same meaning adopted by the Supreme Court in *Deal*. See BLACK'S LAW DICTIONARY (3d ed. 1933) (defining "depredation' as "[t]he act of plundering, robbing, or pillaging" (citing Deal).

The three means of committing a depredation—robbing, plundering, and pillaging—all require the use of force. Depredation-as-robbery involves the use or threatened use of physical force as the Supreme Court found in Stokeling. In the context of "threats of injury to tangible and intangible property," the Fourth Circuit in United States v. Mathis, 932 F.3d 242 (4th Cir. 2019)

held that such threats charged in a Hobbs Act robbery satisfied § 924(c)'s force clause.

With respect to pillaging and plundering, the 1933 edition of BLACK'S LAW DICTIONARY, which was in circulation when Congress first criminalized depredation against government property, defines the terms this way:

> **Pillage**:  Plunder; the forcible taking of private property by an invading or conquering army from the enemy's subjects;

> **Plunder**:  The most common meaning of the term "to plunder" is to take property from persons or places by open force, and this may be in course of a lawful war, or by unlawful hostility, as in the case of pirates or banditti.  But in another and very common meaning, though in some degree figurative, it is used to express the idea of taking property from a person or place, without just right, but not expressing the nature or quality of the wrong done.

Pillaging therefore qualifies as an elements-clause crime because it involves "the forcible taking of property."  The first definition of plundering, taking property "by open force," qualifies as well.

That leaves the second definition of plunder—"taking property form a person or place, without just right."  To the degree that depredation might be understood to encompass non-forceful thefts, § 1361's plain language and legislative history make clear that is not how Congress was using the term in that statute.  Section 1361 requires that a person "commit[ ] any depredation <u>against any property</u>," thus by its terms requiring force to be used against property, which does not occur in a non-forceful theft. (emphasis added). Similarly, § 1361 sets the statutory penalties by focusing on injury to property, raising the statutory-maximum penalty to 10 years "[i]f the damage or attempted damage to such property exceeds the sum of $1,000[.]" Thus, Congress was evidently contemplating that, whether a person "injure[d]" or "commit[ted] any depredation against" government property, some damage or attempted damage would occur.  Had Congress meant to encompass non-forceful thefts within § 1361, it would have worded the statute differently to cover

6

depredation "involving" property and to address "value" rather than damage.  See 18 U.S.C. § 641 (criminalizing, inter alia, theft of government property, and setting statuary penalties based upon "the value of such property").

Section 1361's history likewise shows that Congress did not mean to cover non-forceful thefts.  Before Congress added "or shall willfully injure or commit any depredation against" to what was then § 35, that statute already made it a crime to "take and carry away or take for his own use, or for the use of another, with intent to steal or purloin, any personal property of the United States[.]"  40 Stat. 1015, 1016 (1918).  In 1934, Congress added "or shall willfully injure or commit any depredation against" to that Section, making it a crime to "take and carry away or take for his own use, or for the use of another, with intent to steal or purloin, or shall willfully injure or commit any depredation against, any property of the United States[.]"  48 Stat. 996, 996 (1934).  Had Congress envisioned non-forceful thefts when it made this change, its use of "depredation" would have been redundant of the statutory language that already covered "tak[ing] and carry[ing] away" property.  And the fact that the "commit any depredation against" language was added at the same time as the "willfully injure" language, suggests that Congress was instead contemplating forceful thefts of the kind covered by depredation's typical meaning.  See, e.g., Smith v. United States, 508 U.S. 223, 228, 229 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning. . . . Language, of course, cannot be interpreted apart from context. The meaning of a word that appears ambiguous if viewed in isolation may become clear when the word is analyzed in light of the terms that surround it.").

To commit a depredation against government property by plundering it, robbing it, or pillaging it, will thus necessarily involve a defendant's use of force.  This was the conclusion

reached by the Ninth Circuit, which in the context of piracy offenses, has expressly held that all three species of depredation—plundering, robbing, and pillaging—"require the use of force." United States v. Shi, 525 F.3d 709, 721 (9th Cir. 2008) (discussing piracy under 18 U.S.C. § 2280 by reference to United States v. Smith, 18 U.S. (5 Wheat.) 153, 161 (1820), which defined piracy as "robbery, or forcible depredations upon the sea"); see also United States v. Dire 680 F. 3d 446, 452-59 (4th Cir. 2012) (discussing the history of piracy-as-depredation).

To give one especially colorful example, the Ninth Circuit once held that a defendant committed a depredation against federal property when, after shooting a deer on the National bison Range, he "returned under cover of darkness, climbed the Range's eight-foot-high boundary fence, severed the deer's head, dragged it over the fence and to the road, loaded it in his truck, and drove home." United States v. Rebich, No. 95-30177, 1996 WL 252679, at *1 (9th Cir. May 8, 1996) ("These acts, no less than the actual shooting itself, constitute a depredation of property"). Given the Supreme Court's definition of depredation in Deal, any conduct which qualifies as a depredation under § 1361 will, like the head severing in Rebich, necessarily involve a use of physical force sufficient to satisfy § 3156(a)(4)(A).

Accordingly, the depredation prong under § 1361 requires the use of force and, consequently, qualifies as a crime of violence.

3. **The Bail Reform Act Factors All Favor Pretrial Detention**[3]

As the Court is aware, there are four factors under Section 3142(g) that the Court must

---

[3] The United States provided an analysis of the Bail Reform Act factors in its Motion for Stay of the Release Order (Docket Entry 6), which the United States hereby incorporates by reference. This more fulsome analysis includes information that was known to the United States on February 8, 2021, as well as evidence that has been recovered from a forensic examination of Defendant's electronic devices and other evidence recovered by law enforcement between February 8, 2021, and March 1, 2021.

analyze in determining whether to detain the defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. As noted below, each of these factors weighs in favor of pretrial detention in this case.

### A. The Nature and Circumstances of the Offenses

As this Court has recently noted within the context of cases arising from the Capitol riot, "a number of considerations implicating the dangerousness inherent in a defendant's conduct on January 6 are relevant" to the Court's weighing of this factor under the Bail Reform Act. Opinion, (Docket Entry 23, at 14-15), United States v. Chrestman, 21-MJ-218 (C.J. Howell, February 26, 2021). For example,

> any indication that a defendant engaged in prior planning before arriving at the Capitol, for example, by obtaining weapons or tactical gear, suggests that he was not just caught up in the frenzy of the crowd, but instead came to Washington, D.C. with the intention of causing mayhem and disrupting the democratic process, mandated under the U.S. Constitution, of counting and certifying Electoral College votes.
>
> . . .
>
> These motives and steps taken in anticipation of an attack on Congress speak volumes to both the gravity of the charged offense, as a premeditated component of an attempt to halt the operation of our democratic process, and the danger a defendant poses not just to the community in which he resides, but to the American public as a whole.

Id. at 15.

This Court also noted additional considerations that it would consider regarding the Nature and Circumstances of the Offense:

> Evidence of coordination with other participants before, during, or after the riot indicates that a defendant acted deliberately to amplify and assure the success of the breach of the Capitol. Similarly, a defendant who assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct, for example, by urging rioters to advance on the Capitol or to confront law enforcement, may have inspired further criminal conduct on the part of others. The presence of either of these factors enhances the defendant's responsibility for the destabilizing events of January 6 and thus the seriousness of his conduct.

Id. at 15-16.  Finally, the Court noted that it would consider a defendant's words and deeds once he entered the Capitol grounds in determining whether this factor weighs in favor of detention.

> A defendant who remained only on the grounds surrounding the Capitol exhibited less brazen disregard for restrictions on unlawful entrants than did a defendant who breached the interior of the Capitol building. The conduct of a defendant who injured, attempted to injure, or threatened to injure others, or who damaged or attempted to damage federal property, is more troubling than the conduct of a defendant who, though unlawfully present in a restricted area, merely wandered the premises. Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. These factors measure the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community.

Id. at 16.

Given these considerations, and the facts of this case, the United States respectfully submits that the Nature and Circumstances of the charged offenses weigh heavily in favor of Defendant's detention pending trial. Defendant held a leadership position within the Proud Boys on both a local and national level, and was personally active in planning the Proud Boys' activities on January 6, 2021. Moreover, following the arrest of the Proud Boys' Chairman on January 4, 2021, Defendant was nominated from within to have "war powers" and to take ultimate leadership of the Proud Boys' activities on January 6, 2021.  As noted more fully below, Defendant—dressed all in black,

wearing a tactical vest—led the Proud Boys through the use of encrypted communications and military-style equipment, and he led them with the specific plans to: split up into groups, attempt to break into the Capitol building from as many different points as possible, and prevent the Joint Session of Congress from Certifying the Electoral College results.

### Defendant's Leadership Position in the Proud Boys

For more than two years, Defendant has served in a leadership position with the Proud Boys on both a local and national level. Defendant has been a member of the Proud Boys "Elders Chapter" since at least November 2018,[4] and he has identified himself as the President of his local chapter in Washington State. Most importantly, as relates to January 6, 2021, messages exchanged among those Proud Boys planning to attend the event on January 6, 2021, indicated that Defendant was to be among those leading the group on the ground.

### Defendant's Use of Social Media to Recruit Participants for January 6

Beginning as early as November 4, 2020, Defendant and other Proud Boys leaders utilized their social media accounts to cast doubt on the legitimacy of the 2020 Presidential election, and encourage others – both Proud Boys and Proud Boys supporters alike – to join the Proud Boys in protesting and preventing the Certification of the Electoral College results. For example, Defendant posted the following on social media:

---

[4] The group attempted to "redact" the names of the Elders Chapter by highlighting he names in black, but the document was not actually "redacted" when it was published – leading to the identification of Proud Boys leadership by dozens of sources. See, e.g., Cory Doctow, "Redaction Ineptitude Reveals Names of Proud Boys' New Leaders," BoingBoing (November 28, 2018), *available at* *https://boingboing.net/2018/11/28/black-boxes-vs-ascii.html*.; Jack Crosbie, "Proud Boys Failed to Redact Their Dumb Bylaws and Accidentally Doxed Their 'Elders,'" Splinter (November 28, 2018), *available at* *https://splinternews.com/proud-boys-failed-to-redact-their-new-dumb-bylaws-and-a-1830700905*.

- On November 16, 2020, just days after the Proud Boys prominent attendance at the "Million MAGA March" in Washington, D.C., Defendant posted that "Any militia groups" in the Pacific Northwest area should contact him on an encrypted social media application "or direct message me here" to coordinate.

- On November 16, 2020, Defendant posted "What's more disturbing to me than the Dems trying to steal this election, is how many people . . . just accepted Biden won, despite the obvious corruption... Luke warm Patriots are dangerous."

- On November 26, 2020, Defendant posted "I'm sorry, but at this point in the game, if you're not aware of the corruption all around you and how it's hurting this country and your neighbors, then you are part of the problem."

- On November 27, 2020, Defendant posted "We tried playing nice and by the rules, now you will deal with the monster you created. The spirit of 1776 has resurfaced and has created groups like the Proudboys and we will not be extinguished. We will grow like the flame that fuels us and spread like love that guides us. We are unstoppable, unrelenting and now....unforgiving."

- On December 4, 2020, Defendant posted on social media "You can take a hard stand now, or watch as everything we've all built crumble before your eyes and have nothing to leave to your children. Enough is enough."

- On December 28, 2020, Defendant posted "Fight now, or lose everything."

- On January 4, 2021, Defendant posted "It is apparent now more than ever, that if you are a patriot, you will be targeted and they will come after you, funny thing is that they don't realize is, is we are coming for them."

12

- Similarly, on January 4, 2021, Defendant posted link to an episode of his video podcast *Rebel Talk with Rufio*, which had been recorded a few days earlier.  In that video podcast, Defendant addressed the Electoral College certification on January 6. While discussing alleged voter fraud in the Presidential election, and the public's purported "complacency," Defendant stated, "I think they're relying on complacency. I think they're relying on the Facebook posts, and that's all we're going to do." Defendant went on to say that, rather than being complacent, the Proud Boys were going to "bring back that original spirit of 1776 of what really established the character of what America is. And it's not complacency, it's not low standards. It's 'this is how it's going to be, and I don't give a god damn.'" Later in the program, Defendant stated that voter fraud in the Presidential election had killed democracy, and further stated "Democracy is dead? Well, then no peace for you. No democracy, no peace."

### Defendant's Actions to Raise Money and Gather Equipment for January 6

Defendant used his social media presence to encourage his "followers" to donate money, tactical vests and other military-style equipment to the Proud Boys for use on January 6, 2021. For example:

- Beginning on December 19, 2020, and continuing through December 31, 2020, Defendant exchanged direct messages via social media with an individual that wanted to donate a tactical vest with armored plates to the Proud Boys for their use.

- On December 27, 2020, Defendant created a crowdsourcing campaign which solicited donations for "Protective gear and communications" to be utilized by the Proud Boys on

January 6, 2021. Defendant shared a link to this crowdsourcing campaign on his social media page and encouraged others to share it on their social media pages.

- On December 27, 2020, Defendant exchanged direct messages via social media with an individual about how best to utilize military-style communications equipment on January 6, 2021.

- On December 28, 2020, Defendant exchanged direct messages via social media with an individual who wanted to donate protective gear to the Proud Boys to wear on January 6, 2021.

- On December 28, 2020, Defendant exchanged direct messages via social media with an individual who informed Defendant that s/he had requested donations of protective gear from their own social media followers and would deliver the protective gear to Defendant in advance of January 6, 2021.

- On December 28, 2020, Defendant exchanged direct messages via social media with an individual who stated that s/he had a tactical vest, steel plates, and bear mace to donate to the Proud Boys. Defendant agreed to meet with the individual to receive those items in advance of January 6, 2021.

- Beginning on January 2, 2021, and continuing through January 3, 2021, Defendant exchanged direct messages via social media with an individual who offered to contribute $1,000 to the Proud Boys' "travel fund" in order to send "a combat veteran and a Marine [who] wants to get in the street and fight" to join the Proud Boys in Washington, D.C. on January 6, 2021.

### *Defendant Takes Leadership of Proud Boys' January 6 Activities*

On January 4, 2021, Henry "Enrique" Tarrio, the self-proclaimed "Chairman" of the Proud Boys was arrested shortly after arriving in Washington, D.C., pursuant to a warrant issued by D.C. Superior Court. In communications between Proud Boys members following Tarrio's arrest, it was acknowledged that Defendant would be among those that led the Proud Boys on the ground on January 6, 2021.

Arrangements were made to program and distribute multiple Baofeng[5] radios for use by Proud Boys members to communicate during the event. Baofeng is a Chinese communications equipment manufacturer. Baofeng radios can be programmed to communicate on more than 1,000 different frequencies, making them far more difficult to monitor or overhear than common "walkie talkie" type radios. Specific radio frequencies were communicated to the Proud Boys. The night before the attack, participating Proud Boys members were instructed to meet at the Washington Monument at 10:00 a.m. They were further instructed to wear plain clothes and to await further "orders" at a pre-briefing. Numerous reminders were sent that there was to be "no colors" worn by the Proud Boys on January 6.

At approximately 10:00am on January 6, 2021, a group of Proud Boys gathered near the Washington Monument on the National Mall. Consistent with the orders given by Proud Boys leadership, none of them wore Proud Boys "colors." Shortly after 10:00 a.m., the group began walking toward the Capitol, with Defendant—dressed in all black, wearing a tactical vest, and carrying a bullhorn—in the lead.

---

[5] Law enforcement recovered a Baofeng radio from Defendant's home during the execution of a search warrant—the Baofeng radio recovered from Defendant's home was still tuned to frequency that had been communicated to the group.



The group led by Defendant arrived at the east side of the Capitol before noon. Several of the men in the group were holding Baofeng radios.  Others had them clipped to their belts or jackets. Some had communications earpieces in their ears. Shortly before 12:53 p.m., the group led by Defendant marched to the pedestrian entrance to the Capitol grounds near the Peace Monument on First Street, Northwest. The entrance was secured by a small number of Capitol Police, who stood behind a waist height metal barrier.

Former President Trump was still delivering a speech on the Ellipse at this time – his speech did not end until after 1:00 p.m. Defendant and those he was leading were not present for any part of the speech, because hearing the speech  was not in their plan. While other persons who would later participate in the Capitol riot were watching former President Trump speak, Defendant was leading Proud Boys members on a march around the Capitol and positioning them at an entrance to the Capitol grounds that was guarded by only a handful of Capitol Police officers.

At 12:53 p.m., a large number of individuals, including individuals who had marched with Defendant forced their way through a line of Capitol Police and the metal barriers that had been deployed to protect the Capitol and its occupants. As the crowd approached the next set of

metal barriers multiple individuals who had been marching with Defendant and the Proud Boys acted to intentionally dismantle or disrupt metal barricades that had been deployed by law enforcement. Defendant, a former bodybuilder, positioned his large frame near the front of the crowd as these events took place.

Defendant again led the way as rioters stormed into the west plaza of the Capitol where additional metal barricades and law enforcement were deployed to protect the Capitol and its occupants from the advancing mob. Defendant again positioned himself at the front of the crowd, directly in front of Capitol Police, where he stalked the front line in an apparent effort to intimidate law enforcement and encourage the crowd.

As noted in the United States' Motion for Stay of the Release Order (Docket Entry 6), Defendant had a brief exchange with a bat-wielding Robert Gieswein who would later rally to a location where Proud Boy Dominic Pezzola broke open a window with a riot shield that Pezzola took from an officer while in the west plaza.  The use of non-Proud Boys like Gieswein was discussed among Proud Boys who planned to attend the rally. Certain Proud Boys privy to plans for the event discussed their hope to turn the "normies," or "normiecons"[6] loose on January 6, 2021—to incite and inspire them to "burn that city to ash today" and "smash some pigs to dust."

In order to increase the odds that their plan would succeed, Defendant and those Proud Boys following him dressed "incognito" and spread out to many different locations from which they could force entry into the Capitol. Defendant and others responsible for the January 6 Proud Boys event likely knew from experience that their typical tactic of marching in "uniform," and in

---

[6] This appears to be a reference to Trump supporters who are not otherwise affiliated with the Proud Boys or a militia group.

unison, would draw a concentrated law enforcement response to their location.  By blending in and spreading out, Defendant and those following him on January 6 made it more likely that either a Proud Boy—or a suitably-inspired "normie"—would be able to storm the Capitol and its ground in such a way that would interrupt the Certification of the Electoral College vote.

All of this mayhem plainly envisioned that those carrying out Defendant's stated vision—the reawakening of 1776—would at least attempt to destroy federal government property and force their way inside the building. There was simply no other way for them to enter the Capitol building. That Defendant did not personally break open a window or door on his way into the Capitol neither minimizes his culpability under Section 1361 nor alters its applicability with regard to pretrial detention in this case. Defendant understood full well that the men he was leading as he charged past law enforcement and onto the Capitol grounds were likely to destroy government property, or attempt to do so. Defendant's actions in storming past police furthered this objective and as such, Defendant willfully aided, abetted, counseled, and commanded those who followed him onto Capitol grounds that day to destroy government property.

### Defendant's Statements and Actions after January 6

In addition to his statements and actions leading up to, and during, the riot on January 6, 2021, Defendant made a number of statements after the fact which demonstrate his eager participation in the riot, as well as his lack of remorse for having done so. For example:

- On January 7, 2021, Defendant exchanged messages with an individual via an encrypted messaging application.  During that exchange, the individual asked if Defendant had been at the capitol and, if so, if he was alright. Defendant responded that he had "stormed the

capitol," that he was alright, and that he had stolen a flag from inside the Capitol building.

- On or about January 8, 2021, Defendant posted a picture of a United States Capitol Police Officer administering pepper spray on January 6, 2021, with the caption ". . . if you feel bad for the police, you are part of the problem. They care more about federal property (our property) than protecting and serving the people. BACK THE BLACK AND YELLOW".

### B.      **The Weight of the Evidence Against the Defendant**

As noted above, the weight of the evidence against Defendant is overwhelming, and it weighs heavily in favor of pretrial detention.  This evidence comes in multiple forms – the photographs and video of Defendant at the Capitol on January 6, 2021; Defendant's posts and direct messages on social media; the messages sent and received by Defendant through his cellular telephone; and items seized from Defendant's house during the execution of a federal search warrant.  Together, this evidence paints a clear picture: Defendant was instrumental in helping to plan the Proud Boys' tactics for attacking the Capitol building on January 6; he was instrumental in helping the Proud Boys raise money and/or acquire donated tactical equipment in advance of January 6; and he was instrumental in leading the Proud Boys in the execution of their planned attack on the Capitol building.

### C.      **The Defendant's History and Characteristics**

Defendant has no known criminal history and also has strong ties to the area in which he resides.  Nevertheless, this factor weighs in favor of pretrial detention.  As the Court noted with regard to William Chrestman,

> [H]is more recent behavior surrounding the events January 6 gives rise to significant concerns about the danger he may present to the community. As

explained above, the extent of his involvement in the mob clearly poses a danger. In addition, in the nearly two months that have passed since January 6, defendant has not exhibited any remorse for what occurred at the Capitol. Nothing in the record suggests that he has any remorse about the events of January 6 or disclaimed the beliefs and gang membership animating his actions on that day, and thus there is no evidentiary basis to assume that defendant will refrain from similar activities, if instructed, in the future.

Chrestman, 21-mj-218 (Docket Entry 23, at 27-28).

This is all equally true with regard to Defendant, except that Defendant's position with the Proud Boys is that of <u>giving</u> instructions, not <u>receiving</u> them. Everything about Defendant's actions on behalf of the Proud Boys since November 4, 2020, all of his actions in Washington, D.C., on January 6, 2021, and all of his actions and statements since then show that Defendant is completely unrepentant.  His leadership position in the Proud Boys has not changed, his belief system has not changed, and he is not the least bit sorry for what he has done.  Moreover, law enforcement officers took note of multiple firearms at Defendant's residence during the execution of the search warrant. Though Defendant is legally permitted to own firearms, his possession of firearms – coupled with all of the considerations outlined above – is certainly a factor for the Court's consideration in weighing his pretrial release.

### D.    <u>Defendant Poses Both a Risk of Danger to the Community and a Risk of Flight</u>

#### i.    <u>*Defendant Poses a Substantial Risk of Danger to the Community*</u>

Defendant poses a substantial risk of danger to the community if he is released. Defendant believes that he and his fellow Proud Boys are "Patriots," who are going to "bring back that original spirit of 1776 of what really established the character of what America is. And it's not complacency, it's not low standards. It's 'this is how it's going to be, and I don't give a god damn.'" By his own admission, Defendant participated in the Capitol riot because he does not accept the

result of the Presidential election. In Defendant's view, "No democracy, no peace" and, as he stated both before and after the riot, the police—and those that support them—are "part of the problem."

Setting release conditions for Defendant would place a man who has the wherewithal to plan, fundraise for, equip, and lead a contingent of men to in an attack on a federal building to be returned home where he will be in a position to plan, fundraise for, equip, and lead another attack – a danger that is, unfortunately, quite real. See Rebecca Shabad, "Capitol Police Chief Warns Extremists 'Want to Blow Up the Capitol' When Biden Addresses Congress," NBC NEWS ONLINE (February 25, 2021), *available at https://www.nbcnews.com/politics/congress/capitol-law-enforcement-heads-detail-intelligence-failures-leading-jan-6-n1258829*. None of the release conditions which the Court has within its power to set could protect the community from the danger that Defendant poses if he were to be released.

## ii.    *Defendant Poses a Serious Risk of Flight*

The United States maintains that Defendant is a risk of flight. During the execution of the search warrant, law enforcement agents discovered a valid U.S. Passport issued to someone else who looks like the Defendant. Law enforcement found the passport on a clothes dresser on Defendant's side of the bed in the master bedroom, along with a passport issued to Defendant's wife. No passport for Defendant was found during the search.

Defendant's account of why he possessed this passport is absurd. Rather than the obvious explanation – that Defendant entertained at least the possibility of traveling on the passport after he led a group of Proud Boys members in the Capitol riot, and after several of the Proud Boys members that followed his lead were arrested by the FBI – Defendant expects the Court to believe all of the following:

a.   Defendant's wife of more than two years just happened to keep an "ex-boyfriend's" passport as a keepsake after that relationship ended;

b.   Defendant's wife brought the keepsake passport with her when she moved into her marital home with Defendant;

c.   Defendant's wife just happened to store the keepsake passport, together with her own passport, on top of a clothes dresser on Defendant's side of the bed in the master bedroom, where it was discovered by law enforcement during the search warrant.

As noted previously, should Defendant obtain his release and acquire another such passport, it would be exceedingly difficult to catch him and ensure his presence for trial.

## CONCLUSION

There is no condition, or combination of release conditions, that could guarantee both Defendant's presence for trial and the safety of the community if he is released. A presumption in favor of detention exists in this case which Defendant will not be able to rebut.  Even if he did, all four of the Bail Reform Act factors weigh heavily in favor of detention in this case.

/// /// ///

/// /// ///

/// /// ///

/// /// ///

/// /// ///

/// /// ///

/// /// ///

/// /// ///

22

WHEREFORE, the United States respectfully requests that the Court issue an Order granting the United States' motion that the defendant be held without bond pending trial.

Respectfully submitted,

MICHAEL R. SHERWIN
Acting United States Attorney
New York Bar No. 4444188

By:     _/s/ James B. Nelson_
JAMES B. NELSON
D.C. Bar No. 1613700
Assistant United States Attorney
Federal Major Crimes Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6986
james.nelson@usdoj.gov

By:     _/s/ Jason B.A. McCullough_
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006
Assistant United States Attorney
National Security Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-7233
jason.mccullough2@usdoj.gov

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the Electronic Case Filing (ECF) system, on March 1, 2021.

By:     /s/ James B. Nelson
JAMES B. NELSON
D.C. Bar No. 1613700
Assistant United States Attorney
Federal Major Crimes Section
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6986
james.nelson@usdoj.gov

24