UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Case No. 21-CR-175-2 (TJK) |
| | : |
| JOSEPH RANDALL BIGGS, | : |
| | : |
| **Defendant.** | : |

**UNITED STATES' REPLY TO DEFENDANT'S OPPOSITION TO
THE UNITED STATES' MOTION TO REVOKE PRETRIAL RELEASE**

In his Opposition, the Defendant attempts to paint a picture of an outspoken man who inexplicably found himself "part of a movement and flow of people" who entered the U.S. Capitol building. To the contrary, as set forth in the Superseding Indictment, the government has demonstrated the grave threat posed by the Defendant. He planned, organized, fundraised, and led others onto Capitol grounds for the purpose of obstructing the Electoral College certification and interfering with law enforcement. He also directly interfered with law enforcement's efforts to control the crowd by working with co-Defendant Ethan Nordean and others to knock down a metal barricade. Because of the Defendant's ability to inspire, organize, and direct others to engage in unlawful activity, the Defendant's danger to the community cannot be mitigated through any combination of release conditions. There is simply no adequate method to monitor the Defendant's communication in such a way that would guard against future attacks by his followers. *See United States v. Kelly Meggs*, 21-CR-28-8, Hr'g Tr. at 31:23 – 32:5 (J. Mehta) (Mar. 26, 2021). Because no combination of conditions can adequately protect the community, the government moves this Court to detain the Defendant pending trial.

    A.    **The Defendant's Opposition Ignores the New Charges and Evidence**

According to the Defendant, the government has put forth no new evidence since January

19, 2021, when it originally charged the Defendant by criminal complaint with violations of 18 U.S.C. §§ 1512(c)(2), 1752, and 40 U.S.C. § 5104(e)(2)(D) and (F). *Def. Opp.* (ECF 42) at *1, 6-8. To the contrary, the charges set forth in the Superseding Indictment are substantially different and more serious, and they underscore the danger posed by the Defendant.

First, as a leader of the Proud Boys members that conspired to and did storm the Capitol on January 6, the Defendant presents a danger not only based on his own acts of defiance and violence, but through the actions of those who still undoubtedly support him. The compelling new evidence of the conspiracy with others is discussed at length in the Government's Reply to co-Defendant Nordean's Opposition at Part A. *Gov't Reply* (ECF 45).

Second, the government's evidence of Defendant's obstructive conduct has developed significantly since January 19. Specifically, and as discussed in detail below, the Defendant took direct action to interfere with law enforcement by removing metal barricades. The Defendant also entered the Capitol not once, but twice, and traveled to the Senate chamber where Vice President Mike Pence had been presiding.

This new evidence makes clear that the Defendant was not a man who was simply caught up in the moment and "flow" of people. By his own words, the Defendant carefully plans to achieve his objectives. And in the days before January 6, the Defendant engaged in heated rhetoric about his plans. On January 1, 2021, the Defendant posted, "2021 is the year we take back America." That same day, he posted: "Trump exposed the swamp. Now we need to cast out every Backstabbing republican. Rip them from their high horse and put in good men and women who are God fearing, conservative, Christian warriors." That same day, the Defendant posted, with reference to mask mandates: "Every law makers [sic] who breaks their own stupid Fucking laws should be dragged out of office and hung. The government should fear the people. Not the other

way around. You work for us. You don't have ruling power over me. We only allow you to have that privilege. FAFO." On January 6, Biggs and those under his command brought this violent rhetoric to life. The danger the Defendant poses is that he has the ability to do it again—and to again launch such plans from his home.

### B. The Defendant's Blanket Denials Concerning His Own Conduct are Unavailing

The Defendant claims that he "did not 'storm' anything," he did not "damage anything," and he did not "threaten anyone." The Defendant further claims that he did not "urge" anyone else to do any of those things. These claims are demonstrably false.

The Defendant marched the group to a pedestrian entrance to the Capitol shortly before 12:53pm. Within four minutes of arrival, the crowd, including the Defendant, his co-Defendants, the men under their leadership, and others in the crowd, stormed the Capitol grounds. The Defendant immediately advanced past the trampled police barricades. He recorded himself during this incident. As narrated by the Defendant as he unlawfully advanced toward the Capitol, "Dude, we're right in front of the Capitol right now. American citizens are storming the Capitol—taking it back right now. There's millions of people out here; this is fucking crazy. Oh my God! This is such history! This is insane. We've gone through every barricade thus far. Fuck you!"

The Defendant then made his way to the front of the crowd. He stood on one side of a waist-height black metal fence. On the other side of the fence were Capitol Police officers, who had retreated and were attempted to reform a police line. The Defendant called out to co-Defendant Nordean, who moved next to him at the fence-line. The Defendant and Co-defendant Nordean then shook the metal fence until it broke apart and toppled at their feet. The Defendant then stepped over the fence and into the west plaza of the Capitol. He again made his way toward the front of

the crowd. Again, he recorded himself, and again, he mentioned "we've just taken the Capitol."

A short time later, the Defendant gathered for a selfie-style video with co-Defendant Nordean and other Proud Boys. Again, the Defendant narrated, "So we just stormed the fucking Capitol. Took the motherfucking place back. That was so much fun. January 6 will be a day in infamy."

The Defendant later entered the Capitol from the west through a door that was opened after Dominic Pezzola broke a window and entered the Capitol. The Defendant subsequently exited the Capitol and was depicted on the East side of the Capitol. Approximately thirty minutes after first entering the Capitol on the west side, the Defendant and two other members of the Proud Boys forcibly re-entered the Capitol through the Columbus Doors on the east side of the Capitol.

All of this evidence underscores the Defendant's determination to obstruct the proceedings on January 6. The government submits that there is no basis to conclude that the Defendant is any less motivated to challenge government authority unlawfully than he was on January 6. If anything, his influence has likely increased after the "success" of the January 6 operation. While the Defendant's reported compliance with release conditions to date is commendable, there can be no adequate safeguard against the Defendant's ability to mobilize his men in support of a new unlawful objective. Indeed, the Defendant organized a large mobilization of men for the events on January 6 largely through electronic communications.

**C.    The Defendant's Claims of Turning Himself In To Law Enforcement Are Misleading**

The Defendant's Opposition asserts that the Defendant affirmatively reached out to law enforcement on or about January 16 to report his involvement with the January 6 incident. *Def. Opp.* (ECF 42) at \*6. However, the Defendant fails to mention that he was contacted by the FBI on January 8, 2021. During that conversation, the Defendant asserted that he had not entered the

Capitol. Indeed, the Defendant did not "report his involvement" until January 18—when videos of him inside the Capitol had become public. The Defendant simply cannot take credit for "turning himself in" when he denied entering the Capitol until he'd been caught red-handed.

### D. The Court is Not Limited to Consideration of Destruction of Federal Property When Evaluating the Bail Reform Act Factors

The full course of the Defendant's conduct must be considered when evaluating his danger to the community. That conduct includes the Defendant's planning, fundraising, and organizing, as well as his personal conduct in obstructing the proceedings, interfering with law enforcement, and encouraging others to do the same.

As set forth in detail in the Government Reply to co-Defendant Nordean's Opposition at Part D, once "a hearing is appropriate, the judicial officer must consider several enumerated factors to determine" whether detention or release is appropriate. *United States v. Singleton*, 182 F.3d 7, 9 (D.C. Cir. 1999); *see United States v. Holmes*, 438 F.Supp.2d 1340, 1341 (S.D. Fla. 2005) (reasoning that, under *Singleton*, a court "should evaluate all the factors in subsection (g) when making its detention determination . . . regardless of whether detention is sought under [§ 3142](f)(1) or (f)(2)"); accord *United States v. Plata Hernandez*, 766 Fed. Appx. 651, 656 (10th Cir. 2019) ("The plain language of §3142(f) pertains to what triggers the requirement that a detention hearing be held, not the factors that guide the detention decision."

### E. The "Law of the Case" Doctrine is Plainly Inapplicable

The Defendant asserts that the United States' motion is barred by the "law of the case" doctrine. *Def. Opp* (ECF 42), at *10 - 11.  Notably, the Defendant fails to cite a single Court that has applied "law of the case" to pretrial detention. Moreover, the Bail Reform Act makes clear that a detention hearing may be reopened "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a

material bearing on the issue" whether there are conditions of release that will reasonably assure the safety of the community. 18 U.S.C. § 3142(f). Here, the Superseding Indictment, which charges the Defendant with three additional felonies, including conspiracy, includes new information that has a material bearing on the Defendant's danger to the community.

## CONCLUSION

The additional charges in the Superseding Indictment, and the evidence supporting those charges, change the balance of the Bail Reform Act factors and justify reconsideration of pretrial detention. A presumption in favor of detention exists in this case which the Defendant cannot rebut. Even if he could, all four of the Bail Reform Act factors weigh heavily in favor of detention.

                                    CHANNING D. PHILLIPS
                                    Acting United States Attorney
                                    D.C. Bar No. 415793

By:     */s/ Jason McCullough*
           JASON B.A. MCCULLOUGH
           D.C. Bar No. 998006; NY Bar No. 4544953
           JAMES B. NELSON
           D.C. Bar No. 1613700
           LUKE M. JONES
           VA Bar No. 75053
           Assistant United States Attorneys
           555 4th Street, N.W.
           Washington, D.C. 20530
           (202) 252-7233
           jason.mccullough2@usdoj.gov

## **CERTIFICATE OF SERVICE**

    I HEREBY CERTIFY that I caused a copy of this pleading to be served upon defense counsel via the Electronic Case Filing (ECF) system, on March 31, 2021.

            By:      */s/ Jason McCullough*
                       JASON B.A. MCCULLOUGH
                       D.C. Bar No. 998006; NY Bar No. 4544953
                       Assistant United States Attorney
                       555 4th Street, N.W.
                       Washington, D.C. 20530
                       (202) 252-7233
                       jason.mccullough2@usdoj.gov