APPEAL,CAP,CAT B

# U.S. District Court
## District of Columbia (Washington, DC)
## CRIMINAL DOCKET FOR CASE #: <u>1:21−cr−00175−TJK</u>−1

Case title: USA v. NORDEAN et al
Magistrate judge case number:  1:21−mj−00195−ZMF

Date Filed: 03/03/2021

Assigned to: Judge Timothy J.
Kelly

**<u>Defendant (1)</u>**

| | | |
|---|---|---|
| **ETHAN NORDEAN**<br>*also known as*<br>RUFIO PANMAN | represented by | **David Benjamin Smith**<br>DAVID B. SMITH, PLLC<br>108 North Alfred Street<br>1st Floor<br>Alexandria, VA 22314<br>(703) 548−8911<br>Fax: (703) 548−8935<br>Email: dbs@davidbsmithpllc.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment*<br><br>**Nicholas D. Smith**<br>DAVID B. SMITH, PLLC<br>7 East 20th Street<br>Suite 4r<br>New York, NY 10003<br>917−902−3869<br>Email: nds@davidbsmithpllc.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br>*Designation: CJA Appointment* |

| **<u>Pending Counts</u>** | **<u>Disposition</u>** |
|---|---|
| 18 U.S.C. 1512(c)(2) and 2;<br>TAMPERING WITH A<br>WITNESS, VICTIM OR<br>INFORMANT; Obstruction of an<br>Official Proceeding and Aiding<br>and Abetting<br>(1) | |

18:371; CONSPIRACY TO
DEFRAUD THE UNITED
STATES; Conspiracy
(1s)

18 U.S.C. 1361 and 2;
GOVERNMENT PROPERTY OR
CONTRACTS >; Destruction of
Government Property and Aiding
and Abetting
(2)

18:1512(c)(2), 2; TAMPERING
WITH A WITNESS, VICTIM OR
INFORMANT; Obstruction of an
Official Proceeding and Aiding
and Abetting
(2s)

18 U.S.C. 1752(a)(1);
TEMPORARY RESIDENCE OF
THE PRESIDENT; Entering and
Remaining in a Restricted
Building or Grounds
(3)

18:231(A)(3), 2; CIVIL
DISORDER; Obstruction of Law
Enforcement During Civil
Disorder and Aiding and Abetting
(3s)

18 U.S.C. 1752(a)(2);
TEMPORARY RESIDENCE OF
THE PRESIDENT; Disorderly
and Disruptive Conduct in a
Restricted Building or Grounds
(4)

18;1361, 2; GOVERNMENT
PROPERTY OR CONTRACTS >;
Destruction of Government
Property and Aiding and Abetting
(4s)

18:1752(a)(1); TEMPORARY
RESIDENCE OF THE
PRESIDENT; Entering and
Remaining in a Restricted
Building or Grounds
(5s)

18:1752(a)(2); TEMPORARY
RESIDENCE OF THE
PRESIDENT; Disorderly Conduct
in a Restricted Building or

Grounds
(6s)

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level
(Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| COMPLAINT in VIOLATION of 18 U.S.C. 1361 and 2; 18 U.S.C. 1512(c)(2); 18 U.S.C. 1752(a); 40 U.S.C. 5104(e)(2)(D) and (G) | |

---

**Plaintiff**

| **USA** | represented by | **James B. Nelson** |
| --- | --- | --- |

U.S. ATTORNEY'S OFFICE FOR
DISTRICT OF COLUMBIA
555 4th Street NW
Room 4112
Washington, DC 20001
(202) 252–6986
Email: james.nelson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Jason Bradley Adam McCullough**
U.S. ATTORNEY'S OFFICE
555 4th Street NW
Washington, DC 20530
(202) 252–7233
Email: jason.mccullough2@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

**Luke Matthew Jones**
U.S. ATTORNEY'S OFFICE FOR THE
DISTRICT OF COLUMBIA
555 Fourth Street, NW

Washington, DC 20530
(202) 252–7066
Fax: (202) 616–8470
Email: luke.jones@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant U.S. Attorney*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 02/02/2021 | 6 | | SEALED COMPLAINT as to ETHAN NORDEAN (1). (Attachments: # 1 Affidavit in Support) (zltp)[1:21−mj−00195−ZMF] Modified on 3/22/2021 (zltp). (Entered: 02/03/2021) |
| 02/02/2021 | 8 | | MOTION to Seal Case by USA as to ETHAN NORDEAN. (Attachments: # 1 Text of Proposed Order)(zltp)[1:21−mj−00195−ZMF] Modified on 3/22/2021 (zltp). (Entered: 02/03/2021) |
| 02/02/2021 | 9 | | ORDER granting 8 Motion to Seal Case as to ETHAN NORDEAN (1). Signed by Magistrate Judge Zia M. Faruqui on 2/2/2021. (zltp)[1:21−mj−00195−ZMF] Modified on 3/22/2021 (zltp). (Entered: 02/03/2021) |
| 02/03/2021 | | | Arrest of ETHAN NORDEAN in US District Court Western District of Washington. (bb) [1:21−mj−00195−ZMF] (Entered: 02/26/2021) |
| 02/08/2021 | 5 | | NOTICE OF ATTORNEY APPEARANCE James B. Nelson appearing for USA. (zstd) [1:21−mj−00195−ZMF] (Entered: 02/08/2021) |
| 02/08/2021 | 6 | | MOTION for Emergency Stay and MOTION for Review of Release Order by USA as to ETHAN NORDEAN. (Attachments: # 1 Text of Proposed Order)(zstd) [1:21−mj−00195−ZMF] (Entered: 02/08/2021) |
| 02/08/2021 | 7 | | ORDER, as to ETHAN NORDEAN, GRANTING the government's 6 Motion for Emergency Stay and Review of Release Order. Signed by Chief Judge Beryl A. Howell on February 8, 2021. (lcbah2) [1:21−mj−00195−ZMF] (Entered: 02/08/2021) |
| 02/08/2021 | 8 | | MOTION for Transport Order by USA as to ETHAN NORDEAN. (Attachments: # 1 Text of Proposed Order)(zstd) [1:21−mj−00195−ZMF] (Entered: 02/08/2021) |
| 02/08/2021 | 9 | | ORDER, as to ETHAN NORDEAN, GRANTING the government's 8 Motion for Transport Order. Signed by Chief Judge Beryl A. Howell on February 8, 2021. (lcbah2) [1:21−mj−00195−ZMF] (Entered: 02/08/2021) |
| 02/22/2021 | 11 | | NOTICE OF ATTORNEY APPEARANCE: David Benjamin Smith appearing for ETHAN NORDEAN (bb) [1:21−mj−00195−ZMF] (Entered: 02/23/2021) |
| 02/22/2021 | 12 | | NOTICE OF ATTORNEY APPEARANCE: Nicholas D. Smith appearing for ETHAN NORDEAN (bb) [1:21−mj−00195−ZMF] (Entered: 02/23/2021) |
| 02/23/2021 | 13 | | Defendant's Motion to Lift Stay on Release Order re 7 Order on Motion to Stay, Order on Motion for Review by ETHAN NORDEAN. (bb) [1:21−mj−00195−ZMF] (Entered: 02/23/2021) |
| 02/23/2021 | 14 | | |

| | | | |
|---|---|---|---|
| | | | MOTION to Unseal Case by USA as to ETHAN NORDEAN. (Attachments: # 1 Text of Proposed Order)(zstd) [1:21–mj–00195–ZMF] (Entered: 02/24/2021) |
| 02/25/2021 | | | MINUTE ORDER granting 14 Motion to Unseal Case as to ETHAN NORDEAN, DIRECTING the Clerk's Office to unseal this case. SO ORDERED. Signed by Chief Judge Beryl A. Howell on 2/25/2021. (ztg) [1:21–mj–00195–ZMF] (Entered: 02/25/2021) |
| 02/25/2021 | | | Case unsealed as to ETHAN NORDEAN (bb) [1:21–mj–00195–ZMF] (Entered: 02/25/2021) |
| 02/26/2021 | 15 | | MOTION for Release from Custody *pursuant to 18 U.S.C. s. 3060* by ETHAN NORDEAN. (Smith, Nicholas) [1:21–mj–00195–ZMF] (Entered: 02/26/2021) |
| 02/26/2021 | 16 | | Rule 5(c)(3) Documents Received as to ETHAN NORDEAN from US District Court Western District of Washington Case Number 21–mj–67 (bb) [1:21–mj–00195–ZMF] (Entered: 02/26/2021) |
| 02/26/2021 | | | NOTICE OF HEARING ON MOTIONS in case as to ETHAN NORDEAN re 13 Motion to Lift Stay on Release Order and 15 Motion to Release from Custody Pursuant to 18 U.S.C. § 3060. The parties shall take notice that, unless this case is assigned to another Judge upon the filing of an indictment or information, a Motions Hearing is scheduled for 3/2/2021, at 11:00 AM via videoconference before Chief Judge Beryl A. Howell. Signed by Chief Judge Beryl A. Howell on February 26, 2021. (lcbah2) [1:21–mj–00195–ZMF] (Entered: 02/26/2021) |
| 02/27/2021 | | | MINUTE ORDER (paperless) as to ETHAN NORDEAN DIRECTING the government to submit, by March 1, 2021 at 4:00 PM, a response to defendant's pending 13 Motion to Lift Stay and 15 Motion to Release from Custody Pursuant to 18 U.S.C. § 3060. Signed by Chief Judge Beryl A. Howell on February 27, 2021. (lcbah2) [1:21–mj–00195–ZMF] (Entered: 02/27/2021) |
| 03/01/2021 | | | Set/Reset Hearings as to ETHAN NORDEAN: Motion Hearing set for 3/2/2021 at 11:00 AM via videoconference before Chief Judge Beryl A. Howell. (ztg) [1:21–mj–00195–ZMF] (Entered: 03/01/2021) |
| 03/01/2021 | 17 | | Memorandum in Opposition by USA as to ETHAN NORDEAN re 13 MOTION Defendant's Motion to Lift Stay on Release Order re 7 Order on Motion to Stay, Order on Motion for Review (Nelson, James) [1:21–mj–00195–ZMF] (Entered: 03/01/2021) |
| 03/01/2021 | 18 | | Memorandum in Opposition by USA as to ETHAN NORDEAN re 15 MOTION for Release from Custody *pursuant to 18 U.S.C. s. 3060* (Attachments: # 1 Defendant's Waiver)(Nelson, James) [1:21–mj–00195–ZMF] (Entered: 03/01/2021) |
| 03/01/2021 | 19 | | REPLY TO OPPOSITION to Motion by ETHAN NORDEAN re 15 MOTION for Release from Custody *pursuant to 18 U.S.C. s. 3060*, 13 MOTION Defendant's Motion to Lift Stay on Release Order re 7 Order on Motion to Stay, Order on Motion for Review (Smith, Nicholas) [1:21–mj–00195–ZMF] (Entered: 03/01/2021) |
| 03/02/2021 | | | NOTICE VACATING HEARING as to ETHAN NORDEAN. The parties shall take notice that the motion hearing scheduled to take place today, March 2, 2021, at 11:00 AM is VACATED. A new hearing date and time will be provided |

| | | | |
|---|---|---|---|
| | | | by the deputy clerk by the close of business today.(ztg) [1:21–mj–00195–ZMF] (Entered: 03/02/2021) |
| 03/02/2021 | | | NOTICE OF HEARING as to ETHAN NORDEAN. The parties shall take notice that a Motion Hearing is scheduled for 3/3/2021, at 3:00 PM via videoconference before Chief Judge Beryl A. Howell. Connection details for the hearing will be provided to the parties by the deputy clerk.(ztg) [1:21–mj–00195–ZMF] (Entered: 03/02/2021) |
| 03/02/2021 | 20 | | SUPPLEMENT by ETHAN NORDEAN re 13 MOTION Defendant's Motion to Lift Stay on Release Order re 7 Order on Motion to Stay, Order on Motion for Review *Declaration of Cory Nordean* (Smith, Nicholas) [1:21–mj–00195–ZMF] (Entered: 03/02/2021) |
| 03/02/2021 | 21 | | SUPPLEMENT by USA as to ETHAN NORDEAN re 19 Reply to opposition to Motion, 20 Supplement to any document, 17 Memorandum in Opposition (Attachments: # 1 Exhibits)(Nelson, James) [1:21–mj–00195–ZMF] (Entered: 03/02/2021) |
| 03/03/2021 | 22 | | RESPONSE by ETHAN NORDEAN re 21 Supplement to any document *re: New Evidence Submitted by the Government* (Smith, Nicholas) [1:21–mj–00195–ZMF] (Entered: 03/03/2021) |
| 03/03/2021 | | | Minute Entry for proceedings held before Chief Judge Beryl A. Howell:Motion Hearing as to ETHAN NORDEAN held via videoconference on 3/3/2021. Defendant not present due to an institutional emergency. Defense counsel's oral motion for a waiver under Rule 43, heard and granted. 15 MOTION for Release from Custody pursuant to 18 U.S.C. s. 3060 filed by ETHAN NORDEAN, denied as moot; 6 MOTION for Review of Release Order filed by USA, denied; 13 Defendant's Motion to Lift Stay on Release Order, denied as moot. Magistrate's Release Order AFFIRMED. Defendant released on personal recognizance bond with a condition of home detention, he will be supervised by Western District of Washington. Bond Status of Defendant: personal recognizance with home detention condition/release issued. Present via videoconference: Defense Attorneys: David B. Smith and Nicholas D. Smith; US Attorney: James B. A. McCullough and James B. Nelson; Pretrial Officer: Masharia Holman. Court Reporter: Elizabeth Saint–Loth. (ztg) [1:21–mj–00195–ZMF] (Entered: 03/03/2021) |
| 03/03/2021 | 23 | | ORDER Setting Conditions of Release with Global Positioning System Monitoring. Signed by Chief Judge Beryl A. Howell on 3/3/2021. (Attachments: # 1 Appearance Bond) (ztg) [1:21–mj–00195–ZMF] (Entered: 03/03/2021) |
| 03/03/2021 | 24 | | INDICTMENT as to ETHAN NORDEAN (1) count(s) 1, 2, 3, 4. (zltp) (Entered: 03/04/2021) |
| 03/04/2021 | | | MINUTE ORDER as to ETHAN NORDEAN: Pursuant to the Due Process Protections Act, the Court hereby ORDERS that all government counsel shall review their disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, as set forth in Local Criminal Rule 5.1, and comply with those provisions. The failure to comply could result in dismissal of the indictment or information, dismissal of individual charges, exclusion of government evidence or witnesses, continuances, Bar discipline, or any other remedy that is just under the circumstances. Signed by Judge Timothy J. Kelly on 3/4/2021. (lctjk1) (Entered: 03/04/2021) |

| 03/08/2021 | | | NOTICE OF HEARING as to ETHAN NORDEAN. VTC Arraignment set for 3/16/2021 at 2:00 PM before Judge Timothy J. Kelly. The parties shall contact the Courtroom Deputy at (202) 354–3495 at least one business day in advance to make arrangements to participate. (zkh) (Entered: 03/08/2021) |
|---|---|---|---|
| 03/10/2021 | 26 | | (FIRST SUPERSEDING INDICTMENT) filed by USA as to ETHAN NORDEAN (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, JOSEPH RANDALL BIGGS (2) count(s) 1, 2, 3, 4, 5, 6, ZACHARY REHL (3) count(s) 1, 2, 3, 4, 5, 6, CHARLES DONOHOE (4) count(s) 1, 2, 3, 4, 5, 6 (This document is SEALED and only available to authorized persons.) (zltp) Modified sealing on 3/19/2021 (bb). Modified on 3/19/2021 (zltp). (Entered: 03/12/2021) |
| 03/10/2021 | | | Counts added: ETHAN NORDEAN (1) count(s) 1s, 2s, 3s, 4s, 5s, 6s, JOSEPH RANDALL BIGGS (2) count(s) 1, 2, 3, 4, 5, 6, ZACHARY REHL (3) count(s) 1, 2, 3, 4, 5, 6, CHARLES DONOHOE (4) count(s) 1, 2, 3, 4, 5, 6 (zltp) (Entered: 03/19/2021) |
| 03/12/2021 | 29 | | MOTION TO CONTINUE THE ARRAIGNMENT filed by USA as to ETHAN NORDEAN.(This document is SEALED and only available to authorized persons.) (zltp) Modified sealing on 3/19/2021 (bb). (Entered: 03/19/2021) |
| 03/15/2021 | 27 | | MOTION for Bill of Particulars *as to Count Two of the Indictment* by ETHAN NORDEAN. (Smith, Nicholas) (Entered: 03/15/2021) |
| 03/15/2021 | | | MINUTE ORDER as to ETHAN NORDEAN: It is hereby ORDERED that the arraignment set for March 16, 2021, is hereby CONTINUED to March 23, 2021, at 2:00 p.m. via videoconference. The parties shall contact the Courtroom Deputy at (202) 354–3495 at least one business day in advance to make arrangements to participate. Signed by Judge Timothy J. Kelly on 3/15/2021. (lctjk1) (Entered: 03/15/2021) |
| 03/17/2021 | 28 | | Government's MOTION to Unseal Superseding Indictment and Related Documents by USA as to ETHAN NORDEAN. (Attachments: # 1 Text of Proposed Order)(bb) (Entered: 03/18/2021) |
| 03/19/2021 | | | MINUTE ORDER as to ETHAN NORDEAN granting the Government's 28 Motion to Unseal. It is hereby ORDERED that 26 First Superseding Indictment and 29 Motion to Continue be UNSEALED. The Clerk of Court is instructed to unseal ECF Nos. 26 and 29. Signed by Judge Timothy J. Kelly on 3/19/2021. (lctjk1) (Entered: 03/19/2021) |
| 03/19/2021 | | | Document unsealed as to ETHAN NORDEAN. 29 SEALED MOTION filed by USA as to ETHAN NORDEAN.(This document is SEALED and only available to authorized persons.), 26 Sealed Document (bb) (Entered: 03/19/2021) |
| 03/20/2021 | 30 | | MOTION to Revoke *Pretrial Release* by USA as to ETHAN NORDEAN. (Nelson, James) (Entered: 03/20/2021) |
| 03/21/2021 | 32 | | Memorandum in Opposition by ETHAN NORDEAN re 30 MOTION to Revoke *Pretrial Release* (Attachments: # 1 Exhibit Statement of Nordean's Probation Officer)(Smith, Nicholas) (Entered: 03/21/2021) |
| 03/23/2021 | 34 | | SUPPLEMENT by ETHAN NORDEAN re 30 MOTION to Revoke *Pretrial Release Government Statements to Media about this Investigation* (Smith, Nicholas) (Entered: 03/23/2021) |

| 03/23/2021 | | | Minute Entry for proceedings held before Judge Timothy J. Kelly: VTC Arraignment as to ETHAN NORDEAN (1) as to Counts 1s, 2s, 3s, 4s, 5s, and 6s and JOSEPH RANDALL BIGGS (2) as to Counts 1, 2, 3, 4, 5, and 6 held on 3/23/2021. BOTH defendants appeared by video. Plea of NOT GUILTY entered by ETHAN NORDEAN (1) as to Counts 1s, 2s, 3s, 4s, 5s, and 6s and JOSEPH RANDALL BIGGS (2) as to Counts 1, 2, 3, 4, 5, and 6. Speedy Trial Excludable (XT) started 3/23/2021 through 4/1/2021, in the interest of justice, as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). Response to 31 MOTION to Revoke *Pretrial Release* by Defendant JOSEPH RANDALL BIGGS (2) due by 3/29/2021. VTC Motion Hearing/Status Conference set for 4/1/2021 at 2:00 PM before Judge Timothy J. Kelly. Bond Status of Defendants: 1–Remains on Personal Recognizance/HISP, 2–Remains on Personal Recognizance/HISP; Court Reporter: Timothy Miller; Defense Attorneys: 1–David Benjamin Smith and Nicholas D. Smith, 2–John Daniel Hull, IV; US Attorneys: James B. Nelson, Jason Bradley Adam McCullough, and Luke Matthew Jones. (zkh) (Entered: 03/23/2021) |
| 03/29/2021 | 41 | | SUPPLEMENT by ETHAN NORDEAN re 30 MOTION to Revoke *Pretrial Release Regarding New Evidence Relevant to the Government's Motion to Revoke Release Order* (Attachments: # 1 Exhibit Declaration of Michale Graves, # 2 Exhibit Declaration of Arturo Santaella, # 3 Exhibit Statement of Probation Officer)(Smith, Nicholas) (Entered: 03/29/2021) |
| 03/31/2021 | 45 | | REPLY TO OPPOSITION to Motion by USA as to ETHAN NORDEAN re 30 MOTION to Revoke *Pretrial Release* (McCullough, Jason) (Entered: 03/31/2021) |
| 04/01/2021 | | | NOTICE OF HEARING as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). The VTC Motion Hearing set for 4/1/2021 is **RESCHEDULED** for 4/6/2021 at 11:30 AM before Judge Timothy J. Kelly. (zkh) (Entered: 04/01/2021) |
| 04/05/2021 | 49 | | MOTION for Leave to File *Sur–Reply in Response to New Arguments Raised in Government's Reply in Support of Motion to Revoke Release Order* by ETHAN NORDEAN. (Attachments: # 1 Exhibit Ethan Nordean's Sur–Reply in Response to New Arguments Raised in Government's Reply in Support of Motion to Revoke Release Order, # 2 Exhibit Transcript of Couy Griffin Detention Hearing)(Smith, Nicholas) (Entered: 04/05/2021) |
| 04/06/2021 | | | Minute Entry for proceedings held before Judge Timothy J. Kelly: VTC Motion Hearing as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2) held on 4/6/2021. Both defendants appeared by video. Oral argument on 30 MOTION to Revoke *Pretrial Release* and 31 MOTION to Revoke *Pretrial Release*, heard and taken under advisement. Speedy Trial Excludable (XT) started nunc pro tunc 4/1/2021 through 4/9/2021, in the interest of justice, as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). Any supplemental memoranda due by 4/6/2021. VTC Oral Ruling set for 4/9/2021 at 2:00 PM before Judge Timothy J. Kelly. Bond Status of Defendants: 1–Remains on Personal Recognizance/HISP, 2–Remains on Personal Recognizance/HISP; Court Reporter: Timothy Miller; Defense Attorneys: 1–David Benjamin Smith and Nicholas D. Smith, 2–John Daniel Hull, IV; US Attorneys: James B. Nelson, Jason Bradley Adam McCullough, and Luke Matthew Jones; Pretrial Officer: John Copes. (zkh) (Entered: 04/06/2021) |

| 04/06/2021 | 51 | | NOTICE *of Delivery of Video Evidence* by USA as to ETHAN NORDEAN, JOSEPH RANDALL BIGGS re Motion Hearing,,,, Speedy Trial – Excludable Start,,,, Set Deadlines/Hearings,,, 46 Reply to opposition to Motion, 45 Reply to opposition to Motion (McCullough, Jason) (Entered: 04/06/2021) |
| --- | --- | --- | --- |
| 04/06/2021 | 52 | | NOTICE *of Submission of Evidence Referenced in April 6 Detention Hearing* by ETHAN NORDEAN re 51 Notice (Other), (Smith, Nicholas) (Entered: 04/06/2021) |
| 04/08/2021 | 54 | | NOTICE *of Evidence Relevant to the Government's Detention Motion, Produced to Nordean on April 7, 2021* by ETHAN NORDEAN re 45 Reply to opposition to Motion (Smith, Nicholas) (Entered: 04/08/2021) |
| 04/09/2021 | | | MINUTE ORDER as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). The Oral Ruling currently set for April 9, 2021, is hereby **VACATED**. Signed by Judge Timothy J. Kelly on 4/9/2021. (zkh) (Entered: 04/09/2021) |
| 04/13/2021 | 57 | | NOTICE *of Brady Evidence Produced to Nordean on April 13, 2021* by ETHAN NORDEAN re 30 MOTION to Revoke *Pretrial Release* (Smith, Nicholas) (Entered: 04/13/2021) |
| 04/14/2021 | 58 | | TRANSCRIPT OF MOTION HEARING in case as to ETHAN NORDEAN before Judge Timothy J. Kelly held on 4–6–21; Page Numbers: 1–69; Date of Issuance: 4–14–21; Court Reporter: Timothy R. Miller, Telephone Number (202) 354–3111. Transcripts may be ordered by submitting the Transcript Order Form

For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter r eferenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.

**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.

Redaction Request due 5/5/2021. Redacted Transcript Deadline set for 5/15/2021. Release of Transcript Restriction set for 7/13/2021.(Miller, Timothy) (Entered: 04/14/2021) |
| 04/15/2021 | | | NOTICE OF HEARING as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). VTC Oral Ruling set for 4/16/2021 at 12:00 PM before Judge Timothy J. Kelly. (zkh) (Entered: 04/15/2021) |
| 04/16/2021 | | | NOTICE OF HEARING as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). The VTC Oral Ruling currently set for 4/16/2021 is **RESCHEDULED** for 4/19/2021 at 12:00 PM before Judge Timothy J. Kelly. (zkh) (Entered: 04/16/2021) |
| 04/19/2021 | | | |

| | | |
|---|---|---|
| | | Minute Entry for proceedings held before Judge Timothy J. Kelly: VTC Oral Ruling as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2) held on 4/19/2021. BOTH defendants appeared by video. For the reasons stated on the record, Government's 30 and 31 MOTION to Revoke *Pretrial Release*, GRANTED. Conditions of release REVOKED for ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). Order to be entered by the court. Oral Motion by defendants ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2) for a temporary stay of detention order, heard and DENIED. Speedy Trial Excludable (XT) started nunc pro tunc 4/9/2021 through 5/4/2021, in the interest of justice, as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). VTC Status Conference set for 5/4/2021 at 11:30 AM before Judge Timothy J. Kelly. Bond Status of Defendants: 1–Conditions of Release REVOKED/Order Pending to Report, 2–Conditions of Release REVOKED/Order Pending to Report; Court Reporter: Timothy Miller; Defense Attorneys: 1–David Benjamin Smith and Nicholas D. Smith, 2–John Daniel Hull, IV; US Attorneys: Jason Bradley Adam McCullough and Luke Matthew Jones; Pretrial Officer: Christine Schuck. (zkh) (Entered: 04/19/2021) |
| 04/19/2021 | 64 | NOTICE *in Compliance with Court Order Issued during Oral Ruling on April 19, 2021,* by USA as to ETHAN NORDEAN, JOSEPH RANDALL BIGGS, ZACHARY REHL, CHARLES DONOHOE (Attachments: # 1 Filing in U.S. v. Pezzola, 1:21–cr–175, containing photograph)(Jones, Luke) (Entered: 04/19/2021) |
| 04/20/2021 | 65 | DETENTION ORDER as to ETHAN NORDEAN (1). See Order for details. Signed by Judge Timothy J. Kelly on 4/20/2021. (lctjk1) (Entered: 04/20/2021) |
| 04/22/2021 | 69 | NOTICE OF APPEAL – Final Judgment by ETHAN NORDEAN re Status Conference,,,,, Speedy Trial – Excludable Start,,,,, Set Hearings,,,, Motion Hearing,,,, Speedy Trial – Excludable Start,,,, Set Deadlines/Hearings,,, 65 Order of Detention Pending Trial– Defendant HWOB. Fee Status: No Fee Paid. Parties have been notified. (Smith, Nicholas) (Entered: 04/22/2021) |
| 04/23/2021 | 70 | NOTICE *of Conditions of Confinement following April 20 Detention Order* by ETHAN NORDEAN re 65 Order of Detention Pending Trial– Defendant HWOB (Smith, Nicholas) (Entered: 04/23/2021) |
| 04/23/2021 | 71 | TRANSCRIPT OF ORAL RULING in case as to ETHAN NORDEAN before Judge Timothy J. Kelly held on 4–19–21; Page Numbers: 1–83; Date of Issuance: 4–23–21; Court Reporter: Timothy R. Miller, Telephone Number (202) 354–3111. Transcripts may be ordered by submitting the Transcript Order Form<br><br>For the first 90 days after this filing date, the transcript may be viewed at the courthouse at a public terminal or purchased from the court reporter ref erenced above. After 90 days, the transcript may be accessed via PACER. Other transcript formats, (multi–page, condensed, CD or ASCII) may be purchased from the court reporter.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS:** The parties have twenty–one days to file with the court and the court reporter any request to redact personal identifiers from this transcript. If no such requests are filed, the transcript will be made available to the public via PACER without redaction |

| | | | after 90 days. The policy, which includes the five personal identifiers specifically covered, is located on our website at www.dcd.uscourts.gov.<br><br>Redaction Request due 5/14/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/22/2021.(Miller, Timothy) (Entered: 04/23/2021) |

# United States District Court for the District of Columbia

UNITED STATES OF AMERICA    )
                            )
              vs.           )        Criminal No. _21-cr-175_____
                            )
Ethan Nordean, et al._____)

## NOTICE OF APPEAL

Name and address of appellant:          Ethan Nordean
                                        SeaTac FDC
                                        2425 South 200th Street
                                        Seattle, Washington 98198


Name and address of appellant's attorney:   Nicholas Smith
                                            David Smith
                                            7 East 20th Street
                                            Suite 4R
                                            New York, NY 10003

Offense:   18 U.S.C. § 371; 18 U.S.C. § 1512; 18 U.S.C. § 1752; 18 U.S.C. § 1361; 18 U.S.C. § 231

Concise statement of judgment or order, giving date, and any sentence:

Order of Detention Pending Trial entered April 20, 2021 (ECF No. 65); Oral Ruling
entered April 19, 2021, and related filings including Court's detention findings on April
6, 2021.

Name and institution where now confined, if not on bail:  SeaTacFDC


       I, the above named appellant, hereby appeal to the United States Court of Appeals for the
District of Columbia Circuit from the above-stated judgment.

        April 22, 2021                            Ethan Nordean
_____        _____
DATE                                     APPELLANT   *Nicholas D. Smith*
                                         _____
                                         ATTORNEY FOR APPELLANT


GOVT. APPEAL, NO FEE        [  ]
CJA, NO FEE                 [✔]
PAID USDC FEE               [  ]
PAID USCA FEE               [  ]
Does counsel wish to appear on appeal?                          YES [✔]    NO [ ]
Has counsel ordered transcripts?                               YES [✔]    NO [ ]
Is this appeal pursuant to the 1984 Sentencing Reform Act?     YES [✔]    NO [ ]

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

# UNITED STATES DISTRICT COURT
for the
District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| ETHAN NORDEAN | ) | Case No.   21-cr-175 (TJK) |
| | ) | |
| _Defendant_ | ) | |

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

Upon the

☑ Motion of the Government attorney pursuant to 18 U.S.C. § 3142(f)(1), or

❑ Motion of the Government or Court's own motion pursuant to 18 U.S.C. § 3142(f)(2),

the Court held a detention hearing and found that detention is warranted.  This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II - Findings of Fact and Law as to Presumptions under § 3142(e)

❑ **A.  Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(2)** _(previous violator)_:  There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the safety of any other person and the community because the following conditions have been met:

❑ **(1)** the defendant is charged with one of the following crimes described in 18 U.S.C. § 3142(f)(1):

❑ **(a)** a crime of violence, a violation of 18 U.S.C. § 1591, or an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed; **or**

❑ **(b)** an offense for which the maximum sentence is life imprisonment or death; **or**

❑ **(c)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508); **or**

❑ **(d)** any felony if such person has been convicted of two or more offenses described in subparagraphs (a) through (c) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (a) through (c) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; **or**

❑ **(e)** any felony that is not otherwise a crime of violence but involves:
**(i)** a minor victim; **(ii)** the possession of a firearm or destructive device (as defined in 18 U.S.C. § 921); **(iii)** any other dangerous weapon; or **(iv)** a failure to register under 18 U.S.C. § 2250; _and_

❑ **(2)** the defendant has previously been convicted of a Federal offense that is described in 18 U.S.C. § 3142(f)(1), or of a State or local offense that would have been such an offense if a circumstance giving rise to Federal jurisdiction had existed; _and_

❑ **(3)** the offense described in paragraph (2) above for which the defendant has been convicted was committed while the defendant was on release pending trial for a Federal, State, or local offense; _and_

❑ **(4)** a period of not more than five years has elapsed since the date of conviction, or the release of the defendant from imprisonment, for the offense described in paragraph (2) above, whichever is later.

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

☑ **B.  Rebuttable Presumption Arises Under 18 U.S.C. § 3142(e)(3)** *(narcotics, firearm, other offenses)*:  There is a rebuttable presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant as required and the safety of the community because there is probable cause to believe that the defendant committed one or more of the following offenses:

☐ **(1)** an offense for which a maximum term of imprisonment of 10 years or more is prescribed in the Controlled Substances Act (21 U.S.C. §§ 801-904), the Controlled Substances Import and Export Act (21 U.S.C. §§ 951-971), or Chapter 705 of Title 46, U.S.C. (46 U.S.C. §§ 70501-70508);

☐ **(2)** an offense under 18 U.S.C. §§ 924(c), 956(a), or 2332b;

☑ **(3)** an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;

☐ **(4)** an offense under Chapter 77 of Title 18, U.S.C. (18 U.S.C. §§ 1581-1597) for which a maximum term of imprisonment of 20 years or more is prescribed; **or**

☐ **(5)** an offense involving a minor victim under 18 U.S.C. §§ 1201, 1591, 2241, 2242, 2244(a)(1), 2245, 2251, 2251A, 2252(a)(1), 2252(a)(2), 2252(a)(3), 2252A(a)(1), 2252A(a)(2), 2252A(a)(3), 2252A(a)(4), 2260, 2421, 2422, 2423, or 2425.

☐ **C.  Conclusions Regarding Applicability of Any Presumption Established Above**

☐ The defendant has not introduced sufficient evidence to rebut the presumption above, and detention is ordered on that basis. *(Part III need not be completed.)*

**OR**

☑ The defendant has presented evidence sufficient to rebut the presumption, but after considering the presumption and the other factors discussed below, detention is warranted.

### Part III - Analysis and Statement of the Reasons for Detention

After considering the factors set forth in 18 U.S.C. § 3142(g) and the information presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven:

☑ By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community.

☐ By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

In addition to any findings made on the record at the hearing, the reasons for detention include the following:

☑ Weight of evidence against the defendant is strong
☑ Subject to lengthy period of incarceration if convicted
☐ Prior criminal history
☐ Participation in criminal activity while on probation, parole, or supervision
☐ History of violence or use of weapons
☐ History of alcohol or substance abuse
☐ Lack of stable employment
☐ Lack of stable residence
☐ Lack of financially responsible sureties

AO 472  (Rev. 11/16)  Order of Detention Pending Trial

❑ Lack of significant community or family ties to this district
❑ Significant family or other ties outside the United States
❑ Lack of legal status in the United States
❑ Subject to removal or deportation after serving any period of incarceration
❑ Prior failure to appear in court as ordered
☑ Prior attempt(s) to evade law enforcement
❑ Use of alias(es) or false documents
❑ Background information unknown or unverified
❑ Prior violations of probation, parole, or supervised release

OTHER REASONS OR FURTHER EXPLANATION:

For the Court's complete reasoning, please see the transcript of the Court's oral ruling on April 19, 2021.  In summary:

The Court finds that the nature and circumstances of the offense weigh in favor of detention.  Nordean is charged with multiple felony offenses, including one Congress has characterized under these circumstances as a federal crime of terrorism, and another that exposes him to a 20-year sentence.  In addition, the charges against him are by their very nature gravely serious.  The Grand Jury has charged that he conspired with his co-Defendants and others (1) to stop, delay, or hinder Congress's certification of the Electoral College vote on January 6, and (2) to obstruct or interfere with law enforcement officers engaged in their official duties to protect the Capitol and its occupants while that was happening.  The allegations, set forth in detail on the record, also include his extensive involvement in prior planning for January 6, including by acquiring tactical gear and communications equipment; coordination with other participants before and during the riot, including the use of an encrypted messaging application and other communication devices by his co-conspirators; and evidence that he had a leadership role in these events.  And although Nordean did not carry or use a weapon that day, he said and did things that day that are highly troubling, as explained in detail on the record.  He also celebrated what happened that day, and has not expressed regret or remorse for what he did or what happened.

The Court finds that the weight of the evidence is strong and weighs in favor of detention, even after considering the evidence and arguments advanced by Nordean, as explained in detail on the record.

The Court finds that Nordean's history and characteristics weigh in favor of release, but not overwhelmingly so.  Nordean has no criminal record and has not violated any condition of release in this case.  All that is enough to rebut the presumption of detention.  But Nordean's connections to his community are tenuous, given his expressed desire to move to Tennessee or North Carolina.  Moreover, it is highly concerning to the Court that in the short time he has been on release in this case, he both reported that he lost his passport, and that a firearm of his was stolen months beforehand.

Finally, the Court finds that the nature and seriousness of the danger to any person or the community that would be posed by Nordean's release weighs in favor of detention.  As explained in detail on the record, given the allegations of political violence against him for the events of January 6, his role as a leader and organizer in a network that frequently creates events with large numbers of people, his planning experience and skills, his history of concealing his communications and activities from law enforcement, the circumstances surrounding his lost passport and stolen firearm, and and his lack of regret or remorse for the events of January 6, the Court finds that he poses an identified and articulable threat to public safety that is both concrete and prospective, and that cannot be mitigated by any conditions of release short of detention.

### Part IV - Directions Regarding Detention

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal.  The defendant is directed to report for confinement promptly, and in no event later than two days from the entry of this order, as directed by the Pretrial Services Office in the Western District of Washington.  The defendant must be afforded a reasonable opportunity for private consultation with defense counsel.  On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date: _____04/20/2021_____    _____/s/ Timothy J. Kelly_____
                                           United States District Judge

```
MIME-Version:1.0
From:DCD_ECFNotice@dcd.uscourts.gov
To:DCD_ECFNotice@localhost.localdomain
Bcc:
--Case Participants: Jason Bradley Adam McCullough (caseview.ecf@usdoj.gov,
jason.mccullough2@usdoj.gov, jmccullough1@usa.doj.gov, kim.e.hall@usdoj.gov,
usadc.ecfnarcotics@usdoj.gov), David Benjamin Smith (dbs@davidbsmithpllc.com), Lisa S.
Costner (lisa@lisacostnerlaw.com), Luke Matthew Jones (luke.jones@usdoj.gov,
matthew.ruggiero@usdoj.gov), John Daniel Hull, IV (jdhull@hullmcguire.com), James B.
Nelson (james.nelson@usdoj.gov), Nicholas D. Smith (nds@davidbsmithpllc.com), Judge
Timothy J. Kelly (ed_stein@dcd.uscourts.gov, janine_balekdjian@dcd.uscourts.gov,
joseph_egozi@dcd.uscourts.gov, katrina_harris@dcd.uscourts.gov,
roberto_borgert@dcd.uscourts.gov, samantha_zuba@dcd.uscourts.gov,
tjk_dcdecf@dcd.uscourts.gov, tracy_nelson@dcd.uscourts.gov)
--Non Case Participants: Del Q. Wilber (del.wilber@latimes.com), Jacqueline E. Thomsen
(jathomsen@alm.com), KATELYN POLANTZ (katelyn.polantz@cnn.com), Michael A. Scarcella
(mscarcella@alm.com), Kyle Cheney (kcheney@politico.com), Zoe M. Tillman
(zoe.tillman@buzzfeed.com), Marcy Wheeler (emptywheel@gmail.com), David Yaffe-Bellany
(davidyb@bloomberg.net), Patricia A. McKinney (lisa.rubin@nbcuni.com), Louis A. Williams
(daniel.barnes@nbcuni.com, pete.williams@nbc.com), Joshua A. Gerstein
(jagalerts@yahoo.com), Spencer S. Hsu (spencer.hsu@washpost.com), Harper K. Neidig
(hneidig@thehill.com), Aruna Viswanatha (aruna.viswanatha@wsj.com), Lawrence J. Hurley
(sarah.n.lynch@thomsonreuters.com), AUSA Document Clerk (adavis@usa.doj.gov,
carolyn.carter-mckinley@usdoj.gov, usadc.criminaldocket@usdoj.gov,
usadc.ecfhov@usdoj.gov), AUSA Hearings Clerk (usadc.ecfprobhov@usdoj.gov), Pretrial
Notification (psadistrictcourtgroup@psa.gov), Probation Court Notices
(dcpdb_probation_court_notices@dcp.uscourts.gov)
--No Notice Sent:

Message-Id:7084265@dcd.uscourts.gov
Subject:Activity in Case 1:21-cr-00175-TJK USA v. NORDEAN et al Status Conference
Content-Type: text/html
```

## U.S. District Court

## District of Columbia

**Notice of Electronic Filing**

The following transaction was entered on 4/19/2021 at 3:23 PM and filed on 4/19/2021

| | |
|---|---|
| **Case Name:** | USA v. NORDEAN et al |
| **Case Number:** | 1:21-cr-00175-TJK |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
 Minute Entry for proceedings held before Judge Timothy J. Kelly: VTC Status Conference as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2) held on 4/19/2021. BOTH defendants appeared by video. For the reasons stated on the record, Government's [30] and [31] MOTIONS to Revoke *Pretrial Release*, GRANTED. Conditions of release REVOKED for ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). Order to be entered by the court. Oral Motion by defendants ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2) for a temporary stay of detention order, heard and DENIED. Speedy Trial Excludable (XT) started nunc pro tunc 4/9/2021 through 5/4/2021, in the interest of justice, as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). VTC Status Conference set for 5/4/2021 at 11:30 AM before Judge Timothy J. Kelly. Bond Status of Defendants: 1–Conditions of Release

**REVOKED/Order Pending to Report, 2–Conditions of Release REVOKED/Order Pending to Report; Court Reporter: Timothy Miller; Defense Attorneys: 1–David Benjamin Smith and Nicholas D. Smith, 2–John Daniel Hull, IV; US Attorneys: Jason Bradley Adam McCullough and Luke Matthew Jones; Pretrial Officer: Christine Schuck. (zkh)**

**1:21–cr–00175–TJK–1 Notice has been electronically mailed to:**

John Daniel Hull, IV     jdhull@hullmcguire.com

David Benjamin Smith     dbs@davidbsmithpllc.com

James B. Nelson     james.nelson@usdoj.gov

Luke Matthew Jones     luke.jones@usdoj.gov, matthew.ruggiero@usdoj.gov

Nicholas D. Smith     nds@davidbsmithpllc.com

Jason Bradley Adam McCullough     jason.mccullough2@usdoj.gov, CaseView.ECF@usdoj.gov, Kim.E.Hall@usdoj.gov, jmccullough1@usa.doj.gov, usadc.ecfnarcotics@usdoj.gov

Lisa S. Costner     lisa@lisacostnerlaw.com

**1:21–cr–00175–TJK–1 Notice will be delivered by other means to::**

**1:21–cr–00175–TJK–2 Notice has been electronically mailed to:**

John Daniel Hull, IV     jdhull@hullmcguire.com

David Benjamin Smith     dbs@davidbsmithpllc.com

James B. Nelson     james.nelson@usdoj.gov

Luke Matthew Jones     luke.jones@usdoj.gov, matthew.ruggiero@usdoj.gov

Nicholas D. Smith     nds@davidbsmithpllc.com

Jason Bradley Adam McCullough     jason.mccullough2@usdoj.gov, CaseView.ECF@usdoj.gov, Kim.E.Hall@usdoj.gov, jmccullough1@usa.doj.gov, usadc.ecfnarcotics@usdoj.gov

Lisa S. Costner     lisa@lisacostnerlaw.com

**1:21–cr–00175–TJK–2 Notice will be delivered by other means to::**

```
MIME-Version:1.0
From:DCD_ECFNotice@dcd.uscourts.gov
To:DCD_ECFNotice@localhost.localdomain
Bcc:
--Case Participants: Jason Bradley Adam McCullough (caseview.ecf@usdoj.gov,
jason.mccullough2@usdoj.gov, jmccullough1@usa.doj.gov, kim.e.hall@usdoj.gov,
usadc.ecfnarcotics@usdoj.gov), David Benjamin Smith (dbs@davidbsmithpllc.com), Luke
Matthew Jones (luke.jones@usdoj.gov, matthew.ruggiero@usdoj.gov), John Daniel Hull, IV
(jdhull@hullmcguire.com), James B. Nelson (james.nelson@usdoj.gov), Nicholas D. Smith
(nds@davidbsmithpllc.com), Judge Timothy J. Kelly (ed_stein@dcd.uscourts.gov,
janine_balekdjian@dcd.uscourts.gov, joseph_egozi@dcd.uscourts.gov,
katrina_harris@dcd.uscourts.gov, roberto_borgert@dcd.uscourts.gov,
samantha_zuba@dcd.uscourts.gov, tjk_dcdecf@dcd.uscourts.gov,
tracy_nelson@dcd.uscourts.gov)
--Non Case Participants: Del Q. Wilber (del.wilber@latimes.com), KATELYN POLANTZ
(katelyn.polantz@cnn.com), Marcy Wheeler (emptywheel@gmail.com), David Yaffe-Bellany
(davidyb@bloomberg.net), Patricia A. McKinney (lisa.rubin@nbcuni.com), Spencer S. Hsu
(spencer.hsu@washpost.com), Lawrence J. Hurley (sarah.n.lynch@thomsonreuters.com), Kyle
Cheney (kcheney@politico.com), Joshua A. Gerstein (jagalerts@yahoo.com), Michael A.
Scarcella (mscarcella@alm.com), Zoe M. Tillman (zoe.tillman@buzzfeed.com), AUSA Hearings
Clerk (usadc.ecfprobhov@usdoj.gov), Pretrial Notification (psadistrictcourtgroup@psa.gov),
Probation Court Notices (dcpdb_probation_court_notices@dcp.uscourts.gov)
--No Notice Sent:

Message-Id:7061972@dcd.uscourts.gov
Subject:Activity in Case 1:21-cr-00175-TJK USA v. NORDEAN et al Motion Hearing
Content-Type: text/html
```

## U.S. District Court

### District of Columbia

## Notice of Electronic Filing

The following transaction was entered on 4/6/2021 at 3:09 PM and filed on 4/6/2021

**Case Name:**      USA v. NORDEAN et al

**Case Number:**    1:21–cr–00175–TJK

**Filer:**

**Document Number:** No document attached

**Docket Text:**
**Minute Entry for proceedings held before Judge Timothy J. Kelly: VTC Motion Hearing as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2) held on 4/6/2021. Both defendants appeared by video. Oral argument on [30] MOTION to Revoke *Pretrial Release* and [31] MOTION to Revoke *Pretrial Release*, heard and taken under advisement. Speedy Trial Excludable (XT) started nunc pro tunc 4/1/2021 through 4/9/2021, in the interest of justice, as to ETHAN NORDEAN (1) and JOSEPH RANDALL BIGGS (2). Any supplemental memoranda due by 4/6/2021. VTC Oral Ruling set for 4/9/2021 at 2:00 PM before Judge Timothy J. Kelly. Bond Status of Defendants: 1–Remains on Personal Recognizance/HISP, 2–Remains on Personal Recognizance/HISP; Court Reporter: Timothy Miller; Defense Attorneys: 1–David Benjamin Smith and Nicholas D. Smith, 2–John Daniel Hull, IV; US Attorneys: James B. Nelson, Jason Bradley Adam McCullough, and Luke Matthew Jones; Pretrial Officer: John Copes. (zkh)**

**1:21–cr–00175–TJK–1 Notice has been electronically mailed to:**

John Daniel Hull, IV     jdhull@hullmcguire.com

David Benjamin Smith     dbs@davidbsmithpllc.com

James B. Nelson     james.nelson@usdoj.gov

Luke Matthew Jones     luke.jones@usdoj.gov, matthew.ruggiero@usdoj.gov

Nicholas D. Smith     nds@davidbsmithpllc.com

Jason Bradley Adam McCullough     jason.mccullough2@usdoj.gov, CaseView.ECF@usdoj.gov, Kim.E.Hall@usdoj.gov, jmccullough1@usa.doj.gov, usadc.ecfnarcotics@usdoj.gov

**1:21–cr–00175–TJK–1 Notice will be delivered by other means to::**

**1:21–cr–00175–TJK–2 Notice has been electronically mailed to:**

John Daniel Hull, IV     jdhull@hullmcguire.com

David Benjamin Smith     dbs@davidbsmithpllc.com

James B. Nelson     james.nelson@usdoj.gov

Luke Matthew Jones     luke.jones@usdoj.gov, matthew.ruggiero@usdoj.gov

Nicholas D. Smith     nds@davidbsmithpllc.com

Jason Bradley Adam McCullough     jason.mccullough2@usdoj.gov, CaseView.ECF@usdoj.gov, Kim.E.Hall@usdoj.gov, jmccullough1@usa.doj.gov, usadc.ecfnarcotics@usdoj.gov

**1:21–cr–00175–TJK–2 Notice will be delivered by other means to::**

```
              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.
                                  Washington, D.C.
1-ETHAN NORDEAN                   Tuesday, April 6, 2021
2-JOSEPH RANDALL BIGGS,           11:30 a.m.

            Defendants.
- - - - - - - - - - - - - - - - x
```

_____

TRANSCRIPT OF MOTION HEARING
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Jason B. A. McCullough, Esq.
                          James B. Nelson, Esq.
                          Luke M. Jones, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          David B. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

2

1          **P R O C E E D I N G S**

2               THE DEPUTY CLERK:  We are on the record in

3     criminal matter 21-175, United States of America v.

4     Defendant 1, Ethan Nordean; Defendant 2, Joseph Randall

5     Biggs.

6               Present for the Government are James Nelson, Jason

7     McCullough and Luke Jones; present from Pretrial Services is

8     John Copes; present for Defendant 1 are David Smith and

9     Nicholas Smith; present for Defendant 2 is John Hull; and

10    also present is Defendant 1, Mr. Nordean; and Defendant 2,

11    Mr. Biggs.

12              THE COURT:  All right.  Well, welcome to everyone

13    here.

14              And we are here for argument on the Government's

15    motion to revoke release conditions for Mr. Nordean and

16    Mr. Biggs.  So without further ado, let me turn it over -- I

17    don't know whether it will be Mr. Nelson arguing for the

18    Government in both -- as to both defendants, but I'll go

19    ahead and hear from you, Mr. Nelson, or whoever from the

20    Government is going to take the lead.

21              MR. NELSON:  Thank you, Your Honor.  It will be

22    Mr. McCullough.

23              THE COURT:  Mr. McCullough?

24              MR. MCCULLOUGH:  Thank you, Your Honor, and good

25    morning.

3

1       As the Government has submitted in its papers, the

2  defendant, Ethan Nordean -- we'll address Ethan Nordean

3  first.  The defendant, Ethan Nordean, is dangerous and poses

4  a danger to the community.

5       The defendant, Ethan Nordean, planned, organized,

6  fundraised and led others onto Capitol grounds on January

7  6th.  The purpose of that effort was to obstruct the

8  certification that was taking place that day.  And, in fact,

9  he and his co-conspirators were successful in that effort.

10  They did, in fact, obstruct the certification; they did, in

11  fact, interfere with law enforcement that day; and they did

12  so through a coordinated effort to move onto Capitol grounds

13  and push past barriers and ultimately they did enter the

14  Capitol.

15       THE COURT:  Mr. McCullough, let me ask you to

16  start with -- there was some back-and-forth at the very end

17  -- actually, let me also just start by asking the

18  Government, does the Government object -- I know the --

19  Mr. Nordean's counsel filed something -- a motion to -- for

20  leave to file a surreply.  I think it was late last night.

21  Is there -- does the Government object to me receiving that

22  document?  I mean, this isn't a civil case.  I'm going to

23  let all the parties say their piece on this, obviously.  So

24  does the Government object to that?

25       MR. MCCULLOUGH:  Your Honor, the Government does

1    not object to it.  The Government does not think that it was

2    appropriate in the sense that it did not address new legal

3    issues from the Government's perspective, and I -- I'm happy

4    to start just on one point there.  I don't believe that the

5    Government or the defendant are in disagreement as to the

6    issues that put us into a detention hearing setting.

7              THE COURT:  Right.  Well, what -- that's what I

8    wanted to just refocus on first.  So I'm going to just, for

9    the record, grant that motion and I'll receive that

10   surreply.

11             Yes, Mr. McCullough.  I think starting there,

12   because I did not see that issue percolating until really

13   the very end there.  It sounds like what the -- by the end

14   of all the documents -- all the pleadings, it sounds like

15   the defense was arguing that you haven't -- that the grand

16   jury didn't charge felony destruction of property and so

17   there is no presumption and, in fact, you all don't even

18   have a basis to argue for detention.  So you know, the best

19   defense is a good offense.  So why don't you address,

20   Mr. McCullough, those arguments just before we get into,

21   sort of, the factors and the, sort of, various

22   considerations in play as far as the factors I have to

23   consider.

24             MR. MCCULLOUGH:  Sure.

25             So Your Honor, the grand jury has returned an

1    indictment.  That indictment includes a conspiracy to

2    obstruct and impede the administration of justice, the

3    official proceeding that was taking place, as well as the

4    second object of interfering with law enforcement.  The --

5    that conspiracy theory and the conspiracy indictment that

6    was returned by the grand jury includes statements as to the

7    destruction of property by co-conspirators that were

8    indicted in separate proceedings.  So there is a 371

9    indictment as to the destruction of federal property.  That

10   is one basis on which the grand jury's returned an

11   indictment as to destruction of government property.

12           Separately, as to 1361 itself, the grand jury

13   returned a count that charges the substantive offense of

14   destruction of government property as well as aiding and

15   abetting the destruction of government property.  In that

16   indictment, it is specifically alleged that the damage

17   amount was more than $1,000, and that is in the count that's

18   returned by the grand jury.  And so the Government would

19   basically point to that charge of 1361 as a -- basically, an

20   offense that gets you into the detention hearing setting,

21   and it does so in two ways.

22           One, it is an enumerated offense in Section

23   2332b(g)(5)(B) which is identified as one of the bases for a

24   detention hearing, and that's in -- so in 3142(f)(1)(A), it

25   says that, On motion of the Government, in a case that

1      involves, and then any of the enumerated offenses in 2332b,

2      one of those being a destruction of -- felony destruction of

3      government property.

4              The other, though, Your Honor, is also the fact

5      that there is a rebuttable presumption that applies with

6      respect to that same charge, and so that same charge of 1361

7      basically in 3142(e)(3)(C) states that someone is subject to

8      the rebuttable presumption that detention is appropriate if

9      they have committed one of these acts.  And now, that -- as

10     you know, Your Honor, that is slightly different language in

11     the rebuttable presumption that refers to probable cause by

12     -- a probable cause finding by Your Honor.  It's well

13     settled that the return of an indictment makes conclusive

14     the existence of probable cause, but nonetheless the

15     Government has proffered additional evidence as to the

16     probable cause as to the destruction of that property.

17             So --

18             THE COURT:  Yes, that's one -- Mr. McCullough,

19     just to -- just if I could interrupt for a moment, that

20     point, I thought, was interesting.  I don't know if you're

21     quoting from -- I mean, when Chief Judge Howell first had

22     Mr. Nordean before her, she cited a case -- a 1973 Circuit

23     case for that proposition.  And I suppose that's the

24     Government's -- it's -- that's the Government's position

25     that if it -- particularly -- well, under, I guess, either

 1    prong, if -- or either bases that you just laid out, I --

 2    under that case, I don't -- I can't look past that

 3    indictment -- I'm not saying I would in this case or in any

 4    other case, but just as a -- kind of, as a theoretical

 5    matter, that case seems to suggest I can't look past the

 6    indictment to, sort of, challenge the Government's evidence

 7    and say, Gee, I don't think you have enough here, even for

 8    the standard of probable cause.  The indictment's been

 9    returned, and that case would seem to foreclose that.  I

10    suppose that -- is that the Government's position?

11            MR. MCCULLOUGH:  That is correct, Your Honor.  And

12    in that -- and with respect to that question, that is a

13    question under 3142(e)(3)(C) which is the question as to

14    whether there is a rebuttable presumption.  That is what

15    that case does stand for.  However, in (f)(1)(A), it's

16    simply that the case involves --

17            THE COURT:  Right.

18            MR. MCCULLOUGH:  -- this criminal act.

19            THE COURT:  Right.

20            MR. MCCULLOUGH:  And so it's not even a

21    probable --

22            THE COURT:  Right.

23            MR. MCCULLOUGH:  -- cause question.  We're,

24    frankly --

25            THE COURT:  That's right.

```
 1                    MR. MCCULLOUGH:  -- in -- we're in detention land

 2       and --

 3                    THE COURT:  Yes.

 4                    MR. MCCULLOUGH:  -- so that's where we are, and

 5       then it goes to the, kind of, four factors under -- the (g)

 6       factors of 3142(g).  And so then, you know, it's

 7       certainly -- there's plenty of -- there's fertile ground for

 8       argument as to how those four factors stack up.  The

 9       Government -- and that's where some questions as to the

10       strength of the Government's evidence and those might come

11       into play.  But, Your Honor, in terms of whether it is

12       appropriate to be having a detention hearing, that is -- we

13       are in the appropriate setting here.

14                    THE COURT:  Right.  The language about -- the case

15       involves just -- if you were proceeding under that theory,

16       and let's assume for the moment I could look past the

17       indictment, the Government would lose the rebuttable

18       presumption, but we would still be in detention land through

19       that other provision.  And with the language, just does the

20       case involve it, it would seem to be not a question.  Right

21       or wrong, whatever, the grand jury has charged that offense.

22       I don't know what the argument would be that it -- this case

23       doesn't involve that offense; is that -- that's your

24       position?

25                    MR. MCCULLOUGH:  That's correct, Your Honor.
```

1          THE COURT:  All right.  Yep.

2          All right.  So let's talk about the factors.

3          MR. MCCULLOUGH:  Sure.

4          And so, Your Honor, I think the question here is

5     whether Ethan Nordean poses an identified and articulable

6     threat.  And, as the Government has set forth in its papers,

7     the Government views this as Defendant Ethan Nordean having

8     an unwavering commitment to defying lawful functions of the

9     government.  The -- Ethan Nordean stated as much in advance

10    of January 6th; he then engaged in that conduct on January

11    6th; and he has shown no remorse for that action.

12          And so the -- Your Honor, that, coupled with his

13    ability to encourage, plan, organize and lead others to this

14    kind of activity in the future, that poses the identified

15    and articulable threat.  And, Your Honor, the core feature

16    here is that Ethan Nordean planned this from remote

17    locations.  He didn't plan this from the, you know -- the

18    west alcove of the Capitol.  The defendant planned these

19    actions and made these communications from his home and from

20    other locations.  And so as a result, putting this defendant

21    into home confinement does not adequately protect the public

22    from the danger that it faces from someone like Ethan

23    Nordean who is able to plan and organize and direct

24    individuals to follow him into, kind of, invoking the spirit

25    of 1776.  He's very clear in his messages before January 6th

10

1    that, What people think is that these -- that they're just

2    going to be complacent and they're just going to do -- issue

3    Facebook posts, but, no, we're going to take action.  That

4    is the message that Ethan Nordean was broadcasting, and he

5    has indicated no -- nothing to suggest that he would move

6    away from that.

7            So when this case went before Chief Judge Howell

8    on March 3rd, the Government had not returned this broader

9    indictment.  The Government had not pointed to the existence

10    of and been able to discuss the existence of the messaging

11    -- the Telegram messages in which Ethan Nordean and others

12    in that group indicated that they were planning for some

13    type of criminal activity.  There's very clear discussion of

14    the question that, Everyone stop what you're doing.  We

15    don't want to be subject to gang charges.  There's another

16    statement about, If we're -- if you're talking about playing

17    Minecraft, you shouldn't have your phone anywhere near you.

18    Minecraft being, kind of, a, you know, playful way to

19    describe engaging in criminal activity.

20            And so when Chief Judge Howell looked at this

21    without any of that evidence, she said this is a close call.

22    She said he -- Ethan Nordean is heavily involved in

23    pre-planning.  She said Ethan Nordean had lots of

24    communications in advance about the stolen election and,

25    kind of, motivating people to come to Washington, D.C.  He

1    had solicited donations, and those donations ultimately in

2    the amount of more than $16,000.  He had issued what Chief

3    Judge Howell referred to as fighting words in which he said,

4    you know, Fight now or lose everything, and also, pointed

5    out his statements about invoking the spirit of 1776.  And

6    on ground -- on the ground, she pointed out that he was a

7    ringleader of men who were prepared for violent

8    confrontation and he planned -- he himself planned on coming

9    here.  And what Chief Judge Howell was asking was, what ties

10   him to these other actions?  What ties him to the

11   destruction of property?  What ties him to others under his

12   command taking these actions in furtherance of the plan?

13   And that was the question that Chief Judge Howell raised and

14   the Government, at the time of the hearing on March 3rd, was

15   unable to answer those questions because of the pending

16   superseding indictment which indicated others' involvement.

17           And so here we are now with that additional

18   evidence, and evidence, as I mentioned, that describes the

19   Telegram messages in which individuals are discussing

20   planning for January 6th, and not just planning a march

21   because you don't -- one doesn't need this level of secrecy

22   around planning a march.  They're -- ultimately, in those

23   Telegram messages, they're explicit about what conduct is

24   taking place.  There are people that say, contemporaneous

25   with these actions, Storming the Capitol.  Get there.

1    People are directing them to push inside.  We just stormed

2    the Capitol.  That language is consistent with the language

3    that the defendants in this case were using.  Joseph Biggs,

4    on the ground, says, We've just taken the Capitol.  We just

5    stormed that motherfucker and took it back.  That is -- I

6    mean, conspiracies are, kind of, formed with winks and nods.

7    They're not often memorialized in writing.  Here, we

8    actually have the writing.  We have contemporaneous

9    communications and we have conduct that matches those

10   communications.  And after the fact, there is a celebration

11   of, What we accomplished.  We took the Capitol.  We took it

12   back, including statements by Ethan Nordean.

13           And in addition to that, Chief Judge Howell asked,

14   Well, what did Ethan Nordean specifically do?  How do we

15   know that he was committed to this plan of destroying

16   anything?  And the answer is in the returned indictment

17   which is that, as the crowd surged forward, Ethan Nordean

18   took up an advanced position in the initial entry into the

19   Capitol grounds and he and Joseph Biggs stood side by side

20   and they shook a metal barrier to knock it down.  Now, that

21   is -- I mean, it's the maximum -- the, you know -- actions

22   are louder than words.  When your commanding officer is

23   taking those actions, that speaks volumes as to what the

24   expectation is of the men who are following you.  We are

25   here to advance.  We are here to break things in the process

13

1    if we need to.  And so, Your Honor, it demonstrates not only

2    -- it puts the agreement and the plan to action and it shows

3    that Ethan Nordean was fully committed to this effort to

4    storm the Capitol; to push past law enforcement; and to

5    break things, if necessary.

6            And so then the question becomes, well, what did

7    we do with Dominic Pezzola and this -- and the question as

8    to this destruction of government property as a result of

9    Dominic Pezzola having stolen a riot shield and pushed into

10   the Capitol?  And, Your Honor, Dominic Pezzola is a

11   co-conspirator who is simply charged in a different

12   indictment.  He arrives at the First Street pedestrian gate.

13   He does so with -- he does so at the same time that Ethan

14   Nordean, Joe Biggs and others are there.  There are

15   coordinated actions to move forward.  Dominic Pezzola

16   participated in the process of -- as barriers are removed,

17   Dominic Pezzola is there at the front, much like his

18   co-conspirators and the charged defendants in this case, and

19   then Dominic Pezzola steals a riot shield.  And one of the

20   defendants in this case, Charles Donohoe, can later be seen

21   carrying the shield with Dominic Pezzola.  And Charles

22   Donohoe reports back to the Telegram messaging group, Got a

23   riot shield.  This is effectively adopting Pezzola's actions

24   as the work of the group.  And, in fact, Dominic Pezzola --

25   in his case, the 21-cr-52, Dominic Pezzola describes that

1     the objective was achieved; that stopping the certification

2     was the objective or acknowledged that that was the

3     objective.  Now, he attributes that to, Well, that was on

4     the orders of President Trump, but nonetheless the objective

5     of Dominic Pezzola matches perfectly with the objective of

6     this conspiracy.  For that reason, he is simply a

7     co-conspirator.

8            And so, Your Honor, when you go down the, you

9     know, kind of -- the factors here -- the -- if you will, the

10    Chrestman factors that have been discussed by Chief Judge

11    Howell as to how we, kind of, sort through all of this

12    evidence, the question is whether this -- he's been charged

13    with felony or misdemeanor offenses.  Clearly, felonies.

14    There's a question as to whether he engaged in prior

15    planning.  He did.  He fundraised over $16,000.  He engaged

16    in planning to obtain communications devices.  He obtained

17    protective equipment.  He came to Washington, D.C., with a

18    tactical vest and protective headwear.  He gave directives

19    in advance, what to wear -- dress in plain clothes, not in

20    the black and yellow -- where to go.  And he met -- as the

21    Telegram messages indicate, met with others the night before

22    in an effort to come up with the plan.

23           Now, there's no indication that he carried a

24    dangerous weapon during the riot, but the other factors all

25    point heavily towards -- in favor of this being a serious

1      act.  Did he coordinate with other participants?  Yes, he

2      did.  The Telegram messages make clear that he was

3      coordinating not just in ones and twos but with a large

4      group.  And when they marched, they marched not to the

5      Ellipse to hear the speeches.  They marched to the Capitol

6      and only the Capitol.  And during that march, as we point

7      out in our briefing, he makes statements that are

8      encouraging people to focus their attention on the police

9      and those at the Capitol.  We represent the spirit of 1776.

10     Remind those who have forgotten.  We're here to remind those

11     who have forgotten what that oath is.  He then says

12     something to the effect of, You've got to prove it to us.

13     Prove your shit to us, then, effectively pointing out that

14     the law enforcement had arrested one of their brethren and

15     now it was up to law enforcement to prove to them.  And he

16     said, We don't owe you anything.  You're here to protect and

17     serve the people, not property or bureaucrats, clearly

18     pointing and discussing that, We are going to focus on law

19     enforcement and what's happening inside that building.

20          As to whether he damaged federal property,

21     threatened or confronted law enforcement, his movements to

22     the front of the group clearly indicate that he is

23     representing both a threat to law enforcement and engaging

24     in damage to government property.  He moves to the front of

25     the group.  There are law enforcement officers on the other

1    side.  He takes action with Joseph Biggs to dismantle that
2    barrier.  And, as we've talked about, that action is a
3    communication to those under his command that, This is what
4    we're here to do.

5          So Your Honor, all the factors point heavily in
6    favor of this being a, you know, very serious crime.  The
7    nature and circumstances of the events charged point heavily
8    in favor of detention here for those reasons.  The weight of
9    the evidence against the person, particularly now with the
10   additional evidence that the Government has put forward as
11   to the returned indictment, the Telegram messages which
12   plainly reference criminal activity, that also points
13   heavily in favor of detention.

14         As to the history and characteristics of the
15   person, Your Honor, the Government appreciates that
16   Defendant Ethan Nordean does not have a criminal history,
17   but the, kind of, nature and characteristics here should,
18   and do, incorporate his statements as to the intent to storm
19   the Capitol, the intent to take violent action, and given
20   that he has shown absolutely no remorse for that action and
21   no remorse for what took place, saying, in fact, the day
22   after the event, If you feel bad for the police, you're part
23   of the problem, I mean, that demonstrates a commitment and a
24   total disregard for the mayhem that took place and the
25   injuries that were done to law enforcement that day.  So

1      that -- I think that speaks volumes to the history and

2      characteristics of the person.

3              And, Your Honor, the nature and seriousness of the

4      danger of this person to the community, quite simply, as

5      we've set out in the papers, this planning -- this was not

6      something that happened in an instant.  This was a planned

7      and coordinated effort and the conduct that took place was a

8      success and Ethan Nordean has celebrated that success, and

9      as a result that makes his potential to do something similar

10     in the future all the more dangerous and all the more acute.

11     The success of this action and the defendant's commitment to

12     continuing such an action in the future or directing others

13     to plan such an action in the future, that is the danger,

14     and that's why the Government is here seeking to revoke

15     detention.  The Government does not do it -- the Government

16     has made a careful and thoughtful decision as to why to do

17     this, and the Government believes that Ethan Nordean does

18     pose that danger to the community that these factors are

19     intended to address.

20              THE COURT:  All right.  Before -- I have some

21     follow-up questions even before I hear from the Government

22     -- I mean, even before I hear from defense counsel.  But,

23     Mr. McCullough, why don't you -- I think it makes -- it's

24     probably most efficient, since I think the arguments really

25     overlap, for you to address Mr. Biggs, as well.

1              MR. MCCULLOUGH:  Sure, Your Honor.

2              I think that many of the same --

3              THE COURT:  Right.

4              MR. MCCULLOUGH:  -- many of the same issues here

5        go to Defendant Biggs.  The -- Defendant Biggs was also

6        involved -- directly involved in the planning and

7        coordination of this event.  He is involved in the

8        communications as to when and where to meet, what to wear,

9        etcetera.  He is also involved in fundraising, though, to

10       the Government's information, perhaps -- we don't have a

11       specific dollar sum to offer to the Court.  But, again, the

12       same language in advance of January 6th, the same

13       encouragement of this kind of violent action is present

14       from, you know, as far back as November 5th when Joe Biggs

15       says, It's time for fucking war if they steal this shit.

16       That drumbeat of language as to a plan for violent

17       confrontation on January 6th is there and it's present.  He

18       is involved in the planning of the January 6th effort.  He

19       had -- that marches and directs, much like Ethan Nordean,

20       this group of men to the United States Capitol.  They march

21       around to the First Street gate.  Joseph Biggs, as much like

22       Ethan Nordean, pushes toward the front.  As the Government

23       points out in its briefing, Joseph Biggs makes

24       contemporaneous statements as they are entering the Capitol

25       that reflect the plan.  We've just taken the Capitol.  We

1    just stormed this -- the Capitol.  The Government points out

2    those quotes that Joseph Biggs states that are, kind of,

3    contemporaneous with his actions.  Much like Ethan Nordean,

4    he pushes down this barrier which, again, that is an action

5    that speaks volumes as to what is expected and what is to be

6    done.

7            And so for the same reasons, Joseph Biggs is

8    committed to this common plan or scheme.  He understands

9    that destruction is a natural and foreseeable consequence of

10   what this conspiracy has wrought.  Defendant Biggs enters

11   the Capitol within -- close -- within two minutes of Dominic

12   Pezzola going through the window.  Defendant Biggs then

13   leaves the Capitol and 30 minutes later comes back in a

14   second time.  And so I mean, that just demonstrates his,

15   kind of, commitment to interrupting, interfering with the

16   official proceedings that were taking place inside as well

17   as a disregard for any efforts by law enforcement to have

18   cleared the building or keep the crowd away.

19           And, Your Honor, it's quite simply the same

20   question with respect to Joseph Biggs.  Joseph Biggs planned

21   for these -- this conduct -- engaged in the planning,

22   organization of this conduct from his home.  He advised

23   others where to go; what, you know -- what to wear; where to

24   meet; and how we were going to move to execute the plan.

25   And so the same question as to the Government -- the

1     Government's ability to protect the public goes to Defendant

2     Biggs.  It's simply the fact that Joseph Biggs, much like

3     Ethan Nordean, has not indicated that he has any different

4     view as to January 6th and the events of January 6th now

5     than he did on January 5th.  And so if Defendant Biggs is to

6     be left at home under home detention, there is no way to

7     effectively monitor his communications in a way that would

8     protect the public.

9            THE COURT:  Let me -- and I'm sure I'm previewing

10    what I'm going to hear from defense counsel, but let me just

11    play devil's advocate here in a variety of ways.

12           What we have to go on as far as defendants

13    associated with the Capitol breach and defendants generally

14    is what they do and what they say and other facts that are

15    -- we can associate with the defendant.  Here, we don't have

16    any weapons.  I think the Government has conceded that.  Not

17    only no weapons used that day at the Capitol, no weapons

18    found at their homes or that have been associated with them

19    in any other way, either defendant.  No criminal history for

20    either defendant.  We have a situation where they've both --

21    I don't weigh this too, too heavily, but I do have to weigh

22    it, I think -- that they've been out now since their release

23    in these cases initially.  I'm not -- I understand the

24    Government has new evidence, and I don't blame the

25    Government for coming forward later when the case, as far as

1    you all -- as far as you -- if you -- in your all -- in the

2    Government's view, changed when certain information came to

3    light.  That's fine.  But they've been out now for the many

4    weeks it's been without a problem.  And I have a -- PSA

5    reports from both of them that don't recommend changes in

6    their conditions.

7            And then we get to the issue which is really the

8    core issue which is, sort of, you know, dangerousness and

9    violence.  And, you know, the evidence of violence on that

10   day is, you know, pretty muted.  We have -- I take your

11   point, Mr. McCullough.  First of all, we have this fence --

12   the shaking of the fence.  Okay.  It's something, but it's

13   not directed at a person, certainly.  We do have, as I

14   think, Mr. McCullough, you mentioned, the -- both defendants

15   moving toward the front of a group -- maybe, not at the very

16   front -- in which case they would have had the opportunity

17   to, sort of, more directly engage in violence.  I -- so I

18   weigh that.  They're toward the front of a group of people

19   who are advancing on the Capitol.  Fair enough.  But it's

20   not, you know, violence through their -- directly through

21   their hand, if you will.  And then we have -- and then we go

22   to the evidence -- so -- and that's where we were when the

23   case first came in and the Government did not move to detain

24   them.

25            The new -- the delta here -- the new evidence is

22

1    this issue of planning and what -- the messages the

2    Government has put forth.  I think, you know, look, they do

3    show connectivity.  They do show planning of some sort.  And

4    I'm not saying that at a future hypothetical trial, the

5    Government's not going to be able to stitch together all of

6    this and lay a lot of things that happened that day at these

7    defendants' hands.  Maybe they -- at their feet.  Maybe you

8    will.  But in terms of weighing the question of

9    dangerousness and detention, there is no -- we have -- we

10   definitely have some invocations of fighting months

11   beforehand.  Okay.  I don't -- they're -- locking up

12   everybody who said, Gee, we've got to fight, clearly -- but

13   as for the -- when we get down to the day in question, there

14   isn't anything that is very clearly an invocation to

15   violence at least as I see it.

16           Now, again, you know, I'm looking at the evidence

17   you have as a snapshot right now and this doesn't, I don't

18   think, say anything one way or the other about the -- I

19   mean, it does say something about the strength of the case

20   at this moment, but whether you're able to connect all that

21   up, you may well be able to, but I don't know -- if I'm

22   looking solely not at criminal liability here but I'm

23   looking at dangerousness, how -- what's the best -- I'm

24   going to ask a couple of questions.  But in light of all of

25   that, you know, what's the best evidence that the Government

23

1     has really that what they were -- and, look, I also

2     understand the argument that, Judge, look at the context

3     and, from what happened, you can infer that this was a plan

4     to do violence.  Okay.  Maybe that gets you somewhere, but I

5     think there were probably a lot of people showing up that

6     day with a lot of -- it's possible, with a lot of different

7     plans.  Some went one way; some went the other way.  In

8     terms of connecting the planning to violence, it's not --

9     it's -- these messages don't, you know -- don't move the

10    needle that much.

11             The other piece I just want to mention while it's

12    on my mind is, you know, and that's one of the things -- I

13    mean, the other thing that has happened since -- the other

14    development in the -- in this area that's happened since at

15    least the Government filed its initial motion and since even

16    a lot of the briefing has taken place here is the Circuit's

17    decision in Munchel which, you know, suggests that I have to

18    look at the uniqueness and the context of what happened on

19    that day as part of a forward-going analysis of, is the

20    person a threat?

21             And so I guess, if you would, Mr. McCullough,

22    address those two things.  I mean, the issue of violence and

23    whether I can really infer -- what to make of the fact that

24    clearly there was messaging about a plan.  It's not at least

25    overtly a plan that they -- that anybody mentioned violence

24

 1    about.  Now, you know, maybe, that's good operational

 2    security, but it is what it is.  And then as far as Munchel

 3    goes, how does the Government reconcile, kind of, what the

 4    Circuit instructed me to do -- all courts to do going

 5    forward in terms of Munchel and whether we, kind of, meet

 6    the strictures that they laid out there?

 7              MR. MCCULLOUGH:  Sure.  So Your Honor, the -- one

 8    quick thing on -- you mentioned, kind of, whether they had

 9    any weapons in their home.  They did have weapons in their

10    home, but we're not aware of any effort to bring those

11    weapons to --

12              THE COURT:  All right.

13              MR. MCCULLOUGH:  -- Washington, D.C., but --

14              THE COURT:  Thank you for that correction.

15              MR. MCCULLOUGH:  -- I just wanted to point that

16    out.

17              The -- Your Honor, the Telegram messages the

18    morning of the event -- there are others in this small group

19    of actors.  It's fewer than 10 participants in this Telegram

20    message group where plans were being discussed.  They say, I

21    want to see thousands of normies burn that city to ash

22    today.  I will settle with seeing them smash some pigs to

23    dust.  So this idea of preparing for some sort of violent

24    confrontation, including violent confrontation against law

25    enforcement, that is in the Telegram messages.  It's not,

1      Oh, you know, yes, and I agree, that's what the plan is, but

2      that is -- I mean, that's a pretty stark memorialization of

3      where this group was in terms of its thought process as to

4      January 6th.  This is not, We're going to march, we're going

5      to listen to the speech, and we're going to protect people.

6      This is, I want to see thousands of normies burn that city

7      to ash.  I would settle with seeing them smash some pigs to

8      dust.  Now, these are not words spoken by Ethan Nordean

9      or --

10             THE COURT:  Right.

11             MR. MCCULLOUGH:  -- Joseph Biggs, but these are

12     the statements of others in that group.  And when Ethan

13     Nordean and Joe Biggs moved forward and they -- and there is

14     a metal barrier separating this mob of people, that they

15     have led to the Capitol, from law enforcement, they take

16     action to rip it down.  I mean, that is -- that's a violent

17     action, Your Honor, and when you do that with -- when you --

18     when I, you know, do that with one person behind me, it says

19     one thing.  When I do it with 100 people behind me that I

20     led to the Capitol grounds, it says a different thing,

21     especially in this context.  And so --

22             THE COURT:  Mr. McCullough, can I just jump in and

23     ask you one question right there.  You -- the -- at various

24     times, the Government's motion references photos and videos

25     and you've embedded photos in the motion.  Do I have -- if

26

1     -- to the extent there are relevant video, do I have those

2     video?

3               MR. MCCULLOUGH:  You do not, Your Honor.  The

4     Government would be pleased to submit that video, the video

5     of them tearing down the barrier, or other video of them

6     marching to the Capitol.

7               THE COURT:  Well, whatever you think -- I mean,

8     you reference in the motion photos and video and there are

9     some photos here.  I just -- I wasn't aware that any -- I

10    had received any video.  So I would say, from the

11    Government's perspective -- I mean, I'm -- I think I'm

12    probably -- we're going to probably have to come back on

13    very short notice for me to rule on this because I, you know

14    -- I think it's -- I think, given the import of Munchel and

15    the different decisions that all of us in this courthouse

16    have to make with regard to defendants going forward, I, you

17    know -- I want to take my time and make the right decision

18    here.  And so if you all want to submit that as, you know --

19    obviously, provide a copy to the defense -- I think it makes

20    sense for me to receive it.  I don't know how you've been

21    doing that in other cases.  I've had other -- in some of my

22    other cases, I've had the Government simply, sort of, refer

23    to video that had been publicly posted.  I don't know if

24    this is that type of thing where you can point to a place on

25    the Internet where it exists or whether it's something you

27

1       would need to submit separately, but however you want to do
2       it I will receive it and consider it.
3                    MR. HULL:  If I may, Your Honor, Dan Hull for Joe
4       Biggs.  I would applaud and join in on the idea of getting
5       that tape on the fence to you.  I would very much like you
6       to see that.
7                    THE COURT:  Okay.  Good.
8                    All right.  So -- and anyway, Mr. McCullough, I'm
9       sorry.  I interrupted you, but I wanted to make that point
10      about the video.
11                   MR. MCCULLOUGH:  Sure.
12                   And so, Your Honor, with respect to the -- how
13      Munchel changes this, it fundamentally does not change the
14      question as to whether these defendants pose an identifiable
15      threat to the community.  And the question is whether --
16      prior to January 6th, whether there was a, you know -- a
17      leadership plan in place and these men led a group to attack
18      the Capitol.  That is the Government -- that's the
19      Government's evidence that they led this attack on the
20      Capitol and --
21                   THE COURT:  I mean, it's clearly your strongest
22      point, I think, no doubt.  Your strongest argument is a
23      leadership argument.  What that says -- what, exactly, they
24      were leading and how connected that is to violence and how
25      connected that is to, sort of, forward-looking violence, I

1    think, is, kind of, the core of the question.  Go ahead.

2             MR. MCCULLOUGH:  That's certainly right, Your

3    Honor.  I mean -- but I think the question here is whether

4    that effort to lead and direct a group, to fundraise for a

5    group can still be accomplished and whether the Government

6    has a -- sorry, whether Your Honor has a basis to believe

7    that any strictures put in place as to their home

8    confinement will be strictly followed.  And now, the

9    defendants have not -- there have been no identified issues

10   with their home detention and their release conditions thus

11   far, but, Your Honor, the Government would submit that there

12   -- we don't know what the communications have looked like.

13   And so it's certainly commendable and appropriate to point

14   out that there have been no identified instances, but that

15   doesn't answer the question, and one that was -- and one

16   that's posed, as to whether they can launch another similar

17   event from their homes and whether the release conditions

18   provide any comfort that we can protect the public from that

19   effort.

20            And so, again, it's -- it, you know -- the -- if

21   we look at, you know, kind of, the breaking of the barrier

22   and the leadership forward in isolation, right, if we say,

23   well, it's a, you know -- it's a breaking of a barrier;

24   right?  Big, you know -- big deal; right?  Come on.  It's

25   like, how is that violent?  It's violent when you have --

29

1    when you're, you know -- it's the difference between opening

2    a bottle of wine and opening a bottle of champagne.  When

3    you've got 100 people behind you and that -- and you unleash

4    that force, what does it mean; right?  What does it mean?

5    And what is the -- and what does that act really tell those

6    people who are following you?  That we are here to advance;

7    we are here to --

8              THE COURT:  I think that exact question has always

9    been at the heart of these cases and why, you know --

10   viewing the individual act and looking at the context, but

11   then also trying to consider it was -- I mean, on, you

12   know -- on the record as being -- as recognizing the

13   unique -- the uniquely bad and pernicious -- how uniquely

14   bad and pernicious that effort was that day to interrupt the

15   peaceful transfer of power.  I think, in some ways, the

16   Circuit has flipped that a little bit and -- at least in the

17   detention context and, I think, appropriately made -- has

18   instructed us to look closely at, you know, that's a unique

19   -- that was a uniquely bad situation.  Well, what is the

20   risk of danger going forward?  And I think, you know, that's

21   the question.  You've mentioned Pezzola a few times.

22   There's a defendant who had weapons-making and bomb-making

23   equipment in his house.  He had -- or instructions, not

24   equipment.  Instructions.  He -- and there were several

25   statements of people that were close to him indicating a

1    future -- that they could be a future -- a vector for future

2    violence.  We don't have those direct similar statements

3    here, but we do have a leadership role that is clearly

4    different and more advanced.

5           Let me turn to whoever wants to address this --

6    whichever Mr. Smith will be addressing this question for

7    Mr. Nordean.

8           MR. NICHOLAS SMITH:  Thank you, Your Honor.  It

9    will be Nick Smith, and good afternoon.

10          THE COURT:  Good afternoon.

11          MR. NICHOLAS SMITH:  We'd like to say at the

12   outset thank you to Your Honor for accepting the surreply

13   brief.  We understand that Your Honor is correct that that's

14   normally a civil litigation tool, but thank you nonetheless.

15          And going on that point to begin with, we

16   understand that the Court is likely to rule -- or already

17   has ruled that the Government has satisfied a detention

18   hearing predicate under 3142(f), but with Your Honor's

19   indulgence I'd just like to make a few points on that in

20   response to the Government, if that's okay with the Court.

21          THE COURT:  Absolutely.  I mean, look, I -- for

22   this -- on this point and on the other -- on the earlier

23   point about the surreply and letting the Government -- look,

24   I -- and letting the Government submit some of this video

25   they want me to see, you know, this isn't -- I'm happy to

1    enforce the civil rules and try to get civil cases as

2    streamlined as possible.  Criminal cases have to move

3    quickly, too.  But when someone's liberty is at stake, I'm

4    going to hear your arguments.  I'm going to receive whatever

5    both sides want me to hear and see.  So please, Mr. Smith.

6         MR. NICHOLAS SMITH:  Okay.  Thank you, Your Honor.

7         So to follow up on that point, Your Honor noted

8    correctly that the Court -- it's not the Court's role at

9    this point to look past an indictment, and Mr. Nordean would

10   agree with that point.  I think the argument that we were

11   trying to make in the surreply -- and I think it was alluded

12   to in some of the earlier briefs -- is that even though the

13   Court doesn't second-guess the grand jury, the Government

14   still has a burden of pleading the elements of a defense

15   [sic], and I think I heard Mr. McCullough here say this

16   morning that the Government agrees that its sole predicate

17   for detention here today, notwithstanding the conversation

18   about the new conspiracy charge, is destruction of federal

19   property under 1361.  And, Your Honor, our briefs are

20   pointing out that the indictment -- the superseding

21   indictment does not actually allege any specific destruction

22   of property.  There's a reference that the parties have been

23   making to shaking a metal barricade.  That appears in

24   Paragraph 58 of Government's indictment.  And if Your Honor

25   carefully reads Paragraph 58, you'll see that it says,

1       quote, Nordean and Biggs shook a metal barricade with

2       Capitol Police on either side of the barricade until Nordean

3       and Biggs and others in the crowd were able to knock it

4       down.   The crowd, including Nordean, Biggs, Rehl and

5       Donohoe, advanced past the trampled barricade.

6               Now, the Government doesn't allege destruction in

7       this paragraph, and in other Capitol cases it has.   When

8       there's damage exceeding $1,000 to satisfy the 3142

9       predicate, the Government knows how to plead it and does,

10      and this isn't just a pleading issue.   I understand this

11      isn't Twombly and Iqbal, Your Honor.   We -- this is not

12      pleading with, you know -- but nevertheless, there is a

13      burden to plead the elements of an offense.   There is no

14      destruction of property pled here.   And there's a reason,

15      Your Honor, and it goes to the video that Your Honor hasn't

16      seen, because there isn't destruction of property in that

17      video, Your Honor.

18              Now, if Your Honor would scroll down to Count 3 --

19              THE COURT:  Well, Mr. Smith -- all right.   All

20      right.   I'll -- I -- let me just ask this question while

21      it's on my mind, then.   Well, if all of that is true, why do

22      you concede -- I mean, you're pointing all this out because

23      it -- number one, obviously, in the various factors I have

24      to consider, strength of the Government's evidence is one of

25      them, and this would go to that, for sure.   But is there --

1       are you making a residual or a predicate argument -- an

2       argument before that that if they haven't pled it, even if

3       the grand jury has returned -- and the -- clearly, the grand

4       jury has charged them with that offense -- we're still

5       properly in detention land even if the grand jury has --

6       even -- I would argue, even if the -- I mean, as I discussed

7       with the Government earlier, the language, I think it's

8       whether the case involves a particular charge.  I think

9       that's right.  Maybe something slightly different.  But it's

10      hard to get away from that language if -- even if there's a

11      count on here that charges felony destruction of property,

12      even if that might be subject to challenge by a pretrial

13      motion or whatnot, I mean, isn't it fair to say the case

14      involves that if that's the quote?

15              MR. NICHOLAS SMITH:  I think Your Honor is putting

16      your finger on the verb, "involves," and -- but what we're

17      countering with here is we're saying the case involves an

18      offense of government -- destruction of government property

19      if it's pleaded.  Now, there's one reference in the

20      indictment to destruction of property.  You've read that

21      paragraph, Your Honor, and it doesn't allege destruction of

22      property because the Government's video doesn't show that,

23      but I'll get to that in a second.

24              But then if Your Honor scrolls down to Count 4 of

25      the indictment which --

```
 1                    THE COURT:  I --
 2              MR. NICHOLAS SMITH:  -- is the charging count --
 3              THE COURT:  I'm there.
 4              MR. NICHOLAS SMITH:  -- and if Your Honor sees
 5    this, it says, quote, They aided and abetted others known
 6    and unknown to forcibly enter the Capitol and thereby cause
 7    damage to the building in an amount more than $1,000, Your
 8    Honor.  There is no allegation of damage to the building
 9    from the co-conspirators in this case in this indictment.
10    What it alleges is that there's damage to a barricade at
11    some stage outside of the Capitol.  So Your Honor, we're
12    making the point that it -- our argument is actually that
13    3142(f) is not satisfied.  And we don't think it's a
14    technicality either, Your Honor, because if Your Honor looks
15    at the 3142(f)(1) offenses, they're not just all felony
16    offenses.  They're all -- there's large parts of the Federal
17    Criminal Code that are not included in 3142(f) because, as
18    the D.C. Circuit pointed out in the Singleton case citing
19    Salerno, Your Honor, this is supposed to be -- detention is
20    supposed to be reserved for the most serious felony
21    offenses.
22              Now, we're hearing a lot about conspiracy charges
23    and obstruction of justice and civil disorder, but none of
24    those offenses are actually listed in 3142(f).  Okay?  So
25    we're in a very unusual scenario where the gravamen of the
```

1    Government's case is not the legal basis for its detention

2    request.  The tail is wagging the dog here with the -- there

3    is some -- there is a misdemeanor offense -- there's two

4    misdemeanor offenses they've pled, trespass which doesn't

5    distinguish these defendants from hundreds of others and

6    destruction of property, but destruction of property is not

7    pleaded in this indictment.

8              So Your Honor --

9              THE COURT:  So --

10             MR. NICHOLAS SMITH:  Yeah.  So --

11             THE COURT:  I mean, I'll just point you to

12   Paragraph 23 that talks about the Capitol suffering millions

13   in damage, broken windows, doors, graffiti, blah, blah,

14   blah, blah, blah.  Is it not fair to read that and read --

15   indictment along with that to plead a factual basis for the

16   conspiracy that they were engaged in to tag them or at least

17   to charge them with -- well, to lay that at the feet of

18   their conspiracy that at least some of that damage that's

19   set forth in Paragraph 23 can be linked back to their --

20   the, sort of, organization and the conspiracy that they

21   allegedly engaged in?

22             MR. NICHOLAS SMITH:  Well, Your Honor, I think

23   that would be their best argument.  I agree with Your Honor

24   that that's the best hook they've got, but if that's the

25   case there's a problem here, because this paragraph is in

```
 1    virtually every indictment they've filed in the Capitol
 2    cases.
 3              THE COURT:  Yeah.
 4              MR. NICHOLAS SMITH:  So if it were --
 5              THE COURT:  I don't know that that's a problem.  I
 6    mean, is it?  Why is that a problem?
 7              MR. NICHOLAS SMITH:  It's a problem because, Your
 8    Honor, the charge that's the hook under 3142(f) has to be
 9    pleaded in connection with specific property damage.  If it
10    were sufficient to just cite all of the damage to the
11    Capitol in one paragraph and plead no facts linking the
12    specific charge in the indictment to it, then this would be
13    -- then really there is no reason why 360 people have not
14    automatically satisfied 3142(f) and, Your Honor, we would
15    argue that's contrary to Salerno.  This is about -- bail
16    determinations are about individualized analysis based on
17    the specific crimes that are pleaded -- properly pleaded
18    against the defendant in front of the Court.  And so we
19    agree with the Court that that's probably the only hook in
20    the indictment to connect damage to the defendants, but that
21    that's -- forget about Iqbal and Twombly.  That doesn't
22    satisfy, you know, basic pleading requirements because
23    there's no causation alleged here, Your Honor.
24              But, you know, we appreciate that the Court has
25    thought about this issue already and it would -- thinks that
```

37

1    there's more important issues to discuss here.  So getting

2    to Munchel, Your Honor, the Munchel decision, we argue, is

3    actually a fortiori of everything that the Government has --

4    we've heard this morning as the most powerful argument the

5    Government has for detention.  And in Munchel, Your Honor,

6    the court emphasized that a couple of arguments that the

7    Government has made here today just simply don't work; don't

8    satisfy dangerousness.  Judge Katsas, dissenting in Munchel,

9    pointed out that he would not just have sent the case back

10   for a do-over; he would have reversed outright.  And one of

11   the arguments Judge Katsas zeroed in on was the contention

12   that bravado about patriotism and a stolen election and

13   comments of a political nature that don't identify a

14   specific articulable threat to anyone simply don't even

15   sound under 3142(g)(4).  That's what Judge Katsas's point

16   was.  And I think the kinds of arguments you're hearing

17   today are, sort of, as though this decision doesn't exist or

18   that what Judge Katsas says didn't happen.  These are the

19   types of arguments the D.C. Circuit is saying don't work.

20   They're infringements on people's liberties and free speech

21   rights to put people in prison -- in jail pretrial because

22   of their political beliefs or because they think that

23   something wrong happened in the election.  The court is

24   saying that can't happen, Your Honor.

25           The next best argument the Government comes up

```
 1    with is to cherry-pick messages, Your Honor, from a Telegram
 2    chat in which 60 participants were in there.  There's no
 3    allegation the defendant even knows them.  And, Your Honor,
 4    we'll point out that one individual in these Telegram chats
 5    is cited repeatedly over and over and over.  He's an
 6    unindicted co-conspirator in this case, Your Honor.  There's
 7    no allegation that the defendant knows this person.  Okay?
 8    So if the Government's right that it can just put together a
 9    chat window of 60 people where some people make vague but
10    alarming remarks and then jail a defendant on the basis of
11    those remarks that a defendant might not even know, Your
12    Honor, then consider the implications of that.  Why limit it
13    to a Telegram chat window with 60 people?  Why not say the
14    defendant was on a Twitter thread online where there was 150
15    people and way down -- the defendant himself might not have
16    made any violent comments, but way down in the Twitter
17    thread there's someone who says, This politician should be
18    killed or dead.  Your Honor, that's -- so the --
19              THE COURT:  Mr. Smith, I'll just say -- I mean,
20    the -- Twitter, you know -- anybody can jump into a Twitter
21    thread; right?  But people are generally not randomly
22    connected on the kinds of messaging systems that we're
23    talking about here.  It's a -- Twitter's a -- much more of
24    an open forum; isn't that fair to say?
25              MR. NICHOLAS SMITH:  It is fair to say, Your
```

1    Honor, and -- but that goes to how these people --

2    individuals -- the 60 individuals got into this Telegram

3    message, and this connects up to a larger point about

4    basically a series of claims the Government has had -- made

5    in this case, ever-shifting claims to detain Nordean which

6    it's been -- through all right after, and I'll explain how

7    this connects to the Telegram chat.

8            At first, the Government was representing to the

9    Court that these are encrypted communications --

10           THE COURT:  Right.

11           MR. NICHOLAS SMITH:  -- encrypted -- end-to-end

12   encrypted.  And the -- and that's actually a manner and

13   means of the conspiracy, Your Honor.  It turned out the

14   Government was wrong factually.  These messages are not

15   end-to-end encrypted.  Telegram doesn't encrypt messages for

16   group chats, Your Honor.  So there is no -- that whole

17   species of the means of the conspiracy was based on a

18   premise that could have been verified on Google in 30

19   seconds, Your Honor.

20           So there's a second point here, Your Honor.  The

21   Government has said, basically, it comes down to this video

22   that, you know -- Munchel says that the Government has to

23   identify a specific and articulable threat to an individual

24   or the community and vague comments don't suffice about

25   politics, much less comments of other people.  So they say

1    there's a video of a destruction of a barricade.  The

2    Government's brief represents, quote -- it's the video that

3    Your Honor hasn't seen -- quote, Personally dismantled a

4    barricade.  Your Honor, the video you're going to see does

5    not show the defendant touching a barricade, much less

6    physically dismantling it, Your Honor.  It doesn't show him

7    trampling on a barricade, and it doesn't show the

8    destruction of the barricade.  It shows a barricade sideways

9    on the ground, Your Honor.  And the reason this is important

10   is because in the first two attempts to detain Nordean

11   pretrial, there were different explanations for why he

12   needed to be detained pretrial.  They had nothing to do with

13   a barricade, Your Honor.  At first, he was a risk of flight

14   because there was a fake passport in his home.  That claim

15   is --

16            THE COURT:  Mr. Smith, I -- let me just interrupt

17   you on one point just before you -- you've set this up as,

18   Gee, the, you know -- you've set up the video to knock it

19   down, and I'm not so sure that's -- I mean, I asked to see

20   the video today.  They didn't provide it to me.  So I don't

21   think we can -- I don't think it's fair to say, The

22   Government has said it's all about this video, because I

23   don't -- I mean, they reference it.  I understand they do.

24   But I take their argument now at least, and I don't -- I

25   mean, those -- what you're pointing out happened before I

41

1    was assigned to the case, and not that it's not relevant.

2    I'm going to let you complete your point.  But I see their

3    argument or at least -- and at least as I interpret the

4    strongest point of their argument not necessarily a thing

5    about the video, although I think the video's relevant, but

6    it -- I think the planning aspect is -- I mean, put aside

7    the -- I mean, I know you don't want to and I'm not going

8    to, but regardless of what the specifics of these messages

9    say, the thrust of the Government's argument, it seems to

10   me, is the, kind of, leadership/planning aspect of this.

11   Maybe their evidence isn't as strong as in other cases about

12   that, but that seems to me to be at least conceptually what

13   they're arguing.

14          Anyway, continue.  I'm sorry to have taken you

15   away from the thrust of your argument, but I just wanted to

16   make -- you, kind of, set up this video as -- I mean,

17   obviously, Mr. Hull had said he wants me to see it, you

18   know?  I -- now, I really can't wait to see it.  But I don't

19   know that the whole -- the detention decision is going to

20   turn on that, but --

21          MR. NICHOLAS SMITH:  Okay.  Your Honor, fair

22   enough.  The reason we brought up the video is because I

23   believe that Mr. McCullough is using the video to show -- to

24   try to reach for some sort of element of potential

25   violence --

1           THE COURT:  Sure.

2           MR. NICHOLAS SMITH:  -- because in the Munchel

3    decision -- I'm looking at it now and it says that what was

4    important to the court was the absence of evidence that,

5    quote, Munchel or his wife -- or his mother committed any

6    violence on January 6th, the absence of evidence that

7    Munchel or the co-defendant assaulted a person on January

8    6th, and in light -- if -- and what the court said -- that's

9    the end of the quote -- if, in light of the lack of evidence

10   that, quote, Munchel or the co-defendant committed violence

11   on January 6th, the District Court finds that they do not

12   pose a threat of committing violence in the future, the

13   District Court should consider this finding in making its

14   dangerous [sic] determination.  So I think, Your Honor, that

15   the video seems to be what the Court [sic] is using to show

16   potential violence here, but I think Your Honor pointed out

17   something at the beginning of -- before throwing it to the

18   defense that it almost doesn't matter what the video shows

19   about the barricade because, as Judge Katsas pointed out,

20   this determination of the 3142(g) is not backward-looking.

21   It's forward-looking.  So -- and Judge Katsas also pointed

22   out that, The transition has come and gone and that the

23   threat has long passed.

24           So what the Government is trying to do here is to

25   force the Court, notwithstanding Munchel, to look backwards

1    to look at what happened to a barricade on January 6th

2    rather than looking forwards.  And the reason this is so

3    much stronger than Munchel from the defendants' perspective

4    is that Munchel, unlike Mr. Biggs and Mr. Nordean, didn't

5    have a history of perfect compliance with the strictest

6    conditions of confinement that you can imagine that Judge

7    Howell imposed in this case.  We have a record now of the

8    defendants not making mistakes.  They're limited to the

9    Districts in which they live.  They have to wear ankle

10   bracelets.  It becomes very difficult to find work, as Your

11   Honor knows, when you're confined to your home; when you

12   have a child, like the defendant does, to raise.  He's

13   limited to his home.  He has a third-party custodian in the

14   form of his wife who has guaranteed his appearance in these

15   cases.  He's made exemplary efforts to not just get rid of

16   any firearms that could possibly be in his constructive

17   possession, but to get rid of all of his wife's owned --

18   legally owned firearms.  They're gone as well, Your Honor.

19   What you haven't seen is any articulation of what -- how

20   this threat is supposed to materialize.  Judge Katsas says,

21   The transition has come and gone and the threat has long

22   passed.  The Government responds, Well, he's still a danger.

23   These aren't facts.  A danger how?  Where?

24            THE COURT:  Well, their argument is that he's a --

25   he -- it stems from the planning point I was making before.

44

 1    And I'll read you another quote from Munchel.  In our view,

 2    those who actually assaulted police officers and broke

 3    through windows, doors and barricades, and those who aided,

 4    conspired with, planned or coordinated such actions, are in

 5    a different category of dangerousness than those who cheered

 6    on the violence or entered the Capitol after others cleared

 7    the way.  My only point is they -- that the Circuit also put

 8    planners in a category along with other folks who, you know,

 9    did display clear violence that day, etcetera.  I'm not

10    saying that means that carries the day for the Government

11    here at all, but they -- there is that language in the

12    opinion.

13            MR. NICHOLAS SMITH:  And, Your Honor, I thought

14    Your Honor would ask me about this.  So I have a canned

15    response.  I am sorry.

16            THE COURT:  Good.

17            MR. NICHOLAS SMITH:  But what the Circuit was

18    saying, Your Honor, is that if the evidence fits.  The

19    Circuit was not saying if this case falls into a category of

20    offenses regardless of how many times the Government's

21    explanation for its detention decision has shifted --

22            THE COURT:  Sure.

23            MR. NICHOLAS SMITH:  -- no matter what the facts

24    are.  Your Honor, so I think what the court was saying there

25    is that if there's an element of a conspiracy that's

1     factually established that so -- indicates violence in the

2     future at some articulable moment in time, then, of course,

3     the Circuit's saying, you know, we would -- that -- the

4     outcome would be different than in Munchel.

5            But, Your Honor, to go to Your Honor's next --

6     second point which was leadership, leadership per se, of

7     course, is not criminal.  I think, Your Honor -- so -- and

8     plans per se are not criminal.  And I think the Court did a

9     very fine job pointing out that these references to plans

10    and leadership are very equivocal.  I think that's the best

11    way of putting it; that a reference to coming to D.C. to do

12    a plan can't be sufficient to jail somebody for what could

13    be longer than a year when we don't know what -- the

14    Government hasn't shown what that plan is.

15           But, Your Honor, it's worse than that.  Whatever

16    Your Honor might think of the evidence we've put together to

17    try to rebut this plan notion being a conspiracy, Your

18    Honor, I think it's significant that the Court has not

19    contested the veracity of affidavits we've filed showing

20    that Nordean and Mr. Biggs actually did have a plan on

21    January 6th and it was -- involved a musician coming to an

22    Airbnb house they rented in Washington, D.C., around 3:00 to

23    4:00 o'clock.  Now, the Government might come back and say,

24    There is a -- there's a possible conspiracy to assume

25    control of Congress -- one of the most grave offenses you

1    can imagine -- that is not inconsistent with having a music

2    party in D.C. blocks away from the scene of this notorious

3    offense within a number of hours.  The Court -- the

4    Government might say that, Your Honor, but we think at the

5    very least at this stage when an affidavit has not been

6    rebutted and its veracity is not questioned that that

7    serious doubt should have some effect on the weight of the

8    Government -- the weight of the evidence analysis to the

9    extent that conspiracy is -- to the extent that conspiracy

10   is a basis for detention, Your Honor.  So we think that the

11   Court should seriously consider the implications of a plan

12   to hold a music party at 3:00 to 4:00 in the afternoon when

13   the Government is alleging a multi-month, long-planned,

14   intricate conspiracy to assume control of Congress.  We

15   think that's a relevant point, Your Honor.  And so we don't

16   think leadership per se is a basis for detention.

17            And, Your Honor, there's a couple of other points

18   that Mr. McCullough didn't hit on that are relevant here.

19   So as the Court knows, we're still in the pandemic.  The

20   trial calendar is very congested.  The Government might say

21   that's the fault of the defendants, not their charging

22   decisions, but nevertheless there's a very congested

23   calendar from the Capitol cases.  There is still a prison

24   pandemic in -- it is well known, and Your Honor could almost

25   take judicial notice at this point, that there is a much

1     higher incidence of COVID-19 in jails and prisons than out

2     in the outside world.  And as a result of that, you're

3     seeing hundreds and thousands of prisoners who have been

4     convicted of crimes that are beyond, you know, comparison

5     with what's alleged in this case -- you're talking about

6     leaders of mafia families being released; you're talking

7     about importers of tens of thousands of, you know -- dozens

8     of kilos of cocaine being released; armed violent felonies

9     of criminals being released, having their sentences reduced.

10    The other day, Your Honor, I saw one where a double life

11    sentence was reduced to time served because of COVID-19.

12         So this is -- this context is important, Your

13    Honor, because you have the Government saying, although two

14    federal judges have found that there -- that 3142(g) is not

15    satisfied, there are conditions of confinement.  Although

16    they're complying with their conditions; although the

17    conspiracy charge is based on things that might not be a

18    criminal conspiracy, Your Honor, they should go to prison --

19    jail for possibly up to a year or longer in the middle of a

20    pandemic, Your Honor, when there are people who have been

21    convicted of more serious crimes -- not alleged,

22    convicted -- who are being released.

23         So Your Honor, I don't understand the Government's

24    position with how those two things are reconcilable, Your

25    Honor.  So we think that if a defendant is complying with

1    his strict conditions, to jeopardize their lives and put

2    them in jail when people who are convicted are being

3    released, Your Honor, is not appropriate, and we think

4    that's why the Government doesn't have a response to that

5    point, Your Honor.

6            And the last point I'll make, Your Honor, is these

7    -- the Government's motions are based on proffers.  This

8    isn't like a trial where the evidence -- there's a fact

9    finder who's had an opportunity to weigh the evidence and

10   decide the claims.  These are -- these cases are based on

11   the Government's proffers basically saying, you know, the

12   Government's credible, they're putting forward this

13   evidence, and the Court should trust it.  But, Your Honor,

14   there's this.  I don't think that the history of the efforts

15   to detain Nordean should be disregarded here as though they

16   didn't happen.

17           The Court will see in our papers that they -- the

18   Government initially claimed that Nordean was a flight risk

19   because of a passport that looked like him.  It turned out

20   that was not accurate.  But it also -- the Government

21   represented this passport had been found next to Nordean's

22   bed.  The purpose of that representation, Your Honor, was to

23   show that he's a flight risk.  But it actually wasn't found

24   next to his bed.  It was found in his wife's jewelry box,

25   and this is significant because it's a falsehood, Your

1    Honor.  It's a falsehood that's put forward in an attempt to

2    detain someone pretrial.  The claim has been abandoned, Your

3    Honor.

4            But there's something more significant, and this

5    is the last point.  In front of Judge Howell, the Government

6    represented that Nordean used, quote, Encrypted

7    communications on January 6th to lead a multi-point invasion

8    of the Capitol.  Okay?  At the same time it made that

9    representation, it had Nordean's phone.  It had seized his

10   phone.  The phone showed that his -- the record showed his

11   phone was off during January -- the January 6th events, Your

12   Honor.  So why is the Government saying that Nordean used

13   encrypted communications on January 6th to lead a

14   multi-point invasion if his phone is off?  But it's worse,

15   Your Honor.  The Government also said he used a BaoFeng

16   radio which is a ham radio, an amateur radio, to lead people

17   into the Capitol if his phone didn't.  It turned out, Your

18   Honor, that he didn't receive that radio until after January

19   6th.  Then the Government comes back and says, Actually, the

20   radio we seized from his home is not the one that he got

21   after the 6th.  But it turns out it was, Your Honor.  So the

22   larger point is not -- it's not the minutia of these points,

23   but at what point do the shifting explanations and

24   rationales for detention mean something, Your Honor?

25           THE COURT:  All right.  Very well, Mr. Smith.  I

1    read your papers on that latter point.

2         As to the point about COVID, you mentioned a case

3    in which someone -- a defendant's two lifetime sentences

4    were reduced to time served; is that --

5         MR. NICHOLAS SMITH:  Correct, Your Honor.

6         THE COURT:  That was not one of my cases, was it?

7         MR. NICHOLAS SMITH:  No.

8         THE COURT:  No, I didn't think so.

9         All right.  Let's -- let me hear, Mr. Hull, from

10   you, please.

11        MR. HULL:  Good afternoon, Your Honor.

12        And let me, first of all, say that I support

13   almost everything that Mr. Smith said, but let me make some

14   points that are related, supportive of his arguments and, I

15   think, very important.

16        I want to step back a little bit.  All of -- we're

17   all lawyers.  Most people in this room or this discussion

18   are lawyers.  We like theories.  And the Government has had

19   a number of rolling theories in this case about how this all

20   occurred, and I made a list of them that I'm not going to go

21   through in graphic detail, but they, kind of, go like this.

22   The Proud Boys were responsible for this.  The second theory

23   was that there was multiple small conspiracies of people and

24   groups of people who did this and the rest of it was

25   spontaneous and, kind of, attributable to the madness of

1    crowds, if you will.  The third is Oath Keeper, Three

2    Percent.  The fourth theory was -- and my favorite -- Alex

3    Jones, Roger Stone; then, about three weeks ago, it was back

4    to an alliance between Proud Boys and Oath Keepers probably

5    in Central Florida, although I guess both the indictments

6    and the news media had problems putting those two together.

7    So that was abandoned for a while.  Now, we're back to Oath

8    Keeper.  And I'm not sure what it will be next week, but I

9    just gave you six.

10            I like theories.  That's one of the reasons I

11   became a lawyer.  I like ideas.  But I think we need to

12   really be thinking about all of this as, you know, officers

13   of the court, me for my client, Joe Biggs.  Why are we

14   rolling theories and, at the same time which is just as

15   important, having accumulating or snowballing discovery

16   going at the same time?  We've got new theories that are

17   being put forth in large part arising out of certain

18   indictments, and that's fine.  They can, you know, plead

19   alternatively.  They can be inconsistent.  But we have

20   accumulating discovery at the same time.  And from what I

21   understand -- I went through a lot of the discovery.  I had

22   a little bit of a delay but finally finished the discovery

23   I'd been given -- which is voluminous -- over the weekend.

24   And I understand from talking to Mr. McCullough there will

25   be a lot more discovery.  The discovery in this -- there

1    will be discovery that I can possibly get from other

2    defendants, but certainly I will get from the Government.  I

3    appreciate the discovery has not -- I appreciate that it is

4    trickling in, if you will, but that tricking in is, from

5    what I understand, at some point, likely to be from time to

6    time a snowball.  We've got -- a snowballing, if you will.

7    So we've got all these shifting theories and discovery that,

8    you know, keeps building up and, at the same time, I have a

9    client who is here today, I think, because, in fact, we are

10   in detention land.  We're talking about, is he dangerous?

11   And we're also talking about whether he's a flight risk,

12   whether he would flee.  So I would hope that the Court

13   could, kind of, look at all of this through the lens of

14   shifting theories and more discovery to come, because

15   there's quite a bit.  And Mr. Smith's right.  There's a

16   tendency here a little bit, maybe, by everyone on both sides

17   to cherry-pick about what's there, but I understand a lot

18   more is coming.

19            Now, on Mr. Biggs himself, Mr. Biggs was

20   arrested -- and I say that in quotations -- turned himself

21   over on January 20th, Inauguration Day.  He did that to the

22   care of two FBI agents that he knew.  One in particular,

23   he'd known for a long time.  He has been on home detention

24   for -- I wrote this down -- 11 weeks or 77 days or 2 months

25   and a week.  There's different ways of, you know, putting

1    it.  And the day that -- two days after the Government filed

2    its motion -- they filed it on a Saturday.  On Monday, I got

3    in touch with Mr. Biggs's probation officer or Pretrial

4    Services person and there is in Document No. -- I filed two

5    versions of it, one proofread -- better proofread and the

6    other was the original, 42 and 47.  And you will see at the

7    end of that one exhibit is where the Pretrial Services,

8    Mr. Sweatt, in Orlando says he -- that, I have no concerns

9    about his compliance with his conditions of release or his

10   location monitoring equipment.

11          Now, what's really interesting -- and I did not

12   notice this until really about a week ago -- is that the

13   same day or the day afterwards, there was also a Pretrial

14   Services report, I think, that His Honor had ordered from

15   D.C.  And D.C., of course, has had Orlando be the Pretrial

16   Services point people.  That would be Charles Sweet --

17   excuse me, Charles Sweatt, not Sweet.  And there is a

18   comment in there that was given to Christine Schuck -- I

19   might be mispronouncing her name -- who's with Pretrial

20   Services in D.C., and that is that Mr. Biggs has been super

21   compliant.  Super compliant since January 20th.  Your Honor,

22   you've probably seen more reports than I have.  I've seen a

23   lot of these.  Maybe Mr. McCullough's seen more.  But I have

24   never seen the nomenclature "super compliant" be used in a

25   Pretrial Services assessment of someone who was a defendant

1     in a case, and I wanted to bring that to your attention.

2                  As, I think, the Court knows from my filing which

3     is hopefully short and sweet, the primary thing in

4     Mr. Biggs's life is a young daughter who's --

5                  (Brief interruption.)

6                  Excuse me.  I'll get rid of that.  I apologize.

7                  (Brief pause.)

8                  My apologies.

9                  The primary thing in Mr. Biggs's life and has been

10    for three or four years under this -- excuse me, under --

11    three years under this regime is a daughter who he

12    extricated for a lot of different reasons from Austin,

13    Texas, when he moved in 2018 to the Ormond Beach area.  When

14    he is at home during the day, he has primary care for his

15    daughter.  She will turn four this month.  And there are

16    other people that can help, but that is the primary thing in

17    his life, and it may be the reason why he's been speaking

18    almost daily -- pretty close to daily, maybe, about four or

19    five days -- would be an exception to his Pretrial Services

20    person, Mr. Sweatt, in Orlando.  He has been -- as I've

21    mentioned in other hearings, he's been a model pretrial

22    defendant.

23                  I don't know -- I could go on about certain

24    aspects of Mr. Biggs not being dangerous and not being a

25    risk, but I'm not sure that -- I think, maybe, if the Court

1    would ask me some questions, I'd be happy to field them.

2    But I'm not sure that I need to say much more than what's in

3    the record about his compliance so far.  Is he dangerous?

4    Is he a risk?  The answer to both is clearly no.  We can

5    nitpick on some things.  It happened with respect to the

6    fence; what planning is; what fundraising is; and what

7    certain comments are that were made, sort of, right after

8    this event, but I would like to focus on the things I just

9    mentioned about Mr. Biggs's home detention so far.

10              He has, by the way, also been --

11              (Brief interruption.)

12              MR. NICHOLAS SMITH:  Your Honor, if I may, I think

13   I --

14              MR. HULL:  I'm sorry?

15              THE COURT:  Go ahead, Mr. Hull.

16              MR. HULL:  I would be more than happy to answer

17   questions that His Honor had.  There is a number of things

18   that I wrote down when Mr. McCullough was talking, a few

19   points when Mr. Smith was talking, and I'm not sure all of

20   them need to be addressed today, but this has been a model

21   pretrial defendant, and the evidence that's been used so far

22   has been somewhat vague and flimsy and, I think,

23   cherry-picking would be the word that I would use, as well.

24   I was surprised this was filed and, to be honest with you, I

25   asked that it be withdrawn and it was not, and I was

1       surprised at that, too.

2                   THE COURT:  No, Mr. Hull.  I don't have any

3       specific questions.  I think you've made the point about

4       your client and his both lack of a record and compliance

5       while on supervised -- while on release in this case.

6                   Mr. McCullough, why don't I give you -- before we

7       -- so what I plan to do is, then, just pick a very quick

8       turnaround date, have the Government -- Mr. McCullough, I

9       assume -- how quickly do you think you'll be able to get me

10      whatever you -- whatever video you want to get me or --

11                  MR. MCCULLOUGH:  Before the close of business

12      today.

13                  THE COURT:  Okay.

14                  MR. MCCULLOUGH:  Before 5:00 p.m. today.

15                  THE COURT:  All right.  Great.

16                  So before we pick a quick turnaround time, and

17      I'll rule when we come back, I want to allow you,

18      Mr. McCullough, to address anything either Mr. Smith or

19      Mr. Hull has raised in their argument.

20                  MR. MCCULLOUGH:  I appreciate that, Your Honor.

21                  A couple things that Mr. Smith raised.

22                  And so Mr. Smith refers to a series of arguments

23      that the Government made and then had to withdraw or --

24      that's just factually untrue.  The Government made

25      statements as to the use of encrypted messages to lead this

1    group of men.  Now, the -- these messages -- these Telegram

2    messages are encrypted messages, and that is just a fact.

3    And Mr. Smith can shake his head as to what "encrypted"

4    means, but there is a difference between end-to-end

5    encryption and end-to-server encryption, and Mr. Smith can

6    basically make these, kind of, windup arguments as though

7    the Government has changed course.  The Government has put

8    forward Telegram messages in which planning was occurring

9    and there was an understanding at least -- well, the -- I

10   will say this; that these messages could be, you know, kind

11   of, shielded from public view by nuking them and otherwise.

12   So the Government has not withdrawn its claim as to the use

13   of this Telegram messaging application from which Telegram

14   proudly declares they've never answered service of process

15   on.  So I think that's pretty stark that that's where this

16   planning was going on and that's where they're talking about

17   the use of -- sorry, they're talking about, kind of, you

18   know, Let's all, you know -- every -- all the planning stops

19   now unless we're going to be, you know, brought up on gang

20   charges.  So I think that's pretty significant.

21          Second, this question about the passport.  Your

22   Honor, you can see Mr. Nordean on the video today.  You can

23   look at other pictures.  Mr. Smith concocted a distorted

24   picture of Ethan Nordean's face and said, Doesn't look

25   anything like him.  Your Honor, it looks exactly like him.

1    And so, you know, Your Honor can make that comparison as

2    well and we can put that in front of you.  Now, the

3    Government did not press forward with the passport argument

4    as to Ethan Nordean and flight risk because he has been home

5    for 30 days and he has not fled.  And I'll point out two

6    things.  Mr. Smith says exemplary compliance with Pretrial.

7    Perhaps true; however, the, you know -- two points in the

8    Pretrial report, one being the do-not-possess-firearms.  In

9    the Pretrial report, On March 31st, 2021, the supervising

10   officer reported that defendant informed him he was missing

11   a firearm and he hadn't reported it stolen.  The firearm was

12   reportedly stolen in late December or early January.  Just

13   went missing, as it does.  You know what else is missing?

14   His passport.  The defendant reported to the Western

15   District of Washington that he lost his passport.  PSA has

16   no additional information to report.  So you know, this idea

17   about exemplary compliance, I think there's -- there are

18   some issues there, you know?

19          Finally, you know, with respect to, kind of, this

20   idea that there's no future dangerousness, the leadership

21   point that Your Honor pointed to from the Munchel decision

22   is important.  It is critical.  There are specific and

23   articulable issues that can arise with someone like

24   Defendant Ethan Nordean and Defendant Joe Biggs who are able

25   to plan and organize a group of men to take a violent and

1    criminal action.  Mr. Smith referred to this idea that this

2    is, you know -- that the ransacking of the Capitol would be

3    this kind of a grave crime.  Well, it -- the defendants did,

4    in fact, carry that crime out.  That is what they are

5    charged with.  They are charged with committing a grave act

6    against an institution of democracy.  And the idea that

7    someone walks away from that and says, If you feel bad for

8    law enforcement, you're part of the problem, and, you know,

9    I can't quit this, you know -- I'll lose my family; I'll

10   lose my marriage; I can't quit this, I think that that poses

11   a danger.  And as to what that danger may be, correct, there

12   will not be another counting of the Electoral College vote.

13   But will there be another meeting of Congress, whether it be

14   the State of the Union?  Will there be another meeting of a

15   state or local legislature?  Yes, there will be.  And so

16   that's the issue, is what will this conspiracy wrought in

17   the future?  And I think that there -- for someone that is

18   capable of moving this group of men and to commit these

19   acts, I think that is an important point for Your Honor to

20   consider.

21        So that -- those were the primary points that I

22   wanted to make and, Your Honor, thank you very much.

23        MR. NICHOLAS SMITH:  Your Honor, since the

24   Government referenced the quality of the evidence we

25   submitted, I'd just like to quickly respond to --

1          THE COURT:  I'll give you a minute, Mr. Smith.

2          MR. NICHOLAS SMITH:  Thank you, Your Honor.

3          So Mr. McCullough just said that the defense

4     concocted the passport photo of Mr. Nordean that we

5     submitted in our briefs.  We didn't concoct it.  It was

6     taken right from the Government's briefs.

7          On the second point, the stolen firearm point,

8     Mr. Nordean has already cleared this up with his probation

9     officer.  The fact is, it took him several steps under a

10    state procedure to track down the firearm to accurately

11    represent to the probation officer that it had been stolen

12    and the context and the facts in which it had been stolen.

13    It was left in a vehicle in December or January before a

14    get-together in Seattle.  The doors were left unlocked.  The

15    gun was taken out.  And the reason Mr. Nordean explained

16    this to the probation officer in March was he had to verify

17    his facts to get them represented accurately to the

18    probation officer.  And, Your Honor, the probation officer,

19    Mr. Beetham, now acknowledges that there's nothing untoward

20    about the stolen firearm claim.

21         The one last point, Your Honor, is that you'll

22    notice that Mr. McCullough did not respond to my point about

23    the phone being off during the day or Mr. Nordean supposedly

24    using BaoFeng radios, although he didn't possess them on

25    January 6th.  There's no response to that point and it's

1    significant, Your Honor.

2              And finally, Your Honor, the thrust of the

3    Government's argument here is that there's some sort of

4    danger that's possible even though he's locked up in his

5    home.  They've seized his phone, but let's say there was

6    some theoretical way in which he could communicate

7    inappropriately with others from within the confines of his

8    phone [sic].  That's, sort of, where the Government has

9    retreated to at this point; that there could be

10   communications within a home.  So Your Honor, as Your Honor

11   knows, there are --

12             THE COURT:  But, Mr. Smith, when you say within a

13   home, you mean using a computer.

14             MR. NICHOLAS SMITH:  Well, within the place in

15   which he's now -- his strict conditions of release now

16   include home confinement.

17             THE COURT:  Right.  No, I understand that --

18             MR. NICHOLAS SMITH:  So with --

19             THE COURT:  -- but my point is --

20             MR. NICHOLAS SMITH:  With a computer --

21             THE COURT:  Right.

22             MR. NICHOLAS SMITH:  -- and I think Your Honor

23   knows that it's not unusual at all, if that is the

24   Government's argument, to impose a separate special

25   condition that would prevent those -- exactly the sorts of

1      communications the Government is discussing.  And, in fact,

2      some judges in the Capitol cases have imposed that

3      condition.

4              THE COURT:  Well, I -- you were going to -- that's

5      where I was about to wind up in this whole thing.  That was

6      a -- something I was going to raise, but continue.

7              MR. NICHOLAS SMITH:  And so, Your Honor, we think

8      that if -- a condition -- if the Court is inclined to

9      subscribe to the Government's theory of risk in this case

10     which is virtual risk, the Court could simply impose a

11     condition that would prevent the defendant from not just

12     discussing the case except through lawyers with defendants

13     but from any Proud Boy, period.  And in that case, there is

14     no -- then that leaves no articulable risk that the

15     Government has identified to anyone in society.

16             THE COURT:  Well, you have -- you -- the question

17     is whether he would comply, but -- so --

18             MR. NICHOLAS SMITH:  Well, and he -- I -- we would

19     argue his perfect compliance to date would -- is indicative

20     of his compliance with a special condition.  But, Your

21     Honor, the last point that Mr. McCullough made was that the

22     future risk is not concerning January 6th.  Judge Katsas

23     said we have to look forward, not backward.  So the Court --

24     so the Government has pointed to future meetings of

25     Congress, Your Honor, but that's exactly the point that

 1    Judge Katsas addressed in his dissent.  He said that the

 2    Government in that case -- in the Munchel case had said,

 3    What about March 4th?  There was a threat to the Capitol on

 4    March 4th.  Your Honor probably knows the city was on

 5    lockdown, and then this threat didn't materialize.  And what

 6    Judge Katsas said is the Government cannot keep coming back

 7    with threats that don't materialize when they're not

 8    connected to the defendant in the case.

 9             THE COURT:  All right.  I've heard enough on

10    Munchel.  I mean, I would just say the fact that a threat

11    doesn't materialize doesn't mean there is no threat going

12    forward, you know?  The absence of evidence is not the -- is

13    not evidence of absence -- whatever that old saying is.

14             All right.  So --

15             MR. HULL:  Your Honor, may I have two minutes?

16             THE COURT:  Who -- Mr. --

17             MR. HULL:  Two minutes?

18             THE COURT:  What -- I -- yes, you can have one

19    minute.  How's that?

20             MR. HULL:  I -- thank you, Your Honor.

21             I wanted to make a couple of comments about --

22    responses quickly to what Mr. McCullough had said about

23    planning, fundraising -- which we're not too worried --

24    these kinds of things, and I would also ask that all the

25    parties be allowed to supplement somehow, if they did it

```
1    within 24 hours, what's been done here today.

2              THE COURT:  Mr. Hull, you --

3              MR. HULL:  Yes?

4              THE COURT:  This isn't -- Mr. McCullough had made

5    these points before and you had an opportunity to respond to

6    them.

7              MR. HULL:  No, no, no, no, these -- well, he did,

8    and I could do them by way of supplement, but I think

9    they're important to raise here.

10             Mr. Biggs -- and I didn't want to belabor Mr. --

11   my argument on Mr. Biggs that it would be just to have him

12   remain free.  What -- Mr. Biggs has been a planner and a

13   coordinator his whole life.  He planned two events like

14   this.  They always go to the Capitol.  And he's also done

15   them in Portland.  Fundraising is always important and it

16   usually goes to, you know, Airbnb.  The -- what to wear and

17   what not to wear was because of a stabbing that happened on

18   December 12th in the Harrington Hotel and wanted to make

19   sure that Antifa could not easily locate Proud Boys.  There

20   are --

21             THE COURT:  Mr. Hull, all these --

22             MR. HULL:  Yes?

23             THE COURT:  -- arguments you could have made --

24             MR. HULL:  I agree, Your Honor.  I'm done.

25             THE COURT:  This is -- and so if you want to file
```

1     something, I -- if -- because I'm giving -- because I'm

2     letting the Government go ahead and --

3                  MR. HULL:  I would like to.  I was trying to cut

4     this short and let you ask me questions.  That didn't

5     happen.  But I agree.  I will just do it by supplement.

6                  THE COURT:  All right.  If -- let me say this.  If

7     any party wants to file a supplement by the -- by today,

8     you're given permission to file something today -- something

9     responding to our discussion here today.  And we'll come

10    back shortly and I'll make a decision.

11                 But, Mr. Hull, I didn't mean to cut you off.  It's

12    just that -- you could have made -- those are all points you

13    could have made when I called on you to make your argument.

14    So you know, I --

15                 MR. HULL:  You're exactly correct, Your Honor.  I

16    stand corrected.  I appreciate your comments.

17                 THE COURT:  All right.  So let me ask the parties

18    if they're available -- just looking at -- I have quite a

19    full week.  How does 3:00 o'clock on Thursday work or 2:00

20    o'clock on Friday?

21                 Mr. McCullough, for you first.

22                 MR. MCCULLOUGH:  Both of those times work for the

23    Government, Your Honor.  Thank you.

24                 THE COURT:  All right.  Mr. Smith?

25                 MR. NICHOLAS SMITH:  Your Honor, we would prefer

1    the earlier hearing, if --

2             THE COURT:  Thursday?

3             MR. NICHOLAS SMITH:  Yes.

4             THE COURT:  Thursday at 3:00 o'clock.  All right.

5             MR. DAVID SMITH:  Excuse me, Your Honor.  I have

6    to butt in here.  David Smith here.

7             THE COURT:  Yes.

8             MR. DAVID SMITH:  I can't make it on Thursday.  My

9    partner doesn't realize that because I just -- I -- he

10   doesn't have my calendar.  I can do it on Friday at 2:00

11   o'clock, though.

12            THE COURT:  All right.  Mr. Hull, can you do it

13   at -- Friday at 2:00 o'clock?

14            MR. HULL:  Yes, sir.

15            THE COURT:  All right.  So I'll receive whatever

16   additional -- whatever supplements the parties want to file

17   today; and, Mr. McCullough, I'll receive that -- you'll send

18   someone over with the video; and then we'll be back here

19   Friday at 2:00 o'clock in which -- at which time I will

20   rule.

21            Right now -- let me just ask -- I guess,

22   Mr. McCullough, you're the best person to ask.  I know --

23   what is the -- had we tolled the speedy trial clock until we

24   were -- until our last scheduled hearing on the 8th?

25            MR. MCCULLOUGH:  That -- our last scheduled

67

1    hearing on the --

2              THE COURT:  I'm sorry, the 1st.

3              MR. MCCULLOUGH:  -- 2nd -- the 1st --

4              THE COURT:  On the --

5              MR. MCCULLOUGH:  On Thursday --

6              THE COURT:  The 1st.

7              MR. MCCULLOUGH:  -- the 1st.  Correct.

8              THE COURT:  The 1st.

9              MR. MCCULLOUGH:  So we were tolled through April

10   1st.  I think these -- I think we should -- the Government

11   would propose to continue tolling from the 1st and through

12   this date and until Your Honor renders a decision on this

13   motion.  The efforts to provide discovery to the defendants

14   is ongoing.  As you -- as Your Honor has pointed out, the

15   discovery is quite voluminous; will give the defendants an

16   opportunity to receive and review that discovery.  So the

17   Government would submit that tolling is in the interests of

18   justice at least through the time of Your Honor rendering a

19   decision.  The Government would also submit that there --

20   that that time should continue to toll afterwards.  The

21   Government has not obtained Mr. Smith or Mr. Hull's view on

22   that.

23             THE COURT:  All right.  Mr. -- let me ask

24   Mr. Smith and Mr. Hull.  I'm not going to ask you to toll it

25   or suggest that we toll it until I -- I mean, at -- to some

1    indeterminate time in the future.  My thought is we could do

2    it nunc pro tunc to the 1st which is where, I think, we left

3    off and then simply to Friday, the 9th.  So it would be nunc

4    pro tunc from the 1st to the 9th and for the reasons the

5    Government laid out in terms of voluminous discovery.  I'll

6    rule when we come back on the 9th, and then we'll figure out

7    where we go from here with regard to speedy trial.

8            MR. NICHOLAS SMITH:  No objection, Your Honor.

9            MR. HULL:  No objection.

10           THE COURT:  All right.  So that's what I will do.

11           I will find that the time nunc pro tunc to April

12   1st through our next hearing April 9th is excludable under

13   the Speedy Trial Act because the ends of justice that are

14   served by taking such action outweigh the best interests of

15   the public and this -- and the defendant -- both defendants

16   in a speedy trial.  I'm doing so here to give the defendant

17   -- both defendants a continuing opportunity to receive the

18   very voluminous discovery in this case.  And we will further

19   address that, then, on the 9th.

20           Is there anything further, Mr. McCullough?

21           MR. MCCULLOUGH:  No, Your Honor.  Thank you.

22           THE COURT:  All right.  Is there anything further,

23   Mr. Smith?

24           MR. NICHOLAS SMITH:  No.  Thank you, Your Honor.

25           THE COURT:  Anything further, Mr. Hull?

1          MR. HULL:  No, sir.

2          THE COURT:  All right.  Very well.  I will see

3     everyone on Friday and we will go from there.

4          Counsel are dismissed.

5          (Proceedings concluded at 1:25 p.m.)

6                    * * * * * * * * * * * *

7          **CERTIFICATE OF OFFICIAL COURT REPORTER**

8     **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

9     **that the above and foregoing constitutes a true and accurate**

10    **transcript of my stenographic notes and is a full, true and**

11    **complete transcript of the proceedings to the best of my**

12    **ability, dated this 14th day of April 2021.**

13                          **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                            **Official Court Reporter**
14                          **United States Courthouse**
                            **Room 6722**
15                          **333 Constitution Avenue, NW**
                            **Washington, DC 20001**

16

17

18

19

20

21

22

23

24

25

```
                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.
                                  Washington, D.C.
1-ETHAN NORDEAN                   Monday, April 19, 2021
2-JOSEPH RANDALL BIGGS,           12:00 p.m.

              Defendants.
- - - - - - - - - - - - - - - - x
```

_____

                    TRANSCRIPT OF ORAL RULING
         HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                 UNITED STATES DISTRICT JUDGE

_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Jason B. A. McCullough, Esq.
                          Luke M. Jones, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          David B. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

2

1          **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3     criminal matter 21-175, United States of America v.

4     Defendant 1, Ethan Nordean; Defendant 2, Joseph Randall

5     Biggs.

6              Present for the Government are Jason McCullough

7     and Luke Jones; present from Pretrial Services are Christine

8     Schuck and Shay Holman; present for Defendant 1 are David

9     Smith and Nicholas Smith; present for Defendant 2 is John

10    Hull; also present is Defendant 1, Mr. Nordean; and

11    Defendant 2, Mr. Biggs.

12             THE COURT:  All right.  Well, good afternoon to

13    everyone.

14             And my apologize -- my apologies for having to

15    delay ruling on these motions a few times.  The parties

16    continued to submit materials to me right up until, I think

17    it was, April 13th.  I had a little health issue that

18    sidelined me a few days, and then I had another emergency

19    matter that was assigned to me late last week, and so that's

20    the reason for the delay.

21             Pending before me are the Government's motions to

22    revoke pretrial release as to Defendant Ethan Nordean,

23    according to the second superseding indictment -- or

24    according to the superseding indictment, also known as Rufio

25    Panman -- that's ECF No. 30 -- and Defendant Joseph Biggs,

1    ECF No. 31.  I am going to grant the motions and order the

2    defendants detained until trial for the reasons that follow,

3    obviously, subject to whatever process the defendants may

4    undertake with our Court of Appeals.

5                    THE DEPUTY CLERK:  Excuse me, Judge Kelly.

6                    THE COURT:  Yes?

7                    THE DEPUTY CLERK:  We seem to have lost Mr. Biggs.

8    I know he said that he was experiencing some storms down in

9    Florida and we may lose him.  He has the phone number to

10   call in.  So hopefully, we can get him back, but at this

11   time he is not on the hearing.

12                   THE COURT:  All right.  Let me ask Mr. Hull.

13   Obviously, you'll have a transcript of our ruling here today

14   to share with your client.  My inclination would be just to

15   keep going on the ruling and even without your client being

16   present, given the technological problems.

17                   MR. HULL:  No objections, Your Honor.  That would

18   be fine.

19                   THE COURT:  All right.  First, let me -- let me

20   first run through some history in the case to describe how

21   we got here.  Defendant Nordean was arrested on a warrant

22   linked to a criminal complaint on February 3rd in his home

23   state of Washington.  And at a detention hearing a few days

24   later, he was ordered released by a magistrate judge there,

25   but the Government asked for and received a stay of that

1     order from Chief Judge Howell until she had the opportunity

2     to take up the Government's renewed motion to detain him.

3          On March 3rd, Chief Judge Howell heard argument on

4     the Government's motion to detain Nordean.  She noted that

5     many of Nordean's remarks and activities before January 6th

6     were very troubling.  The Government's argument for

7     detention, though, focused on Nordean's role as a leader and

8     organizer of what happened on January 6th.  And on that

9     score, Chief Judge Howell found the evidence related to his

10    role in planning coming -- that he -- she found that it came

11    up short of warranting detention.  Moreover, she noted, the

12    proffered evidence of what Nordean actually did on that day

13    did not suggest dangerousness in a way that defendants'

14    conduct has -- other defendants' conduct has in other

15    Capitol riot cases.  For example, there was no evidence that

16    Nordean carried a weapon and no evidence that he injured any

17    law enforcement officer.  In the end, she decided that the

18    Government had not met its burden and that there were a set

19    of conditions or combination of conditions that could

20    reasonably assure Nordean's appearance at future proceedings

21    and the safety of any other person and the community.

22         But Chief Judge Howell also thought -- also said

23    that she thought it was a, Close case -- a, quote, Close

24    case, closed quote, as to whether detention was warranted

25    and suggested that the judge assigned to the case could end

1    up reviewing the matter all over again.  She released

2    Nordean with a series of conditions, including home

3    detention, location monitoring, and requirements that he

4    surrender his passport and not possess firearms or other

5    weapons in his home.  Later that day, the grand jury

6    returned a superseding indictment against Nordean.

7            Defendant Biggs -- or, in fact, at that point, I

8    guess it would have just been an -- the first indictment

9    against Nordean.

10           MR. MCCULLOUGH:  That is correct, Your Honor.

11           THE COURT:  All right.

12           Defendant Biggs was arrested in his home state of

13   Florida -- before Nordean was -- on January 20th, and he was

14   charged via complaint.  The Government did not seek his

15   detention at that time.  He was released in that

16   jurisdiction by a magistrate judge there with similarly

17   tight conditions of release, again, home detention and

18   location monitoring, and the conditions also required him to

19   turn in his passport and not possess any firearms or

20   weapons.

21           Then on March 20th, the grand jury returned a

22   superseding indictment -- there it is -- against Nordean,

23   Biggs, and two additional defendants, Zachary Rehl and

24   Charles Donohoe, and charged them with, among other

25   offenses, conspiracy under 18 United States Code Section

1       371.  And the Government moved to revoke both Nordean's and

2       Biggs's pretrial release after the superseding indictment

3       was returned against them.  The Government also proffered

4       new evidence to back up its request in the form of a series

5       of Telegram messages that pertained to the defendants,

6       uncharged co-conspirators, and others.  Over the next few

7       weeks, and even after I held argument on the motion, the

8       parties peppered me with additional pleadings and evidence

9       right up until a few days ago on April 13th.

10               Before I talk about the nature and circumstances

11      of the offense as a whole, let me set out the basic legal

12      framework we're operating under.

13               Quote, In our society, liberty is the norm, and

14      detention prior to trial or without trial is the carefully

15      limited exception, closed quote.  That's United States v.

16      Salerno, 481 U.S. 739 at 755, a Supreme Court case from

17      1987.  Under the Bail Reform Act, or the BRA -- that's 18

18      United States Code Sections 3141 through 3156 -- quote,

19      Congress limited pretrial detention of persons who are

20      presumed innocent to a subset of defendants charged with

21      crimes that are the most serious compared to other federal

22      offenses, closed quote.  That's United States v. Singleton,

23      182 F.3d 7 at 13, a D.C. Circuit case from 1999, and

24      quoting, The most serious -- the quote, The most serious --

25      quoting Salerno, 481 U.S. at 747.  Thus, a detention hearing

must be held at the Government's request only in a case that involves a charged offense falling in one of five enumerated categories, 18 United States Code Section 3142(f)(1)(A) through (E), or if the defendant poses a serious risk of flight or of trying to obstruct justice or threaten, injure, or intimidate a witness or juror.  And the cite there is Section 3142(f)(2)(A) through (B).

A subset of offenses requiring a detention hearing triggers a rebuttable presumption, quote, That no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer believes [sic] there is probable cause to believe that the person committed, closed quote, that subject [sic] of offenses.  That's Section 3142(e)(3).  This subset includes any, quote, Offense listed in Section 2332b(g)(5)(B) of Title 18, United States Code, for which a maximum term of imprisonment of 10 years or more is prescribed, closed quote.  That's 3142(e)(3)(C).  The presumption places, quote, A burden of production on the defendant to offer some credible evidence contrary to the statutory presumption, closed quote.  That's United States v. Taylor, 289 F. Supp. 3d 55 at 63, a D.D.C. case from 2018, quoting United States v. Alatishe -- that's A-L-A-T-I-S-H-E -- 768 F.2d 364 at 371, a D.C. Circuit case from 1985.  But even when the defendant offers evidence to

1    rebut the presumption, it, quote, Is not a bursting bubble

2    that becomes devoid of all force once a defendant has met

3    his burden of production.  That's Taylor, 289 F. Supp. 3d at

4    63, quoting United States v. Jessup, 757 F.2d 378 at 387, a

5    First Circuit case from 1985.  Instead, the presumption is,

6    quote, Incorporated into the other factors considered by the

7    court in determining whether to grant a conditional release

8    and is given substantial weight, closed quote.  That's

9    United States v. Ali, 793 F. Supp. 2d 386 at 391, a D.D.C.

10   case from 2011.

11         Now, the BRA provides that a judicial officer,

12   quote, Shall order, closed quote, the detention of the

13   defendant before trial if, after a detention hearing held

14   under 18 United States Code Section 3142(f), and upon

15   consideration of, quote, The available information

16   concerning, closed quote, certain enumerated factors --

17   that's, again, Section 3142(g) -- quote, The judicial

18   officer finds that no condition or combination of conditions

19   will reasonably assure the safety of the appearance as --

20   the appearance of the person as required and the safety of

21   any other person and the community, closed quote.  That is

22   Section 3142(e)(1).  In common -- quote, In common parlance,

23   the relevant inquiry is whether the defendant is a flight

24   risk or a danger to the community.  United States v.

25   Vasquez-Benitez, 919 F.3d 546 at 550, a D.C. Circuit case

1      from 2019.  The BRA requires that detention be -- the BRA,

2      quote, Requires that detention be supported by clear and

3      convincing evidence when the justification is the safety of

4      the community, closed quote.  That's United States v.

5      Simpkins, 826 F.2d 94 at 96, a D.C. Circuit case from 1987.

6      And even if the defendant does not pose a flight risk,

7      danger to the community alone is sufficient reason to order

8      pretrial detention.  That's Salerno, 481 U.S. at 755.

9           So in order -- in assessing whether pretrial

10     detention or release is warranted, the judicial officer

11     must, quote, Take into account the available information

12     concerning, closed quote, these four factors: one, the

13     nature and circumstances of the offense charged, including

14     whether the offense is a crime of violence; two, the weight

15     of the evidence against the person; three, the history and

16     characteristics of the person, including the person's

17     character, physical and mental condition, family ties,

18     employment, financial resources, length of residence in the

19     community, community ties, past conduct, history relating to

20     drug or alcohol abuse, criminal history, and record

21     concerning appearances at court proceedings, closed quote;

22     and, four, quote, The nature and seriousness of the danger

23     to any person or the community that would be posed by the

24     person's release, closed quote.  And all of those factors

25     are found at -- those four factors are found at 18 United

10

1    States Code 3142(g).  At the detention hearing, both the

2    Government and the defendant may offer evidence or proceed

3    by proffer.  That's United States v. Smith, 79 F.3d 1208 at

4    1210, a D.C. Circuit case from 1996.

5            If a judicial officer [sic] is ordered released

6    under Section 3142 by a judicial officer, including, quote,

7    By a magistrate judge, closed quote, the BRA allows the

8    Government, quote, To file, with the court having original

9    jurisdiction over the offense, a motion for revocation of

10   the order or amendment of the conditions of release.  That's

11   18 United States Code 3145(b).  In this case, given the

12   return of the superseding indictment with new factual

13   allegations, new substantive charges, and a proffer of new

14   evidence, I don't understand my role here in resolving these

15   motions as reviewing either Chief Judge Howell's order or

16   the magistrate's order in Mr. Biggs's case.  I'm making my

17   own independent determination on this detention question.

18   Therefore, I don't believe I owe any deference to the

19   determinations made by those judges, again, which were based

20   on different charging documents, different substantive

21   charges, and different proffered evidence.  In any event,

22   even if I were reviewing the magistrate's decision in

23   Biggs's case, District Courts in this District typically

24   review such decisions de novo, and every Circuit to have

25   decided the question, although not the D.C. Circuit, has

1      said that that is the correct standard.

2              Now, the Government mainly seeks to detain Nordean

3      and Biggs under 18 United States Code Section 3142(e)(3)(C)

4      which provides a rebuttable presumption of detention if

5      there is probable cause to believe that they committed,

6      quote, An offense listed in Section 2332b(g)(5)(B) of Title

7      18, United States Code, for which a maximum term of

8      imprisonment of 10 years or more is prescribed, closed

9      quote.  The grand jury found probable cause to believe that

10     they committed such an offense.  18 United States Code 1361,

11     destruction of government property, is the offense charged

12     in Count 4 of the superseding indicted -- indictment, and it

13     is specifically enumerated in 18 United States Code

14     2332b(g)(5)(B)(i).  Count 4 charges both defendants with the

15     felony variety of that offense, as it alleges that they,

16     quote, Together with those known and unknown aided and

17     abetted others known and unknown to forcibly enter the

18     Capitol and thereby caused damage to the building in an

19     amount more than $1,000, closed quote.  That felony offense

20     carries a maximum sentence of 10 years in prison.  And under

21     Circuit precedent, the return of that indictment, quote,

22     Makes conclusive the existence of probable cause to hold the

23     accused for further prosecution, closed quote.  That's

24     United States v. King, 482 F.2d 768 at 776, a D.C. Circuit

25     case from 1973.  Thus, the defendants are eligible for

1    detention and the rebuttable presumption arises, at least in

2    the first instance.

3              Now, defendants made a few arguments suggesting

4    that pretrial detention is unavailable to the Government as

5    a matter of law here because Count 4 is defective in some

6    way or because the evidence against Nordean and Biggs as to

7    Count 4 is weak.  And just a few points on that.  The

8    statute says there is a rebuttable presumption of detention

9    only if there is, quote, Probable cause, to believe --

10   closed quote, to believe that the defendants committed one

11   of the enumerated offenses which, as everyone here knows, is

12   a relatively low standard.  And, as I mentioned, King says

13   that the return of an indictment charging the offense,

14   quote, Makes conclusive the existence of probable cause to

15   hold the accused.  Now, I don't see anything obviously

16   defective with Count 4 as a matter of law, despite the

17   defendants' arguments, and whether the Government ends up

18   being able to prove felony destruction of property, whether

19   directly or on an aiding and abetting theory, against these

20   defendants really isn't the question before me here today.

21   In light of the text of the statute, though, and King, I

22   think pretrial detention is clearly available to the

23   Government, and the rebuttable does -- presumption does

24   arise under 18 United States Code Section 3142(e)(3)(C).

25             But I'll also point out that defendants are also

1    eligible for detention, at least in my view, under

2    3142(f)(1)(A).  Because the grand jury has charged felony

3    destruction of property under 18 United States Code 1361, at

4    this point the case clearly, quote, Involves, closed quote,

5    an offense listed in Section 2332b(g)(5)(B) for which a

6    maximum term of imprisonment of 10 years or more is

7    prescribed, no matter what motions the defendant [sic] may

8    eventually file to attack the charging document.  The only

9    difference is if that were the only base [sic] for

10   detention, then the rebuttable presumption would not arise.

11         Now, let me move on to the pretrial detention

12   factors that I must consider.  The first statutory factor

13   requires me to consider, quote, The nature and circumstances

14   of the offense charged, closed quote.  18 United States Code

15   Section 3142(g)(1).  There's a lot to unpack here in this

16   case.

17         Nordean, Biggs and their two co-defendants are

18   charged with six offenses, four of which are felonies.  The

19   felonies include conspiracy, felony destruction of property,

20   in violation of 18 United States Code Section 1361;

21   obstruction of law enforcement during civil disorder, in

22   violation of 18 United States Code 231(a)(3); and

23   obstruction of an official proceeding, in violation of 18

24   United States Code Section 1512(c)(2).  The three

25   substantive felonies are charged under an aiding and

14

1    abetting theory, as well.

2            Now, the 1512(c)(2) offense is one for which the

3    maximum term of imprisonment is 10 -- is 20 years.  So it is

4    plainly a serious offense, at least from that perspective.

5    In addition, as part of this factor, I must also consider,

6    quote, Whether the offense is a crime of violence, a

7    violation of Section 1591, a federal crime of terrorism, or

8    involves a minor victim or a controlled substance, firearm,

9    explosive or destructive device, closed quote.  That is 18

10   United States Code Section 3142(g)(1).  The Government

11   argues, and neither defendant contests, that Congress has

12   characterized one of the offenses, felony destruction of

13   property, as a federal crime of terrorism under the facts

14   proffered by the Government.  18 United States Code Section

15   2332b(g)(5) defines "federal crime of terrorism" as an

16   offense that, quote, Is calculated to influence or affect

17   the conduct of government by intimidation or coercion or to

18   retaliate against government conduct, closed quote, and it

19   is included in an enumerated list of -- and is included in

20   an enumerated list of statutes which includes Section 1361.

21   That is the destruction of property statute.  And see 18

22   United States Code Sections 2332b(g)(5)(A) through (B).

23            But in addition to the maximum sentence that

24   Congress has established, and the characterization of at

25   least one of these offenses as a federal crime of terrorism,

1    it is the broader circumstances of the alleged conspiracy

2    that underscores the seriousness of at least the charges

3    against these defendants.  The grand jury has charged that

4    they conspired with each other and others, one, to stop,

5    delay or hinder Congress's certification of the Electoral

6    College vote, in violation of 18 United States Code Section

7    1512(c)(2); and, two, to obstruct or interfere with law

8    enforcement officers engaged in their official duties to

9    protect the Capitol and its occupants while that was

10    happening, in violation of 18 United States Code 231(a)(3).

11    In other words, the defendants stand charged with seeking to

12    steal one of the crown jewels of our country, in a sense, by

13    interfering with the peaceful transfer of power.  I won't

14    belabor the point, but it's no exaggeration to say that the

15    rule of law, the durability of our constitutional order and,

16    in the end, the very existence of our Republic is threatened

17    by such conduct.

18          But it's also fair to say that the allegations the

19    Government is relying on here are not the kind that courts

20    in our District have typically relied on to detain most

21    January 6th defendants before trial, at least so far,

22    because they lacked some of the usual markers -- the more

23    obvious markers of dangerousness.  For example, as I

24    mentioned before, there's no allegation that Nordean or

25    Biggs carried weapons themselves or that they themselves

1    took it upon themselves to fight with police officers

2    directly.  So let's look closely at the specific factual

3    allegations here.

4          To begin with, it bears noting that the defendants

5    and their alleged co-conspirators are alleged to be leaders

6    in an organization known as the Proud Boys.  The grand jury

7    charges that Nordean was a member of the group's leadership

8    through what's known as an Elders chapter and is President

9    of his local chapter in Washington State.  Biggs is a

10   self-described organizer of Proud Boys events.  The other

11   two co-conspirators are alleged to be Presidents of their

12   local chapters in Philadelphia and North Carolina.  Now,

13   quite obviously, there's nothing criminal about being a

14   member of the Proud Boys or sharing their views.  But these

15   allegations about the defendants are relevant to the nature

16   and circumstances of the offense insofar as they show that

17   the defendants were leaders and shared a pre-existing common

18   bond which provides context to explain how these

19   individuals, from disparate parts of the country, are at

20   least alleged to have wound up together in Washington, D.C.,

21   on January 6th.

22         In addition, defendants and their alleged

23   co-conspirators are alleged to have made statements well in

24   advance of January 6th to the effect that they considered

25   the election stolen and that it was important that something

1   be done about it.  Now, I want to emphasize there is no

2   allegation that these crimes -- that these statements are

3   crimes in and of themselves.  I mean, certainly, using

4   profanity -- which I will have to do on numerous occasions

5   when I -- as I'm reading some of these posts -- isn't a

6   crime either.  But they do shed light on the nature and

7   circumstances of the offense, in my view.  And while I

8   certainly weigh what each co-conspirator said against that

9   specific person more heavily since it goes to the weight of

10  the evidence against them, I do think that I can consider

11  what one co-conspirator is alleged to have said against all

12  the co-conspirators to some degree, again, when I consider

13  the nature and circumstances of the offense.

14          The Government has proffered, or the superseding

15  indictment has alleged, the following.  And I'm going to

16  note the ECF docket number that corresponds to where each

17  one of these things is in the record, including ECF No. 26,

18  which you'll hear a lot, which is the reference to the

19  superseding indictment.

20          So on November 4th, 2020, Biggs posted on social

21  media, quote, The left doesn't realize they are radicalizing

22  people by stealing this election.  They are gonna create

23  their own worst enemy from this, closed quote.  ECF No. 31

24  at 5.  The next day, he posted on social media that, quote,

25  It's time for fucking war if they steal this shit, closed

1    quote.  ECF No. 26 at Paragraph 31.

2              On November 10th, 2020, Biggs posted a list [sic]

3    to an article entitled, The Second Civil War is More

4    Realistic Than You Think, closed quote.  ECF No. 31 at 5.

5              On November 16th, Nordean posted on social media

6    that, quote, What's more disturbing to me than the Dems

7    trying to steal this election is how many people -- and then

8    there's an ellipses, dot, dot, dot -- just accepted Biden

9    won, despite the obvious corruption.  ECF No. 26 at

10   Paragraph 32.

11             That same day, November 16th, Nordean, through a

12   post on his social media, said that, quote, Any militia

13   groups, quote -- closed quote, in his area should contacted

14   him -- should contact him through an encrypted social media

15   application or direct messaging.  That's ECF No. 17 at 12.

16             On November 24, 2020, Biggs, in response to

17   another person's social media post calling for unity after

18   the election, posted, quote, No, bitch.  This is war, closed

19   quote.  That's ECF No. 26 at Paragraph 33.

20             A few days later on November 27th, 2020, Nordean

21   posted that, quote, We tried playing nice and by the rules.

22   Now, you will deal with the monster you created.  The spirit

23   of 1776 has resurfaced and created groups like the Proud

24   Boys and will not be extinguished.  We will grow like the

25   flame that fuels us and spread like love that guides us.  We

19

1    are unstoppable, unrelenting, and now unforgiving.  Good

2    luck to all you traitors of this country we so deeply

3    love -- and then there's an ellipses -- you're going to need

4    it.  ECF No. 26 at Paragraph 34.

5              That same day, Co-Defendant Rehl posted that,

6    quote, Hopefully, the firing squads are for the traitors

7    that are trying to steal the election from the American

8    people, closed quote.  That's ECF No. 26 at Paragraph 35.

9              On December 4th, 2020, as things moved into

10   December and -- Nordean posted, You can take a hard stand

11   now or watch as everything we've built crumble before your

12   eyes and have nothing to leave to your children.  Enough is

13   enough, closed quote.  ECF No. 17 at 12.

14             On December 14, 2020, Biggs posted that the Proud

15   Boys would be coming back to Washington, D.C., and that they

16   would be, quote, Bigger and stronger than ever.  ECF No. 31

17   at 5 to 6.

18             Two days later on December 16, 2020, Biggs posted

19   on social media, quote, This is a war on Americanism.  This

20   is only the beginning, closed quote.  ECF No. 31 at 6.

21             The allegations then turn to include certain types

22   of preparations that the defendants undertook in advance of

23   January 6th.  To provide some context, on January 3rd, 2021,

24   an interview with Biggs was posted on YouTube in which Biggs

25   discussed his role in planning Proud Boys events.  During

20

1    that interview, Biggs stated, quote, When we set out to do

2    an event, we go, all right, what is our main objective?  And

3    that's the first thing we discuss.  We take three months to

4    plan an event.  And we go, what's our main objective?  And

5    then we plan around that to achieve that main objective,

6    that goal that we want.  ECF No. 31 at Pages 6 through 7.

7             Now, the Government alleges that on December 27th,

8    Nordean created an online fundraising campaign soliciting

9    donations for, quote, Protective gear and communications,

10   closed quote, to be used on January 6th.  That's ECF No. 26

11   at Paragraph 37.  And in the days that followed, Nordean is

12   alleged to have exchanged direct messages with several

13   individuals about receiving donations of tactical vests,

14   steel plates, protective gear, communications equipment, and

15   in one instance bear mace to be used on January 6th.  That's

16   ECF No. 17 at 14.  Also in the days that followed, on

17   December 30, 2020, Co-Defendant Rehl posted a link to an

18   online fundraiser with the campaign name of, Travel Expenses

19   for Upcoming Patriot Events, closed quote.  The campaign

20   generated over $5,500 in donations between December 30th and

21   January 4th, 2021.  That's ECF No. 26 at Paragraph 38.

22            Then the day after he created his online

23   crowdfunding campaign, on December 28th, Nordean posted,

24   Fight now or lose everything.  ECF No. 17 at 12.

25            The next day, on December 29, the Proud Boys

1    National Chairman posted a message on social media stating

2    that the Proud Boys would, quote, Turn out in record numbers

3    on January 6th, but this time with a twist.  We will not be

4    wearing our traditional black and yellow.  We will be

5    incognito and we will be spread across downtown D.C. in

6    smaller teams.  And who knows?  We might dress in all black

7    for the occasion.  ECF No. 26, Paragraph 12.  Biggs posted a

8    video message that same day echoing these comments.  Quote,

9    We will not be attending D.C. in colors.  We will

10   bleeding -- we will be blending in as one of you.  You won't

11   see us.  You'll even think we are you.  We are going to

12   smell like you, move like you, and look like you.  The only

13   thing that we'll do that's us is think like us, exclamation

14   point.  January 6th is gonna be epic.  ECF No. 31 at 6.

15          Beginning on January 2nd, 2021, of this year, and

16   continuing through the next day, Nordean exchanged direct

17   messages via social media with an individual who offered to

18   contribute $1,000 to the Proud Boys', quote, Travel fund,

19   closed quote, in order to send, quote, A combat veteran and

20   Marine who wants to get in the street and fight, closed

21   quote, to join the Proud Boys in Washington, D.C., on

22   January 6th, 2021.  That's ECF No. 17 at 14.

23          And in the early days of January 2021, defendants

24   are then alleged to have made additional statements online

25   along the lines of those they made in November and December

1    2020 just about the election and certain political matters.

2           On January 20 -- January 1st, Biggs posted, quote,

3    2021 is the year we take back America, closed quote.  That

4    same day, he posted, quote, Trump exposed the swamp.  Now,

5    we can -- now, we need to cast out every backstabbing

6    Republican.  Rip them from their high horse and put in good

7    men and women who are God-fearing, conservative Christian

8    warriors.  Again, the same day, quote, Mike Pence will

9    betray President Trump.  This is my prediction.  I will be

10   in D.C. to witness this historic Judas moment when he turns

11   on the right thing to do for mere coin.

12          The next day, January 2nd, Biggs posted that

13   people who, quote, Carry thin blue line flags, quote [sic],

14   which indicate support for law enforcement officers, quote,

15   Are totally unaware of what's really going on, closed quote,

16   and that, quote, Most law enforcement departments in

17   metropolitan areas are no on [sic] side of the people, and

18   that they exist, quote -- to, quote, Enforced [sic] tyranny.

19   ECF No. 31 at 6.  And with reference to mask mandates, he

20   posted, quote, Every fuck -- every lawmakers who breaks

21   their own stupid fucking laws should be dragged out of

22   office and hung.  The government should fear the people, not

23   the other way around.  ECF No. 46 at 1 through 2.

24          A few days later on January 4th, Nordean posted,

25   It is apparent now more than ever that if you are a patriot,

23

1    you will be targeted and they will come after you.  Funny

2    thing is that they don't realize is we are coming for them.

3    ECF No. 17 at 12.

4         And that same day, Nordean also posted a link to

5    an episode of his video podcast, Rebel Talk with Rufio,

6    which had been recorded a few days earlier.  In that video

7    podcast, Nordean addressed the Electoral College

8    certification on January 6th.  While discussing alleged

9    voter fraud in the presidential election and the public's

10   purported complacency, Nordean stated, quote, I think

11   they're relying on complacency.  I think they're relying on

12   the Facebook posts, and that's all we're going to do, closed

13   quote.  He went on to say that rather than being complacent,

14   Proud Boys were going to, quote, Bring back that original

15   spirit of 1776 of what established the character of what

16   America is.  And it's not complacency.  It's not low

17   standards.  It's, quote, This is how it's going to be, and I

18   don't give a goddamn, closed quote.  ECF No. 17 at 13.

19        The superseding indictment then lays out more

20   specific evidence of planning in the days before January 6th

21   that it alleges were reflected in the encrypted

22   communications and on an application called Telegram.  I'll

23   just pause here and say that I understand defendants to have

24   made the point that these communications were not end-to-end

25   encrypted which is a higher level of encryption, as I

24

1      understand it, and the Government doesn't contest that.  But

2      the Government has represented, and the superseding

3      indictment has charged, that these communications were

4      encrypted in some way and defendants have not challenged

5      that basic assertion.

6           So on January 4th, 2021, shortly after the Proud

7      Boys Chairman's arrest pursuant to an arrest warrant issued

8      by D.C. Superior Court, Co-Defendant Donohoe expressed

9      concern that encrypted communications that involved the

10     Proud Boys Chairman would be compromised when law

11     enforcement examined his -- the Proud Boy Chairman's phone.

12     Donahue [sic] then allegedly created a new channel on the

13     encrypted messaging application entitled New MOSD and took

14     steps to destroy or, quote, Nuke, closed quote, the earlier

15     channel.  After its creation, the, quote, New MOSD, channel

16     included Nordean, Biggs, Rehl, Donohoe and a handful of

17     additional members.  ECF No. 26 at Paragraph 39.  The

18     Government proffers that "MOSD" is believed to stand for

19     "Ministry of Self-Defense."  ECF No. 45 at 4.

20          On January 4th, 2021, at 7:15 p.m., Donohoe posted

21     a message on various encrypted messaging channels, including

22     New MOSD, which read, quote, Hey, have been instructed and

23     listen to me real good.  There is no planning of sorts.  I

24     need to be put into whatever new thing is created.

25     Everything is compromised and we can be looking at gang

25

1    charges, closed quote.  Donohoe then wrote, Stop everything

2    immediately, closed quote, and then, quote, This comes from

3    the top.  ECF No. 6 [sic] at Paragraph 40.

4            The Government then represents that a person

5    identified in the superseding indictment as Unindicted

6    Co-Conspirator 1 advised that participants, quote, Shouldn't

7    be typing plans to commit felonies into your phone, closed

8    quote.  Unindicted Co-Conspirator 1 -- I'll call UCC-1 --

9    later directed that, quote, If you're talking about playing

10   Minecraft, you should just make sure you don't use your

11   phone at all or even have it anywhere around you.  ECF No.

12   45 at 3.  The Government represents that, based on

13   information provided by the FBI, it is common for persons

14   discussing criminal activity online to refer to Minecraft, a

15   video game, as a way of concealing the nature of the

16   activity.  That's ECF No. 45 at 3, Note 2.

17           About an hour after Donohoe's message to stop, at

18   8:20 p.m., UCC-1 posted to the New MOSD channel, quote, We

19   had originally planned on breaking the guys into teams.

20   Let's start divvying them up and getting BaoFeng channels

21   picked out, closed quote.  ECF No. 26, Paragraph 41.

22           The superseding indictment alleges that BaoFeng --

23   spelled B-A-O-F-E-N-G -- is a manufacturer of handheld

24   radios and other communications equipment at Paragraph 41.

25   There is no evidence that Nordean himself used such a radio

1    on January 6th, but one such radio was found by law

2    enforcement in his home, and the defendant provided evidence

3    that the radio was received by him on January 7th -- the day

4    after, obviously, January 6th -- although the Government

5    alleges that it was tuned to the channels that had been

6    picked out by the alleged conspirators in advance of January

7    6th.  That's ECF No. 17 at 15 and Note 5.  Biggs and Rehl,

8    as described later, are alleged to have had equipment --

9    communications equipment on that day.

10           The next morning, on January 5th, Biggs messaged,

11   What -- quote, What are the teams?  I keep hearing team are

12   picked already, closed quote.  A few minutes later, Biggs

13   messaged, Who are we going to be with?  I have guys with me

14   in other chats saying teams are being put together, closed

15   quote.  That's ECF No. 31 at 2.

16           About the same time, a member of a Proud Boys

17   Telegram group stated, quote, It seems like our plan has

18   totally broken down and Rufio -- referring to Defendant

19   Nordean -- has taken control as a single point of contact.

20   ECF No. 30 at 1.

21           That afternoon, a new encrypted messaging channel

22   entitled, quote, Boots on the Ground, closed quote, was

23   created for communications by Proud Boy members in

24   Washington, D.C.  In total, over 60 users participated in

25   Boots on -- in the Boots on the Ground channel, including

27

1    Nordean, Biggs, Rehl, Donohoe and UCC-1.  After the

2    channel's creation, Biggs posted a message to the channel

3    that read, quote, We are trying to avoid getting into any

4    shit tonight.  Tomorrow's the day, closed quote, and then,

5    quote, I'm here with Rufio and a good group, closed quote.

6    ECF 26, Paragraph 42.

7            Later that afternoon, at 5:22 p.m., Biggs stated

8    in an encrypted Telegram message, quote, Woth -- W-O-T-H,

9    presumably "with" -- Rufio trying to get numbers so we can

10   make a plan.  ECF No. 31 at 2.  A few moments later, Biggs

11   posted a message to the Boots on the Ground channel that

12   read, Just trying to get our -- quote, Just trying to get

13   our numbers so we can plan accordingly for tonight and go

14   over tomorrow's plan, closed quote.  ECF No. 26 at Paragraph

15   43.

16           Subsequently, Rehl, who was traveling to

17   Washington, D.C., on January 5th, stated that he was

18   bringing multiple radios with him and that there was a

19   person who was planning to program the radios later that

20   evening.  That's ECF No. 26, Paragraph 44.

21           As things moved into the evening on 8 -- at 8:28

22   p.m., a message was posted to the Boots on the Ground

23   channel that read, quote, Everyone needs to meet at the

24   Washington Monument at 10:00 a.m. tomorrow morning.  Do not

25   be late.  Do not wear colors.  Details will be laid out at

28

1    the pre-meeting.  Come out as a patriot.  ECF No. 26 at 45.

2         At 9:03 p.m., Rehl notified Nordean, Biggs,

3    Donohoe and others that he had arrived in Washington, D.C.

4    Donohoe responded by requesting one of the radios that Rehl

5    had brought.  ECF No. 26 at 40 -- at Paragraph 46.

6         At 9:07 p.m., Donohoe asked, quote, Hey, who's

7    boots on the ground with a plan RN?  Guys are asking, closed

8    quote.  A participant in the encrypted chat stated, quote,

9    Supposed to be Rufio, closed quote.  ECF No. 30 at 2.

10        At 9:09 p.m., UCC-1 broadcast a message to the New

11   MOSD and Boots on the Ground channels that read, quote,

12   Stand by for the shared BaoFeng channel and shared Zello

13   channel.  No colors.  Be decentralized and use good judgment

14   until further orders, closed quote.  UCC-1 also wrote, Rufio

15   -- quote, Rufio is in charge.  Cops are the primary threat.

16   Don't get caught by them or BLM.  Don't get drunk until off

17   the street, closed quote.  UCC-1 then provided a specific

18   radio frequency of 477.985.  ECF No. 26 at 47.

19        At 9:17 p.m., Biggs posted a message on New MOSD

20   that read, We just had a meeting -- again -- woth a lot of

21   guys.  Info should be coming out, closed quote, and then

22   posted, quote, Just spoke with, and the bracket here

23   indicates it's the Proud Boys Chairman, and, quote, I was

24   able to rally everyone here together who came where I said,

25   closed quote.  ECF No. 26, Paragraph 48.

1          And at approximately 9:20 p.m., Biggs posted a

2     message that read, quote, We have a plan.  I'm with Rufio,

3     closed quote.  Donohoe responded, What's the plan so I can

4     pass it on to the MOSD guys?  Biggs responded, quote, I

5     gave -- and, again, brackets here in the indictment

6     referring to the Proud Boys Chairman -- a plan.  The one I

7     told the guys, and he said he had one.  ECF No. 26, the

8     superseding indictment, Paragraph 48.

9          Then January 6th came the next day.  And here are

10    the Government's allegations about what happened on that

11    day.

12         At 6:37 a.m. that morning, Donohoe posted a

13    message to the New MOSD that asked, quote, Are we gonna do a

14    commanders' briefing before the 10:00 a.m., closed quote.

15    ECF No. 26 at Paragraph 49.

16         Subsequently, Donohoe communicated to others that

17    he was on his way to the Washington Monument.  He added,

18    quote, I have the keys until Rufio and Zach show up, closed

19    quote.  ECF No. 26 at Paragraph 50.

20         On the morning of January 6th, Telegram messages

21    were exchanged among the small group of members in the New

22    MOSD message group, which included Nordean, Biggs, Rehl,

23    Donohoe, UCC-1 and a handful of other participants.

24         UCC-1 then said on those Telegram messages:  I

25    want to see thousands of normies burn the city to ash today.

1          Person-2 responded:  Would be epic.

2          UCC-1:  The state is the enemy of the people.

3          Person-2:  We are the people.

4          UCC-1:  Fuck, yeah.

5          Person-3:  God, let it happen.

6          Person-3:  I will settle with seeing them smash

7    some pigs to dust.

8          Person-2:  Fuck those commie traitors.

9          Person-3:  It's going to happen.  These normiecons

10   have no adrenaline control.

11         Person-3:  They are like a pack of wild dogs.

12         Donohoe then chimes in:  I'm leaving with a crew

13   of 15 at 0830 to hoof it to the monument for [sic] colors.

14         Person 2 then responded:  Fuck it.  Let them

15   loose.

16         ECF 45 at 4.

17         Of course, on January 6th, a joint session of the

18   United States Congress had convened at the Capitol to

19   certify the vote count of the Electoral College of the 2020

20   presidential election.  That's Paragraph 4 of the

21   superseding indictment.  And only authorized individuals

22   were permitted to be on the Capitol grounds or inside the

23   building that day.  That's Paragraph -- that's also the

24   superseding indictment at 13.

25         At 10:00 o'clock a.m., a group of Proud Boy

31

1    members then gathered at the Washington Monument.  Shortly

2    after 10:00, Nordean, Biggs, Rehl and Donohoe walked the

3    group to the east side of the Capitol.  That's ECF 26 at

4    Paragraphs 51 through 52.

5         Consistent with the directive issued by the Proud

6    Boys National Chairman, Nordean, Biggs, Rehl and Donohoe

7    were not wearing the Proud Boys colors of black and yellow

8    that day.  Several men in the group, including Biggs and

9    Rehl, were holding walkie-talkie-style communication

10   devices.  At different times, Nordean and Biggs carried and

11   used a bullhorn to speak to the group.  That's ECF No. 26 at

12   Paragraph 53.  Nordean was dressed in all black and was

13   wearing a tactical vest.  ECF 17 at 5.

14        As Nordean walked to the Capitol, he used his

15   megaphone to announce, quote, We represent the spirit of

16   1776.  If you haven't noticed, real men are here.  We know

17   [sic] the oath is, and then there's a bracket for something

18   unintelligible.  We know [sic] the oath is, unintelligible,

19   foreign enemies and domestic.  Let us remind those who have

20   forgotten what that means.  ECF 45 at 8.

21        As Nordean arrived at the east side of the

22   Capitol, he brought the group to a halt.  He then spoke

23   through a microphone [sic], quote, Back the yellow.  You've

24   got to prove it to us.  You took our boy and let the stabber

25   go.  You guys got to prove your shit to us now.  The group

1    then marched on as the defendant spoke through his megaphone

2    again, quote, And don't forget, we don't owe you anything.

3    Your job is to protect and serve the people, not property or

4    bureaucrats.  ECF No. 45 at 8.

5         As Nordean and his co-defendants marched the group

6    of Proud Boy members around the Capitol, one of the men

7    yelled, Let's take the fucking Capitol, closed quote.  The

8    man was chastised and told not to say that.  Specifically,

9    he was told by someone present, quote, None of that.  Let's

10   not fucking yell that, closed quote.  Nordean followed up by

11   calling the man, quote, An idiot.  Another member of the

12   crowd commented, quote, Don't say it.  Do it.  ECF No. 45 at

13   4.

14        Shortly before 12:53 p.m., Nordean, Biggs and Rehl

15   led the group, which also included Donohoe, to the First

16   Street pedestrian entrance which was secured by a small

17   number of Capitol Police who were standing behind waist-high

18   metal barriers.  Biggs led the assembled crowd in a series

19   of chants using a megaphone.  Nordean, Rehl and Donohoe

20   stood nearby.  ECF 26 at Paragraph 54.

21        Nordean, Biggs, Rehl and Donohoe moved toward the

22   Capitol, then, by crossing over barriers that had been

23   violently disassembled and trampled by the crowd moments

24   before they advanced.  That's the superseding indictment,

25   ECF 26 at Page [sic] 55.

1           Biggs recorded himself at some point during this

2    period.  He said, quote, Dude, we're right in front of the

3    Capitol right now.  American citizens are storming the

4    Capitol, taking it back right now.  There's millions of

5    people out here.  This is fucking crazy.  Oh, my God.  This

6    is such history.  This is insane.  We've gone through every

7    barricade thus far.  Fuck you.  ECF No. 46 at 3.

8           As the crowd approached additional set [sic] of

9    metal barriers, certain individuals who had arrived at the

10   First Street pedestrian gate with Nordean, Biggs, Rehl and

11   Donohoe removed additional metal barriers.  That's ECF 26 at

12   56.  Nordean positioned himself near the front of the crowd

13   as these events took place.  And as they unfolded, messages

14   were posted to the encrypted message boards used by Nordean,

15   Biggs, Rehl and Donohoe that people were, quote, Storming,

16   the Capitol.  ECF 26 at Paragraph 56.

17          Nordean, Biggs, Rehl and Donohoe advanced toward

18   the west plaza of the Capitol where additional metal

19   barricades and law enforcement were deployed to protect the

20   Capitol and its occupants from the advancing crowd.  ECF 26

21   at Paragraph 57.

22          While standing next to one another, Nordean and

23   Briggs [sic] are alleged to have shook a metal barricade,

24   with Capitol Police on the other side of the barricade,

25   until Nordean and Biggs and others in the crowd were able to

34

1    knock it down.  The crowd, including Nordean, Biggs, Rehl

2    and Donohoe, advanced past the trampled barricade.  That's

3    ECF 26 at Paragraph 58.

4            I'll just pause and say the parties have provided

5    me video clips of this event.  I don't find it terribly

6    compelling in terms of showing that Nordean and Biggs

7    themselves shook a barricade.  It's obvious -- it's not, to

8    me, clear evidence that either one of them purposely shook

9    it to make it come down.  On the other hand, Nordean and

10   Biggs had positioned themselves right against the fence as

11   the mob pressed against it, and they are clearly happy about

12   law enforcement becoming overwhelmed and the mob pressing

13   forward.  They were clearly happy about what was happening

14   at that point.

15           Upon arriving at the west plaza, Nordean, Biggs

16   and Rehl positioned themselves at or near the front of the

17   crowd.  Upon arriving at the police line, Biggs took a video

18   in which he announced, quote, We've just taken the Capitol,

19   closed quote.  ECF 26 at Paragraph 59.

20           Nordean, for his part, paced at the edge of the

21   line of law enforcement while the group that he had led to

22   the First Street gate spread out in the west plaza of the

23   Capitol.  ECF 26 at Paragraph 60.

24           As the crowd advanced onto the west terrace of the

25   Capitol, messages continued to be exchanged on Telegram.

1    UCC-1 posted a message that encouraged participants in the

2    message group to, quote, Push inside, exclamation point,

3    closed quote.  ECF No. 45 at 5.

4           Shortly thereafter, after Proud Boys member

5    Dominic Pezzola, who is charged in a separate case, robbed a

6    Capitol Police officer of his riot shield allegedly,

7    Co-Defendant Donohoe was captured on video carrying the riot

8    shield with Pezzola.  That's ECF No. 45 at 5.

9           Indeed, Donohoe relayed the news to those on

10   Telegram, announcing, quote, Got a riot shield, exclamation

11   point, closed quote.  ECF No. 45 at 5, also.

12          Around 2:00 o'clock p.m., Donohoe assisted the

13   crowd's effort to advance up a flight of stairs toward the

14   Capitol.  The crowd overwhelmed law enforcement there who

15   were attempting to stop the crowd from advancing.  ECF No.

16   26 at 61 -- at Paragraph 61.

17          At 2:13 p.m., Pezzola then used the riot shield to

18   break a window that allowed rioters to enter the building

19   and force open an adjacent door from the inside.  ECF No. 26

20   at Paragraph 62.  Within a minute of Pezzola breaking the

21   window, Biggs entered the Capitol building through a door

22   that had been forced open by rioters who had entered through

23   the window he had broken.  "He" being Pezzola.  And at least

24   three other Proud Boys who are charged elsewhere also

25   entered through the door within two minutes of its opening.

1    That's ECF No. 26 at Paragraph 62.

2           I'll pause here and note that Pezzola is not

3    charged in this case and not charged as a co-conspirator in

4    this case, but he is charged in a separate case before me.

5    But I don't see why I can't consider what he did, at least

6    to some degree, when I consider the nature of the

7    circumstances of the offense here.  The grand jury has

8    charged that Pezzola -- in this case that Pezzola was a

9    Proud Boy like these defendants, even though Nordean and

10   Biggs do challenge that characterization.  Donohoe, their

11   co-defendant and alleged co-conspirator, was seen carrying

12   the riot shield with Pezzola, even exclaiming that he had

13   got a riot shield.  And consistent with the allegations here

14   concerning the use of communications equipment and radios,

15   Pezzola was apparently wearing an earpiece on January 6th.

16   I'll note that the Government hasn't made that

17   representation to me in this case, but in Pezzola's case it

18   proffered a photo to me clearly showing that earpiece.  So

19   I'm going to ask the Government to supplement the record

20   here to include that photo by 5:00 o'clock p.m. so it's

21   included in the record in this case.

22           Mr. McCullough, do you have a problem doing that?

23           MR. MCCULLOUGH:  Understood, Your Honor, and the

24   Government will do so.

25           THE COURT:  Biggs exclaimed shortly thereafter,

1    quote, This is awesome, closed -- exclamation point, closed

2    quote, after entering the Capitol.  That's ECF No. 31 at 7.

3            As these events unfolded, again, messages were

4    posted to the encrypted messaging group that encouraged

5    participants in the group to participate in what was

6    happening.  One post directed the participants in the group

7    to, quote, Get there, closed quote.  ECF No. 45 at 4.

8            UCC-1 immediately followed that by posting, quote,

9    Storming the Capitol building right now, closed quote, four

10   consecutive times.  ECF No. 45 at 4.

11           Biggs is alleged to have exited the Capitol, posed

12   for a picture on the east side of the building, then, 30

13   minutes later, re-entered the building on that side by,

14   quote, Pushing past at least one law enforcement officer,

15   closed quote.  According to the superseding indictment, he

16   then entered the Senate chamber with another Proud Boys

17   member.  That's ECF No. 26 at Paragraphs 64 through 65.

18           Nordean, for his part, entered and remained in the

19   Capitol, including in the Rotunda, before exiting the

20   Capitol with another member of the Proud Boys.  That's ECF

21   No. 26 at Paragraph 66.

22           At 3:30 [sic] p.m., as some rioters were leaving

23   the Capitol, Donohoe announced on the Boots on the Ground

24   channel, quote, We are regrouping with a second force.  ECF

25   No. 26, Paragraph 68.  But it should be noted that the

1   Government has not proffered any evidence that such a force

2   ever materialized as law enforcement gained more control

3   over the situation.

4          And to close out the story of what happened that

5   day, the allegations, at about 2:20 p.m., members of

6   Congress and Vice President Pence had been evacuated.  ECF

7   No. 26, Paragraph 21.  The joint session of Congress did not

8   reconvene until 8:00 o'clock p.m.  ECF No. 26 at Paragraph

9   22.  And on that day, the grand jury alleges, approximately

10  81 members of the Capitol Police, 58 members of the

11  Metropolitan Police Department were assaulted and the

12  Capitol suffered millions of dollars' worth of damage.  ECF

13  No. 26 at Paragraph 23.

14         And later that evening, Person-2 from the New MOSD

15  message group posted, quote, We failed.  The House is

16  meeting again, closed quote.

17         Now, after January 6th, the superseding indictment

18  alleges, or the Government represents, that the defendants

19  made the following additional statements.

20         Biggs posted a message on Parler that read, quote,

21  What a day, closed quote.  That's ECF No. 26, Paragraph

22  24(b).

23         Donohoe posted a message that read, in part,

24  quote, We stormed the Capitol unarmed, quote -- closed

25  quote, and then, quote, We took it over unarmed.  ECF No.

39

1    26, Paragraph 24(d).

2         Nordean posted a message that read, quote, We

3    stormed the Capitol.  It was great.  Basically, the cops

4    started shooting us with pepper balls and boom bombs and we

5    stormed them and busted down the doors in the Capitol.

6    Thousands and thousands of people.  It was insane.  ECF No.

7    45 at 6.

8         In a private message on January 7th, 2021,

9    Co-Conspirator Rehl wrote, quote, I'm proud as fuck for what

10   we accomplished yesterday, but we need to start planning,

11   and we are starting planning, for a Biden presidency, closed

12   quote.  ECF No. 26, Paragraph 24(c).

13        And that same day, January 7th, Nordean exchanged

14   messages with an individual via an encrypted messaging

15   application.  During the exchange, the individual asked if

16   Nordean had been at the Capitol and, if so, if he was all

17   right.  Nordean responded that he had, quote, Stormed the

18   Capitol, closed quote; that he was all right; and that he

19   had stolen a flag from inside the Capitol building.  ECF No.

20   17 at 18 through 19.

21        And on January 7th, again, that same day, Biggs

22   posted, quote, R.I.P. America, 1776 through 2021, closed

23   quote.  That's ECF No. 31 at 9.

24        And on or about the next day, January 8th, Nordean

25   posted a message on social media that included a picture of

40

1    a Capitol Police officer administering pepper spray on

2    January 6th with a caption that read, in part, quote, If you

3    feel bad for the police, you are part of the problem.  They

4    care more about federal property, our property, than

5    protecting and serving the people.  ECF No. 30 at 19.

6            So that was a long way to get there, I understand,

7    but I think in a case like this, it's important to put on

8    the record all the evidence -- at least a significant

9    portion of it.

10           Considered as a whole, then, I do conclude that

11   the nature and circumstances of the offense weigh strongly

12   in favor of detention.

13           Let me just say a few words about how I see that

14   evidence or how I see those allegations.

15           Chief Judge Howell has set forth a number of

16   considerations which this -- which I have found helpful to

17   differentiate the severity of the conduct of the hundreds of

18   defendants connected to the events of January 6th for

19   purposes of detention.  Cite the parties to the Chrestman

20   opinion, 2021 WL 765662 at 7, Judge Howell's opinion from

21   February 26th, 2021.  These considerations include whether a

22   defendant, one, has been charged with felony or misdemeanor

23   offenses; two, engaged in prior planning before arriving at

24   the Capitol; three, carried or used a dangerous weapon

25   during the riot; four, coordinated with other participants

1    before, during, or after the riot; five, assumed either a

2    formal or a de facto leadership role in the assault by

3    encouraging other rioters' misconduct; and, six, the nature

4    of the defendant's words and movements during the riot,

5    including whether he damaged federal property, threatened or

6    confronted federal officials or law enforcement, or

7    otherwise promoted or celebrated efforts to disrupt the

8    certification of the electoral count -- vote count during

9    the riot.

10           Most of these considerations here weigh in favor

11   of detention.

12           On the first consideration, defendants are charged

13   with multiple felony offenses, including one Congress has

14   characterized under these circumstances as a federal crime

15   of terrorism, and another that exposes them to a 20-year

16   sentence.  The grand jury has charged that they conspired

17   with each other and others, one, to stop, delay or hinder

18   Congress's certification of the Electoral College vote; and,

19   two, to obstruct or interfere with law enforcement officers

20   engaged in their official duties to protect the Capitol and

21   its occupants while that was happening.  I won't belabor the

22   point I meant earlier -- I made earlier.  These are gravely

23   serious matters.  So this factor weighs in favor of

24   detention.

25           On the third [sic], fourth and fifth

1    considerations, the allegations include extensive

2    involvement in prior planning for January 6th, coordinated

3    -- coordination with other participants before, during, and

4    after the riot, and leadership roles for both of them.  This

5    is so even though Nordean only used a bullhorn that day, or

6    at least there's no evidence that he had a walkie-talkie

7    like Biggs or also no evidence that he used his phone on

8    that day.  And although Nordean did not apparently use the

9    encrypted communications channels a lot, Biggs and others

10   who used them said that Nordean and Biggs were the ones with

11   the plan and that Nordean in particular was in charge.

12   Finally, it's important that both Nordean and Biggs are

13   alleged to have made statements in the wake of the election

14   that they believed the election had been stolen and that

15   something had to be done about it.  Biggs, for example,

16   invoked war on several occasions.  And Nordean posted, You

17   can take a hard stand now or watch as everything we've built

18   crumble before your eyes and have nothing to leave your

19   children.  Enough is enough.  Also Nordean:  We tried

20   playing nice and by the rules.  Now, you will deal with the

21   monster you created.  These considerations weigh in favor of

22   detention.

23          On the other side of the ledger, consideration

24   three weighs against detention.  Neither defendant carried

25   or used a weapon that day, although their co-conspirator

1    Donahue [sic] was captured on video possessing a riot shield

2    that was used as a weapon by someone else.

3           And the sixth consideration is a mixed bag.  On

4    the one hand, as I've discussed, the evidence that

5    defendants themselves used physical violence that day at all

6    is relatively modest as compared to many others at the

7    Capitol.  And there's no evidence that they used violence

8    directly against any person.  All of that is significant.

9    On the other hand, both said and did things that day that

10   are highly troubling.  As Nordean walked to the microphone

11   -- or walked to the Capitol, he allegedly used his megaphone

12   to announce that, quote, We represent the spirit of 70 --

13   1776.  If you haven't noticed, real men are here.  We know

14   what the oath is, unintelligible, foreign enemies and

15   domestic.  Let us remind those who have forgotten what that

16   means.  I think it's obvious that that's a reference, even

17   though part of that is unintelligible, to protecting the

18   United States from enemies, foreign and domestic.  Nordean

19   and Biggs positioned themselves at the very front of the

20   crowd that pushed through barricades on their way to the

21   base of the Capitol itself.  Biggs entered the Capitol,

22   left, then re-entered to go back into the Senate chamber

23   which are highly concerning movements.  Nordean suggested

24   that if you feel bad for the police, you're part of the

25   problem.  Both defendants celebrated what happened that day.

1    And Nordean, at least on his own account, stole a flag.

2    Neither defendant has, at any time, expressed regret or

3    remorse for what they did or for what happened that day.

4            So to repeat, given the nature of the charges, the

5    evidence of leadership, prior planning, coordination with

6    other participants particularly by acquiring and using radio

7    communications, the nature and circumstances of the offense

8    weigh, in my view, in favor of detention.

9            The second factor I have to consider is the weight

10   of the evidence against the person.  In many Capitol riot

11   cases, courts often simply note that there are photos or

12   video of the defendants engaging in the key acts for which

13   they're charged, they conclude the evidence is strong, and

14   they move on.  But in a case like this one, this factor

15   takes on a larger importance, given that much of the

16   Government's evidence is circumstantial about the precise

17   nature of the alleged conspiracy.  And as for the other

18   substantive offenses, the strength of the Government's case

19   appears to rest on attempt theories or aiding and abetting

20   theories that depend on what other people did.  In the end,

21   the evidence is overwhelming that Nordean and Biggs had a

22   plan for that day.  But the question is, what is the

23   strength of the Government's case that the plan is what the

24   grand jury charged?

25           In my view, the weight of the evidence is strong

1    enough to weigh in favor of detention, even if, as in most

2    conspiracy cases, we don't have a document or a conversation

3    that lays out the conspiracy plainly.  Defendants -- mostly

4    Defendant Nordean -- make some fair points about some

5    weaknesses in the case, but let me walk through them and

6    explain why I don't think they weaken the case very much in

7    light of all the other evidence.

8             First, they argue that the Proud Boys have worn

9    protective gear, raised funds for travel, and used the

10   Telegram communications application on occasions other than

11   January 6th.  Biggs argues that the Proud Boys gave up

12   marching in their colors because of prior incidents where

13   Proud Boys had been assaulted by Antifa.  Those are fair

14   points, and they take some of the wind out of those

15   allegations.  But still, as I've laid out, the charged

16   conspiracy depends on far more allegations and evidence than

17   those.  On no other occasions do defendants claim that the

18   Proud Boys used radios tuned to the same preset frequency to

19   be able to communicate in real time which, to me, suggests a

20   certain tactical coordination.  And Donohoe's comment that,

21   quote, We can be looking at gang charges, closed quote, and

22   Unindicted Co-Conspirator 1's admonition that, quote --

23   they, quote, Shouldn't be typing plans to commit felonies

24   into your phone, closed quote, suggest that what was going

25   on here was planning to do something unlawful.

1          Second, Nordean also points out that the evidence

2     does not show, as Chief Judge Howell had suggested, specific

3     directions or precise orders to commit a federal offense.

4     But those things aren't necessary for a conspiracy case to

5     be relatively strong, and Chief Judge Howell did not have a

6     conspiracy charge, nor much of the specific Telegram

7     evidence, nor the evidence related to Biggs and the other

8     co-conspirators in front of her when she called detention in

9     this matter a close case.

10          Third, Nordean presents a few other Telegram chats

11    that suggest that there was no coherent plan for January

12    6th, that a few Proud Boys were surprised by what happened

13    that day, and that some thought the focus was protecting

14    supporters of the President from Antifa.  But the

15    superseding indictment does not charge a conspiracy that

16    encompasses all Proud Boys.  And even if someone who was a

17    part of the conspiracy expressed surprise at the way events

18    unfolded that day or what the other -- ultimate outcome was,

19    that does not necessarily mean that there wasn't a

20    conspiracy of the kind alleged in the superseding

21    indictment.

22          Fourth, Nordean points to the 60 Minutes interview

23    of Michael Sherwin, the former Acting United States Attorney

24    for this District who ran this investigation for a time.

25    Sherwin told 60 Minutes that the Government did not know

1    whether there was a plan specifically to breach the Capitol

2    and did not know, quote, What their full plan was, closed

3    quote.  I don't think either of those statements weakens the

4    case much here, given the allegations in the superseding

5    indictment that were broader than merely breaching the

6    Capitol.  And the grand jury does not know -- does not need

7    to know every aspect of a conspiracy to charge one.

8          Let me just pause here, because I haven't

9    addressed this to the parties before in this case and,

10   relatively early on in this briefing, Defendant Nordean

11   raised this issue of former Acting United States Attorney's

12   -- Sherwin's comments.  Obviously, this was a highly

13   unprofessional interview that Mr. Sherwin gave.  And I

14   understand just from news reports about how this has come up

15   in other cases that Mr. Sherwin was referred to DOJ's Office

16   of Professional Responsibility for it.  I know none of the

17   prosecutors here today made those statements, but I am going

18   to warn all the -- all sides here that comments like that

19   violate the local rules of this court, and I'm certainly not

20   going to put up with anything like that from the attorneys

21   who enter their appearance in this case going forward.

22         Fifth, Nordean presented the Court with affidavits

23   from a singer and her agent that, after first proposing the

24   evening of January 5th, Nordean at some point proposed that

25   the singer perform for him and other Proud Boys on January

1    6th at an Airbnb beginning at 3:00 or 4:00 in the afternoon.

2    To some degree, these affidavits undercut the Government's

3    theory.  But on the other hand, the timeline isn't that off,

4    depending on precisely what the defendants anticipated their

5    role to be and how they expected the day's events to unfold.

6    The superseding indictment alleges that the Capitol was

7    breached at about quarter after 2:00, as -- and many people

8    began to pour into the building.  The indictment doesn't

9    necessarily presuppose any further role for the defendants

10   to play such that being back at their rented quarters a few

11   hours later is that strange.

12          Sixth, Nordean has proffered a snippet of video

13   that shows him grabbing a man by the shoulder after the

14   man -- who he represents he does not know -- pushed a police

15   officer that day.  He also offers a video clip of his voice

16   suggesting, apparently, after January 6th but before his

17   arrest in this case, that the Proud Boys should stop

18   rallying, but that clip doesn't contain any further context.

19   Similarly, Biggs says that he twice came to the aid of a

20   police officer that day who was being beaten, but there is

21   no video or photos of those encounters.  The Court can glean

22   little from these representations against the entire weight

23   of all the other evidence we've gone through.  Certainly,

24   the small snippets of video and audio do not preclude a

25   conspiracy to interfere with law enforcement that has been

49

1    charged.  It's hard for me to give Biggs's unverified

2    representations much weight, but even if they're true, both

3    men -- again, I don't think it precludes the charged

4    conspiracy -- both men have expressed views on social media

5    that express little sympathy for the police and their role

6    in certain -- at least in certain contexts.

7            Next, I have to consider, quote -- as the second

8    -- as the third factor, quote, The history and

9    characteristics of the person, including the person's

10   character, physical and mental condition -- and before I --

11   I guess, let me just circle back.

12           I do, then, find that the weight of the evidence,

13   even though just like -- even the -- that the first factor

14   strongly favors detention; and that the second factor, the

15   weight of the evidence, does favor detention, although not

16   as strongly as the first.

17           Next, I have to consider the history and

18   characteristics of the person, including, quote, The

19   person's character, physical and mental condition, family

20   ties, employment, financial resources, length of residence

21   in the community, community ties, past conduct, history

22   relating to drug or alcohol abuse, and -- let's just see --

23   and -- hmm.

24           (Brief pause.)

25           Out of order here.

1          Drug or alcohol abuse, criminal history, and

2     record concerning appearance at court proceedings, closed

3     quote.

4          Let me get straight to the most important things

5     here.  Neither defendant has any criminal record, and

6     neither has violated any condition of release in this case

7     while out so far.  Biggs, who is 37, has been super

8     compliant according to his -- the Pretrial Services officer,

9     and also, had a distinguished military career to his great

10    credit.  All of that is enough to rebut the presumption

11    which remains in the case as, quote, Incorporated into the

12    other factors considered by this court in determining

13    whether to grant a conditional release and is given

14    substantial weight, closed quote.  That's, again, United

15    States v. Ali, 793 F. Supp. 2d 386 at 391, a D.D.C. case

16    from 2011.

17         The remaining information about Biggs and Nordean

18    is a mixed bag to some degree.  Biggs has struggled with

19    PTSD and some alcohol problems; nonetheless, has relatively

20    strong community ties.  He has lived in Daytona Beach,

21    Florida, since -- well, only since 2018, but he does live

22    there with his mother and shares custody of a young daughter

23    with his ex-wife.  He is a Proud Boy -- Proud Boys rally

24    organizer.  He claims to have planned the Proud Boy event in

25    Portland in 2019.  And he represents that he provided the

1    FBI with information about Antifa on a number of occasions.

2    He also represents that he turned himself in once he learned

3    of a video of himself in the Capitol on January 6th.

4              On the other hand, Biggs represents that he began

5    to get, quote, Cautionary, closed quote, phone calls from

6    the FBI starting in 2018 about things he had said on air and

7    on social media.  And although he represents that he has

8    always satisfied the FBI, that he gets the calls in the

9    first place is troubling.  And the Government represents

10   that Biggs at first lied to the FBI when he was contacted on

11   January 8th by telling them that he had not entered the

12   Capitol on January 6th.  That's ECF No. 46 at Pages 4

13   through 5.  According to the Government, Biggs came -- only

14   came clean when the video of him in the Capitol hit social

15   media.

16             Nordean, for his part, lives in Washington State

17   with his wife, who agreed to be his third-party custodian.

18   But his community ties are, in some ways, less than they

19   might seem.  He represents that his ties to the Seattle,

20   Washington area were deep -- are deep and longstanding, and

21   the Court has no reason to doubt that they are longstanding.

22   But at some point after January 6th, the Government

23   represents that he posted -- and this is at ECF No. 45 at 9

24   -- that his family had, quote, Cut ties with him; that his

25   marriage, quote, Has been destroyed, closed quote; and that,

1    quote, His own government seems to think he's the bad guy,

2    closed quote.  He explained that he'd learned that, quote,

3    If you are going to stand for something good, expect the

4    world to stand against you with everything it has, closed

5    quote.  He then closed by stating that he'd decided to move

6    to Tennessee to start a new life because, quote, Nothing is

7    left for me here.  And in the Telegram chats cited by

8    Nordean himself, he appears to be considering moving to

9    North Carolina.  That's ECF 41 at Page 3.

10           And while Nordean does not have any violations of

11   his conditions of release either, Pretrial Services reported

12   two highly troubling things on April 1st reflected in ECF

13   No. 48.  First, Nordean represented to them that he had lost

14   his passport, so he could not turn it in to them; and,

15   second, Nordean reported to Pretrial Services on March 31st,

16   after the Government moved to revoke his conditions of

17   release, that for the first time he reported a firearm of

18   his was stolen back in December or early January, but that

19   he didn't report it stolen to the authorities until March

20   5th, two days after Chief Judge Howell had imposed a

21   condition on him that he not possess firearms.  When the

22   Pretrial Services officer asked Nordean why he was just

23   reporting it, quote -- according to the Pretrial Service

24   officer's report, quote, He didn't have an answer as to why

25   he waited so long, closed quote.

1          Nonetheless, this factor weighs in favor of

2     release, but not overwhelmingly so.

3          The final factor I have to look at is the nature

4     and circumstances [sic] of the danger to any person or the

5     community that would be posed by the person's release,

6     closed quote.  That's 18 United States Code 3142(g).

7          And then, as the Circuit recently found in the

8     recent Munchel decision, to justify detention on the basis

9     of dangerousness, I must find by, quote, Clear and

10    convincing evidence, closed quote, that, quote, No condition

11    or combination of conditions will reasonably assure the

12    safety of any other person and the community, closed quote.

13    That's not a new standard reflected in Munchel.  It is, in

14    fact, 18 United States Code Section 3142(f).  But as the

15    Circuit reminded us in that case, quote, A defendant's

16    detention based on dangerousness accords with due process

17    only insofar as the District Court determines that the

18    defendant's history, characteristics, and alleged criminal

19    conduct make clear that he or she poses a concrete,

20    prospective threat to public safety, or as the Supreme Court

21    articulated in Salerno, quote, An identified and articulable

22    threat to an individual or the community.

23          I do believe that this final factor weighs in

24    favor of detention and that this ultimate standard is met

25    when all the factors are considered here.  Let me explain

54

1    why.

2         First, the defendants have expressed strongly held

3    views that the 2020 presidential election was stolen and

4    have made statements suggestion -- suggesting that force or

5    violence was justified in response.  I don't weigh this very

6    much, frankly, and it doesn't come close to justifying

7    pretrial detention on its own, but it is part of the record

8    and it is something that I have to weigh.

9         Second, I suppose it's worth repeating that the

10   presumption of detention, although it -- I believe it has

11   been rebutted, remains in the case and weighs in favor of

12   detention.  Again, not a crucial or decisive thing here, but

13   weighing in the balance nonetheless.

14        Third, these defendants have alleged, by their --

15   are alleged, by their leadership and their planning, to have

16   facilitated political violence on January 6th, even if they

17   themselves did not carry a weapon or strike a blow.  Thus, a

18   finding that these defendants pose a threat accords with the

19   Circuit's view, as expressed in Munchel, that, quote, Those

20   who actually assaulted police officers and broke through

21   windows, doors, and barricades and -- and here's the

22   language I'll emphasize -- those who aided, conspired with,

23   planned, or coordinated such actions, are in a different

24   category of dangerousness than those who cheered on the

25   violence or entered the Capitol after others had cleared the

1     way, closed quote.

2              Fourth, and as the court noted in Munchel, the

3     threat must be considered in context, and whether a

4     defendant poses a particular threat depends on the nature of

5     the threat identified and the resources and capabilities of

6     the defendant.  In this case, through their leadership in

7     the case of Nordean and their planning skills in the case of

8     Biggs and the networks that these two individuals can draw

9     on, these defendants can produce events that draw large

10    numbers of people, including Proud Boys, others sympathetic

11    to Proud Boy perspectives, and still others on the opposite

12    side of the political spectrum like Antifa.  And they have

13    now -- they're at least alleged to have facilitated

14    violence, either against other civilians or law enforcement,

15    at a large event.  Even if the election has passed, all of

16    politics has not.  Along these lines, it also matters that

17    the defendants have never, at least on the record before me,

18    expressed regret or remorse about their actions or, even

19    more broadly, about what occurred on January 6th.  The audio

20    clip of Nordean does suggest that, at some point, he agreed

21    that the Proud Boys should stop rallying, but without any

22    further context there's no indication that that was some

23    kind of permanent decision.

24             Fifth, especially as to the last of the four

25    factors, I looked closely at the kinds of conditions I could

1    impose on Nordean and Biggs, and at the end of the day I

2    don't think even the most stringent suffices.  That is so

3    because these two individuals could invade -- evade

4    conditions like, for example, as the parties have suggested,

5    requiring no contact with other Proud Boys or even being

6    prohibited from using a computer by simply having an

7    associate in their network come over to their house and lend

8    them a smartphone.  There's really -- that's a pretty simple

9    thing to do, it doesn't require technological savvy, and

10   there's really no way to ensure that doesn't happen.

11        But I think it is incumbent upon me to explain why

12   I don't have confidence that these defendants would abide by

13   such conditions, especially when they've been compliant in

14   this case so far.  So let me explain why.

15        First, the allegations here involve taking steps

16   to conceal communications from others, including law

17   enforcement, including by using Telegram.  If there were any

18   doubt about that as far as Telegram goes in the first place,

19   Co-Defendant Donohoe's creation of a new channel when he

20   believed, quote, Everything was compromised and we can be

21   looking at gang charges, closed quote, strongly suggests

22   that part of the use of Telegram was to avoid detection by

23   law enforcement -- to avoid their communications being

24   detected by law enforcement.  And, not to be forgotten, the

25   use of the radios on January 6th also appears to be a method

1    of concealing communications, at least from law enforcement.

2    So you have that -- those allegations as part of the crimes

3    charged that suggest these are individuals who have a

4    history and some know-how in concealing communications from

5    law enforcement.

6          Next, Biggs is alleged to have further concealed

7    his activity on January 6th by lying to the FBI about

8    whether he entered the Capitol.

9          And, third, Nordean's reporting of his passport

10   being lost, and especially the timing of his reporting of a

11   stolen firearm to authorities and then to his Pretrial

12   Service officer much later, seem, together, to be highly

13   suspect, raising the possibility that these items are

14   stashed somewhere or being held by an associate of his.

15         Fourth, that these men have devoted huge portion

16   [sic] of their lives to be leaders and planners in the Proud

17   Boys organization and, again, that they have not expressed

18   regret or remorse for what they did or what happened that

19   day does not inspire confidence that they would adhere to a

20   condition of release to sever ties from that group.

21         And finally, although defendants have complied

22   with their conditions of release, I simply don't know what I

23   don't know.  Both are ordered not -- currently ordered not

24   to have contact with witnesses or victims in the case, but

25   if they had violated those conditions there is really no way

1    I would know.  And it would not be a violation of their

2    current conditions to, say, contact a Proud Boy who wouldn't

3    fall into the category of witness or victim in the case or

4    to use a computer or to use an Internet -- the Internet.

5          So I do find that this last factor weighs in favor

6    of detention and, upon review of all the factors, I find by

7    clear and convincing evidence that because of the

8    prospective danger they present that no condition or

9    combination of conditions will reasonably assure the safety

10   of any other person and the community.  And I will enter an

11   order ordering the defendants to report to the marshals at

12   the direction of their Pretrial Services officer.

13          I thank everyone for --

14          MR. NICHOLAS SMITH:  Your Honor -- Your Honor --

15          THE COURT:  Yes.

16          MR. NICHOLAS SMITH:  Your Honor, this is Mr. Smith

17   for Mr. Nordean.

18          THE COURT:  Yes.

19          MR. NICHOLAS SMITH:  We appreciate that the Court

20   has ruled and has laid the table well with setting out all

21   of the rules on bail and, you know, we appreciate that that

22   was extremely thorough and we're grateful for that.  But,

23   Your Honor, if possible -- and we -- without repeating

24   anything that the Court has considered or any of the

25   voluminous briefing, we'd like to make an offer of proof on

1    a couple of facts that haven't been put into the record yet,

2    if Your Honor will allow it orally or --

3              THE COURT:  Well, here's what -- I know -- and I

4    hate to do this because you've been all so patient with me,

5    but I think -- does it make more sense -- I'm not, you know

6    -- I do want to give the Government an opportunity at the

7    end of the day to file this additional piece showing Pezzola

8    with the earpiece -- additional photo.  Is there any way,

9    Mr. Smith, you can make these representations on paper and I

10   can certainly take them up before I enter the order, if

11   necessary.

12             MR. NICHOLAS SMITH:  Well, Your Honor, I think --

13   thank you for that opportunity, but I think it relates to

14   the findings that Your Honor just made on conditions, and I

15   think it would behoove the record to have some interaction

16   on the conditions element, if the Court will allow some just

17   very brief points to be made that are not in the record

18   right now, and we would just appreciate the opportunity to

19   clarify some of the conditions points.

20             THE COURT:  Well, I mean, I don't feel -- let me

21   --

22             What's the Government's view on this?

23             I mean, Mr. Smith, here's just the problem, you

24   know?  I have received, like, you know -- the parties

25   submitted, as you are mentioning, extensive briefing and,

1    even after that, additional video, additional audio even

2    after I had heard argument on the motions.  So I mean, why

3    should I give -- why should I --

4            MR. NICHOLAS SMITH:  Your Honor, this doesn't have

5    to do with new facts.  This is just about conditions that

6    the defendant is willing to offer that bear on the Court's

7    analysis of whether -- so the standard, as the Court pointed

8    out, is whether any conditions would suffice to guarantee

9    appearance.  So Your Honor, we'd just like to quickly just

10   run through a couple of these points.

11           THE COURT:  All right.  Let me just ask, does the

12   Government have any objection to this?

13           MR. MCCULLOUGH:  Your Honor, the -- Your Honor has

14   ruled.  Your Honor has weighed all of the factors in

15   considering whether pretrial detention is necessary to

16   protect the public.  I think Your Honor has described your

17   concerns about whether the defendants would be able to abide

18   by those conditions and has explained your logic and

19   reasoning.  I think that we're about to hear from defendant

20   as to some reason that he disagrees with that analysis and,

21   Your Honor, I don't believe it's appropriate to address

22   that.

23           MR. NICHOLAS SMITH:  Your Honor, just to be clear,

24   I'm -- this is not about raising objections with the Court's

25   analysis.  This is just about just clarifying some of the

1      points about conditions that could potentially work that

2      have not been addressed by the Court yet but would -- it

3      would -- we would be grateful for the opportunity to raise a

4      condition with the Court so that it could be addressed as an

5      offer of proof.

6              THE COURT:  Well, then I have to -- but, see, I

7      guess my point, then, Mr. Smith, is then I have to -- what

8      you're asking me to do is consider a new -- more information

9      about my ruling.  And so, you know, then you're not giving

10     me -- you're not giving the Government the opportunity -- I

11     mean, I'm not saying you're not letting folks respond, but

12     now I'm delaying my ruling further to give the Government an

13     opportunity to respond and to give me an opportunity to

14     think about what you're proffering when, all along, for now

15     quite a while you've had the opportunity to clarify these

16     points before.

17             MR. NICHOLAS SMITH:  Your Honor, I should clarify

18     one more thing which is the Government has given the -- been

19     given the opportunity to respond.  In order to save the

20     Court some time, we reached out to the Government last week

21     and proposed a series of conditions.  The Government

22     actually took a few hours to think about them, came back to

23     me, and I would just like to put on the record, Your Honor,

24     that colloquy which I think is very significant to the

25     Court's ruling.

1              THE COURT:  All right.  That -- you can go ahead

2      and put that on the record.

3              MR. NICHOLAS SMITH:  Okay.  Thank you, Your Honor.

4              So as Your Honor noted, the standard is whether

5      any condition or combination of conditions would suffice to

6      guarantee the safety of the public and the defendant's

7      appearance in court.  And so there are -- your -- the Court

8      addressed the condition of perhaps banning communications

9      between Mr. Nordean and other Proud Boys but indicated that

10     -- the Court's finding that it was not satisfied that the

11     defendants, given the record, would comply.  So Your Honor,

12     we approached the Government last week and offered to --

13     offered the following conditions which I'm going to give to

14     Your Honor very briefly.

15             The first condition is to remove all electronic

16     devices from the phone [sic], including -- the home, excuse

17     me, including all cell phones, all laptops, all computers,

18     everything except a telephone -- a landline telephone that

19     could be used to communicate solely with Mr. Nordean's

20     counsel to preserve his right to counsel.

21             The -- we also proposed as a combination or in a

22     -- or alternatively to restrict whatever discretion the

23     probation officer currently has under the conditions of

24     release to allow Mr. Nordean to leave the home for any

25     reason.  So currently, there's just educational and job and

1    religious opportunities outside the home.  We have proposed

2    restricting every single limitation to leave the home except

3    for medical emergency.

4          We've also offered to allow -- and Your Honor's

5    familiar with this type of condition.  We will offer to

6    allow the probation officer to enter the home without a

7    warrant to investigate at any opportunity the probation

8    officer deems fit to examine whether somehow the ankle

9    bracelet that Mr. Nordean is wearing and that the strict

10   conditions of confinement are being complied with, Your

11   Honor.

12         And I think -- at the point where there's no

13   electronic devices in the home, I think we've eliminated the

14   possibility of using the types of encrypted communications

15   that the Court found suspicious in its finding.

16         Your Honor, we're also willing to post the bond of

17   every dollar that the defendant has raised to support

18   himself.  He -- it's, obviously, very difficult to find work

19   in -- when you're confined to your home, but he's willing to

20   post a bond of about $20,000 which he's using to support his

21   mother and his -- excuse me, his wife and his child.  And,

22   Your Honor, if $20,000 is not sufficient, the defendant is

23   willing to place his home as collateral.  The home is the

24   shelter for his child and his wife.  And Your Honor might

25   respond that the home is normally used as a condition -- a

1    collateral condition for risk of flight; however, the

2    defendant would be willing to post the home as collateral

3    against any breach of the conditions of release the Court is

4    willing to impose.  So for example, to take the Court's

5    example, if Mr. Nordean were to insight a rally or some sort

6    of political violence, despite foreswearing it on a couple

7    of occasions in the public record, his home would be seized.

8    That's the home in which his child lives, Your Honor.

9            So I think these are conditions that don't really

10   rely on the Court's trust in the character of the defendant.

11   These are conditions that would, essentially, bankrupt the

12   defendant and cripple his family, Your Honor, and I think

13   those are conditions that show the defendant is not going to

14   breach any order Your Honor imposes and that -- and with a

15   telephone left to speak to your lawyer and no electronic

16   devices in the home, Your Honor, we asked the Government,

17   Well, at this point, can you explain the good-faith basis

18   for asserting that Mr. Nordean may pose some vague harm that

19   hasn't been articulated yet?  And the Government responded

20   that the spirit of 1776 imbues the defendant, and so there

21   are no conditions of release.  But, Your Honor, I think Your

22   Honor would agree that comments about, sort of -- vague,

23   sort of, political comments don't really address the

24   specific conditions we're offering to impose on Mr. Nordean

25   so that he does not leave the home for any reason or

1    communicate with anyone except for his lawyer.

2          THE COURT:  Okay.  So Mr. Smith, I'll -- let me

3    just respond this way.

4          I definitely thought very carefully about the

5    types of conditions that you are proposing here.  And the

6    question is, at what point -- and, in fact, undertook to

7    learn about the -- whatever computer monitoring program

8    there might be -- there is in the Western District of

9    Washington, etcetera.  The problem, I think, is, at the end

10   of the day, given the reasoning I laid out here -- and I'm

11   not going to go over it again -- but given the reason I've

12   laid out here, it's still -- nothing you've said actually

13   prevents -- and I'm not, you know -- prevents an associate

14   from visiting Mr. Nordean or Mr. Biggs in their home and

15   providing them with a smartphone for some period of time.

16         You make the point -- and I think, you know,

17   you're right -- that there are all sorts of things that you

18   can do, for example, to try to mitigate against that to some

19   degree.  As you've said, you can have the probation -- the

20   Pretrial Services person be able to give spot checks.  You

21   can have a -- but, look, there -- that person is not

22   standing outside Mr. Nordean's door.  We know that.  There

23   is a limit to the resources the government can use to

24   ensuring that he not contact -- that he would comply with a

25   non-contact order.

1          So I thought very clearly about the types of

2     things you're talking about.  And I think on the -- for the

3     reasons I've stated, I don't think they're sufficient.

4          MR. NICHOLAS SMITH:  And, Your Honor, just one

5     follow-up.  Is Your Honor finding that a condition of the

6     collateralized home and a bond would not suffice to ensure

7     compliance?

8          THE COURT:  Well, again, the problem with that is,

9     I have no way of knowing what I don't know.  In other words,

10    Mr. Nordean or Mr. Biggs could engage in all sorts of

11    communications with other people -- it -- as -- for the --

12    in exactly the way I suggested, and there would not be any

13    way for the Court to know that that had happened so -- such

14    that it wouldn't be the risk to him of being caught and then

15    having -- I understand.  That is a -- that would create a

16    risk for him, but it is not some -- I think the problem for

17    me is I don't -- I would not know what I don't know and he

18    could be doing all sorts of things that there would be no

19    way of ever finding out, and so there wouldn't be an obvious

20    -- I mean, it's -- like, as I mentioned, I think it's easy

21    for someone to show up to someone's house with a smartphone

22    these days.  That's the way it -- technology works now

23    and --

24          MR. NICHOLAS SMITH:  Your Honor is -- Your Honor's

25    probably familiar with surveillance options outside the

67

1    home.  Is that an option that Your Honor would be willing to

2    consider?

3              THE COURT:  I -- look, Mr. Smith, if you want to

4    -- I've thought about a lot of options, but I'm not going to

5    sit here and have you pepper me with, you know, things that

6    you haven't presented before.  The types of things you've

7    talked about, I have considered, and I have ruled here

8    today.  I feel -- I'm going to give the Government until the

9    close of business today to enter that photograph in the

10   record.  And, obviously, the parties are free to seek review

11   of this -- of the order that I'll enter either later today

12   or first thing tomorrow if you see fit.

13             MR. NICHOLAS SMITH:  Thank you, Your Honor.

14             THE COURT:  All right.

15             MR. HULL:  If I may, Your Honor?  Dan Hull for Joe

16   Biggs, Defendant --

17             THE COURT:  Yes.

18             MR. HULL:  -- No. 2.

19             THE COURT:  Yes, Mr. Hull.

20             MR. HULL:  It pays to be Defendant No. 1 at some

21   point.  I -- as you know, Mr. Biggs was not able to get on

22   the regular Zoom process.  I think he got back on the phone

23   by the conference call --

24             THE COURT:  Okay.

25             MR. HULL:  -- device, but I'm not sure

1   everything -- that he heard everything.  So if I wanted to,

2   I couldn't -- I have not enough information.  I haven't been

3   able to confer with my client about anything that was just

4   said since Mr. McCullough spoke on the conditions; however,

5   I do want to thank you for the thoroughness which -- that

6   you took in this task.  And you have made your ruling.  I

7   agree with Mr. McCullough.  And while it's not that it was

8   unexpected, they've not -- I am not sure at this point how

9   we will proceed.  I can't really do much on this level or

10  any other level until I'm able to talk to Mr. Biggs.  I'm

11  not sure how much Mr. Biggs heard of this today.  I think he

12  heard most of it, but I don't know the parts that he didn't.

13          THE COURT:  And, you know, obviously, there will

14  be a transcript available if -- well, for --

15          MR. HULL:  There will be.

16          THE COURT:  -- to order.  So --

17          MR. HULL:  And thanks, again, for -- thanks --

18  thank you for your efforts on that, sir.  This is novel and

19  difficult.

20          THE COURT:  Well, you're welcome.

21          I guess the question now is -- and, maybe -- what

22  we want to do going forward here with the co-defendants, the

23  possibility of the speedy trial clock and, you know, how the

24  parties want to respond to that ruling.  I'm open to hearing

25  from either side about, sort of, whether we need to build in

1    a little time for the parties to, sort of, assess how they

2    want to go forward.  If that makes sense, I'm happy to give

3    the parties a little breathing space to do that and then to

4    come back and figure out how we want to proceed.

5           I'll just, I guess, turn to Mr. McCullough to

6    start.  But really, this is a, kind of, defendants' call

7    more than the Government's call.

8           MR. MCCULLOUGH:  Yes, Your Honor.  Thank you.

9           I think just first, as a matter of housekeeping,

10   Your Honor had tolled speedy trial up and through April 9th.

11   I think it would be appropriate, based on previous rulings

12   and the record that we had laid at our hearing, to toll the

13   speedy trial through today's date, April 19th, and to do

14   that nunc pro tunc.  So as just a housekeeping matter, we

15   think that that would be appropriate.

16          There -- I'm very happy to, kind of, lay a

17   complete record on the -- how the interests of justice are

18   served by tolling the speedy trial clock here.  And even

19   before doing so, I think the -- frankly, the -- at minimum,

20   it does make sense to get all of our co-defendants on the

21   same track.  And, as I see it, Defendant Rehl is scheduled

22   to have his detention in front -- detention hearing in front

23   of Your Honor on May 3rd which is Monday, May 3rd.

24   Defendant Donohoe is having his hearing before the

25   magistrate judge this afternoon.  So the Government would

1    propose that we continue and toll the time for the speedy

2    trial clock through the -- at least the May 3rd date if not,

3    perhaps, May 5th date to allow time for the defendants to

4    consider this ruling, and also, ensure that we can get all

5    the defendants on the same track.

6            More broadly, Your Honor, I think that this is an

7    unusual and complex case.  It is a conspiracy that is

8    charged.  There are a number of defendants.  There are

9    co-conspirators outside of this charged indictment, as Your

10   Honor knows.  There are a number of agencies that are

11   involved in the investigation.  The volume and sources of

12   evidence, both from witnesses and victims who were present

13   that day as well as the official documents, all of that

14   speaks to, kind of, the unprecedented nature of the volume

15   and complexity of this case.  Certainly, tolling through

16   that period is sensible.  The Government would argue that a

17   -- that it would be appropriate to toll for a period of 60

18   days to allow for continued production of discovery, to

19   allow both the Government and defendants to prepare with

20   respect to that discovery, and to represent their clients

21   accordingly.  But, as I said, I think there's an

22   intermediate ground which would allow the defendants to

23   consider and get us all on the same track and schedule.

24           MR. HULL:  Your Honor --

25           THE COURT:  Mr. --

1          MR. HULL:  -- if I --

2          THE COURT:  Please --

3          MR. Hull:  -- if I may?

4          THE COURT:  -- Mr. Hull.

5          MR. HULL:  I don't want to go out of order, but I

6     would suggest a shorter time until -- at least until about

7     14 or 15 days from now which would be -- and I understand

8     what, you know, Mr. McCullough's saying and I appreciate it,

9     but the -- I was thinking more along the last day of -- say,

10    May 6th or May 7th and, maybe, we can have another idea

11    thrown in there, but I would like it to be a shorter time,

12    especially given what happened today.

13         THE COURT:  Mr. Smith?

14         MR. NICHOLAS SMITH:  I agree with Mr. Hull's

15    sentiments on the Speedy Trial Act timing.

16         But if Your Honor will allow me just to take up

17    one more housekeeping item which is Your Honor proposed a

18    process for moving forward, and we would just note that now

19    that Your Honor's ruled it can take weeks -- sometimes

20    several weeks -- Your Honor is probably familiar with

21    this -- to set up attorney-client calls in jails right now

22    in the country because of the pandemic.  This is going to

23    seriously slow down the process moving forward on every

24    motion.  I can tell you that when Mr. Nordean was in the

25    Seattle SeaTac facility, it was a struggle to get email

1     communications with him, much less attorney-client calls,

2     Your Honor.

3             There's one more item, which is transferring

4     Mr. Nordean to this District.  The Government has

5     represented to us in the past that they will seek his

6     transfer to the D.C. Jail where -- Your Honor -- well, Your

7     Honor was very thorough with putting our supplemental facts

8     into the record, but one additional fact is that there's now

9     been reporting that Capitol defendants have been assaulted,

10    have had their eyes knocked out, and have been beaten up in

11    the D.C. Jail.  That was one reason we thought that finding

12    some kind of conditions with the Government would be

13    appropriate for home confinement.  But, Your Honor, we would

14    ask for a recommendation from the Court that Mr. Nordean

15    remain in Seattle at least temporarily until we can work out

16    how to proceed.

17            THE COURT:  So let me -- okay.  So I think it does

18    make sense to address that issue first.  So let's address

19    the issue.

20            What is the Government's position?

21            I certainly -- again, I suppose, as you point out,

22    Mr. Smith, all I can do is recommend, I think.  And I

23    certainly, you know -- or I suppose I can not request a

24    transfer or not sign a transfer order.

25            Mr. McCullough, what is the Government's position

1    on just -- we'll get to the speedy trial and when we come

2    back and all like that, but this does strike me as a more

3    antecedent matter.  What is the Government's view on that?

4    And how can I -- it, you know -- what's the Government's

5    view on what I should do regarding the placement of these

6    two defendants at this point?

7            MR. MCCULLOUGH:  Well, Your Honor, as you know,

8    the -- that the detention orders have been combined with

9    transfer orders to this District.  I would say that, given

10   some of Mr. Smith's concerns about the ability to confer

11   with defendants particularly while they may be in transit,

12   that it would be appropriate to at least stay or hold off on

13   any transfer order for a time period here to ensure that

14   Mr. Smith and Mr. Hull have an opportunity to have, kind of,

15   continued consultation with their clients as they may be

16   considering appeals and the like, and so --

17           THE COURT:  Mr. McCullough, what did you -- you

18   started by saying that transfer orders and detention orders

19   have been combined?

20           MR. MCCULLOUGH:  I -- my understanding -- the

21   Government -- the -- to date, where we have had a detention

22   order, that has been combined, then, with a transfer order.

23   So someone that is ordered detained is being transferred to

24   the D.C. Jail.  I don't know that the Government has taken a

25   formal position on that.  And so I would want to, basically,

1    make sure that I'm conferring appropriately, but I do think

2    that the main consideration here from the Government's

3    perspective is to ensure that the defendants do have access

4    to counsel.  And at this, kind of, critical time where they

5    may be appealing and considering how to proceed, I think

6    that it's appropriate to at least delay a transfer order to

7    ensure that that can continue.

8              THE COURT:  Sure.  And then I would just -- I --

9    look, I think that makes sense.  And I assume, Mr. Smith and

10   Mr. Hull, you agree.  I -- at least, you know -- we'll talk

11   about when we're going to come back.  But, yes, I think that

12   makes sense and it sounds like something that both

13   defendants would sign on to.

14             MR. HULL:  Yes.

15             THE COURT:  All right.  So let's -- so I will not

16   sign, then, any transfer order pending further consultation

17   with the parties and we'll see how that goes.  I don't know

18   whether -- I guess I don't know what I -- I assume that the

19   defendant would not be automatically transferred here if I

20   don't sign such an order.  But if someone finds out that

21   that's the case and you want to let me know to make sure

22   that I can -- if I need to sign an order to make sure that

23   doesn't happen, then I'm certainly willing to do that,

24   because I think it -- as all the parties have said, it will

25   be easier on everyone if that doesn't happen.

1    MR. NICHOLAS SMITH:  And, Your Honor, one way of

2    resolving this problem because of the conflation of the

3    detention order and the transfer is to -- is a stay -- is a

4    temporary stay on detention so that the defendants can

5    decide when and whether to appeal.  And, you know, we can

6    talk about how long that might be, but that could be one

7    efficient way of resolving this.  I --

8              THE COURT:  Mr. Smith, I appreciate that, and you

9    represent your client well.  I don't think -- given what I

10   have found here, I don't think a stay of that is

11   appropriate.  I don't think a stay of that is appropriate.

12   But I won't enter a transfer order.  And if anyone here

13   thinks -- I'll certainly reach out to try to see what I can

14   find out about this, but if any party -- the Government or

15   counsel -- finds out -- if I need to do something to make

16   sure, at least temporarily, your client stays at the --

17   where -- in the location he's at, just let -- contact

18   chambers jointly and we'll work through it.

19             Mr. McCullough?

20             MR. MCCULLOUGH:  Yes, Your Honor.  And the

21   Government will reach out to the U.S. Marshals Service and

22   confirm what we need to do to ensure that this takes place

23   and is held.  And just for the record, the Government

24   opposes the stay of the detention order.

25             THE COURT:  I thought you would, but I oppose it,

 1      too.

 2              All right.  So I agree, then, again, consistent

 3      with that, let's try to figure out, you know -- I think --

 4      we do have the motion hearing for Co-Defendant Rehl on the

 5      3rd.  Just trying to do this, I -- what about -- and I

 6      want -- I also want to come back, you know, as quickly as we

 7      can here.  So I'm looking -- I guess I would have to find

 8      out, you know -- the question is going to be whether we can

 9      --

10              Ms. Harris, what is the challenge going to be in

11      terms of getting our defendants who will be detained in --

12      maybe, detained in other, you know -- in other jurisdictions

13      at that point?  Is it just -- I mean, there's no way to know

14      whether we'll have lines available into those facilities at

15      this point; is that fair to say?

16              THE DEPUTY CLERK:  That's --

17              THE COURT:  We just --

18              THE DEPUTY CLERK:  -- fair to say.

19              THE COURT:  We'll try to make it work and we'll

20      see.

21              THE DEPUTY CLERK:  Yeah, that's fair to say.  It's

22      going -- it's probably going to be a big challenge.  You

23      have four defendants in four different facilities and every

24      facility has different platforms that they use, and also,

25      various times.  So it's going to be a challenge, but --

1           THE COURT:  Well, at a minimum, we can -- they

2    don't have to -- especially -- well, for these two

3    defendants who are not proceeding with a substantive motion

4    or an arraignment, I think we can do it by audio.  They

5    could call in and just appear by audio, if we need to do

6    that.  It would strike me that that at least obviates the

7    issue of different video platforms.

8           All right.  So what about the 4th as a day that --

9    for us to -- two weeks from tomorrow -- we can pick a time,

10   you know -- 2:00 o'clock in the afternoon as a day when we

11   can all huddle up?  We'll know what, if any, action the

12   defendants might take to appeal my ruling today.  We'll know

13   -- I don't know -- how the landscape of the litigation has

14   changed in a relatively short period of time.  What does the

15   -- it's a day after the Rehl motion hearing.  So again,

16   presumably we could -- we can get them to appear the next

17   day.  We could --

18           THE DEPUTY CLERK:  Judge Kelly --

19           THE COURT:  Yes?

20           THE DEPUTY CLERK:  -- I don't know if you recall,

21   but Tuesday the 4th was not available in the afternoon at

22   the facility where Mr. Rehl is being held, because we were

23   originally going to have that on the 4th, but we had to

24   change it to the 3rd because they don't have a slot in the

25   afternoon.

1              THE COURT:  But could he appear via audio, though?

2              THE DEPUTY CLERK:  No, they don't do any

3     hearings -- the only hearings they have is in the morning.

4     And I have to check with them to see if they could even do

5     audio in the morning.

6              THE COURT:  Okay.  Well, so then -- okay.  Maybe

7     as late as -- just looking at what I have on the 4th --

8     11:30 on that day, perhaps.

9              THE DEPUTY CLERK:  I would have to check with her

10    and see.

11             THE COURT:  Okay.  I mean, all we can do is make

12    an effort here.

13             But how's that for the Government?

14             MR. MCCULLOUGH:  That time works for the

15    Government, Your Honor.  Thank you.

16             THE COURT:  And, Mr. Hull and Mr. Smith?

17             MR. HULL:  Your Honor, that's 11:30 on Tuesday,

18    May 4th?

19             THE COURT:  Tuesday, the 4th.  I think that was

20    the date you suggested, Mr. Hull.

21             MR. HULL:  It was very close.

22             THE COURT:  Please.

23             MR. HULL:  And just for the record, I join in

24    Mr. Smith's motion for a temporary stay.

25             THE COURT:  All right.  I've denied the motion,

1    but okay.

2              MR. NICHOLAS SMITH:  And the 4th works for the --

3    Mr. Nordean, Your Honor, as well.  The 4th at 11:30.  Yes.

4              THE COURT:  Okay.  It does work for you.  Okay.

5              All right.  So given that we're having that short

6    a turnaround, what is -- what are the defendants' positions

7    on Speedy Trial Act for the next two weeks?

8              MR. NICHOLAS SMITH:  Your Honor, we have no

9    objection to tolling through today to accommodate the Court

10   and, you know, through the 4th, as well.  We think that's

11   reasonable.

12             THE COURT:  All right.  Well, thank you,

13   Mr. Smith.  I mean, I think, at the end of the day --

14             Well, Mr. Hull --

15             MR. HULL:  Through the 4th, Your Honor.  Yes, sir.

16             THE COURT:  All right.  Yeah.  I mean, look, we're

17   going to take this one step at a time and see how things go.

18   Obviously, I'm, you know -- I'm sensitive now to the status

19   the defendants are in and so, you know, we'll take it one

20   step at a time.

21             So based on the representations Mr. McCullough has

22   made and the agreement of the two defendants, I will go

23   ahead and find that the time between -- well, nunc pro tunc

24   to the 9th and then going forward until May 4th that the

25   speedy trial between those two dates, April 9th and May 4th,

1    is excludable under the Speedy Trial Act because the ends of

2    justice that are served by taking such action outweigh the

3    best interests of the public and the defendant [sic] in a

4    speedy trial.  I'm doing so here, again, with the consent of

5    both defendants and in light of the extraordinary complexity

6    and extraordinary volume of discovery that is being produced

7    to toll the Speedy Trial Act from the 9th until May 4th.

8            All right.  Is there anything further that either

9    side thinks I need to address today?

10           Mr. McCullough?

11           MR. MCCULLOUGH:  Your Honor, the parties have been

12   in touch about the proposed protective order, and I do want

13   to revisit that with Mr. -- unless Mr. Smith will tell me

14   right now, I think we want to revisit that with Mr. Smith,

15   who I understand was going to reconsider that given whatever

16   the detention result was, but I believe that we had made

17   some progress on agreeing on a protective order with all of

18   the defendants.

19           THE COURT:  All right.  I -- remind me.  So in

20   this case -- at the moment at this case, we do not have a

21   protective order in place?

22           MR. MCCULLOUGH:  That is correct, Your Honor.

23           THE COURT:  Yeah.  So -- okay.  Obviously, that's

24   -- you all don't need me to tell you that that should be a

25   priority.

1      MR. NICHOLAS SMITH:  Your Honor, one of the issues

2    here on the protective order is that there's a provision in

3    the standard order that says that when the Government

4    designates material as highly sensitive, normally, the

5    procedure is that the defendant cannot look at it outside of

6    the presence of the lawyer.  There's a provision that's

7    supposed to accommodate detained defendants that it uses

8    cloud services that will allow, in theory, the defendant to

9    look at the sensitive materials but not to copy them, but

10   we're just not sure what the -- Your Honor knows that every

11   federal facility's a little bit different and they have

12   their own rules and quirks, and so we're not even -- we're

13   not sure whether Mr. Nordean will have access to a

14   cloud-based server.  So that's one issue with that.

15          THE COURT:  All right.  So obviously, that's, you

16   know -- that's something for the parties to look into.  And,

17   again, you don't have to wait until two weeks from tomorrow

18   if you, you know -- obviously, you all know where to find

19   me.

20          MR. MCCULLOUGH:  Thank you, Your Honor.

21          THE COURT:  All right.  Very well.  So if there's

22   nothing further, then, the parties are dismissed until May

23   --

24          MR. HULL:  If I may, Your Honor?  I -- just a --

25          THE COURT:  Oh, I'm sorry.

```
1              MR. HULL:  -- clarification.  I --

2              THE COURT:  Sure.

3              MR. HULL:  No, I apologize.  I meant to barge in

4     earlier, but a clarification without burdening the Court or

5     the court reporter, Mr. Miller.  Can you reiterate, again,

6     your sense of the timing in your order for transfer to the

7     U.S. Marshals.  How did you phrase that?  I mean, what was

8     your idea?  Give me a little bit --

9              THE COURT:  So --

10             MR. HULL:  -- more of a sense of that.

11             THE COURT:  Yes.  Yes.  I -- what I think I'll --

12    I mean, and I -- I'll -- what my intention is, is to just

13    simply say that they should report to the U.S. Marshals as

14    directed by Pretrial Services.  I think that's an

15    appropriate language.

16             MR. HULL:  Thank you.  Thank you, Your Honor.

17             THE COURT:  All right.  Very well.

18             All right.  We'll see everyone on May 4th.  Until

19    then, the parties --

20             MR. NICHOLAS SMITH:  March 4th.

21             THE COURT:  I'm sorry.  What did I say?

22             MR. NICHOLAS SMITH:  May.  I think you said May

23    4th, but I -- Your Honor meant March 4th.

24             THE COURT:  No, I meant May 4th.

25             MR. NICHOLAS SMITH:  Oh, excuse me.
```

```
 1                    (Laughter.)

 2                    There's been a lot of hearings.

 3                    THE COURT:  We already --

 4                    MR. SMITH:  There's been a few hearings here.

 5                    THE COURT:  We already did March, Mr. Smith.

 6                    All right.  So with that, we'll see everyone May

 7        4th.  The parties are dismissed.

 8                    MR. MCCULLOUGH:  Thank you, Your Honor.

 9                    (Proceedings concluded at 2:13 p.m.)

10                    * * * * * * * * * * * *

11                 CERTIFICATE OF OFFICIAL COURT REPORTER

12        I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify

13        that the above and foregoing constitutes a true and accurate

14        transcript of my stenographic notes and is a full, true and

15        complete transcript of the proceedings to the best of my

16        ability, dated this 23rd day of April 2021.

17                                 /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                                   Official Court Reporter
18                                 United States Courthouse
                                   Room 6722
19                                 333 Constitution Avenue, NW
                                   Washington, DC 20001
20

21

22

23

24

25
```