## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-175 |
| | ) |
| | ) **Judge Timothy J. Kelly** |
| ETHAN NORDEAN, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT NORDEAN'S MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Ethan Nordean*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ........................................................ 1

STATUTORY HISTORY AND FACTUAL BACKGROUND ........................... 3

    A.    Section 1512(c)(2)'s structure and legislative history ............... 3

    B.    Section 231(a)(3)'s structure and legislative history ............... 7

    C.    Section 1752 and the U.S. Secret Service ........................ 8

        1.   The legislative history of § 1752 ............................ 8

        2.   The current § 1752 ...................................... 12

        3.   History of the protection of the Executive Mansion ............. 14

    D.    The First Superseding Indictment (FSI) ........................ 16

ARGUMENT ........................................................ 18

    I.    Standard for a Rule 12(b) motion to dismiss ..................... 18

    II.    The Section 1512(c)(2) counts should be dismissed ............... 18

        A.   The FSI fails to state a § 1512(c)(2) offense ................ 18

        B.   If the government's interpretation of § 1512(c)(2) is applied
           it is unconstitutionally vague as to Nordean ................ 24

           1.  § 1512(c)(2) does not provide fair notice that "official
               proceedings" includes proceedings unrelated to the
               administration of justice ............................ 25

           2.  The government's interpretation of "corruptly" fails
               this Circuit's *Poindexter* test ...................... 27

        C.   The rule of lenity dictates that any ambiguities in § 1512(c)(2)
           be resolved in Nordean's favor ........................... 30

        D.   The novel construction principle of the Due Process Clause
           requires rejection of the government's interpretation, which would
           operate as an *ex post facto* law ........................ 31

        E.   The FSI's application of § 1512(c)(2) is invalid under the

First Amendment, as applied to Nordean .......................................... 32

III.   The Section 231(a)(3) counts should be dismissed .......................... 35

    A.   Section 231(a)(3) exceeds Congress's Commerce Clause
authority ................................................................................. 35

        1.   The police power and the Commerce Clause's prohibition
on Congress's regulation of intrastate activity that does
not "substantially affect" interstate commerce ................. 36

        2.   Section 231(a)(3) does not substantially affect interstate
commerce…………………………………………............ 37

            (a)   Section 231(a)(3) does not regulate economic
activity ................................................................. 37

            (b)   The jurisdictional element of § 231(a)(3) does not
limit its reach to activities that substantially
affect interstate commerce ................................... 39

            (c)   Congress did not find that § 231(a)(3)'s activities
substantially affect interstate commerce ............. 40

            (d)   The relationship between § 231(a)(3)'s activities
and any effect on interstate commerce is too
attenuated ............................................................. 42

    B.   Section 231(a)(3) is unconstitutionally vague ........................ 42

        1.   Section 231(a)(3)'s vague standards fail to provide fair
notice and risk arbitrary enforcement .............................. 42

        2.   Section 231(a)(3) cannot be saved by construction without
violating the constitutional separation of powers ............ 45

IV.   The Section 1752 counts should be dismissed ................................... 46

    A.   The FSI fails to state an offense because only the USSS restricts
areas under § 1752 ................................................................. 49

    B.   If the government's interpretation of § 1752 is applied, it is
unconstitutionally vague as to Nordean ................................. 49

1.     The government's interpretation of § 1752(c) is
unconstitutionally vague ............................................... 49

2.     The government's interpretation of § 1752(a)(2) is
unconstitutionally vague ............................................ 51

C.    The rule of lenity dictates that any ambiguities in § 1752 be resolved
in Nordean's favor ................................................................ 54

D.    The novel construction principle dictates against the government's
interpretation, which would operate as an *ex post facto* law ............ 54

V.    The FSI should be dismissed because it does not provide adequate
notice and does not ensure the grand jury made determinations
required by the Fifth Amendment ............................................. 55

A.    The federal property depredation allegations are not elucidated
sufficiently ................................................................................... 56

B.    The civil disorder allegations are not elucidated sufficiently ............ 57

CONCLUSION .................................................................................... 57

## TABLE OF AUTHORITIES

**CASES**                                                                                                 **Page**

*Barenblatt v. United States*, 360 U.S. 109 (1959) ......................................................20

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ..................................................passim

*Brown v. Louisiana*, 383 U.S. 131 (1966) ...............................................................33

*Buckley v. Valeo*, 424 U.S. 1 (1976) ........................................................................24

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ...................................................passim

*City of Houston v. Hill*, 482 U.S. 451 (1987) ..........................................................35

*Coates v. City of Cincinnati*, 402 U.S. 611 (1971) ..............................................44-45

*Colautti v. Franklin*, 439 U.S. 379 (1979) ..............................................................43

*Cole v. Arkansas*, 333 U.S. 196 (1948) ....................................................................55

*Citizens United v. FEC*, 558 U.S. 310 (2010) ..........................................................24

*Connally v. General Constr. Co.*, 269 U.S. 385 (1926) .............................................52

*Corley v. U.S.*, 556 U.S. 303 (2009) .........................................................................47

*Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401 (D.C. Cir. 2013)......................47

*Edwards v. District of Columbia*, 755 F.3d 886 (D.C. Cir. 2014) .........................passim

*Hamling v. United States*, 418 U.S. 87 (1974) .........................................................18

*Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489 (1982)....................passim

*Kent v. Dulles*, 357 U.S. 116 (1958) .........................................................................52

*Kilbourn v. Thompson*, 103 U.S. 168 (1881) ............................................................19

*Kolender v. Lawson*, 461 U.S. 352 (1983) ................................................................24

*McGrain v. Daugherty*, 273 U.S. 136 (1927) ...........................................................19

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) .............................47

*Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.2d 1 (D.C. Cir. 2009) ....................................24

*Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972) ............................... 24,53

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ............................................ passim

*Smith v. O'Grady*, 312 U.S. 329 (1941) ................................................ 55

*Snyder v. Phelps*, 562 U.S. 443 (2011) ................................................ 33

*Stirone v. United States*, 361 U.S. 212 (1960) ........................................ 56

*St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531 (1978) ....................... 40

*Texas v. Johnson*, 491 U.S. 397 (1989) ................................................ 33

*Tinker v. Des Moines Ind. Comm. School Dist.*, 393 U.S. 397 (1989) .................. 33

*Trump v. Mazars United States*, 940 F.3d 710 (D.C. Cir. 2019) ...................... 19

*United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 503 (1969) .................... 47

*United States v. Ballestas*, 795 F.3d 138 (D.C. Cir. 2015) .......................... 12

*United States v. Bronstein*, 849 F.3d 1101 (D.C. Cir. 2017) ......................... 24

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) .............................. passim

*United States v. Bursey*, 2004 U.S. Dist. LEXIS 29661 (D.S.C. Sept. 13, 2004) ...... passim

*United States v. Caputo*, 201 F. Supp. 3d 65 (D.D.C. 2016) .......................... 34

*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) ............................ 21

*United States v. Grace*, 461 U.S. 171 (1983) ......................................... 33

*United States v. Granderson*, 511 U.S. 39 (1994) .................................... passim

*United States v. Harmon*, 474 F. Supp. 3d 76 (D.D.C. 2020) .......................... 12

*United States v. Kozminski*, 487 U.S. 931 (1988) .................................... 45

*United States v. Lanier*, 520 U.S. 259 (1997) ....................................... 24

*United States v. Lopez*, 514 U.S. 549 (1995) ........................................ passim

*United States v. Moore*, 613 F.2d 1029 (D.C. Cir. 1979) ............................. 46

*United States v. Morrison*, 529 U.S. 598 (2000) .................................................... passim

*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) .................................... passim

*United States v. Ragen*, 314 U.S. 513 (1942) .............................................................. 43

*United States v. Rumley*, 345 U.S. 41 (1953) .............................................................. 20

*United States v. Santos*, 553 U.S. 507 (2008) ....................................................... passim

*United States v. Wiltberger*, 18 U.S. 76 (1820) .......................................................... 30

*Virginia v. Hicks*, 539 U.S. 113 (2003) ...................................................................... 44

*Williams v. Fears*, 179 U.S. 270 (1900) ..................................................................... 52

**STATUTES**

18 U.S.C. § 1752 ................................................................................................... passim

18 U.S.C. § 3056 ................................................................................................... passim

18 U.S.C. § 1512(c)(2) .......................................................................................... passim

18 U.S.C. § 231(a)(3) ............................................................................................ passim

18 U.S.C. § 1503 .................................................................................................... 20-21

18 U.S.C. § 1504 .................................................................................................... 20-21

18 U.S.C. § 1505 ................................................................................................... passim

18 U.S.C. § 1510 .................................................................................................... 20-21

18 U.S.C. § 1513 .................................................................................................... 20-21

18 U.S.C. § 1515 .................................................................................................... 20-21

18 U.S.C. § 1516 .................................................................................................... 20-21

18 U.S.C. § 1517 .................................................................................................... 20-21

18 U.S.C. § 1518 .................................................................................................... 20-21

18 U.S.C. § 1519 .................................................................................................... 20-21

18 U.S.C. § 1521 .................................................................................................... 20-21

**RULES AND REGULATIONS**

Federal Rule of Criminal Procedure 7 ................................................................... 11

Federal Rule of Criminal Procedure 12 ................................................................. 12

31 Code of Federal Regulations Part 408 .............................................................. 10

**OTHER AUTHORITIES**

Joseph Story, Commentaries on the Constitution (1833) ....................................... 55

The White House Historical Association ................................................................ 16

W. Blackstone, Commentaries on the Laws of England (1765) ....................... 25, 52

Defendant Ethan Nordean, through his counsel, files this motion to dismiss the First Superseding Indictment (FSI), pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, because it fails to state valid offenses and violates several constitutional protections.

## INTRODUCTION

The FSI charges that, on January 6, 2021, Nordean conspired, attempted to, and did, violate, and aided and abetted the violation of, 18 U.S.C. § 1512(c)(2) and § 231(a)(3).  FSI, Counts 1-3.  It also charges that, on the same day, Nordean violated § 1752 by entering a "restricted building and grounds" without lawful authority.  FSI, Counts 5-6.  Finally, it charges that Nordean attempted to, and did, depredate, and aided and abetted the depredation of, federal property, causing damage over $1,000.  FSI, Count 4.  Those charges should be dismissed with prejudice for the following reasons.

**Section 1512(c)(2).**  The basis of the § 1512(c)(2) charge (Count Two), and the count charging a conspiracy to violate that statute (Count One), is that Nordean and others aimed to "hinder Congress's certification of the Electoral College vote" after the 2020 presidential election, which the FSI characterizes as an "official proceeding" under § 1512(c)(2).  FSI, ¶ 27. Nordean did so, the government alleges, in the misguided belief that the legislature should refuse to certify the vote upon a review of evidence that he mistakenly contended showed voter fraud. But, as the FSI correctly alleges, the joint session of Congress on January 6 did not review evidence and find facts; it merely "formalized the result of the 2020 U.S. Presidential Election." *Id.* at ¶ 3.  Thus, Congress was not exercising its implied power of investigation.  Because Section 1512(c)(2) has never been applied to a "proceeding" that does not involve a tribunal hearing evidence and finding facts, the government misapplies the statute.  Even if its construction were formally correct, as applied to Nordean the government's interpretation of §

1

1512(c)(2) is void for vagueness, requiring dismissal under the Due Process Clause of the Fifth Amendment to the Constitution, particularly in the context of Nordean's political speech, assembly and petitioning of the government for a redress of grievances.  U.S. Const. amend I. And even if the statute's notice were not unconstitutionally vague, the very fact that the government's interpretation of § 1512(c)(2) is without precedent means that the rule of lenity, and the novel construction principle, require any ambiguity to be resolved in Nordean's favor.  In addition, insofar as the FSI's § 1512(c)(2) charges criminalize the nonviolent protest of acts of Congress per se, they violate the First Amendment, as applied to Nordean.

**Section 231(a)(3).**  Section 231(a)(3), concerning interference with local law enforcement during a "civil disorder," exceeds Congress's Commerce Clause authority by reaching purely intrastate interactions between individuals and local law enforcement officers. Such police powers have always belonged to the States.  Section 231(a)(3)'s requirement that a "civil disorder" affect commerce "in any way or degree" lacks the requisite causal nexus between a defendant's act and interstate commerce, nor does it require a substantial effect on commerce.  No interpretation of § 231(a)(3) avoids constitutional infirmity.  In addition, as with its construction of § 1512(c)(2), the government's interpretation of §231(a)(3), as applied to Nordean, is unconstitutionally vague as it rests on imprecise terms—such as "any act"—in defining the crime, providing inadequate notice of the prohibited conduct and facilitating arbitrary and discriminatory enforcement that have manifested in this case.

**Section 1752.**  Since its enactment in 1970, Section 1752 has criminalized the unlawful entry into areas restricted for the protection of U.S. Secret Service (USSS) protectees.  Statutory text, legislative history, and common sense all point to the conclusion that the agency that restricts such areas is the one that guards them, i.e., the USSS.  But here, the government

2

contends that any federal or state entity may criminalize a person's movements under federal law.  It alleges that Nordean violated § 1752 because the Capitol was visibly restricted by the U.S. Capitol Police (USCP).  But the USCP do not guard the Secret Service protectees identified in § 1752; they protect members of Congress, who are neither guarded by the USSS nor covered by § 1752.  The government's interpretation of § 1752 is a nonce argument designed for January 6 defendants alone.   The § 1752 counts should be dismissed for failure to state offenses.  As applied to Nordean, the government's interpretation of § 1752 is also void for vagueness, requiring dismissal under the Due Process Clause of the Fifth Amendment to the Constitution, particularly in the context of Nordean's political speech, assembly and petitioning of the government for a redress of grievances.  Even if the statute's notice were not unconstitutionally vague, the fact that the government's interpretation of a 50-year-old statute is without precedent means that the rule of lenity, and the novel construction principle, require any ambiguity to be resolved in Nordean's favor.

**All Counts, including Count Four.**  The FSI's boilerplate January 6 allegations—not specifying what property was damaged and by whom, or how Nordean interfered with law enforcement—violate the presentment and notice functions of grand jury indictments under the Fifth and Sixth Amendments and Rule 7(c) of the Federal Rules of Criminal Procedure.

On all these grounds, independently and collectively, the Court should dismiss the FSI.

## STATUTORY HISTORY AND FACTUAL BACKGROUND

### A.    Section 1512(c)(2)'s structure and legislative history

Section 1512(c) provides: "Whoever corruptly—

(1)    alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

3

(2)      otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined . . . or imprisoned. . .

§ 1512(c).

Section 1515 defines the term "official proceeding" as used in Section 1512(c).  "[T]he term 'official proceeding' means—

(A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(B) a proceeding before the Congress;

(C) a proceeding before a Federal Government agency which is authorized by law; or

(D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

§ 1515(a)(1).

Section 1515 also defines the term "corruptly"—but only for obstruction offenses charged "in section 1505." § 1515(b).  Before this definition was added, the D.C. Circuit had determined that § 1505's adverb "corruptly" was unconstitutionally vague.  *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991).  Congress subsequently amended § 1515 to provide,

*As used in section 1505*, the term "corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information.

§ 1515(b) (emphasis added).

Section 1512(c)(2) was enacted as part of the Sarbanes-Oxley Act of 2002 (SOX).  SOX was "[a]n Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." Sabanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745.  As the previous U.S. attorney general described it,

4

SOX "was prompted by Enron's massive accounting fraud and revelations that the company's outside auditor, Arthur Andersen, had systematically destroyed potentially incriminating documents." Mem. of William P. Barr, dated June 8, 2018 ("Barr Mem"), p. 5, available at: https://bit.ly/2RYVZ47.  Upon a review of the statute's legislative history, the former attorney general concluded that the plain purpose of § 1512(c)(2) was a "loophole closer meant to address the fact that the existing section 1512(b) covers document destruction only where a defendant has induced another person to do it and does not address document destruction carried out by a defendant directly." *Id.*

The legislative history supports the former attorney general's interpretation of § 1512(c)(2)'s purpose.  A Senate Judiciary Committee report described SOX's purpose as "provid[ing] for criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded securities or alter or destroy evidence in certain Federal investigations." S. Rep. No. 107-146, at 2 (2002).  The report states that the Corporate Fraud Accountability Act was designed to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14-15.  Section 1512(c) did not exist as part of the original proposal.  S. 2010, 107th Cong. (2002).  Rather, Senator Trent Lott introduced it as an amendment in July 2002.  148 Cong. Rec. S6542 (daily ed. July 10, 200).  The senator explained the purpose of adding § 1512(c):

> [This section] would enact stronger laws against *document shredding*.  Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered . . . [T]his section would allow the government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena.  I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year.

*Id.* at S6545 (emphasis added).

Senator Orin Hatch explained that § 1512(c) would "close [] [the] loophole" created by the available obstruction statutes and hold criminally liable a person who, acting alone, destroys documents. *Id.* As the former attorney generally summarized this history, "The legislative history thus confirms that § 1512(c) was not intended as a sweeping provision supplanting wide swathes of obstruction law, but rather as a targeted gap-filler designed to strengthen prohibitions on the impairment of evidence." Barr Mem., p. 6.

Unlike § 1512(c), Section 1505 concerns obstruction of congressional proceedings "by threats or force." It provides criminal penalties for:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of *the power of inquiry* under which *any inquiry or investigation* is being had by either House, or any committee of either House or any joint committee of the Congress—

§ 1505 (emphasis added).

The italicized portions of that section show that Congress limited the obstruction-of-Congress offense to a specific kind of congressional "proceeding": those pursuant to Congress's "power of inquiry," which are "inquir[ies] or investigation[s]." § 1505. The legislative history of § 1505 shows that it was designed to prevent obstruction of only those proceedings held pursuant to Congress's investigative power. *Poindexter*, 951 F.2d at 380-81. Section 241, the predecessor of § 1505, was passed in 1940 to bar witness tampering before Congress. As the D.C. Circuit summarized the legislative history: "The Senate and House Reports and the floor debates concerning [§ 1505's predecessor] . . . state that the 'proposed legislation simply extends the protection now provided by law for witnesses in Court proceedings to witnesses in proceedings before either House of Congress or committees of either House (or joint

committees).'" 951 F.2d at 381 (quoting .R. Rep. No. 1143, 76th Cong., 1st Sess. 1 (1939); S. Rep. No. 1135, 76th Cong., 1st Sess. 1 (1939)).

### B.    Section 231(a)(3)'s structure and legislative history

Section 231 provides criminal penalties for:

> Whoever commits or attempts to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function—

§ 231(a)(3).

Section 231(a)(3) was enacted as part of the Civil Obedience Act of 1968 (COA).  Pub. L. 90-284, Apr. 11, 1968, Title X.  Senator Russell B. Long of Louisiana sponsored the COA during the Senate's debates over the Civil Rights Act of 1968.  114 Cong. Rec. 1294-96 (Jan. 29, 1968).  It was proposed as a rejoinder to the civil rights bill and to the civil rights movement. Long explained the purposes of the COA in floor debate:

First, the COA was to nullify the legal protections proposed under the "hate crime" title of the Civil Rights Act of 1968.  Codified at 18 U.S.C. § 245, that title criminalized interfering with another person because of the person's race or because he engaged in federally protected activity.  Senator Long was clear that the COA was designed to diminish the hate crime law.  114 Cong. Rec. 1287-94 (Jan. 29, 1968).  His "greatest immediate concern" about the hate crime law was "the unwitting stumbling block it could place before State and local officials in their honest attempts to detain and prosecute incendiary rabble rousers." *Id.* at 1289.  He noted that "half of the Baton Rouge police force could have been thrown into jail" under the hate crime law for beating and setting attack dogs on peaceful protestors.  *Id.*

7

Second, it was the COA's purpose to jail civil rights leaders.  For example, Senator Long said the COA was needed due to "a so-called civil rights march led by Dr. Martin Luther King in the streets of Birmingham in March of 1963." 114 Cong. Rec. 1294 (Jan. 29, 1968).  During that march, Long complained, Dr. King had "addressed a tense crowd with inflammatory words," while in jail, King "wrote an inflammatory letter which gained wide recognition in its pleas for Negroes to disobey those laws they felt unjust." *Id.*  Long offered similar explanations for the COA by reference to other civil rights leaders.  114 Cong. Rec. 5536 (Mar. 6, 1968).  As for the constitutional power Congresses needed to pass the COA—the Commerce Clause—Long explained the COA would apply to intrastate conduct so that it would "not leave available to Rap Brown or Stokely Carmichael the technical defense that they did not cross the State boundary with the intent to create a riot." 114 Cong. Rec. 5533.

Third, Senator Long said the COA would "strike at" the "doctrine . . . that one should not obey the laws that stand in the way of alleged 'civil rights.'" 114 Cong. Rec. 1295 (Jan. 29, 1968).

As to the COA section that would become § 231(a)(3), Senator Long explained that this section "would make it a Federal offense for people to snipe at firemen or shoot at policemen while they are trying to do their duty protecting lives and property." 114 Cong. Rec. 5542.

C.      **Section 1752 and the U.S. Secret Service**

1.      *The legislative history of § 1752*

Congress enacted 18 U.S.C. § 1752 as part of the Omnibus Crime Control Act of 1970. Public Law 91-644, Title V, Sec. 18, 84 Stat. 1891-92 (Jan. 2, 1971).  At the time, the USSS was part of the Treasury Department.

8

Later Congresses would amend Section 1752, but like its current iteration, the 1970 statute provided that it was "unlawful for any person . . . (1) willfully and knowingly to enter or remain in . . .(ii) any posted, cordoned off, or otherwise restricted area of a building or grounds where the President is or will be temporarily visiting. . ." 84 Stat. 1891-92.[1] The statute made clear which entity "prescribed regulations" governing the "posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting": the Treasury Department, of which the USSS was then part. § 1752(d)(2); 84 Stat. 1892.

In 1969, Senators Roman Lee Hruska and James Eastland designed S. 2896, which would later be codified at § 1752. The very purpose of the bill was to give the Secret Service the power to restrict areas for temporary visits by the president, a power which no other federal agency then possessed. S. Rep. No. 91-1252 (1970). The Senate Judiciary Committee report accompanying S. 2896 made clear that in 1970, "[a]lthough the Secret Service [was] charged with protecting the person of the President . . . there [was], at the present time, no Federal statute which specifically authorize[d] *them to restrict entry to areas* where the President maintains temporary residences or offices." S. Rep. No. 91-1252, at 7 (emphasis added).

Similarly, during floor debate on the bill, senators explained that the key purpose of the legislation that would become § 1752 was to vest the Secret Service in particular with the authority to set restricted areas, cutting through the patchwork of existing State laws and local ordinances and *freeing the Secret Service from reliance on other government agencies*. Explaining the need for S. 2896, Senator McClellan stated:

> Protecting the President . . . is a formidable task for the Secret Service, which is charged with safeguarding the personal life of the President. As difficult as this task is, however,

---

[1] Unlike the current § 1752, the 1970 statute did not criminalize mere entry into a restricted area but also required the disruption of government business or the obstruction of ingress or egress from the area. 84 Stat. 1891-92.

it is rendered even more difficult because the Secret Service's present powers are
somewhat limited.  Title 18, section 3056 of the United States Code authorizes the Secret
Service to protect the life of the President, but does little more.  *Consequently, the Service
must rely upon a patchwork of State laws and local ordinances and local officers to clear
areas for security perimeters, to provide for free ingress and egress when the President is
visiting, and to protect the President's private homes from trespassers.*

116 Cong. Rec. 35,651 (1970) (statement of Sen. McClellan) (emphasis added).

Similarly, Senator Hruska explained that S. 2896 was needed to empower the Secret

Service to set restricted areas:

It would be unconscionable not to recognize the obvious fact that the President's
vulnerability is maximized when he is traveling or residing temporarily in another section
of the country.  It would be unconscionable not to recognize the obvious fact that *the
Secret Service does not presently possess adequate Federal authority during these most
vulnerable occasions.*  This body cannot ignore the obvious responsibility and duty it has
at this moment to *create the needed* protection and *authority*.

116 Cong. Rec. 35,653 (statement of Sen. Hruska) (emphasis added).

Following enactment, Treasury promulgated regulations governing restricted areas under

§ 1752 in Chapter IV, part 408 of title 31 of the Code of Federal Regulations.  31 C.F.R. §§

408.1-408.3.  Section 408.1 stated that "the regulations governing access to such restricted areas

where the President or any other person protected by the Secret Service is or will be temporarily

visiting are promulgated pursuant to the authority vested in the Secretary of the Treasury by 18

U.S.C. § 1752." 31 C.F.R. § 408.1.  Part 408 provided many examples of the USSS, and no other

agency, exercising its power under § 1752 to set and define restricted areas:

- A temporary residence of President Reagan in California was defined by USSS using

  property law metes and bounds, § 408.2(a);

- For temporary residences of other Secret Service protectees, the Secret Service shall

  provide the description of restricted property, § 408.2(b);

- Concerning temporary offices of Secret Service protectees, the Secret Service shall provide to the pubic "verbal or written notice to prospective visitors at each protective site," § 408.2(c).

As for gaining lawful access to areas restricted under § 1752, Part 408 was clear that authorization must be obtained from the Secret Service.  § 408.3.  No other federal agency was mentioned in Part 408.

In 2006, the Secret Service Authorization and Technical Modification Act of 2005, Public Law 109-177, Title VI, Sec. 602, 120 Stat. 252 (Mar. 9, 2006), amended Section 1752 to eliminate references to regulations.  Subsection (d) of § 1752 as enacted in 1970, which authorized the Secretary of the Treasury to issue regulations, was struck.  References to residences as "designated" were also eliminated.[2]

In 2012, § 1752 was amended for a final time in the Federal Restricted Buildings and Grounds Improvement Act of 2011, Public Law 112-98, Sec. 2, 126 Stat. 263 (Mar. 8, 2012). The Act's legislative history shows that the only agency involved in enforcement of § 1752 is the USSS.   The only agency discussed by members of Congress in connection with § 1752 is the Secret Service.  157 Cong. Rec. H 1372-1373.   Members of Congress offered lectures on the history of the Secret Service.  *Id.*  The 2012 bill's author was Congressman Thomas Rooney of Florida.  Addressing the three restricted areas defined in § 1752(c)—the White House or Vice President's residence, a place where a Secret Service protectee is visiting, and special events of

---

[2] When it later repealed Part 408 of title 31 in April 2018, the Department of Homeland Security, of which the USSS is now part, explained that, in its current form, § 1752 itself defines the restricted areas which were previously described (in the same way) in the regulations, rendering the latter redundant and unnecessary.  Restricted Building or Grounds, 84 Fed. Reg. 18,939-18,940 (Apr. 30, 2018) (repealing 31 C.F.R. Part 408).

national significance—Congressman Rooney simply states the Secret Service is responsible for all three.  157 Cong. Rec. H 1372-1373 ("H.R. 347 ensures that the Secret Service has the ability to secure all necessary areas surrounding restricted buildings and grounds that house our leaders, their families, and foreign heads of state.").  Other representatives flatly state as obvious fact that the Secret Service restricts areas under the statute. For example, Congressman Hank Johnson of Georgia: "Current federal law prohibits individuals from entering or remaining in areas cordoned off as restricted because of protection being provided by the Secret Service." 157 Cong. Rec. H 1373.[3]

2.   *The current § 1752*

In its current version, Section 1752 criminalizes "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so." 18 U.S.C. § 1752(a)(1).  It also criminalizes,

> knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions. . .

§ 1752(a)(2).

In turn, "restricted building or grounds" is statutorily defined.  In Section 1752,

(1) the term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area—

(A) of the White House or its grounds, or the Vice President's official residence or its grounds;

---

[3] Although not relevant to this motion, the 2012 amendment clarified that § 1752 does not apply to people who have lawful authority to enter a restricted area; that the White House and Vice President's residence are restricted areas; and that the requisite *mens rea* is "knowingly," not "willfully."  157 Cong. Rec. H 1372-1373.

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance;

18 U.S.C. § 1752(c)(1).

The first two subparts of Section 1752(c) concern individuals protected by the USSS.  In subpart (A) those individuals are the President (at the White House) and the Vice President (at his or her official residence).  In subpart (B) the individual protected by the Secret Service is the President or "other person protected by the Secret Service."[4] Members of Congress are not protected by the Secret Service. 18 U.S.C. § 3056(a) (setting forth persons USSS is "authorized to protect").  Protection of Congressmen and Senators is the role of a separate federal agency, the United States Capitol Police.  The U.S. Capitol Police do not provide for the protection of Secret Service protectees.  *See* United States Capitol Police: Our Mission, available at: https://www.uscp.gov/; § 3056(a).

The final Section 1752(c) subpart concerns "a building or grounds so restricted in conjunction with an event designated as a special event of national significance." "Designation" in this subpart refers to a specific federal agency process.  Major federal government or public events that are considered to be nationally significant may be designated by the President—or his representative, the Secretary of the Department of Homeland Security (DHS)—as National Special Security Events (NSSE).  18 U.S.C. § 3056(e)(1).  Section 3056 designates the USSS as the lead federal agency responsible for coordinating, planning, exercising and implementing

---

[4] The term "other person protected by the Secret Service" is also statutorily defined.  It means "any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential Memorandum, when such person has not declined such protection." 18 U.S.C. § 1752(c)(2).

security for NSSEs.  *Id.*[5]  Accordingly, all three subparts of 18 U.S.C. § 1752(c)(1) concern decision-making authority or action by the Secret Service.

Section 3056 sets forth the "Powers, authorities, and duties of United States Secret Service." 18 U.S.C. § 3056.  Subsection (d) criminalizes interfering with agents "engaged in the protective functions authorized by this section *or by section 1752 of this title. . .*" 18 U.S.C. § 3056(d) (emphasis added).  Subsection (e) states, "When directed *by the President*, the United States Secret Service is authorized to participate, under *the direction of the Secretary of Homeland Security*, in the planning, coordination, and implementation of security operations at special events of national significance, *as determined by the President*." 18 U.S.C. § 3056(e)(1) (emphasis added).  Finally, subsection (g) stresses the independence of the Secret Service's mission.  "The United States Secret Service shall be maintained as a distinct entity within the Department of Homeland Security and shall not be merged with any other Department function. No personnel and operational elements of the United States Secret Service shall report to an individual other than the Director of the United States Secret Service, who shall report directly to the Secretary of Homeland Security without being required to report through any other official of the Department." 18 U.S.C. § 3056(g).

3.    *History of the protection of the Executive Mansion*

The history of the protection of the Executive Mansion shows that it has generally, if not exclusively, been the duty of a single law enforcement actor or entity, not of overlapping,

---

[5] The joint session of Congress that met at the U.S. Capitol on January 6, 2021, to open, certify, and count the November 2020 presidential election votes was not designated an NSSE. National Special Security Events: Fact Sheet, Jan. 11, 2021, p. 1, Congressional Research Service, available at: https://fas.org/sgp/crs/homesec/R43522.pdf.

independent agencies.  The following points are drawn from The White House Historical Association:[6]

**1812-1814**: President Madison garrisoned a company of 100 militia on the grounds of the President's House.

**1823**: Commissioner for Public Buildings, Joseph Elgar, recommended to President Monroe that plainclothes officers protect the White House.

**1830**: D.C. Marshal Tench Ringgold ordered guards posted at the White House gates to maintain order at the president's "public levees."

**1837-1841**: President Van Burden ordered the White House grounds to be patrolled by day guards and night watchmen.

**1842**: Establishment of the first permanent security force for the White House: an auxiliary guard that consisted of a captain and his three men, who looked out for suspicious-looking people.

**1853-1857**: Franklin Pierce becomes the first president to have a full-time bodyguard, Thomas O'Neil.

**1861**: Metropolitan Police guarded the Executive Mansion but Lincoln "did not want the house to take on the characteristics of an armed camp. Guards inside the Executive Mansion dressed in civilian clothes and concealed their firearms."

**1901**: After the assassination of President McKinley, Congress informally requested Secret Service protection for the president.

---

[6] Founded in 1961 by First Lady Jacqueline Kennedy, The White House Historical Association is a private nonprofit educational organization with a mission to enhance understanding of the Executive Mansion.  The White House Historical Association, About Us, May 10, 2021, available at: https://www.whitehousehistory.org/about.

**1901-1909**: During the Theodore Roosevelt administration, the Secret Service assumed full-time responsibility for protecting the president.

**1922**: At the request of President Warren G. Harding, a permanent White House Police Force was created.

**1930**: The White House Police Force placed under the administration of the Secret Service.

**1951**: Congress passed Public Law 82-79 which permanently authorized Secret Service protection of the president, his immediate family, the president-elect and the vice president.

**1962**: Congress passed Public Law 87-829, enlarging Secret Service coverage to include the vice president and the vice president-elect.

**1970**: Congress passed Public Law 91-217, renaming the White House Police Force the Executive Protective Service.

**1977**: The Executive Protective Service officially renamed the Secret Service Uniformed Division.

**2003**: Congress passed Public Law 107-296, under which the Secret Service was transferred from the Department of the Treasury to the Department of Homeland Security. Guarding the White House, The White House Historical Association, available at: https://www.whitehousehistory.org/press-room/press-timelines/guarding-the-white-house.

### D.    The First Superseding Indictment

The First Superseding Indictment (FSI) charges Nordean with the following offenses:

**Count One**: conspiring to (1) corruptly obstruct, influence, and impede an official proceeding, namely, "Congress's certification of the Electoral College vote" on January 6, in violation of 18 U.S.C. § 1512(c)(2), and to (2) obstruct, impede, and interfere with law

16

enforcement officers engaged in the lawful performance of official duties incident to and during the commission of a civil disorder, in violation of 18 U.S.C. § 231(a)(3).

**Count Two**: corruptly obstructing, influencing, and impeding an official proceeding by entering the Capitol grounds or the Capitol building to "stop, delay and hinder Congress's certification of the Electoral College vote," in violation of § 1512(c)(2).

**Count Three**: obstructing, impeding and interfering with law enforcement officers lawfully engaged in official duties incident to and during the commission of a civil disorder, in violation of § 231(a)(3).

**Count Four**: injuring and committing depredation against property of the United States, causing "damage to the [Capitol] building in an amount more than $1,000."

**Counts Five and Six**: unlawfully and knowingly entering "a restricted building and grounds, that is, any posted, cordoned off, and otherwise restricted area within the United States Capitol and its grounds, where the Vice President and Vice President-elect were temporarily visiting," in violation of § 1752(a)(1), and engaging in disorderly and disruptive conduct that in fact disrupted the orderly conduct of government business while in that restricted area, in violation of § 1752(a)(2).[7]

The FSI does not allege in what sense Nordean's conduct was "corrupt" in the sense of § 1512(c)(2). It alleges that the joint session of Congress on January 6 "formalized the result of the 2020 U.S. Presidential election." FSI, ¶ 3. The FSI does not allege what acts Nordean committed to obstruct, impede or interfere with law enforcement officers on January 6. It does not allege what federal property he depredated, how he depredated it, or what the damage

---

[7] All counts also charge Nordean with attempting to commit, and aiding and abetting the commission of, those offenses.

amounted to.  Nor does it allege how any of the defendants depredated federal property.  The FSI does not allege that the Secret Service set the "restricted area" it alleges Nordean entered or remained in.

## **ARGUMENT**

### I.     **Standard for a Rule 12(b) motion to dismiss a criminal information**

Rule 7 of the Federal Rules of Criminal Procedure provides that "the indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense charged . . ." Fed. R. Crim. P. 7(c)(1).  This rule performs three constitutionally required functions: (1) fulfilling the Sixth Amendment right to be informed of the nature and cause of the accusation; (2) preventing a person from being subject to double jeopardy, as required by the Fifth Amendment; and (3) protecting against prosecution for crimes based on evidence not presented to the grand jury, as required by the Fifth Amendment.  *See*, *e.g.*, *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).

Rule 12 provides that a defendant may move to dismiss the pleadings on the basis of a "defect in the indictment or information," including a "lack of specificity" and a "failure to state an offense." Fed. R. Crim. P. 12(b)(3)(B)(iii),(v).  In the Supreme Court's last decision to address the standard, it held that an indictment must "fairly inform[] a defendant of the charge against which he must defend" and "must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offence, coming under the general description, with which he is charged." *Hamling v. United States*, 418 U.S. 87, 117-18 (1974).

### II.     **The Section 1512(c)(2) counts should be dismissed**

#### A.     **The FSI fails to state § 1512(c)(2) offenses**

Counts One and Two of the FSI, charging Nordean with violating and conspiring to violate § 1512(c)(2), rest on the legal theory that he obstructed, impeded and interfered with the joint session of Congress on January 6, which the FSI characterizes as an "official proceeding" under that statute.  Because the joint session's Electoral College vote count did not exercise Congress's implied power of investigation in aid of legislation but instead "formalized the result of the 2020 U.S. Presidential election," FSI, ¶ 3, the joint session did not constitute an "official proceeding" as that term has been construed in every reported § 1512(c)(2) case on the subject.

It is settled law that proceedings held pursuant to Congress's legislative power under the Constitution exhibit legal characteristics different from those held under its implied and auxiliary power of investigation.  *See*, *e.g.*, *Trump v. Mazars United States*, 940 F.3d 710, 719-23 (D.C. Cir. 2019) (outlining history of Congress's power to investigate in aid of legislation).  In its earliest decision to draw a formal distinction between the legislative and investigative powers, the Supreme Court held that the House of Representatives had exceeded its investigatory authority by opening an inquiry into the bankruptcy proceedings of a firm in which the United States had invested money.  *Kilbourn v. Thompson*, 103 U.S. 168 (1881).  The Court held that Congress's sole route to a remedy in the bankruptcy proceeding was "by a resort to a court of justice" *id.* at 183, because the House's investigation "could result in no valid legislation." *Id.* at 195.  Later, in *McGrain v. Daugherty*, the Court found that Congress properly issued a subpoena for bank records relevant to the Senate's investigation into the Department of Justice because "the subject to be investigated was . . . [p]lainly [a] subject . . . on which legislation could be had." 273 U.S. 136, 176 (1927).

Cases involving defendants' attempts to interfere with Congress's auxiliary investigative power have always included actions that prevent, or are designed to prevent, Congress from

hearing evidence and making factual findings: refusals to answer congressional committees'
requests, *United States v. Rumley*, 345 U.S. 41, 42 (1953); refusals to testify at congressional
hearings, *Barenblatt v. United States*, 360 U.S. 109 (1959); and obstructing proceedings by
making false statements to a congressional inquiry, *United States v. Poindexter*, 951 F.2d 369
(D.C. Cir. 1991).  All of these cases have indisputably involved alleged inference with
Congress's exercise of its investigative power.

That Congress intended to limit congressional obstruction prosecutions to acts interfering
with its investigative power is seen in the text and structure of Chapter 73 of title 18, concerning
"Obstruction of Justice." As noted above, although the government charges Nordean with a
violation of § 1512(c)(2), it is § 1505 that criminalizes obstruction of congressional proceedings
"by threats or force." § 1505.  The government did not use that more appropriate statute here for
a simple reason.  Section 1505 explicitly requires that the obstructed proceeding be an "inquiry
or investigation . . . being had by either House, or any committee of either House or any joint
committee of the Congress." § 1505.  Here, the Congressional Record unequivocally shows the
joint session was not exercising Congress's investigatory power on January 6.  To the contrary, it
shows that members of the House and Senate requested but did not receive such power. 167
Cong. Rec. H79, 105-06, 108, 111 (2021); 167 Cong. Rec. S16, 25, 32 (2021).

Chapter 73's other sections betray a uniform, targeted focus on the obstruction of
proceedings related to the administration of justice. They exhibit that purpose either by focusing
on the investigation affected by the obstruction,[8] or on the actor whose key role in the

---

[8] § 1510 (criminalizing interference with criminal investigation through bribery), § 1516
(obstruction of federal audit), § 1517 (obstruction of examination of financial institution), § 1518
(obstruction of health care investigation), § 1519 (obstruction of federal investigation through
document destruction and falsification).

administration of justice has been affected by the obstruction.[9] Similarly, Section 1515's definition of "official proceeding," as that term is used in § 1512(c)(2), contains an array of proceedings that involve the administration of justice:

(a) As used in sections 1512 and 1513 of this title and in this section—

(1) the term "official proceeding" means—

(A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;

(B) a proceeding before the Congress;

(C) a proceeding before a Federal Government agency which is authorized by law; or

(D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce;

§ 1515(a)(1).

Attempts by the government to charge defendants with violations of § 1512(c) outside this context of a judicial or quasi-judicial proceeding have uniformly failed.  In *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013), for example, the government argued that an FBI investigation qualified as an "official proceeding" under § 1515.  The Ninth Circuit rejected that argument with the following reasoning:

"Proceeding" has been defined in various ways, ranging from the broad to the specific. But an account of both lay and legal dictionaries suggests that definitions of the term fall into one of two categories: "proceeding" may be used either in *a general sense* to mean "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior" *or more specifically as a legal term* to mean "[a] legal action or process; any act done by authority of a court of law; a step taken by either party in a legal case." *Proceeding*, Oxford English Dictionary, *available at* http://www.oed.com; *see*

---

[9] §§ 1503, 1504 (jurors), § 1513 (witnesses, victims, informants), § 1521 (judges or law enforcement officers).

*also* Black's Law Dictionary 1241 (8th ed. 2004) (defining proceeding either narrowly as (1) "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment;" (2) "[a]ny procedural means for seeking redress from a tribunal or agency;" and (3) "[t]he business conducted by a court or other official body; a hearing" or more broadly as "an act or step that is part of a larger action."). As such, one of the word's definitions ("an action or series of actions") is broad enough to include a criminal investigation, as it encompasses a wide range of activities. *See Proceeding*, Oxford English Dictionary, *available at* http://www.oed.com. But the other ("any act done by authority of a court of law; a step taken by either party in a legal case") would exclude criminal investigations in the field, *as it associates the term with formal appearances before a tribunal*. *See id.*

752 F.3d at 1169-70 (emphasis added).

The court of appeals determined that the specifically legal definition of "proceeding"—associated with formal appearances before a tribunal—was the right one for several reasons. First, "the descriptor 'official' indicates a sense of formality normally associated with legal proceedings." *Id.* at 1170.  Second, the word "proceeding" in § 1515(a)(1) is "surrounded with other words that contemplate a legal usage of the term, including 'judge or court,' 'federal grand jury,' 'Congress,' and 'federal government agency.'" *Id.*  Third, legal dictionaries define "proceeding" as "'a word much used to express the *business done in courts*.'" *Id.* (quoting Black's Law Dictionary 1241 (8th ed. 2004)) (emphasis original).  Fourth, the "use of the preposition 'before' suggests an appearance in front of [a body] sitting as a tribunal." *Id.* at 1171. Fifth, "Section 1512 refers to 'prevent[ing] the attendance or testimony of any person in an official proceeding'; 'prevent[ing] the production of a record, document, or other object, in an official proceeding'; and 'be[ing] absent from an official proceeding to which that person has been summoned by legal process.' 18 U.S.C. § 1512(a)(1)(A)-(B), (a)(2)(B)(iv).  The use of the terms 'attendance,' 'testimony,' 'production,' and 'summon[]' when describing an official proceeding strongly implies that some formal hearing before a tribunal is contemplated." *Id.* at 1172.

Every single one of those factors applies to the phrase "a proceeding before the Congress." § 1515(a)(1)(B). As the FSI itself alleges, there was no "hearing *before* a tribunal" on January 6, but rather a "formaliz[ation of] the result of the 2020 U.S. Presidential election." FSI, ¶ 3. The joint session on January 6 was not an exercise of Congress's investigatory power. 167 Cong. Rec. H79, 105-06, 108, 111 (2021); 167 Cong. Rec. S16, 25, 32 (2021). The FSI does not allege Nordean's "obstruction" of Congress on January 6 in the sense meant by all § 1512 precedent: the prevention of a tribunal's ability to hear evidence and make factual findings. With exquisite irony, the government contends that Nordean and the other defendants were very much mistaken in their belief that it would be appropriate for Congress to investigate voter fraud on January 6. FSI, ¶ 28.

Counts One and Two suffer from additional legal flaws. As shown above, the legislative history of § 1512(c)(2) overwhelmingly shows that, in the words of the former U.S. attorney general, Congress intended that the statute serve as a "loophole closer meant to address the fact that the existing section 1512(b) covers document destruction only where a defendant has induced another person to do it and does not address document destruction carried out by a defendant directly." Barr Mem, p. 5. The FSI does not allege that Nordean violated § 1512(c)(2) by virtue of directly destroying or altering documents destined for use in a proceeding to administer justice. It does not even allege a proceeding to administer justice. Instead, it appears to allege that he violated the statute by virtue of his mere presence at the Capitol. That allegation does not state an offense under § 1512(c)(2). It is not even close.

For all of these reasons, Counts One and Two fail to state that Nordean committed offenses under § 1512(c)(2). Therefore, they should be dismissed with prejudice.

**B.     If the government's interpretation of § 1512(c)(2) is applied, it is unconstitutionally vague as to Nordean**

A criminal statute is unconstitutionally vague if it "'fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement.'" *United States v. Bronstein*, 849 F.3d 1101, 1106 (D.C. Cir. 2017) (quoting *Johnson v. United States*, 576 U.S. 591, 595 (2015)); *see also Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.2d 1, 23 (D.C. Cir. 2009) (noting that criminal statute must "'provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal'") (quoting *Buckley v. Valeo*, 424 U.S. 1, 77 (1976)).  "[T]he touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 67 (1997).  "The void-for-vagueness doctrine . . . guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes.  And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) (citing *Kolender v. Lawson*, 461 U.S. 352, 358 (1983)).  In addition, if the law at issue "interferes with the right of free speech or of association, a more stringent vagueness test [] appl[ies]." *Hoffman Estates v. Flipside*, *Hoffman Estates*, 455 U.S. 489, 500 (1982) (citing *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972)).

Vagueness challenges are either facial or as-applied.  "'[T]he distinction between facial and as-applied challenges . . . goes to the breadth of the remedy employed by the Court, not what must be pleaded by the complaint.'" *Edwards v. District of Columbia*, 755 F.3d 886, 1001 (D.C. Cir. 2014) (quoting *Citizens United v. FEC*, 558 U.S. 310, 331 (2010)).

If the government's novel interpretation of § 1512(c)(2) is applied here, it is unconstitutionally vague for the following reasons.

1.      *§ 1512(c)(2) does not provide fair notice that "official proceedings" includes proceedings unrelated to the administration of justice*

As indicated above, § 1512(c)(2) has never been used to prosecute a defendant for the obstruction of an "official proceeding" unrelated to the administration of justice, i.e., a proceeding not charged with hearing evidence and making factual findings.  Moreover, there is no notice, much less fair notice, in § 1512(c)(2) or in any statute in Chapter 73 that a person may be held federally liable for interference with a proceeding that does not resemble a legal tribunal. Accordingly, the government's interpretation of § 1512(c)(2) here is void-for-vagueness as applied to Nordean.

In this case, the void-for-vagueness doctrine's function of guarding against arbitrary or discriminatory law enforcement is worth elaborating.  As Justice Gorsuch explained in a *Dimaya* concurrence,

> Vague laws invite arbitrary power.  Before the Revolution, the crime of treason in English law was so capaciously construed that the mere expression of disfavored opinions could invite transportation or death.  The founders cited the crown's abuse of 'pretended' crimes . . .as one of their reasons for revolution. . . Today's vague laws may not be as invidious, but they can invite the exercise of arbitrary power all the same—by leaving the people in the dark about what the law demands and allowing prosecutors and courts to make it up.

138 S. Ct. at 1223-24.

Justice Gorsuch gave some early, original examples of statutes that failed to provide fair notice and thus led to arbitrary enforcement:

> Blackstone illustrated the point with a case involving a statute that made "stealing sheep, or other cattle" a felony. 1 Blackstone 88 (emphasis deleted). Because the term "cattle" embraced a good deal more then than it does now (including wild animals, no less), the court held the statute failed to provide adequate notice about what it did and did not cover—and so the court treated the term "cattle" as a nullity. *Ibid.* All of which, Blackstone added, had the salutary effect of inducing the legislature to reenter the field and make itself clear by passing a new law extending the statute to "bulls, cows, oxen," and more "by name." . . .

This tradition of courts refusing to apply vague statutes finds parallels in early American practice as well. In *The Enterprise*, 8 F. Cas. 732, F. Cas. No. 4499 (No. 4,499) (CC NY 1810), for example, Justice Livingston found that a statute setting the circumstances in which a ship may enter a port during an embargo was too vague to be applied, concluding that "the court had better pass" the statutory terms by "as unintelligible and useless" rather than "put on them, at great uncertainty, a very harsh signification, and one which the legislature may never have designed." *Id.,* at 735. In *United States* v. *Sharp*, 27 F. Cas. 1041, F. Cas. No. 16264 (No. 16,264) (CC Pa. 1815), Justice Washington confronted a statute which prohibited seamen from making a "revolt." *Id.*, at 1043. But he was unable to determine the meaning of this provision "by any authority . . . either in the common, admiralty, or civil law." *Ibid*. As a result, he declined to "recommend to the jury, to find the prisoners guilty of making, or endeavouring to make a revolt, however strong the evidence may be." *Ibid.*

Nor was the concern with vague laws confined to the most serious offenses like capital crimes. Courts refused to apply vague laws in criminal cases involving relatively modest penalties. *See*, *e.g., McJunkins* v. *State*, 10 Ind. 140, 145 (1858).

138 S. Ct. at 1226.

The concern about vagueness-enabled arbitrary enforcement is manifested here.  It takes two forms, which might be called specific and general arbitrariness.  At a general level, the government's enforcement of § 1512(c)(2) against Nordean is arbitrary because, prior to January 6, it had never prosecuted a violation of that statute by alleging obstruction of a congressional proceeding that was not held pursuant to Congress's investigatory power.  Accordingly, the government's election to put a new interpretation on the statute for a select group of related cases raises questions about discriminatory law enforcement.  Those questions are only underlined by the patently political nature of the circumstances of the offense, as well as the criminalization of Nordean's First Amendment rights to political speech, assembly, and to petition the government for a redress of grievances.  U.S. Const. amend I; *Hoffman Estates*, 455 U.S. at 500 (stricter scrutiny of vague statutes in the context of activities protected by the First Amendment).

Perhaps more serious is the specific arbitrariness here.  The government has charged nearly 500 people with federal crimes related to the January 6 protests.  Many, if not most, of

those defendants allegedly entered the Capitol Building.  Yet many, if not most, of those people have not been charged under § 1512(c)(2), even though the government alleges all the defendants had the same object: to stop the Electoral College vote count.  The explanation for why the government chose to prosecute Nordean under § 1512(c)(2), and not others, is not hard to find.  The government targets him for political reasons.  It is stated on the face of the FSI.  Nordean is a "leader" of the Proud Boys, a "pro-Western fraternal organization for men whose refuse to apologize for creating the modern world; aka Western Chauvinists." FSI, ¶ 5.  Of course, Nordean's affiliation with a political group has nothing to do with § 1512(c)(2).  But the government's naked reliance on Nordean's political associations shows the danger of arbitrariness inherent in the vague and elastic interpretation of § 1512(c)(2) it offers for this specific set of defendants alone.

Insofar as they both allege that Nordean obstructed a type of "official proceeding" nowhere identified in §§ 1512(c)(2) and 1515, Counts One and Two must be dismissed under the Due Process Clause of the Fifth Amendment.

2.   *The government's interpretation of "corruptly" fails this Circuit's* Poindexter *test*

The FSI contends that Nordean's alleged obstruction of Congress on January 6 was aimed at stopping or delaying the Electoral College vote count.  However, the FSI does not allege how Nordean's purported aim, a sincerely held political belief, satisfies § 1512(c)(2)'s "corruptly" requirement.  The FSI alleges that a desire to protest in support of a mistakenly held political belief is "corrupt" under that statute.  That construction is void-for-vagueness as § 1512(c)(2) provides no notice of that interpretation, which would also invite arbitrary and discriminatory law enforcement.

27

In *United States v. Poindexter*, a former national security advisor was charged under §

1505 for obstructing a congressional investigation into the Iran/Contra Affair. 951 F.2d 369, 371

(D.C. Cir. 1991). In that case, the defendant's obstruction consisted of lying to or misleading

Members of the House and Senate Intelligence Committees about U.S. shipments of missiles to

Iran. *Id.* at 372. The relevant passage of § 1505 provided "Whoever corruptly . . . . influences,

obstructs, or impedes or endeavors to influence, obstruct or impede . . .the due and proper

exercise of the power of inquiry under which any inquiry or investigation is being had by either

House, or any committee of either House . . .shall be [punished]. . ." The court held that

Poindexter's lying to Congress, while a violation of § 1001, was not an obstruction offense under

§ 1505.

The D.C. Circuit first determined that two forms of vagueness inhered in the adverb

"corruptly." First, the court observed that the verb "corrupt" "may be used transitively ('A

corrupts B,' i.e., 'A causes B to act corruptly') or intransitively ('A corrupts,' i.e., 'A becomes

corrupt, depraved, impure, etc.')." 951 F.2d at 379. It also found that § 1505's adverb

"corruptly" could take on either a transitive or intransitive meaning. The court decided that §

1505 "favor[ed] the transitive reading." *Id.* Second, the court found that "corruptly" was also

vague in the sense that "[r]eading 'corruptly' to prohibit one from influencing another to act

'immorally' or 'improperly' provides no more guidance than does reading it to prohibit one from

acting 'immorally' or 'improperly' oneself." *Id.*

Accordingly, to avoid unconstitutional vagueness the court construed § 1505 "to include

only 'corrupting' another person by influencing him to violate his legal duty." *Id.* The court

further found that even that definition of "corruptly" may suffer from unconstitutional vagueness

where the defendant's purpose is not "to obtain an improper advantage for himself or someone

else. . ." *Id.* at 385.  The court gave this example of activity the adverb "corruptly" may not cover

without vagueness problems:

> [S]omeone who influences another to violate his legal duty [but] to cause the enactment
> of legislation that would afford no particular benefit to him or anyone connected to him.
> Or, as the Chief Judge instances at the oral argument of this case, there "would be some
> purposes that would be corrupt and some that wouldn't be . . . Suppose the [defendant
> acted] to protect the historical reputation of some historical figure that has been dead for
> 20 years and he decides that he doesn't want to mar that person's reputation."

*Poindexter*, 951 F.2d at 386.

As indicated above, following *Poindexter* Congress amended § 1515 to clarify that "As

used *in Section 1505*, the term 'corruptly' means acting with an improper purpose, personally or

by influencing another, including making a false or misleading statement, or withholding,

concealing, altering or destroying a document or other information." § 1515(b) (emphasis

added).  However, Congress did not amend § 1515 to define "corruptly" as used in § 1512.  In

addition, the phrase "improper purpose" was held unconstitutionally vague in *Poindexter*.  951

F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more

specific—indeed they may be less specific—than 'corrupt.'").

Here, the FSI's construction on § 1512(c)'s adverb "corruptly" fails this Circuit's

*Poindexter* test.  First, the FSI does not allege that Nordean obstructed the January 6 joint session

"to obtain an improper advantage for himself or someone else. . ." *Poindexter*, 951 F.2d at 386.

Instead, it contends he allegedly obstructed the session in support of the sincerely held political

belief that the 2020 presidential election was not fairly decided.  Such an interpretation of §

1512(c) is unconstitutionally vague because it leaves to judges and prosecutors to decide which

sincerely held political beliefs are to be criminalized on an ad hoc basis.  *Dimaya*, 138 S. Ct. at

1223-24.  Second, the FSI neither alleges that Nordean influenced another person to obstruct the

January 6 proceeding in violation of their legal duty, nor that Nordean himself violated any legal

duty by virtue of his mere presence that day.  Accordingly, Counts One and Two should be dismissed as they rest on an unconstitutionally vague interpretation of "corruptly."

### C.     The rule of lenity dictates that any ambiguities in § 1512(c)(2) be resolved in Nordean's favor

Even if § 1512(c)(2) is not unconstitutionally vague as applied to Nordean, any ambiguities in the statute should be resolved in his favor under the rule of lenity.  Under that principle, "where text, structure, and history fail to establish that the government's position is unambiguously correct," courts must "apply the rule of lenity and resolve the ambiguity in [the defendant's] favor." *United States v. Granderson*, 511 U.S. 39, 54 (1994).  "When interpreting a criminal statute, we do not play the part of a mindreader." *United States v. Santos*, 553 U.S. 507, 515 (2008) (Scalia, J.).  "In our seminal rule-of-lenity decision, Chief Justice Marshall rejected the impulse to speculate regarding a dubious congressional intent. 'Probability is not a guide which a court, in construing a penal statute, can safely take.'" *Id.* (quoting *United States v. Wiltberger*, 18 U.S. 76 (1820)).

Here, even if the Court decides that the government's interpretation of § 1512(c)(2) is correct—i.e., that "official proceedings" of Congress include those which are not held pursuant to its investigatory power, that § 1512(c)(2) applies outside the context of document destruction, and that "corruptly" includes a disinterested but mistaken purpose—it is plainly not unambiguously so.   That is shown by the lack of any case law supporting the government's interpretations, by the legislative history which tells against those interpretations, and by the text and structure not just of § 1512(c) but of all sections of Chapter 73.

 Because the government's interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in Nordean's favor by dismissing Counts One and Two. *Granderson*, 511 U.S. at 54; *Santos*, 553 U.S. at 515.

**D.      The novel construction principle of the Due Process Clause requires rejection of the government's interpretation, which would operate as an *ex post facto* law**

Because no court has construed § 1512(c)(2) as the government does in this case, to apply that novel construction against Nordean in this case would violate the novel construction principle of the Due Process Clause of the Fifth Amendment.

The Supreme Court has held that the novel construction principle is similar to an *ex post facto* law which has been described as one "that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). "[A]n unforeseen judicial enlargement of a criminal statute, applied retroactively, operates precisely as an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." *Id.* If a "legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a [court] is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Id.*

*Bouie* also concerned a trespass case that gave every indication of being politically motivated. The 1964 case involved a combination drugstore and restaurant in South Carolina. The restaurant would not serve black Americans. Two black college students took seats in the restaurant. After they entered, an employee hung up a "no trespass" sign. The store manager called the police, who asked the students to leave. When they refused, they were arrested and charged with trespass. The students were tried and convicted, with the State Supreme Court upholding the trespass convictions. The Supreme Court reversed, based on the novel construction principle of the Due Process Clause. It reasoned that the South Carolina Supreme Court's construction of the trespass statute was effectively an *ex post facto* law. By its terms, the state statute merely prohibited "*entry* upon the lands of another . . .after notice from the owner . .

31

prohibiting such entry. . ." 378 U.S. at 355 (emphasis added).  However, there "was nothing in

the statute to indicate that it also prohibited the different act of remaining on the premises after

being asked to leave.  Petitioners did not violate the statute as it was written; they received no

notice before entering either the drugstore or the restaurant department."  *Id.*  Finally, "the

interpretation given the statute by the South Carolina Supreme Court  . . . ha[d] not the slightest

support in prior South Carolina decisions."  *Id*. at 356.

So too here.  Nordean did not "violate the statute as it was written." *Bouie*, 378 U.S. at

355.  Section 1512 prohibits obstruction of "official proceedings" which all courts have

construed to mean proceedings before a tribunal that mimic a court of law.  There is "nothing in

the statute to indicate that it also prohibited the different act," *Bouie*, 378 U.S. at 355, of

interfering with proceedings that do not hear evidence or find facts.  "The interpretation given

the statute by the [government] . . . has not the slightest support in prior [§ 1512] decisions." *Id.*

Accordingly, the novel construction principle requires rejection of the government's

interpretation, which would operate as an *ex post facto* law in violation of the Due Process

Clause of the Fifth Amendment.

E.      **The FSI's application of § 1512(c)(2) is invalid under the First Amendment,
        as applied to Nordean**

As the FSI itself acknowledges, Nordean's activities on January 6 included political

expression, assembly and petitioning of the government for a redress of grievances.  U.S. Const.

amend. I.  Insofar as the § 1512(c)(2) charges characterize protest per se as obstruction of

congressional proceedings, they are unconstitutional applications of the statute as applied to

Nordean.

To prevail on an as-applied challenge under the First Amendment, Nordean must merely

show that § 1512(c)(2) is being unconstitutionally applied as to the specific protected activity for

which he is charged. *Edwards v. Dist. of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). The

first question is whether Nordean's alleged conduct was "expressive." *Texas v. Johnson*, 491

U.S. 397, 404 (1989). "[T]o bring the First Amendment into play," Nordean must merely show

"[a]n intent to convey a particularized message was present" and "the likelihood . . . that the

message would be understood by those who viewed it." *Id.* Next, the court assesses whether the

challenged statute is related in any way to the suppression of free expression. If so, and if the

law is content-neutral, the court must subject the statute to intermediate scrutiny. *Edwards*, 755

F.3d at 1002. Under that standard, the statute is constitutionally applied only if (1) "it is within

the constitutional power of the government"; (2) "it furthers an important or substantial

governmental interest"; (3) "the governmental interest is unrelated to the suppression of free

expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no

greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S.

367, 377 (1968).

      Here, there is no argument that the conduct charged under § 1512(c)(2) was not protected

expression. The entire thrust of the conspiracy charge and underlying § 1512(c)(2) offense is

that Nordean and others protested at the Capitol concerning the results of the 2020 presential

election. FSI, ¶¶ 27, 28. That is the very core of the First Amendment. *See, e.g., Johnson*, 491

U.S. at 404 (flag burning expressive); *Tinker v. Des Moines Ind. Comm. School. Dist.*, 393 U.S.

503, 505 (1969) (students wearing black armbands to protest war is expressive); *Brown v.

Louisiana*, 383 U.S. 131, 141-142 (1966) (sit-in to protest segregation expressive); *United States

v. Grace*, 461 U.S. 171 (1983) (picketing is expressive). *See also Snyder v. Phelps*, 562 U.S.

443, 444 (2011) ("A statement's arguably inappropriate or controversial character . . . is

irrelevant to the question [of] whether it deals with a matter of public concern.").

Similarly, there is no argument that § 1512(c)(2)'s application here is unrelated to the suppression of expression, assembly and the petitioning of the government for a redress of grievances.  Again, the thrust of the obstruction claim is that Nordean and the other defendants intended to affect the actions of Congress: otherwise known as political demonstration and protest.  Critically, the FSI's obstruction claim is not *limited* to any alleged intent to *enter* the Capitol and to affect congressional action *by force or threats*.  FSI, ¶ 27.  After all, the government could have attempted to charge such an offense under § 1505, prohibiting obstruction of Congress's investigatory powers by force or threats.  The FSI does not charge that offense and its obstruction theory encompasses the very act of protesting to affect congressional action itself.  Accordingly, § 1512(c)(2) is here "related to the suppression of free expression." *See*, *e.g.*, *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016) (restricted area statute "related to the suppression of free expression" where charged defendant jumped White House fence to protest executive action).

Accordingly, under an intermediate scrutiny test, the Court applies the *O'Brien* factors to determine the constitutionality of § 1512(c)(2)'s application here.  The following two factors show that the statute's application here is patently unconstitutional: (1) the government's interest *is* related to the suppression of free expression; and (2) the incidental restriction on First Amendment freedoms *is* greater than is essential to the furtherance of that interest.  *O'Brien*, 391 U.S. at 377.  As explained, that the § 1512(c)(2) theory in this case is not limited to an attempt to influence Congress by threats or force can only mean that it covers acts that influence Congress through protest and demonstration.  Moreover, nothing in the FSI cabins Nordean's "obstruction" to the act of entry into the Capitol Building.  If his "obstruction" encompasses protest outside the Capitol Building, the government is criminalizing not just his expression, but

the expression of every group that politically demonstrates outside that building with a view to affecting, or "obstructing," legislation.  Second, that restriction is far greater than is "essential" to the furtherance of the government's legitimate interest in preventing obstruction of official proceedings of Congress.  For the government could adequately protect that interest merely by preventing obstruction of Congress "by threats or force"—*i.e.*, using the proper statute for the crime it is failing to allege, 18 U.S.C. § 1505—or at the very least by preventing obstruction of Congress through unlawful entry into the building.  *City of Houston v. Hill*, 482 U.S. 451, 459 (1987) ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them.").  Accordingly, the FSI's § 1512(c)(2) charges against Nordean unconstitutionally infringe on his First Amendment rights and should be dismissed.

**III.    The Section 231(a)(2) counts should be dismissed**

**A.    Section 231(a)(3) exceeds Congress's Commerce Clause authority**

The Commerce Clause prohibits the criminalization of noneconomic intrastate activity unless "the regulated activity 'substantially affects' interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995).  Under that test, the Supreme Court has invalidated federal criminal laws prohibiting gun possession in a school zone and domestic violence in the Violence against Women Act.  *Lopez*, 514 U.S. at 552-64; *United States v. Morrison*, 529 U.S. 598, 607-19 (2000).  Following *Lopez* and *Morrison*, § 231(a)(3) constitutes an unconstitutional exercise of Congress's power, intruding into the State's constitutionally protected police power, because it regulates strictly local conduct and demonstrates no substantial connection to interstate commerce.

1.    *The police power and the Commerce Clause's prohibition on Congress's regulation of intrastate activity that does not "substantially affect" interstate commerce*

"Under our federal system, the States possess primary authority for defining and enforcing the criminal law." *Lopez*, 514 U.S. at 561 n. 3 (internal quotation marks omitted). Accordingly, the Supreme Court in *Lopez* concluded that, in the criminal context, Congress's "power . . . [t]o regulate Commerce with foreign Nations, and among the several States[,]" under Article I, § 8, cl.3, is inherently limited by the Tenth Amendment's reservation of police power to the States. The limited federal commerce power permits Congress to regulate only three categories of activity:(1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce;" and (3) "those activities that *substantially* affect interstate commerce." *Id.* (emphasis added).

The Supreme Court developed the third *Lopez* category in order to define "the outer limits" on Congress's authority to enact legislation "regulating intrastate economic activity" that "substantially affect[s] interstate commerce." *Lopez*, 514 U.S. at 559; *see also United States v. Robertson*, 514 U.S. 669, 671 (1995) ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress' power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects") (emphasis in original). The regulated activity must "substantially affect" interstate commerce because "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 618.

In *Morrison*, the Supreme Court established a "controlling four-factor test for determining whether a regulated activity 'substantially affects' interstate commerce." *United*

*States v. Adams*, 343 F.3d 1024, 1028 (9th Cir. 2003) (quoting *United States v. McCoy*, 323 F.3d

1114, 1119 (9th Cir. 2003)). Those factors are:

> (1) whether the regulated activity is commercial/economic in nature; (2) whether
> an express jurisdictional element is provided in the statute to limit its reach; (3)
> whether Congress made express findings about the effects of the proscribed activity
> on interstate commerce; and (4) whether the link between the prohibited activity
> and the effect on interstate commerce is attenuated.

*Adams*, 343 F.3d at 1028 (citing *Morrison*, 529 U.S. at 610-612). "The 'most important' factors

for a court to consider are the first and the fourth." *Id.*

2.      *Section 231(a)(3) does not substantially affect interstate commerce*

Section 231(a)(3) criminalizes "any act" that obstructs, impedes, or interferes with a local

police officer performing lawful duties "incident to and during the commission of a civil disorder

which *in any way or degree* obstructs, delays, or adversely affects commerce of the movement of

any article or commodity in commerce. . ." (emphasis added).  Since § 231(a)(3) is not directed

at the channels or instrumentalities of commerce, only the third *Lopez* factor is at issue.

However, under the four controlling factors described in *Adams* and *Morrison*, § 231(a)(3) does

not regulate activity that substantially affects interstate commerce. Accordingly, the statute is

unconstitutional.

a)      Section 231(a)(3) does not regulate economic activity

As in *Lopez* and *Morrison*, the act of interfering with the duties of a law enforcement

officer in a civil disorder is not economic in nature. It therefore fails the first *Morrison* factor.

In *Lopez*, the Court found the activity of gun possession under the Gun-Free School

Zones Act has "nothing to do with 'commerce' or any sort of economic enterprise, however

broadly one might define those terms." *Lopez*, 514 U.S. at 567.  Further, the Gun-Free School

Zones Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* Similarly, in *Morrison*, the Supreme Court concluded that the civil remedy for gender-motivated violence under Violence Against Women Act was a regulation of noneconomic activity that exceeded Congress's commerce authority. 529 U.S. at 617. Even though the VAWA was enacted with the support of significant congressional findings regarding the "nationwide, aggregated impact" of gender-motivated violence on interstate commerce, the Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. The "noneconomic, criminal nature of the conduct at issue was central" to the *Lopez* and *Morrison* rulings. *Morrison*, 529 U.S. at 610.

In contrast to *Lopez* and *Morrison*, in *Gonzales v. Raich*, the Supreme Court upheld a federal law prohibiting the intrastate cultivation of marijuana for personal use because the law formed an "essential part" of the Controlled Substances Act (CSA), which encompassed "a larger regulation of economic activity." 545 U.S. 1, 24-25 (2005) (quoting *Lopez*, 514 U.S. at 561). The majority observed that the "primary purpose" of the CSA is "to control the supply and demand of controlled substances in both lawful and unlawful drug markets." *Raich*, 545 U.S. at 19. Understood within that larger framework, the challenged provision was a regulation on "economic activity" because "failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Id.* at 22.

As with the statutes under consideration in *Lopez* and *Morrison*, the activity regulated by § 231(a)(3) is noneconomic for purposes of the first *Morrison* factor. The gravamen of § 231(a)(3) criminalizes obstruction, interference, and impeding state officers, with no direct

connection to commerce or economic activity. And, unlike in *Raich*, § 231(a)(3) is not part of any larger body of economic regulation; it involves "a brief, single-subject statute[,]" which "by its terms has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms." *Raich*, 545 U.S. at 23-24 (distinguishing *Lopez*, 514 U.S. at 561) (internal quotation marks omitted); *accord Morrison*, 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity").

> b)   The jurisdictional element of § 231(a)(3) does not limit its reach to activities that substantially affect interstate commerce

Although § 231(a)(3) contains a commercial nexus element, the element is faulty because it does not limit the reach of the statute to activities that "substantially affect" interstate commerce.  There are several problems under the second *Morrison* factor on limitations to the statute's reach.

First, the commercial nexus element is not connected to the "any act" element. Section 231(a)(3) makes it a crime to:

> commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder *which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce*.

(Emphasis added). The commercial nexus clause unambiguously modifies the term "civil disorder," not "any act." Thus, a charge under § 231(a)(3) need not be supported by evidence that a defendant's *act* impacted interstate commerce. Instead, it requires evidence only that the act interfered with an officer engaged in the performance of duties "incident to and during the commission of a civil disorder," and that the civil disorder, not the individual's act, minimally affected commerce.

The statutory "incident to and during" connector further diminishes any required link to

interstate commerce. Although the statute does not make clear whether the connector applies to the act itself or to the lawful performance of official duties, either construction places the interstate commerce element another step removed from the regulated activity. The term "incident" as an adjective connotes a degree of separation, in that one occurrence of lesser importance is "[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." INCIDENT, BLACK'S LAW DICTIONARY (11th ed. 2019). Activity with only an incidental connection to an event that affects commerce is not a permissible subject of federal criminal law.

Finally, the commercial nexus element of § 231(a)(3) does not require a *substantial* effect on interstate commerce, but instead requires a civil disorder that affects commerce "in any way or degree." The terms are virtual opposites. Substantial means "[c]onsiderable in extent, amount, or value," whereas the word "any" is expansive and unqualified. *Compare* SUBSTANTIAL, BLACK'S LAW DICTIONARY (11th ed. 2019) *with* ANY, BLACK'S LAW DICTIONARY (11th ed. 2019); *see St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 550 (1978) (statutory language that covered "'any' act" was "broad and unqualified"). An "any way or degree" impact on commerce is not a "substantial" impact.  The second *Morrison* factor is not satisfied.

> c)   Congress did not find that § 231(a)(3)'s activities substantially affect interstate commerce

Formal congressional findings are neither required nor sufficient to establish a valid exercise of federal commerce authority. *Lopez*, 514 U.S. at 562-63; *Morrison*, 529 U.S. at 614. Congressional findings may demonstrate that an activity "substantially affects interstate commerce, even though no such substantial effect [is] visible to the naked eye." *Lopez*, 514 U.S.

40

at 563. But "the existence of congressional findings is not sufficient" when Congress merely

offers a "but-for causal chain from the initial occurrence of violent crime . . . to every attenuated

effect upon interstate commerce." *Morrison*, 529 U.S. at 615.

Here, Congress made no findings to establish that the activity regulated by § 231(a)(3)

substantially affects interstate commerce beyond any impact "visible to the naked eye." The only

potentially relevant findings relate to the impact of "riots" on interstate commerce.  114 Cong.

Rec. 1294-95 (Jan. 29, 1968). Upon first proposing the Civil Obedience Act,

Senator Long stated certain facts, without citation, concerning what he called the "wholesale

Negro violence," which he said "was an almost nightly affair in the streets of our cities" between

1965 and 1967.  114 Cong. Rec. 1295. For example, he said:

> In [1967], nearly 100 people were killed. Nearly 2,000 were injured. Police reported
> 4,289 cases of arson alone. Over 16,000 rioters were arrested. The estimated
> property loss was in the neighborhood of $160 million. The estimated economic
> loss to riot-torn businesses was $504 million.

*Id.*  Senator Long asserted that these "riots" impeded interstate commerce:

> Any riot, as we know and experience them today, generally does impede the flow
> of goods in interstate commerce. It stops the movement of people in interstate
> commerce. It interferes with the goods that were intended to move in interstate
> commerce.

114 Cong. Rec. 5535-36 (Mar. 6, 1968).

But the statutory definition of "civil disorder" involving "acts of violence by assemblages

of three or more persons" (18 U.S.C. § 232(1)) has no connection to riots on the scale described

by Senator Long.  Moreover, § 231(a)(3) does not target the destructive behavior attendant to a

riot; the criminalized conduct is interference with an official's duties "incident to and during" a

civil disorder. The congressional record contains no findings that individual interference with

41

police and firefighters as defined under § 231(a)(3) substantially affects interstate commerce. The third *Morrison* factor is not satisfied.

        d)      The relationship between § 231(a)(3)'s activities and any effect on interstate commerce is too attenuated

Any causal chain that could link the activity proscribed under § 231(a)(3) to any substantial impact on interstate commerce is too far attenuated to place the activity within reach of Congress' commerce authority. The offense conduct of § 231(a)(3) need not affect commerce directly. It suffices to establish that a person's acts interfered with an official's duties performed "incident to and during" any "civil disorder" that, in turn, affects commerce. Such an "incidental effect on interstate commerce . . . does not warrant federal intervention." *Musick v. Burke*, 913 F.2d 1390, 1397 (9th Cir. 1990). The noneconomic conduct penalized by § 231 by definition is too attenuated to satisfy the "substantially affects" test for commercial impact.

Even if interference with police § 231(a)(3) could affect commerce in the aggregate, when considered on a nationwide scale, that would be insufficient to place those acts within the federal commerce authority. In *Morrison*, the Supreme Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." 529 U.S. at 617. Here, the paucity of cases prosecuted under § 231(a)(3) further negates any claim of an aggregate effect. In sum, the four *Morrison* factors demonstrate that § 231(a)(3) regulates purely local, noneconomic activities that do not "substantially affect" interstate commerce. As a result, § 231(a)(3) falls outside of Congress's power to regulate under the Commerce Clause.

    **B.**      **Section 231(a)(3) is unconstitutionally vague**

        1.      *Section 231(a)(3)'s vague standards fail to provide fair notice and risk arbitrary enforcement*

Section 231(a)(3) fails the core tests for satisfying the certainty requirements of the Due Process Clause. First, it is replete with vague and imprecise terms that fail to provide a person of ordinary intelligence a reasonable opportunity to know what is prohibited:

- **"any act"** can include pure speech, expressive conduct, minimal jostling, and grievous assaults;

- **"to obstruct, impede, or interfere"** leaves uncertainty as to whether it defines a culpable mens rea or a required result and, additionally, offers no objective limit requiring, for example, *forcible* interference or assault, *cf.* 18 U.S.C. § 111(a);

- **"incident to and during the commission of a civil disorder"** leaves the degree of connection with a "civil disorder" unclear and fails to state whether the defendant must have participated in the civil disorder;

- **"in any way obstructs, delays, or adversely affects commerce"** provides no limiting concept for what it means to obstruct, delay, or adversely affect commerce.

In addition, Section 231(a)(3) contains no express mens rea at all, leaving police, prosecutors, and judges to decide whether the statute requires knowledge (and if so, of what) or specific intent (and if so, to do what) or neither. A statute's constitutionality under the vagueness doctrine is "closely related" to whether it contains an express mens rea requirement. *See Colautti v. Franklin*, 439 U.S. 379, 395 (1979) ("Because of the absence of a scienter requirement in the provision . . . the statute is little more than 'a trap for those who act in good faith.'") (quoting *United States v. Ragen*, 314 U.S. 513, 524 (1942)).

The statute is prone to vagueness challenge because its terms are dependent on the subjective reaction of others, rather than the acts and intent of the defendant. In *United States v. L. Cohen Grocery Co.*, 255 U.S. 81 (1921), for example, the Court held that a prohibition on "unjust or unreasonable rate[s] or charge[s]" was unconstitutionally vague because assessment of whether charges were "unjust or unreasonable" was left entirely to the "estimation of the court and jury." *Id.* at 89. The Court likewise struck down an ordinance that criminalized behaving in a

manner "annoying to persons passing by." *Coates v. City of Cincinnati*, 402 U.S. 611, 612

(1971). Because "[c]onduct that annoys some people does not annoy others," the ordinance did

not "specif[y] any "standard of conduct . . . at all." *Id.* at 614. And in *City of Chicago v. Morales*,

527 U.S. 41 (1999), the Court invalidated a statute that prohibited loitering "with no apparent

purpose," because it improperly left "'it to the courts to step inside and say who could be

rightfully detained, and who should be set at large.'" *Id.* at 60 (quoting *United States v. Reese*, 92

U.S. 214, 221 (1876)).

Here, § 231(a)(3) triggers criminal liability based on the reactions of others in two ways.

First, it asks whether the defendant's conduct interferes with or impedes others. A gesture, sign,

or other act that distracts one officer could have no impact at all another officer. Second, the

statute asks whether the defendant's act is "incident to and during" a civil disorder in which the

defendant may have no involvement at all. These subjective standards leave it to the discretion of

police and prosecutors to determine whether a particular individual's conduct runs afoul of the

law.

By enacting subsection 3 of the Civil Obedience Act, Congress created "a criminal

prohibition of alarming breadth." *United States v. Stevens*, 559 U.S. 460, 474 (2010). The "very

existence" of statutes like § 231(a)(3) is pernicious because it "may cause others not before the

court to refrain from constitutionally protected speech or expression." *Members of City Council

of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 799 (1984). The mere "threat of enforcement of

an overbroad law may deter or 'chill' constitutionally protected speech," "especially when the

overbroad statute imposes criminal sanctions." *Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

As with the law at issue in *McCoy v. City of Columbia*, which made it unlawful "for any

person to interfere with or molest a police officer," § 231(a)(3)'s vagueness chills protected

speech. *McCoy*, 929 F. Supp. 2d 541, 547-53 (D.S.C. 2013). By expansively encompassing "any act" that could interfere with the duties of a police officer or firefighter during a civil disorder, § 231(a)(3) is not limited to "violent acts" or acts that result in bodily injury or that otherwise put persons or property in imminent danger. *See Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) ("[T]he constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). The statute does not weed out those acts with expressive content or those that occur in a traditional public forum. Section 231(a)(3) reaches a substantial amount of expressive conduct, and without clear boundaries, the law chills free speech.

2.      *Section 231(a)(3) cannot be saved by construction without violation the constitutional separation of powers*

A statute's vagueness does not permit judges to "'rewrite [the] . . . law to conform it to constitutional requirements.'" *Stevens*, 559 U.S. at 481. "When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). "Vague statutes threaten to hand responsibility for defining crimes to relatively unaccountable police, prosecutors, and judges, eroding the people's ability to oversee the creation of the laws they are expected to abide." *Id.* at 2325.  In the present case, the statute's scope "may entirely depend" on a law enforcement official's unbounded speculation about subjective factors, *Coates*, 402 U.S. at 614, thus subjecting "individuals to the risk of arbitrary or discriminatory prosecution and conviction," *United States v. Kozminski*, 487 U.S. 931, 949-950 (1988) (holding statute unconstitutionally vague where liability "depend[ed] entirely upon the victim's state of mind").

It does not matter whether some conduct clearly falls within § 231(a)(3)'s reach. The Supreme Court's holdings "squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson,* 576 U.S. at 602; *accord Dimaya*, 138 S. Ct. at 1214 n.3 (reaffirming this principle). Section 231(a)(3) is not susceptible to construction that eliminates its many constitutional deficiencies without judicial encroachment on the legislative function of defining criminal laws. Accordingly, Counts One and Three of the FSI should be dismissed with prejudice.

## IV.    The Section 1752 counts should be dismissed

### A.    The FSI fails to state an offense because only the USSS restricts areas under § 1752

Counts Five and Six contend that Nordean violated § 1752 by entering the Capitol Building, which the FSI characterizes as a "restricted building and grounds," as that phrase is defined in § 1752.  However, it does not allege that the U.S. Secret Service (USSS) restricted that area under the statute.  FSI, ¶¶ 76, 78.  The government's position is that any government entity may set a restricted area under § 1752 and that the Capitol Police restricted the area Nordean entered on January 6.

The government's position finds no support in the statutory text, the legislative history, or precedent.  Penal statutes are strictly construed.  *United States v. Moore*, 613 F.2d 1029, 198 U.S. App. D.C. 296 (D.C. Cir. 1979).  As shown above, all three definitions of "restricted building or grounds" in § 1752(c)(1) concern the authority and actions of the USSS and not any other federal agency.  Section 3056, concerning the "powers, authorities, and duties of United States Secret Service," confirms that § 1752 is a statute directed to the USSS and not any other federal agency.  18 U.S.C. § 3056(d).  The legislative history of § 1752 is saturated with references to the USSS and to no other federal agency.

Common sense chimes with the statutory analysis. The government claims that any federal or state agency may unilaterally set a "restricted area" and arrest anyone found within it so long as a Secret Service protectee is also present.  The implications of that argument are absurd.  Accordingly, such a statutory interpretation is highly disfavored.  *See United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543, 60 S. Ct. 1059, 84 L. Ed. 1345 (1940) ("When [one possible statutory] meaning has led to absurd or futile results . . . this Court has looked beyond the words to the purpose of the act."); *see also Corley v. U.S.*, 556 U.S. 303, 317, 129 S. Ct. 1558, 173 L. Ed. 2d 443 (2009) (interpreting criminal procedure statute to avoid "absurdities of literalism"); *Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401, 411, 406 U.S. App. D.C. 140 (D.C. Cir. 2013) (recognizing "'the long-standing rule that a statute should not be construed to produce an absurd result'" (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068, 329 U.S. App. D.C. 341 (D.C. Cir. 1998)).

The government's interpretation countenances the following absurdities.   The U.S. Postal Inspection Service (hypothetically) determines that the Secret Service is not properly protecting the president.  Because, according to the government, there is no requirement in the statute for the government to prove that the restricted area was restricted at the direction of the Secret Service, the Postal Service resolves, unilaterally, that the "restricted area" of the White House should extend from the State Department to the west, and to the E. Barrett Prettyman U.S. Courthouse, to the east.  Even though the Secret Service may disagree with the Postal Service's view of the appropriate size of the restricted area, for purposes of § 1752 liability that does not matter, and the reader of the brief is liable, and potentially detainable pretrial, unless some federal agency (the Postal Service? The Secret Service? Both?) gives him "lawful authority" to "knowingly" "remain" where he is.  18 U.S.C. § 1752(a)(1).  Or, to take another absurd example,

47

even if the Secret Service determines that the restricted area protecting a Secret Service protectee temporarily visiting a place is appropriately limited to one block, § 1752(c)(1)(B), a local police unit may unilaterally determine that it should extend 20 blocks.  Any person exercising his First Amendment rights in blocks two to twenty may then be federally prosecuted—by the same government that deemed the restricted area limited to one block.

That is why what little § 1752 precedent there is supports Nordean, while none supports the government's interpretation.  Instructive is *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005).  There, Bursey entered an area restricted by the USSS in advance of a political rally in South Carolina held by the president.  *Id.*, at 304.  Reviewing the trial record, the Fourth Circuit observed that "the Secret Service designated an area near [the rally] as a restricted area." *Id.*  It also noted that the "authorized persons" admitted into the area all "wore lapel pins issued by the Secret Service," meaning that the USSS was the entity that granted "lawful access" to the area. *Id.*  Intending to protest the Iraq war, Bursey approached the restricted area with a megaphone. A Secret Service Agent advised him he could not remain in that area.  He was repeatedly advised thereafter of the same by multiple law enforcement agents over a twenty to twenty-five minute period.  *Id.*  Bursey was charged and convicted under § 1752(a)(1).

One sufficiency argument Bursey raised on appeal was that, as a matter of *mens rea*, "he was never advised that the area was a federally restricted zone, *so designated by the Secret Service.*" 416 F.3d at 308 (emphasis added).  The Fourth Circuit rejected this argument.  But not on the ground that § 1752 restricted areas need not be so restricted by the USSS.  Instead, trial evidence showed that Bursey "understood the restriction to have been created by the Secret Service (as opposed to state or local law enforcement)." *Id.*  Added the Fourth Circuit,

> [T]here was ample evidence that Bursey understood the area to have been restricted by the Secret Service, *and thus a federally restricted zone*.  Specifically, Bursey testified that

he believed that "at that event, October, when the President came to town, that the circumstances would be similar to his prior visits, where … the Secret Service comes in and preempts" local and state police. . . Bursey also acknowledged that, in protesting at two earlier visits to South Carolina by the incumbent President, he was advised in both instances that "the Secret Service had basically preempted the security arrangements" of local police.

*Bursey*, 416 F.3d at 309 (emphasis added).

The import of the Fourth Circuit's logic is clear.  Had the Fourth Circuit even contemplated the idea that entities other than the USSS could restrict areas under § 1752, the above reasoning would lack sense.  Likewise, the trial court also simply assumed the USSS was the only entity that restricts areas under the statute.  *United States v. Bursey*, 2004 U.S. Dist. LEXIS 29661, at *31 (D.S.C. Sept. 13, 2004) ("Bursey's own testimony confirms that he understood the restrictions would be established by the Secret Service.").

Because Counts Five and Six are based on the government's allegation that Nordean crossed into an area restricted not by the USSS but by the U.S. Capitol Police, they should be dismissed for failure to state an offense under § 1752.

**B.      If the government's interpretation of § 1752 is applied, it is unconstitutionally vague as to Nordean**

1.      *The government's interpretation of § 1752(c) is unconstitutionally vague*

If the Court concludes that the FSI properly charges Nordean with violating § 1752 by crossing a boundary set by an agency other than the USSS, the statute is unconstitutionally vague as applied to him.

Under the government's interpretation of § 1752, there is *no* notice, much less "fair notice," of the conduct proscribed *in this case*.  As shown above, the text, legislative history, and common sense all point to the ordinary person's reasonable conclusion that the government agency that may restrict a person from entering an area in which there is a Secret Service

49

protectee is—the Secret Service.  Assuming the truth of the government's allegations in this case, Nordean saw police lined up outside the U.S. Capitol, whether they were U.S. Capitol Police or Metro Police.  But if the text, legislative history and common sense inform an "ordinary person" that he violates § 1752 by entering an area the Secret Service has restricted—as in *Bursey*, one of the handful of cases interpreting the statute—there is no similar notice in the statute that being on the wrong side of a police barricade is, independent of the Secret Service, in violation of that statute.  The FSI does not allege postings on January 6 warning Nordean that the Secret Service designated the area he entered as restricted.  They do not allege any law enforcement officers notified Nordean of that fact.  Nothing in § 1752 so much as hints at the possibility that disobeying local law enforcement per se may result in liability under that statute, provided some USSS protectee lurks somewhere within the restricted area.

The concern about vagueness-enabled arbitrary enforcement is manifested here.  At a general level, the government's enforcement of § 1752 against Nordean is arbitrary because, prior to January 6, it had never prosecuted a violation of that statute with the allegation that the accused entered an area restricted by some government agency other than the USSS. Accordingly, the government's election to put a new interpretation on the statute for a select group of related cases raises questions about discriminatory law enforcement.  Those questions are only underlined by the patently political nature of the circumstances of the offense, as well as the criminalization of Nordean's First Amendment rights to political speech, assembly, and to petition the government for a redress of grievances.  U.S. Const. amend I; *Hoffman Estates*, 455 U.S. at 500 (stricter scrutiny of vague statutes in the context of activities protected by the First Amendment).

Perhaps more serious is the specific arbitrariness here.  Hundreds or perhaps thousands of other protestors "entered" the same "restricted area" as Nordean.  Yet it is undisputed that most of those people have not been charged under § 1752 like him.  The explanation for why the government chose to prosecute Nordean under § 1752, and not others, is not hard to find.  As shown above, it is stated on the face of the FSI.  Nordean is a "leader" of the Proud Boys, a "pro-Western fraternal organization for men whose refuse to apologize for creating the modern world; aka Western Chauvinists." FSI, ¶ 5.

That has anything to do with § 1752 or the Secret Service.  But the government's naked reliance on those factors shows the danger of arbitrariness inherent in the vague and elastic interpretation of § 1752 it offers for this specific set of defendants alone.  Insofar as they both allege that Nordean entered and remained in a "restricted area" set by an agency nowhere identified in the statute, Counts Five and Six are unconstitutionally vague.

> 2.   *The government's interpretation of § 1752(a)(2) is an unconstitutionally vague boundary standard*

Count Six alleges that Nordean engaged in "disorderly and disruptive conduct in and *within such proximity to*, a restricted building and grounds." FSI, ¶ 78 (emphasis added).  To the extent the government has not properly alleged that area Nordean entered was a "restricted area" under § 1752(c) but has somehow alleged that *some* area within the Capitol Building was, the § 1752(a)(2) phrase "within such proximity to" is an unconstitutionally vague boundary standard as applied to Nordean.

"[T]he freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause . . ." *City of Chicago v. Morales*, 527 U.S. 41, 53 (1999).  As the Supreme Court described it in *Morales*, the Court has "expressly identified this 'right to remove from one place to another according to inclination' as 'an attribute of personal liberty protected by the

Constitution.'" *Id.* (quoting *Williams v. Fears*, 179 U.S. 270, 274 (1900)). "Indeed, it is apparent that an individual's decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is 'a part of our heritage,'" *id.* (quoting *Kent v. Dulles*, 357 U.S. 116, 126 (1958)), or "the right to move 'to whatsoever place one's own inclination may direct' identified in Blackstone's commentaries." *Id.* (quoting 1 W. Blackstone, Commentaries on the Laws of England 130 (1765)).

*Morales* concerned a Chicago city ordinance banning "criminal street gang members" and those associating with them from "loitering" in "any public place." Under the ordinance, law enforcement was directed to order all relevant persons to disperse and remove themselves "from the area." 527 U.S. at 47. If those so ordered disobeyed by not leaving "the area," they were guilty of violating the ordinance. The Court held that the ordinance was unconstitutionally vague. Among other notice problems, the Court determined that the ordinance's requirement that the accused remove themselves "from the area," raised a host of ambiguities. "How far must they move? If each loiterer walks around the block and they meet again at the same location, are they subject to arrest or merely to being ordered to disperse again?" 527 U.S. at 59.

The Supreme Court has similarly found vagueness in statutes that rest on the fuzzy boundary standards of "neighborhood" and "locality." In *Connally v. General Constr. Co.*, 269 U.S. 385 (1926), the Court held that "both terms are elastic and, dependent upon the circumstances, may be equally satisfied by areas measured by rods or by miles." *Id.* at 395. *Connally* concerned an Oklahoma statute requiring that "not less than the current rate of per diem wages in the locality where the work is performed shall be paid to laborers . . ." *Id.* at 388. Criminal penalties were imposed for violations. The Court found the statute unconstitutionally vague. The vagueness problem was not just with the terms "neighborhood" and "locality":

Certainly, the expression "near the place" leaves much to be desired in the way of a delimitation of boundaries; for it at once provokes the inquiry, "how near?" . . . The result is that the application of the law depends not upon a word of fixed meaning in itself, or one made definite by statutory or judicial definition, or by the context or other legitimate aid to its construction, but upon the probably varying impressions of juries as to whether given areas are or are not to be included within particular localities. The constitutional guaranty of due process cannot be allowed to rest upon a support so equivocal.

269 U.S. at 395.

Just so here.  The government alleges that, on January 6, Nordean was "within such proximity to a restricted building and grounds" under § 1752(a)(2).  But: "How near?" *Connally*, 269 U.S. at 395.  Were just the steps of the west front of the Capitol "within such proximity to" a "restricted area"? Where *was* the restricted area (if any), as set by the USSS? Were the Senators and Congressmen who themselves objected to the Electoral College vote count "within such proximity to" a restricted area?  Did they receive permission from the Secret Service? All the protestors on the National Mall? The Supreme Court? Is "proximity" measured "by rods or by miles"? *Connally*, 269 U.S. at 395.  And if "'near the place' leaves much to be desired in the way of a delimitation of boundaries," *id.*, how does "within such proximity to" survive when the noun "proximity" is defined as "nearness to [a] place. . ." "Proximity." Collins Dictionary.com, available at: https://www.collinsdictionary.com/us/dictionary/english/proximity (May 17, 2021).

However, the vagueness in the government's § 1752(a)(2) charge here should be more strictly construed than in *Morales* and *Connally*.  For, unlike in those cases, the criminalized activity includes pure political speech, assembly and Nordean's right to petition the government. *Hoffman Estates*, 455 U.S. at 500; *Papachristou*, 405 U.S. at 156.  "The constitutional guaranty" of these rights "cannot be allowed to rest upon a support so equivocal," *Connally*, 269 U.S. at 395, as the vague boundary phrase "within such proximity to." § 1752(a)(2).

**C.      The rule of lenity dictates that ambiguities in § 1752 be resolved in Nordean's favor**

Here, even if the Court decides that the government's interpretation of § 1752 is formally correct—i.e., that any agency may set restricted areas under § 1752(c) and that § 1752(a)(2)'s reference to conduct "within such proximity to" a restricted area applies to the west front of the Capitol steps on January 6—it is plainly not unambiguous*ly* so.  That is shown by the lack of any references in § 1752 to agencies other than the USSS; the statute's legislative history, which similarly focuses exclusively on the USSS; the clear role that the USSS plays in all three definitions of "restricted buildings or grounds" in § 1752(c); the indication in Section 3056 that the USSS enforces restricted areas in § 1752; the lack of any case law supporting the government's position; and the common sense notion that if the USSS patrols and guards the restricted areas in § 1752, it also sets them.

Because the government's interpretations are not unambiguously correct, the Court is required to resolve any ambiguities in Nordean's favor by dismissing Counts Five and Six. *Granderson*, 511 U.S. at 54; *Santos*, 553 U.S. at 515.

**D.      The novel construction principle dictates against the government's interpretation, which would operate as an *ex post facto* law**

Because no court has ever construed Section 1752 to mean that agencies other than the USSS may set restricted areas under the statute, such a construction would be retroactively applied to Nordean would constitute an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment.  *Bouie*, 378 U.S. at 353 (1964).

Nordean did not "violate the statute as it was written." *Bouie*, 378 U.S. at 355.  Section 1752 prohibits entry into an area restricted by the USSS.  There is "nothing in the statute to indicate that it also prohibited the different act," *Bouie*, 378 U.S. at 355, of entering into an area

54

restricted by the U.S. Capitol Police.  "The interpretation given the statute by the [government] .

. . has not the slightest support in prior [§ 1752] decisions." *Id.*

Accordingly, the novel construction principle dictates against the government's

interpretation, which would operate as an *ex post facto* law in violation of the Due Process

Clause of the Fifth Amendment.

**V.    The FSI should be dismissed because it does not provide adequate notice and does
       not ensure the grand jury made determinations required by the Fifth Amendment**

The constitutional rights to presentment to a grand jury and adequate notice of the

charges are embedded in the Fifth and Sixth Amendments to the Constitution and in Rule 7(c) of

the Federal Rules of Criminal Procedure. In the January 6 cases, the government has mass

produced indictments identical in language with the exception of names of protestors. A review

of the FSI reveals that the federal depredation of property and civil disorder charges do not plead

any specific acts or circumstances but rather conclusory January 6 allegations.

"[R]eal notice of the true nature of the charge" is "the first and most universally

recognized requirement of due process." *Smith v. O'Grady*, 312 U.S. 329, 334 (1941). In holding

that the notice requirements of the Sixth Amendment apply to the States through the requirement

of due process, the Supreme Court stated: "No principle of procedural due process is more

clearly established than that notice of the specific charge [is] among the constitutional rights of

every accused in a criminal proceeding in all courts, state or federal." *Cole v. Arkansas*, 333 U.S.

196, 201 (1948); *see* Joseph Story, *Commentaries on the Constitution*, § 1779 (1833) ("[T]he

indictment must charge the time, and place, and nature, and circumstances, of the offense, with

clearness and certainty; so that the party may have full notice of the charge, and be able to make

his defense with all reasonable knowledge and ability.").

The Fifth Amendment's presentment provision also requires that the facts be elucidated sufficiently in the indictment so that the grand jury's finding of probable cause can be ascertained and to foreclose conviction based on any offense not found by the grand jury. *See Stirone v. United States*, 361 U.S. 212, 215-162 (1960) ("[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself."). Without specificity of charged conduct and circumstances, the court would be forced to "guess as to what was in the minds of the grand jury at the time they returned the indictment[,]" which would "deprive the defendant of a basic protection that the grand jury was designed to secure," by allowing a defendant to be convicted "on the basis of facts not found by, and perhaps not even presented to, the grand jury that indicted him." *United States v. Du Bo*, 186 F.3d 1177, 1179 (9th Cir. 1999) (quoting *United States v. Keith*, 605 F.2d 462, 464 (9th Cir. 1979) (citing *Russell v. United States*, 369 U.S. 749, 770 (1962)).

### A.    The federal property depredation charges are not elucidated sufficiently

Count Four alleges that Nordean depredated federal property on January 6, "caus[ing] damage to the [Capitol] building in an amount more than $1,000." FSI, ¶ 74.  However, the FSI does not allege: what property Nordean depredated; how he depredated it; and what the damage to each piece of property was.  That basic pleading failure violates Nordean's constitutional rights to presentment to a grand jury and adequate notice of charges.  U.S. Const. amend. V, VI.

### B.    The civil disorder allegations are not elucidated sufficiently

Count Three alleges that Nordean obstructed, impeded, and interfered with law enforcement during a civil disorder." FSI, ¶ 72.  However, nowhere does the FSI allege how Nordean did those things on January 6 or on any other date.  FSI, ¶¶ 18, 21, 22, 26, 27, 28, 30, 39, 57, 60, 61, 64 (every reference to law enforcement).  That basic pleading failure violates

Nordean's constitutional rights to presentment to a grand jury and adequate notice of charges.

U.S. Const. amend. V, VI.

## **CONCLUSION**

For all the foregoing reasons, Nordean respectfully requests that the Court dismiss the

FSI with prejudice.

Dated: June 3, 2021                    Respectfully submitted.

                                       DAVID B. SMITH, PLLC


                                       */s/ David B. Smith*
                                       David B. Smith (D.C. Bar No. 403068)
                                       108 N. Alfred St.
                                       Alexandria, VA 22314
                                       Phone:(703)548-8911
                                       Fax:(703)548-8935
                                       dbs@davidbsmithpllc.com

                                       Nicholas D. Smith (D.C. Bar No. 1029802)
                                       7 East 20th Street
                                       New York, NY 10003
                                       Phone: (917) 722-1096
                                       nds@davidbsmithpllc.com

                                       *Attorneys for Ethan Nordean*

## **Certificate of Service**

I hereby certify that on the third day of June, 2021, I filed the foregoing motion with the

Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to

the following CM/ECF user(s):

        Jim Nelson
        Assistant United States Attorney
        555 4th Street, N.W., Room 4408
        Washington, D.C. 20530
        (202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Ethan Nordean*