IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-4

1-ETHAN NORDEAN                   Washington, D.C.
2-JOSEPH RANDALL BIGGS            Thursday, June 3, 2021
4-CHARLES DONOHOE,               2:00 p.m.
                Defendants.
- - - - - - - - - - - - - - - - x

_____
               TRANSCRIPT OF STATUS CONFERENCE
       HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
               UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Jason B. A. McCullough, Esq.
                          Luke M. Jones, Esq.
                          Nadia Moore, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          David B. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

                          Lisa S. Costner, Esq.
                          LISA S. COSTNER, P.A.
                          952 W 4th Street
                          Suite 200
                          Winston-Salem, NC 27101
                          (336) 748-1885

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter

1          **P R O C E E D I N G S**

2          THE DEPUTY CLERK:  We are on the record in

3    criminal matter 21-175, United States of America v.

4    Defendant 1, Ethan Nordean; Defendant 2, Joseph Randall

5    Biggs; and Defendant 4, Charles Donohoe.

6          Present for the Government are Jason McCullough,

7    Luke Jones and Nadia Moore; present for Defendant 1 are

8    David Smith and Nicholas Smith; present for Defendant 2 is

9    John Hull; present for Defendant 4 is Lisa Costner; also

10   present are Defendant 1, Mr. Nordean; Defendant 2,

11   Mr. Biggs; Defendant 4, Mr. Donohoe, is not present, but his

12   counsel, Ms. Costner, will make representations to the Court

13   to have his appearance waived.

14         THE COURT:  All right.  Well, good afternoon to

15   everyone and, again, my apologies for that brief delay.

16         Before we begin, Ms. Costner, why don't you make

17   the representations you'd like to regarding your client's

18   whereabouts.

19         MS. COSTNER:  Thank you, Your Honor.

20         Yes.  Last night, Mr. Donohoe was finally

21   transported from the Grady County, Oklahoma, jail and is

22   hopefully heading towards North Carolina.  At our last

23   status conference, the Court inquired as to whether

24   Mr. Donohoe would be willing to waive his appearance if he

25   were either transported or located somewhere where he did

1   not have access to video to attend the hearing.  And after

2   he and I were put in a separate room, we met, and I told the

3   Court that Mr. Donohoe would, in fact, waive his appearance,

4   and I believe the Court made a quick inquiry of Mr. Donohoe.

5   So at this time, I do have Mr. Donohoe's permission to

6   appear in his absence, and we would just ask the Court to

7   allow his appearance to be waived for the hearing this

8   afternoon.

9         THE COURT:  All right.  And based on those

10   representations and our proceedings the last time, I will go

11   ahead and waive his appearance for today's purposes.

12         Let me -- before, then, we begin more broadly and

13   I hear from the Government and defense counsel and what

14   they'd like to do, let me just lay out my understanding of

15   where we are and my thoughts about a few things that have

16   cropped up on the docket since we were last all together

17   about how I might resolve them, but I want to hear what the

18   parties think about all this afterward.

19         I know, because I had the Government before me

20   with regard to the co-defendant who's not here, Mr. Rehl,

21   earlier this week because it was the only time available

22   that -- technologically for Mr. Rehl to be able to be on the

23   line that, I believe, the parties are going to be asking for

24   -- to come back in somewhere between 30 and 60 days from

25   now.  And I just want to -- I -- we -- I do have a bill -- a

1    motion for a bill of particulars and for production of

2    certain evidence filed by Mr. Nordean.  My thought is, you

3    know -- I just received the Government's response to that, I

4    think, last night.  I haven't had a chance to look at it

5    yet.  So my thought is that we could -- I would let the

6    briefing proceed on that if Defendant Nordean wanted to file

7    a reply and that we could address that when we come back,

8    whenever that would be, the next time.  That's number one.

9    Again, this is my thought going forward.

10           I also have the Government's motion for a

11   protective order that, I think, was filed yesterday or the

12   day before.  I haven't -- I can only -- it wasn't -- the

13   Government's motion does not indicate that the motion is

14   unopposed, and so I assume Mr. Nordean will be opposing it.

15   My -- well, I see Mr. Smith shaking his head.  So maybe,

16   that -- it -- the -- I guess I'll -- I was going to say, if

17   it was going to be opposed, then I wouldn't have let that go

18   so long until we gathered next, and I was just going to ask

19   if the parties would just consent to me deciding that on the

20   papers if an opposition came in.  Maybe I'm wrong and,

21   maybe, this is why I should have just let the parties start.

22   But in any event, so there's that other issue.

23           And then, Ms. Costner, as to your client, my

24   thought was -- as you noticed, I haven't decided the

25   detention -- the motion to revoke that you've filed -- or

1    the motion -- the appeal motion for Judge Harvey's

2    determination.  My -- and the more I looked at it, the more

3    I thought -- and the more I looked at how quickly -- as I'm

4    sure you know, Mr. Nordean and Mr. Biggs have appealed to

5    the Circuit my ruling as to -- on their detention.  There's

6    so much overlap in terms of the type of evidence and this is

7    such an unusual situation I, you know -- I could rule on it

8    and probably would come out the same way I did as to their

9    clients, but my thought is let's -- what I'd like to do is

10   at least give -- the other thing I did was look and -- to

11   see how quickly the Circuit's been resolving these motions

12   in these cases.  Of course, we have no idea how long it will

13   take them, but based on what they've done so far it looks to

14   me like if they take a similar amount of time, we might get

15   a ruling this week or early next.

16          So my thought is with regard to you and your

17   client -- and, maybe, your client will be able to join us --

18   I'd like to pick a date.  I'm -- I have Mr. Rehl coming back

19   next Wednesday.  I'd like -- we may not be able to marry you

20   up exactly because of the -- just because of -- for

21   technological reasons, but I'd like to try to come back

22   for -- at least, Ms. Costner, with you and give the Circuit

23   another week or so to see if we get something from them.

24   And if we don't, then I'll just rule on it next week and,

25   you know, you all can decide if you want to wait to get that

1    ruling and then just come back to me instead of appealing my

2    ruling if I happen to detain your client.  So that's how I

3    thought we could -- we can talk about the scheduling later,

4    but I wanted you to know that's how I've been thinking about

5    how to handle that detention issue.

6             So with all of that as a preface, let me turn to

7    Mr. Jones or Mr. McCullough, whoever is going to address

8    this from the Government, and let me know where the parties

9    are and where they'd like to head.

10            MR. MCCULLOUGH:  Thank you, Your Honor.  Jason

11   McCullough for the United States.

12            The -- let's, kind of, start in reverse order.

13   With respect to Donohoe and continuing the detention ruling

14   until June 9th, the Government agrees with that, as it did

15   with Mr. Rehl.  That is a sensible approach, and the

16   Government agrees that it -- that the ruling from the

17   Circuit would seem to be coming out between now and then.

18            With respect to the Government's motion for a

19   protective order, the Government did not want to

20   characterize the defendant's position.  The defendant has

21   indicated to us that it was effectively premature to agree

22   or disagree at this point, as we understood it, and so we

23   did not want to make a representation as to the defendant's

24   position, but we understood that the defendant would

25   certainly want to be heard.  From our perspective, we are at

1    the stage where we are beginning to produce significant

2    volumes of information and data and materials.  Among those

3    materials are materials that belong to certain law

4    enforcement agencies that have indicated that they expect

5    and intend for the Government to protect those materials,

6    not the least of which is the surveillance footage from

7    inside the United States Capitol.  And, as Your Honor knows,

8    there are other designations within the protective order --

9    for instance, for the protection of witnesses, personal

10   identifying information -- and the Government believes that

11   this would expedite discovery to be able to enter in the --

12   into the protective order with all defendants so that we may

13   continue apace with the discovery.

14         With respect to the motion for a bill of

15   particulars, Your Honor, we're -- we would be -- the

16   Government would be willing to come back between now and the

17   next time, if the defendant would prefer, to be heard on

18   that, but the Government would agree that it would be

19   appropriate here to let discovery continue until the next

20   status conference.

21         And so ultimately, where the Government is, when

22   we were before you the last time on May 4th, the Government

23   had represented that it was engaged in the process of

24   continuing its discovery productions.  It had already

25   produced a significant volume of relevant chat messages,

1    video footage, etcetera.  The Government has continued with

2    that process.  One of the things that the Government has

3    done is it has fundamentally sought to return devices that

4    have been seized from individual defendants.  Those devices

5    are being returned to those individual defendants.

6          In addition to that, Your Honor, part of seizure

7    of devices and social media accounts is the process of

8    scoping those materials in accordance with the warrant.  The

9    Government has made significant strides in scoping those

10   materials.  The Government does expect that within the next

11   week, it will be producing scoped versions of Mr. Nordean's

12   telephone and Mr. Nordean's laptop to not only Mr. Nordean,

13   but also the other three defendants which is an important

14   step here, is not only to provide the materials back to the

15   defendant from which it came, but also to provide the scoped

16   materials back to the other defendants.  The Government does

17   expect that that process will continue with respect to the

18   other defendants' devices.  It's -- it is already very much

19   underway.  And the Government would expect that at -- by the

20   time that we come back, that the Government would be

21   substantially complete with that process of scoping the

22   devices and scoping the various social media accounts so

23   that we can distribute the discovery to all the defendants.

24   So we think that that is a significant step.

25         In addition to that, the Government has provided

1   the -- a first production of materials from the FBI's case

2   files on each of the four defendants.  That amounts to over

3   600 files that have been sent out to the four defendants.

4   So the Government is proceeding apace with discovery and

5   would expect to be substantially complete in a period of

6   approximately 45 days.

7            When the Government was before Your Honor last,

8   the Government had proposed a continuance of 60 days, which

9   we came back in 30 at the request of Defendant Biggs.  Now,

10  when we -- now that -- when we look at the calendar, 30 days

11  would put us right in the middle of the July 4th holiday,

12  and the Government believes that it would be appropriate to

13  just continue for an additional 45 days which would put us

14  basically in the middle of July, and the Government has had

15  an opportunity to speak with counsel for Defendant Biggs.

16  We just had an opportunity to speak the last two days.

17  Defendant Biggs does not oppose a 45-day continuance.

18            And just to put it on the record now, Your Honor,

19  given the complexity of the case, the number of defendants

20  and, frankly, the scope of the crime scene -- thousands of

21  people unlawfully on the Capitol grounds, more than 15,000

22  hours of surveillance footage and body-worn camera, at least

23  1,600 electronic devices that have been seized from various

24  individuals on the Capitol grounds, over 20 responding law

25  enforcement agencies -- the size and scope of this case

1    would warrant a tolling of the Speedy Trial Act.  The ends

2    of justice are served by tolling time, and those outweigh

3    the best interests of the public and the defendants in a

4    speedy trial.  And in addition to that, given the volume of

5    discovery that is flowing out to the defendants in this

6    case, it is appropriate to toll time to allow for both

7    defense counsel and Government counsel alike to prepare and

8    engage in due diligence in their effective preparation for

9    trial.  So Your Honor, the Government would propose a

10   tolling of the Speedy Trial Act for -- until the next status

11   conference which the Government would propose to be 45

12   days -- that would put us at approximately July 16th or July

13   19th, Friday or Monday -- and would certainly hear from the

14   defendants as to their position on that.

15            THE COURT:  All right.  Very well.

16            Why don't I hear from counsel for Mr. Nordean

17   first.  Mr. Smith?

18            MR. NICHOLAS SMITH:  Thank you, Judge.

19            So I think we'll start with the protective order

20   issue that the Government mentioned.  The Government is

21   right that we haven't opposed the protective order, and so

22   we were a little bit surprised to see the Government's

23   motion.  We emailed the Government and let it know that the

24   issue with the current protective order is that sensitive

25   and highly-sensitive materials cannot be reviewed by the

1    defendants at -- in prison unless they're accompanied by

2    their legal counsel.  So Mr. Nordean will need to see the

3    evidence in his case.  We've reached out to his facility in

4    Seattle to see whether they can accommodate the cloud

5    computing system for viewing but not downloading sensitive

6    and highly-sensitive material and we haven't received a

7    response.  We let the Government know that we haven't

8    received a response, and we asked the Government not to file

9    its motion until we're able to resolve this issue.  It filed

10   it anyway.  But, Your Honor, our position is that we need

11   some time to figure out how the defendant will review

12   evidence now that he's incarcerated.

13          The other issue is, Your Honor, that the, you know

14   -- as Your Honor knows, that when people are incarcerated,

15   it's difficult to get them on the phone for more than, you

16   know, 15-minute segments, and the protective order requires

17   the defendant to review the order in its entirety in order

18   to sign it and agree to it.  So we just need some time to

19   work that out, Judge.

20          But on the motion -- so that's our position there

21   that --

22          THE COURT:  So let me stop you just to go issue by

23   issue, Mr. Smith.

24          So your -- is your request, then, that I just -- I

25   mean, because I do want to, to the extent I can, move things

1    along on all these issues as quickly as we can.  Is it your

2    request, then, on the protective order issue that I just

3    hold off; that you play this out -- the issues you have with

4    it out with the Government -- and you may come back and

5    inform me, It's fine; we consent -- and just let that play

6    out, do nothing until I hear from you about what --

7    regarding what your position ends up being?

8          MR. NICHOLAS SMITH:  Well, yes, Your Honor, and I

9    think it couldn't be any other way, because if we can't work

10   out a way with the facility for the defendant to review the

11   sensitive and highly-sensitive material, then I don't know

12   how we could agree to the protective order.  And I think

13   there's some -- so I agree to Your Honor's first point.  I

14   think that's what we would do.

15         But there's some interplay between that and the

16   motion to compel we filed, Your Honor, which is the reason

17   we -- we're happy to fully brief the motion cycle and

18   formally address it later, but I'm actually really happy

19   that Mr. Biggs's lawyer asked for a hearing today as opposed

20   to a status report because I think it's important to discuss

21   something that the Government has filed, and that is one of

22   the categories of documents we moved to compel is the

23   evidence that the defendants who are now incarcerated on

24   this basis destroyed property over $1,000.  And Your Honor

25   might recall that we had a conversation about this in the

1      detention motion.  And, you know, the indictment doesn't

2      allege what property the defendants destroyed, and there's

3      one line that says they destroyed property worth over

4      $1,000.  Well, Mr. Biggs and Mr. Nordean didn't destroy any

5      property on the 6th.  They didn't.  So -- and that's really

6      the basis on which they're detained right now.  There was no

7      statutory basis under 3142(f)(1) for detention on any of the

8      other charges.  And so, you know, we haven't received any

9      evidence that Mr. Biggs and Nordean destroyed anything, and

10     we think it's important to get that evidence now because

11     otherwise the defendants are incarcerated improperly under

12     the Bail Reform Act.

13              So Your Honor, we've emailed for this evidence.

14     It looks like, from the Government's response to the motion

15     to compel, that its position is that it doesn't have to

16     produce this evidence but that, essentially, if I'm reading

17     this correctly, that the evidence in support of that claim

18     is the fact that Dominic Pezzola smashed a window and

19     Dominic Pezzola's name is mentioned in the indictment.  But

20     I think Your Honor will go back to this colloquy we had

21     about how, to be held vicariously responsible under

22     Pinkerton liability for someone else's acts, there has to be

23     a co-conspirator, and for there to be a co-conspirator there

24     has to be an allegation of a criminal agreement.  So Your

25     Honor, if Your Honor reviews the indictment, you'll see that

1    the criminal agreement that's alleged in this case is not to

2    destroy property.  There is no allegation of a conspiracy to

3    destroy property.  Even if you take the truth of the

4    indictment on its face, it's a conspiracy to obstruct an

5    official proceeding and a conspiracy to interfere with law

6    enforcement during a civil disorder, Your Honor, and neither

7    one of those charges -- if you want to go by, you know --

8    whatever analysis you want to apply, it doesn't allege an

9    agreement to destroy property.  And there's also no facts or

10   allegations.  The proffers the Government's put forward that

11   there's an agreement between Pezzola and Mr. Biggs and

12   Nordean to destroy property, there wasn't an agreement, but

13   setting that aside it's not even alleged, Your Honor, and

14   there's been no evidence produced in discovery that there

15   was such an agreement between Mr. Pezzola and the defendants

16   here.

17          So absent an agreement, Your Honor, and absent

18   evidence that the defendants destroyed property over $1,000,

19   their incarceration is improper, and it's not -- it's also

20   not an issue that we were able to address in the first

21   hearing because of, Your Honor -- because the -- frankly,

22   the issue of the lack of an agreement between Pezzola and

23   the defendants was never really, sort of, fully discussed,

24   but -- so, Your Honor, that's why we've moved to compel, and

25   I think it's significant that you see in the Government's

1    response here that its evidence supporting their

2    incarceration right now is based on an unalleged claim of

3    the conspiracy between Pezzola and the defendants which no

4    facts have been offered to prove.  So that's -- so we're

5    going to fully brief the motion to compel, but that's why we

6    raised it now.

7           On the Speedy Trial Act, Your Honor, we are going

8    to oppose an extension, but, Your Honor, it's primarily

9    because of the incarceration of the defendants.  We don't

10   know how long that's going to last, but assuming it lasts

11   until trial, Your Honor, the kinds of burdens and logistical

12   hurdles that Mr. McCullough described have no limiting

13   principle to them.

14          THE COURT:  Mr. Smith, can I just stop you for one

15   second.  Again, it's not to interrupt the flow of your

16   argument on this point, but just to close off your position

17   on the motion that you have filed.  Is it -- and you started

18   that by saying you were glad that Mr. Hull had asked -- I

19   wasn't sure whether you meant he asked for that the next

20   date be a hearing as opposed to a status or just that it not

21   be so far into the future, but let me just clarify.

22          So is it -- you said you would -- you'll finish

23   out the briefing cycle on your motion.  And is it your --

24   are you suggesting the way forward on that motion is, when

25   we do come back -- so putting aside -- and I realize these

1    issues are interlocked to some degree -- but that I hear

2    argument and decide your motion the next time we come back?

3              MR. NICHOLAS SMITH:  Your Honor, we would --

4    whenever -- at the Court's pleasure, we'll argue the motion.

5    We just want an opportunity to file a reply brief just to

6    put it --

7              THE COURT:  All right.

8              MR. NICHOLAS SMITH:  -- on the record what our

9    position is.  I was only -- about the hearing, I was just

10   commenting that Dan Hull suggested that we do a hearing

11   today for the status conference instead of a status report,

12   and I --

13             THE COURT:  I see.  Oh.  Oh, I see, that we be

14   present instead of just filing a piece of paper.

15             MR. NICHOLAS SMITH:  Right.

16             THE COURT:  Yes.

17             MR. NICHOLAS SMITH:  Right, Your Honor.

18             THE COURT:  And I --

19             MR. NICHOLAS SMITH:  And so --

20             THE COURT:  Very well.

21             MR. NICHOLAS SMITH:  Okay.

22             So -- and so I'm just noting that, you know, what

23   we have, I think -- because the Government's opposition was

24   filed last night and we're in a hearing today -- a

25   conference today, I'm just noting that its position appears

1     to be that the evidence supporting the detention right now

2     is Dominic Pezzola as opposed to some other form of

3     destruction.  So --

4              THE COURT:  All right.  I didn't mean to sidetrack

5     you.  You can --

6              MR. NICHOLAS SMITH:  Yeah.

7              On the Speedy Trial Act, Your Honor, we are, you

8     know -- if the defendants were out right now released, I

9     don't think we would oppose a Speedy Trial Act extension,

10    but because the principle that Mr. McCullough is

11    outlining -- if it's accurate that, you know, there's an

12    enormous amount of evidence and there's significant

13    logistical burdens to bringing a case, I think that that

14    principle doesn't really have any limit to it and that we

15    could be seeing ends-of-justice continuances indefinitely if

16    that's the case with over 500 defendants.  And, Your Honor,

17    it's our position that 18 U.S.C. 3161(h)(7)(C) addresses the

18    type of argument that the defense -- that the Government is

19    trying to make for a continuance here, and that is that

20    section of the Speedy Trial Act prohibits arguments for

21    continuances based on, quote, General congestion of the

22    docket.  General congestion of the docket.  So this is --

23    this type of argument that the Government has indicted too

24    many people to try at once is not -- is forbidden under the

25    statute, and we don't think that this sort of circumstance

1    is any different than what's contemplated in the statute.

2    So we're opposing the extension.  And I think that's

3    everything that --

4         THE COURT:  All right.  Let me just say this.

5    I'll certainly hear from the Government -- well, I'm going

6    to hear from all the defendants first.  But it doesn't

7    strike me -- general congestion strikes me as something that

8    would apply to my calendar generally.  I think what the

9    Government has been representing is that this particular

10   investigation and case -- and, I guess, that's the

11   distinction there -- but that I don't see what the -- I

12   don't see the Government arguing to me about -- or at least

13   I would not put forth a reason to continue the case as

14   simply because my docket is generally congested.  I agree

15   with you.  That is prohibited by that prong of the statute,

16   but I don't see the Government's argument as equaling that

17   when they're talking about the specific events of January

18   6th and the pressures on the Government in terms of the

19   amount of discovery that's coming out of that investigation

20   that may be relevant to your client.  It -- maybe, it will

21   be; maybe, it won't be, but that's a hard judgment for them

22   to make.  That having been said, Mr. Smith -- I mean, I

23   agree with you in the sense that we're not, you know -- that

24   there is going to have to be a limiting principle here and

25   the Government is not going to be able to just keep coming

1    in and arguing that the scope of the investigation gets them

2    a Speedy Trial Act tolling.  Let me just, you know --

3    indefinitely.

4           Mr. Smith, let me just ask you one other question.

5    Does your motion for a bill of particulars toll the Speedy

6    Trial Act anyway?  I guess I hadn't focused on that, but

7    that's -- obviously, under the Speedy Trial Act, motions do

8    toll it.  Is there any reason to believe that that is not

9    tolling the Speedy Trial Act regardless of the

10   ends-of-justice basis?

11          MR. NICHOLAS SMITH:  Your Honor, it's a great

12   question.  I'd have to research it.  I don't know.  I don't

13   know what -- whether, you know -- the circumstances might

14   depend on the status of the incarceration of the defendant

15   or, you know, other factors, but on its own in isolation, I

16   don't know.

17          THE COURT:  Yeah.  There are times when the

18   Government filing a motion does not toll.  I think, though,

19   that -- well, I don't know for sure, but my suspicion is

20   that it does either way, but in any event -- so let --

21   I'll --

22          MR. NICHOLAS SMITH:  So I guess if -- Your Honor,

23   if that's the case, then I think that our position would be

24   that we're not agreeing to a discretionary extension --

25          THE COURT:  Right.  No, I understand.  I mean,

1    that can be your position regardless of the effect of that.

2    It may be -- it may not matter, but I take your point.

3              Let me hear next from Mr. Hull.

4              MR. HULL:  Thank you, Your Honor.

5              I -- first of all, it's -- Mr. Smith has it right.

6    The idea of getting here, you know, sooner than 60 days and

7    not making it 30 days was just so that we could meet.  You

8    don't know what kinds of issues come up.  But the whole idea

9    for me was that when people are incarcerated, you never know

10   what's going to happen.  There's sometimes issues of

11   conditions of detention.  But I thought it makes sense, even

12   though there's lots more to do on discovery, for us to meet

13   every 30 or 45 days.

14             And since we're on that topic, I don't have any

15   objection at all to an extension or a next status

16   conference.  I was going to say the 15th or 16th.

17   Mr. McCullough and I talked about that this morning.  I

18   think that makes sense in light of the holidays and

19   everything else and --

20             THE COURT:  Mr. Hull, let me just interject and

21   say just for the record, you'll notice in the past you

22   haven't had to twist my arm about this.  I agree with you

23   largely that -- particularly given the incarcerated nature

24   of the defendants and the complexity of the case and all the

25   rest of it, that it's better for us to come back on that

 1    time frame and to come back in person.  So you had me at

 2    hello on that argument originally, and I haven't changed my

 3    mind about it.  So --

 4          MR. HULL:  Well, no, it's good to know, and I

 5    don't mean to belabor it, but I just think it's just --

 6    under the circumstances and especially with the technology

 7    and not being able to get together all -- as easily with our

 8    clients, that makes sense.

 9          And I would also say that it was probably two

10    months ago -- and I'm not sure I've -- I discussed this a

11    little bit with Mr. McCullough -- two months ago that

12    Mr. Biggs read the protective order just before he was

13    incarcerated and he read it, understood it, and I need to

14    file it.  It's actually filed under a slightly different

15    exhibit number because we weren't -- or letter, but I will

16    file that, but we have no problems with the protective order

17    in any of its incarnations.  I mean, this will cover, you

18    know, what was intended and we think it's fine; however,

19    Mr. Smith's, you know, issues that he's raising about being

20    able to review voluminous -- I mean, there's a -- lots of

21    discovery in all these cases, and there may be a bit more in

22    these than any others.  It is going to be hard to get

23    together with, you know, our clients and review this, and

24    I'm willing -- I mean, I like to travel.  There's lots of

25    things I can do and to be flexible with my clients, but I --

1   it would be easier, of course, if people were not

2   incarcerated or there were arrangements that were very fluid

3   and very easy to, you know, review this information with

4   Mr. Biggs. And, you know, we don't know what the Circuit's

5   going to do. That may happen today; it may happen tomorrow;

6   the next couple of days. But in any event, I have to assume

7   for now that's the status quo, and I need to know how to,

8   you know -- I have to read it myself. I need help going

9   through some of it, and then I need to get with Mr. Biggs.

10  So that's a good issue that Mr. Smith raised.

11          Another issue is -- and I'll just -- I hadn't

12  really thought I'd talk about this, but the $1,000 threshold

13  issue is an issue that I join in on, and it's certainly not

14  something that's before the D.C. Circuit. I mean, it's

15  something that can be ruminated, you know -- it can be

16  thought about by you. I don't think that it was really part

17  of our hearings before. It's certainly something you have

18  jurisdiction and hopefully some inclination to look at, but

19  that threshold issue on the damage is important and, you

20  know, I would hope that His Honor would take Mr. Smith's

21  comments along those lines to heart as much as possible

22  because it is, in large part, why the incarceration ended up

23  and we really didn't have that delivered to us probably when

24  we should have. So the issue should be addressed.

25          And the only thing remaining I can think of is

1    just, you know, the Speedy Trial Act date -- the status

2    conference date, and that would be -- mid-July makes a lot

3    of sense.

4            So thank you.

5            THE COURT:  All right.  Ms. Costner?

6            MS. COSTNER:  Yes, Your Honor.

7            With respect to the speedy trial issue, we have no

8    objection to a status conference in 45 days and waiving

9    speedy trial.  I -- my client, until last night, has

10   continued to be in Oklahoma.  I'm hopeful he will be in

11   North Carolina today or tomorrow and I will begin to be able

12   to have meaningful conversations with him.  So at this

13   point, the more time he can remain in North Carolina, the

14   better, at least as -- while he's being detained, the better

15   it would be.

16           And so I did want to talk for a minute about the

17   detention hearing being scheduled for June 9th.  Your Honor

18   has ordered that he be in North Carolina while detained, and

19   I guess if he is continued to be detained he would, then, go

20   to Washington to be held there.  I don't know what impact

21   that would have on -- the hearing on the 9th would have, but

22   if he continues to be detained while we wait for the Circuit

23   Court, I would just like for him to be in North Carolina, if

24   at all possible.

25           THE COURT:  All right.  I don't think that would

1    affect -- I mean, I don't think us scheduling a check-in

2    earlier where I could -- where, number one, I could see if

3    the Circuit ruled; number two, I could hear from you and

4    then rule one way or the other on the 9th, I don't think his

5    whereabouts -- I don't think us scheduling that will affect

6    where he is, but I understand your position on where he

7    should be and, you know, if there's something -- as things

8    go forward, if there's -- if you need to bring something to

9    my attention, please, feel free along those lines.

10           All right.  So let's do this.  Let me -- let's

11    first -- before I get into the Speedy Trial Act, let me try

12    to get a date when all counsel are available for our next

13    status and work backwards from that.  I have Thursday, July

14    15th, in the afternoon available.  Let me first ask

15    Ms. Harris.  Is there any reason why we wouldn't -- that you

16    know of that we wouldn't be able to have our two defendants

17    who are here -- maybe, you know, hope springs eternal, we

18    can loop in Ms. Costner's client as well -- but the two

19    defendants we have with us today, is there any reason why --

20    you know of why we wouldn't be --

21           (Technological interruption.)

22           THE COURT:  All right.  And so let me ask --

23           THE COURT REPORTER:  Judge Kelly --

24           THE COURT:  -- then, the Government --

25           THE COURT REPORTER:  Judge Kelly --

```
 1              THE COURT:  -- is -- are you -- is the Government
 2     counsel available --
 3              THE COURT REPORTER:  Judge Kelly --
 4              THE COURT:  Yes?
 5              THE COURT REPORTER:  I'm sorry to interrupt.  The
 6     Zoom froze.  I missed when you were speaking to Ms. Harris.
 7              THE COURT:  Okay.  Well, just for the record, I
 8     asked Ms. Harris if there was any reason why -- any sort of
 9     technological reason why we wouldn't be able to have both
10     defendants who are present today present on July 15th at
11     2:00 o'clock.  She doesn't -- not know of any reason in
12     terms of the way those facilities schedule hearings,
13     etcetera.
14              Then I was going to turn to Mr. McCullough and see
15     if that date and time worked for the Government.
16              MR. MCCULLOUGH:  That time works for the
17     Government.  Thank you, Your Honor.
18              THE COURT:  All right.  Mr. Smith?
19              MR. NICHOLAS SMITH:  Yes, Your Honor.  That works
20     for us.
21              THE COURT:  All right.  Mr. Hull?
22              MR. HULL:  That's a fine time.  Yes.
23              THE COURT:  Ms. Costner?
24              MS. COSTNER:  That will be fine, Your Honor.
25              THE COURT:  All right.  Ms. Costner, as far as
```

1    scheduling your client -- you and -- well, whether it's your

2    client or not, at least a check-in with you and an

3    opportunity for me to perhaps hear from the Circuit, perhaps

4    not, but in any event to rule on the pending motion you

5    have, is July -- is, sorry, June 9th at 11:00 o'clock

6    available for you?

7            MS. COSTNER:  Yes, that would work for me.

8            THE COURT:  All right.  Is that, Mr. McCullough --

9            MR. MCCULLOUGH:  (Indicates affirmatively.)

10           THE COURT:  I see him shaking his head.  That's

11   available for the Government.  So we'll put --

12           MR. MCCULLOUGH:  Yes, Your Honor.

13           THE COURT:  We'll put you down to come back at

14   that day and at that time just, obviously, via

15   videoconference as we are today and we'll endeavor to

16   resolve that -- your motion at that time.

17           I'm going to study the papers and I'll certainly

18   hear -- just so you know, Ms. Costner, I will hear any

19   argument you'd like to make, but I'll certainly be up to

20   speed on the papers and everything that's been filed and

21   we'll be prepared to rule, unless -- but I will hear from

22   the parties at that time.

23           MS. COSTNER:  Yes, Your Honor.

24           THE COURT:  With regard, then, to the Speedy Trial

25   Act, let me just hear, Mr. McCullough, from you in response

1    to Mr. Smith's argument about why he would not like to --

2    his declining to consent to tolling the Speedy Trial Act --

3    his opposition to that.

4              MR. MCCULLOUGH:  Yes, Your Honor.  Thank you.

5              First of all, my opponent's reference to docket

6    congestion, the Government believes that's misplaced.  That

7    is not the reliance that the Government is placing when it

8    asked for the tolling of the speedy trial here.  The ends of

9    justice are served because of the unique circumstances of

10   this case, the events on January 6th at the Capitol and the

11   larger investigation as well as this specific investigation

12   into a four-defendant case with additional conspirators

13   charged in other indictments and otherwise.  The collection

14   of the evidence here and the need to distribute that and for

15   all counsel to be able to exercise due diligence in

16   reviewing that discovery, that is the basis for the

17   Government's motion.  It is specific to this case.  So the

18   Government believes that the ends of justice are met by

19   continuing here.

20             And the Government hears Your Honor and hears my

21   opponent, Defendant Nordean, that we will not be doing this

22   ad nauseam.  The Government is putting significant effort

23   into distributing the discovery to all four defendants in

24   this case, the most relevant discovery to them, including,

25   as I mentioned, scoping all of the warrants.  And one thing

1    the Government failed to -- or neglected to mention, the

2    Government did ask for consent from the parties to provide

3    unscoped devices to one another, and the Government was

4    unable to secure an agreement there.  And so the Government

5    has put its significant effort into ensuring that these

6    devices are scoped so they can be distributed to the

7    co-defendants and, as I mentioned, that is no small task

8    here.

9              THE COURT:  All right.

10             With regard, then, to the Speedy Trial Act, I will

11   find that the time between today's date and July 15th is

12   excludable under the Speedy Trial Act because the ends of

13   justice that are served by taking such action outweigh the

14   best interests of the public and the defendants in a speedy

15   trial.  And I'm doing so here with the consent of three of

16   the -- three -- well, with two of the three defendants

17   present.  And I'm doing so to give -- as Mr. McCullough has

18   laid out, due to the size of the investigation generally

19   here with regard to the events of January 6th, but also with

20   regard to the nature of this specific case.  Within that,

21   the multi- -- the four co-defendants with -- as

22   Mr. McCullough mentioned, with other alleged co-conspirators

23   not charged in this case, but certainly there's overlap, and

24   there may be overlap in terms of the discovery that needs to

25   be provided to these defendants, the electronic nature of a

1    lot of the evidence, and all the representations that have

2    been made to me regarding the volume of defendants that have

3    been arrested -- I believe, well over 400 -- that -- and the

4    types of discovery that have to be provided to these

5    defendants about the entire event.  So I do think that's --

6    that is -- I do think tolling is appropriate on that basis.

7    As I said, I don't think it's going to be -- it's not going

8    to be appropriate on that basis forever.  And I do think

9    that -- I'll be looking to make sure that progress has been

10   made the next time we gather along those lines.  The other

11   thing I'll just note is I do think it's very likely that at

12   least at -- with regard to Defendant Nordean that the Speedy

13   Trial Act would be tolled in any event because he has a

14   motion pending at this point at least as to him.  I don't

15   know that.  Whatever the law is on that, it is.  I'm not

16   necessarily making a ruling on that, but I'll just say I --

17   in general, the Speedy Trial Act notes that pending motions

18   are generally -- do waive the speedy trial clock and that

19   that may well be what the case is here, unless there's an

20   exception that I am unaware of.  So that -- we will toll

21   speedy trial on that basis from now until we're next here.

22         What I'll also just tell the parties is, look, I

23   will take the -- I will take your -- Mr. Smith, your

24   completion of the briefing cycle on your motion for

25   discovery and -- for production of evidence and bill of

1    particulars and decide whether I want to hear from the

2    parties or resolve it on the papers.  The parties should be

3    -- unless I resolve it on the papers before we come back,

4    the parties should be prepared to address that motion and I

5    will -- when we come back and I will do my best at that time

6    to rule on the motion -- if I haven't ruled on it before

7    then, to rule on it on July 15th.

8            And, as for the motion for protective order, I

9    will do exactly what you had wanted, Mr. Smith.  Look, if

10   the parties can -- if the parties are able to reach an

11   agreement or -- I don't want me to -- I don't want the Court

12   to be the holdup here.  So I'll just leave it to the parties

13   to let me know -- if, at some point, they reach an agreement

14   related to that protective order or some subset of those

15   provisions, you all can let me know and we'll -- and I'll

16   enter whatever protective order the parties have agreed to

17   within reason, as -- if such an agreement is reached between

18   now and when we come back.

19           All right.  With that, is there anything further

20   the Government thinks I need to address today?

21           MR. MCCULLOUGH:  No, Your Honor.  The Government,

22   though, would just put on the record here with respect to

23   the protective order that the Government would be willing to

24   enter the protective order on an interim basis to at least

25   ensure that defense counsel for Nordean would be able to

1     receive the materials as he's pending resolution with SeaTac

2     and just putting that on the record as to the Government's

3     view and would be willing to revisit it at -- after that

4     conclusion is reached.

5              THE COURT:  That's the kind of thing that I'm -- I

6     was thinking of.  And so I just -- I'm not -- the parties --

7     I'm not -- I don't want to weigh in one way or the other.

8     My only point is, if there is a way to have some kind of

9     interim arrangement so that more discovery can flow sooner,

10    you all know where to find me if -- to effectuate any of

11    that.

12             MR. NICHOLAS SMITH:  Your Honor, I can give you a

13    response to that right now.  We never discussed that option

14    with the Government because the form is supposed to be

15    signed by the defendant.  But if Your Honor wants to enter

16    the protective order by proxy for Defendant Nordean so that

17    his counsel can review the materials, the -- we have no

18    objection to that to -- except that we would just note that

19    it's not that we don't have an agreement with the Government

20    on the terms.  It's that the facility -- we're not even sure

21    if the defendant will be able to review sensitive materials

22    right now where he is.  So we're just holding off on the

23    defendant's ability to -- agreement to the protective

24    order's terms.  So -- because the defendant needs to see the

25    evidence.

 1              THE COURT:  All right.  I don't want to let --
 2     fair enough.  I'm going to let you two continue to talk
 3     about this.  If you reach a meeting of the minds that I
 4     should, in fact, enter this agreement -- I mean, I -- you've
 5     represented that now to me, Mr. Smith, but I don't want to
 6     just -- I want to let you -- this percolate and let you two
 7     talk about it.  If you agree that I should enter it subject
 8     to things that might change in the future, you all can file
 9     something on the docket and I will turn around and do that,
10     if that's what the parties want.
11              Mr. Hull, anything further from you?
12              MR. HULL:  Just one thing, Your Honor, and it's
13     generally on discovery, and I'm glad we've been talking
14     about a lot today, is the discovery in this case is, you
15     know -- everyone who's mentioned it, talked about it -- it
16     really never seems to end, and that's probably going to how
17     difficult it is to manage a lot of the discovery.  It's
18     huge, voluminous.  I don't think there's any -- ever been
19     anything quite like this at least in a criminal case.  Is
20     there a way to know -- and I suppose this is a question for
21     Mr. McCullough or for Mr. Jones -- to know when a certain
22     percentage of preliminary discovery will be over?  I'm not
23     complaining.  I'm impressed by the amount of things they're
24     getting out to us and quickly, but it never quite ends and
25     then, at the same time, we have new defendants, new

1     theories, new indictments, you know?

2               THE COURT:  Mr. Hull --

3               MR. HULL:  Can we say five months?  Five months

4     from now, there will be 70 percent of the preliminary

5     discovery done?  I mean, I'm impressed by the way this has

6     been managed, but I'd like to get some kind of notion from

7     the Government of when this does end, if anyone knows.

8               THE COURT:  Mr. McCullough, if you want to give a

9     short answer to that, if you can.

10              But I -- and my suggestion is to the parties to

11    continue these discussions without necessarily needing my

12    time.

13              Mr. McCullough?

14              MR. MCCULLOUGH:  Yes, Your Honor.  Briefly, the

15    Government is continuing to produce discovery.  We would

16    anticipate producing discovery through the next 45 days and

17    will give an update at that time.

18              THE COURT:  All right.  Well, I do think --

19    Mr. Hull raises a fair point which is I do think, when we

20    come back, it -- I think it will be reasonable for the

21    defendants to want to know, and for me to inquire, more than

22    just that things are moving forward but how close to

23    completion we are and what categories of information, for

24    whatever reason, perhaps legitimate, the Government has not

25    been able to produce and for what reason.  I think that's a

1    fair -- that will be something that -- it will be a fair

2    point of discussion when we come back.

3              MR. HULL:  And just so -- Your Honor, excuse me.

4    Just so the -- it's clear, I'm not saying that the discovery

5    isn't, you know, proceeding apace.  It is, and it's been a

6    gargantuan effort, but I think there's a certain point at

7    which you need to know not just to prepare for trial but to

8    prepare for trial with defendants who, in some cases, may be

9    incarcerated before that trial or to get ready for any kind

10   of plea agreements, anything.  This is something that we

11   need to know and, maybe, in 45 days we can have a date.  It

12   doesn't have to be a cutoff.  I realize things keep coming

13   in.  But, you know, 90 percent of preliminary discovery will

14   be finished or the cutoff date by X.  That's fair to ask in

15   this case.

16             THE COURT:  I agree with you, Mr. Hull, and I

17   don't think, again, you -- I didn't -- I hope the parties

18   didn't take what I said before as suggesting that I don't

19   think the Government's doing a reasonable job here, but I do

20   think, more than just knowing things are moving forward,

21   knowing where we are in terms of percentages, what is still

22   to come, and when discovery will be substantially complete

23   or complete in total is a fair thing to want to know, and I

24   think when we come back the Government should be prepared to

25   talk a little bit more about that.

 1          Ms. Costner, anything further from you?

 2          (Brief pause.)

 3          Oh, you are muted, Ms. Costner.

 4          MS. COSTNER:  I was muted.  Yes.  No, Your Honor.

 5          THE COURT:  All right.  Very well.

 6          So I will see -- we'll see -- Ms. Costner, I'll

 7   see you next week.

 8          Everyone else, I will see on -- at our next status

 9   on July 15th.

10          Until then, the parties are dismissed.

11          MR. HULL:  Thank you, Your Honor.

12          MR. MCCULLOUGH:  Thank you, Your Honor.

13          MR. JONES:  Thank you, Your Honor.

14          (Proceedings concluded at 3:09 p.m.)

15                  * * * * * * * * * * *

16          **<u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>**

17     **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby**

18   **certify that the above and foregoing constitutes a true and**

19   **accurate transcript of my stenographic notes and is a full,**

20   **true and complete transcript of the proceedings to the best**

21   **of my ability, dated this 13th day of July 2021.**

22     **Please note:  This hearing occurred during the COVID-19**

23   **pandemic and is, therefore, subject to the technological**

24   **limitations of court reporting remotely.**

25                          **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                            **Official Court Reporter**



```
                          United States Courthouse
                          Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
```