# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| v. | ) Case No. 1:21-cr-175 |
| | ) |
| | ) **Judge Timothy J. Kelly** |
| ETHAN NORDEAN, et al., | ) |
| | ) |
| Defendants. | ) |
| | ) |

## DEFENDANT NORDEAN'S MOTION TO REOPEN BAIL HEARING

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Ethan Nordean*

**Request for Oral Hearing**

# TABLE OF CONTENTS

I.      Detention information obtained after Nordean's bail was revoked ................. 2

    A.      Leadership and political rallying ................................................ 2

    B.      Video showing Nordean permitted to enter the Capitol Building ............... 5

    C.      Mitigating Telegram chats produced after detention ........................ 5

    D.      Government concedes that its claim that Nordean is legally responsible
            for over $1,000 in property damage rests on Pezzola's window-smashing
            alone ................................................................................ 6

    E.      Nordean's current conditions of confinement and the prospect of
            a distant trial ...................................................................... 7

    F.      New release conditions options for Nordean ................................ 8

II.     Argument ................................................................................ 10

    A.      Standard for reopening bail hearing under § 3142(f) ...................... 10

    B.      Nordean's case does not "involve" an "offense" listed in § 3142(f)(1) ...... 10

        1.      The FSI failed to present essential conspiracy and *Pinkerton*
                elements to the grand jury in violation of Nordean's Fifth
                Amendment right ..................................................... 11

        2.      The FSI failed to present essential elements of the aiding
                and abetting offense to the grand jury in violation of Nodean's
                Fifth Amendment right ............................................. 15

    C.      New information "materially bears" on conditions of release .............. 17

        1.      Recent January 6 defendant release orders ........................ 17

        2.      New information shows that detaining Nordean for a year
                or longer while the aforementioned defendants are released
                is grossly disparate ................................................. 19

III.    Conclusion ............................................................................ 23

Defendant Nordean, through his counsel, moves to reopen his detention hearing, pursuant to 18 U.S.C. § 3142(f), for the following reasons.

Nordean's release order was revoked in April.  In the following three months, a great deal of information "that was not known to [him] at the time of the [detention hearing]" has been obtained.  § 3142(f).  In part, the information was not then known to him because the government withheld it over the course of multiple detention hearings, only to produce mitigating material after his bail had been revoked, including video showing law enforcement permitting Nordean to enter the Capitol Building on January 6.  It also includes material Nordean has uncovered through diligent investigation which rebuts any claim that he occupies a current leadership role in the Proud Boys.  This information materially bears on the issue whether there are conditions of release that will reasonably assure public safety.  Nor does the First Superseding Indictment (FSI) allege the elements of a crime necessary to support the detention predicate that Nordean destroyed, or aided and abetted the destruction of, over $1,000 in federal property on January 6.

Nordean offers a bond secured by $1,000,000 in cash and, if that is not sufficient, pledges a home of nearly equivalent value, against any material breach of a release condition.  A network of video cameras has been installed around the home where he would be detained that display every entrance to the residence.  The video is streamed through an application that makes 24/7 surveillance free to any pretrial service office with the internet, creating a virtual Panopticon.  Nordean consents to random, warrantless searches of the home during detention and proposes the use of a random electronic storage detection dog sweep of the home, at his expense.  The government has not shown by any evidence, much less evidence clear and convincing, some

1

specific harm Nordean would impose on the community for which he would be willing to risk $50, let alone $1 million and a home.

As the Court knows, Nordean is not accused of assault or violence. It also knows that many January 6 defendants who committed assaults and acts of violence on January 6 have been released on bail, including many also accused of conspiracy. Pretrial detention is degrading his Fifth and Sixth Amendment rights, as Nordean is unable to view nearly any evidence in his case or to virtually confer with counsel. The amount of complex discovery he must review is enormous. Because there is no statutory basis for detention under § 3142(f) and there are conditions that reasonably assure public safety, indeed virtually guarantee it, he should be released so that he can adequately prepare for trial against novel claims the government has never before charged. If these conditions and facts do not satisfy the BRA, under which liberty is the norm, the precedent set by this case will be dangerous.

## I.     Detention information obtained after Nordean's bail was revoked

### A.     Leadership and political rallying

On April 19, the Court's decision to revoke Nordean's bail rested largely on two § 3142(g)(4) danger-to-the-community factors: Nordean's perceived current leadership of the Proud Boys organization[1] and the possibility that he would engage in dangerous political rallying in the future. Specifically, the Court found that:

> [T]hrough their leadership . . . and the networks that these two individuals can draw on, [Nordean and Biggs] can produce events that draw large numbers of people, including

---

[1] As the Court knows, the dangerousness factors focus on future risk, not on the historical facts alleged in the indictment. *United States v. Munchel*, 991 F.3d 1273, 1285 (D.C. Cir. 2021) (question of whether defendant poses an "unmitigable threat to public safety" is "forward-looking" and "does not turn on any generalized, backward-looking assessment of the rioters or the riot"). Nordean focuses in this motion on his lack of any current leadership role in the group. But that does not mean he concedes that leadership per se is a basis for detention absent a showing that the leadership is criminal in nature.

Proud Boys, others sympathetic to Proud Boy perspectives . . . Even if the [2020
presidential] election has passed all of politics has not.

Hr'g Trans., 4/19/21, p. 55.

The Court also noted the "leadership roles" for Nordean and Biggs "before, during, and
after the riot." Hr'g Trans., 4/19/21, pp. 42; 44 (stressing leadership factor in detention).
Specifically, the Court noted that "the grand jury charge[d] that Nordean was a member of the
group's leadership through what's known as an Elders chapter and is President of his local
chapter in Washington State." *Id.* at 16.

However, as the Court observed, Section 3142(g)(4) dangerousness analysis is forward-
looking, *Munchel*, 991 F.3d at 1285, and Nordean is no longer a leader of the group in any
capacity. Following the detention hearing, Nordean managed to obtain a sworn declaration from
a current leader of the organization. ECF No. 85-1. Specifically, the declarant is the current
president of the Seattle chapter of the group, i.e., one of the leadership roles the Court previously
assigned to Nordean. *Id.* at 1. The declarant swore under penalty of perjury that the Elders
chapter no longer engages in activity and was dissolved this summer. *Id.* Moreover, he swore
that the Pacific Northwest section of the organization had become autonomous of, and retains no
connection to, any national group. The declarant swore that Nordean is not a president of the
group in Seattle, nor in any other chapter. *Id.* at 2. Nordean "no longer has any leadership role
in [Seattle] or the [Pacific Northwest]. He is no longer a participant in any Proud Boys Internet
communications, and has not been since his arrest in February 2021, including the period
between March 3, 2021 and April 19, 2021 during which he was released on house arrest." *Id.* at
2.

The government has not factually rebutted that sworn declaration since it was filed on
May 16, 2021.

3

Before his bail was revoked, Nordean had presented a February 2021 audio recording of himself in a conversation with members of his group in which he rejected future political rallying.  However, the Court found that "without any further context there's no indication that that was some kind of permanent decision." Hr'g Trans., 4/19/21, p. 55:22.

There was "further context." A week before the April 19 detention hearing, the government compiled a review of Nordean's audio messages on the Telegram app.  ECF No. 100-1.  In a FD-302 memorandum dated April 14, the government noted multiple additional statements from Nordean forswearing rallying.  *Id.*  The government neither produced the audio messages to Nordean before the detention hearing nor referenced them when the Court made its comment on April 19 about a lack of "further context." That is particularly disturbing given Nordean's previous submission to the Court of one, but not all of, those audio recordings.  In that submission, Nordean's counsel noted that, because the government possessed his phone and had not produced the audio file, Nordean had to obtain it from a third-party.  Yet despite knowing that Nordean was attempting to show his lack of intent to rally in the future with the audio files, the government withheld additional audio files demonstrating the point until after the Court detained him.[2] *See* LCrR 5.1 (beginning at arraignment, the government must make good-faith efforts to disclose as soon as reasonably possible "information that is inconsistent with or tends to negate the defendant's guilt as to any element").

---

[2] This is similar to another episode in the government's second, unsuccessful attempt to detain Nordean.  The government represented to the Chief Judge that Nordean used "encrypted communications" on January 6 to lead an invasion of the Capitol Building from multiple points. Yet his phone was powered off during the relevant time period.  Having seized the device, the government possessed information that would disprove its claim.  It did not produce the *Brady* material to the defense before the bail hearing.  Hr'g Trans., 3/3/21, p. 37.

**B.      Video showing Nordean permitted to enter the Capitol Building**

Excepting property destruction, each charge against Nordean relies, at least in part, on the claim that he illegally entered the Capitol Building on January 6.  The government has made this point repeatedly.  Nordean's entry into an alleged "restricted area" set under § 1752 was without "lawful authority." FSI, ¶¶ 76, 78.  Nordean's "obstruction" of Congress was "corrupt" because his entry into the Capitol was "unlawful." ECF No. 106, p. 23.  And Nordean "interfered" with law enforcement officers by virtue of his "unlawful" entry into the Capitol Building.  *Id.* at 40 (citing FSI ¶¶ 20, 61-67 as examples of alleged facts establishing a § 231(a)(3) offense).

Yet, on July 7, about three months after Nordean's bail was revoked, the government produced for the first time a Capitol security video depicting the following.  Two law enforcement officers stand aside and permit Nordean to enter the Capitol Building.  The government has provided no explanation for why this video was produced about five months after he was indicted.

**C.      Mitigating Telegram chats produced after detention**

Two weeks after the Court revoked Nordean's bail, the government produced additional Telegram chats extracted from his phone.  ECF No. 79.  Like the Telegram chats it used to support detention, the post-detention production was drawn from the same device (Nordean's phone), the same app (Telegram), and only postdate by some days the chats the government used to detain Nordean.  *Id.* at 2.  The Court will recall that because the Telegram messages are "encrypted" (though not end-to-end encrypted), they are designed to evade law enforcement and are therefore candid, according to the government.   The chats produced post-detention show the following:

- Nordean endorsing the comment that the affidavit filed in support of defendant Biggs' criminal complaint was a "steaming pile of dog shit that tries to make it seem like the capital shit was planned";

- Nordean indicating several times he did not want to rally in the future.  "Fuck politics, build communities and local economy," he wrote days before his arrest;

- Chats indicating a lack of coordination between Nordean and Dominic Pezzola on January 6.

ECF No. 79, pp. 2-5.

      **D.**    **Government concedes that its claim that Nordean is legally responsible for over $1,000 in property damage rests on Pezzola's window-smashing alone**

In seeking revocation of Nordean's release order, the government relied on one of the FSI's charges alone—that Nordean destroyed, or aided and abetted the destruction of, property, damaged in an amount exceeding $1,000.  ECF No. 45, pp. 6-7.  However, the government declined to describe the full extent of its alleged evidence in support of that charge.  Although it cited Pezzola's smashing of a Capitol window, the government represented that was only one piece of evidence among others supporting the property destruction claim.  *Id.* at 6 ("Defendant . . . did aid and abet the violent and destructive entry into the Capitol, *including* that of Pezzola, who is charged elsewhere.") (emphasis added).  The government also proffered Nordean's "personal[] breaking down [of] barriers" as another piece of evidence supporting the over-$1,000-in-damage claim.  *Id.* at 7.  Further, in Nordean's appeal to the D.C. Circuit, the sole piece of evidence the government was willing to cite in support of the $1,000 damage claim was the "fence-shaking" video.  USCA Case No. 21-3021, Doc. No. 1898908, p. 39 n. 19.  As to Pezzola's actions, all the government was willing to represent to the court of appeals was the following, in a footnote:

> The government further alleged that Dominic Pezzola's activities were relevant in this case, because video images showed that Donohoe was carrying the stolen shield with Pezzola, thus effectively "adopting" Pezzola's actions for the group.

6

*Id*. at 22 n. 13.

The Court will notice that the government's appellate brief makes no argument about Nordean's alleged *Pinkerton* conspiracy liability for the window Pezzola smashed.  USCA Case No. 21-3021, Doc. No. 1898908.  Yet in the status conference on July 15, the government acknowledged for the first time that the $1,000-in-property-damage claim is based on Pezzola's window-smashing alone, and not on any other incident of property destruction.  This concession is legally significant for bail purposes for the reasons described below.

### E.    Nordean's current conditions of confinement and the prospect of a distant trial in 2022

The government has been advised that Nordean cannot review electronic discovery at his jail facility absent the presence of defense counsel.  That facility is thousands of miles from the courthouse.  As of July 6, the facility announced to counsel that it will "no longer schedule any attorney/client VTCs and telephone calls with its inmates after July 1, 2021."[3]

On July 19, the government wrote an email to the facility, copying Nordean's counsel. The email indicated that on July 16, the government called an official at the Seattle facility to see whether those access-to-counsel denials could be ameliorated.  Counsel for the government indicated that the jail official represented on July 16 that (1) the jail can "in some circumstances" store discovery materials in the education department and permit inmates to review them there but not take them elsewhere and (2) the facility "is returning to protocol in which legal visits are in-person as opposed to virtual" and that the official will "inquire about the possibility of arranging for virtual meetings with counsel for Mr. Nordean."

---

[3] Nordean's counsel advised the government that Nordean still has access to a common-area CJA phone line, but (1) counsel and the defendant cannot plan these sporadic phone calls, as Nordean may use the line whenever it happens to be free; and (2) the phone is in a common area where it is extremely difficult to hear the defendant in the ambient jail noise.

On July 20, in response to questions from Nordean's counsel, an official at Nordean's facility apprised the government and defense counsel as follows.  First, the facility is "not able to accommodate virtual visits" between Nordean and counsel, only in-person legal visitation in Seattle.  "If there is an impending court deadline, the inmate may request a *one-time legal call* through his unit team" (emphasis added).  Second, for Nordean's review of electronic discovery in this case, "in-person" is the "best option." The official noted that a process designed for sex offenders permits inmates to view CDs in their unit, but the official could not commit that counsel would be able to virtually or telephonically meet with Nordean at the same time as he accessed CDs in the CD viewing unit of the facility, i.e., counsel and Nordean cannot review discovery productions together.  Late in the day on July 20, counsel held a phone call with the facility official to confirm that point.  The official confirmed that Nordean and his counsel will not be able to speak on an attorney-client phone line and review electronic discovery at the same time.

By its own description, the government has produced an enormous amount of discovery material in this case, which is continuing.  There is no set discovery schedule and no calendared trial date.  Other January 6 trials are scheduled for the spring of 2022.

F.     **New release conditions options for Nordean**

In finding that no release condition or combination of conditions could reasonably assure public safety, the Court focused on a specific risk: that no condition could "ensure" that an associate of Nordean's does not visit him in his "home and provid[e] [him] with a smartphone for some period of time." Hr'g Trans., 4/19/21, pp. 65-66.

Following Nordean's bail revocation, a network of video cameras has been installed around the residence where Nordean was previously confined in home detention, providing a

view on every entrance to the dwelling.[4]  The video is streamed through a commercial

application that makes 24/7 surveillance free to any pretrial service office with the internet.[5]

Credentials can be provided that make pretrial services the only party with access to the video.

Below is a blueprint of the home depicting the video camera coverage of the residence:



*One of the cameras installed at the home confinement residence; an ESD dog*

---

[4] Some of these cameras were in place prior to Nordean's detention, others were subsequently installed and/or moved to complete visual coverage of the residence.

[5] The surveillance application is called Ring.  *See* https://ring.com/security-cameras.

Nordean consents to random, warrantless searches of the residence for any material breach of a release condition. *See*, *e.g.*, *United States v. Yeary*, 740 F.3d 569, 583 (11th Cir. 2014) (court may impose a warrantless search condition of pretrial release with the defendant's knowing and voluntary consent). That would include a random ESD dog sweep or sweeps to detect any breach of a condition forbidding Nordean's use or possession of electronic devices, at the discretion of pretrial services and at defendant's expense.[6]

He also offers a secured bond of $1,000,000 in cash and, if that is not sufficient, pledges a home of nearly equivalent value, against any material breach of a condition of release.

## II.   Argument

### A.   Standard for reopening bail hearing under § 3142(f)

The Court may "reopen" a detention decision "at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community." § 3142(f).

Here, the court of appeals directed Nordean and defendant Biggs to present "to the district court in the first instance" arguments they raised on appeal about the government withholding material information bearing on the government's detention motion. *U.S. v. Biggs*, 2021 U.S. App. LEXIS 19125, *3 (D.C. Cir. June 25, 2021) (citing § 3142(f)).

---

[6] The Seattle Police Department's K9 Unit uses dogs trained to detect chemical compounds found in electronic devices. Seattle Police Department, Canine (K9) Unit, available at: https://www.seattle.gov/police/about-us/about-policing/k9. Nordean will compensate the Department for the dog's time or make an equivalent charitable contribution to the K9 Unit as a condition of release.

**B.**     **Nordean's case does not "involve" an "offense" listed in § 3142(f)(1)**

As shown above, the government conceded on July 15 that the sole piece of property

damage exceeding $1,000 for which Nordean is detained under § 3142(f)(1) is the Capitol

window smashed by Dominic Pezzola.  Because the FSI does not constitutionally charge a crime

that would render Nordean liable for that loss, his case does not "involve" an "offense" listed in

Section 3142(f)(1).

> 1.     *The FSI failed to present essential conspiracy and* Pinkerton *elements to
> the grand jury in violation of Nordean's Fifth Amendment right*

The FSI does not charge a criminal conspiracy between Pezzola and Nordean.  Therefore,

Nordean cannot be held liable for Pezzola's acts under the principles of *Pinkerton v. United*

*States*, 328 U.S. 640 (1946).  Under the Fifth Amendment to the Constitution, "No person shall

be held to answer for a capital, or otherwise infamous crime, unless on a presentment or

indictment of a Grand Jury. . ." U.S. Const. amend. V.  "The right to have the grand jury make

the charge on its own judgment is a substantial right which cannot be taken away," *Stirone v.*

*United States*, 361 U.S. 212, 218-19, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960), the "very purpose" of

which "is to limit [the accused's] jeopardy to offenses charged by a group of his fellow citizens

acting independently of either prosecuting attorney or judge," *id*. at 218.  Thus, "[t]o allow the

prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand

jury at the time they returned the indictment would deprive the defendant" of the "protection

which the guaranty of the intervention of a grand jury was designed to secure[,] [f]or a defendant

could then be convicted on the basis of facts not found by, and perhaps not even presented to, the

grand jury which indicted him." *Russell v. United States*, 369 U.S. 749, 770, 82 S. Ct. 1038, 8 L.

Ed. 2d 240 (1962).

11

Accordingly, courts have long held that an indictment that omits an essential element of an offense—much less the entire offense—is deficient under the Fifth Amendment. *Apprendi v. New Jersey*, 530 U.S. 466, 500 (2000) (Thomas, J., concurring) (discussing cases and treatises since the 1840s, which repeatedly emphasize the importance of including every element in an indictment); *Jones v. United States*, 526 U.S. 227, 243 n.6, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999) (holding that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt"); *United States v. Pupo*, 841 F.2d 1235, 1239 (4th Cir. 1988) (en banc) ("It is well established that an indictment is defective if it fails to allege elements of scienter that are expressly contained in the statute that describes the offense."). Thus, "[a]s a general rule, criminal proceedings were [properly] submitted to a jury after being initiated by an indictment containing 'all the facts and circumstances which constitute the offence, . . . stated with such certainty and precision, that the defendant . . . may be enabled to determine the species of offence they constitute, in order that he may prepare his defence accordingly . . . and that there may be no doubt as to the judgment which should be given, if the defendant be convicted.'" *Apprendi*, 530 U.S. at 478 (quoting J. Archbold, Pleading and Evidence in Criminal Cases 44 (15th ed. 1862)); *Alleyne v. United States*, 570 U.S. 99, 122, 133, 133 S. Ct. 2151, 186 L. Ed. 2d 314 (2013) (Breyer, J., concurring) (noting that "*Apprendi* has now defined the relevant legal regime for an additional decade").

Here, the FSI does not allege all the elements of a criminal conspiracy between Pezzola and Nordean—it does not even charge the crime. The essential elements of a conspiracy charge are (1) an agreement among two or more persons, (2) either to commit an offense against the

United States or to defraud the United States, (3) with knowledge of the conspiracy and with actual participation in it, where (4) one or more of the co-conspirators takes any overt act in furtherance of the conspiracy.  18 U.S.C. § 371; *Braverman v. United States*, 317 U.S. 49, 53, 87 L. Ed. 23, 63 S. Ct. 99 (1942).  "The crime of conspiracy focuses on *agreements, not groups*." *United States v. Martin*, 618 F.3d 705, 735 (7th Cir. 2010) (emphasis added).  And as to "each co-coconspirator," the government must allege and prove his understanding of, and agreement with, the plan to commit an offense against the United States.  *United States v. North*, 708 F. Supp. 375, 377 (D.D.C. 1988).  That is the very definition of "co-conspirator"—a person who is in agreement with the charged criminal conspiracy.  *United States v. Tabron*, 437 F.3d 63, 66 (D.C. Cir. 2006) (same).  Once the co-conspirators are established, the *Pinkerton* doctrine holds that a defendant may be held vicariously liable for reasonably foreseeable substantive offenses committed by other *co-conspirators* in furtherance of *the charged* conspiracy.  *See*, *e.g.*, *United States v. Garcia*, 497 F.3d 964, 967 (9th Cir. 2007) (holding that to rely on co-conspiracy liability under *Pinkerton*, a co-conspirator must have committed the substantive offense while the defendant was a member of the same conspiracy).

The FSI charges a conspiracy between *Ethan Nordean, Joseph Biggs, Zachary Rehl, and Charles Donohoe—not between* "*all Proud Boys*."  FSI, ¶ 26.  It alleges that the objects of the *Defendants'* charged conspiracy were to (1) stop, delay, or hinder Congress's certification of the Electoral College vote, and (2) obstruct and interfere with law enforcement officers engaged in their official duties to protect the Capitol and its occupants from those who had unlawfully advanced onto Capitol grounds.  *Id.* at ¶ 27.  The FSI contains one paragraph concerning Pezzola:

> At 2:14 p.m., BIGGS entered the Capitol Building through a door on the northwest side. The door was opened after a Proud Boy member, Dominic Pezzola, charged elsewhere,

13

used a riot shield at 2:13 p.m. to break a window that allowed rioters to enter the building and force open an adjacent door from the inside.  BIGGS and Proud Boys members Gilbert Garcia, William Pepe, and Joshua Pruitt, each of whom are charged elsewhere, entered the same door within two minutes of its opening.  At 2:19 p.m., a member of the Boots on the Ground Channel posted, "We just stormed the capitol."

FSI, ¶ 62.[7]

The Court will notice that this paragraph does not allege that (1) Pezzola was a party to, or a co-conspirator of, the conspiracy alleged in the FSI, or even that (2) Pezzola is an *unindicted* co-conspirator *to the criminal agreement alleged in this indictment*.  Thus, the FSI does not charge or allege the elements of a conspiracy involving Pezzola.  The *Pinkerton* question is not even reached because no indictment has been presented to a grand jury alleging a conspiracy crime involving Dominic Pezzola *and Nordean*.  *See*, *e.g.*, *United States v. Kingrea*, 573 F.3d 186, 193-94 (4th Cir. 2009) (vacating conspiracy conviction because indictment did not allege essential element of conspiracy offense and thus violated defendant's presentment right under Fifth Amendment).  The bare allegation that Pezzola was a "Proud Boy member" is not sufficient to render Nordean liable for the smashed window because (1) "the crime of conspiracy focuses on agreements, not groups," *Martin*, 618 F.3d at 735; and anyway, (2) the First Amendment does not permit various liability by virtue of association with a group absent the allegation and "'clear proof a defendant specifically intends to accomplish the [illegal] aim[] of the organization'" at issue—here, property destruction.  *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 917 (1982) (quoting *Scales v. United States*, 367 U.S. 203, 229 (1961)).

But even if the FSI had charged a criminal agreement between Pezzola and Nordean *under § 371*, it separately fails to allege, and therefore failed to present to the grand jury, "fact[s] that increase[] the penalty for a crime beyond the prescribed statutory maximum." *Apprendi*, 530

---

[7] Capitol video shows that hundreds, if not thousands, of protestors entered through this door following Pezzola's actions, not just members of Nordean's group.

U.S. at 490.  "Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne*, 570 U.S. at 103. "Consequently, those facts must [also] be presented to the grand jury and included in the indictment." *United States v. Masud al Safarini*, 257 F. Supp. 2d 191, 199 (D.D.C. 2003) (citing *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The FSI's conspiracy is charged under § 371.  FSI, ¶ 25.  That offense carries a five-year statutory maximum sentence.  § 371.  However, Nordean's alleged substantive-offense vicarious liability under *Pinkerton* for Pezzola's smashing of a window would carry a 10-year maximum.  § 1361.  Accordingly, facts that increase Nordean's potential penalty under *Pinkerton* are "elements" that must be presented to the grand jury.  *Alleyne*, 570 U.S. at 103; *Apprendi*, 530 U.S. at 500; *Hamling*, 418 U.S. at 117. Thus, the FSI was required to allege: (1) while Pezzola and Nordean were members of the conspiracy charged in the FSI, (2) Pezzola depredated federal property, (3) in furtherance of the conspiratorial objectives in the FSI, (4) which property offense was reasonably foreseeable to Nordean.  *United States v. Washington*, 106 F.3d 983, 1011 (D.C. Cir. 1997).  The FSI alleges none of those elements— it does not even allege Pezzola was in agreement with the conspiracy alleged in the FSI.

> 2.   *The FSI failed to present essential elements of the aiding and abetting offense to the grand jury in violation of Nordean's Fifth Amendment right*

The FSI charges only one other offense which could satisfy § 3142(f)(1)'s requirement that Nordean's case "involves" an "offense" under that subsection totaling over $1,000 in property destruction, i.e., aiding and abetting the depredation of federal property.  FSI, ¶ 74 (charging 18 U.S.C. § 2).  Here, too, the FSI failed to present essential elements of the offense to the grand jury in violation of Nordean's Fifth Amendment right.

"[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission." *Rosemond v. United States*, 572 U.S. 65, 71 (2014).  As to the second element—notably stricter than the *Pinkerton* standard—"[a]n intent to advance some different or lesser offense is not, or at least not usually, sufficient: Instead, the intent must go to *the specific and entire crime charged. . .*" *Id.* at 76 (emphasis added).  As *Rosemond* put it, quoting Judge Learned Hand: to aid and abet a crime, "a defendant must not just 'in some sort associate himself with the venture,' but also 'participate in it as in something that he wishes to bring about' and 'seek by his action to make it succeed.'" *Id.* (quoting *Nye & Nissen v. United States*, 336 U.S. 613, 619 (1949)).  That is why merely "knowing that a crime is being committed, even when coupled with presence at the scene" is not enough to constitute aiding and abetting." *United States v. Garguilo*, 310 F.2d 249, 253 (2d Cir. 1962); *see also United States v. Centeno*, 793 F.3d 378, 387 (3d Cir. 2015) ("Neither mere presence at the scene of the crime nor mere knowledge of the crime is sufficient to support a [aiding and abetting] conviction."); *United States v. Rosalez*, 711 F.3d 1194, 1205 (10th Cir. 2013) ("Mere presence at a crime scene or knowledge alone that a crime is being committed is insufficient.").

The FSI alleges neither *Rosemond* element of aiding and abetting liability with respect to Nordean and Pezzola's window-smashing crime.  It neither alleges Nordean "took an affirmative act in furtherance" of the window-smashing, nor that he took that act with the intent to facilitate *the specific offense at issue*, i.e., destruction of the window.  Accordingly, the government did not constitutionally present to the grand jury the charge that Nordean aided and abetted Pezzola's destruction of property.  *Alleyne*, 570 U.S. at 103; *Apprendi*, 530 U.S. at 500; *Hamling*, 418 U.S. at 117.

16

Recall that the government's first indictment contended that Nordean "aided and abetted" property destruction by "appearing to engage in a brief exchange with" Robert Gieswein, a man who later entered through the window broken by Pezzola. ECF No. 13, p. 5. The government dropped that failed claim from the FSI after the Chief Judge pointed out that it did not plead an aiding and abetting offense. Hr'g Trans., 3/3/21, pp. 79-80. If anything, the FSI's aiding and abetting claim is even "weaker," in the Chief Judge's words, as it does not even reference Nordean at all in connection with Pezzola's breaking of a window—or anything else Pezzola allegedly did, ever. FSI, ¶ 62.

Therefore, Nordean's case does not "involve" an "offense" listed in § 3142(f)(1).[8]

## C.      New information "materially bears" on conditions of release

Even if the Court determines that Nordean's case somehow "involves" an "offense" listed in § 3142(f)(1), notwithstanding the FSI's presentment flaws, the information he has obtained following revocation of his release order in April overwhelmingly shows the government has not presented "clear and convincing evidence" that the "threat" he poses to public safety is "unmitigable" by *any* condition or *combination* of conditions. *Munchel*, 991 F.3d at 1285.

### 1.      *Recent January 6 defendant release orders*

Since such safety determinations are relative, Nordean will begin with recent cases where the threat posed by other January 6 defendants has been found mitigable by conditions of release under the BRA. Consider Patrick McCaughey, III. Among other felonies in a nine-count

---

[8] A finding that Nordean's case does not "involve" the "offense" that Nordean destroyed, or aided and abetted the destruction of, *over $1,000* in federal property for purposes of § 3142(f)(1) does not first require dismissal of Count 4, charging a violation of § 1361. Section 1361 also contains a misdemeanor offense for damage less than $1,000 and the government appears to allege that Nordean and Biggs caused damage to a fence they "shook." However, a misdemeanor offense does not satisfy the detainable offenses listed in § 3142(f)(1).

indictment, McCaughey is charged with assaults on multiple officers within the Capitol Building.
*United States v. McCaughey*, 21-cr-40 (D.D.C. 2021).  These are not "technical" assaults.
Having stolen a police shield, McCaughey used it to pin an officer to a door and squeeze him as
the officer cried out in pain, blood dripping from his mouth.  ECF No. 30, p. 4.  Later, body
camera footage depicts the defendant striking multiple officers with the stolen riot shield.  Judge
McFadden initially denied the defendant's motion to reopen detention.  However, after
McCaughey presented video evidence showing the officer's pinning at a different angle, and
more to the point, after the defendant pledged a $725,000 secured bond, Judge McFadden
released him on the following conditions beyond the standard ones: home detention and GPS
location monitoring.  ECF Nos. 54, 54-1.

Consider Michael Perkins.  Perkins is charged with engaging in a coordinated *attack* on
law enforcement with four co-defendants.  *United States v. Perkins*, 21-cr-447, ECF No. 10, p. 3
(D.D.C. 2021).  During a violent melee with officers, Perkins picked up a flagpole and threw it
like a spear at a line of law enforcement.  *Id.* at 8.  Picking it up, he thrust the weapon into the
chest of a police officer.  *Id.*  Not finished, he raised the pole over his head and brought it down
like a club on the head of another officer.  *Id.* at 11.  Magistrate Judge Harvey denied the
government's motion to detain Perkins pretrial, releasing him on conditions that included home
detention with GPS location monitoring.  ECF No. 29.

Consider this Court's release of Douglas Jensen, charged with five felonies.  Initially
detained pretrial, Jensen moved to reopen the bail hearing under § 3142(f).  As the Court knows,
Jensen was one of the first protestors to breach the Senate, menacing a lone police officer who
defended the legislative chamber like Horatius at the bridge.  The government alleged that
Jensen was "*the most aggressive of the rioters* because he was constantly encouraging other

rioters to advance forward in the *standoff with law enforcement* in the Ohio Clock Corridor."
*United States v. Douglas Jensen*, ECF No. 24, p. 13 (D.D.C. 2021) (emphasis added).  He caried
a knife with a three-inch blade.  He appeared to subscribe to certain QAnon theories that could
suggest personal instability.  Nevertheless, the Court released Jensen on strict conditions
including home incarceration, GPS location monitoring, and submitting to substance abuse and
mental health screening.  ECF No. 30.

Apart from those recent release orders in cases involving assaults on law enforcement,
many January 6 defendants charged with conspiracy, or who present other factors potentially
suggestive of dangerousness, have been released, too:

- *U.S. v. Caldwell*, 21-cr-28, ECF No. 75 (D.D.C. 2021) (Mehta, J.) (leader of Oath
  Keepers conspiracy released on strict conditions, including a ban on communications
  with Oath Keepers members.  Oath Keepers members equipped in paramilitary uniforms
  entered the Capitol in military "stack" formation, had trained in combat tactics before
  January 6, and appeared to be stockpiling firearms across the Potomac);

- *U.S. v. Steele*, 21-cr-28 (D.D.C. 2021) (member of Oath Keepers conspiracy released on
  strict conditions);

- *U.S. v. Connie Meggs*, 21-cr-28 (D.D.C. 2021) (same);

- *U.S. v. Crowl*, 21-cr-28 (D.D.C. 2021) (same);

- *U.S. v. Young*, 21-cr-28 (D.D.C. 2021) (same);

- *U.S. v. James*, 21-cr-28 (D.D.C. 2021) (same);

- *U.S. v. Klein*, 21-cr-236, Apr. 12, 201 (D.D.C. 2021) (Bates, J.) (releasing defendant who
  placed himself at front of mob and used force against several officers to breach the
  Capitol's entrance);

- *U.S. v. Barnett*, 21-cr-38 (D.D.C. 2021) (Cooper, J.) (releasing man who entered Capitol
  with stun gun, stole mail from the House Speaker, and left threatening note on her desk);

- *U.S. v. Griffin*, 21-cr-92 (D.D.C. 2021) (Howell, C.J.) (releasing man who said that if
  there were a Second Amendment rally at the Capitol there would be "blood runnin'" from
  walls).

2.      *New information shows that detaining Nordean for a year or longer while the aforementioned defendants are released is grossly disparate*

As the Court knows, Nordean is not charged with assaulting anyone on January 6.  He is not charged with conspiring to assault anyone.  Nor is he charged with violence.  To the contrary, the government belatedly produced Capitol footage showing Nordean stopping another protestor from shoving a law enforcement officer on January 6.  ECF No. 57.

As Nordean's motion to dismiss shows, the charges against him are virtually all predicated on strained and novel readings of nonviolent process-crime statutes.  That is worlds from the concrete assaults on law enforcement alleged in the *McCaughey*, *Jensen*, *Perkins*, and *Klein* cases, a legal theory as old as the hills.  As the Court knows, it does not take a social scientist to determine that a defendant who proves willing to smash a pole on a police officer's head stands on a higher level of dangerousness than one who "obstructs" an "official proceeding" by entering the Capitol Building.  Yet it is the former category of defendant who has been released under the BRA and Nordean who is detained.  The Court will recall that Nordean had complied with his conditions of release for over a month before his bail was revoked.

Following his detention, Nordean filed a declaration from a current leader of the group swearing that Nordean is no longer a leader in the organization in any sense of the word.  ECF No. 85-1.  It swears, on penalty of perjury, that at no point did Nordean communicate with Proud Boys during his home detention.  The government has not factually rebutted that declaration.  Following his detention, the government produced evidence it withheld throughout the bail proceedings.  It shows that Nordean repeatedly disavowed future political rallying, in the days before his arrest in February.  The government never provided any explanation for why the material was not produced until after Nordean's bail was revoked.  On July 7, months after he was detained, the government produced a video showing law enforcement officers permitting

20

Nordean to enter the Capitol Building on January 6.  That affects the merits of several of the government's novel charges, all of which Nordean has challenged in a motion to dismiss that had not been filed at the time his bail was revoked over three months ago.

Nordean is willing to post a $1 million secured bond, in cash.  If a million in cash is not sufficient to the Court, he is willing to pledge a home of nearly equivalent value.  He is willing to pledge this collateral against any material breach of any condition of release imposed by the Court.  As to the chance that an associate of Nordean's might give him a phone, the risk identified by the Court in revoking his bail: (1) weeks ago, Nordean's counsel inquired whether the government possessed any evidence indicating that the Proud Boys organization has engaged in violent rallying or other group crimes since January 6 or evidence indicating that a member of the group has violated a defendant's bail conditions.  The government disdained to respond; (2) Nordean has installed a network of cameras around the home, which any pretrial services office with the internet may access for free, 24/7.  The government also refused to respond to Nordean's question whether his new conditions of release would satisfy it.

Although the BRA release standard is whether there are conditions that "reasonably assure" the safety of the community, § 3142(g), the government will in response to this motion ignore the statutory language and raise a host of speculative objections.  The government will contend that Nordean's video surveillance does not guarantee things, ignoring that *its* burden is to offer "clear and convincing evidence" that Nordean's conditions do not even "reasonably" assure public safety.  It will offer no evidence showing a likelihood that, half a year on from the charged crime, Nordean will in some undefined way harm the public on complete lockdown, never mind that he complied with his bail conditions for over a month before he was detained.  It

will say, There is no guarantee an associate of Nordean's will not remotely disable the cameras with (say) a laser beam during an hour of the day that pretrial services cannot monitor the video.

Even if the Court were to treat these as good faith arguments, they would fail. A noted penal reformer showed why three centuries ago. His Panopticon, a prison design, would much later become the model for US supermax detention facilities. See The Bentham Project: the Panopticon, University College London, available at: https://www.ucl.ac.uk/bentham-project/who-was-jeremy-bentham/panopticon. His key penal innovation was the "central inspection principle." Before the video age, prisoners could not be monitored all at the same time. So Bentham arrayed their cells in a circle around a central inspection tower. Although the tower would be manned by only one guard who could not monitor the cells all at once, the system would still reap great efficiencies. The mere possibility of being monitored was enough to keep the inmates in line. So too with Nordean's cameras and a $1 million bond.

If home incarceration, GPS monitoring, a network of video cameras outside the home streaming 24/7, warrantless and random searches featuring electronics-sniffing dogs, and a bond secured by a $1,000,000 and a home are not conditions that "reasonably" assure public safety, in a nonviolent case, due to the theoretical risk of the defendant being given a cell phone to commit an unspecified crime, it is difficult to conceive of any defendant not being detained pretrial. This is a dangerous precedent for liberty.

Then the Court must consider Nordean's constitutional rights to due process and assistance of counsel. Currently, Nordean is unable to review any electronic evidence or receive regular legal phone calls. His facility recently advised that it cannot set up virtual legal visits between Nordean and counsel and that if counsel wishes to review evidence with Nordean, it must be in person, in Seattle. Preparing for trial in this case while incarcerated at all, much less

in these conditions, is simply infeasible.  As the government notes at every opportunity, this case
is but one of the prosecutions making up one of the largest, if not the largest, criminal
investigations in DOJ's history.  The amount of already produced discovery Nordean will be
required to review with counsel, but cannot while incarcerated, is enormous.  Complicating
matters further, the government's bid to share grand jury materials with a discovery contractor
was recently denied.  *In Re Capitol Breach Grand Jury Investigations within the District of
Columbia*, Grand Jury Action No. 21-20 (D.D.C. July 16, 2021).  There is a serious risk this
development will significantly frustrate the government's attempts to set up a centralized
database for January 6 discovery.  Even before that development, trials for January 6 defendants
were being scheduled for the spring of 2022.  Here, there is no discovery schedule and no trial
date calendared.

### III.     Conclusion

In sum, then, the government has produced no evidence, much less the clear and
convincing kind, showing any specific risk that Nordean, who has no criminal history, poses to
the public, half a year following the charged crimes.  He is not accused of violence.  Nordean is
no longer a "leader" of his group.  He has repeatedly disavowed political rallying, though that is
not a crime.  The government has not even proffered evidence that his former group has engaged
in dangerous rallying since January 6.  Nordean has offered unprecedented conditions of release,
including 24/7 video surveillance; warrantless, random searches of his home; removal of all
electronics from the residence; GPS location monitoring; and complete home incarceration.  He
offers a bond secured by $1 million in cash and, if necessary, a home of nearly equivalent value,
against any material breach of his release conditions.  To prepare for trial on novel charges, he
must review an enormous amount of discovery with counsel, which he cannot now do while

incarcerated.  Although people accused of violent crimes, including murder and rape, are granted

bail every day in this country, and indeed although many January 6 defendants accused of assault

on law enforcement have been granted bail, Nordean would likely remain detained for a year or

longer awaiting trial, if he is not released.  Significantly, that pretrial detention would outlast the

sentence of conviction recently imposed on a January 6 defendant who was accused of the same

obstruction crime as Nordean.  If these facts require detention, it is hard to see what is left of the

BRA's protections.

Dated: July 20, 2021                    Respectfully submitted,

*/s/ David B. Smith*
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Ethan Nordean*

## Certificate of Service

I hereby certify that on the 20th day of July, 2021, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Jim Nelson
> Assistant United States Attorney
> 555 4th Street, N.W., Room 4408
> Washington, D.C. 20530
> (202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, D.C. Bar No. 403068
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com
*Counsel to Ethan Nordean*

25