## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 1:21-cr-175 |
|  | ) |
|  | ) **Judge Timothy J. Kelly** |
| ETHAN NORDEAN, et al., | ) |
|  | ) |
| Defendants. | ) |
|  | ) |

**DEFENDANT NORDEAN'S RESPONSE TO THE GOVERNMENT'S SURREPLY TO
HIS MOTION TO DISMISS THE FIRST SUPERSEDING INDICTMENT**

David B. Smith (D.C. Bar No. 403068)
David B Smith PLLC
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Counsel to Ethan Nordean*

## <u>TABLE OF CONTENTS</u>

Argument .................................................................................................. 2

    I.    The government's new "official proceeding" and "corruptly" arguments
        fail .......................................................................................... 2

        A.    "Official proceeding" ................................................ 2

        B.    "Corruptly" .............................................................. 15

    II.    The government's *ejusdem generis* argument is confused .............. 17

    III.    The FSI does not identify any "federally protected function" as defined
        in § 232 .................................................................................... 23

Conclusion .............................................................................................. 28

The government's surreply demands that the Court not believe its eyes.[1]  It asks the Court

not to see that the Department of Justice's own handbook for prosecutors—available online for

anyone to read—refutes its outcome-oriented interpretation of "official proceeding" here.  It asks

the Court not to see that, before January 6, the government adopted in court Nordean's

interpretation of that phrase.  It asks the Court to pretend that the last U.S. Attorney General did

not authoritatively reject the government's construction of Section 1512(c)'s residual clause, as it

would render superfluous the rest of Chapter 73.  It asks the Court to turn a blind eye to binding

Supreme Court and D.C. Circuit precedent concerning interpretation of the terms "department"

and "agency" in Title 18, precedent with which the government plainly was not familiar before

filing its Section 231(a)(3) charges, as demonstrated by its cobbled-together list of "numerous"

federally protected functions said to be affected by a civil disorder—none of which was

presented to the Grand Jury, though the existence of the "federally protected function" affected

by the disorder is an element of a Section 231(a)(3) offense.

The Court may find it strange that the government even asks it to look at a picture of the

Capitol Building and call it the Supreme Court.  ECF No. 130, pp. 1, 7.  After all, the Capitol is

the building on which the largest investigation in DOJ history is centered.  But the mix-up[2]

---

[1] The government represented to Nordean, and to the Court, that it needed to file its surreply to
address two "new" issues raised in Nordean's reply to the government's opposition to his motion
to dismiss the First Superseding Indictment (FSI): (1) whether the FSI satisfies the definition of
"federally protected function" in 18 U.S.C. § 231(a)(3); and (2) whether the FSI makes proper
use of § 1512(c)'s residual clause.  ECF No. 121, p. 2.  The surreply breaches the government's
scheduling agreement with Nordean, and its representations to the Court in seeking leave to file,
as the government does not limit itself to those two issues but instead uses the Court's leave to
make new arguments on other issues.

[2] The government filed a notice of errata to correct the error, after several media outlets reported
it.  ECF No. 133.  Still, that the government led its surreply with such a factual error—by way of
belittling the Defendant's "confusion" as to the difference between the Capitol and Supreme
Court—is a sign of how ill-considered its factual and legal positions are in this case.  It also

might be considered fitting when the Court reflects that the government is demanding that it make law, rather than apply it, all the way down the line.

**Argument**

**I.      The government's new "official proceeding" and "corruptly" arguments fail**

As Nordean indicated above in footnote 1, the government's surreply attempts to shoehorn new arguments into the motion cycle concerning the Court's interpretation of Section 1512(c)'s terms "corruptly" and "official proceeding." ECF No. 130, pp. 2, 6-11.  While the Court could reject them on that basis alone, it should also find they lack merit.

**A.      "Official proceeding"**

Nordean's reply showed that the government was selectively editing out portions of the cases on which it relied, which did not support its argument that any loosely defined "formality" is sufficient to establish an "official proceeding" under § 1515(a)(1).  ECF No. 113, pp. 5-7.  The surreply attempts to show the government was right all along and that it is Nordean who misrepresents those decisions.  Surreply, pp. 9-11.  Its rationalizations are confusing.  It is worth repeating that the government represented to the Court that in *Kelley*, the D.C. Circuit held "that a 'formal investigation' conducted by the Officer of the Inspector General at the Agency for International Development qualified as 'proceeding' for purposes of 18 U.S.C. § 1505." ECF No. 106, p. 18 (citing *United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994)).  That was the

---

continues the stream of inaccurate claims the government has filed in this Court, from its misrepresentation that Nordean used "encrypted communications" on January 6—when his phone was off; to its claim that Nordean used a ham radio that day—when he did not receive it until after January 6; to its claim that a passport bearing the photograph of a person who "looks just like him" was found on the table "next to Nordean's side of the bed"—when it was found in his wife's jewelry box and the person bears no resemblance to Nordean; to its misrepresentation that it secured multiple phone call availability for Nordean at the jail during its ex parte conversations about Nordean's privileged communications—when it only asked the jail for one call.

government's entire description of *Kelley*.  It was, at best, incomplete.  The D.C. Circuit held

there that the AID investigation at issue qualified as a § 1505 "proceeding" because (1) other

cases cited by the D.C. Circuit involved agency investigations "with some *adjudicative* power"

or with "the power to enhance their investigations *through the issuance of subpoenas or*

*warrants*"; and (2) the IG in the AID investigation at issue was "empowered to issue subpoenas

and to compel sworn testimony in connection with *an investigation*. . ." *Kelley*, 36 F.3d 1118 at

1127 (emphasis added).[3]

Critically, the government's description of *Kelley* neglected to mention a decisive fact.

In *Kelley*, the *government agreed and stipulated that § 1505's "proceeding" should be construed*

*the same as § 1512's "official proceeding." Kelley*, 36 F.3d at 1128.  That prompted the D.C.

Circuit to premise part of its decision on that basis.  *Id.*  Perhaps that accounts for why DOJ's

Resource Manual instructs prosecutors—to this day—that there is no difference between the two

definitions.  DOJ Resource Manual, § 1730 ("This definition [of 'proceeding' in § 1512] is in

large part a restatement of the judicial interpretation of the word 'proceeding' in § 1503 and

1505."), available at: https://www.justice.gov/archives/jm/criminal-resource-manual-1730-

protection-government-processes-official-proceeding-requirement.[4]

---

[3] The government quibbles with Nordean's description of *Kelley* but the distinctions it attempts to draw are too obscure to meaningfully address. ECF No. 130, p. 9 n. 5.

[4] Lest the government now attempt to steer the FSI through the loophole phrase "in large part" in "This definition [of 'proceeding' in § 1512] is *in large part* a restatement of the judicial interpretation of the word 'proceeding' in § 1505," the DOJ Manual helpfully clarifies that the only difference between "proceeding" in § 1505 and "official proceeding" in § 1512 is that the latter "does away with the pending proceeding requirement," which has nothing to do with the government's argument.  DOJ Resource Manual, § 1730, available at: https://www.justice.gov/archives/jm/criminal-resource-manual-1730-protection-government-processes-official-proceeding-requirement.

Finally, it is binding law on this Court that Section 1505's "proceeding"—which the DOJ itself says is the same as "official proceeding" in Section 1512, DOJ Manual, § 1730—means a proceeding held pursuant to Congress's *power of investigation and inquiry*, *United States v. Poindexter*, 951 F.2d 369, 380-82 (D.C. Cir. 1991), which the government very much does "concede" the joint session on January 6 was not. *See*, *e.g.*, *United States v. William Pepe*, 21-cr-52, ECF No. 55, p. 8 n. 3 (D.D.C. 2021) ("[T]he certification of the Electoral College vote *is not an 'inquiry or investigation*.'") (emphasis added). To be clear: before January 6, the government never charged "obstruction of a congressional proceeding," under any statute, where the "proceeding" was *not* an investigation or inquiry.

So, the government has no argument, in this Circuit, that any manner of procedural "formalism," even if it lacks "adjudicative power" or the power "to issue subpoenas or warrants," *Kelley*, 36 F.3d 1118 at 1127, creates an "official proceeding" under § 1512. The government labors to distinguish the Fifth Circuit's and Second Circuit's constructions of "official proceeding," which are consistent with *Kelley*'s, in *United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008)[5] and *United States v. Perez*, 575 F.3d 164 (2d Cir. 2009). *Perez* and *Ramos* concerned *agency* proceedings, so they are different situations, the government proposes. ECF No. 130, p. 10. That misses the point. Although the agency proceeding was not an "official proceeding" in *Ramos* and was in *Perez*, the only reason the issue lay within the realm of reasonable argument in both cases was *the presence of an investigation in the first place, agency*

---

[5] The Court will notice that although the government bristles at the reality that it "selectively omitted" relevant points, ECF No. 130, p. 11, it omits to account for its decision to quote the unitalicized portion of the following holding from *Ramos* and to omit the italicized language: "'[O]fficial proceeding' is consistently used throughout § 1512 in a manner that contemplates a formal environment *in which people are called to appear or produce documents*." *Ramos*, 537 F.3d at 463 (emphasis added). *See* Gov't Opp. at ECF No. 106, p. 17. Notice, too, that after quoting *Ramos*'s "formal environment" the government did not use an ellipsis mark. *Id.*

*or otherwise.*  Here, the government concedes the joint session was not any kind of investigation or inquiry, *Pepe*, 21-cr-52, ECF No. 55, p. 8 n. 3 ("[T]he certification of the Electoral College vote is not an 'inquiry or investigation.'"), *i.e.*, there is no question here of "obstruction of justice," i.e., of a truth-seeking proceeding carrying the threat of penalty.  *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005) ("Chapter 73 of Title 18 of the United States Code provides criminal sanctions for those who obstruct justice.").

None of the ceremonial procedures in the Electoral Count Act of 1887 (ECA) repetitively cited by the government has anything to do with investigations or inquiries and no court has ever found an "official proceeding" on the basis of "grave significance" alone—or on the basis of furniture placement.  ECF No. 130, pp. 10-11.  As Nordean explained, unlike in Chapter 73's obstruction of justice statutes, the ECA's procedures do not govern the public's interaction with a body pursuing a truth-seeking function carrying a penalty; they concern how members of Congress interact with *each other* during Electoral College vote count certification, *a political function*.  3 U.S.C. § 15.

And that raises yet another problem with the government's hypothesis that the Electoral College vote certification is an "official proceeding" under the obstruction statutes.[6]  The ECA is treated by most constitutional scholars as a so-called non-binding internal House rule given statutory form.  That is for two reasons.  First, under the constitutional principle of "legislative entrenchment," one legislature cannot bind a future legislature, i.e., purport to pass legislation that a future Congress cannot amend.  *See*, *e.g.*, *INS v. Chada*, 462 U.S. 919, 951 (1983) (holding

---

[6] Whether the political question component of Article III justiciability is jurisdictional, *Bancoult v. McNamara*, 445 F.3d 427, 432 (D.C. Cir. 2006), or not, *Oryszak v. Sullivan*, 576 F.3d 522, 527 (D.C. Cir. 2009), in either case it is not a waivable argument and may be raised at any time, including by the Court *sua sponte*. *Oryszak*, 576 F.3d at 527.

that the only permissible method for legislative action is through the procedure provided in Article I, Section 7, requiring passage by both Houses of Congress and either signature by the president or override of a presidential veto); *Entrenchment of Ordinary Legislation*, *A Reply to Professors Posner and Vermeule*, John C. Roberts and Erwin Chemerinsky, 91 Calif. L. Review, 1773, 1776 (2003).  And, second, the ECA purported not only to bind future Congresses with legislation but to do so on the subject of parliamentary procedure, over each Congress's constitutional power to set its own rules.  U.S. Const. Art. I, § 5, cl. 2 ("each House may determine the Rules of its Proceedings.") (the "Rulemaking Clause").  Consequently, the ECA is generally interpreted as a hortatory House internal rule in statutory form, in order to avoid the constitutional questions it glaringly raises.  *Is the Electoral Count Act Unconstitutional?*, Vasan Kesavan, 80 N.C.L. Rev. 1653, 1793 (2002) (most-cited analysis of the ECA among legal scholars).

The implications of the government's novel attempt to import the federal obstruction statutes into Congress's self-governing election rules, and vice versa, are enormous.  Consider the government's claim that one "corruptly" obstructs the Electoral College vote certification by delaying it "wrongfully." ECF No. 130, p. 8.  Therefore, according to the government, Democratic presidential candidate Al Gore, and everyone who facilitated his statewide recount of Florida votes during the 2000 presidential election, was guilty of obstruction of an "official proceeding."  They are all guilty, according to the government because (1) they delayed the Electoral College vote certification by insisting on statewide recounts of ballots; and (2) they acted "wrongfully" (thus, "corruptly") because the recounts they engineered violated the Equal Protection Clause rights of voters by valuing their votes less than others.'  *Bush v. Gore*, 531 U.S. 98, 104 (2000).  Or consider the members of Congress who objected on January 6 to vote

certification for certain States.  They are guilty of obstruction of an "official proceeding," and they are all felons, because (1) they delayed the vote certification; and (2) they acted "wrongfully" because, after all, there was no recognized legal basis for objecting that the vote counts in those States were fraudulent to a degree overbalancing proper vote tallies.

It should be clear to the Court what problem is raised by the government's attempt to drag the courts into this uncharted morass.  The government's interpretations of "official proceeding" and "corruptly" require the Court to first answer nonjusticiable political questions. *See Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691 (1962); *see also Luther v. Borden*, 48 U.S. 1 (1849) (holding courts could not decide whether the defendant trespassed during an insurrection as that would first require deciding the political question whether the Royal Charter government of Rhode Island satisfied the Constitution's republican form of government guarantee).   The political question doctrine is a facet of the separation of powers.  Under *Baker*, "an issue is non-justiciable if 'prominent on the surface' of that issue one finds:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*United States v. Rostenkowski*, 59 F.3d 1291, 1304 (D.C. Cir. 1995) (quoting *Baker*, 369 U.S. at 217).

The D.C. Circuit has paid particularly close attention to the political question doctrine in cases where criminal prosecutions turn on interpretation of ambiguous House rules.  "[T]he Rulemaking Clause of Article I clearly reserves to each House of the Congress the authority to make its own rules and judicial interpretation of an ambiguous House Rule runs the risk of the

court intruding into the sphere of influence reserved to the legislative branch under the Constitution." *Rostenkowski*, 49 F.3d at 1306.  Added the D.C. Circuit, where "a court cannot be confident that its interpretation is correct, there is too great a chance that it will interpret the Rule differently than would the Congress itself; in that circumstance, the court would effectively be making the Rules—a power that the Rulemaking Clause reserved to each House alone." *Id.*

As noted, the ECA is treated as a non-binding internal House rule given statutory form, to avoid constitutional conflict with the Rulemaking Clause and the legislative anti-entrenchment principle.  *Chada*, 462 U.S. at 951; Kesavan, 80 N.C.L. Rev. 1653, 1793.  Moreover, as certain Justices and many legal observers have noted over the years, the ECA's legislative history is littered with indications that Congress did not intend for any role for federal courts in the interpretation of the ECA.  *See*, *e.g.*, *Gore*, 531 U.S. at 153-54 (noting that the ECA's legislative history "makes clear its intent to commit the power to resolve disputes [about the meaning of ECF] to Congress," citing House reports and congressional record) (Breyer, J., dissenting).

Yet, here, the government relies, almost exclusively, on this Court imposing a judicial gloss on the ECA's notoriously opaque internal rule procedures, in order to establish an "official proceeding" under Section 1512.  ECF No. 130, pp. 2, 10-11; ECF No. 106, pp. 14-20.  It also relies on this Court to define Congress's constitutional powers and duties concerning the Electoral College vote count under the Twelfth Amendment—an amendment so vague that Congress felt prompted to enact the (no less vague) ECA after the scandals of the Presidential election of 1876.  *Congress Sowed the Seeds of Jan. 6 in 1887: the Electoral Vote Count Act lets Congress think it can choose the President, but it's unconstitutional*, Judge J. Michael Luttig and

David B. Rivkin, Jr., Wall Street Journal, Mar. 18, 2021, available at:

https://www.wsj.com/articles/congress-sowed-the-seeds-of-jan-6-in-1887-11616086776.[7]

Thus, the government's "official proceeding" argument implicates the first three political

question factors under *Baker*: (1) there is "a textually demonstrable constitutional commitment of

the [Electoral College vote count] issue to a coordinate political department." *Baker*, 369 U.S. at

217.  The authority to determine the rules of Congress's proceedings is given exclusively to

Congress under the Rulemaking Clause, not the federal courts.  U.S. Const. Art. I, § 5, cl. 2.  In

any case, as Judge Luttig observes, neither the Electors Clause nor the 12th Amendment

empowers Congress to resolve disputes over the validity of a state's electoral slate—*but neither*

*does the Constitution empower the federal courts to do so.  Supra* 8[8]; (2) The notoriously

confusing and ambiguous ECA offers "a lack of judicially discoverable and manageable

---

[7] Judge Luttig notes that, contrary to the government's claim here that the ECA demonstrates
Congress's decision-making discretion during the Electoral College vote count (which is
supposed to show that it was an adjudicative-type "official proceeding"), the ECA was enacted
"largely to *limit* Congress's role in determining which electoral votes to accept" (emphasis
added).

ECA aside, the former Fourth Circuit judge adds, "The Constitution's Electors Clause gives *state*
*legislatures* plenary authority over the manner of choosing electors and relegates Congress to
determining on what day the Electoral College would cast its votes.  The 12th Amendment,
ratified in 1804, reformed the Electoral College by providing for separate votes for president and
vice president. It also reiterates the Article I, Section 1 language that the certified state electoral
results are to be transmitted to Washington, opened by the president of the Senate, and counted
in the presence of both congressional houses.  *No constitutional provision empowers Congress to*
*resolve disputes over the validity of a state's electoral slate—or for that matter addresses who is*
*to resolve these disputes. Significantly, the 12th Amendment gives Congress no power to enact*
*legislation to enforce its provisions. . .*"(emphasis added).  Thus, it is clear why the government
virtually relies on the ECA alone to establish its adjudicative-type "official proceeding" point.

[8] As to the vice president's role as presiding officer, Vice President Pence himself correctly pointed
out that the duties of the President of the Senate were "largely ceremonial,"i.e., not "adjudicative,"
as the government would have it. Ltr. of Vice President Mike Pence, Jan. 6, 2021, available at:
https://bit.ly/2WVy9s0.

standards for resolving" the "official proceeding" question.  *Baker*, 369 U.S. at 217.  That is

shown by the obvious mismatch between the archaic ECA procedures cited by the government

and all of the Section 1512 case law analyzed by the parties.  It is also demonstrated by the

imponderables created by the government's importation of House rules into obstruction-of-

justice jurisprudence, and vice versa, such as whether every person who delays the vote count

"wrongfully" (a hopelessly vague political question) is a felon; and (3) it is impossible to decide

the "official proceeding" question in the government's favor "without an initial policy

determination" left to a coordinate political branch, *Baker*, 369 U.S. at 217, i.e., what are the

procedures permissible to Congress in counting and certifying Electoral College votes under the

Constitution and ECA?[9]

The equation of the joint session of Congress with a Chapter 73 "official proceeding"

raises additional political questions.  Throughout briefing on Nordean's motion to dismiss, the

government has centered its "official proceeding" argument on the procedures of the *joint*

*session* convened to certify Electoral College votes.  ECF No. 130, pp. 2, 6, 10, 11; ECF No.

106, pp. 13-15, 18-20.  Yet a full hour before the first protestor intrusion into the Capitol, as

alleged by the government (FSI, p. 5), the joint session had been suspended.  167 Cong. Rec.

H77 (Jan. 6, 2021).  That is because, shortly before 1:15 p.m. Eastern Time, members of

Congress objected to the certificate from the State of Arizona.  *Id.*  As a result, the Vice

President directed "the two Houses [to] *withdraw from the joint session*." *Id.* (emphasis added).

---

[9] Had the government limited itself to charging precedented criminal offenses, such as assault, theft, destruction of government property, D.C. trespass, and the like, there would be few difficult legal questions.  The government is forcing the Court onto political ground because it decided that it must federally prosecute virtually every protestor, whether or not they committed traditional crimes like assault and property destruction.

> The VICE PRESIDENT. Are there further objections to the certificate from the State of Arizona?
>
> There was no objection.
>
> The VICE PRESIDENT. The two Houses will withdraw from joint session. Each House will deliberate separately on the pending objection and report its decision back to the joint session.
>
> The Senate will now retire to its Chamber.
>
> The Senate retired to its Chamber.
>
> ☐ 1315

*Jan. 6, 2021 Congressional Record* (square symbol represents the time of day).

What the January 6 protestors "obstructed" appears not to have been the joint session composed of both Houses, but instead separated House deliberations on Republican objections to the Arizona certificate.  As the ECA procedures cited by the government show, there was no possibility of the separated Houses certifying or not certifying Electoral College votes before reconvening in the joint session.  3 U.S.C. § 15 ("When the two Houses have [separately] voted, they shall immediately again meet, and the presiding officer shall then announce the decision of the questions submitted.").  The joint session appears to have reconvened at approximately 11:35 p.m. that day, with the Vice President announcing the "resumption" of the joint session:

> Vice President.
>
> At 11:35 p.m., the Sergeant at Arms, Paul D. Irving, announced the Vice President and the Senate of the United States.
>
> The Senate entered the Hall of the House of Representatives, headed by the Vice President and the Secretary of the Senate, the Members and officers of the House rising to receive them.
>
> The Vice President took his seat as the Presiding Officer of the joint convention of the two Houses, the Speaker of the House occupying the chair on his left. Senators took seats to the right of the rostrum as prescribed by law.
>
> The VICE PRESIDENT. The joint session of Congress to count the electoral vote will resume. The tellers will take their chairs.
>
> The two Houses retired to consider separately and decide upon the vote of the State of Arizona, to which an objection has been filed.
>
> The Secretary of the Senate will report the action of the Senate.
>
> The Secretary of the Senate read the order of the Senate, as follows:
>
> *Ordered*, That the Senate by a vote of 6 ayes to 93 nays rejects the objection to the electoral votes cast in the State of Arizona for Joseph R. Biden, Jr., for President and KAMALA D. HARRIS for Vice President.

The point is not that the January 6 protests and intrusions into the Capitol bear no responsibility for the delay of approximately 10 hours.  The point is that the government asks the Court not only to declare the joint session an "official proceeding" under the obstruction laws, but to find that, under the parliamentary rules of Congress (either chamber? Both?), a joint session that "retired" and was "suspended" before, and not as a result of, those intrusions, and that could not formally certify or decertify Electoral College certificates, was also an "official proceeding."

Finally, the government addresses Justice Kavanaugh's confirmation hearings.  ECF No. 130, pp. 6-8.  The Court will recall that Nordean had observed that the hearings supply one example supporting his void-for-vagueness argument that Section 1512(c) did not provide fair notice that courts would regard the joint session on January 6 as an "official proceeding" the disruption of which constitutes a felony obstruction offense.  The government's points badly misfire.

First, the Court will recall that Nordean pasted a picture of perhaps a hundred or more protestors crowding the steps of the Capitol Building during Justice Kavanaugh's hearing. Reply, p. 15.  He did so because the scene is visually similar to photographs of protestors on the same steps the government pastes into its briefs in January 6 cases.  The government responds, "the Court will immediately recognize" that Nordean's image "depicts protestors on the steps of the Supreme Court," which shows the "frivolous nature" of the comparison.  ECF No. 130, p. 1, 7 n. 2.[10]  Nordean's error, says the government, underscores why the Justice Kavanaugh hearing

---

[10] One reason the Court will not "immediately recognize" the Supreme Court in the image is the allegorical statue of the god of War, standing in a Capitol niche on the right side of the photograph.  Another is the allegorical statue of the goddess of Peace, to the left side, in this case much more obscured than her counterpart.  See Architect of the Capitol, War and Peace,

comparison "should remain on the Internet." The government's mistake betrays a lack of serious thought about the reality that many protestors have disrupted congressional proceedings in the past—but none has been charged with felony obstruction of Congress under Section 1512.

Second, the government's understanding of its legal theories in the January 6 cases seems to short-circuit when analyzing Justice Kavanaugh's hearings.  It does not deny that, on October 6, 2018, Vice President Mike Pence, a USSS protectee, presided in his role as President of the Senate.  It does not deny that protestors "broke through Capitol Police barricades and rushed up the steps to the Capitol Rotunda."[11] Earlier hearings saw hundreds of protestors prowling around the offices of senators who were targeted for their support of the Supreme Court nominee, including the office of Senate Judiciary Committee Chairman Chuck Grassley and others. *Kavanaugh protests escalate*, *over 120 arrested on Capitol Hill*, ABC News, Sept. 24, 2018, available at: https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-arrested-capitol-hill/story?id=58048599.  Indeed, video depicts protestors "taking control" of Senator Grassley's office—scenes similar in some ways to those showing January 6 defendants stalking the offices of members of Congress.  *Kavanaugh protestors take over Sen. Grassley's office*, Wash. Post., Sept. 6, 2018, available at: https://www.washingtonpost.com/video/politics/kavanaugh-protesters-take-over-sen-grassleys-office/2018/09/06/9732de44-b1ef-11e8-8b53-50116768e499_video.html.  Further, the protestors who assumed control of Senator Grassley's office admitted on camera that their intent was to disrupt the "official proceedings," chanting

---

available at: https://www.aoc.gov/explore-capitol-campus/art/war-and-peace.  Both are visual reminders that political questions are resolved by political branches.

[11] *Kavanaugh protestors ignore Capitol barricades ahead of Saturday vote*, Roll Call, Oct. 6, 2018, available at: https://www.rollcall.com/2018/10/06/kavanaugh-protesters-ignore-capitol-barricades-ahead-of-saturday-vote/.

"*The system is corrupt, and that's why we disrupt, the system is corrupt, and that's why we disrupt*":



*Protestors who "took over" Sen. Grassley's office during "official proceeding"*

The government does not seem to understand that, in this and other January 6 cases, it charges people with obstruction of "official proceedings" when protestors break through Capitol Police barricades surrounding the Capitol, when a USSS protectee is within the Capitol, and when their alleged intent was to disrupt the proceeding: all true of the Justice Kavanaugh protestors cited above. The government does not seem to understand that its obstruction charge is *not even limited to entry to the Capitol Building or to threats or violence*, such that every single one of the protestors in Senator Grassley's office depicted above should be arrested immediately, jailed without bail, and charged with felony obstruction under Section 1512(c)(2)—according to the government.[12] The reasons why the government has not charged

---

[12] The government quibbles that *certain* of the protestors who screamed and demonstrated at the Vice President on October 6, 2018 had "lawfully accessed the building." ECF No. 130, p. 7. It simply ignores the protestors who broke through Capitol Police barricades and the protestors who had no lawful authority to storm senators' offices. It attempts to distinguish the events by noting the property damage and assaults on law enforcement on January 6. ECF No. 130, p. 7 n. 4. That would be a credible distinction if the government accused *Nordean* of assault, which it

the Sen. Grassley protestors, and will not, do not concern principled legal or factual distinctions but political calculations enabled by its novel obstruction theory, the sort of vague claim that permits "discriminatory law enforcement" in which "prosecutors and courts [] make [the crime's definition] up." *Sessions v. Dimaya*, 138 S Ct. 1204, 1224 (2018) (Gorsuch, J., concurring).[13]

**B.    "Corruptly"**

The government still does not understand the D.C. Circuit's *Poindexter* decision.  ECF No. 130, p. 8.  It argues that the "*Poindexter* court's fixation on 'transitive' versus 'intransitive'. . . has no bearing on Section 1512(c)(2)" because Congress later enacted Section 1515(b), which "expand[ed] the reach of the obstruction statute to cover direct actions by the defendant." *Id.*

First, Section 1515(b), which provides that "corruptly" may mean "acting . . . personally or by influencing another. . .", explicitly applies *only to Section 1505*, not Section 1512.  18 U.S.C. § 1515(b).

Second, the reason *Poindexter* devised the transitive/intransitive distinction in the first place was that defining "corruptly" merely to mean acting with an "improper purpose" was unconstitutionally vague.  *Poindexter*, 951 F.2d at 379 ("Words like 'depraved,' 'evil,' 'immoral,' 'wicked,' and 'improper' are no more specific—indeed they may be less specific— than 'corrupt.'").  The surreply explicitly acknowledges that the government's theory is that "corruptly" in Section 1512 means nothing more or less than "wrongfully." ECF No. 130, p. 8.

---

does not.  As for property damage, as the Court knows, the government has offered no evidence *Nordean* destroyed any property.

[13] There is a reason the government quotes a general statement from, but does not describe, *United States v. Kay*, 513 F.3d 432, 442 (5th Cir. 2007). There, the defendant challenged his Foreign Corrupt Practices Act bribery conviction on the frivolous ground that *one* of the *seven* standards for conviction was void-for-vagueness.  The government's quote from *Kay* stands for the uncontroversial proposition that bribery per se is not a vaguely defined offense simply because the government *in Haiti* did not have the resources to eradicate all bribery.

And the FSI charges Nordean with acting "wrongfully" on the basis that he "trespass[ed] into a restricted area" and "interfere[d] with law enforcement." *Id.*  That is, Nordean's "obstruction" was "corrupt" because the government has also charged offenses under Section 1752 and Section 231(a)(3).  The Court will notice the government ignores, and fails to distinguish, the large body of case law cited by Nordean setting forth the consensus view that "corruptly" means acting with the intent to obtain an improper advantage for oneself or someone else, i.e., the definition that both the dissent and majority in *Arthur Andersen LLP* centered on. Reply, pp. 19-20; 515 U.S. at 516 (Scalia, J., dissenting).

The government says there is no problem with the "mere fact that multiple criminal statutes apply to an individual's conduct." ECF No. 130, p. 9.  It does not understand.  It is uncontroversial that the same actus reus may implicate more than one criminal statute.  But that is not equivalent to the proposition that allegations of multiple crimes based on the same act *satisfy the "corruptly" element of Section 1512*.  To be clear, the D.C. Circuit has already rejected the government's "corruptly" theory.  Again, Poindexter was charged both with making false statements to Congress under § 1001 and obstructing Congress under § 1505.  Both charges were based on the same lies to Congress.  His obstruction conviction was reversed, based on the Court's understanding of "corruptly," *even as the § 1001 conviction was sustained*.  Thus, the government's theory that "corruptly" is satisfied whenever it charges another crime involving the same set of facts is explicitly foreclosed by *Poindexter*.  *Poindexter*, 951 F.2d at 371.[14]

Indeed, in a recent January 6 case hearing, Judge Moss found fault with, and potential vagueness in, this very definition of "corruptly."  The Court found that the government's

---

[14] The government says Nordean "confuses the issues presented in" *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996)—then it fails to address *Morrison*.  ECF No. 130, p. 8.

definition of "corruptly" in the January 6 cases may not, and indeed may likely not, provide

adequate notice to the public about when they "corruptly" obstruct an "official proceeding."

*U.S. v. Montgomery*, 21-cr-46, 8/3/21 Hr'g (D.D.C. 2021) (Moss, J.).[15]

## II.  The government's *ejusdem generis* argument is confused

Before addressing the government's misunderstanding of *Yates v. United States*, 574 U.S.

528 (2015), Nordean asks the Court to reflect on the following remarkable fact.  The government

pretends it does not exist.  The last *U.S. Attorney General*—the final decisionmaker for the

Department of Justice—issued a legal analysis concluding that the government is misapplying

the "catch-all" clause of Section 1512(c) in this case.  Mem. of William P. Barr, dated June 8,

2018, p. 5, available at: https://bit.ly/2RYVZ47.

Applying *Yates*; the Supreme Court's decision in *Begay v. United States*, 553 U.S. 137,

142-43 (2008); and the canon of *ejusdem generis*, the U.S. Attorney General concluded:

> [I]t is clear that use of the word 'otherwise' in the residual clause [of Section 1512(c)(2)]
> expressly links the clause to the forms of obstruction specifically defined elsewhere in the
> provision. Unless it serves that purpose, the word 'otherwise' does no work at all and is
> mere surplusage.  [An] interpretation of the residual clause as covering *any and all acts*
> that influence a proceeding reads the word 'otherwise' out of the statute altogether.  But
> any proper interpretation of the clause must give effect to the word 'otherwise'; it must
> do some work. . . .
>
> Consequently, under the statute's plain language and structure, the most natural and
> plausible reading of 1512(c)(2) is that it covers acts that have the *same kind of obstructive
> impact* as the listed forms of obstruction—i.e., impairing the availability or integrity of
> evidence—but cause this impairment in a different way than the enumerated actions do.
> Under this construction, then, the "catch all" language in clause (c)(2) encompasses any
> conduct, even if not specifically described in 1512, that is directed at undermining *a
> proceeding's truth-finding function* through actions impairing *the integrity and
> availability of evidence*.

Barr Mem., pp. 4-5.

---

[15] Nordean will provide a copy of the transcript of this hearing to the Court when he obtains it.

The U.S. Attorney General's exposition of Section 1512(c)(2) shows where the government errs in its analysis of the Section 1512(c) cases on which it relies.  Indeed, the Attorney General himself ably distinguished the government's cases.  The surreply argues that "courts have repeatedly upheld [Section 1512(c)(2)'s] application to obstructive acts that reach beyond impairment of records." ECF No. 130, p. 4 (citing *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2014) and *United States v. Phillips*, 583 F.3d 1261, 1265 (10th Cir. 1009)). But as the Attorney General explained, the government misses the point.  Even *Volpendesto* and *Phillips*, the highest DOJ official wrote, concerned application of Section 1512(c)(2) to "attempts to *prevent the flow of evidence to a proceeding*." Barr Mem., pp. 4-5 (emphasis added).[16]

Similarly, the Attorney General's analysis shows where the government's reading of *Yates* goes wrong.  *Yates* held that the phrase "record, document, or tangible object" in Section 1519 implied a congressional intent to prevent the *impairment of information* destined for a *truth-finding* proceeding.  574 U.S. at 533.  Although "tangible object" in isolation need not imply that intent, the doctrine of *ejusdem generis* counseled reading that phrase in light of the preceding "record, document." *Id* at 545.  Identically, Section 1512(c) penalizes whoever "alters, destroys, mutilates, or conceals a *record*, *document*, *or other object* . . . or *otherwise* obstructs, influences or impedes any official proceeding. . ." § 1512(c) (emphasis added).  Just as in *Yates*, Section 1512(c)'s reference to *records and documents* implies a congressional intent to prevent the impairment of information which is "used" in an "official proceeding."  Indeed, *every*

---

[16] Every other decision cited by the government is consistent with the Attorney General's guiding principle that a Section 1512(c)(2) offense must at least focus on an action that "*impair[s] the integrity or availability of evidence*." Barr Mem., p. 5.  *See U.S. v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (false statements in a court proceeding); *U.S. v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (false testimony to a grand jury).  Also, of course, the government's decisions precede *Yates*.

subsection of Section 1512 reveals that intent.  § 1512(a) (referencing interference with "attendance or testimony"; "record[s], document[s] or other object[s]"; "communication[s]" with law enforcement); § 1512(b) (same focus).

The government attempts to avoid *Yates*—and its own former Attorney General—by arguing that *ejusdem generis* and *noscitur a sociis* are "only applicable when a statute sets forth a list of specific items separated by commas and followed by a general or collective term." ECF No. 130, p. 4 (citing *Ali v. Federal Bureau of Prisons*, 552 U.S. 214 (2008)).  The government is exactly right—which is why those canons apply to 1512(c) but not to the statute in *Ali*.   As with virtually every other decision on which it relies, the government cites a general statement from *Ali* and does not provide the Court with any additional information about the case.  There is a reason for that.

Section 2680(c) of Title 28 provides that the U.S. government's waiver of sovereign immunity does not apply to claims arising from the detention of property by "any officer of customs or excise or any other law enforcement officers." *Ali*, 552 U.S. at 216 (quoting 28 U.S.C. § 2680(c)).  The petitioner argued that the clause applied only to law enforcement officers enforcing customs or excise laws.  *Id.*  *Ali* rejected the application of *ejusdem generis* to § 2680(c) for the simple reason that there was "no list of specific items separated by commas and followed by a general or collective term." *Id.* at 225.  It rejected application of *noscitur a sociis* (a word is known by the company it keeps) because "although customs and excise are mentioned [only] *twice* in § 2680(c), nothing in the overall statutory context suggests that customs and excise officers were the exclusive focus of the provision." *Id.* (emphasis added).

Here, unlike in § 2680(c), there *is* a "specific list of items separated by commas and followed by a general or collective term." Section 1512(c) provides:

Whoever corruptly—

(1) *alters*, *destroys*, *mutilates*, *or conceals* a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; *or*

(2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so . . . shall be fined . . . or imprisoned. . .

§ 1512(c) (emphasis added).

The "specific list of items separated by commas" includes the actus reus verbs "alter, destroy, mutilate or conceal." They are "separated by commas." And they are followed by the "general or collective term" "or otherwise obstructs. . ." This list plainly establishes that Congress "remained focused on a common attribute when it used the catchall phrase." *Ali*, 552 U.S. at 225.  Namely, the attribute the former U.S. Attorney General identified: *actions impairing the integrity and availability of evidence in a truth-finding proceeding*.  Barr Mem., pp. 4-5.  There is no support in *Ali*, or in any other case, for the government's strange claim that, because there is a formatting space between subsections (1) and (2) of Section 1512, the *ejusdem generis* canon does not apply.  ECF No. 130, p. 4.  Moreover, unlike in *Ali*, where "nothing in the overall statutory context" supported the petitioner's *noscitur a sociis* argument, here there is nothing in Section 1512 that supports *the government's* reading of Section 1512(c) that would support an obstruction conviction for actions *having nothing to do with the integrity and availability of evidence in a truth-finding proceeding*.

The government next claims that a concurrence and dissent in *United States v. Aguilar* supports its interpretation of Section 1512(c).  ECF No. 130, p. 5.  Justice Scalia, the government notes, declined to apply *ejusdem generis* to the "omnibus clause" in § 1503.  *Id.* (citing 514 U.S. 593, 610) (Scalia, J., concurring and dissenting)).  A glance at § 1503 shows the government's

error.  The so-called "omnibus clause" of Section 1503 is nothing like the provision in §

1512(c)(2).  The "omnibus clause" is emboldened below:

> **Whoever** corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, **or corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice**, shall be punished . . .

§ 1503 (emboldening added).

Aguilar attempted to argue that, under *ejusdem generis*, since all the rest of Section 1503

refers to actions directed at jurors and court officers, the emboldened omnibus clause could not

apply to actions directed at witnesses.  514 U.S. at 614.  But as Justice Scalia noted, the

provisions in Section 1503 "only share the word 'Whoever,' which begins the statute, and the

penalty provision which ends it." *Id.* at 615.  They were in that sense "independent." What

Justice Scalia meant is easy to see: the unemboldened first part of Section 1503 begins with the

phrase "whoever corruptly, or by threats or force, or by any threatening letter or communication.

. ." and *so does* the emboldened "omnibus clause." In stark contrast, as seen above, not only do

subsections (1) and (2) of Section 1512(c) share more than the term "whoever" (they share a

*necessary element of the offense*, the "corruptly" element), subsection (2)'s crime is expressly

linked to subsection (1) by the reference words "or *otherwise*," indissolubly connecting the

meaning of the second subsection to the first. Thus, unlike in Section 1503, subsections (1) and

(2) of Section 1512 are not "independent provisions" in the sense meant by Justice Scalia's *Aguilar* concurrent/dissent.[17]

Finally, the government contends that the legislative history of Section 1512(c)(2) supports its interpretation. ECF No. 130, p. 6.  That is misleading.  The reason the government cites no legislative history is that it all runs in favor of Nordean's interpretation, as the former U.S. Attorney General has observed.  Barr Mem., pp. 5-6.  The Court should in particular review the Senate Judiciary Committee report on what would become the Sarbanes-Oxley Act of 2002. It states that the Corporate Fraud Accountability Act was designed to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. Rep. No. 107-146, at 14-15.  Section 1512(c) did not exist as part of the original proposal. S. 2010, 107th Cong. (2002).  Rather, Senator Trent Lott introduced it as an amendment in July 2002. 148 Cong. Rec. S6542 (daily ed. July 10, 2002).  The senator explained the purpose of adding § 1512(c):

> [This section] would enact stronger laws against document shredding. Current law prohibits obstruction of justice by a defendant acting alone, but only if a proceeding is pending and a subpoena has been issued for the evidence that has been destroyed or altered . . . [T]his section would allow the government to charge obstruction against individuals who acted alone, even if the tampering took place prior to the issuance of a grand jury subpoena. I think this is something we need to make clear so we do not have a repeat of what we saw with the Enron matter earlier this year.

*Id.* at S6545.

Senator Orin Hatch similarly explained that § 1512(c) would "close [] [the] loophole" created by the available obstruction statutes and hold criminally liable a person who, acting

---

[17] The government repeatedly refers to § 1512(c)(2) as an "omnibus clause" to conflate it with the "omnibus clause" in § 1503.  ECF No. 130, p. 5.  The Court will notice that none of the government's cases refer to § 1512(c)(2) as an "omnibus clause" but rather a "catch all" or "residual clause." There is a difference, as Justice Scalia's dissent/concurrence in *Aguilar* notes.

alone, destroys documents. *Id.* There is no support whatsoever in the legislative history that the Sarbanes-Oxley reforms were intended to effect a sweeping changing in Congress's understanding of a congressional "proceeding" under Section 1505 (an "inquiry" or "investigation") or to create an obstruction crime that renders the rest of Chapter 73 superfluous.

As with the "corruptly" issue, Judge Moss recently stated in a January 6 case that he was concerned by the lack of any limiting principle in applying Section 1512(c)(2) in a way that would swallow the rest of Chapter 73. Significantly, Judge Moss raised this point *sua sponte*, though no party had briefed the issue in that case. *Montgomery*, 21-cr-46, 8/3/21 Hr'g (D.D.C. 2021) (Moss, J.).

## III. The FSI does not identify any "federally protected function" as defined in § 231

The Court will notice that the surreply offers two pages of throat-clearing before explaining which "department, agency or instrumentality of the United States," § 232(3), the FSI alleges was "adversely affected" by the "civil disorder" on January 6, § 231(a)(3), in light of the fact that Congress is neither a "department," nor an "agency," nor an "instrumentality" of the United States. ECF No. 130, pp. 12-13. Then it fails to identify one that satisfies 18 U.S.C. § 6 or overcomes the default presumption that § 6's definitions control the meaning of "department" and "agency" in every Title 18 statute.

As any observer of the January 6 cases understands, the government's theory in this case is—or was—that the joint session of Congress was the federal function interfered with by the "civil disorder." But the government makes no argument that Congress satisfies the definitions of "department" or "agency" in § 6.[18] It acknowledges that, in *Hubbard v. United States*, the

---

[18] The Court will notice that the government does not address *United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997), which held that, after *Hubbard*, "an entity within the Legislative Branch cannot be a 'department' within the meaning of § 1001 *and 18 U.S.C. § 6*. . ." and that

Supreme Court held that, in view of § 6, the government must make a "fairly powerful" showing that a statute's reference to a "department" or "agency" is intended to include "the legislative, or judicial branches of the government." 514 U.S. 695, 700 (1995).  *Hubbard* made clear that this showing must be made with the "*text* of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts," *Id.* at 701 (emphasis added)—not the "context" of the facts in the criminal case at issue. Contrary to the government's suggestion, there is nothing about *Hubbard*'s rule that is limited to the old version of § 1001.  ECF No. 130, p. 14.  *Hubbard* concluded that the government did not make a "powerful showing" that § 1001's term "department" somehow referred to the judicial branch notwithstanding § 6.  *Hubbard* based this conclusion on the bare fact that the text of § 1001 did not define "department" that way.  514 U.S. at 702.

The surreply does not identify any definition of "department" or "agency" in Section 231 or 232 that would include Congress. The government merely pastes the definitions of "civil disorder" and "law enforcement officer" from Section 232.  ECF No. 130, p. 12.  But the definition at issue is the "federally protected function," which is an element distinct from whether a civil disorder exists or what a law enforcement officer is.  As the text shows, the purpose of Section 231 is not to prevent any interference with a law enforcement officer during a civil disorder, but during a civil disorder that adversely affects a "federally protected function" (or interstate commerce), *which is therefore an element different from the law enforcement officers.  See United States v. Rupert*, 2021 U.S. Dist. LEXIS 53152, *43 (D. Minn. Jan. 6, 2021)

---

neither is Congress an "agency" under § 6.  *Id.* at 153.  Nor does the government address *United States v. Dean*, 55 F.3d 640, 659 (D.C. Cir. 1995) (reversing conviction for making false statements to Congress, which was neither a "department" nor an "agency" under § 6).

(rejecting government's argument that it could simply point to law enforcement officers interfered with during a civil disorder to satisfy the "federally protected function" element).

The government argues that "'federally protected function' . . . signals an effort by Congress to ensure that its anti-riot statute could reach any unlawful interference with law enforcement during a civil disorder that the federal government had the authority to regulate." ECF No. 130, p. 13.  Were that the case, there would be no need for the term "federal protected function" at all.  Section 231(a)(3) would merely need to prohibit interference with a "law enforcement officer" (defined to include "any officer . . . of the United States . . while engaged in the enforcement of any of the criminal laws of the United States," § 232(7)) during a "civil disorder" (defined as any "public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of or results in damage or injury to the property or person of any other individual," § 232(1)).  The government tries reframing its tautological point as follows: "If law enforcement officers were engaged in the performance of a federally protected function when a disorder interfered with that function, it is axiomatic that law enforcement would quell the disturbance." ECF No. 130, p. 15.  So: if law enforcement officers were engaged in law enforcement when a disorder interfered with law enforcement, the officers would engage in law enforcement.  It is not hard to see what is going on.  To avoid *Hubbard* and § 6, the government resorts to reading the "federally protected function" element out of § 231(a)(3).

The government's last-minute list of "numerous federally protected functions" fails for many, overlapping reasons:

- **U.S. Capitol Police**.  Again, the USCP are the "law enforcement officers" the government alleges Nordean "interfered" with under § 231(a)(3) during the "civil disorder." If the USCP are also the "federally protected function," i.e., the police are both the protecting function and the function that is protected, the term "federally protected function" adds nothing

to the meaning of § 231(a)(3).  Statutes must be construed to avoid surplusage.  *See*, *e.g.*, *Indep. Ins. Agents of Am.*, *Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000); *Rupert*, 2021 U.S. Dist. LEXIS 53152, *43.

- **"Executive departments and agencies."**  The surreply cites 2 U.S.C. § 1970, which states that executive departments and agencies "may assist the United States Capitol Police in the performance of its duties by providing services . . ." § 1970(a)(1).  First, by citing this statute the government inadvertently shows the USCP are not an "executive department or agency." Therefore, USCP does not satisfy the definition of "department" or "agency" in § 6.  Second, the government does not identify the "function, operation, or action carried out" by any "executive department or agency" on January 6 that was adversely affected by the civil disorder. § 232(3).

- **Archivist of the United States**.  The government states, "pursuant to 3 U.S.C. § 6, the Archivist of the United States has the responsibility to safeguard the electoral certificates submitted by the states." ECF No. 130, p. 15.  However, Section 6 does not actually say that. Rather, it states that the Archivist has the duty to transmit to Congress "copies in full" of the certificates, which need not entail "safeguarding" them, whatever the government may mean by that. (Same-day mail and email now exist, unlike in 1887.) § 6.  In any case, the Archivist is the administrator for the National Archives and Records Administration which is neither a "department" nor an "agency" under 18 U.S.C. § 6, and the government does not explain how the certificates were adversely affected by the civil disorder; it merely states a legal conclusion.

- **The President of the Senate.**  The government notes the Vice President's role as President of the Senate under the ECA.  It is not clear what argument the government intends to make, as the Senate is not a "department, agency or instrumentality of the United States" under 18 U.S.C. § 6, even assuming the President of the Senate could be characterized as an "officer" or "employee" thereof. § 232(3).  *Dean*, 55 F.3d at 659.

- **Commencement of term of office statute.**  The government cites the statute stating that the term of office for President "shall, in all cases, commence on the 20th day of January next succeeding the day on which the votes of the electors have been given." 3 U.S.C. § 101.  The "function" described in § 101 is that the President and Vice President's term shall begin on January 20.  But the government does not argue that the "civil disorder" adversely affected that function.  Rather, it alleges that the disorder "affected the counting of the votes of the electors," which is not the "function" in § 101; the joint session resumed on January 6.

- **The Secret Service.**  Officers of the U.S. Secret Service, like that of the U.S. Capitol Police, are "law enforcement officers" under § 232(7).  See 18 U.S.C. § 3056(b)(3), (d) (describing USSS as a "law enforcement agency").  The government alleges the USSS were "engaged in the enforcement . . . of criminal laws of the United States," § 232(7), on January 6 because the government alleges that protestors breached a "restricted area" under § 1752, which it is the duty of the USSS to enforce. § 3056(d).  As explained above, if the USSS are also the "federally protected function," the term "federally protected function" adds nothing to the meaning of § 231(a)(3).  *Hawke*, 211 F.3d at 644 (statutes must be construed to avoid surplusage); *Rupert*, 2021 U.S. Dist. LEXIS 53152, *43.

- **Department of Homeland Security (DHS)**.  The government represents that DHS had the responsibility to protect the Capitol and its grounds on January 6, pursuant to 40 U.S.C. § 1315 and that was a "federally protected function."  First, that is not accurate.  The USCP are designated with statutory authority to protect the Capitol and its grounds, not DHS.  2 U.S.C. § 1961(a).  Second, the government does not specify what DHS agency it is referring to, or how it was adversely affected, but if it is a "law enforcement agency," that would not identify a "federally protected function" for all the reasons cited above.  *Rupert*, 2021 U.S. Dist. LEXIS 53152, *43.

Besides not satisfying the definitions of "department" and "agency" in § 6, the above list suffers from other flaws.  As the government acknowledges, the "civil disorder's" "adverse effect" on a "federally protected function" is an element of the FSI's § 231(a)(3) charges.  Not only does that mean that the government would have to establish beyond a reasonable doubt an adverse effect on every function identified in its list—to the extent it relies on the function to establish guilt—it was required to establish probable cause of a "federally protected function" to the Grand Jury to satisfy the Fifth Amendment's presentment requirement.  *Apprendi v. New Jersey*, 530 U.S. 466, 500 (2000); *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 1783 (2002) ("In federal prosecutions, [*Apprendi*] facts must also be charged in the indictment.").  Yet it is almost surely the case that none of the list of "numerous functions" was presented to the Grand Jury, but instead that the joint session of Congress was so presented as the "federally protected function." Because Congress is neither a "department" nor an "agency" under § 6, to the extent that the Court relies on one of the "numerous federally protected functions" listed by the government, Nordean's Fifth Amendment presentment right has been violated because the government did not present such "functions" to the Grand Jury.

The government's own cases show what is lacking in the FSI.  The government suggests that the "federally protected function" was merely law enforcement itself in *United States v. Dodge*, 538 F.2d 770 (8th Cir. 1976).  That is not accurate.  The "federally protected function" in *Dodge* was a federally protected Native American reservation.  *Id.* at 775.  *See also Cohen's*

27

*Handbook of Federal Indian Law*, § 3.04[2][c][ii] (Nell Jessup Newton, et al. eds., 2005 & supp. 2009) (explaining that the modern legal use of the term "reservation" describes "federally protected Indian tribal lands").  Likewise, in *United States v. Jaramillo*, 380 F. Supp. 1375 (D. Neb. 1974), in addition to the presence of an Indian reservation (it is not a coincidence most of the small number of reported § 231(a)(3) cases occur on Native American reservations, "federally protected functions"), another "federally protected function" was the "operation of the post office"—which Section 232 explicitly cites as an example of a "federally protected function," unlike the law enforcement officer functions identified by the government here. § 232(3).

**Conclusion**

For all the foregoing reasons, Nordean respectfully requests that the Court dismiss the FSI with prejudice.

Dated: August 4, 2021                          Respectfully submitted,


                                              */s/ David B. Smith*
                                              David B. Smith (D.C. Bar No. 403068)
                                              108 N. Alfred St.
                                              Alexandria, VA 22314
                                              Phone:(703)548-8911
                                              Fax:(703)548-8935
                                              dbs@davidbsmithpllc.com

                                              Nicholas D. Smith (D.C. Bar No. 1029802)
                                              7 East 20th Street
                                              New York, NY 10003
                                              Phone: (917) 902-3869
                                              nds@davidbsmithpllc.com

                                              *Attorneys for Ethan Nordean*

**Certificate of Service**

I hereby certify that on the 4th day of August, 2021, I filed the foregoing filing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Jim Nelson
> Assistant United States Attorney
> 555 4th Street, N.W., Room 4408
> Washington, D.C. 20530
> (202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> /s/ David B. Smith
> David B. Smith, VA Bar No. 25930
> David B. Smith, PLLC
> 108 North Alfred Street, 1st FL
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> dbs@davidbsmithpllc.com
>
> *Attorneys for Ethan Nordean*

29