IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-4

1-ETHAN NORDEAN                   Washington, D.C.
2-JOSEPH RANDALL BIGGS            Thursday, July 15, 2021
4-CHARLES DONOHOE,                11:00 a.m.
                Defendants.
- - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF STATUS CONFERENCE
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Luke M. Jones, Esq.
                          Jason B. A. McCullough, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          David B. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

                          Lisa S. Costner, Esq.
                          FEDERAL PUBLIC DEFENDER FOR THE
                          MIDDLE DISTRICT OF NORTH CAROLINA
                          251 North Main Street
                          Suite 849
                          Winston-Salem, NC 27101
                          (336) 631-5172

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter

2

1          **P R O C E E D I N G S**

2          THE DEPUTY CLERK:  We are on the record in

3   criminal matter 21-175, United States of America v.

4   Defendant 1, Ethan Nordean; Defendant 2, Joseph Randall

5   Biggs; and Defendant 4, Charles Donohoe.

6          Present for the Government are Jason McCullough

7   and Luke Jones; present for Defendant 1 are David Smith and

8   Nicholas Smith; present for Defendant 2 is John Hull;

9   present for Defendant 4 is Lisa Costner.  Also present is

10  Defendant 1, Mr. Nordean; Defendant 2, Mr. Biggs; and

11  Defendant 4, Mr. Donohoe.

12         THE COURT:  All right.  Well, good morning to

13  everyone.

14         We are here for a status in this matter and, as I

15  said I would, I will hear argument from the parties on the

16  motion to compel discovery and for a bill of particulars.

17         Let me start by -- I know the Government had filed

18  a number of -- made a number of filings on the docket

19  updating me on the state of discovery.  So I thought what it

20  made sense to do was hear from the Government at least in

21  terms of -- allow it to make representations about where

22  discovery stands and then discovery, it seems to me, bleeds

23  into these -- some of the issues with -- regarding the

24  motions and then, Mr. Smith, if it will be you handling

25  that, I'll hear from you on your -- on the motion and then

1        I'll hear from the Government in response.

2              I think, at least from reading the papers, at

3     least some of these issues may have been overtaken by events

4     in terms of the protective order and what may or may not

5     have been produced by then, but at least I want to make sure

6     I have what are the live issues, whether they are about the

7     motion to compel or the bill of particulars, hear from both

8     parties, and even if I don't -- I -- I'm going to resolve it

9     very quickly.  I don't know that I'll resolve it today, but

10    I'll have something for the parties very quickly on --

11    depending on what's remaining and what I think of the

12    issues, I plan to resolve that pretty quickly so that the

13    parties can have certainty on that going forward.

14              So that's my game plan for today.

15              So who, from the Government, wants to give me, at

16    least in the first instance, a, kind of, update on where

17    things stand in addition to at least supplement or in

18    addition to the filings the Government's made?

19              MR. JONES:  Good morning, Your Honor.  Luke Jones

20    for the United States.  I'm happy to provide that update and

21    some thoughts on the way forward that may assist the Court.

22              We have continued to produce discovery at a rapid

23    pace.  We filed our discovery correspondence for the record.

24    We filed a memorandum prepared by the office with respect to

25    the office-wide efforts to meet the Government's discovery

1    obligations, but as our discovery correspondence indicates,

2    we, the prosecution team on this particular case, have taken

3    steps to ensure we're moving forward with producing all

4    discoverable material to the defendants even as that

5    office-wide effort unfolds.

6          Since our last hearing, and as we indicated we

7    would, we've provided cross-discovery of the defendants' FBI

8    files -- that is, providing discovery from each defendant's

9    FBI files as well as search warrants and grand jury

10   subpoenas, grand jury subpoena returns -- to each of the

11   defendants across their cases.  As counsel have made

12   specific requests for discoverable material -- for example,

13   U.S. Capitol Police video -- we've provided that material or

14   are working to do so and to produce it to all counsel.

15   We're now able to do that with respect to all four counsel

16   in this case now that we have a protective order as to all

17   defendants.

18          As the Court knows, one of the larger categories

19   of data in the case are devices and accounts -- devices

20   recovered from defendants and accounts obtained through

21   search warrants.  We've, obviously, provided those materials

22   to the defendants who controlled the devices and accounts.

23   As we've said at our last hearing and previously, given that

24   the defendants have not consented to the production of the

25   unscoped material to other defendants -- which is their

1    prerogative -- the FBI has been working to scope those

2    materials and we've begun producing that scoped material

3    across the defendants.  Our target is to complete that

4    process for the devices and accounts controlled by each of

5    the four defendants and produce the scoped materials to the

6    other defendants by the end of next month, August.  That is

7    no small task.  And I'm -- and to be clear with the Court,

8    as we proceed with producing cross-discovery to these

9    defendants from other cases, we'll need to ensure that,

10   where necessary, devices and accounts from other charged or

11   uncharged individuals are scoped.  And all of that, of

12   course, is caveated -- limited to those devices that have

13   been opened.  As the -- as devices are seized, there's often

14   a period of time before devices can be opened either based

15   on technical reasons or resource constraints, given the

16   magnitude of the evidence gathered in these cases.  And the

17   other caveat that we've put on it is, as additional

18   individuals are charged and arrested which is still ongoing

19   every day, the Government obtains additional devices and

20   accounts, and so the denominator of potentially discoverable

21   material is not fixed both as a matter of defendants with

22   whom the defendants in this case are more directly

23   associated as well as Capitol riots defendants generally.

24            So in the next few weeks -- in the coming weeks,

25   we intend -- in addition to what I've described -- intend to

1    produce -- we intend to produce additional tranches of

2    cross-discovery from discovery out- -- from defendants

3    outside of this charged indictment focused on associates of

4    these defendants.  Several of them are charged before Your

5    Honor in other cases.  This is separate in a sense from the

6    office-wide effort, as we're seeking to accelerate that --

7    the pace of that cross-discovery -- notwithstanding the,

8    sort of, overall January 6th-wide discovery challenges -- to

9    accelerate the pace as to those individuals whose devices,

10   accounts, discovery would be most relevant to these four

11   defendants.  As we do that, as we've indicated before, we

12   are open to taking the cues from defense counsel.  We're

13   certainly starting with those defendants that, I think, it's

14   -- are most obviously relevant, and I think it's no secret

15   who those individuals are based on the charges and based on

16   the discovery we've provided so far.

17          As to the road forward, as Your Honor knows,

18   there's currently Defendant Nordean's motion to dismiss

19   pending and Defendant Biggs has sought to join that motion.

20   There's additional briefing to be done; noticed that Your

21   Honor granted the Government's motion -- unopposed motion

22   this morning regarding additional briefing and that -- so

23   that briefing will conclude on August 5th, and we expect the

24   Court would want to hear argument on that motion, you know,

25   to -- not to jump ahead, but I -- the issues raised in the

1    motion to compel and motion for bill of particulars, as Your

2    Honor I believe indicated, bleed also into that motion to

3    dismiss.  We're certain the Court will want to hear argument

4    on that motion, and we'll be ready as soon as it makes sense

5    for the Court and the defendants to address that motion to

6    dismiss as soon as possible.

7            So between now and then -- which hopefully won't

8    be too long -- the speedy trial clock will, of course, be

9    tolled based on the pending motion during that time.  Our

10   proposal and suggestion is that we continue with the planned

11   discovery that we've outlined, including the productions of

12   discovery related to individuals not charged in this case,

13   and to confer directly with counsel for all four defendants

14   regarding further schedules for any additional motions that

15   they intend or anticipate filing with an eye toward setting

16   a schedule toward a trial date which is certainly where we

17   want to get.  I think at this point, based on our

18   conversations with defense counsel, there may be additional

19   motions filed.  And in terms of setting that schedule and

20   how that will impact the longer-term trial schedule, we

21   think it makes sense for the parties, and all parties, to

22   confer and then get back to the Court with either agreements

23   or disagreements as to what makes the most sense.  We've had

24   some individual conversations with defense counsel, but as

25   the Court no doubt knows, we need to talk to all four --

1    counsel for all four defendants.  Obviously, one of those is

2    not here at this status today.  We'd suggest, if possible,

3    that when we do come back for the hearing presumably on the

4    motion to dismiss which would be a next status, in effect,

5    that we attempt to get all four defendants at the hearing.

6    But in any event, we'll certainly be talking -- reaching out

7    to counsel for all four defendants.  We think there's an

8    opportunity to work constructively in the interests of

9    efficiency in presenting a path forward to the Court.

10            THE COURT:  All right.  That all -- let me hear --

11   that all seems, for the most part, reasonable to me.  With

12   regard to motions other than the one we'll discuss here

13   today, I think it does make sense for the parties to confer

14   and lay out their agreement or disagreement about a

15   potential schedule forward that might -- that would put at

16   least -- well, for additional -- that would govern the

17   filing and briefing of additional pretrial motions that the

18   parties think are coming.  I think that does make sense.

19            But let me turn to Mr. Smith and the other defense

20   counsel about -- let's put -- we'll put aside the -- for the

21   moment the issues that are -- that may still be ripe

22   regarding the motion to compel and the motion for a bill of

23   particulars which are very -- which, I think, was -- which

24   are very targeted and will be -- I'll address that in a

25   moment.  But let me hear from you first, Mr. Smith, on, sort

1      of -- again, putting aside the motion we're going to talk

2      about today -- generally speaking, how Mr. Jones laid out

3      the way forward.

4                MR. NICHOLAS SMITH:  Thank you, Your Honor.

5                So we agree with much of what Mr. Jones just said.

6      There's been a good deal of general discovery that's been

7      produced and, you know, more in this case than in some of

8      the other ones, but the issue we're having here is, kind of,

9      twofold.  The first one is that we've been seeking more

10     targeted types of discovery from the Government that doesn't

11     fit nicely within the, kind of, general January 6th

12     discovery that Mr. Jones has been referring to -- and I

13     think that ties in with the motion to compel which I'll

14     address in a minute --

15                THE COURT:  Right.

16                MR. NICHOLAS SMITH:  -- but one of those pieces of

17     evidence is some evidence that we, you know -- some evidence

18     that there's any agreement -- criminal agreement between the

19     defendants on the screen right now and Dominic Pezzola to

20     destroy property.

21                THE COURT:  We'll get to it.  We'll get to it,

22     Mr. Smith.  Anything you've raised in your motion to compel,

23     I'm not trying to skirt over that.  I just --

24                MR. NICHOLAS SMITH:  I understand.

25                THE COURT:  We're going to return to your motion

1    and we will talk about that.  I just want to make sure,

2    broadly speaking, aside from these specific targeted

3    requests you've made, are -- does that seem like a

4    reasonable way forward?  Obviously, with all the caveats

5    that -- the things you've raised already.

6         MR. NICHOLAS SMITH:  Your Honor, we would just

7    note that in other January 6th cases, the Government has

8    proposed pretty early on a discovery schedule with relevant

9    dates for, you know, Rule 16 and Local Rule 5 and

10   impeachment materials and witness statements that are

11   calendared out, you know, months in advance.  And that

12   happened in cases where the AUSAs in the matters took the

13   position, like Mr. Jones, that there's a lot of general

14   discovery happening and a lot of cross-production, but they

15   were still able to, you know, put calendar dates out with

16   discovery scheduling.  So you know, we've asked for that,

17   and we think that would help move the parties along in the

18   litigation particularly given that all of them are detained

19   pretrial.

20         And, you know, we would just note that in the

21   other major conspiracy case, the Oath Keepers case, Your

22   Honor probably knows that there's trial dates set.  One of

23   them is in January -- late January, I believe -- of 2022,

24   but the second is in April, I think.  April 2022.  Most -- I

25   think it's fair to say that most of those defendants are not

1    detained pretrial, but in April -- if we're looking at

2    something like an April date for a trial or later, that is

3    some pretty serious pretrial time.  And I won't get to that,

4    you know -- I can get to that point later.

5              But one thing to note about discovery here is that

6    we entered a protective order that was an interim one, and

7    it was interim for Mr. Nordean because he is now unable in

8    the facility he's in to review highly-sensitive material for

9    a couple of reasons.  The facility doesn't allow cloud

10   computing for inmates which would let Mr. Nordean look at

11   the material without downloading it.  And it also just

12   generally, for any kind of discovery, doesn't allow

13   electronic viewing of discovery unless counsel's present at

14   the facility.  So the facility's a few thousand miles away

15   from the District Court and that's going to be a serious

16   problem.  We've asked the Government for proposals on what

17   to do and they've, kind of, responded by saying, Well, you

18   know, some other, you know -- someone working for the

19   defense counsel can visit Mr. Nordean.  But that's not

20   really how federal prison rules work.  If you're not counsel

21   for an inmate, you're not admitted to the jail.  And so we

22   need to -- I'm just letting the Court know that right now,

23   Mr. Nordean can't review evidence in his own case.

24             And I'll just give the Court one really quick

25   example of why that's so important.  So earlier in this

1     case, the Government was representing that Mr. Nordean used

2     encrypted communications on January 6th -- on the day of the

3     6th to lead an invasion of the Capitol, is what they said in

4     their papers.  And, you know, Mr. Nordean's phone wasn't

5     even on that day.  It wasn't even on.  And the only -- the

6     Government had his phone.  So they knew it was off.  But the

7     only way we were able to find out about this and to check

8     the claim in court is because, you know, I could talk to

9     Mr. Nordean about the evidence whenever I wanted to.  I'd

10    get him on the phone and he tells me.  But, you know, these

11    kinds of problems are going to keep coming up over and over

12    again if they can't review the evidence in a way that we can

13    respond quickly to the Government.

14          So I think, you know, those are my only points on

15    the discovery.

16          THE COURT:  Mr. Smith, you don't have to convince

17    me of the need for you to be able to confer with your client

18    about the evidence before trial.  I think that's --

19          MR. JONES:  Your Honor, if I --

20          THE COURT:  Mr. --

21          MR. JONES:  If I could be heard on that point?

22          THE COURT:  Sure.  And actually, Mr. Jones, can I

23    -- why don't you just respond to everything Mr. Smith has

24    raised which is -- so there's one issue of Mr. Nordean's

25    access to the evidence; and then the other, kind of, general

1     point he raised, I think, was --

2              Putting aside the issue of trial dates, etcetera,

3     look, I -- we're going to -- that's, I think, what

4     Mr. Jones -- Mr. -- I'm addressing Mr. Smith now.  What

5     Mr. Jones had raised was the idea of the parties, I think,

6     conferring on other pretrial motions that may be out there

7     and proposing something going forward.  And so look, as far

8     as I'm concerned, discovery is -- should be moving apace,

9     again, with the caveat that we'll talk about the things

10    we'll talk about today, and we'll get a track to resolve any

11    other major pretrial motions, and then when we are here

12    next, at least as to that motion to dismiss, I think the

13    parties are right: the briefing will be completed; I think

14    we'll -- you all will argue it; and, at that point, I do

15    think we'll have a better handle on when we might set the

16    case for trial.  So Mr. Smith, you're going to get your

17    trial date.  I'm sensitive to the points you're raising

18    about detention.  And, you know, unfortunately, these cases

19    are complex not only in terms of discovery, but then just,

20    again, a quick glance at the motion you've filed raise a lot

21    of difficult, you know -- interesting and novel issues.  So

22    we're going to move forward, but I don't think we have to

23    necessarily address that point today in -- at least to get a

24    date for trial.

25             But the two -- so Mr. Jones, if you would raise --

1    if you would address, one, the issue of Mr. Nordean's

2    access; and then, two, I think the other point Mr. Smith

3    raised that it's fair to respond to is that -- this issue of

4    deadlines and with regard to the evidentiary production.

5    Now, it may be that this case is different from other cases

6    in that I do think, as you alluded to, Mr. Jones, it's

7    harder in a case like this one as perhaps -- as -- to draw a

8    hard line between, sort of, discovery that's relevant to

9    these four defendants and then the broader, sort of,

10   discovery that's related to the entire January 6th event.

11   There are -- other uncharged individuals to varying degrees,

12   it seems to me, are relevant.  And it may be you want that

13   flexibility to be able to go to the defense and say, Listen,

14   we can give you Person A or Person B next.  We -- you give

15   us the priority and we'll go forward.  And where that line

16   ends about productions you might make that are apart from

17   the -- again, the broader January 6th discovery tranche that

18   the Government is also working on is a difficult one.

19          So -- I don't know.  Mr. Jones, why don't you

20   address those two issues.

21          MR. JONES:  Certainly, Your Honor.

22          First, with respect to the issue of the

23   defendant's ability to review discovery, this is a nut we

24   have not been able to crack.  I cannot imagine the defense

25   is attempting to obstruct their own ability to review

1    discovery, but, quite frankly, we have offered repeatedly to

2    Mr. Smith to reach out to SeaTac with them separately to

3    endeavor to identify exactly what is possible and isn't

4    possible.  Mr. Smith, yesterday, provided a copy of some

5    information provided by SeaTac as to their policies.  We've

6    followed up with requests about details and a suggestion

7    that we reach out to try to identify, for example, whether

8    the policy at SeaTac allows for only defense counsel to

9    visit with the client or for legal staff.  I mean, as

10   recently as the last hour, it -- we found information that

11   indicates that legal staff are permitted to visit with

12   defense counsel to review discovery.  I don't know what else

13   we can do, but we have made clear throughout that we --

14   our -- it's certainly in our interest that Defendant Nordean

15   has access to discovery, however that happens, and, you

16   know, we would, again, commit to continuing that effort, you

17   know?

18           As a practical matter, it, you know -- it may be

19   -- this may be mooted if the U.S. Marshals Service

20   transports Mr. Nordean to the District of Columbia, but, you

21   know, that's obviously a separate issue.  As to his ability

22   to review discovery at that facility at SeaTac, we don't

23   believe that issue's been exhausted.  We don't believe the

24   information gathering has been exhausted.  And at this

25   point, you know, I think we will independently reach out to

1    SeaTac to see if we can get better information.  Mr. Smith

2    has not provided the contact information for the persons

3    that he's spoken with there or communicated with there,

4    notwithstanding our request for that information.  And so

5    we'll continue to make our efforts on that front, but we'd

6    like the Court to know it's not for lack of our interest in

7    Mr. Nordean being permitted to review his own discovery.

8              THE COURT:  All right.  On that point -- let me

9    just -- before you get to the next one, Mr. Jones, let me

10   just ask the parties to do this.  Two weeks from tomorrow is

11   July 30th.  I'd like a joint report from the parties -- a

12   joint status report -- either party can file it -- on the

13   status of where things stand on Mr. Nordean's ability to

14   access evidence where he's being detained.  That will at

15   least give me an interim report on where things stand.  So

16   if the parties would file -- either party can do it, but it

17   will be a joint report laying out where things stand on that

18   effort by July 30th, two weeks from tomorrow.

19             MR. NICHOLAS SMITH:  Your Honor, I -- we think

20   that's an excellent solution.  But can we ask that we move

21   up the date?  Because we think that, you know -- I can

22   respond to Mr. Jones's information now.  I think he just

23   mentioned that the prison rules themselves say that defense

24   counsel has to be present in addition --

25             THE COURT:  All right.  Mr. Smith, here's the

1    thing.  We have a limited amount of time today.  So if you

2    want me to move it up, I'm happy to do that.  I want to give

3    the parties enough -- let's do it this way, then.  I'll make

4    it due July 26th, if you think that's more -- if you don't

5    need any more time.  That would be a week from Monday.  But,

6    again, I want to give the parties enough time to run things

7    as far as they can and not to have the report be, Well, we

8    played phone tag and nothing has changed.  So we'll make it

9    -- if you -- if your position is you'd rather it be earlier,

10   I'll make it due July 26th.  Monday, July 26th, a joint

11   report from both sides just letting me know where things

12   stand on your efforts to resolve this.  I don't want to burn

13   any more time today talking about the back-and-forth you may

14   have already had.

15           Mr. Jones, on the other point about discovery,

16   sort of, deadlines --

17           MR. JONES:  Right, right.

18           THE COURT:  -- that Mr. Smith raised --

19           MR. JONES:  Certainly, Your Honor.

20           And here, again, I think one of the issues -- I

21   mean, as with the earlier topic, in terms of setting a

22   schedule going forward, one of the, I think, challenges with

23   respect to Defendant Nordean is that counsel has elected not

24   to speak on the phone with us but rather to communicate only

25   in writing which is certainly fine but, frankly, slows

1    things down.  It makes communication more difficult.  The --

2    we have been in communication regarding specific discovery

3    requests, general discovery requests.  There's been frequent

4    email correspondence.  The first indication we heard from

5    Mr. Smith that he'd be raising the issue of discovery

6    deadlines or other court deadlines was at an -- in an email

7    at 9:30 this morning.  We are happy to work with counsel --

8    counsel for all four defendants -- about schedules.  We are

9    always happy to talk to counsel.  We have been talking to

10   counsel throughout this case.  And we're open to figuring

11   out a schedule that makes sense going forward and then

12   reporting back to the Court.

13          THE COURT:  All right.

14          MR. JONES:  I think that -- the suggestion that

15   the Government has been -- avoided doing that type of

16   scheduling in this case while doing it in other cases is,

17   frankly, absurd.  And we're, you know -- we want to make

18   sure the record is clear on that.

19          THE COURT:  All right.

20          MR. JONES:  We're happy to move forward and

21   discuss the schedule, and we'd like to do that.

22          THE COURT:  All right.  I'll -- and I'll just say

23   this.  I'm going to leave that to the parties to continue to

24   discuss.  If there's something the parties want to raise

25   with me about that issue after your discussions -- your

1    status report of July 26th -- you may do so, but I'm not

2    going to burn any more time talking about it.  It sounds,

3    again, like the Government is open to prioritizing things

4    however the defense would like.  And, at this point, I think

5    that's -- that showing of -- I don't think there's anything

6    more for me to push them on or to decide today.

7              Let me turn to Mr. -- before we get to the motion

8    -- and I do want to get to the motion -- Mr. Hull, is there

9    anything on these generalized issues that we've been talking

10   about as far as discovery or the parties conferring on any

11   other motions and a schedule for them -- is there anything

12   you want to raise, Mr. Hull?

13             MR. HULL:  There are, Your Honor.  Dan Hull for

14   Joseph Biggs.

15             I -- one of the things that we discussed on June

16   3rd near the very end was -- and this is what I'm most

17   interested in now.  I have a few issues that, I think, I can

18   go over quickly on conditions of detention, progress of some

19   of the discovery, and preparing my client for trial.  But

20   the Government was asked by me, and I think there was some

21   agreement by His Honor, that we would be given -- and I know

22   it's very difficult to do.  They've been doing the best job

23   they can.  And I know more than anyone how hard they're

24   working on discovery, because they're -- I've talked to them

25   a lot about it.  However, at what point can we say X amount

1       of a percentage of preliminary discovery is done?  And we

2       still don't have an answer to that question.

3               Since we were last here on June 3rd, there's new

4       nomenclatures that are popped up in a lot of these

5       hearings -- and I've heard, you know, pretty much the same

6       way the press would or an interested participant would --

7       and that is we're hearing about defendant-specific

8       discovery; we're hearing about general discovery; we're

9       hearing about cross-discovery.  In the case of these

10      particular clients who are alleged to be leaders of some

11      kind of invasion, this is an enormous amount of material.

12      Can we just, you know -- for purposes of trial date,

13      preparing trial -- and I have issues with respect to

14      Seminole County which I'll -- about very briefly later.  But

15      is there a date?  I think in the -- I was looking at the

16      transcript.  It said, you know, Can we get a date?  Ninety

17      percent of preliminary discovery will be finished or the

18      cutoff date by X; is that fair to ask?  And I think Your

19      Honor said something like, I agree with you, Mr. Hull, you

20      know?  Can we get something?  A snapshot?

21              THE COURT:  Right.  Mr. Hull, here's my -- I'll

22      certainly let Mr. Jones respond, but I do think part of the,

23      I think, conceptual, it seems to me, problem with the

24      Government making that representation is the question

25      that's, sort of, behind it which is, how many other

1    individuals out there do the parties think are discovery

2    that we'll call -- I mean, I don't -- we'll call it

3    case-specific discovery.  You raised it.  Your clients are

4    alleged to be, to varying degrees, leaders.  So naturally,

5    in a case like this, I think that's probably a pretty --

6    that may well be a pretty expansive number.  And so the

7    parties are going to have to confer about really what that

8    means.  For the Government to simply say, Well, we think

9    we're 90 percent there, if the parties don't agree on, sort

10   of, what the universe of relevant material is, aside from

11   the general material -- January 6th material, then it's hard

12   for them to make that representation.  But I take your

13   point.  I mean, I think we're going to -- but you will know

14   -- let's put it this way.  It seems to me that if they're --

15   if they are representing to you all, Look, we can prioritize

16   A versus B versus C, it seems to me the parties, at least in

17   the first instance, have to, kind of, talk about what the

18   universe of individuals they think are, sort of, part of the

19   -- of this case that are more directly relevant to this case

20   and then talk about prioritization.  And you may well be

21   able to look at that and say, Okay.  I can tell, you know,

22   there's -- however many people.  I don't even want to

23   speculate.  I've gotten discovery on this many of them.  So

24   I know where things stand.  I -- Mr. Hull, does that make

25   any sense to you?

```
 1                    (Brief pause.)

 2                    You're muted, Mr. Hull.  Sorry.

 3                    MR. HULL:  Excuse me.  I'm sorry.  I was muted.

 4                    It does, Your Honor.  And I appreciate your

 5       comments and I appreciate your -- I know we have a lot to do

 6       today in this status conference.  But, you know, things seem

 7       to be, you know, changing and cascading almost in terms of

 8       the amount of information that might be out there.

 9       Forty-two days ago today, we said -- and it was the last

10       thing we said -- that we all, I think, agree that it was

11       fair to make an assessment of when substantially all the

12       discovery -- the preliminary discovery would be complete.

13       And now, we're, kind of, saying -- and I think I get why.

14       There's a lot of it.  There's an enormous amount of it.

15       We're saying that that may not be possible.  That, of

16       course, affects, you know, trial dates; that affect -- we've

17       got four guys who are incarcerated here with varying degrees

18       of difficulty to, like, prepare them.  I have big issues on

19       that.  And I'm willing to work with the Government on that.

20       We can talk about it later or at some other juncture.  But,

21       you know, we think that we need a little bit more than what

22       we're getting, and it keeps changing.  It's a moving target.

23       I'm not asking for a cutoff.  I'm just saying --

24                    THE COURT:  Right.

25                    MR. HULL:  -- what percentage of preliminary
```

1      stuff -- especially with this new category of

2      cross-discovery and general discovery in the case of our

3      clients -- when can we expect it to be done?  It's an

4      enormous amount of stuff, and I think you know that.  I

5      appreciate your concern, though.

6              THE COURT:  Mr. -- well, Mr. Jones, do you want to

7      respond to that.  I'm hearing -- I -- maybe, there's a way

8      that you can say -- you can provide the defendants that

9      answer at least with regard to core discovery that, sort of,

10     relates directly to the four defendants but doesn't get into

11     other individuals that you still think are relevant or,

12     maybe, this is something that you need to discuss with

13     defense counsel to try to get a universe that you all agree

14     on are more or less the core individuals that you're going

15     to provide discovery with -- to and then they can work

16     forward and see, Okay.  I've gotten discovery from whatever

17     percentage of those individuals the parties agree are

18     relevant.  So I -- Mr. Jones, I think overall what

19     Mr. Hull's just saying is he would like some sort of ability

20     to, sort of, measure progress and to know when at least

21     anything you're going to provide that is outside the general

22     discovery that you're going to provide everyone related to

23     the January 6th event generally, like, how he can measure

24     progress toward that goal.

25              MR. HULL:  And, Your Honor, my -- I would love to

```
 1    hear just a defendant-specific -- that category --
 2              THE COURT:  Right.
 3              MR. HULL:  -- which was the only category 42 days
 4    ago on what percentage, a date, some kind of estimate then.
 5    That would be wonderful.
 6              THE COURT:  Mr. Jones, what can you tell us today
 7    or what can you --
 8              MR. JONES:  Certainly.
 9              THE COURT:  -- tell me you can work toward -- even
10    if you can't make a representation right now, what can you
11    tell me how you can work toward trying to give Mr. Hull the
12    kind of estimates he's looking for?
13              MR. JONES:  Certainly, Your Honor.  And we
14    appreciate the issues Mr. Hull's raising.  Those are the
15    issues we're squarely focused on, as well.
16              As I mentioned earlier, our target is to produce
17    the -- substantially produce the preliminary, so to speak,
18    discovery or discovery with respect to each of the four
19    defendants by the end of August.  That would include scoped
20    materials from large data sets like devices and accounts as
21    well as all of the other evidence gathered in the course of
22    the investigation directly of those individuals at, you know
23    -- to the extent it's discoverable.
24              I -- on the same -- at the same time, we're
25    proceeding with the cross-discovery as to defendants outside
```

1    of this case which are, no doubt, relevant, and we'll be

2    doing that over the course of the next month and certainly

3    be in a position to update the Court and be in communication

4    with the parties between now and then about that progress.

5    As I mentioned earlier, you know, in a sense, the

6    denominator's -- is still growing as to both the January

7    6th-wide discovery, but also the narrower, sort of, circles

8    within the Venn diagram surrounding the four defendants in

9    this case.

10            THE COURT:  Sure.  And there's nothing you can do

11    about that.  I mean, that just is what it is, and you have a

12    continuing discovery -- I don't mean cut you off, Mr. Jones,

13    but that issue seems to me -- that just -- that can't be

14    anything really Mr. Hull complains about, and I'm not saying

15    he is, but that's, you know -- that's just inherent in the

16    nature of this case.  You're going to -- the Government is

17    going to come into possession of new information that you're

18    going to have to turn around and disclose.  I know you're

19    aware of that, but that's not really, I think, the heart of

20    his -- of what he's raising.

21            MR. JONES:  Understood.  I just want to ensure

22    that we make that caveat clear.

23            As to -- as I said earlier, our target's -- the

24    end of the month of August is the discovery for the four

25    defendants.  And, you know, we hope to be substantially far

1        along with respect to additional tranches of discovery as

2        to, you know, prioritized individuals, you know?  For

3        example, Dominic Pezzola, who's charged before Your Honor

4        and who's been a figure in the litigation in this case and

5        in the indictment, he, his co-defendants, and other

6        defendants charged before Your Honor who are closely

7        associated with these defendants.  That's where we're

8        starting.  As you suggested, we are open to working with

9        counsel to prioritize issues and to receive specific

10       discovery requests, you know, and we're moving forward apace

11       and trying to prioritize what needs to be prioritized.

12               THE COURT:  All right.  All right, Mr. Jones.

13               Mr. Hull, so you have that representation,

14       substantial completion of the core discovery for the four

15       defendants by the end of August.  I -- the only reason I'm

16       repeating it is I thought I saw you, kind of, cup your ear

17       while Mr. Jones was speaking at that very point.  And so you

18       have that as the expectation here.  That doesn't mean, as

19       Mr. Jones said, they're not going to be at the same time

20       disclosing other discovery linked to other individuals that

21       the Government is conceding is relevant and discoverable

22       here.  So the -- it's not like that's the only thing that's

23       going to be going on between now and September 1st, but

24       that's their expectation regarding at least the core

25       discovery related to the four defendants here.  So I --

1          MR. HULL:  I take it -- and I take it, Your Honor,

2     the August deadline that -- and Mr. Jones can chime in about

3     this really quickly and we'll move on to something else.

4     The August deadline is more than just scoped materials --

5     scoped discovery?  Because that's what it seemed like he was

6     talking about at the outset.

7          MR. JONES:  Well, we're certainly going to

8     continue to produce materials that are outside the scoped

9     collections of search warrants and device reviews.  To the

10    extent, you know -- for example, you know, additional U.S.

11    Capitol Police video that is identified as relevant, you

12    know, that -- we're going to be pushing that out.  Anything

13    else that's gathered with respect to subpoena returns that

14    come in from, you know, subpoenas that had been issued in

15    the past, we'll be pushing that out.  But, you know, any

16    additional information we're, you know -- that, sort of,

17    would fall within the ambit of an individual's case as

18    viewed by the FBI and the Government, we'll be pushing that

19    out, and that's what we're working to substantially complete

20    in addition to the scoped material that we referenced with

21    respect --

22          MR. HULL:  Can we assign an estimated percentage

23    to "substantial"?

24          MR. JONES:  I think percentages are difficult.  I

25    think our hope is that we don't have more that we're sitting

1    on that we're aware of that we, you know -- we haven't

2    pushed out.

3              THE COURT:  Mr. Hull, let me translate that for

4    you.  They hope it's 100 percent -- to say that 100 percent

5    and then have someone -- if there's 1 percent that's,

6    (inaudible) they don't want to be caught saying,

7    (inaudible.)  That's how I interpret what Mr. Jones just

8    said.

9              MR. HULL:  Thank you.  I've worked everywhere but

10   DOJ.

11             THE COURT:  All right.  Mr. Hull, any further

12   other global issues you want to raise?

13             MR. HULL:  Not at this point, Your Honor.

14             THE COURT:  All right.  Ms. Costner, I believe

15   you're next up.  Anything further you want to -- you would

16   like to raise with me on, sort of, the kind of -- anything

17   other than the motion that I'm going to hear from the

18   parties on in a moment?

19             MS. COSTNER:  No, Your Honor.  I mean, I think

20   that in terms of the general information that Mr. Jones laid

21   out, I really don't have anything to add.  Mr. Smith and

22   Mr. Hull have expressed pretty much any concern that I might

23   have.  And so I really -- I guess that's one advantage of

24   going last in some ways, is there's really not much more to

25   say.

1          I would just, you know -- my client is still in

2     the Middle District of North Carolina.  Anything that could

3     be done to continue to keep him here, it would be

4     appreciated.  I understand that the Court's ruling was

5     through any detention matters.  We did appeal.  And I'm not

6     admitted in the Circuit Court of Appeals in D.C.  So I'm

7     trying to see how that's going along.  But if there's any

8     way that Mr. Donohoe can continue to remain in the Middle

9     District, that certainly would be something that I would

10    very much appreciate to have access to my client.

11          THE COURT:  I have not ordered him to D.C.;

12    correct, Ms. Costner?

13          MS. COSTNER:  I don't believe you have, Your

14    Honor.

15          THE COURT:  All right.  And does the Government

16    have -- The Government doesn't object to that -- to

17    Mr. Donohoe remaining there in North Carolina near

18    Ms. Costner, does it?

19          MR. JONES:  I should -- to be clear, Your Honor;

20    that the U.S. Marshals Service is in charge of where

21    defendants reside and that is their lane, and that is the

22    Government's position.

23          THE COURT:  All right.

24          MR. JONES:  So I don't have further information

25    about the status of any movement or, frankly, anything

1    additional to represent at this point.

2         THE COURT:  All right.  Well, Ms. Costner, I'll

3    just say this.  I'm not going to order him to come to D.C.

4    So whatever happens outside that, I suppose, may be to some

5    degree outside my authority.  All I can tell you is I --

6    given the representations here, I have no plans to enter

7    such an order.  So --

8         All right.  So why don't we turn now to the

9    motion.  Mr. Smith, I'll turn to you.  And I think what

10   would be helpful for me is -- it seems to me at least some

11   chunks of this may have -- now be, sort of, overtaken by

12   events in terms of things that may have been produced or

13   representations that may have been made to you and your

14   client, not all of it, but, maybe, some of it.  So if you

15   would walk through, kind of, the categories, you know --

16   some of the categories of information, I think, you are both

17   -- you both make a discovery motion regarding and a motion

18   for a bill of particulars; some only one or the other.  And

19   if -- I think the best way to do it is just walk through

20   those categories, let me know what you think is -- whether

21   the category is still a live issue or not, and your

22   argument.

23        MR. NICHOLAS SMITH:  Thank you, Your Honor.

24        So we -- the purpose of the motion to compel is

25   that a good deal of evidence has been produced, like

1    Mr. Jones just described, but the problem is that the

2    evidence doesn't relate really to the elements of a couple

3    of the crimes that have been charged.  It's general evidence

4    about January 6th.

5         So one of those crimes is really important to

6    everyone here who's detained, because I think all the

7    parties are -- agree that the basis -- the statutory basis

8    for detention here is 3142(f) based on the claim that all of

9    the people here destroyed or aided and abetted the

10   destruction of federal property on the 6th worth $1,000 or

11   more.  And I think the issue at the detention hearing, Your

12   Honor, was that because the claim -- the charge had been

13   formally made, even if it -- there was a charge that $1,000

14   in property destruction was there, but it would be improper

15   for the Court to look behind --

16        THE COURT:  Yep.

17        MR. NICHOLAS SMITH:  -- the indictment under a

18   case, Your Honor, called King which was 482 F.2d 768.  And

19   the purpose -- so this gets to our motion to compel of this

20   --

21        THE COURT:  Yep.

22        MR. NICHOLAS SMITH:  -- and which is King, I think

23   Your Honor will notice, is a decision from 1973 before the

24   Bail Reform Act was enacted.  And I -- it's our reading of

25   this case, Your Honor, that it holds that a prosecution can

1    move forward not -- it doesn't so much concern when

2    detention -- how long detention will last before trial so

3    much as whether the case -- the prosecution can move forward

4    based on a probable cause -- an alleged probable cause

5    violation that didn't really look very serious in King, but

6    whatever.  It didn't relate to detention.

7           So Your Honor, we think that -- we moved for the

8    Government to produce the evidence that it says supports the

9    claim that the defendants are responsible for $1,000 in

10   property damage.  They responded in two ways, Your Honor.

11   They said in response to the motion to compel that the

12   Government has identified, but not alleged, Mr. Pezzola as a

13   co-conspirator.  It doesn't -- I don't think "identified" is

14   a legal term.  I think the cases require the Government to

15   allege in an indictment a fact that the Government wants to

16   detain someone based on a charge.  So for example, that's

17   Apprendi.  There's an -- the Apprendi decision at 530 U.S.

18   at 500 holds that not only the elements of the charges must

19   be alleged and proven for Fifth and Sixth Amendment

20   purposes, but the facts that establish the elements must be

21   --

22           THE COURT:  Right.  Mr. Smith, but let me just

23   interrupt you for one moment.  As we said earlier, some of

24   this does bleed into a motion to dismiss.  And I just want

25   you to -- and I'm not trying to cut you off, but the motion

1    you have before me is a motion that asks for me to do one of

2    two things: order that the Government produce certain

3    evidence or order that the Government give you -- produce to

4    you a bill of particulars.  So it's not -- framing it as,

5    for example, a defect in the indictment or talking about,

6    Well, they allege -- this is alleged in the indictment; this

7    is not; they haven't alleged that Mr. Pezzola was a

8    co-conspirator in the indictment, I just don't see how it

9    gets you connected to the relief at issue here with regard

10   to these two motions.

11              MR. NICHOLAS SMITH:  Okay, Your Honor.  So in

12   terms of the motion to compel, I believe -- I think I can

13   put it as simply as this.  Section 3142(f) requires that a

14   case involves -- quote, involves -- a crime that's a crime

15   of violence for which all of these defendants are detained

16   -- involved.

17              THE COURT:  Right.

18              MR. NICHOLAS SMITH:  Now, Your Honor, if the Court

19   -- if the Government were to concede later in the case, as

20   it does sometimes, that the charge -- that there is no

21   evidence to support a particular claim or charge, I think

22   everyone would agree at that point that the case no longer

23   involves that charge.

24              THE COURT:  I agree.

25              MR. NICHOLAS SMITH:  So if, in response to a

1   motion to compel, the Government either says, We're not

2   going to give you this evidence or explain when we'll

3   produce it, or alternatively it refuses to explain what --

4   the facts or the evidence in response to a bill of

5   particulars, then I think, Your Honor, there's no other way

6   of establishing the case no longer involves, under 3142(f),

7   the charged crime except through a motion to compel or

8   particulars.

9           THE COURT:  Sure.  I get it.  And I get why you're

10  linking it to the detention issue, because that raises the

11  stakes and underscores the importance here.  I'm not

12  disagreeing with you.  But the legal framework I have to

13  apply is not anything to do with 3142(f).  It is simply the

14  legal standard that governs a motion to compel or a motion

15  for a bill of particulars and --

16          MR. NICHOLAS SMITH:  So Your Honor, that is Rule

17  16.

18          THE COURT:  Yep.

19          MR. NICHOLAS SMITH:  Rule 16 says that the

20  Government is required to produce the defense any

21  information or data -- I think that's pretty broad -- that

22  relates -- that is material to the preparation of the

23  defense -- that is material --

24          THE COURT:  Mm-hmm.

25          MR. NICHOLAS SMITH:  -- to the preparation of the

 1      defense.

 2              THE COURT:  Of course.

 3              MR. NICHOLAS SMITH:  The Government is alleging

 4      that the defendants on the screen destroyed or aided and

 5      abetted the destruction of $1,000 in property damage.  We've

 6      asked the Government to produce or identify, and both, the

 7      evidence that supports that claim, and their response is

 8      they will not -- they, sort of -- so I was getting to the

 9      kinds of responses they make.  They allege -- they say the

10      evidence is, on the face of the indictment, that Pezzola is

11      a Proud Boy, they say, and they say the defendants are Proud

12      Boys; therefore, there is liability that extends to them.

13      Now, Your Honor, there's a case called Scales -- it's a

14      Supreme Court case, 367 U.S. 203 -- which holds that

15      criminal liability cannot attach by virtue of common

16      membership in an organization alone without agreement to

17      commit the violent acts of the organization.  So there --

18      that was a case from about 60 years ago, Your Honor, which

19      holds that if the Government's just alleging Mr. Pezzola is

20      a Proud Boy and he destroyed something and, therefore,

21      everyone here is guilty of something, there's -- there is

22      just black-letter law that that's not sufficient.

23              THE COURT:  That's a -- right.  That was a --

24      again, we're talking about a -- now, we're -- all of a

25      sudden, we're -- again, we're talking about a motion to

1   dismiss; correct?

2            MR. NICHOLAS SMITH:  No, Your Honor.  So Rule 16

3   says that the material evidence that's material to the

4   defense --

5            THE COURT:  Okay.

6            MR. NICHOLAS SMITH:  -- okay, has to be produced

7   --

8            THE COURT:  Sure.

9            MR. NICHOLAS SMITH:  -- to the defense, and Rule

10  5.1 says that if evidence is exculpatory in any way or any

11  -- actually, Rule .51 [sic] of the local --

12           THE COURT:  Yes.

13           MR. NICHOLAS SMITH:  -- look farther than,

14  (inaudible.)  If it has any tendency to mitigate or,

15  (inaudible) -- the defendant, it not only has to be

16  produced, but it has to be produced as soon as it becomes

17  known to the --

18           THE COURT:  Of course.

19           MR. NICHOLAS SMITH:  Okay.  So Your Honor, we're

20  moving to compel the evidence that the Government represents

21  shows an agreement between Dominic Pezzola and Mr. Nordean

22  and the other defendants to destroy property.  Their

23  response --

24           THE COURT:  Okay.

25           MR. NICHOLAS SMITH:  -- is they will not -- they

1    don't say what it is or when they will produce it.

2              THE COURT:  Well --

3              MR. NICHOLAS SMITH:  So -- yeah.

4              THE COURT:  Isn't -- I'll -- okay.  I'll hear from

5    Mr. -- well, why don't I continue to hear from you.  But I

6    assume you -- the issue here is it's a very different thing

7    to say -- for the Government to represent, There is no such

8    evidence, as opposed to, We've produced to you all the

9    evidence, but we don't think we have to point it out.

10   And --

11             MR. NICHOLAS SMITH:  Your Honor, in fact, neither

12   one of those responses has been forthcoming, Your Honor.

13             THE COURT:  All right.

14             MR. NICHOLAS SMITH:  So their response is not,

15   We've produced it and you haven't found it.  Their response

16   is not, We don't have it.  It would be sufficient if they

17   responded, We don't have it.  That would be in compliance

18   with their Rule 16 obligations to say, There is no evidence

19   of an agreement between Pezzola and Mr. Nordean.  Because,

20   Your Honor, there isn't.  So the -- so they have an

21   obligation to produce evidence of the agreement.  But, Your

22   Honor, we're -- the point we're making about what allegation

23   is required in the indictment, you're right -- Your Honor is

24   correct that that is a motion to dismiss issue.  That is.

25   But there's a slightly separate issue here of whether the

1    Government can say, We will not give you the evidence we say

2    exists to support this claim, or even identify it, which is

3    the bill of particulars issue.

4              THE COURT:  Right.

5              MR. NICHOLAS SMITH:  If the -- it could -- the

6    Government could say something to the effect of, It's too

7    burdensome to produce this information, or --

8              THE COURT:  Right.

9              MR. NICHOLAS SMITH:  -- I'll -- under Rule 16, we

10   don't have to produce it right now.

11             THE COURT:  Sure.  Sure.  But they're not going to

12   do that.  But -- because it's what they've charged.  So I

13   take your point.  I take your point.

14             MR. NICHOLAS SMITH:  Okay, Your Honor.  So we

15   think it's crucial to get that information now rather than

16   in August, because it's the whole basis for the detention of

17   the defendants.  So if, for example, Mr. McCullough were

18   coming into court often and saying, We have evidence that

19   there's an agreement between Nordean and Pezzola to destroy

20   property.  We have evidence.  It's there.  But it doesn't

21   really exist, Your Honor, I think Your Honor would agree

22   that that's very inappropriate and that that would be a very

23   troubling reason for keeping people in prison, you know?

24             THE COURT:  There's no question, which is why I

25   don't expect the Government to be all of a sudden

1   representing to me that no such evidence -- whatever their

2   representations and argument is going to be here, I --

3            MR. NICHOLAS SMITH:  Okay.  Your Honor --

4            THE COURT:  -- the most unlikely one is no such

5   evidence exists, but --

6            MR. NICHOLAS SMITH:  Or, Your Honor, it could be

7   what they've said in their briefs which is the evidence is

8   Dominic Pezzola is a Proud Boy.  That's what the -- okay.

9   And I'm saying the First Amendment bars that kind of

10  argument -- that's the Scales decision -- in which case, we

11  would not be in detention zone, Your Honor.

12           So the second piece of information we've requested

13  is the evidence supporting the 231 civil disorder charge.  I

14  think we've given the Court citations to all of the

15  references to law enforcement.  The Government subsequently

16  added a few others that aren't relevant to the 231 charge,

17  but Your Honor will see that they don't explain how

18  Mr. Nordean interfered with law enforcement.  And so we're

19  making a request to either produce the evidence that shows

20  he interfered with law enforcement under Rule 16 and 5.1 or

21  identify in a bill of particulars what the acts are -- this,

22  kind of, ties into the motion to dismiss slightly for the

23  bill of particulars which we would --

24           THE COURT:  Right.

25           MR. NICHOLAS SMITH:  -- say is alternative relief

1    to a motion to dismiss for particularity grounds -- but

2    identify the acts that are a violation of 231.  And the

3    reason that's so essential here, Your Honor, is because

4    "act" is not defined in the statute.  The statute

5    criminalizes any act that interferes with law enforcement in

6    any way, and you -- the Court knows that that's a little bit

7    unusual for a criminal statute.  Usually, the actus reus in

8    a statute is defined.  So it will be obstructing a law

9    enforcement officer is an offense or disorderly conduct is

10   an offense, not any act that interferes with.  And, Your

11   Honor, the Government cited a case it relies on for the

12   point that that's not vague.  It's called the Mechanic case

13   in the Eighth Circuit.  And the Mechanic case doesn't help

14   the Government at all here.  It means that to avoid

15   vagueness and First Amendment problems with 231, Mechanic

16   held that the Government has to allege violent acts, acts of

17   violence.  So if that -- that appears to be the Government's

18   position in this case that Mechanic controls construction of

19   231, in which case we're moving to compel the documents

20   showing Mr. Nordean's violent acts on January 6th.

21          So those are the two categories, I think, the main

22   ones, of the motion to compel discovery.

23          Just generally on the bill of particulars, Your

24   Honor, we agree that there's a tradeoff between dismissal on

25   Fifth and Sixth Amendment grounds and a bill of particulars.

1    So if Your Honor were to find that the indictment satisfies

2    the Fifth and Sixth -- presentment and notice, Your Honor

3    could still find that the indictment needs more

4    particularity on certain --

5              THE COURT:  All right.

6              MR. NICHOLAS SMITH:  -- facts because -- and the

7    final point is Rule 7 says the indictment must contain,

8    quote, the essential facts constituting the offense.  The

9    essential facts constituting the offense.  In Apprendi,

10   Justice Thomas said that the presentment and notice

11   requirements of the Fifth Amendment and Sixth Amendment

12   essentially track that language from Rule 7.  Justice Thomas

13   held that the identification of which facts are the elements

14   of the offense is required to satisfy the Fifth and Sixth

15   Amendment.  Which facts?  So what would Justice Thomas mean

16   besides facts?  He would mean just bare recitation of a

17   statutory phrase, for example, doesn't identify facts.  It's

18   a -- so those are -- that's -- we agree that the bill of

19   particulars is alternative relief, but we think at the very

20   least the information showing the basis for detaining

21   everyone on the screen is very critical to get out and --

22             THE COURT:  Can I -- okay.  Thank you.

23             Can I infer, then, that the issue regarding UCC-1

24   has been resolved?

25             MR. NICHOLAS SMITH:  Your Honor, we're not moving

```
 1      -- you're -- we're not going to waste the Court's time on
 2      that now.  We --
 3                 THE COURT:  The --
 4                 MR. NICHOLAS SMITH:  Your Honor, the -- without --
 5                 THE COURT:  It's in your motion.  I'm glad -- I
 6      just want to know whether it's still a live -- I -- you may
 7      not want to address it in argument.  I just -- is it still a
 8      live controversy between --
 9                 MR. NICHOLAS SMITH:  It is, Your Honor, but the
10      Court's -- the issue is they've identified this individual
11      by something called a handle that the individual uses on,
12      you know -- in a chat app, but the legal name of that
13      individual has not been identified, but Your Honor is busy.
14      So -- and we want to keep this focused here because we've
15      got lots of things.  So we really just want the Pezzola
16      evidence, if it exists --
17                 THE COURT:  All right.
18                 MR. NICHOLAS SMITH:  -- or if it doesn't, an
19      admission it doesn't, Your Honor.
20                 THE COURT:  All right.  Can I characterize -- and
21      I'm not trying to -- I appreciate the -- your wanting to
22      keep things focused today.  But should I consider that a
23      withdrawn request, then, by you, Mr. Smith, regarding UCC-1?
24                 MR. NICHOLAS SMITH:  Your Honor, I think it's
25      important to identify this individual.  They -- the
```

1    Government has represented that -- the reason this is

2    important is because we can speculate about who this

3    individual is, and if we're correct in our speculations

4    there is public information showing that this person was at

5    one point a government informant.  And we don't think that's

6    particularly important for the, you know -- the specific

7    crimes that are alleged here.  We think it's important

8    because the Government is relying on his statements, which

9    are very aggressive, to detain everyone else.  So it would

10   be -- if the individual is an informant, it would just be

11   important to the extent that that wouldn't be -- shed much

12   light -- assuming control over this individual, that

13   wouldn't shed much light on the dangerousness of people who

14   are not being controlled, essentially.  So we ask for that

15   information to identify the individual.

16          THE COURT:  All right.  So it's still an

17   outstanding -- I understand you don't want to emphasize it

18   here today.  But it's still something before me that you're

19   requesting; fair?

20          MR. NICHOLAS SMITH:  Correct, Your Honor.

21          THE COURT:  Okay.  The other piece is the --

22   again, I -- maybe, this falls into the same category.  But

23   the other, kind of, area that, I think, you had identified

24   was this issue about whether the Secret Service had

25   restricted the area and the Government response --

 1          MR. NICHOLAS SMITH:  Thank you, Your Honor.

 2          So the Government's conceded, I think, in other

 3    cases, and I believe it will here, that the Secret Service

 4    did not set the restricted --

 5          THE COURT:  Right.

 6          MR. NICHOLAS SMITH:  -- area in this case and they

 7    contend that it doesn't matter.

 8          THE COURT:  Okay.  So --

 9          MR. NICHOLAS SMITH:  That's withdrawn.

10          THE COURT:  And --

11          MR. NICHOLAS SMITH:  Yes.

12          THE COURT:  All right.  So that's not a live

13    issue, then, between the parties, assuming that's what they

14    -- I think that's what they represented in their papers,

15    but, maybe, they'll say that here today.

16          All right.  Thank you, Mr. Smith.

17          Who -- will it be Mr. McCullough or Mr. Jones?

18          MR. JONES:  I'll give it a shot, Your Honor.

19          THE COURT:  All right.  Mr. Jones?

20          MR. JONES:  The arguments presented by Mr. Smith

21    are not in the neighborhood of a motion to compel or bill of

22    particulars.  The arguments are in support of a motion for

23    release which this Court has litigated and the D.C. Circuit

24    has reviewed.  The defendant has -- challenges the

25    sufficiency of the evidence that's been presented.  That is

1    an issue that's directly litigated in the context of a

2    detention hearing, and this Court is well familiar with that

3    litigation as to not just this defendant but the others.

4    There are hundreds of pages of briefing on the issue of

5    detention, many of which are focused on the nature and

6    circumstances of the offense and the weight of the evidence.

7    We've been down that road.  To the extent the defendant will

8    -- seeks to reopen that issue and the Court permits it,

9    we'll obviously continue to litigate that, but simply

10   because the defense is unsatisfied with the evidence and

11   discovery provided does not entitle the defendant to a

12   motion -- to a bill of particulars.  I mean, in this case --

13             THE COURT:  No, but you -- I'll say the same thing

14   to you, Mr. Jones, that I said to Mr. Smith which is, again,

15   this has -- it is linked to detention only in the sense that

16   the detention issue underscores the importance of the

17   information, but I'm still applying -- I'm not applying the

18   law of detention here.  I'm not reconsidering detention.  I

19   said that to Mr. Smith.  I will say that to you, Mr. Jones.

20   But what I do have to do is apply the relevant law of

21   discovery, the relevant law surrounding bills of particular

22   -- bills of particulars to see whether the defense is

23   entitled to that, and if they are and that means that they

24   get some information that they're going to come back and use

25   to their advantage in one way or another, including on the

1    detention issue, well, so be it.  But that's a question for

2    another day; isn't it?

3              MR. JONES:  Yeah, I think that's right, Your

4    Honor.

5              THE COURT:  Okay.

6              MR. JONES:  You know, as to, you know, the issue

7    of Dominic Pezzola, we've produced evidence that shows his

8    involvement in chat messages with defendants in this case.

9    We have produced evidence showing his association with

10   members of the conspiracy; namely, carrying a riot shield

11   with Defendant Donohoe across the west terrace prior to

12   bashing in the window of the U.S. Capitol.  I mean, the

13   defense's request for discovery is not a request for, you

14   know, We want video of X, Y, Z.  We want records of X, Y, Z.

15   They want proof to support the allegations in the indictment

16   and they argue that that proof is insufficient, and that's

17   an issue for, you know, potentially a motion for [sic]

18   dismiss, but also for trial.  And, no doubt, we, you know --

19   we are continuing to produce discovery.  We believe we've

20   addressed these issues already.  We don't, you know -- at --

21   to the extent a motion to compel, you know, should be

22   denied, it's, you know -- it's always without prejudice, you

23   know, because a -- discovery's always ongoing and

24   defendants, you know, can always continue to make discovery

25   requests.  So we're not asking for Your Honor to deny the

1    motion with prejudice.

2              As to a bill of particulars, we just don't think

3    that it's anywhere near the standard, especially in light of

4    the requirements of Rule 7, the amount of ink that's been

5    presented in the speaking indictment, and in the litigation

6    papers in this case as well as the discovery that we've

7    already provided.

8              So for the reasons we've stated in our papers --

9    and I won't echo here in the interests of time -- we think

10   that defendant's not entitled to that relief, either the

11   bill of particulars or any order to compel discovery.

12             MR. NICHOLAS SMITH:  Your Honor --

13             THE COURT:  All right.  Let's just --

14             MR. NICHOLAS SMITH:  -- may I --

15             THE COURT:  Let --

16             MR. NICHOLAS SMITH:  -- comment on that?

17             THE COURT:  Let's just -- hold on one second,

18   Mr. Smith.

19             Mr. Jones, let me just try to get some things off

20   the table here.  So what's the issue -- is the Government

21   conceding that the area was not restricted by the Secret

22   Service?  And so, quite obviously, if it wasn't, then you

23   have no evidence of that and you're not -- you haven't --

24   you're not failing to produce such evidence.  You don't have

25   any evidence of it.  It didn't happen as far as the

1    Government's concerned and you just simply don't think, as a

2    matter of law, that that's required; is that fair?

3                    (Brief pause.)

4                    You're muted.

5                    MR. JONES:  That's correct, Your Honor.  We don't

6    believe that, as a matter of law, that's required.  I mean,

7    again, we're stepping into an issue of, I think, statutory

8    interpretation and how it applies and what the elements of

9    the offenses are --

10                   THE COURT:  Right.  Okay.  So --

11                   MR. JONES:  -- rather than an issue of discovery.

12                   THE COURT:  There's no evidence that you're aware

13   of that the restricted area was set by the Secret Service

14   that you are refusing or not producing to the defendant?

15                   MR. JONES:  That's correct, Your Honor.

16                   THE COURT:  All right.  So that issue is gone.

17                   Let's just talk about, then, the CC-1 [sic] issue

18   for a moment.  What's the Government's position on what it

19   has produced and what its -- whether it has an obligation

20   to, sort of, further identify that individual by name, I

21   guess, as opposed to simply some sort of online identifier?

22                   MR. JONES:  I -- Your Honor, if I recall

23   correctly, where we left this issue was the defense had

24   inquired about the identity of UCC-1 and, I believe, the

25   related issue of whether that person was a CHS.  We did

1     provide information short of the person's name, but -- and

2     did confirm that the person was not a CHS.  I believe that's

3     where we left the conversation with defense counsel.  I'd

4     have to check back to be certain about that.

5                THE COURT:  Is it the Government's -- again, I'm

6     just trying to figure out what's in front of me to decide --

7     what is still a live controversy, if you will, between the

8     parties.  Is it the Government's position that you don't

9     have to, and don't intend to, identify that person further,

10    including by their, sort of -- by their name?

11               MR. JONES:  I -- it's our position that we're not

12    obligated to produce that name at this time.

13               THE COURT:  All right.

14               MR. NICHOLAS SMITH:  Your Honor, can I make one

15    comment on the last point about the Pezzola evidence that

16    Mr. Jones just made to close the loop --

17               THE COURT:  Well --

18               MR. NICHOLAS SMITH:  -- on this?

19               THE COURT:  -- we'll circle back to that in one --

20    I'll -- I'm going to hear from you again very briefly,

21    Mr. Smith.  I just -- I'm just trying to figure out what's

22    still live here.

23               All right.  And, Mr. Jones, with regard to the --

24    so taking the issue of UCC-1, putting that aside; taking the

25    Secret Service restricted area, putting that aside, we're

1   left with this issue -- the three other issue areas, I

2   think, are still floating around out there are this issue of

3   the property and what was -- what specific property was

4   depredated in what amount and how; two, kind of, related to

5   that is any evidence of a conspiracy with Mr. Pezzola; and,

6   three, this issue of, again, how Mr. Nordean and the other

7   defendants are charged with obstructing law enforcement

8   during a civil disorder.  And the question is, sort of, what

9   is the evidence of that and what -- and how is he alleged to

10   have done that?

11          With regard those categories of information, I

12   just -- I -- the Government is not withholding any

13   information in -- that falls into either -- any of those

14   three baskets from the defense; is it?

15          MR. JONES:  No, Your Honor.  There's no evidence

16   that we have identified and decided we need to keep this on

17   the shelf and not let it get out to the defense.  There's

18   nothing --

19          THE COURT:  All right.

20          MR. JONES:  -- in that category --

21          THE COURT:  All right.  So I mean, to me, to some

22   degree, that is not necessarily relevant to the bill of

23   particulars, of course, but it is relevant to the question

24   of production.

25          Mr. Smith, with regard, then, to those three

1    issues on the -- at least on the production side -- on the

2    motion to compel discovery, they're not saying they're

3    withholding any evidence.  So how can I -- I mean, what --

4    I'm not sure what I'd really be compelling them to do.

5    They're saying, We're turning -- there's nothing we're

6    withholding consciously in any of those three categories.

7    Doesn't that mean your real beef with them, with that

8    representation, is either with the indictment -- and you've

9    got your motion to dismiss that we'll -- there's going to be

10   further briefing on.  Okay.  And then isn't really your

11   issue, then -- turn on -- or isn't it reduced to the bill of

12   particulars?

13            MR. NICHOLAS SMITH:  No, Your Honor, because

14   contrary to what the Government just told you, if you look

15   at their opposition to the motion to compel, they actually

16   say that they, quote, believe that there is other evidence

17   that bears on the question of whether the $1,000 property

18   damage element has been satisfied.  They don't identify that

19   evidence, and they state that it's separate from the

20   evidence relating to Pezzola's participation in chats.  So

21   Your Honor, the opposition itself says the Government

22   believes there's evidence that relates to this.  It's -- it

23   represented that to the Court, Your Honor --

24            THE COURT:  Right.

25            MR. NICHOLAS SMITH:  -- as it's different from the

1   evidence relating to Pezzola.  So --

2              THE COURT:  Right.

3              MR. NICHOLAS SMITH:  -- they say this evidence

4   exists.  We're asking to compel it under Rule --

5              THE COURT:  But they're saying -- but they're

6   telling me today they've produced it to you.

7              MR. NICHOLAS SMITH:  Your Honor, that would --

8   okay.  That --

9              THE COURT:  Either they produced it to you or they

10  plan to, but they're certainly not withholding it, is what

11  they're telling me today.

12             MR. NICHOLAS SMITH:  Your Honor, if they've

13  produced something that relates to destruction of property

14  since they made the representation that there's other

15  evidence they believe relates to it, they have not

16  identified it and I have not seen it, Your Honor, but just

17  --

18             THE COURT:  Well, but that's a separate question;

19  isn't it, Mr. Smith?  Whether they have to identify it as

20  such is a separate --

21             MR. NICHOLAS SMITH:  Your Honor --

22             THE COURT:  -- question.  I'm not trying to be,

23  you know, picayune about it, but it is --

24             MR. NICHOLAS SMITH:  Your Honor, there's four

25  people detained right now on the basis of the claim they

1    destroyed $1,000 of damage.  What you're hearing the

2    Government say, Your Honor, is, We're not going to say what

3    our theory is.  It might relate to Pezzola.  In which case,

4    the evidence they've given you, Your Honor, is -- what

5    Mr. Jones just said is his participation in chats.  That is

6    the evidence they cited.  I'll tell you what that means.

7    There's one reference to Pezzola in thousands of pages of

8    texts.  There's no communications from him that have been

9    identified, much less evidence of an agreement to destroy

10   property, Your Honor.  So the evidence we're asking them to

11   produce is evidence of an agreement between Pezzola and the

12   defendants to destroy property.  His -- he's referenced in

13   one chat, I think Your Honor would agree, is not evidence of

14   an agreement to destroy property.  Okay, Your Honor?

15           The indictment is required to allege a criminal

16   agreement between Pezzola -- to hold Pezzola's actions

17   accountable against Mr. Nordean.  It's not just that it

18   doesn't allege that.  It's that the Government won't

19   identify what the evidence is supporting the claim on which

20   four people are detained right now.  That's either a motion

21   for a bill of particulars issue or it's a motion to produce

22   the evidence they themselves say supports their claim in

23   opposition to the motion to compel.  If -- Your Honor, if

24   there was a world where we couldn't file a motion to compel

25   to figure out what the evidence is, we can't file a motion

1    to -- for a bill of particulars, and the indictment

2    satisfies the elements of Rule 7, then these defendants

3    could be detained for four years on the basis of a claim for

4    which there's no evidence, Your Honor.  So --

5            THE COURT:  I agree with you that, one way or the

6    other, we're going to get at this.  And the question is

7    just, sort of, which motion does it?  And with --

8            MR. NICHOLAS SMITH:  And --

9            THE COURT:  -- regard to -- I do think it is -- I

10   think there is case law out there about -- that -- in the

11   discovery context that talks about whether the Government

12   not only has to produce something but has to, sort of,

13   specifically identify it, and that would be evidence of X or

14   Y or Z; and then the bill of particulars is whether there

15   are facts alleged, right, that you think you're entitled to

16   to be able to put on your defense.  I think this falls,

17   maybe, a little bit further into -- like I said before, it's

18   certainly not an issue of, sort of, typical -- a motion --

19   typical motion to compel because the Government is saying,

20   We're producing it all.  So the question, then, is, do they

21   have to specifically identify it?  Maybe they do; maybe,

22   they don't.  And then the bill of particulars.  Do they have

23   to give you the facts -- in other words, do they have to,

24   with more particularity, say what property is at issue here?

25   And this is your argument on this point, you know?  What

1   property is at issue, how much was the property destroyed,

2   and what did they do to destroy it?

3          MR. NICHOLAS SMITH:  Your Honor, I think it's

4   reducible to a single question.  Their opposition says,

5   beyond the Pezzola evidence -- which they're uncomfortable

6   relying on completely but for -- because it's

7   insufficient -- beyond that evidence, they say, there is

8   other evidence, they believe.  Your Honor, it's a very

9   simple question to the Government.  Have you produced the

10  evidence you're referring to in your opposition to the

11  motion to dismiss and what is it?  And what's --

12         THE COURT:  Right.

13         MR. NICHOLAS SMITH:  -- the evidence?

14         THE COURT:  Well, they've answered the first part

15  of it and they've said the -- I think --

16         Well, so, Mr. Jones, let me just ask you that

17  question.

18         MR. JONES:  Yes, Your Honor.  I think I can

19  resolve this issue.  I mean --

20         THE COURT:  All right.

21         MR. JONES:  -- the Government's statement -- the

22  defense has taken issue with the allegation that Defendant

23  Nordean is liable for the window broken by Dominic Pezzola.

24  We've presented -- disclosed evidence that we believe

25  supports that allegation.  They're -- beyond Dominic

1      Pezzola's actual destruction of property, what we've said is

2      there's other evidence that's relevant to that charge.

3      There's not another -- there's not an independent allegation

4      of a substantive destruction of property that the Government

5      is hiding within the indictment.  There's not another window

6      that we're pointing to.

7                THE COURT:  Okay.

8                MR. JONES:  What we're saying is that there's

9      evidence -- for example, when Defendant Nordean with

10     Defendant Joe Biggs shake the barrier in front of the line

11     of police on the west terrace, that's -- we think that's

12     relevant evidence as to the defendants' mens rea with

13     respect to the destruction of property charge, as are all

14     the communications, as are all the other pieces of evidence

15     that prove up the crime.  I mean -- and at that moment where

16     they're shaking the barrier, Dominic Pezzola is directly

17     adjacent to them.  We think that's relevant to our proof of

18     the 1361 charge, and we've made that clear.

19               THE COURT:  All right.  So Mr. Jones, you're not

20     -- there's not -- obviously, again, we have a -- it's a --

21     kind of, an unusual situation here insofar as there's this

22     much broader set of things going on that are -- you're not

23     attempting to link to these defendants.  So it -- this is

24     tricky.  But your point is you're not alleging that there --

25     like you said, there's not another window or another --

```
1                  MR. JONES:  Another object that's been --

2                  THE COURT:  -- another object --

3                  MR. JONES:  Right.  Right.

4                  THE COURT:  -- that you're basing the destruction

5       of property charge on.  It is -- the Pezzola window, so to

6       speak, is the item that you're alleging was the subject of

7       that charge.

8                  MR. JONES:  That's correct.  I mean, I think --

9       we've produced evidence of, you know -- with respect to the

10      destruction of the barrier that, you know, is not

11      independently charged in the indictment, but the allegation

12      in the indictment is the destruction of the Pezzola window,

13      so to speak.

14                 THE COURT:  And just to close this off, there's --

15      Mr. Smith, part of his argument is that you haven't produced

16      discovery, I think, that would -- I think it's the discovery

17      part of the motion -- that you haven't produced discovery

18      that substantiates that the damage was over $1,000.  What is

19      your response to that?

20                 MR. JONES:  We have produced that discovery to the

21      defendant in the term -- in the form of an -- estimates by

22      the Architect of the Capitol as to the value of the property

23      destroyed.

24                 MR. NICHOLAS SMITH:  The judge is referring to the

25      fence, I believe, Mr. --
```

1      THE COURT:  No, I was referring to the window.

2      MR. NICHOLAS SMITH:  Oh, the window.  Okay.

3      THE COURT:  That -- they're only proceeding on the

4  window.  So the fence is not a -- is not -- the value of the

5  fence, it doesn't seem to me, has -- does not -- is not

6  relevant.

7      MR. NICHOLAS SMITH:  Your Honor, I -- if the

8  Government is only proceeding on the window, that would be

9  the first time it has identified that in response to any

10  motion we've filed, Your Honor.  So if --

11      THE COURT:  All right.  Well, that -- they're

12  representing it now.  I -- so I think we can take them at

13  their word on that.  He -- what Mr. Jones just said --

14  Mr. Jones, you correct me -- is that the point of the

15  language you each quoted from before is -- was meant to

16  capture -- or was meant to make the point that there's other

17  evidence relevant to that count out there -- other elements

18  perhaps of that count, but that as far as the property that

19  has been destroyed, they're not proceeding under any other

20  theory other than the Pezzola window, so to speak.

21      Mr. Jones, have I got that right?

22      MR. JONES:  You have, Your Honor.

23      THE COURT:  All right.

24      MR. JONES:  And, Your Honor, if I could just --

25      THE COURT:  Yep.

```
 1            MR. JONES:  Well, one note to put on that.  I
 2    mean, the value of the window was one issue that, you know,
 3    because it comes in the form of the Architect of the Capitol
 4    estimate, is highly-sensitive discovery.  Because we had
 5    some delay in getting a protective order in place with
 6    respect to Defendant Nordean --
 7            THE COURT:  Right.
 8            MR. JONES:  -- we were prevented from producing
 9    that as we had already produced it to other defendants.
10            THE COURT:  Right.
11            MR. JONES:  And I will say we've been pushing out
12    discovery quickly in this case, and I had believed that the
13    UCC-1 issue had been resolved which is why it was not top of
14    mind, but I am reminded that we did produce an FBI report
15    revealing the true name of UCC-1 as indicated in Serial 40
16    that was produced to Defendant Nordean and to -- now to the
17    other defendants in cross-discovery.  So --
18            THE COURT:  All right.
19            MR. JONES:  -- just directing the -- counsel and
20    the other counsel to that serial and, obviously, open to
21    follow-up questions regarding that.
22            THE COURT:  All right.  So it sounds like UCC-1
23    and the Secret Service issues are to the side and it's these
24    other issues that are still live in varying degrees.
25            Mr. Smith, I'll give you the last word to respond
```

1    to anything Mr. Jones said.

2              MR. NICHOLAS SMITH:  Thank you, Your Honor.

3              I just want to be clear with the Court as well as

4    the Government that it sounds like the Court's understanding

5    is that if the defense contends the basis for the detention

6    right now is conspiracy to destroy $1,000 in property --

7    over $1,000 in property which consists of the window, the

8    Government has stated its evidence is not evidence that is

9    not produced of that alleged conspiracy.  The evidence in

10   support of the conspiracy for the $1,000 in damage is what

11   Mr. Jones referred to as Pezzola's participation in the

12   chats.  I think he's referring to Telegram chats.  And I

13   believe that's the only fact that Mr. Jones said was the

14   evidence that had been produced.

15             THE COURT:  Well --

16             MR. NICHOLAS SMITH:  It also --

17             THE COURT:  Let me --

18             MR. NICHOLAS SMITH:  -- says that all of the

19   evidence -- the relevant evidence has been produced.  Is

20   that a fair summary of the Government's response to the

21   motion --

22             THE COURT:  I -- let me jump in.  Well, all right.

23   Mr. Jones, why don't I just have you correct whatever you

24   think you would like to with regard to what Mr. Smith said.

25             MR. JONES:  That's not an accurate description of

1    our position or what I said.  We clarified that with respect

2    to the indictment and the allegation of the substantive 1361

3    charge, the relevant property is the window destroyed

4    directly by Dominic Pezzola.  It is not our position that

5    the evidence of Defendant Nordean or any other defendants'

6    liability for the destruction of that window is limited to

7    Defendant Pezzola knocking in the window.  We referenced

8    Telegram chats.  There is other video evidence, you know --

9    the amount -- the compilation of evidence across this case,

10   I mean, all points toward the proof that, we submit,

11   satisfies the elements of the offense.  And so a, you

12   know -- this motion for -- to compel discovery is, in fact,

13   I think, a motion to compel proof in support of the charge

14   that's been alleged, and that's different than a motion to

15   compel discovery and, as we've told Your Honor, you know,

16   there's not evidence that we're holding back, you know?  The

17   defendant's characterization of the evidence is not

18   something we're adopting here either.

19            THE COURT:  All right.  Mr. Smith, any response to

20   all of that or anything Mr. Jones said before, as well?

21            MR. NICHOLAS SMITH:  Thank you, Your Honor.

22            So the ambiguity that's left here based on what

23   the Government has said is what its theory -- legal theory

24   it is or what charge it is at all that's responsible for

25   holding him for $1,000 in property damage.  So it could be,

1    based on what Mr. Jones said, a conspiracy to destroy

2    property with Pezzola.  They -- the Government's noted a

3    number of times that it's identified him as a co-conspirator

4    not -- outside of the pleadings, Your Honor.  There is no

5    allegation of conspiracy with Pezzola.  So that would seem

6    to eliminate conspiracy, Your Honor.  Then Mr. Jones

7    referred to his -- Mr. Pezzola's presence near the

8    defendants on the 6th.  I'm not sure if Your Honor picked up

9    what sort of legal claim that is, but it's not conspiracy

10   which is an allegation of a criminal agreement.  So Your

11   Honor, we're just left with the point here that the

12   Government -- the indictment does not allege a conspiracy

13   between Pezzola and the defendants.  So there's no

14   allegation of conspiracy.  And then Mr. Jones just said that

15   the defendants were near Pezzola on the 6th.  So I'm not

16   sure what legal theory that's left us with here.

17           THE COURT:  Mr. Jones, do you want to respond to

18   any of that.

19           MR. JONES:  We don't see a distinction between

20   identifying or alleging Dominic Pezzola as a co-conspirator.

21           MR. NICHOLAS SMITH:  Your Honor, it's the Apprendi

22   case.  The Fifth and Sixth Amendment require that for any

23   charge, the -- that the elements of the offense be alleged.

24   That's Apprendi.  That's 530 U.S. at 500.  It's not just --

25           THE COURT:  Well --

```
1              MR. NICHOLAS SMITH:  It's not just the type of

2     criminal charge that has to be alleged but the actual

3     charge.  It has to be the elements of the charge.  There's

4     -- if you go to the paragraph of the indictment that

5     mentions Pezzola once, you will not see an allegation of an

6     agreement -- any agreement -- between Pezzola and the

7     defendants.  What the Government has said in its papers is

8     that Pezzola is a Proud Boy; Nordean is a Proud Boy;

9     therefore, he's liable.  That -- but that's not a legal

10    theory, Your Honor.  So I think we've gotten somewhere in

11    identifying what's going on with this claim.

12             THE COURT:  Well, is this -- let me -- isn't what

13    you are raising here, again, more, again, aptly directed

14    toward the completion of the briefing on the motion to

15    dismiss?

16             MR. NICHOLAS SMITH:  And, Your Honor, if we hadn't

17    accomplished what we did just now, what the Government would

18    say in response to the motion to dismiss is there might be

19    other evidence beyond the Pezzola allegation that might

20    satisfy the destruction of property claim.

21             THE COURT:  Well --

22             MR. NICHOLAS SMITH:  Your Honor --

23             THE COURT:  -- again, they have -- hold on.  They

24    haven't limited what evidence might support that claim as

25    far as what they've represented here to me, I don't think.
```

1    The only thing they have limited it to is -- and they've

2    made clear, it seems to me -- is they're not proceeding on a

3    theory that there's some other object out there that was --

4    that is the subject of the destruction of property charge.

5    It -- Pezzola window.  Now, what evidence they have that

6    links these clients to that, I think they've not -- they've

7    left open.  Let's put it that way.  Is that --

8                MR. NICHOLAS SMITH:  Your Honor, there's two

9    possible ways --

10               THE COURT:  Hold on.  Hold on.  Hold on,

11   Mr. Smith.

12               Mr. Jones, is that fair?

13               MR. JONES:  Yeah -- yes.  As to the object of the

14   destruction of property, it's the window.

15               THE COURT:  Right.  And you haven't --

16               MR. JONES:  Full stop.

17               THE COURT:  But by -- and by -- and you haven't

18   tried -- haven't represented the limits one way or the other

19   on what -- the evidence you would use to prove that charge;

20   is that fair?

21               MR. JONES:  Of course not.  I mean, there could be

22   -- there's any, you know, host of relevant evidence that's

23   probative as to that ultimate charge.

24               THE COURT:  All right.  And you're not --

25               MR. JONES:  That's what we would presented --

1     that's what we would present at trial.  I mean, the defense

2     is contending, you know -- dispute is with the strength of

3     the evidence which is --

4               THE COURT:  And you're --

5               MR. JONES:  -- understandable and the point of

6     further motions and trial --

7               MR. NICHOLAS SMITH:  Your Honor --

8               THE COURT:  And you're not --

9               MR. JONES:  -- and then -- and an issue --

10              THE COURT:  You're not --

11              MR. JONES:  -- that we've litigated extensively in

12    the context of detention.

13              THE COURT:  All right.  And you're not --

14    Mr. Jones, again -- I know you've said this, like, two other

15    times -- but the Government is not withholding any evidence

16    that they intend to use to prove that charge.  It may not

17    all be produced.  We've talked about discovery and all the

18    rest of it.  But you're not withholding any of that evidence

19    intentionally; is that fair?

20              MR. JONES:  That's fair, Your Honor.  That's

21    correct.

22              MR. NICHOLAS SMITH:  Your Honor --

23              THE COURT:  Mr. Smith, you're chomping at the bit.

24    So go ahead.

25              MR. NICHOLAS SMITH:  Your Honor, I think Mr. Jones

1    represented before not that they're just withholding it

2    deliberately but they had produced the evidence that

3    supports the $1,000 in property damage being liable to the

4    defendant.  So if -- without beating a dead horse, I think

5    if we lay it all out in one sentence, I think it really will

6    come into focus here.  They have not alleged a conspiracy.

7    The property damage consists of the broken window by

8    Pezzola, number one.  Number two -- that's all it consists

9    of, the broken window by Pezzola.  That's what Mr. Jones

10   just said.

11           Number --

12           THE COURT:  Correct.

13           MR. NICHOLAS SMITH:  -- two, they do not allege a

14   conspiracy between the defendants and Mr. Pezzola.  You have

15   to allege claims to make them under Apprendi and the Fifth

16   and Sixth Amendments.  To be held liable, they have to

17   allege it.  They have not alleged that there's a conspiracy

18   between Mr. Pezzola and it's not in the indictment, Your

19   Honor.

20           Number three, they say that they -- that if the

21   defendants are going to be liable for the $1,000 in property

22   damage, absent a conspiracy, there has to be some charged

23   claim for which they could be held responsible for that.

24   That would leave the theories of direct destruction which

25   the Government has just conceded is not the case.  They say

1    it's Pezzola.  They just admitted that.  Then the other

2    theory would be aiding and abetting liability.  That would

3    be the only remaining theory that would support it.  Your

4    Honor, the Chief Judge of this court in the first detention

5    hearing for Mr. Nordean asked the Government, Is your theory

6    that Mr. Nordean is responsible under aiding and abetting

7    because some other Proud Boy destroyed property or is there

8    some specific act that he did -- took to further the offense

9    beyond mere presence?  The aiding and abetting theory

10   requires more than mere presence.  So Your Honor, she said

11   that -- the court said, That would be very weak evidence

12   indeed if the theory was merely aiding and abetting by

13   virtue of common membership in the Proud Boys.  That's what

14   the court said.

15        So Your Honor, if we -- if you stack up all of

16   these things here, it appears that the only piece of

17   property destruction is the window.  They have not alleged a

18   conspiracy between Nordean and Pezzola to destroy the

19   window.  That leaves the aiding and abetting theory which

20   the Chief Judge has said is weak if based on common

21   membership in a political organization.  I think that's what

22   we're left with here.

23        THE COURT:  All right.  But -- fair enough.  Let

24   me -- I'll give you -- Mr. Jones, do you have any quick

25   response to that?  You don't have to have one.

```
 1            MR. JONES:  I think we've said enough, Your Honor.

 2            THE COURT:  All right.  Let's -- so I will take

 3    all this under advisement and I will get you all an answer,

 4    whether on paper or in person, on the motion to compel and

 5    the motion for a bill of particulars promptly.

 6            As I get into it, if I think I want -- I think

 7    sometimes the quickest way to do it is orally, although

 8    given the number of people that would have to coordinate for

 9    that it may be easier, frankly, for me to just write the

10    opinion.  Let me ask, actually, each defense counsel.  If I

11    was going to rule orally on it -- I -- again, we're going to

12    set another date here, but I'm not going to wait until that

13    next date.

14            Mr. Smith, would you be willing to waive your

15    client's appearance for me simply to rule orally if --

16            MR. NICHOLAS SMITH:  Yes, Your Honor.

17            THE COURT:  -- to do that?

18            MR. NICHOLAS SMITH:  Yes, Your Honor.

19            THE COURT:  All right.  And let me ask the same

20    question to Mr. Hull.

21            MR. HULL:  Yes, sir.  I would.

22            THE COURT:  All right.  And, Ms. Costner, same

23    question to you.

24            MS. COSTNER:  Yes, Your Honor.

25            THE COURT:  All right.  So if I do rule orally, I
```

1     will -- we will -- we'll proceed without the defendants

2     there just for me to put that on the record.  If not, you'll

3     get something in writing.

4            Let's pick a next day.  What's a length of time --

5     my sense is I want to have that entire matter -- the other

6     -- obviously, the other motions briefed out and, maybe,

7     that -- the part we want to build in a little bit of time if

8     the parties want to talk about other motions they'd like to

9     tee up at the same time for the next time we're together.

10    So my thought, looking at my schedule -- and in particular,

11    my trial schedule -- is to set this down in -- basically, in

12    another 60 days in mid-September where we would -- I'll hear

13    argument on the motions to dismiss and any other motions the

14    parties want to tee up at that point.  And at that point,

15    you know, obviously, we'll check in, discovery should be

16    significantly advanced, and I think we can talk at that

17    point about a trial date.  And my -- the date that I have

18    open -- I would do it a few weeks sooner, but I just -- I

19    have another trial the week before -- is September 20 --

20           Well, actually, before I even pick out a

21    particular day, Ms. Harris, will you remind us of the matrix

22    of other things we have to consider in terms of having

23    Mr. Donohoe, Mr. Biggs, and Mr. Nordean with us as well as

24    the possibility that we can finally get the fourth defendant

25    with us so we can try to tee all this up to have them all

```
 1    together.

 2              THE DEPUTY CLERK:  Yes, Your Honor.  So with

 3    regards to Mr. Rehl, because his appearance is the hardest,

 4    it would need to be on a Monday, Tuesday, or Wednesday

 5    which, of course, is not guaranteed which --

 6              THE COURT:  Right.

 7              THE DEPUTY CLERK:  -- day it will be until the

 8    week before.  Also --

 9              THE COURT:  Right.

10              THE DEPUTY CLERK:  -- I want to let you know,

11    because they do not do Zoom at his facility, he could appear

12    on the Zoom, but it would be by telephone.  It will not --

13              THE COURT:  Okay.

14              THE DEPUTY CLERK:  -- be by video.  So any morning

15    Monday, Tuesday, or Wednesday would probably be the best

16    option.

17              THE COURT:  All right.  Well, looking at my

18    calendar, the date that I was going to pick out was

19    September 21st -- well, let's see, yeah -- September 21st at

20    10:00 a.m.  Is that available for you, Mr. Smith?

21              MR. NICHOLAS SMITH:  Yes, Your Honor.

22              MR. DAVID SMITH:  No, no, wait.  Hang on.  Judge,

23    this is David Smith.  I'm looking at the calendar.  We --

24              You, Nick, have an oral argument in the Fourth

25    Circuit in two cases.
```

1          MR. NICHOLAS SMITH:  Your Honor, I have an oral

2     argument in the Fourth Circuit.

3          THE COURT:  All right.  All right.  So actually,

4     before we do this, Ms. Harris, is there any other -- with

5     regard to the defendants we have here -- so putting aside

6     the defendant who's not with us -- there's no other

7     limitation you know of -- again, with regard to Mr. Rehl, we

8     want to make it a Monday or Tuesday or, I think you said, a

9     Wednesday and in the morning.  Are there any other

10    restrictions with regard to Mr. Biggs, Mr. Nordean,

11    Mr. Donohoe that their facilities have that we need to

12    account for?

13         THE DEPUTY CLERK:  Yes.  So Mr. Donohoe's facility

14    also requires the morning because the afternoon is reserved

15    for other first appearance matters.

16         THE COURT:  Right.

17         THE DEPUTY CLERK:  And I would also suggest that

18    we would do it at 11:00 a.m., because Mr. Nordean is on the

19    West Coast and I believe 8:00 a.m. -- it will be 8:00

20    a.m. --

21         THE COURT:  Right.

22         THE DEPUTY CLERK:  -- their time there and I'm not

23    sure if they will do a hearing at 7:00 a.m.  I don't know

24    for sure, but just --

25         THE COURT:  All right.

```
 1              THE DEPUTY CLERK:  -- to be safe I think 11:00

 2   a.m. would be a better time.

 3              THE COURT:  Should have checked with you from the

 4   start.  11:00 a.m. does make sense.

 5              So looking at the calendar, then -- looking at my

 6   calendar and overlapping that and now hearing that, well,

 7   Mr. Smith has an argument, what about the 20th at 11:00

 8   o'clock?  It would be Monday the 20th at 11:00 o'clock.

 9              Mr. Smith, that's the day before your argument.

10              MR. NICHOLAS SMITH:  Yes.  Yes, that works, Your

11   Honor.

12              THE COURT:  All right.  Not ideal for you, I'm

13   sure, but it is what we have.

14              MR. NICHOLAS SMITH:  It's fine, Your Honor.  Thank

15   you.

16              THE COURT:  Mr. -- do we still have -- well, I'm

17   looking on the screen here.  Oh, Mr. Hull.  Mr. Hull, are

18   you available?

19              MR. HULL:  Yeah, I am.  Thanks for asking.  I was

20   somehow unconnected for 15 minutes, but now I'm back on.

21   Nice to see everybody again.

22              Let me make sure I understand one thing.  Your

23   Honor is saying, because of your trial schedule and the way

24   this all, kind of, pans out, that September 20th is the

25   absolute earliest --
```

1          THE COURT:  Well, it's not --

2          MR. HULL:  -- that you'd be able to do it?

3          THE COURT:  It's not the absolute earliest.  What

4     I'm trying to bake in here is enough time -- I -- there are

5     two trials that are on my books right now that are going to

6     chew up a lot of time in August and September before then,

7     but separate and apart from that, the parties may want to

8     tee up another -- other motions that --

9          MR. HULL:  Sure.

10         THE COURT:  -- dispositive motions.  So my thought

11    is, again, to have you all confer, agree on a briefing

12    schedule, and you can tee them all up for me at the same

13    time.  So it will allow me to hear argument on -- if there's

14    another motion or two that the parties want to hear argument

15    on, we would do it all at the same time.  So that's the

16    reasoning.

17         MR. HULL:  All right.  I understand.  I would,

18    believe it or not, like it even earlier than that, but I

19    appreciate your schedule.  Is it possible to move that --

20    make that even earlier, depending on what happens with

21    respect to the trials you have?  I don't mean to make things

22    any harder for you and Ms. Harris.  But is that possible?

23         THE COURT:  It's -- well, if one of them -- let's

24    put it this way.  We'll keep an eye out on how those trials

25    go, but also the briefing schedule the parties agree to on

 1    any -- if they do -- on additional motions, and if it's

 2    possible to bring you all in sooner we'll keep an eye on

 3    that and see if we can do it.

 4              MR. HULL:  I would really appreciate that.

 5              THE COURT:  Okay.  We'll keep --

 6              MR. HULL:  Get that on the record and we'll do

 7    that.

 8              THE COURT:  We'll keep an eye on it and see if

 9    it's possible.  Of course --

10              MR. HULL:  Otherwise, the date is okay.  It's,

11    kind of, an alternative or whatever we're calling it.  Of

12    course --

13              THE COURT:  I don't love them --

14              MR. HULL:  11:00 a.m.?

15              THE COURT:  All right.  At 11:00 a.m.  Correct.

16              Ms. Costner, same question to you.

17              MS. COSTNER:  Your Honor, I'm going to be out of

18    the country from September 11th through September --

19    returning September 21st.  So the 20th will be problematic

20    for me.

21              THE COURT:  Well, the only other day that would

22    conform to everything is not great for me -- well, we don't

23    know whether it would conform to everyone else, but I can do

24    the 22nd which, I think, again, the morning of the 22nd

25    would work for all the defendants.

```
1              MR. DAVID SMITH:  Your Honor, this is David Smith

2    again.  Nick needs to -- he's got two oral arguments --

3              MR. NICHOLAS SMITH:  David, David, David, let me

4    just -- hang on a second here.

5              So Your Honor, the session in Richmond is the 21st

6    to the -- is the 21st to the 23rd.  They haven't -- they

7    have not identified the dates this far in advance.  But,

8    Your Honor, this is a VTC hearing, Your Honor.  So I don't

9    --

10             THE COURT:  Right.

11             MR. NICHOLAS SMITH:  -- I think it's probably

12   unlikely that if Your Honor sets a status conference in --

13   this date that it's going to conflict.  I think we'll have a

14   better sense within a month --

15             THE COURT:  All right.

16             MR. NICHOLAS SMITH:  -- which date.  So I think

17   Your Honor should just go ahead and set it and --

18             THE COURT:  All right.

19             MR. NICHOLAS SMITH:  -- at that time and --

20             THE COURT:  So the 21st and the 22nd, then,

21   Mr. Smith, are, sort of, equally risky for you, but it

22   doesn't -- one or the other doesn't really matter --

23             MR. NICHOLAS SMITH:  No, Your Honor should just --

24             THE COURT:  All right.

25             MR. NICHOLAS SMITH:  -- just -- yeah.
```

```
1            MS. COSTNER:  Your Honor, can I talk for a minute?
2   I just looked at the flight schedule and actually I get in
3   the evening of the 20th, it looks like.  So assuming all
4   flights go as planned, I should be available the 21st.  I'll
5   be very jet lagged, but I can make it.
6            THE COURT:  All right.  So with all of that baked
7   in, let's try the 21st, then, at 11:00 a.m.
8            And, Mr. Jones and Mr. McCullough, are you
9   available then?
10           MR. JONES:  Yes, Your Honor.
11           THE COURT:  All right.  Without -- any defense
12   counsel, speak up if that's a bad date for you.
13           MR. DAVID SMITH:  Your Honor, again, just to --
14           MR. NICHOLAS SMITH:  David, David, David, we've
15   got -- we've nailed this down.  So we're setting it for the
16   21st and it's okay.  It's all right.  It's all right.
17           MR. DAVID SMITH:  Your Honor, that's a -- that's
18   not a Zoom hearing in Richmond.  That's a live hearing.
19   Nick is in New York.  He's down there --
20           MR. NICHOLAS SMITH:  My partner is neglecting to
21   remember that I have a laptop.  So I'll be okay, Your Honor.
22   That's --
23           THE COURT:  All right.
24           MR. NICHOLAS SMITH:  Yeah.
25           THE COURT:  All right.  Mr. Smith, obviously,
```

1    look, if -- you're going to know in a month.  And if it

2    conflicts, you'll let us know and we'll reschedule it if --

3             MR. NICHOLAS SMITH:  Thank you.

4             THE COURT:  So we'll -- you'll know well in

5    advance and we'll figure it out.

6             All right.  With that, I don't -- I think I've

7    given you homework for your report by the 26th.  I will get

8    to work on resolving your motion.  I'll expect -- I won't

9    put a time frame on it because I'll just leave that to the

10   parties, but I'll -- if there are other motions the parties

11   want me to hear on that day, I'll let the parties work out

12   an appropriate briefing schedule and propose it or disagree

13   and submit something that lays out your disagreement and

14   we'll go from there.

15            Anything further, Mr. Jones, you think I need to

16   take up today?

17            MR. JONES:  Your Honor, we'd ask that the Court

18   make a record that the Speedy Trial Act clock is tolled

19   based on the pending motions, the motion to compel discovery

20   and for bill of particulars which is still -- which is, at

21   this point, under review by the Court; the pending motion to

22   dismiss by Mr. Nordean and Mr. Biggs which are still in

23   briefing; and in addition, that the interests of justice,

24   based on the complexity of the case and the complexity of

25   the discovery which we discussed at length during this

1    hearing, weigh in favor of tolling the speedy trial clock

2    between now and our next date.

3                THE COURT:  All right.  Let me go ahead and hear

4    the positions of Mr. Smith; then Mr. Hull; then Ms. Costner

5    on those requests.

6                MR. NICHOLAS SMITH:  Your Honor, I think you and

7    -- you pointed this out initially that the Speedy Trial Act

8    will be tolled pending the motion.  So I think that's

9    correct, and I -- so our consent isn't required.

10               THE COURT:  All right.  Mr. Hull?

11               MR. HULL:  Sure.  I'm in agreement with that.

12               Before we conclude today -- I know this has been a

13   long one -- there's a couple things I want to put on the

14   record; don't need to do it now.  Thank you.

15               THE COURT:  All right.  Ms. Costner?

16               MS. COSTNER:  I agree, Your Honor.

17               THE COURT:  All right.  I am going to find --

18   well, first of all, the -- make a record that it -- at a

19   minimum, the pending motion to dismiss will toll the speedy

20   trial clock all the way until our next time which is

21   September 21st.  I don't know -- frankly, the question of

22   the -- to compel -- particulars -- I don't think -- because

23   I've heard argument now and will plan to resolve that, I

24   think -- I -- my understanding of the law is that will only

25   toll the speedy trial for another 30 days or so.  But in any

1    event, it doesn't really matter because, for those 30 days,

2    it's covered by both motions.

3          But in any event, until September 21st, with the

4    agreement of the parties, I do find that the Speedy Trial

5    Act is tolled by virtue of the pending motion to dismiss.

6    In addition, I will find that the time between today's date

7    and September 21st is excludable under the Speedy Trial Act

8    because the ends of justice that are served by taking such

9    action outweigh the best interests of the public and the

10   defendant in a speedy trial.  And, again, I'm doing so here

11   reflecting the unusual and complex nature of this case and

12   the discovery and volume of the discovery that has been

13   generated by it.  And for those reasons, in addition to the

14   pending motion, I'll exclude time because the ends of

15   justice that are served by taking such action outweigh the

16   best interests of the public and the defendant in a speedy

17   trial.

18         Other than that, Mr. Jones, anything further you

19   want to put on the record?

20         MR. JONES:  No, Your Honor.  Thank you.

21         THE COURT:  All right.  Mr. Smith?

22         MR. NICHOLAS SMITH:  No, Your Honor.  Thank you.

23         THE COURT:  Mr. Hull?

24         MR. HULL:  Yes, I do, and I think this is probably

25   the right time to do it.  Are we done with pretty much

1    everything else, Your Honor, that --

2              THE COURT:  Yes, we are, Mr. Hull.

3              MR. HULL:  Okay.

4              Well, first of all, thank you for granting my

5    motion to join this morning.  But I also want to thank you

6    for -- we are happy that Joe Biggs is in Florida as opposed

7    to D.C., and I want you to know the comments that follow

8    after that is not -- I don't want to take away from that.

9    We appreciate it.  I think that's where he needs to be.  We

10   don't want him in D.C.

11             Having said that, Joe Biggs is in Seminole County

12   Jail, as you know, as part of a 100 -- maybe, 150-person

13   inmate federal lockup which is a subset of that very big

14   jail.  About -- well, on May 21st and 22nd, there were some

15   threats to him which, I think, were documented in at least a

16   footnote to one of the briefs that we've filed in the D.C.

17   Circuit a month-and-a-half ago.  But he had to be, you know,

18   relocated from one part of the prison to the other because a

19   couple of members of a gang -- and it's a transitional kind

20   of place, sort of, a way station/transfer station; comes --

21   people come in and out, you know -- had threatened him.  So

22   he was moved and there was a lot of scuttlebutt about that.

23             And I don't mean to gild the lily, but this was

24   something that we were very concerned about and we decided

25   not to report about on June 3rd because it had subsided, but

1   there have been threats to him either because of his

2   affiliation with the Proud Boys or because of his politics

3   or just because of, you know, the way he tends to keep to

4   himself and tries to stay out of trouble, whatever it is.

5   That had subsided, but given the in-and-outs of this

6   veritable -- I don't want to say it's a bus station, but

7   people are coming in and out to be transferred for lots of

8   different types of federal -- I -- there's just, like, a new

9   crop in and I expect that to happen again.

10          About a week after that happened, I was talking

11   with Mr. Biggs on the phone and learned that an injury that

12   he's had -- finally had taken care of that was to his knee

13   -- his right knee which was exacerbated by -- it was

14   actually a knee injury that he might have gotten when he was

15   younger, but it's exacerbated by explosions in Iraq and

16   Afghanistan.  It was finally operated on in February of last

17   year over at the Daytona Beach VA.  And to make a long story

18   short, for the first time in the 16 months since this

19   happened, what we've found is that he woke up one day with

20   his knee swollen and in great pain, had some X-rays taken,

21   and apparently he needs at some point -- and I have talked

22   to Mr. McCullough about this or tipped him off.

23          Can everybody still hear me?  I'm on, sort of, a

24   -- yeah.

25          I have talked to Mr. McCullough about this a

1    little bit just to put him on notice.  The -- he was in

2    great pain and his knee was swelling up with blood.  There's

3    a prosthetic device, according to an X-ray that he finally

4    was able to get at Seminole Jail -- which is not the

5    Cleveland Clinic -- but they were able to, you know, get an

6    X-ray to him saying that he needs to have that replaced.

7           I mention this because I think it's important to

8    have a status conference in these kind of situations to

9    mention conditions of detention, you know?  We have a threat

10    to him; we have an injury that he was quite surprised that

11    would flare up in jail, but it did and it was painful and it

12    may, at some point, require, you know, something different

13    with respect to a medical procedure at the VA or something

14    like that.  It's -- I understand that they actually showed

15    that there needed to be a new prosthetic behind either his

16    ACL or LCL.  I'm not sure which it is.

17           The last thing I was going to mention and we can

18    all get out of here is that the wait for -- the -- there --

19    it's problematic and different for all of these defendants

20    to be prepared, but I -- for trial, but I've got a situation

21    and I'm -- I talk to Joe Biggs twice a day but on an

22    insecure line.  The secure line just for talking, you

23    know -- it is never with a landline, with a cell phone.  He

24    can hear me; I can't hear him.  There's two other ways --

25    Smart Mail and Securus -- to talk with him.  One of them's

1    secure, but it's just basically email.  And from talking to

2    the people in classifications over at Seminole Jail, I don't

3    really know a way possible in that setup -- and it's, I

4    guess, a medium-security state jail; sort of,

5    medium-security/light -- I don't know a way to prepare him

6    for trial -- I don't know a way to -- I mean, I find myself

7    editing discovery, and it's not really important what I

8    think a lot about the discovery.  It's important what he

9    thinks about it.  We know of no way through classifications

10   to be able to share information from discovery with him.  If

11   the Justice Department wants to work with me on that about

12   Seminole, that's fine, but right now the only way for anyone

13   to visit him is me in person and I need to bring what I have

14   with me either with a laptop or hard copies.  You can't send

15   him books; you can't send him hard copies.  Some jails,

16   apparently, have used COVID as a way to close off, you know

17   -- make everything virtual but not secure.

18           So I think without, you know, belaboring it too

19   much, you understand that there are some problems with

20   preparing people -- no matter, you know, what kind of

21   inroads we make with the Justice Department -- with these

22   places of incarceration.  Having said that, very happy he's

23   where he is and not in D.C., but I need -- I think that

24   problem needs to be on the record because it's not getting

25   any better as discovery snowballs and proliferates.

1              So thank you.

2              THE COURT:  All right.  Mr. Hull, I'll just

3      respond with a few points.

4              I think it's wise in the first instance -- while

5      you were talking, I saw Mr. McCullough nodding when you

6      said, Will the Justice Department work with me on this?  So

7      I think in the first instance, it makes sense for you to

8      approach the Government and see what can be done, whether

9      it's generalized access to Mr. Biggs or a particular problem

10     that he has -- a health problem or what or any other -- a

11     threat to him at the jail.

12             Number two, though, regardless of how things go

13     with the Government, as you, I'm sure, know, my ability to

14     order -- my ability to issue orders that affect a particular

15     federal prisoner's status is, sort of -- is limited.  And so

16     I'm open -- if you bring to my attention anything that I can

17     do lawfully to improve whatever situation you're bringing to

18     my attention, I will do it.  You know where to find me, and

19     I'm open to taking any action that you think I can take that

20     can help solve any of those problems.

21             So like I said, I think taking it up with the

22     Government in the first instance makes sense and, regardless

23     of how things go along those lines, you know where to find

24     me if you think there's something I can do.

25             MR. HULL:  Your Honor, I do appreciate your

1    comments and your concerns.  I want you to know that I have

2    not avoided the Government, but I have become very good

3    friends with people over at classifications at Seminole

4    Jail.  And while, in many respects, this is a place where

5    you can get outside messages from people virtually that you

6    know that are not confidential, with respect to any setup

7    that they have right now that I know of, unless something

8    could be instituted, it doesn't matter what the Justice

9    Department -- I, like, ask them to do.  They don't have it.

10   There's no way to take, you know, 4 or 5,000 files or 15,000

11   hours of video or, you know, what we have here -- maybe,

12   more than that -- and review this with somebody who's -- the

13   Government thinks is a major player in this case.

14            THE COURT:  Right.

15            MR. HULL:  This all occurred on, like, a half-acre

16   of land.  So anybody who gets near Joe Biggs and said, Hey,

17   I liked you on Infowars, you know, is a possible

18   co-conspirator.  There's a lot to go over with him, and

19   unless a setup can be done specially for him to prepare for

20   trial, you know, the only thing that we could really do is

21   have me go down there -- which I'm happy to do; I have

22   relatives in the area -- and stay around there or figure out

23   a way.  But this is a problem, especially when there's no

24   trial date in sight.

25            So -- and I -- again, I appreciate your comments.

1    I'll reach out to Mr. Jones and Mr. McCullough, see if we

2    can do more, but I've researched this pretty well and it's

3    not a good situation preparing anybody for trial.

4          So thank you.

5          THE COURT:  All right.  Very well.  Finally --

6          Mr. McCullough, you want to say --

7          MR. MCCULLOUGH:  Just two items for the record.

8          Mr. Hull did call about the health and safety

9    issues.  The Government responded that we were prepared to

10   do anything we could to ensure that both health and safety

11   were secured.  That was the last that I had heard of

12   anything until today.

13         With respect to the discovery issues and

14   classification of discovery being provided to the jail,

15   again, first time we're hearing this.  And, as I indicated,

16   we are very happy to work with Mr. Hull in an attempt to

17   find an accommodation.  And I understand Mr. Hull has done

18   great work so far.  So there may not -- much -- be much more

19   that can be done, but we will participate.

20         THE COURT:  All right.  Very well.

21         Finally, Ms. Costner, anything further from you?

22         MS. COSTNER:  No, Your Honor.

23         THE COURT:  All right.  Mr. Smith, was that a --

24   were you trying to signal -- Mr. Nicholas Smith, were you

25   trying to signal me?

```
 1           MR. NICHOLAS SMITH:  Oh, no, Your Honor.  Someone
 2     just walked by me.  So --
 3           THE COURT:  All right.  Very --
 4           MR. NICHOLAS SMITH:  -- I was saying --
 5           THE COURT:  Very well.
 6           MR. NICHOLAS SMITH:  -- goodbye.  But I'm saying
 7     goodbye to Your Honor, too.  So --
 8           THE COURT:  All right.  Very well.
 9           MR. HULL:  Your Honor, one other thing.
10     Mr. McCullough's right.  We did -- I did share the
11     information with him to give him a heads-up about a possible
12     -- a medical issue; however, we did not speak about the
13     threat to Mr. Biggs's person, and that's -- that will happen
14     again in this place.  It's a, you know -- it's just too much
15     activity and people know that he's there at this point --
16     Joe Biggs is there -- before they get in.  But otherwise,
17     happy to work with Mr. McCullough on that, but the --
18     preparing for trial right now is a really important issue,
19     but I do worry about, you know, somebody wanting to, you
20     know, test Joe Biggs's mettle.  I think that's going to be
21     coming up more and more.
22           THE COURT:  All right.  Again, anything that I can
23     do to alleviate that, you all know where to find me.
24           MR. MCCULLOUGH:  And, Your Honor, I apologize, but
25     just for the record, my recollection of the conversation is
```

1    we did talk about the safety issue and I understood that

2    Mr. Biggs had moved to a separate facility for that reason.

3    That's my recollection of the conversation.

4                THE COURT:  All right.  Very well.

5                Until, then, our next status/hearing on the motion

6    to dismiss, the parties are dismissed.

7                MR. JONES:  Thank you, Your Honor.

8                MR. HULL:  Thank you.

9                (Proceedings concluded at 1:12 p.m.)

10               * * * * * * * * * * * *

11        **CERTIFICATE OF OFFICIAL COURT REPORTER**

12        **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby**

13   **certify that the above and foregoing constitutes a true and**

14   **accurate transcript of my stenographic notes and is a full,**

15   **true and complete transcript of the proceedings to the best**

16   **of my ability, dated this 1st day of September 2021.**

17        **Please note:  This hearing occurred during the COVID-19**

18   **pandemic and is, therefore, subject to the technological**

19   **limitations of court reporting remotely.**

20                              **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                                **Official Court Reporter**
21                              **United States Courthouse**
                                **Room 6722**
22                              **333 Constitution Avenue, NW**
                                **Washington, DC 20001**
23

24

25