IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-3
                                          1:21-cr-00175-TJK-4
1-ETHAN NORDEAN
2-JOSEPH RANDALL BIGGS             Washington, D.C.
3-ZACHARY REHL                    Tuesday, December 14, 2021
4-CHARLES DONOHOE,                10:00 a.m.
                    Defendants.
- - - - - - - - - - - - - - - - x
_____

                    TRANSCRIPT OF STATUS CONFERENCE
             HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                    UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:   Luke M. Jones, Esq.
                         Erik M. Kenerson, Esq.
                         Jason B.A. McCullough, Esq.
                         James Pearce, Esq.
                         U.S. ATTORNEY'S OFFICE
                         555 4th Street, NW
                         Washington, DC 20530
                         (202) 252-7233

For the Defendants:      Nicholas D. Smith, Esq.
                         David B. Smith, Esq.
                         DAVID B. SMITH, PLLC
                         7 East 20th Street
                         Suite 4r
                         New York, NY 10003
                         (917) 902-3869

                         John D. Hull, IV, Esq.
                         HULL MCGUIRE PC
                         1420 N Street, NW
                         Washington, DC 20005
                         (202) 429-6520

                         Ira Knight, Esq.
                         Lisa S. Costner, Esq.
                         FEDERAL PUBLIC DEFENDERS OFFICE
                         301 North Elm Street
                         Suite 410
                         Greensboro, NC 27401
                         (336) 333-5455

```
APPEARANCES VIA VIDEOCONFERENCE CONTINUED:

For the Defendants:      Carmen D. Hernandez, Esq.
                         7166 Mink Hollow Road
                         Highland, MD 20777
                         (240) 472-3391

Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.
```

1    **P R O C E E D I N G S**

2         THE DEPUTY CLERK:  We are on the record in

3    criminal matter 21-175, United States of America v.

4    Defendant 1, Ethan Nordean; Defendant 2, Joseph R. Biggs;

5    Defendant 3, Zachary Rehl; and Defendant 4, Charles Donohoe.

6         Present for the Government are Jason McCullough,

7    Luke Jones, Erik Kenerson, and James Pearce; present for

8    Defendant 1 are David Smith and Nicholas Smith; present for

9    Defendant 2 is John Hull; present for Defendant 3 is Carmen

10   Hernandez; present for Defendant 4 are Ira Knight and Lisa

11   Costner; also present is Defendant 1, Ethan Nordean;

12   Defendant 2, Joseph Biggs; Defendant 4, Charles Donohoe; and

13   the appearance of Defendant 3, Zachary Rehl, has been waived

14   for this portion of the hearing.

15        THE COURT:  All right.  Good late morning,

16   everyone.

17        Ms. Hernandez, first, do you -- can you confirm

18   that Mr. -- that your client waives his presence here for

19   this portion of the hearing.

20        MS. HERNANDEZ:  Your Honor, we actually never got

21   to that point.  It was very short before he got removed, but

22   he was present while the Court -- at the earlier hearing

23   while the Court indicated what would happen and he did not

24   voice any objection to that, and I understand that the

25   Court's not really going to hear any evidence today at this

1    portion of the hearing.  So --

2              THE COURT:  All right.  I think --

3              MS. HERNANDEZ:  -- to the extent that I am able to

4    do so, I will waive his presence.

5              THE COURT:  All right.  And it may be that

6    you're -- as you point out, you're not really able to do

7    that, but I do think, given the nature of what I described

8    we're going to have here which is not -- I'm not receiving

9    any evidence, I'm not receiving any argument, that it's

10   appropriate to proceed even without Mr. Rehl present.

11             So I'm going to do a couple of things here today

12   and then give everyone a little bit of homework.

13             First, I'll let everyone know, I hoped to have it

14   by today, but later this week, I'll have an opinion out that

15   will deny the motion to dismiss -- or the -- I guess it's

16   motions to dismiss perhaps.  I think there's no point in me

17   spending any time talking about it now.  You all will read

18   it.  I think particularly on the 1512 issue, it was a very

19   complex motion to resolve.  And so I'll leave it at that for

20   now, but you'll have that by the end of the week.

21             That was -- and because I did resolve that, I'm

22   prepared today to rule on the various motions to reopen that

23   have been pending and which were delayed in part because of

24   that.  And so I'm going to chew up a few moments now and

25   rule on the motions to reopen and then -- and I'm going to

1    deny them.  I'll just cut to the chase.  I am denying it,

2    though, without prejudice as to the arguments that have been

3    made under 3142(i), and I'm going to ask the parties --

4    particularly the -- first, the Government, and then the

5    defendants -- to provide me more information about what

6    exactly -- from the Government -- at least on the

7    Government's side, what your plan and proposal is to make

8    sure these defendants can participate in their own defense

9    and have access to counsel and for -- and I'll ask the

10   Government -- the defendants to respond to that and to

11   explain exactly what the situation is right now with regard

12   to the -- their ability to communicate with counsel and

13   access evidence.

14        And, certainly, I'll -- I'm going to take those

15   under advisement, and if I think that the defendants are not

16   going to be able to adequately prepare for trial and consult

17   with their counsel ahead of trial, I'll take up a renewed

18   motion along 3142(i).  It's a rarely used provision.  Maybe

19   it will be applicable here.  I don't want to pre-judge that.

20   But I -- but on that score, and particularly because I know

21   the situation at least as -- on the -- in the D.C. Jail is

22   evolving in a positive way in terms of -- and I know none of

23   these defendants are detained there -- but they're having

24   great strides in making sure that defendants there have

25   access to electronic evidence and access to counsel, and it

1      may be that some of these defendants -- some of the

2      defendants in this case should be transferred here if they

3      can't -- if the -- where they are right now won't facilitate

4      that.   That's for another day, but I want to assure everyone

5      that that's an open issue in my mind, and I'm going to give

6      the parties homework to, sort of, let me know exactly what

7      -- how they think that that's going to work, and we'll come

8      back very early in January and I'll -- for me to consider

9      what the parties filed.

10                So let me just go ahead and rule on the motions

11     for reopening and then we'll talk about where we go from

12     here in a moment.

13                So previously, I ordered Defendants Nordean and

14     Biggs detained pending trial, and the Circuit affirmed that

15     decision.   That's ECF No. 107 in this case.   And similarly,

16     I ordered Defendant Rehl detained, and he did not appeal

17     that ruling.

18                I have before me Defendant Nordean's motion to

19     reopen bail proceedings -- that's ECF No. 122 -- which the

20     Government opposed and about which the parties filed various

21     responses and relevant materials at ECFs Nos. 134, 136, 139,

22     140, 144, 150, 152, 160, 166, 181, 182, 197, 206, and 217;

23     Biggs's motion to reopen, which is ECF No. 137, which the

24     Government opposed and, again, about which the parties filed

25     various responses and relevant materials at 151, 161, 169,

1    187, and 196; and Rehl's motion to reopen, ECF No. 190 and

2    191, which the Government opposed and to which the parties

3    filed various responses and relevant materials at 198, 200,

4    203, 210, 213, and 215.  I previously held hearings on the

5    motions.

6         As I mentioned earlier, I'll note especially --

7    that especially Nordean's motion has been pending far longer

8    than such a motion would have typically.  And the reason for

9    that is, as I expressed in this case before, the evidence

10   against all the defendants is overlapping and interrelated.

11   And I thought it incumbent upon me, in ruling on that

12   motion, to consider the evidence and argument that

13   Defendants Biggs and Rehl raised in their motions as well

14   and vice versa.  And in addition, while that briefing was

15   taking place, the parties took the opportunity -- or while

16   that briefing -- at some point, the -- oh -- and while that

17   briefing was taking place, the parties took the opportunity

18   to supplement the motions as discovery proceeded.  And

19   finally, defendants filed a motion to dismiss -- file --

20   defendants filed a motion to dismiss the indictment that was

21   comprehensive and, as I mentioned before, raised some

22   difficult and hard issues.  Of course, the BRA factors

23   include the nature of the circumstances -- the nature and

24   circumstances of the charged offenses.  And had I dismissed

25   the obstruction count in particular -- given the potential

1     sentence involved in that count -- I think it could have had

2     a material impact on a detention decision.  So I wanted to

3     know -- wait to know how I was going to rule to resolve that

4     motion -- that issue before ruling on these motions, and the

5     supplemental briefing I asked for on the obstruction count

6     was completed just 10 days ago.

7              So as for the legal standard, I can reconsider

8     pretrial detention at any time before trial if the judicial

9     officer finds that, quote, Information exists that was not

10    known to the movant at the time of the hearing and that has

11    a material bearing on the issue whether there are conditions

12    of release that will reasonably assure the appearance of

13    such person as required and the safety of any other person

14    and the community.  That's 18 United States Code Section

15    3142(f)(2).  In other words, the statute requires that a

16    movant provide information that is both new and material.

17    And I cite United States v. Lee, 451 F. Supp. 3d 1 at 5, a

18    D.D.C. case from 2020.  Previously, information --

19    previously available information, even if material, is not

20    grounds to reopen a detention hearing.  Again, I cite that

21    case -- the same case, Lee, at 5.  And any new information

22    is only material if it is, quote, Essential to, or capable

23    of significantly affecting, the detention decision, closed

24    quote.  That's United States v. Worrell, Case No. 21-cr-292.

25    The cite is 2021 WL 2366934 at 9, a D.D.C. case from June

1    9th, 2021.  And information is not material merely because

2    it is of the type of information that has a logical

3    connection to the detention analysis.  That is the Worrell

4    case again.

5           And, of course, as we all know, under the Bail

6    Reform Act, courts must consider the following factors in

7    determining whether some condition or combination of

8    conditions will reasonably assure community safety or the

9    defendant's appearance at trial and pretrial proceedings:

10   one, the nature and circumstances of the charged offenses;

11   the weight of the evidence against the defendant; the

12   history and characteristics of the defendant; and the nature

13   and seriousness of the danger to any person or the community

14   that would be posed by the defendant's release.  That's 18

15   United States Code Section 3142(g).

16          I'm obviously not going to reiterate the basis for

17   my original detention decisions today, although if we had

18   the time I would, because I think the only way to consider

19   the evidence and argument that the parties have proffered is

20   to view them in light of those decisions and the basis for

21   them.  I laid out the basis for those decisions in great

22   detail back in April and, as for Nordean and Biggs -- as for

23   Nordean and Biggs, and then in June for Mr. Rehl.  So I

24   incorporate my prior analysis of all the BRA factors for

25   these defendants, including the detailed findings I made on

1       each BRA factor, as if I restated them on the record here

2       today.  In the end, I weighed the factors and did find by

3       clear and convincing evidence that because of the

4       prospective danger the defendants present, that no condition

5       or combination of conditions will reasonably assure the

6       safety of any other person and the community.

7               And today, in summary, I find that the defendants

8       have presented to me some information that was not known to

9       them at the prior detention hearing.  But I'm going to deny

10      the motions because I don't think that, even considered

11      collectively, the information is material in the sense that

12      it causes me to change my analysis of any of the BRA factors

13      or how I weighed them to conclude that there -- to conclude

14      that there is a -- to conclude that there is clear and

15      convincing evidence that they should be detained.

16              So let me get to that reasoning.

17              First, Nordean, and to some extent Rehl, argues

18      that this case does not involve a crime listed in Section

19      3142(f)(1) because the first superseding indictment does not

20      make allegations sufficient to hold defendants liable for

21      the property depredation allegedly committed by Dominic

22      Pezzola.  More specifically, Nordean argues that the first

23      superseding indictment does not sufficiently allege

24      Pinkerton or aiding and abetting liability.  I respectfully

25      disagree with Mr. Nordean.  To hold defendants liable for

1    Pezzola's actions under a Pinkerton theory of liability

2    where a defendant is held liable for all substantive

3    offenses committed by his co-conspirator in furtherance of

4    the conspiracy, the first superseding indictment need not

5    charge Pezzola in the conspiracy or even specifically allege

6    that Pezzola is an unindicted co-conspirator, nor must it

7    spell out exactly how the Government will establish

8    Pinkerton liability.  And I cite United States v.

9    Washington, a D.C. Circuit case from 1997, 106 F.3d 983 at

10   1011.  It is enough that the first superseding indictment

11   alleges that the defendants were part of a conspiracy and

12   that one of the overt acts in furtherance of the conspiracy

13   was Pezzola's property deprivation [sic].  There is likewise

14   no need for the first superseding indictment to detail how

15   the defendants are liable as aiders and abettors.  And I'll

16   point the court -- point the parties to United States v.

17   Ashley, 606 F.3d 135 at 143, a D.C. Circuit [sic] case from

18   2010.  Explicitly charging the defendants with aiding and

19   abetting property deprivation [sic] is sufficient.  And

20   while Nordean also argues that there is a presentment

21   problem with these charges, at this point, I don't agree

22   either.  Defendants are specifically charged with conspiracy

23   and committing and aiding and abetting the felony property

24   deprivation -- depredation that the Government later

25   clarified was carried out by Pezzola.  I don't see why that

1    does not sufficiently show that this case involves a crime

2    listed in Section 3142(f)(1).  Of course, none of this is to

3    say that the evidence at trial will be sufficient to

4    actually hold the defendants criminally liable.  But for

5    now, this case does involve a crime under that section.

6              Nordean also presents an affidavit that he argues

7    shows he is no longer a Proud Boys leader and organizer.

8    This is ECF No. 85-1.  He is alleged both in the first

9    amended indictment -- he is alleged in the first amended

10   indictment to have been both a member of the Proud Boys

11   Elders Chapter and president of his local chapter.  The

12   affiant represents that the Elders Chapter of the Proud Boys

13   no longer engages in any activity and that as of February

14   2021, he replaced Nordean as president of his local chapter,

15   which as of then is also no longer associated with the

16   national Proud Boys organization.  And finally, the affiant

17   says that Nordean was not a part of any Proud Boys Internet

18   communications when he was on release briefly earlier this

19   year.  So to begin with, the Government points out, all this

20   information was available at the time of the original

21   detention hearing and my original detention decision.  But

22   even if it was not -- even assuming that it is new here, it

23   is not material to the defendant's characteristics or to the

24   danger that he would -- that would be posed by his release.

25   That is so because I simply would not give this affidavit

1    much, if any, weight.  Given the entire record before me,

2    including what Nordean's alleged statements and actions say

3    about his commitment to the organization and to the causes

4    that motivated his activity on January 6th, even if I

5    credited the statements in this affidavit, these are

6    voluntary and potentially temporary, after-the-fact

7    disassociations that say little about the threat Nordean

8    would pose going forward if released.  And I think one

9    person's knowledge about who in the organization Nordean was

10   or was not in communication with -- and only -- as the

11   Government points out, only via the Internet -- while

12   released is similarly immaterial.  Again, not that it's not

13   relevant and not that I don't weigh it, but under the

14   analysis here, immaterial in the sense that it doesn't alter

15   the calculus.

16            Nordean also brings to my attention videos that he

17   says show that law enforcement let him enter the Capitol.

18   See ECF No. 131.  I don't think the videos really show that.

19   And viewed -- especially viewed in their entirety, they show

20   something much closer to the Government's interpretation, at

21   least in my view: many rioters walking past what are

22   obviously outnumbered police officers.  But even if

23   Nordean's interpretation was accurate, and assuming this is

24   information he did not have at the time of his original

25   detention hearing, I -- again, it's not material.  Simply

1    put, nothing about my detention decision turned on what was

2    happening at the exact moment Nordean set foot in the

3    Capitol building.

4           In various filings, Nordean and, at one point,

5    Defendant Rehl have also tried to point to other January 6th

6    defendants who have been released pending trial, holding

7    them out as, kind of, comparators.  As all the parties

8    aware, the -- are aware, the overwhelming number of January

9    6th defendants are not detained pretrial, and the

10   overwhelming number of January 6th defendants whose cases

11   happen to be pending before me are also not detained pending

12   trial.  In any event, in my view, these purported

13   comparators are of little value, because each judge is

14   tasked with making an individualized determination regarding

15   each defendant based on a fact-intensive evaluation of the

16   BRA factors.  I don't think what other judges found in other

17   cases -- or even what I found in other cases -- says much

18   about whether these defendants, who are alleged to have

19   played a planning and leadership role related to January

20   6th, should be detained pending trial.  And in many of the

21   cases cited, the allegations are really not like the ones in

22   this case.  The Circuit in the Munchel decision said that,

23   quote, Those who actually assaulted police officers and

24   broke through doors, windows, and barricades -- which isn't

25   the defendants in this case -- and those who aided,

1    conspired with, planned, or coordinated such actions, are in

2    a different category of dangerousness than those who cheered

3    on the violence or entered the Capitol after others cleared

4    the way.  And although they're only allegations at this

5    point, that is what -- in terms of planning or coordination,

6    that is what the defendants in this case are charged with.

7            Nordean, Biggs, and Rehl also argue that in

8    weighing the BRA factors, I should consider the difficulties

9    they have had and are facing in exercising their right to

10    consult with counsel and participate in their own defense.

11    In particular, they say they cannot view the voluminous

12    electronic evidence produced to their lawyers.  And I want

13    to pause here -- and I already said a few things about this

14    before I began to rule -- but I'm going to pause here

15    because I want to say in no uncertain terms that it is

16    crucial that they be able to consult with their counsel,

17    review the evidence against them, and to participate in

18    their own defense.  And so, as we'll discuss, the next order

19    of business here is going -- for me, anyway -- is going to

20    be to make sure that they can.  I know these defendants are

21    not -- none of these defendants in this case are detained in

22    the D.C. Jail, but I have been following the progress that's

23    been made there regarding the ability of January 6th

24    defendants and, frankly, going forward, any defendant, to

25    review electronic evidence and communicate with counsel.

1    I'm not going to go into the details of that, but I think

2    there has been a lot of progress made in terms of providing

3    the ability to do that.  But in any event, the BRA does not

4    incorporate these kinds of problems as a factor, and the

5    parties haven't cited any case in which a court considered

6    them as part of the BRA factors.  So at least at this point,

7    I don't see these issues as material to the BRA factors.

8    And similarly, the health concerns that Biggs raises are not

9    material under a BRA analysis.

10           That said, as I mentioned a moment ago, Nordean

11   also cites to Section 3142(i) which provides that, quote,

12   The judicial officer may, by subsequent order, permit the

13   temporary release of the person, in the custody of a United

14   States marshal or another appropriate person, to the extent

15   that the judicial officer determines such release to be

16   necessary for the preparation of the person's defense or for

17   another compelling reason, closed quote.  And on rare

18   occasions, as Nordean points out in his motion, this

19   provision has been used to release defendants to prepare for

20   trial.  I'm -- maybe, it will be warranted here, but I

21   certainly -- I can't conclude that right now with the health

22   situation evolving, I think, in a hopeful direction and

23   given, as I mentioned, the positive direction at least at

24   the D.C. Jail in terms of the ability to let defendants

25   access this information electronically.  We have a trial

1      date in May and, as I mentioned, we're -- I'm going to ask
2      the Government to submit a filing shortly and have the
3      defendants respond to that about how they're going -- how
4      the defendants are going to adequately prepare for their own
5      defense.  I want to hear, of course, from defendants about
6      what precisely the conditions are at the moment in -- where
7      they are incarcerated.  And we'll come back and discuss this
8      issue, and if I'm not satisfied that it can reasonably
9      happen, I will certainly consider whether warrant -- release
10     under that provision is warranted.  So to the extent the
11     motion requests release under that provision, I'm going to
12     deny it without prejudice at this point.
13              Nordean also points to evidence that has been
14     produced to him since the original detention hearing that
15     bolsters his earlier argument that after January 6th, he
16     foreswore organizing and leading future Proud Boy rallies.
17     Obviously, any evidence on this point is relevant to
18     evaluating the forward-looking danger that would be posed by
19     his release.  And I've reviewed the evidence cited, and
20     while it certainly suggests that many in the organization,
21     including Nordean, considered a temporary pause on rallies,
22     it also shows Nordean in -- as late as late January saying
23     things like, We are on the brink of absolute war, vowing
24     that, quote, We can be smarter, train, plan, etcetera, but
25     we will never stop, closed quote, and talking about setting

1    up regional training every few months, ordering gear in

2    bulk, and rallying.  And I point the parties to ECF No. 84

3    at 10 through 11.  And in the end, on balance, this evidence

4    does not materially change how I evaluated and then weighed

5    the BRA factors before and in my ultimate decision to detain

6    him.  And in addition, I'll add that just according to media

7    reports, it appears that there was at least a Proud Boy

8    rally a few months ago in August in Portland, Oregon.

9              In sealed filings at ECF No. 144, 151, and 169,

10   both Nordean and Biggs bring to my attention evidence [sic]

11   that they argue is relevant to the weight of the evidence

12   against them.  They argue the information assessed --

13   suggests that defendants had no plan for January 6th or at

14   least that they didn't have the plan charged in the first

15   superseding indictment.  The information in those filings --

16   those sealed filings is also, I find, not material to my

17   detain -- decision to detain defendants, again, in the sense

18   that it does not change my assessment of the evidence

19   against them or how I weighed all the BRA factors.  In my

20   view, the source of that information that was provided was

21   not necessarily in a position to know about whatever the

22   defendants had planned for January 6th one way or the other.

23             Nordean and the Government have also sparred over

24   additional videos taken on January 6th, one taken largely

25   earlier in the day by a man named Eddie Block, and another

 1    taken of the moment when a fence was breached near the
 2    Capitol with Defendant Nordean near the front of the mob.  I
 3    point the parties to ECF Nos. 152, 160, 166, 182, and 197.
 4    I've watched those videos and I've read what the parties
 5    have represented about them.  In summary, I -- again, I
 6    don't think they're particularly revealing one way or the
 7    other.  The videos are slices -- some very short snippets;
 8    other -- the Block video, quite long, that I think it was --
 9    Defendant Rehl asked me to watch in its entirety, which I
10    did.  But they are slices of a large, complex, chaotic, and
11    what became fast-moving event involving many people.  No
12    doubt, there are portions that the defendants can't -- that
13    the defendants can, and are, pointing to that are consistent
14    with their defense, but there are also other portions the
15    Government spins as favorable to what it has alleged.  In
16    the end, I don't find them material to my detention
17    decision, again, insofar as they don't call me to -- cause
18    me to change my analysis of any BRA factor or my ultimate
19    weighing of them.
20             As I mentioned, Biggs also raised this sealed
21    material that I discussed and the problems with access to
22    his lawyer and discovery.  I've already mentioned those
23    issues.  Other than that in his motion and in one additional
24    point we'll get to, he does not raise anything else that he
25    would not have known at the time of the original hearing and

1    the detention decision.

2          In his motion, other than topics I've already

3    covered, Mr. Rehl spends a lot of time contesting the

4    strength of the evidence against him.  He notes that -- what

5    the first superseding indictment says and does -- says and

6    does not say; he quibbles with how the Government

7    characterizes certain evidence; he points out the

8    unremarkable fact that some of the evidence proffered by the

9    Government goes beyond what is alleged in the first

10    superseding indictment.  None of this is new or material.

11    He cites various video evidence, including the entire Block

12    video, which I mentioned I reviewed, and other snippets of

13    video.  And for the reasons I described above, again, for

14    those same reasons, I don't find these videos material

15    either.  Rehl also raises a series of other points that are

16    almost self-evidently immaterial: that the FBI apparently

17    executed a search warrant at another member of the

18    Philadelphia Proud Boys house in October, see ECF No. 203;

19    that certain groups were issued permits by the Capitol

20    Police that day; or that another person has taken credit for

21    organizing the Stop the Steal rally on the Ellipse, see ECF

22    No. 200.

23          Finally, Nordean and Biggs also urge me to

24    consider conditions of release that they say would

25    reasonably protect the community.  Mr. Nordean would put up

1    a bond of $1 million and a house of almost equal value.  He

2    has placed cameras around the outside of his house that he

3    says Pretrial could monitor and he consents to random,

4    warrantless searches to ensure that he will comply with any

5    conditions of release, including a potential ban on

6    electronic devices or the Internet.  His parents also pledge

7    to visit him at that location and ensure that he is

8    complying with his conditions of release.  Biggs suggests

9    similar conditions, although he didn't -- does not, I don't

10   believe, raise the issue of bond.

11            I considered, and rejected, the feasibility and

12   effectiveness of these types of conditions of release last

13   time, and these new proposals do not change my analysis.  I

14   ran through the reasons last time why I felt detention was

15   appropriate on the record.  I'm not going to run through the

16   entire list again.  I'll just say that given the allegations

17   against the defendants -- given the allegations -- that --

18   I'll just say that in response to the proposed conditions,

19   given the allegations against the defendants; given what

20   their words say about future planning and the threat they

21   would pose going forward; given their leadership and

22   organizing skills; given their remorse -- their lack of

23   remorse for the events of January 6th; given the allegations

24   that they used technologically sophisticated means to

25   communicate and organize with other Proud Boys that

1   concealed that activity from law enforcement -- that is,

2   that the communications themselves were concealed from law

3   enforcement by means of encryption at least in part and,

4   again, by use of the radios with specific channels -- I

5   don't see how the proposed conditions can reasonably assure

6   that, using means that are either high-tech or low-tech,

7   they won't pose a threat to the community by continuing

8   those efforts.

9           In Nordean's case especially, I'll reiterate one

10  point I made last time that gives me great concern about his

11  activities after January 6th and his dangerousness: that the

12  reporting of his passport being lost and especially the

13  timing of his reporting of a stolen firearm to authorities

14  and his Pretrial Services officer seem, together, to me to

15  be suspect, and to me they raise the possibility that these

16  items are stashed somewhere or are being held by an

17  associate.

18          I also acknowledge -- I acknowledge that the

19  standard I have to apply here is whether the conditions will

20  reasonably assure the safety of the community, not assure it

21  to a certainty.  No conditions could do that.

22          But the reason for my rejection of these

23  conditions is twofold.  First, I think, to some degree, they

24  still rely on me to trust that the defendants will comply.

25  And, no doubt, the proposed conditions would make it more

1    difficult for defendants to continue their activities in

2    terms of communication and leadership.  It would make -- it

3    certainly also would make the Court's ability to detect

4    those activities, if they occurred, easier.  But I don't see

5    how Pretrial can be expected to watch cameras 24 hours a

6    day.  And the reality is that technology can be used to

7    communicate with others without detection, especially here

8    when the defendants would need access to at least some

9    electronic devices to communicate with counsel and to review

10   discovery.  I don't know how the distinction between

11   different uses of those devices could be meaningfully

12   policed by Pretrial Services.  It's my understanding there's

13   no foolproof way to do that.  Now, of course, no conditions

14   of release, as I mentioned, are 100 percent.  They always

15   involve an assessment that the defendant will or will not

16   likely comply.  So that alone is not a reason to reject

17   them.

18          So my analysis turns more on the second part; that

19   I do not assess the defendants will comply with the

20   conditions and refrain from doing things that pose a danger

21   to the community, things that they are alleged to have

22   devoted so much time to doing before January 6th, for all

23   the reasons I've already expressed today and at the prior

24   hearing, in part because of the possibility they can do so

25   without detection.  Indeed, although I said before that I

1     don't think comparing cases and conditions of release has

2     much value, I'll note that I've already released one January

3     6th defendant with a simple "no Internet" connection [sic] a

4     few months ago, and he promptly violated that conviction --

5     that condition on multiple occasions within weeks, detected

6     only because Pretrial Services made a random check at his

7     house.  And the stakes in that case were far lower, given

8     that he was not an alleged organizer and leader.

9              So for all those reasons, I will deny the motions

10    to reopen.

11             As I said, I do have concerns and I do want more

12    clarity about what the conditions -- what conditions -- or

13    what the current ability of the defendants to communicate

14    with their counsel is and to review electronic evidence.

15    And so I think we've got a number of -- my thought is to

16    have the Government, in relatively short order, file

17    something that lays out for me how they think that these

18    defendants are going to be able to participate in their own

19    defense and review that information in a way that does not

20    -- that -- materially disadvantage them and allows them to

21    exercise their constitutional rights to defend themselves.

22             My thought is to have the Government file a

23    document, let's say, within a week by the 21st that will lay

24    out exactly what their plan is.  I know in at least one

25    case, as I recall, the Government had urged me to transfer

1    one of the defendants to the District of Columbia.  I don't

2    know if that's going to be something the Government renews

3    in terms of a request, but I just -- I throw that out there

4    if the Government thinks that's appropriate in -- with

5    regard to any particular defendant.  But in any event, I

6    need more information about that, and I'll have the -- first

7    of all, from the Government's perspective, I don't know who

8    to ask.  Is a week to submit that document reasonable?

9           (Brief pause.)

10          I have a lot of faces.  I just don't know who I

11   should call -- Mr. Jones?

12          MR. JONES:  Yes, Your Honor.  I'm -- I think that

13   is a reasonable amount of time.

14          THE COURT:  All right.  And I'm going to have the

15   defendants respond to that Government filing and make

16   whatever representations you all feel is appropriate --

17   whatever representations you think are appropriate about the

18   current difficulties you have and -- the current

19   difficulties your clients are facing and then, separately,

20   if the Government is proposing some sort of change to the

21   status quo, that you all will let me know why that will or

22   will not work.  I'm guessing it will be will not work, but

23   let me know.  And I would like to have that, let's say --

24   we've got the holiday in here.  Can I have that by -- giving

25   a little bit extra -- I was going to say a week, but I see

1    we have Christmas in the interim.  So is having that by the

2    30th reasonable?  Let me ask Mr. Smith.

3              MR. NICHOLAS SMITH:  Having -- sorry, Your Honor.

4    Is having a response to the Government's submission on

5    conditions reasonable by the 30th?

6              THE COURT:  Correct.  Is having a response to

7    their submission on the conditions insofar as they relate to

8    the preparation for trial?

9              MR. NICHOLAS SMITH:  Yes, Your Honor, it is, but I

10   think circumstances may overcome the dating and briefing

11   because we will be appealing.  So I think our first question

12   for the Court was when the dismissal order -- it anticipates

13   the dismissal order being entered -- I think Your Honor said

14   at the beginning of the hearing it might be entered today

15   but, maybe, next week.

16             THE COURT:  Oh, well --

17             MR. NICHOLAS SMITH:  Your Honor --

18             THE COURT:  -- you're going to --

19             MR. NICHOLAS SMITH:  -- there's going to be

20   interplay between these issues.  So -- yeah.

21             THE COURT:  No, I understand.  So Mr. Smith, the

22   -- you're going to be appealing my decision to reopen?

23             MR. NICHOLAS SMITH:  That is correct, Your Honor,

24   but Your Honor linked, throughout various ports of the --

25   parts of the hearing, the decision on bail to dismissal, I

```
1    think, explicitly, Your Honor.  So these things will be
2    linked.  So --
3              THE COURT:  Right.
4              MR. NICHOLAS SMITH:  So I think that's a necessary
5    effect of the decision.
6              THE COURT:  Sure.
7              MR. NICHOLAS SMITH:  So we -- I think our first
8    question was when the dismissal order will be entered, and
9    then I think the next question is whether a written order
10   will be entered for the bail reopening decision.
11             THE COURT:  So it -- whatever order I have to
12   enter for the bail -- I don't think it will be.  This
13   transcript will be the basis.  And so I'm denying it on the
14   record right now.  So -- or I have denied it on the record
15   right now.  So I don't believe you need any further -- and
16   if I -- maybe, I do need to enter a minute order just simply
17   denying it, but I don't think I do.  So I'm ordering it
18   denied for the reasons that I've laid out here.  So that's
19   immediately appealable.
20             MR. NICHOLAS SMITH:  And, Your Honor, on current
21   conditions, we filed a -- Nordean's counsel filed a notice,
22   I believe, a couple of days before today's hearing
23   indicating that Mr. Nordean is currently in the SHU.  I
24   haven't spoken to him since filing that notice, but I
25   believe he may still be in the SHU which is solitary
```

1    confinement.  So access to counsel, it becomes a little bit

2    more difficult in that context.  So we --

3              THE COURT:  So --

4              MR. NICHOLAS SMITH:  We can give the Court a, kind

5    of, immediate update on status --

6              THE COURT:  Well, I don't -- I want the update --

7    first of all, obviously, to be clear, I did -- I don't know

8    why and -- I don't control those conditions in which he's

9    being held, and I don't know why that's happening either.  I

10   -- let me --

11             MR. NICHOLAS SMITH:  Your Honor, it's a -- just to

12   -- as Your Honor knows, it's just a reality of being in a

13   federal prison that sometimes there are lockdowns and people

14   are placed in the SHU arbitrarily sometimes.  So --

15             THE COURT:  Right.  I understand.  And I'm not

16   commenting or endorsing it one way or another.  It just is

17   what it is.  Obviously, that's relevant.  You're going to

18   want to bring that, if he's there, to my attention with this

19   filing.

20             Let me just back up.  And so I don't need an

21   update right now about that, although I think it will be

22   relevant to what you tell me in your filing.  Your point is

23   -- so you're going to have -- you have an order to appeal,

24   if you so choose to, on detention right now.  We'll see how

25   that plays out.  I hear what you're saying.  I -- maybe,

1    these things will -- maybe, it -- that will be overtaken by

2    events if you appeal and are -- and win that appeal, but I

3    don't want to assume that.  If that happens, it happens, and

4    we'll address, you know -- obviously, we'll address that if

5    that happens.  In the meantime, I want to set an aggressive

6    schedule here to get information that I can assess with

7    regard to whether they're going to be able to -- whether all

8    the defendants are going to be able to adequately defend

9    themselves and in particular, then, to consider whether

10   release under 34 -- 3142(i) is appropriate.

11          So my question to you -- so my answer to you is

12   you have an order right now to appeal, number one, on

13   detention.

14          Number two, it -- what I said on the -- and, you

15   know, what I said about the motion to dismiss is -- which --

16   is that, before the end of the week, you will have an order

17   and an opinion on that.  And so that will -- that process

18   will play out.  You will do that.  But I want to have -- I

19   need to have information on what the Government's plan is to

20   make sure that your clients can defend themselves, and I

21   want you to be able to respond.  So however you proceed on

22   appeal, you will proceed, but my thought is to have that due

23   to me on the 30th.  Do you have any objection to that,

24   Mr. Smith?

25          MR. NICHOLAS SMITH:  No, Your Honor.

1          THE COURT:  All right.  Any other defendant think

2     that's not enough time?  I know we have the holidays here,

3     but I'm trying to --

4          MR. HULL:  (Indicating.)

5          THE COURT:  Mr. Hull, is that -- are you raising

6     your hand?  I just see a hand --

7          MR. HULL:  I actually did.  I was trying to be --

8          THE COURT:  I'm sorry.  I had never seen that

9     before and I just noticed it.

10          MR. HULL:  You know what?  I -- well, it worked.

11          I would think those days would be fine, the 21st

12     and the 30th.  I would like some clarification -- and that's

13     why I raised my hand -- about the --

14          THE COURT:  Okay.

15          MR. HULL:  -- (inaudible) -- that's begun on the

16     21st, and I -- it's a simple question.  It seems to me we're

17     looking at three scenarios here: the defendants stay where

18     they are and prepare for trial; the defendants are released

19     under 3142(i) temporarily for a relatively long time to

20     prepare for trial; and the third is that they'd be

21     transferred to the D.C. Jail.  Am I reading that the right

22     way or is that something that the Government can raise

23     itself?  It seems to me those are the three scenarios that

24     we are looking at at this point in terms of preparing for

25     trial.  Is that right?

1          THE COURT:  I guess I think that -- I'm sure

2     Mr. Smith would add, as a practical matter, you also might

3     be -- you also might win the day on appeal, in theory.  So

4     there's that avenue, as well.  But yes, putting that aside,

5     I think you are right.  I think you are right.  And I don't

6     want to, you know -- my point is to put the burden here on

7     the Government to come forward and say, what is your plan

8     for each defendant to make sure they're going to be able to

9     access this evidence in a timely way and that they're going

10    to be able to meaningfully participate in their defense?  I

11    don't know what they will come back and say as far as,

12    Judge, we think they should be transferred here or there,

13    you know -- transferred to D.C. or not.  So it seems to me,

14    Mr. Hull, just putting the ball in their court to come back

15    and say, Here's what we propose, and then to have you all

16    that -- respond to that and say, Here's why that won't work.

17    We think it's good for this reason, but it's not going to

18    work for that reason, or respond however you would like.

19          MR. HULL:  I understand.  And thank you for your

20    answer.  And I do not share, by the way -- and I'll just

21    raise it now; I'm sure this will come up -- the optimism

22    about the ability of the D.C. Jail to accommodate people for

23    purposes of trial preparation.  I don't share that at all

24    based on research and, you know, other --

25          THE COURT:  Well, to be clear, I'm not saying I'm

```
 1    -- I don't want to go too far in what I said before, but I
 2    know that a lot of work is being done along those lines, but
 3    I -- your skepticism is fair.
 4              MR. HULL:  No, and I know there was some opining
 5    about that in one of your colleagues' recent hearings and --
 6    but it sounded to me like it just got -- it went from
 7    terrible to a little bit better.
 8              One other thing before we --
 9              THE COURT:  Well, Mr. Hull, let me just make one
10    point on that.  The condition -- as I understand it, the
11    conditions that came out of one of those hearings had to do
12    also with just the conditions that -- in which people were
13    kept; didn't have anything to do with, you know, access to
14    counsel or any of these other issues, and that that was
15    largely a part of the jail where January 6th defendants were
16    not being kept.  So I'm not -- I don't -- I just don't want
17    to confuse the two issues.
18              MR. HULL:  And I understand that.
19              THE COURT:  Anyway, but go ahead.
20              MR. HULL:  No, I understand that perfectly, Your
21    Honor, and I am not talking about conditions at the jail or
22    --
23              THE COURT:  Right.
24              MR. HULL:  -- you know -- I'm talking about
25    laptops, the ability to use the laptops, the ability to talk
```

1    with counsel, those sorts of things.  Only trial

2    preparation, not that the D.C. Jail is a bad place.  Just

3    trial preparation.

4            The other thing I would add -- just bring up, not

5    to muddy the waters, but -- and I may disagree with

6    Mr. Smith on this -- I don't see -- if there was an appeal

7    by Mr. Smith or by me or by both of us, I don't see that as

8    taking the 3142(i) issue away from you myself.  I think we

9    can do those contemporaneously.  If --

10           THE COURT:  Oh, yeah.  I see -- huh.  I see the

11   technical issue that you're raising here.  Yeah.  I -- huh.

12   I --

13           MR. HULL:  I think it might make sense to do it

14   that way, but -- I'm just thinking out loud, to be honest,

15   but I think they're separate issues, and I think we can go

16   down both paths and --

17           THE COURT:  Right.  I don't -- look, I guess it

18   was an unspoken assumption of mine.  The motions that were,

19   you know -- the motions that were before me were really to

20   reopen the detention proceeding and to analyze the BRA

21   factors.  I, you know -- as far -- well, I said -- I mean, I

22   think the ruling speaks for itself that I denied it with

23   regard to the BRA factors, but as to 3142(i), I denied it

24   without prejudice because I need to know what the -- more

25   information on this -- these aspects of it.  So Mr. Hull, I

1    don't see that as -- at the moment, as tying my hands to

2    release them under that provision either.  I suppose that's

3    a legal issue that we'll cross, and if I -- if we get to the

4    point where I feel like that's the way to go, you know, we

5    can cross that bridge -- there would be ways, I suppose, for

6    you to pull your appeal down and thus giving me jurisdiction

7    back to do that if folks thought that was an issue, but I

8    think that's something we can deal with in due course if we

9    get to that point.

10                MR. HULL:  I understand.  I think --

11                THE COURT:  That's my reaction.

12                MR. HULL:  -- (inaudible) -- decide that one

13   separately, notwithstanding appeals that would be filed.

14   So --

15                THE COURT:  All right.

16                MR. NICHOLAS SMITH:  (Indicating.)

17                THE COURT:  All right.  Mr. Smith, I see you have

18   a -- I don't know whether you have a hand raised icon or

19   that you just have it up because you hit it accidentally.

20                MR. NICHOLAS SMITH:  Judge, I will -- I do have a

21   comment.  So I'll take advantage of the hand icon.

22                But not to be too particular about this, but for

23   purposes of FRAP 9, we would just like to make sure we

24   understand the Court's ruling in two very narrow respects.

25                The Court indicated that the cameras that had been

1    placed around Mr. Nordean's home could not be viewed 24

2    hours a day and 7 days a week by Pretrial Services because

3    of their working hours.  Does the Court find that the

4    possibility of being viewed by those cameras, which are on

5    all of the time, does not serve a deterrence purpose?

6              THE COURT:  Is that your only question, Mr. --

7              MR. NICHOLAS SMITH:  That's -- we're trying to

8    understand just the nature of the -- so as the Court knows,

9    FRAP 9 requires the Court to state its reasons --

10             THE COURT:  Right.

11             MR. NICHOLAS SMITH:  -- in rejecting -- so the

12   question for the Court -- the Court made a finding that

13   cameras around the home cannot be viewed by Pretrial

14   Services 24 hours a day because Pretrial Services has other

15   work.  They need to sleep and eat.  The question for the

16   Court is whether the possibility of being viewed by the

17   cameras from the perspective of the defendant does not

18   create deterrence.

19             THE COURT:  I think inherent in my ruling was that

20   I don't think it provides -- that the entire package that

21   was provided does not provide sufficient deterrence.

22             MR. NICHOLAS SMITH:  I guess --

23             THE COURT:  Do you have --

24             MR. NICHOLAS SMITH:  I guess, Your Honor --

25             THE COURT:  Do you --

1        MR. NICHOLAS SMITH:  I --

2        THE COURT:  Any other question, Mr. Smith, before

3   I move on?

4        MR. NICHOLAS SMITH:  Yes, sir.  The Court noted

5   that the -- that it was considering dangerousness and it

6   deemed the danger -- the Court was referring to the danger

7   of releasing Mr. Nordean, but we would like to just get the

8   reason -- the specific danger that the Court is

9   contemplating.  Was it the participation in a future rally

10  that was the danger or could the -- can the Court state the

11  reason for the -- what the danger is.

12       THE COURT:  I think I'd refer you to the original

13  ruling that I made in which the danger was -- I mean, all

14  I'm doing is denying a motion here, but I think I spoke at

15  length about the danger during the last ruling, and I would

16  just cite you back to that.

17       Let me ask the -- let me turn to the Government,

18  then.  I'm going to ask for your response to the -- I'll

19  give you the, sort of, reply, if you will, to what the

20  defense files on the 6th.  Mr. Jones, is that acceptable --

21       MR. JONES:  That's fine.

22       THE COURT:  -- wherever you are?

23       MR. JONES:  That's fine, Your Honor.

24       THE COURT:  All right.  And what I'd like to do,

25  then, is -- we've been doing these on Tuesdays because of

1    the possibility that we'll have all the defendants together.

2              Ms. Harris, can you see whether the 11th in the

3    morning is available at 10:00 o'clock.

4              THE DEPUTY CLERK:  It's available --

5              THE COURT:  I know --

6              THE DEPUTY CLERK:  -- on the Court's schedule.  I

7    don't -- I won't know about each individual facility until I

8    reach out.

9              THE COURT:  All right.  Well, that's -- it's the

10   same problem we've always had.

11             THE DEPUTY CLERK:  Correct.

12             THE COURT:  Is that -- let me -- given the sheer

13   volume of counsel here, let me just ask, if I wanted to have

14   a hearing on the 11th at 10:00 a.m. in the hopes that we

15   would have all of the defendants present to talk about the

16   Government's plan to make sure that these defendants have

17   access to the evidence and access to counsel and can defend

18   themself adequately at trial, are -- is the Government

19   available the 11th at 10:00 o'clock?

20             MR. JONES:  Yes, Your Honor.  The Government's

21   available.

22             THE COURT:  All right.  Is any defense counsel

23   unavailable?

24             (Brief pause.)

25             MR. NICHOLAS SMITH:  No, Your Honor, not --

1          THE COURT:  All right.

2          MR. NICHOLAS SMITH:  -- Mr. Nordean's counsel.

3          THE COURT:  All right.  Hearing none -- hearing no

4     objection, then, we will endeavor to set it for 10:00

5     o'clock on the 11th and we'll go from there as far as that

6     is concerned and I'll hear from the parties about how the

7     Government's going to ensure that these defendants can do --

8     can exercise their -- those constitutional rights.

9          Apart from that, Ms. Hernandez, you are new to the

10    case.  Welcome.

11         MS. HERNANDEZ:  Yes, sir.

12         THE COURT:  Obviously, I think also, by that time

13    -- as I mentioned, there are -- I know there are outstanding

14    motions that your predecessor counsel filed.  If -- I'll at

15    least, at that point -- and I -- as I said this to you

16    before, the prior proceeding, I'll -- I'm going to give you

17    and the Government an opportunity to, sort of, see what --

18    see if those motions are still operative and we can be

19    prepared to talk about those if they are still outstanding

20    on the 11th or whatever the status there is.

21         Let me also mention to all counsel just so you are

22    all aware, I had an earlier portion of today's proceeding --

23    we proceeded under seal out of an abundance of caution that

24    I thought there would be matters that would be discussed

25    under -- that -- at that hearing that would need to be under

1    seal.  As it turned out, those matters were not discussed.

2    And so the -- a transcript of that proceeding will be

3    available for counsel if they would like to order it and see

4    what happened, but the long and short of what happened is

5    that Ms. Hernandez is now representing Mr. Rehl.

6              Is there anything further the Government thinks

7    that I should address here today?

8              MR. JONES:  Your Honor, we -- the Government would

9    request that the Speedy Trial Act be tolled until the next

10   hearing in the interests of justice for the reasons the

11   Court has stated in previous hearings in addition to any

12   automatic tolling by pending motions that have not yet been

13   resolved.

14             THE COURT:  Well, I think that the motions that

15   have been filed by Mr. Rehl at least -- I haven't gone back

16   and looked and see -- do toll the Speedy Trial Act.  I mean,

17   I -- and I do know -- I will say -- I guess the other point

18   to make is that -- and actually, this -- let me also say

19   this.  I said this before and I'll say it again.  I know the

20   court's -- we have a trial date in May right now.  I didn't,

21   you know -- I -- as I -- the colloquy I had with Mr. Smith

22   the last time we were together, that did not play a role in

23   -- I mean, I think -- I have not assumed that we'll be able

24   to make that happen sooner.  But that being said, I know the

25   court's -- the procedures in place to safeguard parties and

1    counsel, given the public health situation, is evolving.

2    And I think it has evolved to the point, my understanding,

3    that the ceremonial courtroom still will be required for a

4    trial like this one where we have four defendants, but it

5    will not be required for every single trial that the

6    courthouse -- for -- at least for voir dire for every single

7    trial that this courthouse hosts.

8              This is a long-winded way of saying it's possible

9    that I might be able to -- we may be able to dislodge an

10   earlier trial date.  I don't know that's the case, but it

11   seems to me, given the reasons why, in part, speedy trial

12   has been excluded because of the public health situation,

13   that if that's possible, it's incumbent upon me to try to

14   have the trial sooner.  So that's another thing that we can

15   discuss when we're next here and I'll be able to look at

16   that -- sort of, the master trial calendar the court has,

17   consult with the parties at that hearing to see if it's

18   possible to move it up.  I think -- the Government may know

19   this better than I do -- Judge Mehta has the courtroom for a

20   large chunk of time right before we do.  So it may not be

21   possible.  And I know we're reserving quite a bit of time.

22   I think five or six weeks, as I recall.  So it may not -- we

23   may not have such a long -- there may not be the opportunity

24   to do that, but if there is, it's something we should

25   explore.

1           What are the --

2           MS. HERNANDEZ:  I'm sorry, Your Honor.  This is

3    Carmen Hernandez.  Coming into the case right now, I'm not

4    sure that I would be able to be prepared for trial at an

5    earlier date, one; and, two, Mr. Rehl told me that he has

6    yet to see a single piece of discovery.

7           THE COURT:  Well, that's, I guess, one reason to

8    -- one -- another thing to provide me -- that -- well, that

9    doesn't answer the question of whether it would have been

10   technologically possible.  It just suggests that -- well,

11   let's put it this way.  I'm glad you're on the case,

12   Ms. Hernandez.  As we go forward, that's exactly the kind of

13   thing, though, if it's technologically not possible for him

14   to do that, that we're going to have to make sure is

15   alleviated, but I take your point about the trial and we'll

16   cross that bridge when we come to it.

17          MS. HERNANDEZ:  Okay.

18          THE COURT:  What's -- let me just hear from each

19   defendant's counsel, as far as speedy trial between now and

20   when we come back on the 11th, what your view is in terms of

21   whether it should be excluded for -- in the interests of

22   justice in addition to the -- whatever tolling is available

23   simply because there are motions pending.

24          It seems to me, Ms. Hernandez, given your

25   situation, I would assume just simply for you to get up to

1    speed, that amount of time would have to be excluded under

2    speedy trial.  I'll -- I guess I'll start with you.  What's

3    your view on that, Ms. Hernandez?

4           MS. HERNANDEZ:  I believe that just even a new

5    attorney entering the case would almost automatically toll

6    the speedy trial.  I don't like to waive speedy trial.  I

7    think the Court has enough information to make findings on

8    the record, but I agree with the Court's assessment.

9           THE COURT:  All right.  Any -- Mr. Smith, do you

10   want to address this for Mr. Nordean.

11          MR. NICHOLAS SMITH:  Your Honor, we take the

12   position that because there are pending motions, the

13   question of defendant consent is not relevant to the issue

14   of the Speedy Trial Act at this moment.

15          THE COURT:  All right.  Mr. Hull?

16          MR. HULL:  No objection to excluding the time.

17          THE COURT:  And, Mr. -- Ms. Costner or Mr. Knight?

18   Sorry.

19          MS. COSTNER:  Your Honor, no objection.

20          THE COURT:  All right.

21          Well, I mean, I think, given the public health

22   situation and that we do know that -- for all the reasons

23   I've mentioned in this case before at various times

24   regarding the public health situation, number one; number

25   two, the voluminous discovery that, again, there's a long

1    record of in this case; and, number three, Ms. Hernandez's

2    recent entry into the case to represent Mr. Rehl; and the

3    lack of any objection from any defendant, I will go ahead

4    and find that the time between today's date and January 11th

5    is excludable under the Speedy Trial Act because the ends of

6    justice that are served by taking such action outweigh the

7    best interests of the public and the defendant in a speedy

8    trial.  And, as I've mentioned here, I'm doing so to give

9    Ms. Hernandez the opportunity to receive discovery, review

10   it, talk to her client, generally get up to speed on the

11   case.  That's number one.  And, number two, I'm doing it

12   because of the voluminous discovery in the case generally

13   that, again, there's an extensive record of in the case.

14   And, number three, I'm doing it for all the reasons that

15   have been laid out in a series of standing orders by Chief

16   Judge Howell whose findings I incorporate here today that

17   reflect the difficulties in proceeding to trial, especially

18   in a multi-defendant case such as this one, for the public

19   health reasons laid out in those orders.

20             All right.  Anything else further from the

21   Government?

22             MR. JONES:  No, Your Honor.  Thank you.

23             THE COURT:  Anything else further from any

24   defendant?

25             MR. DAVID SMITH:  Your Honor, David Smith here.  I

1    have two requests.  One, that we be able to order the

2    transcript of your decision on the bail on an expedited

3    basis, because it's rather long and technical and we really

4    do need a transcript.

5            THE COURT:  I don't know what my -- what I can or

6    can't do as far as -- I mean, I -- let me put it this way.

7    You will have no -- the -- anything I am empowered to do to

8    get you that transcript as quickly as possible, you will

9    have.  I don't know what exactly that is, but I won't be the

10   barrier.  I'll put it that way.

11           MR. DAVID SMITH:  Thank you, Your Honor.

12           And I have another related request; that you do

13   have power over both of these requests.  You -- this -- Your

14   Honor is well aware of how much time we've already spent on

15   this case.  And I think it's time to file an interim voucher

16   under CJA.  Will -- and I imagine the other lawyers in this

17   case, except perhaps Ms. Hernandez who just entered, would

18   possibly want to do the same.  Maybe we do that.

19           THE COURT:  You won't -- I mean, let me put it

20   this way.  You've alerted me to the fact that one may be

21   coming, and when it comes, it will be addressed very

22   promptly.  I'll put it that way.  So you won't have -- I do

23   have to approve those, absolutely, and I guess, technically,

24   I do approve the transcripts, but the point is they won't

25   sit.  You will get it -- you will get action as soon as they

1    come in.

2         MR. DAVID SMITH:  Thank you, Your Honor.  Thank

3    you.

4         THE COURT:  Absolutely.

5         MR. NICHOLAS SMITH:  Your Honor, one last point

6    just to piggyback on what Mr. Smith just said.

7         Your Honor noted that Mr. Nordean would need

8    technology to speak to counsel and review discovery if his

9    motion had been granted, but, Your Honor, I just -- we would

10   just like to make clear for the record that we were

11   proposing using a landline telephone and that the video

12   cameras don't need computer technology in the home to

13   operate them and that we were proposing sending documents by

14   mail and FedEx to the defendant to review.  That was our

15   proposal, but -- we understand Your Honor's not going to

16   change its mind, but that was our -- that was the offer that

17   we had made.

18        THE COURT:  The offer was that he have no

19   electronic -- no electronics whatsoever?

20        MR. NICHOLAS SMITH:  No electronics whatsoever,

21   Your Honor, and the only electronic device that was going to

22   be in the home was an Ethernet box that allows -- just the

23   box that allows the cameras to be connected to the Internet

24   so that the footage can be piped to the Pretrial Services.

25   It would be no cell phones, no electronics, no computers

1  whatsoever, Your Honor.  So we're talking, you know, really

2  nothing but --

3           THE COURT:  Even so, I think I made clear that my

4  concern was whether by electronic means or -- whether by

5  high-tech or low-tech means there would be ways of evading

6  these conditions as there are all conditions.  So I take

7  your point that, maybe --

8           MR. NICHOLAS SMITH:  Well, Your Honor, we just

9  want to be clear that it was every entrance to the dwelling

10  that's covered by video cameras, Your Honor.  So I -- so if

11  Your Honor's --

12           THE COURT:  Mr. --

13           MR. NICHOLAS SMITH:  -- willing to make a factual

14  finding on how that's evaded, we would be grateful, but if

15  Your Honor is disinclined to do that, then --

16           THE COURT:  I'm not inclined to add to my ruling.

17  Correct.

18           MR. NICHOLAS SMITH:  Okay.  Thank you, Your Honor.

19           THE COURT:  All right.  Anything further from any

20  defense counsel?

21           (Brief pause.)

22           All right.  Very well.  We'll see everyone on

23  January 11th.  Until then, the parties are dismissed.

24           MR. DAVID SMITH:  Thank you.

25           MR. JONES:  Thank you, Your Honor.

1          (Proceedings concluded at 12:17 p.m.)

2                    * * * * * * * * * * * *

3              CERTIFICATE OF OFFICIAL COURT REPORTER

4          I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby

5     certify that the above and foregoing constitutes a true and

6     accurate transcript of my stenographic notes and is a full,

7     true and complete transcript of the proceedings to the best

8     of my ability, dated this 17th day of December 2021.

9          Please note:  This hearing occurred during the COVID-19

10    pandemic and is, therefore, subject to the technological

11    limitations of court reporting remotely.

12                          /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                            Official Court Reporter
13                          United States Courthouse
                            Room 6722
14                          333 Constitution Avenue, NW
                            Washington, DC 20001

15

16

17

18

19

20

21

22

23

24

25