```
              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-2
                                          1:21-cr-00175-TJK-3
v.                                        1:21-cr-00175-TJK-4

2-JOSEPH RANDALL BIGGS             Washington, D.C.
3-ZACHARY REHL                     Tuesday, February 8, 2022
4-CHARLES DONOHOE,                 10:00 a.m.
                  Defendants.
- - - - - - - - - - - - - - - - x
```

---

```
              TRANSCRIPT OF STATUS CONFERENCE
      HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
```

---

```
APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Luke M. Jones, Esq.
                          Jason B.A. McCullough, Esq.
                          Erik M. Kenerson, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

                          Carmen D. Hernandez, Esq.
                          7166 Mink Hollow Road
                          Highland, MD 20777
                          (240) 472-3391

                          Lisa S. Costner, Esq.
                          Ira Knight, Esq.
                          FEDERAL PUBLIC DEFENDERS OFFICE
                          301 North Elm Street
                          Suite 410
                          Greensboro, NC 27401
                          (336) 333-5455

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
```

1          **P R O C E E D I N G S**

2                THE DEPUTY CLERK:  We are on the record in

3     Criminal Matter 21-175, United States of America v.

4     Defendant 2, Joseph Biggs; Defendant 3, Zachary Rehl; and

5     Defendant 4, Charles Donohoe.

6                Present for the Government are Jason McCullough,

7     Luke Jones, and Erik Kenerson; present for Defendant 2 is

8     John Hull; present for Defendant 3 is Carmen Hernandez;

9     present for Defendant 4 is Ira Knight and Lisa Costner; also

10    present are Defendants 2, Mr. Biggs; Defendant 3, Mr. Rehl;

11    and Defendant 4, Mr. Donohoe.

12                THE COURT:  All right.  Well, good morning to

13    everyone.

14                We are -- for just -- for scheduling reasons,

15    we're without one of our co-defendants right now, and

16    Mr. Nordean -- I scheduled his status to begin at 11:00,

17    again, just because I suppose the facility where he is

18    wouldn't make him available at the present.

19                So let me turn it over -- we've, sort of,

20    scheduled today, I think, as a status and a check-in to see

21    where things are.  I know Mr. Nordean has two motions

22    pending, one of which, I may attempt to -- well, one of

23    which, I'll hear him for oral argument on when I have him

24    here at 11:00; and another we may try to address, as well.

25    So I don't think -- I did see, Ms. Hernandez, you filed

1       something today, sort of, joining that motion, but that

2       caveat aside, I don't think I have anything ripe from any

3       defendant who is before me at the present.

4              So why don't I just have the Government report --

5       and I have noticed on the docket the -- all the discovery

6       developments that have taken place since we've been here the

7       last time.  So why don't I have whoever wants to address

8       where that is for the Government, and then I'll hear from

9       each defense counsel if there's any issues you want to raise

10      with me at the present.

11             MR. JONES:  Good morning, Your Honor.  Luke Jones

12      for the United States.

13             Starting with the discovery update, as Your Honor

14      mentioned, we filed our recent discovery correspondence and

15      those productions continue apace.  We're continuing to make,

16      you know, discovery productions on a rolling basis,

17      case-specific discovery, so to speak, which includes

18      materials from each of the defendants' FBI case files; also

19      includes materials obtained from devices and accounts

20      pursuant to search warrants.  And we've produced, as we've

21      represented before, unscoped versions of devices and

22      accounts to each of the defendants and we continue to make

23      productions of scoped material as that becomes available.

24      As it has before and continues to do, the Government has

25      made several productions of discovery materials that were

1    produced in other cases that may be relevant to these

2    defendants.  In those instances, the Government has produced

3    not only the material from those other cases, but also the

4    underlying discovery correspondence to facilitate their

5    review by counsel.

6         With respect to that cross-discovery, you know,

7    that matter overlaps somewhat with the office-wide discovery

8    which I'll get to, but, you know, just for Your Honor's

9    awareness and the parties' awareness, what we're endeavoring

10   to do is make as fulsome a production as we can on a rolling

11   basis and as quickly as we can to, you know, meet our

12   discovery obligations and give the defendants everything

13   they may wish to review in advance of trial, you know?  Not

14   every defendant at the Capitol is going to be particularly

15   relevant to this case and perhaps not even every Proud Boy

16   who was present at the Capitol, but, you know, we're seeking

17   to err on the side of producing as much as we can, focusing

18   as best we can on what's most likely to be relevant.

19        I do have some updates, sort of, on the

20   office-wide front, but -- and I'll make those

21   representations now, say up front that I expect the office

22   is going to be making an office-wide filing in this and

23   other cases by tomorrow, I believe, which will more fully

24   lay out where things stand, but I do have some

25   representations to make with respect to the office-wide

1    effort and, you know, we've made this point before, but I
2    think it bears repeating that, you know, the events of
3    January 6th were historic not only because it was the first
4    time we had American citizens attacking the Capitol, but
5    also the amount of physical and digital evidence seized
6    under this investigation is unprecedented and the
7    Government, with a significant discovery team and the
8    significant team from the FBI, have taken extraordinary
9    steps to gather and to categorize and to make searchable
10   this evidence so it's usable, obviously, not merely by the
11   Government but, importantly, by the defense.
12            So the two main, sort of, prongs of this, as the
13   Court knows, are the Evidence.com instance and the
14   Relativity database.
15            So for -- starting with the Evidence.com, since
16   October of 2021, the Government has made available over
17   24,000 files consisting of Capitol Police surveillance and
18   body-worn camera from multiple agencies and the Secret
19   Service, and that has been made available to the defense in
20   that Evidence.com instance.  For context, these, you know --
21   these files, you know, end to end, would take over 100 days
22   to review that video and, you know, an issue I know Mr. Hull
23   has raised in terms of the volume of video at issue in the
24   case.  What I think is important to note is that the
25   Government has provided multiple analytic tools to assist

1    the defense in locating footage they may consider relevant

2    and those, you know -- development of those tools continues

3    as we move forward.  With respect to the Relativity database

4    -- and I should note just with respect to the D.C. Jail and

5    availability of Evidence.com to inmates, we've provided

6    inmates housed at the Department of Corrections access to

7    the materials on Evidence.com through a separate instance of

8    the database which is available on their DOC-issued laptops

9    -- their tablets, rather.  The -- on -- yeah, and that was

10   made available on February 4th.

11          On the Relativity side, since January 21st, legal

12   defense teams have been able to access the FPD's Relativity

13   workspace that currently contains the 10 -- first 10 global

14   discovery productions which comprise the materials that the

15   Government believes may be most relevant to the preparation

16   of any defendant's case.  And although this team -- this

17   discovery team at the Department of Justice and the FBI have

18   worked tirelessly, there's, frankly, still much to be

19   accomplished particularly with respect to the Relativity

20   database.  In November, you may recall the Government had

21   projected that by the end of January, the Government would

22   provide the discoverable portions of several hundred

23   thousand FBI records.  The team is using a completely novel

24   process to identify and extract data from FBI systems.

25   There have been, admittedly, technical delays and

1    malfunctions that have now been resolved.  There was also

2    delays caused by COVID quarantines of government

3    officials/personnel and, as a result, this process, as

4    anticipated in October, has taken longer than originally

5    anticipated.  As of yesterday, the 7th, the existing FBI

6    materials were delivered to the contractor, Deloitte.  Once

7    they are uploaded into Relativity, we anticipate it will

8    take some time to create standard views, layouts, and coding

9    panes to optimize review of the documents.  Once those

10    materials are ready for human review, we've already secured

11    staffing resources to review, redact, and quality check

12    those productions to the defendants' database.

13           So the, sort of, upshot of this is that, you know,

14    the effort to provide access to the full range of

15    potentially discoverable materials to counsel which is, you

16    know -- as we continue to stress, because we think it's

17    important -- is historic, it's not without challenges.  And

18    we understand that certain defendants may wish to forego

19    access to those databases in an effort to get to trial, you

20    know?  We think, given the -- given what will be available

21    through these databases, we think it's -- would be unwise to

22    forego access to those databases, but -- and we're

23    nonetheless, you know, preparing a robust plan to

24    accommodate requests to go forward without those databases

25    being fully populated and available and may -- we -- the

1    office expects that we'll be able to do that in discrete

2    cases.  I, you know -- in complex cases, frankly, such as

3    this one, we think it would be difficult to provide defense

4    counsel the full range of materials that they may view as

5    relevant to the preparation of their defense short of more

6    fully populating the database we are using to provide the

7    global discovery.  And so we want to make sure we note that

8    for counsel and for the Court.  And, as I mentioned at the

9    beginning, we anticipate a more comprehensive filing by our

10   discovery coordinator, Emily Miller, tomorrow on the 9th.

11           That is the discovery update.  And, as I -- as

12   Your Honor knows, in terms of the specific discovery to this

13   case, our -- we provided the correspondence on the docket

14   and we've been making continued productions which we

15   understand defense has been able to access.

16           THE COURT:  All right.  Mr. Jones, can I ask one

17   -- and so I -- so that's a good summary, and I certainly

18   will look forward to reading the broader office-wide update

19   to see where things stand.

20           The other thing I wanted to -- I was surprised

21   this morning to see that Mr. Biggs and Mr. Nordean are --

22   have not been brought to the District of Columbia, and for

23   all the reasons I laid out in that order, I thought that

24   would be -- and I understand the counterarguments -- but

25   that would facilitate, in some ways, their ability to

1    prepare.  And I realize you're not the Marshals Service.

2    And had I known they hadn't been moved, I, frankly, would

3    have ordered a representative of the marshals here.  But do

4    you have -- I mean, do you have any idea why that is the

5    case and what was confusing about ordering them here

6    forthwith two-and-a-half weeks ago?

7                MR. JONES:  What I can say, Your Honor, is that I,

8    you know -- after Your Honor's order, we did -- our office

9    did reach out to the Marshals Service through a supervisor,

10   you know, to make sure that they were aware of it and

11   they've had -- our office has had multiple follow-up

12   conversations with the supervisory Deputy U.S. Marshal for

13   D.C.  The Government -- the latest information provided by

14   the Marshals Service as of, I think, as early as this

15   morning was that the next transport from Florida, where

16   Mr. Biggs is, is scheduled for February 23rd and we expect

17   he'll be transported then, but we do not know yet the

18   potential date for Mr. Nordean's transport, but, obviously,

19   we'll -- we can communicate that information to the Court

20   when we have it.  At -- as Your Honor indicated, the

21   Government does not control when and how the U.S. Marshals

22   Service transports and houses detainees and -- but can

23   report that, you know, the Marshals Service is aware of the

24   Court's order and we --

25                THE COURT:  I mean, that's just not -- I mean, I

1  know you're not in control of that.  I understand,

2  Mr. Jones.  But when -- especially when we all know that may

3  take a little bit of time -- I'm sympathetic to that in the

4  sense that it may -- the transport takes some time, but --

5  and during that time, it will be difficult for their lawyers

6  to be in touch with them, but we need to get this going.  I

7  don't -- I just don't think it's -- I mean, we're talking --

8  you're telling me that it -- they might not -- they won't be

9  here -- nothing -- literally nothing will happen on an order

10  to bring someone here forthwith for over a month, and I

11  don't -- I just don't think that's acceptable.

12         So I guess -- why don't I ask you to do this,

13  Mr. Jones.  I'm going to ask you, by tomorrow, to give me --

14  I mean, again, if I'd known this was going to be a hold-up,

15  I would have ordered a representative of the marshals to be

16  here today.  We don't have that.  So I mean, I've got to

17  deal -- and it has been -- as you all know, it's challenging

18  enough to get everyone who is present here together for

19  these statuses.  So I'm going to ask you to file something

20  detailed tomorrow letting me know exactly what the marshals

21  have said regarding -- what representations they have given

22  your office about when my order of January, I think it was,

23  21st -- about my order to bring these defendants here

24  forthwith on January 21st -- about when the marshals is

25  going to -- plans to comply with that order, because I don't

1   think doing nothing for a month does that and I think, as a

2   practical matter, again, they've got to prepare for trial.

3   Part of the reason to bring them here is because it's going

4   to facilitate that.  And I, you know -- we can't be losing a

5   month here and a month there.  I'm not going to burn any

6   more time talking about it here because, again, I understand

7   the position you're in, Mr. Jones.  It's not your doing.

8   But to reiterate, had I known this -- had I known nothing

9   was going to happen, I would have ordered the marshals to be

10  present here today.

11          All right.  Anything -- any other updates from the

12  Government on anything you think important to raise here

13  today?

14          MR. JONES:  I don't believe so, Your Honor.

15          THE COURT:  All right.  So let me start --

16  Mr. Hull, let me start with you.  You're -- you -- there's

17  -- I can see from the discovery letters that you're being --

18  you're receiving a lot of information -- a lot of discovery.

19  There's no doubt about that.  Anything --

20          MR. HULL:  That's always been true.

21          THE COURT:  Say again.

22          MR. HULL:  I said that's always been true.

23          THE COURT:  Right.  What -- are there any issues

24  you want to raise with me at this point?

25          MR. HULL:  No, except to, maybe, add to what's --

1   we just talked about in terms of transporting Mr. Biggs to

2   D.C.  Our understanding is that they haven't -- transport

3   orders come in every night around 10:00 o'clock or have --

4   for -- well, for transport during the week and that it

5   usually takes three to four weeks, no longer than that, and

6   what we understand is that because of the lockdown -- and

7   violence-related lockdowns in some of the federal holds

8   might have something to do with it.  There's been --

9          THE COURT:  Right.

10          MR. HULL:  -- noise -- no -- news about that, but

11   we're -- for once, this last two or three weeks, we're with

12   you.  We'd like to get this moving and we're packed up and

13   ready to go.

14          THE COURT:  All right.  I mean, it may be --

15   Mr. Hull, as you mentioned, it may be -- one defensible --

16   potentially defensible reason for some delay over the last

17   few weeks is, as you said, the spike in the Omicron variant

18   and all that may have wreaked on the system, but, obviously,

19   at least here and, I think, nationally, that seems to be

20   passing.  And so, again, we're going to -- we're -- I'll

21   follow up on this, as I said.  I'm going to get the

22   Government's response tomorrow and -- in writing about this.

23   And I trust you'll be available, even if we don't -- even if

24   we can't get all of your clients, we may have to just have a

25   hearing and ask you to waive their presence just for the

1     purposes of talking to the marshal about what in the world

2     is going on here.  So we'll --

3               MR. HULL:  That makes sense.  Sure.

4               THE COURT:  We'll get to that if we get to it.

5               Let me ask either Mr. Knight or Ms. Costner, any

6     -- again, I can see that you're getting quite a bit of

7     discovery to you and, you know, Mr. Donohoe remains near you

8     for now.  I thought, you know -- obviously, at some point,

9     he's going to have to be brought here for the trial, but my

10    inclination, again, given where things stood at least from

11    your representations, was to just leave him be for now.  But

12    in any event, anything you want to raise with me at this

13    point?

14              MS. COSTNER:  Good morning, Your Honor.

15              Nothing to raise at this point in time.  We're

16    happy to have Mr. Donohoe still in the Middle District and

17    hope that could continue as long as possible, but at this

18    point, we really have no issues to raise.

19              THE COURT:  All right.  Let's see.  Same question,

20    then, Ms. Hernandez.

21              MS. HERNANDEZ:  Good morning, Your Honor.

22              THE COURT:  Good morning.

23              MS. HERNANDEZ:  Mr. Rehl is still in Philadelphia

24    which is what we prefer at this point.

25              THE COURT:  Yes.

 1            MS. HERNANDEZ:  And just so the Court understands,

 2    I understand that the D.C. Jail is attempting to accommodate

 3    these discovery issues, but as of last week in an unrelated

 4    case when we went to visit a client at the jail, counsel --

 5    and we had -- we believed we had assurances that we would be

 6    able to meet with the defendant face to face so we could

 7    review discovery.  We had to meet through a partition in a

 8    room that was not -- that was -- that other lawyers and

 9    defendants were present.  So we couldn't have any

10    attorney-client privileges communications.  So that still

11    remains an issue even when they get here.  And my

12    understanding with the jail is whenever someone in a unit

13    gets tested positive, then the whole unit gets placed on

14    quarantine.  So I understand they're trying their best, but

15    it's still a mess.

16            THE COURT:  Ms. Hernandez, was -- is that client

17    of yours able to communicate with you through a -- and I

18    realize this is not -- I mean, this is not a substitute for

19    what you're raising.  But, again, I have been told that

20    these tablets enable them to communicate with the lawyers in

21    some way.  Again, not a substitute for what you're

22    describing.  But is that working?

23            MS. HERNANDEZ:  Yes, there is a -- sort of, a text

24    messaging system.

25            THE COURT:  Right.

1          MS. HERNANDEZ:  But, you know, with the amount of

2     discovery in these cases, it's -- you need to sit down with

3     a client and discuss.

4          THE COURT:  Right.

5          MS. HERNANDEZ:  So it's -- it is something to

6     have.  It's at least something to have.  Also -- I mean,

7     just background -- so when people were on quarantine, we

8     were getting these -- you could request an attorney-client

9     call by email to the jail authorities and they would give

10    you the call the following day.  When they come out of

11    quarantine, they stopped that phone calling system.  And

12    then there is some ability to have videoconferencing, but

13    given the number of defendants and the availability, it's

14    very limited.  That's just background.

15          I am still in the process of getting up to speed

16    on the case.  I'm still trying to get the evidence to

17    Mr. Rehl.  I -- the Government has been very accommodating

18    in trying to get me the materials in a separate hard drive

19    so that I don't have to reinvent the wheel and I don't have

20    to depend on prior counsel to get that to me.  So I'm

21    appreciative of that.  But I still have not -- Mr. Rehl

22    has -- still hasn't seen the bulk of the -- or any of the

23    evidence, really.  He still -- but the Philadelphia facility

24    is telling me that they will make it available to him once

25    they receive it and he should have access to a computer or

1    laptop.  So I'm hopeful that will be better than what would

2    be available at the D.C. Jail.

3              THE COURT:  All right.  It's for that reason and

4    that -- the way you had represented things that, you know,

5    I'm -- we're keeping the status quo for now for him and

6    we'll see how things go.

7              MS. HERNANDEZ:  Yeah, I understand and he

8    understands that if we were in trial, that this -- he will

9    be in D.C.  I can't imagine that the --

10             THE COURT:  Right.

11             MS. HERNANDEZ:  -- marshals will drive to

12   Philadelphia every morning.

13             THE COURT:  No, I don't think so.

14             All right.  My thought is, given the rest of the

15   scheduling order -- given, kind of, the rest of where we are

16   here, is to set things down for another status in a month.

17   As I said, I'm going to -- Mr. Nordean has filed a couple of

18   motions that I may -- I will address with him, and they may

19   well ultimately involve additional, you know -- regarding

20   discovery in a couple of different ways, and they may

21   ultimately affect discovery all defendants will receive.

22   But putting that aside, my thought is to just schedule

23   another check-in in about a month in early March to see

24   where things are and to go from there.  We have at least two

25   motions pending at this point.  And so my thought is simply

1    to come back -- the date I was looking at -- actually,

2    today's the 8th -- it would be March 8th, which is a

3    Tuesday, and basically have another check-in like this.

4            Mr. Jones, does that seem reasonable to you?

5            MR. JONES:  Yes, Your Honor.

6            THE COURT:  And same, I guess, question to

7    Mr. Hull and Ms. Costner and Ms. Hernandez.

8            MR. HULL:  Yes, sir.  That's fine.  The 8th is

9    good.

10           MS. COSTNER:  The 8th works for us, as well.

11           (Brief pause.)

12           THE COURT:  Ms. Hernandez, you're muted.  It's

13   okay.

14           MS. HERNANDEZ:  The 8th is bad for me.  I have a

15   -- I have two statuses -- I have three matters on the 8th.

16   One of them is a multi-defendant case.  So the 8th is -- the

17   9th, I'm available --

18           THE COURT:  Well, I think it's actually --

19           MS. HERNANDEZ:  -- or depending on what time the

20   Court -- I have an -- I'm sorry, I have an 11:00 a.m. and a

21   3:00 p.m.  So --

22           THE COURT:  On the --

23           MS. HERNANDEZ:  -- before or after.

24           THE COURT:  On the 8th?

25           MS. HERNANDEZ:  Yes, sir.

```
 1              THE COURT:  The reason I'm -- Ms. Hernandez, I
 2     think -- Ms. Harris will correct me if this is not
 3     correct -- but I think on the -- the reason I've been having
 4     these on Tuesdays is actually because of your client, I
 5     believe, and the day that his facility will make him
 6     available.
 7              Ms. Harris, is that right?
 8              THE DEPUTY CLERK:  So Tuesday is the day they have
 9     the most slots available.  So --
10              THE COURT:  Okay.
11              THE DEPUTY CLERK:  -- it's limited on Wednesday.
12     They sometimes have slots on Mondays.  It's really the luck
13     of the draw, quite honestly, Judge Kelly.
14              THE COURT:  All right.
15              MS. HERNANDEZ:  Your Honor, I'm available before
16     11:00 on Tuesday.  I'm --
17              THE COURT:  So why don't I -- all right.  I was
18     thinking this same time, 10:00 o'clock, since it's been the
19     most -- I think we've gotten everyone, you know -- we've had
20     the most luck getting everyone together on those days.  So
21     why don't we set it for March 8th at 10:00 o'clock and we'll
22     go from there.
23              What is the view of -- I -- as I said, I think --
24     there are at least those two motions from your co-defendant
25     and, I guess, now Mr. Rehl has joined one of them.  But
```

1      what's the views of the Government and each party about

2      whether I can toll time in the interests of justice between

3      now and the 8th just as a backstop for discovery purposes?

4              Mr. Jones?

5              MR. JONES:  Yes, Your Honor.  Yeah, the Government

6      would ask that the Court exclude time under the Speedy Trial

7      Act until we return on the 8th.  The pending motions,

8      obviously, toll it until those are resolved.  But in any

9      event, I think the discovery -- complex discovery issues

10     which we've discussed here today and, as Ms. Hernandez in

11     particular has noted, the need to make further progress on

12     that front provides an interests-of-justice basis for

13     excluding time.

14             THE COURT:  All right.  Let me ask Mr. Hull and

15     then Ms. Costner and then Ms. Hernandez what your views are

16     on that.

17             MR. HULL:  Your Honor, I also agree that the

18     motions that we're doing exclude the time.  And we've been

19     doing that pretty regularly in this case anyway.  So we

20     would not object to it.  Either way, we think we -- it's

21     probably appropriate and you would get it.  So yes.

22             THE COURT:  Ms. Costner?

23             MS. COSTNER:  No objection, Your Honor.

24             THE COURT:  Ms. Hernandez?

25             MS. HERNANDEZ:  Your Honor, the same here.  The

 1    only thing I would state -- and I can file a written motion

 2    to this effect -- the Government is producing immense

 3    amounts of discovery.  At some point, if we are going to

 4    trial in May, I think the Court has to put a deadline on any

 5    evidence the Government intends to introduce in its case in

 6    chief so that we -- he can review it and we can respond to

 7    it; that, you know, there will be experts and all sorts of

 8    other information.  I know that the judges have been saying,

 9    Well, it's a continuing investigation, but at some point, it

10    can't be that the day before trial, we're -- and I'm not

11    ascribing any bad motive to anybody.

12                 THE COURT:  No.

13                 MS. HERNANDEZ:  I'm just saying the line has to be

14    drawn at some point.

15                 THE COURT:  Yeah.  No, that's a totally fair

16    point, Ms. Hernandez.  I agree with you.  And if -- I guess

17    I should make one thing clear at least for the present -- at

18    least at this point which is that, obviously, as we get

19    close to the motions dates, that is certainly -- those

20    dates, as they stand now, are certainly without prejudice to

21    any defendant.  If you were to receive and become aware of

22    something through discovery that necessitated the filing of

23    a pretrial motion, if you learn of that after that -- after

24    the date I've set -- if something's produced to you in such

25    -- in a voluminous way that you don't set eyes on this piece

1    of information, whatever it might be, until after that

2    motions date, I'm going to be very open to the fact that

3    you're going to have -- you're going to have the right to

4    file such a motion.  I mean, that's just -- I think that's

5    fundamental fairness.  I can't even imagine the Government

6    objecting to that.

7            You're making an even broader point which is, at

8    some point, if the Government hasn't produced something -- I

9    guess what you're saying, Ms. Hernandez, is they can't turn

10   around -- I mean -- or let me put it this way.  If they

11   produce something the day before trial, to take the most

12   extreme example, they're not going to be able to turn around

13   and use that information against you at trial.  Obviously,

14   that, I think, is -- especially in a case like this -- is a

15   reasonable position.  So I agree with you.  And, maybe,

16   that's something the Government, frankly, should be prepared

17   to address when we come back in March.  We're [sic] still be

18   months away from the trial date, but I agree with you.

19   There has to be a point where if they -- and, look, as I

20   think is clear, they -- there's a lot of information they're

21   producing to you that ultimately, as far as your client

22   goes, is probably not going to be relevant.  They can't make

23   that call.  And so they're erring on the side of producing a

24   lot of information that you're probably going to review and

25   say, This is neither here nor there, but -- and so I think

1    that's fair.  But we are -- but they are going to have to

2    comply, quite obviously, with their Brady obligations and

3    they are going to have to -- and there is going to be a time

4    when, clearly -- and I think this is the point you were

5    making -- they're not going to be able to produce something

6    to you the day before the trial and turn around and use it

7    against you.  So I think that's fair.

8              And let me ask Mr. Jones.  Is that -- what are

9    your thoughts on that?  And I think that's, maybe, something

10   we should -- we can start to think about when we come back

11   in early March.

12             MR. JONES:  I think that makes sense, Your Honor,

13   and I don't think the Government disagrees with Your Honor,

14   you know, with those points in principle; certainly be

15   willing to address them at the --

16             THE COURT:  Okay.

17             MR. JONES:  -- next status hearing.

18             THE COURT:  All right.  So you know,

19   Ms. Hernandez, I -- I'll just say -- I mean, you can take

20   from this colloquy that we will take that up when we come

21   back and you're not going to be -- in a case like this where

22   -- one way or the other, you're not going to be sand- -- I'm

23   not going to let the defense be sandbagged.  I'll just tell

24   you that right now.

25             MS. HERNANDEZ:  There's a lot of evidence out

1    there, Your Honor.  I just -- I'm --

2              THE COURT:  No, I hear you.

3              MS. HERNANDEZ:  I know Mr. Hull has made that

4    point.  It's -- it is -- and I think Mr. Jones just made the

5    point that we could watch some of these videos for 100 hours

6    straight -- 100 days straight and still not get to the end

7    of them.

8              THE COURT:  I hear you.  And I think -- you all

9    are going to have to -- look, you all are better positioned

10   than me to think about this, but -- and I think that's

11   something -- that's a fair point for him to make and for you

12   to make.  On the other hand, as I said, I think a lot -- it

13   strikes me that a lot of what is being produced ultimately

14   isn't going to be -- I don't want to say it's not relevant.

15   I suppose, in theory, anything can be relevant.  But it's

16   not going to be something the Government's going to want to

17   introduce; it's not going to be something you're going to

18   want to introduce.  It doesn't help you, it doesn't help

19   them, and it's not ultimately going to be a reason for you

20   to complain about a late production or for them to turn

21   around and try to use it against you.  We're just going to

22   have to feel our way.  I -- you all are in a better position

23   than me right now to say, Well, you know, we think we have

24   all the key things.  What we -- we really -- we don't have

25   this particular thing that we really do think is relevant,

1   Judge, and you need to get on top of them about it; or, Yes,

2   at this point, it looks like all the things we're getting

3   are things that are just marginally relevant and really are

4   not going to play a role in the trial at all.  Maybe you're

5   not -- I know -- and you, Ms. Hernandez, of everyone on the

6   -- on our -- in our session here, are the newest to this

7   case.  So I think you're probably also in a -- you're

8   catching up more than even everyone else.  So let's make

9   that a point of discussion the next time we come.  We'll

10   have another month, hopefully, for the Government to keep

11   trying to pump this stuff out and we'll see where we are.

12            MR. HULL:  Your Honor, I -- Dan Hull for Joe

13   Biggs.

14            I have one other question along the lines of the

15   discussion we're having now.  And I want to understand,

16   especially in the case of four defendants who are being

17   detained for their leadership roles -- leadership has always

18   been a powerful theory in this case.  When -- I was really,

19   (inaudible) -- and actually happy to hear from you -- from

20   Mr. Jones that some -- like, was it that --

21            Did you say, Mr. Jones -- I suppose he should

22   answer or -- answer the question -- which Proud Boys are

23   not, you know, part of the scenario of -- about the attack?

24   For example, if Joe Biggs goes in on the west side up the

25   hill with a lot of, (inaudible) -- people and seen later on

1    the east side, you know, your average newspaper reporter

2    sees 100 followers over on the east side.  I like the idea

3    of not having everything these guys do in that square

4    footage have something to do with this.  But why -- I'm just

5    wondering why anybody would be left out.

6              THE COURT:  Well, look, I don't think -- I hear

7    what you are saying, Mr. Biggs [sic], and if you want to

8    have those discussions with the Government, that's fine.

9    Obviously, there's a charging document here that only

10   charges certain individuals with a particular conspiracy.

11   I, you know -- and beyond that, I don't think -- I'm not

12   going to -- I don't think it's an appropriate use of

13   everyone else's time to have -- to, sort of, make the

14   Government explain its charging decisions here without a

15   motion on that pending in any way.  I mean --

16             MR. HULL:  Well, Your Honor --

17             THE COURT:  -- I --

18             MR. HULL:  Your Honor, I agree --

19             THE COURT:  I think --

20             MR. HULL:  Yeah, I agree with you.  I just -- it

21   just seemed to me that that was something different than we

22   have had, you know?  I'm -- I was happy to hear it, and I'm

23   wondering how that works out in the calculus of everything

24   in these leadership theories that we have, and that's all.

25   And no, I'm not -- and I agree with you.  It's

1      inappropriate, as well.  But can, you know -- to hear that,

2      all of a sudden, we might not have, maybe, Proud Boys

3      relevant to a conspiracy theory over on this side depending

4      on what happened with -- a few hours after people weren't,

5      (inaudible) -- at all, that's a new and different thing to

6      me, and I'm just chewing on that.  And no, I will not take

7      up everything with the times -- the time of the Court on

8      that.

9               THE COURT:  All right.  So given the position of

10      the -- given -- all right.

11               So I will find, then, that the time between

12      today's date and March 8th is excludable under the Speedy

13      Trial Act because the ends of justice that are served by

14      taking such action outweigh the best interests of the public

15      and the defendant in a speedy trial.  And I'm doing so here

16      to give the defendants the continued opportunity to receive

17      and review all the discovery in this matter -- particularly

18      Ms. Hernandez who is relatively new to the case -- and,

19      again, I'm doing so with the consent of all three

20      defendants.  And for those reasons, the Speedy Trial Act

21      will be tolled through March 8th.

22               Anything further from the Government, Mr. Jones?

23               MR. JONES:  Your Honor, just to note we'll file

24      tomorrow with respect to the marshal issue you've raised.

25               And with respect to the -- I think, the point

1    raised by Ms. Hernandez, at the risk of repeating myself, I

2    think one of the issues that we noted earlier was not merely

3    the -- I think the volume of information we're producing in

4    discovery, obviously, is sizable and a substantial burden on

5    defense counsel to review.  One of the, you know -- the

6    reasons why the office-wide effort, especially with respect

7    to Relativity and Evidence.com, are important is because, as

8    the Government has represented, it provides a means by which

9    counsel can make targeted searches and more readily access

10   that material that is likely to be particularly relevant as

11   opposed to having, you know, mountains of video that -- and

12   documents that they would otherwise need to review seriatim.

13   So you know, I made the point that I think -- we think it's,

14   you know -- it may be unwise to forego the ability to use

15   those databases and I think, you know, we'll make our filing

16   with the office-wide information likely tomorrow and we can

17   -- the Court and the parties can, you know -- we can go from

18   there.  I just wanted to, sort of, reiterate that point, as

19   I think it's an important perhaps nuance with respect to how

20   this discovery is being produced and how it can be made

21   accessible to counsel.

22            THE COURT:  It's a fair point, Mr. Jones, and I

23   had actually intended to make that point myself when I was

24   addressing Ms. Hernandez a moment ago and I think in just --

25   in all the things we were discussing, it got lost, but I

1    think that is fair.  That is a fair point.

2              Anything further, Mr. Hull --

3              Ms. Hernandez, I will -- Ms. Hernandez, anything

4    further from you on that point or anything else?

5              MS. HERNANDEZ:  No, not on that point, Your Honor.

6    I just -- I was reminded.  Mr. Nordean filed a motion under

7    seal.  My understanding of the reason for the under-seal

8    filing is that it's based on highly-sensitive -- information

9    designated highly-sensitive in discovery which, under the

10   protective order, requires that it be filed under seal.

11   What I'm not clear about -- and I'm not sure the other

12   counsel are clear about -- so those of -- the other

13   co-defendants are not getting formally copied on those

14   under-seal motions, I don't believe, and I don't -- I think

15   the under seal is for purposes of public consumption, not

16   for purposes of co-defendants in the case.  And I also -- I

17   believe that we weren't copied on the Court's order.  I know

18   that the motion, at that point, had only been filed by

19   Nordean, but ordinarily, we would all get copied.  So I'm

20   not sure what the ground rules for that are, but I would

21   request that even if a -- unless it's under seal because

22   it's, like, medical information personal to some defendant,

23   if it's under seal under the protective order, I would

24   request that we all get copied and access to it.

25              THE COURT:  I -- let me -- all right.  Let me come

1     -- well, we may as well address this.  I was -- I -- part of

2     this, I think, is, like, a technical issue with just, sort

3     of, when -- how things -- when they get filed under seal.  I

4     think as a --

5              Ms. Harris, you tell me if this is correct.  I

6     think just in the ordinary course, if one party files

7     something under seal, the other parties typically don't --

8     just as a logistical matter, don't get access to it; is that

9     right, Ms. Harris?

10             THE DEPUTY CLERK:  That's correct.

11             THE COURT:  All right.  So I'm not -- I don't

12    disagree with you, Ms. Hernandez, regardless of that

13    technicality that, like, if everyone else -- if all the

14    other counsel have signed the protective order and all the

15    rest, that you may have access to it.

16             But let me ask Mr. Jones.  Is that -- how -- does

17    the Government have any objection to -- again, assuming all

18    counsel and their clients have signed that protective order,

19    there's no reason why the co-defendants shouldn't have

20    access to that filing; is that fair?

21             MR. JONES:  That's fair, Your Honor.  That's

22    correct.  That would be our position.  Our understanding is

23    that the, you know -- the court's, sort of, clerical rules

24    prohibit distribution of the -- of sealed orders, including

25    minute orders, to counsel by email except, you know, unless

1   they have a USDOJ.gov email.  So within the government, so

2   to speak, at least another branch of government, there's

3   permission to share that.  So we're able to receive, for

4   example, a minute order issued by the Court that may only be

5   available to defense counsel by courier or U.S. mail and

6   wouldn't, in the normal course, be distributed to

7   co-defendants or co-counsel, you know?  In this instance,

8   for example, you know, the Government wouldn't have an issue

9   providing that material to the defense attorneys in a secure

10  manner, you know, provided the Court was okay with that, you

11  know?  We, obviously, want to get the Court's blessing on

12  that whenever we're dealing with sealed material, regardless

13  of the reason.

14              THE COURT:  Sure.

15              MR. JONES:  So --

16              THE COURT:  Sure.  All right.  So let me --

17              MS. HERNANDEZ:  I'm sorry, Your Honor.  I'm -- on

18  that score, I'm -- again, I can file something in writing,

19  but it appears to me that the motion that was filed under

20  seal, the better way to file it is as a redacted motion.  I

21  mean, lots of it is just legal argument ordinarily.

22              THE COURT:  Yeah.

23              MS. HERNANDEZ:  That would make it easier, because

24  then we would have an ECF filing with redactions --

25              THE COURT:  Sure.

1          MS. HERNANDEZ:  -- which I think is the way all

2     the, like, videos are handled.  The Government says, This is

3     highly sensitive.  There's a video.  We -- not producing it

4     public- -- anyway --

5          THE COURT:  Yeah.  The particular nation of -- the

6     particular nature of that motion, I think, actually, it, as

7     a practical matter, makes sense that it's filed in its

8     entirety under seal, but I take your point.  And so let me

9     look into this and figure out a way of making sure that you

10    all can get that.  I do know -- I issued -- because there

11    was -- only one defendant had filed the motion, the minute

12    order related to it was only directed to that one defendant

13    because there were no other defendants on that motion, but I

14    take your point.  We -- we'll -- I'll look into, just

15    logistically, how best to try to facilitate this, but I

16    don't disagree with you.

17         MR. HULL:  And, Your Honor, Ms. Hernandez makes a

18    great point.  Just for practical purposes in this, there are

19    two motions out there that I am pretty sure I want to join

20    in on.  I'm not positive.  I'm pretty sure.  Nick Smith has

21    been too busy to give -- and he intended to give me those

22    motions.  But if we could have some kind of a regime where

23    we shared this, we could at least know what to do with

24    respect to joining in on the motions and protecting the

25    record.  So I -- that's why it would be important to me.

 1            THE COURT:  Sure.  That's fair.  And, again,

 2    there's no reason why -- again, if you're entitled to -- if

 3    you've signed a protective order, there is no reason why --

 4    whether you wanted to join it or not join it, whatever,

 5    there's no reason why you shouldn't see that motion.  So I

 6    agree.  Anything further -- so I'll -- let me look into that

 7    and try to figure out logistically the best way to overcome

 8    that and we'll go from there.

 9            MS. HERNANDEZ:  And if the Court is going to hear

10    Mr. Nordean's motions at 11:00, I would like to participate.

11    I -- obviously, I can join by the public line, but I don't

12    -- my client, I'm sure, would also like to -- I've joined

13    one of the motions now.  But can we participate as,

14    quote-unquote, participants even if we don't have speaking

15    roles at this point?

16            THE COURT:  Well, I -- say that again.  What about

17    the speaking role part, Ms. Hernandez?

18            MS. HERNANDEZ:  I said, can we participate in the

19    hearing even though I don't anticipate that I will be adding

20    much to the motion since I just joined it this morning but

21    --

22            THE COURT:  Right.  I think -- Ms. Hernandez,

23    here's how I think, as a practical matter, we should handle

24    that.  Again, your -- my understanding is we'll probably --

25            Ms. Harris, how long do we have Mr. Rehl for?

```
1              THE DEPUTY CLERK:  Until 11:00 o'clock.

2              THE COURT:  Until 11:00 o'clock?  That's what I

3     thought.

4              MS. HERNANDEZ:  I spoke to his counselor and I was

5     told that he would be -- he could participate until 11:50 or

6     something when they -- at noon, they had the Eastern

7     District of Philadelphia cases.  So --

8              THE COURT:  All right.  Well, I think --

9     Ms. Hernandez, here's how I think the easiest thing to do

10    it would be.  I mean, I realize you've joined it at the last

11    minute.  And so I -- but I had to, sort of, schedule today

12    around you -- only there being one movement [sic].  And so

13    what I think -- if your client wants to -- if you and your

14    client, frankly, want to call -- if your client's available

15    -- can and if you can call in to listen to the argument, you

16    may do so.  You won't be able to -- let me think about this.

17    Although now that I think about it, the motion you joined is

18    the motion under seal; correct?

19             MS. HERNANDEZ:  Yes, sir.

20             THE COURT:  Yeah.  So that is going to be a

21    problem, because obviously we won't have a public line for

22    that.  So I think the answer is I don't think I will be able

23    -- we'll be able to -- if -- well, I'll put it this way.

24    We'll -- I guess we can have you call in.  Maybe not -- your

25    client won't be able to, but I guess I'd rather, you know --
```

```
 1    again, you're not really the movant, but I think we can
 2    accommodate that.  So if you'll reach --
 3              MS. HERNANDEZ:  Thank you.
 4              THE COURT:  If you'll reach out to Ms. Harris
 5    about how to call in, I think that makes sense.  You've
 6    joined the motion, and even if -- just to be present, I
 7    think that's fair, even if we can't accommodate your client.
 8              MS. HERNANDEZ:  Thank you.
 9              THE DEPUTY CLERK:  Judge Kelly --
10              THE COURT:  Yes?
11              THE DEPUTY CLERK:  -- can she just stay on the
12    hearing?
13              THE COURT:  Is that how -- I -- it depends on how
14    you've set it up technically, but if that's --
15              THE DEPUTY CLERK:  It -- she should -- she
16    probably should just stay here --
17              THE COURT:  All right.
18              THE DEPUTY CLERK:  -- in the Zoom.
19              THE COURT:  Very well.
20              THE DEPUTY CLERK:  But Mr. Rehl -- I'm not sure
21    who she spoke with, but I received an email from BOP
22    regarding his time slot and she reiterated in her email that
23    it's for one hour and one hour only at 10:00 o'clock.  So
24    I'm not --
25              THE COURT:  All right.
```

```
 1              THE DEPUTY CLERK:  -- sure --

 2              MS. HERNANDEZ:  That's fine.  And if part of it is

 3    under seal, that may not be possible to do with Mr. Rehl.

 4              THE COURT:  Right.  I mean, the entirety of the

 5    motion you joined is under seal.  So -- all right.

 6              Ms. Costner, anything further on your --

 7              DEFENDANT REHL:  (Indicating.)

 8              MR. MCCULLOUGH:  Your Honor, I think Mr. Rehl was

 9    trying to get your attention.

10              THE COURT:  I'm sorry.  I did not see that.

11              Mr. Rehl?

12              (Brief pause.)

13              I know.  You're -- Mr. Rehl's muted.  So they're

14    going to have to unmute him.  I know he knows that, but the

15    person there will have to unmute him if he's going to be

16    able to say something.

17              MS. HERNANDEZ:  Zachary, you're muted.  We can't

18    hear you.

19              THE COURT:  You're muted, sir.

20              (Brief pause.)

21              MS. HERNANDEZ:  You're still muted.

22              (Brief pause.)

23              THE COURT:  I don't know if we're going to be able

24    to --

25              THE CORRECTIONS OFFICER:  Your Honor, can you hear
```

```
 1    us now?
 2              THE COURT:  Yes.  Yes.  Thank you.
 3              THE CORRECTIONS OFFICER:  Your Honor, my name's
 4    Chris Cole [ph].  I'm working at the FDC in Philadelphia
 5    here.  We can leave Mr. Rehl on this video approximately
 6    until about 11:50 a.m.  The issue is the Eastern District of
 7    Pennsylvania has this secure bridge and they do magistrate
 8    court on Tuesday, Wednesday, and Friday.  So I can -- we can
 9    accommodate up until about 11:50, 11:55 on this secure
10    bridge, and then we'll have to exit at that point.
11              THE COURT:  All right.  I don't expect us to go
12    much past that.  So why don't we leave --
13              Ms. Hernandez, again, because you've joined that
14    motion, we'll just have you and keep you and Mr. Rehl here
15    and we'll go from there.
16              MS. HERNANDEZ:  Thank you, Your Honor.
17              THE COURT:  All right.  Very well.
18              Finally, I think I have -- Ms. Costner, anything
19    further from you?
20              MS. COSTNER:  No, Your Honor.
21              THE COURT:  All right.  So for all of you, then,
22    we will -- I will see you all back here on March 8th at
23    10:00 a.m.
24              And I will -- I'm going to virtually leave the
25    bench.  And, Ms. Harris, you let me know when we've -- when
```

1   we're all ready to go for Mr. Nordean and now Mr. Rehl as

2   well at 11:00.

3           THE DEPUTY CLERK:  Okay.  Will do.

4           THE COURT:  Until then, the parties are dismissed.

5           MS. HERNANDEZ:  Thank you, Your Honor.

6           MR. JONES:  Thank you, Your Honor.

7           (Proceedings concluded at 11:00 a.m.)

8                   * * * * * * * * * * * *

9               CERTIFICATE OF OFFICIAL COURT REPORTER

10      I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby

11  certify that the above and foregoing constitutes a true and

12  accurate transcript of my stenographic notes and is a full,

13  true and complete transcript of the proceedings to the best

14  of my ability, dated this 10th day of March 2022.

15      Please note:  This hearing occurred during the COVID-19

16  pandemic and is, therefore, subject to the technological

17  limitations of court reporting remotely.

18                          /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                            Official Court Reporter
19                          United States Courthouse
                            Room 6722
20                          333 Constitution Avenue, NW
                            Washington, DC 20001

21

22

23

24

25