IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-3
                                          1:21-cr-00175-TJK-4
1-ETHAN NORDEAN
2-JOSEPH RANDALL BIGGS             Washington, D.C.
3-ZACHARY REHL                    Tuesday, January 11, 2022
4-CHARLES DONOHOE,                10:00 a.m.
                  Defendants.
- - - - - - - - - - - - - - - - - x
_____

                TRANSCRIPT OF STATUS CONFERENCE
        HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:   Luke M. Jones, Esq.
                         Erik M. Kenerson, Esq.
                         Jason B.A. McCullough, Esq.
                         U.S. ATTORNEY'S OFFICE
                         555 4th Street, NW
                         Washington, DC 20530
                         (202) 252-7233

For the Defendants:      Nicholas D. Smith, Esq.
                         David B. Smith, Esq.
                         DAVID B. SMITH, PLLC
                         7 East 20th Street
                         Suite 4r
                         New York, NY 10003
                         (917) 902-3869

                         John D. Hull, IV, Esq.
                         HULL MCGUIRE PC
                         1420 N Street, NW
                         Washington, DC 20005
                         (202) 429-6520

                         Carmen D. Hernandez, Esq.
                         7166 Mink Hollow Road
                         Highland, MD 20777
                         (240) 472-3391

APPEARANCES VIA VIDEOCONFERENCE CONTINUED:

For the Defendants:        Ira Knight, Esq.
                           Lisa S. Costner, Esq.
                           FEDERAL PUBLIC DEFENDERS OFFICE
                           301 North Elm Street
                           Suite 410
                           Greensboro, NC 27401
                           (336) 333-5455

Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

<u>**P R O C E E D I N G S**</u>

1

2          THE DEPUTY CLERK:  We are on the record in

3    Criminal Matter 21-175, United States of America v.

4    Defendant 1, Ethan Nordean; Defendant 2, Joseph R. Biggs;

5    Defendant 3, Zachary Rehl; and Defendant 4, Charles Donohoe.

6          Present for the Government are Jason McCullough,

7    Luke Jones, and Erik Kenerson; present for Defendant 1 are

8    David Smith and Nicholas Smith; present for Defendant 2 is

9    John Hull; present for Defendant 3 is Carmen Hernandez;

10   present for Defendant 4 are Ira Knight and Lisa Costner;

11   also present are Defendant 1, Mr. Nordean; Defendant 2,

12   Mr. Biggs; Defendant 4, Mr. Donohoe.  Defendant 3, Mr. Rehl,

13   is not present.

14         THE COURT:  All right.  Well, good morning,

15   everyone.

16         Today, we are here for a status conference and to

17   address the filings the parties have submitted that I asked

18   for simply to ensure that the defendants have

19   constitutionally appropriate access to counsel and ability

20   to prepare for their defenses.  I want to go through and

21   briefly hear from you all on those issues, and then I

22   thought the next thing we could do here today is talk about

23   dates for a pretrial conference and dates for pretrial

24   motions practice to get those on the calendar so we can be

25   prepared for trial in May.  The -- so why don't I go ahead

1    and hear, I guess -- I've read the submissions of the

2    parties --

3              MS. HERNANDEZ:  I'm sorry, Your Honor.

4              THE COURT:  -- and --

5              MS. HERNANDEZ:  This is Carmen Hernandez for

6    Mr. Rehl.  I'm not sure why he's not online.

7              THE COURT:  Oh, Ms. --

8              MS. HERNANDEZ:  I was speaking with him earlier

9    today.

10             THE COURT:  Ms. Hernandez, thank you for just,

11   sort of, briefly -- for raising that.  We were told -- and I

12   thought you knew this -- but I know Ms. Harris was told that

13   Mr. Rehl would not be made available today for our hearing.

14             Now, I think as far as the issues about his

15   ability to confer with counsel, I was going to just simply

16   say, it -- with regard to him, obviously, he's detained in

17   Pennsylvania.  You are in D.C.  You have not raised concerns

18   about his ability -- I -- at least -- I know you're new to

19   the case.  So I'm not trying to lock you into some position,

20   but I don't have anything from you so far saying you have

21   concerns about your ability to consult with him, his ability

22   to look at evidence, and I'm not going to make any decisions

23   on his whereabouts -- whether to transfer him today.  I

24   wondered if you had had the opportunity -- and so I'm not

25   going to -- other than scheduling matters, I'm not going to

1    do anything that will affect him today at all.  I guess --

2    so I -- number one, I thought you'd known -- knew that, and

3    that's unfortunate.

4         How -- have you had discussions with him -- just

5    to, kind of, check this box with regard to him, have you had

6    discussions with him about whether -- given that you're in

7    D.C., whether he wants to be transferred to D.C., or are you

8    satisfied -- and given -- I don't know if you -- I know you

9    have other defendants in D.C. Jail.  The Government has laid

10   out, sort of, what's currently available and what is coming

11   as far as folks who are detained there and their ability to

12   review evidence through these tablets that are being

13   provided.  Do you know whether he has a view about where he

14   wants to continue to be detained?

15        MS. HERNANDEZ:  Right.  So currently, he would

16   prefer to stay in Philadelphia under the current conditions

17   without prejudice to changing that position one --

18   preferably, he'd like to be home where he can have full

19   access to review discovery.  And I'm still in the process of

20   determining exactly how much access Philadelphia can

21   provide.  Right now, I believe -- I -- right now, I believe

22   that it's better than D.C. particularly under the current

23   COVID conditions at the D.C. Jail.  D.C. Jail currently is

24   on lockdown and there are no contact visits between

25   attorneys.  So it would be no better than if -- where he is

1    now.

2              THE COURT:  Obviously -- right.  At the very -- at

3    the moment right now, we're in a bad stretch, no question,

4    but before this, obviously, a few weeks ago, it wasn't --

5    those same conditions weren't in place.

6              All right.  Well, Ms. Hernandez, I'm not going

7    to -- as I said, I think -- the one thing that I have to

8    consider, though, in addition to what you're saying about

9    him being near his family and all the rest is -- I do think

10   that we have had a -- I know -- again, I know you're new to

11   the case.  We have had a problem with him being able to be

12   available for status conferences.  It's very -- and even

13   when I have had him before me, it's been very truncated as

14   far as the amount of time.

15             MS. HERNANDEZ:  Right.

16             THE COURT:  So as we get closer to trial, I don't

17   see how -- and we really get into the preparation phase

18   here, I don't see how -- I'm reluctant to let him remain

19   there simply because I can't get him to be able to appear.

20             MS. HERNANDEZ:  Well, I don't think -- I will tell

21   the Court from my experience in other cases, right now, I

22   have a four-defendant case in front of Judge Boasberg not

23   related to January 6th --

24             THE COURT:  Right.

25             MS. HERNANDEZ:  -- and it's been hellish trying to

1    get the -- they're all at the D.C. Jail.  They cannot --

2    with the COVID matter, they can't -- they're not producing

3    four defendants at the same time.  They --

4              THE COURT:  Well --

5              MS. HERNANDEZ:  -- just won't.

6              THE COURT:  Right.  I know that there are --

7    again, I think the conditions at this very moment are not

8    what they were two, three, four weeks ago, and hopefully are

9    not going to be what they are in two, three, four weeks.  We

10   don't really know, but fair enough.  In any event, I thought

11   -- and I'm sorry you didn't know that.  We were aware that

12   he wouldn't be here today.  And we're going to reschedule,

13   obviously, to discuss, sort of, this issue of where your

14   client remains detained and what his view is, what your view

15   is about the best way to make sure he's prepared for trial.

16   So we won't address that today, but -- because we don't have

17   him because they wouldn't make him available.  And we're

18   going to get -- afterward, if you would reach out -- you and

19   the Government would reach out to Ms. Harris, we're going to

20   reschedule a status for him as soon as we can.

21             MS. HERNANDEZ:  Thank you, Your Honor.

22             THE COURT:  All right.  With regard -- I guess I

23   may as well also just check off, Mr. Donohoe has also -- did

24   not file anything in relation to the Government's filing.  I

25   know, from prior representations, he and counsel prefer that

 1    he stay in North Carolina.  He hasn't raised any concerns

 2    about preparing for trial there and access to counsel

 3    preparing for trial.  I guess, Ms. -- Mr. Knight and

 4    Ms. Costner, I'm happy to leave the status quo with him at

 5    the moment, certainly.  Obviously, he's going to have to be

 6    brought to D.C. for trial at some point and that could --

 7    and that will be a period of time where he might be

 8    unavailable to you for some period while he's in transit.

 9    So you all will have to think about that as we go forward,

10    when you want me to bring him to D.C.  And, again, given

11    what the Government has laid out as far as the ability for

12    defendants to have these tablets and to access information

13    either through the tablet in the future or through a -- I

14    forget what they refer to it as -- this, sort of, discovery

15    room in the jail, it may be you all think that he's better

16    off here at some point in the future, but I'll -- I'm not

17    going to disturb the status quo on his front since no one is

18    raising an issue about him being able to consult with

19    counsel and him being able to prepare for trial.

20            Is that a fair, sort of, summary of the status of

21    things at the moment?

22            MR. KNIGHT:  Yes, Your Honor.  We have access to

23    Mr. Donohoe.  We're able to review discovery with him.

24            THE COURT:  All right.

25            MR. KNIGHT:  And it's some months until trial, and

1   right now with the COVID situation and all of the other

2   moving pieces, certainly, if the need arises to move just

3   Mr. Donohoe, then it's something we can address at that

4   point.

5              THE COURT:  Okay.  All right.  So the other two

6   defendants have responded to the Government's filing.  And

7   I -- again, I thought -- maybe, I should, frankly, first

8   hear from the Government about updating things because,

9   obviously, in the few weeks we've had since your submission,

10  I'm sure the conditions that exist at this precise moment in

11  time are not the same as they were when you filed it back on

12  December 19th -- no, no, no, I have it in front of me here

13  somewhere -- but back in December.

14             In any event, whoever from the Government wants to

15  address it, could you just let me know if there's any

16  updates from what you filed.  Again, I was, you know --

17  again, we've all -- the public health situation has taken a

18  turn not in a good way, obviously, over the last few weeks

19  and particularly in Washington.  But what is the -- what are

20  the changes from -- the -- what, if any, are the changes

21  that have been made from when you filed your document

22  informing me about what's going on at D.C. Jail from then to

23  now?

24             MR. JONES:  Sure, Your Honor.  Luke Jones for the

25  United States.

```
 1              So we did file a reply on January 6th.  The bottom

 2    line, as Your Honor indicates, is that, you know, the

 3    current status, which we believe will be temporary, is that

 4    there are measures being taken in light of the public health

 5    crisis.  In terms of the plan going forward at D.C. Jail and

 6    particularly at CTF with respect to access to counsel and

 7    ability to review discovery, those same representations are

 8    the case.  It's just a matter of getting back to normal, so

 9    to speak, with respect to the restrictions, you know?  In

10    addition to that, I know and I believe as Your Honor knows

11    that not only are those measures being taken to improve

12    access but that those measures are continuing and there's

13    all indications that access to counsel and ability to review

14    discovery are trending in the direction of more access, more

15    ability to review discovery.  So you know, in light of that

16    and in light of the fact that the defendants are not yet at

17    the D.C. Jail or CTF and insofar as they have raised

18    concerns about where they are now, our position is as we've

19    stated; that they should be transported to D.C.

20              THE COURT:  Okay.

21              MR. JONES:  And I -- if -- just one more note,

22    Your Honor.

23              THE COURT:  Sure.

24              MR. JONES:  I do -- we do anticipate a, sort of,

25    further office-wide update to be filed in cases near the end
```

1   of the week or early next week with respect to office-wide

2   discovery generally and, obviously, that will impact the --

3   how that discovery is reviewed at the facilities.

4        THE COURT:  Do you anticipate the update including

5   -- I mean, obviously, your update is going to detail what

6   information has been provided.  Do you anticipate the update

7   including -- not about -- not information about what

8   information has gone through the pipeline but, if you will,

9   the kinds of things you represented in your filing which

10  are, Here's how we're expanding the pipeline, if you will?

11  Do you know one way or the other?

12       MR. JONES:  I don't know one way or the other,

13  Your Honor, and I don't want to, sort of, jump the gun on

14  that.  I just don't have the information.  So I do know more

15  information is coming and, obviously, we'll produce that as

16  it's available.

17       THE COURT:  Okay.  All right.  So let me just hear

18  from counsel for Mr. Nordean and counsel for Mr. Biggs.  I

19  mean, I think whatever you want to say about the -- whatever

20  shortcomings might be present currently at the D.C. Jail and

21  even, eventually, the situation for both defendants, it

22  seems to me -- perhaps this is not true with regard to

23  Mr. Biggs.  He seems to have -- in -- on the

24  access-to-counsel front, it seems counsel is communicating

25  with him very well where he is and doesn't dispute that he'd

 1   be able to communicate very well with him if he were moved

 2   to D.C., but as far as the access to evidence and

 3   information, it seems to me there's little doubt it would be

 4   a greatly improved situation if the defendants were ordered

 5   to be detained in D.C.  Both lawyers are in D.C., and so I

 6   thought it was fairly persuasive in terms of trying to give

 7   them the maximum ability to prepare for trial and review

 8   evidence against them and to communicate with counsel to

 9   follow the normal procedure, frankly, which, in most cases,

10   is followed from the start, and transport them here to D.C.

11            So Mr. Smith, I'll hear from you first.

12            MR. NICHOLAS SMITH:  Thank you, Your Honor.

13            So I think the first point we'd like to make is

14   that, as the Court knows, in the past two years, there's

15   been, kind of, a sea change in access to inmates in federal

16   facilities from their lawyers, and it really has made an

17   incredibly significant difference in one's ability to

18   receive legal advice.  Sometimes counsel has to wait for,

19   you know, days, if not weeks, to hear back from a facility

20   about arranging a visit and so forth.  So I think our first,

21   you know, sentiment here is that Ms. Hernandez is correct.

22   There is not much of a difference between the facilities

23   where the defendants are currently detained and in

24   Washington, D.C., except that, as the Court noted, the

25   COVID-19 surge situation is probably worse in D.C. than in

```
 1     most other places in the country right now.  And I think
 2     Ms. Hernandez might have made this point, but some of the
 3     discovery review protocols that Mr. Jones was just
 4     discussing have not actually been implemented.  They're
 5     just --
 6               THE COURT:  Correct.
 7               MR. SMITH:  -- proposals, I think, at this point.
 8               THE COURT:  Well, it -- I -- to be fair, I think
 9     it's somewhere in between those two things.  It's not a
10     proposal.  They're representing that this is going to
11     happen.  So I -- it's more than a proposal, but you are
12     right that not everything the Government has laid out is the
13     current reality.  No question.
14               MR. NICHOLAS SMITH:  And I think, Your Honor, it's
15     a little bit unusual here that we have the Department of
16     Justice recently issuing a policy saying that thousands of
17     in- -- thousands of convicted prisoners during the pandemic
18     would not need to return to prison after they had been
19     released on home confinement under BOP regulations but that
20     presumptively innocent individuals would be subject to
21     restrictions and lack of ability to confer with counsel in
22     prisons at this time.  So I think it creates a little bit of
23     an unusual dichotomy here where the same standards are not
24     being applied, I think, Your Honor.
25               But I can say with respect to Nordean
```

1    specifically, it's my understanding that he recently left

2    the SHU.  He was in solitary for about 30 days.  He didn't

3    receive -- or counsel did not receive any explanation for

4    why he was placed in solitary.  Counsel has tried to obtain

5    the information from the facility but wasn't provided it.

6    But it's also my understanding that now -- Mr. Nordean will

7    now be in lockdown as Ms. Hernandez noted.  I don't know how

8    long that will last, but lockdown, Your Honor, makes it very

9    difficult to prepare for a complex trial on what I think

10   even the Court has called novel or challenging charges.

11            THE COURT:  There's -- Mr. Smith, there's no

12   question, but here's the issue in front of me at this point,

13   it seems to me.  He's -- the question at the moment is -- I

14   -- obviously, lockdowns are going to make things hard, but

15   right now, he's locked down on the other side of the country

16   from this court and from counsel and he's locked down

17   without, for example, the ability to look at evidence on a

18   laptop.  I get the fact that the laptop situation right now

19   at the D.C. Jail is not great.  Okay?  I get that.  But the

20   reality is there is some ability to do that in D.C. and

21   there is additional avenues to be able to look at voluminous

22   discovery that are more than proposals that are -- the

23   Government represents are going to come online soon.  I --

24   we all know no such initiatives are being taken where

25   Mr. Nordean is being held currently.  So again, it -- the

1    question is whether it would be better to follow, you know,

2    again, frankly, the typical BOP or marshals policy.  Why

3    wouldn't it be -- make sense to follow that normal policy,

4    bring him to a place where -- yes, I take your point.  At

5    the moment, today, the COVID situation may well be worse in

6    D.C. than it is in other parts of the country, but if

7    anything, what we've learned about the virus is that it's,

8    you know -- it goes in waves and -- in place one and place

9    two and, in a month, they could be completely reversed about

10   where the virus raises its head.  So I take your point about

11   all the problems, but I -- the point for me is it's hard for

12   me to see why it doesn't increase his access both to counsel

13   and to the evidence, at least in your client's shoes, to

14   bring him here to D.C.

15            MR. NICHOLAS SMITH:  Well, Your Honor, it's -- I

16   think the response is that it's now been a -- nearly a year

17   since these detainees have been in the D.C. Jail for these

18   cases, and if the laptop situation is still so tangled that

19   you have them unable to review evidence or having to wait in

20   lines that last for four weeks, I don't understand why the

21   Court should assume the situation will improve.  And I think

22   that it's, kind of, a false choice to say that the only two

23   options here are SeaTac and Washington, D.C.  We still have

24   an outstanding 3142(i) motion that would allow the Court, in

25   the extraordinary circumstances of the restrictions of the

1   pandemic, to allow them to prepare for trial with the

2   strictest conditions the Court could imagine.  And I think,

3   Your Honor -- even from the Government's perspective, I

4   think this is in their interest because if -- with a

5   complicated trial like this, to, kind of -- to leave them --

6   to leave the defendants in jail for over a year and, you

7   know, when they're not able to meet with counsel frequently

8   enough to prepare for a trial like this, I think it's

9   risking the trial outright, Your Honor.

10              THE COURT:  Well, Mr. Smith, also, let me just

11  say, I didn't see you -- I said when we were last here that

12  I would consider a renewed motion for 3142(i).  I denied it

13  without prejudice and said I would consider it if you

14  renewed it.  I didn't see a renewed motion filed, and I saw

15  that you, in fact, appealed the detention -- my prior

16  detention decision which is, of course, your right.  So it's

17  not clear to me whether I -- I mean, is it your position

18  that I would have jurisdiction to consider a 3142(i)

19  argument here today?

20              MR. NICHOLAS SMITH:  Oh, Judge, I think there must

21  be some confusion, because it was our understanding in the

22  last hearing that the Court left that option open

23  deliberately.  So --

24              THE COURT:  I --

25              MR. NICHOLAS SMITH:  So it wasn't -- so there was

 1     nothing for us to -- I think, for us to file if --

 2              THE COURT:  Okay.  I didn't -- my point is only --

 3     I mean, this is, maybe, a technical point here.  I certainly

 4     wanted information from the Government about how your client

 5     and all the other defendants were going to be able to

 6     prepare for trial, because I think I have an independent

 7     obligation to ensure that they both can confer with counsel

 8     and prepare adequately for trial.  And I think what I said

 9     was I would consider -- I denied it without prejudice, as

10     you mentioned, and I said I would consider a renewed motion,

11     and the way I saw it as, in the meantime, I have to make

12     sure that this -- that these defendants are able to prepare

13     for trial, as I said.  It wasn't clear to me with you all

14     choosing to appeal whether your view was that I have

15     jurisdiction today to consider a 34 -- 3142(i) argument,

16     given your appeal, but you're saying you think I do.

17              MR. NICHOLAS SMITH:  Well, Judge, I think what

18     we're saying is that if you -- if -- it's my understanding

19     that if you -- we go back through the December 14th

20     transcript, I think Your Honor will see that there was no

21     denial of the 3142(i) motion but rather it was left -- taken

22     under advisement or kept --

23              THE COURT:  No, no, no, I denied it without

24     prejudice.  That's what I said.

25              MR. NICHOLAS SMITH:  Okay.  Well, then, Your

```
 1   Honor, I think we don't have a position.  I never considered
 2   that possibility.
 3              THE COURT:  Okay.  I'm not trying to be -- I --
 4   what I said -- I'm pretty confident I said -- was I'm
 5   denying it without prejudice to be renewed down the line
 6   once we got these -- once I got additional information about
 7   exactly what the status with regard to these defendants was
 8   in terms of their access to counsel and the evidence.
 9   That's -- I mean, I don't really -- I don't know what -- I'm
10   not sure what -- and I wasn't sure whether you all -- again,
11   you all had the -- well, anyway, that's -- that is what I
12   ruled.  I denied it without prejudice, is my memory.
13   Whether that gives me, today, the ability to consider a
14   3142(i) argument -- again, I haven't looked at the nature of
15   your appeal or --
16              MR. NICHOLAS SMITH:  Well --
17              THE COURT:  -- what -- your arguments there.
18              MR. NICHOLAS SMITH:  -- there seems to be no
19   conflict, then.  If there's no open or pending issue on
20   3142(i), then I don't think there will be any problem with
21   an --
22              THE COURT:  Okay.
23              MR. NICHOLAS SMITH:  -- appeal being in conflict
24   with this Court's, you know --
25              THE COURT:  Okay.
```

1     MR. NICHOLAS SMITH:  Your Honor, it was our

2  understanding that the purpose of the status conference

3  today would be to resolve that pending or open 3142(i)

4  issue, but if it's already been decided, I --

5     THE COURT:  No, it hasn't -- what -- I mean, I

6  very -- I don't have the transcript in front of me, but I'm

7  pretty confident I said I denied it without prejudice.

8  Again, I -- the whole point was -- and, again, I don't think

9  -- I don't really think we're saying different things.

10  Maybe we had different expectations.  Look, whether it's

11  resolving a 3442(i) [sic] motion or -- if your intention was

12  for me to consider that as well as my independent duty, I'm

13  not going to be technical about it.  I just want to make

14  sure I'm not doing something that conflicts -- that your

15  position would be that I don't have jurisdiction to do.

16     MS. HERNANDEZ:  Your Honor, can I pipe in?

17  Specifically, under Federal Rule of Appellate Procedure 12.1

18  and Federal Rule of Criminal Procedure 37(a), the Court can

19  consider a motion even after an appeal is taken under

20  certain circumstances, if that's what the question -- the

21  Court is asking.

22     THE COURT:  Well, I guess the question is, what

23  are the "certain circumstances"?  But I mean, I, you know --

24  I know this can be tricky, and I'm not trying to throw a

25  monkey wrench into this today and I'll take a look at it

```
 1    afterward.  It really doesn't -- I'm going to resolve this
 2    promptly, and whether I resolve it as a question of
 3    transferring the defendants and making sure they have
 4    adequate constitutional, (inaudible) -- constitutional
 5    ability to prepare for trial is one issue, and whether I end
 6    up ruling on a 30 -- a renewed -- what is effectively a
 7    renewed 3142(i) motion, I'm happy to do that, too, but I
 8    just want to make sure the parties are not -- don't, you
 9    know -- don't think I'm doing something that I don't have an
10    obligation to do.  I know --
11              In any event, Mr. Smith, you --
12              MR. NICHOLAS SMITH:  Well, one thing is clear,
13    Your Honor.  If Your Honor ruled on that motion in a way
14    that -- to grant the relief, it would obviously moot any
15    appeal, clearly, but it would not -- it would -- the only
16    event in which it would not moot the appeal is if relief is
17    denied.  Then there would be --
18              THE COURT:  Okay.
19              MR. NICHOLAS SMITH:  -- a purpose in appealing,
20    but otherwise no.  So --
21              THE COURT:  Okay.
22              MR. NICHOLAS SMITH:  -- it might be as simple as
23    that.  I --
24              THE COURT:  All right.  Yeah, I -- given -- I was
25    planning on -- I -- given that wrinkle, I may want to take a
```

1   day and just make sure that I don't overstep, but in any

2   event -- all right.  Mr. Smith, whether couched as the

3   transfer issue or whether couched under 3142(i), anything

4   further on this issue with your client?

5           MR. NICHOLAS SMITH:  There's one more point.

6   There's also a health issue for Mr. Nordean.  He is

7   experiencing a kidney stone, or multiple, right now.  So --

8   which is extremely painful.  I believe they're trying to

9   treat it in the facility and he's received ibuprofen, but

10  I'm not really sure if it's resolved yet.

11          THE COURT:  All right.  So that's something you --

12  I can -- at a minimum, before ordering any transfer, I would

13  just -- we'll have some -- I'll reach out and try to get

14  more clarity on that from where he is.  You wouldn't want

15  him to be transferred in the middle of some kind of

16  treatment, obviously.

17          Mr. Hull, let me hear from you on the same topic,

18  whether it's couched as 3142(i) or whether it's couched as,

19  you know -- I -- what I would have couched -- what I would

20  have -- I'll pose it as I posed it to Mr. Smith.  Why, all

21  things considered, shouldn't I just have the marshals follow

22  their normal procedure and transfer Mr. Biggs here?  It

23  sounds like you, again -- you -- you're in touch with him,

24  and that's good.  Wherever he is, you're in touch with him

25  now.  You would be able to have -- you would be in touch

```
 1    with him in D.C.  You have the laptops in D.C.  You have the

 2    tablets that all -- apparently -- I did not know this until

 3    the Government's filing -- that all January 6th defendants

 4    are issued.  And so wouldn't things be better -- and you're

 5    here, obviously.  So -- in the D.C. area.  So why shouldn't

 6    I transfer him here?

 7               MR. HULL:  Thank you, Your Honor.

 8               Absolutely not.  You shouldn't transfer him here.

 9    And I'll get to that in a second, but what -- I'd like to,

10    sort of, reiterate what Mr. Smith said.  I'm surprised that

11    we all seem to forget about what the exercise was supposed

12    to be here today.  I interrupted you a couple of times --

13    and, maybe, I shouldn't have -- in our last status

14    conference about making sure that we understood that if we

15    appealed detention, that you would be able to keep and have

16    power to hear and decide the point about temporary release.

17    And I --

18               THE COURT:  Right.

19               MR. HULL:  I don't want to beat that to death, but

20    that's what I thought we were doing here today.

21               THE COURT:  So I'm going to -- Mr. Hull, I

22    don't -- I'm going to just -- I'm sorry to interrupt you,

23    but let me just say, I don't think it's functionally very

24    different.  I mean, I think -- I don't think you -- the

25    question you're raising is functionally very different.
```

```
 1    Obviously, if there were a constitutional problem with their
 2    ability to do this -- somewhere, I probably have the ability
 3    to do this and it probably would be 3142(i).  So I -- as
 4    long as we're all on the same page that I have the ability
 5    to consider that, I consider that wide open.  So I wouldn't
 6    -- don't --
 7              MR. HULL:  I understand, Your Honor.
 8              THE COURT:  That's part of what we're talking
 9    about here today.
10              MR. HULL:  Right.  I understand.  It just -- the
11    way the colloquy started between you and Mr. Smith, it made
12    it sound as though we should have or might have filed a
13    motion for temporary release under this.  I almost felt like
14    that was done for us sua sponte by you -- by your --
15              THE COURT:  Well --
16              MR. HULL:  -- to --
17              MR. NICHOLAS SMITH:  You know, I --
18              THE COURT:  I'm going to --
19              MR. HULL:  -- (inaudible) -- do with these guys --
20    (inaudible.)
21              THE COURT:  I'm going to just -- look, I think the
22    easiest thing for me to do is just consider, you know --
23    what you're filing is a renewed motion under 3142(i).  So
24    done.  Mr. Hull --
25              MR. NICHOLAS SMITH:  (Indicating.)
```

```
 1                 THE COURT:  Mr. Smith, what did --

 2                 MR. HULL:  (Inaudible.)

 3                 THE COURT:  Mr. Smith --

 4                 MR. NICHOLAS SMITH:  I was just going to jump in

 5      to the judge's defense here.  The judge did say in the

 6      hearing that it was technically denied and that it would

 7      require a renewed --

 8                 THE COURT:  All right.  Mr. Smith, I'm going to

 9      note this day that you came to my defense.

10                 But apart from that -- look, this is a -- it's a

11      technicality.  It's a -- I'm not into technicalities and I'm

12      happy to consider your filing here a renewed motion.  I just

13      want to make sure I'm not -- we all are on the same page

14      that we think I have the jurisdiction to do it.  I -- but

15      that's fine.  Mr. Hull, please, just --

16                 MR. HULL:  We're good and I understand, Your

17      Honor.

18                 Mr. Nordean -- excuse me, Mr. Biggs, kind of, like

19      Mr. Nordean and some of the other defendants in all of these

20      cases, has been talking to me every day, it's true, on the

21      phone.  I've been able to do that because of the regime that

22      they have in place in Seminole County.  I'm not sure, for

23      one thing, based on some of the things that go on and the

24      way that D.C. Jail is set up, that I will be able to do that

25      anymore.  I have a fair amount of contact and visits with
```

```
 1    D.C. Jail, both the correctional treatment facility and the

 2    main jail, and it is a phenomenally dysfunctional place that

 3    has nothing to do with COVID or squalor or people getting

 4    beat up by guards.  It -- this is not a place where the

 5    rules are ever the same two days in a row.  That's true of

 6    both jails, both the one at 1901 D and 1901 E Street.  I

 7    don't think that anyone should have to prepare for trial in

 8    -- with -- you spend more time getting in and out of that

 9    jail -- and I've been there about 10 times to both

10    facilities in the last couple of months -- last 6 weeks --

11    than you do actually spending time with your client in

12    the --

13                THE COURT:  But, Mr. Hull, you're not able to see

14    -- and I get that you have Mr. -- you're able to talk with

15    Mr. Biggs in other ways, and that's great, but you don't

16    have access to him physically now either.  So --

17                MR. HULL:  I don't need that.  As I pointed out,

18    Your Honor --

19                THE COURT:  Okay.

20                MR. HULL:  -- (inaudible) -- interrupt you.  What

21    he needs to do is see a lot of videos.

22                THE COURT:  Yep.

23                MR. HULL:  He needs to see a lot of videos, and if

24    we assume for a second that -- and that's been the big

25    problem all along.  He's a major player in this according to
```

1    the Government.  It's not just Biggs-specific discovery, but

2    it's also discovery that's general to everyone.  He's

3    supposed to be a leader of a -- at least part of a

4    conspiracy here.  So a lot of different tapes and videos

5    involve him.  Let's assume for a second on the low side that

6    we have 15,000 hours of videos.  Fifteen thousand hours.  I

7    think there's more than that.  As you've noticed, I haven't

8    asked for a percentage of how much discovery's coming in for

9    a few status conferences.  If he were -- and I think this is

10   probably not the best way to do it for me as a lawyer with

11   him.  If he were to see 10 percent of that, 10 percent of

12   that would be 1,500 hours.  That's, without sleeping,

13   62-and-a-half days of watching videos.  And it's more than

14   we think.  It's more than, like -- when we talk about the

15   discovery and the laptops and how the situation is improving

16   in D.C., I think that is really a false flag, and I don't

17   think it's done on purpose.  I think we just don't think

18   about how much stuff it is these major people have to

19   review.

20           In the case of Joe, he's a very good candidate for

21   going home to Ormond Beach.  For one thing, he doesn't have

22   a criminal record and, as you know, for three months, he had

23   high marks for home detention before he was detained on

24   April 22nd.  And I know it sounds like, kind of, a long walk

25   to do this.  It's not always done under 3142(i).  But what

1    will happen is this if he goes to the D.C. Jail.  Yes, I

2    will be able to see him physically more, but I may be

3    talking to him less because of the way the phone system

4    works there.  I have other people I talk with in both

5    buildings on the phone system.  The phone system is not that

6    good and I wonder about how secure it is.  It's been very

7    secure at the Seminole Jail and they've done a very good job

8    there.  My problem is getting him to see videos and talking

9    with him about it.  And there's just really no way to do

10   this unless he is, kind of, on his own, sleeping when he

11   can, to go through this and talking to me when he can.

12            The jail -- and let me reiterate this.  This jail

13   at both D and E Street is a nightmare, and it has nothing to

14   do with COVID; it has nothing to do with squalor; it has

15   nothing to do with people getting beat up.  These are people

16   who do not want to be there.  It is the most unhappy place

17   I've ever been.  I've been there a lot.  And if they can

18   figure out a way to make their jobs easier by having you not

19   do yours, they will.  This is not a place to prepare anyone

20   for a trial, especially like this.

21            THE COURT:  Mr. Hull, let me just respond in this

22   way, and it's not a substantive response, but you're arguing

23   to me that no one housed in D.C. Jail can adequately prepare

24   for trial, and we haven't -- I don't know the answer to

25   this, but I haven't been made aware of any defendant who has

 1     been released under 3142(i) who was beforehand housed in the

 2     D.C. Jail on that basis.  So if the D.C. Jail is -- and,

 3     look, I certainly carry no grief for the problems that have

 4     been identified there both in recent years and in years gone

 5     by, but obviously somebody is preparing adequately for trial

 6     there.  I don't even -- let me put it this way.  I don't

 7     even have -- no one has brought to my attention, you know,

 8     judges repeatedly denying motions either -- I mean, granting

 9     them or denying them.  So we haven't seen, both historically

10     and even in recent -- even during COVID and post-January

11     6th, a wave of defendants being released from D.C. Jail on

12     3142(i) grounds.  So how do you square that?

13             MR. HULL:  Well, first of all, people don't raise

14     3142(i) a lot.  Second --

15             THE COURT:  True.

16             MR. HULL:  Second, Joe is different.  Joe Biggs is

17     different because his trial's coming up in May.  He's a

18     major player in this.  You've got the other trials coming up

19     in August, other times.  Some people think that some of

20     these might be settled.  I would imagine -- he may be the

21     first, but I would be -- imagine that other people with

22     diligent lawyers will think, like, this is impossible to do.

23     And if you just think a little bit about -- when I was

24     talking about videos earlier -- hours of videos -- now,

25     yeah, he should be able to see a lot more videos than 1,500

 1     hours, but just 15,000, that's aside from images, reports,
 2     FBI reports.  There's a -- and he -- and another good
 3     reason, he has seen almost no films so far.  And I did that
 4     for a reason.  I did not want him to see films under the
 5     circumstances that he's -- it's not a bad place to be, but
 6     they don't have a good setup in the library.  I think this
 7     laptop -- this idea of laptops for January 6th is, kind of,
 8     a ruse.  I don't think that people are going to be able to
 9     prepare for this if they're going for a six-week trial in
10     May, and I think that's particularly true of people who the
11     Government has said all along is a major player in this
12     whole conspiracy.  We've got a small area of the Capitol
13     where all this happened.  It happened about three floors --
14     lots of things -- it's -- three- or four-ring circus going
15     on there.  A lot of people on this call have worked in the
16     building and we know that, like, if you're going to film
17     something, you're going to catch a lot of different other
18     people, a lot of different views.  There are many films of
19     the same events in this.  So I don't think it's overstated
20     to say that it's -- there was never a better circumstance or
21     a better candidate for somebody to go home and look at
22     voluminous videos to prepare himself in a situation where,
23     you know -- he has been called in pleadings and other cases,
24     This guy is the guy who's, sort of, the nerve center for a
25     lot of different things going on in the attack.

1          Another thing I would say is that the whole idea

2    -- and I will be quiet in a minute -- the whole idea of his

3    detention is based on future dangerousness and his

4    leadership.  Future dangerousness, sort of, presupposes he

5    will do something like this again or commandeer something

6    like this again.  You have a person who is, right now, in

7    more of a nerve center or a way station to, like, commandeer

8    something like that or put that together than he ever would

9    being in his house in Ormond Beach, and it would be

10   particularly true if he went to the jail and was housed like

11   everybody else at the Correctional Treatment Facility.  So I

12   don't see, you know -- if you're worried about future

13   dangerousness and that's the predicate for having him in

14   jail in the first place, you know, put him home.  He's less

15   likely to start another revolution from home than he is from

16   either one of these jails.

17          THE COURT:  All right.  I do want to give you all

18   your due under 3142(i).  And so I'm not going to rule today,

19   but I'm going to rule quite promptly, and I know my track

20   record on that one motion is -- before you people is

21   questionable, but I'm going to turn this around quickly, but

22   I do want to look at the 3142(i) standard in addition to the

23   other things I mentioned that I think I have a, you know --

24   an independent duty to make sure that your clients,

25   regardless, have adequate -- the adequate -- their

1    constitutional rights are preserved to counsel and to

2    participate in their own defense.

3              MR. HULL:  Your Honor, if I may --

4              THE COURT:  Yes.

5              MR. HULL:  -- just one other thing.  Is there a

6    way for us to get some actual updated -- even if it's

7    anecdotal -- data on what the experience has been over at

8    the Correctional Treatment Facility or at the main jail with

9    videos?  I think it will be a lot -- I don't think it's

10   quite as rosy as we've heard and we would all like to think.

11   In other words, can Justice do that or Department of

12   Corrections or the D.C. counterpart of that?  I'm not sure

13   that this January -- a laptop for every January 6th

14   defendant, you know, it sounds nice.  I'm not sure they all

15   work, I'm not sure there's enough of them, and in cases

16   of --

17             THE COURT:  In --

18             MR. HULL:  -- substance, there's just not enough

19   time for them to do this under those circumstances.

20             THE COURT:  In fairness, I think it's -- I don't

21   know that it really matters, Mr. Hull, the distinction, but

22   it's -- I think the representation was it's a tablet for

23   everyone.  The laptop thing is a separate program.

24             But, Mr. Jones, do you want to address that issue

25   of what we know about this -- the issue -- the tablets, when

1      they are anticipated to be rolled out or, maybe, whether

2      they are already, the functionality, and how the Government

3      anticipates them being able to be used.

4           MR. JONES:  As of right now, Your Honor, I don't

5      have additional representations to make than what we've put

6      in our most recent filing.  As I indicated earlier, I do

7      expect an office-wide filing that would likely address that

8      issue in the next -- in the coming days, but assuming it did

9      not, you know, we can certainly, at the Court's direction,

10     provide additional information.

11          THE COURT:  But just reiterate what is -- what you

12     did put down in writing.  In other words, it -- the idea --

13     just to make sure we're all on the same page; that at least

14     now, the proposal or the plan is to give one to every

15     January 6th defendant?  Am I -- was I -- did I read that

16     right?

17          MR. JONES:  There -- the proposal now is that

18     there are laptops made available to each of the defendants,

19     you know?  Everyone at CTF already has tablets.  Those don't

20     have the full functionality of the laptops which can allow

21     for, you know, more extensive reviews, and there's not one

22     laptop per defendant, but those are made available.

23          THE COURT:  But there is -- but just so I'm clear,

24     is there one -- not laptop, but one tablet for every

25     defendant?

```
 1                    MR. JONES:  Yes, that's my understanding, Your
 2     Honor.  There's one tablet --
 3                    THE COURT:  Okay.
 4                    MR. JONES:  -- for each --
 5                    THE COURT:  And --
 6                    MR. JONES:  -- defendant.
 7                    THE COURT:  And currently?  Right now?
 8                    MR. JONES:  Currently, yes.  Now, it -- given the
 9     current public health situation, you know --
10                    THE COURT:  Right.
11                    MR. JONES:  -- I can't say for certain exactly
12     where each tablet is or the access to them, but that is the,
13     sort of, normal course under the --
14                    THE COURT:  They exist right now?
15                    MR. JONES:  Correct.
16                    THE COURT:  Okay.  And the functionality that is
17     planned for those, again, could you just walk through -- I
18     know -- I think this is something that is not current.  But
19     what is the eventual functionality plan there?
20                    MR. JONES:  Well, I -- to be clear, these tablets
21     don't have the case-specific discovery on them.  The -- that
22     would be provided through -- provided by defense attorneys,
23     through the facility, loaded onto laptops which can be
24     reviewed by each of the defendants.  The tablets have, you
25     know -- provide ability to communicate with defense
```

1    attorneys; provide other legal library access; and, you know

2    -- but the, sort of, instances of the databases and the

3    case-specific discovery would be provided through the laptop

4    program.

5         THE COURT:  Okay.  But I thought there were

6    representations, though, that there were going to be --

7    there was going to be -- at least the plan was --

8         MR. JONES:  And just to --

9         THE COURT:  Where do I have it here --

10        MR. JONES:  Just to correct myself, Your Honor --

11        THE COURT:  Yep.  Yep.

12        MR. JONES:  -- (inaudible.)  The office-wide --

13    that is, for example, the database -- Evidence.com

14    database --

15        THE COURT:  Right.

16        MR. JONES:  -- that would be on the tablet, not

17    the laptop.

18        THE COURT:  Right.  So -- right.  So every tablet

19    will have or does have the Evidence.com database.

20        MR. JONES:  Will have.  Yes.

21        THE COURT:  Will have?  Okay.  That's what I

22    just --

23        MS. HERNANDEZ:  Your Honor, it's hard to believe

24    that will work because the quantity of evidence -- I know of

25    no tablet -- I'm not an expert on technology, but I know of

1   no tablet that would hold the quantity of video evidence --

2   I mean, the terabyte quantities of video evidence that we're

3   talking about in this case.  The Government just produced a

4   16-terabyte, I believe, external hard drive with respect to

5   one item in this case.  So it's hard to believe it's going

6   to happen.

7        Secondly, Your Honor, the jail does not produce

8   chargers when they produce tablets or laptops to the

9   defendants -- to the -- because they don't want the

10  defendants with electrical cords which means my

11  understanding -- this has been for a long time -- the most

12  you're going to get a charge on a tablet or a laptop is

13  about four hours a day.  When the tablet -- when the charge

14  ends, that's it.  That tablet may still be in their

15  possession, but they don't get a new charged tablet or

16  charged laptop until the following day.

17        And a third aspect to this is my understanding is

18  they don't even get the tablets unless they are in a room by

19  themselves.  So if they're in a cell with another inmate,

20  they're not going to be able to access discovery -- they may

21  have a tablet, but they're not able to access discovery for

22  privacy issues, and I'm -- so there's multiple layers of

23  problems with the notion -- as Mr. Hull indicated, the

24  extent of discovery in this case.  I know we have a lot of

25  defendants who prepare for trial from the D.C. Jail and

1    we're not, you know, asking that they be released under

2    3142(i), but none of those cases involve the extensive

3    discovery in this case which has required the Government to

4    create this Evidence.com and Relativity.com.  This is unique

5    to this case.

6              THE COURT:  Sure.

7              MS. HERNANDEZ:  And I can -- it is all -- the

8    amount of discovery -- as Mr. Hull indicated, if these

9    people stayed up 24 hours a day from now until the end of

10   the year, they will not be able to review everything --

11             MR. HULL:  And, Your Honor --

12             MS. HERNANDEZ:  -- and that --

13             MR. HULL:  -- if I may --

14             I'm sorry, Carmen -- Ms. Hernandez.

15             If I may, even if it were tablets; even if it were

16   PCs; even if it were very powerful Macs, there would not be

17   enough time to prepare for trial with a smart client unless

18   they start preparing for it now.  I have two iPads.  I was

19   joking with Mr. Smith about this early on.  I tried to see a

20   little bit of the discovery that was coming in very

21   dutifully apace from the Government on the iPad.  You can't

22   do it.  And so I need something stronger to see this, to

23   store it.  I think we all underestimate -- it's like feeding

24   tons and tons of material into a toothpaste tube and

25   assuming that we're going to somehow be able to, like, you

```
 1    know, get that into the heads or -- and Mr. Biggs is going

 2    to want to review this, look at this.  He's a bright guy.

 3    He knows a lot about, you know, how Washington works in the

 4    sense that he's been there a lot.  He's been in lots of

 5    marches.  This is an important thing for him to do from the

 6    standpoint of, like, you know, going in now and starting to

 7    prepare.  And I could say to you, you know, Your Honor,

 8    let's -- you're right -- and I shouldn't say this -- let's

 9    get him to the D.C. Jail and then we'll see what happens and

10    we'll renew our -- a motion to -- for temporary release.  We

11    don't have the time.

12                 THE COURT:  Right.  I mean --

13                 MR. HULL:  (Inaudible) --

14                 THE COURT:  -- Mr. Hull --

15                 MR. HULL:  -- now.

16                 THE COURT:  -- I hear what you are saying.  I

17    think it cuts -- it cuts both ways.  What you need -- I

18    agree -- is a decision from me promptly, and you're going to

19    get one within a few days, but because -- you're right.  You

20    need -- he needs to be -- begin preparing now, and whether

21    that's going to be him released or be -- remaining where he

22    is now or being transferred to D.C., it has to be clarified

23    very promptly.  I --

24                 MR. HULL:  And just so I'm clear, I would rather

25    prepare him where he is now or at home than in the D.C.
```

```
1    Jail.  In the D.C. Jail, I will have very little verbal
2    contact with him.  He may have a laptop every once in a
3    while -- or not a laptop but a tablet, and I think this is a
4    concerning situation from a Sixth Amendment standpoint that
5    we should all worry about.  It's not fluff.  It's not, like,
6    a ruse to try to get, you know, him out of jail and back
7    home --
8              THE COURT:  No --
9              MR. HULL:  -- (inaudible) -- place he can actually
10   prepare for trial and get ready for this, and we're ready to
11   go to trial and he's supposed to be a big player.
12             THE COURT:  All right.  Let me just -- I've heard
13   a lot from the defense.  Does anyone from the Government
14   want to give me --
15             MR. JONES:  Yes, Your Honor.
16             THE COURT:  -- give me a response to anything
17   you've heard.
18             MR. JONES:  Yes, Your Honor.  I want to make sure
19   we're clear on a couple points --
20             THE COURT:  Okay.
21             MR. JONES:  -- in response to what Ms. Hernandez
22   raised.
23             To be clear, the data accessible via tablet is
24   cloud based.  So that's not a matter of loading on terabytes
25   and terabytes of data onto a tablet.  That -- to the extent
```

1   materials are accessible through the tablet, that's just

2   like accessing information in the cloud.

3         Within CTF, the defendants are each in their own

4   cell.  There are restrictions on where and when a defendant

5   can access a laptop, but the tablets are -- do not have the

6   same restrictions.

7         And I believe those are the two points I wanted to

8   make sure I responded to.  I, you know -- to the point

9   raised by Mr. Smith and Mr. Hull regarding the need for the

10  defendants to be prepared for trial, certainly, the -- it's

11  in the Government's interest that the defendants are, you

12  know, constitutionally prepared for trial and have access,

13  reasonable ability to review discovery.  That's our

14  priority, as well.  And I think the question before the

15  Court is how we get there.  And, you know, with respect to

16  the motion for 3142(i) release, to the extent that's before

17  the Court, you know, we believe that, you know, at this

18  point, we're still in a hypothetical posture and that there

19  are, you know, opportunities available at the D.C. Jail not

20  currently available to the defendants and that the Court

21  should permit that process to play out.

22        THE COURT:  Mr. Jones, is -- does the Government

23  agree that I have jurisdiction to grant -- given that --

24  given -- again, let's assume my memory is correct and that

25  what I -- well, no, I guess, Mr. Smith confirmed it.  Given

```
 1    the posture here today, does the Government have concerns

 2    that -- about whether I have jurisdiction to grant a

 3    3142(i), given that I denied it without prejudice to be

 4    renewed?  Again, assuming I con- -- I certainly consider

 5    their filing -- their subsequent filing to be a renewed

 6    31 -- a motion under 3142(i).

 7            MR. JONES:  Not aware of authority that, you know,

 8    strips jurisdiction of Your Honor to make that ruling.

 9            THE COURT:  Okay.

10            MR. JONES:  Could certainly check on that, but not

11    aware of authority that would remove jurisdiction to make a

12    ruling on 3142(i) --

13            THE COURT:  All right.

14            MR. JONES:  -- in light of the appeal.

15            THE COURT:  I get that you don't want me to grant

16    3142(i) release, but just on the jurisdictional point.

17            All right.  So I'm going to take that under

18    advisement and I'm going to --

19            MR. NICHOLAS SMITH:  Your Honor --

20            THE COURT:  -- get you all --

21            MR. NICHOLAS SMITH:  -- can we just --

22            THE COURT:  Yes?

23            MR. NICHOLAS SMITH:  -- make one more quick point,

24    Your Honor, before --

25            THE COURT:  Yes.
```

1          MR. NICHOLAS SMITH:  Okay.

2          THE COURT:  Very quickly, Mr. Smith.

3          MR. NICHOLAS SMITH:  Quickly, I can't recall if

4    Ms. Hernandez covered this, but the "no contact meetings"

5    protocol at the D.C. Jail means that attorney-client

6    privileged conversations will be extremely difficult.  That

7    is a really big hurdle.

8          And the second point, Your Honor, is that I think

9    the Court has an option -- has some optionality with 3142(i)

10   here that would allow it to split the difference if it's

11   inclined.  So the Court is correct that the parties would

12   need a ruling in the short term on this issue, but that

13   doesn't mean that the Court would have to grant release, if

14   it does grant release, immediately.  What it could do is it

15   could say that, Given the current trial date in May, I will

16   order the temporary release under 3142(i) between X and Y

17   dates.  So it could be dates at some point in the future

18   that the Court determines are sufficient to prepare for

19   trial outside of the restrictions imposed by the pandemic.

20   So --

21         THE COURT:  No question that 3142(i) allows -- I

22   mean, it's temporary release.  It's right there in the name.

23   So I agree with you on that.  Agree with you.

24         Let's -- so --

25         MS. HERNANDEZ:  I'm sorry, Your Honor.  May I say

1    one more thing about transfer to D.C. if that's the option

2    the Court is looking at?  With --

3              THE COURT:  Well --

4              MS. HERNANDEZ:  -- the COVID situation now, I am

5    positive that there would -- defendants would be quarantined

6    for at least 14 days after they arrived at D.C.  So whatever

7    delays there -- so there's another layer of problems.

8              THE COURT:  Yep, and I've been thinking about that

9    and, you know, again, I have to balance that against, you

10   know -- again, apart from the 3142(i) issue, Mr. Hull's

11   point is well taken, too, that they have to get where

12   they're going to be.

13             All right.  Let's just try to get some other

14   things -- again, I am sorry that -- in any event, I'll --

15   I'm going to get you a ruling on that very promptly.

16             MR. HULL:  I apologize, Your Honor.  If I may just

17   add one more thing, I would respectfully -- for the first

18   time, maybe, ever -- disagree with Mr. Smith, my learned

19   colleague, about what happened in our last status conference

20   and go back and, kind of, look at that with respect to

21   temporary release.

22             Also, you don't have to decide it tomorrow.  I'd

23   like you to think about it, and I'd like you to think about

24   the future dangerous [sic] arguments that I made earlier,

25   but --

```
 1                    THE COURT:  Well --
 2                    MR. HULL:  -- you know, once we do this, you know,
 3         we need to be in, sort of, a regime where people can start
 4         getting ready, and we're going to --
 5                    THE COURT:  Yep.
 6                    MR. HULL:  -- (inaudible) -- about that in a
 7         minute and I will be quiet.
 8                    THE COURT:  No, no, you're -- fair enough,
 9         Mr. Hull.
10                    Let's -- what I'd like to do also today, then, is
11         go ahead and set a pretrial conference date linked to the
12         trial date and set a motions schedule as well, and that will
13         put into great relief how quickly, I think, the parties are
14         going to have to be getting ready.  The dates -- let me just
15         grab the -- the date I had picked out was -- and I'm looking
16         at the calendar -- April 27th which is three weeks
17         beforehand -- three weeks before at least the date we have
18         to pick the jury.  Let me just pull it up here.  Yeah.  One,
19         two, three.
20                    Is there any -- let me just ask it this way.  Is
21         there any counsel that doesn't -- thinks that that date for
22         a pretrial conference could not work for them, including the
23         Government?
24                    MR. HULL:  I -- Your Honor, that would be a bad
25         week for me.  I'd like to do it the week before, if
```

```
 1            anything.  I will be out of -- I will be in Ohio that week
 2            and there's nothing I can do about it.  So --
 3                      THE COURT:  So --
 4                      MS. HERNANDEZ:  Your Honor, I'm in trial that week
 5            in front of Judge Boasberg if it goes forward.
 6                      THE COURT:  Well, I mean, obviously, we have a
 7            whole slew of cases being set for trial here, and this one
 8            in particular, I'm -- we're commandeering the entire
 9            ceremonial courtroom in -- for.  So it's going to have to
10            take some precedence over trials that courts -- that judges
11            have more flexibility in scheduling, obviously.  I can -- we
12            can adjust it to --
13                      Mr. Hull, your preference would be the 20th?
14                      MR. HULL:  Yes, sir.  It would.
15                      THE COURT:  All right.  Is there any party that
16            thinks they can't make the 20th work?
17                      (Brief pause.)
18                      All right.
19                      MS. HERNANDEZ:  Your Honor, I'm sorry.  I am in
20            trial -- I -- and I -- it's interesting, because it's a
21            four-defendant trial in front of Judge Boasberg.  I thought
22            that case was going to be tried in the ceremonial courtroom,
23            but I may be wrong.
24                      THE COURT:  Well, no, no, no, you're right that --
25            obviously, what I meant was -- is the -- we don't have to
```

```
 1    have our pretrial conference in the ceremonial courtroom.
 2    So that's fair, although I thought that -- I don't have the
 3    schedule in front of me, but I had thought that there was
 4    another trial that was lined up.  Which trial is that,
 5    Ms. Hernandez?
 6              MS. HERNANDEZ:  It's a local trial, U.S. v. Moore
 7    [ph].
 8              THE COURT:  Huh.  Okay.
 9              MS. HERNANDEZ:  And there's six defense counsel
10    and two prosecutors, four defendants.  So I don't know how
11    that gets held anywhere but a ceremonial courtroom.
12              THE COURT:  Well, is Judge Boasberg sitting on
13    Fridays?
14              MS. HERNANDEZ:  Not sure, but --
15              THE COURT:  I mean --
16              MS. HERNANDEZ:  He may not have -- he may not.
17              THE COURT:  Why don't we, then, just set it for
18    the week Mr. -- we could set it for the 22nd, which is a
19    Friday, in the hopes that Judge Boasberg won't be sitting on
20    Fridays.  Again -- and, maybe, if we had it early in the
21    morning, let's say, at 10:00 a.m., he would -- that's not
22    that early -- maybe, he'd give you a chance to participate.
23    Is that our best -- I mean, given your trial schedule, is
24    that the best we can do?
25              MR. JONES:  I --
```

 1              MS. HERNANDEZ:  I'm sorry.  Who --

 2              THE COURT:  Ms. Hernandez, is that --

 3              MS. HERNANDEZ:  Yes, sir.  That's fine.  I should

 4     be able to do something to accommodate that.  Yes.

 5              THE COURT:  All right.  Well, maybe -- Mr. Jones,

 6     you wanted to say something?

 7              MR. JONES:  No, I just -- I thought that might

 8     have been a date when Mr. Hull was in Ohio.  So I just

 9     wanted to make sure that wasn't a barrier.

10              THE COURT:  Mr. Hull, the 22nd works for you?

11              MR. HULL:  It does.  I'm not in Ohio.

12     Thank you --

13              THE COURT:  Okay.

14              MR. HULL:  -- Mr. Jones.

15              THE COURT:  Okay.  All right.  And let's do this.

16     We'll even set it for 9:30.  That way -- again, that will

17     give Ms. Hernandez, maybe, the best opportunity to try to

18     steal a little bit of time if she happens to be in trial

19     before Judge Boasberg.

20              MS. HERNANDEZ:  And, Your Honor, your

21     understanding is that would be in person?

22              THE COURT:  No, we don't -- I don't think -- well,

23     let's put it this way.  I don't want to, at this point --

24     but thank you for making me clarify this.  I think that the

25     question is whether we -- for whatever reason, the pretrial

1   motions that are filed will require, sort of, in-person

2   testimony or not.  If they don't, I don't -- if -- I don't

3   see a reason why we can't do it remotely, but -- so we'll

4   see what's filed and what the parties think and we'll go

5   from there, but presumptively I think we could do it -- I

6   could -- I think we could do it remotely.

7            The other -- I will say, the other benefit to

8   doing it in person -- and, frankly, again, given the volume

9   of defendants here, maybe, we won't be able to do it, given

10  the use of the ceremonial courtroom has to be put, but you'd

11  get a sense of how we're going to operate, you know, in

12  terms of COVID and all the precautions that have -- being

13  taken.  I don't know if you've tried a case in our

14  courthouse since the pandemic, Ms. Hernandez.  I have done

15  one.  It actually worked, I think, reasonably well.  But in

16  any event, let's say presumptively it's going to be remote

17  unless we go ahead and change things.

18           So look -- working backwards from the 20 -- from

19  that date of the 22nd, again, at 9:30, why don't -- what

20  I'll -- why don't we have -- I'll ask the parties to submit

21  a pretrial statement the week beforehand on the 13th and

22  I'll put in an order what I want to see in that pretrial

23  statement, but, you know, it will include the parties'

24  proposed jury instructions, exhibits, stipulations, a

25  proposed verdict form, the usual stuff.

```
 1              As far as a motions schedule, the dates that I

 2     thought made sense would be pretrial motions by March 16th,

 3     oppositions by the 30th, and replies by the 6th.  That is,

 4     April 6th.  Is that a schedule that the parties can live

 5     with?

 6              (Brief pause.)

 7              MR. JONES:  Speaking for the Government, Your

 8     Honor, that strikes us as a reasonable schedule.  Obviously,

 9     confer with my colleagues and others to make sure there's no

10     issues there and we'll let the Court know if that's the

11     case, but --

12              THE COURT:  All right.  Any defense counsel?

13              MR. HULL:  Not to go out of order, Your Honor, but

14     that sounds fine to me.  I would have a question I'm curious

15     about.  Assuming we're going to be in a COVID regime, let's

16     -- something like that, how long does it take to put

17     together a jury for this?  Does it make it longer?  I know

18     you're using more rooms and more space.

19              THE COURT:  Right.  I have found -- I found that

20     it does take a little longer because -- and we'll certainly

21     go through this on the -- in the pretrial conference --

22     because of the way we have to do it in terms of you can't

23     get the venire in the room at the same time -- you can't get

24     the entire venire.  So you, kind of, have to do it in two

25     parts.  So it does slow things down somewhat, but I picked
```

```
 1    a, you know -- obviously, it was not a case like this one,
 2    but I think we picked a jury in two days, a day-and-a-half.
 3    So it wasn't -- I thought, overall, the procedures went
 4    pretty smoothly, but there is a little bit of a -- extra
 5    time simply because you can't get everyone in the room at
 6    the same time with --
 7              MR. HULL:  Thank you.
 8              THE COURT:  -- proper spacing, etcetera.
 9              MR. HULL:  Thank you.
10              THE COURT:  All right.  So we'll set that as the
11    motion schedule unless there are -- anyone else objects.
12              And then the other thing that I usually set is --
13    and I don't know if it's going to be an issue here -- is an
14    early date for the Government to inform the defendants if
15    they're going to be using any 404(b) evidence in the case.
16    And I -- again, I don't know whether that's going to be an
17    issue here or not, but my thought was -- Mr. Jones, any
18    reason the Government couldn't notify the defendant and
19    provide any 404(e) -- (b) evidence by February 4th?
20              (Brief pause.)
21              MR. JONES:  That seems a little soon, Your Honor,
22    but -- for the Government.  I think we would request more
23    time than that.  Perhaps --
24              THE COURT:  All right.  I'll give you one more
25    week.  February 11th.  And if there's some reason why you
```

1     want to move to change that, you can --

2              MR. JONES:  Sure.

3              THE COURT:  -- let me know.  But I mean, I do

4     think if we're going to be in, you know -- if that's -- if

5     404(b) evidence --

6              MR. JONES:  Yep.

7              THE COURT:  -- is going to be at issue here, the

8     defendants have the right to know about that well in advance

9     and --

10             MR. NICHOLAS SMITH:  (Indicating.)

11             THE COURT:  Yes, Mr. Smith?

12             MR. NICHOLAS SMITH:  Your Honor, for the -- the

13    Court mentioned the pretrial statement, but we would just

14    like to make a request.  In addition to ID'ing Government

15    witnesses and the exhibit list, we'd like it to include a

16    listing of lesser included offenses that either party might

17    seek.  The Court might have included that anyway, but just

18    in case.

19             THE COURT:  Is that -- let me ask the Government.

20    Does the Government have any objection to that?

21             MR. JONES:  No objection to addressing that issue

22    at the same time as the pretrial statement.

23             THE COURT:  Okay.  I'll include it, then,

24    Mr. Smith.

25             All right.  So now, we have at least a framework

 1    going forward.

 2              And the other thing I'll just mention, Mr. Smith,

 3    you filed -- I have at least -- I have a motion you filed

 4    that the Government has to respond to.  So obviously, when I

 5    get their response and your reply, I'll move on those as

 6    quickly as I can.  If we need to come back with just you and

 7    your client, we'll do that just, you know, without delay,

 8    but I think the Government's response is -- I think it's due

 9    tomorrow, as I recall.  So we'll -- we won't let that

10    linger, but I wanted you to know that I know that's out

11    there.

12              MR. NICHOLAS SMITH:  (Indicates affirmatively.)

13              MR. JONES:  And, Your Honor, just to be upfront,

14    the Government's going to be seeking an extension with

15    respect to one of the motions filed by Mr. Smith, but we

16    will advise the Court of that.

17              THE COURT:  All right.  I will take your request

18    under advisement, but, obviously, we need to move things

19    forward as expeditiously as we can, but I'll certainly --

20    I'll see your motion.

21              MR. JONES:  Understood, Your Honor.

22              And if I could, with respect to the overall

23    schedule, the motions date of March 16th, I assume that is

24    with respect to all motions or is there -- is the Court

25    envisioning a motions in limine deadline or the ability --

```
 1                    THE COURT:  No, that --
 2                    MR. JONES:  -- for the parties to file motions in
 3         limine --
 4                    THE COURT:  That --
 5                    MR. JONES:  -- beyond that --
 6                    THE COURT:  That includes motions in limine.
 7         Motions to suppress, motions in limine, any pretrial
 8         motions.
 9                    MR. NICHOLAS SMITH:  Your Honor, the -- since the
10         pretrial statement will be following that motions deadline
11         by about a month, there could be some issues that come up
12         with -- for example, the defense isn't aware of certain
13         Government witnesses or exhibits.  We would need some
14         ability to try to strike at --
15                    THE COURT:  Certainly, if you didn't -- I mean,
16         look, I expect that the parties will be working on that
17         joint statement well in advance of the date it's due and,
18         frankly, also, that it would be, through discovery,
19         etcetera, foreseeable to you that certain motions might need
20         to be filed.  If you can make your case that you didn't have
21         notice of a particular issue or witness or whatever, you can
22         certainly move to late file that motion and I'll take that
23         up, but I don't -- I'm not going to say, Mr. Smith, that
24         there's a blanket policy that if you don't file it by that
25         date, you won't be heard.
```

1          MR. NICHOLAS SMITH:  Thank you.

2          MS. HERNANDEZ:  Your Honor, with respect to the

3     type of publicity generally on these cases and particularly

4     with respect to the Proud Boys, I anticipate that I would be

5     requesting a jury questionnaire --

6          THE COURT:  Hmm.

7          MS. HERNANDEZ:  -- and that voir dire would have

8     to be more exacting than ordinary.  I know there's a case

9     before the Supreme Court right now, I believe, on the type

10    of voir dire that's necessary in a case like -- with this

11    kind of publicity.  It arises out of the Boston Marathon

12    bombing.  And I don't know if -- I'm not sure whether -- I

13    think if a jury questionnaire goes out, it would need to go

14    out -- my understanding is, maybe, a couple of months before

15    the jury gets selected.  I don't -- I'm not -- I don't know

16    those details but might need to get that in advance of

17    March.  I don't know.

18          THE COURT:  Let me -- right now, we have your

19    pretrial statement being due -- I know we edited these dates

20    around a little bit -- the 13th -- April 13th.  Is that

21    correct?  I think it is.  Let me -- Ms. Hernandez, why don't

22    I take that and do some homework on that.  And if we do need

23    to -- if that will be something that you'll -- we may have

24    to set a separate -- I -- let me look into the timing issue

25    and, obviously, if we need to -- if I need to have -- direct

1   the parties to meet and confer about that and propose

2   something either jointly or separately, I'll set a separate

3   date for that earlier, but thank you for that catch.

4               MR. HULL:  An excellent suggestion that I --

5               THE COURT:  Yeah.

6               MR. HULL:  -- (inaudible) -- need that in this

7   one.

8               THE COURT:  It may -- whether we do or don't, we

9   have to -- if we need to decide earlier, we will do that.

10              All right.  That's what I had on my to-do list at

11  least to lock in.

12              Let me ask the Government, is there anything

13  else -- other than me deciding the 30 -- now the renewed

14  3142(i)/transfer issues, is there anything else you think

15  you want to raise with me here today?

16              MR. JONES:  I think we still need a date to come

17  back --

18              THE COURT:  Right.

19              MR. JONES:  -- and --

20              THE COURT:  Right.  Fair --

21              MR. JONES:  -- and then the speedy trial which is,

22  at least for now, automatically tolled and -- under the

23  Chief Judge's order, and I -- presumably the pending motion.

24              THE COURT:  Yeah.  I mean, I -- well, I think the

25  reality is -- at least because of Mr. Nordean's motion, I

1    think it is tolled by virtue of that motion.  So I don't

2    know that we need to make findings about the Speedy Trial

3    Act.  That said, I guess coming back is fine.  I was

4    thinking partly the answer to that was I wanted to see what

5    the Government's response to Mr. Nordean's motion is, but I

6    do think it makes sense to make a -- to have an interim

7    status.  So let's try to pick that out.

8            How does -- well, some of this -- we've been

9    having them on Tuesdays, Ms. Hernandez, you'll be interested

10   to know, because that was the day that we were told it was

11   most likely that we would get your client with us or most

12   likely or even -- that may have been the only date.

13   Ms. Harris could, maybe, correct me.  But -- so I say we --

14   I think it makes sense to stick with Tuesdays.  How about we

15   just come back -- because, again, I don't want to let things

16   get too far without making sure that things are on track --

17   that the -- let's see.  I have a bunch of matters, although

18   I could -- I can move them.  The date that I think makes

19   sense is February 8th if the parties are available.  I have

20   some things in the morning, but, again, because this was the

21   time that we thought it was most likely we'd be able to have

22   all four defendants, I think it makes sense to stick with it

23   and I can reschedule some of these other matters.  But how

24   does February 8th at 10:00 o'clock look --

25            First of all, Ms. Harris, is that -- for all the

1    reasons we've discussed in the past, that's a good date, I

2    assume, in terms of maximizing the chances we'll have all

3    four defendants with us; correct?

4              THE DEPUTY CLERK:  Yes, it maximizes the chances.

5              THE COURT:  Okay.  Is there any defendant who --

6    or any counsel who could not make February 8th at 10:00

7    o'clock?

8              (Brief pause.)

9              All right.

10             MR. JONES:  Works for the Government, Your Honor.

11             THE COURT:  Fantastic.  All right.  So let's come

12   back February 8th at 10:00 o'clock.  And, obviously, at that

13   point, I'll -- I will have resolved this -- these other

14   motions -- or I will have resolved the issue we discussed

15   here today.  With regard to Mr. Smith's motion --

16   Mr. Nordean's motion, the parties should be prepared -- if I

17   don't resolve that beforehand, the parties should certainly

18   be prepared to discuss that on that date.

19             MR. NICHOLAS SMITH:  (Indicating.)

20             THE COURT:  Yes, Mr. Smith?

21             MR. NICHOLAS SMITH:  Just so the Court knows; that

22   there are two under -- there are two motions.  There's one

23   motion that's under seal.  That's --

24             THE COURT:  I do know that, and I was going to

25   say, I don't know how the Government will respond -- what

1    their response is going to be to that, but what we will do

2    is prepare that day to -- if we need to, to go under seal to

3    address that motion if it's not resolved before then.

4              MS. HERNANDEZ:  Your Honor, may I ask with

5    Mr. Rehl if the Court could inquire of the facility whether

6    they could at least allow him to join by phone?  Perhaps the

7    problem is the video hookup that may be causing them to,

8    sort of, shortcut his access.

9              THE COURT:  Ms. Hernandez, if I -- obviously --

10   well, of course.  Number one, of course.

11             So Ms. Harris, I know you're shaking --

12             Ms. Harris is shaking her head.  Yeah, we've -- I

13   think that she -- I trust Ms. Harris would have tried that,

14   and I can tell by the expression on her face that she has

15   tried.  Ms. Hernandez --

16             THE DEPUTY CLERK:  Judge Kelly --

17             THE COURT:  -- maybe -- yes?

18             THE DEPUTY CLERK:  Judge Kelly, can I just let

19   Ms. Hernandez know the procedure?  Because she's not privy

20   to what the procedure is there on how I even schedule.

21             THE COURT:  All right.  Why don't we --

22             THE DEPUTY CLERK:  I just --

23             THE COURT:  You --

24             MS. HERNANDEZ:  I can talk to your deputy, Your

25   Honor.

1         THE COURT:  I think -- why don't we -- can you

2    have that conversation after --

3         MS. HERNANDEZ:  Yes.

4         THE COURT:  -- we've concluded here today.  I

5    think -- and, Ms. Hernandez, that's something -- again,

6    whenever we get your client here and we can -- and we

7    discuss things and where he's to be detained, you know,

8    that's something you need to keep in mind.  It's just --

9    it's been very, very difficult to get him present for this

10   case.  I think it's a real problem.

11        MS. HERNANDEZ:  It's not easy to get defendants

12   from D.C. Jail either, just --

13        THE COURT:  Well, but -- well, I've had enough --

14   I -- if -- with proper scheduling and that -- you've raised

15   the point about co-defendants, and that is a problem.  No

16   question.  They won't put a number of people in one place at

17   a time.  But other than that, it's not a problem.  And with

18   him, it's just really been a -- quite a big problem.

19        All right.  So with our next date and time

20   confirmed and, again, motions pending that toll the speedy

21   trial until -- well, toll the speedy trial, anything further

22   from the Government at this point?

23        MR. JONES:  No, Your Honor.

24        THE COURT:  All right.  Anything further from any

25   defense counsel at this point?

1          MR. NICHOLAS SMITH:  No.

2          MR. HULL:  No, sir.

3          THE COURT:  All right.  We will -- you'll get, as

4    I said, an order from me shortly on what we discussed here

5    today, and I'll take a look at the motion -- the

6    Government's responses to Mr. Nordean's motions when they

7    come in.  So until February 8th, the parties are dismissed.

8          MR. DAVID SMITH:  Thank you, Your Honor.

9          THE DEPUTY CLERK:  Ms. Hernandez, please just stay

10   on and once everyone leaves I'll explain it to you.

11          (Proceedings concluded at 11:40 a.m.)

12          * * * * * * * * * * * *

13          **CERTIFICATE OF OFFICIAL COURT REPORTER**

14       **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby**

15   **certify that the above and foregoing constitutes a true and**

16   **accurate transcript of my stenographic notes and is a full,**

17   **true and complete transcript of the proceedings to the best**

18   **of my ability, dated this 15th day of April 2022.**

19       **Please note:  This hearing occurred during the COVID-19**

20   **pandemic and is, therefore, subject to the technological**

21   **limitations of court reporting remotely.**

22                              **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                               **Official Court Reporter**
23                             **United States Courthouse**
                               **Room 6722**
24                             **333 Constitution Avenue, NW**
                               **Washington, DC 20001**

25