```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
- - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-3
                                          1:21-cr-00175-TJK-5
1-ETHAN NORDEAN                           1:21-cr-00175-TJK-6
2-JOSEPH RANDALL BIGGS
3-ZACHARY REHL                    Washington, D.C.
5-ENRIQUE TARRIO                  Thursday, June 9, 2022
6-DOMINIC PEZZOLA,                2:30 p.m.
                   Defendants.
- - - - - - - - - - - - - - - - x
```
_____

### TRANSCRIPT OF MOTION HEARING
#### HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
#### UNITED STATES DISTRICT JUDGE
_____

**APPEARANCES VIA VIDEOCONFERENCE:**

```
For the United States:  Jason B.A. McCullough, Esq.
                        Conor Mulroe, Esq.
                        U.S. ATTORNEY'S OFFICE
                        555 4th Street, NW
                        Washington, DC 20530
                        (202) 252-7233

For the Defendants:     Nicholas D. Smith, Esq.
                        DAVID B. SMITH, PLLC
                        7 East 20th Street
                        Suite 4r
                        New York, NY 10003
                        (917) 902-3869

                        John D. Hull, IV, Esq.
                        HULL MCGUIRE PC
                        1420 N Street, NW
                        Washington, DC 20005
                        (202) 429-6520

                        Carmen D. Hernandez, Esq.
                        7166 Mink Hollow Road
                        Highland, MD 20777
                        (240) 472-3391
```

APPEARANCES VIA VIDEOCONFERENCE CONTINUED:

```
For the Defendants:      Nayib Hassan, Esq.
                         LAW OFFICES OF NAYIB HASSAN, P.A.
                         6175 NW 153 Street
                         Suite 209
                         Miami Lakes, FL 33014
                         (305) 403-7323

                         Sabino Jauregui, Esq.
                         JAUREGUI LAW, P.A.
                         1014 West 49 Street
                         Hialeah, FL 33012
                         (305) 822-2901

                         Steven A. Metcalf, II, Esq.
                         METCALF & METCALF, P.C.
                         99 Park Avenue
                         6th Floor
                         New York, NY 10016
                         (646) 253-0514


Court Reporter:          Timothy R. Miller, RPR, CRR, NJ-CCR
                         Official Court Reporter
                         U.S. Courthouse, Room 6722
                         333 Constitution Avenue, NW
                         Washington, DC 20001
                         (202) 354-3111
```

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1                      **P R O C E E D I N G S**

2              THE DEPUTY CLERK:  We are on the record in

3    Criminal Matter 21-175, United States of America v.

4    Defendant 1, Ethan Nordean; Defendant 2, Joseph R. Biggs;

5    Defendant 3, Zachary Rehl; Defendant 5, Enrique Tarrio,

6    Defendant 6, Dominic J. Pezzola.

7              Present for the Government are Jason McCullough

8    and Conor Mulroe; present for Defendant 1 is Nicholas Smith;

9    present for Defendant 2 is John Hull; present for Defendant

10   3 is Carmen Hernandez; present for Defendant 5 are Nayib

11   Hassan and Sabino Jauregui; present for Defendant 6 is

12   Steven Metcalf.  Also present are Defendant 2, Mr. Biggs;

13   Defendant 5, Mr. Tarrio; and Defendant 6, Mr. Pezzola.  The

14   appearance for Defendant 1, Mr. Nordean, and Defendant 3,

15   Mr. Rehl, has been waived.

16              THE COURT:  All right.  Good afternoon to

17   everyone.

18              And let me just have -- if I can, very quickly,

19   make sure Mr. Smith and Ms. Hernandez waive the presence of

20   their clients or are comfortable with waiving the presence

21   of their clients for the purposes of this hearing.

22              Mr. Smith?

23              MR. SMITH:  Good afternoon, Judge.  Yes, on behalf

24   of Mr. Nordean, we waive his presence today.

25              THE COURT:  And, Ms. Hernandez?

```
 1            MS. HERNANDEZ:  Same here, Your Honor.  He would

 2    prefer to participate, but we are where we are.

 3            THE COURT:  All right.  Very well.

 4            The first thing, then, is for -- a few house- --

 5    we're here primarily for me to hear, Mr. Smith, you and the

 6    Government argue your motion regarding Brady, but I have a

 7    couple of housekeeping matters before we get to that.

 8            First, is there any reason why, with the consent

 9    of the defendants we do have, they shouldn't be arraigned on

10    the indictment that has come -- the super- -- the third

11    superseding indictment?  First, let me just ask, I guess,

12    Mr. McCullough.  There, I see -- is it your request that I

13    arraign the defendants we have here today, today?

14            MR. MCCULLOUGH:  Those defendants that are

15    present, Your Honor, if it works for the Court, then it

16    makes sense to arraign them today.  If Your Honor would

17    prefer, in the matter of efficiency, to wait until everybody

18    is together, we understand that, but it seems that given our

19    difficulties, it makes sense to arraign those that we have

20    today.

21            THE COURT:  I think that's right.

22            Does any counsel -- let me put it this way.  In

23    order for us to do that, I'd have to have Mr. Biggs,

24    Mr. Tarrio, and Mr. Pezzola agree to that.  So let me ask

25    Mr. -- counsel for each of them whether they agree to --
```

1    whether their client would agree to be arraigned via

2    videoconference here today.

3              Mr. Hull, I'll -- I guess I'll start with you.

4              MR. HULL:  Yeah -- excuse me -- he does, Your

5    Honor.

6              THE COURT:  All right.

7              MR. HULL:  We agree.

8              THE COURT:  Mr. Hassan, I'll ask you next.

9              MR. HASSAN:  Yes, Your Honor.

10             THE COURT:  All right.  And, Mr. Metcalf?

11             MR. METCALF:  Yes, Your Honor.  We agree.

12             THE COURT:  All right.  Very well, then.

13             Ms. Harris, why don't you go ahead and then

14   arraign those three defendants.

15             THE DEPUTY CLERK:  Yes, Your Honor.

16             I'll begin with Defendant 2 and Defendant 5.

17             Joseph R. Biggs and Enrique Tarrio, in Criminal

18   Matter 21-175, you are each charged with 18 United States

19   Code Section 2384, seditious conspiracy; 18 United States

20   Code Section 1512(k), conspiracy to obstruct official

21   proceeding; 18 United States Code Sections 1512(c)(2) and 2,

22   obstruction of an official proceeding and aiding and

23   abetting; 18 United States Code Section 372, conspiracy to

24   prevent an officer from discharging any duties; 18 United

25   States Code Sections 231(a)(3) and 2, obstruction of law

1   enforcement during civil disorder and aiding and abetting;

2   18 United States Code Sections 1361 and 2, destruction of

3   government property and aiding and abetting; and 18 United

4   States Code Section 111(a)(1), assaulting, resisting, or

5   impeding certain officers.

6           Mr. Hull, does your client waive the formal

7   reading of the third superseding indictment?  And for the

8   purposes of this arraignment, how does he wish to plea?

9           MR. HULL:  He does, and he pleads not guilty to

10   all charges.

11           THE DEPUTY CLERK:  A plea of not guilty is entered

12   for Defendant 2, Joseph Biggs.

13           And, Mr. Hassan, does your client waive the formal

14   reading of the third superseding indictment?  And for the

15   purposes of this arraignment, how does he wish to plea?

16           MR. HASSAN:  He waives formal reading of the

17   indictment, enters a plea of not guilty as to all charges,

18   and requests that the Court maintain the standing discovery

19   order.

20           THE DEPUTY CLERK:  A plea of not guilty is entered

21   for Defendant 5, Enrique Tarrio.

22           Dominic J. Pezzola, in Criminal Matter 21-175, you

23   are charged with 18 United States Code Section 2384,

24   seditious conspiracy; 18 United States Code Section 1512(k),

25   conspiracy to obstruct official proceeding; 18 United States

1    Code Sections 1512(c)(2) and 2, obstruction of an official

2    proceeding and aiding and abetting; 18 United States Code

3    Section 372, conspiracy to prevent an officer from

4    discharging any duties; 18 United States Code Sections

5    231(a)(3) and 2, obstruction of law enforcement during civil

6    disorder and aiding and abetting; 18 United States Code

7    Sections 1361 and 2, destruction of Government property and

8    aiding and abetting; 18 United States Code Section

9    111(a)(1), assaulting, resisting, or impeding certain

10   officers; and 18 United States Code Section 2112, robbery of

11   personal property of the United States.

12           Mr. Metcalf, does your client waive the formal

13   reading of the third superseding indictment?  And for the

14   purposes of this arraignment, how does he wish to plea?

15           MR. METCALF:  Waives formal reading and pleads not

16   guilty to all counts.  Thank you.

17           THE DEPUTY CLERK:  A plea of not guilty is entered

18   for Defendant 6, Dominic J. Pezzola, Your Honor.

19           THE COURT:  All right.  Very well.

20           A couple of other housekeeping notes.  I talked to

21   the parties, I think, last time we were all here about the

22   issue of potential -- excuse requests coming in from

23   potential members of the panel.  I was misinformed.  We

24   don't have any of those in play right now, but as I

25   mentioned earlier, what typically happens is I will be

1    informed of them.  I will make them available to counsel to

2    come in.  What -- the procedure that, I think, makes sense

3    is I've asked -- so we -- we're not -- I don't have to

4    bother you all every time one comes in, is I've asked the

5    Clerk's Office to just inform me when we get them every --

6    if we get some -- every Tuesday, and whatever batch that is

7    that we might get, I will let the counsel know and I'll give

8    counsel the opportunity to come in and take a look at the

9    request -- the excuse forms, and you'll have until Friday to

10   let me know if you have any objection to my releasing of

11   that person from the potential panel.  We don't have any

12   yet, so we haven't had to go down this path, but I just

13   wanted to let you all know we'll reach out to counsel via

14   email; let you all know when they come in; you'll have until

15   Friday; and then that Monday, I will let the Clerk's Office

16   know either this person is excused or they're not or

17   whatever the case may be so that the potential members of

18   the panel will have that information on a rolling basis.

19   That's number one.

20          The other, kind of, jury-related point of --

21   housekeeping point I wanted to mention to everyone is -- and

22   we've, kind of, touched on this before -- I am considering

23   using a pre-voir dire questionnaire and we can talk about as

24   -- what my thought is on that; it probably won't be that

25   different from the types of questions I might ask -- kind

1    of, the global questions I might ask everyone who comes in

2    on a panel in a -- on a typical case.  Obviously, we'll have

3    to talk a little bit more about certain unique features of

4    this case, but it might not be that different, but in any

5    event, what I will probably do is just ask the parties to

6    think about potential questions and include them in the

7    joint pretrial statement that the scheduling order already

8    reflects and we can talk about them at the pretrial

9    conference about what -- how I might capture your concerns

10   with questions that would be part of that pre-voir dire

11   questionnaire that the jurors would fill in right when they

12   come in on the day they're scheduled to come in which is

13   August 8th.

14           Any questions on either of those two points before

15   we move on to the motion?

16           MS. HERNANDEZ:  Your Honor, on the questionnaire,

17   I think I had indicated my understanding is that there's a

18   deadline if they're going to be presented to the jurors in

19   advance.

20           THE COURT:  So I looked into that, Ms. Hernandez,

21   and that is generally not done here as far as the

22   information from the jury office that I was told.

23   Obviously, they are told, you know, It's a -- going to be a

24   six-week case, and if you aren't able to make it, tell us

25   your excuse.  But the process that was laid out to me by our

1    jury office is to give them a questionnaire right when they

2    come in on the first day and then we can talk about how we

3    want to address that, but they -- we can take some period of

4    time to look at those questionnaires and decide whether the

5    parties and I want to excuse anybody based solely on the

6    questionnaire.  I'm, you know -- for some types of excuses,

7    we might all agree, look, this person says -- maybe, they

8    weren't caught in the first round and it's an issue of,

9    Well, I have -- I, you know -- I have some legitimate

10   personal excuse that I can't be present for that long, and

11   we might all agree to release them, or it's someone whose

12   connection to the events of the day are so obvious that we

13   all agree, you know?  For some other things where it's a

14   grayer area, I think we're going to have to, you know, have

15   them come back and just deal with them like we would every

16   other juror and simply question -- (inaudible.)

17        MS. HERNANDEZ:  With all due respect, Your Honor,

18   this is not your typical case.  I said with all due respect.

19   We have hearings starting this evening that are going to be

20   focused on our clients.  We've delayed the trial for more

21   than a year because of the unprecedented nature of the case.

22   The fact that we don't -- and I agree.  This District does

23   not ordinarily provide questionnaires.  This is not the

24   ordinary case, Your Honor.

25        THE COURT:  But, Ms. Hernandez --

1          MS. HERNANDEZ:  Judge Mehta is -- the most similar

2     case is the Oath Keepers case pending before Judge Mehta.

3     He --

4          THE COURT:  Right.

5          MS. HERNANDEZ:  -- actually brought up the notion

6     of providing -- of doing a questionnaire.  Judge Chutkan has

7     granted a motion to do a questionnaire.

8          THE COURT:  To send -- Ms. Hernandez --

9          MS. HERNANDEZ:  (Inaudible) -- conspiracy, Your

10    Honor.

11         THE COURT:  Ms. Hernandez, just to be -- just so

12    I'm clear with what you're saying, I'm not -- you -- it's

13    more than a questionnaire, what you're saying those judges

14    are doing.  You're saying they are going to send them out

15    ahead of time.

16         MS. HERNANDEZ:  No.  My understanding is the

17    jurors -- the panel --

18         THE COURT:  Right.

19         MS. HERNANDEZ:  -- will be brought in in

20    advance -- on a date in advance -- that's why I asked about

21    when that deadline was --

22         THE COURT:  I see.

23         MS. HERNANDEZ:  -- and will fill out the

24    questionnaires while in the courthouse.

25         THE COURT:  Right.

 1          MS. HERNANDEZ:  We will get the questionnaires.

 2     So not the day that we're going to be selecting them.

 3     Some --

 4          THE COURT:  Right.

 5          MS. HERNANDEZ:  Some period of time in advance.

 6     We will all get the questionnaires: the Court, the

 7     Government, defense counsel.  We can --

 8          THE COURT:  Right.

 9          MS. HERNANDEZ:  -- go through them.  That type of

10     thing.  And, again, not only is -- are these January 6th

11     cases different, but this particular case is different.

12          THE COURT:  Sure.

13          MS. HERNANDEZ:  As I say, the most analogous case

14     is the Oath Keepers conspiracy in front of Judge Mehta.  I

15     --

16          THE COURT:  I think the only thing, then, we're --

17     I don't know if we're disagreeing about -- but that I --

18     I'll get more clarity about is whether -- my -- I don't have

19     an understanding that in those cases, they're actually

20     coming in before the trial date, but I might be wrong, but

21     I'll see.  It may just be that the day that the jury is

22     picked is a day or two after that first date because the

23     first thing they're going to do when they come in is fill

24     out the questionnaire, but I'll get more -- I hear what

25     you're saying.  I'll get more clarity on that.  If there's a

1    way to do that, I'm open to that.  I'm trying to be as

2    practical, again --

3            MS. HERNANDEZ:  And I think, as Mr. Smith noted,

4    it is -- it not only protects our clients' due process

5    rights and rights to a fair trial; it expedites --

6            THE COURT:  Right.

7            MS. HERNANDEZ:  -- the jury selection.

8            THE COURT:  I hear you.  I mean, I hear what you

9    are saying.  I think the only thing we're now debating --

10   and I want to go back and get some more information -- is to

11   see whether it is possible to bring them in early or whether

12   we're just talking about the -- having them here --

13   basically, having them fill out the questionnaire a week

14   before August 8th, if that's possible, or whether it's the

15   question of they fill it out on August 8th and we have a few

16   days to go through it and we have them -- we actually pick

17   the jury on August 10th, to just take a random date.  So

18   I'll -- but I'll look into more of that, but I don't

19   disagree with you in theory that it will be a timesaver if

20   done right.  And so I think we just have to figure out how

21   to get that done, but I don't disagree.

22           MS. HERNANDEZ:  You agree with me too often in

23   theory and then deny my motions.

24           THE COURT:  No --

25           MS. HERNANDEZ:  I just want to say that.

 1                  (Laughter.)

 2                  THE COURT:  All right.  Fair enough.

 3                  All right.  So with those two -- but I -- and

 4      it -- and to your point -- I mean, the main thing that you

 5      had raised is whether there's this deadline, and I doubt

 6      that there would be a deadline that would be before whatever

 7      date they would be brought in.  So anyway, I'll do a little

 8      more homework on that timing issue.

 9                  MS. HERNANDEZ:  Thank you, Your Honor.

10                  THE COURT:  Absolutely.

11                  MR. MCCULLOUGH:  Your Honor, prior -- if -- prior

12      to getting to the motion, I just wanted to raise one item

13      which, I think, falls into the category of, kind of,

14      housekeeping in general issues with respect to the trial and

15      upcoming dates.  The issue that I wanted to raise is that,

16      as everyone knows -- everyone on this call knows, the House

17      Select Committee is conducting an investigation into the

18      events of January 6th.  Public reporting indicates that the

19      committee has interviewed approximately 1,000 witnesses.  We

20      do not have copies of the transcripts of those interviews.

21      We have asked the committee to review the transcripts, but

22      we have not been able to negotiate an agreement with them

23      that would permit us to disclose those transcripts to the

24      defense where it would be necessary under law and our

25      discovery obligations.  We have no ability, as Your Honor

1    knows, to compel Congress, a coordinate branch of

2    government, to give those transcripts to us.  We also

3    understand that the committee is going to hold six public

4    televised hearings during the month of June.  We understand

5    further that the committee expects to release the copies of

6    the 1,000 transcripts to the public in early September and

7    that a report of the committee's findings will be released

8    around the same time.

9            As I mentioned, Your Honor, the executive branch

10   does not control the manner or the timing of the committee's

11   release of information, but if the public reporting is

12   correct, it would appear that a large volume of materials

13   that neither the Government nor the defense currently have

14   access to will be released to the public in the middle of

15   our August trial.  So we wanted to raise this issue as one

16   that the Court and the parties should consider and confer

17   about in advance of the August 8th trial date.

18           MS. HERNANDEZ:  Another indication --

19           MR. SMITH:  Your Honor -- Ms. Hernandez, may I

20   have an opportunity to respond to Mr. McCullough?

21           Judge, may I just make one comment about the same

22   subject matter that --

23           THE COURT:  Yes, Mr. Smith.

24           MR. SMITH:  Okay.  Judge, the Court has spent many

25   hours over the past few status conferences laboring to

1    balance the parties' schedules and interests in setting a

2    trial date, and in creating scheduling orders, the Court

3    knows that because of various different developments in the

4    case, it's had to put off a couple of trial dates -- or the

5    May trial date, and the parties have scrambled to keep up

6    with the scheduling orders that the Court has submitted and

7    then, Your Honor, last week -- well, rather, go backwards in

8    time.  The Government represented to the Court that if there

9    was going to be a new indictment and new charges in this

10   case, new defendants, they would return it in May.  That

11   didn't happen.  And now, they've returned a sedition charge

12   in June with two months to go before trial, Judge.  And so

13   we have this new charge.  And the first question, I'm sure,

14   the Court asked was, are there any new allegations or is

15   there some --

16              THE COURT:  Mr. Smith, just out of curiosity, how

17   does this link -- we -- Mr. McCullough's point was about the

18   January 6th committee and the issue that that -- and the

19   fact that --

20              MR. SMITH:  Judge, I'm about to close the loop.

21              THE COURT:  All right.

22              MR. SMITH:  Okay.

23              THE COURT:  All right.

24              MR. SMITH:  So I'm sure the Court reviewed the new

25   charges and saw that there are no new allegations that this

1    sedition charge is based on.  So the question, then,

2    becomes, why now?  Why is the indictment being returned now

3    when the Government represented to the Court that it would

4    be returned in May, if at all, and this sedition charge, if

5    it was going to be brought, could have brought eight months

6    ago -- the Government could have brought it eight months

7    ago?  So the only explanation that makes any sense, Your

8    Honor, is the Government is timing this indictment to

9    coincide with the hearing on Capitol Hill that

10   Mr. McCullough just referenced and that he said that his

11   office had nothing to do with and, Judge, this is pretty

12   unnerving.  There is no other explanation to the timing --

13             THE COURT:  Mr. Smith, I think to make sweeping

14   conclusions about that there is no other explanation for the

15   timing of this is unwarranted.  Let me put it that way.

16             MR. SMITH:  Well --

17             THE COURT:  And I --

18             MR. SMITH:  -- Judge --

19             THE COURT:  And so I --

20             MR. SMITH:  -- we will respectfully disagree that

21   it's unwarranted.  We will -- we would submit that it's

22   perfectly reasonable and lying on the surface, but, Your

23   Honor, there's still a problem here which is that the

24   Government has represented to the Court many times that an

25   indictment would be filed in May, if at all.  It broke that

 1    commitment to the Court and it brought a charge that is

 2    going to necessitate extremely heavy briefing, as it knows

 3    right now, immediately.  So I think, Judge, what you'll hear

 4    from one of the other counsel today is that the defense have

 5    a proposed amendment to the briefing schedule to accommodate

 6    motion to dismiss briefing and other briefing that would

 7    extend the current deadline.  Judge, the current deadline

 8    for pretrial motion is now June 15th which is -- which would

 9    be impossible to accommodate with the new charges.  So I

10    think my point, Your Honor, is that you have the prosecutor

11    now suggesting that because of something that the Government

12    knew months ago, we probably can't hold the trial -- it

13    would be unwise to hold the trial in August --

14             THE COURT:  No, no, I -- Mr. Smith, I don't hear

15    Mr. McCullough saying that.  I --

16             Mr. McCullough, are you -- is that what you're

17    suggesting, Mr. McCullough?

18             MR. MCCULLOUGH:  Your Honor, so first of all, the

19    Government strenuously objects to the, kind of, premise that

20    there's any coordination going on between this office and

21    the House Select Committee in terms of the timing of the

22    decision to indict and to bring a superseding indictment

23    here in this case.  So full stop on that.

24             The information in terms of the release of

25    information that would be relevant -- the release of 1,000

1    interviews and a final report in the middle of the trial was

2    something that we wanted to make sure that all parties were

3    aware of, including the Court and defense counsel, so that

4    everyone could adequately consider it and plan for it.  That

5    is the statement.  And so that is, kind of, part two of

6    this.  The suggestion that this has been timed in some way

7    to coincide with that, not true.

8           Finally, in -- as Mr. Smith noted, the factual

9    allegations in the third superseding indictment are entirely

10   consistent with the second superseding indictment.  So the

11   charges are predicated on the facts as they were set forth

12   in the second superseding indictment.  There is substantial

13   overlap with the existing charges.  And so, you know, here,

14   it's just simply that this conduct gave rise to multiple

15   crimes and the Government made the determination to bring

16   the third superseding indictment.  And so, you know, we

17   understand that there may need to be additional briefing

18   that takes place, and to the extent that there needs to be

19   an extended briefing schedule to accommodate the additional

20   motions to dismiss, the Government does not oppose that.

21          THE COURT:  All right.  So I -- look, with regard

22   to the January --

23          MS. HERNANDEZ:  I'm awed with the Government's

24   graciousness, Your Honor.

25          THE COURT:  With regard to the January 6th

```
 1    committee, what they do is, as I think we all recognize,
 2    beyond the power of anyone around our table here today but
 3    beyond any of our ability to affect.  So we're going to have
 4    to -- I certainly think it is fair for the Government to,
 5    sort of, put that on the table right now and for us to be
 6    thinking about how, if at all, that affects us going
 7    forward.  I didn't see it as a reason not to -- to delay our
 8    trial, but it -- we're all going to have to think about how
 9    -- the fact that the committee exists, the fact that they
10    are holding these hearings, and that they may or may not
11    disclose the documents and the evidence that Mr. McCullough
12    mentioned that we're going to have to think about how we all
13    want to consider that, but as far as I'm concerned, if I
14    don't have any -- one side or the other asking for any
15    delay, we're going to assume that we're going forward, but
16    I'll hear either -- any party on whether you think a delay
17    is warranted.  I mean, but --
18                MR. SMITH:  Judge --
19                THE COURT:  -- I don't have that request before me
20    today, clearly.
21                MR. SMITH:  Judge, we'd like to just stress
22    something that might seem obvious but it bears mentioning
23    again and again which is that mixing politics and criminal
24    justice is dangerous and we have to run from it like fire,
25    Judge.
```

1          THE COURT:  I --

2          MR. SMITH:  It's extremely dangerous and it might

3    seem silly to say, but if you look at the timing of the

4    Government's indictment last week and when the charges could

5    have been brought and what is coming from Capitol Hill this

6    week, there is no doubt.  What is happening is dangerous and

7    it's un-American, Judge.

8          THE COURT:  I wholly agree that politics and law

9    enforcement are -- you don't want the peanut butter of one

10   to be in the chocolate of the other.  There's no question.

11   It's important for the rule of law.  It's important for our

12   country.  No question.  But I mean, the Government said --

13   had represented that they anticipated something happening in

14   May and the timing was such that it slipped briefly.  So I

15   don't -- to me, I can't connect the dots that you want to,

16   Mr. Smith.  Frankly, you know, if it had been the week

17   before, it would have been May, too, and you'd probably be

18   making the same argument.  So I'm not -- I -- look, I think

19   we all have to think about how that -- the things

20   Mr. McCullough put on the table will affect -- could affect

21   our proceeding, but I don't think there's anything for me to

22   address here today about that.

23          The one thing there is something for me to address

24   I agree with you on -- and I think the Government agrees as

25   well -- is, obviously, you may -- we may need to build in --

1    we need to build in any timing for a motion to dismiss that

2    the parties want to bring.  So let me just --

3                 MS. HERNANDEZ:  Your Honor --

4                 THE COURT:  Yes?

5                 MS. HERNANDEZ:  -- before you move on --

6                 THE COURT:  Yep.

7                 MS. HERNANDEZ:  -- I'd like to know whether the

8    Government -- well, one, I -- let me say this.  I respect

9    that the Court is trying to take both sides at their word,

10   but I'd like to know when the Government first learned that

11   there was going to be 1,000 transcripts of witness

12   interviews that would be dropped on our lap sometime on or

13   around the trial date.  It may not have been in the middle

14   or before or whatever.  And, more importantly, I would like

15   to know; I'd like the Court to inquire what other surprises

16   are lurking in the background.  I will say the following.

17   It is my understanding from -- I won't tell the Court where

18   I'm getting my information, unless the Court orders me --

19   that there may be -- still be yet another superseding

20   indictment.  Your Honor, we all -- Mr. Tarrio's lawyers in

21   particular deserve great credit for trying to get up to

22   speed.  I entered the case in December.  We're trying to get

23   up to speed.  Our clients are detained.  Let's put it all on

24   the table.  We -- I mean --

25                 THE COURT:  Well --

```
 1              MS. HERNANDEZ:  -- this is -- I apologize, Your

 2    Honor.

 3              THE COURT:  No, no --

 4              MS. HERNANDEZ:  (Inaudible) -- complain about the

 5    manner in which discovery's being produced, the extent of

 6    the discovery, and seditious -- there are two -- I won't go

 7    off on that tangent.  Seditious conspiracy, I find it --

 8              MR. HASSAN:  Judge --

 9              MS. HERNANDEZ:  -- I find it very -- (inaudible.)

10              MR. HASSAN:  Judge, if I may interject to

11    Ms. Hernandez, Judge, just two days ago, the defendant made

12    a request of some Brady information from the Government, and

13    now we're talking about two days later and we haven't

14    received any response from the Government.  That -- those

15    requests from the Government are pretty much necessary for a

16    presentation of our case potentially because we're

17    requesting any communication Mr. Tarrio did or any other

18    member of the Proud Boy organization with the Metropolitan

19    Police Department or, for that purpose, with the Secret

20    Service, and we haven't received any information, Judge,

21    regarding our Brady request.  All these mechanics are

22    playing -- pretty much, we're catching up to speed, Judge.

23    We're going through the discovery and we're working as fast

24    as possible, Judge, and I appreciate the Government having

25    Mr. Tarrio as located right now at Miami FDC which gives the
```

```
1    added flexibility.  He just got there today.  But, Judge, as
2    you're well aware, this is a -- tantamount of a lot of
3    information, a lot of information quickly which we're
4    getting up to speed, but I -- we don't want to be caught off
5    guard later on.  The defense, we don't want to be caught off
6    with another --
7              THE COURT:  All right.
8              MR. HASSAN:  -- indictment which the Government
9    intends to present at a later time, Judge.
10             THE COURT:  The -- let me just ask this of
11   Mr. McCullough which, I think, is a -- is something that we
12   can -- something that's clearly in the Government's control
13   and it's fair to inquire about, is, Mr. McCullough, do you
14   have any reason to think there's going to be another
15   superseding indictment or is this the indictment we're going
16   to be going to trial with?
17             MR. MCCULLOUGH:  My understanding, Your Honor;
18   that this is the indictment that the Government is going to
19   trial on.
20             THE COURT:  All right.  So we're not, you know --
21   we're -- you don't anticipate any further changes in the
22   charging document?
23             MR. MCCULLOUGH:  That is correct, Your Honor.
24             THE COURT:  All right.  With regard to what the
25   Government knew about what the January 6th committee might
```

1    or might not do, Ms. Hernandez, it strikes me that, quite

2    frankly, they might -- I mean, I'm not going to interrogate

3    them about that because, quite frankly, they don't know what

4    they're going to do right now.  I mean, the reality is

5    tomorrow or the next day, they could decide, We're going to

6    release them all, you know, this week or we're going to hold

7    off and wait until December.  So --

8               MS. HERNANDEZ:  I don't believe that's accurate,

9    Your Honor.  I believe there's been discussions between the

10   Department of Justice and the January 6th committee.  I will

11   tell the Court that I have received calls from the January

12   6th committee about clients -- none of these clients -- once

13   they plead, misdemeanor clients, lawyers from the January

14   6th committee calling me to ask whether my client wants to

15   speak, and my understanding from those conversations is that

16   there have been negotiations with the Department of Justice.

17   I'm not privy to those negotiations.  I don't know what they

18   contend.  I'm just -- I don't care what those conversations

19   are.  I just want to know what the Government knows that may

20   impact my ability to represent my client and that may impact

21   the Court's scheduling.  That's what I'm interested in.

22              THE COURT:  I understand, and that's -- I -- as I

23   understood Mr. McCullough, that's why he was making those

24   representations, and the representations he made included --

25   you just said, Ms. Hernandez, Well, I understand there have

 1    been negotiations.  I think that's what Mr. McCullough just

 2    said.  They were -- they have been negotiating to try to get

 3    some of that information and they haven't been able to.

 4            MS. HERNANDEZ:  Your Honor, but if he would have

 5    told us this three months ago, maybe, we would have agreed

 6    -- even an inkling, I -- maybe, we would have agreed to a

 7    different trial date.  We're all doing -- working as

 8    diligently as we can to get to the same spot, and I'm just

 9    -- I know the Court needs to stand there and say, you

10    know -- take us at our word, but it is -- it doesn't feel

11    that way from my end, a seditious conspiracy charge at this

12    point.  There are -- Your Honor, to charge my client and

13    some of these other gentlemen, who have no prior violent

14    convictions and who are veterans, with seditious conspiracy,

15    it is an affront.  It -- I find it --

16            THE COURT:  Ms. Hernandez --

17            MS. HERNANDEZ:  -- (inaudible) --

18            THE COURT:  -- we're going to --

19            MS. HERNANDEZ:  -- (inaudible) --

20            THE COURT:  -- we're trying to --

21            MS. HERNANDEZ:  I know, but I find it so

22    disturbing and so --

23            THE COURT:  All right.

24            MS. HERNANDEZ:  -- and so awful.  I don't know

25    what words to use.

1                THE COURT:  Ms. Hernandez --

2                MR. HULL:  Your Honor --

3                THE COURT:  -- we're all -- what we're all trying

4      to do is trying to figure out how to quick- -- as quickly as

5      possible, get to a place where your client will be able to

6      contest those charges.  All right?  So I hear what you are

7      saying.

8                Mr. McCullough, is there anything else about what

9      you know about the January 6th -- what the January 6th

10     committee might or might not do that you feel you need to

11     put on the record here so that all of us can try to account

12     for it going forward, given the current trial schedule?

13               MR. MCCULLOUGH:  No, Your Honor.  That was the

14     information that I intended to convey so that people could

15     under- -- all parties here to this call could understand and

16     plan for it.

17               MR. HULL:  Your Honor, if I may, Dan Hull for Joe

18     Biggs.  What -- I guess I tend to agree with -- or wonder

19     along with Ms. Hernandez, why are we hearing about this now?

20     And despite the fact we've got two different branches of

21     government here, why can't we have the transcripts so that

22     we can still go to trial?  We could see them.  They're --

23     not every transcript would necessarily relate to what we

24     need to do.  If they're available now and --

25               THE COURT:  Well, they're not --

1          MR. HULL:  (Inaudible) -- it's been -- but they're

2     starting to release things this week.  If they were

3     available now, we could theoretically, if we hustled, be

4     able to look at them and use them for preparation in advance

5     of the August 8th trial date which we very much want to

6     stick to.

7          THE COURT:  Right.  And I don't -- I didn't take

8     Mr. McCullough -- I mean, it sounds to me like the federal

9     -- that the executive branch is trying to negotiate to

10    acquire those.  If they have them --

11         Mr. McCullough, if the executive branch comes into

12    possession of those, you will disclose them as part of your

13    discovery obligations in this case; is that correct?

14         MR. MCCULLOUGH:  That is correct.

15         THE COURT:  All right.

16         MR. HULL:  Sure.  But --

17         THE COURT:  So --

18         MR. HULL:  -- Your Honor, what is it about this

19    that makes it so difficult in advance of the August 8th

20    trial date?  We've been -- I mean, as much as I understand

21    and appreciate the disclosure about the negotiations that

22    Mr. McCullough made today, and we're hearing them just

23    today, and, you know, it doesn't give us much time to

24    prepare.  We're not given any real reason --

25         THE COURT:  Mr. Hull, you've been told about

```
 1    something that the Government doesn't have.  I mean, I --
 2    there's nothing he can do to --
 3              MR. HULL:  All I'm saying --
 4              THE COURT:  -- further that along --
 5              MR. HULL:  -- aside from the timing allegation or
 6    about, you know, who's timing and who's trying to do what to
 7    whom, on this week, while the Select Committee is finally
 8    disclosing some of the things that it has, you know, it
 9    sounds a little to me like what Mr. McCullough is saying,
10    Isn't this another good reason, aside from the superseding
11    indictment -- and now, I need to get ready to file motions;
12    do whatever we need to do -- to move the trial date?  I
13    mean, that's obviously -- moving the trial date is very
14    important to the Justice Department.  For whatever reason,
15    they do not want to try this case now, and they certainly
16    don't want to do it first, and want to wait, want to have
17    our guys in jail while they do it.  Everything --
18              THE COURT:  Mr. --
19              MR. HULL:  -- that Mr. McCullough said this
20    morning, kind of, suggests that that would be the way to go,
21    and yet we're hearing it now just, like, you know, less than
22    two months before trial.
23              MR. MCCULLOUGH:  So Your Honor --
24              THE COURT:  Listen --
25              MR. MCCULLOUGH:  -- if I may just briefly respond
```

1    to that?  I --

2                   THE COURT:  Please.

3                   MR. MCCULLOUGH:  The Government's not making any

4    request to change the trial date.  The Government is making

5    all parties aware of something that could potentially happen

6    in the middle of this trial.  And so I have that

7    information.  I've provided that information to all counsel

8    so that we can all plan for it.  If that -- I'll leave it

9    there.  I think that is the -- that's the purpose.  I think

10   that message was communicated.  Mr. Hull himself, in a

11   filing today, mentioned the hearing that will be taking

12   place this evening.  It is clear that we are aware of and

13   tracking the release of this information, and I want all

14   parties to be aware of the information that we have as to an

15   additional tranche of materials that may drop in the middle

16   of our trial.

17                   THE COURT:  All right.  Here's what I'm going to

18   say about this, and then I'm going to hear -- because I do

19   -- I had another matter at -- apologize for being a few

20   moments late to this matter because I had another matter

21   before it and I have another matter set after it.

22                   I think -- obviously, what the parties are

23   reacting to not only is this information; is the fact that

24   we have the -- a motions date on the 15th.  I, you know --

25   my thought coming out of today was to come back on the 16th

1    which is just one week later and, basically, one day short

2    of the discovery deadline, as well.  If the parties -- I'm

3    going to simply say this, given the uncertain status of

4    everything.  If the parties want, for whatever reason --

5    because they're processing this information and they want to

6    think about how they're proceeding, and you all want to

7    either jointly or separately propose adjusting the trial --

8    propose adjusting the motions schedule in some way, you may

9    do so and I will take it up very rapidly and, frankly, I

10   think, one way or the other, we're going to also have to

11   build in a schedule to -- for motions to attack the new

12   charges, should the defendants want to do that.  So I don't

13   think it makes sense for it -- us -- for us to discuss it

14   any more with this time that we're all together, but I think

15   the parties are going to have to discuss that, and if you

16   want to adjust, for whatever reason -- I'm not saying

17   anything for the moment about the trial date -- but if you

18   all think that I need to push that motions date for some

19   reason, I'm here, and whether it's a joint request or a

20   request from some of you or one of you, I'll take it up if

21   you file it.

22              MR. HULL:  Your Honor, Dan Hull for Joe Biggs.

23              As Mr. Smith just, sort of, prefaced for everyone,

24   we do -- we have come up -- the five of us -- five

25   defendants -- with a suggestion that Your Honor might want

1    to take into your account on changing your pretrial schedule

2    so that we keep our date -- or trial date --

3                THE COURT:  Right.

4                MR. HULL:  -- have enough room to respond to

5    things and we will, so it's not a surprise or doesn't seem

6    smarmy or anything -- it will be -- it will come right after

7    this is -- hearing is over.  So we have come up with

8    something and it's for you to consider and for the

9    Government to respond to.

10               THE COURT:  All right.  You know, if you -- I

11   mean, the most efficient way to potentially handle things,

12   also, is to raise it with the Government and see what they

13   think and, maybe, you will have an agreement among all

14   parties.  I leave that to you, but it, you know -- if I --

15   if you think it's a -- it might be a valuable way to proceed

16   to have them weigh in one way or the other and then I might

17   get something you all agree to and that I would agree to,

18   but proceed as you may, but thank you for giving me that

19   heads-up, though.

20               All right.  So the housekeeping took longer than

21   we thought, but that's going to be the way things probably

22   proceed here.

23               Mr. Smith, I'll -- let me preface -- before I hear

24   from both sides on the motion, let me preface this by saying

25   I haven't read -- I've read all of your filings.  I haven't

1    read every single case you've cited, but I plan to do that

2    before ruling and which I know I need to do promptly.  I

3    think both sides make pretty reasonable arguments here, and

4    I think it's very easy to see the situation from the

5    perspective of both parties.  I don't think it requires me

6    -- if I end up siding with the defendants, I don't think it

7    requires me to believe that the Government is intentionally

8    hiding Brady evidence here.  I don't think they are, but,

9    again, beside -- I don't think it requires you to find that

10   way to side with the defendants.  And by the same token, the

11   Government has raised, I think, some practical problems or

12   some concerns that, I think, don't make it necessarily

13   obvious that I should side with the -- with a -- with the

14   defendants, and I can -- I could end up -- just because I

15   end up siding with the Government doesn't mean I don't have

16   sympathy for where the Government stand here on this with

17   trying to navigate the great expanse of discovery they've

18   been provided.

19        So with that, why don't I be quiet and hear from

20   you, Mr. Smith.

21        MR. SMITH:  Thank you, Judge.  So I'll just pick

22   up right where the Court left off with the practical

23   problems that the Government has identified with --

24        THE COURT:  There's practical problems on all

25   sides, to be clear, but go ahead.

1              MR. SMITH:  So Judge, we will submit to the Court

2     that these are largely illusory problems, and when they're

3     not illusory, they're easily compartmentalized and dealt

4     with separately and that there are large categories of

5     evidence for which even the Government's theoretical

6     objections don't apply.  So Judge, they say -- the

7     Government says that this would be impossible -- such an

8     order would be impossible to comply with, notwithstanding

9     that this District Court has already ordered -- entered such

10    orders in the past, because the Government -- there would be

11    marginal cases where the prosecutors would struggle whether

12    certain information is Brady.  As the Court knows, that's

13    always the case.  That's also a dilemma that the Government

14    faces when it's deciding whether to produce documents.  The

15    Government says that they have a Hobson's choice.  They --

16    if they produce too much, then they're swamping the defense;

17    if they produce too little, they're withholding it.  That is

18    also true with every single production decision the

19    Government has in every criminal case.  So those cannot be

20    defenses -- those cannot be reasons for not entering this

21    order if they're always true, Your Honor.  They also say,

22    Judge, that intent evidence is sometimes subjective, and so

23    the Government can never determine whether intent evidence

24    is Brady.  This is also just -- proves way too much, Your

25    Honor.

1          So if you scrape all of those just very general

2     objections that are always true away, Judge, there's not

3     really anything left.  The way that the Court -- the

4     Government would comply with the Court's order is to, in

5     good faith, identify the Brady material that it is aware of.

6     Having reviewed the evidence, having many agents and many

7     AUSAs on this case, they would identify for the defense

8     those pieces of information that are Brady under Rule 5.1.

9     And, Judge, as for what is Brady in this case, there has

10    been an ocean of pretrial briefing where the defendants

11    outlined their defense theories, what they believe are the

12    exculpatory information that has already been produced.  So

13    it's all there for the Government, Judge, and they haven't

14    -- the Government hasn't identified why it would be

15    burdensome to create a document to point out this -- these

16    pieces of evidence in the record.

17          And, Judge, the last point is we think that this

18    example of the Hemphill video we described in our reply --

19          THE COURT:  Yep.

20          MR. SMITH:   -- brief is the perfect example of

21    this, Judge.  And in a surreply the Government submitted

22    today, they said, Well, we mistakenly called this video

23    which shows Defendant Nordean and Rehl saying they don't

24    have a plan to go into the building -- we mistakenly called

25    it a global production, but we have facial recognition

 1    technology that actually identified this video except that

 2    it was very low down in the queue, and so we just didn't

 3    look below that far down in the queue yet, and that's why we

 4    didn't identify this as relevant to Nordean.  Well, Judge,

 5    if -- I think the surreply cuts in the defendant's favor.

 6    If that technology exists and the Government has access to

 7    it and the defense doesn't, all the more reason that it

 8    would be less burdensome for the Government to identify the

 9    Brady; that it can be identified with facial recognition

10    technology.

11            THE COURT:  I -- let me just respond to that last

12    point, Mr. Smith.  I mean, I think the example of that video

13    also, kind of, reflects, I think, some of the other -- let's

14    say for a moment they had -- the software did hit on it and

15    they had identified it as video of your client.  Their --

16    part of their response was, Well, this isn't even Brady

17    because look at the other things that are in the video.  Let

18    me just say this.  And without getting into a debate about

19    whether that's true or not true, it would be -- just through

20    the facial recognition software, it seems to me, it would

21    not be obvious to them whether it was Brady or not Brady;

22    isn't that fair?

23            MR. SMITH:  So Your Honor, when the subject matter

24    of the case is whether the defendant has a plan that's --

25            THE COURT:  Right.

```
 1              MR. SMITH:  -- a conspiracy to enter the Capitol

 2      building --

 3              THE COURT:  Right.

 4              MR. SMITH:  -- and that there is a videotaped

 5      exchange about whether the defendant has a plan to enter the

 6      Capitol building and he says, No, it is -- that is Brady,

 7      Your Honor, even if it's -- theoretically, it's possible for

 8      the Government to come up with some extenuating argument as

 9      to why it's not.  That is always -- it -- spin is --

10              THE COURT:  No, no, I'm not -- I'm trying to not

11      engage you on that point but just to say that the fact

12      that -- the content of that exchange would not necessarily

13      be captured by some sort of tool that would enable the

14      Government to say, This is Brady, or, It's not Brady.

15              MR. SMITH:  Oh, yes, Your Honor.  So my point

16      about this -- the facial recognition software is that this

17      identifies for the Government much more efficiently than a

18      solo defense lawyer who's reviewing all the evidence himself

19      where the possible Brady is.

20              THE COURT:  Right.  Right.

21              MR. SMITH:  Then --

22              THE COURT:  Just --

23              MR. SMITH:  -- that --

24              THE COURT:  -- (inaudible.)

25              MR. SMITH:  -- that is -- then that could be
```

1    narrowed down by simply viewing the content of those videos

2    that the facial recognition technology picks up on.  So for

3    example, if the facial recognition technology picks up on a

4    video of Nordean and it shows him discussing what his

5    favorite fast food is, you -- the Court is correct that that

6    would not be Brady simply because the facial recognition

7    technology picks it up, but once it's been filtered and the

8    Government views it and then is aware of it, then that --

9    then the duty of the Government under the Court's order is

10   to identify it as Brady.  Now, the Government -- it -- to

11   identify it as Brady is to identify it as information that

12   the defense may regard as Brady.  The Government is not

13   necessarily stipulating that this is objective Brady.

14   They're saying the defense would likely view this as Brady.

15   So there isn't even an evidentiary concession the Government

16   has to make.

17            THE COURT:  Right, but, maybe -- I guess my only

18   point is that it's -- maybe, the Government, for example, in

19   this hypothetical, but -- or not -- it's not really a

20   hypothetical -- in this example, maybe, they would decide --

21   it is -- I think part of the dispute between the parties is

22   whether this -- and in fairness to you, your motion says,

23   Look, you've got to give us Brady that you're aware of.  And

24   I guess it gets tricky in the sense that, maybe, they would

25   choose not -- maybe, this video that they acquired, they

1    would never choose to look at because it's -- they don't

2    think it's relevant yet, has -- it's another angle -- maybe,

3    it's another angle of your client, some slice of that day,

4    but, maybe, they would choose, in trying to prioritize

5    things, not to look at it, in which case, even if their

6    software -- and which it seems to me -- it's unclear to me

7    whether you're saying, Well, look, the software hits it.  It

8    shows it's your client.  If the Government chose not to look

9    at it for whatever reason, they just don't think it's a

10   high-priority item to review, given the -- how much

11   discovery there is, We're just going to produce it and leave

12   it at that, in that scenario, are you saying they'd have an

13   independent obligation to review it, or if they chose not to

14   review it just because they don't think that -- they get

15   bang for the buck there, then they wouldn't have to produce

16   it to you; is that fair?

17           MR. SMITH:  Judge, that's fair, and we think that

18   this objection that the Government raises is in the nature

19   of letting the perfect be the enemy of the good.  It is --

20           THE COURT:  Maybe.

21           MR. SMITH:  It is, of course, true that there are

22   some videos the Government might choose not to watch in good

23   faith.  It decides how it wants to manage its own resources.

24   This rule simply says that if the Government is aware of a

25   piece of evidence that the defense would likely regard as

 1    Brady, it will be identified.  It's a simple enough rule to

 2    follow and there are always marginal cases with questions of

 3    judgment, but that doesn't mean that the underlying

 4    premise -- the thrust of the issue isn't worthy or worth

 5    pursuing because of these exceptions.

 6              So in your -- yes, the answer to the judge --

 7    you -- the Court's question is yes, that if the Government

 8    had not viewed the Hemphill video at any point before their

 9    identification of Brady transpires and there is some

10    good-faith basis for not having reviewed the video, then

11    they would not be in breach of the order and we would still

12    accept such an order because we believe the Government will

13    comply in good faith with -- if the Court issues an order.

14              THE COURT:  Right.  It's -- and I guess I should

15    say at the outset, obviously, I think the only reason we're

16    even in a place where, you know -- in -- I think you --

17    well, maybe, the defense would concede this; maybe, you

18    wouldn't, but I would say in, you know, 999 cases out of

19    1,000, we're not -- the -- Brady doesn't -- the -- Brady

20    doesn't require the Government to undertake the kind of

21    identification that you're requesting, and I think the case

22    law both sides have cited is very clear about that.  The

23    question is just in an extreme example -- in an extreme kind

24    of case like this, and even putting aside the certain cases

25    we have where the Government -- at least there was the

1    suggestion that the Government, sort of, affirmatively hid

2    Brady evidence -- put that aside for the moment -- but that

3    in some very extreme set of circumstances where the volume

4    of discovery is so great that the Government has some -- to

5    comply with its Brady obligations, has some additional

6    affirmative obligation, there aren't that many cases that

7    recognize it, but there are a few, and so -- and I think,

8    undeniably, we're in a case where, at a minimum, it's

9    something that I have to strongly consider.

10            MR. SMITH:  And, Judge, I think I just want to

11   make one more practical point which is that --

12            THE COURT:  Yep.

13            MR. SMITH:  -- you know, having been a former

14   lawyer yourself, in, you know -- in criminal justice, the

15   Court would recognize that anytime a team of lawyers is

16   working together reviewing evidence, there are going to be

17   moments when they say, Ooh, this is a really good piece of

18   evidence.  Well, hey, you know, this is bad for us.  This is

19   the bad stuff.  That's what lawyers do when they're working

20   together.  So when we're talking about the kinds of Brady

21   they would identify, I'm not -- we're not suggesting the

22   Government has to go through every piece of evidence and

23   make a one or zero designation about it and that --

24            THE COURT:  Right.

25            MR. SMITH:  -- it's -- we're talking about the

1     kinds of things that the Government lawyers have probably

2     already said, Ooh, that's not very good, about.  That's the

3     evidence we're --

4                THE COURT:  Well, and when you say -- just out of

5     curiosity, when you say "the Government lawyers," do you

6     mean the lawyers on this case or every single lawyer at the

7     Department of Justice?  Because I think that's another, you

8     know -- not to get too in the weeds on it -- on this portion

9     either, but that's another piece where I think -- I mean,

10    you are absolutely right when you say in your motion that

11    the Brady obligation applies to all -- to everyone, you know

12    -- to -- it's not just the lawyers on -- assigned to this

13    particular trial team, clearly, or even the agents who

14    worked on it or who might testify.  It's a broader

15    obligation than that.  But, again, you can see a scenario --

16    if I'm trying to capture, Mr. Smith, what you just, kind of,

17    laid out as the type of evidence that the folks who are, you

18    know, deeply -- are preparing for this case or getting ready

19    for trial are deeply in the weeds on the evidence, the type

20    of evidence that those folks would say, Ooh, that's bad for

21    us, that's not necessarily going to capture -- I don't know,

22    you know -- if there's some -- it's hard to imagine what it

23    would be, but some scrap of evidence out there that you

24    might well contend -- and I might agree with you -- might be

25    helpful for you but that isn't really known to the people

1    working on this case.  It's known to some agent out there,

2    kind of, on the periphery of this investigation.  I don't

3    know how -- it's hard to put into words how to capture one

4    category of information but not another; isn't it?  Is it --

5              MR. SMITH:  Judge --

6              THE COURT:  And theoretically, it's all Brady

7    information.

8              MR. SMITH:  Judge, I think our response would be

9    twofold.

10             One, again, this is a, kind of, "perfect being the

11   enemy of the good" problem.  There will always be some piece

12   of evidence that might slip between the cracks with an order

13   like this, and that's inevitable and we accept that.

14             And I think the second response is the Government

15   now says it has a protocol in place using facial recognition

16   technology that eliminates the distinction the Court's

17   trying to draw.  I think the Government's surreply suggests

18   that with this facial recognition software, there's a system

19   in place where agents off the case who view potential Brady

20   information have a duty and instructions to forward that

21   Brady along to the prosecution team.  So I think that gives

22   -- should give some assurance that the order the Court

23   imposes is not futile in that sense.

24             THE COURT:  All right.  Anything further before I

25   turn to Mr. McCullough?

```
 1            MR. SMITH:  No, Your -- oh, I think the last point

 2     we'd make, Your Honor, is that if this principle from

 3     Saffarinia and Hsia that we've -- that we're using --

 4     relying on here, if it doesn't apply in the context of the

 5     historically largest discovery production ever in the

 6     history of the Department of Justice, it basically -- what

 7     the Court and Government are saying is that it's bad law

 8     and --

 9            THE COURT:  They -- the Government may well be

10     saying that.  I don't know.  We'll have to see.  But I take

11     your point.  It's -- and it's, frankly, why we're having

12     this argument.

13            MS. HERNANDEZ:  Before you move on to

14     Mr. McCullough, I just want the Court to understand, they've

15     produced this discovery because somehow they understood that

16     it had something to do with our clients.  This is a woman.

17     We didn't know this until two weeks ago.  This is some --

18            THE COURT:  Right.

19            MS. HERNANDEZ:  -- defendant out there.  They

20     produced it specifically -- they haven't produced all the

21     discovery in every January 6th -- they produced it

22     because --

23            THE COURT:  Right.

24            MS. HERNANDEZ:  -- they believed it had something

25     to do with our client, and yet there was no notice to us:
```

```
 1      By the way, there might be something in there.  It was

 2      produced the same day that was the four-terabyte plus some

 3      other discovery.  That's the point.  They have all these

 4      tools.  We don't.

 5                  THE COURT:  Right.

 6                  MS. HERNANDEZ:  But whether intentionally -- I

 7      don't -- I'm not --

 8                  THE COURT:  Right.

 9                  MS. HERNANDEZ:  -- accusing them of anything.

10      Intentionally our inadvertently, it gets buried, and we're

11      trying -- we're moving to a two-month-away trial and we --

12      and they have tools that we don't, Your Honor.  Unless you

13      want to give us the amount -- the money to hire -- to get

14      these face recognition programs or something -- that's all

15      I'm saying.  They have the tools.  Let's be fair here.

16                  THE COURT:  Mr. McCullough, I'll hear from you --

17                  MR. MULROE:  Good afternoon, Your Honor.

18                  THE COURT:  -- or whoever -- I'm sorry,

19      Mr. Mulroe.  Whoever -- I didn't mean to -- whoever is going

20      to address it on the Government's behalf.

21                  MR. MULROE:  Thank you, Judge.

22                  I should start by correcting something that

23      Ms. Hernandez just said which is that this was produced to

24      the defendants because we had reason to think it related

25      specifically to them.  That's not accurate.  The Hemphill
```

1    videos along with numerous other items from Ms. Hemphill's

2    case were produced as part of the global discovery.  The

3    members of this case team had nothing to do with the timing

4    of the production of those materials.  We did not make the

5    call of sending those over or the timing of when they went

6    over.  So that was entirely out of our hands.  And as we've

7    represented to the defense, we were not aware of this

8    content of this video prior to it being brought to our

9    attention by Mr. Smith.  And then that, kind of, illustrates

10   a point which I think the Court already appreciates which is

11   that the facial recognition software is going to identify

12   whether a defendant or any other person appears in a video,

13   but it's not going to indicate any qualitative assessment of

14   what's happening in the video or what he might be saying in

15   the video or whether that video's inculpatory or

16   exculpatory.  So I just want to make sure that that's clear.

17              THE COURT:  Well, it's clear.  And, look, we're

18   spending a lot of time talking about facial recognition and

19   software, but -- I mean, and videos, but the kind of order

20   that I'm being asked to enter would not -- I mean, there

21   are, you know -- there's all different types of discovery in

22   this case from -- I imagine, right -- from text messages to

23   emails to documents.  So you know, we -- I -- the parties

24   and I need to be thinking about how it applies to all sorts

25   of things that are not, you know -- that have nothing to do

1       with facial recognition software, I guess, is my point.

2              MR. MULROE:  Mm-hmm.  And I think the only reason

3       the facial recognition piece deserves some special attention

4       is because the other textual materials are searchable by

5       text searches.  And so defense counsel can search for the

6       names and nicknames of their clients of those things as the

7       Government has been doing and as we've made effort to, then,

8       direct them to anything --

9              THE COURT:  Mr. Mulroe, the -- all that other

10      stuff is searchable.  It -- you mean, the index is

11      searchable or the actual document is searchable?

12             MR. MULROE:  The actual documents, Your Honor, are

13      searchable, and this is why, in the Government's view, the

14      availability of this industry standard Relativity database

15      is a critical factor distinguishing this case from some of

16      the other cases that Mr. Smith cites in his brief.  I know

17      that Mr. Smith may not prefer to use Relativity, but

18      Relativity comes with an incredibly powerful suite of tools

19      that allow for text searching; that allow for smart

20      searching of different variations of names.  And so that

21      puts these defense counsel in a position to find the

22      relevant materials within this large volume; that defendants

23      in a case, you know, from the '90s where they've got storage

24      containers full of paper, it's just not remotely analogous

25      there.  He's not left to his own devices in this database.

 1    Deloitte is available to provide technical support, to

 2    provide training.  Sitting here today, I don't know to what

 3    extent Mr. Smith has availed himself of those resources, but

 4    they are available.  And so these materials are not the kind

 5    of undifferentiated document dump that we see in the cases

 6    where courts have ordered relief of the kind that Nordean is

 7    asking for.

 8              THE COURT:  Did I not -- I'm trying to remember

 9    this.  I thought I remember Mr. Smith pointing out that,

10    like, there was a database at issue in one of these cases

11    that was similar to the one here.  No?

12              MR. MULROE:  Yes, Your Honor.  In Saffarinia, I

13    think the opinion makes reference to the fact that the

14    defendant there did have a Relativity database, but --

15              THE COURT:  Right.  It was --

16              MR. MULROE:  -- I think that --

17              THE COURT:  It was actually literally a Relativity

18    database which is --

19              MR. MULROE:  Yes, but --

20              THE COURT:  -- (inaudible) -- anyway --

21              MR. MULROE:  -- at least taking -- the defendant

22    in Saffarinia, taking his complaints at face value, the

23    Government provided this database but didn't provide the

24    index of the loan -- load files or provided a very, very

25    short index.  The defendant, then, asked the Government for

1    a more comprehensive index and the Government responded with

2    an index of hundreds of thousands of rows.  And so, you

3    know, Relativity in that case is not necessarily the same as

4    Relativity in this case, because we've made available not

5    only the database with its search tools, but we've also been

6    providing in our cover letters and indexes more direction as

7    to where exactly the relevant documents can be found.  And

8    so just to provide one concrete example of that, all the

9    materials, as they enter the Relativity database, are coded

10   by which defendant or which other individual they correspond

11   with.  So that's an additional step.  That's not just

12   putting the documents into the system.  That's actually

13   applying this coding, and that's part of the resources we've

14   devoted.  And so if counsel for Nordean wishes to see

15   documents that are relevant to Nordean, he can select the

16   name "Nordean" from that drop-down list.  If he became

17   interested, as Mr. Smith did here, in some other individual

18   such as Ms. Hemphill, they can easily search for her name

19   and her materials in that system.  So we say that to

20   emphasize the extent to which the Government has made these

21   materials useful to the defense counsel.  And to be clear,

22   it's not about the amount of effort that we've put in.  It's

23   about the results of that effort and their assistance to the

24   defendants.  We can't force them to avail themselves of

25   those resources, but we've made them available.

```
 1                 MR. SMITH:  Judge, it's extremely important to

 2       understand how everything Mr. Mulroe's just said, nothing he

 3       identified would have helped the defense find the Hemphill

 4       videos.

 5                 THE COURT:  Right.  No --

 6                 MR. SMITH:  So Mr. Mulroe referenced coding.  The

 7       coding, if you go into Relativity, would not identify

 8       Mr. Nordean being in the Hemphill video.  What would

 9       identify it is the unique facial recognition software --

10                 THE COURT:  No, but, Mr. Smith, hold on.  Hold on.

11       Just one point -- counterpoint to all that.  I agree with

12       you.  Nothing -- what you just said, but my order wouldn't

13       have affected it either.  In other words, I -- if no one on

14       this -- if the Government is right that no one on this trial

15       team looked at that video and saw the exchange you saw and

16       the other exchange that the Government points to to say it's

17       not Brady but the whole video, right --

18                 MR. SMITH:  Judge --

19                 THE COURT:  -- an order saying you've got to turn

20       over the Brady you know -- again, I'm not -- this isn't --

21                 MR. SMITH:  Judge --

22                 THE COURT:  -- you know -- neither here nor there,

23       but it wouldn't have changed the outcome with regard to this

24       video either.

25                 MR. SMITH:  Judge, they --
```

 1             THE COURT:  No?

 2             MR. SMITH:  The Government has made a

 3  representation in this case that they did not watch the

 4  Hemphill videos.  They made that representation, but they've

 5  also informed the Court that they're using facial

 6  recognition technology and that Mr. Nordean -- the defendant

 7  appeared in the Hemphill videos and that that information

 8  was made aware to the Government.  If Your Honor reviews the

 9  surreply, you'll see it says, There's a queue we've created

10  with facial recognition technology.

11             THE COURT:  Right.

12             MR. SMITH:  The Hemphill videos were in the queue,

13  but we -- the Government says to this effect -- did not

14  reach it yet.  Okay, Your Honor?

15             THE COURT:  Right.

16             MR. SMITH:  So in that case, it is true that it is

17  possible that, just using the example of the Hemphill video,

18  some pieces of information could slip between the cracks of

19  the Court's order, but the Court has learned that there are

20  protocols in place that make this not likely because facial

21  recognition technology would identify for the Government

22  that the defendant is in a relevant piece of video; it

23  creates a queue for the Government to review; and the

24  Government can review those videos and, in fact, likely

25  will.  The --

```
 1                    THE COURT:  Sure.  What -- but that's -- I think
 2          that's -- that's the question, can and likely will.  "Can,"
 3          I agree with you.  Clearly, "can" is true.  "Likely will" is
 4          the other question.  I mean --
 5                    MR. SMITH:  Well --
 6                    THE COURT:  -- I'm not saying --
 7                    MR. SMITH:  -- Judge, they have self-interest,
 8          Judge.
 9                    THE COURT:  Right.  No, no --
10                    MR. SMITH:  (Inaudible) -- surprised at trial by
11          information that they're -- that they could have reviewed
12          but not -- they're good lawyers.
13                    THE COURT:  Right.  No --
14                    MR. SMITH:  So one -- and --
15                    THE COURT:  I don't disagree, and I'm not saying
16          -- I'm not trying to suggest that just because this example
17          isn't, sort of, you know -- it's not conclusive that my
18          order would change the outcome means you lose.  I'm not
19          saying that at all.  I'm just pointing out it -- we're
20          getting into, like, you know -- the question of whether all
21          the information that, in theory, you should have gets to you
22          doesn't necessarily turn on even the kind of order I could
23          enter here.  So I hear you.  I'm not -- but, again, that's
24          what I'm saying.  I don't think that means you lose your --
25          I am not going to agree with your motion just because this
```

 1     one example doesn't fully illustrate a case where, you know,

 2     no question, you would get what you need.

 3              MR. SMITH:  And, Judge, the other response we'd

 4     like to make to Mr. Mulroe's points is that the Court is

 5     absolutely correct that the defendant in Saffarinia also had

 6     access to Relativity itself.

 7              THE COURT:  Right.

 8              MR. SMITH:  I don't think this is a coincidence,

 9     Judge, because Relativity is easily the most difficult

10     discovery review software I have ever used, Your Honor, and

11     it's not my opinion alone.  The defendants -- the

12     Government's cooperating witness in this case is represented

13     by federal defenders -- associate federal defenders who

14     themselves have told me that this is so difficult to use

15     that they've used -- they've described it with curse words

16     to me, Your Honor; that it is extremely difficult to use, to

17     log in and to extract information from it.  Meanwhile, the

18     Government has an army of agents and software that allow --

19     that queues this information up for them that's unavailable

20     to the defense, Your Honor.  So pointing to Relativity and

21     codes on Relativity is simply -- is a pretext, Judge.  It is

22     not a basis for not granting the order.

23              THE COURT:  All right.  Mr. Mulroe, is there -- I

24     don't -- I let Mr. Smith get a word in there, but I wasn't

25     sure if you were done with everything you were going to say.

1              MR. MULROE:  Judge, briefly, I -- we would just

2      flatly dispute Mr. Smith's characterization of Relativity.

3      It's the industry-leading software that, as I understand, is

4      routinely used by large law firms in major commercial

5      litigation.  So it's a powerful and user-friendly system and

6      that's why we chose it.

7              I do have just a couple points to make.  And we

8      spent a bit of time on the Hemphill video, but I think

9      that's warranted because I think the Hemphill episode is an

10     example of three important points relevant to the Court's

11     consideration.

12             The first is the, kind of, practical question that

13     Mr. Smith began his argument with, and he argued, Well, the

14     Government has already decided whether to produce these

15     things.  So it's no additional burden to ask the Government

16     to identify which ones may be exculpatory.  And we submit

17     that that's just not right, and the Hemphill video would be

18     a great example of that.  The facial recognition software,

19     as it runs in the normal course, if it were to bring

20     something like this to our attention, we would see that

21     Nordean appears in the video and we would make the decision

22     on the spot to produce it and to bring it to the defendant's

23     attention as something that may be relevant to him to make

24     it part of his case file, and our position is that we would

25     thereby discharge our discovery obligations, but to ask us

```
1    to go to the additional step of making a determination for
2    every item we produce or don't produce, that's just far
3    beyond the normal discovery practice that the Government has
4    in place.
5              THE COURT:  True, but --
6              MR. MULROE:  If something is --
7              THE COURT:  -- but to be -- Mr. Mulroe, let me
8    just say this.  Mr. Smith is not saying you have to make a
9    yea or nay on everything you produce; right?  He is not
10   saying that.  He's saying if you happen to -- and, I guess,
11   this is -- right -- if you happen to review an item and see
12   that -- again, putting aside the question of what is Brady
13   for the moment, and if you decide, Yes, this is arguably
14   Brady or possibly Brady or something along those lines, that
15   you have a duty to flag it, which is not quite the same as
16   saying, for every single thing you produce, you've got to,
17   kind of, you know, give it a zero or one as Brady or not
18   Brady; right?
19             MR. MULROE:  Yes, Your Honor.  And that brings me
20   to the next point that the Hemphill videos illustrate which
21   is the likelihood of just extensive and protracted fighting
22   about these things after the fact.  So Hemphill here, you
23   know -- the order that Mr. Smith is asking for is not even
24   in place yet and we're still sitting on this hearing
25   disputing things like whether it is or is not Brady -- I
```

 1    think we've got a disagreement about that -- whether the

 2    Government saw it or not; whether the Government should have

 3    seen it or not; whether the Government was acting in bad

 4    faith or not in their decision to review it or not review

 5    it, to flag it or not flag it.  These are all questions

 6    that, frankly, are just not raised by the black-letter

 7    standard law with Brady and that would be raised by the

 8    order that he's asking for and they're not easily answered

 9    questions, and I think that even taking Mr. Smith's

10    arguments on their own terms shows the complications,

11    because on the one hand, he says that he's only asking us

12    for a good-faith effort to identify what we are aware of,

13    but then he's separately arguing that any knowledge about

14    this Brady stuff on any Government actor should be imputed

15    to us.  He's arguing that good faith or bad faith is

16    irrelevant in the Brady context.  And so, Your Honor, these

17    questions are ones that are just not necessary to answer for

18    the defendant to have the access that he needs and for the

19    Government to fairly and justly discharge its discovery

20    obligations under Brady, and that's why we think that the

21    order he's asking for is entirely uncalled for.

22              THE COURT:  I know what Mr. Smith's -- anything

23    further, Mr. Mulroe?

24              (Brief pause.)

25              MR. SMITH:  Your Honor --

```
 1                    THE COURT:  One second, Mr. Smith.

 2                    MR. MULROE:  Your Honor, beyond that, we would

 3       rest on the papers.  Thank you.

 4                    THE COURT:  All right.  I know what Mr. Smith is

 5       going to say.  What he's going to say -- part is, maybe,

 6       that, Look, there's going to be, you know -- we're going to

 7       have disputes one way or the other either way here.  And

 8       wouldn't you want to -- I mean, wouldn't you want to be

 9       disputing this stuff ahead of time perhaps as opposed to

10       after the fact when -- if we happen to learn something and

11       then -- and say the Government hasn't discharged its

12       obligations?  That either way, there's going to be gray

13       areas and difficulties and entering an order like this, kind

14       of, tilts the balance in a way that, you know, when it all

15       shakes out, they're more likely to be able to have what they

16       need.  I don't know.

17                    Mr. Smith, what -- I'm not saying that carries the

18       day.  But that's your argument; right?

19                    MR. SMITH:  No -- that is our argument, Judge.

20       That's --

21                    THE COURT:  All right.

22                    MR. SMITH:  -- our argument.

23                    THE COURT:  All right.  It's a hard one.  It's a

24       hard one for practical reasons.  It's a hard one because of

25       a lot of the unique features of a case like this, but
```

1  something tells me it won't be the first -- the last hard

2  one.

3          Ms. Hernandez, I have your -- I see your hand up.

4          MS. HERNANDEZ:  Your Honor, just -- Relativity is

5  a document database.  And so you can search by name.  Videos

6  are on Evidence.com.  There's no way to search by name.

7  That's why the facial recognition program that the

8  Government has is -- which we don't have -- is so important.

9  We fell on this Hemphill video --

10          THE COURT:  Right.

11          MS. HERNANDEZ:  -- by chance.  The Government can

12  run their facial recognition and find these videos.  We have

13  no way of searching for it.  Relativity- --

14          THE COURT:  Well --

15          MS. HERNANDEZ:  -- -.com gives us documents.  They

16  claim that they've produced it in the global discovery.

17  There's no way for us to search.

18          THE COURT:  Ms. Hernandez -- so I mean, again, we,

19  kind of, circle back to the facial recognition issue which I

20  think is --

21          MS. HERNANDEZ:  Which is a big deal, Your Honor.

22          THE COURT:  No, no, no, I'm not saying that,

23  but -- I mean, I am --

24          Let me just inquire of the Government.  I -- am I

25  -- would I be wrong to conclude that if the Government has

 1     this facial recognition software and -- for every video that

 2     pings on one of these defendants, there's no reason why that

 3     video wouldn't be produced to the defendants in this case;

 4     isn't that -- Mr. Mulroe, isn't that right?

 5              MR. MULROE:  Your Honor, yes, and just I would

 6     distinguish between producing the videos and identifying the

 7     videos.

 8              THE COURT:  No, I --

 9              MR. MULROE:  So --

10              THE COURT:  I -- well, okay, but --

11              MR. MULROE:  So the -- our position --

12              THE COURT:  Go ahead.

13              MR. MULROE:  -- is that the videos are all

14     produced already because they're all part of this global

15     discovery database.  Now, you know, to get the defendants

16     meaningful access to them, we are endeavoring to identify

17     the videos to them.  And so our intention by the discovery

18     deadline of next Friday is to run the comprehensive facial

19     recognition software and, you know, QC -- quality check it

20     to make sure it was done properly for each of the defendants

21     in this case and then to inform counsel -- to provide them

22     the report of any of those videos where they could find

23     their client.

24              THE COURT:  So in theory -- again, this is only

25     one, kind of, aspect of this request, but the point is, at

```
1    least on the facial recognition stuff, they should have a
2    roadmap to all the videos where their clients are captured.
3              MR. SMITH:  The -- Judge --
4              MR. MULROE:  Yes.
5              MR. SMITH:  Judge --
6              MR. MULROE:  Yes, Your Honor.
7              MR. SMITH:  -- the -- what the Government is
8    saying and what has happened is the
9    facial-recognition-identified videos are produced,
10   Mr. Mulroe is saying, but --
11             THE COURT:  Right.
12             MR. SMITH:  -- to take the Hemphill example,
13   they're produced as something called global discovery --
14             THE COURT:  No, no, no.  Mr. Smith, I understand
15   that, but what Mr. Mulroe is saying is when they close up
16   discovery here next week -- I mean, not that -- we all know
17   the Government's discovery obligations are ongoing.  I don't
18   want to suggest anything otherwise.  But the point is,
19   they're going to give -- they plan on running that software
20   and giving all of you a way to, then, look at the global
21   discovery to know, Okay.  My client is here, here, here,
22   here, here, here, and here, so that you can look at those
23   select videos.
24             Is that -- Mr. Mulroe --
25             MR. MULROE:  Your Honor --
```

1          THE COURT:  -- is that accurate?

2          MR. MULROE:  That's accurate, and just to put it

3     differently, to the extent there may be other Hemphill-like

4     videos out there, they will be brought to the attention of

5     defense counsel and then it will be up to them to look at

6     them and decide whether it's inculpatory, exculpatory, or

7     neither.

8          THE COURT:  I mean, I -- I mean, that at least --

9     I -- that at least, Ms. Hernandez, apart from how this

10    motion affects other pieces of this, should give you some

11    comfort that you're going to get identified to you -- not

12    just produced, but identified --

13         MS. HERNANDEZ:  Right.

14         THE COURT:  -- where your client shows up in this

15    world of video.

16         MS. HERNANDEZ:  Absolutely.  It's a first step,

17    Your Honor, absolutely, which we haven't had until this

18    concession or acceptance that they're going to -- but, Your

19    Honor, if we're going to get 500 pages of index saying, Your

20    client appears -- these -- that's going to be a problem.  So

21    if they, in fact, know that it may be exculpatory and I --

22    we're all criminal defense lawyers.  Nothing in the criminal

23    law is fully exculpatory.  So if they know it, please, can

24    we have those ident- -- also checked off?  So 500 pages, but

25    the first 50 pages are more significant than the other 500.

1    That would be my position.  Mr. Smith may have a different

2    position, but yes, that statement by Mr. -- by the

3    prosecutor is a great deal more helpful than what we've had

4    to date.

5              MR. SMITH:  Judge, one last point that's not in

6    the papers.  A judge in this court has already entered a

7    Saffarinia order in January -- the January 6th cases and the

8    judge did it with, I think, about 20 minutes of argument on

9    the spot.  He ordered the Government to identify Brady

10   material only to the extent it was aware of it.  That was

11   Judge McFadden in the Griffin case, 21-cr-92.  And, you

12   know, the Government raised similar objections there, but

13   the court was satisfied within a matter of minutes that it

14   was reasonable enough to --

15             THE COURT:  All right.  I'm going to take -- I

16   will take a look at that.

17             MR. SMITH:  It --

18             THE COURT:  I will take a look at it, Mr. Smith.

19   You've made your point.

20             MR. MULROE:  Judge, if I could just say one more

21   thing, kind of, in closing -- and this is in the brief, but

22   I think it bears emphasis -- that it's not the case that the

23   Government has not made any Brady identification at all.  In

24   our opposition, we identify several occasions where we have

25   brought specific pieces of arguably favorable evidence to

1    the attention of defense counsel.  Those include the grand

2    jury transcript that's, kind of, the roadmap of the case

3    that we discussed in the context of Ms. Hernandez's motion.

4    So that, I think, should give the Court some assurance that,

5    you know, we're really not trying to hide the ball here --

6              THE COURT:  I'm not --

7              MR. MULROE:  -- and that does distinguish this

8    case from the others.

9              THE COURT:  I -- well, I don't know to what extent

10   that was at -- in some of the others, maybe, that's correct.

11   And I hear you.  You made that point in your opposition and

12   pointed out a number of occasions where the Government has

13   pointed to particular -- has raised particular types of

14   evidence with the defendants or with me.

15             All right.  So what I -- I'll endeavor to rule on

16   this promptly, and I will suggest that we simply roll over

17   our -- roll over our -- to have another status one week from

18   today.  I can do it at 2:00 o'clock, and that would be --

19   will be one day away from the discovery deadline.  We would

20   be one day after -- if it stands -- the motions deadline,

21   but, again, I -- I'll let the parties talk about that and

22   see how they want to adjust that and if they want to adjust

23   that, number one, to account for any attacks on the new

24   charges in the indictment, but then -- and if you want to

25   adjust it more broadly for whatever reason you all see fit,

1    I'll certainly consider that.

2              Let me just say, does any --

3              MS. HERNANDEZ:  (Indicating.)

4              THE COURT:  Ms. Hernandez, yes?

5              MS. HERNANDEZ:  Your Honor, I know you denied by

6    minute order the motion for case in chief discovery.

7              THE COURT:  Yes.

8              MS. HERNANDEZ:  To the extent that we now have a

9    whole new and very serious charge two months before trial, I

10   will renew my motion orally or in writing, because now we

11   have a different set of circumstances.  Now, we're, again,

12   crunched up -- not through any fault of our own and without

13   getting into, you know, arguments as to whose fault it is,

14   we're now, again, crunched and it would be helpful to the

15   defense to know yesterday what new evidence we have to

16   contend with with respect to seditious conspiracy which is

17   as serious an offense as anyone here -- I mean, that has all

18   sorts of consequences.  So --

19             THE COURT:  All right.

20             MS. HERNANDEZ:  -- I'm going to renew it.  I'll do

21   it in writing if the Court wants.

22             THE COURT:  No, if you -- I don't want to make you

23   -- I don't want to burn your time -- Ms. Hernandez, if

24   that's the substance of your argument, I don't want to make

25   you go -- I'll leave it to you, Ms. Hernandez.  I don't want

```
 1      to -- I'm not going to make you --
 2              MS. HERNANDEZ:  I understand, but it is, Your
 3      Honor -- we're -- again, we're, like, sort of, back at step
 4      one with respect to a new charge just --
 5              THE COURT:  Well, I -- let me -- all right.  Very
 6      well.  Very well.
 7              MR. HULL:  (Indicating.)
 8              THE COURT:  Mr. Hull has his hand up.
 9              MR. HULL:  I do, Your Honor.  I was going to
10      mention, the 16th would be fine for me for a status
11      conference, but in addition to that, is it possible for
12      Mr. McCullough or someone from the Department of Justice to
13      give us a status report of sorts on the transcripts that
14      have not yet been released by the Select Committee?  I think
15      that would be -- make sense.  I don't want to push you too
16      hard, but between now and then, I'm sure he can do a lot,
17      and a lot of these transcripts were transcripts that -- they
18      can be easily searched for the -- based on the kind of
19      searches we've had to go through already, and they're really
20      not that much information compared to what we've been
21      sifting through.  Also, most -- as I understand it, most of
22      the Select Committee interviewees were not under indictment
23      or at least at the time of their interviews or depositions.
24      They did them both ways.  I would like to know more about
25      that if we could on the 16th, if that makes sense to you.
```

 1              THE COURT:  Well, let me just say this.

 2     Mr. McCullough -- I'm not going to order a particular -- a,

 3     sort of -- a status report on a particular date.

 4     Mr. McCullough, I would expect that if you get -- let me put

 5     it this way.  I would expect the Government to be completely

 6     transparent with these defendants going forward about,

 7     number one, what you learn about when the committee is

 8     likely to release any materials that might be relevant to

 9     this case; and, number two, more obviously -- which, I

10     think, is Mr. Hull's point -- if the executive branch comes

11     into possession of transcripts that are from the Select

12     Committee, that it would immediately notify and disclose

13     those transcripts to the defendants in this case.  Is there

14     any reason why the Government wouldn't be operating along

15     this -- the lines I just laid out?

16              MR. MCCULLOUGH:  Yes.  To begin, Your Honor, in

17     terms of -- the Government does not have possession of the

18     transcripts at this time.  When -- if the Government comes

19     into possession of the transcripts at a time prior to their

20     public release, the Government would promptly review those

21     materials and produce them as it does in the course of

22     discovery.  And so --

23              THE COURT:  Well, let me put it to you this way,

24     Mr. McCullough.  I understand, like, there's a normal

25     discovery, sort of, process which I understand the

```
 1    Government has to go through in the usual course, but on the
 2    other hand, you know, we're, kind of, bearing down on -- I
 3    mean, it may not feel like it to the outside world, but to
 4    anyone preparing for it -- I'm sure you feel it, as well --
 5    we're a couple months away from trial.  So I would expect
 6    the Government to notify the defendants, like, you know,
 7    when I say promptly, you know, within a day that you come
 8    into the -- into possession of those and we can talk about,
 9    like, what review the Government might do and how long that
10    might take, but I think they have the right to know, you
11    know, within 24 hours, if you've come into possession of a
12    large -- a large or small tranche of potentially relevant
13    transcripts.  Does that make sense to you?
14              MR. MCCULLOUGH:  Yes, Your Honor.  That's --
15              THE COURT:  All right.
16              MR. HULL:  And, Your Honor --
17              MR. MCCULLOUGH:  (Inaudible) -- that is consistent
18    with the Government's understanding.
19              THE COURT:  All right.
20              MR. HULL:  Let me just add that I do not think
21    that Mr. McCullough would have brought these up today unless
22    he thought they were important in the context he was
23    bringing them up.  So let's see them and, you know --
24              THE COURT:  Well --
25              MR. HULL:  -- given --
```

```
 1              THE COURT:  -- again, Mr. Hull, he doesn't have
 2    them and he's -- and I have made it clear that -- and he has
 3    made clear that you will know that the Government has them
 4    within 24 hours of them receiving them and then we can, if
 5    necessary, fight about how long it takes you to get them,
 6    but at least -- that's -- I'll put it this way.  That's what
 7    I'm ordering right now.  So to make it very clear so that
 8    the defense feels comfortable; that the Government inform
 9    you within 24 hours of it receiving any materials from the
10    committee.  And, again, we can -- how that -- how those get
11    rolled out and produced, we'll cross that bridge when and if
12    we get to it.
13              MR. HULL:  What I'm saying is by his very remarks
14    today about them, he's made it very clear they're important
15    now.
16              THE COURT:  Right, but he doesn't have them.  So
17    there's nothing he can do or I can do at the moment about
18    them.
19              Let me look around.
20              MR. MCCULLOUGH:  Your --
21              THE COURT:  All right.  Is there any --
22              MR. MCCULLOUGH:  (Indicating.)
23              THE COURT:  Mr. McCullough, you have your hand
24    raised.
25              MR. MCCULLOUGH:  I'm not going to return to this
```

1   issue, but the one request I was going to make of Your Honor

2   is that the Government would respectfully move to continue

3   the status for next week that you've set on Thursday just to

4   get us past the discovery deadline.  I think everyone on

5   this call recognize -- or everyone on this hearing

6   recognizes the importance of getting the materials out the

7   door, getting them organized for the defendants.  I think

8   that the Government's time is best spent ensuring that the

9   materials are fully, you know -- that its discovery

10  obligations are fully discharged rather than coming together

11  on the 16th to talk about what's going to happen the

12  following day.

13             THE COURT:  Let me see what -- with the

14  understanding that, again, I'm not going to hold up ruling

15  on the outstanding Brady motion whether we meet on Thursday

16  or not, what does -- what do -- Ms. Hernandez, what do you

17  think about the wisdom of trying to get through that

18  discovery deadline before we come back?

19             MS. HERNANDEZ:  Am I the obstructionist here?

20             THE COURT:  No.  I'm -- No.  I mean, I could --

21  I'm going to ask the others, too.  I just thought I'd start

22  with you.

23             (Laughter.)

24             MS. HERNANDEZ:  I would like, you know -- I think

25  Mr. Hull, Your Honor, last week, mentioned that it would be

1    helpful to have at least weekly hearings before the Court

2    because all these issues arise.

3              THE COURT:  Yep.

4              MS. HERNANDEZ:  If we wait until Friday instead of

5    Thursday, that would be -- if the deadline -- it -- whatever

6    day the deadline is or may be -- I just think the weekly

7    helps as the Court can -- the Court may not want to see

8    us --

9              THE COURT:  No --

10             MS. HERNANDEZ:  -- every week, but it is very

11   helpful to us.

12             THE COURT:  No, no.  You have my commitment to

13   meet as often as we need to.  My -- I guess what

14   Mr. McCullough's -- and I agree with you, sort of, in

15   principle.  What he's saying is for next week, given -- the

16   deadline is Friday.  So he is asking, can we push -- we

17   could do it -- now, you know, we've been doing it on

18   Thursday because we have the largest number of defendants I

19   -- we can get before me on a Thursday which is why we do it.

20   Now, we can do it on Tuesday if you all think, you know --

21             MS. HERNANDEZ:  Can we do it on Tuesday so my poor

22   client can believe that we're here --

23             THE COURT:  Well, maybe, we should do that,

24   actually.  We could push it to the following Tuesday and try

25   to do it.

 1           Ms. Harris --

 2           And for once, we'd be able to have your client

 3    with us.

 4           Ms. Harris, what -- remind me of the timing of

 5    when Ms. Hernandez's client can be with us.  Is it -- it's

 6    either the morning or the afternoon, but I can't recall.

 7           THE DEPUTY CLERK:  So --

 8           THE COURT:  And it's not -- and, as you -- you're

 9    going to point out to me, it's not -- we're not guaranteed

10    to have him.

11           THE DEPUTY CLERK:  That's correct.  But the best

12    option is either Monday mornings or Tuesday mornings for

13    Ms. Hernandez's client, but that also --

14           THE COURT:  Right.

15           THE DEPUTY CLERK:  -- jeopardizes Mr. Nordean

16    because he can only appear in the afternoon, and then it

17    would have to be 10:00 -- it would have to be 11:00 o'clock,

18    actually, because Mr. Biggs would not be able to appear

19    until 10:30 or later and Mr. Rehl's facility does not do

20    half-hour increments.  It would have to start at the top of

21    the hour.

22           THE COURT:  At 11:00.

23           THE DEPUTY CLERK:  So it would have to be 11:00

24    o'clock if it's a morning hearing, but then that prohibits

25    Mr. Nordean from being a part of the hearing because he

1  cannot start until 2:00 o'clock.

2          THE COURT:  Well, let me propose, then --

3          THE DEPUTY CLERK:  One more thing, Your Honor.

4          THE COURT:  Yep.

5          THE DEPUTY CLERK:  So there have been occasions

6  where Philadelphia sometimes has an afternoon 2:00 o'clock

7  hearing on Mondays, not guaranteeing it.  It's only, like

8  you said, if it's available.  I won't know until the week

9  before --

10          THE COURT:  Right.

11          THE DEPUTY CLERK:  -- but that's the one day I

12  know that they have had an afternoon slot available before.

13          THE COURT:  But that Monday is a federal holiday.

14          THE DEPUTY CLERK:  Oh, yes.  I'm --

15          THE COURT:  So --

16          THE DEPUTY CLERK:  -- thinking about --

17          THE COURT:  So --

18          THE DEPUTY CLERK:  -- next week.  So yes --

19          THE COURT:  Yes.

20          THE DEPUTY CLERK:  -- that wouldn't work.

21          THE COURT:  So -- all right.  Let me just do this.

22  We'll -- we would have a -- we would -- we will get every

23  defendant we possibly can which excludes some of your

24  clients but would likely perhaps include Ms. Hernandez's

25  client if we came together next on the 21st at 11:00 o'clock

1    which would just be for the purpose of, like the Government

2    mentioned, getting through that discovery -- the discovery

3    deadline and, again, the parties, if you want to adjust the

4    motions deadline, I'll take up whatever you file.  But what

5    do the -- is there anyone who would object to our next

6    status -- understanding that usual would be every week, but

7    is there any party that would object to our next status

8    being on the 21st at 11:00 o'clock and with the

9    understanding that we'll get every defendant we can?

10                 MS. HERNANDEZ:  (Indicating.)

11                 THE COURT:  All right.  Ms. Hernandez, you're

12    going to object.

13                 MS. HERNANDEZ:  I'm not available on -- I just

14    checked my calendar.  I'm not available on the 21st.  So --

15                 THE COURT:  All right.

16                 MS. HERNANDEZ:  -- (inaudible.)

17                 MR. METCALF:  Steven Metcalf.  I'm not available

18    on the 22nd either.

19                 THE COURT:  Well, I mean, in light of all of that,

20    why don't we do this, then.  Why don't we at least

21    tentatively set things for the 16th, one week from now.

22    Same time, same place, except we'll do it at 2:00 o'clock.

23    If the -- and what I'll ask the parties to do -- and it can

24    be jointly on behalf of all of you; it could be just -- or

25    it could be separately.  If any party thinks that we should

1    vacate the 16th to give the parties space to be doing other

2    things, whether that's discovery or something else, you can

3    file something on the 15th, and if we all think it wouldn't

4    be productive or there's no salient issue that the parties

5    want to raise with me at that point, you can file something

6    -- a status report on the 15th, ask me to continue the 16th,

7    and we'll reset for whenever you all -- well, whenever's

8    good for your schedule and mine.  Let's put it that way.  So

9    we'll at least set a control date on the 16th, 2:00 o'clock

10   in the afternoon, and we'll -- if there's a reason to vacate

11   that, if the parties -- if any party wants to vacate it,

12   file something on the 15th and I'll -- or before and we'll

13   go from there.

14           Does any party object to that course of action

15   going forward?

16           (Brief pause.)

17           All right.  Seeing nothing, that's what we will

18   do.

19           Let me put it this way.  We had a discussion on

20   the 9th about the Speedy Trial Act and I heard various

21   parties take various positions about tolling the Speedy

22   Trial Act that one week.  We're coming to the end of the --

23   of discovery tolling the speedy trial, but it -- does any

24   party -- let me put it this way.  Does any party have any

25   position today that's different from your position of one

1    week ago?

2              (Brief pause.)

3              MR. METCALF:  (Indicating.)

4              MR. MCCULLOUGH:  Nothing different --

5              THE COURT:  Mr. --

6              MR. MCCULLOUGH:  -- from the --

7              THE COURT:  Mr. --

8              MR. MCCULLOUGH:  Nothing different from the

9    Government, Your Honor.  So the Government renews its

10   position.

11             THE COURT:  All right.  Mr. Metcalf, I see your

12   hand up.

13             MR. METCALF:  I do, Your Honor.  Last week, I took

14   no position.  This week, I join Mr. Smith's position based

15   on the new charges, based on these seditious conspiracy

16   charges coming now as opposed to eight months ago, and I

17   adopt Mr. Smith's position that he took at the last

18   appearance.

19             THE COURT:  All right.  So you object.  Very well.

20             MS. HERNANDEZ:  Your Honor, may I say, I know we

21   -- this is another one of my recurring themes.  It would be

22   more just and more fair for everyone if our clients were

23   released and the trial date were pushed back.  I will tell

24   the Court that the only other case with seditious conspiracy

25   counts in the United States is before Judge Mehta, and half

 1    the defendants charged with seditious conspiracy in that

 2    case, a number of whom brought firearms to Northern

 3    Virginia, are released pretrial and have been released

 4    pretrial since day one and they are no different from our

 5    clients.  So --

 6              THE COURT:  Well --

 7              MS. HERNANDEZ:  -- given everything we've heard,

 8    including the thousand transcripts, the fair and just thing

 9    would be for the Court to release our clients, home

10    incarceration 24/7 with an attack dog at their feet so they

11    can --

12              THE COURT:  And --

13              MS. HERNANDEZ:  -- review the --

14              THE COURT:  And --

15              MS. HERNANDEZ:  -- discovery and so we can all

16    review all the discovery that we have --

17              THE COURT:  Ms. --

18              MS. HERNANDEZ:  -- and so that we could all go to

19    trial with all --

20              THE COURT:  Ms. Hernandez --

21              MS. HERNANDEZ:  -- the evidence --

22              THE COURT:  Ms. Hernandez, there -- as I recall,

23    there are -- many of those defendants are also detained,

24    however, but, as you know, courts have to make an

25    individualized determination about detention.  I've done so.

```
 1    I've been affirmed by the Circuit numerous times.  And so I

 2    hear your request.

 3              MS. HERNANDEZ:  My client didn't have a gun --

 4              THE COURT:  I --

 5              MS. HERNANDEZ:  -- and --

 6              THE COURT:  Ms. Hernandez, I --

 7              MS. HERNANDEZ:  I understand, Your Honor.  It's --

 8              THE COURT:  I understand.

 9              MR. HULL:  Thank --

10              THE COURT:  Ms. --

11              MR. HULL:  Thank you, Your Honor.  I --

12    unfortunately --

13              Thank you, also, Carmen.

14              THE COURT:  Mr. Hull, hold on.  Are you -- if

15    you're going to make the same argument Ms. Hernandez made --

16              MR. HULL:  No --

17              THE COURT:  I mean -- all right.

18              MR. HULL:  -- I'm not.

19              THE COURT:  Go ahead.

20              MR. HULL:  No, no, no.  I would need to make the

21    same -- I -- last week, I believe I said no objection.  I

22    would also have to, on speedy trial, be -- have to be able

23    to also adopt Mr. Smith's reason, given the superseding

24    indictment.  I hope that's understandable.

25              THE COURT:  All right.  That's -- very well.
```

```
 1                    Mr. Metcalf, I have your hand up.  Is that just --
 2                    MR. METCALF:  That was my hand up from before.
 3                    THE COURT:  All right.  You have to learn how to
 4          put --
 5                    MR. METCALF:  (Inaudible.)
 6                    THE COURT:  You have to learn how to put your hand
 7          down.
 8                    Mr. Hassan?
 9                    (Brief pause.)
10                    Mr. Hassan, you're muted.
11                    MR. HASSAN:  Judge, my apologies.  Yeah --
12                    THE COURT:  It's all right.
13                    MR. HASSAN:  -- I have to unmute myself every once
14          in a while, Judge.
15                    There's actually two motions pending before the
16          Court, Judge.  And I just wanted some clarity from the Court
17          to see if the -- when the Court was going to be addressing
18          them.  Number one is going to be the change of venue
19          motion --
20                    THE COURT:  Yes.
21                    MR. HASSAN:  -- and I think that is going to
22          impact regarding the jury pool and the panel that we're
23          going to have, Judge.  Based --
24                    THE COURT:  So --
25                    MR. HASSAN:  -- upon our arguments, that may
```

1    impact that panel at large and that panel.

2            And number two is -- and then I think this is more

3    on the forefront as far as what's going on right now with

4    the January 6th Select Committee and with everything else

5    that we have going on with the new seditious conspiracy --

6    is Ms. Hernandez's motion on the motion for leave to respond

7    to the, you know, press in light of the new charges, Judge.

8    And I think that that's tantamount to, right now, what's

9    going on in situations because all of us have been contacted

10   in one capacity or another and we just want to make a press

11   release of some sort in -- on behalf of our clients, always

12   withstanding the protective order that's been put into

13   place, Judge.

14           THE COURT:  Okay.  Fair enough.  So the motion for

15   venue, if I can get to it ahead of -- we'll see.  If -- at a

16   minimum -- let's put it this way.  I will get to it at the

17   pretrial conference and decide it.  If -- let's just see

18   what my bandwidth is between then and now -- now and then to

19   get to it, but at a minimum, I'll decide it at the pretrial

20   conference.

21           On the other motion you mentioned -- let me ask

22   the Government.

23           When is the Government -- how quickly can the

24   Government respond to Ms. Hernandez's motion?  Which I just

25   don't recall precisely when it was filed.

```
1              MR. MCCULLOUGH:  Your Honor, I think if we can
2     have 10 days to respond, that would be reasonable.
3              THE COURT:  Well, when was it --
4              Ms. Hernandez, I'll -- you're going to know when
5     you filed your motion.
6              MS. HERNANDEZ:  Your Honor, the Government --
7              THE COURT:  What day was it?
8              MS. HERNANDEZ:  Yeah, the 6th.  The Government
9     issued a press release and in -- attached --
10             THE COURT:  I --
11             MS. HERNANDEZ:  -- an --
12             THE COURT:  Ms. Hernandez --
13             MS. HERNANDEZ:  -- an unfiled -- and I got a lot
14    of calls about it and --
15             THE COURT:  I understand.  You filed it on the
16    6th; correct?
17             MS. HERNANDEZ:  (Indicates affirmatively.)
18             THE COURT:  All right.  I know -- look, I know the
19    Government is -- has got a lot of balls in the air, like the
20    defense does, but let me ask you, Mr. McCullough, if you'll
21    respond sooner, because I do think -- let's put it this way.
22    It's a motion that -- I think Mr. Hassan's request
23    reflects -- is, sort of -- it's a time-sensitive motion.
24    Let me put it that way.  And so I'm going to order the
25    Government to respond to it by the 13th which is Monday and
```

1     then ask the -- if -- Ms. Hernandez, if you would like to

2     file a reply -- you don't have to, but if you would like --

3     to file it on Wednesday, the 15th.

4              MS. HERNANDEZ:  Yes, sir.

5              THE COURT:  All right.  Very well.

6              MR. MCCULLOUGH:  Your Honor --

7              THE COURT:  Yes?

8              MR. MCCULLOUGH:  -- if I may, in an effort to be

9     -- to -- it was -- hearing your order earlier about the

10    notification to defendants upon 24 hours of receipt of the

11    transcripts which the Government -- I understand that.  I

12    just want to be clear that I understand that to mean that

13    we're notifying defendants as to the DOJ's receipt of these

14    transcripts.  I -- Your Honor, I cannot speak for the

15    entirety of the executive branch.  To the extent that there

16    are other components of the executive branch that may have

17    received access to a transcript, I can't speak to that.

18    That is well beyond the contours of the prosecution team.  I

19    just want to make that clear.

20             THE COURT:  Well, I don't know -- let's --

21             MS. HERNANDEZ:  That's exactly the point, Your

22    Honor.

23             THE COURT:  Let's --

24             MS. HERNANDEZ:  In my conversations with counsel

25    for the January 6th Committee who reached out to me to speak

1    to other defendants, there have been discussions with --

2    from the -- the January 6th Committee has been in

3    discussions with DOJ, Main Justice, I don't know who --

4    maybe, Attorney General Garland -- from the start.  It may

5    not be --

6             THE COURT:  Right.

7             MS. HERNANDEZ:  -- the -- so --

8             THE COURT:  But, Ms. Hernandez, Mr. McCullough is

9    -- he's saying -- my order would apply to any component of

10   the Department of Justice all the way up to Attorney General

11   Garland.  Mr. McCullough is saying, Well, in theory, there

12   could be other components of the executive branch that are

13   in touch with them and, in theory, they could -- right?  But

14   he's not --

15            So Mr. McCullough, I think we're all in agreement.

16   We're talking about when the Department of Justice, in any

17   -- any component of the Department of Justice receives those

18   transcripts and you learn about it, that you notify the

19   defendants.

20            MR. MCCULLOUGH:  Yes, Your Honor.  Thank you.

21            THE COURT:  Yes.  Very well.

22            MR. SMITH:  Judge, we would just put in one

23   response to this at this point that under this Circuit's

24   case law, information is in the possession, custody, and --

25            THE COURT:  I --

 1          MR. SMITH:  -- control of the Government when it's

 2     in the executive branch.

 3          THE COURT:  Mr. Smith, I'm not disputing your --

 4     necessarily disputing what you're saying about the case law

 5     and I'm not making any pronouncements about what constitutes

 6     legal possession or not.  I'm just simply saying that my

 7     order, to inform you, is only linked to -- for the moment is

 8     only linked to the Department of Justice coming into

 9     possession of those materials.  The -- and so we'll cross

10     that bridge to it if anybody -- anybody, whether it's

11     Mr. McCullough or you -- learn that somehow these

12     transcripts have wound up with the Department of Defense.  I

13     don't know that any of us think that that's likely, but why

14     don't we cross that bridge when we come to it.  How does

15     that sound?

16          MR. SMITH:  Thank you, Judge, but if the

17     transcripts were in the possession of some other executive

18     agency or office, we would -- I think we would be able to

19     move to compel them now if they are in their possession now,

20     and if we're not aware of that, then we wouldn't be able to

21     move to compel them.

22          THE COURT:  But --

23          MR. SMITH:  So if -- so I -- we would argue that

24     it's the Government's duty to find out if they're in -- if

25     the transcripts are now in the possession of the executive

1   department -- branch and inform us of that.

2            THE COURT:  Nothing about my order that extends to

3   the -- let me put it this way.  Nothing about my order that

4   extends to the Government -- the transcripts coming into the

5   possession of the Department of Justice changes anything

6   else -- changes anything about what the prosecution's

7   discovery obligations are more broadly.  Let's put it --

8   it's not meant to displace any other obligation they might

9   have.

10           MR. SMITH:  Thank you, Judge.

11           THE COURT:  All right.  Very well.

12           Well, before I forget, let's put it this way --

13  let's -- let me say that I will find that the time between

14  today's date and June 16th is excludable under the Speedy

15  Trial Act because the ends of justice that are served by

16  taking such action outweigh the best interests of the public

17  and the defendant in a speedy trial.  And, again, I'm doing

18  so here to give the Government the opportunity here at the

19  very end to complete -- to finalize its discovery

20  obligations at least as far as production goes regarding

21  this matter between now and the 16th and, for that reason,

22  toll the speedy trial between today and June 16th.

23           Anything further from you, Mr. McCullough?

24           MR. MCCULLOUGH:  No, thank you, Your Honor.

25           THE COURT:  Anything from any other defense

1    counsel at this time?

2              MS. HERNANDEZ:  No --

3              THE COURT:  All right.

4              MS. HERNANDEZ:  -- thank you, Your Honor.

5              THE COURT:  Very well.  We'll see you all in a

6    week, and until then, the parties are dismissed.

7              (Proceedings concluded at 4:33 p.m.)

8                    * * * * * * * * * * * *

9              **CERTIFICATE OF OFFICIAL COURT REPORTER**

10        I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby

11   certify that the above and foregoing constitutes a true and

12   accurate transcript of my stenographic notes and is a full,

13   true and complete transcript of the proceedings to the best

14   of my ability, dated this 15th day of July 2022.

15        Please note:  This hearing occurred during the COVID-19

16   pandemic and is, therefore, subject to the technological

17   limitations of court reporting remotely.

18                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                                Official Court Reporter
19                              United States Courthouse
                                Room 6722
20                              333 Constitution Avenue, NW
                                Washington, DC 20001
21

22

23

24

25