**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 21-CR-175 (TJK)** |
| | : | |
| **ETHAN NORDEAN,** | : | |
| **JOSEPH R. BIGGS,** | : | |
| **ZACHARY REHL,** | : | |
| **ENRIQUE TARRIO, and** | : | |
| **DOMINIC J. PEZZOLA,** | : | |
| | : | |
| **Defendants.** | : | |

**GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT STATEMENTS**

**TABLE OF CONTENTS**

I.  INTRODUCTION AND BACKGROUND ........................................................................... 3

II.  ARGUMENT ..................................................................................................................... 7

   A.  Background: Relevance and Hearsay ........................................................................ 9

   B.  Non-Hearsay: Co-conspirator Statements ............................................................. 10

      1.  Legal Standard ................................................................................................. 10

      2.  No Pretrial Hearing is Necessary .................................................................... 11

      3.  Analysis ........................................................................................................... 12

      4.  Selected Statements by MOSD Leaders .......................................................... 15

      5.  Statements by Non-Leadership ........................................................................ 18

   C.  Non-Hearsay: Statements Not Offered for the Truth of the Matter Asserted .............. 19

      1.  Questions and Commands ................................................................................ 20

      2.  Defendant's State of Mind ............................................................................... 20

      3.  Effect on the Listener ...................................................................................... 25

   D.  Hearsay Exceptions ................................................................................................. 28

      1.  Rule 803(1):  Present Sense Impressions ....................................................... 28

      2.  Rule 803(2):  Excited Utterances .................................................................... 29

      3.  Rule 803(3): Then-Existing Mental, Emotional, or Physical Condition .................. 31

      4.  Rule 804(b)(3):  Statements Against Interest .................................................. 32

III.  CONCLUSION ................................................................................................................ 35

## GOVERNMENT'S MOTION *IN LIMINE* TO ADMIT STATEMENTS

The government respectfully submits this memorandum of law in support of its *motion in limine* to admit categories of statements that the government intends to use at trial. Through this motion, the government presents its theories of admissibility for certain categories of statements that the government intends to introduce at trial. The statements in the government's case-in-chief are often admissible under multiple, non-exclusive theories, including that the statements are (1) not hearsay because they are statements by a party opponent (including co-conspirator statements), Fed. R. Evid. 801(d)(2)); (2) not hearsay because they are either not assertions or not offered for the truth of the matter asserted or both, Fed R. Evid. 801(c)(2); (3) exceptions to the rule against hearsay because they are present sense impressions, excited utterances, or statements of the declarant's then existing state of mind (such as motive, intent, or plan), Fed. R. Evid. 803, or statements against interest, Fed. R. Evid. 804(b)(3).

To assist this Court in its analysis of the admissibility of evidence to be presented at trial, the government begins with a summary of the charged conspiracy and the facts that the government anticipates will be elicited at trial. This brief serves to demonstrate the relevance and admissibility of certain statements to the issues in controversy.  Primary among those issues to be resolved by the jury are questions of intent. Specifically, the jury will be called upon to evaluate whether the defendants and their co-conspirators – including Enrique Tarrio, Joseph Biggs, Ethan Nordean, Zachary Rehl, Charles Donohoe, Jeremy Bertino, Persons 2 and 3, and Dominic Pezzola – entered into an agreement to accomplish an unlawful objective. The defendant's own words, and those of their co-conspirators, reveal (1) their motive to stop the lawful transfer of power; (2) their agreement to use force to do so, including against law enforcement and elected officials; (3) their

efforts to recruit individuals to carry out the criminal objective of the conspiracy;[1] and (4) their efforts to encourage other individuals present on January 6 to use force to achieve their objective. Thus they are necessary for the jury to evaluate the defendants' intent.

## I.      INTRODUCTION AND BACKGROUND

On June 6, 2022, the grand jury returned the Third Superseding Indictment, which charges each defendant with violations of 18 U.S.C. §§ 2384 (seditious conspiracy), 1512(k) (conspiracy to obstruct an official proceeding); 1512(c)(2) (obstruction of an official proceeding), 372 (conspiracy to prevent an officer from discharging any duties), 231(a)(3) (obstruction of law enforcement during civil disorder), 1361 (destruction of government property), and 111(a)(1) (assaulting, resisting, or impeding certain officers).  Pezzola is additionally charged with robbery of personal property of the United States, in violation of 18 U.S.C. § 2112.

The evidence at trial will show that each of these crimes was motivated by the defendants' refusal to accept the results of the 2020 Presidential Election.  In the weeks following that election, the defendants – in their roles as leaders and members of the Proud Boys – publicly and privately expressed their rejection of the results and their beliefs about the necessary response.  The response they advocated was not peaceful demonstration or legal challenge; it was "force," "violence," "war," and, in Rehl's words, "firing squads . . . for the traitors that are trying to steal the election from the American people."

Meanwhile, alongside their expressions of fury against the "traitors" who would effectuate the peaceful transfer of power, the defendants and other Proud Boys nurtured rage against the law enforcement officers who maintained public safety in the streets.  Although the Proud Boys had historically held themselves out as allied with the police, that began to change in December of

---

[1] Some MOSD members, such as Pezzola, joined the conspiracy after its inception – some as late as the day of January 6.

2020 as a result of two perceived offenses by the D.C. Metropolitan Police Department: first, its failure to bring charges against a person who stabbed Proud Boy Jeremy Bertino during a spree of Proud Boys violence at a rally on December 12, and second, the charging (and later arrest) of Tarrio for destruction of property after he publicly admitted to burning a "Black Lives Matter" banner stolen from a church. Once again, the defendants gave voice to this hostility and used their influence to spread it among their followers. In the leadup to January 6, the Proud Boys' collective attitude toward police was concisely stated by one co-conspirator: "#fucktheblue."

The defendants harnessed these twin currents of Proud Boys anger into a plot to violently disrupt the transfer of power. The agreement at the heart of that conspiracy was reached no later than December 19, 2020, when Tarrio and Biggs discussed the need to radicalize: "[W]e recruit losers who wanna drink. Let's get radical and get some real men." A day later, Tarrio created the Ministry of Self Defense [MOSD], the structure by which the MOSD Leaders would mobilize their "real men," explaining to Biggs that "This is the thing. The new thing."

In the encrypted chat group Tarrio created, the MOSD Leaders – including Tarrio, Biggs, Nordean, Rehl, Donohoe, Persons 2 and 3, and Bertino – discussed travel plans for January 6, use of tactical and communications gear, and the importance of an ironclad chain of command. They also submitted nominations for which "real men" should be brought into the group as their foot soldiers. As the leaders' discussions illustrate, MOSD members were chosen for two crucial traits: the discipline to follow orders from leadership and the penchant to employ street violence against the Proud Boys' perceived adversaries. These were the men Tarrio, Nordean, Biggs, and Rehl wanted at their backs as they marched to the Capitol on January 6.

The selected recruits began assembling roughly one week later, on December 27, in a new encrypted chat group. Tarrio immediately posted a message laying out ground rules, including

that "Screenshots or the sharing of information outside of this chat is an instant disavowal out of the chapter. NO EXCEPTIONS. What is said here will stay."  Tarrio also told members not to "use threats of violence in this chat" and to behave like "gentlemen."   However, the discussion among members showed that they immediately recognized the latter instruction – as well as the "Self Defense" portion of the group's name – to be a fig leaf.  The group quickly began trading videos of Proud Boys assaulting people, discussing optimal tactics for "seek-and-destroy missions," and encouraging one another to "storm" state capitols if they could not be present for the main event in D.C.  None of this discussion drew rebuke from the MOSD Leaders who created and monitored the various discussion groups; instead, it showed that they had selected exactly the right men for the job.  As one recruit observed, "What I took away from this whole thing is, to be in this group you need to be three things, or have three things," one of which was "being able to fucking kick ass when you need to kick the fuck ass."

As January 6 drew closer, MOSD Leaders continued to stoke rage about the election and against police, and they continued to mobilize their MOSD subordinates.  Defendants did not share with lower ranked members a detailed battle plan.  They did not need to: What mattered was that MOSD members would follow orders, whether or not they understood or were privy to the overarching strategy.  As Person 3 advised during a video briefing by leadership on December 30:

> Turn your brains off a little bit on trying to figure out what the big picture is, and follow the ten guys that you're with.  You're going to have a leader of those ten guys….  [Directions] could come from any single person that you see on your screen right now…Yes, you might be getting told things from different people, but it's all information from the *same plan*.  Biggs is not going to tell you something different than I'm gonna tell you.  Enrique [Tarrio] is not going to tell you something different than Zach [Rehl] is going to tell you.  It's all one operational plan, so don't get hung up on the delivery.  The information is all the same.

For this reason, the MOSD members (and others who joined and followed them on the day of the attack) were the *instruments* or *tools* of the conspiracy.  This dynamic was manifest the night

before the attack, when leaders circulated a directive to "meet at the Washington Monument at 10am tomorrow morning!," where "Details will be laid out at the pre meeting!"  Rather than disseminate the details ahead of time, Biggs provided assurance that he and Nordean were together in person, that they have "a plan," and that the plan had been discussed with Tarrio.  Meanwhile, the MOSD members' continued violent rhetoric in the days before the attack – such as "time to stack those bodies in front of Capitol Hill" – provided reciprocal assurance to leadership that they had chosen the right men for the job.

On the morning of January 6, numerous MOSD members and other rank-and-file Proud Boys gathered at the Washington Monument as directed.  There on the national mall, the MOSD Leaders' statements took on even greater intensity.  With the Proud Boys mustered into a pack for marching, Nordean and Biggs took turns with a megaphone, using Tarrio's recent arrest as a flashpoint, and urging their listeners to align with them, and against law enforcement ("back the yellow").  Nordean proclaimed that "real men are here" who "represent the spirit of 1776" and who planned to "remind those who have forgotten" what the constitutional oath of office means.  As the Proud Boys group marched past police officers donning riot gear, there were shouts of "treason" and "fucking scum," showing that the leaders' speeches had reached a receptive audience.

Once the siege of the Capitol began, the physical conduct of the defendants and their followers speaks for itself.  Throughout the attack, microphones captured numerous statements by the MOSD Leaders, their co-conspirators, and the followers who were the "tools" of the conspiracy.  These included exclamations of pure glee, such as Biggs proclaiming that "I have such a boner right now," and Pezzola boasting that he was enjoying a "victory smoke in the Capitol."  They also included exhortations to the crowd.  As the rioters began to overwhelm a line

of officers on the Pennsylvania Avenue NW walkway, Rehl shouted "Fuck them!  Storm the Capitol!"  The Telegram chats also continued to be active during the attack, with co-conspirators who were not physically present sending words of encouragement like "Push inside!" and words of approval like "Abahahhaha op success."

After the rioters had been cleared from the Capitol, MOSD Leaders and their co-conspirators celebrated their success.  That night, Tarrio asserted to the Proud Boys "Elders" who had approved his formation of the MOSD, "Make no mistake. We did this." Similarly, Bertino told Tarrio "You know we made this happen," and "I'm so proud of my country today," to which Tarrio replied, "I know."  The next day, Rehl similarly told an MOSD chat group that he was "proud as fuck what we accomplished," and Tarrio would later tell a group of MOSD members that he was "Proud of y'all," even if "we're going to be the fuckdolls of the government for a little."

## II.   <u>ARGUMENT</u>

As the above factual summary demonstrates, the defendants and their co-conspirators made statements before, during, and after the attack on the Capitol.  They made these statements to each other, to their followers, and to the public.  They made them to inflame, to exhort, to recruit, to direct, and to congratulate.  In all cases, the statements are admissible at trial.

To begin, virtually all of the statements to be admitted were made by the defendants and their co-conspirators during and in furtherance of the conspiracy; as such, they are "not hearsay" pursuant to Rule 801(d)(2)(E).

At the same time, the statements will almost never be offered to prove the truth of any matter asserted – not to prove that the election was stolen, not to prove that the "traitors" deserve firing squads, not to prove that Biggs was sexually aroused when he stormed the Capitol.  Instead,

they will be offered to show the intent and motivation[2] of the defendants and relevant third parties. *See* Fed. R. Evid. 803(3).

In the rare instance where neither of the above factors applies – that is, where the government offers a statement for the truth of the matter asserted that was not made by a co-conspirator in furtherance of the conspiracy – the statements will be admissible pursuant to one or more hearsay exceptions.  *See* Fed. R. Evid. 803, 804.  As discussed below, such statements qualify variously as present sense impressions, excited utterances, statements of then-existing conditions, and/or statements against interest.

Before beginning the analysis, it bears noting that most of the statements identified below are admissible under multiple exceptions (indeed, some are admissible under *all* of the identified theories and exceptions).  Therefore an argument that a particular statement is not being offered for the truth of the matter asserted (for example) does not imply that the same statement is not also admissible as a co-conspirator statement or under one of the hearsay exceptions. The examples and arguments below are non-exhaustive; they provide a framework for resolving any challenges the defense may make to these or to other, similar statements that have been provided in the government's exhibit disclosure of September 30.

---

[2] This *non-hearsay* basis of admission is separate and distinct from the hearsay *exception* under Rule 803(3) for a "statement of the declarants then-existing state of mind (such as motive, intent, or plan)," under which an assertion is offered for its truth.  The difference is between "Don't shoot!" (circumstantially showing fear) and "I'm scared" (offered for its truth).  *Cf. United States v. Reyes*, 78 M.J. 831, 834 (A. Ct. Crim. App. 2019), aff'd, 80 M.J. 218 (C.A.A.F. 2020) (explaining that analogous Rule of Military Evidence 803(3) "should not be confused with the non-hearsay *use* of statements offered as *circumstantial* evidence of a declarant's state of mind"). Rule 803(3) applies to certain statements in this case and its discussed *infra*.

### A.    <u>Background: Relevance and Hearsay</u>

Relevant evidence is admissible, Fed. R. Evid. 402, and evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action, Fed. R. Evid. 401."

Relevant evidence may only be excluded if its "probative value is *substantially* outweighed" by countervailing factors such as "unfair prejudice, confusing the issues or misleading the jury." Fed. R. Evid. 403 (emphasis added). This rule "establishes a high barrier to justify the exclusion of relevant evidence, by requiring that its probative value must be 'substantially' outweighed by considerations such as 'unfair' prejudice." *United States v. Lieu*, 963 F.3d 122, 128 (D.C. Cir. 2020). "Rule 403 does not bar powerful, or even prejudicial evidence. Instead, the Rule focuses on the danger of *unfair* prejudice, and gives the court discretion to exclude evidence only if that danger *substantially* outweigh[s] the evidence's probative value." *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) (emphasis in original) (cleaned up). In this analysis, "it is a sound rule that the balance should generally be struck in favor of admission when the evidence indicates a close relationship to the event charged." *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984) (quoting *United States v. Da*y, 591 F.2d 861, 878 (D.C. Cir. 1978)) (emphasis in original) (cleaned up); *see also Roberson*, 581 F. Supp. 3d at 76 ("Rule 403 does not countenance exclusion of evidence because it too effectively suggests that the defendant committed the charged crime.").

When a party seeks to introduce an out-of-court statement to prove the truth of a matter asserted, it may be subject to exclusion under the rule against hearsay. Fed. R. Evid. 801, 802. This rule, however, applies *only* to statements that are offered "to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c)(2). The rule also is inapplicable to statements by a party-opponent, including his co-conspirators, which are not hearsay. Fed. R. Evid.

801(d)(2)(A), (d)(2)(E).  Additionally, the rule is subject to various exceptions for statements that, although offered for the truth of the matter asserted, are nonetheless admissible because they fall into categories with special indicators of reliability.  Fed. R. Evid. 803, 804.

In sum, so long as an out-of-court statement is relevant, has probative value not substantially outweighed by countervailing factors, and is not inadmissible hearsay, it should be admitted.

### B.      Non-Hearsay: Co-conspirator Statements

#### 1.   Legal Standard

Rule 801 holds that any statement "offered against an opposing party" is "not hearsay." Fed. R. Evid. 801(d)(2).  That definitional exclusion applies not only to statements "made by the party" himself, *id.* (d)(2)(A), but also includes statements "made by the party's coconspirator during and in furtherance of the conspiracy," *id.* (d)(2)(E). Nearly every out-of-court statement to be offered by the government during the trial is admissible on this basis.

Three requirements apply for the admission of co-conspirator statement: (1) a conspiracy existed; (2) the declarant and the defendant against whom the statement is offered were members of the conspiracy; and (3) the statements were made in furtherance of the conspiracy. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 175-76 (1987); *United States v. Perholtz*, 842 F.2d 343, 356 (D.C. Cir. 1988).  Each of these elements need only be proven by a preponderance of the evidence, *see United States v. Brockenborrugh,* 575 F.3d 726, 735 (D.C. Cir. 2009), and can be shown by evidence that is not itself admissible, *see* Fed. R. Evid. 104(a); *United States v. Khatallah*, 278 F. Supp. 3d 1, 4-5 (D.D.C. 2017) (citing *Bourjaily*, 483 U.S. at 176).  The determination must, however, be based at least partially on some independent evidence of the conspiracy," that is, on evidence other than the statements whose admissibility is in question.  *See*,

*United States v. Gewin,* 471 F.3d 197, 201 (D.C. Cir. 2006) (citation and internal quotation marks omitted). Any finding by the court that the requirements of Rule 801(d)(2)(E) are met must be based at least in part "on some independent evidence of the conspiracy" – that is, on evidence other than the statements whose admissibility is in question. *Id.* The required independent evidence may take many forms, including "contemporaneous acts suggestive of the charged conspiracy and/or corroborative of the contents of the purported co-conspirator statements." *United States v. Gatling*, 96 F.3d 1511, 1520-21 (D.C. Cir. 1996)).

   2. <u>No Pretrial Hearing is Necessary</u>

 Before applying the above requirements to statements in this case, a note on procedure. Courts in this district largely decline to conduct "disfavored 'mini-trial[s]'" for making pre-trial rulings on the admissibility of co-conspirator statements. *See United States v. Jackson,* 627 F.2d 1198, 1218 (D.C Cir. 1980); *see also Khatallah,* 278 F. Supp. 3d at 4-5 (*citing Bourjaily,* 483 U.S. at 176). Foregoing such proceedings prior to trial is entirely proper, and in fact the necessary findings can even wait until *after* the jury has heard or seen the statements, because a court "may, in [its] discretion, permit the introduction of evidence as to things said and done by an alleged co-conspirator subject to being connected up and followed by evidence of the existence of the conspiracy." *United States v. Jackson*, 627 F.2d 1198, 1218 (D.C. Cir. 1980) (quoting *United States v. Vaught*, 485 F.2d 320, 323 (4th Cir. 1973)); *see also United States v. Slade*, 627 F.2d 293, 307 (D.C. Cir. 1980) (noting that trial court "retains discretion . . . to admit particular co-conspirator statements conditioned on a later showing of substantial independent evidence of the three prerequisites for their admission").

 There are good reasons that this district rejects "mini-trials" on the admissibility of co-conspirator statements. For one, such hearings would involve the same evidence to be later offered at trial, making them a duplicative "waste of judicial resources." *United States v. White*, 116 F.3d

903, 915 (D.C. Cir. 1997).  For another, they might give defense counsel "two bites at the apple to

cross-examine" witnesses.  *United States v. Apodaca*, 275 F. Supp. 3d 123, 139 (D.D.C. 2017).

And third, given the frequent importance of cooperator testimony in proving conspiracies, pretrial

hearings would often pose risks to witness safety.  *See United States v. Edelin*, 128 F. Supp. 2d 23,

45 (D.D.C. 2001).

Accordingly, while the government submits this motion to assist the Court in its evaluation

of statements to be offered and to provide fair notice to defense counsel, the Court is not required

to conclusively decide any Rule 801(d)(2)(E) issues before trial, leaving no need for any separate

evidentiary hearing on the topic.

Relatedly, binding Circuit precedent holds that the government need not specify every co-

conspirator statement it intends to offer at trial, because "[n]othing in the Federal Rules of

Evidence or in the Jencks Act requires such disclosure."  *United States v. Tarantino*, 846 F.2d

1384, 1418 (D.C. Cir. 1988); *see also United States v. Roberts*, 811 F.2d 257 (4th Cir. 1987) (en

banc); *United States v. Orr*, 825 F.2d 1537 (11th Cir. 1987).  In this case, the government has

already provided the defense with numerous recorded co-conspirator statements in the form of

chat messages and videos to be offered as exhibits at trial.  As *Tarantino* makes clear, there is no

separate requirement that the government identify other co-conspirator statements that may be

proven by, for example, the testimony of cooperating witnesses.

    3.  <u>Analysis</u>

For each co-conspirator statement to be offered at trial, the evidence satisfies Rule

801(d)(2)(E)'s requirements by a preponderance of the evidence.

    a.  <u>A conspiracy existed</u>

The defendants are charged in Counts One, Two, and Four with conspiracy offenses that

each fundamentally involve an agreement to use force to prevent the certification proceeding and

thereby stop the transfer of presidential power.  This Court itself has already found that the evidence of the conspiracy is strong enough to justify detaining the defendants.  *See, e.g.*, ECF 71 at 44-49 (Court's ruling on Nordean and Biggs detention).  Based on all the facts summarized above, and those that will be adduced at trial, the government will demonstrate that there is a preponderance of evidence to believe that a conspiracy existed and that the defendants were members.

### b.   Declarants were members of the conspiracy

 "Where one is a defendant, the declarations of his co-conspirator done in furtherance of the conspiracy formed between them are deemed to be authorized by the defendant and are admissible against him." *United States v. Russo*, 302 F.3d 37, 45-46 (2d Cir. 2002)*.*  This principle applies to statements of co-defendants charged in the same conspiracy case, but also to the statements of uncharged co-conspirators.

There is no requirement that the defendant heard or later became aware of the statement. For example, "statements of [the defendant's] co-conspirators are admissible against him, even if made before he joined the conspiracy." *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir. 1986).  Hence Pezzola cannot argue that he is immune from statements made before he joined: "those statements may be admitted against him, even though he was not a member of the conspiracy at the time the statements were made, on the theory that he assumes the risk for what has already happened in the scheme." *United States v. Farhane*, 634 F.3d 127, 161 n.35 (2d Cir. 2011) (internal quotation marks omitted).

Nor is it required that "the person *to whom the statement is made* also be a member." *United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013) (quoting *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 139 (2d Cir. 2008)) (emphasis added and internal quotation marks omitted); *see also* 2 McCormick On Evid. § 259 (8th ed.) ("The statement need not be made

to a member of the conspiracy but may be made to someone outside the conspiracy and even unwittingly to a government informer as long as a conspiracy exists and the person making the statement is making it during and in furtherance of the conspiracy").

For each example in the "Selected Statements" section below, there are described sufficient facts to establish that the declarant was a member of the conspiracy. The same will go for any other co-conspirator declarant whose statements are offered at trial.

### c. Statements were made in furtherance of the conspiracy

Courts have "broadly construed" the category of statements made "in furtherance of" a conspiracy. *United States v. Johnson*, 872 F.2d 612, 623 (5th Cir. 1989); *see also United States v. Patton*, 594 F.2d 444, 447 (5th Cir. 1979) ("[T]he phrase [in furtherance of the conspiracy] must not be applied too strictly or the purpose of the exception would be defeated"). The breadth of the concept is evident in the variety of theories that have been affirmed. For example, statements are admissible that can "reasonably be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy." *Tarantino*, 846 F.2d at 1412. So are those "that provide reassurance, or seek to induce a co-conspirator's assistance, or serve to foster trust and cohesiveness." *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999). "Statements relating past events meet the in-furtherance test if they serve some current purpose in the conspiracy." *United States v. Thai*, 29 F.3d 785, 813 (2d Cir. 1994). Likewise statements that inform a co-conspirator "of the identity and activities of his co-conspirators." *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989). "Moreover, so long as a co-conspirator statement was in furtherance of the conspiracy, there is no requirement that it  have been in furtherance of the interests of the defendant himself or of any particular co-conspirator." *Gupta*, at 747 F.3d at 124.

4.  Selected Statements by MOSD Leaders

a.  Tarrio's explanation of command structure

On December 29, 2020, Tarrio sent a message to the MOSD Prospect chat explaining the leadership structure the recruits were being invited to join: "Tomorrow night at 9pm we will be having a live session to inform you guys how this all works.  Just because you're in here doesn't mean you will stay in here. The choice will be yours once you hear what leadership has to say. This chapter will have a top down structure. If that's something you're not comfortable with...I'll tell you now...don't even watch the live session.  Upper tier leadership consists of six members that are broken up into two sections, Operations and Marketing."  Tarrio then provided the Telegram handles of the "upper tier leadership," which included Person 3 and Rehl as part of "Operations," and Tarrio, Biggs, and Nordean as part of "Marketing."  This statement both "enhance[ed]" the MOSD members' "usefulness to the conspiracy" by ensuring they would adhere to the top-down structure, *Tarantino*, 846 F.2d at 1412, and informed the members "of the identity and activities of [the] co-conspirators" by providing a leadership roster, *Rastelli*, 870 F.2d at 837. *See also United States v. Miles*, 290 F.3d 1341, 1351 (11th Cir. 2002) ("[S]tatements explaining the conspiracy to a new member are made in furtherance of the conspiracy.").

b.  Person 3's emphasis on trust and loyalty

As quoted in the facts section above, Person 3 told the following to MOSD members during a video briefing on December 30, 2020:

> Turn your brains off a little bit on trying to figure out what the big picture is, and follow the ten guys that you're with.  You're going to have a leader of those ten guys….  [Directions] could come from any single person that you see on your screen right now…Yes, you might be getting told things from different people, but it's all information from the *same plan*.  Biggs is not going to tell you something different than I'm gonna tell you.  Enrique [Tarrio] is not going to tell you something different than Zach [Rehl] is going to tell you.  It's all one operational plan, so don't get hung up on the delivery.  The information is all the same.

15

At the time of the briefing, Person 3 was a member of the conspiracy, and an MOSD Leader. Accordingly his statement to MOSD Members – which served to "provide reassurance, [and] seek to induce a co-conspirator's assistance, [and] serve to foster trust and cohesiveness," is admissible as a co-conspirator statement. *Gigante*, 166 F.3d at 82.

       c.  <u>Person 3 and Tarrio's exchange about the "main operating theater"</u>

On the evening of January 3, Person 3 sent a voice message to the MOSD Leaders chat stating the following:

> Well, I mean the main operating theater should be out in front of the House of Representatives – should be out in front of the Capitol building. Uh, that's where the vote is taking place, and all of the objections. So, we can ignore the rest of these stages and all that shit, and uh, plan the operations based around the front entrance to the Capitol building. Um, I strongly recommend you use the national mall and not Pennsylvania Avenue though – it's a wide open space – you can see everything coming from all angle.

Early the next morning, Tarrio responded: "I didn't hear this voice note until now, you want to storm the Capitol." Again, Person 3 and Tarrio were members of the conspiracy, and each of their statements was made to advance the conspiracy. Person 3 was providing tactical recommendations for the best way to accomplish the group's goal on January 6, and Tarrio immediately made the leap from "out in front of the House of Representatives" to "storm[ing] the Capitol."

       d.  <u>Nordean's directive that the rally would continue</u>

On January 4, 2021, Nordean sent the following in a voice message to the MOSD Members Main chat:

> Right now, we're planning ahead as if the rally is continuing. As far as what we do tomorrow, that's what we're trying to figure out - where everything is gonna be at, how extensive this is, um and everything that's included in his charges. So, right now, I want everyone to stand by and not make any moves. Do not wear colors by any means if you're out on the street, and just assume the worst. Just take it from me, to basically stand by, if you have any other details, please let me know.

Nordean's statement encouraged the MOSD rank-and-file — who would be instrumental in carrying out the conspiracy's objectives at his and other leaders' direction — to continue to be prepared to rally on January 6 despite Tarrio's arrest.  It also provided them with "reassurance" that there would be a plan in place despite that arrest, thereby "maintain[ing] trust and cohesiveness," all of which makes it a statement in furtherance of the conspiracy.  *United States v. Mayfield*, 909 F.3d 956, 962 (8th Cir. 2018).

e.   Biggs's updates and reassurance to MOSD Leaders

On January 5, during discussions among MOSD leadership of whether a "plan" was in place and how Tarrio might be contacted, Biggs sent the following messages:

> We just had a meeting woth a lot of guys. Info should be coming out […] Just spoke with Enrique […] I was able to rally everyone here together who came where I said […]  We have a plan. I'm with rufio […] I gave Enrique a plan. The one I told the guys and he said he had one.

Again, this statement served to reassure the members of the conspiracy, as well as to inform them of pertinent recent developments.  This statement is evidence of a plan being discussed amongst Tarrio, Nordean, and Donohoe, and the existence of that plan —though not its contents — being relayed back to other conspirators.  When one conspirator updates another on the progress of the conspiracy, that is a statement in furtherance of the conspiracy.  *See United States v. Harris*, 886 F.3d 1120, 1131 (8th Cir. 2018).

f.   Bertino and Person 2's direction to MOSD leaders to continue the attack

On January 6, 2021, between approximately 1:03pm and 1:11pm the following messages were exchanged in the MOSD Leaders chat:

| Person 2: | Push inside! Find some eggs and rotten tomatoes! |
| Bertino: | They deploy the mace yet? |
| Donohoe: | We are trying |

These messages were exchanged shortly after the Capitol grounds were breached by Nordean, Biggs, Pezzola, Rehl, Donohoe, and others. Each of these statements are admissible as co-conspirator statements. Aware that rioters including his co-conspirators were storming the Capitol, Person 2 sought to encourage the men to continue their efforts to "push inside" and stop the certification. Bertino's question about the status of the police reaction, which would enable him to keep abreast of the response at the Capitol and thereby provide effective encouragement and advice to the men on the ground, furthered their conspiracy as well. Donohoe's report that the men were "trying" provided other members of the conspiracy with the current status of their actions and likewise furthered the conspiracy.

     5.  Statements by Non-Leadership

The evidence at trial will also include statements by other MOSD Members and followers who joined and participated in the defendants' efforts to achieve their criminal objective.

The government expects the evidence at trial to show that, regardless of whether they were members of MOSD or in direct communication with the defendants prior to the event, numerous individuals entered the conspiracy in advance of or on January 6 when they willfully joined forces with the Proud Boys to overwhelm the Capitol's defenders and fulfill the criminal objective of stopping the certification. *See United States v. Gaviria*, 116 F.3d 1498, 1515 (D.C. Cir. 1997) ("In proving that an agreement to violate the law existed, the government need only show that the conspirators agreed on the essential nature of the plan, not that they agreed on the details of their criminal scheme." (internal quotation marks omitted)).

But even if the Court did not find that such individuals were co-conspirators of the defendants, their statements would still be admissible for non-hearsay purposes, because they are third parties whose intentions and conduct are relevant to the offenses charged. As discussed

above, it was part of the co-conspirators plan to mobilize a small army of followers whose anger and strength could be harnessed in the attack on the Capitol.  It was expressly part of the conspiracy that the hand-picked members of MOSD would not be brought fully into the planning by leadership but were nonetheless expected to obey commands (hence Person 3's instruction to "turn your brains off" and "follow").  But the conspiracy's tools were not limited to the official members of MOSD; they also included other Proud Boys who heeded the call to gather at the Washington Monument, and even non-Proud Boys who were drawn to follow the group that day.  The things these people did and said in reaction to the defendants' leadership are integral parts of the conspiracy, and the Proud Boys would never have succeeded in breaching the Capitol if they had not established and harnessed this force.

## C.      Non-Hearsay: Statements Not Offered for the Truth of the Matter Asserted

By its terms, the rule against hearsay "does not apply to evidence that is not offered for its truth but for another purpose."  *Sabre Int'l Sec. v. Torres Advanced Enter. Sol., LLC*, 72 F. Supp. 3d 131, 141 (D.D.C. 2014).  Nor does it apply to statements that are not "intended . . . as an assertion."  Fed. R. Evid. 801(a), (c); *see also Ali v. District of Columbia Government*, 810 F. Supp. 2d 78, 83 (D.D.C. 2011) ("If [a] statement is not an assertion or is not offered to prove the facts asserted, it is not hearsay." (quoting 2 McCormick On Evid. § 249 (6th ed. 2009))).

In this case, many of the statements that the government will seek to admit will serve to demonstrate the intent, motive, or state of mind of the declarant.  Such statements, as discussed below, are exception to the rule against hearsay.  Fed. R. Evid. 803(3).  Others statements will be introduced to show the effect on the listener; or the conveyance of some question, command or instruction.  Such statements are not hearsay.  Fed. R. Evid. 801, 802.

Note that these purposes are not mutually exclusive and tend to overlap.  A message from an MOSD Leader to MOSD members, for example, might be relevant all at once to (1) circumstantially show the leader's mental state; (2) prove the effect on the members as listeners; (3) provide context for messages that directly follow; and (4) explain the future conduct of the members.  None of these purposes depends on the truth of any matter being asserted.

### 1. Questions and Commands

"Questions and commands generally are not intended as assertions, and therefore cannot constitute hearsay."  *United States v. Thomas*, 451 F.3d 543, 548 (8th Cir. 2006); *see also id.* (collecting cases).  As leaders of MOSD, Nordean, Biggs, Rehl, and Tarrio would regularly give instructions to their subordinates, such as when Tarrio ordered prospective MOSD members to complete an application form, or when Nordean and Biggs gave literal "marching orders" to the crowd of Proud Boys on the national mall.  Likewise, in preparation for January 6, various MOSD members asked questions about where they should go, what they should bring, what was the "plan," and so forth.  Because none of these statements were "asserting" any "matter," they are not hearsay and are admissible.

### 2. Defendant's State of Mind

Statements are likewise not offered for the truth of a matter asserted, and therefore non-hearsay, when they circumstantially show the defendant's "intent, motive, or state of mind,"[3] and thereby "help to explain his future conduct, and serve to refute any possibility of mistake or misunderstanding."  *United States v. Safavian*, 435 F. Supp. 2d 36, 45 (D.D.C. 2006).

The government expects that, at trial, much of the defendants' physical conduct will not be in serious dispute.  The main questions for the jury will instead be those relating to *mens rea*:  what

_____

3

the defendants knew and intended, and what was their shared understanding of the agreement they entered into. It is therefore necessary that the jury receive evidence of statements that "help to explain [the defendant's] motive and intent at the time [they] undertook certain actions" such as the creation of MOSD and the storming of the Capitol; with that purpose such statements are "non-hearsay." *United States v. Safavian*, 435 F. Supp. 2d 36, 45 (D.D.C. 2006). Some examples follow.

### a. Defendants' Motive to Reverse the Election

As summarized in the facts section, the defendants vehemently believed that Donald Trump should be the rightful winner of the 2020 Presidential Election and that a victory by Joseph Biden was illegitimate and unacceptable. Many of their statements in the aftermath of the election will be offered as circumstantial evidence of this belief, which fundamentally motivated the charged offenses. For example:

- On November 4, Biggs made the following public post on Parler: "I'm sitting here, I'm sitting here reading all this shit about the election, how everyone's so shocked that it's so close. So close? It's only so close because the motherfuckers stopped counting last night. That's uhhhh, never happens . . . Trump was winning by such a large margin, you guys got scared as fuck, so to be the scandalous, leftist, democrat fucking, Marxist pieces of shit that you are, you told everybody to stop counting because you're fucking so scared of losing . . . Well guess what guys? You're probably going to get something like that. You're probably going to have a civil war now. And I'm not calling for something like that, I'm just saying, it's, it's a natural reaction to what I'm seeing happening now. It's like if I see a person go poke a bear, I know if they go poke a bear, they're gonna get attacked. . . . You are pissing people off by trying to steal this election. Trump was winning by a landslide, and you dumb fucking cunts want to stop the fucking election and stop counting."

- On November 26, Tarrio posted a screenshot of President-elect Biden encouraging Americans to "remember: We're at war with a virus — not with each other." Tarrio then commented, "No, YOU need to remember the American people are at war with YOU. No Trump... No peace. No quarter."

- On November 27, Rehl made the following public post on Parler: "Hopefully the firing squads are for the traitors that are trying to steal the election from the American people."

      b.  <u>Defendants' and co-conspirators' understanding that Congress would<br>         conduct the Electoral College Certification on January 6</u>

Several of the charged offenses will require the government to prove that the defendants had a

criminal agreement relating to what was happening inside the Capitol on January 6; for example,

that they conspired to corruptly obstruct an "official proceeding," 18 U.S.C. § 1512(k), and that

they conspired to prevent by force the "execution of any law of the United States," 18 U.S.C. §

2384.   To satisfy these elements, the government will offer proof of the conspirators' basic

understanding of the Electoral College certification process.   The clearest such evidence is their

own statements about the process.   For example:

- On December 23, 2020, in response to a Parler post asking the significance of January 6, Rehl posted: "Its the day where Congress gets to argue the legitimacy of the electoral college votes, and yes, there will be a big rally on that day."

- On December 30, during the MOSD video briefing by leadership, Bertino quoted a question from a subordinate member that had been submitted:   "What time is the whole political presidential situation happening that day with Pence?"   Bertino replied that there was not yet a "plan for D.C.," and Tarrio elaborated, "I mean, we somewhat know, we just—there's a lot of detailed information I guess we gotta go over, but yes, we will have a plan for D.C."

- As quoted above, on January 3, Person 3 sent a message to the MOSD leaders' Telegram group that included the following:   "[T]he main operating theater should be out in front of the House of Representatives.   It should be out in front of the Capitol building.   That's where the vote is taking place and all of the objections."

- On the evening of January 6, during a text message exchange with Tarrio, Bertino stated, "They HAVE to certify today! Or it's invalid."

      c.  <u>Defendants' and co-conspirators' willingness to use force and<br>         violence</u>

Seditious Conspiracy requires an agreement to use "force" against the government.

18 U.S.C. § 2384.   Likewise 18 U.S.C. § 372 involves "force, intimidation, or threat."   The

government intends to prove the defendants willfully entered this part of their agreement by

showing that they regularly advocated the use of violence, both in connection with the 2020

election and more generally against those they considered their political adversaries, including

police.  For example:

- On December 14, 2020, Biggs posted the following message on Parler:  "If police block electors from entering a building to cast a vote for Trump. We the people will treat your think blue line like we do antifa. We will knock you to your senses and bypass your unconstitutional asses. Get in our way and get walked over. You will become the enemy of the state. You will be tried for treason. You will have no chance. FAFO [fuck around and find out]. We arent here to play games. This is war[.]"

- On December 28, 2020, in an Episode of his podcast "Rebel Talk," Nordean said the following: "To get things done right, like, you have to-- the things that we are gonna have to do to get things back on track, if we can at all, is not going to be, you know, gum drops and rainbows, and freaking unicorns.  It's not gonna be handshakes and hugs, it's gonna be freaking fists to the face and potentially, you know, even worse.

- On December 31, 2020, on another episode of his podcast, Nordean said the following: "When police officers go after criminals, they use force.  Which is aka violence.  Okay?  So, when police officers or government officials are breaking the law, what are we supposed to do as the people?  Discourse?  What are we supposed to – debate?  No, you have to use force."

- On January 1, 2021, an MOSD member shared with the group an article that featured a photograph of a group of Proud Boys.  A member commented, "Good lookin' 'terrorists,'" apparently mocking those who viewed the Proud Boys as violent extremists.  Person 3 responded, Let's quit playing games and oblige them . . . in Minecraft."[4]

- On January 2, 2022, Biggs posted the following message on Parler: "Every law makers who breaks their own stupid Fucking laws should be dragged out of office and hung. The government should fear the people. Not the other way around. You work for us. You don't have ruling power over me. We only allow you to have that privilege. F AFO."

    d.  <u>Defendants' hostility toward police</u>

As described in the facts section above, the defendants and their followers felt increasingly

hostile toward law enforcement in the leadup to January 6.  This animus both motivated the

---

[4]  Minecraft is a popular video game.  In Proud Boys chat groups, when members discussed committing violence or other crimes, they often used the phrase "…in Minecraft" to suggest they were not talking about real life.

conspiracy and contributed to its success, since a group of Proud Boys that was friendly or neutral toward police would have been less likely to force their way through the lines.  The defendants and others made various statements that demonstrated this relevant mental state.  For example:

- On January 1, when an MOSD leader stated that "We could have ran [the police] the fuck over in DC and they wouldn't have been able to do shit," Tarrio responded, "I had a plan for it… But someone talked me out of it."  Biggs responded, "Yeah. We could have," and added, "I wanna fuck shit up."  Bertino commented, "#fucktheblue," and another MOSD leader remarked, "Agree, they chose their fucking side so let's get this done."

- On the evening of January 5, a member of Person 2 sent a message to the members stating, in part, that "cops are the primary threat."

### e.   Defendants' consciousness of guilt

Statements that evince consciousness of guilt are not hearsay because they are not offered for the truth of any matter asserted.  These include statements made by defendants or co-conspirators for the purpose of escaping punishment.  *See United States v. Ogedengbe*, 188 F. App'x 572, 574 (9th Cir. 2006) (affirming admission of non-testifying co-defendant's "false exculpatory statements that showed consciousness of guilt and evidenced the existence of the conspiracy").  In this case, the government will offer various statements by the defendants and co-conspirators that circumstantially demonstrate their awareness of the unlawful nature of their agreement.  For example:

- On January 4, 2021, after learning of Tarrio's arrest, Donohoe messaged the MOSD Leaders chat group:  "Each one of us should personally clear our history of that MOSD chat . . .  Do not add enrique [Tarrio] to this chat until we get a verbal confirmation that he is in possession of his phone."

- Later that day, Rehl explained how best to erase evidence: "[Y]ou gotta manually delete each message from each chat 'for everyone' deleting all will only clear it for you, only the owner can nuke the chat."  He also commented, "since enrique [Tarrio] knew the cops were for him, hopefully he logged outta telegram."

- On January 6, in the midst of the riot they had helped start, Biggs told Rehl, "Hey, keep your faces covered, they're getting pictures.  Keep your mask up."  Rehl replied, "It's too late for that, but fuck it," and then pulled on his mask.

f. <u>Defendants' celebration of the Capitol riot</u>

Finally, in proving that the defendants' shared objective was to violently obstruct the certification process, the government will introduce statements by which the defendants and co-conspirators celebrated the violent obstruction they helped accomplish. For example:

- On January 6, in the midst of the riot, Biggs was filmed saying for an apparent friend and fellow Proud Boy: "This is – I have such a boner right now. What's up, dude? How you been? What's up, brother? I know, hey, get this. What's going on, man? This is the craziest fucking day ever in American history! This is insane. . . . This is awesome man! Like to be here right now, I have a fucking boner! Hahahaha!"

- Shortly after entering the Capitol, Pezzola filmed a video of himself saying: "Victory smoke in the Capitol, boys. This is fucking awesome. I knew we could take this motherfucker over if we just tried hard enough. Proud of your motherfucking boy."

- On January 7, 2021, in response to a Parler post that read "The only thing that could have made today great is if everyone didn't leave when they told them to," Rehl commented "I agree."

3. <u>Effect on the Listener</u>

Like statements offered to show the speaker's mental state, statements offered to show an effect on the listener are non-hearsay because they are offered to prove something other than the truth of the matter asserted. *See, e.g., United States v. Thompson*, 279 F.3d 1043, 1047 (D.C. Cir. 2002) (citing *United States v. Baird*, 29 F.3d 647, 653 (D.C. Cir.1994); *United States v. Detrich*, 865 F.2d 17, 20-21 (2d Cir. 1988)). This principle applies to the many communications among MOSD's leaders and members, which shaped the participants' understanding of the agreement they formed.

a. <u>Statements by Members</u>

Especially probative in this regard are statements by the newly recruited MOSD members in the early days of the group's existence. When forming the group, Tarrio and the other leaders made clear that members were expected to "fit in or fuck off," to "stay on topic," and that they

would be removed if they violated the group's norms.  It is telling, then, that the MOSD chat involved statements like the following, and that Tarrio and his fellow leaders embraced the declarants as their hand-picked foot soldiers – and led them directly to the Capitol on January 6:

- On December 27, two minutes after being added to the "Ministry of Self Defense" chat by Donohoe, Telegram user "President Leo Kuznetsov" sent the message "Im ready to log into minecraft," meaning he was ready to commit crimes and violence.

- Approximately one hour later, two members sent a series of videos (four in total) showing individuals being punched and shoved, and in one case apparently knocked unconscious.  In two of the videos the attackers are wearing Proud Boys colors; a third video is emblazoned with the Proud Boys catchphrase "POYB."  Members of the chat responded to the videos with messages such as "Nite nite sweetie," "Philly style…eat that cigarette commie fag," "and "Lol that fag ain't left his basement since."  None of the defendants, or any other MOSD leaders or members, objected to this celebration of violence.

- On December 28, a member proposed a plan for MOSD members who could not travel to Washington, DC for January 6:  "I know some of you are going to DC, that's great, that's freakin' awesome, but guys who can't go, are you thinking about maybe just going and rallying at your state capitol? […] Represent, country-wide, storm everyone's capitols, do that in fifty states, they just can't avoid it."  User "SirLancelot" replied, "Could be a good idea," and user "Juggernaut" replied, "Wow."  None of the defendants, or any other MOSD leaders or members, expressed surprise or disagreement with the notion that "storming capitols" was part of the "rallying" the group was preparing for.

- On December 29, a member sent an audio message stating, in part: "If we all went in as 'tifa [Antifa], somehow using their fucking shit to identify ourselves amongst each other, everyone wearing red arm bands, everyone wearing, uh, yellow fucking hammer and sickle on their shirts. And then roll up with 'tifa and beat the motherfuck out of them? This could grow some legs… I'm just sayin."  Another member responded: "This could break some legs... 'just sayin' . . . In minecraft, of course."  None of the defendants, or any other MOSD leaders or members, admonished them that the proposal was inconsistent with self-defense.

- On December 29, a member sent an audio message stating in part: "It's a good thing that we've figured out how to raise good amount of money off of Parler and everything else, because we're gonna need to fuckin' raise probably a lot of bail money."  No one disagreed.

- On December 29, a member sent a video showing numerous clips of violence, set to a song with the refrain "Protest time again / Hop in the car, gonna punch 'em in the face."

MOSD members made similarly violent (and even more specific) statements just days before the riot.  On January 3, 2021, a member commented, "Gonna be war soon......," to which another member responded, "Yes Sir time to stack those bodies in front of Capitol Hill."  A third MOSD member asked: "So are the normies and 'other' attendees going to push thru police lines and storm the capitol buildings? A few million vs A few hundred coptifa should be enough. I saw a few normie groups rush police lines on the 12th."

      b.  <u>Statements by leaders</u>

Likewise, statements by MOSD leaders to MOSD members are relevant to show that the leaders' words provoked a particular response by their followers.  Admitting these chants, speeches, and other utterances is necessary to help the jury decide whether the sudden onslaught that followed was truly spontaneous or was the predictable result of a shared strategy.  Statements admissible for this purpose include the following:

- Nordean used a megaphone to deliver the following speech:  "We got some guys last time we were here get stabbed.  And the guy who was the stabber got let out.  What was it?  $500 bail or something like that?  Enrique shows up and gets detained before he gets to D.C. and he's charged with two felonies – multiple felonies.  For what?  We put ourselves on the line every goddamn time we come here.  We put our lives and our safety and everything on the line and these people put us in jail.  We'll I'm tired of it.  It's time to just say no.  Back the yellow.  Back the yellow, gentlemen!"

- Biggs then took the megaphone and gave a speech of his own:  "I know we said that we were gonna come out here and not make a scene, not have a presence, but after what they did to our boy Enrique, we're gonna let D.C. fucking know we're goddamn here.  We're gonna let the motherfucking world know that we fucking exist and we're not going any goddamn where.  So let's fucking march through this fucking city that's our goddamn city and be loud and motherfucking Proud Boy proud.  So let's go fucking kick some goddamn ass.  Metaphorically speaking, but you know what I mean."

- As they led the march to the Capitol, Nordean, Biggs, and Rehl led the crowd in chants such as "Whose Streets?  Our Streets!"; "Whose house?  Our house!"; "Whose Capitol?  Our Capitol!"

- Nordean gave another amplified speech: "We represent the spirit of 1776. If you haven't noticed, real men are here. We know what the oath is – support, support and defend the constitution of the United States against foreign enemies and domestic. Let us remind those who have forgotten what that means." Then, addressing police, Nordean continued: "And don't forget, we don't owe you anything. We don't owe you anything. Your job is protect and serve the people, not property or bureaucrats."

### D.    <u>Hearsay Exceptions</u>

Various statements the government will offer are covered by hearsay "exceptions," Fed. R. Evid. 803, 804, either as alternative bases for admission or (in rare cases) the sole basis of admissibility.

   1. <u>Rule 803(1): Present Sense Impressions</u>

      a. <u>Legal Standard</u>

The "present sense impression" exception permits the use for the truth of any "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1). "The exception is grounded in the idea that statements about an event and made soon after perceiving that event are especially trustworthy because substantial contemporaneity of event and statement negate the likelihood of deliberate or conscious misrepresentation." *United States v. Wills*, 18-0117 (PLF), 2018 WL 6716096, at *2-3 (D.D.C. Dec. 21, 2018) (internal quotations omitted); *Navarette v. California*, 572 U.S. 393, 400 (2014). The "contemporaneity of event and statement" need only be "substantial" and not absolute, because "in many, if not most, instances precise contemporaneity is not possible and hence a slight lapse is allowable." Advisory Note to Fed R. Evid. 803. The "fundamental premise behind this hearsay exception is that substantial contemporaneity of event and statement minimizes unreality due to the declarant's defective recollection or conscious fabrication." *United States v. Green*, 556 F.2d 151, 155 (3d Cir. 2009) (quoting *United States v. Manfre*, 368 F.3d 832, 840 (8th Cir. 2004).

### b. Selected Statements

The government will use Rule 803(1) as one of bases for admissibility of various recorded statements by law enforcement officers over police radio, which were made in real-time based on the officers' observations. *See Flythe v. District of Columbia*, 4 F. Supp. 3d 222, 234 (D.D.C. 2014) (ruling that radio runs made by police officers occurring several seconds and moments after an event qualified as present sense impressions).

The government also anticipates using this hearsay exception for the admission of audio-recorded present-sense impressions by rioters at the Capitol, including the following:

- An unidentified individual shouting "They're rushing the fucking Capitol, brother! The Proud Boys are rushing the Capitol!"

- Biggs recording himself saying: "Dude, we're right, we're right in front of the Capitol right now. American citizens are storming the Capitol – taking it back right now. There's millions of people out here. This is fucking crazy. What the fuck!? Oh my God! This is such history. Woohoohoo! This is, this is insane. We've gone through every barricade thus far. Fuck you!"

### 2. Rule 803(2): Excited Utterances

### a. Legal Standard

The "excited utterance" exception permits the use for the truth of any "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). "The rationale underlying the 'excited utterance' exception is that 'excitement suspends the declarant's powers of reflection and fabrication, consequently minimizing the possibility that the utterance will be influenced by self-interest and therefore rendered unreliable." *United States v. Alexander*, 331 F.3d 166, 122 (D.C. Cir. 2003) (quoting *United States v. Brown,* 254 F.3d 454, 458 (3d Cir. 2001)); *see also United States v. Joy,* 192 F.3d 761, 766 (7th Cir. 1999) ("This exception is premised on the belief that a person is

unlikely to fabricate lies (which presumably takes some deliberate reflection) while his mind is preoccupied with the stress of an exciting event.").

"For a statement to qualify as an excited utterance, the proponent of the exception must establish: (1) the occurrence of a startling event; (2) that the declarant made the statement while under the stress of excitement caused by the event; and (3) that the declarant's statement relates to the startling event." *Alexander,* 331 F.3d at 122. "[U]nlike the hearsay exception for present sense impressions, an excited utterance need not be contemporaneous with the startling event to be admissible. Rather, the utterance must be contemporaneous with the excitement engendered by the startling event." *Id.* (internal quotation marks and citation omitted)." Relevant factors in assessing the sufficiency of the "excitement" include "the characteristics of the event; the subject matter of the statement; whether the statement was made in response to an inquiry; and the declarant's age, motive to lie and physical and mental condition." *Id.* For an audio-recorded statement, the Court can also consider the declarant's "tone and tenor of voice." *Id.* (citing *United States v. Woodfolk,* 656 A.2d 1145, 1151 n. 16 (D.C. 1995)).

b.   Selected Statements

Many of the police radio recordings, discussed above as present-sense impressions, qualify additionally as excited utterances. *See United States v. Morrow,* No. 04–355 (CKK), 2005 WL 3163803, at *3 (D.D.C. June 9, 2005) ("[C]ourts across a multitude of jurisdictions . . . have collectively concurred that audio tapes and written logs of 911 calls, telephone calls, and police dispatches are admissible under the present sense impression and excited utterance exceptions to the hearsay rule."). The tone and tenor of the declarant officers' voices will make clear they were "under the stress" caused by the "startling event" of the attack on the Capitol. Several officers will themselves be called as witnesses, and the government anticipates their testimony will show that "stress" and "startling" can hardly suffice to describe the traumatic shock of that day

30

Likewise, some statements that are admissible as co-conspirator statements and present-sense impressions will also separately qualify for admission as excited utterances.  The Proud Boys, like many other rioters, were electrified and euphoric as they succeeded in overcoming line after line of the Capitol's defenses.  Each of their excited statements is therefore admissible for the truth of the matter asserted.  For example, William Pepe's excited shouting of "Let's go!  This is what we came for!  Yeah!," is admissible to prove that "this" – storming the Capitol – was what the Proud Boys "came for."  Pepe was a co-conspirator, but even if he was not, he was a tool of the conspiracy in that he was led to the Capitol by the defendants as part of the Proud Boys marching group and then turned loose on its defenses.  His excited (and therefore candid) recognition that "this is what we came for" is thus highly probative of the Proud Boys' collectively shared purpose.

### 3.  Rule 803(3): Then-Existing Mental, Emotional, or Physical Condition

#### a.  Legal Standard

The "then-existing . . . condition" exception permits the use for the truth of any "statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." To qualify under this exception, "[t]he statement must be limited to a declaration showing the declarant's state of mind and not the factual occurrence engendering that state of mind." *United States v. Lentz*, 282 F. Supp. 2d 399, 411 (E.D. Va. 2002) (quoting *United States v. Joe*, 8 F.3d 1488, 1492 (10th Cir. 1993)), aff'd, 58 F. App'x 961 (4th Cir. 2003).

### b. Selected Statements

As quoted above, during a discussion about violence toward police, Biggs stated: "I'm ready to just be the Zamboni.  And roll over mother fuckers."  This statement is admissible under Rule 803(3) for the truth of what Biggs felt "ready" to do.

This exception also applies to the various statements of pride expressed by defendants and co-conspirators after the event:  Bertino saying, "I'm so proud of my country today"; Rehl saying, "I'm proud as fuck what we accomplished"; and Tarrio telling MOSD, "Proud of y'all."  Likewise Pezzola, upon first joining MOSD, greeting his co-conspirators by saying "Hey brothers proud as fuck to be here!"

### 4. Rule 804(b)(3):  Statements Against Interest

### a. Legal Standard

The "statement against interest" exception permits the use for the truth of certain statements that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability."  Fed. R. Evid. 804(b)(3).  Two additional requirements apply here:  First, the declarant must be "unavailable as a witness," Fed. R. Evid. 804(b), which generally applies to defendants in criminal trials who are expected to exercise their Fifth Amendment privilege.  *See, e.g.*, *United States v. Stratton*, 779 F.2d 820, 828 (2d Cir. 1985); *United States v. Rhodes*, 22-CR-15 (APM) ECF No. 322, at 2 (D.D.C. Sept. 19, 2022).  Second, given that this is a criminal case, the statement must be "supported by corroborating circumstances that clearly indicate its trustworthiness."  This exception is based on the "commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make

self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

Admission of such statements "hinges on whether the statement was sufficiently against the declarant's interest 'that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.'" *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007) (quoting *Williamson v. United States*, 512 U.S. 594, 603-04 (1994)). "Whether a challenged statement is sufficiently self-inculpatory can only be answered by viewing it in context"; accordingly, "this determination must be made on a case-by-case basis." *Id.* at 155 (citations omitted).

To qualify as a statement against interest under Rule 804(b)(3), the statement need not be sufficient, standing alone, to convict the declarant. *See United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011). Instead, Rule 804(b)(3) "encompasses disserving statements by a declarant that would have probative value in a trial against the declarant." *United States v. Alvarez*, 584 F.2d 694, 699 (5th Cir. 1978); *see also Persico*, 645 F.3d at 102. Nor does the Rule "require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution." *Persico*, 645 F.3d at 102 (quotation marks omitted).

b. <u>Selected Statements</u>

While holding police riot shield he'd acquired during the attack on the Capitol, Pezzola made the statement, "Why don't you shut up, ok? I took this from a fucking cop shut the fuck up!" Around the same time, when a bystander asked, "did you steal a riot shield?," Pezzola answered, "Yeah." These statements are admissible against all defendants as statements against interest. First, because Pezzola will be standing trial, he will be unavailable as a witness. *See Slatten*, 865 F.3d at 805 (finding that at a joint trial, a defendant's codefendant qualifies as "an unavailable witness"). Second, the statements would have a great tendency to "expose the declarant to civil or

criminal liability," and do in fact expose Pezzola to criminal liability on the very charges being tried.  Lastly, the statements are strongly "supported by corroborating circumstances," namely, the videos the government will introduce of Pezzola robbing an officer of the shield, carrying it around the Capitol grounds, and using it to smash a window to make entry into the building.  The statements are therefore admissible against all defendants as statements against interest.

Around the same time, Biggs recorded statements including: "So, we just stormed the fucking Capitol!  . . .  Took the motherfucking place back!  Hahahaha!  That was so much fun!  Wooo! . . . January 6 will be a day in infamy!"  Like Pezzola, Biggs will presumably be unavailable as a witness at trial.  Like Pezzola's statement about having stolen the shield, Biggs's statement about storming the Capitol was against his penal interest.  And like Pezzola's theft of the shield, Biggs's storming of the Capitol is corroborated by extensive video evidence.  Biggs's statement that "we just stormed the Capitol" is therefore admissible as a statement against interest.

### III.   <u>CONCLUSION</u>

For the foregoing reasons, the government submits that all the above-described statements are admissible at trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:   */s/ Jason McCullough*
JASON B.A. MCCULLOUGH
D.C. Bar No. 998006, NY Bar No. 4544953
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
   On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7233 //
jason.mccullough2@usdoj.gov


By:   */s/ Conor Mulroe*
CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov