## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **Case No. 21-CR-175 (TJK)** |
| | **:** | |
| **ETHAN NORDEAN, et al.** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

## UNITED STATES' MOTIONS *IN LIMINE*

The United States respectfully submits this omnibus brief arguing motions *in limine* in advance of the trial in this case scheduled for December 12, 2022.  Although neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence expressly contemplate motions *in limine*, the practice of allowing such motions has developed over time "pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States,* 469 U.S. 38, 41 n. 4 (1984). "Motions in limine are designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Barnes v. D.C.*, 924 F. Supp. 2d 74, 78 (D.D.C. 2013) (quoting *Graves v. District of Columbia*, 850 F.Supp.2d 6, 10 (D.D.C. 2011).

The government offers the authorities and analysis below to promote efficiency and reduce the need to argue objections mid-trial.  For each motion herein, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

**TABLE OF CONTENTS**

I.   Motion *in Limine* to Establish Relevance of Conduct by Co-Conspirators
and "Tools" of the Conspiracy ........................................................................................3

II.   Motion *in Limine* to Admit Certain Categories of Multimedia ....................................7

  A.  Legal Framework .......................................................................................................7

  B.  Overlapping Bases for Admissibility of Multimedia ................................................9

    1.   Authentication by a witness with knowledge ........................................................9

    2.   Authentication by metadata ................................................................................10

    3.   Authentication by comparison ............................................................................11

    4.   Authentication based on process or system that produces an accurate result .....11

    5.   Authentication based on status as an "official publication" ...............................12

  C.  Categories of Multimedia to be Offered ..................................................................13

III.  Motions *in Limine* to Admit Certain Statutes and Records .......................................14

  A.  Judicial Notice of the Federal Electoral College Certification Law ........................14

  B.  Admission of the Congressional Record and S. Con. Res 1 .....................................14

IV.  Motions *in Limine* to Limit Unnecessary Discussion of Security-Related Topics .....15

  A.  Exact Locations of USCP Cameras ..........................................................................16

  B.  Secret Service Protocols ..........................................................................................18

V.   Motion *in Limine* to Limit Cross Examination of Confidential Human Sources........20

VI.  Motion *in Limine* to Preclude Defendants' Introduction of Their Own
Out-of-Court Statements as Inadmissible Hearsay ............................................................22

  A.  The Rule of Completeness cannot circumvent the rule against hearsay ..................22

  B.  Law enforcement testimony cannot circumvent the rule against hearsay................23

VII. Motion *in Limine* to Preclude Improper Defense Arguments ....................................24

  A.  First Amendment .....................................................................................................24

    1.   *Brandenburg* is Inapplicable ...........................................................................24

    2.   Admission of Defendants' Statements Does Not Violate the First Amendment............25

    3.   Defendants Should be Precluded from Raising a First Amendment
Defense to the Jury .......................................................................................................26

  B.  Charging Decisions and Selective Prosecution .......................................................28

  C.  Entrapment or Public Authority Defenses ...............................................................29

    1.   The defendants have not provided the requisite notice........................................29

    2.   The defendants' actions were not authorized by the President .............................30

    3.   The defendants' actions were not authorized by law enforcement........................31

    4.   The defendants' actions were not caused by agent provocateurs .........................32

  D.  ████████████████████ [UNDER SEAL] .................................................32

  E.  Jury Nullification.....................................................................................................34

    1.   Conditions of Incarceration.................................................................................35

    2.   Penalties and Collateral Consequences...............................................................35

  F.  Unsupported Claims of Self-Defense or Defense of Others .....................................36

CONCLUSION .................................................................................................................37

I.  **Motion *in Limine* to Establish Relevance of Conduct by Co-Conspirators and "Tools" of the Conspiracy**

As summarized in the government's Motion *in Limine* to Admit Statements (the "Statements Motion"), ECF 475, and as will be proven at trial, the core objective of the conspiracy was to forcibly oppose the lawful transfer of Presidential power.  The leaders of this conspiracy — including Tarrio, Nordean, Biggs, and Rehl — recruited and mobilized a group of subordinates to carry out their criminal objective. Certain members' penchant for unlawful conduct was well-known to the leaders of the group (*see*, *e.g.*, ECF 336 at ¶ 6, 23), and Tarrio and Biggs sought out the "real men" necessary to carry out their criminal objective.

Many of the individuals recruited into the exclusive chapter of "hand-picked" men, including Pezzola, would soon come to learn the criminal objective of the conspiracy. Indeed, messages among the "hand-picked" men in the message group that Tarrio created reflected the group's focus on the use of force at the Capitol on January 6, with one member commenting that it was time to "stack those bodies in front of Capitol Hill." Others — the "tools" — would merely be used in furtherance of the conspiracy. These "tools" served as instruments of the defendants to carry out their criminal objective. While unwitting to the criminal objective, they were employed to take action on behalf of and in furtherance of the criminal objective. Such group includes those non-Proud Boys — or "normies" — who the defendants sought to "let [] loose" on January 6.

The government intends to present evidence about actions by third parties who either were members of the conspiracy or, short of that, were the "tools" of the conspiracy deployed by the defendants in furtherance of their criminal objectives.  The evidence is relevant and admissible. The conduct of both the defendants' co-conspirators and the defendants' "tools" is relevant as it reflects the manner and means of the conspiracy as defendants themselves saw it. *See* ECF 475 at 7, 32 (Rehl telling an MOSD chat group with roughly 90 participants that he was "proud as fuck what we

accomplished yesterday"). The defendants viewed their forcible opposition to the lawful transfer of power as something they achieved by mobilizing the crowd; the jury should be permitted to see the full scope of that undertaking.

For alleged co-conspirators, the government will present evidence at trial that evinces each co-conspirator's agreement to join in the unlawful objective. Such evidence includes, among other things, the co-conspirators' voluntary and willful (1) submission to the on-the-ground leadership of Nordean, Biggs, and Rehl by following them in formation to the Capitol, and (2) actions in concert with the defendants that furthered the defendants' shared purpose of forcibly overwhelming the Capitol's defenses and halting the certification process. *See United States v. Wood*, 879 F.2d 927, 938 (D.C. Cir. 1989) ("Circumstantial evidence, including inferences from a 'development and a collocation of circumstances,' suffices to prove participation in a conspiracy." (quoting *Glasser v. United States*, 315 U.S. 60, 67 (1942))); *United States v. Navarrete*, 125 F.3d 559, 562 (7th Cir. 1997) ("Although mere presence is insufficient to show that [a person] was acting in furtherance of a conspiracy, the government can prove that [a person] joined a conspiracy if his 'presence, along with other evidence indicating that the presence or act was intended to advance the ends of the conspiracy' is shown." (quoting *United States v. Johnson–Dix*, 54 F.3d 1295, 1302 (7th Cir. 1995))).

It is important to note that it does not matter whether all these members of the conspiracy understood and "agreed on the details" of the scheme, so long as they agreed on the "essential nature of the plan." *United States v. Gatling*, 96 F.3d 1511, 1518 (D.C. Cir. 1996); *cf.* ECF 71 at 46 (Court's ruling on Nordean and Biggs detention, explaining that "even if someone who was a part of the conspiracy expressed surprise at the way events unfolded that day or what the ultimate outcome was . . . that does not necessarily mean there wasn't a conspiracy of the kind alleged."). And in fact, the evidence will show that the conspiracy's leaders purposefully kept subordinates in the dark about the precise details, urging them to "turn off [their] brains" and "follow the . . . guys you're with." ECF

475 at 15 (Statements Motion, quoting statement from Person 3 to MOSD members).  In assembling their group of foot soldiers, the leader defendants sought loyal followers, not co-equal partners. *Cf. United States v. Mahdi*, 598 F.3d 883, 891 (D.C. Cir. 2010) (finding that evidence of defendant exercising "organization control" to keep "the worker bees in line" was intrinsic evidence of conspiracy). Willing followers all, the fact that each may not have been fully privy to the entire plan in no way negates their being co-conspirators.[1] Co-conspirators need not share *all* of the charged criminal objectives of the conspiracy, so long as they formed *some* agreement with the defendants. Hypothetically, if a particular member of the marching group lacked sufficient understanding of what was happening in Congress to make him part of a conspiracy to corruptly obstruct an official proceeding in violation of 18 U.S.C. § 1512, he could still be part of a conspiracy to use force to oppose the lawful transfer of Presidential power in violation of 18 U.S.C. § 2384 or a conspiracy to forcibly prevent law enforcement officers from discharging their duties in violation of 18 U.S.C. § 372.  His conduct is relevant regardless.

Many of these individuals, after being led to the Capitol in formation by Nordean, Biggs, and Rehl, employed force against persons and property in furtherance of the conspiracy.[2]  The government

---

[1] Because the individuals above (and similar others) were members of the conspiracy who acted in furtherance of the conspiracy, their conduct is highly relevant — indeed, intrinsic — to the charged offenses.  *See United States v. Moore*, 651 F.3d 30, 63 (D.C. Cir. 2011), *aff'd sub nom. Smith v. United States*, 568 U.S. 106 (2013) ("Intrinsic" evidence encompasses evidence that is either "of an act that is part of the charged offense" or is of "acts performed contemporaneously with the charged crime ... if they facilitate the commission of the charged crime." (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000))).

[2] Proof of others co-conspirators' conduct is admissible regardless of whether the actors are indicted in the same case as the defendants.  *United States v. Khatallah,* 41 F.4th 608, 625–26 (D.C. Cir. 2022) (holding that a rational jury could convict Khatallah "as vicariously liable" for violations of 18 U.S.C. § 1361 by co-conspirators who were not charged in the indictment); *Cf. United States v. Richardson*, 477 F.2d 1280, 1283 (8th Cir. 1973) (collecting cases for rule that co-conspirator statements are admissible "even in the absence of a conspiracy charge so long as there is independent evidence of concert of action").  The Court applied this same reasoning early in the case when it found that the conduct of Pezzola — who at that time was charged separately — was part of the "nature and circumstances of the offense" for purposes of Nordean's and Bigg's

will offer evidence of this conduct as both evidence of the existence of the conspiracy and as examples of the manner and means of the conspiracy. Such examples include, but are not limited to, the following:

- Daniel Lyons Scott, aka "Milkshake," a Proud Boy, led a crowd in shoving a line of officers to force their way up a set of steps leading to the Capitol.[3]

- Alan Fischer and Zachary Johnson, both Proud Boys, were part of a crowd trying to force its way through a line of officers defending an entrance to the Capitol building known as the "tunnel" on the Lower West Terrace.  Johnson passed weapons up to rioters on the front line of the crowd, including a sledgehammer and a can of chemical spray.[4]

- Edward George, a Proud Boy, engaged in a shoving match with an officer while trying to force his way into the Capitol through the Senate Carriage Door.[5]

- Steven Miles, a Proud Boy, shoved and threw punches at officers in an altercation at the west front of the Capitol, and used a plank of wood resembling a two-by-four to break a window to make entry into the Capitol building.[6]

- Christopher Worrell, a Proud Boy, sprayed a chemical irritant while in the restricted area of the Capitol grounds.[7]

- Robert Gieswein, who is not a Proud Boy but who joined the marching group and wore orange masking tape as insignia showing affiliation with the marching group, sprayed officers with chemical irritant at multiple times and places inside the Capitol.[8]

Evidence of the conspiracy is not bound by the actions of the co-conspirators. As the evidence will show, on January 6, the defendants sought to harness the actions of others to achieve their

---

detention.  ECF 71 at 36.

[3] Scott is a defendant in case no. 1:21-cr-292-RCL.

[4] Fischer and Johnson are defendants in case no. 1:22-cr-11-RJL.

[5] George is a defendant in case no. 1:21-cr-378-TJK.

[6] Miles is a defendant in case no. 1:22-cr-136-JMC.

[7] Worrell is a defendant in case no. 1:21-cr-292-RCL.

[8] Gieswein is a defendant in case no. 1:21-cr-00024-EGS.

objective of forcibly opposing the lawful transfer of Presidential power.  In so doing, the defendants used these individuals as "tools."

To be clear, the government is not seeking here to hold the defendants criminally liable for the acts of the "tools" of the conspiracy under the principles of *Pinkerton* or the Sentencing Guidelines' "relevant conduct" analysis.  Rather, the actions of the "tools" of the conspiracy serve to illustrate the manner and means employed by the defendants in furtherance of their criminal objective. The evidence will show that the defendants' use of the "tools" was successful.   The crowd's force of numbers (1) helped the defendants overwhelm the various police lines they breached (Rehl at 12:54 p.m.: "Fuck them! Storm the Capitol!"); (2) helped allow members of the Proud Boys to play a key role in taking a vulnerable and key stairway *en route* to the Capitol building (Pezzola: "We're not stopping! We're not fucking stopping!"); (3) forced the evacuation of the House and Senate chambers; and (4) made it impossible for law enforcement to quickly clear the building so that the Congressional proceeding could resume (Tarrio: "Don't fucking leave!").

Accordingly, the Court should overrule any relevance objection to evidence of the conduct of co-conspirators and "tools" of the conspiracy.

## II.    Motion *in Limine* to Admit Certain Categories of Multimedia

The government has identified, and provided to the defense, certain categories of photographic and video exhibits that it intends to offer at trial.  The following sections describe each category of evidence and explain why each is admissible as relevant and authentic.

### A.  Legal Framework

"As a general rule, tangible evidence such as photographs must be properly identified or authenticated before being admitted into evidence at trial." *United States v. Blackwell*, 694 F.2d 1325, 1329 (D.C. Cir. 1982) (citations omitted). To satisfy this requirement, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid.

901(a).  Rule 901(b) provides a non-exhaustive list of examples of methods for showing authenticity.

Those include, as relevant here:

> (1) *Testimony of a Witness with Knowledge*. Testimony that an item is what it is claimed to be.
> . . .
> (3) *Comparison by an Expert Witness or the Trier of Fact*. A comparison with an authenticated specimen by an expert witness or the trier of fact.
> (4) *Distinctive Characteristics and the Like*. The appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.
> . . .
> (7) *Evidence About Public Records*. Evidence that: (A) a document was recorded or filed in a public office as authorized by law; or (B) a purported public record or statement is from the office where items of this kind are kept.
> . . .
> (9) *Evidence About a Process or System*. Evidence describing a process or system and showing that it produces an accurate result.

Fed. R. Evid. 901(b)(1), (3), (4), (7), (9).

In making the showing necessary for admissibility, "the proponent's burden of proof" is "slight," and the "ultimate resolution of the evidence's authenticity is reserved for the jury." *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 48 (D.D.C. 2016) (quoting *McQueeney v. Wilmington Tr. Co.*, 779 F.2d 916, 928 (3d Cir.1985)); *United States v. Safavian*, 435 F. Supp. 2d 36, 38 (D.D.C. 2006). To make the requisite *prima facie* showing, "circumstantial evidence of authenticity can be sufficient." *United States v. Bruner*, 657 F.2d 1278, 1284 (D.C. Cir. 1981).  And such evidence need not "rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be," *Hassanshahi*, 195 F. Supp. 3d at 48 (citing *United States v. Pluta*, 176 F.3d 43, 49 (2d Cir. 1999) (internal quotation marks and citation omitted)). Rather, the party offering the evidence need only "demonstrate that, as a matter of reasonable probability, possibilities of misidentification and adulteration have been eliminated." *United States v. Celis*, 608 F.3d 818, 842 (D.C. Cir. 2010) (quoting *United States v. Stewart*, 104 F.3d 1377, 1383 (D.C. Cir. 1997) (internal quotation marks omitted)).

## B.  Overlapping Bases for Admissibility of Multimedia

As introduced herein, there are multiple, overlapping bases that the government intends to use for the authentication and introduction of photographs and videos at trial. The government offers this non-exclusive list of bases for authentication should the government be unable to enter into stipulations with the defendants in advance of trial.

### 1.  Authentication by a witness with knowledge

To begin, any witness with knowledge of the events depicted in a photograph or video can authenticate the evidence, including but not limited to the person who took the photograph or video. *See* Fed. R. Evid. 901(b)(1).  Here, that includes any person who was present for the events depicted in the photograph or video and has a recollection sufficient for them to recognize the scene depicted. *See, e.g.*, *Am. Wrecking Corp. v. Sec'y of Lab.*, 351 F.3d 1254, 1262 (D.C. Cir. 2003).  Any individual that observed the events depicted in the photograph or video can testify that the photograph or video appears to fairly and accurately show the events that took place.  *See* FRE 901(b)(1); *see also United States v. Rembert*, 863 F.2d 1023, 1026 (D.C. Cir. 1988) (citing, e.g., *Simms v. Dixon*, 291 A.2d 184 (D.C. 1972); E. Cleary, McCormick on Evidence (3d ed. 1984) at 671).

Even a person who was not present for a specific event can circumstantially establish the authenticity of a photograph or video depicting that event if they can (1) identify the location(s) depicted in the video; and (2) establish that the video is generally consistent with their knowledge of events that occurred during the Capitol riot. *See, e.g.*, *Rembert*, 863 F. 2d at 1028 ("Even if direct testimony as to foundation matters is absent . . . the contents of a photograph itself, together with such other circumstantial or indirect evidence as bears upon the issue, may serve to explain and authenticate a photograph sufficiently to justify its admission into evidence." (quoting *United States v. Stearns*, 550 F.2d 1167, 1171 (9th Cir. 1977) (Kennedy, J.))); *Holmquist*, 36 F.3d at 169 ("A photograph's contents, buttressed by indirect or circumstantial evidence, can form a sufficient basis

for authentication even without the testimony of the photographer or some other person who was present at the time it was taken."). On this authority the government could authenticate riot footage through, for example, the testimony of an experienced Capitol Police officer who is familiar with all areas of the Capitol and who knows that the events of January 6 are unique in modern history. *Cf. Safavian*, 435 F. Supp. 2d at 36 (authenticating emails based on "distinctive characteristics" and citing Fed. R. Evid. 901(b)(4)); *Klayman v. Judicial Watch*, 299 F. Supp. 3d 141 (D.D.C. 2018) (admitting emails and advertisements by comparing later versions with admitted versions). Again, this is a low bar that requires only a *prima facie* showing that the evidence is what the government purports it to be — namely, photographs and videos of the Capitol siege in progress.

### 2.   Authentication by metadata

Where necessary, the government can also authenticate the specific time or place of a photograph or video using metadata. When a digital media file is extracted from a device or otherwise seized by the government, it often contains metadata that specifies the time, and sometimes place, the file was created, along with other information. At trial, the government will sometimes call law enforcement personnel to testify about the process of extracting data from digital devices and reviewing the extracted materials. Such testimony is sufficient to make a *prima facie* showing that a photograph or video was made at the time or place reflected in the metadata. *See, e.g.*, *United States v. Banks*, 43 F.4th 912, 918 (8th Cir. 2022) ("While the officers were not present when the images and videos were first captured, their testimony [about reviewing extraction reports] provided a rational basis to believe that the exhibits had been created within the relevant time frame and stored on [the defendant's] cellular phones."); *Lorraine v. Markel Am. Ins. Co.*, 241 F.R.D. 534, 547-48 (D. Md. 2007) ("Because metadata shows the date, time and identity of the creator of an electronic record, as well as all changes made to it, metadata is a distinctive characteristic of all electronic evidence that can be used to authenticate it under Rule 901(b)(4)."); *United States v. Gilbreath*, No. 3:19-CR-127-

TAV-HBG, 2020 WL 5441226, at *3 (E.D. Tenn. Sept. 10, 2020) ("Metadata . . . showed that these images were created at defendant's home and on defendant's cell phone on September 12, 2015.").

### 3. Authentication by comparison

Similarly and alternatively, in instances where precision of time and place is relevant but cannot be established by a witness with knowledge or by the media's metadata, the government will authenticate exhibits by reference to other, already-authenticated exhibits depicting the same time and place. This method of "[a]uthentication by comparison is routine." *Valve Corp. v. Ironburg Inventions Ltd.*, 8 F.4th 1364, 1371 (Fed. Cir. 2021); *see also United States v. Hoyt*, 946 F.2d 127, at *1 (D.C. Cir. 1991) (unpub.) (noting that Fed. R. Evid. 901(b)(3) permits authentication by comparison); *Stearns*, 550 F.2d at 1171-72 (finding that first picture "authenticates the other four pictures as to time"); *Safavian*, 435 F. Supp. 2d at 40 (allowing authentication of emails by means of comparison with other "emails that already have been independently authenticated").

### 4. Authentication based on process or system that produces an accurate result

Certain multimedia, such as security cameras ("CCTV") operated by the U.S. Capitol Police (USCP) and body-worn cameras (BWC) worn by officers of the Metropolitan Police Department (MPD) can be authenticated under Fed. R. Evid 901(b)(9) by "describing a process or system and showing that it produces an accurate result." *See United States v. Dale*, 991 F.2d 819, 843 (D.C. Cir. 1993) ("Tapes may be authenticated by testimony describing the process or system that created the tape"); *United States v. Pinke*, 614 F. App'x 651, 653 (4th Cir. 2015) (unpub.) (finding "sufficient evidence of authentication" of a prison's closed circuit video where "a Government witness explained the manner in which the prison's closed circuit video system operates, the means by which he obtained the video, and that he downloaded it onto the DVD that was played for the jury."). Multiple USCP and MPD witnesses to be called by the government are available to testify to the systems employed by USCP and MPD, respectively. These witnesses will be able to explain how the system is used,

that it reliably records and depicts the areas that the camera faces, and the internal characteristics of videos — such as date and time stamps — which allow USCP and MPD to identify and retrieve segments of video.

### 5.  Authentication based on status as an "official publication"

Certain evidence in this case, such as video taken by the Senate Recording Studio, is also "self-authenticating," meaning it "require[s] no extrinsic evidence of authenticity in order to be admitted."  Fed. R. Evid. 902.[9]  This is so because it qualifies as an "Official Publication[]," defined as any "book, pamphlet, or other publication purporting to be issued by a public authority."  Fed. R. Evid. 902(5).  Official materials published on government websites fall into this category and are self-authenticating under Rule 902.  *See Williams v. Long*, 585 F. Supp. 2d 679, (D. Md. 2008); *cf. MMA Consultants 1, Inc. v. Republic of Peru*, 245 F. Supp. 3d 486, 503-504 (S.D.N.Y. 2017) (Congressional transcripts); *Singletary v. Howard Univ.*, No. 1:17-cv-01198, 2018 U.S. Dist. LEXIS 164945, 2018 WL 4623569 (D.D.C., Sept. 26, 2018) *rev'd on other grounds* (government-issued guidebook).

The United States Senate uses the Senate Recording Studio to contemporaneously record Senate proceedings and distribute those recordings to the public.  *See* https://www.senate.gov/floor/, last accessed Oct. 12, 2022 (publicly available archived recordings of Senate Recording Studio).  The Senate Recording Studio recorded the proceedings relating to the Electoral College Certification on January 6, 2021, up to the point when the rioters breached the building and forced the proceedings into recess.  *See id*., proceedings for January 6, 2021.  Subsequently, the Senate Recording Studio recorded the Electoral College Certification proceedings after the rioters were cleared from the

---

[9] Further underscoring the multiple paths to authentication, it is worth noting that Senate Recording Studio footage may also be authenticated through any of the mechanisms outlined in this motion, including Fed. R. Evid. 901(b)(1), (3), (4), (9).

Capitol Building and the session resumed.  *Id*.  During the interim, the Senate Recording Studio captured footage of rioters who were present on the Senate floor during the recess.

### C.  Categories of Multimedia to be Offered

The government plans to introduce certain videos and photos recovered from defendants' phones and social media accounts,[10] as well as videos and photographs taken by third parties such as other rioters and journalists who were present inside and outside the Capitol on January 6. Among other ways, these materials can be authenticated through the processes described in Sections II.B.1-3, *supra*.

The evidence at trial will also include video captured by law enforcement, including CCTV and BWC footage.  Like any other videos, these can be authenticated by any person with direct knowledge of the scene depicted or with sufficient circumstantial knowledge (*see* Fed. R. Evid. 901(b)(1) and discussion *supra* at Section II.B.1) or through metadata or comparison (*see* Fed. R. Evid. 901(b)(4) and discussion *supra* at Section II.B.2-3. Alternatively, given the automated nature of the recording devices in question, the BWC and CCTV footage can be authenticated under Rule 901(b)(9), which allows authentication by "[e]vidence describing a process or system and showing

---

[10] As discussed in the government's Statements Motion, ECF 475, the government intends to introduce videos, images, and statements posted by the defendants to social media; the purpose of such evidence will be to provide evidence of the existence and scope of the conspiracy and show the defendants' motive and intent to oppose the authority of the government by force on January 6 and as evidence of their consciousness of wrongfulness in doing so.  The relevance of such evidence depends on the government's authenticating the relevant accounts as actually belonging to the defendants, which it will readily accomplish.  The government can prove a defendant's ownership of a social media account using "circumstantial evidence linking the defendant to the social media account." *United States v. Lamm*, 5 F. 4th 942, 948 (8th Cir. 2021). Such circumstantial evidence can include "the presence of a nickname, date of birth, address, email address, and photos." *United States v. Barber*, 937 F.3d 965, 970-71 (7th Cir. 2019) ("This court has relied on evidence such as on someone's Facebook page as circumstantial evidence that a page might belong to that person"). *See also United States v. Bowens*, 938 F.3d 790, 795 (6th Cir. 2019) (finding that photograph of defendants, and first name of one defendant, constituted sufficient "circumstantial evidence from which the jury could infer that the defendants were the ones posting" incriminating social media content).

that it produces an accurate result." *See Dale*, 991 F.2d at 843; *Pinke*, 614 F. App'x at 653.

The government also anticipates introducing videos captured by the Senate Recording Studio, which videos can be authenticated through any of the processes described above.

**III.     Motions *in Limine* to Admit Certain Statutes and Records**

**A.   Judicial Notice of the Federal Electoral College Certification Law**

The proceedings that took place on January 6, 2021, were mandated by, and directed under the authority of, several constitutional and federal statutory provisions.  In fact, as Vice President Pence gaveled the Senate to Order on January 6, 2021 to proceed with the Electoral College Certification Official Proceeding, he quoted directly from, and cited to, Title 3, United States Code, Section 17.

The government requests that the Court take judicial notice of, and admit into evidence, copies of Article II, Section 1 of the Constitution of the United States, the Twelfth Amendment, as well as 3 U.S.C. §§ 15-18 relating to the Electoral College Certification Official Proceedings.  It is well established that district courts may take judicial notice of law "without plea or proof." *See United States v. Davila-Nieves*, 670 F.3d 1, 7 (1st Cir. 2012).  The government makes this request even though "no motion is required in order for the court to take judicial notice."  *Moore v. Reno*, No. 00-5180, 2000 U.S. App. LEXIS 35425; 2000 WL 1838862 (D.D.C. Nov. 14, 2000).  Further, "where a federal prosecution hinges on an interpretation or application of state law, it is the district court's function to explain the relevant state law to the jury." *See United States v. Fazal-Ur-Raheman-Fazal*, 355 F.3d 40, 49 (1st Cir. 2004).

**B.   Admission of the Congressional Record and S. Con. Res 1**

The Congressional proceedings on January 6, 2021, were memorialized in the Congressional Record.  The Congressional Record is a public record under Federal Rule of Evidence 902(5).  *See MMA Consultants*, 245 F. Supp. 3d at 503-504.  The government intends to introduce portions of the

Congressional Record at trial, including the bodies' "concurrent resolution to provide for the counting on January 6, 2021, of the electoral votes for President and Vice President of the United States," S. Con. Res. 1, 117th Cong. (2021).  For the same reasons as the Senate Recording Studios footage above, these records should be admitted as self-authenticating.

IV.     **Motions *in Limine* to Limit Unnecessary Discussion of Security-Related Topics**

Certain topics that could arise at trial — namely the exact locations of USCP CCTV cameras and the protocols of the U.S. Secret Service (USSS) — have little to no probative value but would compromise significant security interests if needlessly disclosed to the public.  The government does not intend to elicit any of the following topics in its case-in-chief and, therefore, cross-examination on such topics would be beyond the scope of direct and impermissible. Fed. R. Evid. 611(b). To the extent that defendants seek to argue that any of the following topics are relevant and within the scope of the government's examination, the government requests an order under Fed. R. Evid. 403 foreclosing unnecessary cross-examination on these topics.

It is well-established that a district court has the discretion to limit a criminal defendant's presentation of evidence and cross-examination of witnesses. *See Alford v. United States,* 282 U.S. 687 (1931) ("The extent of cross-examination [of a witness] with respect to an appropriate subject of inquiry is within the sound discretion of the trial court."); *United States v. Whitmore*, 359 F.3d 609, 615-16 (D.C. Cir. 2004) ("The district court . . . has considerable discretion to place reasonable limits on a criminal defendant's presentation of evidence and cross-examination of government witnesses."). A court has the discretion to prohibit cross-examination that goes beyond matters testified to on direct examination. Fed. R. Evid. 611(b). This is particularly so when the information at issue is of a sensitive nature. *See e.g., United States v. Balistreri,* 779 F.2d 1191, 1216-17 (7th Cir. 1985) (upholding district court's decision to prohibit cross-examination of agent about sensitive information about which that agent did not testify on direct examination and which did not pertain to

the charges in the case), *overruled on other grounds* by *Fowler v. Butts,* 829 F.3d 788 (7th Cir. 2016).

The Confrontation Clause only guarantees "an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). Even evidence that may be relevant to an affirmative defense should be excluded until the defendant sufficiently establishes that defense through affirmative evidence presented during his own case-in-chief. *See United States v. Lin,* 101 F.3d 760, 768 (D.C. Cir. 1996) (acknowledging trial court has discretion to limit cross-examination on prejudicial matters without reasonable grounding in fact); *United States v. Sampol,* 636 F.2d 621, 663-64 (D.C. Cir. 1980) (holding that trial court properly limited cross-examination of alleged CIA murder scheme until defense put forth sufficient evidence of the affirmative defense in its case-in-chief).  Preventing the defendants from exploring the topics identified above will not infringe their Confrontation Clause right because the exact positions of cameras, the camera map and U.S. Secret Service protocols, implicate national security concerns, are of marginal probative value, and any probative value can be addressed without compromising the protective functions of government agencies.

## A.  Exact Locations of USCP Cameras

The government seeks an order limiting the defense from probing, during cross-examination, the exact locations of Capitol Police surveillance cameras or from using the maps, which show each camera's physical location, as an exhibit at trial. The government produced such information to defendants in discovery pursuant to the Highly Sensitive designation of the Protective Order. *See* ECF 83 and 103. The defendants have been able to make use of such information in order to identify evidence and prepare for trial; however, none of the information serves to illuminate any fact of consequence that is before the jury.

This lack of relevance must be balanced against the national security implications at stake here. The U.S. Capitol Police's surveillance system serves an important and ongoing function in protecting Congress, and therefore, national security. Furthermore, the government represents that the maps that show the physical location of cameras have been designated as "Security Information" under 2 U.S.C. § 1979, which generally requires approval of the Capitol Police Board before they may be released.

Evidence about the exact locations of cameras, and the maps used to locate the cameras, should be excluded in light of the ongoing security needs of Congress. Absent some concrete and specific defense need to probe the camera's location, there is nothing to be gained from such questioning. A general description, and the footage from the camera itself, will make clear what the camera recorded and what it did not. Additionally, presenting the map of all Capitol Police cameras would risk compromising these security concerns for no additional probative value: the map contains numerous cameras installed in parts of the Capitol that the defendants did not visit.

Here, the video footage itself reveals the *general* location and angle of the camera's positioning. Additional details as to the precise location of the cameras are not relevant to the jury's fact-finding mission. Even assuming the evidence that the government seeks to exclude is marginally relevant, such relevance is substantially outweighed by the danger to national security. The Supreme Court has recognized that trial courts' balancing should account for concerns extrinsic to the litigation, such as "witness' safety." *Olden v. Kentucky*, 488 U.S. 227, 232 (1988). Accordingly, courts have properly balanced the sensitivity of national security-related information against the probative value of such information to the case, excluding the evidence where its relevance is slight. *See, e.g., United States v. Marshall*, 544 F. Supp. 3d 1032, 1042 (D. Mont. 2021); *United States v. Mohammed*, 410 F. Supp. 2d 913, 918 (S.D. Cal. 2005); *cf. United States v. Sarkissian*, 841 F.2d 959, 965 (9th Cir. 1988) (endorsing balancing test in context of Classified Information Procedures Act). If a map that revealed

the location of all Capitol cameras were introduced in this trial, or in any trial, it would become available to the general public and foreign adversaries. Immediately, anyone could learn about the Capitol Police's camera coverage as of January 6, 2021, and — importantly — could learn about the parts of the Capitol where cameras were not installed. Broader presentation of evidence about camera locations could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses. *Id.*

### B.  Secret Service Protocols

To meet its burden of proof at trial, the government will call a witness from the United States Secret Service to testify that at the time of the Capitol breach, Secret Service agents were on duty to protect Vice President Mike Pence and his two immediate family members, all of whom were present at the Capitol. The witness will further testify about the Capitol breach's effect on the Secret Service's protection of Vice President Pence and his family members.  The purpose of this testimony will be to explain — in part — the bases for enhanced security controls at the Capitol on January 6 as well as establish an element of the charge at Count Five, *i.e.*, that the civil disorder at the Capitol on January 6 interfered with a federally protected function.

The very nature of the Secret Service's role in protecting the Vice President and his family implicates sensitive information related to that agency's ability to protect high-ranking members of the Executive branch and, by extension, national security. Thus, the government seeks an order limiting the cross-examination of the Secret Service witnesses to questioning about the federally protected function performed by the Secret Service as testified to on direct exam, namely, protecting the Vice President and his family. The government further requests that such order preclude cross-examination that would elicit information that does not directly relate to whether the Secret Service was performing that function at the Capitol on January 6, 2021.  Specifically, cross-examination should not be permitted to extend to (1) Secret Service protocols related to the locations where

protectees or their motorcades are taken at the Capitol or other government buildings when emergencies occur, and (2) details about the nature of Secret Service protective details, such as the number and type of agents the Secret Service assigns to protectees. These topics have no relevance to any issue at controversy, and even if they did, any relevance would be substantially outweighed by the danger of prejudicing the government's legitimate interest in the safety of senior government officials. *See* Fed. R. Evid. 403.

Cross-examination of Secret Service witnesses about extraneous matters beyond the scope of direct examination should be excluded as irrelevant or unduly prejudicial. Specifically, the Secret Service's general protocols about relocation for safety should be excluded as irrelevant because such evidence does not tend to make a fact of consequence more or less probable. Fed. R. Evid. 401). Similarly, evidence of the nature of Secret Service protective details is not relevant in this case. The disorder on January 6 interfered with the Secret Service's duties to protectees in this case insofar as they were required to take evasive action of the mob. The number or type of assigned agents on a protective detail is simply not relevant and could not alter the probability that there was interference with the Secret Service. None of the other elements to be proven, or available defenses, implicates further testimony from the Secret Service.

Even assuming the evidence to be excluded is marginally relevant, such relevance is substantially outweighed by the danger of confusion of the issues, mini-trials, undue delay, and waste of time. *See* discussion *supra* Section IV.A. Broader cross-examination of Secret Service witnesses could compromise national security without adding any appreciable benefit to the determination of the truth, or the veracity or bias of witnesses. *Id.*[11]

---

[11] If the defense believes that it is necessary to present evidence or cross-examine witnesses about the exact locations of USCP cameras or USSS procedures, the government requests that the Court conduct a hearing in camera to resolve the issue. Courts have found that in camera proceedings are

V.      **Motion *in Limine* to Limit Cross Examination of Confidential Human Sources**

The government requests an order placing reasonable limits on the cross examination of any Confidential Human Source ("CHS" or "Sources") to prevent eliciting unnecessary testimony that would prejudice the witness and the government.  Specifically the government requests that:

1. The defense shall be prohibited from asking any questions seeking personal identifying information from the witnesses, specifically, their address or date of birth;

2. Apart from the instant investigation, the defense shall be prohibited from asking any questions about the witnesses' participation in past or pending investigations or undercover operations; and

3. The defense shall be prohibited from eliciting testimony, either on cross-examination or on direct, that would reveal details about the FBI's CHS program such as the training and methods used by the FBI as part of their undercover operations.

Protecting witnesses' safety and the integrity of ongoing investigations are compelling interests that courts have long recognized.  That precedent readily justifies the reasonable security measures proposed here.  The Confrontation Clause of the Sixth Amendment gives a defendant the right to confront and cross-examine the government's witnesses who testify against the defendant. See *Maryland v. Craig*, 497 U.S. 836, 846 (1990); *Smith v. Illinois*, 390 U.S. 129 (1968).  The

---

appropriate in circumstances where security concerns like these are present.  *See United States v. Nixon*, 418 U.S. 683, 714 (1974) (affirming district court's order for in camera inspection of subpoenaed presidential materials); *United States v. Kampiles*, 609 F.2d 1233, 1248 (7th Cir. 1979) ("It is settled that in camera . . . proceedings to evaluate bona fide Government claims regarding national security information are proper."); *In re Taylor*, 567 F.2d 1183, 1188 (2d Cir. 1977) (finding that in camera proceedings "serve to resolve, without disclosure, the conflict between the threatened deprivation of a party's constitutional rights and the Government's claim of privilege based on the needs of public security."); *United States v. Brown*, 539 F.2d 467, 470 (5th Cir. 1976) (per curiam) (same). At any such hearing, the defendant should be required to make a specific proffer of some relevant purpose that is not substantially outweighed by the prejudice that disclosure would inflict on the government's security interests.  *Cf. United States v. Willie*, 941 F.2d 1384, 1393 (10th Cir. 1991) (explaining that a "proffer of great specificity" was necessary to support admission of testimony that could have proper or improper purposes).

"elements of confrontation—physical presence, oath, cross-examination, and observation of demeanor by the trier or fact—serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Craig*, 497 U.S. at 846. "The rule is that once cross-examination reveals sufficient information to appraise the witnesses' veracity, confrontation demands are satisfied." *United States v. Falsia*, 724 F.2d 1339, 1343 (9th Cir. 1983).

As the Supreme Court recognized in *Delaware v. Van Arsdall*, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." 475 U.S. 673, 679 (1986); *see also United States v. Palermo*, 410 F.2d 468, 472 (7th Cir. 1969) (citing *United States v. Varelli*, 407 F.2d 735 (7th Cir. 1969)); *Siegfriedt v. Fair*, 982 F.2d 14, 18 (1st Cir. 1992); *United States v. Contreras*, 602 F.2d 1237, 1239-40 (5th Cir. 1979) (where there was reasonable fear the disclosure of DEA agent's home address and frequented locations would endanger him and his family, no error in precluding cross-examination as to home address and other background information even though agent was "instrumental in defendant's arrest"); *United States v. Maso*, 2007 WL 3121986, *4 (11th Cir. Oct. 26, 2007) (per curiam) (unpublished) ("The district court did not violate [the defendant's] right to confront witnesses by allowing the [cooperating witness] to testify using a pseudonym."); *Brown v. Kuhlman*, 142 F.3d 529, 532 n.3 (2d Cir. 1998) (undercover detective who testified in closed courtroom due to safety concerns was permitted to testify using his badge number instead of his true name). The protections requested herein, while minimally restrictive, would ensure the integrity of any ongoing investigations and would reduce the security threat posed to any testifying Sources.

VI.     **Motion *in Limine* to Preclude Defendants' Introduction of Their Own Out-of-Court Statements as Inadmissible Hearsay**

A defendant's own out-of-court statements are hearsay that cannot be admitted to prove the truth of any matter asserted.  Fed. R. Evid. 801, 802.  The government can offer the defendant's statements as statements of a party opponent, Fed. R. Evid. 801(d)(2)(A), or other non-hearsay or hearsay execution, but the defendant has no corresponding right to admit his own statements without subjecting himself to cross-examination.

### A. The Rule of Completeness cannot circumvent the rule against hearsay

Nor does Federal Rule of Evidence 106, the "Rule of Completeness," provide an end-run around the prohibition against hearsay.  That rule provides that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part--or any other writing or recorded statement--that in fairness ought to be considered at the same time." Fed. R. Evid. 106.  Rule 106 directs the Court to "permit such *limited portions* [of a statement] to be contemporaneously introduced as will remove the distortion that otherwise would accompany the prosecution's evidence. *United States v. Sutton*, 801 F.2d 1346, 1369 (D.C. Cir. 1986) (emphasis added). The rule does not "empower[] a court to admit *unrelated* hearsay." *United States v. Woolbright*, 831 F.2d 1390, 1395 (8th Cir. 1987) (emphasis added). "The provision of Rule 106 grounding admission on 'fairness' reasonably should be interpreted to incorporate the common-law requirements that the evidence be relevant, and be necessary to qualify or explain the already introduced evidence allegedly taken out of context . . . In almost all cases we think Rule 106 will be invoked rarely and for a limited purpose." *Sutton*, 801 F.2d at 1369.

In this case, many of the defendants' statements to be offered by the government were made in chat groups, or using social media accounts, that were active over extended periods of time.  Rule 106 does not make all statements within these groups and accounts admissible over a hearsay

objection, but only those narrow portions that are necessary to "correct a misleading impression." *Sutton*, 801 F.2d at 1368 (quoting Advisory Committee note to Rule 106). By way of analogy, Courts of Appeals have rejected the notion that "all documents contained in agglomerated files must be admitted into evidence merely because they happen to be physically stored in the same file." *Jamison v. Collins*, 291 F.3d 380, 387 (6th Cir. 2002), as amended on denial of reh'g (July 11, 2002) (quoting *United States v. Boylan*, 898 F.2d 230, 257 (1st Cir.1990)).

Accordingly, at trial the Court should reject any effort by the defendants to use the Rule of Completeness as a backdoor to admit otherwise inadmissible hearsay.

**B.  Law enforcement testimony cannot circumvent the rule against hearsay**

Another mechanism by which the government anticipates that the defendants may attempt to introduce their own prior statements is through the testimony of law enforcement officers with whom certain of the defendants had communications. Specifically, defense counsel recently identified specific law enforcement officers that they would like to call in their defense case. The government anticipates that these officers are being called, at least in part, to elicit self-serving statements made by the defendants to law enforcement about their travels to Washington, D.C. or other areas. Any such statements by defendants, if offered for the truth of the matter asserted, would be inadmissible hearsay.

An equally defective mechanism by which counsel might attempt to introduce defendants' prior statements to the jury would be for defendants to elicit lay opinion testimony from the officers. As an initial matter, such testimony would likely be irrelevant and inadmissible on that basis. Additionally, if such opinions are predicated on self-serving statements by the defendants, the opinion testimony is likewise inadmissible as a vehicle to admit defendants' hearsay. The Rules of Evidence allow only expert witnesses to offer opinions based on otherwise-inadmissible evidence, Fed. R. Evid. 703, and even in that context, expert opinion testimony cannot be a backdoor for hearsay. *See*

*Gilmore v. Palestinian Interim Self-Government Authority*, 843 F.3d 958, 972 (D.C. Cir. 2016) ("The expert must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials. Otherwise, the expert is simply repeating hearsay evidence without applying any expertise whatsoever, a practice that allows the [proponent] to circumvent the rules prohibiting hearsay") (cleaned up); *DL v. D.C.*, 109 F. Supp. 3d 12, 30 (D.D.C. 2015) ("An expert is entitled to rely on inadmissible evidence in forming his or her opinion, though the expert 'must form his [or her] own opinions by applying his [or her] extensive experience and a reliable methodology to the inadmissible materials,' rather than simply 'transmit' the hearsay to the jury."). At trial the Court should reject any effort by the defendants to admit otherwise inadmissible hearsay indirectly through a law enforcement officer or other percipient witness.

## VII.   Motion *in Limine* to Preclude Improper Defense Arguments

### A. First Amendment

The United States moves this Court to admit in its case-in-chief statements that evince the defendants' motive or intent, or which go to prove an element of any offense with which they are charged.  The government also moves *in limine* to preclude the defense from eliciting evidence or arguing to the jury that their statements and actions were protected by the First Amendment.

### 1. *Brandenburg* is Inapplicable

Defendant Rehl has posited that the government must meet the standard articulated in *Brandenburg v. Ohio*, 395 U.S. 444 (1969) to convict him in this case.  *See, e.g.*, ECF 439 (moving to dismiss on First Amendment grounds).  He is mistaken about *Brandenburg's* applicability in this context.  *Brandenburg* is applicable when the government seeks to punish a defendant's statements— when an utterance is the *actus reus* of the crime charged.  As discussed below, this is not the case here: the *actus reus* of the conspiracy offenses is a criminal agreement, not the statements themselves. *See United States v. Shabani*, 513 U.S. 10, 16 (1994).   The defendants' statements thus form part of

the government's quantum of proof of that agreement, which is precisely the type of use sanctioned in *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  It is instructive that *Mitchell* does not cite *Brandenburg*.  If the law was in fact that the government must meet the *Brandenburg* test to rely on statements to prove an element of the crime or motive or intent, the Supreme Court would have so said in *Mitchell*.

### 2.  Admission of Defendants' Statements Does Not Violate the First Amendment

The government intends to introduce several statements, made by these defendants, that will aid the jury's determination as to whether the government has met the elements of the conspiracy statutes at issue and/or to show motive and intent.  *See Mitchell*, 508 U.S. at 489 (the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent").  "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like." *Id*. Accordingly, the government asks that the Court rule that the First Amendment does not bar admission at trial of any statement that the government offers to establish the defendants' motive, intent, or an element of the crime, such as whether they possessed knowledge of the conspiracies with which they are charged.

Courts across the country, including this Court's colleagues in January 6th cases, have allowed evidence of defendants' statements for the purposes sanctioned by *Mitchell*.  As Judge Cooper recently ruled:

> Nor does the Court find any First Amendment concerns in the government's use of Robertson's statements to show intent. . . .  If Robertson had expressed his views only through social media, he almost certainly would not be here. But he also allegedly took action—entering the Capitol without lawful authority in an alleged attempt to impede the Electoral College vote certification. His words remain relevant to his intent and motive for taking those alleged actions.

*United States v. Robertson*, --- F. Supp. 3d ----, 2022 WL 969546 at *6 (D.D.C. 2022) (internal citation omitted).  Outside of the context of January 6th, *Mitchell* has been cited to uphold the admission of a wide range of statements, including but not limited to rap lyrics, terrorist materials, and speeches advocating civil disobedience.  *United States v. Smith*, 967 F.3d 1196, 1205 (11th Cir. 2020) (rap lyrics); *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) ("This challenge is meritless, however, because here the speech is not 'itself the proscribed conduct.' The speech was not the basis for the prosecution, but instead it was used to establish the existence of, and [defendant's] participation in, the alleged RICO enterprise") (internal citation omitted) (rap lyrics and tattoos); *United States v. Salameh*, 152 F.3d 88, 111-12 (2d Cir. 1998) (the defendants were not "prosecuted for possessing or reading terrorist materials. The materials seized . . . were used appropriately to prove the existence of the bombing conspiracy and its motive"); *United States v. Fullmer*, 584 F.3d 132, 158 (9th Cir. 2009) (speeches advocating civil disobedience).[12]

The defendants' statements that shed light on the elements of the offenses, or motive or intent, should be admitted in this case as expressly permitted by *Mitchell*, regardless of whether any of those statements may otherwise constitute speech protected by the First Amendment.

### 3. Defendants Should be Precluded from Raising a First Amendment Defense to the Jury

The government also moves *in limine* to preclude the defendants from arguing to the jury that their conduct was protected by the First Amendment.  None of the offenses with which the defendants are charged punish speech, as crimes such as threats or solicitation do.  The crimes with which the defendants are charged punish agreements to commit defined criminal objectives (the conspiracy

---

[12]     The court in *Fullmer* specifically noted that one particular defendant's conduct—which included writing an editorial and recruiting speakers to travel and advocate on behalf of his organization—was not criminal, and that punishing him based on that conduct alone would be unconstitutional. *Fullmer*, 584 F.3d at 158.  The court nonetheless, citing *Mitchell*, held that this defendant's "conduct . . . does provide circumstantial evidence from which a jury could have reasonably inferred that Harper was involved in a conspiracy." *Id.*

statutes); the corrupt obstruction, influence, or impediment of an official proceeding (substantive violation of 18 U.S.C. § 1512(c)(2)); or actions taken during the riot.

As this Court recognized in ruling on the defendants' motions to dismiss the First Superseding Indictment, "[n]o matter [the rioters'] political motivations or any political message they wished to express, this alleged conduct is simply not protected by the First Amendment." ECF 263 at 29. Although the Court has not yet ruled on the defendants' motion to dismiss the Third Superseding Indictment, the seditious conspiracy statute does not proscribe protected speech for a similar reason: 18 U.S.C. § 2384 "proscribes 'speech' only when it constitutes an agreement to use force against the United States." *United States v. Rahman*, 189 F.3d 88, 114 (2d Cir. 1999); *see also id.* at 115 ("To be convicted under Section 2384, one must conspire to *use* force, not just to *advocate* the use of force"). *See also generally* ECF 454 (Gov't Omnibus Opp'n to Defendants' Motions to Dismiss) at 42-44.

If the government establishes the elements of any of the offenses with which the defendants are charged, the First Amendment provides them no defense, even if evidence of the defendants' crimes is intertwined with political discussion and/or rhetoric. *See United States v. Amawi*, 695 F.3d 457, 482 (6th Cir. 2012) ("[A]lthough the conspiracy was closely related to, and indeed proved by, many of the defendants' conversations about political and religious matters, the conviction was based on an agreement to cooperate in the commission a crime, not simply to talk about it"); *see also United States v. Hassan*, 742 F.3d 104, 127-28 (4th Cir. 2014) (citing *Amawi*).

Accordingly, any line of cross-examination or argument that the defendants may wish to make regarding the First Amendment is irrelevant under Fed. R. Evid. 401 because it lacks a "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" and because they are not entitled to a First Amendment defense as a matter of law. To the extent there is any relevance to any of the defendants' First Amendment claims, the Court should exclude any questioning and argument along those lines

under Fed. R. Evid. 403. Any attempt to shift the jury's attention to questions about whether the defendants' statements were protected by the First Amendment, rather than the charged offenses risks confusing the issues, wasting time, and unfairly prejudicing the jury.

### B.  Charging Decisions and Selective Prosecution

The United States moves *in limine* to exclude all evidence and arguments regarding its charging decisions.  The Supreme Court has recognized that the "Attorney General and United States Attorneys retain 'broad discretion' to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (citing *Wayte v. United States*, 470 U.S. 596, 607 (1985)). "They have this latitude because they are designated by statute as the President's delegates to help him discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed.'" *Id.* (citing U.S. Const. Art. II, § 3); *see* 28 U.S.C. §§ 516, 547.   As a general matter, "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978); *see also United States v. Batchelder*, 442 U.S. 114, 124-25 (1979) ("Selectivity in the enforcement of criminal laws is, of course, subject to constitutional constraints.").

Defendant Nordean filed a motion for discovery based on selective prosecution, which the Court rightly denied.  *See* ECF Nos. 267, 378.  Indeed, the D.C. Circuit has recognized that a selective-prosecution claim implicates "an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged." *United States v. Washington*, 705 F.2d 489, 495 (D.C. Cir. 1983); *see also United States v. Stone,* 394 F.Supp.3d 1, 30 n.24 (D.D.C. 2019) ("the Supreme Court found that a claim of selective prosecution is not a 'defense' that triggers discovery under Rule 16 because a claim of selective prosecution is not a response to the government's case-in-chief") (citing *Armstrong,* 517 U.S. at 461-462).  After all, evidence that some

other individual is currently uncharged or has been charged with a lesser crime than those charged here has no probative value to the issues at trial and serves only to confuse or mislead the jury. *See* Fed. R. Evid. 402 and 403.

The defendants should be precluded from introducing evidence or making arguments regarding charging decisions made by the United States. To the extent that any defendant seeks to present evidence or arguments that other individuals have not been charged for related conduct and/or that it is unfair that he has been charged, while other individuals involved in related criminal conduct remain uncharged or charged with lesser offenses, such evidence is irrelevant, inadmissible, and only serves to divert the jury's attention to matters unrelated to the defendants' guilt or innocence.

### C. Entrapment or Public Authority Defenses

The defendants should be prohibited from making arguments or attempting to introduce evidence that law enforcement gave permission to the defendants to enter the U.S. Capitol. The defense of entrapment by estoppel only "applies to a defendant who reasonably relies on the assurance of a government official that specified conduct will not violate the law." *United States v. Alvarado*, 808 F.3d 474, 484–85 (11th Cir. 2015). Such reliance must be "objectively reasonable." *United States v. Barker*, 546 F.2d 940, 948 (D.C. Cir. 1976). This defense is unavailable in this case, for procedural as well as substantive reasons.

### 1. The defendants have not provided the requisite notice

Federal Rule of Criminal Procedure 12.3(a)(1) requires defendants to provide notice if they "intend[ ] to assert a defense of actual or believed exercise of public authority on behalf of a law enforcement agency or federal intelligence agency at the time of the alleged offense." Such notice must be in writing and be filed with the clerk "within the time provided for filing a pretrial motion, or at any later time the court sets." Fed. R. Crim. P. 12.3(a)(1). The notice must contain the law enforcement or federal intelligence agency involved, the specific agency member, and the time during

which the defendant claims to have acted with public authority.  Fed. R. Crim. P. 12.3(a)(2)(A)-(C).

A failure to comply allows the court to exclude the testimony of any undisclosed witness except the

defendant.  Fed. R. Crim. P. 12.3(c).

As of the date of this filing, no defendant in this case has served notice pursuant to Rule

12.3(a)(1).  They are therefore barred from advancing a public authority defense.

### 2.   The defendants' actions were not authorized by the President

Even if notice had been timely, defendants should be precluded from advancing a public

authority defense. As an initial matter, former President Trump did not have the authority to permit

or authorize a conspiracy to forcibly oppose the authority of the government or the execution of the

laws of the United States, nor could he have lawfully sanctioned the attack on the United States

Capitol on January 6 or any of the other criminal conduct allegedly perpetrated by defendants. As

Chief Judge Howell wrote last year in rejecting the idea of an entrapment-by-estoppel defense for

January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his
> responsibilities under Article II, lawfully permit actions that directly undermine the
> Constitution. Thus, a President cannot, within the confines of his constitutional
> authority, prevent the constitutionally mandated certification of the results of a
> Presidential Election or encourage others to do so on his behalf, nor can he direct an
> assault on the coequal Legislative branch of government. Were a President to attempt
> to condone such conduct, he would act *ultra vires* and thus without the force of his
> constitutional authority. . . . Put simply, even if former President Trump in fact
> [explicitly directed the rioters' actions,] his statements would not immunize
> defendants charged with offenses arising from the January 6 assault on the Capitol
> from criminal liability.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 32-33 (D.D.C. 2021).

The D.C. Circuit came to the same conclusion in *United States v. North*, when addressing

Oliver North's contention that President Ronald Reagan authorized his obstruction of Congress

in that case. 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded

in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990). The court made clear that "'[n]either the

President nor any of [North's] superiors had the legal authority to order anyone to violate the law,' particularly if such 'orders,' explicit or implicit, represented nothing more than [the President's] desires." *Id.* at 891 n.24.

Thus, even if former President Trump explicitly called for the defendants to engage in the charged criminal conduct, that could not underlie a public-authority defense or entrapment-by-estoppel. In any event, that did not happen.

### 3.   The defendants' actions were not authorized by law enforcement

The same reasoning applies to any argument based on acts or omissions of the Capitol Police or other law enforcement: "the logic in *Chrestman* that a U.S. President cannot unilaterally abrogate statutory law applies with equal force to government actors in less powerful offices, such as law enforcement officers protecting the U.S. Capitol Building."  Memorandum and Order, *United States v. Williams*, No. 21-cr-377-BAH, at *2 (D.D.C. June 8, 2022).  Even if the defendants could establish that a member of law enforcement told them that it was lawful to enter the Capitol building or allowed them to do so, the defendants' reliance on any such statement would not be reasonable in light of the "obvious police barricades, police lines, and police orders restricting entry at the Capitol." *Chrestman*, 525 F. Supp. 3d at 32.

In addition to prohibiting any defense arguments that law enforcement actively communicated to the defendants that entering the Capitol building or grounds was lawful, the Court should also bar the defendants from arguing that any failure to act by law enforcement rendered their conduct legal. The same reasoning that applied in *Chrestman* again applies here.  That is, like the Chief Executive, a Metropolitan Police Officer or Capitol Police Officer cannot "unilaterally abrogate criminal laws duly enacted by Congress" through his or her purported inaction.  *Chrestman*, 525 F. Supp. 3d at 33. An officer cannot shield an individual from liability for an illegal act by failing to enforce the law or ratify unlawful conduct by failing to prevent it.  As Chief Judge Howell explained in the context of

another January 6 case, "[s]ettled caselaw makes clear that law officer inaction—whatever the reason for the inaction—cannot sanction unlawful conduct." *Williams*, No. 21-cr-377-BAH, at *3.

### 4.  The defendants' actions were not caused by agent provocateurs

Defendants in other, unrelated January 6 cases have introduced arguments that the defendants' actions were encouraged by agents of the government. Absent such a proffer of evidence, defendants should be precluded from making any such arguments to the jury, whether during a jury address or on cross-examination, such that the Court may evaluate the relevance of any such line of argument. *Cf. Michelson v. United States*, 335 U.S. 469, 481 (1948) (approving of the trial court's "scrupulous" efforts to guard against the asking of "a groundless question to waft an unwarranted innuendo into the jury box.").

**D.**  █████████████████████  **[UNDER SEAL]**







### E.  Jury Nullification

Defendants should be prohibited from making arguments or attempting to introduce irrelevant evidence that encourages jury nullification.  As the D.C. Circuit has made clear,

> A jury has no more "right" to find a "guilty" defendant "not guilty" than it has to find a "not guilty" defendant "guilty," and the fact that the former cannot be corrected by a court, while the latter can be, does not create a right out of the power to misapply the law. Such verdicts are lawless, a denial of due process and constitute an exercise of erroneously seized power.

*Washington*, 705 F.2d at 494.  Evidence that only serves to support a jury nullification argument or verdict has no relevance to guilt or innocence.  *See United States v. Gorham*, 523 F.2d 1088, 1097-98 (D.C. Cir. 1975); *see also United States v. Funches*, 135 F.3d 1405, 1409 (11th Cir. 1998) ("No reversible error is committed when evidence, otherwise inadmissible under Rule 402 of the Federal Rules of Evidence, is excluded, even if the evidence might have encouraged the jury to disregard the law and to acquit the defendant").  In particular, the Court should permit no argument, evidence, or questioning regarding the following topics, which would only serve to encourage jurors to decide the case based on factors other than the facts and the law:

### 1.  Conditions of Incarceration

The defendants' conditions of incarceration are not relevant to any fact of consequence in this trial. Any attempt to raise or suggest that the defendants been subject to unsafe or unsanitary conditions while incarcerated should be viewed as an effort to trigger the jury to consider an improper, emotional basis in reaching a verdict. *See United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013); *United States v. Ausby,* 2019 WL 7037605, at *10 (D.D.C. Dec. 20, 2019) (slip opinion).  Such evidence only serves to inflame the passions of the jury and is properly viewed as an invitation for the jury to engage in nullification. The defendants have raised such arguments in motions and arguments with the Court. *See, e.g.*, ECF 317 at 1.  Such arguments have no place in this trial.

### 2.  Penalties and Collateral Consequences

The potential penalties faced by a defendant are irrelevant to the jury's determination of guilt or innocence.  *See Shannon v. United States*, 512 U.S. 573, 579 (1994) ("[A] jury has no sentencing function, it should be admonished to 'reach its verdict without regard to what sentence might be imposed.'" (quoting *United States v. Rogers*, 422 U.S. 35, 40 (1975))).  Accordingly, the D.C. Circuit has held that "the jury is not to consider the potential punishment which could result from a conviction." *United States v. Broxton,* 926 F.2d 1180, 1183 (D.C. Cir. 1991).  Any discussion of possible penalties would serve no purpose beside improperly inviting the jury to render a verdict based on sympathy for the defendants – that is, to engage in jury nullification. *See United States v. Bell*, 506 F.2d 207, 226 (D.C. Cir. 1974) ("[E]vidence which has the effect of inspiring sympathy for the defendant or for the victim … is prejudicial and inadmissible when otherwise irrelevant") (internal citation omitted); *United States v. White*, 225 F. Supp. 514, 519 (D.D.C 1963) ("The proffered testimony (which was clearly designed solely to arouse sympathy for defendant) was thus properly excluded.").

The same goes for any evidence or argument concerning possible collateral consequences of

conviction, which in this case could involve the loss of military benefits. Such issues and arguments have no place in this trial and no bearing on the guilt or innocence of the defendants.

### F. Unsupported Claims of Self-Defense or Defense of Others

To establish a prima facie case of self-defense on January 6, defendants must make an offer of proof of "(1) a reasonable belief that the use of force was necessary to defend himself or another against the immediate use of unlawful force and (2) the use of no more force than was reasonably necessary in the circumstances." "A defendant cannot claim self-defense if he was the aggressor or if he provoked the conflict upon himself." *Waters v. Lockett*, 896 F.3d 559, 569 (D.C. Cir. 2018) (internal quotation marks and citation omitted).   That principle applies fully to Section 111 prosecutions. *See*, *e.g.*, *United States v. Mumuni Saleh*, 946 F.3d 97, 110 (2d Cir. 2019) ("Mumuni was the initial aggressor in the altercation with Agent Coughlin; as such, he could not, as a matter of law, have been acting in self-defense"); *United States v. Acosta-Sierra*, 690 F.3d 1111, 1126 (9th Cir. 2012) ("[A]n individual who is the attacker cannot make out a claim of self-defense as a justification for an assault."). Here, the defendants will not be able to put forth any evidence that they had a reasonable belief that their actions were necessary to defend themselves or others against the immediate use of unlawful force. Absent such a proffer of evidence, defendants should be precluded from making any such arguments to the jury, whether during a jury address or on cross-examination.

## CONCLUSION

For the foregoing reasons, the United States asks that the Court grant the requested relief or, if the Court reserves ruling, to consider the below arguments when the relevant issues arise during trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By:   /s/ *Jason McCullough*

JASON B.A. MCCULLOUGH
D.C. Bar No. 998006, NY Bar No. 4544953
ERIK M. KENERSON, OH Bar No. 82960
NADIA E. MOORE, NY Bar No. 4826566
  On Detail to the District of Columbia
Assistant United States Attorneys
601 D Street, N.W.
Washington, D.C. 20530
(202) 252-7233 //
jason.mccullough2@usdoj.gov

By:   /s/ *Conor Mulroe*

CONOR MULROE, NY Bar No. 5289640
Trial Attorney
U.S. Department of Justice, Criminal Division
1301 New York Ave. NW, Suite 700
Washington, D.C. 20530
(202) 330-1788
Conor.Mulroe@usdoj.gov