UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
| v. | ) Case No. 1:21-cr-175-TJK |
|  | ) |
| ETHAN NORDEAN, et al., | ) |
|  | ) |
| Defendants. | ) |

**DEFENDANT NORDEAN'S SUPPLEMENTAL MEMORANDUM REGARDING THE GOVERNMENT'S PROPOSED RULE 404(b) EVIDENCE, "TOOLS" EVIDENCE, AND THE FIRST AMENDMENT DEFENSE**

In the pretrial conference held on November 18, the government raised new arguments in support of its proposed Rule 404(b) and "tools-of-the-conspiracy" evidence and against the Defendants' First Amendment defense. The Court therefore granted Defendant Nordean's oral motion for leave to respond in a supplemental memorandum.

As with its novel charges, the novel evidentiary doctrines the government creates for this case are not justified by the circumstances of January 6. The Court should consider the cumulative effect of sustaining the government's unprecedented arguments. Already, the Court has been persuaded to interpret criminal statutes in new ways and to retroactively apply those interpretations to the Defendants' conduct; now the government asks the Court for an expanded power to prove Defendants' guilt based on unrelated inflammatory episodes that serve no non-character purpose and the bad acts of third parties unlinked to the Defendants via a cognizable principle of defendant liability. It asks the Court to deny the defense a black-letter-law instruction on the right to assemble and to petition the government. Even if the government's case were factually stronger than it is, granting its requests would result in reversible error.

1

### A. The December 12, 2022 rally evidence serves no non-character purpose; even if it did in theory, the government has not laid a sufficient factual foundation and doing so would require a mini-trial in what will already be a 6-week trial

The government has offered two arguments for the admission at trial of evidence of the Defendants' alleged conduct at the Proud Boys' December 12, 2020 rally in D.C.: (1) the rally is "intrinsic" evidence, i.e., "part of the charged offense" or an uncharged act "performed contemporaneously with the charged crime . . . [that] facilitate[s] the commission of the charged crime," *United States v. Bowie*, 232 F.3d 923, 929-30 (D.C. Cir. 2000); or, "if the Court does not like that argument," (2) the rally is extrinsic bad act evidence "admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).  The government itself characterized the material as Rule 404(b) evidence in a discovery letter.  ECF No. 489-2, pp. 1-2.

The government's briefing made two arguments in support of the claim that—notwithstanding its letter admission to the contrary—the December 12 rally is "intrinsic" evidence in this case and thus not even analyzed under the rubric of Rule 404(b).  ECF No. 515, pp. 14-15.  First, that rally is said to have "led directly to the creation of the [Ministry of Self Defense], and it is undeniable evidence of the intent of those who joined MOSD." *Id.*, p. 14.[1]  Second, Nordean's "attitude toward the police" was "shaped" by "the events of December 12." *Id.*, p. 15.  And, according to the government, Nordean's isolated statement on January 6 that "'some guys last time we were here [on December 12] got stabbed'" is "direct evidence underlying the formation of the conspiracy . . ." *Id.*  However, as Nordean pointed out in briefing, it does not logically follow from the fact that some Proud Boys created the MOSD Telegram chat window after the December 12 rally and used that platform or associational unit

---

[1] The Court will notice that the government does explain what "the intent" was.

to communicate about their plans for January 6 that the two events were motivated by the same impulse or entailed the same plan. Nor does a stray Nordean comment on January 6 provide evidence that the "formation of the conspiracy" turned on the "shape" of his "attitude toward the police." One swallow does not a summer make. To the contrary, the government charges that the alleged seditious conspiracy was motivated by the "transfer of presidential power. . . [,]" Third Superseding Indictment (TSI), ¶ 27; that the charged conspiracy to obstruct an official proceeding was motivated by Congress' "Certification of the Electoral College vote," *id.*, ¶ 110; and that the Section 372 conspiracy was motivated by the same reason. *Id.*, ¶¶ 113-14 (incorporating earlier allegations). Even if Nordean's "attitude toward the police" was "shaped" by December 12, that cannot be "direct evidence" of the charged conspiracies because, of course, police as such are not responsible for the political decision whether to "transfer presidential power." Voters and (in rare circumstances) Members of Congress are. No evidence shows that Nordean subjectively and wrongly believed otherwise.

Accordingly, in the motions hearing held on November 17, the government changed its argument. Nordean had argued that alleged bad acts during the December 12 rally did not satisfy any traditional non-character purpose under Rule 404(b)(2). Those acts could not inform the Defendants' "intent" in this case as the rally in D.C. on January 6 had not even been planned by December 12, 2020. *See, e.g., United States v. Cardenas*, 895 F.2d 1338, 1343 (11th Cir. 1990) (to establish relevance under Rule 404(b)(2) where extrinsic evidence is offered as proof of intent "it must be 'determined that the extrinsic offense requires the same intent as the charged offense'") (quoting *United States v. Barnes*, 586 F.2d 1052, 1057 (5th Cir. 1978)). Whatever Defendants' intent was on December 12, it could not have been the "same intent as the charged offense[s]" because there was no opportunity on December 12 to interfere with the "lawful

3

transfer of presidential power" and Congress' "Certification of the Electoral College vote," nor was the opportunity to later do those things conceived of by December 12, as the government acknowledged in oral argument.  TSI, ¶¶ 27, 110.  This prompted the Court to observe that the government had not identified any traditional non-character purpose under Rule 404(b)(2) for the December 12 rally evidence.

In response, the government argued on November 17 that it would show evidence to the jury suggesting that the Defendants were instigators of violence on December 12.  Thus, it appeared that the government's argument was that the extrinsic evidence established that Defendants "generally supported using violence to achieve goals."  However, that description perfectly tracks the definition of impermissible character evidence.  Fed. R. Evid. 404(b)(1) ("Prohibited Uses.  Evidence of any other crime, wrong or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."); *see United States v. Commanche*, 577 F.3d 1261, 1267 (10th Cir. 2009) (reversing conviction under Rule 404(b) due to admission of improper evidence of a defendant's propensity for violence); *United States v. Himelwright*, 42 F.3d 777, 782 (3d Cir. 1992) ("[W]hen evidence of prior bad acts is offered, the proponent must clearly articulate how that evidence fits into a chain of logical inferences, *no link of which may be the inference that the defendant has the propensity to commit the crime charged*.") (emphasis added).

In the pretrial conference on November 18, the government again amended its Rule 404(b) argument as to the December 12 rally.  This time it displayed in Court post-December 12 Telegram messages from unidentified "tools of the conspiracy" whose comments may have suggested some link between the December 12 rally and the 2020 presidential election.  But these messages—which the government collected after making its argument—do nothing to cure

4

the flaws identified above. First, the messages were not sent by Nordean or any other Defendant, and thus shed no light on *their* intent. Second, the government did not show that the messages were co-conspirator statements and thus that the Defendants could be held accountable for them. Third, the government did not show that Nordean or the other Defendants reviewed the messages and, in any case, certainly did not show that Nordean or the other Defendants adopted or ratified the messages. Fourth, even if some unidentified nondefendants linked the December 12 rally and the 2020 presidential election, the Defendants' actions on December 12 still could not be evidence of their intent on January 6. As Nordean has already shown, whatever Defendants' intent was on December 12, it could not have been the "same intent as the charged offense[s]" because there was no opportunity on December 12 to interfere with the "lawful transfer of presidential power" and Congress' "Certification of the Electoral College vote," nor was the opportunity to later do those things conceived of by December 12, as the government has acknowledged. *Cardenas*, 895 F.2d at 1343; *Barnes*, 586 F.2d at 1057. With those opportunities removed—and without a planned January 6 rally even conceived of—Defendants' relevant alleged intent from the December 12 rally reduces to nothing more than a general propensity to use violence to achieve goals. That is impermissible evidence. Fed. R. Evid. 404(b)(1).

Additional flaws in the government's argument militate against the December 12 rally evidence. "In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that *the act occurred* and *that the defendant was the actor*." *Huddleston v. United States*, 485 U.S. 681, 689, 99 L. Ed. 2d 771, 108 S. Ct. 1496 (1988) (emphasis added). In *Huddleston*, the Supreme Court held that the trial court is required to make a preliminary determination as to whether the jury could reasonably find by a preponderance of the evidence that the alleged prior act did, in fact, occur. *Id.* at 690. In doing so, the trial court must

"examine[] all the evidence in the case." *Id.*

Here, the government has shown the Court no evidence whatsoever that Nordean committed, planned to commit, aided and abetted or solicited any act of violence in D.C. on December 12. It has shown the Court no evidence that Nordean committed, planned to commit, aided and abetted or solicited the destruction of any property that day. It has shown the Court no evidence that Nordean linked his actions on December 12 to the 2020 presidential election. Instead, the government merely proffered on November 17 that Jeremy Bertino would testify at trial that "the Proud Boys" instigated violence on December 12. However, the government proffered no evidence that Defendant Nordean—or any other identified Defendant—"was the actor." *Huddleston*, 485 U.S. at 689. "The Proud Boys" are not a defendant in this case. Nor did the government proffer that Bertino would testify that this alleged violence on December 12 was propelled by an intent to interfere with the "lawful transfer of presidential power" and Congress' "Certification of the Electoral College vote." Accordingly, the December 12 rally evidence is not admissible under Rule 404(b).

Even if the December 12 rally evidence were somehow admissible under Rule 404(b)(2) without an identifiable non-character purpose, its miniscule probative value to this case would be engulfed by the unfair prejudice and jury confusion involved in displaying to the jury scenes of violence from an unrelated episode pertaining to a D.C. African-American church for which Nordean bears no criminal responsibility.

> **B. The government's "tools of the conspiracy" evidence does not satisfy the preliminary questions test under Rule 104(b)**

"When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. . ." Fed. R. Evid. 104(b). Pretrial hearings on such preliminary questions are appropriate where justice so requires. Fed. R.

6

Evid. 104(c)(3).  In deciding preliminary questions under Rule 104(b), the trial court must determine before trial that a reasonable jury could make the requisite factual determination based on the evidence before it.  WEINSTEIN'S FEDERAL EVIDENCE § 104.30 (2020); *Huddleston*, 485 U.S. at 689.

As the Court knows, the government proposes to show the jury the criminal actions of individuals on January 6 who are (a) nondefendants, (b) not members of the charged conspiracies, (c) not members of the Proud Boys, and (d) not linked to the Defendants through a recognized principle of liability such as conspiracy, aiding and abetting, solicitation, or "willfully causing an act to be done."  ECF No. 494, pp. 3-7.  The government describes the relevance of such evidence as follows: "the 'tools' of the conspiracy *[were] deployed* by the defendants in furtherance of their criminal objectives." *Id.*, p. 3 (emphasis added).  "These 'tools' served as instruments of the defendants to carry out their criminal objective.  While unwitting to the criminal objective, they *were employed to take action* on behalf of and in furtherance of the criminal objective." *Id.* (emphasis added).  According to the government, this group includes all "normies" whom the Defendants "sought to 'let [] loose' on January 6." *Id.*  Although the government does not say it in plain English, its "tools" argument aims to show the jury any and all criminal acts by any actor on January 6 on the contradictory relevance theory that these Defendants caused all of those acts and yet, at the same time, are not "criminally liable" for any of them.  ECF No. 494, p. 7.

In the November 18 hearing, the Court indicated that the "tools" evidence might satisfy the test of relevance even if the government could not establish that the Defendants are legally

7

responsible for the "tools'" actions under a recognized theory of liability.[2] The Court suggested that relevance may lie in the following argument: the government alleges that the Defendants conspired to use "normies" to further their conspiratorial aims and thus the "jury should be permitted to see" what Defendants "achieved by mobilizing the crowd." ECF No. 494, p. 4.

However, embedded in the government's argument is a factual premise failing which the test of relevance cannot be satisfied. Whether acts of violence on January 6 by "normies" were caused or "mobilized" by the Defendants is a fact question. If those acts were not caused by the Defendants' "mobilization," they are not relevant under the government's novel argument. A counterfactual shows this to be the case. Suppose Normies 1-4 rushed past barriers, ran into the Capitol, and assaulted police officers. They have never heard of the Proud Boys, nor did they see or hear the Defendants on January 6. Displaying their actions to the jury cannot demonstrate the "manner and means of the defendants' conspiracy," ECF No. 494, p. 3, as there is no causal relationship to speak of.

In response, the government will try to contend that even absent any causal relationship between the Defendants' actions and those of "normies," the latter are relevant inasmuch as the Defendants allegedly dreamed of being or aspired to be an instigator of the normies on January

---

[2] One of Defendant Biggs' counsel filed a memorandum stating that Nordean has argued that "a *third party* must also be culpable to be used to advance a conspiracy." ECF No. 546, p. 2 n. 1 (emphasis added). To be clear, Nordean has not made, and does not make, that argument: Nordean's point in the November 18 hearing was that it would be unprecedented for the bad acts of the "normies" to be relevant in this case absent a showing that *the Defendants* could be held responsible for those acts under a recognized theory of liability. Biggs' counsel may assume that all theories of liability under which Defendants may be held accountable for the normies' acts are necessarily premised on the normies' principal/accomplice/co-conspirator criminal liability. That is not so: as the parties' draft jury instructions indicate, a defendant "is responsible for an act which he willfully *causes to be done* if the act would be criminal *if performed by him directly* or by another." (Biggs' counsel also mentions prosecutorial discretion in connection with why the normies may not have been charged here. The issue is not whether or why any party is or is not *charged* but whether the bad acts of third parties can be relevant absent a theory of liability).

6. But while Defendants' alleged pre-January 6 comments about riling up the normies may in that case still hold relevance as to the nature/scope of the alleged criminal agreement, the *actions* of the normies themselves would not be relevant.  Absent any causal relationship between the Defendants' actions and the normies' criminal acts, the latter can logically show neither that the conspiracy "succeeded" nor that the Defendants' alleged agreement somehow "planned" the normies' actions even where unilaterally undertaken without knowledge of Defendants' desires.

      The absurdity of the government's relevance argument in the absence of a causal relationship can be easily shown.  Suppose two defendants plot to "overthrow the government" by staging a protest in front of the White House so intimidating that the president flees his office in terror.  When the day arrives, the conspirators begin loudly marching around the White House perimeter.  As it happens, the president suffers a heart attack that day, though not from fear but due to untreated coronary heart disease.  He is rushed out of the building on a stretcher an hour after the conspirators launch their First Amendment protest/coup d'état.  At trial, the government intends to show the jury video of the president on a stretcher being rushed from the building.  Its argument: although the defendants did not cause the chief executive's departure, they were "proud of what they accomplished," ECF No. 494, p. 4, and thus the video is relevant.  Of course, no court would accept that theory of noncausal relevance.

      Here, the government has adduced no evidence to show that the actions of the "normies" or other nondefendants were caused by the Defendants' actions.  ECF No. 494, pp. 3-7.  None exists.  The government has not adduced the statement of any "normie" or other nondefendant to the effect that their acts were "caused" by the Defendants.  Accordingly, the Court has no basis on which to conclude that a reasonable jury could find proof sufficient to support a finding that a fact on which relevance depends—Defendants' causation of actions by "normies"—exists.

*Huddleston*, 485 U.S. at 689.  The "tool" evidence must be excluded on that ground.

      **C.**      **The government's motion to preclude the Defendants from raising a First Amendment defense is addressed to a straw man**

In the November 18 pretrial conference, the government argued that the Court should preclude the Defendants from raising a First Amendment defense—and should decline to instruct the jury on First Amendment law—on this ground: if the jury concludes that the government has proven beyond a reasonable doubt that the Defendants committed the elements of any given criminal offense, by definition the covered activity cannot be protected expression under the First Amendment.  Thus, it argues, any First Amendment defense/instruction would be at best superfluous.  That argument misunderstands the nature of as-applied constitutional challenges and ignores the complete overlap between (a) the mens rea/actus rei of the government's novel § 1512(c)(2) charge and (b) lawful protest outside the Capitol Building, in the factual circumstances that may be established by the evidence at trial.

As the Court knows, the government does not limit its § 1512(c)(2) theory to acts that corruptly obstruct, influence or impede congressional proceedings from inside the Capitol Building.  To the contrary, it has indicated in court filings, repeatedly, that the obstruction charges do not require it to prove that the Defendants had any plan to enter that building on January 6.  Similarly, the government has made clear that a January 6 defendant need not commit any act of violence or property destruction to violate § 1512(c)(2).  Thus, the government contends it may establish the Defendants' guilt on this charge even if it proves only that Defendants agreed to some nonviolent act that, from outside the Capitol Building, corruptly obstructs, influences or impedes a congressional proceeding inside the building.  In addition, the government contends that Section 1512(c)(2)'s "corruptly" element is satisfied by any "wrongful" or "evil" purpose—which, the government argues, is not limited to the use of

10

unlawful means or the intended accomplishment of unlawful ends.

Taken together, then, the government argues that it may prove a completed § 1512(c)(2) offense or a conspiracy to commit that offense based on conduct and a mental state that wholly overlaps with expressive activity protected under binding First Amendment precedent. *Jeanette Rankin Brigade v. Chief of Capitol Police*, 342 F. Supp. 575 (D.D.C. 1973) (three-judge panel) *aff'd* 409 U.S. 972 (1972). In *Jeanette Rankin Brigade*, this Court struck down a title 40 statute prohibiting parading/demonstrating on the Capitol Grounds. Concluding that the Capitol Grounds are a public forum, it held that the act of parading, demonstrating or moving in assemblages in the Grounds per se could not constitute a criminal offense. 342 F. Supp. at 584. Because the Supreme Court summarily affirmed *Jeannette Rankin Brigade* it is binding law on this Court. *Lederman v. United States*, 291 F.3d 36, 41 (D.C. Cir. 2002) ("The Supreme Court summarily affirmed, making *Jeannette Rankin Brigade* binding precedent."); *see also Kroll v. United States Capitol Police*, 590 F. Supp. 1282, 1289 (D.D.C. 1983) ("The United States Capitol is a unique situs for demonstration activity"), *rev'd on other grounds*, 270 U.S. App. D.C. 136, 847 F.2d 899 (D.C. Cir. 1988); *Farina v. United States*, 622 A.2d 50, 55 (D.C. 1993) (Rogers, J.) (describing the Capitol Grounds as "a quintessential public forum."). *Cf. Edwards v. South Carolina*, 372 U.S. 229, 235, 83 S. Ct. 680, 9 L. Ed. 2d 697 (1963) (characterizing demonstrations on the grounds of a state legislature to be "an exercise of these basic constitutional rights in their most pristine and classic form"); *Adderley v. Florida*, 385 U.S. 39, 41, 17 L. Ed. 2d 149, 87 S. Ct. 242 (1966) ("Traditionally, state capitol grounds are open to the public.").

When a defendant "parades" or "demonstrates," in the title 40 sense, he "march[es] or

11

gather[s] somewhere to show [his] opposition to something or [his] support for something."[3] To avoid overbreadth, criminal "demonstration" must "inevitably intrude upon the senses of those persons in the immediate area." *See*, *e.g.*, *Kroll v. U.S. Capitol Police*, 590 F. Supp. 1282, 1291 (D.D.C. 1983), *rev'd on other grounds*, 847 F.2d 899 (D.C. Cir. 1988). If one intends to show opposition to something in a manner that inevitably intrudes upon the senses of persons gathered for a proceeding, one necessarily intends to "influence" that proceeding, § 1512(c)(2), because to "influence" is to "affect or alter by indirect or tangible means."[4] One cannot inevitably intrude upon the senses of a person in the area without affecting them by indirect or tangible means. Therefore, to the extent the government establishes at trial that a plan among the Defendants to obstruct, influence or impede the joint session involved nothing more than demonstration against Congress's actions while outside the Capitol Building and with any "wrongful purpose," the mens rea and actus rei of the § 1512(c)(2) charge would completely overlap with the intent to engage in protected parading/demonstration under *Jeanette Rankin Brigade* and *Lederman*.

Precluding the Defendants from raising a First Amendment defense and receiving a related instruction would be erroneous for another reason. The jury may conclude that evidence of Defendants' pre-January 6 "planning" amounted to some sort of agreement but one that falls between the Defendants' position—that they had no concrete plan whatsoever—and the government's argument that the plan was to obstruct the joint session through the use of force. To cover that factual permutation, the jury must be instructed on the aforementioned binding First Amendment law holding that demonstration/parading simpliciter in the Capitol Grounds is

---

[3] *Demonstrate*, Collins English Dictionary, https://www.collinsdictionary.com/us/dictionary/english/demonstrate.

[4] *Influence*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/influence.

protected expressive activity notwithstanding the broadly defined elements of § 1512(c)(2).

The government's contention that the First Amendment has no application wherever it proves the elements of a criminal offense is inconsistent with basic constitutional law. By definition, an as-applied First Amendment challenge is made where the defendant cannot be convicted of the offense despite the fact that the government has proven he committed its elements, as the application of the criminal statute in those specific circumstances reaches expressive activity. *E.g.*, *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016) (citing *Edwards v. Dist. of Columbia*, 755 F.3d. 996, 1001 (D.C. Cir. 2014)).[5]

Nor is it the case that overlap between the government's novel § 1512(c)(2) theory and protected demonstration on the Capitol Grounds would involve two separate mental states, one lawful and the other a mens rea. As shown above, the intent to demonstrate on the Capitol Grounds can overlap entirely with the intent to "corruptly" influence a congressional proceeding where: (1) no distinction is drawn between protest outside and inside the Capitol Building and (2) where "corruptly" is defined to mean acting with any "wrongful" or "evil" purpose. In sum, depriving the Defendants of a First Amendment defense would violate their "constitutional rights to counsel and to a jury trial," as those rights "encompass a right to have [the defendant's] theory of the case argued vigorously to the jury." *United States v. De Loach*, 504 F.2d 185, 189 (D.C. Cir. 1974).

---

[5] The government may respond that a motion to dismiss was denied in *Caputo* or that Nordean unsuccessfully raised a First Amendment argument in his motion to dismiss. That is beside the point. The as-applied challenge Nordean describes above is fact-dependent and will turn on what the government proves to a jury at trial, i.e., whether the Defendants' alleged agreement contemplated activity beyond the expressive activity protected in *Jeannette Rankin Brigade-Lederman*.

Dated: November 21, 2022                    Respectfully submitted,

/s/ David B. Smith
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
1123 Broadway, Suite 909
New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorneys for Ethan Nordean*

**Certificate of Service**

I hereby certify that on the 21st day of November, 2022, I filed the foregoing motion with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

Connor Mulroe
Assistant United States Attorney
555 4th Street, N.W., Room 4408
Washington, D.C. 20530

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

14