IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES

v.  Case No. 21-cr-175-3 (TJK)

ZACHARY REHL

ZACHARY REHL'S REPLY TO THE GOVERNMENT'S SUPPLEMENTAL
MEMORANDUM REGARDING MOTIONS *IN LIMINE*

Zachary Rehl, by his undersigned counsel, submits the instant memorandum to provide this Honorable Court with supplemental authority in response to the government's Supplemental Memorandum which has doubled down on the novel arguments made at the hearings held on November 17 and 18, 2022. In addition, he respectfully moves to adopt the submissions by codefendants Biggs (Supplemental Memorandum in Opposition, ECF 546) and Nordean (Supplemental Memorandum, ECF 547).

I. The Government's Arguments Must Be Considered in Light of Mr. Rehl's Peaceful Conduct, Which is Protected by or Within the Shadow of the First Amendment

As set out in the Third Superseding Indictment (TSI), on January 6, Mr. Rehl did not battle law enforcement nor assault any officer or any other person. He did not destroy any property. He did not have or use any weapons nor otherwise use violence. He did not force his way into the Capitol. TSI (ECF 380) at ¶¶70 to 104.

None of the Proud Boys, who traveled from Philadelphia to DC with Mr. Rehl for the political rally on January 6 or who entered the Capitol with Mr. Rehl, have been charged with a felony offense.

1

With respect to the earlier Proud Boys rallies in DC, where the government claims the Proud Boys were the "aggressors," Mr. Rehl did not attend the November "Million MAGA March." On December 12, 2020, when Bertino and three other Proud Boys were stabbed after the Trump rally had concluded, Mr. Rehl was not with them. He had returned to his hotel room. Significantly, the Metropolitan Police Department Report of the stabbing incident describes the events as "First Amendment demonstrations."[1]

Mr. Rehl has never been arrested at a political rally. When his home was searched, he did not have any weapons. In the months before January 6, 2021, Mr. Rehl never directed or encouraged anyone to interfere by force or corruptly with the Congress of the United States.

In sum, Mr. Rehl's words and expressive conduct on January 6 and before were protected by the First Amendment, or at a minimum must be considered within the "shadow of the First Amendment." *United States v. Spock*, 416 F.2d 165, 173 (1st Cir. 1969) (vacating judgment in a prosecution for conspiracy to counsel, aid and abet registrants to resist draft).

> Inseparable from the question of the sufficiency of the evidence to convict are the rights of the defendants, and others, under the First Amendment. We approach the constitutional problem on the assumption, which we will later support, that the ultimate objective of defendants' alleged agreement, *viz*., the expression of opposition to the war and the draft, was legal, but that the means or intermediate objectives encompassed both legal and illegal activity without any clear indication, initially, as to who intended what. This intertwining of legal and illegal aspects, the public setting of the agreement and its political purposes, and the loose confederation of possibly innocent and possibly guilty participants raise the most serious First Amendment problems. Indeed our Brother Coffin, in dissent, admits to a temptation 'to say that the law should recognize

---

[1] MPD **CCN** #20176594 - PUBLIC INCIDENT REPORT at 2 ("On Saturday, 12/12/2020, at approximately 2100 hours, officers working *First Amendment demonstrations* in the District of Columbia responded for a fight in progress.") (emphasis added)

no overt conspiracy in the sensitive area of public opinion.' This temptation leads him down paths that we cannot follow, but which, nevertheless, we must consider.

*Spock*, 416 F.2d at 169.

In the instant case, this Court is "confronted with a case of prosecution for the expression of an idea through activity," and "[a]ccordingly . . .must examine with particular care the interests advanced by [the government] to support its prosecution." *Texas v. Johnson,* 491 U.S. 397, 411 (1989). Indeed, in *Johnson,* the Supreme Court noted that:

> a principal function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger.

*Id.* at 408-09.

*Johnson* involved the prosecution for burning an American flag during demonstrations "to protest the policies of the Reagan administration" while President Reagan was being nominated for a second term at the Republican National Convention held in Dallas in 1984. *Id.* at 399. The Court recognized that Johnson's prosecution involved "his expression of dissatisfaction with the policies of this country, expression situated at the core of our First Amendment values." *Id.* at 410. Indeed, as in the instant case, at the time that Johnson burned the American flag, other demonstrators engaged in disorderly conduct, as they "spray-painted the walls of buildings and overturned potted plants, but Johnson himself took no part in such activities." *Johnson,* 491 U.S. at 408-09. In reversing the conviction, the Court found that flag-burning was "expressive conduct" protected by the First Amendment and rejected the argument

propounded by Texas that the breaches of the peace by other demonstrators nullified the flag burner's First Amendment rights. *Id.* at 408.

II. **The Words and Expressive Conduct That the Government Seeks to Use to Prove the Charged Conspiracies Against Mr. Rehl Are Protected by the First Amendment**

Relying on *United States v. Shabani*, 513 U.S. 10, 16 (1994), the government argues that the First Amendment does not apply to Mr. Rehl's prosecution because "the *actus reus* of the conspiracy offenses is a criminal agreement, not the statements themselves." For starters, *Shabani* involved a drug conspiracy prosecution where the criminal agreement was the sale of drugs, activity that is not protected by the First Amendment. "Shabani participated in a narcotics distribution scheme in Anchorage, Alaska, with his girlfriend, her family, and other associates. Shabani was allegedly the supplier of drugs, which he arranged to be smuggled from California. In an undercover operation, federal agents purchased cocaine from distributors involved in the conspiracy." *Shabani*, 513 U.S. at 11. Indeed, the *Shabani* opinion does not once mention the First Amendment.

Here, the gravamen of each of the charged conspiracies is an agreement to influence and affect the work of Congress – activity that is at the very core of First Amendment protection. Whether those alleged agreements were criminal depends on whether the government can prove that they entailed the use of force for the seditious and section 372 conspiracy charges or corruption for the obstruction charges. In each instance, the government seeks to introduce Mr. Rehl's words and expressive conduct and those of others as evidence of the agreement itself, asking the jury to infer the existence of the alleged conspiracies from those words and expressive

conduct.  It now also seeks to introduce the words and conduct of "tools of the conspiracy." In *Shabani*, the prosecution could introduce drug activity not protected by the First Amendment to ask the jury to infer the existence of a conspiracy.  Here, without the words and expressive conduct, the government cannot prove that Mr. Rehl entered any agreement, much less an illegal one.

With respect to the civil disorder count, an element of the offense is civil disorder. Again the line between civil disorder, not protected by the First Amendment and civil disobedience or expressive conduct as in flag burning is for the jury to decide.  This is particularly so in a case where Mr. Rehl himself is not alleged personally to have committed any acts of violence, used force, or acted corruptly.  The Sixth Amendment and the due process clause guarantee to Mr. Rehl "a meaningful opportunity to present a complete defense."  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006).  In this case, a complete defense for Mr. Rehl involves the opportunity to argue that his words and expressive conduct were protected by the First Amendment.

Moreover, the Supreme Court has never imposed such a limitation on the application of the First Amendment.  The very cases the government cites included a requirement that "such testimony "be *scrutinized with care* to assure that the statements are not expressions of mere lawful and permissible difference of opinion with our own government or quite proper appreciation of the land of birth." *Wisconsin v. Mitchell,* 508 U.S. 476, 489 (1993) (emphasis added) (quoting *Haupt v. United States,* 330 U.S. 631, 642 (1947)).  To be sure, as Mr. Rehl previously argued, *Mitchell* is inapposite because it reviewed a hate-crime sentencing enhancement not the use of speech to prove the crime itself. *Mitchell,* 508 U.S. at 485 ("Traditionally, sentencing judges have considered a wide variety of factors in addition to

evidence bearing on guilt in determining what sentence to impose on a convicted defendant").[2] Moreover, contrary to the government's argument at the hearing, at the time *Mitchell* was decided the Supreme Court had yet to hold that sentencing enhancements were elements of the offense, as it did for the first time in *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

Indeed, in this case, the government's "tools theory" of prosecution turns on its head the *strictissimi juris* standard, which the Supreme Court has applied:

> the element of an individual defendant's criminal intent, like all of the other elements, must be judged *strictissimi juris*, for otherwise there is a danger that one in sympathy with the legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share

*Noto v. United States*, 367 U.S. 290, 299–300 (1961).  Instead of "scrutinizing with care" the government wants to sweep broadly to introduce words out of context and indiscriminately, without regard to when the statements were made, by whom or in what context. The First Amendment prohibits the use of political speech in this manner.

Nor has the government provided any authority for the proposition that words spoken by others that do not satisfy the co-conspirator exception can be introduced to prove the intent of the non-declarant in any context, much less in the context of speech that is at the core of First Amendment protection.  Notably, the only case the government can muster for the proposition that another person's statement can be used to prove a different person's consciousness of guilt is an unreported drug case from another circuit, namely *United States v. Ogendengbe*, 188 F. App'x

---

[2] "We granted certiorari because of the importance of the question presented and the existence of a conflict of authority among state high courts on the constitutionality of statutes similar to Wisconsin's penalty-enhancement provision." *Mitchell,* at 482-83.

572 (9th Cir. 2006).

### III. The "Tools Theory" of Prosecution is Without Precedent, Violates the First Amendment and Mr. Rehl's Rights Guaranteed by the Sixth Amendment and Due Process of Law

#### A. There is No Precedent for a Tools Theory of Prosecution

In its Supplemental Memorandum, the government fails to cite a single case to support its "tools theory" of prosecution. *See* Supp. Memo (ECF 550) at 12-13. In its original Motion *In Limine* (ECF 494) the government also fails to cite a single case of its "tools theory" of prosecution. Such an unprecedented and vague theory simply violates Mr. Rehl's rights to due process of law as it fails to provide fair notice of the charges against him and allows for discriminatory enforcement by the government.

#### B. As Applied to Mr. Rehl, the Tools Theory Violates the First Amendment

##### 1. The *Brandenburg* imminent violence test

The "tools theory" of prosecution cannot be squared with the *Brandenburg* "imminent" violence test. *Brandenburg v. Ohio,* 395 U.S. 444 (1969). In arguing that the Proud Boys incited violence by weaponizing an untold number of persons, whom it identifies only as third-party "tools of the conspiracy"[3], the government necessarily implicates the First Amendment advocacy protections enshrined in *Brandenburg*.

---

3 Gov. Supplemental Memorandum (ECF 550) at 12-13 (tools include "Proud Boys members and affiliates whom the defendants recruited and led to the Capitol as part of their marching group" and "apparent strangers").

In *Brandenburg*, the Supreme Court held that inflammatory speech intending to advocate illegal action can be prosecuted only under limited circumstances. *Brandenburg* involved the prosecution of a KKK leader, who gave a speech that included a number of derogatory racial slurs followed by saying that "it's possible that there might have to be some vengeance [sic] taken." Reviewing a number of Supreme Court decisions, the Court explained that its

> decisions have fashioned the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing *imminent* lawless action and is likely to incite or produce such action.

*Brandenburg,* 395 U.S. at 447 (emphasis added).   Under the *Brandenburg* test, the majority of the statements the government seeks to introduce, which preceded by days and months the events of January 6, cannot be used against Mr. Rehl and the other defendants.

- Statements made from December 14 through January 3, which the government claims show that defendants "regularly advocated the use of violence, both in connection with the 2020 election and more generally against those they considered their political adversaries" fail the *Brandenburg* test. *See, e.g.,* Gov Motion in Limine to Admit Statements (ECF 475) at 22-23.

- Statements that the government describes as showing "hostility toward police" (*id.* at 23-24) also fail the *Brandenburg test* as the government claims these statements "contributed to" the conspiracy's success because of its effect on others. But none of the statements satisfy the required imminence of action.

8

- All the statements that the government describes in the section titled "Effect on the Listener" (*id.* at 25-28) cannot be used against Mr. Rehl and the other defendants unless they meet the *Brandenburg* imminence test. None of the cases the government cites – which include drug and bribery cases -- where no First Amendment interests were at issue support the admission of such statements.

- The statements that the government describes as "consciousness of guilt" (*id.* at 24) also fail the *Brandenburg* test and are also taken out of context. Mr. Rehl was not advocating that others erase their chats; he simply was pointing out that Telegram chats could only be cleared by the chat owner. The Tools Theory Amounts to Guilt By Association

> **2. The "tools theory" turns the protections afforded by the First Amendment on its head.**

The government's "tools theory" turns on its head the protections afforded by the First Amendment that in judging speech "intent must be judged 'according to the strictest law'", *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 919 and n. 54 (1982) ("*strictissimi juris*"). Instead of applying the "strictest" standard, the government takes statements out of context and seeks to attribute to all the most charged rhetoric of any one person, no matter how distant from the violence or how unconnected to Mr. Rehl. Such a careless attribution of motive was rejected by the Supreme Court, which distinguished the liability of those who participated in violent activity from others who joined the NAACP boycott but were not violent. *N. A. A. C. P. v. Claiborne Hardware Co.,* 458 U.S. at 886, where the Court held that:

> (1) boycott activity which was not itself violent was constitutionally protected; (2) persons who participated in the boycott but who were not shown to have participated in violent activity or to have ratified it could not be held liable; (3) in the absence of showing

that violent activity followed the speeches, organizer who made impassioned speeches which contained references to violence against those who did not participate could not be held liable; (4) persons who could be held liable could be held liable only for the damages resulting from the violent activity, nor for all damages resulting from the boycott; and (5) there was no basis for imposing liability on civil rights organization.

Indeed, the words used by some of the NAACP organizers in calling for the boycott of white businesses were quite explicit and threatening of violence but the Court nonetheless held that they were protected by the First Amendment.[4]

> The emotionally charged rhetoric of Charles Evers' speeches did not transcend the bounds of protected speech set forth in *Brandenburg*. The lengthy addresses generally contained an impassioned plea for black citizens to unify, to support and respect each other, and to realize the political and economic power available to them. In the course of those pleas, strong language was used. If that language had been followed by acts of violence, a substantial question would be presented whether Evers could be held liable for the consequences of that unlawful conduct. In this case, however -- with the possible exception of the Cox incident -- the acts of violence identified in 1966 occurred weeks or months after the April 1, 1966, speech; the chancellor made no finding of any violence after the challenged 1969 speech.
>
> Strong and effective extemporaneous rhetoric cannot be nicely channeled in purely dulcet phrases. An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech. To rule otherwise would ignore the "profound national commitment"

---

4  On April 19, Charles Evers spoke and led a march to the courthouse where he demanded the discharge of the entire Port Gibson Police Force. In one of his speeches, "Evers stated that boycott violators would be "disciplined" by their own people and warned that the Sheriff could not sleep with boycott violators at night."  Two days later, Evers gave another speech to several hundred people, in which he stated "If we catch any of you going in any of them racist stores, we're gonna break your damn neck." *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. at 902.

> that "debate on public issues should be uninhibited, robust, and wide-open."
>
> For these reasons, we conclude that Evers' addresses did not exceed the bounds of protected speech. If there were other evidence of his authorization of wrongful conduct, the references to discipline in the speeches could be used to corroborate that evidence. But any such theory fails for the simple reason that there is no evidence -- apart from the speeches themselves -- that Evers authorized, ratified, or directly threatened acts of violence. The chancellor's findings are not sufficient to establish that Evers had a duty to "repudiate" the acts of violence that occurred. The findings are constitutionally inadequate to support the damages judgment against him.

N. A. A. C. P. v. Claiborne Hardware Co., 458 U.S. at 928–29.

## IV. Unduly Prejudicial Evidence Unconnected to Mr. Rehl Is Not Admissible

### A. Evidence Alleging that the Proud Boys Were the Aggressors on December 12, 2022 is Not Admissible Against Mr. Rehl

The Government may not "parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo."

*Huddleston v. United States*, 485 U.S. 681, 689 (1988)

> Evidence is admissible under Rule 404(b) only if it is relevant. "Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case." In the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor.

*Id.* As to Mr. Rehl, the Government cannot meet the *Huddleston* test with respect to the events of December 12, 2022, when four Proud Boys, including Bertino, who has pleaded guilty and is now a cooperating witness, were stabbed.

11

At the recent hearings, the government argued that it will seek to introduce evidence that the Proud Boys were the "aggressors" on December 12 to show the "Proud Boys willingness to use violence affirmatively" to accomplish its political goals. (Quotes from counsel's notes). For starters, the violence that took place of December 12 was not perpetrated by Mr. Rehl. Nor was Mr. Rehl the "aggressor" with respect to any acts of violence that occurred on that day. Indeed, Mr. Rehl was not present when Bertino and other Proud Boys were stabbed. Thus, the government cannot meet the *Huddleston* test that requires it to show that the defendant was the "actor" of the "other acts" evidence.

Moreover, it is clear that admission of this evidence will result in a mini-trial about the events that transpired on December 12, 2022 as the facts of that evening are in dispute. No Proud Boy has been convicted as an "aggressor" for the knife assaults that took place that night. Accordingly, if the government seeks to paint the Proud Boys as aggressors, defendants would have the right to confront that allegation with evidence that they acted in self-defense from assaults by counter demonstrators, one of whom stabbed Bertino and the others. *See* FED R. EVID. 104(b); *Huddleston*, 485 U.S. at 691–92 ("protection against unfair prejudice emanates . . . from the relevancy requirement of Rule 402 – as enforced through Rule 104(b)").

Under Rule 104(b)[5], the Court could admit the evidence subject to the government establishing that the evidence is relevant by showing that the "act occurred and that the defendant

---

[5] Rule 104(b) provides:

> **Relevance That Depends on a Fact**. When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later.

was the actor." *Huddleston.* If the government fails to establish the relevancy of the evidence, the Court will then be faced with granting a mistrial, as striking the evidence will not eliminate the substantial prejudice. Alternatively, to avoid the possibility of a mistrial, the Court could hold a pretrial hearing under Rule 104(c), which provides that the Court "must conduct any hearing on a preliminary question so that the jury cannot hear it if "(2) a defendant in a criminal case is a witness and so requests; or (3) justice so requires."

Similarly, other unduly prejudicial evidence that has no connection to Mr. Rehl should be excluded. While counsel has not yet had an opportunity to review the entire exhibit list provided by the Government, a few examples of irrelevant and unduly prejudicial materials follow.

### B. Assaults on MPD Officers Not Perpetrated by Mr. Rehl Are Not Admissible against Mr. Rehl

The government plans to call MPD Officer Daniel Hodges, who was assaulted and pinned between one of the doors at the Capitol.[6] The video of that assault, showing Officer Hodges crying out in pain has been widely aired. Officer Hodges testified before the House J6 Committee. Several men with no connection to Mr. Rehl or the other Proud Boys were recently convicted of this offense in a bench trial.[7] Apparently, pursuant to the "tools theory" of prosecution, the government intends to introduce this and other such unrelated and unduly prejudicial pieces of evidence.

---

[6] *Officer Daniel Hodges testifies at trial of man accused of crushing him in doorframe on Jan. 6,* by Jordan Fisher 8/30/22 at *https://tinyurl.com/2p8nvwhw* (attached as Exhibit 1).

[7] *USA v. McCaughey, III*, et al, No. 1:21-cr-00040 (TNM)( Verdict of guilty rendered by the Court as to some counts, 9/13/22).

## C. Books Written and Speeches Made by Third Parties

The government has also noted its intent to introduce the book, *The 48 Laws of Power* by Robert Greene, a self-help book, apparently because one of the defendants allegedly quoted or paraphrased a sentence or two from the book.[8] It is unclear whether the government proposes to read passages from the book, have someone describe its contents or have the book go back to the jury for their reading enjoyment. Again, there is no evidence that Mr. Rehl has read the book or adheres to its theories and no attempt to explain how the hearsay rules are overcome.

The government also seeks to introduce a video of President Franklin D. Roosevelt's speech to the Congress on December 8, 1941 and the Congressional Record from that date, apparently because one of the defendants allegedly was overheard using the phrase a "day that will live in infamy." Again, there is no evidence that Mr. Rehl has ever watched the video of the FDR speech, which is inadmissible hearsay. It is also not clear what use the government intends to make of the FDR speech and the Congressional record for December 8, 1941, other than to

---

[8] Shortform (at https://tinyurl.com/e6rdtn25) describes the book's content:

In The 48 Laws of Power, Robert Greene asserts that whether you like it or not, you're part of a never-ending game of power. You're either striving for and wielding power, or you're a pawn being played by someone more powerful than you. You choose your role.

This book is for those who prefer to be players rather than pawns. To turn you from an amateur into a master player, Greene has codified 48 laws of power based on historical examples of people who've excelled or failed at wielding power, with glorious or bloody results (or both). Some key principles you'll learn: use your enemies, keep others dependent on you, say as little as possible, take credit for others' work, and don't get your hands dirty. You can choose to apply or dismiss these rules - but you can't escape them.

inflame the jury's passions.

None of this evidence is relevant or admissible against Mr. Rehl unless what the government proposes is a show trial that does not meet the constitutional requirements for a fair trial where Mr. Rehl's guilt or innocence is to be judged on competent evidence that is relevant to what he did on January 6 rather than a trial where Mr. Rehl is judged "guilty by association", a "thoroughly discredited doctrine." *Uphaus v. Wyman*, 360 U.S. 72, 79 (1959).

. The introduction of such inflammatory evidence cannot overcome the fact that on January 6, Mr. Rehl did not destroy any property, did not assault or injure any person, did not force his way into the Capitol and did not otherwise use any force or violence nor conspired with anyone to do any of those things.

The D.C. Circuit has made clear that it is error to admit evidence adversely reflecting on a defendant, when he did not commit the prejudicial acts. *See United States v. Shelton,* 628 F.2d 54, 58 (D.C. Cir. 1980) (reversal where government engaged in "conscious effort" to sway the jury by prejudicial innuendo).

> It is settled that evidence of other crimes is inadmissible to show criminal propensity or to demonstrate that the defendant is a bad person. Indeed, such evidence is never admissible unless it is "necessary" to establish a material fact such as "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Even then, where the evidence concerns an alleged crime which has not been reduced to final judgment, the trial court must make a preliminary finding that there is "clear and convincing evidence" to connect the defendant to the other crime. These carefully delineated rules exist because of the enormous danger of prejudice to the defendant that evidence of other crimes creates. We have recognized before that juries are prone to draw illogical and incorrect inferences from such evidence.

15

*Id.* at 56 (internal citations omitted).

Even in a case that involved a bona fide terrorist organization that has been found to have murdered its enemies and kidnapped Americans, the DC Circuit has forbidden the use of such inflammatory irrelevant evidence. *See United States v. Palmera Pineda*, 592 F.3d 199, 200 (D.C. Cir. 2010) where the D.C. Circuit held that "the district court erred by admitting evidence of crimes in which Pineda was not involved." The case is particularly apt because it involved the prosecution of a high-ranking member of the Colombian guerilla organization Fuerzas Armadas Revolucionarias de Colombia (FARC) in connection with the kidnapping of several Americans.[9] Even though the FARC was a named defendant in the case, the DC Circuit found that it was error to admit "other crimes" evidence in which the defendant himself had not participated. That is exactly what the government is seeking to do in this case in connection with the December 12, 2020 stabbing of Proud Boys, with the evidence of the assault on MPD Officer Hodges and with other similarly unduly prejudicial evidence, not committed by Mr. Rehl.

### V.   Mr. Rehl Has a Constitutional Right to Present a First Amendment Defense

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'

*Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683,

---

[9] Unlike the Proud Boys, which enjoys First Amendment associational protections, the FARC has been designated by the State Department as a foreign terrorist organization pursuant to 8 U.S.C. § 1189. *United States v. Rubio*, 677 F.3d 1257 (D.C. Cir. 2012)

690 (1986)). For all the reasons set out above, the government's attempt to prohibit Mr. Rehl from raising a First Amendment defense would violate his constitutional rights.

Indeed, in the *Rahman* case, which involved the prosecution of 10 defendants charged with clearly violent conduct including rendering assistance to those who bombed the World Trade Center, the Second Circuit recognized that to be convicted for seditious conspiracy under Section 2384, "one must conspire to *use* force, not just to *advocate* the use of force." *United States v. Rahman*, 189 F.3d 88, 115 (2d Cir. 1999). [10] While the Second Circuit rejected a facial challenge to the seditious conspiracy charge, it clearly recognized that First Amendment issues may present an as applied defense to the charges. In defending against the specific offenses with which he is charged, it is for the jury to decide, under the facts of this case, whether Mr. Rehl conspired "to *use* force" not protected by the First Amendment, or whether he merely advocated First Amendment protected activity. He has a constitutional right to present that defense to the jury under the facts of this case.

Ironically, even as it argues that Mr. Rehl cannot mount a First Amendment defense nor argue that his statements are protected by the First Amendment, the government filed as an exhibit the jury instructions in the *Rahman* case, wherein Judge Mukasey instructed the jury, to the contrary:

---

10  *United States v. Rahman,* involved the prosecution of 10 persons, including a Muslim cleric who were charged "with seditious conspiracy and other offenses arising from alleged plots to bomb office building, tunnels, and bridges in New York City, to assassinate President of Egypt, and to assassinate Israeli citizen who professed militant Zionism" *United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999)

> I do want to discuss briefly evidence that has been introduced about statements by some defendants expressing their opinions about various political, public, or religious issues. I want to emphasize to you that expression of opinion alone -- opinion in the sense of a point of view -- even an opinion advocating violence, is not a crime in this country.
> . . .
> What this means is that there are potentially three categories of statements that you may find were proved in this case. One is simple statements of a point of view on a political, social, or religious issue without any of the related circumstances I discussed in the numbered paragraphs above. ***Those statements may never be treated as evidence of a crime.***

Gov Response To Defendants' Motions To Dismiss (ECF 454-1) at 20-21 (emphasis added).

## CONCLUSION

For the foregoing reasons, the Court should reject the supplemental arguments raised by the Government in its Supplemental Memorandum and those made at the hearings. Mr. Rehl is not charged with committing violence. He is charged with conspiring to use force and conspiring to influence Congress corruptly under various statutes. None of those offenses are categorically a crime of violence. The gravamen of each of the conspiracies is advocacy which is protected by the First Amendment, unless the government can prove the element of force or corruption. Under the facts of this case, he has a constitutional right to mount a First Amendment defense. The "tools theory" of prosecution violates Mr. Rehl's constitutional rights to be tried for his own conduct and not as a function of guilt by association.

Respectfully submitted,

/s/ *Carmen D. Hernandez*
**Carmen D. Hernandez**
7166 Mink Hollow Rd
Highland, MD 20777
240-472-3391

## CERTIFICATE OF SERVICE

I hereby certify that the instant notice was served on all counsel of record 29th day of November, 2022 on all counsel of record via ECF.

/s/ *Carmen D. Hernandez*

**Carmen D. Hernandez**