```
                   IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF COLUMBIA
        - - - - - - - - - - - - - - - x
        UNITED STATES OF AMERICA        CR Nos. 1:21-cr-00175-TJK-1
                                                1:21-cr-00175-TJK-2
        v.                                      1:21-cr-00175-TJK-3
                                                1:21-cr-00175-TJK-5
        1-ETHAN NORDEAN                         1:21-cr-00175-TJK-6
        2-JOSEPH R. BIGGS
        3-ZACHARY REHL                  Washington, D.C.
        5-ENRIQUE TARRIO                Friday, December 2, 2022
        6-DOMINIC J. PEZZOLA,           9:30 a.m.
                             Defendants.
        - - - - - - - - - - - - - - - x
```
_____

                   TRANSCRIPT OF STATUS CONFERENCE
              HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                     UNITED STATES DISTRICT JUDGE

_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:    Erik M. Kenerson, Esq.
                          Conor Mulroe, Esq.
                          Nadia Moore, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233


For the Defendants:       Nicholas D. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

                          Norman A. Pattis, Esq.
                          PATTIS & SMITH, LLC
                          383 Orange Street
                          1st Floor
                          New Haven, CT 06511
                          (203) 393-3017

APPEARANCES VIA VIDEOCONFERENCE CONTINUED:

For the Defendants:       Carmen D. Hernandez, Esq.
                          7166 Mink Hollow Road
                          Highland, MD 20777
                          (240) 472-3391

                          Nayib Hassan, Esq.
                          LAW OFFICES OF NAYIB HASSAN, P.A.
                          6175 NW 153 Street
                          Suite 209
                          Miami Lakes, FL 33014
                          (305) 403-7323

                          Sabino Jauregui, Esq.
                          JAUREGUI LAW, P.A.
                          1014 West 49 Street
                          Hialeah, FL 33012
                          (305) 822-2901

                          Steven A. Metcalf, II, Esq.
                          METCALF & METCALF, P.C.
                          99 Park Avenue
                          6th Floor
                          New York, NY 10016
                          (646) 253-0514

Court Reporter:           Timothy R. Miller, RPR, CRR, NJ-CCR
                          Official Court Reporter
                          U.S. Courthouse, Room 6722
                          333 Constitution Avenue, NW
                          Washington, DC 20001
                          (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1          **P R O C E E D I N G S**

2          THE DEPUTY CLERK:  We are on the record in

3     Criminal Matter 21-175, United States of America v.

4     Defendant 1, Ethan Nordean; Defendant 2, Joseph R. Biggs;

5     Defendant 3, Zachary Rehl; Defendant 5, Enrique Tarrio; and

6     Defendant 6, Dominic J. Pezzola.

7          Present for the Government are Erik Kenerson,

8     Conor Mulroe, and Nadia Moore; present for Defendant 1 is

9     Nicholas Smith; present for Defendant 2 are John Hull and

10    Norman Pattis; present for Defendant 3 is Carmen Hernandez;

11    present for Defendant 5 are Nayib Hassan and Sabino

12    Jauregui; and present for Defendant 6 is Steven Metcalf.

13         The appearance of all five defendants has been

14    waived.

15         THE COURT:  All right.  Well, good morning to

16    everyone.

17         I thought it made sense for us to just huddle up

18    very briefly with regard to the questionnaire.  I wanted to

19    run by the parties just a few suggested changes I'd like to

20    make and, sort of, close off some of the -- I think I had

21    said to Mr. Hull that I would hear from him again if I

22    decided not to include some of the additional questions he

23    was urging me to.  So let me just walk through, I think,

24    some of these changes I'm going to propose that I don't

25    think will be terribly controversial, but just so the

1    parties have a chance to hear them.

2            Obviously, I will change, both on the first page

3    and in the preliminary matter, that the jurors are to report

4    back on -- number one, that they -- the schedule has

5    changed.  They should report back on the 19th, number one.

6            And then, number two, with regard to the other

7    preliminary matter, I'll indicate that we're not sitting

8    that week that we've already discussed before the Christmas

9    holiday -- between the Christmas holiday and the New Year

10   holiday.  So they'll be aware of those changes.

11           We also have two questions right now -- they are

12   54 and 55 -- that talk about the exact same question, but

13   they indicate, This case may involve evidence that the

14   defendants expressed hostility towards -- one is Black Lives

15   Matter; the other is Antifa.  I think it would be helpful,

16   kind of, consistent with the rest of the -- how we've

17   structured some of the other questions, to have an

18   antecedent question that just says, What have you read,

19   heard -- I think we -- have you read, seen, or heard

20   anything about Antifa or Black Lives Matter?  We may get

21   jurors who just have never heard anything about either of

22   those, and I think it would be useful to have them just

23   answer that preliminary question before we go to the next

24   question about, There may be -- the evidence may show that

25   the defendants were hostile to these.  Do you have any, you

1    know -- do you have any strong beliefs?

2          So any comment on that change?  Just an antecedent

3    question asking jurors whether they have heard, seen -- I

4    think it's -- what did we say -- read, seen, or heard

5    anything about those two topics.

6          MR. HASSAN:  Judge, if I may, Nayib Hassan on

7    behalf of Enrique Tarrio, Judge.

8          This is part and parcel to the motion in limine

9    that the Court needs to rule on.  So my concerns are we're

10   providing this information over to the jurors in

11   anticipation of potentially the Court's ruling regarding

12   Black Lives Matter -- whether the incident regarding Black

13   Lives Matter is going to come into trial.  Should the Court

14   exclude it out, then they're already going to be somewhat

15   predisposed.  (Inaudible) -- be concerns regarding -- Black

16   Lives Matter concerns.

17         THE COURT:  Okay.

18         MR. HASSAN:  So that raises whistles to myself and

19   concerns to at least Mr. Tarrio and, I would imagine, to all

20   of the co-defendants that that may be an issue that we're

21   going to -- that that's a cause for concern for us --

22         THE COURT:  Okay.

23         MR. HASSAN:  -- (inaudible) -- in the trial.

24         THE COURT:  Mr. Hassan, I hadn't realized -- I was

25   going to raise that issue regarding the -- I guess it's the

1    additional question of the -- the question about the -- it's

2    Question 53 about the fire- -- the question about the fact

3    that one of the defendants had been previously arrested for

4    the ammunition.  I didn't realize that you all think that 53

5    and 54 -- or I'm sorry, that also you think 54 and 55 -- I

6    hadn't -- I mean, I know we had discussed those topics.  It

7    seemed to me, one way or the other -- I don't -- I had

8    thought that the parties had agreed that one way or the

9    other -- probably those two concepts were going to come in

10   one way or the other, frankly, but if you think that that's

11   still an issue that I could -- if I decide to exclude chunks

12   of evidence, it won't come in at all, then I just won't

13   include it for now.  In other words, I hadn't realized that

14   50 -- that you think 54 and 55 still turn on the question of

15   those motions in limine.  So if you think they do, I'll just

16   take them out, and what we'll do is if the -- if I decide to

17   include the evidence, I will ask every juror those

18   additional questions as we screen them individually --

19            MR. HASSAN:  Judge --

20            THE COURT:  -- (inaudible) --

21            MR. HULL:  Your Honor, I -- Dan Hull for --

22            THE COURT:  Hold on, Mr. Hull.  Mr. Hassan has the

23   floor.

24            MR. HULL:  Sorry.

25            THE COURT:  Yes, sir?

1          MR. HASSAN:  Judge, so if the Court recalls, the

2     Court addressed the banner in front of the -- the flag and

3     was discussing whether the flag and the mention of flagging

4     of Black Live Matter concerns, and the Court pretty much

5     gives -- gave an indication that the Court didn't have to

6     reference it being a Black Lives Matter flag; that it could

7     be -- simply be referenced as a banner that was burned

8     rather than a Black Lives Matter flag.  So that's, sort of,

9     the concerns that we have.  I know part of the rally may --

10    I know the Government may try to elicit testimony during the

11    rally and, sort of, during the issues that -- during the

12    walk that Tarrio was not a part of, but I know some of my

13    colleagues were a part of; that Black Lives Matter were

14    addressed during that.  Maybe my colleague can give some

15    input in regards to that.  What I know regarding the banner

16    and the flag, whatever the Court wants to call it, that's a

17    primary concern regarding our position.  That's regarding

18    December 12th and what happened that day.

19         THE COURT:  All right.  But putting the --

20    putting -- we're going to be in a position, obviously, when

21    we administer these that I've -- according to the schedule

22    we've laid out, I won't have ruled one way or the other,

23    but -- so my point to you, sir, is you -- Mr. Hassan, you

24    think that I should exclude it because -- at this

25    point because -- and I'll -- look, these are important

1    things, and if that's going to be part of the case, I'm

2    going to ask -- I'll just have to ask each of them

3    individually about these things and I just won't include it.

4    Is that -- is it your position I shouldn't include those two

5    questions?

6              MR. HASSAN:  Judge, it's a delicate balance based

7    upon what the Court's going to introduce at trial, but I'll

8    let my colleague speak in regards to at the rally or at the

9    protest, because my focus has been not the rally itself but

10   everything --

11             THE COURT:  No, I understand.  I had just thought

12   that, one way or the other, the issue of your -- whether --

13   and that's why the question is worded, I thought, in a way

14   that is -- let's put it this way.  It's vague of how --

15   what, you know -- about what it's encompassing.  It just

16   says your clients have -- the defendant -- that the case may

17   involve evidence that the defendants expressed hostility

18   toward, you know, those two organizations, but, again, it --

19   I had assumed that one -- frankly, however I resolve those

20   motions in limine, that those concepts were going to be part

21   of the case regardless.

22             Does anyone else want to address this exact

23   question of -- I guess it's, again, 50 -- Questions 54 and

24   55.

25             Mr. --

```
 1                    Ms. Hernandez, I'll hear from you.  I see your
 2       hand is up.
 3                    MS. HERNANDEZ:  Thank you, Your Honor.
 4                    I agree with the Court.  I think that if the issue
 5       is still up in the air, I would rather not have the question
 6       in there and leave it to voir dire, because I don't want to
 7       put that idea in the jurors' heads --
 8                    THE COURT:  Sure.
 9                    MS. HERNANDEZ:  -- (inaudible) -- fact it doesn't
10       come in.  I will ask --
11                    (Brief pause.)
12                    (Inaudible) -- to that that my client was not
13       present, (inaudible) -- becomes -- or if when the flag was
14       stolen, so that becomes -- I don't want to put that idea
15       in --
16                    THE COURT:  Right.  I understand your point.  And
17       I -- again, I -- in thinking about what we're going to
18       discuss here today, I had assumed that, again, those
19       concepts were such a part of the case that it wouldn't turn
20       on that, but I'm going to defer to the defendants'
21       objections on this, I think, because as you -- for you --
22       the reasons you pointed out, Ms. Hernandez.
23                    Mr. Kenerson?
24                    MS. HERNANDEZ:  Your Honor --
25                    THE COURT:  Oh, I'm sorry.
```

1     MS. HERNANDEZ:  -- I think Antifa will --

2     (Brief pause.)

3     THE COURT:  Go ahead, Ms. Hernandez.

4  Ms. Hernandez, you're --

5     All right.  Let's just give her a moment.

6  Ms. Hernandez is -- for the record, her screen is frozen.

7     (Brief pause.)

8     MS. HERNANDEZ:  So I think, as the Court -- I --

9  it's probably likely that Antifa will come into the case, no

10  matter what the Court limits, but I'm not sure about Black

11  Lives Matter.

12     THE COURT:  Okay.  Ms. Hernandez, can you just --

13  you -- probably half of what you just said, your screen was

14  frozen.  So at the risk of -- if you could just summarize

15  it, that would be helpful.

16     MS. HERNANDEZ:  So I said I think Antifa is likely

17  to be part of the case no matter what the Court rules on the

18  in limine motions about the banner and that type of thing

19  just because there were chants of --

20     THE COURT:  Sure.

21     MS. HERNANDEZ:  -- (inaudible) -- during the

22  parade up to -- on January 6th, but I'm not sure Black Lives

23  Matter and Antifa should be deemed to be the same concept.

24     THE COURT:  Right.  No, they're not.  And so your

25  point would be you wouldn't object to including Antifa in

```
 1    there because you think that's going to be an issue one way
 2    or the other.
 3                MS. HERNANDEZ:  Probably, Your Honor.  Yes.
 4                THE COURT:  All right.  I see Mr. Hassan may be
 5    nodding.
 6                Let me hear from Mr. Kenerson.  I think you had
 7    your electronic hand up next.
 8                MR. KENERSON:  I did.  Thank you, Your Honor.
 9                I think that the -- I understand the Court's
10    wanting to defer to the defendants on this.  I think,
11    though, that that's -- I think, with respect to both Black
12    Lives Matter and Antifa, that there's going to be -- even if
13    the Court grants Mr. Hassan's motion as it relates to the
14    words on the flag that were burned by Mr. Tarrio and others,
15    then I just don't see a way that the words "Black Lives
16    Matter" do not come into this trial.  It's all throughout
17    the defendants' chats leading up.  It's all throughout what
18    they talk about.  It's through what the testimony of the
19    civilian witnesses we will put on will talk about, how the
20    Proud Boys function themselves; how they viewed,
21    essentially, who they thought was taking down America in
22    2020 leading up to the election.
23                I, you know -- we could -- you could tweak the
24    wording so it doesn't say "expressed hostility towards" if
25    there's still a question in the Court's mind as to whether
```

 1    it's coming out, but it's, frankly, kind of, surprising --

 2    it's, kind of, surprising to the Government that the

 3    defendants, who want to get as much evidence about the

 4    jurors as they can in the questionnaire, would say, We don't

 5    want what the jurors think about Black Lives Matter.  And

 6    it's going to be much -- when we're doing a questionnaire to

 7    begin with, it will be much more complicated to ask that

 8    question on the fly of every juror if the Court later deems

 9    that some of this evidence is coming in.

10            THE COURT:  Any -- I think, Mr. Hull, you were

11    next, and then Mr. Smith.

12            MR. HULL:  Yeah, and I think I can be brief on

13    this, Your Honor.

14            I had assumed that -- well, I talked with

15    Mr. Hassan briefly yesterday about the fact that his motion

16    in limine would figure into some of this, and I assumed that

17    that would be through some issues, flags versus banners,

18    that kind of thing, but I would keep both of these in as you

19    had proposed.  I guess I agree with those who have said

20    there's no way for either one of these questions that the

21    juror will -- jurors will not hear evidence about this and

22    would prefer them to start thinking about this and about how

23    they think of this whole matter and these kinds of issues

24    when they do the questionnaire, not later.  I think that's

25    pretty important; however, Mr. Hassan has a good point about

```
 1    other issues, but that issue, I don't think I would agree
 2    with him on.
 3              THE COURT:  Mr. Smith?
 4              MR. SMITH:  Thank you, Judge.
 5              So this is the last conference, I think, we're
 6    having before the Court will be deciding all of the pretrial
 7    motions regarding evidence.  So there's a couple of
 8    housekeeping things I just wanted to discuss with the Court,
 9    but, maybe, the Court would be inclined to let Mr. Hassan
10    and Hernandez round out the questions about the
11    questionnaire first.
12              THE COURT:  So --
13              MR. SMITH:  I have none about the --
14              THE COURT:  Well, we're going through my things I
15    want to discuss, and then if we want to turn back to things
16    you'd like to raise, I'm happy to do it.  So do you have
17    anything, Mr. Smith, you want to -- is there anything --
18              MR. SMITH:  Nothing.
19              THE COURT:  -- you want to add --
20              MR. SMITH:  No comment.
21              THE COURT:  No comment on this?  All right.
22              MR. SMITH:  Yes.
23              THE COURT:  Mr. Hassan --
24              MR. SMITH:  Thank you, Judge.
25              THE COURT:  -- let me go back to you.
```

1    MR. HASSAN:  Judge, just to circle back, if the

2    Court looks at how the Court phrased Question No. 54 in

3    relation to how the parties suggested the question being

4    written down in the proposed -- the parties' proposed jury

5    instructions, it just gives a different vibe to -- as far as

6    how the questions are laid out.  So Question 71 that the

7    defense proposed, Have you read, seen, or heard anything

8    about Black Lives Matter?  72, Do you think Black Lives

9    Matter is a legitimate organization?  73, Do you feel

10   strongly about Black Lives Matter movement?  So it breaks it

11   down.  Rather than showing, Oh, look, hostility -- that

12   these individuals are showing hostility, it turns the table

13   around and rather than expressly showing that these

14   individuals have hostility, rather than just laying it down,

15   What are [sic] your position regarding Black Lives Matter?

16        THE COURT:  We're not going to -- Mr. Hassan, I'm

17   not going to ask that question.  The -- here are the

18   questions that are in play.  Have you heard, seen, or read

19   anything about them?  And, number two, Do you have such

20   strong -- and then if we want to characterize how it will

21   connect to the case, here we've characterized that -- I've

22   characterized it as it -- the case may involve evidence that

23   the defendants expressed it -- expressed hostility.  So that

24   is, I think -- we could talk about how you want to -- you

25   might characterize that or not characterize it.  But then,

1    Do you have any strong beliefs about the organization that

2    would affect your ability to -- a fair and impartial juror?

3    Those are the two questions I'm going to -- that are in play

4    about these organizations to be in this questionnaire.  So

5    the question is whether you think -- I hear what some of

6    your co-defendants have said.  They seem to agree with the

7    Government that, one way or the other, these two concepts --

8    this doesn't say anything about the flag or anything like

9    that -- that, one way or the other, those concepts are going

10   to be in the case, and so they'd rather have a

11   questionnaire -- they'd rather have a question that at least

12   it allows the potential jurors to express, number one,

13   whether they know anything about the organization; and,

14   number two, whether they have strong feelings about it such

15   that it would affect their ability to fair -- be a fair and

16   impartial juror, given that the evidence -- the case may

17   involve evidence that the defendants expressed hostility --

18   again, that's the language that we have right now -- toward

19   those organizations.

20        So I guess, all of that being equal, do you --

21   have you rethought -- do you still think that these

22   questions should be there or would you rather them be out?

23        MR. HASSAN:  Judge, I maintain my previous

24   position, Judge, and I'll advise the Court the following,

25   Judge.  Mr. Hull expressed the position contrary, Mr. Smith

```
 1    did not speak as to that, Mr. Metcalf did not speak as to

 2    that, and Ms. Carmen -- Ms. Hernandez spoke in regards to

 3    our position contrary to Mr. Hull.  So those --

 4              THE COURT:  The --

 5              MR. HASSAN:  -- (inaudible) -- the parties.

 6    Ms. Hernandez initially expressed positions that are in

 7    agreement with our position.

 8              THE COURT:  She -- Ms. Hernandez was in agreement

 9    on Black Lives Matter but not Antifa, as I --

10              MR. HASSAN:  Correct.

11              THE COURT:  -- recall.

12              MR. HASSAN:  Correct, Antifa coming in, keeping

13    the Black Lives Matter --

14              THE COURT:  Right.

15              MR. HASSAN:  -- (inaudible.)

16              THE COURT:  Right.  Ms. --

17              MR. HASSAN:  So I agree with Ms. Hernandez

18    completely and disagree with Mr. Hull.  That Black Lives

19    Matter question should not come in --

20              THE COURT:  All right.  Ms. Hernandez --

21              MR. HASSAN:  -- (inaudible.)

22              THE COURT:  Ms. Hernandez, on this issue?

23              MS. HERNANDEZ:  Right.  On this issue, Your Honor,

24    I think I partially agree with Mr. Mulroe [sic] on the

25    phrasing.  I'm not sure that I want that -- the evidence
```

1    that the defendants expressed hostility, you know?  I don't

2    want to put that -- maybe, the others want to put that

3    concept out there.  Especially because this document is

4    coming from the Court, I'm a little bit concerned about

5    having in there -- as I say, my client -- I have -- I think

6    the -- we'll see how the evidence comes in, but I'm not --

7    I --

8              THE COURT:  Right.

9              MS. HERNANDEZ:  -- I'm swayed that the question

10   about Antifa and BLM should come in, but not necessarily the

11   wording of -- that the -- there's evidence that the

12   defendants expressed hostility.  Rather, maybe, just adding

13   "opinion" on it or something --

14             THE COURT:  How about --

15             MS. HERNANDEZ:  -- (inaudible.)

16             THE COURT:  How about the word "opposed"?  I mean,

17   "opposed," at least it's, I think, more neutral.

18             MS. HERNANDEZ:  Well, I would say the following.

19   I know my client doesn't oppose Black Lives Matter --

20             THE COURT:  Well --

21             MS. HERNANDEZ:  -- to the extent they oppose

22   police brutality, for example.  So I would rather say "have

23   an opinion" than -- I don't know.  I -- "hostility," I want

24   out.  I think Mr. Mulroe [sic] suggested that would not --

25   he would go along with that, but however the Court wants to

 1  phrase it that doesn't express or -- that positive statement

 2  that they expressed hostility.  Maybe they have an opinion

 3  or --

 4          THE COURT:  But the problem is -- again, we're

 5  asking -- it's, sort of -- we're trying to give these jurors

 6  the sense of, you know, Do you have such strong beliefs

 7  about Black Lives Matter that it would affect your ability?

 8  It's hard for them to put that in context without knowing,

 9  generally speaking, what your client's position was on this.

10          MS. HERNANDEZ:  What if we asked that our clients

11  expressed -- some evidence that they expressed strong

12  beliefs?  The defendants expressed strong beliefs about

13  Antifa and Black Lives Matter?

14          THE COURT:  But it's confusing because, again --

15  all right.  Here's what I'm going to do, unless I -- unless

16  anyone else wants to be heard on this.  If -- I'll -- I'm

17  going to respect -- and if we have to ask about Black Lives

18  Matter individually, I'll do it.  We'll leave Antifa in, and

19  I'm going to just say, Involved evidence that the defendants

20  opposed Antifa.  I don't think there's any doubt that's

21  coming in one way or the other.  "Opposed," I think, is a

22  little more neutral than "expressed hostility toward," and

23  we'll -- and, again, even then, the question is couched as

24  far as "may," but I'll split the baby.  We'll take the Black

25  Lives Matter question -- questions, I guess, at this point,

 1   out, and given what -- given the sensitivities on all of

 2   this, I'm also going to take the question, again, about the

 3   possession of a magazine -- so that's 53 -- I will take that

 4   out, again, out of an abundance of caution, and if I have to

 5   ask each of the jurors that question as we screen them, I

 6   will do that.

 7          Two other quick points before I just, sort of,

 8   open it up for anyone else's comments.

 9          We have -- so I will get the -- we will get the

10   lists from both parties of witnesses today.  We'll integrate

11   that and we'll integrate that on the back of this and

12   include that.

13          And then just as far as logistics go -- goes,

14   what -- we will let the -- once we have all the

15   questionnaires filled out on Monday, we will let the

16   Government know.  My understanding is the Government's going

17   to load these onto the USfx [sic] system to be able to make

18   it available to all of you.  We will let the Government

19   know.  We'll have the -- we'll have -- we'll let them know.

20   If you all can be prepared to send someone over to pick up

21   the questionnaires, we'll -- and bring them back to your

22   office, you can scan and download them into the system, and

23   then if -- we'll have the originals come back to the court

24   and we'll maintain them here, but they should be out to all

25   counsel as soon as that downloading process into USfx [sic]

1    is completed.

2              Mr. -- so those were all the -- that -- those were

3    all the things that I wanted to lay out to the parties.

4              Mr. Smith, what did you want to raise?

5              MR. SMITH:  Thank you, Judge.

6              So as I noted, I think this is the last conference

7    before the Court will be ruling on the 12th on the pretrial

8    motions in limine, and I think everyone knows that there has

9    been an uncommonly large share of sealed litigation in this

10   case.  The standard normally under the Sixth Amendment and

11   local rules is for litigation to be occurring publicly.  The

12   defendants are entitled to a public trial.  And we're

13   getting very concerned about the percentage of discovery and

14   material that's being produced by the Government that is

15   sealed, Your Honor --

16             THE COURT:  Okay.  Mr. Smith, does this --

17             MR. SMITH:  And --

18             THE COURT:  Mr. Smith, does this --

19             MR. SMITH:  No, Your Honor.  This does not

20   pertain --

21             THE COURT:  Mr. Smith -- okay.  And it -- only one

22   of us is going to talk at a time, for sure.

23             Does this have anything to do with the

24   questionnaire?

25             MR. SMITH:  Your Honor, it does have to do with

1    the questionnaire.

2              THE COURT:  All right.

3              MR. SMITH:  It has to do with all of the motions

4    pending before the Court, Your Honor.

5              THE COURT:  No, no, I don't care -- okay.  Very

6    well.  Continue.

7              MR. SMITH:  So Your Honor, last week, the

8    Government made a Jencks production pursuant to the

9    scheduling order.  Your Honor, this -- I'm sorry, but

10   this -- if this is not addressed in this conference, it --

11             THE COURT:  I understand that, but you're not

12   answering my question, Mr. Smith, whether it has anything to

13   do with the contents of the questionnaire.  I don't mind

14   hearing what you have to say, but I want to put the

15   questionnaire to bed first.

16             MR. SMITH:  Your Honor, I apologize.  I thought

17   that the Court had just indicated that the Court was opening

18   the floor to statement -- to questions pertaining to the

19   case.

20             THE COURT:  No, no, pertaining --

21             MR. SMITH:  So I --

22             THE COURT:  That's all right.  No, pertaining to

23   the questionnaire.  So let's just put the questionnaire to

24   bed and then I will hear you.

25             Is there anything else about the questionnaire the

1    parties would like to be heard on?

2              MR. HULL:  (Indicating.)

3              THE COURT:  Mr. Hull?

4              MR. HULL:  Yes, Your Honor.  There's a few other

5    things that I'm -- I'd like to discuss more roundly and it

6    won't take too long, I don't think, about -- there were

7    categories of questions, I think, that mainly came from

8    Ms. Hernandez, mainly from Mr. Hassan and from me that were

9    in the joint proposal.  The joint proposal, I don't think

10   the Government took everything we did, but we talked for a

11   long time about certain things that we wanted in.  I wanted

12   to point out what those things are at least generally, what

13   they are specifically in my case.  I'm usually not that

14   focused on questionnaires, but I am for this case.  And I

15   think that the best way -- I was trying to figure -- I

16   actually talked with Mr. McCullough about the best way of

17   getting this -- bringing this forward without, like, going

18   back and forth and making this a two-hour session.  You had

19   "brief" on your scheduling order, and I noticed that.  So

20   I'll just do it this way.  On the joint -- this is on the

21   joint proposal that you received, and using that as a guide,

22   I think of that as -- that's one of many drafts, but before

23   yours came, there's a few others that I thought were

24   important, and they had to do mainly with media and a little

25   bit with the subject of groups in my case, and I had some --

```
 1   I think we talked about these on the 18th.  I think that
 2   it's probably a good idea here not just to ask what they
 3   read but to identify certain kinds of things.  There's a lot
 4   of traditional media like the New York Times, L.A. papers,
 5   Washington paper.  There's also things like Sedition
 6   Hunters.  I -- it's easy to list those.  It does make your
 7   job a little bit more difficult in the sense that people,
 8   you know -- I have more to talk about, but I think like --
 9   although it's not an open-ended question, I think that
10   No. 35 -- it would have been submitted to you.  It starts
11   out, Do you read, and it starts, The New York Times.  That's
12   one question.  I think there are, like, 15 different, sort
13   of, sample media outlets.  I think that makes sense to have
14   in addition to what you have.  I think the more, the better
15   here.
16         We -- what I also had, there's, like, three other
17   categories.  Another was I think -- you did adopt, Do
18   people -- Do you discuss this with people in the
19   neighborhood or people that you know?  You had a version of
20   that.  I'd like a little bit more detailed one of that, and
21   it would have been in 39, 40, and 41 of the joint proposal.
22   So those three.
23         There's also questions that I suggested that had
24   to do with -- at the very end about the concept of a
25   group -- of a male-only group.  I think that sticks in a lot
```

1    of people's craw in -- generally in our culture, and I'd

2    like to know -- like, the Proud Boys are, you know, a

3    male-only -- some people have a problem with that.  I'd like

4    to have one specific question on that, and I did at 90.

5             Now, Mr. Hassan had some great questions that he

6    took from a questionnaire and it -- in a very high-profile,

7    famous case in Boston that everybody assumed might be --

8    have a shot at being transferred, and it was not, and I

9    liked what he put in.  It does make people talk more and

10   gives more for you to do, but I think we -- the more

11   information you have from these jurors, the better.  I've

12   watched a few of the voir dires in other cases here, and I

13   think it's probably better to give them, maybe, a little bit

14   more to look at and have them come in with that.

15            You wouldn't have to accept all of Mr. Hassan's

16   open-ended questions, but I liked all of them, and I think

17   that they were -- I'm sure Mr. Hassan has a -- he has --

18   most of them were on page -- excuse me -- the ones that

19   they -- in the joint -- excuse me for a second -- yeah -- 57

20   in the joint proposal, the one that came to you around the

21   4th from the Government, all the way to 84.  There's quite a

22   few.  Maybe they could be condensed, but they -- thought

23   they, you know, elicited good stuff.

24            There's a third category that we did with -- and

25   that's the final one -- with Ms. Hernandez; had things about

 1   firearms and, you know, magazines versus -- were they really

 2   magazines or were they some kind of merchandising material?

 3   I think you've covered that in this, but I just wanted to

 4   point out that I -- and I appreciate the way you worked in

 5   some -- a lot of these into shorter versions near the end of

 6   yours, you know?  You got a lot of them in there, but I

 7   think a few more questions -- specific ones like the ones I

 8   just talked about and the open-ended questions that

 9   Mr. Hassan did, all excellent.  If any case is going to have

10   open-ended or a little bit more for the jurors -- for the

11   panel to do, I think this is it.  So I would, you know -- I

12   would err on the side of giving them a little bit more to

13   think about and to talk about, even if that extends voir

14   dire by a day.

15          THE COURT:  All right.  Anyone else besides --

16   I -- before I hear from Mr. Kenerson, any other defendant

17   want to be heard on the question -- on, basically, the point

18   Mr. Hull was making?

19          (Brief pause.)

20          No.

21          Mr. Kenerson?

22          MR. KENERSON:  Thank you, Your Honor.

23          We -- obviously, the Government expressed its

24   position to the Court back on the 18th about the open-ended

25   questions.  We still believe that those are best addressed

1    during voir dire itself; that this survey is designed to see

2    whether the jurors have any opinions that might be better

3    explored in voir dire and that those opinions would be best

4    explored by the Court in questioning that can go back and

5    forth and the parties can read the jurors' facial cues and

6    things like that.

7        Just with respect to Mr. Hull's questions about

8    news sources, I note that the Court, at Question 30 in

9    the -- of the Court's proposed voir dire, has given the

10   jurors a chance to list whatever their primary sources of

11   news are.  So I think the Court's questionnaire captures, I

12   think, the spirit of what Mr. Hull was trying to get with

13   the long list and that, again, we would be able to follow

14   up -- the Court would be able to follow up with the jurors

15   in voir dire.

16       So that's, I guess, kind of, the response to

17   Mr. Hull.  If the Court has any questions, happy to answer

18   them.

19       We did have one other issue with -- related to the

20   questionnaire generally --

21       THE COURT:  Okay.

22       MR. KENERSON:  -- if the Court would be willing to

23   hear it.

24       So I -- it's going to be -- and it -- I think,

25   given just the logistics of where we are, where we're not

1    going to be starting jury selection until the 19th at this

2    point, and I think we would expect jury selection to go at

3    least a few days in this case, and I think the Court had

4    already said to Mr. Pattis that we would not sit the

5    afternoon of the 23rd, that Friday of that week.  I think,

6    given that reality, it's going to be the Government's

7    request that we just tell the jurors up front that we're not

8    going to start with opening statements and evidence until

9    the 3rd of January, and there's a couple of reasons for

10   that.  One is the practicalities of how long, I think,

11   everyone can expect jury selection to take vis-à-vis how

12   much we can -- evidence we can expect to get in which, I

13   think, is not much, if any, even if we did start.  But as a

14   practical matter, if there is a chance we're not going to

15   start -- and I think that there actually is a chance that

16   even if we don't guarantee it, we don't start until the

17   3rd -- that relieves the Government of having to have

18   witnesses here and on call.  Witnesses are, of course,

19   coming in from out of town and it's close to the holidays.

20   There's also the chance of -- given the holidays; given the

21   fact that we are now at, kind of, the height of COVID

22   season, that we lose a couple of jurors over the holidays.

23   If we do not swear them beforehand, we can get new jurors,

24   if needed.  If we do swear the jury ahead of time, then we

25   are, kind of, starting down --

```
 1              THE COURT:  So --

 2              MR. KENERSON:  So --

 3              THE COURT:  Go ahead, Mr. Kenerson.  Finish your

 4    point.

 5              MR. KENERSON:  So anyway, that was the lead-in to

 6    saying, I think, if the Court agrees with us on that, we

 7    would ask that the Court put it into the questionnaire.

 8              THE COURT:  Well, I don't think -- let me put it

 9    this way, Mr. Kenerson.  I -- your -- I -- the -- I think --

10    the connection to the questionnaire, I think, is a tenuous

11    one to your point.  I understand the parties wanting more --

12    wanting assurances on that.  Let's do this.  I'll discuss

13    that request with the parties on the 12th.  I don't think

14    it's anything we need to -- I mean, for the jurors -- for

15    their planning purposes, I don't really think it matters to

16    them whether I swear them on the 23rd or not.  I take your

17    point about swearing them, and I think it's a good one that

18    we're going to have to think through, but I don't think I

19    need to instruct that -- they need to know that we're going

20    to start selecting a jury on the 19th; that we're not going

21    to be there in that interim week; and I, you know -- I don't

22    know why they have to be informed about that wrinkle, and

23    I'm -- and, as I said, I think that's something on the 12th,

24    like, in -- I'll discuss with the parties.  I had given some

25    thought to it.  And so I'll hear from you on it at that
```

1   time.  And it may be that -- I mean, I don't think -- let's

2   put it this way.  If we put -- if we bake into it also

3   opening statements, the reality is, you know, I can't

4   imagine the Government getting through more than one

5   witness.  So it -- the burden on the Government of having at

6   least one witness in the hopper is not too great.

7        So to your overall -- so let me just say, on the

8   questionnaire -- let's just put that to bed -- I mean, I

9   have thought about the things Mr. Hull and the other

10  defendants have raised on this.  I do think, as the -- as

11  Mr. Kenerson said, on some of these questions, I've met the

12  defense halfway in terms of laying out -- giving them some

13  open-ended questions in terms of the particular sources that

14  they're interested in.  I think a lot of the other

15  open-ended questions, frankly, it's not so much their

16  open-endedness, but it's the fact that they cover topics

17  that I don't think we particularly need to cover, number

18  one; and, number two, I think, again -- generally speaking,

19  I think it's important for -- I think it -- for the

20  follow-up questions and the narrative answers, I think it is

21  more important that we be -- that I do it with them

22  individually.  So I'm not going to include -- I mean, I've

23  thought about it.  I wanted to give you a chance -- to give

24  the -- you all a chance to be heard again particularly

25  because I said I would, but I'm going to keep the questions

```
 1    as they are with the changes that I mentioned: the timing
 2    changes, number one, instructing them on the timing; and
 3    then I will omit, pursuant to our conversations -- well, I
 4    will add a question that just says, Have you read, heard, or
 5    seen anything about Antifa?  I will omit the question -- the
 6    one -- the question -- and I will omit Questions 53 and 54
 7    which are because of the uncertainty about whether that
 8    evidence will come in.
 9              All right.  With that, Mr. Smith, let me hear from
10    you.
11              MR. SMITH:  Thank you, Judge.
12              So I just would like to raise a sealing issue
13    briefly, because I think it will impact the Court's pending
14    rulings.
15              THE COURT:  Okay.
16              MR. SMITH:  A couple weeks ago, Your Honor, the
17    Court heard argument on the motions in limine and the
18    Government, in those hearings, updated some of its arguments
19    with proffers about what Government witnesses would testify
20    at trial, and among other things, the Government testified
21    that -- the Government proffered that the witnesses would
22    testify that, you know -- there's evidence on the
23    co-conspirator statement issue.  There's evidence of the
24    conspiracy in this case sufficient to establish probable
25    cause of it because we have two witnesses who have pled
```

1    guilty to conspiracy.  They said, Donohoe and Jeremy

2    Bertino.  The Government proffered that one of the

3    witnesses, Jeremy Bertino, would testify at trial that the

4    Proud Boys were responsible for violence, Your Honor, on

5    December 12th, 2020, the December 2020 rally.  That was one

6    of the Government's rationales for using that event as

7    404(b) evidence.

8              So Your Honor, this week, the Government

9    identified its Jencks material under the scheduling order

10   and, Judge, the Government has sealed -- has designated as

11   "sensitive" or "highly sensitive," I believe, every single

12   document that pertains to Jencks.  So we've asked the

13   Government why the -- all of the Jencks material is

14   designated "sensitive" which means it can't be filed

15   publicly, Your Honor, as Your Honor knows, and the

16   indication was that the witness safety -- that the safety of

17   the witnesses could be implicated by publicly filing these

18   materials, but, Your Honor, there's another reason why these

19   materials might be designated "sensitive," and I would

20   suggest that's because of their content.  Much of what the

21   Government has represented in hearings last week about the

22   motions in limine is conflicted with -- is inconsistent with

23   the witness statements they've given us, Judge.

24              And, you know, at a very high level, basically,

25   the Government's representations about the purpose of the

```
 1     MOSD and that being the, kind of, "By Way of Canarsie"
 2     reason for why the December 12th rally is relevant to this
 3     case, that is not accurate, Your Honor.  Both Donohoe and
 4     Bertino have told the Government on multiple occasions there
 5     was no plan regarding the Capitol before January 6th.  This
 6     is direct- -- I mean, not only is this Brady evidence,
 7     Judge, but it's directly relevant to the pending motions
 8     before the Court --
 9               THE COURT:  Okay.
10               MR. SMITH:  -- the co-conspirator statement
11     motion.  So Your Honor, the point is we would like to be
12     able to have a public trial, and that means updating the
13     Court on the witness statements that are inconsistent with
14     the Government arguments they've been making in court over
15     the past couple of weeks, and we need to be able to file
16     these inconsistent statements publicly.  These statements --
17     we've identified the subject matter of the statements to the
18     Government.  They relate -- they don't relate to witness
19     safety because, after all, why would a witness be endangered
20     by making statements that are exculpatory to the witnesses
21     themselves?  That does not endanger a witness.  In response,
22     the Government said, We will only give you our position on
23     unsealing if you give us the specific quotes.  So while
24     we're preparing for a trial, the Government says, We will
25     withhold this information from the public that's
```

1    inconsistent with our arguments until you spend your time

2    copying and pasting quotes and sending us an email with

3    them.  Judge, that's not how this should work.  We need to

4    be able to show the Court that it might be issuing -- about

5    to issue a decision on a premise that's factually false, and

6    we would submit that the Court should order the Government

7    to lift the sensitivity designations from Jencks material

8    that doesn't pertain to secret witnesses or anything of the

9    like.  These are public witnesses whose plea agreements and

10   statements of the offense are public.  They're public.  The

11   Government has gone into hearings and selectively given the

12   Court information from these witness interviews that are

13   sensitive but then not given the Court other information

14   which is inconsistent with its representations.  So we would

15   say, at that point, it's waived if there's any sensitivity

16   designation on those subjects.

17         So Judge, our request is we don't want to have to

18   brief -- in the midst of preparing for trial, brief all of

19   these motions to lift the sensitivity designations.  We

20   think that for public Government witnesses, the Jencks

21   material should not be sensitive and the public should see

22   that the Government's representations about the conspiracy

23   are not accurate.  The witnesses have told the Government

24   many times there was no plan relating to the Capitol before

25   January 6th.  It's being withheld from the public and they

1    should know it, Judge.

2              THE COURT:  All right.  Does anyone -- any other

3    defendant want to be heard on this particular topic?

4              MS. HERNANDEZ:  (Indicating.)

5              THE COURT:  Ms. Hernandez, is that why your hand's

6    up?

7              MS. HERNANDEZ:  (Indicates affirmatively.)

8              THE COURT:  All right.  Go right ahead.

9              MS. HERNANDEZ:  Your Honor, I agree with

10   Mr. Smith.  I would -- the protective order explicitly

11   states that the "highly sensitive" designation will not be

12   used for any purposes except security or other identified

13   purposes.  Mr. Smith is absolutely correct.  The Government

14   has chosen on these three witnesses -- Bertino, Donohoe, and

15   another one -- to make their cooperation plea agreements

16   public.  As the Court well knows, when the Government asks

17   the Court to seal a cooperation agreement, the Court does,

18   and they'll -- and everything about it is sealed, but in

19   these cases, the Government has chosen, and the moment they

20   chose to do that, then all the exculpatory information or

21   the -- all the information that's inconsistent should have

22   been produced to us under Brady and the Due Process

23   Protections Act.

24              And the Government continues, in line with that

25   problem, is that their plea agreement -- their statement of

1    offenses are these lengthy discussions which lays out the

2    Government's theory of the case which are not material at

3    all to the plea, and then we are hamstrung and I -- we have

4    a Sixth Amendment right to a public trial for a reason.  The

5    constitution wants all this information out, not a one-sided

6    exposition of the Government's theory.

7            And I believe, again, we're dealing with

8    violations of Brady.  I believe they have made

9    representations in hearings that the Court has relied on

10   without letting us know this information in advance, and

11   it's -- it is -- I find it insulting, because I would not

12   misrepresent to the Court.  I have that -- I feel that I

13   have an obligation, and I have one client and that is

14   Mr. Rehl.  I don't have -- the Government's obligation is to

15   do justice, not to win, and I wouldn't do some of the things

16   that the Government is doing.  I just find it completely

17   offensive in these cases where the stakes are so high, and

18   for us -- as Mr. Smith says, for us to be wasting time on

19   these issues when we have so much to prepare for -- and

20   there's another issue with making them sealed.  That means

21   we cannot provide this information to our clients without

22   being present either ourselves or a paralegal or an

23   investigator because we cannot leave this material with the

24   defendants which means it puts another burden on our

25   preparation.  The clients have a right to assist in their

1    defense, and they're being hamstrung because they ought to

2    be able to read this stuff.  They have more information

3    about these events than we do.

4             So the whole thing, Your Honor -- I just think

5    it's a very callous way to proceed in a case of this

6    magnitude, you know?  None of these defendants had firearms

7    or weapons of any kind, and they're being charged with

8    seditious conspiracy which heretofore had not been charged

9    against any American who had not actually, you know, used

10   violence personally; had firearms; had that kind of a

11   conspiracy.  I find it -- and I would hope that the Court

12   would step in and prevent this from continuing.  I feel as

13   if we're going to be doing this in the middle of trial, and

14   it's just -- it's not the way to do business in a federal

15   court in a case of this magnitude.

16            THE COURT:  All right.  Mr. Hull, do you want to

17   be heard on this topic?

18            MR. HULL:  I only want to say I agree

19   wholeheartedly with what Mr. Smith said and what

20   Ms. Hernandez said, and I'm glad that she brought in the 19-

21   -- that 1955 burglar case which, I think, applies here.  We

22   have -- the statements of offenses and the plea agreements

23   here that are done by at least two of the defendants don't

24   even seem like -- they sidestep the conspiracy issue.  It's,

25   like, kind of, amazing to read them, and a lot of what --

1    there is -- and I'm not saying it's always bad.  There is an

2    overload of gamesmanship in this case, and I think that

3    needs to be said and I think both Ms. Hernandez and

4    Mr. Smith said it in a certain way -- in a -- said it in a

5    different way, but yeah, I agree with what they said.

6                    THE COURT:  All right.  Mr. Kenerson?

7                    MR. KENERSON:  Thank you, Your Honor.

8                    I want to, I guess, start with Mr. Hull's recent

9    statement about gamesmanship and want to lay out a little

10   bit of the history here for the Court.  I know Mr. Smith and

11   Ms. Hernandez have both just told the Court that the

12   Government just made these productions last week as part of

13   a Jencks Act production.  Of course, we did comply with the

14   Court's obligations to provide Jencks material to the

15   defendants last week -- or earlier this week, but this

16   all -- as our cover letter to that production noted, this is

17   almost all -- and with respect to what we're discussing

18   today, is all -- material that was provided previously.

19   Charles Donohoe entered his guilty plea on April 8th of

20   2022.  The FBI 302 recording his interview was provided on

21   April 28th, 2022.  In the cover letter in which we provided

22   that 302, we specifically highlighted that the production

23   included his 302.

24                    Jeremy Bertino pled guilty on October 6th of 2022.

25   The materials at issue were provided to the defendants on

1     October 11th, 2022.  That included recordings of all of

2     Mr. Bertino's interviews with the Government.  It included

3     the 302s.  It included transcripts of some of those

4     interviews, but even the ones for which there were not

5     transcripts provided October 11th, the recordings were.

6           So it is simply not accurate to say that the

7     defendants just -- were just provided this material earlier

8     this week.  They have had it, in the case of Mr. Donohoe,

9     since April; in the case of Mr. Bertino, since October; and

10    in both cases, within weeks in the case of Mr. Donohoe; days

11    in the case of Mr. Bertino -- of them entering their guilty

12    pleas.  So the defendants have had ample opportunity to make

13    whatever use of this material they think can, or should, be

14    made of it.

15          The -- with respect to Mr. Smith's point about the

16    sensitivity designation, as we said to the defendants in our

17    email conversations yesterday, the Government has designated

18    the entirety of the documents provided to them.  The entire

19    302s, the entire transcripts, all of that has been

20    designated as "highly sensitive" under the protective order

21    for witness security reasons.  The Government has, I think,

22    a legitimate concern for preventing the entirety of a 302;

23    the entirety of a multi-hundred-page transcript from being

24    available on PACER, certainly, prior to when the witness

25    testifies, and the -- and we also offered, like I said, to

1    work with the defense if they believe they need to cite in a

2    public filing some portion of those materials.  They could

3    cite those to us.  We would let them know whether we

4    believed that, in and of itself, is highly sensitive.  I

5    mean, Mr. Smith, Ms. Hernandez both seem to think that there

6    is something that the Court and the public needs to know in

7    these documents based on their review of them.  I don't

8    think it's too much extra work for them to identify for the

9    Government exactly what that is.  They have already

10   identified it for themselves, or so it seems.

11             In any event, one thing certainly that the

12   Government -- the audience for this material -- even if, for

13   some reason, the hundreds of pages of transcripts were

14   relevant -- is the Court, and the Government made very clear

15   as well yesterday that if the defense thinks the Court needs

16   to see this information in its entirety to determine the

17   outstanding motion, they can certainly file the motion under

18   seal.  The Government -- or they could file the materials

19   under seal.  The Government is not preventing the Court from

20   deciding any matters at issue.  The Government is not

21   preventing the defendants from filing something on the

22   public docket saying, you know -- trying to argue that the

23   Government has -- improperly relying upon something.  The

24   Government is willing to work with the defense, as we said,

25   to get to something that can be filed public or to allow the

1   defense to file hundreds of pages of transcripts with the

2   Court under seal.  We're not trying to hide anything.  And,

3   in fact, we have provided this material timely.  The

4   defendants -- we brought it to their attention this week.

5   They noticed it this week, but it was provided to them

6   timely.

7          THE COURT:  So it seems to me --

8          MR. SMITH:  (Indicating.)

9          THE COURT:  Mr. Smith, do you want to respond?

10         MR. SMITH:  Yeah, Judge, just very briefly.

11         We would just like to say in response that the

12  fact that documents have been produced to the defense

13  doesn't mean that the Government should be making material

14  omissions or representations in court that are inconsistent

15  with testimony they plan to prepare for trial.  That is not

16  an excuse for making claims in court that are not accurate,

17  I think we would say.

18         The second thing is, Your Honor, when Mr. Kenerson

19  referenced productions to the defense earlier than the

20  Jencks identification last week, what happens is the

21  Government will be producing documents almost every other

22  day in this case.  There are several -- the productions have

23  just been rolling for approximately two years.  So Your

24  Honor, occasionally, the defense will get a discovery letter

25  that says, See the attached drive, with no description of

1    what's on the drive.  So last week, we got a Jencks

2    letter -- the defendants did -- that identified the specific

3    witness statements and interviews that would be relevant to

4    the Government's witnesses.  That's when the material was

5    identified to us specifically.  We can -- Your Honor, it's

6    the case that solo defense attorneys who are court appointed

7    can review -- it -- I guess, hypothetically, they could work

8    7 days a week, 24 hours a day to review the entire universe

9    of discovery, and that's true, but what -- the Government

10   identified these as Jencks statements last week, Your Honor.

11          So Judge, Mr. Kenerson said that if the defendants

12   just merely show the Government what they want to file

13   publicly, then the parties could work it out.  Your Honor,

14   we've already told the Government what subject matter we

15   would like to file publicly.  The Government responded by

16   saying, Give us specific quotations.  Judge, that's -- as

17   Ms. Hernandez indicated, we do not have time for that, and

18   the subject matter we've identified for the Government

19   should show that there's no risk to the witnesses' safety by

20   discussing these subjects.  They're the subjects of the

21   motion in limine filings made by the parties.  So we think

22   the Court could just rule right now that if the witnesses

23   are making statements to the Government about the subject

24   matter of the Court's -- of the Government's filings and the

25   Government is making representations about what those

1    witnesses told them in court, we should be able to publicly

2    file inconsistent statements that go to the pending motions

3    in limine that the Government's witnesses have filed.

4            THE COURT:  Ms. Hernandez, is your -- I can't tell

5    whether your hand is up from before or it's a new hand.

6            MS. HERNANDEZ:  Yeah, it -- I -- it -- Your Honor,

7    again, the security issue -- we recognize there's a security

8    issue and the Government can always present it, but when you

9    have identified a witness as a cooperator and have disclosed

10   the quote-un- -- the alleged -- allegedly incriminatory

11   information, if there's security issues for a witness, it

12   would be when it comes out that they may have evidence

13   against the defendants.  If there's evidence that's

14   favorable to the defendant, that should not present a

15   security issue after you've already outed your witness as a

16   cooperator.  So I mean, the security issue just makes no

17   sense.  It makes no sense in this instance, Your Honor.

18           THE COURT:  Here's what, I think -- so there are

19   three, kind of -- it seems to me there are three issues

20   here.  In the first -- the first issue is the issue of

21   whether any of this recently -- or -- recently identified

22   information is relevant to any of the motions in limine.

23   And I'm going to ask -- what I'm going to do is just ask,

24   because of the time we're on, if any defendant wants to file

25   a pleading, they're going to do it under seal for the

1    moment, and I want that filing on Monday, and you can lay

2    out exactly -- and you can attach under seal whatever

3    materials you want to attach and make your argument about

4    why this material changes -- how I should consider it in

5    resolving the pending motions, number one.  And if the other

6    party would like to respond to that in some way, they can

7    respond to it.  I guess it would be the Government.  If the

8    Government wants to respond to that, they can respond on

9    Wednesday, the 7th.  So I'm -- it's an aggressive schedule,

10   but if I need to get my arms around what you all are

11   arguing, that's just going to have to be the way it has to

12   be.

13           On the second and third layers of this -- so

14   that's number one.  On the second and third layers of this,

15   it seems to me the second and third layers are, number one,

16   the extent to which -- or how the defendants are able to use

17   it with regard to their, you know -- the other -- the

18   downstream effects of having designated it "highly

19   sensitive" are, number one, the difficulties in terms of the

20   defendants using that information, how they're able to use

21   it with their clients; and, two, whether the public --

22   whether it should be on the public docket.  And I think what

23   we should do is I'm going to have a much better sense of

24   what we're talking about once the defense files whatever

25   they're going to file on Monday, once the Government

1   responds to that on the 7th.  Quite frankly, if you want to

2   include in the filing, whatever the defendants file on

3   Monday, not only -- if you want to include not only, number

4   one, why the information is relevant to the pending motions,

5   but, number two, why you think it shouldn't be highly

6   sensitive, you can include that in there, and I'm going to

7   be in a much better position to understand those arguments

8   once I see the information itself.  The Government can

9   respond by the 7th.  And, you know, again, I guess it's two

10  different layers.  One is how the defendants are being

11  hamstrung in their use of the documents which, again, is, to

12  me, a far more urgent -- I put the -- that's a much more

13  urgent issue, again.  And then third is the issue of the

14  public and whether all of this should be unsealed, and

15  that's -- I -- that's an important issue, but it's not as

16  time sensitive, it seems to me, as, number one, my ability

17  to see whether this changes the outcome of any motions; and,

18  two, whether the defendants are able to use the information

19  in mounting their defense.

20          So I'll get something on Monday from the

21  defendants, I'll get something on Wednesday from the

22  Government, and I'll -- and, number one, I'll use whatever

23  you have for me as far as resolving the issues on the 12th,

24  and then we'll go from with regard to whether I think

25  there's a -- there continues to be a reason to make -- to

 1      keep this information, A, off the public docket; and, B,

 2      whether the restrictions on the defendants' individual uses

 3      of it -- whether there's a basis for that, as well.

 4              Ms. -- well, I've got -- I'll go with Mr. Kenerson

 5      first.

 6              MR. KENERSON:  Thank you, Your Honor.

 7              Just -- I -- very briefly, I -- there's just a

 8      couple of things Mr. Smith said that I think we just want to

 9      note for the record --

10              THE COURT:  Okay.

11              MR. KENERSON:  -- our disagreement with.

12              THE COURT:  Okay.

13              MR. KENERSON:  One is that the Government has

14      somehow misrepresented to the Court the import of what the

15      Government -- what the testimony would be, what the

16      Government's evidence would be, all of that.  Well, of

17      course, if they raise specific issues in their motion on

18      Monday, we'll respond in kind.

19              THE COURT:  I predict they will.  I predict they

20      will.  So very well.

21              MR. KENERSON:  So -- but -- and the second point

22      is, as to the notice issue, I think, as we already said, the

23      cover letter for Mr. Donohoe's 302 identified that it

24      includes his FD-302.  The index that went with -- which was

25      an Excel spreadsheet -- that went with the cover letter for

1    the materials that included Mr. Bertino's material

2    specifically identified that there were transcripts from

3    Mr. Bertino; that there were interviews from Mr. Bertino;

4    and on multiple different places, it said "Bertino recorded

5    interview" for the different recording files.  So I think

6    that the -- we take issue with the idea that this is newly

7    produced or newly identified, but we'll respond in kind on

8    Wednesday to -- substantively.  We just wanted to get that

9    on the record.

10              THE COURT:  All right.  Ms. Hernandez?

11              MS. HERNANDEZ:  Your Honor, several things.

12              Number one, I have asked the Government to

13   un-designate all the Jencks and all the trial exhibits.

14   Like, all the pretrial materials that have just been

15   produced.  I've asked them, for purposes of disclosure to my

16   client, to just un-designate everything in there.  I mean,

17   we're weeks away from when this --

18              THE COURT:  Right.

19              MS. HERNANDEZ:  -- stuff is going to come out, and

20   the preparation issue which I -- let me get off this a

21   minute.  I want to thank the Court.  I don't know if the

22   Court is aware.  Our client -- at least my client -- I

23   believe --

24              THE COURT:  I am aware.

25              MS. HERNANDEZ:  -- (inaudible) -- been moved

 1    closer to D.C. --

 2              THE COURT:  Correct.

 3              MS. HERNANDEZ:  -- (inaudible) -- so I want to

 4    thank whatever efforts the Court had in that.

 5              THE COURT:  I did meet with them and Mr. Nordean

 6    is moved there, as well.

 7              MS. HERNANDEZ:  Right.

 8              MR. SMITH:  Thank you, Judge.

 9              MS. HERNANDEZ:  So I've asked the Court -- not

10    just with this -- these two items that -- these witness- --

11    I've asked specifically for all the pretrial materials that

12    have just been produced to be un-designated.  As I say,

13    we're weeks away from this all coming in.  There's no reason

14    for us to be hamstrung with our clients.  It would be nice

15    to just make copies of what we can and then have to deal

16    with videos and stuff in a different fashion.  And I'm -- I

17    thank the Court for taking --

18              THE COURT:  I -- and, Ms. Hernandez, let me just

19    say, I -- again, I prioritized the issues here as, number

20    one, I need to have all the information I need to make

21    pretrial rulings; and, two, you all need to be able to

22    use -- make, you know -- make use of this with your clients.

23    And I agree with you.  We're right on top of trial.  And so,

24    again, in whatever you file on Monday, if you want to

25    include just laying out this issue for me -- I'm not trying

1    to -- no, I'm trying hard here -- you're going to have to be

2    filing something identifying this information and why you

3    think it impacts the pending motions.  I don't want to load

4    you up with --

5             MS. HERNANDEZ:  Yeah.  I'm --

6             THE COURT:  -- writing assignments.  I'm sensitive

7    to this --

8             MS. HERNANDEZ:  At this point --

9             THE COURT:  -- but --

10            MS. HERNANDEZ:  -- I'm just talking about the --

11   just all the -- the clients need to review it.  This --

12            THE COURT:  No, I --

13            MS. HERNANDEZ:  I understand the Court's order

14   with respect to the --

15            THE COURT:  Right.

16            MS. HERNANDEZ:  -- reference to motions.  I'm just

17   talking now about the whole thing being unsealed for

18   purposes of review by the client that -- and I want to say

19   something else with respect to Brady notices or not.  I just

20   finished trying a murder case, first degree -- essentially,

21   first degree murder where four people were charged with

22   pumping 19 bullets into a defendant, and the Government --

23   obviously, there were security issues, yet the Government

24   was able to designate in their letters, This is Brady; this

25   is favorable information, even if perhaps in the notice they

1    withheld the identity of a witness or something.  So I find

2    it -- and we had this fight a few months ago where we asked

3    the Court to require the Government to identify Brady.  So

4    if, in fact, we over- -- we missed the fact that some of the

5    Bertino materials were Brady exculpatory because, as

6    Mr. Smith said, it comes in in the flood of -- we are

7    still -- let me just say this, Your Honor.  With respect to

8    discovery, I'm really concerned, because part of the problem

9    is we're still getting these global discovery productions

10   which, as I understand from Government counsel, we may

11   get into the trial.  They will continue.  And in other

12   cases, we're told, No big deal.  It's global discovery.  It

13   may not touch on your clients.  With this tools theory of

14   prosecution, I have no idea whether I'm supposed to be -- at

15   the same time I'm preparing for trial, also be looking at

16   this whole, you know -- hordes of material that are being

17   produced.

18            So again, I think -- I mean, if the Court wants us

19   to file something -- again, I think if the Government is in

20   possession of Brady, they ought to designate in the cover

21   letter, This is favorable, or arguably favorable or however

22   they want to phrase it not to bind themselves because we --

23   the extent of the materials that are being produced, it --

24   just the trial materials -- just the Jencks and the

25   exhibits -- it's huge, Your Honor.  These videos are very

 1    large.  I'm still making my way through it.  So I just want

 2    the Court to understand where we are.  And that's all I

 3    needed to say on this point.  I have other issues I would

 4    like to bring to the Court's attention when we're through

 5    this issue.

 6              THE COURT:  Mr. Jauregui?

 7              MR. JAUREGUI:  Judge, mine is a different issue.

 8    If you're still on this issue, mine is a defense witness

 9    list issue.  I'll wait.

10              THE COURT:  All right.  Anyone else want to be

11    heard on this issue?

12              MR. SMITH:  (Indicating.)

13              THE COURT:  Mr. Smith?

14              MR. SMITH:  Judge, I'd just like to say for the

15    record that Mr. Kenerson referenced what he believed was the

16    discovery production in which these Bertino and Donohoe

17    witness statements were first made.  It was a -- he

18    indicated that Mr. Bertino was highlighted by name and that

19    his statements were referenced.  Actually, Your Honor, I'm

20    looking at the discovery letter right now.  It's dated

21    October 11th, 2022.  Bertino's and Donohoe's names were not

22    referenced in the cover letter.  It merely says, quote, We

23    write to memorialize discovery productions in the

24    above-captioned case.  As of today, we have made available a

25    USAfx folder containing FBI files and evidence associated

1    with certain individuals who have provided information to

2    the Government, end quote.  That's the Government's

3    discovery letter.  Your Honor, we get letters like that

4    almost every other day in this case, and the materials that

5    are -- that it -- that this is referencing include the

6    Government's two key cooperating witnesses saying there was

7    no plan regarding the Capitol before January 6th.

8              THE COURT:  Mr. Smith, I'm not --

9              MR. SMITH:  That is Brady information, Judge.

10             THE COURT:  I'm not holding -- I hear what you are

11   saying, and that's why -- I'm not -- I'm going to receive

12   what you file on Monday and we'll see how it impacts these

13   motions.

14             MR. HASSAN:  (Indicating.)

15             THE COURT:  Mr. --

16             MR. SMITH:  Thank you, Judge.

17             THE COURT:  Mr. Hassan?

18             MR. HASSAN:  Judge, one real quick thing, Judge.

19   I know the Court referenced that all the defendants were at

20   Alexandria.  Mr. Tarrio, last -- yesterday, was transferred.

21   He was supposed to go to Alexandria.  They dropped him off

22   at Rappahannock.  So if the Court -- I don't know if the

23   Court can reach out to the marshals, see if he's going to

24   stay at Rappahannock or he's going to be transferred to

25   Alexandria.  That's just a concern.  It's easier for us to

 1    go to Alexandria and it's much more convenient for

 2    transportation purposes.  So I just wanted to put that out

 3    there.  I know Mr. Jauregui had a separate issue, but I just

 4    wanted to --

 5              THE COURT:  I understand.  And I didn't mean to

 6    suggest they all were there.  All I said, I believe, was

 7    that I knew Mr. Nordean and Mr. Rehl were there.

 8              All right.  So let's pivot to -- Mr. Hassan, your

 9    hand is up again.

10              MR. HASSAN:  My apologies, Judge.

11              THE COURT:  Okay.  All right.  I can't tell.

12              All right.  So I'll get the submissions on the 5th

13    and the 7th.  We'll see where we go from there on all of

14    that.

15              Mr. Jauregui?

16              MR. JAUREGUI:  Thank you, Your Honor.

17              Judge, I know that our defense witness lists are

18    due today, and we have a very important -- we have a big

19    problem, Judge.  Six months ago, we informed the Government

20    that we were very interested in having Lieutenant Shane

21    Lamond testify in our case.  Lieutenant Lamond is a very

22    relevant, highly probative, exculpatory witness for our

23    case, Judge.  Our client and other members of the Proud Boys

24    were in constant contact with Lieutenant Lamond who was an

25    intelligence officer at the MPA [sic].  Okay?  And his

1    testimony, I can proffer, is that Tarrio and other Proud

2    Boys would tell him exactly what they were going to do,

3    where they were going to be in all of their activities in

4    all of their rallies.  We've told the Government and we've

5    asked them to help us and to cooperate in having him come in

6    and testify, and we are hearing at the very last minute now

7    that all of a sudden, the Government is telling the defense

8    counsel for Mr. Lamond that he -- that they're looking into

9    him for obstruction into the investigation of Mr. Tarrio at

10   this last minute.  They have known this for six months.  And

11   the purpose of them informing defense counsel of that is a

12   tactical decision.  They're applying pressure because they

13   know they cannot prove at trial that there was a conspiracy

14   for sedition; that there was a conspiracy for any kind of

15   obstruction.  Because how can there be sedition if the Proud

16   Boys are informing law enforcement of their plans on January

17   6th; if they're telling law enforcement that they're not

18   going to go in colors; if they're telling law enforcement

19   their exact plans on what they're going to do on January 6th

20   and what they're going to do in other rallies?  So what are

21   they doing?  They're taking him off of the playing field by

22   threatening him with arrest; by telling the defense counsel,

23   Look, if your guy takes the stand, we believe he's

24   obstructing.  He has obstructed in the past.  And they don't

25   want him to testify because it will completely and totally

1   destroy their case.  It's very concerning, especially when

2   we have our witness lists due today.

3          THE COURT:  Well, what is --

4          MR. JAUREGUI:  Is that what the Government's going

5   to do with all of our witnesses?  They're going to send

6   armed FBI agents to their houses, knock on their houses,

7   send three or four agents over there, and threaten them with

8   arrest, with obstruction if they dare to come into court and

9   tell the truth and testify for the defense?  We're very,

10  very concerned.  Lieutenant Lamond, who's a highly decorated

11  officer's [sic] attorney is online, actually.  He's willing

12  to come into this hearing, if Your Honor permits it, and

13  answer any questions you may have.

14         THE COURT:  No, there's no need for that.  Go

15  ahead.

16         MR. JAUREGUI:  Judge, this is a

17  complete deprivation of our client's right to a fair trial.

18  I thought that the purpose of a trial was to find out the

19  truth, to have the witnesses come in and tell the truth, and

20  then have the jury make a determination as to my client's

21  guilt or innocence.  What the Government is doing is

22  applying this pressure intentionally to prevent the jury

23  from learning the truth and having the jury hear only

24  one-sided testimony from the Government's witnesses.

25         THE COURT:  All right.  Mr. Jauregui --

```
 1              MR. JAUREGUI:  Now, we have a --
 2              THE COURT:  Mr. Jauregui --
 3              MR. JAUREGUI:  Yes, Your Honor?
 4              THE COURT:  -- for purposes of today, nothing
 5    prohibits you, of course -- first of all, the witness lists
 6    that you're both going to -- that both -- all the sides are
 7    going to provide, you're going to be providing, number one,
 8    on email, not on the public docket.  So that -- your lists
 9    here are not going to be public, number one.
10              Number two, the -- nothing prevents you, of
11    course -- again, just for purposes of why we're here now,
12    the -- it's going to be -- nothing prohibits you, of
13    course -- and I know you're -- I don't think you're saying
14    this, but for purposes of our hearing today, nothing
15    prohibits you from putting that witness on your list and --
16    for purposes of making sure we don't have a juror who knows
17    the officer.  So that's -- just for purposes of today, I
18    don't think it really affects the witness list issue.
19              Now, if you want to -- and I guess I'd say third
20    is, you're not -- of course, you're not going to be in a
21    position to have to call him until January.  I'm not saying
22    you shouldn't raise the issue with me here today.  My point
23    is, it's not an issue that's right in front of me to have to
24    decide.  I'm going to hear from the Government in a second,
25    but -- and I'm -- if you want to move for some kind of
```

1    relief because you think the Government's been acting

2    improperly, I'll hear your motion, but -- and I understand

3    you wanting to take a shot across the bow here today, but I

4    don't think it -- other than making me aware of this

5    potential issue, I don't think there's anything I really

6    have to decide today; is that fair?

7            MR. JAUREGUI:  That's fair, Judge.  I'd ask the

8    Government to immunize Lieutenant Lamond.  After reviewing

9    tens of thousands of pages, Judge, recordings, I find no

10   evidence that Lieutenant Lamond obstructed anything.  So for

11   them to now complain that he obstructed the investigation

12   into Tarrio at the last minute before he's about to testify,

13   Judge, it's very worrying.  I think Your Honor should be

14   worried.  And I will file an appropriate motion, but I

15   challenge the Government to immunize Lieutenant Lamond --

16   it's the right thing to do -- and to let him testify.  Let

17   him tell the truth at trial.

18           THE COURT:  Do -- does anyone from the Government

19   want to respond here -- well, hold on one second.

20           Mr. Smith and Ms. Hernandez, you have your hands

21   raised.  Is it on this issue?

22           MR. SMITH:  Yes, Your Honor.  I would just like

23   to, sort of, supplement Mr. Jauregui's point about why what

24   he's just revealed is relevant to the witness list.  Judge,

25   this is not just one witness that this issue pertains to.

1    There are a couple of defense witnesses who have been

2    approached by the Government prosecutors themselves, not

3    just agents, and after being told that the witnesses'

4    testimony is not consistent with the Government's theory in

5    this case, the witness is informed they may be charged.

6    This has happened multiple times, Judge.  This isn't just

7    Officer Lamond.  This is a couple of other defense

8    witnesses.  This is getting to the point where this is a

9    problem, Judge, and the Court indicated we might have to

10   file a motion --

11           THE COURT:  Well --

12           MR. SMITH:  -- but for purposes of the disclosure

13   today, the concern is that this is going to happen with

14   other defense witnesses.

15           THE COURT:  I see.

16           MR. SMITH:  And so, Judge, our plan was we've got

17   about 16 witnesses on our list, but we'd like to add some

18   John Does to the list as well, because we are concerned that

19   the same thing that happened with some of our current

20   witnesses will happen with other witnesses.  Judge, there

21   was an incidence where one of the prosecutors in this case

22   flew to the home of a defense witness and suggested after

23   the end of a hearing -- of an interview with her that she

24   would be prosecuted after being informed that the witness's

25   statements were not consistent with the Government's case.

1    I've never heard of something like that particularly coming

2    from prosecutors, you know?  Absolute immunity doesn't

3    extend to the investigative function.  Usually, agents are

4    the ones doing these things.  So Judge, I'll also mention

5    that with this witness, her counsel wasn't present.  She was

6    retained by counsel -- she had retained counsel.  The

7    counsel was not present during this interview.

8              Judge, we're also hearing from some other

9    witnesses, that we could talk about in a sealed session,

10   similar situations, Judge, with pressure being applied.  Why

11   don't you suggest this to the defense counsel?  So this

12   is -- we have two weeks before trial starts in earnest.

13   We're not exactly sure what to do -- how the Court is going

14   to deal with this problem with so little time left.

15             THE COURT:  Well, of course, it's not -- when you

16   say "with so little time left," these are the kinds of

17   things that don't -- I mean, whenever the trial was going to

18   begin, these are the types of things that can happen when

19   trial gets close.  They don't happen typically six months

20   before the trial.

21             Ms. Hernandez?

22             MS. HERNANDEZ:  Your Honor, I had the same

23   concerns.  A number of my potential witnesses are members of

24   the Proud Boys.  I -- let me back up by saying the

25   following.  In the Oath Keepers case, Your Honor, the

1    Government -- after being informed that a person was going

2    to be a witness for the defense, the Government filed

3    charges against Kellye SoRelle who is an attorney for the

4    Oath Keepers/girlfriend of Mr. Rhodes, the leader of the

5    Oath Keepers.  So they knew she -- her role in whatever --

6    in the January 6th matter from day one.  She was a known

7    entity, and yet they --

8                   (Brief pause.)

9                   (Inaudible) -- indicted her a week before -- a

10   week or two after she was noted as a defense witness.  It

11   raises the specter that the timing is questionable.  I won't

12   accuse them specifically.  I wasn't in that trial, but I

13   know that for a fact.  And I know it came up again with

14   respect to another defense witness that ended up not

15   testifying because the Government called the defense

16   witness's lawyer and said, Your client is exposed.  And so

17   in that case, the defense attorney says, Fifth Amendment.

18   So I am very concerned that every witness -- a number of

19   witnesses that I need to note would be Oath Keepers who the

20   Government has known their role in the case from January 6th

21   and has not prosecuted them.  I am concerned that they will

22   either contact them or put pressure on them or contact their

23   lawyers and explicitly say, Your client has exposure.  I

24   would ask the Court not to require us to identify witnesses.

25   Again, I -- the last two trials that I have had in this

1    District, including the recent murder case, Judge, I -- and

2    the -- and in the previous case in front of Judge Mehta, a

3    drug case, Judge Mehta did not require us to identify

4    defense witnesses.  It is a problem, you know?

5           The Government is concerned about their CHs and

6    won't give those -- our -- their names, but, you know, when

7    I go to interview somebody, I don't have an FBI agent with

8    me.  I don't have the authority to say, I can prosecute you.

9    So the pressure the Government can put -- bring on some of

10   these -- on our witnesses is not the same as mine.  And,

11   again, by definition, most of our witnesses -- many of our

12   witnesses are Proud Boys who would have information about

13   what they -- what the defendants did or didn't do, what

14   defendants said or didn't do.

15          So I think, at this point, given Mr. Jauregui's

16   assertions to the Court, that the Court not require us to

17   identify witnesses, because by identifying witnesses, we're

18   putting -- they're getting -- they will get exposed to the

19   Government in the course of their regular business reviewing

20   whether they should indict them or not.  I want to -- I --

21   it's a very difficult position for us.  Unless the Court is

22   going to immunize every single one of the witnesses we

23   identify -- which I doubt that the Court is going to do

24   that wholesale -- I would ask the Court -- we don't need to

25   identify witnesses at this point.

```
 1              THE COURT:  Ms. Hernandez, how am I -- then when
 2    it turns out we have jurors that happen to know these people
 3    one way or the other -- I mean, that's part of the reason
 4    why we go through this exercise.  And so, you know, I'm
 5    concerned about that.
 6              MS. HERNANDEZ:  Okay.  So first of all --
 7              THE COURT:  I mean, when the reality is --
 8              MS. HERNANDEZ:  The majority -- the -- this issue
 9    is less problematic here because most of our witnesses are
10    not local.  Every trial that's tried before the --
11              THE COURT:  Right.
12              MS. HERNANDEZ:  -- (inaudible) -- you might have
13    more of a danger because the witnesses are local.  Most of
14    our witnesses are not local.  So that issue is less
15    problematic.
16              Number two, the names -- if that's the primary
17    purpose, those names do not have to be disclosed until the
18    Court -- until December 19th; right?  That's -- in fact,
19    that's when the Court -- the -- I mean, the -- I -- my
20    understanding is the reason is to include them in the
21    questionnaire, but those witnesses really do not have to be
22    disclosed until December 19th.
23              So whatever compromise the Court can reach -- I --
24    the Court is allowing the Government not to disclose the
25    names of a lot of people right now that we believe is a --
```

1  have exculpatory information, right, on the sealed matters.

2          THE COURT:  Whoa, whoa, whoa.

3          MS. HERNANDEZ:  The Court made a ruling that as to

4  some of the persons, we're not entitled to the identity of

5  those persons.  So I mean, the Court has made those kind of

6  judgment calls --

7          THE COURT:  Yeah, but --

8          MS. HERNANDEZ:  -- and weighed the interests.  So

9  at a minimum, I don't think we should have to disclose

10 witnesses until the 19th.  That's the date the rubber meets

11 the road or whatever that little saying is.  But, again, I

12 don't -- I guess defense counsel have to get together and

13 figure out how we deal with this issue.  This is not just a

14 theoretical issue.  Mr. Jauregui has -- I mean, this is a

15 police officer.  A decorated --

16         THE COURT:  Sure.

17         MS. HERNANDEZ:  -- member of the force and, all of

18 a sudden, he becomes subject to potential prosecution?  And

19 it happened --

20         THE COURT:  Well, and in the Oath Keepers case,

21 Judge Mehta required the -- I mean, the reason it happened

22 is because he did require the defense to produce their

23 witnesses in time for the questionnaire --

24         MS. HERNANDEZ:  Correct, but the point is that

25 we -- why -- that was done in the dark, and now we know what

1    happens.  I mean, the prosecution of that one particular

2    person seemed oddly timed.  They -- that person had been in

3    the mix, and I know because I have a member -- I have a

4    client in the Oath Keepers case.  That person, Kellye

5    SoRelle, had been known to the Government from January 6th

6    or earlier.  She's -- she is the known general counsel to

7    the Oath Keepers, and yet she gets indicted for the first

8    time a week after or days after the Government -- the

9    defense notes her -- and she ended up not testifying.

10              But it -- I -- again, at a minimum, I would ask

11   the Court to delay until the 19th so we can figure out if

12   there's something for us that we can do to insulate these

13   witnesses.  I have witnesses that are very relevant to this

14   case.  I have witnesses who were with Mr. Rehl -- who can

15   tell the Court what they saw.  They were with Mr. Rehl.  And

16   I'm deadly afraid of -- I don't want to expose them to

17   prosecution, and I don't want to lose them as potential

18   witnesses.  I don't know whether the Court can impose a

19   morator- -- I don't know.  I don't know how we can

20   strategize to protect our clients' interests and still do

21   what the Court requires in order to -- I -- as I say, I

22   think the danger that these jurors are going to know these

23   witnesses is much lower in this case because most of the

24   witnesses are from out of town.  What is the likelihood that

25   a D.C. juror has -- personally knows a witness from

```
1    Philadelphia or Seattle or some -- or Miami or whatever?  I
2    think the odds are much lower.  And I just -- as I -- again,
3    I keep on going to Judge Boasberg's trial.  We tried a case
4    in front of Judge Boasberg, a murder case.
5              THE COURT:  Well --
6              MS. HERNANDEZ:  We weren't required to disclose --
7              THE COURT:  He --
8              MS. HERNANDEZ:  -- witnesses.
9              THE COURT:  Right.  That's his practice generally.
10   So -- and he's the out- -- and he's the exception.
11             MS. HERNANDEZ:  He's the coming -- incoming Chief
12   Judge.
13             THE COURT:  He is, whenever that happens, but
14   the -- he is the exception that proves the rule.
15             Mr. Hull?  Before I hear from the Government.
16             MR. HULL:  Thanks, Your Honor.  I'll be brief.
17             I'm just going to -- about what I'm hearing about
18   Mr. -- or I think it's Captain or Lieutenant Lamond.  This
19   is the only contact who's been in this case for -- as a
20   person that people know, even before we got 302s, that, you
21   know, was a great witness for the proposition that the Proud
22   Boys planned things in cities.  They worked hand in hand
23   with the cops.  Certainly, they wouldn't be, you know, doing
24   the kind of planning they're doing and then decide to commit
25   an insurrection unless they were just incredibly cynical.
```

```
1    Shane Lamond has counterparts who are much more difficult to
2    find in other cities, one midwestern city I was thinking of,
3    and then Portland and Seattle, but they weren't as
4    consistent.  So this is a major witness, and I actually -- I
5    mean, I guess I'm just echoing what's been said here, but --
6              THE COURT:  All right.
7              MR. HULL:  -- this is about -- this is a person
8    who is, like, you know, kind of, the linchpin of a lot -- of
9    the defense for -- I think every defendant, kind of,
10   is going to -- relying on, you know, his testimony to a
11   certain extent.  And I know he might not be there, I'm sure.
12   I get that.
13             I also wanted to ask the question about -- and I
14   will say, there are some overly paranoid people all over the
15   country who I've talked with who, I think, would, under
16   normal circumstances, want to come forward to do certain
17   things and have had visits not from agents but from AUSAs, a
18   lot of different AUSAs, including ones in this case.
19             The last thing is Attachment-A, which is what I am
20   concerned about, not to be contrary to what Ms. Hernandez is
21   saying.  I want to make sure we have an Attachment-A that
22   has all those names on there, and I think it might be a
23   relatively lengthy one.  And my question was, is -- besides
24   the jurors actually seeing it when they fill it out, is that
25   made public?  I mean, I couldn't find the Attachment-A along
```

1    with the questionnaire for the Oath Keepers case, and I

2    assumed it would have been made public at some --

3            THE COURT:  I don't have any plans -- let me put

4    it this way.  I don't have any plans to make it public.  The

5    questionnaire itself, I, you know -- let me put it this way.

6    For purposes of administering it next week and before the

7    trial, no, there's no -- I don't have any plans to make it

8    public.  I don't think it would be made public.

9            MR. HULL:  I was under the impression that it

10   would not be public -- and that's probably a good thing --

11   until people testify.  I mean, the way the regime has gone,

12   you know, in any other cases.  And, maybe, that would

13   alleviate some of the fears that Ms. Hernandez has, but I

14   assume that -- I mean, I told, you know -- I've told

15   certain -- people certain things like, No, this will not be

16   on the record right away; no, you will not be doxxed; this

17   and that.  That's very important to a lot of these people.

18           THE COURT:  All right.  Yes, I have no plans to

19   make it public.  That -- it -- certainly not before the

20   trial gets underway.  And I don't know -- even know why,

21   once it gets underway, there would be a reason to do so.

22           MR. HULL:  That's good to hear.

23           THE COURT:  All right.  Let me go ahead and hear,

24   after all of that -- does any other -- let's see.  All

25   right.  After all of that, let me go ahead and hear from

```
 1      whoever from the Government wants to address all of this.
 2              MR. KENERSON:   Thank you, Your Honor.   Erik
 3      Kenerson, again, for the United States.
 4              That -- I -- it -- the allegations that the
 5      Government has somehow pressured witnesses, threatened
 6      witnesses, gone to witnesses when they were represented by
 7      counsel without counsel present, all of that is just
 8      categorically false.   And the defense has, of course, made
 9      allegations to that -- the Government over email.   The
10      Government has denied it.   They have not filed a motion to
11      this point -- on that point.   They're bringing it up today
12      to the Court for the first time.   It is not -- there is
13      nothing that's a reason for the Court to delay witness lists
14      here.   I think -- just to put some gloss on, I think Mr. --
15      Lieutenant Lamond, the Government has provided the defense
16      counsel back in August of this year with a number of
17      materials related to Lieutenant Lamond.   Lieutenant Lamond
18      has been represented by counsel throughout this entire --
19      throughout that entire time and before August, as well.   So
20      the idea that there is just now the possibility of a Fifth
21      Amendment privilege coming up is just completely belied by
22      all of the materials provided to the defense counsel in this
23      case as well as the fact that he's been represented this
24      entire time.
25              The -- I, you know -- it -- it's hard to respond
```

1    to a bald accusation with a bald denial, but that's where we

2    are.  There were bald accusations.  The Government baldly

3    denies them.  Nothing -- there has been nothing that the

4    Government -- that -- has done that would warrant putting

5    John Does on a witness list; withholding names from a

6    witness list; and, of course, as the Court knows, witnesses,

7    they -- Ms. Hernandez termed them as defense witnesses.

8    They don't belong to either party.  The Government has put

9    forth its lengthy witness list to the defense going back to

10   October.  They were free to contact any of the Government

11   witnesses that it wanted to.  Those who were represented by

12   counsel, we told them counsel.  They can go through counsel

13   and talk to them.  Those who are not represented by counsel,

14   they were free to go to on their own to try to talk to.

15            So there's no proprietorship over witness lists.

16   Whether there's -- someone has a Fifth Amendment is

17   something that exists outside of what the Government does.

18   If someone -- and if that person decides to assert a Fifth,

19   that exists outside what the Government does, as well.  And,

20   maybe, someone asserts a Fifth and they don't have a proper

21   Fifth and then they can litigate that, but nonetheless, that

22   doesn't have anything to do with what -- the actions the

23   Government takes here and certainly doesn't have anything to

24   do with whether the defendants should comply with the

25   Court's order to provide names ahead of the questionnaire on

1    Monday.

2            Just a couple of points with relation to that.  I

3    mean, I know that a lot of these witnesses are not from

4    here.  The defendants have spent a lot of ink in this case

5    arguing to the Court that the Proud Boys are so notorious

6    that they've gotten so much press coverage in the District

7    of Columbia that they cannot get a fair trial here.  I mean,

8    it's certainly possible that someone who they are -- noticed

9    has been involved somewhere in press coverage that the

10   jurors will know about them, and I think that would be

11   helpful for the Court to go through with the jurors if

12   that's the case.

13           With regard to the idea that the Court has

14   authorized withholding the identities of some individuals

15   that the Government has disclosed information about, those

16   individuals are not witnesses.  The Government doesn't

17   intend to call them.  The Court has gone through the legal

18   analysis and determined that their identities do not need to

19   be provided.  These are individuals the defense is

20   considering calling as witnesses in the case.  I think

21   that's a categorically different situation.

22           So I think if the Court is going to entertain any

23   of the allegations of misconduct that have just been raised,

24   the Court should instruct the defendants to file something

25   on a similar schedule and we'll respond in writing, but I

1  don't think the Court should take any action based off bald

2  accusations raised for the first time orally today.

3           MR. SMITH:  Your Honor, just on that, we're happy

4  to submit sworn affidavits showing that there -- that the --

5  that what we said is not categorically false.  It's

6  absolutely true, and it does suggest misconduct.  We're also

7  happy to submit an affidavit indicating that agents called

8  one of the witnesses after the prosecutors interviewed her

9  to tell her, Actually, the suggestion of charges against you

10  was inflated.  So we're happy to submit that to the Court --

11           MR. JAUREGUI:  And, Judge --

12           MR. SMITH:  -- on a schedule -- on a very -- on

13  the tightest schedule that we can possibly -- think we can

14  possibly get, Your Honor.  And so then we think that would

15  at least provide some factual basis to follow the guideline

16  that Ms. Hernandez suggested which is that defense witnesses

17  can be disclosed prompt- -- shortly before trial -- the week

18  of December 19th when the jury could, you know -- the

19  potential jury could be notified of the witness names.  I

20  think later stages in voir dire could be available for

21  disclosing the witness names.

22           THE COURT:  Well --

23           MR. JAUREGUI:  And --

24           THE COURT:  Mr. Jauregui?

25           MR. JAUREGUI:  I'm sorry to interrupt, Your Honor.

 1          THE COURT:  That's all right.

 2          MR. JAUREGUI:  I'm sorry to interrupt, Your Honor.

 3   Sabino Jauregui on behalf of Tarrio.

 4          Judge, I can tell you that I received an email at

 5   5:33 this morning from defense counsel for Lieutenant Lamond

 6   informing me of the Government emailing them yesterday and,

 7   all of a sudden, telling them about this obstruction of

 8   justice into Mr. Tarrio's investigation.  We have not known

 9   that for six months.

10          And, further, we have been emailing back and forth

11   with the Government since -- actually, October 10th, we

12   emailed the Government trying to secure their cooperation to

13   have Lieutenant Lamond come in and testify.  So they could

14   have sent defense counsel an email back in October.  They

15   could have told us back in October.  Instead, they did it

16   yesterday.  So to say that we've known this for many, many

17   months, it's just simply incorrect.

18          THE COURT:  Well --

19          MR. JAUREGUI:  I will be filing a written motion

20   today, but we need to know for our opening statements

21   whether or not we're going to be able to call Lieutenant

22   Lamond to testify.

23          THE COURT:  Right.  That's -- the issues with him

24   are -- it strikes me, are just of a different character than

25   the other issues that the parties are raising.

1          Ms. Hernandez, I'll hear from you.

2          MS. HERNANDEZ:  Just on the timing, Your Honor, my

3     understanding in the Oath Keepers case is that the night --

4     or the day before a witness -- a defense witness was to

5     testify, the Government, again, spoke to counsel for that

6     witness and said, Just want to be clear you understand that

7     your client has exposure.  I believe that's on the public

8     record.  It may be that the Government believes that they

9     had that obligation, but the point is that it is happening,

10    and in a case like this where the defense witnesses will be

11    Proud Boys who have yet to be charged, one has to worry

12    that, Well, you've had almost two years and had never

13    charged them, but all of a sudden, a charging decision is

14    being made?  That's the concern.

15          So I don't -- again, I -- my primary purpose at

16    this point at today's hearing is to request the Court not to

17    require the defense to identify the witnesses until the 19th

18    would be -- or the 20th or whatever day the Court gets to

19    the point where you have to ask jurors.  How about these

20    people?  Do you know them?  Because at least that gives less

21    time for the Government to -- maybe, it's inherent in the

22    case because the witnesses are friends, participants, Proud

23    Boys, whatever, but it is a -- it is not an idle concern.

24    That's what I want the Court to understand.  It is a very

25    serious concern.

```
 1              THE COURT:  All right.  I am going to take your --
 2    I'm going to take your requests under advisement,
 3    Ms. Hernandez.  I hear what you're saying.  I mean, it is a
 4    last-minute request, although I know you all are under, you
 5    know, a lot of -- you all are juggling a lot of balls here,
 6    but I'll take it under advisement.  As of right now, you all
 7    are still -- let me go ahead and put it this way.  I'll
 8    have -- I'll allow both parties, if it just gives me a
 9    little more leeway here, to provide your witness lists
10    tomorrow, December 3rd, which just gives me a little more
11    time to take this under advisement, and if I decide to grant
12    your motion, Ms. Hernandez, you'll hear from me before the
13    end of the day Saturday and you'll know what your
14    obligations are, but I think, as of right now, the parties
15    will still provide those witness lists on Saturday the 3rd
16    so we will have them to be able to integrate them into the
17    questionnaire for the 5th.
18              All right.  I'll look forward to -- well, it
19    wasn't -- we -- it wasn't quite as short of a conference as
20    I'd hoped, but we did get through the questionnaire and a
21    few other things.
22              MS. HERNANDEZ:  (Indicating.)  Housekeeping --
23              THE COURT:  Ms. Hernandez, I see your --
24              MS. HERNANDEZ:  Yes.
25              THE COURT:  -- I see your hand up.
```

1          MR. HULL:  Your Honor, just -- remind -- for me,

2     remind me.  As I recall, we exchange the witnesses --

3     witness lists when we do it, and also, send it to chambers

4     at the same time.  That's what your minute order said?

5          THE COURT:  I know that --

6          MS. HERNANDEZ:  Dan --

7          THE COURT:  I know that it was to be provided to

8     me.  I don't know -- is that -- I don't have the scheduling

9     order in front of me.  Do you all have it?

10          MS. HERNANDEZ:  We'll figure that out, Your Honor.

11          MR. HULL:  No.  Yeah, we will look at the

12     schedule.

13          THE COURT:  Yeah.  I don't have it in front of me.

14          MR. HULL:  (Inaudible) -- definitely emailed to

15     your chambers at this point tomorrow --

16          THE COURT:  Well, for -- yes, for purposes --

17     certainly, for purposes of being able to make sure it's

18     included in the questionnaire, it was -- I know -- I'm sure

19     I said provide it to us via the chambers email.

20          MR. PATTIS:  (Indicating.)

21          THE COURT:  Mr. Pattis?

22          MR. PATTIS:  A small point, Judge.  Is it possible

23     to attend on the 12th via remote -- via audio or do you

24     require in-person attendance?  I come from a distance.  I'm

25     a full member of the bar here.  So I understand my

 1   obligations and I'll do what's required.

 2           THE COURT:  Given that it's mostly an oral ruling

 3   to hear me rule rather than to have argument, as long as we

 4   can technologically permit that, that's fine, Mr. Pattis.

 5   So --

 6           MR. PATTIS:  Thank you.

 7           THE COURT:  -- (inaudible) -- to join whether it's

 8   via video or at least via audio.

 9           MR. PATTIS:  Thank you, sir.

10           THE COURT:  You're welcome.

11           Mr. Kenerson?

12           MR. KENERSON:  Thank you, Your Honor.

13           One point of clarification that is not related to

14   anything else we've been discussing today.  Is -- has -- I

15   apologize if I had missed the Court tell us this at some

16   point.  Has the Court determined how many alternate jurors

17   it's going to seek for this case?

18           THE COURT:  You know, I have not mentioned that,

19   and it's something I've been thinking about over the last

20   few days.  I think it behooves us to -- for a variety of

21   reasons, to take a few extras than we normally would have.

22   So I am thinking about that.  And, frankly, that's another

23   thing.  Depending on the number we take, the -- it -- either

24   on the 12th or before we begin the 19th, I'll -- obviously,

25   what I usually do is ask the parties to give me numbers

1    that -- of the folks who will end up -- of the numbers

2    corresponding to juror positions in the box that will

3    ultimately be the alternates.  So before we even know,

4    obviously, who they are, we'll know who the alternates are.

5    Does the Government have a position on that?  I think -- in

6    the Oath Keepers case, I think Judge Mehta took four

7    alternates or he may -- he took a few extra than normal.

8         MR. KENERSON:  Yes, he did.  I think they sat 16

9    in that case and ultimately did lose two of them before --

10        THE COURT:  Yeah.

11        MR. KENERSON:  -- the trial ended.

12        THE COURT:  Right.

13        MR. KENERSON:  So I think our request is that the

14   Court should take extras, at least 16.

15        THE COURT:  Yeah, I think that sounds about right.

16        MS. HERNANDEZ:  (Indicating.)

17        THE COURT:  Ms. Hernandez?

18        MS. HERNANDEZ:  Your Honor, on that point, I think

19   the defense would ask for additional peremptories which is

20   done in these multi-defendant cases which also, then -- that

21   means the Government would have more, but that means the

22   Court has to bring in more jurors to satisfy that.

23        THE COURT:  Well, we're already -- we're bringing

24   in so many already, but, Ms. Hernandez, I'll take your --

25   I'll -- I think -- let's do this.  Let's put off until the

1    12th this issue of how many extra -- how many, you know --

2    what the number will be in terms of peremptories -- not only

3    peremptories but in terms of alternates.

4         MS. HERNANDEZ:  And I did have two other things

5    which are, sort of, housekeeping.  I've asked the Government

6    and they haven't responded.

7         Number one, it is the practice in this District in

8    all the trials I've ever been in that on the first day of

9    jury selection -- or well, maybe, in this case, not

10   necessarily because we won't be open- -- at least on the

11   first day of opening statements that the Government produces

12   a hard copy -- a binder with a hard copy of every exhibit

13   that it plans to introduce and that binder goes to each of

14   the defense counsel.  I've asked whether that's their plan

15   in this case.  I have not -- I asked more than two -- nearly

16   two weeks ago.  I get no response because, I guess, when the

17   Government doesn't want to answer, they just don't answer.

18        And the other thing that may be coming your way,

19   I'd like to tell the Court.  I've also asked the Government

20   to identify the -- all the co-conspirators and all the tools

21   of the conspiracy now that they've introduced this notion of

22   tools of the conspiracy.  Again, in this District, it's --

23   judges ordinarily, as a grant, ask the Government to

24   identify their co-conspirators.  I have no case law on tools

25   because I -- there is no --

```
 1                THE COURT:  Well --
 2                MS. HERNANDEZ:  -- case law on tools.
 3                THE COURT:  Right.  Ms. Hernandez, why don't we
 4     wait and see what I rule on all of that which might affect
 5     what you want to request.  Let's put it --
 6                MS. HERNANDEZ:  You mean you -- then we're -- the
 7     defense is going to win some of its motions?
 8                THE COURT:  The defense has won motions,
 9     Ms. Hernandez, before me.
10                MR. SMITH:  Stop it, Carmen.
11                THE COURT:  You know that.
12                MS. HERNANDEZ:  I guess I'm getting punch drunk,
13     Your Honor.  Sorry.
14                MR. METCALF:  (Indicating.)
15                THE COURT:  Mr. Metcalf, anything from -- I see
16     your hand raised.
17                MR. METCALF:  Yes, Your Honor.  I'm going to be
18     preparing for this out of state as well, and I would just
19     ask for the same relief that Mr. Pattis asked for with
20     regards to December 12th.
21                THE COURT:  Well, Mr. Metcalf, Mr. Pattis is one
22     of two counsel for that particular defendant.  So no, I'm
23     not going to -- I think every defendant should be
24     represented by counsel present that day.  As today's hearing
25     reflects, we may well be discussing other matters that are
```

1   going to come up in preparation for the 19th, and the

2   reason -- one of the reasons I was comfortable letting

3   Mr. Pattis only attend via audio is because he -- Mr. Hull

4   will be present in the courtroom.

5              All right.

6              MR. METCALF:  Understood.  Thank you, Your Honor.

7              THE COURT:  All right.  I think we've cleared away

8   at least part of the -- all the issues about the

9   questionnaire.  I'll take, as I said, this issue about

10  delaying the witness lists under advisement.  I'll just

11  consider it an oral motion on your behalf, Ms. Hernandez,

12  that I'll rule on, and we'll go from there.

13             MS. HERNANDEZ:  Thank you, Your Honor.

14             THE COURT:  So until the 12th, the parties are

15  dismissed.

16             MS. HERNANDEZ:  Thank you, Judge.

17             MR. HULL:  Thank you, Your Honor.  Our next brief

18  hearing.

19             (Proceedings concluded at 11:16 a.m.)

20             * * * * * * * * * * * *

21             **CERTIFICATE OF OFFICIAL COURT REPORTER**

22  **    I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby**

23  **certify that the above and foregoing constitutes a true and**

24  **accurate transcript of my stenographic notes and is a full,**

25  **true and complete transcript of the proceedings to the best**

1      of my ability, dated this 3rd day of December 2022.

2          Please note:  This hearing occurred during the COVID-19

3      pandemic and is, therefore, subject to the technological

4      limitations of court reporting remotely.

5                              /s/Timothy R. Miller, RPR, CRR, NJ-CCR
                               Official Court Reporter
6                              United States Courthouse
                               Room 6722
7                              333 Constitution Avenue, NW
                               Washington, DC 20001

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25