UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA *

* Case No.: 21-CR-175-TJK

v. *

ETHAN NORDEAN, et al., *

Defendants. *

---

## DEFENDANT ENRIQUE TARRIO'S MOTION TO DISMISS THE INDICTMENT IF THE GOVERNMENT DECLINES TO IMMUNIZE DEFENSE WITNESS LIEUTENANT SHANE LAMOND

Defendant Enrique Tarrio (hereinafter referred to as "Tarrio"), through counsel, respectfully seeks an order dismissing the indictment if the government declines to seek immunity for defense witness, Lieutenant Shane Lamond (hereinafter referred to as "Lamond"). Lamond has substantial exculpatory information to provide regarding Tarrio and most, if not all, the co-defendants in the instant case. The government claims that Lamond is under investigation and is in danger of being prosecuted for criminal charges, forcing him to invoke his Fifth Amendment right and preventing him from testifying at Tarrio's trial. The government refuses to seek use immunity for Lamond's testimony. Tarrio has a constitutional right to elicit this exculpatory testimony, but cannot exercise his constitutional right to do so based on the government's actions. Further, Lamond's testimony at this trial is necessary to the public interest under 18 U.S.C. §§ 6002-6003.

The government began its investigation into the underlying allegations in this case on January 6, 2021. An innumerable number of witnesses have cooperated with

the government for approximately 23 months. The government has interviewed multitudes of other witnesses, executed numerous search warrants, analyzed terabytes of electronic data, and utilized the forensic expertise of multiple governmental agencies at their disposal.

During the past two years, the investigation, including the production of millions of pages of discovery, countless phone records and data dumps, thousands of hours of videos, and imbedded CHS informants, there has been no clear evidence of Lamond engaging in any illegal activity. The government was informed by the defense months ago of their intention to call Lamond to testify. At no point was Lamond in danger of being prosecuted, until now. On the eve of trial, the government contacted counsel for Lamond and informed him that Lamond's actions might be considered obstruction of justice into Tarrio's investigation and he may be prosecuted. Waiting until now is a tactical decision by the government to prevent Tarrio from exercising his constitutional right to present a defense. Knowing that Lamond's testimony would exonerate Tarrio at trial and depriving Tarrio of his constitutional right is impermissible.

Preventing Lamond from testifying by holding an ostensible continuing investigation over his head violates Tarrio's Sixth Amendment right to compulsory process of witnesses who would testify in his defense. If the government declines to immunize Lt Lamond, then the indictment against Tarrio should be dismissed.

## I. Brief Summary of the Witness Respective Role in this Case

Liuetenant Lamond is a highly decorated 22-year veteran of law enforcement. He has served as an intelligence officer whose specific duty was to interact with and

communicate with various groups of varying political orientation that visited Washington, D.C.. Tarrio communicated with Lamond before every trip. He informed Lamond of the purpose of the trip, the agenda, and the location. The Proud Boys respected law enforcement and, unlike Antifa and BLM, did not call to defund the police. They did not torch police cars, destroy police property, attack police officers, riot, loot, nor destroy private property. Tarrio informed Lamond of the Proud Boys January 6 plans; to wit: they would not be wearing colors to protect themselves from being attacked and stabbed by Antifa as they had been on two previous occasions; they planned to be present to watch Trump's speech; Tarrio planned to speak at the rally; they planned to protest the results of the election, and later that night they planned to party with plenty of beer and babes.

Lamond was in communication with Tarrio during the time period of and concerning, some of the key events alleged in the indictment. Lamond would provide exculpatory testimony negating Tarrio's alleged criminal intent. We are unaware of any conceivable reason, particularly given that Lamond has been cooperating with the government for approximately two years and after review of the voluminous discovery in this case, why the government might still be investigating Lamond in connection with this case.

## II. Tarrio's Right to Call Exculpatory Witnesses

A criminal defendant "has the right to present his own witnesses to establish a defense. This is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967). Pursuant to this right, the government cannot improperly interfere with a defendant's ability to call exculpatory witnesses at trial.

"[P]rosecutorial and judicial actions aimed at discouraging defense witnesses from testifying [have] been deemed to deprive the criminal defendant of his Sixth Amendment compulsory process right." *United States v. Davis*, 974 F.2d 182, 186 (D.C. Cir. 1992) (citing *Webb v. Texas*, 409 U.S. 95 (1972) (per curiam)). Where the government prevents exculpatory witnesses from testifying by impermissibly threatening prosecution of the witnesses, whether directly or indirectly, the defendant's conviction may be subject to reversal. In *United States v. Blackwell*, 694 F.2d 1325 (D.C. Cir. 1982), the D.C. Circuit stated that misinformation provided by the prosecution to the exculpatory witness about the potential for future (reinstated) charges might have constituted harmful and reversible error (however, the Court did not decide the issue because the defendant withdrew the exculpatory witness' subpoena before she testified). Id. at 1343. See also *United States v. Smith*, 478 F.2d 976, 979 (D.C. Cir. 1973) (reversing convictions because "the prosecutor's warning was plainly a threat that resulted in depriving the defendants of [the witness'] testimony"). In *Smith*, the prosecution advised an exculpatory witness "that if he took the stand… he 'would' be prosecuted… He was then not charged with any offenses and plain inference under the circumstances was that if he did not testify, he would not be prosecuted for any of said offenses." *United States v. Simmons*, 670 F.2d 365, 369 & n.1 (D.C. Cir. 1982) (describing *Smith*, 478 F.2d at 978-79). Our Court of Appeals explained that "[t]he admonition that the prosecutor gave to [the exculpatory witness] was obviously calculated to induce him not to testify for the defense. It was a threat over and above any advice that the record indicated was timely, necessary or appropriate." Id.

In other circuits, courts are also clear that the government cannot prevent exculpatory witnesses from testifying through improper threats of criminal exposure. See *Blackwell*, 694 F.2d at 1333-34 (string cite[1] showing the "[v]arious types of governmental and judicial interference that have been found to deprive the criminal defendant of the right to present his own witnesses to establish a defense."). See also *United States v. Lord*, 711 F.2d 887, 891-92 (9th Cir. 1983) (prosecutor telling a witness that whether he would be prosecuted depended on his testimony, may have constituted prosecutorial misconduct warranting a judgment of acquittal unless the prosecution sought use immunity for the witness at a new trial); *United States v.Morrison*, 535 F.2d 223, 229 (3rd Cir. 1979) (citing Dicta in *United States v. Leonard*, 494 F.2d 955, 985 n.79 (D.C. Cir. 1974) (concurring and dissenting opinion) (one circumstance in which due process may demand that the government request use immunity is where prosecutorial misconduct has caused a defense witness to fear self-incrimination and withhold testimony that is otherwise available).

[1] *Webb v. Texas*, 409 U.S. 95, 34 L. Ed. 2d 330, 93 S. Ct. 351 (1972) (per curiam) (defense witness effectively driven off witness stand by remarks of trial judge regarding the penalties for perjury); United States v. Smith, 156 U.S. App. D.C. 66, 478 F.2d 976 (D.C. Cir. 1973) (defense witness told by prosecutor that if he testified as indicated by other testimony he could or would be prosecuted for carrying a concealed weapon, obstructing justice, and as an accessory to murder); United States v. MacCloskey, 682 F.2d 468 (4th Cir. 1982) (U.S. Attorney telephoned defendant's girlfriend's attorney to advise him to remind his client that if she testified at trial she could be reindicted on dropped charges); United States v. Goodwin, 625 F.2d 693 (5th Cir. 1980) (defense witnesses intimidated by threats of prison officials conditioned upon whether the witnesses testified at trial); *United States v. Hammond*, 598 F.2d 1008 (5th Cir. 1979) (defense witness threatened by FBI agent with retaliation in other cases pending against him); *United States v. Henricksen*, 564 F.2d 197 (5th Cir. 1977) (per curiam) (defense witness intimidated by terms of his plea bargain in another case); *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) (per curiam) (defense witness told by secret service agent during recess of trial that he would be prosecuted for a felony if he testified); *Berg v. Morris*, 483 F. Supp. 179 (E.D. Cal. 1980) (trial court coerced witness into giving inculpatory evidence by twice warning him that his probation would be revoked and perjury charges filed if the truth were not told).

Where the government improperly threatens criminal prosecution to prevent exculpatory witnesses from testifying, courts typically present the government with two choices: Either grant the witness use immunity under 18 U.S.C. §§ 6002-6003 or dismiss the case. See *Lord*, supra, 711 F.2d at 892-93; *United States v. Bahadar*, 954 F.2d 821, 826 (2nd Cir. 1992) (the immunity decision is up to the executive branch, but the court has the power to subject the government to certain choices, including the choice to immunize a witness at the risk of dismissal of the indictment). Courts typically employ a two-factor test when determining whether to present the government with such a choice, requiring the defendant to show: (1) the government has forced a potential witness to invoke his Fifth Amendment right through misconduct, such as (a) threats, harassment, or other forms of intimidation, (b) conferring immunity on some witnesses and not others, unmoored from legitimate law enforcement concerns, or (c) deliberately denying immunity for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation; and (2) the relevant witness' testimony is material, exculpatory, not cumulative, and not obtainable from any other source. See *United States v. Ebbers*, 458 F.3d 110, 119 (2nd Cir. 2006) (citations omitted).

In another case pending in this Court, in which a similar motion is pending, the government's opposition brief concedes that the test articulated by the Second Circuit should be used to evaluate that motion. See *United States v. Sussman*, 1:21-cr-582-CRC (D.D.C.) (ECF No. 70, at 10-11). Further, the Second Circuit's framework is consistent with existing precedent in this Circuit. In *Smith* and *Blackwell*, the Court of Appeals demonstrated its willingness to reverse convictions where the government impermissibly prevented exculpatory witnesses from testifying. See *Smith*, 478 F.2d at

979 (reversing convictions); *Blackwell*, 694 F.2d at 1343 (declining to reverse conviction only because the defendant had withdrawn the exculpatory witness' subpoena before she testified); cf. *Simmons*, 670 F.2d at 371 (remanding for an evidentiary hearing on possible prosecutorial misconduct and noting that if the trial court grants a new trial, the witness could be compelled to testify by a grant of immunity); cf. *United States v. Lugg*, 892 F.2d 101, 104 (D.C. Cir. 1989) (acknowledging that case law in the Second, Seventh, and Ninth Circuits indicates that the government may be compelled to grant a defense witness immunity where prosecutorial misconduct is involved, or where the prosecutor's decision not to immunize a witness distorts the judicial fact-finding process).

## III. Argument

### A. The Government Is Forcing Lamond to Invoke his Fifth Amendment Right Not to Testify in Tarrio's Trial.

We have subpoenaed Lamond to testify in Tarrio's defense. We understand that Lamond will invoke his Fifth Amendment right not to testify based on the government's representation that he is still under investigation and facing possible criminal prosecution. Notwithstanding the foregoing, the government has not provided any details about the ostensible multi-year investigations into Lamond – not to us, and to the best of our understanding, not to Lamond's counsel. It is especially curious that after these past two years and with Lamond's full cooperation, the government has still not completed its purported investigation of Lamond. We are not aware of any contention by the government that Lamond has not cooperated fully or completely. It is not

reasonable to expect any additional evidence to be obtained from any further investigation against Lamond or that the government has sufficient evidence to support an indictment against Lamond.

Upon reason and belief, as recently as December 1, 2022, the government confirmed to Lamond's counsel its position that Lamond remains a subject of an investigation for his obstruction of justice into an investigation of Tarrio. We understand that the government will not concede that Lamond has never been identified as a target and they have not agreed to offer him immunity. Lamond's counsel informed us that Lamond will invoke his 5th Amendment privilege and not testify absent a grant of immunity by the government or similar order from the Court. The government's actions violate Tarrio's constitutional due process.

B. The Testimony of Lamond Would Be Material, Exculpatory, Non-Cumulative, and Not Obtainable From Any Other Source.

1. Anticipated Testimony of Lamond

Lamond is a highly decorated intelligence officer of the MPA (Metropolitan Police). Lamond was charged with the duty to communicate with, befriend, and learn everything he can from the various groups that will be visiting his jurisdiction in order to anticipate and react to their actions. He established a relationship with the Proud Boys, among other groups, in order to monitor their movements, anticipate their actions, and the counteractions of other groups such as Antifa and BLM. Lamond knew Tarrio personally and had interactions with him in person on November 14, December 12, and multiple other times leading up to January 6. These communications were in person and via electronic communications. The communications were memorialized internally

in the MPA, and Lamond, as per his training and established protocol, communicated this information up the chain of his command. Tarrio and the Proud Boys absolutely respected and revered law enforcement. Unlike other groups, such as Antifa and BLM, that called to defund the police, Tarrio and the Proud Boys supported the police, law and order. Tarrio was not afraid of the police, but rather he collaborated, cooperated, and confided with the police, and specifically with Lamond reference his future plans, agendas, and locations of activities in Washington D.C.

After being stabbed and the stabbings of his brothers in the Proud Boys, Tarrio did not want to participate in any more violence. Tarrio wanted to get the Proud Boys message out without bloodshed or physical altercations. Tarrio clearly and accurately kept law enforcement informed of Proud Boys itinerary and expected law enforcement to be present during all activity to prevent any further violent attacks on the Proud Boys. Specifically, Tarrio informed Lamond where he would be staying, where and when they would be marching, where and when he would be speaking, and how they would be dressed. Tarrio did this for the protection of his men, for the protection of the police, and most importantly for the protection of the people. If he informed law enforcement via Lamond of his actions, the police would be mobilized to protect the people, and keep people safe from the marauding hordes of Antifa. There were in-person and electronic communications with Lamond during and concerning key allegations in the indictment. Lamond's testimony is relevant and material, relating directly to issues of intent and motive, and exculpatory. Lamond's testimony is critical for Tarrio to receive a fair trial. There is a substantial likelihood that Lamond's testimony would exculpate Tarrio. If

Tarrio planned a seditious conspiracy and/or a conspiracy to obstruct an official proceeding, would he tell his law enforcement his every move?

Finally, these and other questions are not cumulative and cannot be obtained from any other source besides Lamond.

## CONCLUSION

More than 22 months after the investigation in this case began, and just a few weeks before this trial, the government apparently insists that exculpatory defense witnesses are still under investigation, forcing them to invoke their Fifth Amendment right not to testify at Tarrio's trial. We can conceive of no reason why Lamond is still under investigation after all this time, given his extensive witness cooperation, the numerous search warrants, copious discovery, and forensic expertise the government has brought to bear in this matter over such a long period of time. Counsels for the other co-defendants in this case have had similar experiences with the government intimating and pressuring exculpatory defense witnesses. This tactic is a misuse of the government's power and unconstitutional.

If the government does not grant these witnesses use immunity for their testimony, Tarrio's compulsory process rights under the Sixth Amendment would be violated, which would deny him due process of law. Accordingly, we respectfully request that the Court dismiss the indictment if the government refuses to seek use immunity for Lamond and other exculpatory defense witnesses, or, in the alternative, issue an order compelling their immunity.

Respectfully submitted,

***BY: /s/ Sabino Jauregui, Esq.***
Florida Bar Number 503134
Jauregui Law, P.A.
1014 West 49 Street
Hialeah, Florida 33012
Phone 305-822-2901
FAX 305-822-2902

*/s/ Nayib Hassan*
Florida Bar No. 20949
Attorney for Defendant
LAW OFC.OF NAYIB HASSAN
6175 NW 153 St., Suite 221
Miami Lakes, Florida 33014
Tel. No.: 305.403.7323
Fax No.: 305.403.1522

**CERTIFICATE OF SERVICE**

***I HEREBY CERTIFY*** *that a true and correct copy of the foregoing was* electronically noticed through the CM/ECF system to the US Attorney's Office on this 5th day of December 4, 2022 to the following:

Jason McCollough
Luke Jones
Erik Kenerson
Nadia Moore

***BY: /s/ Sabino Jauregui, Esq.***
Florida Bar Number 503134
Jauregui Law, P.A.
1014 West 49 Street
Hialeah, Florida 33012
Phone 305-822-2901
FAX 305-822-2902