IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          CR Nos. 1:21-cr-00175-TJK-1
                                          1:21-cr-00175-TJK-2
v.                                        1:21-cr-00175-TJK-3
                                          1:21-cr-00175-TJK-5
1-ETHAN NORDEAN                           1:21-cr-00175-TJK-6
2-JOSEPH R. BIGGS
3-ZACHARY REHL                    Washington, D.C.
5-ENRIQUE TARRIO                  Wednesday, December 14, 2022
6-DOMINIC J. PEZZOLA,             9:30 a.m.
                    Defendants.

- - - - - - - - - - - - - - - - x

_____

TRANSCRIPT OF ORAL RULING & STATUS CONFERENCE
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

For the United States:    Erik M. Kenerson, Esq.
                          Jason B.A. McCullough, Esq.
                          Conor Mulroe, Esq.
                          Nadia Moore, Esq.
                          U.S. ATTORNEY'S OFFICE
                          555 4th Street, NW
                          Washington, DC 20530
                          (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                          DAVID B. SMITH, PLLC
                          7 East 20th Street
                          Suite 4r
                          New York, NY 10003
                          (917) 902-3869

                          John D. Hull, IV, Esq.
                          HULL MCGUIRE PC
                          1420 N Street, NW
                          Washington, DC 20005
                          (202) 429-6520

                          Norman A. Pattis, Esq.
                          PATTIS & SMITH, LLC
                          383 Orange Street
                          1st Floor
                          New Haven, CT 06511
                          (203) 393-3017

APPEARANCES CONTINUED:

For the Defendants:     Carmen D. Hernandez, Esq.
                        7166 Mink Hollow Road
                        Highland, MD 20777
                        (240) 472-3391

                        Nayib Hassan, Esq.
                        LAW OFFICES OF NAYIB HASSAN, P.A.
                        6175 NW 153 Street
                        Suite 209
                        Miami Lakes, FL 33014
                        (305) 403-7323

                        Sabino Jauregui, Esq.
                        JAUREGUI LAW, P.A.
                        1014 West 49 Street
                        Hialeah, FL 33012
                        (305) 822-2901

                        Steven A. Metcalf, II, Esq.
                        METCALF & METCALF, P.C.
                        99 Park Avenue
                        6th Floor
                        New York, NY 10016
                        (646) 253-0514

Court Reporter:         Timothy R. Miller, RPR, CRR, NJ-CCR
                        Official Court Reporter
                        U.S. Courthouse, Room 6722
                        333 Constitution Avenue, NW
                        Washington, DC 20001
                        (202) 354-3111


Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.

1        **P R O C E E D I N G S**

2            THE DEPUTY CLERK:  Your Honor, this is Criminal

3    Matter 21-175, United States of America v. Defendant 1,

4    Ethan Nordean; Defendant 2, Joseph R. Biggs; Defendant 3,

5    Zachary Rehl; Defendant 5, Enrique Tarrio; Defendant 6,

6    Dominic J. Pezzola.

7            Present for the Government are Jason McCullough,

8    Erik Kenerson, Conor Mulroe, and Nadia Moore; present for

9    Defendant 1 is Nicholas Smith; present for Defendant 2 are

10   John Hull and Norman Pattis.  Mr. Pattis is appearing by

11   telephone.  Present for Defendant 3 is Carmen Hernandez;

12   present for Defendant 5 are Nayib Hassan and Sabino

13   Jauregui; present for Defendant 6 is Steven Metcalf.  Also

14   present is Defendant 1, Mr. Nordean; Defendant 2, Mr. Biggs;

15   Defendant 3, Mr. Rehl; Defendant 5, Mr. Tarrio; and

16   Defendant 6, Mr. Pezzola.

17           THE COURT:  All right.  Good morning to everyone.

18           We are here to try to knock out as much as we can

19   here in three, I think, distinct areas.

20           First, I owe you all a motion in limine ruling

21   which I'm about to deliver to you, number one.

22           Number two, there were a cluster of other motions

23   that came in on other topics that we can address as a second

24   basket.

25           And then, number three, there are a couple of

1    other housekeeping and administrative matters I think it

2    makes sense for us to just touch base on today.

3           So without further ado, I hope to just deliver the

4    motion in limine ruling, but I just want to make sure --

5    just ask the parties if there's anything preliminary either

6    side wants to raise.

7           MR. MCCULLOUGH:  No, Your Honor.

8           THE COURT:  All right.  Seeing no hands in the

9    air, I will proceed.

10          So before me are the Government's and the

11   defendants' various motions in limine.  They include, among

12   some others, the Government's motion to admit statements

13   which was ECF No. 475; the Government's omnibus motion in

14   limine which was ECF 494; Defendant Nordean's and Defendant

15   Tarrio's motion to exclude Government exhibits which were

16   ECF Nos. 489 and 491; and Defendant Rehl's motion to sever

17   and to preclude the Government from using First

18   Amendment-protected statements, ECF Nos. 492 and 495.

19          So here's what I'm going to do.  I'm going to walk

20   through each motion and, to the extent possible, issue

21   rulings on what's in and what's out.  In some circumstances,

22   evidence will be admissible for some purposes but not

23   others.  And in other circumstances -- particularly those

24   where the Government has offered, sort of, theories of

25   admissibility -- I may end up reserving ruling in whole or

1   in part until trial.  But in those cases, I hope to offer

2   some guidance at least on how I view the parties' arguments

3   in order to streamline our arguments that come up later on.

4          So let me begin -- to keep us organized, I'm going

5   to try to go, sort of, issue by issue at least -- in each

6   motion, unless there's some overlap between the motions, and

7   then I, kind of, toggle between them as, I think, makes

8   sense.  I'll begin with the Government's motions; then turn

9   to the defendants'.  And there, I'll start with Nordean and

10  Tarrio's motions to exclude exhibits; conclude with

11  Defendant Rehl's motion to sever; then, after ruling on all

12  the motions, among the administrative things we can talk

13  about is, sort of, how I'm going to resolve any objections

14  in a streamlined way at trial.

15         Before delving into those -- yeah, before we delve

16  into those issues, let me also clarify where things stand on

17  some of these other outstanding motions.  I think I ruled in

18  this way already, but to be clear, I'm going to deny without

19  prejudice Rehl's motion to preclude the Government from

20  disclosing or using marital communications, ECF 486, as well

21  as Nordean's and Biggs's motion to exclude the testimony of

22  proposed expert Oren Segal.  That's ECF Nos. 490 and 498.

23  I'm doing this because the Government has represented that

24  it doesn't intend to use those marital communications or to

25  call Mr. Segal as a witness.  So those three motions are

1    moot.  Of course, if anything changes, the defendants are

2    free to renew them.

3          I'm also going to deny without prejudice Rehl's

4    motion to file additional motions with respect to ongoing

5    discovery.  That's ECF 493.  Obviously, if Mr. Rehl believes

6    additional motions are necessary, counsel can move for leave

7    to file if and when that time comes.

8          So turning first, then, to the Government's motion

9    to admit statements which is ECF No. 495 [sic].  Nordean

10    opposed the motion at 499.  And Mr. Rehl also filed an

11    opposition, but it focused on familiar First Amendment

12    issues -- or similar First Amendment issues as his own

13    motion in limine, so I'll discuss those together.  Now, this

14    is a circumstance where the Government offers theories of

15    admissibility for broad categories of statements.  So on

16    those issues, I'll offer the parties some guidelines to help

17    tailor their arguments on the admissibility of specific

18    statements at trial.

19          The first category of statements the Government

20    proffers are co-conspirator statements.  Of course, under

21    Rule 801(d)(2), a party's statements are exempted from the

22    general bar against hearsay.  And Rule 801(d)(2)(E) extends

23    the exemption to statements by a party's co-conspirator made

24    during the course and in furtherance of the conspiracy.  To

25    find a statement admissible under this rule, quote, A

1    District Court must find by a preponderance of the evidence

2    that a conspiracy existed and that the defendant and

3    declarant were members of the conspiracy.  That's United

4    States v. Gerwin, 471 F.3d 197 at 201, a D.C. Circuit case

5    from 2006.  I may consider the statements themselves, but

6    any finding that a statement satisfies this rule must

7    rend -- must rest on some independent evidence of the

8    conspiracy.  That's that same case.

9          The defendants start out by insisting that I

10   should hold a pretrial hearing to determine whether the

11   Government can satisfy Rule 801(d)(2)(E).  And in so doing,

12   they point to the Circuit's decision in United States v.

13   Jackson which noted that, quote, The better practice is for

14   the court to determine before the hearsay evidence is

15   admitted that the independent -- that the evidence

16   independent of hearsay testimony proves the existence of the

17   conspiracy sufficiently to justify the admission of the

18   hearsay declarations, closed quote.  That's 627 F.2d 1198 at

19   1218, a D.C. Circuit case from 1980.  But the court did

20   acknowledge that, quote, In -- it is just impractical in

21   many cases for a court to do so.

22         At the very least, defendants say I should order

23   the Government to disclose every co-conspirator statement

24   they intend to offer at trial to evaluate whether a pretrial

25   hearing is necessary.  That's the approach Judge Friedman

1    took in a case called United States v. Bazezew on which the

2    defendants also rely.  That's 783 F. Supp. 2d 160 at 166.

3    But Judge Friedman also explained that District Courts

4    retain, quote, Considerable discretion to proceed to trial

5    and to admit particular statements, as they are offered,

6    subject to connection, closed quote, later on, quote, To

7    avoid mini-trials of the evidence in advance of the actual

8    trial.  In such cases, quote, A trial court defers

9    determinations regarding the admissibility of co-conspirator

10   statements until the close of the government's case at

11   trial.  And that's what I'm going to do here.

12          As I understand it, much of the Government's

13   evidence consists of statements made by defendants and other

14   Proud Boys leaders and members in various chat groups.  That

15   being the case, I don't think it's practical for me to issue

16   a broad ruling on the admissibility of co-conspirator

17   statements before the close of the Government's case in

18   chief.  So for now, I'm going to provisionally admit

19   statements by the defendants and any other person who's --

20   any other person that has been -- has admitted to being part

21   of the conspiracy, so the defendants and any witness that's

22   admitted to being part of the conspiracy, so long as the

23   statements were made, of course, during and in furtherance

24   of the conspiracy.  And just for the record, I've reviewed

25   the additional evidence and argument that Mr. Nordean has

1    proffered on this issue under seal.  I've certainly taken it

2    under advisement, but it doesn't change my ruling here.  At

3    the close of the Government's case in chief, the defendants

4    may re-raise their objection that there's insufficient

5    evidence of a conspiracy to admit the statements under this

6    rule; however, if, during the Government's case in chief,

7    the defendants want to object to a particular statement as

8    failing the rule's other elements -- that is, that the

9    statement was made during and in furtherance of the

10   conspiracy -- I'll certainly take up those objections on a

11   case-by-case basis.

12          But in any event, to reiterate, this is a

13   provisional ruling that only applies to the -- to these

14   defendants' statements and, again, anyone else who has

15   admitted to being part of the conspiracy.  Now, the

16   Government also proffers that it will offer, quote,

17   Statements by other MOSD -- that's Ministry of

18   Self-Defense -- by other MOSD members and followers who

19   joined and participated in the defendants' efforts to

20   achieve their criminal objective, closed quote.  That's the

21   Government's motion, ECF No. 75 -- 475 at 18.

22          This group of people includes what the Government

23   has called tools of the conspiracy, and the parties have

24   argued and briefed this point at length.  I'll just say for

25   purposes of a co-conspirator statement analysis, I don't

1    think I have a factual basis to conclude that anyone beyond

2    the parties I've already mentioned were co-conspirators such

3    that their statements are admissible under 801(d)(2)(E).

4    Especially with respect to the MOSD membership group, the

5    Government's evidence suggests that the defendants

6    intentionally left members in the dark about their plans and

7    instructed them to, sort of, turn their brains off and just

8    follow the leadership's orders.  That's ECF No. 75 [sic] at

9    5.  So while the Government need not prove that every

10   co-conspirator, quote, Agreed on the details of their

11   criminal scheme, closed quote, they still have to prove that

12   an agreement to violate the law existed.  That's United

13   States v. Gaviria, 116 F.3d 1498 at 1515, a D.C. Circuit

14   case from 1997.  It's just not clear based on what I have in

15   front of me that that's the case to these, sort of, broad

16   swaths of individuals.

17          So I'm not going to provisionally admit any

18   statements under 801(d)(2)(E) other than the ones that I've

19   mentioned.  And if the Government seeks to admit additional

20   statements under the co-conspirator rule, it will have to

21   proffer a factual basis to [sic] me to conclude that the

22   person was, in fact, a co-conspirator and, of course,

23   satisfy the other elements of the rule that the statement

24   was made during and in furtherance of the conspiracy.  It

25   also may be that the Government turns to other theories of

1    admissibility for these statements on a case-by-case basis.

2         Next, the Government proffers several non-hearsay

3    purposes that different categories of statements may serve.

4    Of course, a statement is only hearsay if offered for the

5    truth of the matter asserted.  That's Rule 801(c)(2).  A

6    statement is admissible for a non-hearsay purpose -- that

7    is, not for the truth of the matter asserted -- so long as

8    that purpose is relevant and, of course, the risk of unfair

9    prejudice does not substantially outweigh its probative

10   value.

11        The Government discusses three categories of

12   statements it expects to offer as non-hearsay: first is

13   questions and commands; the second is statements going to

14   the declarant's mental state; and the third is statements

15   offered to show effect on the listener.  So here, again,

16   I'll offer some preliminary guidance as to which of the

17   Government's theories I find persuasive and which I don't

18   subject to specific objections at trial that a particular

19   statement does not fit the particular proposed non-hearsay

20   use.  And, of course, I'll hear objections that a statement

21   offered for a non-hearsay purpose is nonetheless either

22   irrelevant or fails 403 balancing.  And any statement I

23   admit under these theories could come with limiting

24   instructions if the parties request them.

25        So first are questions and commands.  First --

1     it's pretty -- it's black-letter law that questions and

2     commands generally are not hearsay because they don't assert

3     any truth.  So to the extent the Government intends to offer

4     questions or commands into evidence such as a member of the

5     MOSD leadership's instructions to members or members'

6     questions about how to prepare for January 6th, those

7     statements are probably admissible as non-hearsay so long as

8     they're relevant and not excluded under Rule 403.  But, of

9     course, if a statement styled as a question or command, in

10    fact, asserts some truth, then I'll hear specific objections

11    to that end at trial.  Not sure I'm doing much here other

12    than, sort of, restating the law.  The law is pretty clear

13    on questions and commands.  And we'll play things out on a

14    case-by-case basis.

15           The second category is state of mind.  The

16    Government discusses statements it may offer as

17    circumstantial evidence of the declarant's state of mind.

18    Again, not for the truth of the matter asserted.  And I'll

19    note that this non-hearsay use for statements is distinct

20    from the then-existing "state of mind" hearsay exception,

21    Rule 803(3), which allows statements that themselves

22    directly express the declarant's motive, intent, or plan to

23    be admitted for their truth.  The Government proffers six

24    categories of statements under this general heading which

25    I'll discuss in turn.

1          Before diving in, I'll note that many of the

2     statements the Government proffers in this category are the

3     defendants' own statements.  Of course, any statements [sic]

4     are not hearsay and are admissible against the declarant

5     under Rule 801(d)(2)(A).  They also may be admissible as

6     co-conspirator statements under 801(d)(2)(E).  This

7     non-hearsay state of mind theory seems to me to be just

8     another way these statements might be admissible.  Indeed,

9     the Government, in proffering a particular statement, may

10    decide to argue it's a co-conspirator statement and it

11    satisfies some other exception as, kind of, a backstop.

12          In any event, Nordean argues that these statements

13    reflecting another declarant's state of mind still aren't

14    admissible against him unless, There is some independent

15    evidence -- quote, There is some independent evidence which

16    connects the declarant's statement with the non-declarant's

17    activities, closed quote.  For that, he cites a Second

18    Circuit case, United States v. Cain, 671 F.3d 271 at 300.

19    It's a Second Circuit case from 2012.  Nordean cites no

20    precedent in this Circuit for such a proposition.  Even so,

21    I'm not sure Cain is really applicable here for a few

22    reasons.  To start, the Second Circuit rule that a

23    non-declarant's [sic] statement of his own intent must

24    connect to a non-declarant's activities to be admissible to

25    show the intent of the non-declarant concerns the 803(3)

1    hearsay exception -- under which the statement is offered

2    for its truth -- not statements offered as non-hearsay

3    evidence of a declarant's mental state.  In fact, the Cain

4    court expressly noted that it didn't need to decide whether

5    the -- this, sort of, Second Circuit rule was satisfied

6    because, quote, To the extent that the statements were

7    offered as relevant to the declarant's state of mind, they

8    were not hearsay at all.  Thus, the court held that even if

9    the District Court erred in its 803(3) analysis -- Rule

10   803(3) -- that error was harmless because the statements

11   were not used for an impermissible hearsay purpose and

12   should have been admitted in any case.  So if anything, Cain

13   supports the Government's position that statements offered

14   for a non-hearsay "state of mind" purpose are broadly

15   admissible.

16           Moreover, unlike in Cain, I don't understand the

17   Government to be arguing that these statements are

18   admissible to show anyone's state of mind other than the

19   declarant.  Nordean is right in this sense: perhaps without

20   some greater showing, these statements can only be admitted

21   to show the declarant's state of mind and not the state of

22   mind of anybody else.  But, again, I don't understand the

23   Government to be arguing anything more than they're

24   admissible to show the declarant's state of mind.  But if

25   the jury credits the declarant's state of mind suggested by

1   the evidence, there's no reason the jury can't use that more

2   broadly as evidence of the existence of the conspiracy just

3   as, for example, acts of one alleged co-conspirator can be

4   admitted into evidence against the other co-conspirators, if

5   relevant to prove the existence of the conspiracy.  That's

6   Anderson v. United States, 417 U.S. 211 at 219, a Supreme

7   Court case from 1974.  In each of the categories of evidence

8   below, that is surely an appropriate inference the jury

9   could draw.  So I don't think there's any authority

10  suggesting I need to cabin the jury's use of these

11  statements any more than by ensuring that they're

12  admissible, again, only to show the declarant's state of

13  mind.

14          Turning now to the first non-hearsay "state of

15  mind" category, the Government says it intends to offer

16  statements by the defendants tending to show their belief

17  that the election was stolen.  I agree that the statements

18  tending to show that belief that the election was stolen

19  from former President Trump are admissible under this

20  theory.  It's the Government's burden to prove that the

21  defendants conspired, among other things, to prevent,

22  hinder, or delay the execution of a law by force and to

23  oppose -- and -- by force and oppose by force the U.S.

24  Government's authority.  A deeply held belief that the

25  election was stolen from the defendants' preferred candidate

1    is relevant to show their motive to do so.

2         Nordean argues that such motive evidence is at

3    best cumulative and at worst designed to inflame the jury's

4    partisan prejudice with the defendants' political

5    commentary.  That's ECF No. 499 at 18.  So he says, it

6    should fail the Rule 403 balancing.  Of course, as I've

7    said, I'll entertain objections to specific statements as

8    they come up.  But on the whole, evidence that specific

9    beliefs motivated defendants' actions leading up to and on

10   January 6th are going to be admissible under Rule 403.  That

11   rule requires that for the evidence to be excluded, the risk

12   of unfair prejudice must substantially outweigh any

13   probative value of the evidence.  And in a case like this

14   where so much depends on the defendants' intent, motive

15   evidence is especially probative toward helping the jury

16   evaluate whether the defendants acted with the requisite

17   mens rea.

18        Again, as I mentioned above, the -- these -- this

19   evidence is admissible to show the declarant's belief that

20   the election was stolen.  It's not generally admissible to

21   show any other person's belief along those lines.  And I

22   don't think, again, there's any need to further cabin the

23   jury's use of this evidence.

24        Second, the Government discusses statements that

25   show defendants' and their co-conspirators' understanding

1     that Congress would certify the electoral votes on January

2     6th.  Again, the Government may not use these statements to

3     prove what Congress was doing on January 6th.  But assuming

4     the Government otherwise proves that fact, which I don't

5     doubt it will, the defendants' awareness of the electoral

6     certification progress -- process is relevant to proving

7     that they conspired to obstruct an official proceeding and

8     prevent the execution of a law.  So statements to that

9     effect should be admissible as non-hearsay.

10              Again, assuming the declarant is a defendant or an

11     admitted co-conspirator, then these statements would be

12     admissible to show the declarant's understanding about what

13     Congress was doing that day.  To the extent the Government

14     anticipates using this theory to admit the statements of

15     anybody else, they are going to have to show why the

16     declarant's belief is relevant.  I won't keep repeating this

17     caveat, but it obviously stands for each of the categories

18     that follow.

19              Third, the Government proffers statements to show

20     the defendants' and their co-conspirators' willingness to

21     use force and violence.  ECF No. 75 [sic] at 22.  Again, I

22     agree with the Government that the statements they discuss

23     in this section don't assert any truth, but they are,

24     rather, circumstantial evidence of defendants' and others'

25     willingness to use violence.  And to the extent these

1   statements are assertions, the truth of the matter is

2   essentially that the declarants would use violence.  So

3   alternatively, they could fall under, again, the closely

4   related 803(3) hearsay exception.

5          Nordean does not object to these statements on

6   hearsay grounds.  Rather, he says they're inadmissible

7   character evidence which the Government is only offering to

8   show defendants' propensity for violence.  First, I'll note

9   that even though, as the Government argues, prior statements

10   by the accused are the heartland of criminal prosecution,

11   ECF No. 512 at 14, that doesn't mean that statements can't

12   be inadmissible character evidence.  Indeed, one of the

13   cases the Government cites, United States v. Roberson,

14   establishes that courts may need to evaluate a defendant's

15   statements under the rules governing character evidence.

16   That's 581 F. Supp. 3d 65 at 74, a D.D.C. case from 2022 --

17   from this year.  In this way, I can broadly characterize the

18   statements the Government seeks to admit as violent

19   advocacy.

20          But even through that lens, I think the statements

21   are admissible.  The statements the Government cites were

22   all -- at least in their examples in their brief, were all

23   made while the conspiracy was allegedly underway or, at the

24   earliest, in the days leading up to its formation.  What's

25   more, they generally relate to the conspiracy's subject

1 matter; that is, defendants' efforts to resist what they

2 viewed as an unlawful transition of presidential power and

3 the betrayal of government officials and law enforcement.

4 All in all, the Government seeks to offer these statements

5 as direct evidence of the conspiracy.  So by definition,

6 they are not inadmissible propensity evidence.

7    Thus, these statements are generally admissible

8 either as non-hearsay, circumstantial evidence of the

9 defendant's [sic] intent to use violence in connection with

10 the conspiracy or as direct evidence of a declarant's intent

11 to use violence in connection with the conspiracy under Rule

12 803(3).  I don't think the character evidence [sic]

13 otherwise prohibit admitting such evidence for those

14 purposes.

15    The only question remaining is whether these

16 statements satisfy 403 balancing.  I think, in general, they

17 will do so.  Again, as I mentioned before, it's the

18 Government's burden to prove that the defendants conspired

19 to use force to stop the transition of presidential power,

20 while defendants will counter there was no plan for violence

21 and they intended only peaceful protest.  So evidence that

22 defendants and their co-conspirators expressly called for

23 violence against law enforcement or government officials is

24 probative of their intent.

25    Fourth, the Government says it will offer

1    statements showing defendants' hostility toward police.

2    They argue, This animus both motivated the conspiracy and

3    contributed to its success since a group of Proud Boys that

4    was friendly or neutral toward the police would have been

5    less likely to force their way through the lines, closed

6    quote.  And broadly speaking, I agree and accept this theory

7    as a general matter.  As mentioned earlier, to the extent

8    we're talking about defendants or those who have pled guilty

9    to one of the charged conspiracies, the relevance of the

10   declarant's statement is self-evident.  And, again, here, I

11   disagree with Nordean that statements tending to show this

12   kind of hostility generally fare -- fail the 403 balancing

13   test.

14         Fifth, the defendant -- or the Government says it

15   will offer statements tending to show defendants'

16   consciousness of guilt.  Again, here, I do believe this is a

17   permissible non-hearsay use for defendants' statements.

18   It's actually a -- quite a common way in which statements

19   like the ones at issue are admitted at trial.  These

20   statements are some circumstantial evidence that defendants

21   knew their conduct was unlawful.  The evidence is relevant

22   to show their intent leading up to January 6th, especially

23   because defendants have expressed before January 6th that

24   they only planned to engage in lawful, First

25   Amendment-protected protest.

1          Here, too, Nordean argues that other defendants'

2     statements in this category are not admissible against him.

3     And, again, I think he's right in the sense that the

4     statements are only admissible to show the declarant's

5     consciousness of guilt.  But the jury's use of these

6     statements need not be cabined any further than that.  If

7     the jury credits that consciousness of guilt, it can

8     consider such statements as evidence that the broader

9     conspiracy existed.

10          Nordean points to United States v. -- man, I'm

11     going to have a hard time pronouncing it, but it's --

12     Ogedengbe, an unpublished decision from the Ninth Circuit,

13     to argue that other defendants' statements in this category

14     are not admissible against him.  It's 188 F. -- Federal

15     Appendix 572 at 574, a Ninth Circuit case from 2006.  The

16     case really doesn't offer much analysis to go on, but I

17     think what's there in -- on balance really favors the

18     Government's position.  There, the court noted that the

19     trial court had admitted a co-defendant's statements, quote,

20     As false exculpatory statements that showed consciousness of

21     guilt and evidenced the existence of the conspiracy, closed

22     quote.  So it held that this admission of, quote,

23     Non-hearsay statements did not violate the Confrontation

24     Clause, closed quote.  The court also, as Nordean says,

25     rejected the defendant's argument that the District Court

1    should have issued a limiting instruction if the

2    co-defendant's statements, quote, Were admitted only to show

3    consciousness of guilt.  But I think Nordean is wrong to

4    suggest that the court only rejected this argument because

5    the statements also satisfied the co-conspirator rule.

6    Rather, the court only noted that, quote, The statements

7    were admissible, closed quote, as to both defendants.  In

8    fact, the statements probably would not have satisfied

9    801(d)(2)(E) because it appears they were made after the

10   conspiracy ended in that case.  And in addition, this

11   opinion cites Anderson which specifically -- the case I

12   mentioned earlier -- which specifically explains the

13   admissibility of statements not offered for the truth of the

14   matter asserted and made after the close of a conspiracy to

15   prove that the conspiracy existed.  That's Anderson at 219.

16   So in short, this Ninth Circuit case, I think, supports the

17   notion that evidence of one co-conspirator's consciousness

18   of guilt is relevant to show the conspiracy's existed --

19   existence and so, again, these statements are broadly

20   admissible at least in that sense against all the

21   defendants, even if they're only, sort of, admissible in the

22   first instance to show the consciousness of guilt of the

23   speaker.

24            Sixth, the Government proffered defendants'

25   statements celebrating the Capitol riot, the events of

1    January 6th.  I agree that defendants' reactions to the

2    events of that day are relevant, the -- and such statements

3    generally lack any inherent truth value, so they would be

4    admitted as non-hearsay.  I'll also note that two of the

5    three statements the Government highlights in its motion --

6    statements by Mr. Biggs and Mr. Pezzola while they're inside

7    the Capitol -- probably also satisfy the excited utterance

8    hearsay exception.  Of course, they're also statements of

9    the defendants, as well.

10           The third and final category of non-hearsay

11   statements the Government proffers is statements relevant to

12   show the effect on the listener.  It's, of course, well

13   settled that, quote, An out-of-court statement that is

14   offered to show its effect on the hearer's state of mind is

15   not hearsay under Rule 801(c).  That's United States v.

16   Thompson, 279 F.3d 1043 at 1047, a D.C. Circuit case from

17   2002.  The Government offers two categories of statements

18   under this theory: statements by MOSD members and statements

19   by MOSD leaders.

20           I'll take the MOSD leaders first.  I'm not sure

21   why the Government characterized it as MOSD leaders.  It

22   might have just called them the defendants' statements,

23   since all the examples they use are the defendants, which

24   they characterize as, quote, Chants, speeches, and other

25   utterances, closed quote, on January 6th that itself --

1    itself that, quote, Provoked a particular response by their

2    followers.  That's ECF No. 475 at 27 through 28.  The

3    Government highlighted Nordean's and Biggs's speeches at the

4    rally before marching to the Capitol as well as theirs and

5    Mr. Rehl's chants while leading the crowd to the Capitol

6    grounds.

7          I won't admit these statements to show the effect

8    on the listener without more foundation about what that

9    effect was.  I suppose the Government's theory -- maybe, the

10   Government's theory is that the effect was that the crowd

11   ended up storming the Capitol, but at this point, it seems

12   hard for me to draw a straight line between the defendants'

13   statements and the crowd's conduct.  Indeed, in a way, that

14   more attenuated effect on the listener is part of what the

15   Government is trying to prove.  So I'm not going to admit

16   them on this basis without more specific, sort of, direct,

17   immediate proof about what the effect of these speeches were

18   on the listeners.

19         Even so, it seems to me these statements are going

20   to be admissible one way or the other.  It seems evident,

21   again, that they're admissible as an opposing party's

22   statement under 801(d)(2)(A) or even potentially

23   co-conspirator statements under 801(d)(2)(E).

24         Turning to the statements of MOSD members, I think

25   the Government's theory is even trickier.  The Government

1    cites several statements from Telegram chat groups

2    advocating violence and one even advocating, sort of,

3    storming state capitols on January 6th.  The Government says

4    it's telling that the MOSD chat group included these

5    statements after Mr. Tarrio told the group that members were

6    supposed to -- well, fit in or eff off and stay on topic or

7    else be removed.  That's ECF No. 75 [sic] at 25 to 26.  But,

8    you know, on -- at least in this initial argument, the

9    Government, I think, seems to have it backwards, suggesting

10   at least on paper that the MOSD members' statements could

11   demonstrate the effect that Tarrio's statements had on them.

12   But that's not the way the "effect on the listener" theory

13   works as far as I understand it.

14          In any event, I'm skeptical that the statements in

15   this category may be admissible for the effect on the

16   listeners; that is, the listeners being the defendants and

17   other MOSD members in the chat.  I get that the Government

18   has proffered that at the first MOSD member meeting, Tarrio

19   and other leaders told members, again, to fit in or eff off

20   and to stay on topic and if they didn't, they'd be removed.

21   And defendants have, at various points, insisted to me that

22   the MOSD's purpose was to get, sort of, Proud Boys rallies

23   under control -- this is the defendants -- under control to

24   reduce the risk of violence.  So all of that actually, sort

25   of, backs the Government's theory to some degree.  But I

1    don't think I have any specific representations before me --

2    at least none was teed up in the motion -- about how many

3    people were in these chats, how often a supposed listener

4    against whom the Government might seek to admit these

5    statements ever responded to comments like the ones at issue

6    such that the listener's silence could take on the kind of

7    meaning the Government wants to suggest that it has.  So I'm

8    not going to bless admitting these statements on this theory

9    now without more information, without more of a foundation

10   along the lines that I've suggested.

11           Next, we move to hearsay exceptions.  So finally,

12   the Government discusses statements that fall under several

13   hearsay exceptions, including Rules 803(1), present-sense

14   impression; 803(2), excited utterance; 803(3), statements of

15   the declarant's then-existing mental, emotional, or physical

16   condition, the exception we mentioned a moment ago; and

17   804(b)(3), the -- an unavailable witness statements -- an

18   unavailable witness's statements against interest.

19           I'm not going to belabor these exceptions here.

20   Suffice it to say that if a statement satisfies one of these

21   exceptions, it's going to come in as long as it's relevant

22   and doesn't fail the 403 balancing.  And as I read the

23   papers, I think the Government's theories of admissibility

24   in these areas are generally sound.  Of course, I will take

25   up any objections on a case-by-case basis, but generally,

1    again, the Government's theories seem sound to me.

2            Nordean, again, here argues that even where

3    others' statements satisfy a hearsay exception, they're

4    still inadmissible against him.  He cites a footnote in

5    Bruton v. United States, of course, a leading Confrontation

6    Clause case, 391 U.S. 123 at 128, Note 3, a Supreme Court

7    case from 1968.  But he takes one sentence fragment very

8    much out of context.  He points out that the Supreme Court,

9    quote, Emphasized that the hearsay statement inculpating a

10   non-declarant defendant was clearly inadmissible against him

11   under the traditional Rules of Evidence, closed quote.  But

12   in that note, the Court clearly stated that no hearsay

13   exception applied.  That is why the statement was

14   inadmissible.  Here, we're discussing statements that are

15   covered by hearsay exceptions.  So I don't think this -- the

16   comment in the footnote in Bruton means anything for what I

17   have to decide here today.

18           And more broadly on the subject of Bruton, I did

19   have an exchange with counsel for Mr. Rehl at the November

20   18th hearing where she raised the issue -- argued that there

21   could be Bruton issues here.  I'm not sure whether she was

22   citing to the same footnote or making some different

23   argument, but just in case she intended to raise a Bruton

24   issue in the classic Confrontation Clause sense, I'll make

25   clear for the record that the Government has not, to date,

1    suggested that it would be seeking to admit any testimonial

2    statement -- testimonial for purposes of Bruton -- by any

3    defendant.  So I don't see any Bruton issue arising here.

4              And before concluding, I'll just address Rehl's --

5    or before moving on to the next motion, I'll address Rehl's

6    separate opposition to the Government's motion on First

7    Amendment grounds which more or less mirrors Mr. Rehl's

8    affirmative motion to exclude his First Amendment-protected

9    statements.

10             I'm going to deny Mr. Rehl's motion.  I'll be

11   brief on this point because I think I've already explained

12   my view of the law on this issue several times throughout

13   this litigation, including in my recent ruling on the motion

14   to dismiss the indictment.  Mr. Rehl argues, as he has many

15   times before, that the Government's use of his prior

16   statements violates the First Amendment because they don't

17   satisfy the standard for incitement that the Supreme Court

18   announced in the well-known case of Brandenburg v. Ohio, 395

19   U.S. 444, a Supreme Court case from 1969.  But Brandenburg

20   does not supply the correct standard for this case.  The --

21   his Brandenburg argument blurs the distinction between

22   statutes that criminalize speech itself and the Government's

23   use of a defendant's statements as evidence of a separate

24   crime.  The Government has not charged Mr. Rehl with

25   incitement or any offense that criminalizes speech itself.

1          Instead, the Government seeks to use Mr. Rehl's

2     statements as evidence of another, non-speech offense to

3     prove, among other things, his motive and intent.  The

4     Supreme Court has expressly authorized the evidentiary use

5     of speech in Wisconsin v. Mitchell.  That's 508 U.S. 476 at

6     489, a Supreme Court case from 1980 -- 1993.  So I will deny

7     Mr. Rehl's motion on this point.

8          Turning next to the Government's omnibus motion in

9     limine.  There's a bunch of uncontested issues, first, I can

10    rule on in that motion that the defendants don't contest --

11    didn't contest on paper; didn't contest in person.  First

12    among them, the Government offers several theories on how it

13    will authenticate multimedia evidence.  I'm not going to

14    rule on all that now, but I see no issue with any of the

15    authentication methods the Government sets out.  And, again,

16    the defendants do not object to them.

17          Second, as I said at the hearing, it seems to me

18    the parties are more or less in the same place on the

19    Government's motion to limit cross-examination of their --

20    of Secret Service agents.  So I'll grant the Government's

21    motion to preclude examination on -- quoting from the

22    Government's brief at ECF No. 494 at 18 to 19 -- quote, One,

23    Secret Service protocols related to the locations where

24    protectees or their motorcades are taken at the Capitol or

25    other government buildings when emergencies occur; and, two,

1    details about the nature of Secret Service protective

2    details such as the number and type of agents the Secret

3    Service assigns to protectees, closed quote.  This

4    information isn't relevant to the defendants' charges, and

5    public examination of these matters would compromise the

6    security of these government officials.  This is consistent

7    with Judge McFadden's ruling on this same issue which both

8    parties referenced and it strikes me as exactly right.

9    Also, Nordean did not directly respond to the Government's

10   motion to preclude cross-examination on the specific

11   locations of U.S. Capitol Police surveillance cameras, and I

12   agree such evidence is irrelevant and would needlessly risk

13   security.  So I'll grant that part of the motion, as well.

14          Third, on the Government's motion to limit

15   cross-examination of confidential human sources, no party

16   has represented that it intends to call such a witness.  So

17   I'll reserve ruling on that issue for now.  If I have to

18   revisit it, I will.

19          Fourth, the Government moved to preclude arguments

20   about the Government's charging decisions, selective

21   prosecution, entrapment, any public-authority defenses,

22   conditions of incarceration, penalties and collateral

23   consequences, and unsupported claims of self-defense or the

24   defense of others.  No defendant has suggested he intends to

25   raise any such arguments or defenses at trial.  No defendant

1    opposed the Government's motion on those matters.  So I will

2    grant the motion as to those matters.

3            Okay.  So now for the more contested issues in the

4    Government's motion.  I'll start with the motion to

5    establish the relevance of conduct by alleged non-defendant

6    co-conspirators and so-called tools of the conspiracy.

7    Again, this is -- has been the focus of intense argument and

8    the subject of supplemental briefing.

9            As I mentioned, I think the only way this has

10   already come up in my rulings is, sort of, the tools

11   evidence statements that the Government wanted to use the

12   "effect of -- on the listener" theory to admit, that I said

13   I would not admit on that theory at least on the record

14   before me now.  This is really about the relevance of

15   conduct of tools of the conspiracy.  So first off, I want to

16   be clear about one thing.  I think contrary to some of the

17   defendants' briefing on this issue, there is no "tools

18   theory" of the prosecution.  What I'm dealing with here is

19   whether and to what extent statements -- and in this case,

20   conduct -- by non-defendants are relevant as to some -- are

21   relevant as some evidence of the conspiracy among the

22   defendants.  The Government has not suggested it will prove

23   its case only through the conduct of others, nor is it

24   pursuing some kind of vicarious liability as we have

25   discussed at length.  Certainly, we can discuss whether a

1    jury instruction is necessary on that point at a later date.

2    But at the moment, all I'm dealing with here is the question

3    of whether this is relevant and admissible evidence.

4              Turning to that issue, the Government discusses

5    conduct by either members of the Proud Boys or persons

6    affiliated with the Proud Boys who acted violently in

7    breaching the Capitol.  The Government goes to great lengths

8    to explain its theory of how these individuals might be the

9    defendants' co-conspirators.  But whether or not these

10   individuals are true co-conspirators strikes me as a

11   non-issue at least as far as their conduct goes.  Rather,

12   their conduct is relevant to the extent -- well, let's put

13   it this way.  It's a non-issue in the sense that there is a

14   theory -- I think, a persuasive theory -- that even if

15   they're not true co-conspirators, that some of this conduct

16   is admissible that I'll talk about.  Rather, the -- I think

17   this conduct is relevant to the extent it is evidence of the

18   charged conspiracies among the defendants.  Again, these

19   tools don't necessarily need to be co-conspirators as a

20   matter of law for that to be the case.  I don't think I need

21   to pass judgment either way on whether anyone in this group

22   of tools is a co-conspirator, frankly, nor could I, on the

23   record before me, even make such a determination, but in any

24   event, I don't think I need to.

25             The Government's theory is essentially that the

1    defendants led a, sort of, specially selected subgroup

2    within the Proud Boys to violent ends.  They allege that the

3    defendants and other MOSD leaders hand-picked individuals

4    they saw as ready and willing to follow their orders and

5    achieve their aims through violence.  In that way, a jury

6    might understand the conduct of those individuals -- again,

7    selected for membership in the MOSD or other similar chat

8    groups -- as evidence of pre-planning by the defendants and

9    a conspiracy to use force.  After all, I've -- as I've said

10   many times at various proceedings, sometimes the best

11   evidence of a conspiratorial agreement is concerted,

12   unlawful action that follows the alleged agreement.

13           But, look, I think there are limits to this

14   theory.  For the conduct along these lines to be relevant,

15   it has to bear some connection to the defendants.  So for

16   example, conduct by those in the MOSD leadership or MOSD

17   membership or Boots on the Ground Telegram chat groups, all

18   of which the Government says were, sort of, intrinsic to the

19   conspiracy, would be relevant.  Actions by those who the

20   defendants themselves led to the Capitol and then actions by

21   those who, you know, sort of, at the same time and nearly --

22   and adjacent to the defendants both followed them to the

23   Capitol and then stormed the Capitol with them, again, I

24   think, are relevant.  A rational juror could find that

25   conduct like that is some evidence of how these defendants

1    carried out the alleged objective of the charged

2    conspiracies.

3            But on the other hand, mere evidence that people

4    unrelated -- unaffiliated with the Proud Boys or perhaps

5    even some Proud Boys who didn't march and were not

6    adjacent -- march with these defendants -- some of the --

7    that other people committed violent acts without any nexus

8    to the defendants' planning groups or their conduct that day

9    does push the bounds of relevance and carries a real risk of

10   unfair prejudice.  Now, as the briefing proceeded, I don't

11   see the Government planning to offer this kind of evidence,

12   but we'll see.

13           So to be sure, direct evidence, like the

14   statements the Government cited in its reply brief, that the

15   defendants and their co-conspirators intended to mobilize

16   either other Proud Boys or so-called normies in furtherance

17   of their conspiracies is relevant, but for those

18   individuals' conduct to be relevant, I think the Government

19   needs to establish some nexus between the defendants on the

20   one hand and these non-parties that suggest that the

21   non-parties' conduct was caused by or advanced the alleged

22   conspiracies.  As I read its papers, that seems to be the

23   line the Government intends to toe here.  In their

24   supplemental filing on this issue, the Government said the

25   tools will consist primarily of those Proud Boy members and

1    affiliates whom the defendants recruited and led to the
2    Capitol as part of their marching group as well as apparent
3    strangers whose conduct nonetheless has a causal
4    relationship with the defendants.  I think with those
5    caveats, the tools conduct evidence is at least generally
6    admissible.  I suppose, again, the latter category of the
7    causal relationship with the defendants, that may be in the
8    eye of the beholder and I may have to -- they may have to --
9    the Government may have to proffer to me exactly what that
10   causal connection is before that comes in, but I don't
11   think -- but with those caveats, I think the tools conduct,
12   as long as it is connected to the defendants in those ways,
13   at least generally is going to be admissible.  And contrary
14   to what Mr. Rehl argued in a supplemental filing, I don't
15   think admitting evidence of the tools conduct sets out --
16   raises any First Amendment concerns.
17           A final note on this.  My ruling on this issue
18   pertains to the Government's proffer of, sort of, specific
19   acts of violence by particular individuals.  Evidence
20   depicting the events of January 6th writ large, including
21   certain video montages, I think, elsewhere, I'm going to --
22   I will rule is relevant, sort of, background information for
23   the jury.  It helps to explain the timeline of the events
24   that day.  It's also relevant, as even I admitted it in
25   another case, as evidence of some of the non-conspiracy

1    charges like the Section 231 charges.  So I think some of

2    that could come in.  But that evidence is relevant within

3    limits.  I'm not going to let the Government overdo it or

4    suggest that these defendants were responsible for more of

5    what happened that day than the evidence supports.  In any

6    event, the limits I've discussed on the Government's use of

7    the tools evidence to prove the charged conspiracies, I

8    think, is separate from very limited evidence that I

9    anticipate I'll end up admitting on these other grounds that

10   will give the jury some kind of overview of what was

11   happening at the Capitol more broadly.

12          Next, the Government asks me to take judicial

13   notice of, and admit into evidence, Article II, Section I of

14   the Constitution, the Twelfth Amendment, and the Electoral

15   Count Act.  The Government also proffers it will move to

16   admit portions of the Congressional Record at trial which it

17   says is a public record under Federal Rule of Evidence

18   902(5).

19          First, I'll grant the Government's motion to take

20   judicial notice of Article II, Section I, and the Twelfth

21   Amendment and the Electoral Count Act, and specifically the

22   fact that these laws, as the Government points out in its

23   reply, set the dates and procedures governing the transition

24   of presidential power.  I think these laws, contrary to some

25   of the defendants' arguments in opposition, are not

1    substantive laws the jury has to apply in this case.  The

2    Government has to prove the fact of these laws and that they

3    regulate the transition of power so that the jury can

4    consider whether the defendants seditiously conspired to

5    prevent, hinder, or delay their execution.  That is the sort

6    of adjudicative fact that, Can be accurately and readily

7    determined from sources whose accuracy cannot reasonably be

8    questioned, closed quote, under Federal Rule of Evidence

9    201(b)(2).  Indeed, the Government cites a First Circuit

10   case for the proposition that, quote, It is well established

11   that District Courts may take judicial notice of a law.

12   That's United States v. Davila-Nieves, 670 F.3d 1 at 7, a

13   First Circuit case from 2012.

14          And even if these laws' existence weren't subject

15   to judicial notice, I see no reason not to admit them.  They

16   are obviously relevant to the Government's case.  They're

17   not hearsay because they're not assertions of fact.  So I'll

18   admit these laws into evidence without further foundation.

19          I will also deny Nordean's motion with respect to

20   the Congressional Record.  I don't think Mr. Nordean

21   counters the Government's argument successfully that

22   Congressional Records are self-authenticating under Rule

23   902(5).  He does -- he contends they're hearsay.  But the

24   Government says it isn't offering the evidence to prove the

25   truth of any extrinsic fact asserted during the proceedings

1    but only to prove the fact of the proceedings themselves.

2    And while I don't have the specific records before me now, I

3    will admit the records the Government identifies for that

4    purpose at trial, potentially subject to a limiting

5    instruction.  And if the records the Government seeks to

6    admit only set out the office's activities, they also could

7    be admissible as public records under Rule 803(a) --

8    (8)(A)(i).

9         The next issue is the defendants' statements and

10   the rule of completeness.  The Government moves to preclude

11   defendants from admitting -- from wholesale admitting their

12   own favorable statements in chat groups or otherwise under

13   the rule of completeness.  I said -- as I said at the

14   hearing, I don't think this is an issue I can resolve

15   pretrial, you know?  Of course, the rule of completeness

16   can't entirely trump the general hearsay bar to a defendant

17   admitting his own statements.  There may be circumstances

18   where the defendants have legitimate arguments to admit

19   their otherwise hearsay statements under that rule.  I'll

20   take those up on a case-by-case basis.

21        The Government also moves to preclude defendants

22   from raising a First Amendment defense.  So I'll start by

23   granting the Government's motion with respect to any

24   argument about Brandenburg, incitement, or the admissibility

25   of the defendants' statements.  As I've already explained, I

1    don't think Brandenburg is the relevant standard and I don't

2    think there's any -- well, I don't think it supplies the

3    relevant standard here.

4         But it is a different question whether defense

5    counsel may make any First Amendment-related argument to the

6    jury or whether any First Amendment jury instruction will be

7    appropriate.  I think everyone here agrees that peacefully

8    protesting outside the Capitol is First Amendment-protected

9    activity as a general matter.

10        Either way, here's how I see it now.  I'm not

11   going to issue a sweeping ruling precluding any particular

12   defense right now or decide what jury instruction on this

13   topic might be appropriate.  For now, it seems to me the

14   only ground rule that has to be clear is what the parties

15   can say in their opening statements.  It seems to me

16   defendants can obviously say, if they would like, that all

17   they planned to do on January 6th was peacefully protest

18   outside the Capitol.  And I'm not going to -- I think it's

19   fine if counsel tells the jury in their openings, if they

20   would like -- if they like, that the First Amendment would

21   generally protect such activity, as long as they don't

22   suggest that, for example, planning to move in a restricted

23   area would be protected by the First Amendment.  That's not,

24   though, really, a First Amendment defense.  In other words,

25   it's not something that would require an acquittal if the

1    Government otherwise proved up all the elements of the
2    charged offenses.  So if the Government -- if the defendants
3    want to say that in their opening, it seems fine to me.
4    They can.  If there's anything else they want to say about
5    the First Amendment in opening, I think they'll have to tee
6    me -- tee that up for me more specifically than I have --
7    than has happened already.
8              Look, aside from what I've just explained, I think
9    I understand Mr. Nordean's argument that there may be a true
10   First Amendment defense at least to the obstruction charge.
11   In his supplemental filing, he made an argument along those
12   lines.  I'm not -- I think I understand it.  I'm not sure I
13   agree, but I don't think I have to decide that now and in
14   the abstract.  No defendant has pointed to a specific First
15   Amendment defense that he actually intends to offer at this
16   point.  So I won't resolve the Government's motion, but --
17   beyond what I've already said about opening statements.  If,
18   after the Government's case in chief, defendants think an
19   actual First Amendment defense is available on the 1512
20   charge based on the evidence the Government elicits at
21   trial, I'll consider the issue then.  And, of course, we
22   will have to grapple with this issue when we work out
23   what -- the jury instructions on the obstruction charge.
24              So again, as far as either side wants to open by
25   telling the jury that an agreement to peacefully protest

1    outside the Capitol is lawful and protected by the First

2    Amendment, again, without implying that that could extend

3    into unrestricted areas, that seems fine to me, but if

4    anyone wants to go beyond that, I'm going to have to hear

5    about it ahead of time.

6              The Government's omnibus motion also raised an

7    issue that was briefed and argued under seal.  I think at

8    the end of the day, the parties ended up without any genuine

9    dispute on that, and I ruled that Mr. Nordean can elicit

10   testimony about facts and circumstances concerning his entry

11   into the Capitol, including the conduct of any police

12   officers that he witnessed, but nothing more.

13             Now, that's the end of the Government's motions.

14             Let me check in.  Tim, how are you doing?  Can you

15   use a break or are you okay?

16             THE COURT REPORTER:  I'm good.

17             THE COURT:  You're good?

18             THE COURT REPORTER:  Yes.

19             THE COURT:  Okay.  I'll continue on, then.

20             All right.  So those are the Government's motions.

21             Next, I'll turn to Nordean and Tarrio's motions to

22   exclude Government exhibits.  Those are ECFs Nos. 489 and

23   491.  The motions often overlap.  So I'll just, sort of,

24   discuss them together.

25             Nordean and Tarrio both first moved to exclude

1   so-called group evidence about their membership in the Proud

2   Boys.  The Government has represented that such evidence

3   will include evidence regarding the structure and

4   organization of the Proud Boys, including different degree

5   rankings a member of the Proud Boys can attain, how they

6   attain those ranks, and how those ranks impact power

7   dynamics between Proud Boy members.  That's ECF No. 489 at

8   7, quoting the Government's 404(b) notice letter.  The

9   defendants argue that the evidence about the Proud Boys

10   organization as well as their membership in it is irrelevant

11   under Rule 401, unfairly prejudicial under Rule 403,

12   improper character evidence under Rule 404, and violates the

13   defendants' First Amendment rights.  At the end of the day,

14   I have to disagree on each front and will deny the

15   defendants' motion on this issue.

16         I'll begin with character evidence.  Over

17   Nordean's insistence otherwise, I don't believe the

18   Government's evidence about the Proud Boys organization and

19   the defendants' membership in it is extrinsic evidence of

20   their character.  First of all, broadly speaking, evidence

21   about the Proud Boys organizational structure is not

22   evidence of the defendants' crimes, wrongs, or other acts.

23   So I don't think, in this circumstance, it's subject to a

24   404(b) analysis.  And even to the extent defendants'

25   membership in the Proud Boys is an act in the sense that

1    Rule 404(b) contemplates, I still don't think it falls under

2    that rule.   As the Government has argued in its opposition,

3    the membership is intrinsic, non-propensity evidence of the

4    conspiracies charged.   That's ECF No. 515 at 8.

5         The D.C. Circuit has explained that because Rule

6    404(b) applies only to evidence of a defendant's other

7    crimes, wrongs, or acts, it creates a dichotomy between

8    crimes or acts that constitute the charged crime and crimes

9    or acts that do not.   That's United States v. Bowie, 232

10   F.3d 923 at 927, a D.C. Circuit from -- case from 2000.

11   Some courts have called, quote, Evidence of the same crime

12   intrinsic and evidence of other crimes extrinsic.   Again,

13   that's Bowie.   Intrinsic evidence is not subject to the

14   404(b) analysis.   Now, in Bowie, the D.C. Circuit took a

15   narrower view of what constitutes intrinsic evidence which

16   I'll discuss in greater detail a little bit later.   But the

17   Bowie court still recognized that evidence is properly

18   considered intrinsic if it is an act that is part of the

19   charged offense or evidence of some uncharged acts performed

20   contemporaneously with the charged crime if they facilitate

21   the commission of the charged crime.   That's Page 929.

22        So I think evidence about the defendants' Proud

23   Boy membership falls into that latter category of intrinsic

24   evidence.   The Government is not arguing the defendants'

25   past membership in the Proud Boys is somehow relevant to the

1    crimes charged.  Rather, they contend that such membership

2    directly facilitated the charged conspiracies.

3    Specifically, as they outline in their opposition, quote,

4    Tarrio formed the MOSD immediately after President Trump's

5    announcement of the "wild" rally on January 6th; that he and

6    other leader defendants drew exclusively upon Proud Boys

7    members for its recruits; that they used their status as

8    senior Proud Boys leaders to establish a command structure;

9    and they used that command structure to assemble their

10   subordinates in Washington, D.C., and to bring them to the

11   Capitol.  That's ECF No. 515 at 7 through 8.  In this way,

12   the defendants' Proud Boy membership is intrinsic to the

13   charged conspiracies.  It doesn't have to be -- it doesn't

14   fall under Rule 404(b).

15           Mr. Nordean cites a couple of out-of-Circuit cases

16   where appellate courts found error in District Courts'

17   admission of gang-affiliation evidence, including United

18   States v. Roark, 924 F.2d 1426, an Eighth Circuit case from

19   1991; and United States v. Irvin, 87 F.3d 860, a Seventh

20   Circuit case from 1996.  The Government counters with cases

21   where gang-affiliation evidence was admissible such as

22   where, quote, It is relevant to demonstrate the existence of

23   a joint venture or conspiracy and a relationship among its

24   members and each defendant's knowledge of and participation

25   in the charged conspiracy, closed quote.  That's ECF No. 515

1     at 10, quoting United States v. Castillo-Aguirre, 983 F.3d
2     927 at 936, a Seventh Circuit case from 2020.  I'm not going
3     to walk through each of the cases cited by Mr. Nordean,
4     which are distinguishable on several grounds, particularly
5     because, unlike gangs, the Proud Boys are not an inherently
6     criminal enterprise, nor has the Government suggested that
7     it is.  So the Rule 404 concerns in gang-related cases are
8     different.  Here, suffice it to say that no case Nordean
9     cites suggests that evidence of the defendants' membership
10    in the Proud Boys is inadmissible, in my view, as long as
11    it's offered for the purposes I've discussed.

12             Nor does evidence of the Proud Boys membership
13    violate the First Amendment.  In Dawson v. Delaware, where
14    the Supreme Court considered whether the trial court
15    properly admitted evidence of the defendant's membership in
16    the Aryan Brotherhood during the sentencing phase of a death
17    penalty case, in that case, the Court held that, quote, The
18    Constitution does not erect a per se barrier to the
19    admission of evidence concerning one's beliefs and
20    associations simply because those beliefs and associations
21    are protected by the First Amendment, 503 U.S. 159 at 165, a
22    Supreme Court case from 1992.  True, the Supreme Court did
23    not [sic] hold that the admission of Dawson's Aryan
24    Brotherhood membership was unconstitutional, but only
25    because it proved nothing more than his abstract beliefs.

1     That's the case at 167.  The organization had nothing to do

2     with that crime.  But the Court expressly recognized that,

3     quote, Associational evidence might serve legitimate

4     purposes.  That's 166.

5                Of course, the First Amendment protects the

6     defendants' membership in the Proud Boys.  But like [sic]

7     Dawson, that's far from irrelevant to the case.  I've

8     already -- as I've already discussed, this evidence does

9     more than prove the defendants' abstract beliefs.  Nordean's

10    reliance on United States v. Lemon, a D.C. Circuit case from

11    1983, is even more misplaced.  There, the Circuit considered

12    only, quote, The First Amendment principles that govern the

13    consideration of membership or affiliation with an

14    organization for the purposes of sentencing, closed quote,

15    not whether affiliation evidence is admissible in a

16    conspiracy prosecution against members of the same

17    organization.  And even if Lemon were on point, it said

18    affiliation evidence comports with the First Amendment if

19    there is, quote, Sufficiently reliable evidence of the

20    defendant's connection to the illegal activity within the

21    organization.  That's Lemon at 940.  So I think the charging

22    document in this case alleges just that.  So Lemon poses no

23    bar to admitting evidence of the defendants' Proud Boys

24    membership here.

25                So I do find, to wrap up the Proud Boys group

1    evidence issue, that for the reasons I've already discussed,

2    this information is generally relevant and satisfies 403

3    balancing.  Indeed, it really is difficult for me to imagine

4    how the jury would understanding -- would understand how

5    these defendants knew each other, came together, or had

6    authority to influence -- or influence over others without

7    it.  That's not to say that the defendants' concerns about

8    unfair prejudice stemming from jurors' opinions about the

9    Proud Boys aren't legitimate.  And, of course, we'll -- that

10   will be the subject of voir dire with potential jurors.

11   And, of course, I'd hear -- I will hear argument from the

12   defendants on any selected aspects of this evidence that

13   they think violates Rule 403.  For example, I think at

14   argument, it came up that the Government was considering

15   offering evidence some sort of violent act was needed for

16   membership in the Proud Boys, you know?  On that, I'll take

17   it up and reserve on that, because I do think something like

18   that poses slightly different concerns than simply just

19   membership, structure, and the like.  But in any event --

20   but given how essential the defendants' roles in the Proud

21   Boys are to understanding the charges in this case, I think,

22   in general, this evidence does not fail 403 balancing.

23           All right.  The other big -- another big chunk of

24   evidence that the parties -- that is raised in the defense

25   motions that the parties go back and forth about is evidence

1    about the December 12th rally.  I'm going to do my best to

2    walk through this thicket.  So the Government's evidence

3    that -- the Government's evidence -- well, this is -- the

4    Government's evidence in this regard is really one

5    subcategory of evidence that the defendants object to

6    because they believe it's improper character evidence.  So

7    let me first discuss the Government's evidence concerning a

8    Proud Boys rally that took place in D.C. on December 12th of

9    2021.  At that rally, the Proud Boys clashed with members of

10   Antifa and some Proud Boys were injured.  Subject to certain

11   limits, I do think evidence about December 12th is

12   admissible under Rule 404(b).

13           First, to the extent the Government argued at the

14   hearings that -- on this motion that it would offer evidence

15   about December 12th to show that the Proud Boys instigated

16   violence or that Proud Boys leadership, including the

17   defendants, generally supported using violence at political

18   rallies, it's not admissible for that purpose.  The

19   Government seemed to walk that back in its supplemental

20   filing, so I won't belabor the point.  But I don't --

21   suffice to say I don't think that's a viable theory of

22   admission.

23           Second, I don't think I agree with the

24   Government's argument that the December 12th rally is

25   intrinsic to the conspiracy.  As I've said, the D.C. Circuit

1    has taken a stricter view of that concept than other

2    Circuits, and it's hard for me to see how an event that

3    predated, let's say, the creation of the MOSD is truly

4    intrinsic to the conspiracy under Bowie.  But regardless,

5    the Bowie court noted that functionally, the only

6    consequences of labeling evidence "intrinsic" are to relieve

7    the prosecution of Rule 404(b)'s notice requirement and the

8    court of its obligation to give an appropriate limiting

9    instruction.  That's Bowie at 927.  Here, the Government

10   included the December 12th rally evidence in its 404(b)

11   notice.  So I'll proceed with that analysis.

12          The D.C. Circuit has held that in conspiracy

13   cases, the Government, quote, Has considerable leeway in

14   offering evidence of other offenses to inform the jury of

15   the background of the conspiracy charged and to help explain

16   to the jury how the illegal relationship between the

17   participants in the crime developed, closed quote.  That's

18   United States -- a cleaned-up quote from United States v.

19   Machado-Erazo, 47 F.4th 721 at 728, a D.C. Circuit case from

20   2018.  For example, in United States v. Straker, the Circuit

21   upheld the District Court's admission -- in a hostage-taking

22   case -- of evidence that some defendants were involved in

23   other uncharged hostage-takings.  The court said that that

24   evidence was relevant, To -- quote, To both how those

25   defendants started to work together as kidnappers, and their

1    motive and intent to kidnap wealthy civilians to extort

2    ransom money.  That's 800 F.3d 570 at 590, a D.C. Circuit

3    case from 2015.  Additionally, quote, Evidence that

4    defendants jointly engaged in under -- in other criminal

5    activity can be relevant to shed light on how the

6    relationship of mutual trust developed between those

7    individuals, closed quote.  So as for motive and intent

8    element -- evidence, the court elaborated that such evidence

9    is, quote, Particularly probative where the Government has

10   alleged a conspiracy, closed quote, because the Government

11   must, quote, Establish that the conspiracy was knowingly

12   formed and the defendants willfully participated in the plan

13   to commit it with the intent to further some purpose of the

14   conspiracy, closed quote.

15        And I think evidence about the defendants'

16   participation in the December 12th rally is admissible for

17   similar reasons.  The Government's theory is that the events

18   of December 12th were, in large part, the impetus for

19   Tarrio's forming the MOSD.  The Government alleges that

20   those who were in the MOSD leaders chat, including Tarrio,

21   Biggs, and Nordean, specifically discussed the violence that

22   occurred at the December 12th rally with respect to

23   recruitment for January 6th.  That's ECF No. 550 at 9.

24   There's also evidence that the events of -- that the events

25   of the -- at the December 12th rally contributed to some

1    defendants' and, maybe, some other MOSD members' views that

2    law enforcement was not on their side and inspired the group

3    to change its approach to engaging with law enforcement

4    before January 6th.  In short, based on all the Government

5    has proffered, I do think evidence about the December 12th

6    rally is probative, non-propensity 404(b) evidence

7    concerning these defendants' relationships of trust with

8    each other, their motivation and intent in forming the MOSD

9    chapter at the center of the charges, and defendants' and

10   other members' increasing hostility toward law enforcement.

11          And I think, over Nordean's insistence otherwise,

12   evidence of his and other defendants' attitudes toward law

13   enforcement is relevant as to their motives leading up to

14   January 6th, their motive and intent.  A reasonable jury

15   might include [sic] that a group of individuals who believe

16   law enforcement is set against them or had chosen another

17   side is more likely to conspire to use force against the

18   police to achieve their ends.  That's especially true here

19   where some defendants have argued at various stages in this

20   case that the Proud Boys historical ties to and support for

21   law enforcement is favorable to their defense.

22          Now, one other detail.  To the extent there's any

23   evidence of specific acts of violence by Proud Boys at the

24   December 12th rally, that's not really 404(b) evidence

25   unless the defendants themselves were the actors.  So such

1    evidence would only be subject to a relevance and 403

2    balancing analysis.  On this, I do think there's a risk that

3    a jury might attribute violent acts -- particularly, sort

4    of, acts that might be considered, you know, where they --

5    where the Proud Boy was the initial aggressor, that that --

6    there must -- that a jury might attribute that aggression or

7    those violent acts of uncharged Proud Boys to the

8    defendant -- to the defendants.  That said, the Government's

9    point that, quote, A core part of its theory is the

10   defendants recruited subordinates whom they knew were

11   willing and able to use violence, is, from my perspective,

12   well taken.  So I do think that evidence of violence by

13   individual Proud Boys on the 12th could be admissible, but

14   only for the purposes of showing that the defendants later

15   used -- some defendants later used that information to

16   select those individuals for a role for their plan for

17   January 6th.

18          A final caveat.  In supplemental filings, Mr. Rehl

19   is subject -- has suggested that he was not present for the

20   violence on December 12th.  So none of this admissible -- is

21   admissible as to him.  So to the extent that any of this

22   gets admitted under 404(b), it would only be admissible for

23   some 404(b) ground -- for example, intent and motive -- but

24   only as to a particular defendant.  So he's right that it,

25   you know -- I would admit it as -- on whatever basis, but

1    only as to a particular defendant, and if there's no factual

2    basis to admit it as to his intent or motive or whatever the

3    basis is, then it wouldn't be.

4            Next, and closely related to the December 12th

5    issue, I'll consider Tarrio and Nordean's motions to exclude

6    evidence that Tarrio stole and burned a Black Lives Matter

7    flag from a historically Black church on December 12th.

8    Later, when Tarrio returned -- this is, sort of, part of a

9    series of pieces of information and potential evidence.

10   Later, when Tarrio returned to D.C. on January 4th ahead of

11   the January 6th rally, he was arrested and charged with

12   destruction of property and with possession of two

13   large-capacity magazines in D.C. Superior Court.  And in

14   light of these charges, Tarrio was ordered to leave the

15   District of Columbia on -- when he was released on -- I

16   guess it's the 5th.

17           So to start, and to the extent Tarrio moved to

18   exclude this evidence in the first place, I am going to

19   allow the Government to present evidence that Tarrio brought

20   the magazines into D.C. on January 4th and then was arrested

21   on a warrant for the December 12th conduct when he came --

22   when he arrived in D.C.  I think Tarrio's conduct in this

23   regard is actually intrinsic evidence of the conspiracy: the

24   fact that he was coming to D.C., the fact that he had the

25   magazines.  It's relevant.  It explains why -- and it's --

1    and the overall fact that he was arrested is relevant

2    because it does explain why he wasn't at the Capitol on

3    January 6th but was outside the District of Columbia.

4         I do think the issue of Tarrio's theft and

5    destruction of the Black Lives Matter flag is a little bit

6    of a different story -- on January -- that's back on

7    December 12th, to be clear -- is a little bit of a different

8    story.  I tend to agree with Tarrio that evidence that he

9    stole and burned a Black Lives Matter flag or banner is

10   needlessly inflammatory, even if there is going to be

11   evidence -- other evidence at the trial that the defendants

12   opposed the Black Lives Matter organization generally.  At

13   least on the record before me now -- and I'm open to

14   correction on this as we -- as things evolve over the next

15   few weeks -- it seems to me, though, the details of this

16   offense have very marginal probative value and I -- which is

17   substantially outweighed by the risk of prejudice.  So on

18   the record before me, I'm inclined to exclude it.

19        That said, even if I exclude the details of the

20   conduct that led to the arrest, I'll still allow the

21   Government, as I said, to admit evidence that Tarrio was

22   charged in D.C. Superior Court with some offense arising out

23   of the December 12th rally.  Again, as I mentioned, I think

24   this evidence has a -- probative value because it explains

25   Tarrio's arrest on January 4th which, in turn, explains why

1   he wasn't on the Capitol -- at the Capitol on January 6th.

2   It provides necessary context to other defendants' and

3   co-conspirators' relevant statements, including statements

4   the -- that at least one cooperator made, saying the arrest

5   could be the shot heard 'round the world and the normies

6   will eff up the cops; Mr. Biggs's speech before marching to

7   the Capitol in which he says, After what they did to our boy

8   Enrique, we're going to let D.C. know that we effing exist

9   and we're not going any goddamn where.

10              So I think -- in summary, I think it makes sense

11  to include -- to exclude the details of that offense if

12  Tarrio so wishes.  I could just say -- we could just say he

13  was arrested for destruction of property and leave it at

14  that.  I'll ask counsel for Mr. Tarrio to just think about

15  how you'd like me to describe the December 12th offense for

16  which he was arrested on January 4th.  And, as I said, if

17  there's some reason why Tarrio's conduct -- his offense

18  conduct is more integral in some way to the Government's

19  case than I understand, then, you know, the Government can

20  raise that with me later on.

21              Related to this issue, Tarrio also moves to

22  exclude any videos depicting his arrest and location at the

23  jail.  I can't -- it's hard for me to judge the

24  admissibility of that kind of evidence.  I haven't seen any

25  of those videos, and I really don't have any description of

1    what this evidence might look like.  I don't know that the

2    Government has suggested it will offer these videos.  So

3    I'll just defer ruling on this until it comes up at trial.

4          Last in this category, Nordean moves to exclude

5    any evidence related to an unlawful breach of the Oregon

6    State Capitol in late December 2020.  The parties seem to

7    agree that the defendants had nothing to do with the Oregon

8    State Capitol event.  So it's not really, as Nordean

9    contends, 404(b) evidence.  Rather, the Government sends --

10   says it intends to offer evidence of, quote, After-the-fact

11   discussions, closed quote, about the rally, quote, Among

12   members of the Proud Boys, closed quote.  That's ECF No. 515

13   at 17.

14         But the only states [sic] the Government cites in

15   its -- as examples of this category were made by

16   unidentified members of the Official -- what's known as the

17   Official Presidents chat.  And while Nordean, Tarrio, and

18   Rehl were members of this group, it apparently had well over

19   100 members.  And unlike some of the other chat groups we've

20   talked about, the Government doesn't claim that this chat

21   was, sort of, a part of the charged conspiracies.  So I

22   would agree with the Government that evidence about what

23   happened in Oregon could be relevant and admissible if, for

24   example, a member of one of the charged -- a defendant or a

25   member of one of the charged conspiracies praised it.  But

1    based on what the Government has proffered, I agree with the

2    defendants that statements about the Oregon Capitol event by

3    other Proud Boys presidents, without any further foundation

4    that these events were -- had anything to do with the

5    charged conspiracies, is not relevant.  So at least for now,

6    I'll grant the motion on that issue, again, subject to

7    reconsideration if the Government comes forward with

8    evidence to more closely connect whoever was making these

9    comments to the charged conspiracy.

10          Moving along, Nordean and Tarrio also object to

11   various categories of videos from the Government's witness

12   list depicting the events of January 6th, including videos

13   not depicting defendants; videos from media compilations;

14   and Government-created montages.  Some -- subject to some of

15   the caveats that I'm going to mention, I'm going to

16   generally deny these motions.

17          Beginning with the motions [sic] recorded by both

18   protesters and the media that don't depict the defendants'

19   activities, I think these are generally relevant/admissible.

20   If the videos depict the conduct of the conspiracy's tools

21   along the lines and limitations that I've already laid out,

22   I think they're admissible for the reasons I've already

23   discussed at length.  And in any event, in response to

24   Mr. Nordean's objection, the Government clarified that the

25   majority of the videos it intends to admit depict

1    defendants' own actions that day which would obviously be

2    admissible.

3              As I mentioned earlier, I do think, to some

4    degree -- some degree -- videos depicting the Capitol -- the

5    events at the Capitol as a whole are relevant to the

6    Government's burden to prove the violations of 18 United

7    States Code Section 231(a)(3) charged in Count 5.  One

8    element of that offense is that a defendant committed an act

9    to obstruct or impede or interfere with a law enforcement

10   officer, quote, Incident to and during the commission of a

11   civil disorder, closed quote.  So I will give the Government

12   a little leeway on that, as I did in another January 6th

13   case that I tried, but not too much.  Rule 403 presents --

14   prevents the Government from showing the jury so many videos

15   that they become needlessly cumulative or that run the risk

16   of confusing the jury about what acts these defendants were

17   responsible for.  Based on the -- what the Government has

18   proffered, I don't expect it to get that far.  And the few

19   videos that are admitted along these lines,

20   cross-examination can make clear that the Government does

21   not allege any connection between the defendants and a lot

22   of this other conduct that happened that day.

23             Nordean also objects to video clips that were

24   selectively edited by the media which create an exaggerated

25   impression of events and feature political commentary by

1    reporters.  That's ECF No. 489 at 13.  But the Government

2    has clarified that it only produced these videos so that the

3    defendants had the source material for various clips.  It

4    does not intend to admit the montages in full or the

5    commentary to which Nordean objects.  So at this point, this

6    should be a non-issue.

7          Mr. Nordean also objects to two Government-created

8    montages: one of compiled Capitol Police footage and another

9    of recordings from the events in the chambers of Congress.

10   Again, I do think both are admissible.  First, the Capitol

11   Police footage is admissible for the same reasons as other

12   videos not depicting these defendants.  In particular, it

13   offers direct evidence of Count 5.  Again, I actually don't

14   know how long that video is, but, you know, evidence that

15   I'm going to admit, as I said before, in this category, the

16   amount of it will certainly be limited.  But in any event,

17   that video provides relevant background and context for the

18   jury concerning the day's events.  And if the parties want a

19   limiting instruction in some way about that kind of footage,

20   I'm certainly open to that.

21         As for the congressional chambers footage,

22   Mr. Nordean's only complaint is that the videos purport to

23   instruct the jury on laws; that is, the Twelfth Amendment

24   and the Electoral Count Act.  Based on the Government's

25   description of the video, it doesn't seem like that's the

1     case.  Based on its representations, I don't expect that any
2     of the Government's witnesses will opine on the laws or
3     attempt to obstruct -- instruct the jury on them, but we
4     will see.
5              The Government also intends to offer three
6     interrelated selfie videos Nordean filmed of himself
7     describing an interaction with a stranger at a bar.  The
8     stranger criticized his mentality about COVID precautions
9     and he narrates to the camera, I was part of effing storming
10    the Capitol of the most powerful country.  He then also
11    says, 1776.  And in these videos, he appears intoxicated.
12             Nordean objects, arguing that these videos serve
13    no purpose other than to embarrass him in front of the jury.
14    But on the whole, I disagree and I will admit them.  In the
15    video, Nordean actually confesses to criminal conduct,
16    admitting that he was part of storming the Capitol.  And
17    while Nordean obviously doesn't dispute that he entered the
18    Capitol on January 6th, he does argue that he didn't do so
19    with the unlawful intent as charged in indictment.  Yet, I
20    think a reasonable jury might find that his word choice,
21    "storming," suggests otherwise.  And a jury could also draw
22    a similar conclusion from the fact that he connects the
23    Capitol breach to 1776.  In any event, even if Nordean
24    doesn't dispute the allegations that he admits to in that
25    video, the Government is generally free to prove its case as

1    it sees fit, including details -- including proving up

2    details on which the defendants agree or have conceded.  And

3    that principle generally stems from Old Chief v. United

4    States, 519 U.S. 172 at 189, a Supreme Court case from 1997.

5    And while the video might be embarrassing, I don't think it

6    fails the Rule 403 test.

7         The Government has included five other selfie

8    videos on its witness list to provide context for the three

9    I've just discussed, but it reports that it no longer

10   intends to offer those videos in light of Nordean's

11   objection.  So I won't address them here.

12        Nordean also moves to exclude two categories of

13   Telegram chats from trial: one, those predating the

14   conspiracy; and, two, messages that contain derogatory,

15   racist, sexist, homophobic, or anti-Semitic remarks, or else

16   references to occasional drug or alcohol use.  Similarly,

17   Tarrio also moves to exclude any mention of the Black Lives

18   Matter movement or organization.

19        I'm not going to categorically exclude any

20   Telegram message predating the conspiracy's onset.  There

21   are any number of reasons why such statements might be

22   relevant such as if they provide background on how the

23   defendants met, their motives in -- or their motives in

24   forming the conspiracy in the first place.  As for the

25   derogatory remarks, I'm not going to require the Government

1   to redact everything that might be offensive or allude to

2   drug and alcohol use.  Simply put, the jury has the right to

3   hear the way these defendants speak in the evidence the

4   Government chooses to present.  And requiring the Government

5   to redact every stray word or comment that might offend

6   someone would needlessly fill their evidence with gaps,

7   rendering it less comprehensible [sic] to the jury.  By and

8   large, I can and will mitigate the risk of unfair prejudice

9   stemming from such comments with limiting instructions, if

10  they are requested.  Of course, this is only true to a

11  point.  The evidence containing any such comments still has

12  to pass muster under Rule 403.  And, of course, it has to be

13  relevant -- well, it has to be relevant and, of course, it

14  has to pass muster under Rule 403; that is, its probative

15  value cannot be substantially outweighed by the unfair

16  prejudice of any vulgarity or offensive comments.  If the --

17  I do think if the Government tried to admit evidence of the

18  sort that Judge McFadden included -- excluded in United

19  States v. Hale-Cusanelli -- an example we talked about at

20  argument -- I would probably exclude that under Rule 403.

21  But in that case, that was pretty extreme stuff.  I don't

22  know the -- and I also don't really know the context -- what

23  purpose that was being offered and how that connected with

24  the Government's other evidence, but it was pretty extreme

25  stuff.  I haven't seen anything the Government intends to

1    introduce along those lines that would rise to that level.

2    But I'll consider them on a case-by-case basis as things go

3    forward.

4         Nor will I categorically preclude the Government

5    from entering any evidence whatsoever about the defendants'

6    views on the Black Lives Matter organization or movement.

7    Tarrio doesn't cite any specific examples of the evidence he

8    seeks to exclude.  So I'm not really in a position pretrial

9    to evaluate whether the evidence is relevant and satisfies

10   the 403 balancing.  The Government has said, as I recall

11   during argument, that there's going to be plenty of evidence

12   that generally the defendants did oppose Black Lives Matter.

13   I'll take it as it comes, but I don't have any basis right

14   now that I can say that it needs to be excluded.

15        Nordean next objects to the Government admitting

16   various statements he made in posts on Parler, a social

17   media site, and in online interviews.  Broadly speaking,

18   these posts express his views on an array of politically

19   controversial subjects like COVID-19 protective measures and

20   the Black Lives Matter movement again.

21        I'm not going to rule on the admissibility of

22   these statements pretrial.  I think -- well, let me just set

23   out what I think the right ground rules are.  On the one

24   hand, statements in posts and during interviews about

25   subjects that relate to January 6th events such as -- and

1    that relate to the 2020 election; that relate to Congress;

2    that relate to the -- potentially the conspirators' --

3    alleged conspirators' growing discontent with law

4    enforcement, I think those are all admissible evidence of a

5    particular speaker's intent leading up to January 6th.  To

6    the extent politically controversial comments relate to

7    the -- things like, as I said, the election, federal policy,

8    Congress, I think they're fair game for the same reasons.

9    The Government does have to commit -- convince the jury that

10   Nordean conspired to use force to oppose the authority of

11   the United States Government.  And vehement opposition to

12   Federal Government policies might inform -- would, of

13   course, inform why a speaker would do so.  I think others

14   that become less linked to the election -- less linked to

15   the federal election, less linked to January 6th might not

16   shed light on that.  So in short, as to this category, I

17   think many of these statements are going to be admissible in

18   many cases, but I think the further they are untethered from

19   either the Federal Government or concerns about the

20   election, the more they might slide into exclusion under

21   403.

22          Next, we will talk -- next, Nordean and Tarrio

23   both move to exclude a document titled 1776 Returns which an

24   associate of Tarrio's sent to him.  It purports to set out a

25   plan to occupy various government buildings on January 6th.

1    Defendants argue this document fails 403 balancing because

2    there's no direct evidence that Tarrio opened the document

3    or shared it with any of the other defendants.  But while,

4    in my view, the lack of such evidence might be good

5    information for the defendants to use in cross-examination,

6    there's not a reason to exclude -- these are not reasons to

7    exclude the document from evidence altogether.

8            In -- and in any event, at our hearing back in

9    November, the Government proffered some further information

10   that the individual who sent this document was a woman who

11   Mr. Tarrio was romantically involved with and that they

12   communicated at length after he [sic] sent it.  The

13   Government also proffered evidence that after this

14   individual sent Tarrio this 1776 Returns document, he began

15   referencing terms that the document used such as the "winter

16   palace."  So there's at least some evidence on which a jury

17   could infer that Mr. Tarrio was familiar with the document

18   apart from the fact that he was emailed it.  So given the

19   similarity between the document's plan and the events of

20   what happened on January 6th, I think the document's

21   relevant and admissible and, again, the defendants can

22   elicit at least facts they think separate Mr. Tarrio from

23   the document.

24           Nordean's last objection is to multimedia

25   demonstrative exhibits the Government created to map out

1    defendants' route to the Capitol.  He argues these modules

2    contain implicit arguments about the defendants' intent that

3    are misleadingly presented as neutral evidence and,

4    therefore, fail 403 balancing.  But, as I said at the

5    November 17th hearing, as long as these modules accurately

6    depict defendants' movements on January 6th, they are

7    admissible.

8            The last motion that I had wanted to rule on here

9    today is Mr. Rehl's motion to sever.  And I am going to deny

10   that motion, as well.

11           Federal Rule of Criminal Procedure 14(a) provides

12   that if the joinder of offenses or defendants in an

13   indictment, an information, or a consolidation for trial

14   appears to prejudice a defendant or the Government, the

15   court may order separate trials of counts, sever the

16   defendants' trials, or provide any other relief that justice

17   requires.  The D.C. Circuit has explained that under that

18   rule, District Courts have significant flexibility to

19   determine how to remedy any potential risk of prejudice

20   posed by the joinder of multiple defendants in a single

21   trial, closed quote.  That's United States v. Moore, 651

22   F.3d 30 at 95, a D.C. Circuit case from 2011.

23           As the Moore court elaborated, that balance has

24   been struck in favor of joint trials.  That's Moore at 95.

25   And the Supreme Court has instructed that, quote, A District

1    Court should grant a severance under Rule 14 only if there

2    is a serious risk that a joint trial would compromise a

3    specific trial right of one of the defendants or prevent the

4    jury from making a reliable judgment about guilt or

5    innocence.  That's Zafrio v. United States, 506 U.S. 534 at

6    539, a Supreme Court case from 1993.  And even -- in that

7    case, even, quote, When the risk of prejudice is high, less

8    drastic measures, such as limiting instructions, often will

9    suffice to cure any risk of prejudice.

10             I -- after reading Mr. Rehl's motion, I'm not

11   preceded -- I'm not persuaded that severance is warranted

12   here.  First, he says that the offenses with which he's been

13   charged are, quote, Not of the same character and not based

14   on the same act or transaction and his -- as his

15   co-defendants.  I just don't think that's true.  Mr. Rehl

16   faces exactly the same charges as his co-defendants, save

17   the robbery offense that only Mr. Pezzola has been charged

18   with.  And to the extent Mr. Rehl argues that he's less

19   culpable than his co-defendants, even if that's true, that's

20   not enough to justify severance.  As the D.C. Circuit said

21   in Moore, some disparity in evidence does not compel

22   severance.  Rather, quote, Absent a dramatic disparity of

23   evidence, any prejudice caused by joinder is best dealt with

24   by instructions to the jury to give individual consideration

25   to each defendant, closed quote.  That's also Moore, quoting

1   another D.C. Circuit case, United States v. Slade at -- 627

2   F.2d 293 at 309, a D.C. Circuit case from 1980.  And that's

3   certainly an instruction we can discuss at a later date.

4   But at this stage, the evidence against Rehl, as I see it,

5   is not so dramatically different from his co-defendants as

6   to require severance.  Rather, as I've discussed in detail

7   in prior rulings such as my detention rulings, there is,

8   quote, Substantial and independent evidence of Mr. Rehl's

9   significant involvement in the conspiracy, so severance is

10   not required.  That's United States v. Tarantino, 846 F.2d

11   1384 at 1399, a D.C. Circuit case from 1988.

12          Mr. Rehl also argues that the Government will be

13   introducing prejudicial evidence against Mr. Tarrio and

14   Mr. Pezzola that would not be admissible against Mr. Rehl in

15   his own trial.  But even to the extent any evidence is not

16   directly relevant to Rehl's role in the conspiracy, the few

17   discrete evidentiary concerns Rehl cites risk only the sort

18   of prejudice I can mitigate with a limiting instruction, if

19   appropriate, down the road.

20          Rehl also says that his defense, quote, Will be

21   decidedly antagonistic and irreconcilable with Mr. Pezzola's

22   defense.  That's ECF No. 492.  But he doesn't detail how

23   that's the case.  He's argued in support of this point,

24   essentially, that there's some different and prejudicial

25   evidence related to Pezzola's conduct on January 6th that

1    neither he nor the other defendants were involved with.  But

2    as I've already said, I don't think that disparity is enough

3    to justify severance.  And while Rehl has said that part of

4    his defense will include the fact that he was not privy to

5    some of the meetings the other defendants held, his core

6    defense is generally consistent with the others; that is,

7    that there was no conspiratorial agreement to do unlawful

8    activity on January 6th.

9            Rehl next argues that the Government has failed to

10   allege a single conspiracy that involved a single common

11   plan that involved Mr. Rehl.  Rather, he argues, quote, The

12   indictment explicitly alleges the existence of multiple

13   separate plans.  Those separate plans included the one set

14   out in the 1776 Returns document; one stemming from a

15   meeting between Tarrio, Biggs, and Nordean ahead of January

16   6th; and one between Pezzola and Donohoe resulting in

17   Pezzola stealing a riot shield and smashing a Capitol window

18   to gain entry.  But the third superseding indictment does

19   not charge these events as discrete conspiracies.  Rather,

20   the evidence Rehl cites is evidence of overt acts in

21   furtherance of the broader conspiracies charged.  So there's

22   no basis for severance here, even if Rehl did not

23   participate in every overt act furthering the charged

24   conspiracies.

25            Finally, Mr. Rehl argues that the Government will

 1   offer non-co-conspirator statements that will present Bruton

 2   problems because Rehl will not be able to confront or

 3   cross-examine the declarant.  But as I said earlier, Bruton

 4   only comes into play when statements are testimonial, and

 5   I -- there does not seem to be any Bruton or Confrontation

 6   Clause issue here that I've been apprised of.  So I don't

 7   see any reason to sever Mr. Rehl's charges on this basis at

 8   this point.

 9           So for all these reasons, I will deny Mr. Rehl's

10   motion to sever.

11           Given how long that's taken me and given that I'm

12   sure now the court reporter would like a break, I'm going to

13   step down for 10 minutes.  We'll take a 10-minute recess.

14   I'll come back and we'll get to the other things we need to

15   get to.

16           THE DEPUTY CLERK:  All rise.  This Honorable Court

17   stands in recess for 10 minutes.

18           (Brief recess taken.)

19           THE DEPUTY CLERK:  Your Honor, we're back on the

20   record in Criminal Matter 21-175, United States of America

21   v. Ethan Nordean, et al.

22           THE COURT:  All right.  Thank you all for enduring

23   that ruling.

24           We have several buckets of motions here left.  And

25   let me propose to the parties how I'd like to handle things.

 1    I don't -- the -- one of the motions in front of me is

 2    Mr. Nordean's motion to lift the sensitivity designation.  I

 3    don't need to hear argument on that, and I'm prepared to

 4    just deny it and explain why.  So I propose I do that first.

 5          Second, there's -- I have -- we have Mr. Tarrio,

 6    Mr. Biggs's motion to transfer or -- motion to transfer, I

 7    guess it is, or in the alternative, to bring in additional

 8    jurors.  I will hear from you on that and I think I'm

 9    prepared to rule on it, and I'll just -- because I think I

10    can explain some of the things we can do to mitigate the

11    concern you all are mentioning, but I think we can have a,

12    you know -- a discussion about that.  I think we can get

13    that -- all of that done in about 30 minutes and I'll let

14    everyone go to lunch and come back and we can take up the,

15    sort of, witness-based motions on the other side of lunch

16    because I think those will be a little -- you'll probably

17    be -- want to be heard on a little more extensively.

18          Does anyone object to that?

19          MR. SMITH:  (Indicating.)

20          THE COURT:  Yes, Mr. Smith?

21          MR. SMITH:  So Judge, good afternoon.

22          Before we move on to the next set of motions, I

23    just had a couple of clarifying questions about the Court's

24    order because it's an -- it was an oral ruling and I just --

25    there's no argument.  I'm just making sure that -- I

1    think --

2                    THE COURT:  Okay.

3                    MR. SMITH:  -- we're already on the same page --

4                    THE COURT:  Okay.

5                    MR. SMITH:  -- with you.

6                    So on the issue where -- about the declarant's

7    state of mind being used, the declarant's out-of-court

8    statement being used as, kind of, evidence of the state of

9    mind of a non-declarant defendant, I think the Court was

10   emphasizing that the declarant's statements would only be

11   considered for the declarant's state of mind and the Court

12   was, kind of, indicating this was a point of law and at --

13   however, that the declarant's out-of-court statement could

14   still be used -- the jury could infer based on a declarant's

15   out-of-court statement that a conspiracy existed even though

16   a defendant non-declarant had not adopted that statement.

17   That -- I took --

18                    THE COURT:  I -- really, what I'm saying is it --

19   there's no further limitation that I have to give on that

20   statement.  So if the Government offers a statement that

21   is as to Defendant A's state of mind, I -- if you all would

22   like a limiting instruction that that is only admissible for

23   Defendant A's state of mind, that's perfectly fine.

24                    MR. SMITH:  That answers --

25                    THE COURT:  Okay.

```
 1                    MR. SMITH:  -- my question --

 2                    THE COURT:  Okay.

 3                    MR. SMITH:  -- Your Honor.  That --

 4                    THE COURT:  But --

 5                    MR. SMITH:  That was it.

 6                    THE COURT:  But I don't think -- I would say my

 7      point is I don't think any further limitation is needed and

 8      the jury is able to, sort of, like -- if they buy that state

 9      of mind, consider that more broadly in the case.

10                    MR. SMITH:  We agree 100 percent.

11                    THE COURT:  Okay.

12                    MR. SMITH:  And we would -- just wanted to --

13                    THE COURT:  And --

14                    MR. SMITH:  -- clarify that a limiting instruction

15      would be appropriate --

16                    THE COURT:  It --

17                    MR. SMITH:  -- for that point alone.

18                    THE COURT:  If you would like one, yes.  I mean,

19      in some circumstances, folks don't want them and we'll take

20      that up as we go, but yeah, I think that's right.

21                    MR. SMITH:  And would the Court intend to use a,

22      kind of, general limiting instruction at the --

23                    THE COURT:  We can talk about it.  I mean, it,

24      kind of, depends, right, a little -- I would probably almost

25      certainly defer -- well, I'll take your -- the defense views
```

```
1   on this very, you know -- I'll take them greatly into
2   account.  I mean, I think sometimes defendants don't -- as
3   you well know, sometimes defendants don't want a particular
4   limiting instruction because it, sort of, you know -- don't
5   think of an elephant.  So I -- maybe, this isn't that kind
6   of situation, but the point is you -- we can -- I don't know
7   how often this is going to come up.  If it makes sense to
8   give some kind of overall thing that explains when something
9   is introduced for the state of mind of one defendant, it's
10  not, you know -- I -- we can address that in the future, but
11  yes, I think a limiting instruction would be appropriate.
12             MR. SMITH:  Thank you, Your Honor.
13             On the tools point, the Court said that the
14  limiting principle for the tools evidence was that, I think,
15  quote, The -- it must bear some connection to the
16  defendants.  And so I just wanted -- and then another point
17  the Court was -- more specifically said, the connection
18  would be causal, a causal relationship.  And I think what I
19  wanted to clarify here is that it can't be just any
20  connection because it -- I could give some silly examples
21  where it, you know --
22             THE COURT:  They both have brown hair?
23             MR. SMITH:  They both have brown hair.
24             THE COURT:  Right.  No, that's --
25             MR. SMITH:  They both have brown hair.  I was
```

1    going to say blond, but, like --

2              (Laughter.)

3              But I think the connection has to be causal,

4    because otherwise there wouldn't be any relevant factor

5    that -- let's say there was a non-defendant Proud Boy who

6    didn't have any conversationals [sic] -- that -- who doesn't

7    even know the defendants --

8              THE COURT:  Right.

9              MR. SMITH:  -- and had no conversations with the

10   defendants before January 6th.  Even on the day of, they

11   weren't with them.  They weren't --

12             THE COURT:  Oh, they weren't together.

13             MR. SMITH:  So -- yeah, but you could --

14             THE COURT:  Right.

15             MR. SMITH:  -- say -- well, the Government might

16   argue, Well, there, the connection is Proud Boys membership,

17   but --

18             THE COURT:  Yeah, I --

19             MR. SMITH:  So --

20             THE COURT:  Right.  So I'll take them up -- I'll

21   take these up as they go, but it strikes me that you're

22   probably right that merely membership in the Proud Boys

23   doesn't get you there.

24             MR. SMITH:  And -- but -- so I think we -- one

25   of -- in our briefing, we point out there's a preliminary

1    question here under Rule 104 that, quote, When relevance of

2    evidence depends on whether a fact exists, proof must be

3    introduced sufficient to support a finding that the fact

4    does exist, end quote, and we cited some cases holding that

5    the Court actually has to make a determination before

6    this -- the evidence on which -- which depends on the fact's

7    existence.  Before it reaches the jury, the Court has to

8    make a finding that there's sufficient proof for a

9    reasonable jury to find that that fact on which relevance

10   turns does exist.  So one of the arguments we made in the

11   briefing was that the causal factor here is the fact.  So

12   if, for every, kind of, tools evidence the Government wants

13   to use, the fact that has to be proved before relevance is

14   established is a causal relationship between the defendant's

15   actions and the non-defendant's --

16              THE COURT:  Yeah.  It --

17              MR. SMITH:  -- act or statement --

18              THE COURT:  It strikes me that they could

19   proceed -- I'll have to look at the rule.  It strikes me

20   that they could proceed by proffer that this is what the

21   causal connection is, but generally speaking, yes, I think

22   you're right that it's not like the Government would get to

23   introduce that and later on prove that.  I think that's

24   right.

25              MR. SMITH:  So the way that it would proceed at

1    trial is the Government would make a proffer before the

2    tools evidence was shown to the jury and -- about --

3                THE COURT:  I think that's right, you know?  Look,

4    I think the contours of this will be apparent as we go.

5    There's -- if there's one particular person they're talking

6    about as the tool and they make that showing, then they

7    don't have to keep making it, but yeah, I think that's

8    right, because I'm flying blind on the tools at this point.

9                MR. SMITH:  Okay.  So --

10               THE COURT:  So I think that's right.

11               MR. HULL:  Your Honor --

12               MS. HERNANDEZ:  So are we, Your Honor.

13               THE COURT:  All right.  All right.  All right.

14               MR. SMITH:  Judge, on the First Amendment issue, I

15   think there's only one little clarification we wanted to

16   make which was the Court drew a distinction between a First

17   Amendment argument and a specific First Amendment defense,

18   and I think on the -- we take the Court's point about not

19   limiting the defense's ability to raise the argument that

20   the Capitol grounds are a public forum and merely an intent

21   to or a plan to protest at the Capitol grounds per se cannot

22   be a criminal offense --

23               THE COURT:  Well --

24               MR. SMITH:  -- per se, Your Honor.  So that would

25   be the holding from Jeannette Rankin Brigade.

1          THE COURT:  Yeah, I'm not sure I agree.  But,

2     look, you're going to be able to make -- again, for now,

3     we're just talking about what you'll be able to say in

4     opening, and I don't think you can say per se that's -- I

5     think you -- it strikes me the way around this is that the

6     defense can say, If all my -- if all the Government proves

7     to you is an agreement to protest outside the Capitol, then

8     they haven't proven their case.  I think they would agree

9     with that, I think, but I --

10          MR. SMITH:  So here -- and here's where this

11     connects to the next point, Your Honor.  So if -- and,

12     again, we -- I feel like I've had this conversation about

13     1512 about 1,000 times in the last, you know, two years, but

14     if the crime is outside the context of evidence and

15     investigations and we say that any act that influences any

16     proceeding in Congress with a wrongful purpose is a crime,

17     then we're in a zone where the Government could, in theory,

18     prove its case by saying, Here is an -- here is a plan to

19     protest outside the Capitol.  Let's say there was no

20     contemplation of the restricted area.  Let's set that aside.

21          THE COURT:  Right.  But why --

22          MR. SMITH:  If the Government were to -- just

23     round out -- just one thought.

24          THE COURT:  Right.

25          MR. SMITH:  If the Government were to prove that

1    there was a plan to influence a proceeding inside Congress

2    while on the Capitol grounds with a wrongful purpose, if we

3    allow that definition of "corruptly," then you have an

4    offense that is both an offense and an activity that's

5    protected under Jeannette --

6              THE COURT:  Okay.

7              MR. SMITH:  -- Rankin Brigade.

8              THE COURT:  Okay.

9              MR. SMITH:  So --

10             THE COURT:  I'm not sure I agree.  But the point

11   is, why do I have to decide that now?

12             MR. SMITH:  Because -- I just wanted to clarify

13   that in opening argument, we will be able to say that under

14   the instructions, it -- the Court hasn't decided --

15             THE COURT:  Right --

16             MR. SMITH:  -- what the instructions --

17             THE COURT:  -- we haven't --

18             MR. SMITH:  -- will be yet.

19             THE COURT:  -- yet.  So I wouldn't talk about

20   instructions, but go ahead.

21             MR. SMITH:  So if the instructions were agreed

22   that any act that influences any proceeding in Congress done

23   with a wrongful purpose can satisfy the instruction, then

24   there is a -- I'm saying there is a -- there's a Venn

25   diagram --

```
 1                    THE COURT:  I understand --

 2                    MR. SMITH:  -- where the two things intersect, the

 3     right -- the First Amendment right --

 4                    THE COURT:  What do you want to say in your

 5     opening?

 6                    MR. SMITH:  So the statement is that if the

 7     Government established -- if you determine beyond a

 8     reasonable doubt that the Government has proven a plan or an

 9     act to influence or obstruct or impede Congress's proceeding

10     and has proven that the defendant's intent was a wrongful

11     purpose and not an unlawful means, you may not find the

12     defendant guilty --

13                    THE COURT:  But that --

14                    MR. SMITH:  -- because --

15                    THE COURT:  We're talking about closing argument

16     now.  We're not talking -- I mean --

17                    MR. SMITH:  No, no, we're allowed to -- we're

18     allowed -- in opening statements, we're allowed to make an

19     argument about what the evidence will show.

20                    THE COURT:  Right.

21                    MR. SMITH:  So if the evidence shows -- if the

22     evidence shows --

23                    THE COURT:  No, you're making a legal argument,

24     though.

25                    MR. SMITH:  No, you --
```

```
 1              THE COURT:  Go ahead.
 2              MR. SMITH:  Okay.  So --
 3              THE COURT:  Right.
 4              MR. SMITH:  The --
 5              THE COURT:  If the evidence shows --
 6              MR. SMITH:  I'm --
 7              THE COURT:  -- that --
 8              MR. SMITH:  -- explaining --
 9              THE COURT:  -- then the law --
10              MR. SMITH:  -- what the First Amendment defense --
11    what --
12              THE COURT:  Right.
13              MR. SMITH:  So the Court asked, Is there -- and I
14    think this is an entirely correct observation that in most
15    cases, if the Government has proven an offense beyond a
16    reasonable doubt, there's by definition no First Amendment
17    defense.  In the --
18              THE COURT:  Right.
19              MR. SMITH:  -- vast majority of cases, that -- it
20    can't be otherwise --
21              THE COURT:  Right.
22              MR. SMITH:  -- but what -- but the way it gets a
23    little hinky here is when there's this zone that involves
24    influencing Congress with a wrongful purpose, not an
25    unlawful means.
```

1            THE COURT:  Right.

2            MR. SMITH:  It -- there, the two -- the defense

3    intersects with the offense -- the elements of the offense,

4    and what that is is an as-applied challenge.  That's the

5    whole nature of an as-applied challenge.  It means the Court

6    can't say -- and it didn't say -- based on the face of the

7    indictment, there's necessarily a facial violation of the

8    First Amendment rights of the defendants involved.  It

9    depends on the facts, and that's for the jury to decide.  So

10   we're just clarifying that if we could be precise about it,

11   then we're -- we have to be able to argue that that's --

12            THE COURT:  Well, if I agree that you're right on

13   the law, which I'm not sure I agree, but okay.  I mean, I

14   think we're going to have to stick a pin in it and I -- I'm

15   going to have to -- I'll say this.  Why don't you confer

16   with the Government on this and see if you all can get to a

17   place where you agree.  You probably won't, but we're

18   talking about for opening statements only, not what the --

19   so I understand what you're saying.

20            MR. SMITH:  Well, it was -- Judge, it was briefed

21   in the jury instructions.  We had, like, a -- it's confusing

22   because we had different color codings and footnotes and

23   everything else, but if you really dig deep down into the

24   footnotes --

25            THE COURT:  All right.

```
 1              MR. SMITH:  -- that that's the issue that's --

 2              THE COURT:  All right.

 3              MR. SMITH:  Yeah.

 4              THE COURT:  I'll take a look at it.  So the -- to

 5    answer your question, I haven't given you the ruling you

 6    want, but I have -- but I'll take a look at what -- the

 7    point you're making.

 8              MR. SMITH:  But the -- so just to clarify this

 9    issue, the Court agrees that an act that is -- a plan to

10    protest outside the Capitol without contemplation of a

11    restricted area that does not -- that involves no unlawful

12    means could present a conflict between -- could present a

13    conflict between First Amendment rights and an obstruction

14    of justice --

15              THE COURT:  I don't know.  I'm not saying I agree

16    with that.  I am saying that I think in opening, as I said

17    before -- well, I -- you heard what I said.  If you want

18    more than that, I'm going to have to think about the

19    argument you're making, and I will do that between now and

20    when you open.

21              MR. SMITH:  And more than saying the -- a plan --

22              THE COURT:  I understand.

23              MR. SMITH:  -- or intent to protest inside the

24    Capitol grounds is not, in itself, a criminal offense --

25              THE COURT:  I --
```

```
 1              MR. SMITH:  -- under the First Amendment.
 2              THE COURT:  I want --
 3              MR. SMITH:  That's -- that was the --
 4              THE COURT:  I want you and the Government to see
 5     if -- let's put it this way.  And I want the Government to
 6     try to tee up, also, whether it thinks you can say anything
 7     more than what I just said.  I'll try to resolve it
 8     beforehand, but I hear -- I understand there's an unresolved
 9     issue.
10              MR. SMITH:  Okay.  Your Honor, on the December
11     12th evidence, I think, again, we have another preliminary
12     question under Rule 104 that the Court has to rule on.  So I
13     think the Court indicated that the relevance lies in -- of
14     that event lies in the impetus for creating the Ministry of
15     Self-Defense group.  I think the issue we're trying to
16     clarify here is that we have shown the Court evidence that
17     the Government has not established that this group's
18     creation had some connection to January 6th.
19              THE COURT:  Well --
20              MR. SMITH:  In fact, we think all of the evidence
21     we've shown the Court shows that this -- the impetus was to
22     avoid the types of violence and chaos that --
23              THE COURT:  Right.
24              MR. SMITH:  -- is -- the Government plans on
25     depicting for December 12th.  So I think we're in a scenario
```

```
 1   where it's the -- it's backwards; that if the -- if all of

 2   the evidence is showing, even the Government's witnesses,

 3   that this entity was created to avoid violence and to avoid

 4   chaos --

 5               THE COURT:  Right.

 6               MR. SMITH:  -- then there wouldn't -- the --

 7               THE COURT:  That's the --

 8               MR. SMITH:  -- the factual support --

 9               THE COURT:  That's the evidence you want to rely

10   on.  They have other evidence.

11               MR. SMITH:  Your Honor, I -- part of the

12   frustration here with the sealed -- order is actually all of

13   their witnesses contradict what they're --

14               THE COURT:  Well --

15               MR. SMITH:  -- saying.

16               THE COURT:  -- they --

17               MR. SMITH:  So the problem is we can't -- the

18   Court has to, under Rule 40- -- 104 --

19               THE COURT:  I'll look at --

20               MR. SMITH:  Yeah.

21               THE COURT:  -- the point you're making.  I'll look

22   at --

23               MR. SMITH:  Okay.

24               THE COURT:  -- the point you're making.

25               MR. SMITH:  Okay.  Thank you, Your Honor.
```

```
1              And we'd just like the ability to argue this, I
2     guess, I think, before the admission of the --
3              THE COURT:  I'll look at the point you're making.
4              MR. SMITH:  Okay.  Thank you.
5              And the last issue is on the racist, sexist, and
6     homophobic statements.  The Court said there would be a
7     line at which it would be in- -- a 403 balance would not be
8     appropriate to admit this kind of evidence --
9              THE COURT:  It --
10             MR. SMITH:  -- and --
11             THE COURT:  It could get -- yes, in theory.
12             MR. SMITH:  And, well, Judge, one example was the
13    Government -- the example the Government gave was it said
14    that -- it showed that one of the cooperating witnesses had
15    a --
16             THE COURT:  Right.
17             MR. SMITH:  -- chat handle that he used that had
18    the N word in it.
19             THE COURT:  Yes.
20             MR. SMITH:  And the Government said that, Well,
21    what are we going to do?  I mean, that was just his chat
22    handle.
23             THE COURT:  Right.
24             MR. SMITH:  Because -- you know what I mean by
25    handle, Judge.  Like --
```

```
1                   THE COURT:  Yes, I do.

2                   MR. SMITH:  -- the, kind of, fake name.  The --

3                   THE COURT:  Correct.

4                   MR. SMITH:  -- pseudonym.  But that is exactly the

5        type of issue -- that is exactly the type of evidence that

6        has no content in it.  There is no --

7                   THE COURT:  I'm not going to make them change

8        that.

9                   MR. SMITH:  But -- so --

10                  THE COURT:  I'm ruling on it.  I'm not going to

11       make them change it.

12                  MR. SMITH:  But I guess we would just --

13                  THE COURT:  No.

14                  MR. SMITH:  Just --

15                  THE COURT:  Mr. Smith --

16                  MR. SMITH:  Okay.  Okay.

17                  THE COURT:  -- I've ruled.  You may return to

18       your --

19                  MR. SMITH:  Okay.

20                  THE COURT:  -- seat.

21                  MR. SMITH:  Thank you, Judge.  That's --

22                  THE COURT:  Thank you.

23                  MR. SMITH:  -- everything.

24                  THE COURT:  All right.

25                  MR. SMITH:  Okay.  Thanks.
```

1          MR. HULL:  Your Honor, very quickly, Dan Hull for

2     Joe Biggs.

3          And I've been wanting to ask this question for

4     about 90 minutes.  Aren't we really saying that tool theory,

5     as we've been talking about it, without more really isn't a

6     theory at all and it's something that has been batted about?

7     It's not a thing.  It's not an entity.  It's just something

8     that was talked about, sort of, as a -- just concede --

9     there's -- it doesn't make any -- and correct me if I'm

10    wrong in summarizing you, but there is no tool theory

11    without more; without some sort of nexus or --

12          THE COURT:  I --

13          MR. HULL:  -- establishment in Western logic.

14          THE COURT:  That's what -- the Government, in

15    their own papers, said that's what they're going to do.

16    There's going to be this nexus, this connection.  In fact,

17    they said, I believe, a causal connection.  So I don't think

18    this is -- I don't see the Government jumping up and saying,

19    This is -- I -- this is what they argued.

20          MR. HULL:  That it's there, but you -- but we have

21    yet to see it in terms of a proffer or a pattern that --

22          THE COURT:  Well, I -- the proffer -- for example,

23    one of the things they said was everyone marching behind the

24    defendants who were leading people in a march, that's a

25    connection.  So I don't know what more they need to do to

```
 1    proffer that.
 2              MR. HULL:  Okay.
 3              THE COURT:  All right.
 4              MR. HULL:  Well, I gather that it's something that
 5    we're going to do on a piece-by-piece basis.
 6              THE COURT:  Like all evidence, it will come in on
 7    a piece-by-piece basis.
 8              MR. HULL:  Thank you very much.
 9              THE COURT:  Yes.  All right.  So I'm going to take
10    up --
11              MS. HERNANDEZ:  (Indicating.)
12              THE COURT:  Ms. Hernandez?  Yes, Ms. Hernandez?
13              MS. HERNANDEZ:  Your Honor, I just -- I don't need
14    the Court to rule on anything.  I just want to let the --
15              THE COURT:  That's good.
16              MS. HERNANDEZ:  -- Court know, at the last status,
17    I mentioned that I had made some discovery demands of the
18    Government regarding tools -- who the tools were.  And we
19    really don't know who they identify so far.  At least I
20    don't -- I haven't figured it out.  So I just want to alert
21    the Court that we're going to discuss with the Government or
22    I'm going to discuss with the Government certain discovery
23    demands that I've made.  If we don't resolve it, we'll be
24    coming back to the Court.  I just want to alert the Court
25    that we --
```

```
 1                THE COURT:  Okay.

 2                MS. HERNANDEZ:  -- may be coming back to Your

 3      Honor with more --

 4                THE COURT:  Oh.

 5                MS. HERNANDEZ:  -- disputes.

 6                THE COURT:  I think I hardly needed that alert --

 7                MS. HERNANDEZ:  Okay.

 8                THE COURT:  -- Ms. Hernandez, but all right.

 9                Okay.  So to take them in the order that I'd like

10      to, I'm going to deny the -- ECF No. 567 is Mr. Nordean's

11      motion to lift the sensitivity designation.  I am going to

12      deny that motion to lift that designation wholesale on

13      statements by the defendants' -- by the Government's

14      cooperating witnesses, including those recently reproduced

15      to the defendants as Jencks material.  Mr. Nordean asserts

16      that there's no basis on which to find that releasing

17      this -- these materials publicly might jeopardize witness

18      safety.  But I will credit the Government's contention that

19      a witness is more likely to receive threats and be chilled

20      from participating at trial if all their statements are

21      released, even if their plea documents are public.  And

22      especially given the history of threats related to witnesses

23      in this case, I think the Government's concerns are

24      legitimate.

25                What's more, I don't think there's any reason why
```

1      it's necessary to lift -- and I fully understand that it's

2      the Government's burden to explain why, in the first

3      instance, things need to be kept under seal, but -- I

4      believe they've done that, but just on the flip side, I

5      don't think there's any reason necessary -- that it's

6      necessary to lift that designation now.  I know Mr. --

7      counsel for Mr. Nordean complained that the security did

8      not -- designations have prohibited him from quoting the

9      materials in public filings, somehow interfering with his

10     right to a public trial.  I don't really think that's true

11     as either a factual or a legal matter.  The Government

12     offered to work with defense counsel to approve the use of

13     specific statements within the sensitive materials and

14     public filings.  Mr. Nordean declined to take up the

15     Government on this offer, calling it unreasonable and

16     disingenuous and -- but it -- at the end of the day, he

17     didn't take them up on it.

18             There's no case that I know of, also, that

19     suggests that a defendant's right to a public trial would be

20     infringed if I don't grant the motion under these

21     circumstances.  Mr. Nordean expresses concern about publicly

22     using these materials to examine witnesses at trial, but the

23     Government has made clear it will not attempt to use the

24     designations to impede the defendant's use of the materials

25     at trial and that they -- the Government would consent to an

 1    amendment to the protective order to make that clear, and I
 2    assure the defendants that regardless of what the Government
 3    consents to, I will allow them to fully make -- make full
 4    use of these materials to defend themself before the jury.
 5    So I'm going to deny that motion.
 6              MR. SMITH:  (Indicating.)
 7              THE COURT:  Mr. Smith, I'm not going to -- is it
 8    on that motion?
 9              MR. SMITH:  We have to put something on the
10    record, Your Honor, right here, because we weren't able
11    to -- so Judge, the Court just indicated that by designating
12    these materials "sensitive," the Government hasn't prevented
13    the defendants from making arguments.  Judge, there were
14    about six different subjects that that Court considered
15    today on the motions in limine that we're prohibited from
16    entering arguments on the record today in a public hearing.
17              THE COURT:  No, today wasn't for argument, though.
18              MR. SMITH:  But, Your Honor, if we want to clarify
19    points -- if we --
20              THE COURT:  Well, we can -- going forward, you
21    have every right to clarify my rulings.  So don't worry
22    about that.
23              MR. SMITH:  So suppose --
24              THE COURT:  We had argument -- Mr. Smith, sit
25    down.

1              MR. SMITH:  Yeah.

2              THE COURT:  We had argument on these motions.  I

3      heard you.  If anyone wanted to go by -- if anyone wanted to

4      go under seal to have that argument, you -- we were free --

5      in fact, we did.  We did on a number of them.

6              MR. SMITH:  So -- okay.  So we're only meaning --

7      indicating for the record that we were unable to clarify

8      factual points that seemed to be the basis of the Court's

9      ruling in the hearing today because the facts relating to

10     MOSD, the nature of the conspiracy, whether it existed, and

11     the duration are all facts that are under seal and sealed in

12     the record.

13             THE COURT:  Very well.

14             MR. SMITH:  Thank you.

15             THE COURT:  You may return to your seat, sir.

16     Thank you.

17             All right.  Mr. Tarrio and Mr. Biggs have moved on

18     the jury matters.  Let me lay out where I am on this, but

19     I'm going to hear you -- hear anyone who would like to

20     respond.

21             So there is a -- just so you all know -- so my

22     inclination is to deny your motion.  It may not surprise

23     you, but, number one, the whole -- I had denied your earlier

24     motion until we had a chance to do voir dire, and we have

25     not had a chance to do that yet.  I understand that your

 1    argument is, Judge, there's -- I mean, in summary, there's a
 2    higher -- we may be looking at -- as compared to, say, the
 3    Oath Keepers trial, a higher level of jurors -- potential
 4    jurors expressing biases, and one of your suggestions was to
 5    bring in more jurors.  We can do that.  So there's no bar to
 6    that.  And, in fact, what I -- so I'm going to take a look
 7    at what's come in and we can, for example, you know, on
 8    Tuesday morning, have, let's just say, a group of
 9    additional potential jurors come in, fill out the
10    questionnaire, and basically have them backfill the group we
11    have.
12           So look, maybe, we'll get there.  I, you know -- I
13    don't -- I just don't want to put the cart before the horse.
14    I don't know.  When jurors say, I have a bias, and even
15    potentially when they check a box on a form that says, I
16    don't think I can, you know -- it's a bias that's going to
17    be a problem for me, we may -- it may be that they have to
18    be, you know -- they have to be excused for cause.  I mean,
19    I, you know -- if it is, it is.  Sometimes jurors will say,
20    Actually, I read that question wrong and, actually, no, I
21    can set it aside.  Oh.  I checked that way?  I thought it
22    was the other way; or, Well, you know, Judge, now that you
23    put it that way, you're right.  I really can set it aside;
24    or some will say, No, I really can't.  That's my honest
25    view, in which case, okay.

1              So that's where I think I am on this.  I don't

2     think -- I understand your -- the issue you're putting in

3     front of me in a neon, you know -- I understand the point

4     you're making.  I don't disagree, you know?  If we have to

5     do that, we'll do it.  I think I can bring in -- I don't

6     know how big a tranche of -- it can be, but I can bring in a

7     group, if we see the need for it, to just continue on in the

8     process, have them fill out the questionnaire, and we'll

9     just keep rolling through.

10             I'll hear you on it if you want, but that's where

11    I am.  You may -- look, you may turn out to be right, but I

12    think we have to continue on in the process to see.

13             MR. HASSAN:  Judge, so my calls for caution in

14    regards to this is twofold; right?  So I don't know how many

15    jurors we can pull out on a given day, Judge.  So that's

16    number one.  I don't know how many jurors are pulled out on

17    any certain situation.  So the Court expresses on Tuesday.

18    I don't know if that's a large load of jurors that will be

19    coming in, Judge.  I don't know if the Court saw --

20             THE COURT:  I can do -- I don't know the upper

21    limit, but I think I have the ability to pull a lot of folks

22    in if we need to.  So we're only going to burn through,

23    right, you know -- we're probably going to bring in -- I

24    think in the Oath Keepers, they might have done 15 and -- 15

25    in the morning, 15 in the afternoon.  I'm not sure.  We can

1    bring in 20 in the morning, 20 in the afternoon, depending

2    on how quickly we go.  So we're going to have a sense of

3    where this is headed in a day or two, and if the rate at

4    which we're striking people is so through the roof that I

5    have to bring in more, I'll just do it.

6              MR. HASSAN:  Judge, my calls for caution in

7    regards to this is -- I don't know if the Court had an

8    opportunity to review the different lists that the

9    Government provided --

10             THE COURT:  Yeah.

11             MR. HASSAN:  -- as well as the defense, Judge.

12             THE COURT:  I did.

13             MR. HASSAN:  And, Judge, in all fairness, Judge,

14   if the Court would just permit me about five minutes,

15   Judge --

16             THE COURT:  Yeah.

17             MR. HASSAN:  -- let's say -- and I'm pulling at

18   random here, Judge, but these are expressed objections that

19   the defense had, and we met collectively as a group, Judge,

20   and these were expressions made by certain jurors, and this

21   is noted on their actual juror questionnaire.  As the Court

22   notes, the juror questionnaire as far as presented by

23   defense, we wanted more open-ended questions.  It, sort of,

24   goes that the individuals that provided open-ended

25   questions -- and I'm going to highlight a few, Judge.

1    There's one individual that says that they're of a certain

2    religion.  She's a Jewish person.  Their grandfather was a

3    Holocaust -- The Proud Boys are a -- fascist Nazis and I

4    hate them all.  How can that, in and of itself, not be

5    fair -- how can that juror be fair and impartial?

6              Judge, I'm going to go on.

7              THE COURT:  What --

8              MR. HASSAN:  One here:  Also, the Proud Boys and

9    Oath Keepers are vile white supremacists that should be in

10   jail.  I will be thrilled to find them guilty.

11             THE COURT:  I --

12             MR. HASSAN:  Judge, juror -- another juror --

13             THE COURT:  Okay.  Okay.  You know, this isn't

14   argument.  I understand.  Those people, yeah, they're going

15   to be struck for cause.  I hear what you're saying.

16             MR. HASSAN:  Judge -- but the Government is not

17   agreeing, Judge.  So we have jurors that have expressed and

18   we have put out our lists.  We have attempted to communicate

19   with the Government.  Even more so that on Wednesday when

20   the Court required us to provide notice to both parties and

21   attempt to meet and confer, we did so.  We provided the list

22   in a timely fashion at the time that the Court orders.

23   Thereafter, on Friday evening, the defense sent another

24   email attempting to meet and confer with the Government,

25   once again, and it was, then, expressed that they would not

```
1    meet with us; potentially on Saturday -- on Monday morning

2    prior to the hearing.  Judge, we have 120 -- what -- 150

3    jurors or 110 jurors that are still being contested.  Judge,

4    this is ludicrous.  I mean, we're supposed to meet and

5    confer, come to an agreement, and the Government's not in

6    good faith doing that.  They're having these jurors which

7    we're wasting our time here --

8                THE COURT:  Okay.

9                MR. HASSAN:  -- which I'm expressing to the Court.

10               THE COURT:  I -- so why don't I hear from the -- I

11   mean, if your point, in summary, is that we need to exclude

12   more jurors in the first instance because we were going to

13   waste our time, let me hear from the Government on that.

14               MR. HASSAN:  Judge, even more so.  When the Court

15   initially drafted the juror questionnaire and we're

16   expressing the juror questionnaire --

17               THE COURT:  Right.

18               MR. HASSAN:  -- one of the notations the Court

19   expressly made that day -- and I stood up right after the

20   Court made the statement and I inquired from the Court -- is

21   we don't want to waste the jurors' times.

22               THE COURT:  Right.

23               MR. HASSAN:  Judge, we have -- I mean, we have --

24               THE COURT:  Let me --

25               MR. HASSAN:  -- at least --
```

```
 1                    THE COURT:  -- hear from them.  You made your
 2      point, I think; right?  I can't -- I want to hear from the
 3      Government on why --
 4                    MR. HASSAN:  I get it, Judge.
 5                    THE COURT:  -- they haven't agreed to more.
 6                    MR. HASSAN:  I'm just, frankly, upset that we're
 7      here wasting our time and we're potentially wasting the
 8      jurors' time --
 9                    THE COURT:  Listen --
10                    MR. HASSAN:  -- as well --
11                    THE COURT:  -- it's --
12                    MR. HASSAN:  -- because --
13                    THE COURT:  -- it's fair and that's why I want to
14      hear from the Government on it -- about it.
15                    MR. HASSAN:  Thank you.
16                    THE COURT:  I mean, I don't want to -- first of
17      all, to be clear, I don't want to waste my time, most of
18      all.  I don't want to waste your time.
19                    (Laughter.)
20                    Sort of a joke.  But really, we do have an
21      obligation not to waste the jurors' time.  So I'm hearing
22      what you are saying.  And if there are more folks we should
23      release -- and to be very clear, the ones that you have
24      agreed on, I am going to release them.  I'm sure you --
25      that's the point of why I wanted you to tell me that.  And,
```

1       maybe, they'll be able to serve on another jury.  Who knows?

2       But if there are more that the Government needs to look at,

3       let me --

4               Who from the Government would like to address this

5       point?

6               MR. KENERSON:  Thank you, Your Honor.  This is

7       Erik Kenerson on behalf of the United States.

8               As, I think, Mr. Hassan indicated, the parties

9       exchanged lists of jurors that they thought should be struck

10      for cause.  The Court's, I think, venue order

11      contemplated -- or venue order and the way the Government

12      conceptualized voir dire is that we would come in and we

13      would talk to jurors and we would see why they wrote the

14      things that they wrote.  Some of them will certainly be

15      struck for cause.  Some of the people who look like they

16      should be struck for cause based on their answers probably

17      won't be.  Some will be.  Some who look like they shouldn't

18      be struck for cause on their answers will be.  I mean,

19      that's, kind of, the nature of voir dire.

20              THE COURT:  Did you limit the ones that you've

21      agreed to to things like scheduling and -- is that your

22      point?

23              MR. KENERSON:  As a general matter, we have, yes.

24              THE COURT:  Okay.  All right.  So you don't think,

25      conceptually, I should release anyone, even if their form is

 1    the way it is in the first instance just because, again,

 2    that juror may rehabilitate -- I mean, it may be unlikely in

 3    some of these cases, but you think that juror may

 4    rehabilitate him or herself?

 5              MR. KENERSON:  As a general matter, yes.  I

 6    think --

 7              THE COURT:  Yeah.

 8              MR. KENERSON:  -- there was one juror that the

 9    parties agreed to who filled out the form in such an erratic

10    fashion that everyone, kind of, agreed that there was --

11              THE COURT:  Right.

12              MR. KENERSON:  -- something going on there.

13              THE COURT:  Right.

14              MR. KENERSON:  But as a general matter, yes, we

15    agree with the -- with what the Court just said --

16              THE COURT:  Okay.

17              MR. KENERSON:  -- and we don't think it's a waste

18    of time to bring them in and ask them questions and some

19    will be struck and some won't.

20              THE COURT:  Okay.  All right.

21              I -- look, I had not even -- when laying out this

22    process, I don't think they -- as I recall, I -- maybe, that

23    was the Government's position all -- let me put it this way.

24    From how I understand it proceeded in the Oath Keepers case,

25    they struck very few jurors ahead of time like this.  So I

1     assume that was the Government's position in that case, as

2     well.  I, you know -- I hadn't -- let me put it this way.  I

3     had not really given much thought to it.  I thought to

4     myself, look, we'll put the -- we'll let the parties take a

5     crack at it.  If you can agree, you can agree; if you can't,

6     you can't.  And I hadn't really thought through what the --

7     my view of that would be one way or the other.  But, look,

8     if that's your position, that's a reasonable position.

9     That's fine.  I mean, that -- it's at least understandable.

10    Let's put it that way.  And if we have to, you know -- the

11    good news is we've got a questionnaire to go off of.  We

12    will -- for people who have those extreme ones that you just

13    mentioned, we'll go right to that question, see the answer.

14    If they -- if they're stuck on it, they'll be excused and

15    we'll move on to the next one.  We can still move relatively

16    quickly.

17              MS. HERNANDEZ:  Your Honor, I had -- Carmen

18    Hernandez.

19              I had joined Mr. Tarrio's motion and a large

20    part -- I was concerned with the BLM issue which may have

21    been at least softened by the Court's ruling today, but I'm

22    concerned that I believe, if I understand correctly, the

23    January 6th Committee is going to be issuing a report this

24    week or next week.  I don't know if it's -- where it's going

25    to catch us in terms of the jury selection, and I don't know

1    what -- if we start selecting on the 19th and they issue a

2    report on the 24th -- I mean, I don't know how the Court is

3    going to take that fact into consideration.

4              THE COURT:  So I don't -- look, I don't think --

5    we're just going to -- I think we just have to address it

6    when it happens.  I don't think there's anything we can do.

7    First of all, who knows what -- I mean, I guess, given the

8    situation --

9              MS. HERNANDEZ:  It's not going to be good for us.

10   I can --

11             THE COURT:  Well, that's true.  I mean, one of the

12   nice things, as I recall, about the instructions we sent out

13   with the questionnaire was an instruction that said, Hey,

14   don't watch the media about this.  Look, the -- it's all --

15             MS. HERNANDEZ:  I know.

16             THE COURT:  -- we can do; right?  So look, I think

17   the answer is we just -- we have to take it as it comes and

18   roll accordingly.  I mean, there's -- I don't know whether

19   they've -- I mean, the other Oath Keepers trial, I think, is

20   under -- I think they've completed --

21             MS. HERNANDEZ:  They -- I think --

22             THE COURT:  -- jury selection --

23             MS. HERNANDEZ:  -- they've started already this

24   week or --

25             THE COURT:  Right.  They --

1           MS. HERNANDEZ:  They picked --

2           THE COURT:  So --

3           MS. HERNANDEZ:  -- a jury.

4           THE COURT:  So they're -- they won't be in jury

5    selection, but they'll be in the middle of a trial when that

6    happens and we just have to deal with it.  All right.

7           MR. HULL:  (Indicating.)

8           THE COURT:  All right.  Yes, Mr. Hull?

9           MR. HULL:  Briefly, Your Honor, as you know,

10   Mr. Biggs yesterday, somewhat late, filed a motion to

11   transfer to Virginia; otherwise joined Mr. Tarrio's --

12          THE COURT:  Yes.

13          MR. HULL:  -- motion.

14          THE COURT:  That's right.

15          MR. HULL:  And, you know, to add to what

16   Ms. Hernandez just said, I don't see -- and I think this is

17   in the footnote to my short motion that I filed yesterday --

18   I do not see how, if the House Committee does, in fact, do

19   anything, like, that would be similar to what they did on

20   June 9th and we have a repeat of that and there's a report

21   later -- I think it would be very difficult, if not

22   impossible, just from a human nature standpoint in, sort of,

23   the confining, you know, contours of D.C. to immunize -- I

24   mean, keep people away from that information.  That's going

25   to be a big news event if, in fact, it happens.  I know this

1    sounds a little bit premature and we can deal with it,

2    hopefully cure it with voir dire, but I don't see voir dire

3    curing that.  If there is, in fact, a repeat of June 9th or

4    something after it, I just think that's not the way things

5    work, you know?  People having friends, family, associates,

6    whatever here.  And I think that would be terribly unfair if

7    it happened.  I'm not sure what it would do to voir dire.

8              THE COURT:  I don't know what happened on June

9    9th.  I guess you mean it was a hearing that day --

10             MR. HULL:  It was -- that was the -- well, what I

11   meant by that, that was the hearing that really gave rise to

12   us doing this in December rather than --

13             THE COURT:  Right, right, right.  Okay.

14             MR. HULL:  With the --

15             THE COURT:  Yeah.  I mean, look, we -- we'll have

16   to see what happens.  From just reading the papers, it seems

17   like whatever happens is likely to focus on people, you

18   know -- let me put it this way.  I think there's no reason

19   to believe that whatever happens is going to focus on these

20   defendants.  Maybe it will happen; maybe, it won't.  But I

21   don't think we have reason to believe that.  Sure --

22             MR. PATTIS:  Judge, Norm Pattis here.  May I speak

23   at some point?

24             THE COURT:  Yes.

25             MR. PATTIS:  I have reason to believe it -- and

1    the -- I don't -- I can't see the room.  So I'm sorry if

2    it's --

3              THE COURT:  That's all right.

4              MR. PATTIS:  I've been representing a number of

5    people before the Committee, and I have it on good grounds

6    that I'm told I can't disclose that the Committee intends to

7    publish a video either on the 19th when it makes its -- when

8    it's expected to vote on criminal referrals or on the 21st

9    and that that -- when it, I guess, releases the report, and

10   that video is going to include detailed film footage of

11   events that day which will be similar, I'm told -- and,

12   again, I don't know this, Judge, obviously -- is going to

13   focus on Proud Boys and extremist groups.  I will agree and

14   concede that the primary focus will be on the top of the

15   ticket, as it were, but I have very grave concerns -- and I

16   tried to discuss this with the Government last night; I was

17   unable to to get a call back -- that we're going to have a

18   repeat of June 9th and what -- I would like to file a

19   supplemental brief that assumes that to be the case because

20   I think, in the event there is a repeat of that, there would

21   be good grounds to move to continue this yet again or, in

22   the alternative, consider more probing voir dire, because I

23   think it -- if the Proud Boys and Mr. Biggs are going to be

24   made the centerpiece of another public relations bit by

25   Benny and the Jets and his committee over there, I -- to me,

1    that strikes me as the height of irresponsibility.  The

2    caption on this case is United States of America v. Joe

3    Biggs, et al.  It's not Justice Department v. Joe Biggs.

4    And if the Government can't get its act together such that,

5    given the separation of powers doctrine, one branch --

6           THE COURT:  Well, I'm glad you raised this -- I'm

7    glad you raised the separation of powers.

8           MR. PATTIS:  No.  I mean, I get it.

9           THE COURT:  Right.

10          MR. PATTIS:  But yet it's that party that's

11   pursuing our clients, and if there's a structural problem

12   that is going to result in the absence of a fair trial, then

13   there ought not to be a trial, and it just cannot be the

14   case that the Justice Department can come in and say, Oh,

15   well, you know, just by coincidence's sake, we're going to

16   start trial the day that Congress, that separate -- an

17   independent body with plenary power, dumps all over your

18   client in a way that would get a lawyer sanctioned and/or

19   disbarred.  Oh, well.  That's separation of powers.  That

20   just --

21          THE COURT:  Mr. --

22          MR. PATTIS:  -- can't be the case, Judge.

23          THE COURT:  All right.  Mr. Pattis, let me just

24   say this.  I think this might have been before you were in

25   the case, but -- I mean, the reason --

1    MR. PATTIS:  It was, sir.

2        THE COURT:  -- the reason -- the -- what I'm about

3    to say, I think, might reflect some things that happened

4    before you joined the case.

5        MR. PATTIS:  Understood.

6        THE COURT:  But let me just say this.  I mean,

7    part of the reason why we are here at this time is because

8    it was a date that all the attorneys agreed on.  I realize

9    many defendants wanted a trial earlier.  I'm not suggesting

10   they didn't.  But one of the reasons we're here is because

11   it was a date that was convenient to all counsel, you know?

12   To be honest -- I mean, you know, given what we know about

13   Congress and the way these things work, it might have been

14   anticipated that this was possible.  So look, I -- my point

15   to you is only this.  I don't -- if you want to file

16   something, you can.  I -- if I were you, I think it may make

17   sense to just wait and let's wait and see and you won't

18   have --

19       MR. PATTIS:  Understood.

20       THE COURT:  -- to file anything.  You'll be before

21   me.  And if what transpires next week at -- whenever it

22   does, is something that you feel warrants a continuance, you

23   can make the argument.  I mean, I'm not going to not let you

24   make it.

25       MR. HULL:  Let me just say, Your Honor --

1          MR. PATTIS:  Thank you.  I'm very --

2          MR. HULL:  Dan Hull --

3          MR. PATTIS:  I didn't mean to get so emotional

4     about it.  It's just flabbergasting to me that this has

5     happened.  And I'll stop.  I know you've got a lot on your

6     plate today.

7          MR. HULL:  I would just like to say for the record

8     that Mr. Pattis, in fact, was, I think, entered -- if you

9     can -- we can check it -- counsel of record --

10          THE COURT:  Okay.

11          MR. HULL:  -- for Mr. Biggs as of May.  And he and

12     I actually discussed this very point last night.  I

13     wasn't -- I was under the assumption that he might not be

14     able to make this point, but something we talked about

15     yesterday.  We both have, actually, different information

16     about -- but reliable that something will happen on Monday

17     that has a video of the Proud Boys, number one.  That's not

18     good.  Number two, then there will be a report.  And I just

19     think the timing of this -- and this was my -- I picked

20     December 12th just because it was the closest thing as a

21     four, you know -- four months starting on a Monday away

22     and -- but the reason we continued this trial before and the

23     reason Mr. Biggs, twice now, has asked for a transfer is

24     because of what's going on with the House Committee.

25          THE COURT:  But, Mr. Hull -- I mean, just to

1    respond to this for a moment, Alexandria is right across the

2    river.

3            MR. HULL:  It is.

4            THE COURT:  It's not going to -- the media -- and,

5    frankly, this has been throughout this -- these --

6    throughout these issues about transfer is these are national

7    stories and it's not -- the -- a transfer is not going to

8    materially affect -- certainly, a transfer to Alexandria is

9    not going to have any material difference in the amount of

10   media that the jurors would be exposed to about a report

11   that comes out about the Committee.  In short -- let's put

12   it this way.  If something -- if the Committee takes action

13   next week, you all will bring it to my attention and I

14   will -- and I'll hear your arguments if you want to move for

15   a continuance.  But right now, we're just speculating and

16   everyone really wants to eat lunch.

17           MR. HULL:  I agree with that.  Your Honor --

18           THE COURT:  So --

19           MR. HULL:  -- I agree.  I just want to point out

20   that -- I mean, my notion -- my whole notion of the transfer

21   here -- and this is to echo a few things that Mr. Hassan

22   just said -- we're not saying here that -- and, maybe, I'm

23   misinterpreting you or misinterpreting the way that Judge

24   Mehta had looked at the Haldeman case.  And we're not saying

25   the Eastern District of Virginia is better.  We're just

1    saying this is bad.  This is a bad place to do this and a

2    bad -- and may be a very bad place to do this now based on

3    fairly good information.  In fact, I actually think there's

4    some public record, mainstream media accounts basically

5    backing up what Mr. Pattis and I are saying, but I think

6    it's an important thing to talk about now and it's not just

7    a, you know --

8              THE COURT:  Okay.

9              MR. HULL:  -- "protect the record," kind of --

10             THE COURT:  We --

11             MR. HULL:  -- exercise.

12             THE COURT:  We -- it's on my radar screen.

13             MR. HULL:  Thank you, sir.

14             MS. HERNANDEZ:  Your Honor, can I vote for Miami

15   in the winter?

16             (Laughter.)

17             THE COURT:  You --

18             MS. HERNANDEZ:  They've invited us to go visit

19   them.  I wouldn't just --

20             THE COURT:  All right.  Ms. -- all right.  Is

21   that -- all right.

22             (Laughter.)

23             It's 12:45.  Let's all be back at 1:45 and I'll

24   hear you on the other -- the, sort of, witness-related

25   motions.  We'll call it that.

```
 1                THE DEPUTY CLERK:  All rise.

 2                MR. PATTIS:  Thank you.

 3                THE DEPUTY CLERK:  This Honorable Court stands in

 4     recess.

 5                (Luncheon recess taken at 12:44 p.m.)

 6                THE DEPUTY CLERK:  Your Honor, we're back on the

 7     record in Criminal Matter 21-175, United States of America

 8     v. Ethan Nordean, et al.

 9                THE COURT:  All right.  Well, good afternoon.

10                So just for the record, there at the end, the

11     motions on -- from Mr. Tarrio, Mr. Biggs, ECF 582 and 588, I

12     did deny without prejudice.

13                So let's talk now about the, sort of,

14     witness-related motions principally filed by Mr. -- counsel

15     for Mr. Tarrio and counsel for Mr. Rehl.  I'm just mostly

16     interested in your views on, sort of, what, really, I have

17     the power to do here, because this is an area of the law I

18     just don't know much about.  So I'll hear from the defense

19     and then I'll hear from the Government in response.

20                MR. JAUREGUI:  Thank you, Judge.  Sabino Jauregui

21     on behalf of Enrique Tarrio.

22     ████████████████████████████████████████████████████████

23     ████████████████████████████████████████████████████

24     ████████████████████████████████████████████████████████

25     ████████████████████████████████████████████████████████████
```



1  ███████████████████████████████████████

2  ███████████████████████████████████████████

3  ███████████████████████████████████████████

4  ██████████████████████████████

5              MR. MCCULLOUGH:  Your Honor, respectfully, we

6  would move to take this under seal.  This -- the --

7              THE COURT:  All right.

8              MR. MCCULLOUGH:  -- information that we're

9  discussing at this point is --

10             THE COURT:  Okay.

11             MR. MCCULLOUGH:  -- non-public.

12             THE COURT:  All right.

13             MR. MCCULLOUGH:  And we'd also move to strike any

14  of those references from the transcript.

15             THE COURT:  All right.

16             MR. JAUREGUI:  If Your Honor wants, I can proceed

17  and skip that part.

18             THE COURT:  All right.  So let's just proceed --

19  first of all, there's no objection to the testimony being

20  struck?

21             MR. JAUREGUI:  No, Your Honor.

22             THE COURT:  All right.  So that -- I shall -- I

23  will order that.

24             And, Counsel, let me just say, I know this is

25  hard, but we've had this happen on other occasions.  Let's

1    put it that way.

2              MR. JAUREGUI:  I understand.

3              THE COURT:  So --

4              MR. MCCULLOUGH:  And, sorry, Your Honor.  Just to

5    be clear, the Government, in terms of moving to strike, it's

6    just moving to place under seal the statements as opposed to

7    being on the public record.

8              THE COURT:  Right.  Fair enough.  Not strike --

9    strike from the public record and place under seal --

10             MR. MCCULLOUGH:  Thank you.

11             THE COURT:  -- is a better way of putting it.

12             All right.  So if you can continue on -- let's --

13             MR. JAUREGUI:  Sure.

14             THE COURT:  Let's me put it -- let's put it this

15   way.  In the interest of time, I'll hear you.  If there's

16   something you think that you can't say here and you want to

17   file it under seal to make the point later today, I'm -- I

18   think that's just the easiest way for me to receive it.

19             MR. JAUREGUI:  No problem, Judge.  I won't --

20             THE COURT:  All right.

21             MR. JAUREGUI:  I'll -- I won't talk about that

22   part.

23             THE COURT:  Okay.

24             MR. JAUREGUI:  It was only after all these months

25   that we finally sent the subpoena that we, then, get an

1    email from Lieutenant Lamond's attorney saying, We've been

2    contacted from our friends from the Government.

3    Mr. McCullough, apparently, and Ms. Ballantyne who were in

4    communication with Mr. Lamond's counsel and, at that point,

5    now he's asserting his Fifth Amendment right.  Okay?  We

6    were never told that before.

7            THE COURT:  Right.  I mean, you can see why you

8    weren't necessarily told -- I mean, I -- of all the things,

9    I can see why you might not have been told it before.

10           MR. JAUREGUI:  Right.

11           THE COURT:  Is that fair?  I mean, we are where we

12   are, but --

13           MR. JAUREGUI:  Right.

14           THE COURT:  All right.

15           MR. JAUREGUI:  But we are prejudiced, Judge, on

16   the eve of trial.  We're now finding out that our star

17   witness cannot come in and testify.  The guy that's going to

18   say that our client was in constant communication with him;

19   that our client would tell him where he was going to be,

20   what he was going to do, when he was coming in, it's the

21   heart of our defense as to whether or not he actually

22   planned some kind of seditious conspiracy or some kind of

23   conspiracy to obstruct an official proceeding, and we're now

24   left with a choice where we can't present that evidence.  So

25   I'm asking Your Honor to either dismiss the indictment --

1    I'm asking Your Honor, if you don't -- Your Honor doesn't

2    want to dismiss the indictment, I think Lieutenant Lamond

3    has waived his Fifth Amendment privilege in testifying and

4    in cooperating in his own investigation over and over again,

5    even after giving the warnings.  I think he's waived that

6    Fifth Amendment right.

7         THE COURT:  All right.  Let -- can we press pause

8    for a moment and, Counsel, can you confer with Government

9    counsel about exactly what should be in the public domain

10   here and what should not.

11        (Brief pause.)

12        MS. HERNANDEZ:  Your Honor, I know the Court

13   doesn't want to --

14        THE COURT:  Ms. Hernandez, they have the -- I'm

15   going to hear from you in a moment.

16        MS. HERNANDEZ:  I just want to object on Sixth

17   Amendment grounds.  We have a right to a public trial.

18        THE COURT:  All right.  Your objection is noted

19   and overruled.

20        (Brief pause.)

21        MR. JAUREGUI:  Okay.

22        THE COURT:  And to be very clear, again, Counsel,

23   I don't want you to feel constrained in what you can present

24   to me and I, you know -- and so if there's anything that's

25   not in your filing that you want to supplement your filing

1    with -- I'd appreciate you do it later today -- you should

2    do that.

3             MR. JAUREGUI:  Right.

4             THE COURT:  So I, you know --

5             MR. JAUREGUI:  Understood.

6             THE COURT:  Rather than trying to toggle in and

7    out of under-seal proceedings.

8             MR. JAUREGUI:  Understood, Judge.

9             Since I already made that point, let me get on to

10   my third point, Judge.

11            THE COURT REPORTER:  Can you pull the microphone

12   toward you, please.

13            MR. JAUREGUI:  Sure.

14            Judge, if he does come and testify and he does, at

15   that point, try to assert his Fifth Amendment privilege,

16   I -- then I ask Your Honor to find him unavailable for

17   purposes of testifying.  So then we can, then, bring in the

18   evidence, his messages, any other communications can come

19   into evidence as being a witness that is unavailable to

20   testify.  So I'm moving under those three different options.

21   I think any one of those can help us greatly in presenting a

22   real defense with real material exculpatory evidence, Judge.

23            Thank you.

24            THE COURT:  All right.  Very well.

25            Ms. Hernandez?

```
 1                 MS. HERNANDEZ:  Good afternoon, Your Honor.

 2                 THE COURT:  Good afternoon.

 3                 MS. HERNANDEZ:  I just want to say, whatever

 4       conversation took part between the Government and

 5       Mr. Jauregui, I don't know if it -- I -- all the defendants,

 6       I believe, benefit from Officer Lamond's -- Lieutenant

 7       Lamond's testimony.  So --

 8                 THE COURT:  Fair.

 9                 MS. HERNANDEZ:  -- I'm sure we will find out

10       later, but I, you know -- my position is that there is no

11       need for so much secrecy.  I have tried a lot of cases, a

12       lot of sensitive issues, and I've never seen the extent --

13                 THE COURT:  All right.

14                 MS. HERNANDEZ:  -- of sealing.  I -- that's all --

15                 THE COURT:  You --

16                 MS. HERNANDEZ:  -- I'll say.  I know the Court

17       doesn't want to --

18                 THE COURT:  You've made your point.  Tell me

19       about --

20                 MS. HERNANDEZ:  Okay.  So --

21                 THE COURT:  And you've made the broader point that

22       the testimony of that witness would benefit the other

23       witnesses --

24                 MS. HERNANDEZ:  We -- it would benefit all --

25                 THE COURT:  -- the other defendants.
```

1          MS. HERNANDEZ:  Yeah, without a doubt.

2          THE COURT:  Okay.

3          MS. HERNANDEZ:  So -- and the Government filed an

4     opposition last night which, I guess, I feel almost like

5     they didn't read my memo, but -- or my motion.  I am not

6     asking that the Government delay all their investigations of

7     January 6th or that, you know, we wait until 2027 to have

8     these witnesses.  I'm talking about three specific

9     witnesses.  Two of them travel with Mr. -- two of them are

10    Proud Boys from Philadelphia.  So they've known Mr. Rehl for

11    months or years.  They traveled on the 5th to D.C. together.

12    They -- stopping in Delaware to buy some cases of beer,

13    because I understand Delaware doesn't have tax.  Their taxes

14    are lower.  They spent the 5th of January together in the

15    same hotel.  I -- two -- they rented two -- they got two

16    rooms.  They got up the next morning.  They went to the

17    Capitol together.  They entered the Capitol together.  At

18    2:53, there are videos and everything else that the

19    Government has produced at different times and introduced at

20    different times.  They left the Capitol together.  They

21    stayed together that evening and they went home on the 7th.

22    So we're talking about percipient witnesses up and down the

23    ladder.

24          THE COURT:  Tell me about, though, your view of --

25    I mean, I think -- I understood most of what you just said

1    from what you had on paper, but I guess it -- I'm -- again,

2    I think the law in this area is the thing that I'm new to.

3         MS. HERNANDEZ:  So obviously, if the Court were to

4    find that this was done intentionally, then I think the

5    remedy is dismissal because they -- my client has a Sixth

6    Amendment and due process right to present a complete

7    defense and I would argue that these are, you know -- if

8    they were cooperators, under Roviaro, you would release that

9    information to us.  I'm not -- what I've argued on that

10   score is that this is similar to, like, a Batson claim or

11   you could analogize it.  If there's sufficient evidence,

12   then the Court should require the Government to give

13   explanations of why they did whatever they did and then you

14   can decide, but I -- the D.C. Circuit case law on when a

15   witness becomes unavailable doesn't -- I mean, I think

16   the -- I think the D.C. Circuit says even if the motive --

17   even if the Government's motive is impeccable, the question

18   is, what's the result?  And so just the -- I guess the least

19   problematic or the least extraordinary remedy that I'm

20   asking which happens in courts all the time --

21        THE COURT:  Okay.  Well, that -- I was going to

22   get to that as, like, I just don't -- so if something

23   happens all the time, you have my attention, because --

24        MS. HERNANDEZ:  Well --

25        THE COURT:  -- some of these other remedies don't

1   happen all the time, quite obviously.

2            MS. HERNANDEZ:  Correct.  Correct.

3            THE COURT:  Anyway --

4            MS. HERNANDEZ:  At the same time, I don't think

5   we, defense counsel -- I'll tell the Court.  I think this is

6   the first time I've ever stood in front of a court and said

7   they're keeping witnesses from me, whether -- again, I'm not

8   accusing them of doing it intentionally.  I don't have

9   that -- I think there is a pattern that could be -- where

10  the Court could find that, but for purposes of now, let's do

11  the --

12           THE COURT:  Right.

13           MS. HERNANDEZ:  -- narrowest.

14           THE COURT:  And it's also -- again, like a lot of

15  other aspects of this case, it's unusual that you have this

16  many people facing -- legitimately facing exposure, you

17  know?  I -- anyway, it's just --

18           MS. HERNANDEZ:  Correct.  And --

19           THE COURT:  -- one more way in which this is an

20  unusual circumstance.

21           MS. HERNANDEZ:  Right.  And I fully acknowledge

22  that it's quite easy for prosecutors to provide explanations

23  for their conduct.  I'm not suggesting that they can't come

24  up with multiple reasons, but the bottom line is -- for

25  example, I just had a case before the next -- next-to-be

1   Chief Judge of this District, Judge Boasberg.  It was a

2   murder case, kidnapping, not a pretty case.  On the eve of

3   trial, a couple of the defendants said, We have exculpatory

4   information to provide to the court -- to the co-defendant.

5   Judge Boasberg held a hearing.  Ultimately, for reasons --

6   ultimately, I --

7            (Laughter.)

8            Ultimately, he denied the motion on the -- I mean,

9   I'm laughing because supposedly, the exculpatory

10  information -- let me be straight.  The exculpatory

11  information being offered was that these defendants did not

12  do the crime.  There were other people who had done the

13  crime.  As it turned out, the three people that they were

14  willing to accuse had all -- were all dead.  So by the time

15  we got to the third witness where Judge Boasberg said, What,

16  you know -- what about this witness?  That witness also died

17  a few weeks ago.  It -- so the -- so it's not funny in one

18  sense, but the reason it was -- first, the hearing was held,

19  a serious hearing.  You've got -- you're saying that there's

20  exculpatory information that you were provided.  If you

21  weren't being tried -- and that's slightly different,

22  because that's -- that includes a Fifth Amendment at trial

23  which is a different -- a slightly different situation than

24  we have here.  But the bottom line is that courts do that

25  all the time, you know?  That's the -- somebody's got

1    exculpatory information.  You can't provide it for Fifth

2    Amendment reasons.  So we can sever the case -- the

3    defendant out, try that person, and then you're available to

4    testify.

5              So I think that's the most common, and I don't

6    think there's any -- there's -- I don't think there's any

7    case law that would prohibit the Court from doing that.  And

8    we're talking about a finite amount of time.  One witness

9    has pleaded guilty.  The Government -- Mr. McCullough was

10   the prosecutor in that case.  He asked for a continuance of

11   the sentencing hearing.  The judge, in fact, in her minute

12   order, said, It's a misdemeanor.  Why do you need time?  He

13   filed some response which I believe was provided to the

14   Court.  If the Court believes -- I would ask the Court to

15   share that -- it -- if, after in-camera review, the Court

16   believes that it's relevant to the issue, I would ask the

17   Court to share it with me.

18             But -- so that case is now scheduled for

19   sentencing in February and they gave the Court three dates

20   sometime in February.  So that would be a finite, date

21   certain time.  It's one witness.  I -- that person entered

22   the Capitol.  He is a president of a Proud Boys chapter.  He

23   pleaded guilty to a misdemeanor.  If he's -- it's not a

24   cooperation deal, but the statement of offense is public and

25   it refers to Mr. Rehl and he entered the Capitol with

1    Mr. Rehl.  So definitely has -- and he was a Boots on the

2    Ground participant.  So I believe that that's finite.

3            The other two are part of the three.  Your Honor

4    took a plea on one of them recently.

5            THE COURT:  I'm sorry.  What did you just say?

6            MS. HERNANDEZ:  The other two witnesses that I

7    want are --

8            THE COURT:  Right.

9            MS. HERNANDEZ:  -- one of -- there were three men

10   that --

11           THE COURT:  Right.

12           MS. HERNANDEZ:  -- traveled to --

13           THE COURT:  Right.

14           MS. HERNANDEZ:  -- Philadelphia [sic] with

15   Mr. Rehl and Your Honor took a plea.  I believe it's your

16   case.  Giddings, I believe.  It's a public -- he's -- he

17   entered into a cooperation deal.  It's a misdemeanor case, a

18   very lengthy statement of offense for a misdemeanor case,

19   multiple references to my client.  Bottom line is there's

20   not a single statement that says, Mr. Rehl told me about a

21   plan to attack the Capitol, storm the Capitol, enter the

22   Capitol, you know?  He doesn't say, He directed me; or, He

23   ordered me; or, He discussed.  And he was present, I

24   believe, of -- he's not a member of the MOSD, but my

25   understanding is he may have been present during some of the

```
 1    MOSD videoconferences.  But bottom line, that person -- the
 2    Government is going to put that person on the stand.  There
 3    are two other people of that group that traveled.  And the
 4    Government, in their memo, claims that the average
 5    resolution of these cases is a year, and these people were
 6    arrested and charged for the first time with misdemeanors
 7    just about a year ago.  So again, that should be a finite
 8    process.  It -- we're not talking about waiting until 2027.
 9    We're not talking about asking the Government to -- I think
10    the argument they made was Mr. Rehl wants his -- to wait
11    until we've fully investigated every January 6th case.
12    That's not what I'm asking.
13              THE COURT:  But as to this individual --
14              MS. HERNANDEZ:  Excuse me?
15              THE COURT:  -- you -- as to this individual --
16              MS. HERNANDEZ:  Two.
17              THE COURT:  -- you were saying -- right, but I'm
18    just -- as to this particular individual, you're saying
19    you -- I think you just said the Government's going to call
20    him at this trial.
21              MS. HERNANDEZ:  Pursuant to a plea agreement --
22              THE COURT:  Right.  So --
23              MS. HERNANDEZ:  -- a cooperation plea agreement.
24              THE COURT:  Sure.  So --
25              MS. HERNANDEZ:  Just -- I would say -- let me say
```

```
1    this --
2                THE COURT:  But that puts him in a very
3    different --
4                MS. HERNANDEZ:  I don't need anything with respect
5    to that person.
6                THE COURT:  Oh, I'm sorry.
7                MS. HERNANDEZ:  I'm not asking for anything.
8    It -- there were three men who traveled with Mr. Rehl to
9    D.C.  One of them -- they're all charged at the same time
10   with the four basic misdemeanors.
11               THE COURT:  I understand.
12               MS. HERNANDEZ:  So the one person just
13   testified -- just pled, cooperation deal, and he's been put
14   on the witness -- I think that's public information.  The --
15               THE COURT:  Well --
16               MS. HERNANDEZ:  -- plea --
17               THE COURT:  -- whether it is or --
18               MS. HERNANDEZ:  The plea is public.
19               THE COURT:  That -- right, the plea is public.
20   And that person is -- so anyway, your point is --
21               MS. HERNANDEZ:  Anyway --
22               THE COURT:  -- that --
23               MS. HERNANDEZ:  -- the plea is --
24               THE COURT:  We're not --
25               MS. HERNANDEZ:  -- public.
```

1        THE COURT:  -- talking about that person.

2        MS. HERNANDEZ:  Yeah, we're not talking --

3        THE COURT:  Okay.

4        MS. HERNANDEZ:  -- about that person.

5        THE COURT:  Okay.

6        MS. HERNANDEZ:  We're talking about the two other

7   people.  And, look -- and I recognize -- I didn't put their

8   names.  I put the case numbers in because no -- the way

9   these cases are covered, as soon as you put somebody's --

10        THE COURT:  Right.

11        MS. HERNANDEZ:  -- name in the paper, it, you

12   know -- they become an infamous person.

13        Anyway, but -- so these two people; that I've

14   spoken to all their lawyers, I have sent them a subpoena,

15   I -- they've -- the lawyers accepted the subpoena.  The

16   third person, I'm waiting to hear back whether the lawyer

17   will accept the subpoena.  If not, I will have it served.

18   So they've been served.  They will provide exculpatory

19   information.  They're as percipient as you want -- as can

20   be, I would argue to the Court, the description that I've

21   given you, and he's entitled under the Sixth Amendment and

22   the Due Process Clause to put those men on the stand --

23        THE COURT:  Can you --

24        MS. HERNANDEZ:  -- and say, You were with him all

25   day.  You were with him on the 5th, on the 6th.  Did you

1   hear him say anything?  Did he direct you to do anything?

2          THE COURT:  Well --

3          MS. HERNANDEZ:  All of that.

4          THE COURT:  -- is that -- the nature of the

5   exculpatory information --

6          MS. HERNANDEZ:  Yes.

7          THE COURT:  -- from your perspective is, sort of,

8   in the absence of other things.

9          MS. HERNANDEZ:  Yeah.

10         THE COURT:  In other words --

11         MS. HERNANDEZ:  They will --

12         THE COURT:  -- I was with the person and, you

13  know, he wasn't doing anything that suggested what he's

14  being charged with here, I guess, is --

15         MS. HERNANDEZ:  Not only was he not doing --

16         THE COURT:  I'm trying to --

17         MS. HERNANDEZ:  Yes.  Not only was he not doing,

18  but in theory, he would be one of the tools; right?  The

19  Government's theory is that the gentlemen who came to D.C.

20  and who the clients led to the Capitol --

21         THE COURT:  Sure.

22         MS. HERNANDEZ:  -- and marched them and whatever

23  are the tools.  Well, fine.  And these tools -- I don't -- I

24  hate that term.

25         THE COURT:  Yeah.  Fair.

```
 1            MS. HERNANDEZ:  But these gentlemen, as the Court
 2   knows, they entered -- none of them have been charged with a
 3   felony.  They entered the Capitol, not forcefully.  They
 4   entered at 2:53.  There's a video of them.  Someone says,
 5   Should we go in?  Somebody else says -- curiosity -- it's,
 6   sort of, this curiosity and there's a video out there.  You
 7   can hear someone in the crowd saying, The Vice President has
 8   left the -- you -- that kind of information.  So it --
 9            THE COURT:  Okay.
10            MS. HERNANDEZ:  I can make the argument easily
11   that they didn't enter to disrupt anything because what
12   you're hearing is the Vice President -- right or wrong -- I
13   know we've had this conversation.  I don't know where the
14   Vice President was or wasn't at any particular time, but the
15   crowd believed the Vice President had left and they entered
16   out of -- one of them talks about, Let's see what's
17   happening, or, What's happened in there.  They entered for a
18   specific purpose and it was not to storm the Capitol.  It
19   was not to overthrow the government.  So I believe these are
20   witnesses that I'm entitled to put on the stand --
21            THE COURT:  All right.
22            MS. HERNANDEZ:  -- in my client's favor.  I mean,
23   they fit a number of boxes.  I don't want to go through all
24   the boxes that they fit at this point, but they fit a lot of
25   boxes.  So the easiest thing is for the Court to say, Fine.
```

```
 1    I'll sever Mr. Rehl out and in -- after February 13th or
 2    whatever -- sometime in February, one of the witnesses will
 3    be available.  According to the Government, these cases take
 4    about a year average.  The record reflects that they have --
 5    these two other -- the most percipient witnesses have not
 6    been offered pleas.  So what are we talking about?  Four
 7    months?  Five months?  Six months?
 8            So I believe that there's a Sixth Amendment right.
 9    The Government doesn't have any right to keep these
10    witnesses from me.  And I think the D.C. Circuit says if a
11    witness is exculpatory and is made unavailable -- I won't
12    challenge their reasoning.  I won't challenge their
13    reasoning, but if the Court wants to go and do a full
14    examination, given the other -- given the -- Mr. -- the --
15    Lieutenant Lamond's statement; given the two declarations
16    that Mr. Nordean's attorney filed, that's fine.  But for my
17    purposes, the most immediate, these are exculpatory
18    witnesses.  I want them.  And it wouldn't take very much for
19    the Court to uphold my client's Sixth Amendment and due
20    process rights.  That's the easiest, most common remedy that
21    is available.  I can, you know -- there's dismissal and
22    there is -- I'll concede that the notion of judicial
23    immunity is -- I think the Court has --
24            THE COURT:  Edgy --
25            MS. HERNANDEZ:  Edgy.
```

```
1            THE COURT:  -- perhaps.
2            MS. HERNANDEZ:  New age, new wave.  I don't know
3   what -- yes, edgy.  I mean, I concede -- although the
4   argument I'm making is you don't even have to give him
5   immunity.  If you --
6            THE COURT:  Right.
7            MS. HERNANDEZ:  If you just climbed --
8            THE COURT:  I understand.
9            MS. HERNANDEZ:  -- you know --
10            THE COURT:  I understand.
11            MS. HERNANDEZ:  It -- the Fifth Amendment works,
12   you know -- as Oliver North found out after he was granted
13   immunity by the, you know -- they prosecuted him.  They
14   convicted him.  The D.C. Circuit said you can't use -- it's
15   immunized testimony.  And I think if you compelled them to
16   testify, they'd be in the same shoes.
17            But anyway, that's what I'm asking for, very --
18   the narrowest remedy is not extraordinary.  It's available
19   to the Court.  It happens regularly, if not every day.  And
20   that's what I'm asking for.
21            THE COURT:  Okay.  Thank you, Ms. Hernandez.
22            Can I hear from the Government in response to all
23   this, please.
24            MR. KENERSON:  Thank you, Your Honor.  Erik
25   Kenerson for the United States.
```

1              One thing I want to, I guess, just raise at the

2    outset, again, about what Ms. Hernandez just said, she --

3    the first thing she said when she walked up to the podium is

4    that she thought that Lieutenant Lamond had exculpatory

5    information to offer as to all the defendants.  She then

6    made most of her presentation about the other members from

7    Philadelphia who traveled down with Mr. Rehl.  In her actual

8    motion, her request was for the Court to sever Mr. Rehl

9    until not only the three people she focused on, but also

10   Mr. Lamond are available to testify.  So I don't know if

11   she's withdrawing that portion of her request, if that's

12   what her argument was, but the way -- what Ms. Hernandez

13   is --

14             THE COURT:  I'll consider it an alternative

15   request.  I think, in fairness, you know, she's asking for

16   all of it and she'll take what she can get, if I know

17   Ms. Hernandez.

18             MR. KENERSON:  Understood.  Understood.

19             So I think with respect to the three witnesses

20   that she's focused on, certainly, the Government has made

21   the case and it sounds like there's broad agreement that

22   judicial immunity is not really an option here.  Dismissal

23   is not appropriate on the facts here.  I don't think

24   severance is either.  And Ms. Hernandez -- her proffer as to

25   what these witnesses would say is mostly about what they

1    wouldn't say.

2                THE COURT:  Well, that's why I asked her that

3    question.  Yes.

4                MR. KENERSON:  And just given there's been a

5    number of cases from the D.C. Circuit and other Circuits

6    around the country.  We cited Lugg, L-U-G-G.

7                THE COURT:  Yes.

8                MR. KENERSON:  That was a case where actual

9    co-defendants who the defendant considered would provide

10   exculpatory witness were -- testimony were pending

11   sentencing and D.C. Circuit said there was no need to sever

12   in that case, you know?  Ms. Hernandez asked us to

13   provide -- or asked the Court to take a look at the

14   Government's motion to continue in Mr. Finley.  We provided

15   that to the Court.  I think the Court will -- I know

16   Ms. Hernandez has said that she's not really alleging

17   Government misconduct but the Court can, maybe, find

18   Government misconduct.  I think it's been pretty clear from

19   the materials that we have provided to the Court that there

20   has been no Government misconduct.  And the Government has

21   an interest in trying these defendants together.

22               So I think putting together the lack of a proffer

23   about what these other alleged exculpatory witnesses

24   actually would say, the fact that their case is pending is

25   through no malfeasance on the part of the Government, the

1    Government's significant interest in trying all of these

2    defendants together, there's no reason to sever out Mr. Rehl

3    in this case.  A lot of the evidence of the type that Mr. --

4    that Ms. Hernandez said, inferences about what people did

5    not say, that's potentially available from other sources.

6    She has not made a proffer that she can't get that from

7    anywhere else.  There's information about what was said on

8    the upper west terrace before folks went in.  I mean, that's

9    on video.  The Government expects that's coming into

10   evidence.  So she'll be able to make whatever argument she

11   wants to make to the jury as a result of that.  So I just --

12   there has not been, in the Government's view, a showing that

13   will require severing out Mr. Rehl in trying this case

14   again, essentially, over once more for Mr. Rehl only to get

15   evidence from witnesses who have a valid Fifth Amendment

16   privilege right now.

17           But if the Court has any more questions, I would

18   ask --

19           THE COURT:  Well, why don't you address the issue

20   with Mr. Tarrio.

21           MR. KENERSON:  Sure.

22           THE COURT:  I mean, as it applies to him.

23           MR. KENERSON:  And if the Court would permit

24   Mr. McCullough to address that one?

25           THE COURT:  Very well.

1           MR. KENERSON:   Thank you.

2           MR. MCCULLOUGH:   Thank you, Your Honor.   Jason

3    McCullough for the United States.

4           I think the core issue here with Lieutenant Lamond

5    is that that is just simply not an issue of the Government's

6    making.   There was one -- the Government had provided

7    materials to Mr. Tarrio's lawyers.   It produced extensive

8    discovery on the communications between Mr. Tarrio and

9    Mr. Lamond.   Mr. Tarrio himself was aware of those

10   communications, including the information that has, kind of,

11   led to some of the public reporting in this case.   Defendant

12   Tarrio's counsel, certainly, would have been aware of the

13   public reporting of his suspension.   They would have been

14   aware of some of the other public reporting of his current

15   status.   And, Your Honor, that is just where Lieutenant

16   Lamond is right now, and that's not through the Government's

17   misconduct or improper conduct.   That's just simply the

18   investigation that has taken place.   And so there,

19   certainly, just -- there is no remedy here for this.   As --

20   and I think my colleague, kind of, recited and I think we

21   all agree on, kind of, Supreme Court case law in terms of

22   judicial immunity.   The D.C. Circuit has been very clear in

23   terms of what we are to do here.   And in the absence of any

24   kind of even, you know, scintilla of Government misconduct

25   here, there is -- there's just no, kind of, basis on which

1    to begin to even think through issues as to whether the

2    Government should be forced to immunize Lieutenant Lamond.

3    That's just -- he is in the situation that he is in right

4    now as a result of his making.  He's under investigation for

5    that purpose.  That's where we are.

6              THE COURT:  All right.  Well, it's an unusual --

7    as I said, it's --

8              MR. MCCULLOUGH:  And, actually -- and I apologize.

9    I just did want to -- I wanted to note one thing.  There was

10   a statement -- and I don't think it was in any way

11   malicious -- but to suggest that Ms. Ballantyne and I had,

12   kind of, communicated to Lieutenant Lamond's lawyers his

13   status or otherwise.  That's just not true.  That's -- that

14   investigation is taking place in a separate part of our

15   office.

16             THE COURT:  Okay.

17             MS. HERNANDEZ:  So with respect to Lieutenant

18   Lamond, Your Honor, I think you recognize that if he gives

19   exculpatory information as to Mr. Tarrio, that flows down to

20   all the defendants or redounds to all the defendants in the

21   conspiracy.  That's all I'll say about that.

22             With respect to the gentleman that I want to --

23   that I'm asking about, the three men -- I'm sorry, the two

24   Philly persons.  They're the ones who were charged with

25   misdemeanors since December of 2021 --

```
1              THE COURT:  Right.

2              MS. HERNANDEZ:  -- and there's just continuing --

3    they are all -- they are MOSD members in the sense that they

4    are the people that, you know -- remember, the MOSD -- each

5    person was supposed to bring people into the MOSD.  The

6    MOSD, there were leaders, and then the plan was to bring --

7              THE COURT:  Members --

8              MS. HERNANDEZ:  -- persons along.  Exactly.  And

9    each supposedly was supposed to bring up to 10 people and

10   there's -- there are -- in fact, on January 5th, Mr. --

11   there's a text message or a Telegram message where, after

12   the message comes out from Mr. Biggs, We have a plan, and my

13   client responds -- We have a plan.  Meet at the Capitol --

14   at the Washington Monument the next morning at 10:00.  My

15   client responds and says, If there -- if we're still

16   planning on hanging together with the -- our 10 people, we

17   can decide that.  So I -- at that point, my client still

18   believes the plan is the 10 persons.  These people are MOSD

19   members brought into the MOSD by my client.  They are his

20   people.

21             THE COURT:  Okay.

22             MS. HERNANDEZ:  So I -- and if the Court wants a

23   more specific and explicit statement of the -- of their

24   affirmative statement of their exculpatory information, I am

25   happy to provide it.  I don't think I have to provide it
```

1     publicly or I would ask that I be allowed to provide it ex

2     parte.

3               THE COURT:  Well, is it anything more than in the

4     nature of what we discussed?  In other words --

5               MS. HERNANDEZ:  Well, if -- and then -- and let

6     me --

7               THE COURT:  I --

8               MS. HERNANDEZ:  Under Old Chief, the Government

9     doesn't get to tell me how to -- doesn't get to tell me that

10    I get to show them videos of stick figures -- three men

11    in -- a one-minute video after they've shown the jury 17

12    hours of multimedia spectacular things.  I get to bring in

13    human beings.  We can --

14              THE COURT:  Right.  I'm not -- no one's, I don't

15    think -- I understand, but my --

16              MS. HERNANDEZ:  You don't want me to go there.

17              THE COURT:  No, no, no, but my -- just my question

18    is you were saying, Well, if I want a more specific proffer

19    of what the evidence would be, and I'm trying to -- I'm just

20    trying to get a sense of, is it -- it's the same kinds of

21    things we've been discussing --

22              MS. HERNANDEZ:  It is --

23              THE COURT:  I don't want to, like --

24              MS. HERNANDEZ:  Right.

25              THE COURT:  I'm not trying to minimize it.

```
 1              MS. HERNANDEZ:  Right.
 2              THE COURT:  I'm just trying to understand --
 3              MS. HERNANDEZ:  Right.
 4              THE COURT:  -- it.
 5              MS. HERNANDEZ:  I mean, no --
 6              THE COURT:  Ms. Hernandez, just if you would let
 7     me speak, because I know --
 8              MS. HERNANDEZ:  Yes, sir.
 9              THE COURT:  -- the court reporter's --
10              MS. HERNANDEZ:  Sorry.
11              THE COURT:  -- looking at me like --
12              MS. HERNANDEZ:  Yes, sir.
13              THE COURT:  Okay.
14              MS. HERNANDEZ:  Sorry.
15              THE COURT:  Okay.
16              MS. HERNANDEZ:  Sorry, sorry, sorry.
17              THE COURT:  You and I do this a lot.  We have to
18     get out of the habit of it.
19              MS. HERNANDEZ:  Yes, sir.  I grew up in New York.
20              THE COURT:  See, right there.
21              So the point is it's the absence of -- it's almost
22     the, you know -- it's the fact that he was going about his
23     business that day in a way that's inconsistent with the
24     charged conspiracy --
25              MS. HERNANDEZ:  No --
```

1          THE COURT:  -- in your view.

2          MS. HERNANDEZ:  I think it's an affirmative

3   statement that they were discussing what they were going to

4   do.  They were together the night before.  They were

5   together.

6          THE COURT:  I see.

7          MS. HERNANDEZ:  It's the affirmative --

8          THE COURT:  Okay.

9          MS. HERNANDEZ:  -- of what -- it wasn't just, He

10  didn't tell us not to do that.  It's, We discussed what we

11  were going to do, where we were going to meet.  What's the

12  next step?  And, again -- I mean, I know the Government

13  wants to downplay it.  I, you know -- every time they bring

14  a witness into the stand, I'm going to going to say, Well,

15  is this the same thing?  Is this an absence of blah, blah,

16  blah?  They don't get to tell me.  I don't have that many --

17  let me say this.  Ten people, in theory, is the people he

18  brought into the MOSD.  I've got two of them at least;

19  maybe, a third.  I can't tell the Court right now whether

20  the third person I'm asking for is a MOSD member.  I do know

21  he was on Boots on the Ground.

22          THE COURT:  Okay.

23          MS. HERNANDEZ:  So he -- these are MOSD members.

24  They will say they had affirmative conversations with my

25  client.  I also -- let me say this.  I -- and I don't like

```
 1    to --
 2                (Brief interruption.)
 3                THE COURT:  All right.  We don't know where that
 4    came from.
 5                Keep going, Ms. Hernandez.
 6                THE DEPUTY CLERK:  Did you kick something down
 7    there, Ms. Hernandez?
 8                MS. HERNANDEZ:  Did I touch something?
 9                THE DEPUTY CLERK:  Did you kick something down
10    there?
11                MS. HERNANDEZ:  I don't like to accuse anybody,
12    and I particularly don't like to accuse -- I don't like to
13    take on that burden.  I don't shy away from taking it on if
14    I need to, but I -- that's not the burden I'm taking.  But I
15    have a limited number of witnesses.  In the universe of
16    witnesses, there are a limited number of witnesses that are
17    this intimately involved with my client from months before
18    to January 6th and after.  The Government has at its
19    disposal for many reasons -- I don't know -- a cast of
20    thousands, I suppose, with all the benefits that the United
21    States can bring to bear.  I'm not -- it's a system.  I'm
22    not -- am not -- it is a system, but they can offer pleas;
23    they can offer cooperation; they can allow Mr. Bertino to
24    stay out even though he's a felon in possession.  They --
25    when they went to his house, apparently, they found guns.
```

1    He's out.

2              THE COURT:  All right.  Ms. Hernandez --

3              MS. HERNANDEZ:  My client --

4              THE COURT:  -- I got it.

5              MS. HERNANDEZ:  -- is in.

6              THE COURT:  I got your point.  I got your point.

7              MS. HERNANDEZ:  Okay.  So I have a very limited

8    number of witnesses.  These are intimately able to provide

9    exculpatory information -- affirmative exculpatory

10   information about my client.  In the balance of things, I

11   understand that the case law says there's an interest in the

12   Government trying all their people together.  That has to

13   give way to my client's Fifth and Sixth Amendment rights.

14   There is no balance between the Fifth and Sixth Amendment

15   rights and --

16             THE COURT:  All right.

17             MS. HERNANDEZ:  -- the Government's interests,

18   especially in these cases where there's -- I mean, look at

19   all the Proud Boys who are being charged and tried

20   separately.  So I --

21             THE COURT:  Okay.  I --

22             MS. HERNANDEZ:  I'm very, very --

23             THE COURT:  Ms. Hernandez, this is why we're

24   having the argument and why I wanted to hear you on it.  So

25   I'll --

```
 1              MS. HERNANDEZ:  I just think this is a very
 2    important -- a fundamental issue for my client, Your Honor.
 3              THE COURT:  Okay.  Okay.
 4              MS. HERNANDEZ:  Thank you.
 5              THE COURT:  Absolutely.
 6              MR. JAUREGUI:  Judge, if I may address just one
 7    quick issue?
 8              THE COURT:  Mm-hmm -- wait.  The same issue or --
 9    I mean, on this topic?
10              MR. JAUREGUI:  On this topic just --
11              THE COURT:  All right.
12              MR. JAUREGUI:  -- because Mr. McCullough brought
13    it up.  I mean, we didn't come up with this from out of
14    nowhere.  I mean, we received an email from Lieutenant
15    Lamond's attorney informing us that the Government had
16    reached out to him and had spoken to them about the -- about
17    their investigation and what ramifications he would have if
18    he would testify, and the prosecutors that were copied on
19    this email with us are here in this courtroom with us.
20    There is another prosecutor that I assume is not here.  Now,
21    I don't know who talked to Mr. Schamel -- I don't know if it
22    was one prosecutor, two prosecutors, or three prosecutors --
23    to tell him that if Lieutenant Lamond testified, there could
24    be some problem.  I don't know if that was the pressure or
25    the intimidation.  I don't know who did it, but we got this
```

```
 1    email on December 2nd at 5:33 in the morning.  That's the
 2    first time we ever found out that, all of a sudden,
 3    Lieutenant Lamond was not going to testify.  Throughout all
 4    these months, we've been in communication with Lieutenant
 5    Lamond's attorney and we all thought he was going to come in
 6    and testify until we got this email on December 2nd --
 7               THE COURT:  All right.
 8               MR. JAUREGUI:  -- that he informs us that he
 9    was -- that the Government contacted him.  And who knows
10    what was discussed there?  Because I don't know.  I just --
11               THE COURT:  Okay.
12               MR. JAUREGUI:  -- wanted to make sure that Your
13    Honor --
14               THE COURT:  All right.
15               MR. JAUREGUI:  -- knew that.  Okay?
16               THE COURT:  All right.  Very well.
17               MR. SMITH:  Your Honor --
18               THE COURT:  Yes, Mr. Smith?
19               MR. SMITH:  Thank you, Judge.
20               MR. MCCULLOUGH:  Can I be -- and can I just --
21               MR. SMITH:  We'd just like to clarify our position
22    vis-à-vis these motions --
23               THE COURT:  All right.  Mr. McCullough, I'll give
24    you the last word on all this.
25               MR. MCCULLOUGH:  Thank you.
```

```
 1                    MR. SMITH:  Oh --

 2                    MR. MCCULLOUGH:  Yeah.  Thank you.

 3                    THE COURT:  No, no, no, Mr. Smith --

 4                    MR. SMITH:  No, no --

 5                    THE COURT:  -- you can --

 6                    MR. SMITH:  -- no, no, no.

 7                    THE COURT:  Let me hear from Mr. Smith just to

 8     clarify his position and then you can respond --

 9                    MR. SMITH:  So Judge, this isn't about the facts

10     or the merits at all.  This is just to note that Mr. Nordean

11     joined Mr. Rehl's motion, but we're just clarifying here

12     that Mr. Rehl's asking for severance and continuance.  To

13     the extent the Court were to construe that as a continuance

14     motion without severance, we would --

15                    THE COURT:  You would oppose.

16                    MR. SMITH:  We would oppose, because we think that

17     could imply a trial in fall of next year --

18                    THE COURT:  Understood.

19                    MR. SMITH:  -- given the calendar.  Okay.

20                    THE COURT:  Got it.

21                    Mr. McCullough?

22                    MR. MCCULLOUGH:  This -- the question about this

23     email from Mr. Schamel, my understanding is -- and from the

24     correspondence that I've seen -- that Mr. Schamel reached

25     out to the U.S. Attorney's Office.  I was copied on that
```

```
 1    email, but the team that's handling that both fielded and
 2    responded to it.  So --
 3                THE COURT:  Okay.  All right.
 4                All right.  Look, I'm going to take this under
 5    advisement.  As I said, it -- I think these motions were
 6    just filed, you know, on Friday.  And so I'm going to take
 7    it under advisement and I'll let you know what I think about
 8    it as soon as I can.
 9                So now, let's -- let me just have us pivot to a
10    few administrative matters that might be relevant for
11    Monday.
12                Number one, I think -- well, unless this hasn't
13    been communicated, we'll be in Courtroom 24 --
14                Ms. Harris, do I have that right?  24?
15                THE DEPUTY CLERK:  (Indicates affirmatively.)
16                THE COURT:  24.
17                -- Courtroom 24.  It's in the Annex, a little bit
18    bigger space.  So that's where we will be for the voir dire
19    on Monday.
20                The -- we can talk about this more, but my
21    initial --
22                Ms. Hernandez, you had raised the issue of
23    peremptories, and I think giving the defense a few more and
24    giving the Government a few more is what makes sense.  So my
25    proposal that you all don't -- we don't have to necessarily
```

1   decide on now -- but my proposal was just to increase each

2   by 2.  So the defense would get 12, the Government would get

3   8, and I think I've mentioned we would have 4 alternates.

4   We will proceed with 4 alternates.

5               MS. HERNANDEZ:  I'm sorry, Your Honor.

6               THE COURT:  Mm-hmm.

7               MS. HERNANDEZ:  I think I would ask the Court to

8   pick a number divisible by five.

9               (Laughter.)

10              THE COURT:  Understood why.

11              I will email -- chambers will email the parties.

12  We'll select four random seat numbers that we will let you

13  all know in advance.  Those will be the alternates before we

14  even set foot in the courthouse on Monday.  So you'll know

15  as you're sizing things up who will be in an alternate seat

16  and who will not.

17              Let's see.

18              Oh, and I'll ask the defendants between now and

19  Monday to think about the order you would like to, sort of,

20  go in.  We're going to have a consistent order in terms of

21  who will cross a given witness first all the way down the

22  line, who will open first, who will put on their case first.

23  So if you all would consult with each other, let me know on

24  Monday, and then you will participate in the voir dire in

25  that order.  So it doesn't matter to me what order, but

1   whatever order it is, just let me know and we can have a

2   consistent order as we go through, who goes first and who

3   goes last.

4            MR. PATTIS:  Judge, are you open to comments on

5   that?  This is Norm Pattis.

6            THE COURT:  I'm open to comments on it.  Sure,

7   Mr. Pattis.

8            MR. PATTIS:  I've been reading through the Proud

9   Boys [sic] trial and Judge Mehta gave the defense the option

10  to select who would open on a cross with the

11  understanding -- and I'm not sure how it worked out as the

12  trial played out; I'm not that deep into the transcripts

13  yet -- with the understanding that there would be a set

14  order thereafter.  Would you be open to our determining

15  among ourselves who went first --

16           THE COURT:  Just --

17           MR. PATTIS:  -- so that it wasn't the same person

18  going first each time?

19           THE COURT:  Well, and I suppose a particular

20  witness -- I'll think about it.  I'll think about it,

21  Mr. Pattis.

22           MR. PATTIS:  Thank you, sir.  Thank you.

23           THE COURT:  Absolutely.

24           MR. HASSAN:  Judge, if I may, we were talking, the

25  defense, Judge.  We would want some more direction as far as

```
 1     how the Court conducts the voir dire, Judge.  If the --
 2               THE COURT:  Sure.
 3               MR. HASSAN:  -- Court's going to direct the voir
 4     dire --
 5               THE COURT:  Yeah.
 6               MR. HASSAN:  -- should we speak to the Court?  Are
 7     we going to give the opportunity to speak to the independent
 8     jurors, Judge?  So --
 9               THE COURT:  Sure.
10               MR. HASSAN:  -- if we can have some discretion --
11               THE COURT:  Yeah.
12               MR. HASSAN:  -- with regards to that, Judge?
13               THE COURT:  Absolutely.  So what we'll do is
14     bring, you know -- you'll have all the paper.  We're going
15     to bring in -- I think the way they did it in the Oath
16     Keepers -- we'll bring in a small subset of the -- they're
17     not going to be all -- all of them sitting around all day,
18     right, along the lines of trying to care about people's
19     time.  We'll bring in a small group.  We'll see -- in the
20     morning and they will come into the courtroom.  I will ask
21     the questions first.  I think -- look, I don't want this to
22     veer off into things that -- into topics that are
23     irrelevant.  So I will follow up first with the
24     questionnaire and with all -- with the juror.  I'm going to
25     be asking questions -- look, if there's a -- just to give
```

1   you an idea, right, if they've ticked, I know something

2   about, you know -- I have a -- I know something about the

3   Proud Boys, just -- right?  Okay.  Well, I'll follow up with

4   that.  What do you know?  How did you learn it?  That kind

5   of thing.  Once we, kind of, get their -- whatever the facts

6   are about their knowledge, then it becomes a question of,

7   Okay.  Can you set that aside -- can you set whatever facts

8   you learned?  Number one.  And can you set aside whatever

9   feelings -- if you have strong feelings one way or the other

10  about it, can you set that aside and be a fair juror?  See

11  what they say, or if they've already checked no, you know --

12  I have a concern.  No?  Okay.  Tell us about that.

13          So I plan on doing most of that and we'll see

14  where we land at the end.  If you all think there are

15  questions that I should ask, I think in the first instance

16  we're all going to have those headsets.  If you'll pick up

17  the headset and say, Judge, I think you need to -- what

18  about, you know, in this area?  And, look, we'll go -- if I

19  think it's a fair question, I might ask it.  Maybe I'll

20  ask -- maybe, if I -- if you want to -- if it's something

21  particularly you want to follow up on, perhaps I'll just

22  say, You go ahead and do it.  But I think I'll end up

23  doing -- I mean, the way I typically do it is I end up doing

24  most of the questioning.  And, you know, again, I don't want

25  to -- I want to keep the process going quickly and I don't

1    want to -- I know it has to be thorough about their views,

2    but I don't think things have to be wide-ranging.  It's,

3    factually, what do they know?  And, factually, what do they

4    know about the topics we've aligned?

5              Now, I think, given my rulings on -- we can talk

6    about this.  I think I am going to have to ask each of them

7    something about a few of the things we omitted from the

8    questionnaire, right, like, in terms of something, you

9    know -- this case could involve possession of ammunition,

10   you know?  Do you have any strong feelings about that?  I

11   think the Black Lives Matter stuff, even though I ruled the

12   way I ruled on the banner, it sounds like it's going to be

13   there one way or the other.  So I think I have to ask, you

14   know, the same identical question we've asked about Antifa

15   and just, you know, say, you know, Do you know anything

16   about the Black Lives Matter organization?  And depending on

17   what you know, do you have a strong feeling about it, you

18   know?  Probe a little bit about what they know and ask them

19   if, you know, whatever -- there may be evidence in the case

20   the defendants, sort of, opposed that organization.  Do you

21   have any, you know -- do you have -- so that's the way I see

22   it.

23             And then so we'll go through each juror.  If we

24   can't qualify them, we won't, and we'll dismiss them if

25   they're -- if they have to be excused for cause for -- one

```
 1    way or the other, and then we'll get to the -- we'll just
 2    keep going until we get to -- I guess I haven't done it --
 3    it's something -- maybe, it's -- given the number of
 4    peremptories, you know, I -- we usually do a couple extra.
 5    So maybe, on the order of, like, 38, I think that would make
 6    it.  Basically, a number that would -- if every -- if both
 7    parties used all their peremptories, and then including the
 8    alternates, we usually do a couple more just in case
 9    something happens.
10              MR. MCCULLOUGH:  (Indicating.)
11              THE COURT:  Yes, Mr. McCullough?
12              MR. MCCULLOUGH:  Just on the strikes, will both
13    parties be getting two strikes for the alternates, as well?
14              THE COURT:  Oh, yeah.
15              MR. MCCULLOUGH:  You just haven't mentioned that.
16              THE COURT:  Yeah.
17              MR. MCCULLOUGH:  I just wanted to make sure we
18    were --
19              THE COURT:  I'll have to think of -- yeah.  I
20    think that's typically how it's done; isn't it?
21              MR. MCCULLOUGH:  Yeah.  Thank you --
22              THE COURT:  Yeah --
23              MR. MCCULLOUGH:  -- Your Honor.
24              THE COURT:  -- but I hadn't thought about the
25    alternate strikes.  Right.
```

1          In any event, that's right.  So that's two more.

2     So it's coming up on about 40, you know -- in the

3     neighborhood of 40, whatever the math dictates, and once one

4     gets to 40, we'll stop.  What I typically do is when I get

5     to the number we need, stop, and then have you all exercise

6     your peremptories at once.  So you'll each, you know -- each

7     side will fill out their forms.  We'll get them.  You'll be

8     able to look around the courtroom and know, Okay, if we

9     strike that person, who's moving and replacing them in.  And

10    then everyone who's struck is gone, they fill into the box,

11    and we're off and running.

12          MR. HASSAN:  Judge --

13          THE COURT:  And as I mentioned, there -- we do

14    have -- I'm going to -- over the next few days, I'm going to

15    look at -- look more closely at the -- what's been submitted

16    already.  Concededly, I haven't looked at it that closely

17    yet.  And if we need to line up another tranche of jurors if

18    I think, just trying to eyeball the numbers and everything,

19    that that's something that we need to do, we can do it, and

20    we'll start -- what we'll do is, I think just for personnel

21    purposes, we can start a little bit late one day if we need

22    to and have that next tranche come in, fill out the

23    questionnaires, we'll get it all to you.  We can basically

24    put them at the end so that we'll have them ready to bring

25    in, again, in small groups if we need to.

```
1            MR. HASSAN:  Judge, will the Court be requesting
2      strikes in the presence of the jury or outside the presence?
3      Just some judges do it differently, Judge, so that's why I'm
4      inquiring.
5            THE COURT:  It's okay.  Yeah, it's -- you don't
6      practice in this courthouse.  I'm perfectly -- it's okay to
7      ask the question.
8            MR. HASSAN:  Judge, I've been in New York; I've
9      been in --
10           THE COURT:  No, that's --
11           MR. HASSAN:  -- Florida trying cases.  So --
12           THE COURT:  It's fine.  It's fine.  So you mean
13     strikes for cause?
14           MR. HASSAN:  Correct, Judge.
15           THE COURT:  Yeah.  I think typically, again, we
16     have these little phones which are incredibly handy and I
17     think, you know, I usually -- if a party -- I mean, look, I
18     think it will become -- and, maybe, in this case, very
19     clearly -- it will become obvious.  Usually, I'll just -- I
20     mean, if it's obvious, I might just say to the parties,
21     Look, you know, we -- does anyone object to striking this
22     person for cause for whatever reason?  If no one objects,
23     they're excused.  If a party wants to do it -- if you want
24     to pick up the phone and just say, We think they need to be,
25     you know, struck for cause, you can do it that way.
```

1          MR. HASSAN:  Understood, Judge.  Thank you.

2          THE COURT:  Okay.  So those are my major

3     housekeeping matters.

4          MR. MCCULLOUGH:  (Indicating.)

5          THE COURT:  But, Mr. McCullough, is there anything

6     you want to raise before we adjourn for the day?

7          MR. MCCULLOUGH:  Just a few, Your Honor.

8          THE COURT:  Yes.

9          MR. MCCULLOUGH:  So just one item was that a few

10    of the jurors on their questionnaire indicated that they

11    would be in -- on vacation later in the week.  And so we'd

12    be very happy to provide you those numbers just to ensure

13    that -- to the extent you don't want to go in order, you

14    know, 1 through 40 because No. 60 --

15         THE COURT:  Right.

16         MR. MCCULLOUGH:  -- is going to be on vacation the

17    second half of the week, if Your Honor would like, we'd be

18    happy to provide you with that list.  If not, we're fine

19    with that, but I wanted to make you aware that we did --

20         THE COURT:  Right.

21         MR. MCCULLOUGH:  -- see that pattern.

22         THE COURT:  Okay.  Yeah, that's fair.  Well, I'll

23    put it this way.  I think we're going to have to go through

24    and do that on our own.  And what I'd do there -- look, if

25    we -- I'll consult with the parties before -- how we figure

1    this out, but I think it makes sense to voir dire those

2    people -- your point is to voir dire them early in the week

3    so we have them, of course, and -- but once we get to it --

4    if we qualify them, I think we'd have to keep them in the

5    order they came for purposes of strikes and who fills in

6    the -- who fills in the, you know -- the box and all like

7    that, but okay.  That's -- I assume no one -- no -- there

8    will be no objection to that, again, taking them out of

9    order just so we make sure that they -- we can voir dire

10   them before they go on vacation.

11            MR. MCCULLOUGH:  Correct, Your Honor.

12            And then the second thing was that the

13   Government -- just based on the way that this calendar is

14   lining up, the Government believes that we should make the

15   decision now that we will not impanel this jury until we

16   return from the holiday break.  There are a number of

17   reasons why that makes sense.  I think, you know, talking

18   about, you know, don't think about the --

19            (Brief pause.)

20            You mentioned, you know, don't think about the

21   elephant.  The elephant that we're all not thinking about is

22   the fact that we're going to have some -- potentially

23   another hearing, another -- additional transcripts that may

24   come out.  It will make sense, the Government believes, to

25   have the opportunity to let that take place.

 1                  THE COURT:  Oh, you mean a hearing -- a January
 2      6th hearing --
 3                  MR. MCCULLOUGH:  Correct.
 4                  THE COURT:  -- Committee hearing?  Okay.
 5                  MR. MCCULLOUGH:  Correct.
 6                  THE COURT:  Yeah, I -- is there any thought that
 7      it's actually going to be a hearing?
 8                  MR. PATTIS:  Yes.
 9                  MR. MCCULLOUGH:  There -- yes, Your Honor.  There
10      were --
11                  MR. PATTIS:  There's probably at least one; maybe,
12      two.
13                  THE COURT:  Okay.
14                  MR. MCCULLOUGH:  Yes, there was a statement that
15      there would be, and I believe if I -- if I'm recounting it
16      correctly -- and, obviously, whatever's in the press
17      controls because that's what I'm reporting -- I believe it's
18      the 21st --
19                  THE COURT:  Okay.
20                  MR. MCCULLOUGH:  -- is what was being said.  So
21      Your Honor, that -- as -- just as an initial matter, it will
22      give us an opportunity to bring this panel back after the
23      holidays and you'll -- we'll be able to do a, you know,
24      confirmatory voir dire because you'll have, kind of,
25      different -- panelists at the different stages here which, I

1    think, will be important.

2             Two, I think -- I'm sorry.

3             THE COURT:  No, go ahead.

4             MR. MCCULLOUGH:  I'm about to talk you out of --

5             THE COURT:  Finish.

6             MR. MCCULLOUGH:  -- your decision --

7             THE COURT:  No, no, no, no, no, keep going.

8             MR. MCCULLOUGH:  Two, I think that we've got, you

9    know, people -- just from a health perspective, it certainly

10   makes sense to make sure that we're not going to lose people

11   on the return from traveling during the holidays,

12   interacting with their family members, et cetera, just so --

13   just to make sure that we, kind of, bring back that, you

14   know -- kind of, a group that we're ready to go with in the

15   new year.  And so, you know, kind of, for those three

16   reasons, we think it really makes a lot of sense to just,

17   kind of, march towards that end state now.  And I think

18   the -- I mean, you know, kind of, just as another just, kind

19   of, practicality matter, the -- kind of, that process of

20   even doing, kind of, the peremptories as we do, we're going

21   to have to, kind of -- that will have to be a separate day

22   because we'll have to bring everybody back and we might

23   have, kind of, holidays at the end of the week.  So just,

24   you know, kind of, practical reasons; obviously, I think,

25   you know, reasons of protecting the jury and the integrity

1    of the jury in terms of swearing them in, we think that that

2    all counsels in favor of setting that now.

3              THE COURT:  Listen, I think it is -- well, we'll

4    see, but given -- let me just say, I -- from the minute we

5    had this schedule, I thought it was very, very likely that

6    that's the way this would play out.  So I think -- let's

7    just take it one day at a time.  I anticipate,

8    Mr. McCullough, that you're right; that for all the

9    prudential reasons you're laying out, at the end of the day,

10   we will not probably swear the jury before the holiday.

11   It -- I think it's the safer way to go.  Now, if we get a

12   jury on Wednesday, then I'm going to eat my words and,

13   maybe, we -- maybe, at that point, it will make sense to do

14   it, but let's just take it day by day.  I hear what you're

15   saying.  I think prudence counsels that if we get close to

16   the end of the week and we're not really going to get

17   openings or anything going anyway, that that's probably the

18   wise course.

19             MR. MCCULLOUGH:  And then --

20             MS. HERNANDEZ:  (Indicating.)

21             MR. MCCULLOUGH:  Sure, Carmen.  Go ahead.

22             MS. HERNANDEZ:  No, go ahead.  I thought you were

23   done, Mr. McCullough.

24             (Laughter.)

25             MR. MCCULLOUGH:  We had one additional item just

1    on the preliminary instructions that Your Honor had

2    circulated.

3             THE COURT:  Oh, yes.

4             MR. MCCULLOUGH:  We had one additional paragraph

5    that we wanted to propose.

6             MS. HERNANDEZ:  We oppose.

7             MR. MCCULLOUGH:  For the record, Carmen just

8    whispered in my ear that she opposes, but I think she was

9    being sarcastic.

10            We wanted to just add a paragraph that indicated

11    that because of the large teams here that are in place at

12    both of the -- both on the prosecution and the defense, that

13    people may be coming and going and for the jury not to read

14    anything into that.  I can read you the paragraph that we

15    have.  I'm -- also, I'm happy to --

16             THE COURT:  Why don't you --

17             MR. MCCULLOUGH:  -- provide it to you.

18             THE COURT:  -- email it -- why don't you just

19    email it to chambers, Counsel, the defense.  That sounds

20    unobjectionable, but I'll take a look at it.  It seems

21    reasonable to me.

22             MS. HERNANDEZ:  Your Honor, in the interests of

23    sanity -- mine -- I gather from the Court's discussion that

24    there's a possibility -- I misunderstood the Court's order.

25    I thought the Court's order was we're not starting trial

1    until the 3rd of January, but I understand the Court is

2    saying if we pick a jury in two days, we might start trial.

3              THE COURT:  No, I never -- I don't think I ever

4    said that.  I think the -- as I recall -- you mean before

5    today?

6              MS. HERNANDEZ:  I'm -- yeah, I just read the

7    order -- the Court's order of it and I thought, Oh, great --

8              THE COURT:  Oh.

9              MS. HERNANDEZ:  -- the 3rd --

10             THE COURT:  Something I wrote?

11             MS. HERNANDEZ:  You issued an order, Your Honor,

12   about the schedule --

13             THE COURT:  Correct.

14             MS. HERNANDEZ:  -- when we start and what days

15   we're sitting and it's going to be six weeks.

16             THE COURT:  Yeah, I'm aware of that order.  I

17   don't remember that --

18             MS. HERNANDEZ:  No, no, you -- I don't know that

19   you -- I missed -- I may have misread and understood that

20   we're not starting trial until the 3rd no matter what --

21             THE COURT:  No, that is what Mr. -- that is what

22   the Government and perhaps the defense, at various times

23   before today, have tried to get me to say.  And what I am

24   saying is this.  I -- look, I -- first of all, I think it's

25   unlikely that we get all the way through here, okay, and if

1    we're -- but I don't want to -- I -- and I -- actually, what

2    the -- as I -- what I recall is the Government said, Well,

3    what about our witnesses?  They're going to be on call.

4    That's, you know -- and I said, Look, the -- what is the

5    odds -- what are the odds that we are going to get all the

6    way through to a witness on Friday, especially since I did

7    tell you that you're going to get Friday afternoon off?

8                   MS. HERNANDEZ:  I know.

9                   THE COURT:  So --

10                  MS. HERNANDEZ:  There's just a --

11                  THE COURT:  -- not a --

12                  MS. HERNANDEZ:  There's two days of opening

13   statement with this many lawyers, I bet.

14                  THE COURT:  There you go.  Well, hopefully it's

15   not going to be two days --

16                  MS. HERNANDEZ:  I mean --

17                  THE COURT:  -- but I think --

18                  MS. HERNANDEZ:  -- there's five and the Government

19   is -- I believe, are going to take three hours.  Those

20   multimedia things take a long time.  I -- the -- I mean, I

21   just think, from a planning point of view, I -- again, it's

22   sanity.  I mean --

23                  THE COURT:  I think it's very --

24                  MS. HERNANDEZ:  -- we're all very busy.

25                  THE COURT:  Look, I think it's very, very, very,

1   very -- for you -- I think it's very unlikely, and I'm --

2   and if we get --

3           MS. HERNANDEZ:  I want more than unlikely.

4           THE COURT:  If we --

5           MS. HERNANDEZ:  I mean, I want the Court to tell

6   me I don't have to pick a jury and work on opening

7   statement.  And then I think it would -- I don't think it

8   would be real good to -- in the unlikely event we pick a

9   jury in one day because we all agree on everything, it

10  would -- I don't think it would be very good to, like, do

11  opening statements and send them home for a week-and-a-half

12  and come back.

13          THE COURT:  There's a strong argument for that.  I

14  agree.

15          MS. HERNANDEZ:  I want a definite.

16          THE COURT:  A very --

17          MS. HERNANDEZ:  Anyway --

18          THE COURT:  -- strong argument.  Yeah, I don't

19  think -- let me put it this way.  I'll think about giving

20  you all that assurance soon.  I just think the reality is I

21  think we need to be nimble --

22          MS. HERNANDEZ:  I agree.

23          THE COURT:  -- and I hate to, like, make that

24  commitment --

25          MS. HERNANDEZ:  I agree, but I really would ask

1      that the Court consider that.

2              One other housekeeping thing.  We've talked around

3      this topic several times.  The House Committee has

4      transcripts.  We know for a fact, I believe, that they have

5      at least one transcript of Mr. Bertino.  I don't know how

6      many other transcripts they have.  The Government has

7      indicated they have no ability to force release of the

8      transcripts.  Well, apparently, they're -- some transcripts

9      were produced and the Government will not share the

10     correspondence between Department of Justice and the House

11     Committee relating to those transcripts.  Be that as it may,

12     I will tell the Court that I sent an email to counsel for

13     the January 6th Committee with whom I had spoken in the

14     past.  They wanted to speak to one of my clients, not --

15             THE COURT:  Ms. Hernandez, I beg you to get to

16     your point.

17             MS. HERNANDEZ:  I'm sorry?

18             THE COURT:  I beg you to get to your point.

19             MS. HERNANDEZ:  I know it's separation of powers

20     or whatever.  Is there anything that the Court is --

21             THE COURT:  I have already ordered the Government

22     to provide you the transcripts when they --

23             MS. HERNANDEZ:  I know.

24             THE COURT:  -- get it.

25             MS. HERNANDEZ:  Yeah, but the -- I understand.

1    But will the Court entertain a Rule 17(c) plea -- 17(c)

2    subpoena to be issued to the House Committee for copies of

3    relevant transcripts?

4            THE COURT:  I don't know what to tell you.

5    I'll -- I have -- I'll look at the authority you're citing

6    and --

7            MS. HERNANDEZ:  I don't have authority to cite.

8            THE COURT:  Okay.

9            MS. HERNANDEZ:  I just have -- the Court has -- is

10   omnipotent on Rule 17(c).

11           THE COURT:  I'll look at it.

12           Anything further before we break so I can --

13           MR. PATTIS:  Yes, sir.

14           THE COURT:  -- get to --

15           MR. HULL:  Your Honor, I can do this very briefly.

16   Two things.

17           THE COURT:  All right.  Mr. Hull?

18           MR. HULL:  Dan Hull for Joe Biggs.

19           First of all, I wanted to add to or chime in on my

20   co-counsel, Norm Pattis's idea for mixing up the

21   examinations, the cross-examinations.  I think that's a fair

22   way to do it.  We all have the same case but yet not the

23   same case with different types of witnesses --

24           THE COURT:  I'll think -- I said I will think

25   about it.

```
 1                    MR. HULL:  And I would appreciate that.
 2                    The other thing that's been on my mind for a
 3         really long time -- since March -- am I permitted, Dan Hull,
 4         to continue in this case?  I trust I --
 5                    THE COURT:  I'll be entering an order on that
 6         soon --
 7                    MR. HULL:  Okay.
 8                    THE COURT:  -- but I -- I'll be entering an order
 9         on that soon.  I -- you're not going to -- I don't think
10         it's going to be an issue, Mr. Hull.
11                    MR. HULL:  Pardon?
12                    THE COURT:  I don't -- I think you will be able to
13         continue.
14                    MR. HULL:  Well, that's very important
15         information.
16                    THE COURT:  Okay.  No, that's fair.
17                    MR. HULL:  Thank you for -- no.  Fair.
18                    THE COURT:  Absolutely.
19                    MR. PATTIS:  Judge, Norm Pattis.
20                    A strict -- really, a housekeeping matter.  What
21         happens if we don't finish picking next week?  Will we
22         resume, then, after the 1st of the year or --
23                    THE COURT:  Yes, sir.  Wherever we are --
24                    MR. PATTIS:  Okay.  Thank you.
25                    THE COURT:  Wherever we are on the 23rd, we will
```

1    pick up on the 3rd.

2              MR. PATTIS:  Thank you.

3              MR. JAUREGUI:  (Indicating.)

4              THE COURT:  Mr. Jauregui?

5              MR. JAUREGUI:  Judge, just on the Lamond issue, I

6    just wanted to make sure that we could expect an order from

7    Your Honor before opening just so that I could prepare.

8              THE COURT:  Before opening?  Yes.

9              MR. JAUREGUI:  Okay.  Thank you.

10             THE COURT:  Yes.

11             MR. JAUREGUI:  Thank you, Judge.

12             THE COURT:  All right.  Until Monday, the parties

13   are dismissed.

14             THE DEPUTY CLERK:  All rise.  This Honorable Court

15   is adjourned.

16             (Proceedings concluded at 3:04 p.m.)

17                  *  *  *  *  *  *  *  *  *  *  *

18             **CERTIFICATE OF OFFICIAL COURT REPORTER**

19   **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

20   **that the above and foregoing constitutes a true and accurate**

21   **transcript of my stenographic notes and is a full, true and**

22   **complete transcript of the proceedings to the best of my**

23   **ability, dated this 19th day of December 2022.**

24                          **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                             **Official Court Reporter**
25                          **United States Courthouse**
                             **Room 6722**

333 Constitution Avenue, NW
Washington, DC 20001