UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>ETHAN NORDEAN, et al.,<br><br>Defendants. | )<br>)<br>) Case No. 1:21-cr-175-TJK<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**NORDEAN'S OMNIBUS RESPONSE TO THE GOVERNMENT'S MOTIONS (1) TO PRECLUDE IMPROPER IMPEACHMENT, (2) TO LIMIT CROSS-EXAMINATION RELATED TO CHS MATTERS, AND (3) TO ADMIT TELEGRAM EXHIBITS**

The government filed three trial motions over the weekend, all of them after 6 p.m. on Saturday, January 28. Gov't Mot. to Exclude Improper Impeachment Evid., ECF No. 644; Gov't Mot. to Limit Cross-Examination Related to CHS Matters, ECF No. 645; Gov't Motion to Admit Telegram Exhibits. ECF No. 646. As to the last motion, Nordean appreciates the government's effort to accelerate the pace of trial through early resolution of admissibility issues outside the presence of the jury. Nordean concurs with that approach. However, the government's remaining motions are misguided, should not have been filed under seal,[1] and seek relief barred by the Sixth Amendment, the Federal Rules of Evidence and the Local Rules.

**I.   The government's third attempt to exclude proper impeachment material should be denied and the government should be directed not to object during cross-examination on grounds the Court has already properly rejected**

In his direct examination, Matthew Greene testified as follows:

> Q: [B]ased on your experience *in December [2020],* did that leave you with—

---

[1] As explained *infra*, resolution of the government's CHS-related motion need not entail discussion of information covered by the protective order, assuming arguendo such protection somehow still applies during trial even though the government does not and cannot now invoke the *Roviaro* privilege. That informants were involved in this case and have made exculpatory statements was revealed—without government objection—in opening statements.

1

> well, what was your understanding of what leadership of Proud Boys *expected* in terms of willingness to use force on January 6th?
>
> A: My understanding was that if there was violence started, you should not back down.
>
> Q: Did that understanding factor one way or the other into decisions you made in terms of your actions on January 6th?
>
> A: It did.

Tr. 5478 (emphasis added).

> Q: So because every Proud Boy [] didn't say to you [']don't commit an act of violence['], you believe that that's what they were condoning?
>
> A: Along with the celebration when violence did take place, yes.

Tr. 5559.

In the first exchange above, the government elicited from Greene not merely what he "understood" *on January 6th itself* about the desires of "Proud Boys leadership." Instead, the government elicited what Greene "understood" *based on his experience at the December 12, 2020 rally* about what leadership "*expected*" for January 6— i.e., the government elicited from Greene his purported understanding *leading up to January 6* about the use of force.

However, in his January 18, 2021 recorded interview with the FBI, Greene denied any *expectations* about the use of force on January 6 whatsoever:

- "**Nobody I knew or even talked to went down there [to D.C.] to be violent**. It was not the plan at all."

- "**Breaking down doors, busting up the Capitol**. That was never my plan. **Was it anyone's plan? I don't think so**. Like I said, we were just marching down towards the Capitol and all of a sudden it snaps."

- "I'm telling you, sir [to FBI agent], **the entire mood was peaceful**."

In his direct examination, Greene also testified that he conspired "in tandem with Dominic Pezzola and William Pepe [to] stop[] the electoral count." Tr. 5575. He testified that he

2

intended to interfere with Congress's electoral vote count that day. *Id.* Indeed, Greene testified that this conspiracy involved "everybody around [him,]" all of whom "had the same idea." *Id.*

However, in his January 18, 2021 interview with the FBI, Greene directly contradicted that trial testimony in several statements:

- "I did not go down there [to the Capitol] to cause any trouble. It was all about the president who wanted us to be there. That's all it was. **I just got caught up in shit**. **I just wanted to help people**."

- Agent: "[Let's say] somebody else tells us that Matt Greene wasn't just patching up wounds and helping the needy down there at the riot but that Matt Greene was down there as part of a bigger plan to storm the Capitol the day the electoral votes were being counted? And that Matt Greene may have done things way beyond walking through the Rotunda of the Capitol? It's one thing to walk in and be in a place where you're not supposed to be and it's another thing to be there with ulterior motives."

  Greene: "**In my heart of hearts, I'm telling you the God's honest truth: we went down there [to the Capitol] because the president told us to, and shit got out of hand. I don't know why shit got out of hand. If you watch the videos, you'll *just* see me helping anyone that I could**…."

The government objected to Nordean's introduction of the extrinsic proof of Greene's inconsistent video statements. At the time, the government did not contend that Greene's January 18 statements were not inconsistent with his trial testimony. Instead, the government alluded to one concluding line from Greene's direct testimony where the witness stated, "When I initially spoke to the FBI, I was honestly not—I didn't believe I had done anything wrong." Tr. 5529. Thus, the government argued that because the witness had admitted prior inconsistent statements, extrinsic proof of them was inadmissible under Federal Rule of Evidence 613(b):

MR. KENERSON: . . . [T]he witness needs a chance to answer his questions as to [what] he told the FBI. If his answer is yes [that he made an inconsistent statement], that's the end of it. If his answer is no [that he did not make an inconsistent statement], then we can go to extrinsic evidence.

> THE COURT: I think that's right, Mr. Smith. . . . [I]f [the witness] says, Yes, in fact, I told the FBI something different than [what] I'm saying here today, I think that's the end of the impeachment.

Tr. 5680.

Nordean was then barred from moving extrinsic proof of Greene's prior inconsistent statements into evidence. *Id.* Later, Nordean asked the Court for an opportunity to brief the issue. Initially, the Court set a deadline for Friday, January 27. However, Nordean's counsel learned that the D.C. Circuit long ago decided that extrinsic proof of a witness's prior inconsistent statement is still admissible even where the witness admits inconsistency in cross-examination. *Williams v. United States*, 403 F.2d 176,179 (D.C. Cir. 1968). Counsel apprised the Court of *Williams* in the afternoon of Wednesday, January 25.

After 10 p.m. on Wednesday evening, the government sent the following email to the Court:

> Dear Chambers and Counsel:
>
> In accordance with the court's trial procedures order, suggesting that the parties preview legal disputes by sending supporting law to chambers, the government submits that the *Williams* decision cited by Nordean does not support what he requests to do tomorrow, that is play the clips he was not permitted to play today to the jury. *Williams* involved a statement that was actually put to the witness and that caused him to change his trial testimony. Those facts are not analogous to what happened with Mr. Greene, where he admitted having made certain statements to the FBI, which counsel claimed were inconsistent, and did not change his trial testimony as a result.
>
> The D.C. Circuit has endorsed and long followed the rule the Court followed this morning, which is also the procedure as taught in basic trial advocacy class. *See United States v. Wright*, 489 F.2d 1181, 1187 (D.C. Cir. 1973), which postdates the *Williams* case: "Moreover, procedures governing introduction and use of prior inconsistent statements were not followed in this case. Before introducing extrinsic proof of a witness' prior inconsistent statement, the witness must be asked whether he or she made the statement and must be given an opportunity to explain it. *Gordon v. Thomas*, 63 App.D.C. 148, 70 F.2d 752 (1932); *District of Columbia v. Chessin*, 61 App.D.C. 260, 61 F.2d 523 (1932); *Washington & O.D. Ry. Co. v. Smith,* 53 App.D.C. 184, 289 F. 582 (1923); *Gordon v. United States*, 53 App.D.C. 154, 289 F. 552 (1923). See also 3A J. Wigmore Evidence § 1019 (Chadbourn rev. 1970); C. McCormick, Evidence § 37

4

(1954); Rule 613(b), Proposed Federal Rules of Evidence. This procedure was not employed here; the prosecution did not even seek an opportunity to cross-examine Miss Fleming. More importantly, prior inconsistent statements are admissible only for impeachment purposes, not as substantive evidence to prove the truth of the matter asserted, and the jury should be instructed to this effect. *See United States v. McClain*, 142 U.S.App.D.C. 213, 440 F.2d 241 (1971); *Jones v. United States*, 128 U.S.App.D.C. 36, 385 F.2d 296 (1967); *Cannady v. United States*, 122 U.S.App.D.C. 99, 351 F.2d 796 (1965); *Byrd v. United States*, 119 U.S.App.D.C. 360, 342 F.2d 939 (1965)." (footnotes omitted).

Thank you,

Erik Kenerson

1/25/23 Gov't Email to Chambers.

The same evening, Nordean's counsel emailed the following response to the government's communication:

Chambers,

The government's email below concerning *Williams v. United States*, 403 F.2d 176,179 (D.C. Cir. 1968), conflates distinct issues and provides an incorrect rule of law on the relevant matter.

In *Williams*, the D.C. Circuit rejected the government's argument here that a witness's prior inconsistent statement may not be admitted under FRE 613(b) where "the witness admitted that his earlier statement contradicted his testimony." 403 F.2d at 179. The Circuit found that this rule is dictated by *Gordon v. United States*, 344 U.S. 414, 73 S. Ct. 369, 97 L. Ed 447 (1953). *Williams*, 403 F.2d at 179.

The government attempts to distinguish *Williams* by noting it "involved a [prior] statement that was actually put to the witness and that caused him to change his trial testimony." As the Court will see in reviewing *Williams*, the fact that the witness admitted an inconsistency in cross-examination after initially denying it was not the basis for the holding. Rather, the rationale was that "the best evidence of any contradiction which might impeach [the witness's] credibility [is] the prior statement itself." *Williams*, 403 F.2d at 179. That rationale does not turn on the number of times it takes for the witness to admit a prior inconsistent statement before introducing the extrinsic evidence of that statement.

Beyond the D.C. Circuit, multiple circuit decisions show that following the government's request would result in legal error. None has anything to do with the government's proffered distinction concerning how many times it takes for the witness to admit an inconsistency in cross-examination. *United States v. Lopez*, 870 F.3d. 573, 582 (7th Cir.

2017) ("[E]ven when a witness admits to making a prior inconsistent statement, Federal Rule of Evidence 613(b) should be read broadly to allow a party to introduce extrinsic evidence to emphasize the fact that the witness made the prior statement[.]"); *United States v. Strother*, 49 F.3d 869 (2d Cir. 1995) (same).

The Second Circuit has explained why the government is mistaken and why the error it invites would not be harmless:

"We reject the government's claim that, because [the defendant] was permitted to cross examine [the witness] as to the two documents, the district court errors were harmless. *Extrinsic evidence of a prior inconsistent statement is more persuasive to a jury than a witness's acknowledgement of inconsistencies in a prior statement.*"

*Strother*, 49 F.3d at 871 (emphasis added).

Just so, here. Witness Greene acknowledged in his testimony that he previously informed the FBI that he did not witness the Proud Boys group planning to storm the Capitol or engage in violence at any point on January 6 and that he himself had no intent to commit any crime. But, as the D.C. Circuit and at least two other circuits have held, the video evidence of Greene's prior inconsistent statements "is more persuasive to a jury than [his] acknowledgment of inconsistencies." *Williams*, 403 F.2d at 179; *Strother*, 49 F.3d at 871. The video clips allow the jury to see the witness's demeanor and judge for themselves which statement is more credible.

The government cites *United States v. Wright*, 489 F.2d 1181, 1187 (D.C. Cir. 1973) for the principle that "before introducing extrinsic proof of a witness' prior inconsistent statement, the witness must be asked whether he or she made the statement and must be given an opportunity to explain it." Of course, Greene was asked about the prior inconsistent statements and was given an opportunity to explain them. The government's email below does not deny that fact. As the government knows, that "procedure taught in basic trial advocacy class" is not the issue before the Court. Neither *Wright* nor any of the decisions cited by the government addresses or contradicts the rule in *Williams* (and *Strother* and *Lopez*) that once the witness has been asked about the prior inconsistent statement and given an opportunity to explain it, the prior inconsistent statement may be moved into evidence. Indeed, that is the plain language of Rule 613(b).

Finally, the government's email includes a line about hearsay. As it knows, Greene's prior inconsistent statements are moved into evidence not for their truth but to impeach the witness.

Thank you for considering this email, Judge Kelly!

Nick Smith

1/25/23 Nordean Email to Chambers.

6

On Saturday, January 28, the government filed a Motion to Exclude Improper Impeachment Evidence, ECF No. 644—its third effort to exclude from evidence Greene's prior inconsistent statements.  This time, however, the government sought the same relief—for precisely the opposite reason.  In a footnote near the end of its brief, the government acknowledged that its original basis for objecting to the introduction of Greene's prior inconsistent statements—that the witness had admitted in direct and cross-examination that there were inconsistencies in his relevant statements—was wrong as a matter of D.C. Circuit law:

> After further reflection, the government is withdrawing its earlier objection to the defendants' ability to play inconsistent statements for the jury after a witness admits to making those statements, so long as the statement at issue is both actually inconsistent with the witness's trial testimony and material. *See United States v. Marshall*, 935 F.2d 1298, 1300 (D.C. Cir. 1991) [quotation omitted].

ECF No. 644, p. 4 n. 3.

Having successfully interfered with Nordean's cross-examination of its witness with an erroneous objection, the government now seeks to retrospectively cure the error it solicited with the opposite argument, that the extrinsic statements Nordean seeks to introduce are not inconsistent after all.  ECF No. 644, pp. 2-4.  The government's effort centers around the fact that Greene carefully refrained from testifying on direct about "an explicit plan" among the Proud Boys.  *Id.*, p. 3.  Of course, that thin semantic distinction ignores the testimony, quoted above, the government elicited from Greene as to the witness's "expectation" from "leadership" about the use of force, as developed *between the December 12, 2020 rally and the lead up to January 6.*  Tr. 5478.  That testimony is contradicted by Greene's prior statements to the FBI, cited above, including that "Nobody I knew or even talked to went down there [to the Capitol] to be violent" and "I'm telling you, sir [to FBI agent], the entire mood was peaceful."

7

The government itself acknowledges inconsistencies between Greene's (1) trial testimony that he intended to interfere with members of Congress and entered into a criminal conspiracy with Pezzola and "everybody around [him,]," all of whom "had the same idea" and (2) his prior statements to the FBI that in his "heart of hearts, I'm telling you the God's honest truth" that all Greene did on January 6 was help wounded protesters that day.  ECF No. 644, p. 4.

Accordingly, Nordean should be given an opportunity to introduce these prior inconsistent statements, which total no more than approximately 1.5 minutes of interview footage.  Fed. R. Evid. 613(b).  *Williams*, 403 F.2d at 179; *Marshall*, 935 F.2d at 1300; *Lopez*, 870 F.3d. at 582; *Strother*, 49 F.3d at 871.

## II. The relief sought by the government's motion to restrict all CHS-related cross-examination is unconstitutional, unprecedented, unnecessary, vague, and the motion is improperly sealed

On Saturday, January 28, the government filed an under-seal Motion to Limit Cross-Examination Related to CHS Matters.  ECF No. 645.  It summarized the requested relief as follows:

> The government asks this Court to require defense counsel to pre-clear any questions regarding FBI CHSs (or other government informants) that counsel intends to ask of any government witness on direct or cross-examination so that the Court may impose appropriate limitations on such questioning.

ECF No. 645, p. 9.  The government's unprecedented, nonpublic request is inappropriate and should be rejected for many reasons.

First, the motion is improperly sealed.  Nordean has the right to a public trial.  U.S. Const. amend VI.  "The English common law, the American constitutional system, and the concept of the 'consent of the governed,' stress the 'public' nature of legal principles and decisions." *Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165, 1177 (6th Cir. 1983).

8

These principles do not serve the public's interest alone but also the defendant's. When a trial is not held in secret:

> [Courts] know that they will continue to be held responsible by the public for their rulings. Without access to the proceedings, the public cannot analyze and critique the reasoning of the court. The remedies or penalties imposed by the court will be more readily accepted, or corrected if erroneous, if the public has an opportunity to review the facts presented to the court. In his concurrence [in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980)], Justice Brennan emphasized this link between access to the courtroom and the popular control necessary in our representative form of government. Although the federal judiciary is not a majoritarian institution, public access provides an element of accountability. One of the ways we minimize judicial error and misconduct is through public scrutiny and discussion.
>
> Finally, Justice Brennan points out that open trials promote "true and accurate fact finding." 448 U.S. at 596. When information is disseminated to the public through the media, previously unidentified witnesses may come forward with evidence. Witnesses in an open trial may be less inclined to perjure themselves. Public access creates a critical audience and hence encourages truthful exposition of facts, an essential function of a trial.

*Brown & Williamson Tobacco Corp.*, 710 F.2d at 1178. As the court of appeals summarized the principle, "[o]nly the most compelling reasons can justify non-disclosure of judicial records." *Id*. at 1179-80. Here, the government's motion can and should be resolved publicly. For the fact that this case involves multiple informants who have made exculpatory statements was explicitly revealed to the jury and the public in opening statements—without government objection. Below is a copy of a slide shown to the jury in opening statements. None of this information is still subject to the protective order *during trial*.

### Defense witnesses – Government Informants

- Multiple government informants on the group's march, at the Capitol
- Will testify that the march to the Capitol was just for the cameras
- Will testify that, despite being involved in Defendants' Telegram communications and the march, they were not aware of any plan to storm the Capitol
- Will testify that the Proud Boys group directed them to stay away from law enforcement

9

Case 1:21-cr-00175-TJK   Document 647   Filed 01/29/23   Page 10 of 15

Second, the Sixth Amendment guarantees "the right of an accused in a criminal prosecution to be confronted with the witnesses against him." *Davis v. Alaska*, 415 US. 308, 315 (1974). The core of that right is cross-examination, "the principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316. Here, the government does not even identify what ostensible evidentiary privilege or rule would permit this Court to restrict Nordean's cross-examination in the extraordinary "preclearance" fashion it proposes. Certainly, it does not formally invoke the so-called "informant's privilege," nor could it. That privilege permits the government in certain circumstances to withhold from a defendant identifying information for an informant. *Roviaro v. United States*, 353 U.S. 53, 59 (1957). Yet, here, the government *has* provided such information to the defense with respect to every potential informant about whom the defense may pose questions on cross-examination. To the extent any *Roviaro* privilege once existed with respect to those CHSs, it has been waived or overruled. Nor does the government assert otherwise. *Roviaro* does not authorize the Court to restrict the Sixth Amendment cross-examination rights of a defendant as to an informant once the identifying information has been produced and the privilege waived or overruled. The government cites no authority for that proposition and there is none.

Third, the reasons given by the government for its unprecedented request lack sense. It alludes vaguely to "the public interest in protecting the flow of [CHS] information" which, it says, must be balanced against the defendants' rights to present their defense. ECF No. 645, p. 7. As explained above, that balancing framework from *Roviaro* is not even applicable to this question. Yet even under its own terms the government nowhere makes any factual showing or proffer as to how the "public interest" would be harmed through cross-examination, given that the government has already provided all the *Roviaro* information to the defense, all or nearly all

10

of those witnesses are subject to trial subpoena, and the protective order does not and cannot restrict the use of such information *at trial*. If the government is suggesting that it has advanced knowledge that these informant witnesses do not intend to comply with court-issued subpoenas or that they intend to invoke a privilege not to testify, that would be highly improper. It is misconduct for the government to suggest to defense witnesses or their counsel that they ought not testify on those grounds. *E.g.*, *United States v. Blackwell*, 694 F.2d 1325, 1334 (D.C. Cir. 1982) (citing with approval decision finding government misconduct where "the prosecutor sent at least three messages to a potential defense witness through her attorney warning her that, if she testified, she was liable to prosecution, [and] that her testimony would be used as evidence against her. . ."). The motion should be denied on this basis alone, as the government has provided no factual "public interest" basis against which the defendants' conceded cross-examination rights must be "balanced."

Fourth, the government demands that the Court simply presume that the defense has "no good faith basis to believe that [any and all government] witness[es] ha[ve] the appropriate foundational knowledge" to address questions about the CHSs. ECF No. 645, p. 9. This is true, the government further argues, *even with respect to FBI agent witnesses*. "The identities of most of the CHSs whose information has been disclosed to defense counsel in this case are unknown to almost all of the agents the government expects to call as witnesses in this trial." Notably, the government does not identify which agents may be exceptions to this "fact," nor whether those agents will be called to testify at trial or made available to the defense if not called by the government. Thus, says the government, FBI agents may not be cross-examined about Confidential Human Sources. . .operated by the FBI—for the agents lack the "foundational ability" to respond to such questions. *Id.*, p. 11. Moreover, the government contends, even if

11

defense counsel seek to cross-examine agents about the CHSs already disclosed to the defense and whose presence the jury was notified of, they must obtain preliminary clearance to do so outside the presence of the jury, thereby delaying trial and fragmenting the defendants' cross-examination. *Id.*

All this is unprecedented nonsense. Acceding to the government's anomalous demands for secrecy in a public trial would result in reversible error no less than in the case of its misguided impeachment arguments. The government's witness list has named nearly half a dozen case agents involved in this investigation, including Brandon Camiliere, Kathryn Camiliere, Peter Dubrowski, Nicholas Hanak, and Nicole Miller. Unlike seizing agents, case agents are not just empowered but duty-bound to be familiar with the investigation, its history and its progress. Even if in the FBI's records management system the identities of CHSs are "generally" known only to their handling agents and their supervisors (a "fact" for which the government provides no supporting evidence), ECF No. 645, p. 10, the defense at the very least has a good-faith basis to believe that the case agents here have acquired the "foundational ability" to address pertinent questions pertaining to the CHSs—in the many months since the first CHS was disclosed to the defense. And even if those agents are still somehow unaware of the legal names of CHSs—despite the fact that the U.S. Attorney's Office has had knowledge of them for perhaps a year or longer—the agents are still competent to field relevant related questions, such as those concerning the authenticity and meaning of FBI records establishing that certain CHSs were indeed present with the Proud Boys group on the march and in Proud Boys Telegram channels.

Fifth, no rule or precedent requires the defense to "preclear" such questions with the government and Court before cross-examining a witness and outside the presence of the jury.

The government cites none.  Neither the Trial Procedures Order nor Federal Rule of Evidence 104(a) requires a defendant to "preclear" its cross-examination questions.  Rule 104 provides,

> The court must conduct any hearing on a preliminary question so that the jury cannot hear it if:
>
> (1) the hearing involves the admissibility of a confession;
>
> (2) a defendant in a criminal case is a witness and so requests; or
>
> (3) justice so requires.

Fed. R. Evid. 104(c).

Subparts (1) and (2) plainly do not apply here.  The government cites no authority holding that "justice requires" that a defendant "preclear" cross-examination of every witness on any question pertaining to informants.  There is none.  The suggestion is offensive to elementary adversarial principles.  If the government were correct, it could demand all the defense's cross-examination questions in advance and coach its witnesses beforehand.  The suggestion is without any precedent in this court or elsewhere in any common law legal system.

Sixth, the government seeks to preclude any and all cross-examination whatsoever "into the FBI's sources and methods concerning its handling of CHSs." ECF No. 645, p. 11.  The government cites no privilege.  It cites no rule of evidence.  It does not cite a single precedent in this or any other court.  The request is baseless—and betrays a lack of seriousness in the government's requests.  So far from being classified or sensitive information, the Bureau's "sources and methods" for handling CHSs are public information, published in a manual called the Domestic Investigations and Operations Guide.  Helpfully, it can be found on the FBI's public website.  The Court has already determined that certain CHS-related material is relevant in this trial.  Indeed, the government's very motion calls certain parts of that evidence

"exculpatory." *Id.*, p. 2. Plainly, there are relevant questions defense counsel may pose to FBI agents to provide context for the jury about this evidence, such as what a "CHS" is in the first place, why a CHS would have been communicating with a handler agent on January 6, what a handler agent is, and the like. No rule permits the indiscriminate foreclosure of all such questions regardless of the witness or specific information sought.

**III.     The government's motion *in limine* to admit out-of-court Telegram statements**

On Saturday, January 28, the government filed a motion to admit out-of-court Telegram statements, and certain other out-of-court statements, made by various defendants. ECF No. 646. The motion cites a thicket of hearsay rules, seemingly without linking every statement to a rule of admissibility. *Id.* Accompanying this motion was a single PDF encompassing the statements. The document runs to 198 pages.

Also on January 28, the government notified the defense that the agent through whom the government will seek admission of these out-of-court statements—Special Agent Peter Dubrowski—will testify "as early as Wednesday, 2/1/." 1/28/23 Gov't Email.

Nordean needs an opportunity to assess the government's admissibility arguments and to cross-check them against the 198-page PDF provided by the government on January 28. Nordean notes that the format in which the out-of-court statements are arranged in the January 28 PDF is different from the way in which the government's Telegram exhibits were earlier presented. This means Nordean's time will also be consumed by having to rearrange his own responsive Telegram exhibits. Nordean anticipates filing a response to the government's motion *in limine* by Tuesday evening.

Dated: January 29, 2023                                     Respectfully submitted,

                                                                            /s/ David B. Smith

> David B. Smith, D.C. Bar No. 403068
> David B. Smith, PLLC
> 108 North Alfred Street, 1st FL
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> dbs@davidbsmithpllc.com
>
> Nicholas D. Smith, D.C. Bar No. 1029802
> 1123 Broadway, Suite 909
> New York, NY 10010
> (917) 902-3869
> nds@davidbsmithpllc.com
> *Counsel to Ethan Nordean*

### Certificate of Service

I hereby certify that on the 29th day of January, 2023, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Jim Nelson
> Assistant United States Attorney
> 555 4th Street, N.W., Room 4408
> Washington, D.C. 20530
> (202) 252-6986

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> /s/ David B. Smith
> David B. Smith, D.C. Bar No. 403068
> David B. Smith, PLLC
> 108 North Alfred Street, 1st FL
> Alexandria, Virginia 22314
> (703) 548-8911 / Fax (703) 548-8935
> dbs@davidbsmithpllc.com