UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DOMINIC PEZZOLA,<br>　　　　*Defendant*. | Criminal Action No. 21-175-6 (TJK) |

### ORDER

Before the Court is Defendant Pezzola's Motion for Mistrial and Motion to Strike Government's Exhibit 528-1A. ECF No. 660. On top of those requests, the motion also seeks an evidentiary hearing insofar as the Court finds further factual development necessary. The Court will deny the motion.

Pezzola's motion concerns Government's Exhibit 528-1A, a document titled *1776 Returns*. FBI Special Agent Peter Dubrowski testified that, about a week before January 6, 2021, Defendant Tarrio received a message containing the document from a person stored in his phone as "Eryk-A." Trial Tr. 8381–83. The nine-page document describes a plan to occupy, on January 6, 2021, several government buildings—though not the U.S. Capitol. It also uses the distinctive phrase "Storm the Winter Palace." Dubrowski testified that Tarrio used the term "Winter Palace" in a later Telegram conversation with Jeremy Bertino. Trial Tr. 8389. Government's Exhibit 523-1 also portrays Tarrio discussing *1776 Returns* with, it appears, the person who sent it to him.

Over several objections, the Court admitted the *1776 Returns* document. *See* Trial Tr. 8383–88. Before that, the Court also overruled pretrial objections to the document's admissibility in its December 14, 2022, ruling on the parties' motions in limine. The Court held that *1776*

*Returns* is relevant because it sketches a plan similar to what happened on January 6. Moreover, the evidence of Tarrio's later use of the term "Winter Palace" and his discussion of the document portrayed in Government's Exhibit 523-1 permit the possible inference that Tarrio was familiar with the document's contents. Collectively, those facts bear on Tarrio's state of mind around January 6, 2021.

Pezzola's motion concerns the document's origins. He claims that the government created *1776 Returns* and arranged for it to be sent to Tarrio "to frame or implicate Tarrio in a government-created scheme to storm buildings around the Capitol." ECF No. 660 at 1. The government denies that is so. ECF No. 665.

The parties agree on the following facts. A man named Samuel Armes testified about *1776 Returns* before both the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol and before a grand jury in this case. Armes testified that, as an undergraduate at the University of South Florida, he participated in a certificate program designed to give students the skills to work for a federal intelligence agency. *See* H. Select Comm. Tr. at 4–8. In that program, Armes did some research for the United States Special Operations Command about the use of blockchain technology by drug cartels and terrorist organizations. *Id.* at 7. Armes described that program as having "groomed" him to "work for the CIA and FBI." *Id.* at 4.[1] After graduating from college, Armes worked in the private sector on blockchain-technology issues. *Id.* at 5. According to Armes, in late 2020, he became concerned about speculation that then-President Trump would refuse to leave office or to acknowledge defeat if he lost the upcoming election. *Id.* at 10–11. He responded by describing in writing what he "thought might happen in a worst-case scenario" of that nature. *Id*. The result, as he put it, was a "three-to-five page document" that contained maps

---

[1] Armes defined the term "groomed" to mean "trained" or "educated." H. Select Comm. Tr. at 7.

and images, including the location of possible protests responding to the "chaos" he thought would result if there was uncertainty about who had won the election. *Id.* at 12–13. He also testified that he shared that document with a woman named Erika Flores, who may be the same woman who allegedly later sent *1776 Returns* to Tarrio. *See id.* at 13–15.

Beyond those facts, Pezzola's conclusions are hard to square with Armes's testimony. He describes Armes as a "CIA and FBI asset" and a member of the "intelligence community." ECF No. 660 at 4. But Armes testified that he was a "citizen" and "not a government employee," H. Select Comm. Tr. at 5, who did blockchain-related research as part of an undergraduate program, and then did private blockchain-related work after graduating, *id*. Pezzola says Armes wrote *1776 Returns*. ECF No. 660 at 4. Armes testified that he recognized some ideas and images in *1776 Returns* but that he had "never seen [*1776 Returns*] in [his] life." H. Select Comm. Tr. at 20. He also explained that, even insofar as the ideas expressed in *1776 Returns* were like his, they had been substantially altered. *See id.* at 20–27. Pezzola also claims Armes told Erika Flores to send *1776 Returns* to Tarrio. ECF No. 660 at 4. Armes explicitly denied having done so and testified that he barely knew Tarrio and did not approve of Tarrio's political beliefs. *See* H. Select Comm. Tr. at 16. Armes acknowledged that Flores attributed the document to him but said his ideas could have been, at most, the document's "inspiration." *Id.* at 19–20.

Pezzola supports his conclusions with conjecture. He points out, for instance, that Armes ascribed his initial concern about the 2020 election to a group that includes people he describes pejoratively as "deep state neocon establishment and intelligence community hawks and spokesmen." ECF No. 660 at 4 n.1. To support the idea that Armes was a member of the intelligence community, he notes that Armes had a professor mentor, something he says "[f]ew people in modern America have." ECF No. 665 at 4. And he insinuates that the University of South Florida is

3

some kind of front for the U.S. intelligence community by describing Armes's "college education" using scare quotes. *See id.* Those are inadequate bases for the Court to form any conclusions.

Pezzola also inaccurately portrays this case's litigation history. He says that neither the Court nor Defendants knew about Armes's testimony before the Court's December 14 ruling. ECF No. 660 at 3. But the government correctly points out that Armes provided indistinguishable testimony to the grand jury and that Defendants have known about that testimony since at least November 2022. ECF No. 663 at 2, 4–5 & n.1.

All that is to say that the factual leaps Pezzola would have the Court take are unconvincing. And even then, at bottom, they are beside the point because the relevance of *1776 Returns* has nothing to do with its author or his or her motivations. As the Court has explained, it admitted the document because of the window the jury may conclude that it provides into Tarrio's mental state. For that purpose, the contents of the document, and that Tarrio had access to it, appears to have discussed it, and used a distinctive term from it are what matter.

So even if Pezzola were right about the document's origins, a mistrial would be inappropriate. A trial court should declare a mistrial if, in its discretion, it determines that an evidentiary error has substantially prejudiced the defendant. *See United States v. Tarantino*, 846 F.2d 1384, 1413 (D.C. Cir. 1988); *United States v. Eccleston*, 961 F.2d 955, 959–61 (D.C. Cir. 1992). Because Pezzola has not shown either that the document's origins could render it inadmissible or that any error has prejudiced him, the Court will not declare a mistrial. For the same reasons, the Court will not strike Government's Exhibit 528-1A. Nothing in Pezzola's filings calls into question the Court's reasons for admitting the exhibit.

Nor will the Court hold an evidentiary hearing. Not only is the information Pezzola seeks irrelevant, but it is also overwhelmingly likely that any hearing would duplicate the information

that is already publicly available. Besides, the Court need not hold an evidentiary hearing to further investigate even relevant factual claims that lack a substantial foundation. *See United States v. Slatten*, 395 F. Supp. 3d 45, 100–02 (D.D.C. 2019).

Finally, Pezzola's gestures at *Brady v. Maryland*, 373 U.S. 83 (1963), and the concept of entrapment are misplaced. *See* ECF No. 660 at 5; ECF No. 665 at 6. As the Court has already explained, Defendants have long known about Armes's testimony, so it cannot be said that, under *Brady*, the evidence was "suppressed" by the government. *United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015).[2] On the latter point, "entrapment is an affirmative defense . . . to otherwise culpable conduct," *Pollard v. District of Columbia*, 191 F. Supp. 3d 58, 76 (D.D.C. 2016) (quotation omitted), not a basis for striking evidence or declaring a mistrial. The proper way to raise such a defense is to request a jury instruction after "the presentation of evidence" but "before closings." *United States v. Carpenter*, No. 21-CV-305 (JEB), 2023 WL 1860978, at *3 (D.D.C. Feb. 9, 2023). And in any event, an entrapment defense on these facts—even if it were merited—would pertain to Tarrio, not Pezzola.

\*     \*     \*

For those reasons, it is hereby **ORDERED** that Pezzola's Motion for Mistrial and Motion to Strike Government's Exhibit 528-1A, ECF No. 660, is **DENIED**.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: March 2, 2023

---

[2] Moreover, because the information does not undercut the relevance of *1776 Returns*, it is hard to see why the evidence is "favorable to the accused," and Pezzola identifies no "prejudice" in any event. *Pasha*, 797 F.3d at 1133.