UNITED STATES DISTRICT FOR THE DISTRICT
OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 21-cr-00303-ABJ |
| | ) | |
| DOMINIC  PEZZOLA | ) | |
| | ) | |
| Defendant | ) | |

**DEFENDANT PEZZOLA'S REPLY TO UNITED STATES'
RESPONSE TO PEZZOLA'S RULE 29 AND 33 MOTIONS**

COMES NOW Defendant Dominic Pezzola, by undersigned counsel, with this Reply to the United States' recent 86-page response (ECF #833) to Defendants' motion for acquittal and a new trial.

The government begins its response with yet another recounting of its accusations and narrative that the Proud Boy defendants were primary instigators of the disruption of the proceedings of Congress on January 6, 2021, claims that the defendants in this case were leaders of all the breaches of the Capitol and its grounds, and claims that the defendants plotted seditious obstruction and violence for weeks or months in advance.

## I.  COURT SHOULD GRANT PEZZOLA'S RULE 29 MOTION

Defendant Pezzola took the witness stand in his own defense, and while debunking every other aspect of this case acknowledged that he broke one pane of glass in a

1

window at the Capitol, causing damage (even under the government's inflated evaluations) under $800.  He did so after another, quite mysterious individual, wearing a red cap, glasses and a red sweater (#RedonRedGlasses from here on) broke the pane of glass directly to the right. Like so many other important breachers and instigators on January 6, Mr. #RedonRedGlasses remains unidentified—at least according to public statements by the Department of Justice.

It is significant that not only was #RedonRedGlasses guy the first person to breach the Capitol by breaking a window.  #RedonRedGlasses then entered the Capitol and became the first demonstrator to confront officers in the Crypt. #RedonRedGlasses is then seen waving at other demonstrators to follow him into the Crypt; where he became the leader of *that breach* as well.  Then, later on, #RedonRedGlasses, along with Ashley Babbitt, became the first two demonstrators to try to breach the broken windows of the House Chamber entryway.

#RedonRedGlasses—the mysterious man who shattered the first window and then led Pezzola to swing a plastic shield against another window pane— would have been the second demonstrator into the House Chamber if Ashley Babbitt had not been slain by a Capitol police officer while trying to climb through a window.   This significant player in the events of Jan. 6 was clearly wearing a cell phone in his pants pocket and is seen on numerous videos having detailed discussions with officers.  Yet the FBI claims it has not identified him.

2

The same goes for Pezzola's "robbery" of a police shield from a Capitol Police officer.  Video at trial showed another unidentified rioter—a tall, muscular black man wearing a black shirt with a white "W" emblem—was actually the person who took the shield from the officer.  (Pezzola, laying on his back after falling in a scrum of disoriented people, then used the shield which was handed off to him by the large man with the "W" emblem, to get to his feet.  Thereafter Pezzola had possession of the shield for about an hour.

Like the mysterious #RedonRedGlasses guy, the large man in the "W" shirt is supposedly unidentified.  But the man exhibited many attributes of a police officer, including wearing two (2) layers of plastic gloves on his hands, beneath other gloves.  And "W" was also an important player in the first breach at the Peace Monument area.

## A. GOVERNMENT PRESENTED NO EVIDENCE AT ALL OTHER THAN OF THE DEFENDANTS' INNOCENCE

Unfortunately for the government, the facts shown at trial never evinced any plotting, obstruction, or overarching intent which would support a conviction under 18 U.S.C. § 1512.  Codefendants (and, marginally, even Pezzola who joined the Proud Boys fewer than 30 days earlier) did post some hyperbolic remarks on social media – as is their Constitutional right.  But those remarks were wholly rhetorical and aimed—not at the U.S. Congress—but at Antifa, or political opponents.

Worst of all for the Government, despite flagrant efforts to violate *Brady v. Maryland* at every turn, the Federal undercover asserts whom we have learned about, who were tasked with keeping an eye on the Proud Boys, had nothing to report.  Prior to January 6, 2021, none of these up to 50 Confidential Human Sources reported any plans, conspiracy, or intent as alleged by the Government.  If these CHS' had witnessed any of the Government's theory, their reports would have been introduced against these Defendants at trial.  That is especially true because at trial the Government had nothing in the way of evidence other than deliberately misrepresenting the Defendants communications and statements.  We may be forgiven for recalling the book in the Sherlock Holmes' series where evidence that something did not happen may be evidence that something else happened instead, as when the dog doesn't bark.

Therefore, the suppression of evidence in the form of all of the CHS' – which Pezzola by counsel explicitly requested – demands acquittal now under *Brady v. Maryland* and progeny as a violation of the U.S. Constitution.

A successful *Brady* claim to over-turn a conviction after trial requires that favorable evidence to the accused for exculpatory ***or impeachment purposes*** was suppressed by the government which prejudiced the accused. *Id.*  Favorability to the accused requires exculpatory or impeachment value. *Id. (emphasis added).* Suppression by the government can be an intentional or inadvertent failure to

disclose the evidence. *Id.* at 137.

The scope of the requirements of *Brady v. Maryland* is very broad.   For

instance,

> As a result, this policy requires disclosure by prosecutors of
> information beyond that which is "material" to guilt as
> articulated in *Kyles v. Whitley*, 514 U.S. 419 (1995), and
> *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999).

(USJMM) § 9-5.001, https://www.justice.gov/jm/jm-9-5000-issues-related-trials-
and-other-court-proceedings#9-5.002.

> **1. Materiality and Admissibility.** Exculpatory and
> impeachment evidence is material to a finding of guilt—and
> thus the Constitution requires disclosure—when there is a
> reasonable probability that effective use of the evidence will
> result in an acquittal. *United States v. Bagley*, 475 U.S. 667,
> 676 (1985). Recognizing that it is sometimes difficult to assess
> the materiality of evidence before trial, prosecutors generally
> must take a broad view of materiality and err on the side of
> disclosing exculpatory and impeaching evidence. *Kyles*, 514
> U.S. at 439. While ordinarily, evidence that would not be
> admissible at trial need not be disclosed, this policy
> encourages prosecutors to err on the side of disclosure if
> admissibility is a close question.
>
> **2. The prosecution team**. It is the obligation of federal
> prosecutors, in preparing for trial, to seek all exculpatory and
> impeachment information from all the members of the
> prosecution team. Members of the prosecution team include
> federal, state, and local law enforcement officers and other
> government officials participating in the investigation and
> prosecution of the criminal case against the defendant.  *Kyles*,
> 514 U.S. at 437.

*Id.* A "prosecutor must disclose information that is inconsistent with any element

of any crime charged" and --

> "… must disclose information that either casts a substantial doubt upon the accuracy of any evidence---including but not limited to witness testimony—the prosecutor intends to rely on to prove an element of any crime charged, or might have a significant bearing on the admissibility of the evidence.  This information must be disclosed regardless of whether it is likely to make the difference between convictions and acquittal of the defendant for a charged crime."

*Id.*

The disclosure requirement, "applies to information regardless of whether the information subject to disclosure would itself constitute admissible evidence."

*Id.*

"[S]uppression by the prosecution of evidence favorable to an accused <u>upon request</u> violates due process where the evidence is material to either guilt <u>**or punishment**</u>, irrespective of the good faith or bad faith of the prosecution." *United States V. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014). (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963) *(emphases added).*

> "***Impeachment evidence,*** however, as well as exculpatory evidence, ***falls within the Brady rule.*** See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). ***Such evidence is "evidence favorable to an accused,"*** *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196, so that, if disclosed and used effectively, ***it may make the difference between conviction and acquittal***. Cf. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend")."

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985)

*(emphases added).*

### B. PROSECUTION IS FOUNDED ON A FALSEHOOD

The Government's traditional recitation of wishful thinking begins with its first false accusation the repeated deception that "[D]uring a nationally televised Presidential debate, and candidate Donald Trump told the Proud Boys to 'stand back and stand by'" to paint a false picture of some giant conspiracy.

Indeed, the U.S. Department of Justice seems to weave its narrative of the Proud Boys as some kind of leaders not on any facts or evidence from January 6, 2021, but from this misrepresentation of the Presidential debate.

Joe Biden brought up the Proud Boys, not Trump.  See Jonathon Moseley,

### GOVERNMENT PROVED ONLY SELF-DEFENSE EFFORTS BY DEFENDANTS

In its Opposition, the government again stretches the imagination with its depiction of facts.  Consider the final paragraph of page 11:

> Later the same evening [Dec. 12, 2020], the Proud Boys
> viciously attacked a pedestrian (who they believed was
> associated with Antifa) who was walking down 12th Street
> NW. Ex. 272. After being confronted, shoved and punched in
> the face by a member of the Proud Boys, the victim pulled out
> a knife and continued to retreat. Id.; Ex. 270. A large group of
> Proud Boys swarmed the victim and beat him until he was left

motionless on the ground, only ceasing the assault when
police intervened. Id. Pezzola was one of the men engaged in
the attack. Tr. 10076:19-24 (Bertino). During the victim's
retreat, he stabbed multiple people, including co-conspirator
Jeremy Bertino. Ex. 272 and 603-29; Tr. 9973:8-20 (Bertino).

Not a single witness depicted the December 12 stabbing episode in this way.

Multiple witnesses, including Pezzola and even government witnesses Greene and

Bertino, testified that Pezzola acted heroically, in defense of others, when he

helped subdue the attacker who had stabbed Bertino and others.

GOVERNMENT PROVES THAT EVERY REFERENCE WAS TO SELF

DEFENSE; NOTHING ABOUT ANY OF THE CHARGED COUNTS

Similarly, the government's depiction of the Ministry of Self Defense is

almost entirely mythical.  The government describes the creation of the MOSD as

being designed to "standardize event organizing" and to help the club to "harness

ourselves in large numbers," including specifically the "rally boys" who were

known for engaging in violence at political demonstrations."[1]

The government continues:

However, Tarrio also signaled a broader purpose to the elders,
suggesting that the MOSD mission involved political
revolution: when he was advocating for the creation of the
chapter, he sent the message "-whispers- Seventeen seventy
six…." Ex. 500-74. As one of the Elders had previously told

---

[1]     The fictional primitive, nomadic, Dothraki people in the TV series "Game of Thrones"
chant "*It is known!"* to express shared beliefs devoid of any evidence chanted as a sign of
belonging to the group.  No need for proof, when *"It is known!"*  One affirms their membership
in the group by joining the groundless chant *"It is known!"* as an article of faith.

> the group in the leadup to the December rally, "[t]here wasn't much of a reason to rally before other than punching commies. But now there's a real reason. We are months away from gulags. It's now or never. We fight or  get locked up." Ex. 500-40. Nordean agreed: "Perfectly said my brotha." Id.

Government's response, at 14-15.

The Government's own case is soaking in the Proud Boys efforts at self-defense.  "We are months away from gulags. It's now or never. We fight or  get locked up."  The Government quotes the Defendants as musing.  The Government knows that the Defendants' commentaries were focused on the threat _to them_ from what they perceived as a totalitarian impulse among the Federal Government. Strange that their predictions turned out to be perfectly accurate.  But the focus of these not-yet-fully-formed thoughts was entirely about the Proud Boys being attacked by the Government.

Unfortunately, the Government's case collapsed from a lack of evidence.  It is not merely that the evidence fails to meet the burden, but that evidence of guilt is non-existent.  There isn't any supporting the Government's accusations.

The evidence admitted in the case actually proved the Defendants innocent, except that the Defendants held political views that the prosecutors and the jurors didn't like.

To say the least, this depiction of the Ministry of Self Defense as having some forbidden, lawless, or violent purpose is the opposite of the truth.  The

evidence revealed at trial established that Tarrio and others established the MOSD to prevent future violent conflicts and ensure that future Proud Boy rallies would remain safe for all participants.  The MOSD was established to *keep the Proud Boys compliant with Proud Boy rules such as sobriety, good conduct, and nonviolence.*  The primary rule—evinced by <u>all documents, records, text messages, emails, zoom meetings and social media</u>—was that violence *could only be deployed by the Proud Boys in self defense*.

And again, all the "violence" associated with Proud Boy rallies or Proud Boy social media was aimed at Antifa, Black-Lives-Matter rioters, and communist elements; never at the U.S. Congress, or government institutions.

C.  THE GOVERNMENT'S "TOOL THEORY" HAS NO PLACE IN CONSTITUTIONAL LAW –WHICH RECOGNIZES NO GUILT BY ASSOCIATION OR COLLECTIVIST GUILT

The government's response makes a mockery out of the idea of individual criminal liability:

> ***Multiple Proud Boys*** participated in the clash with police at the Peace Monument. ***One Proud Boy***, who had been personally recruited by Ethan Nordean to come to January 6 and be "on the front lines" with him, charged forward and held up a Proud Boys' hand gesture as the barricades fell. Tr. 12261:6 – 12262:6 (Miller); Ex. 550-2 and -3. Co-conspirator Donohoe posted a selfie style video to the MOSD Leaders chat group in which he filmed himself crossing the fallen barricades at the Peace Circle. Donohoe remarked sarcastically, "Oops! Looks like we just stormed the Capitol building!" Ex. 1137; Tr. 10143:1-4 (Bertino). Upon viewing this video in the MOSD message group, Bertino encouraged the MOSD leaders to "form a spear." Ex. 1137. He then instructed the members, "Storming the capital right now!!" Tr. 10156:21 – 10157:10 (Bertino); Ex. 510-33. He gave the same

instruction to the Boots on Ground chat, which was created for all
Proud Boys members in Washington, D.C. on January 6, and he told
the men to "Get there." Id. at10156:1-8; Ex. 512-8.
Opposition, page 22. *(Emphases added.)*

But the Constitution recognizes no concept of guilty crowds or guilt by

association. "It is well-established that the determination of probable cause must be

an individualized matter." *Carr v. District of Columbia*, 565 F. Supp. 2d 94, 99

(D.C. Cir. 2009). See also *Barham v. Ramsey*, 434 F.3d 565, 573 (D.C. Cir. 2006).

"Where the standard is probable cause, a search or seizure of a person must be

supported by probable cause particularized with respect to that person. This

requirement cannot be undercut or avoided by simply pointing to the fact that

coincidentally there exists probable cause to search or seize another ...." *Ybarra v.*

*Illinois*, 444 U.S. 85, 91, 100 (1979). "To demonstrate that plaintiffs' arrests were

valid, therefore, the District must show that it had probable cause to arrest each

individual . . ." *Carr*, 565 F. Supp. 2d at 99. "**The fact that rioting is a group**

**offense does not eliminate the constitutional requirement of particularized**

**suspicion of guilt.**" *Id. (emphasis added).*

This is true even if the "mob" has a generalized characterization of criminal

behavior. *Carr*, supra, at 99.  Thus, even if a "mob" that Mr. Rivera was in the

proximity of engaged in violent and destructive behavior, Mr. Rivera cannot be

prosecuted merely for associating with them. See *Washington Mobilization*

*Committee v. Cullinane*, 566 F.2d 107 (D.C. Cir. 1977); *Dellums v. Powell*, 566

F.2d 167 (D.C. Cir. 1977); *Barham v. Ramsey*, 434 F.3d 565 (D.C. Cir. 2006);

*Carr*, at 101.

> This is where things fall apart. Although both Governor DeSantis and Sheriff Williams argue that the phrase "willfully participate" is commonly understood, neither party offers an actual definition. Is it enough to stand passively near violence? What if you continue protesting when violence erupts? What if that protest merely involves standing with a sign while others fight around you? Does it depend on whether your sign expresses a message that is pro- or anti-law enforcement? What about filming the violence? What if you are in the process of leaving the disturbance and give a rioter a bottle of water to wash tear gas from their eyes?
>
> The Governor would have this Court pencil in an exception for a person who merely "attend[s]" a violent demonstration but does not actively engage in violence or conduct that poses an imminent risk of injury or property damage. ECF No. 99 at 13. But the Governor offers no explanation or construction that limits when mere attendance becomes participation, except that a person must "intend to commit violence." Id. But this ignores the plain text of the statute, which separates a person from an assembly of three or more persons sharing that intent. See *infra*.

*See, The Dream Defenders, et al., v. Ron DeSantis, 21-cv-191, ECF No. 137 (N.D. Fla. Sept. 9, 2021), (Mark E. Walker, Chief United States District Judge),* Page 53 *(injunction against anti-riot law in part because the legislation appeared to criminalize the defendant's protest activities even if he did not participate in the violent acts of others).*   And continuing:

> If this Court does not enjoin the statute's enforcement, ***the lawless actions of a few rogue individuals could effectively criminalize the protected speech of hundreds, if not thousands, of law-abiding Floridians. This violates the First Amendment. See, e.g., Bible Believers v. Wayne Cnty., Mich., 805 F.3d 228, 252 (6th Cir. 2015).*** Florida's interest in preventing public violence is beyond question, but when that

interest collides with rights guaranteed by the First Amendment, the "government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. Otherwise, those rights, which "are delicate and vulnerable, as well as supremely precious in our society," may be suffocated. Id. Section 870.01(2), through its ambiguity, chills speech and eviscerates that essential breathing space. The law is overbroad.[27]

Accordingly, I conclude that Plaintiffs have established a substantial likelihood of success on the merits as to their overbreadth claim.

*Id.,* at Page 77 *(emphases added).*

Collectivist punishment is not permitted nor constitutional within U.S. criminal law.  With rare exceptions inapplicable here (such as hiring someone to commit a criminal act), no person under the U.S. Constitution may be convicted or sentenced for what other people did.

There is of course no precedent for the Government's invented "tools" theory.

### D. THE GOVERNMENT'S CASE IS GUILT BY ASSOCIATION

Note that the Defendants here at bar are not the same as all "Proud Boys." One cannot read these claims as referring to the same set of Defendants as here in this case.  There were many other Proud Boys in Washington, D.C., that day who are not among these Defendants.  But more disturbing, there is evidence of law enforcement and the news media falsely calling random people "Proud Boys." Some group wearing orange, knitted ski hats who had nothing to do with these

Defendants were tagged as Proud Boys.  Police radio traffic refers to a group of Proud Boys wearing arm bands – which are unknown to these Defendants. Therefore, the claim above is constitutionally infirm because one cannot suggest that these unnamed people the same as these Defendants.

However, even now, the prosecution cannot tell us and makes no attempt to tell us in the passage quoted above who these "Multiple Proud Boys" are who "participated in the clash."

Therefore, we must understand this to mean that none of the referenced people are any of the Defendants here in this case at bar.  Indeed, we don't even know how these mysterious figures "participated" which is itself guilt by association.

Who is this "One Proud Boy, who had been personally recruited by Ethan Nordean to come to January 6?"  Clearly, it was not any of these Defendants.  So how are the Defendants guilty of what other, unidentified people did?  They're not.

E. PROSECUTION SUFFERED FAILURE OF PROOF BY INABILITY TO PARSE HUMAN LANGUAGE AND ITS MEANING

And again we see the Government unable to parse language to separate joking from serious talk:  The Opposition claims "Donohoe remarked sarcastically, "**Oops! Looks like we just stormed the Capitol building!**" Ex. 1137.

In other words, they did *not* just storm the Capitol.  That's called humor. [2]

Or more preciously, sarcasm. [3]  One does not "storm" something by accident. This

is no more probative than a vacationer returning home and saying "We conquered

France" meaning their whirlwind sight-seeing tour was a success.  No conquering,

spilling of blood, or warfare was involved in the vacation.

The context, location, circumstances, and complete remarks show that the

Defendants *did not* storm the Capitol but were fond of outlandish comments that to

them they thought were funny or ironic.  Again there was a failure of evidence.

And again the Government relies on comments by Bertino, who was

nowhere near the District of Columbia, still recovering from being stabbed by

Antifa rioters in December.

## F.  FAILURE OF EVIDENCE OF ANY CONSPIRACY BY THE DEFENDANTS

There was no evidence presented of any conspiracy between the Defendants

and any "tools," and overwhelming evidence that none of the Defendants had any

plans to engage in any such conspiracy or any other.

The Government accuses Zachary Rehl of "storming" the Capitol armed

---

[2]      "Humour:  human behavior," Encyclopedia Britannica, https://www.britannica.com/topic/humor

[3]      "Sarcasm," Cambridge Dictionary,  (**the use of remarks that clearly mean the opposite of what they say…**") **https://dictionary.cambridge.org/dictionary/english/sarcasm**

with nothing but goggles and a radio.  He is then shown in a group debating whether or not to go into the Capitol, waffling back and forth.  No plan there.

Despite the fervent wishes of the Government, there is no evidence that the Proud Boys played any leading role in regard to anything on or concerning January 6, 2021.  The Government wishes us to imagine what if the Proud Boys had been in the front of crowds approaching the Capitol.  But they were not.  No evidence supported such a fervent hope by prosecutors.  The evidence shows that hundreds even perhaps a thousand other demonstrators went ahead of the Proud Boys onto the Capitol grounds and into the U.S. Capitol building.

There was no evidence that the Proud Boys Defendants played any role in leading anyone else to, toward, at, or into the U.S. Capitol or its grounds.

Of course we recall that imaginative but unsworn insistence by prosecutors does not count as evidence.  The prosecution had a theory.  It just had no evidence to support its theory.

G. CONJECTURE, SPECULATION IMPROPERLY ALLOWED

The prosecution's case consisted almost entirely of conjecture, speculation, and attempted mind-reading.  The Government sought to tell the jury what Defendants really meant, which was not what the Defendants said or did.  That is, the prosecution asked the jury to disregard the lack of evidence and join the prosecutors in a story not grounded in fact.

H. VIOLATIONS OF *BRADY V. MARYLAND* REQUIRE ACQUITTAL,
DISMISSAL, AND/OR A NEW TRIAL.

The Government has been engaged in the most massive, flagrant series of

violations of *Brady v. Maryland* in American history.  This is obviously because

the Government either does not understand or deliberately ignores its obligations.

### 1) **Brady – Disclosures At Trial Unconstitutional**

First, the DoJ has adopted the corrupt policy of only disclosing information

during a trial and only the night before a witness testifies:

Prosecutors are required to produce disclosures early enough to allow

Defendant's counsel to make effective use of the information and for the

Defendant not to be prejudiced by the late disclosure.  On occasion, appellate

courts have allowed disclosure just before or during trial *because under those*

*circumstances in that particular case defense counsel could make use of a prior*

*inconsistent statement of a witness or other information about a witness in*

*impeachment.*

However, there is no rule nor any appellate endorsement of an automatic

rule that disclosure is ***always*** timely just before or during trial.  It depends.  On the

contrary, prosecutors are admonished by precedent to make disclosure in sufficient

time to allow defense counsel to make effective use of the information.  On a case

by case basis, this will require disclosure long before trial.

> **D.   Timing of disclosure.** Due process requires that
> disclosure of exculpatory and impeachment evidence material

to guilt or innocence be made ***in sufficient time to permit the defendant to make effective use of that information at trial.*** See, e.g. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1997); *United States v. Farley*, 2 F.3d 645, 654 (6th Cir. 1993). In most cases, the disclosures required by the Constitution and this policy will be made in advance of trial.

> **1.    Exculpatory    information.** Exculpatory information   must   be   disclosed   reasonably promptly after it is discovered.

*See* United States Justice Manual (USJMM) § 9-5.001, https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.002. *(Emphases added.)*

In a recurring pattern of misunderstanding judicial decisions, the DoJ has transformed appellate generosity that *sometimes* disclosure can be timely just before trial or during trial before a witness testifies into an unwarranted rigid rule that disclosure is *always* timely if just before a witness testifies.

That is not the law.  Prejudice to the Defendant is the governing rule.

Where, as here, learning the identity of a potential witness would then require counsel to reach out to the witness, attempt to interview the witness, issue a subpoena, have the subpoena served, and subpoena the witness long enough ahead of trial to not be subject to being quashed for being untimely will *always* require disclosure long before trial commences.  A Defendant will *always* be prejudiced by learning of a witness after the trial has already started or just before.

**2) Brady – Disclosures of Likely Witnesses Required**

Second, the DoJ refuses to confront the fact that *Brady* demands disclosure

of potential witnesses not just outright proof of innocence.  That is *Brady* covers

more than a single step or "hop" from the evidence to innocence.

Closely associated with the federal rule are several U.S. Supreme Court

decisions which hold that a defendant has a right to the testimony of witnesses.

*See, United States v. Dennis*, 384 U.S. 855 (1966); *United States v. Proctor &*

*Gamble*, 356 U.S. 677 (1958).

> "Witnesses, particularly eye witnesses, to a crime
> are the property of neither the prosecution nor the
> defense. Both sides have an equal right, and
> should have an equal opportunity, to interview
> them."

*Gregory v. United States* 369 F.2d 185, 188 (D.C. Cir. 1966). See also, Model
Code Of Prof'l Responsibility Rule 3.8(d).

The D.C. Circuit decided in *U.S. v. Johnson*, 953 F.2d 688 (D.C. Cir. 1992)

> "The district judge found that because appellant
> was acquainted with the potential witness and
> was aware that he was present at her arrest,
> appellant had as much access to the potential
> witness as did the prosecution."

*Johnson* is marked as not selected for publication, but cites a D.C. Circuit

rule that it may be cited as persuasive or for the general disposition when relevant.

Here, although the expansive, sweeping language of precedents and even the

Department of Justice's own guidance make it clear, few precedents explicitly

discuss the fact that the identity of even *potential* witnesses are subject to the

constitutional force of *Brady* disclosures.

In *Johnson*, the District Court and Court of Appeals decided that the Defendant there already knew the identity of the potential witness, but would not have considered the issue if there were no obligation for the Government to disclose potential witnesses when asked.

Courts in in this jurisdiction disfavor narrow readings by prosecutors as to their obligations under *Brady*.  *United States v. Saffarinia*, 424 F.Supp.3d 46, 57 (D.D.C.), *supported by United States v. Paxson*, 861 F.2d 730, 737 (D.C. Cir. 1988).

> Justice MARSHALL, with whom Justice BRENNAN joins, dissenting.
>
> When the Government withholds from a defendant evidence that might impeach the prosecution's only witnesses, that failure to disclose cannot be deemed harmless error. Because that is precisely the nature of the undisclosed evidence in this case, I would affirm the judgment of the Court of Appeals and would not remand for further proceedings.

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985).

Under *Brady*, it is relevant that the Defendant explicitly asked for specific information, not passively hoping that the prosecution will notice and think to disclose it:

> "The test of materiality in a case like *Brady* in which specific information has been requested by the defense is not necessarily the same as in a case in which no such request has been made...." [14]

*United States v. Agurs*, 427 U.S. 97, 106, 49 L.Ed.2d 342, 96 S.Ct. 2392 (1976)

> "The heart of the holding in *Brady* is the prosecution's suppression of evidence, ***in the face of a defense production request***, where the evidence is favorable to the Defendant and is material either to guilt or to punishment. Important, then, are (a) suppression by the prosecution after a request by the defense, (b) the evidence's favorable character for the defense, and (c) the materiality of the evidence.  * * *"

*Moore v. Illinois,* 8212 5001, 408 U.S. 786,794-795,  92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) *(emphasis added).*

The mistake that *Brady* only applies to direct evidence of innocence is beyond reasonable contemplation.  "[S]uppression by the prosecution of evidence favorable to an accused <u>upon request</u> violates due process where the evidence is material to either guilt ***or punishment***, irrespective of the good faith or bad faith of the prosecution." *United States V. Sitzmann*, 74 F.Supp.3d 128, 133-134 (D.D.C. 2014). (*quoting Brady v. Maryland,* 373 U.S. 83, 87 (1963) *(emphases added).*

> "***Impeachment evidence,*** however, as well as exculpatory evidence, ***falls within the Brady rule.*** See *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). ***Such evidence is "evidence favorable to an accused,"***  *Brady*, 373 U.S., at 87, 83 S.Ct., at 1196, so that, if disclosed and used effectively, ***it may make the difference between conviction and acquittal***. Cf. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173 1177, 3 L.Ed.2d 1217 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend")."

*United States v. Bagley*, 473 U.S. 667, 87 L.Ed.2d 481, 105 S.Ct. 3375 (1985) *(emphases added).*

A successful *Brady* claim to over-turn a conviction after trial requires that

favorable evidence to the accused for exculpatory ***or impeachment purposes*** was

suppressed by the government which prejudiced the accused. *Id.*  Favorability to

the accused requires exculpatory or impeachment value. *Id. (emphasis added).*

Suppression by the government can be an intentional or inadvertent failure to

disclose the evidence. *Id.* at 137.

The scope of the requirements of *Brady v. Maryland* is very broad.   For

instance,

> As a result, this policy requires disclosure by prosecutors of
> information beyond that which is "material" to guilt as
> articulated in *Kyles v. Whitley*, 514 U.S. 419 (1995), and
> *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999).

(USJMM) § 9-5.001, https://www.justice.gov/jm/jm-9-5000-issues-related-trials-
and-other-court-proceedings#9-5.002.

> **1. Materiality and Admissibility.** Exculpatory and
> impeachment evidence is material to a finding of guilt—and
> thus the Constitution requires disclosure—when there is a
> reasonable probability that effective use of the evidence will
> result in an acquittal. *United States v. Bagley*, 475 U.S. 667,
> 676 (1985). Recognizing that it is sometimes difficult to assess
> the materiality of evidence before trial, prosecutors generally
> must take a broad view of materiality and err on the side of
> disclosing exculpatory and impeaching evidence. *Kyles*, 514
> U.S. at 439. While ordinarily, evidence that would not be
> admissible at trial need not be disclosed, this policy
> encourages prosecutors to err on the side of disclosure if
> admissibility is a close question.
>
> **2. The prosecution team**. It is the obligation of federal
> prosecutors, in preparing for trial, to seek all exculpatory and

> impeachment information from all the members of the
> prosecution team. Members of the prosecution team include
> federal, state, and local law enforcement officers and other
> government officials participating in the investigation and
> prosecution of the criminal case against the defendant.  *Kyles*,
> 514 U.S. at 437.

*Id.* A "prosecutor must disclose information that is inconsistent with any element

of any crime charged" and --

> "… must disclose information that either casts a substantial
> doubt upon the accuracy of any evidence---including but
> not limited to witness testimony—the prosecutor intends to
> rely on to prove an element of any crime charged, or might
> have a significant bearing on the admissibility of the
> evidence.  This information must be disclosed regardless of
> whether it is likely to make the difference between
> convictions and acquittal of the defendant for a charged
> crime."

*Id.*

The disclosure requirement, "applies to information regardless of whether

the information subject to disclosure would itself constitute admissible evidence."

*Id.*

The Defendant is entitled to the documents and the evidence, to the extent

potentially or here likely to be exculpatory information as required by *Brady v.*

*Maryland, 373 U.S. 83 (1963) ; See also, USA v Theodore F. Stevens*, No. 1:08-

CR-00231-EGS, U.S. District Court for the District of Columbia, Memorandum

and Opinion by Judge Emmett Sullivan,  (Docket No. 257, December 22, 2008);

*United States v. Sitzmann*, 74 F.Supp.3d 128, 133 (D.D.C. 2014)

### 3)  <u>**Brady – Undercover Agents Hired to be Witnesses**</u>

Third, the DoJ failed to inform the Defendants that approximately a dozen – possibly as many as 50 – demonstrators in and among the Defendants were in some sense or another assets of many different Federal agencies.

This was and is exculpatory evidence because these 10 to 50 "Confidential Human Sources" were tasked by their various agencies to watch the Proud Boys and report back any plans or conspiracies on the part of the Proud Boys.

There were none.

The fact that these CHS undercover federal assets were specifically assigned to report on the activities and plans of the Proud Boys from within and had nothing negative to report is exculpatory.   These witnesses would have proven to the jury and the appellate courts to follow that the Defendants are not guilty of any plans, conspiracy, attempts, or intent to commit any of the acts of which they are charged.

Yet the Government withheld this clearly exculpatory evidence.  A few of the Federal government's undercover assets were revealed only on the eve of their testimony.  Disrespecting the Court and its trial schedule as well as shredding the U.S. Constitution, the prosecution waited until the night before Defendants' counsel was already prepping to call witnesses the following day to reveal that the defense witnesses were Federal agents or assets.  Not only was this untimely and therefore illegal conduct and unprofessional conduct ethically, but it is clear that

the Government would never have disclosed the exculpatory testimony of these undercover assets who had nothing to report about any looming plans by the Proud Boys despite being instructed to keep an eye on the Proud Boys, if not pressed at the last minute.

This repeated farce of the prosecution revealing that defense witnesses were undercover federal assets – who had not seen any conspiracy, plans, or intent by the Proud Boys – that it prompted veteran Carmen Hernandez as an experienced and well-known civil libertarian defense attorney in this courthouse – and no conservative certainly – to declare in open court that she is not a CHS (because it was appearing that everyone else was).

This behavior was of course not only unconstitutional and illegal but also disruptive of the court's schedule.  Defendants' counsel could have chosen and called alternative witnesses for those time slots if promptly informed well ahead of the trial.   The Court's schedule was repeatedly interrupted by delays, motions, and skipped trial days to deal with the Government's lack of candor until the last minute.

## II. UNDER RULE 33, PEZZOLA AND OTHER DEFENDANTS ARE ENTITLED TO A NEW TRIAL DUE TO NEWLY DISCOVERED EVIDENCE

### A. JUROR DISCLOSES JURY DELIBERATION, REVEALS VIOLATION OF INSTRUCTIONS AND BURDEN OF PROOF

After the close of the evidence, after the parties had rested, after closing

25

arguments, after the charge to the jury with instructions, and after the jury verdict,

a juror sat down to talk to a reporter about the trial.

Naturally, Defendant is not questioning the juror's right to talk after the trial

is over.  It is what the juror said that is the problem, not that he said it.

The purported juror explained the jury's verdict decision to <u>VICE</u> as

follows:

> **What evidence convinced you that the Proud Boys had entered into a seditious conspiracy?**
>
> It was all the chatter. All the chats. Parler, Telegram…those telegram text messages back and forth. Not just the chats, but also the private texts. I think that was what it boiled down to.
>
> What they had to say prior to Jan. 6 and the fact that they wanted to do so much in secret. ***<u>And that's why the government couldn't  present too much of the evidence</u> that they had already deleted, because it was unrecoverable. So, they didn't they definitely didn't want people to know. They didn't want everybody to know the plan, the Proud Boys, because then I guess it would have gotten out. And they didn't want it to get out.***

Todd Zwillich, "Inside the Proud Boys Jury:  More than a dozen right-wing extremists have now been convicted of seditious conspiracy against the United States for their role in Jan. 6," <u>VICE Magazine</u>, May 5, 2023, accessible at: https://www.vice.com/en/article/epvxqw/enrique-tarrio-proud-boys-jury *(emphases added).*

So the jury substituted proof beyond a reasonable doubt with essentially

"maybe it could have been true."  And the prosecutors openly appealed and

seduced the jury into this error.

The juror states that "***the government couldn't present too much of the evidence.***"  Again, this is purporting to describe the jury deliberation of the entire jury – that there was a lack of evidence with which to convict the Defendants.

Thus, it appears that the jury did not sincerely contemplate that a lack of evidence should result in a "not guilty" verdict, but rather focused on excuses suggested by the prosecution as to why there was insufficient evidence to convict. The jury convicted the Defendants in spite of a lack of evidence beyond a reasonable guilt.  And again, we can see throughout the transcript the prosecution pitching that theory to the jury.

But the Government cannot fill up the gaps in its case with arguing in effect "We can't prove our case, but that could have perhaps been because the evidence we don't have to prove our case was concealed or deleted."

It is equally possible that such evidence never existed because what the Government claims just never happened.  That is the purpose of evidence:  To determine what is the truth, not to simply confirm the false assumptions of the Government at any cost.

Even the charge of deleting evidence suffers from the same "Well, it might be true" defect.  The FBI agents displayed general confusion, contradictions, and conflicting stories about what they thought they were seeing in "extracts" from databases.  No one who actually did the "extractions" testified, and those who did

testify disclaimed any understanding or knowledge of the process or its accuracy. FBI agents guessed that blank messages might show deletions – or maybe not.

**_Maybe there could have been evidence beyond a reasonable doubt, but we can't find it._**

Here, Defendants sought more specific jury instructions clarifying the burden of proof of presumed innocent until proven guilty beyond a reasonable doubt, and how "maybes" and "could bes" and "possibilities" cannot satisfy the Government's burden on a criminal case, but are the contrary the very stuff of reasonable doubt.

"Could be" means "but also could not be."  "Maybe" means "but maybe not."  A "possibility" means "possibly not as well."

The jury instructions obviously failed to make clear enough that the Government may not satisfy its burden by speculation, conjecture, etc.

The jury instructions did not instruct the jury of what it means to find each element of each crime charged established beyond a reasonable doubt.

This failure is compounded by other parts of the jury instructions such as the flawed instructions on circumstantial evidence.  Circumstantial evidence is not only necessarily unreliable and ineffective to meet the guilt beyond a reasonable doubt standard, but the jury instructions presented (not only in this case but as a mistake in many cases) invites the jury to believe that the "beyond a reasonable

doubt" standard does not apply.  As presented to a lay person jury, the jury instructions of circumstantial evidence are incomprehensible other than as a relaxation of the Government's burden of proof of guilt beyond a reasonable doubt.

B. DEFENDANTS DID NOT DAMAGE THE BLACK METAL FENCE VALUED OVER $1,000

Recently discovered pictures below show that the black metal fence which Defendants were convicted of destroying was mostly still standing in good condition an hour after Proud Boy codefendants passed through, touched or damaged small sections.

Initially, recall that the official from the Architect's Office testified that the black fence was designed to be disassembled and stowed away in storage, and it frequently was in storage unassembled.  His testimony was not of any damage but of the desire of his office to simply buy a new one for whatever reason.



These images show MPD officers in yellow jackets. This means these images are from AFTER 2:30 pm on January 6.



**The government's concealment of information which undermined its prosecution.**

As each week passes in the aftermath of the trial, new revelations are published in news outlets which fundamentally undermine the government's claims at trial.  Pezzola's motion mentioned the recent revelations regarding Mr. Copeland.

The government's response seeks to evade the obvious implications of these revelations.  "Pezzola does not articulate how that would change the outcome of his case," writes the government.

Pezzola's motion requesting a new trial highlights numerous suspicious actors who committed violent crimes and breaches on January 6 that have not been identified by the government or have not been held to the same account of the law as the Tarrio, Biggs, Rehl and Nordean who committed no violent crimes during the riot.

Despite being widely documented breaking the law during the Capitol riot, John Sullivan, formerly known as Utah's Antifa leader and Insurgence USA founder Jayden X spent just one night in jail after being apprehended by the FBI on January 14, 2021.

Unlike the vast majority of J6 defendants who have been held in pretrial detention, subsequent of his arrest Sullivan has managed to attend trial only by Zoom to adjudicate his charges surrounding his role in the Capitol riot.

Sullivan is regularly posting footage from combat zones in the Ukraine.

The government may argue Sullivan's case is irrelevant in regard to the defendants who were convicted of seditious conspiracy. However, if there were ever a conspired, plotted and premeditated plan to attack the Capitol on January 6, mounting new evidence indicates John Sullivan is one of the ring leaders of such an operation rather than the leaders of the Proud Boys, one of whom was not even in the nation's Capital during the riot.

**Crimes Sullivan committed on camera.**

John Sullivan's younger brother James explicitly warns John Sullivan "planned" an insurrection on January 6.

James Sullivan contends John Sullivan conspired with the government to orchestrate violence on January 6 and claims the government is concealing information surrounding Sullivan's orchestration of "Utah's Terriotest Plan To Storm The Capitol."

In a June 22 interview conducted by an investigative journalist with The Gateway Pundit, James Sullivan details the contractual agreements his brother made with several media outlets to document the violence he helped orchestrate during the riot and contends Sullivan deployed Antifa's Discord servers around all sides of the Capitol to document "Trump supporters slipping up."

John Sullivan actually referred his to plans for January 6 as "Utah's TERRIOTEST Plan To Storm the Capitol" in numerous social media posts ahead of the riot.

Either Sullivan is referring to a "terrorist plan"

The defense requests Sullivan testify under oath surrounding whether his description of a "Terriotest" is in regards to my client's co-defendant Enrique Tarrio. While Tarrio was not even in Washington, DC on January 6, he faces years

in prison for allegedly plotting a seditious conspricay. Throughout trial the only actual blue print of a plan exhibited during trial was, The *1776 Returns* Document, which was apparently created by government agencies and disseminated amongst the Proud Boys. The defense is requesting a retrial after obtaining new evidence that indicates Henry Enrique Tarrio and his co-defendants were framed by the Federal Bureau of Investigations and/or divisions of the US Department of Justice to be incriminated with "seditious conspiracy," an antiquated Civil War-era crime that the US government used to arrest slave-holding Confederates.

Provided the opportunity to testify, James Sullivan will expose Sullivan's actual plot to orchestrate a Terriotest plan. "It's all planned. The entire thing was planned," James Sullivan contends. It's unclear whether John Sullivan

The defense would like to subpoena a new witness James Sullivan in addition to his brother John "Jayden X" Sullivan in a motion for a retrial or acquittal of the Proud Boys seditious conspiracy case.

In an interview with investigative journalist Alicia Powe, James Sullivan, John's younger brother, pledges "to testify for any J6er" to prove that his brother was a part of the a network that plotted to storm the Capitol Building on January 6.

According to his PSR, Tarrio is facing 18 years in prison despite not being at the Capitol. In contrast, John Sullivan was apprehended by the FBI on January 14,

2021. After spending just one night in jail, Sullivan was released and has only attended hearing remotely on Zoom. The government has withheld evidence about Sullivan's collaboration with he government prior to January 6, despite Sullivan's key role in the Capitol riot.

James Sullivan contends his brother "plotted" an insurrection equipped with Antifa's Discord servers to document Trump supporters "slipping up." According to James Sullivan, John Sullivan was paid by multiple media outlets to

While the government may argue Sullivan's case is irrelevant in regard to the defendants convicted of seditious conspiracy, James Sullivan pledges to reveal how John Sullivan plotted the events of January 6, disseminated weapons during the Capitol riot when provided the opportunity to testify.

James Sullivan will expose Sullivan's actual plot to orchestrate a Terriotest plan. "It's all planned. The entire thing was planned," James Sulivan contends. It's unclear whether John Sullivan

https://rumble.com/v3597nc-bro-sounds-alarm-jayden-x-plotted-utahs-terriotest-plan-to-storm-the-capito.html

The J6 defendant who was arrested by the FBI on January 14 and Investigative journalist Alicia Powe, a reporter with The Gateway Pundit, obtained

links to hundreds of hours of January 6 footage published by a group that self

identifies as "Sedition Hunter" and "Capitol Hunters."

The footage was discovered on the Twitter page of a user who uses the

moniker bigfoot@OSINTyeti. The spreadsheet published on

Bigfoot@OSINTyeti's Twitter page includes links to "Body cams," hundreds of

hours of police body cam footage,  "Capitol Security" footage from every angle of

the Capitol grounds

https://twitter.com/OSINTyeti/status/1647290407603298306?s=20

https://docs.google.com/spreadsheets/d/1C0jUPS7S11HAe6mfFlx8zixfN7xI1C7n
Rg7Gx_B8tWI/edit



While scouring through the massive database of footage and photographs identifying protesters on the Capitol grounds during the riot, Powe discovered John "Jayden X" Sullivan was regularly posting on social media.

On Twitter, Mr. Sullivan purports to be "Reporting on the War in the Ukrain and other global conflicts, protests, and political happenings across the globe."

Sullivan, a J6 defendant who garnered notoriety from the footage he recorded during the riot while disguising himself a Trump supporter and breaking the law, including 1512, obstruction of an official proceeding, is has not been subjected to the lengthy pretrial detention as have Pezzola, Enrique Tarrio, Joseph Biggs, Ethan Nordean and Zachary Rehl.

On June 30, article published The Gateway Pundit features an interview with Sullivan's younger brother James Sullivan. Sullivan warns he is fighting with the government to expose the crimes John Sullivan has committed. He explains during the call how  John Sullivan orchestrated Utah's 'Terriotest' Plan to Storm the Capitol on January 6.

https://twitter.com/gatewaypundit/status/1674765880813817856?s=20

CONCLUSION

For all the above reasons, and those stated in the motion, Pezzola requests

acquittal and/or new trial.

/s/ Roger Roots, esq.

CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2023, I uploaded this document to the Court's electronic ECF system, serving all parties.

/s/ Roger Roots