**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
|  | ) |
|  | ) |
|  | ) |
| v. | ) Case No. 21-cr-175-TJK |
|  | ) |
|  | ) |
| ETHAN NORDEAN, et al., | ) |
|  | ) |
| Defendant. | ) |
|  | ) |

**SENTENCING MEMORANDUM OF ETHAN NORDEAN**

# **Table of Contents**

Introduction ........................................................................................................ 1

Factual background ............................................................................................ 2

    A.    Nordean's background, family, and character ........................................ 2

    B.    The convictions and presentence investigation report ......................... 2

Argument ............................................................................................................ 4

    I.    Sentencing procedure ........................................................................... 4

    II.    The PSR has incorrectly calculated the Guidelines range ................... 5

        A.    The guideline for seditious conspiracy is not U.S.S.G. §2J1.2 .... 5

        B.    Nordean's offenses did not involve the "administration of justice" ... 9

        C.    The "offense" was not "extensive in scope, planning or preparation"; Nordean was not an organizer or leader ................. 11

        D.    The PSR applies incorrect guidelines to Counts 4 and 5 ........... 12

        E.    The "terrorism enhancement" does not apply; the clear and convincing evidence standard applies to §3A1.4 ...................... 13

    III.    The § 3553(a) factors favor a significant downward variance ............. 19

        A.    The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1)) .................... 19

            1.    The novelty of the § 1512(c) charge calls for leniency ....... 20

            2.    The novelty of the § 2384 charge calls for leniency .............. 21

            3.    The novelty of the terrorism enhancement's application calls for leniency ......................................................... 22

            4.    Nordean's conduct was less severe than that of the Oath Keepers ..................................................................... 23

            5.    Nordean's efforts to stop assault on law enforcement ....... 24

6.    First-time offender status ............................................... 24

7.    Nordean's remorse ....................................................... 25

B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6)) ............... 25

C.    The seriousness of the offense and deterrence (§ 3553(a)(2)) .......... 31

Conclusion ........................................................................ 32

Ethan Nordean's sentencing posture is an uncommon one for federal court.  At sentencing, he will express sincere remorse for his contribution to the chaos at the Capitol on January 6.  In jail for the past two and a half years he has had time to reflect on the event. Reflection has done nothing to improve his opinion of the day, which is a low one.

At the same time, however, Nordean's sentencing range is driven primarily by a novel offense that, in its 20-year history leading up to January 6, had never been applied to conduct unrelated to evidence impairment, like Nordean's in this case.  There is almost certainly no dispute that had Nordean read every word of Section 1512 of Title 18 even as he marched towards the Capitol Building he could not have known that his conduct that day would constitute the obstruction-of-justice offense driving a future sentence.  Rarely, if ever, can that be said of a defendant sentenced in federal (or any) court.  Most of the Guidelines range proposed by the government rests on an argument that Congress "administered justice" on January 6.  There is almost certainly no dispute here that had even a federal criminal practitioner reviewed the Guidelines as he marched towards the Capitol he could not have known that a court would later hold that legislatures share in the business of justice administration with the courts.

The government reckons that Nordean's Guidelines range is 324-405 months' incarceration.  Nordean calculates the range at 15-21 months.  The difference lies in the government's arguments that Congress administers justice and that the terrorism sentencing enhancements apply.  It doesn't and they don't.  But even it did and they do, sentencing Nordean in that range would create hundreds or possibly thousands of unwarranted sentence disparities. As Nordean shows below, the government cannot distinguish his conduct from that of hundreds of parading and demonstrating protesters—on a factual plane.  Nordean walked in and out of the Capitol like hundreds of Class B misdemeanants.  When the government does distinguish

1

Nordean's actions from any other January 6 defendant's, it relies on characterization, not facts, and it relies on abstract words, not words that point to concrete things.  It does rely on one concrete fact: Nordean belongs to a political organization targeted by the government.  Nordean respectfully requests a sentence within the properly calculated Guidelines range.

**Factual background**

> **A.     Nordean's background, family, employment history, and character**

Nordean is 33 years old.  He grew up in Auburn, Washington, a suburb in the Seattle area, where he has lived his whole life.  He was raised in a stable middle-class household by his mother and father who have been married for 35 years.  Nordean has no criminal history.

As a young adult, it was Nordean's ambition to become a U.S. Navy SEAL.  But although he was accepted into a SEAL training program he was later forced to withdraw after incurring a serious physical injury. That left him at loose ends.  For most of the rest of his adult life, Nordean, who did not go to college, has cycled through various odd jobs.

From about 2012 to 2015, Nordean was a young adult leader at New Life Christian Center in Washington.  In the same period, he was also a mentor for Young Life, a nonprofit that brings together adults and troubled youths.  In 2017, Nordean joined the Proud Boys group.  Two years later, he married his wife, with whom he raises his 12-year-old daughter from a prior relationship.  Nordean has not seen his daughter in over two years.

> **B.     The convictions and presentence investigation report**

On May 4, 2023, the jury returned a verdict finding Nordean guilty of seditious conspiracy, 18 U.S.C. § 2384 (Count One); conspiracy to obstruct an official proceeding, 18 U.S.C. § 1512(k) (Count Two); obstruction of an official proceeding, 18 U.S.C. § 1512(c)(2) (Count Three); conspiracy to impede or injure a federal officer, 18 U.S.C. § 372 (Count Four); a

civil disorder offense, 18 U.S.C. § 231(a)(3) (Count Five); and destruction of government property (a black fence), 18 U.S.C. § 1361 (Count Six).  The jury hung on Count Seven (destruction of a Capitol Window) and Count Eight (Defendant Donohoe's assault of an officer by throwing a water bottle).  The jury acquitted Nordean on Count Nine (Pezzola's assault of an officer).  Verdict, ECF 804.

The Probation Office issued a draft Presentence Report (PSR) on July 26, 2023.  For Count One, the PSR applied U.S.S.G. §2X5.1 and determined that the "most analogous offense guideline" was U.S.S.G. §2M1.1 (Treason).  PSR, ¶ 108.  However, §2M1.1 provides that if a defendant's conduct was not "tantamount to waging war against the United States," use "the offense level applicable to the most analogous offense." §2M1.1(a)(2).  The PSR determined that Count One was not "tantamount to waging war against the United States" and accordingly applied U.S.S.G. §2J1.2 (Obstruction of Justice).  For Counts Two and Three, the PSR also applied §2J1.2.  For Count Four, the PSR applied §2X5.1 and deemed "the most analogous offense guideline" to be §2J1.2.  PSR, ¶ 111.  For Count Five, the PSR applied §2X5.1 and deemed "the most analogous offense guideline" to be U.S.S.G. §2A2.2 (via the cross-reference at §2A2.4).  PSR, ¶ 112.  For Count Six, the PSR applied §2B1.1.

The PSR grouped Counts One through Four pursuant to U.S.S.G. §3D1.2(b) because they involved the same victim "(Congress/Government)" and two or more acts or transactions connected by a common criminal objective.  PSR, ¶ 114.  It then grouped Counts Five and Six pursuant to §3D1.2(c) because those counts embody conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to another count.  PSR, ¶ 115.  Thus, for the grouped Counts, the PSR applied U.S.S.G. §2J1.2 as the guideline that produces the highest offense level.  PSR, ¶ 116.

The PSR started at a base offense level of 14 under U.S.S.G. §2J1.2(a).  PSR, ¶ 117.  It added eight levels under the specific offense characteristic at U.S.S.G. §2J1.2(b)(1)(B), finding the offense caused or threatened to cause physical injury to a person in order to obstruct "the administration of justice."  *Id.*, ¶ 118.  It added another three levels under the specific offense characteristic at §2J1.2(b)(2), finding the offense resulted in substantial interference with "the administration of justice." *Id.*, ¶ 119.  It added another two levels under the specific offense characteristic at §2J1.2(b)(3), finding the offense was extensive in scope, planning, or preparation.  *Id.*, ¶ 120.  Finally, it added four levels under the organizer or leader adjustment at U.S.S.G. §3B1.1(a).  *Id.*, ¶ 122.

Nordean falls in Criminal History Category I.  The PSR calculated a total offense level of 31.  Thus, it calculated his sentencing range at 108 to 135 months' incarceration.  PSR, ¶ 169.

On August 8, Nordean filed his objections to the draft PSR via CM/ECF.  ECF 842.  These are set out in Nordean's argument section *infra*.

On August 9, the government objected to the draft PSR on the ground that it should have applied the "terrorism enhancement" to Count Six under U.S.S.G. §3A1.4.  ECF 844, Gov't Ltr. 8/9/2023.  The government explicitly declined to seek application of Section 3A1.4 as to any Count beyond Count Six.  *Id.*, p. 1 n. 1 ("Because the defendants were all convicted of an offense specifically enumerated as a federal crime of terrorism, *i.e.*, Count Six, the government does not seek the application of Section 3A1.4 to Counts One-Four.").

**Argument**

**I.    Sentencing procedure**

As it knows, the Court has broad discretion to consider nearly every aspect of a particular case, and a particular defendant, in fashioning an appropriate sentence.  *United States v. Booker*,

543 U.S. 220 (2005); *Gall v. United States*, 552 U.S. 38 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).  Although the Court must first calculate the appropriate sentencing range under the Guidelines, it is not bound by the Guidelines or Guidelines Policy Statements.  It may make its own policy judgments, even if different from those in the Guidelines.  *Kimbrough*, 552 U.S. at 101.

The Court must merely impose a sentence consistent with the terms of 18 U.S.C. § 3553(a) and § 3661.  As the Court knows, the cardinal requirement of § 3553(a) is that the "court shall impose a sentence sufficient, but not greater than necessary to comply with the purposes of [§ 3553(a)]. . ." § 3553(a).

## II.     The PSR has incorrectly calculated the Guidelines range

### A.     The guideline for seditious conspiracy is not U.S.S.G. §2J1.2; the government's concession that Section 2M1.1 does not apply illustrates that seditious conspiracy has been improperly charged here

The PSR has incorrectly applied U.S.S.G. §2J1.2 to the seditious conspiracy conviction in Count One.  Seditious conspiracy is not an obstruction-of-justice offense involving the administration of justice.  Accordingly, "the provisions of 18 U.S.C. § 3553 shall control . . ." U.S.S.G. §2X5.1.

The PSR correctly determines that there is no Guideline specifically applicable to 18 U.S.C. § 2384.  The way it reached that determination underscores that a § 2384 offense was not properly charged here.  As indicated, the PSR found that "the most analogous offense guideline" (U.S.S.G. §2X5.1) for seditious conspiracy was the guideline for treason, under U.S.S.G. §2M1.1.  Such reasoning is understandable.  The parties' ample pretrial briefing demonstrated that the offense in § 2384 is a Civil War-era codification of the then-common law crime of "constructive" treason.  Nordean Reply in Resp. to Gov't's Opp. to Mot. to Dismiss Counts One,

Two, Three, Four, Five, Seven, Eight and Nine of the Third Superseding Indictment, ECF 458;

Catherine M. Tarrant, *To "insure domestic Tranquility": Congress and the Law of Seditious*

*Conspiracy*, 1859-1861, 15 AM. J. LEGAL HIST. 107, 109 (1971).

    Yet the PSR concludes that the guideline for treason—punishable by death, 18 U.S.C. §

2381—does not apply.  Section 2M1.1 states that the guideline applies "if the conduct is

tantamount to waging war against the United States." U.S.S.G. §2M1.1(a)(1).  The PSR reasons

that Nordean's Count One offense was not "tantamount to waging war against the United

States."  PSR, ¶ 108.  The government does not object to that (reasonable) conclusion.  ECF 844,

p. 1 ("The government does not dispute the Guidelines calculations set forth for Counts One-

Five . . .").  However, waging war against the United States, simpliciter, is the offense of treason

itself.  § 2381.  Section 2M1.1 does not merely cover waging war against the United States but

also "conduct [that] is tantamount to waging war against the United States." §2M1.1(a)(1).

"Tantamount" means "equivalent in value, significance, or effect." *Tantamount*, Merriam-

Webster Online Dictionary, available at https://www.merriam-

webster.com/dictionary/tantamount.  Before enactment of the offense now codified in § 2384, the

conduct it proscribes—conspiring to use force to prevent the execution of a law—was known at

common law as "constructive" treason—i.e., conduct "tantamount" to treason.  As one early case

described the "constructive" treason offense,

> If numbers and force can render one law ineffectual, which is tantamount to its repeal, the
> whole system of laws may be destroyed in detail. All laws will at last yield to the
> violence of the seditious and discontented. Although but one law be immediately
> assailed, yet the treasonable design is completed, and the generality of intent designated,
> by a part assuming the government of the whole. And thus, by trampling on the legal
> powers of the constituted authorities, the rights of all are invaded by the force and
> violence of a few.

*Case of Fries*, 9 F. Cas. 826, 1799 U.S. App. LEXIS 35, at **370 (Cir. Ct. Penn. 1799).

Courts in the period immediately preceding and following enactment of the seditious conspiracy law in the Act of July 31, 1861 continued to find efforts to forcibly prevent the "execution of federal law" "tantamount" to "levying war" against the United States, i.e., "constructive treason." *United States v. Greathouse*, 4 Sawy. 457, 2 Abb. U.S. 364 (Cir. Ct. N.D. Cal. 1863); *Charge to the Grand Jury-Treason*, 30 F. Cas. 1036 (Cir. Ct. Ohio Southern Oct. 1, 1861); *Charge to Grand Jury-Treason*, 30 F. Cas. 1039, 1 Sprague 602 (Cir. Ct. Mass. Mar. 1, 1861); *United States v. Hanway*, Cas. No. 15,299 (1851).

"It is a well-established rule of construction that where Congress uses terms that have accumulated settled meaning under . . . the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of those terms." *Neder v. United States*, 527 U.S. 1, 21, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999)).

By agreeing that Nordean has not committed an offense "tantamount to waging war against the United States," U.S.S.G. §2M1.1(a)(1), the government has conceded it has not properly charged an offense under § 2384.  ECF 844, p. 1.  The government is surely correct: as shown below, Nordean's conduct is indistinguishable from the conduct of hundreds of January 6 protesters who have been charged with misdemeanors.  Thus, there is no applicable Guideline for Count One and § 3553 controls.

Even if a § 2384 offense were properly charged here, the applicable Guideline would not be U.S.S.G. §2J1.2. That section applies to "Obstruction of Justice." §2J1.2.  Seditious conspiracy is not a species of obstruction of justice and, before the January 6 cases, no court had ever held otherwise.  The § 2384 offense could only be regarded as "analogous" to an obstruction-of-justice offense if one accepts the premise that the government has properly charged a Section 1512(c) offense in the January 6 cases.  It has not.  *United States v. Fischer*, 64

F. 4th 329, 352 (D.C. Cir. 2023) (two panel members agreeing that the construction of § 1512(c) in the jury instructions is "breathtakingly" overbroad).  But even if the government properly charged § 1512(c) offenses here, they could hardly be regarded as analogous to seditious conspiracy.  That proves too much.  The government has charged over 300 protesters under § 1512(c).  It does not contend in sentencing they have all committed a crime akin to sedition.

Nor could it seriously do so: its § 1512(c) interpretation creates an offense conceptually indistinguishable from the Class B misdemeanor of parading/demonstrating in the Capitol Building.  If one "demonstrates" or "parades" in the Capitol (40 U.S.C. § 5104(e)(2)(G)) during an "official proceeding," one cannot avoid "influenc[ing]" that proceeding in some manner, or at least that is one's attempted object. § 1512(c)(2).  But those charged under Section 1512(c)(2) and who therefore allegedly acted with an "unlawful purpose" (the government's definition of "corruptly," satisfied by any trespass or parading charge, according to the government) shared that purpose with the misdemeanants who "demonstrated" or "paraded" against electoral vote certification in the Capitol.  In other words, if the government's novel § 1512(c)(2) offense is a crime "analogous" to seditious conspiracy, so is a Class B parading offense.  Thus, according to the government, over a thousand protesters have committed an offense akin to sedition.  It is surely strange, then, that most of those defendants receive probationary sentences for an offense that is itself akin to treason, a hanging crime.  The government's kludgy charging regime for January 6 purports to separate mice from elephants, when the naked eye sees they are either all mice or all elephants.[1]

---

[1] Soon after the Capitol riot, Judge Howell noted this liminal fuzziness between the January 6 offenses. The judge opined that it should be fixed by using § 1512(c) consistently rather than selectively.  Nordean believes that approach would be too punitive (and argues that the crime is misapplied), but at least the judge's position is principled, unlike the status quo.

In sum, the government's novel § 2384 offense does not have an "analogous" guideline. Therefore, "the provisions of 18 U.S.C. § 3553 shall control . . ." U.S.S.G. §2X5.1.

**B.      Nordean's offenses did not involve "the administration of justice"**

The PSR applied two specific offense characteristic enhancements under the obstruction-of-justice guideline at U.S.S.G. §2J1.2: §2J1.2(b)(1)(B) (eight levels) and §2J1.2(b)(2) (three levels).  Neither applies, factually or legally.

Both sections require a defendant's interference with "the administration of justice." U.S.S.G. §§ 2J1.2(b)(1)(B) and §2J1.2(b)(2).  There may have been a time when an argument that Congress administers justice would be called frivolous by impartial observers.  In any case, Congress does not administer justice.  Such a holding would conflict with separation-of-power principles, not to mention ordinary language usage.  *United States v. Seefried*, 2022 U.S. Dist. LEXIS 196980, __ F. Supp. 3d __ (D.D.C. Oct. 29, 2022).

Notably, judges who have denied motions to dismiss the government's novel § 1512(c)(2) offense have reasoned that the motions should not be granted precisely because Congress does *not* administer justice.  *E.g.*, *United States v. Montgomery*, 578 F. Supp. 3d 54, 61-65 (D.D.C. 2021) ("Congress's constitutionally assigned duties do not include the 'administration of justice. . .'"); *see also United States v. Sandlin*, 575 F. Supp. 3d 16, 23-24 (D.D.C. 2021).  Given that the Guidelines are construed using the tools of statutory interpretation, it is difficult to understand how one reconciles that reasoning with a finding that Congress *does* administer justice—but only when it comes to finding sentencing enhancements applicable.  *United States v. Savin*, 349 F.3d 27, 35-36 (2d Cir. 2003) (courts interpret the Guidelines just as they do statutes); *United States v. Peterson*, 629 F.3d 432, 434 (4th Cir. 2011) (same); *United States v. Bustillos-Pena*, 612 F.3d 863, 868 (5th Cir. 2010) (same); *United States*

*v. Bahhur*, 200 F.3d 917, 927 (6th Cir. 2000) (same); *United States v. Smith*, 989 F.3d 575, 586

(7th Cir. 2021) (same); *United States v. Collins*, 754 F.3d 626, 630 (8th Cir. 2014)

(same); *United States v. Kirilyuk*, 29 F.4th 1128, 1137 (9th Cir. 2022) (same).

  Nor do the enhancements apply factually.  No evidence at trial showed Nordean "causing

or threatening to cause physical injury to a person." U.S.S.G. §2J1.2(b)(1)(B).  Insufficient

evidence showed that Nordean caused property damage.  *Id.*  At most, one might infer that

Nordean helped pull down a segment of the black metal fence.  No evidence showed that

Nordean damaged it.  But even if the Court concludes there was sufficient evidence on that

score, no evidence showed that Nordean pulled down the fence "in order to obstruct the

administration of justice." Even if Congress's activities that day could be regarded as

"administering justice," no evidence showed that Nordean's activity at the fence was not driven

by mere boorishness and inappropriate behavior prompted by on-the-spot interactions among the

crowd and law enforcement.

  As for "substantial interference" with the administration of justice, U.S.S.G. §2J1.2(b)(2),

no evidence demonstrated that Nordean's conduct satisfied any of the examples of such conduct

in the Guidelines commentary, all of which involve evidence impairment and court-related

functions.  §2J1.2 cmt. n. 1.  By definition, in the context of a large riot, "substantial inference"

must take on a relative quality and mean interference more serious than the average rioter's.

Otherwise, "substantial" becomes more like "just average."  The evidence showed that after the

incident involving the fence, Nordean walked in the Capitol Building and walked out soon

thereafter.  It showed him preventing a law enforcement officer from being assaulted by another

rioter.  It did not show him assaulting anyone, entering congresspersons' offices, or looking for

members of Congress and their staff.  In contrast, hundreds of protesters who did engage in those

activities have been sentenced under Guidelines other than, and less punitive than, §2J1.2(b)(2).

Accordingly, the enhancement does not apply on the facts.

      **C.**     **The "offense" was not "extensive in scope, planning or preparation" and Nordean was not "an organizer or leader of [] criminal activity"**

The PSR added two levels under U.S.S.G. §2J1.2(b)(3) because "the offense was

otherwise extensive in scope, planning, or preparation" and four levels under the adjustment at

U.S.S.G. §3B1.1(a) because Nordean "was an organizer or leader of a criminal activity that

involved five or more participants or was otherwise extensive." These enhancements do not

apply legally or factually.

The first guideline provides,

> If the offense (A) involved the destruction, alteration, or fabrication of a substantial
> number of records, documents, or tangible objects; (B) involved the selection of any
> essential or especially probative record, document, or tangible object, to destroy or alter;
> or (C) *was otherwise* extensive in scope, planning, or preparation, increase by 2 levels.

§2J1.2(b)(3) (emphasis added).

The first two subsections are expressly limited to object evidence. The "otherwise

clause" in subsection (C) follows immediately after the list of object-impairment offenses.

Under the canons of ejusdem generis and noscitur a sociis, the offense in subsection (C) should

therefore be read to constitute a crime similar in kind and degree of obstruction to the previous

examples. *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson

v. United States*, 576 U.S. 591, 604 (2015). Nordean's offense did not involve object evidence

impairment. Accordingly, subsection (C) does not apply.

Nor does it apply factually. To be sure, the government's evidence at trial showed

"planning" and "preparation" on Nordean's part. Only, the "planning" evidence was

indistinguishable from a plan to protest the election in Washington, D.C., like thousands of other

people.  Under the Guideline, the "*offense*" must be "extensive[ly] . . . plann[ed] or prepar[ed]." That was not shown here.

The same evidentiary flaw applies to U.S.S.G. §3B1.1(a).  Indeed, Nordean "led" a group of protesters towards the Capitol with a bullhorn.  Thousands of others did the same thing as Nordean.  They have not been charged like him, of course.  They do not belong to the political group targeted by the government of which all the defendants in this case are members.  That is to say, no evidence showed that what Nordean was doing was "organiz[ing] or lead[ing] . . . a criminal activity," whereas the same activity by others was merely marching or parading.

### D.      The PSR applies incorrect guidelines to Counts Four and Five

Court Four charged an offense under 18 U.S.C. § 372, "Conspiracy to Prevent an Officer from Discharging Any Duties." PSR, ¶ 105.  Applying U.S.S.G. §2X5.1, the PSR determined that "the most analogous offense guideline" was the obstruction-of-justice guideline at U.S.S.G. §2J1.2.  *Id.*, ¶ 111.  That is not correct.

Section 372 criminalizes conspiracies to use force, intimidation or threat to prevent officers of the United States from discharging their duties or to induce the officers to leave the place where their duties are required to be performed.  § 372.  The victims of the crime are officers of the United States.  The "most analogous guideline" is therefore found in Part A of Chapter Two, "Offenses against the Person," and specifically U.S.S.G. §2A2.4, which tracks the crime perfectly (assuming arguendo members of Congress are officers of the United States).  Its title is "Obstructing or Impeding Officers." While the "Statutory Provisions" section in the Commentary references two sections in Chapter 73, those involve crimes directed at individual victims.  §2A2.4 cmt. (citing 18 U.S.C. § 1501 (assault on process servers); § 1502 (resistance to an extradition agent)).

Section 2J1.2, by contrast, betrays a broader focus on an obstructed proceeding. It is found in Part J of Chapter Two, titled "Offenses Involving the Administration of Justice." It refers to interference with "the administration of justice," an abstraction. §2J1.2(b)(1)(B); §2J1.2(b)(2).  It refers repeatedly to the impairment of evidence, not interference with officers per se.  §2J1.2(b)(3).  Accordingly, under §2X5.1, the proper guideline for Count Four is §2A2.4.

The PSR correctly applies §2A2.4 to Count Five, charging a civil-disorder offense under § 231(a)(3).  PSR, ¶ 112.  However, it also applies the cross-reference at §2A2.4(c)(1) such that the aggravated assault guideline at §2A2.2 would apply.  *Id.*  That is clearly incorrect. "'Aggravated assault' means a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony." §2A2.2 cmt. n. 1.  In the first place, Nordean was acquitted of Pezzola's assault and the jury hung on the only other assault charge regarding Donohoe throwing a water bottle.  Therefore, it would not be appropriate to find Nordean committed a "felonious assault." In any case, the water bottle was not a dangerous weapon; no evidence showed Nordean's intent to cause bodily injury; and none of the other aggravated assault predicates are satisfied.  Thus, §2A2.4 applies to Count Five.

### E.   The "terrorism enhancement" does not apply; the clear and convincing evidence standard applies to § 3A1.4

"The Sentencing Guidelines call for a twelve-level increase in offense level and an automatic bump to criminal history Category VI if 'the offense is a felony that involved, or was intended to promote, a federal crime of terrorism[,]' U.S.S.G. § 3A1.4(a), (b), defined as an offense falling within an enumerated list that is 'calculated to influence or affect the conduct of

13

government by intimidation or coercion, or to retaliate against government conduct[,]' 18 U.S.C. § 2332b(g)(5)." *United States v. Abukhatallah*, 41 F.4th 608, 645 (D.C. Cir. 2022).  The "calculated to influence or affect" element of the definition imposes a specific intent requirement that a sentencing court must find before applying the enhancement.  *E.g.*, *United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008).

The Circuits are split on the standard of proof.  While the ordinary standard at sentencing is a preponderance of the evidence, some circuits apply the stricter clear and convincing evidence standard to sentencing enhancements that dramatically increase a defendant's Guidelines range, including the terrorism enhancement, to safeguard the defendant's due process right.  *United States v. Amer Sinan Alhaggagi*, 978 F.3d 693, 700-701 (9th Cir. 2020) (applying the clear and convincing evidence standard to § 3A1.4).  Indeed, in *Alhaggagi*, the government "agree[d] it was the government's burden to prove [the 'calculated to influence'] element by clear and convincing evidence, because application of the enhancement here increased the guidelines range from a low end of 51 months to a low end of 324 months, an increase of over 22 years." *Id.*

The first court of appeals to apply the clear and convincing standard at sentencing was the Third Circuit.  *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990).  Prompted by due process concerns, the court held that "legal rules-even rules that function perfectly well in familiar contexts when stated in categorical terms--cannot always be applied in extreme situations." *Id.* at 1100.  The court of appeals limited its holding to the "extreme context" in which the district court's findings regarding uncharged conduct increased the defendant's sentence "from about 30 months to 30 *years*--the equivalent of a 22-level increase in his offense level." *Id.* at 1100-01. The court distinguished this "most dramatic example" from other, smaller

14

increases in the base offense level under the Sentencing Guidelines, suggesting that the preponderance standard provides sufficient due process protections for "probably even a ten-level increase…." *Id.* at 1100; *see also United States v. Paster*, 173 F.3d 206, 219-20 (3d Cir. 1999) (applying clear and convincing standard to nine-level upward departure). Of course, the terrorism enhancement's application is more extreme than the enhancement in *Kikumura*, elevating the defendant's offense level by at least 12 levels, with a mandatory minimum of 32 levels, and increasing the criminal history category to VI, the highest level, in every case.  In a case such as Nordean's, where the defendant has no criminal history, the defendant's criminal history category leaps five levels.  That is why the Ninth Circuit has applied *Kikumura* to § 3A1.4.  *Alhaggagi*, 978 F.3d at 700-701.

Reviewing this split of authority, the D.C. Circuit appears to have endorsed *Kikumura*'s "extraordinary circumstances" approach.  *United States v. Long*, 328 F.3d 655, 671 (D.C. Cir. 2003) ("Lower courts, however, have recognized that 'legal rules-even rules that function perfectly well in familiar contexts when stated in categorical terms--cannot always be applied in extreme situations.'") (quoting *Kikumura*, 918 F.2d at 1100).  The "extreme situation" discussed in *Long* was the one described in *Kikumura*. *Long*, 328 F.3d at 671.  *Long* denied that the district court had erred in applying the preponderance standard in that case—but the determination was a factual one, not legal.  *Id.*  Indeed, the *Long* court presumed *Kikumura*'s rule applied in reviewing the district court's sentence; otherwise, there would have been no need to conduct a factual analysis under *Kikumura. Id.*  Here, given that the terrorism enhancement would become

"a tail which wags the dog of the substantive offense," *Long*, 328 F.3d at 671, the court should apply the clear and convincing standard to avoid violating Nordean's due process right.[2]

As the D.C. Circuit recently put it, the clear and convincing evidence standard is "a heightened standard of proof under which the fact finder must 'give the benefit of the doubt to the defendant.'" *United States v. Munchel*, 991 F.3d 1273, 1289 (D.C. Cir. 2021) (quoting *United States v. Montague*, 40 F.3d 1251, 1255 (D.C. Cir. 1994)).  The sentencing court must "view the evidence as the Guidelines require . . . 'in a light most favorable to the defendant,' and find [the guideline satisfied] only on evidence with respect to which the judge is clearly convinced."

With the exception of the Oath Keepers case, every judge in this court to consider the issue has rejected the government's requests to apply the terrorism enhancement in January 6 cases.  Noting that one defendant was "part of some of the most violent and shocking confrontations with police officers that day" and was one of the most egregious rioters in the entire mob, Judge McFadden declined to apply the terrorism enhancement.  *Judge Rejects "Terrorism" Sentencing Enhancement for Leader of Jan. 6 Tunnel Confrontation*, Politico, Feb. 27, 2023, https://www.politico.com/news/2023/02/27/judge-rejects-terrorism-sentencing-jan-6-00084592. Similarly, Judge Friedrich declined to apply the terrorism enhancement in the case of Guy Reffitt, who carried a gun with him at the Capitol.  *Capitol Rioter Guy Reffitt Gets Longest Jan. 6 Sentence, But No Terrorism Enhancement*, NBC News, Aug. 1, 2022, available at: https://www.cnbc.com/2022/08/01/capitol-rioter-guy-reffitt-gets-longest-jan-6-sentence-but-no-

---

[2] The D.C. Circuit cited approvingly to *Long* after the Guidelines became advisory in *United States v. Booker*, 543 U.S. 220 (2005). *See United States v. Dorcely*, 454 F.3d 366, 372-73 (D.C. Cir. 2006).  The *Dorcely* court affirmed the use of the preponderance standard for relevant acquitted conduct. *Id.*  Of course, that is not the same due process issue as the "extraordinary circumstances" one addressed in *Long* and *Kikumura.*

terrorism-enhancement.html. Judge Friedrich reasoned that applying the enhancement would create unwarranted sentence disparities. *Id.* In another case involving one of the most notorious and violent January 6 defendants, Judge Berman Jackson declined to apply the terrorism enhancement. *United States v. Daniel Rodriguez*, 21-cr-246-ABJ (D.D.C. 2021).

Turning to the government's PSR objections here, it has offered no factual argument at all that would satisfy § 3A1.4, much less one that meets the clear and convincing evidence hurdle. Although the government declines to argue that § 3A1.4 applies to any conviction other than Count Six concerning destruction of the black fence, it does not attempt to show how Nordean's purported destruction of the fence specifically was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." § 2332b(g)(5)(A).[3] Nordean has argued that the government presented insufficient evidence to show (a) that he destroyed a fence segment and (b) that even if Nordean pulled a fence segment down, he caused more than $1,000 in property damage to it. But even if sufficient evidence at trial showed those things, no evidence, and certainly no evidence satisfying the clear and convincing evidence standard, showed that Nordean took that action to influence the government through coercion. Nordean was holding a beer can at the time, and plainly under the influence. If he did pull down the fence segment, there is a manifest calculation that is no less plausible than government "coercion": a simple desire to be on the other side of the fence. An effort to pull down a fence to stand in a different spot is not one that is "calculated to influence or

---

[3] Nordean reserves the right to brief the court if the government attempts to change its position immediately before sentencing and argue that § 3A1.4 applies to other counts via the Upward Departure Provision in Application Note 4. Nordean preserves all arguments against the application of that note, including but not limited to the argument that it was outside the scope of the Commission's statutory authority in the Antiterrorism and Effective Death Penalty Act of 1996.

affect the conduct of government by intimidation or coercion." The government has shown no evidence whatsoever that this was not Nordean's "calculation."  In addition, it does not make sense to say that one "coerces" the government by pulling down a fence segment.  The government has not explained who was "coerced" by this action and what "government conduct" Nordean aimed to achieve by an action that occurred in a matter of seconds.  Certainly, he could not have calculated that the fence segment would be observed by members of Congress who were hundreds of yards away and inside a building.  Or take the police officers nearby.  It is not possible to conclude that the video of Nordean standing at the fence, depicting no verbal communication between him and the police, shows his specific intent, by clear and convincing evidence, to coerce some particular action from a law enforcement officer.  What action would that be?

The government relies exclusively on the jury's finding in Count One that Nordean conspired to oppose the authority of the government by force.  ECF 844, p. 2.  But § 2384 is not a "federal crime of terrorism" listed in § 2332b(g)(5)(A).  Moreover, the jury made no finding that damage to the black fence in Count Six was "calculated" by the goal of the conspiracy charged in Count One, by any defendant, much less Nordean specifically.  The government made no argument at trial that but for seditious conspiracy, Nordean would not have "destroyed" the black fence.  No evidence at trial showed that the black fence episode was preplanned and not simply some spontaneous action taken in the moment.  In short, to simply point to the conviction in Count One—which Congress notably omitted from the "federal crimes of terrorism" list—does not come close to satisfying the clear and convincing evidence standard in order to apply § 3A1.4 to Count Six.

The excessiveness of the government's terrorism enhancement argument is reflected in its lack of any precedential support. No court has held that fence-shaking at a political protest—or other discrete acts of property damage at a protest—constitutes legal terrorism. The government's disproportionate argument would turn thousands of domestic political protesters, many of whom wish to "influence" government, into legal "terrorists." Suppose political protesters line up along a barricade at a modestly sized demonstration. One pulls the barricade down. Under the government's new § 3A1.4 theory, the most severe Guidelines enhancement applies to them all. They aided and abetted property damage, a "federal crime of terrorism." They are *political* protesters so, by definition, they intend to "influence" government. Therefore, they are all legal terrorists. This is never how § 3A1.4 has been applied. The government's request to apply it here is irresponsible.

In sum, Nordean's total offense level should be 14. In criminal history category I, his sentencing range should be 15-21 months' incarceration. U.S.S.G. Ch. 5.

## III.   The § 3553(a) factors favor a significant downward variance

### A.   The nature and circumstances of the offense and the history and characteristics of the defendant (§ 3553(a)(1))

A number of considerations under § 3553(a)(1) warrant a significant downward variance[4] in Nordean's case: (1) even though the court has accepted the government's novel § 1512(c)(2) charge, which drives the sentencing range, it has still acknowledged that the question is a close one, meriting leniency in sentencing if not lenity; (2) the seditious conspiracy statute has never been used in the manner it has been applied here, also meriting leniency; (3) the terrorism

---

[4] Should the court apply the Guidelines range calculated by Nordean, he contends that a sentence in the range of 15-21 months' incarceration would be appropriate on Count 5, charging an offense under 18 U.S.C. § 231(a)(3). To the extent the court calculates a higher range, Nordean argues for a downward variance for the reasons cited in this section.

enhancement has never been applied in the context of domestic political protest, meriting

leniency; (4) Nordean's nonviolent case is far less severe than that of the Oath Keeper

defendants; (5) Nordean made efforts to stop assaults on January 6; (6) Nordean's first-offender

status; and (7) Nordean's remorse.[5]

### 1.        The novelty of the government's § 1512(c) charge calls for leniency

Setting aside the terrorism enhancement, Nordean's sentencing range is driven almost

entirely by his convictions under § 1512(c)(2).  The novelty of that charge warrants significant

leniency.

Along with most judges in this district, this court declined to dismiss the § 1512(c)(2)

charge.  However, it acknowledged in oral argument that the closeness of the question gave the

court pause.  And for good reason.  At least three judges in this district, including two on the

court of appeals, have found that the government's novel, evidence-free interpretation of the

obstruction-of-justice offense is "breathtakingly" overbroad.  *United States v. Fischer*, 64 F.4th

329 (D.C. Cir. 2023); *United States v. Miller*, 589 F. Supp. 3d 60 (D.D.C. 2022).  Even the

panelist who authored *Fischer*'s lead opinion acknowledged that before January 6 no court had

applied § 1512(c)(2) to acts of protest not intended to affect the integrity or availability of

evidence.  *Fischer*, 64 F.4th at 338.

The court has heard argument that applying a novel construction of a criminal statute to

conduct that occurred before any court's adoption of the new interpretation can amount to a due

---

[5] With respect to sections III.A.1-III.A.3 of Nordean's memorandum, Nordean requests that the
court regard these arguments not just in a general variance context but as arguments that the
court should exercise its power to decline to apply the following guidelines on policy grounds:
U.S.S.G. §2J1.2(b)(2), §2J1.2(b)(1)(B), §2J1.2(b)(3), §3B1.1(a), and §3A1.4.  *Kimbrough*, 552
U.S. at 101.

process violation akin to an ex post facto law. *United States v. Lanier*, 520 U.S. 259, 264 (1997) (citing *Bouie v. City of Columbia*, 378 U.S. 347, 353-54 (1964)). A fortiori, then, if such a novel charge is still permitted, leniency is certainly appropriate. Even if he had reviewed the relevant statute on the morning of January 6, Nordean could not have known that what appeared to be a trespass in the Capitol that day would constitute a novel obstruction-of-justice offense, the first in Chapter 73 that does not entail evidence or an investigation. The point is not that ignorance of the law is an excuse. The point is that even if we posit a public that is aware of Section 1512(c), it could not have been fairly notified of a future interpretation of the statute that decouples the crime from evidence and investigations for the first time in its 20-year history.

Leniency becomes even more appropriate if the court determines that, notwithstanding the ordinary meaning of "the administration of justice," a special meaning applies for January 6 defendants. In that case, eleven extra levels are added to Nordean's total offense level. Just as with the novel crime itself, even if Nordean had read the Guidelines on his march towards the Capitol, he could not have known that Congress's proceeding that day would be regarded as "the administration of justice," something that happens in courts, not a legislature.

## 2.      The novelty of the § 2384 charge calls for leniency

Similarly, the court denied Nordean's motion to dismiss the seditious conspiracy charge. Just like with the § 1512(c) charge, the novelty of the government's § 2384 charge warrants leniency.

Section 2384 was created in response to, and to address circumstances like, the heavily armed attack on the federal fort at Fort Sumter, sparking the Civil War, in which roughly 2% of the population died. Catherine M. Tarrant, *To "insure domestic Tranquility": Congress and the Law of Seditious Conspiracy*, 1859-1861, 15 AM. J. LEGAL HIST. 107, 109 (1971). In the

statute's long history, no court has applied it to protest conduct like Nordean's.  No court has applied § 2384 to the act of pulling down a fence.  No court has applied it to an unarmed protester who walked in the Capitol and walked out, like a Class B parading misdemeanant.  The weight of this history urges caution in sentencing Nordean under § 2384.

### 3.      The novelty of applying the terrorism enhancement to this conduct calls for leniency

Nordean has argued that the terrorism enhancement does not apply here.  But if the court does apply it, the novelty of its application warrants a significant downward variance.

As indicated, the terrorism enhancement has never applied to disorderly acts of political protest such as Nordean engaged in.  Yet thousands upon thousands of protesters have attempted to "influence government" through protest that has devolved into acts of property destruction.  Nothing distinguishes Nordean's actions from theirs.  This is another powerful reason to downwardly vary.

Legal jargon aside, severely punishing people for actions they could not have known were the grave crimes with which they are charged strikes many people as unfair and wrong.  A mother tells her son not to take sweets from the jar.  In the past he's been sent to his room, scolded, or had his hand slapped for infractions.  However, this time and without warning, the mother exacts the penalty of the bazaar, cutting off the boy's finger.  Many people, perhaps most of them, do not find arbitrary punitive patterns like this consistent with everyday justice.  That's true even if the mother cared deeply about this particular cookie batch. For decades if not longer, many protesters have done exactly what Nordean did at the Capitol.  They were not punished as the government proposes.  It is not close.

It is the defendant's actions alone that should count here, not political commentary characterizing those actions.  They were nonviolent.  It is easy to respond that no historical

demonstrations at the Capitol were like the one on January 6.  That can be said when comparing any event in history to any other event.  What matters is that the new interpretations placed on these criminal statutes and rules by the government could also have applied to countless prior demonstrations at the Capitol, pale comparisons to January 6 though they are—but the laws and rules never were applied in the past.

### 4.  Nordean's conduct was far less severe than that of the Oath Keeper defendants

Although no group of political protesters had been punished under these statutes and rules prior to January 6, the Oath Keeper defendants have been.  A comparison of their actions to Nordean's urges a downward variance.

Nordean will focus on the most significant difference.  Nordean carried no weapons on January 6.  His group carried no weapons.  On information and belief, Nordean can say with a fair degree of confidence that his is very likely the sole historical example of a seditious conspiracy to topple the government that entailed no weapons but rather walking into a building unarmed.

Contrast that with the Oath Keepers.  According to the government, their conspiracy revolved around "amass[ing] an arsenal of firearms across the Potomac River. . ." *United States v. Elmer Stewart Rhodes*, 22-cr-15-APM (D.D.C. 2021), ECF 565, Gov't Sentencing Mem., p. 1.  Rhodes and his co-conspirators "accumulat[ed] firearms and other weapons, and plan[ned] for their transport to the Capitol and the QRF staging location just across the river." *Id.*, p. 61.

The argument here does not turn on the court's duty to avoid unwarranted sentence disparities.  For the important reason cited above, among others, the Oath Keepers are not proper comparators for Nordean's case.  The point is that, assuming arguendo that the Oath Keepers' conduct which included stockpiling firearms satisfied the crimes charged in both cases and the

23

Guidelines at issue, the stark difference between the cases in the potential for seditious violence is a reason to downwardly vary from Guidelines as they were novelly applied in the Oath Keepers case.

### 5.     Nordean's efforts to stop assault on law enforcement

After *Booker-Gall-Kimbrough*, the case law is clear that good deeds, both exceptional and otherwise, whether performed pre-indictment or post-indictment, are a valid basis for a downward variance.  *See United States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008).

As the Court will recall, substantial evidence at trial, including multiple video exhibits, depicted Nordean attempting, on more than one occasion, to stop a protester, Christopher Quaglin, from assaulting law enforcement officers near the Capitol on January 6.  Defense witness Travis Nugent testified that he saw Nordean "pacing" between the line of police officers and the crowd, which appeared to the witness to be Nordean's effort to put his body between rioters like Quaglin and law enforcement.  These good deeds are reasons to downwardly vary.

### 6.     First-time offender status

The fact that Nordean is a first-time offender is an appropriate basis for a downward variance.  *United States v. Huckins*, 529 F.3d 1312, 1317 (10th Cir. 2008) (affirming that district court's downward variance from 60-to-79-month range to below the calculated Guidelines range was reasonable and permissibly took into account the defendant's lack of a criminal record); *United States v. Munoz-Nava*, 524 F.3d 1142, 1143 (10th Cir. 2008) (downward variance to one year imprisonment and one year home confinement from recommended Guidelines range of 65-78 months imprisonment supported by district court's finding of several factors including that defendant had no felony criminal record and his offense was "highly out of character"); *United*

*States v. Tomko*, 562 F.3d 558, 560 (3d Cir. 2009) (affirming probationary sentence based partly on defendant's "negligible criminal history").

That the Guidelines already take into account Nordean's lack of criminal history does not mean that it is inappropriate for the Court to vary downward on the same basis.  *See United States v. Ransom*, 756 F.3d 770, 775 (D.C. Cir. 2014) ("[I]t is not error for a district court to enter sentencing variances based on factors already taken into account by the Advisory Guidelines . . . when a district court applies broader § 3553(a) considerations in granting [a sentencing] variance.").

### 7.    Nordean's remorse

A defendant's true remorse, whether exceptional or not, is a valid basis for a downward variance.  And district courts may vary downward based on remorse even where the acceptance of responsibility adjustment under U.S.S.G. §3E1.1 does not apply because the defendant exercised his right to trial.  *E.g.*, *United States v. Howe*, 543 Fed. 3d 128, 138 (3d Cir. 2008).

As explained above, Nordean deeply regrets his decision to enter the restricted area and the Capitol Building and to disobey orders from law enforcement to turn around.  To the extent his presence there and the members of his marching group contributed to the distress of outnumbered law enforcement officers, members of Congress, and their staff, he offers them his sincere apology.  Nordean will personally demonstrate remorse at sentencing in his allocution.

### B.    Avoiding unwarranted sentence disparities (§ 3553(a)(6))

Section 3553(a) requires courts to fashion a sentence in a way that avoids "unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." § 3553(a)(6).  Sentencing Nordean in the Guidelines range proposed by the government would create unwarranted sentence disparities along a number of dimensions.

First, a sentence in the range proposed by the government would create unwarranted disparities between thousands upon thousands of pre-January 6 protesters at the Capitol and elsewhere who engaged in conduct like Nordean's and were not charged federally but rather under the typical practice that prevailed in this district before January 6, whereby protesters "post and forfeit": pay to have their demonstration-related case dropped for approximately $25-100. ACLU, District of Columbia, Demonstrations in D.C., available at: https://www.acludc.org/en/know-your-rights/know-your-rights-demonstrations-dc.  Nordean's off-color Telegram chats about coming to D.C. do not convert this disparity into a "warranted" one. The disparity between a $25-100 fine and the 27-33 years of incarceration calculated by the government is rather significant.

Second, a sentence in the government's range would create unwarranted disparities between other January 6 defendants charged under § 1512(c)(2) and Nordean.  Approximately 63 defendants have been sentenced under that statute and not under § 2384.  Department of Justice January 6 Sentencing Chart, dated Aug. 15, 2023, available at: https://www.justice.gov/file/1593211/download. The average sentence imposed on those 63 defendants was 38 months' incarceration.  *Id.*  The low end of Nordean's sentencing range proposed by the government—324 months—is over eight times higher than this court's average § 1512(c)(2) sentence for January 6 defendants.  And Nordean's personal conduct was less severe than that of many of those protesters.  *Id.*

The government will argue that these are not apples-to-apples comparisons given that the terrorism enhancement was not applied in, and § 2384 was not charged in, the 63 comparator cases.  The government will point out that both those factors involve the contemplated use of force and/or intimidation or coercion of government which are not necessary components of a §

26

1512(c)(2) conviction.   A quick glance at the sentencing statistics shows that the government's distinction fails.  For a great many of the 63 § 1512(c)(2) defendants were also convicted of assault under § 111(a), i.e., their January 6 conduct necessarily entailed the use of force, § 111(a), and an effort to obstruct the joint session. Department of Justice January 6 Sentencing Chart, dated Aug. 15, 2023, available at: https://www.justice.gov/file/1593211/download. And that is a significant undercount.  In virtually all the 63 comparator cases, including those where § 111(a) was not also charged, the defendant's conduct could have been described as politically "coercive" or "intimidating" notwithstanding no use of force merely in virtue of the fact that the defendant entered the Capitol Building.  *Id.*  Thus, for the very same reasons the government contends the court should apply the terrorism enhancement here, this court could have applied it in other § 1512(c)(2)/ § 111(a) cases.  Yet, as explained above, this court has regularly rejected its application.  The difference between the average sentence of 38 months' incarceration and the government's 324-405 months range is another unwarranted sentence disparity.  Almost certainly, it is accounted for by Nordean's membership in a political organization targeted, as such, by the government.

Finally, a sentence in the government's range (or close to it) would create hundreds of unwarranted sentence disparities between Nordean's case and hundreds of protesters who were sentenced for a Title 40 parading offense alone.  As shown above, there is no conceptual distinction between the novel § 1512(c)(2) offense and a parading/demonstrating offense under § 5104(e)(2)(G).  *Supra* 11.  The government has never articulated how Nordean's conduct—his specific actions on January 6—are factually distinct from that of a parading/demonstrating defendant.  In many instances, the conduct of misdemeanants was more disruptive than Nordean's. Department of Justice January 6 Sentencing Chart, dated Aug. 15, 2023, available at:

https://www.justice.gov/file/1593211/download.  Here are some misdemeanor examples that are

rather difficult to factually distinguish from Nordean's seditious conspiracy case.  In every single

one of these cases, the government could have pulled the defendants' pre-January 6 text

messages and characterized plans to protest in D.C. as a "conspiracy," as it did with Nordean:

| 1/6 Def. & Case No. | Charge | Sentence | Offense Conduct |
|---|---|---|---|
| Josh & Jessica Bustle, 21cr238 | Parading in Capitol | 24 mos. probation and 24 mos. supervised release | Entered Capitol Building, remained for 20 minutes. Posted on Facebook, "Pence is a traitor. We stormed the capital (sic). . . We need a revolution!" |
| Bryan Ivey, 21cr267 | Parading in Capitol | 36 mos. probation | Entered Capitol Building through a breached window, waving additional rioters into the building, spending 30 minutes inside. |
| Valerie Ehrke, 21cr97 | Parading in Capitol | 36 mos. probation | Entered Capitol Building. |
| Andrew Bennett, 21cr227 | Parading in Capitol | 3 mos. home confinement, 24 mos. probation | Entered the Capitol Building, livestreaming the event on his Facebook page for over an hour. |
| Lori, Thomas Vinson, 21cr355 | Parading in Capitol | 5 years probation, 120 hours of community service | Entered the Capitol Building, later telling news outlet that her actions were "justified" and that she would "do this all over again." |
| Jordan Stotts, 21cr272 | Parading in Capitol | 24 mos. probation | Entered the Capitol Building, remained inside for an hour, celebrating with others and taking videos with his cell phone. |

| Glen Croy, 21cr162 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building. Chief Judge suggested at plea hearing that parading offense is not conceptually different from government's obstruction of justice charge under § 1512(c)(2) |
|---|---|---|---|
| Douglas Sweet, Cindy Fitchett, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, Fitchett filming herself saying, "We are storming the Capitol. We have broken in." |
| Eric Torrens, 21cr204 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking celebratory pictures in the Crypt. |
| Rasha Abdual-Ragheb, 21cr42 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, desiring to demonstrate against Congress. |
| Jonathan Sanders, 21cr384 | Parading in the Capitol | 36 mos. probation, 60 hours community service | Entered the Capitol Building, intending to protest presidential election |
| Michael Orangias, 21cr265 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures inside. |
| John Wilkerson, 21cr302 | Parading in the Capitol | 36 mos. probation, 60 hours of community service | Entered the Capitol Building, posting on social media, "today was a good day, we got inside the Capitol." |
| Brandon Nelson, 21cr344 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, co-defendant texting, "We stormed the Capitol and shut it down. Currently still inside" and "Patriots won't go down without a fight." |

| Andrew Wrigley, 21cr42 | Parading in the Capitol | 18 mos. probation | Entered the Capitol Building, taking pictures of himself inside |
|---|---|---|---|
| Jacob Hiles, 21cr155 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures showing him smoking "an unknown substance" inside. |
| Bruce Harrison, 21cr365 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures of himself inside. |
| Terry Brown, 21cr41 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, disobeyed police order to leave. |
| Felipe Marquez, 21cr136 | Disorderly conduct in the Capitol | 18 mos. probation | Entered the "hideaway" office of Senator Merkley, saying, "We only broke a couple windows." |
| Michael Rusyn, 21cr303 | Parading in the Capitol | 24 mos. probation | Among the first to enter the Capitol through a certain door, part of a group of people who shouted, "Tell Pelosi we're coming for that b****," called police traitors, and shouted "Stop the steal." |
| Andrew Hatley, 21cr98 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures with various historical statues. |
| Nicholas Reimler, 21cr239 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, taking pictures of himself and friends. |
| Caleb Jones, 21cr321 | Parading in the Capitol | 2 mos. home confinement, 24 mos. probation | Entered the Capitol Building, "walking down numerous hallways and into the Capitol Rotunda." |

| Anthony R. Mariotto, 21cr94 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building, posting on Facebook, "This is our house" under selfie photograph. |
|---|---|---|---|
| Michael Stepakoff, 21cr96 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, posting on social media after, "The Capitol is OUR house, not theirs." |
| Tanner Sells, 21cr549 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building. |
| Gary Edwards, 21cr366 | Parading in the Capitol | 12 mos. probation | Entered the Capitol Building, including Senate office S140. |
| Zachary, Kelsey Wilson, 21cr578 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, penetrating all the way to the Speaker's personal office |
| Jennifer Parks, Esther Schwemmer, 21cr363 | Parading in the Capitol | 24 mos. probation | Entered the Capitol Building, taking pictures inside |
| Jackson Kostolsky, 21cr197 | Parading in the Capitol | 36 mos. probation | Entered the Capitol Building |
| Eduardo Gonzalez, 21cr115 | Parading in the Capitol | 24 mos. probation | Entered the Capitol, smoking marijuana inside "multiple times." |
| Israel Tutrow, 21cr310 | Parading in Capitol | 36 mos. probation | Entered the Capitol Building with a knife |

In short, sentencing in or near the government's proposed Guidelines range would create hundreds if not thousands of unwarranted sentence disparities.

## C.      The seriousness of the offense and deterrence (§ 3553(a)(2))

The Court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense" and to "afford adequate deterrence to criminal conduct" and to "protect the public from further crimes of the defendant." § 3553(a)(2).

The penalties Nordean has already incurred as a result of this case are sufficient to deter

him from ever again entering the Capitol, protesting there, and recidivating.  He has been

incarcerated since April 2021.  Long stretches of that period saw Nordean held in solitary

confinement.  His reputation and name have been permanently defaced in the court of public

opinion.  He will struggle for the rest of his life to hold down gainful employment.  He has been

separated from his 12-year-old daughter for over two years, missing holidays and birthdays.  He

has been sued multiple times by wealthy plaintiffs represented by dozens of sophisticated

lawyers for the exact same conduct for which he is being punished here.

All of these developments are serious penalties for Nordean's conduct and serve as potent

specific and general deterrence.  The shame Nordean has experienced is itself a guarantee of

deterrence.  *See*, *e.g.*, *United States v. Polizzi*, 549 F. Supp. 2d 308, 449 (E.D.N.Y. 2008)

(specific deterrence satisfied by "intense shame created by the convictions); *United States v.*

*Maynard*, 2020 U.S. Dist. LEXIS 179542, at *5 (E.D.N.Y. Dec. 17, 2012) (Weinstein, J.)

(same).

**Conclusion**

For all the foregoing reasons, Nordean respectfully requests a sentence within the

properly calculated Guidelines range.

Dated: August 16, 2023                              Respectfully submitted,

                                                    */s/ David B. Smith*
                                                    David B. Smith (D.C. Bar No. 403068)
                                                    108 N. Alfred St.
                                                    Alexandria, VA 22314
                                                    Phone:(703)548-8911
                                                    Fax:(703)548-8935
                                                    dbs@davidbsmithpllc.com

                                                    Nicholas D. Smith (D.C. Bar No. 1029802)
                                                    1123 Broadway, Suite 909

New York, NY 10010
Phone: (917) 902-3869
nds@davidbsmithpllc.com

*Attorneys for Ethan Nordean*

## <u>Certificate of Service</u>

I hereby certify that on the 16th day of August, 2023, I filed the foregoing submission with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s): Counsel of record.

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

/s/ David B. Smith
David B. Smith, VA Bar No. 25930
David B. Smith, PLLC
108 North Alfred Street, 1st FL
Alexandria, Virginia 22314
(703) 548-8911 / Fax (703) 548-8935
dbs@davidbsmithpllc.com

*Attorneys for Ethan Nordean*

33