UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | 1:21-cr-00175-TJK |
| | : | |
| **ETHAN NORDEAN, ET AL.** | : | AUGUST 23, 2023 |

**DEFENDANTS BIGGS' AND REHL'S REPLY MEMORANDUM RE: SENTENCING**

Mssrs. Biggs and Rehl raise two objections to arguments made by the Government in its sentencing memorandum of August 17, 2023. First, the terrorism enhancement is uncalled for and is unsupported by the factual allegations and the counts of conviction in this case. Second, the Government's portrayal of the men through its selective reading of their criminal history mischaracterizes the defendants and is unnecessary surplusage given the factors this Court must consider in sentencing.

**I.     The "Terrorism" Enhancement is Outside the Heartland of Offenses the Guidelines Seek to Capture as Eligible for Extra Punishment**

The Government seeks a terrorism enhancement as to each defendant pursuant to Section 3a1.4 of the United States Sentencing Guidelines. If applied, the enhancement would elevate the already steep penalties recommended in the PSR to catastrophic levels – 30 years for Rehl and 33 years for Biggs. One takes the Government at its word in this case – it seeks draconian sentences to be imposed, not merely as an expressive gesture to capture the imagination of headlines writers and

1

partisans.[1] It has almost invariably been the case in the January 6 prosecutions that the Government's reach far exceeds what sentencing authorities have permitted it to grasp. Yet case by case by case the Government continues to seek excessive sentences. Cynicism is perhaps unavoidable: is the Government seeking to try these cases in the press for purposes unrelated to just punishment?

The defendants contend that the terrorism enhancement is inapplicable in this case as outside the heartland of what the United States Sentencing Commission contemplated.

Section 3A1.4 calls for a terrorism enhancement if the following conditions are met:

(a) If the offense is a felony that involved, or as intended to promote, a federal crime of terrorism, increase by 12 levels; but it the resulting offense level is less that level 32, increase to level 32.
(b) In each such case, the defendant's criminal history category … hll be Category VI.

Section 3A1.4, USSG.

---

[1] The political nature of these prosecutions cannot be ignored; the call for draconian sentences is consistent this the desire to send the loudest possible signal, to change "social norms," as it were, in such a way as to deter others from ever even considering acts similar to those engaged in by the defendants. See, Cass Sunstein, *On the Expressive Function of Law,* University of Pennsylvania Law Review, Vol. 144: 2021 (1996)(exploring the function of law as "making statements"" rather than controlling behavior). "[Reformers] argue that the expressive value is lost when an alleged domestic terrorist is criminally charged without being expressly labeled as a terrorist." Note, *Responding to Domestic Terrorism: A Crisis of Legitimacy*, Harvard Law Review, Vol 136, 1914, 1920 (2023). The author of the Note goes on to note: "[T]he government may not be able to differentiate adequately between peaceful, First Amendment-protected conduct and genuine threats of domestic terrorism. Moreover, those who are concerned about the civil liberties risks associated with aggrandizing the federal government's power in this context argue that the risk of selective targeting of groups is higher due to political polarization." *Id.*, 1926. The author notes the obvious: "There is no federal crime of domestic terrorism.) *Id.*, 1916; efforts to use the Guidelines effectively to create one are "misguided." *Id*.

The Applications Notes specify that "a federal crime of terrorism" has the meaning given that term in 18 U.S.C. Section 2332(g)(5). Section 2332(g)(5) covers a broad range of conduct. To satisfy that definition, an offense must satisfy two conditions: first, it must be "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct;" the conduct must also be a violation of one of roughly 50 discrete statutes. One count of conviction in the instant case is captured by the net, to wit: A violation of 18 U.S.C. Section 1361, pertaining to a fence knocked over in the course of the riot on January 6, 2021. Because the fence was valued at more than $1,000, the offense is a felony. Did the drafters of the Guidelines really consider the destruction of a fence in the course of a riot to be "a federal crime of terrorism"?

1. **What "Terroristic" Conduct the Guidelines Captures**

The Government seeks to enhance the sentences in this case by application of a Guidelines provision targeting such crimes as assassination of federal officials, using biological or nuclear weapons, using other weapons of mass destruction, arson, disrupting activities having a substantial impact on interstate commerce, including air and sea travel, and consorting with known terrorists. One statute, 18 U.S.C. Section 1361, involving destruction of government property, falls within the list of nearly 50 specified federal statutes supporting the enhancement. But as applied in this case, the statute involves the destruction of a fence used as a tool to demarcate the permitter of a protected area and useful primarily for crowd control. The value of the fence can be measured in the tens of thousands of dollars. It simply bears no meaningful comparison

to the other harms contemplated by the Sentencing Commission when it drafted the Guidelines.

A table reflecting the nature of the crimes captured by Section 2332(g)(5) demonstrates why this case is not what drafters of the Guidelines had in mind. The destruction of a fence simply does not belong in the catalog of horribles contemplated by the list of crimes. The following table reflects the offenses listed in Section (g)(5). All offenses are found in Title 18 of the United States Code.

| 18 U.S.C… | Proscribed conduct | Consequence of violation |
|---|---|---|
| Section (i) | | |
| 1. 32 | destruction of aircraft or aircraft facility | substantial property damage |
| 2. 37 | relating to violence at International airport | violence; risk of injury to person |
| 3. 81 | arson within specified areas | substantial property damage |
| 4. 175 | re: biological weapons | risk of widespread injuries to persons |
| 5. 175c | use of variola virus | risk of widespread injuries to persons |
| 6. 229 | re: chemical weapons | risk of widespread injuries to persons |
| 7. 351 | assassination/kidnapping | risk of serious injury to person |
| 8. 831 | re: nuclear weapons | risk of widespread injuries to persons |
| 9. 832 | threatened mass destruction | substantial disruption of normal life |
| 10. 842 | re: plastic explosives | risk of widespread injury to persons |
| 11. 844 | arson/bombing federal property | risk of injury to persons/property |
| 12. 930 | re: attempting to kill | risk of serious injury to person |
| 13. 956 | conspiracy to murder/kidnap | risk of serious injury to person |
| 14. 1030 | re. protection of computers | substantial interference with commerce |
| 15. 1114 | killing federal officials | risk of serious injuries to persons |
| 16. 1116 | killing diplomats | risk of serious injury to person |
| 17. 1203 | re: hostage taking | risk of serious injury to person |
| 18. 1361 | re: government property | **THE INSTANT OFFENSE**[2] |
| 19. 1362 | re: communications systems | property damage |

---

[2] The defendants were convicted on one count of 18 U.S.C. Section 1361, involving a perimeter fence at the Capitol. The entire fence was replaced, at a cost of approximately $32,000.

| 18 U.S.C… | Proscribed conduct | Consequence of violation |
|---|---|---|
| 20. 1363 | re: maritime property | property damage |
| 21. 1366 | re: energy facility | property damage |
| 22. 1751 | kidnapping president/staff | risk of serious injury to person |
| 23. 1992 | re: mass transportation/utilities | property damage |
| 24. 2155 | re: national defense facilities | property damage |
| 25. 2156 | re: national defense facilities | property damage |
| 26. 2280 | re: maritime navigation | property damage |
| 27. 2281 | re: fixed maritime property | property damage |
| 28. 2332 | re: murder outside U.S. | serious injury to person |
| 29. 2332a | re: weapons of mass destruction | risk of serious injuries to persons |
| 30. 2332b | re: terrorism across borders | risk of serious injury to persons |
| 31. 2332f | re: bombing public places | risk of injury to persons/places |
| 32. 2332g | re: missiles targeting aircraft | risk of injury to persons/places |
| 33. 2332h | re: radiation dispersal devices | risk of serious injury to person |
| 34. 2332i | re: nuclear terrorism | risk of serious injury to person |
| 35. 2339 | re: harboring terrorists | risk of injury to person |
| 36. 2339A | re: material support to terrorists | risk of injury to person |
| 37. 2339B | re: support terrorist organization | risk of injury to person |
| 38. 2339C | re: financing terrorism | risk of injury to person |
| 39. 2339D | re: training by foreign terrorists | risk of injury to person |
| 40. 2340A | re: torture | 92risk of injury to person |

Section (ii)

| 41. 92 | re: atomic weapons | risk of injury to persons/property |
|---|---|---|
| 42. 236 | sabotage of nuclear facility | risk of injury to persons/property |

Section (iii)

| 43. 46502 | re: aircraft piracy | risk of injury to persons |
|---|---|---|
| 44. 46504 | re: assault on a flight crew | injury to persons |
| 45. 46505 | re: used of explosives on aircraft | serious risk of injuries to persons |
| 46. 46506 | re: homicide on aircraft | injury to person |
| 47. 60123 | re: destruction pipelines | injury to property |

Section (iv)

| 48. Specified narcotics offenses[3] | | injury to persons. |
|---|---|---|

Almost every predicate statute supporting application of the terrorism statute involves risk of serious injury to persons or property, substantial interference with

---

[3] Section 1010A of the Controlled Substances Import and Export Act (relating to narco-terrorism).

interstate travel and/or commerce, or providing substantial assistance to registered terrorist organizations. While the destruction of Government property arising under 18 U.S.C. Section 1361 may well overlap with these categories, it is not necessary that it do so in every case. For example, blowing up a building would easily involve substantial property damage and potential risk of injury to persons. But not every act damaging government property does so. There is a center of gravity in the overwhelming majority of predicate statutes supporting the enhancement that reflects catastrophic harm – murder, kidnapping, use of nuclear or biohazard weapons, interference with air travel. When these acts are done with the intent to influence or obstruct the operation of government, the activities reflect the gravitas necessary to support a claim of terrorism. At worst, the fence at issue here was destroyed as rioters surged toward the Capitol building intent on obstructing an official proceeding; the fence was knocked over and rendered incapable of being used gain. The destruction of the fence served no independent criminal purpose, it was a means to an end. One arguably might kill a public official or blow up an airliner to send a message; destroying a fence sends no message, it was an obstacle to be overcome in order to get to the Capitol building. The terrorism enhancement does not apply to obstruction of official proceedings; it should not apply to overcoming an incidental, and comparatively trivial, obstacle to accomplishing the obstruction.

2. **The Destruction of a Perimeter Fence is Different in Kind from the Other Conduct Warranting an Enhancement**

Destruction of a portion of perimeter fence at a public event is simply so different from the other sorts of activities contemplated by the predicate offenses that, although

6

the conduct might meet the statutory definition of 18 U.S.C. Section 1361, it is different in kind. As such, the terrorism enhancement is inappropriate.

The defendants were convicted of one count of 18 U.S.C. Section 1361, relating to destruction of a crowd-control fence outside the Capitol on January 6, 2021. The fencing at various locations served several purposes, marking off areas in which the public was not free to travel, and helping control crowd movements on Inauguration Day. The entire fence, used only periodically, had to be replaced at a cost of approximately $32,000, according to a representative of the Architect of the Capitol. Significantly, the PSR recommends restitution from Mssrs. Biggs and Rehl to the Government at $2,000 each. It is impossible to say just how many people contributed to damage to the fence.

### 3. The Courts' Application of This Enhancement Has Been Inconsistent, Yielding Potentially Unwarranted Sentencing Disparities

Application of the terrorism enhancement has been inconsistent in this District. In *United States v. Reffitt*, the Government sought the enhancement against a recruiter for The Three Percenters. The enhancement was rejected by Judge Dabney Friedrich, despite the fact that the defendant was armed while engaging in obstructing an official proceeding. Judge Friedrich sentenced Mr. Reffitt to 7.25 years, about half of what the Government sought. 1:21-cr-00032.

In *United States v. Judd*, Judge McFadden rejected the Government's request for a terrorism enhancement for a man who used an incendiary device in a crowded tunnel packed with police and protestors, noting that Mr. Judd as "in some ways there at the

behest of the president." 1:21-cr-00040. The Court imposed one-third of the sentence the Government sought in the *Judd* case.

After a defendant's vitriolic outburst directed at prosecutors and the Government, Judge Amit Mehta did apply the terrorism enhancement to Audrey Southard-Rumsey, a Florida music teacher. The judge singled out threatening language Ms. Southard-Rumsey directed at former House Speaker Nancy Pelosi; she was sentenced to six years, despite the enhancement. 1:21-cr-00387.

In *United States v. Rhodes* and *United States v. Meggs*, 1:22-cr-00015, involving two members of the Oath Keepers tried together and convicted of seditious conspiracy, Judge Mehta applied the terrorism enhancement, but then imposed sentences well below the Government's request. Significantly, the evidence in the Oath Keepers case reflects that members of the group had arranged to have firearms in close proximity to the Capitol on January 6, 2021, and were prepared both to transport the weapons into the City and to use the weapons in support of the opposition to the Government.

Mr. Rhodes was sentenced to 18 years after a defiant presentation in Court at sentencing; Mr. Meggs was sentenced to 14 years.

Thus, guns may, or may not, be a salient feature in applying the enhancement; speaking out may also be a factor, but seditious conspiracy is not a predicate offense justifying the enhancement. Even when applied, Courts have not sentenced in accordance with the enhancement's requirements. No clear and discernable pattern emerges from application of the enhancement. The danger of inconsistent application and unwarranted disparities is obvious.

It is clear that the Government seeks the enhancement with some regularity; what is unclear is why the Courts sometimes give it, and sometimes deny it, while never sentencing in accordance with its full force and vigor. The terrorism enhancement's use in this district suggests a jurisprudence mired in search of coherence.

Whether the federal penal code needs to be amended to create a statute capable of evenhanded and coherent application is a topic for another day and another branch of government. The defendants contend that given the treatment of defendants in related cases to date, application of the enhancement would result in further confusion. They request that the Court reject application of the enhancement.

**4. In the Event that the Court Believes the Conduct Warrants a Terrorism Enhancement, the Defendants Request A Non-Guidelines Sentence as the Conduct at Issue is Outside of the Heartland of What the Sentencing Commission Contemplated**

> "United States Sentencing Guidelines. Section 5K2.0 provides: "The sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.' " United States Sentencing Guidelines § 5K2.0 (*quoting* 18 U.S.C. § 3553(b)). The Supreme Court has explained that district courts may depart under section 5K2.0 on the basis of a particular factor not specifically mentioned in the Guidelines if, "considering the structure and theory of both relevant individual guidelines and the Guidelines taken as a whole … it is sufficient to take the case out of the Guideline's heartland." *Koon v. United States*, 518 U.S. 81, 96, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996) (internal citation and quotation marks omitted).

*United States v. Vizcaino*, 202 F.3d 345, 347, 2000 U.S. App. LEXIS 2018, *6, 340 U.S. App. D.C. 122.

The defendants were convicted in this case of interlocking conspiracies to use force against the authority of the United States Government and to obstruct an official

9

proceeding. They did so by means of participating in a riot at the Capitol on January 6, 2021. That riot was sometimes violent and sometimes resulted in destruction of property. They were convicted of a property-related offense.

The defendants contend that the minor nature of the property destruction in this case, when compared to the gravity of the predicate offenses rendering a defendant eligible for the terrorism enhancement, is "sufficient to take the case out of the Guideline's heartland." *Koon v. United States*, 518 U.S. 81, 96, 135 L. Ed. 2d 392, 116 S. Ct. 2035 (1996). The defendants did not destroy a fence in order to influence or threaten the government or government officials. They did so, on the evidence the jury credited, in order to gain access to an official proceeding. As noted earlier, obstruction of an official proceeding and seditious conspiracy are not predicate offenses. The destruction of the fence here was a means to an end; the end sought is not among the predicate offenses Guidelines drafters contemplated when creating the enhancement.

## II. The Government's Use of the Defendants' Criminal Histories Mischaracterizes the Defendants

The Government's selective use of criminal histories resulting in both defendants having been categorized as Criminal History I is extraordinary and unnecessary. The defendants suggest that the conduct at issue is overstated, irrelevant and should not, in fairness, be considered by the Court as it contemplates a sentence sufficient, but not greater than necessary, to serve the goals of just punishment.

## III. Conclusion

It is difficult to resist the conclusion that the Government seeks a terrorism enhancement in this case for its anchoring effect. The draft PSRs in this case sought sentences in the range of 10 to 14 years for the defendants. These are more than

sufficient sentences. Indeed, in the defendants' views, as argued in their sentencing memorandum, sentences far less than what the PSR recommends are appropriate. Designating the men as terrorists may have consequences inconsistent with the any rehabilitative goals the Burean of Prisons may offer by rendering them ineligible to participate in programs.

The Government's pursuit of a questionable terrorism enhancements more than doubles the Guidelines sentences. Are the defendants supposed now to pin their hopes on a mere PSR sentence, and be grateful to the Court for not imposing a sentence of 30 years, but, only, let's say, 15 years? That is still in excess of the PSR recommendations.

The Government's posture here is that of an unscrupulous merchant. It has a product worth, let's say $5 dollars. But cash-flow is poor, and it wants $10. If it marks up the price of the item on the shelf to $15 and then announces a sale – 1/3 off! – an unwitting consumer may think he's scored a bargain paying $10 for an item worth only $5. The defendants look to this Court to protect them from such a merchant.

The defendants ask this Court to reject the Government's exorbitant suggestions. Neither Mr. Biggs nor Mr. Rehl is a terrorist. It is ridiculous to suggest so. Respect for the law and just punishment will not be served by pretending otherwise.

                              DEFENDANTS BIGGS AND REHL

                  By  /s/ NORMAN A. PATTIS /s/
                        383 Orange Street
                        New Haven, CT 06524
                        203.393.3017 (phone)
                        203.393.9745 (fax)
                        npattis@pattislaw.com
                        ct13120

## **CERTIFICATION OF SERVICE**

The undersigned hereby certifies that, on the above-captioned date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

*/s/ Norm Pattis /s/*