18009

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .
                                   .   Case Number 21-cr-175
          Plaintiff,               .
                                   .
     vs.                           .
                                   .
ETHAN NORDEAN, JOSEPH R. BIGGS,    .
ZACHARY REHL, ENRIQUE TARRIO,      .   Washington, D.C.
DOMINIC J. PEZZOLA,                .   April 12, 2023
                                   .   1:50 p.m.
          Defendants.              .
- - - - - - - - - - - - - - - - - -

TRANSCRIPT OF JURY TRIAL - AFTERNOON SESSION
BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:       ERIK KENERSON, AUSA
                             JASON MCCULLOUGH, AUSA
                             United States Attorney's Office
                             601 D Street Northwest
                             Washington, D.C. 20579

                             CONOR MULROE, ESQ.
                             United States Department of Justice
                             1301 New York Avenue Northwest
                             Suite 700
                             Washington, D.C. 20005

                             NADIA MOORE, AUSA
                             United States Attorney's Office
                             271 Cadman Plaza East
                             Brooklyn, New York 11201

For Defendant Nordean:       NICHOLAS SMITH, ESQ.
                             David B. Smith, PLLC
                             1123 Broadway
                             Suite 909
                             New York, New York 10010

-- continued --

APPEARANCES (CONTINUED):

For Defendant Biggs:        JOHN HULL, IV, ESQ.
                            Hull McGuire PC
                            1420 N Street Northwest
                            Washington, D.C. 20005

                            NORMAN PATTIS, ESQ.
                            Pattis & Smith, LLC
                            383 Orange Street
                            First Floor
                            New Haven, Connecticut 06511

For Defendant Rehl:         CARMEN HERNANDEZ, ESQ.
                            7166 Mink Hollow Road
                            Highland, Maryland 20777

For Defendant Tarrio:       NAYIB HASSAN, ESQ.
                            Law Offices of Nayib Hassan, P.A.
                            6175 NW 153rd Street
                            Suite 209
                            Miami Lakes, Florida 33014

                            SABINO JAUREGUI, ESQ.
                            Jauregui Law, P.A.
                            1014 West 49th Street
                            Hialeah, Florida 33012

For Defendant Pezzola:      STEVEN METCALF, II, ESQ.
                            Metcalf & Metcalf, P.C.
                            99 Park Avenue
                            Sixth Floor
                            New York, New York 10016

Official Court Reporter:    SARA A. WICK, RPR, CRR
                            333 Constitution Avenue Northwest
                            Room 4704-B
                            Washington, D.C. 20001
                            202-354-3284

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

18011

<u>C O N T E N T S</u>

TESTIMONY

ZACHARY REHL           Direct Examination (Continued)... 18016
                       Direct Examination............... 18063

18012

P R O C E E D I N G S

(Call to order of the court.)

(Jury not present.)

COURTROOM DEPUTY:  We are back on the record in Criminal Matter 21-175, United States of America versus Ethan Nordean, et al.

MR. SMITH:  Your Honor, for the proceedings tomorrow when we deal with the jury-related issues, does Your Honor have a sense of what hours we would probably be meeting?

THE COURT:  When we will be dealing with the jury instructions, did you say?

MR. SMITH:  Yes.

THE COURT:  So here's my thinking:  I thought if we came in in the morning, let's say 9:30, we would have enough time probably to address everything we need to address and not be here on Friday.

Do I see -- is that the sense of all the parties?  I see a lot of the defense heads nodding.

MR. METCALF:  I have a sense that we would be able to do that by lunch tomorrow.

THE COURT:  From your mouth to God's ears, Mr. Metcalf.

MR. METCALF:  We may have to keep Ms. Hernandez from talking, but --

MS. HERNANDEZ:  I grew up in New York, too.  It

doesn't go one way.

MR. PATTIS:  You've managed to hurt both of her feelings, Mr. Metcalf.

THE COURT:  I've got to step in here and make peace. So my thought is, 9:30.  9:30, I think, is a good time to start.  Again, my thought is, we're close on the jury instructions, and we will do what we need to do with everyone's expectation that we can wrap everything up on Thursday, and then you will have Friday to prepare for whatever remaining testimony there is and instructions and closings.

All right.  So any reason we shouldn't bring in the jury and continue?  There is a reason?

MS. HERNANDEZ:  Your Honor, I had an issue I wanted to -- I filed a motion months ago with respect to the two gentlemen who came to D.C. with Mr. Rehl who have a pending civil -- misdemeanor matter.  They were charged in December 2021, and the case has just been sitting there.

I asked the Court for multiple relief, multiple different relief, including granting immunity, severance, blah, blah, blah.

At this point, I think we're past those requests, but I do want to introduce, either by stipulation or otherwise, that the men who entered the Capitol with Mr. Rehl, the three men that came from Philadelphia with him and Mr. Finley, all have been charged by misdemeanor.  Whether we do it as to the facts that

are alleged so that it's not a charging decision, rather, it's just a factual basis, I'd like to -- and I can introduce the sworn statements on the -- you know, there are sworn statements in the files.

THE COURT:  So, a couple of reactions, and I don't want to spend my more time on this right now at all, because you're dropping this in the middle of a situation where we've got the jury waiting.  I encourage you to discuss with the government what potential portion of what you're talking about they might concede to, at least before raising it here with me.

But we did litigate charging decisions in other cases.  So I don't know what the relevance of all of that would be.

Again, to the extent you indicate it could be by some sort of stipulation or something like that, or maybe there are facts that you might want, again, I think the first -- the first stop in the train station might be to talk with the government about it.

After that, again, depending on what you're asking for, it just doesn't sound -- the bulk of what you're asking for sounds like something I've already excluded from the trial and so would not entertain now.

MS. HERNANDEZ:  Right.  So the arguments were made before the government did an opening statement where they argued specifically that Mr. Rehl brought a fighting force to D.C. for January 6.  So it's to refute that argument that he brought a

fighting force.

THE COURT:  Right.  And you have --

MS. HERNANDEZ:  And that argument wasn't available at the time I filed the motions pretrial.

THE COURT:  That's true, but none of -- you have many ways of factually refuting what the government argued, of course in part by telling the jury, look, the government promised X, and in fact, you didn't get X.

But it has nothing to do with -- the facts of whether -- what those folks did and did not do and the fighting force and all the rest has nothing to do with what the defendant -- what the government charged them with.  Literally, there was a motion that I granted, probably over -- with no objection, excluding charging decisions.

MS. HERNANDEZ:  And I'm not challenging the charging decision aspect of it.

THE COURT:  All right.  Look, I just think if you have an idea that there's some other thing you want in, I'd just encourage to you talk to --

MS. HERNANDEZ:  And there's not enough video of those gentlemen to be able to say see, he's here, he's here, he's here, to be able to argue to the jury from the evidence.

THE COURT:  Now, that sounds more like a factual stipulation, that maybe there's something the government would agree to.  I don't know.  But that's a factual thing that maybe

they would agree to.

Ms. Harris, why don't you bring in the jury, and we will resume.

(Jury entered courtroom.)

THE COURT:  All right.  Everyone may be seated.

Ms. Hernandez, you may continue your direct examination.

MS. HERNANDEZ:  Thank you, Your Honor.

DIRECT EXAMINATION (Continued)

BY MS. HERNANDEZ:

Q.   Good afternoon, Mr. Rehl.

Good afternoon, ladies and gentlemen.

So -- I'm sorry.  Could we play Government Exhibit 400D.

THE COURT:  Counsel, I could not hear you.

MS. HERNANDEZ:  Sorry.  I was turned to Ms. Rehl -- or Ms. Rhode.  First name, last initial the same.

Ms. Rhode, Government Exhibit 400D, as in David.

BY MS. HERNANDEZ:

Q.   Mr. Rehl, you testified earlier that was not your voice mentioning storming the Capitol; correct?

A.   Yes.

Q.   So I want to play it again and see if there's any other information from that video that you can provide to the jury about whether that's your voice or not.

A.   Okay.

Q.   If we could play it, please.

(Video played.)

BY MS. HERNANDEZ:

Q.   So from your recollection of that day, is there any more information you can provide about whoever yelled that out?

A.   Yeah.  I mean, look, first of all, again, I have an iPhone, and everyone who has an iPhone knows the phones aren't cheap. They're not cheap for a reason.  The technology is designed to pick up the closest sounds to the phone.  And one thing I observed with this, for example, there's a guy right behind me screaming going (sound effect).

Q.   Hold on, please.  Is that guy you're talking about on the screen right now?

A.   He's not.  He's behind me on this.  Okay?  And at one point afterwards, you're going to hear him still screaming, and he's going to sound closer than the person who says "F that, storm the Capitol."

Q.   Can you play a little bit more, please.

(Video played.)

BY MS. HERNANDEZ:

Q.   Did you see the person that you're saying was closer -- the person you were describing was on the screen at that point?

A.   No, no, no, no.  He was behind me when I was facing that direction.  So he was behind me.  So, you heard him.  He's right behind me over here, and you can go hear him going (sound effect), but as you heard the "F that, storm the Capitol," the

guy behind me sounds closer than the guy who said "F that, storm the Capitol."

Q.    Hold on a second.  Is there any place in this video where you can see that gentleman you're talking about?

A.    Here now, no.

Q.    At any point in the video?

A.    Yes, when I spin around.

Q.    Okay.  So later in this video or --

A.    Earlier.

Q.    Can we start again, please.

(Video played.)

        BY MS. HERNANDEZ:

Q.    Did you see it at any time?  I'm waiting for you to tell me where to stop the video.

A.    Oh, I thought you were playing it to point out the guy.

Q.    I don't know who the guy is.  You need to point it out for me.

A.    I thought you were playing so you could listen for the shouting from the guy.

Q.    So, first, I would like you to point out this person you recall or believe was the person saying that.

A.    Okay.  I'm tracking now.

Q.    So when you see that point on the video, can you raise your hand or something?

A.    Okay.

Q.   Okay.  Can we start again.  Thank you.

(Video played.)

THE WITNESS:  Stop.

BY MS. HERNANDEZ:

Q.   Okay.  Who is the person?

A.   This guy screaming behind me --

Q.   Hold on.  So you're saying in the other video, this guy is standing behind you?

A.   He's standing behind me.  When I move forward, he's still behind me.  So he's shouting.  He continues shouting.  The iPhone is designed to pick up what's closest to you.  And it's picking up his voice better than it's picking up the person who said "F that, storm the Capitol," even though whoever said that was farther away than this man.

Q.   Okay.  Let's play it, please, from there.

(Video played.)

BY MS. HERNANDEZ:

Q.   So it's your testimony that's the guy who says those words?

A.   No, no.  I'm comparing the loudness of -- between the two statements, the statement and the guy screaming.

Q.   Okay.  So you don't know --

A.   It's my opinion that the man behind me was shouting, and you're picking that up, and that's louder than whoever said "F that, storm the Capitol" statement.

Q.   I see.  You're saying if that had been you saying it, that

would have been the louder voice?

A.    Yes.  For example, prior in the day, I shot a video of the motorcades driving by.  You heard my voice loud as clear.  I said, "It's fucking Trump," and you heard it, because it's right there.  Like I said, the iPhone is designed to pick up on things like that when you're that close to it.

Q.    Can we play 400A.

(Video played.)

        BY MS. HERNANDEZ:

Q.    So that's the voice you say it's you?

A.    Yes.

Q.    And you can hear it clearly?

A.    Yes.

Q.    Because it's the phone right next to your face?

A.    Because the iPhone is designed to pick up who is closest to it.

Q.    I'm sorry, Ms. Rhode.  Thank you for your assistance.  Can we go back to 400D.  And can you lower the volume.

(Video played.)

        BY MS. HERNANDEZ:

Q.    Thank you.  So you earlier testified about what you actually saw versus what was being taped from your phone; correct?

A.    Yes, to that extent.

Q.    Sorry?

A.    Yes.

Q.    And that's two different things is what you're saying?

A.    What's that?

Q.    When you're capturing a video from your phone, your phone is above your head or gets a different viewpoint than what your eyes see?

A.    Right, absolutely.  Because like I said, I'm reaching over. The phone has the ability to look over the shoulders of multiple rows of people at once.

Q.    Okay.  You need to speak more slowly and into the microphone.

A.    The phone has the ability to look over, you know, when you're reaching it over your head, to look over multiple rows of people.

Q.    Okay.  And what I'm -- what I would like to clarify is at this point in time, when this is happening, when that gentleman, particularly the guy with the black hat and the -- Mr. Johnson, is knocking over the fence, you personally and the Proud Boys had no intent, or did you, to attack the U.S. Capitol?

        MR. KENERSON:  Objection; compound as to him and the Proud Boys.

        BY MS. HERNANDEZ:

Q.    Okay.  You personally at this point, you personally had no --

        MR. KENERSON:  Objection; leading.

BY MS. HERNANDEZ:

Q.    -- intent, if any, to attack the Capitol?

        THE COURT:  Sustained as to leading.

        BY MS. HERNANDEZ:

Q.    Did you or did you not have an intent at this point in time to attack the U.S. Capitol?

        MR. KENERSON:  Same objection.

        THE COURT:  I will overrule the objection there.

        THE WITNESS:  We had no intent at anything at all, especially at this point.

        MR. KENERSON:  Object.  Move to strike; nonresponsive, "we."

        THE COURT:  I understand the objection, and I will strike the answer.

    Ms. Hernandez, you can ask the question again.

        BY MS. HERNANDEZ:

Q.    So I'm asking you, the question is, what your intent was.

A.    Okay.

Q.    So don't answer "we."  Answer yourself.

    So what, if any, intent did you have at this point when this is happening to attack the U.S. Capitol itself?

A.    Absolutely not, never did cross my mind ever to attack the Capitol.

Q.    So -- and at this point in this video that we've seen which is about a minute long, had Mr. Nordean said anything to you

about attacking the Capitol?

A.    No.

Q.    Mr. Biggs, had he --

A.    No.

Q.    -- said anything about -- no, okay.

And I won't ask you about Mr. Pezzola, because you have testified you had no conversations with him that day.

A.    That's correct.

Q.    So when you described the scene earlier, I understood you to say that you thought this was just normal rowdy crowd stuff?

A.    No.  So, I had a bunch of different thoughts going on at once because I thought you were asking me something else related to the guy with the black megaphone.  What I was describing here is that -- when we collided with this crowd, it was a rowdy crowd.  All right?  And my understanding was that somewhere, somewhere around this area, there's supposed to be stages set up.  That's what I was understanding before I came there that day.

I've been to multiple Trump rallies before.  Everyone knows that -- maybe not everyone.  But a lot of people know that Trump attracts large crowds of people to his rallies and events and speeches and everything.  Some people wait hours.  They'll camp out to wait in line for his events.

So the fact that this event was kind of -- this scenario was off the cuff a little bit.  No one really expected Trump to

go over to the Capitol at all.  It was random.  It was unexpected.

So to see -- like I said, I'm not trying to downplay anything that happened at the Capitol that day.  I'm talking about this scene right here, what was crossing my mind at the time was, there's a huge crowd of people who want to go rush the area and try and find these stages, so that that way, they can be in the front and see the president speak, because that's what people do.  They want to be in the front.  It's like that in protests.  It's like that in concerts.

Not everybody.  Some people don't like to be in the front. But a lot of people do.  And like I said, people wait hours and sometimes overnight to see Donald Trump speak and get in the front.

So the fact that people were trying to push these barriers and get up to that area, it didn't really phase me at the time, and it didn't.

Q.   Okay.  Thank you.

Could you pull up Government Exhibit 602-52.

So, before lunch, you were also explaining a particular message, and we will get back to that in a minute.  And you described -- the message said something about being "proud of what we accomplished today."

A.   Yes.

Q.   And you explained that what you were proud of was a lot of

Americans protesting with flags?

A.    Yes, that's correct.

Q.    Is this or is this not what you were talking about?

A.    This is exactly what I'm talking about.  I took multiple pictures of the crowd all throughout the day.  I took multiple pictures of the crowd aligned with the Washington Monument, because all throughout history in the United States, when people go protest at the Capitol, usually you see the Washington Monument, and you see huge crowds of people all along the Washington Mall.  That's what I seen there that day.

That's what I thought was historic.  And that's what I thought patriotism looked like.

Q.    And on this video down here -- and this is at -- I'm sorry.  Can you go up so we can see the date?

This is on January 6 at 6:18 p.m.  Can we go down again, please.  And the last sentence, at 6:20:58, which is in connection with this photograph, what does it say?

A.    It says, "This is what patriotism looks like.  Today was indeed a historical day for sure.  I will never forget this day for as long as I live.  Keep up the fight, America.  When government fears its people, you have freedom.  When people fear government, you have tyranny."

Q.    So that last sentence, do you know where it comes from?

A.    Yes.  It comes from Thomas Jefferson, and it's a metaphorical -- and my understanding it's been used

metaphorically ever since.

Q.   And when you say "metaphorically ever since," what is your understanding of what it means?

A.   Well, you can vote people out of office, and if they feel like their job is on the line because you tell them that they're doing a terrible job, you can vote them out of office.  That's what they fear.  They receive a paycheck.  That's their livelihood.

Q.   So did you -- did that last sentence, at least at the time you wrote it on June -- I'm sorry, on January 6, did you intend -- that statement about "when government fears its people," what was your intent in writing that phrase, "when government fears its people"?

A.   Protesting specifically.

Q.   Did it have anything to do with beating up cops or destroying property?

A.   None of that is protesting activity, and I don't agree with any of it.

Q.   Okay.  So today as you sit there two and a half years later, you have seen a lot more information about what happened on January 6; is that correct?

A.   Absolutely.  In the days after that, everyone started seeing more and more.

Q.   And when I say "more information," have you reviewed a lot of videos?

A.    Since then?  Yes, I have.

Q.    And statements by other people?

A.    Yeah, you could say that.

Q.    And statements from Donald Trump?

A.    Oh, yes, absolutely.

Q.    And other politicians?

A.    Correct, yes.

Q.    So today, as you sit here, what's your opinion of what happened on January 6?

A.    I think what ultimately unfolded, all the violence, was a disgrace.  I do.  And I think that ultimately, it's not the sort of reason -- it didn't do any good.  It didn't do Trump good that day.  It disrupted the legal process.  And like I said, anybody who assaulted cops, they're charged with that, rightfully so.

      At the time when I was down there, it looked like a big giant protest.  I'd seen little scuffles here and there, nothing out of the ordinary from protests, that I've seen at many, many protests.  Things happen at protests sometimes.

      But at the end of the day, like I said, I thought it was a protest.  That's what I went there for.  When I left, that's what it was.

Q.    So we also spoke earlier today -- Ms. Rhode, can you pull up Government 503-10.

      Earlier today, we spoke a little bit about the function of

the MoSD.  And this particular message comes from the Ministry of Self-Defense, in other words, the MoSD, main chat group?

A.    Correct.

Q.    Can we go down, please.  Thank you.

This person -- go to 1:06.  This BrotherHunter Jake Phillips, do you know him?

A.    I don't.  I don't think I ever met him.

Q.    And he's talking about seeking-and-destroying type missions.

Do you see that?

A.    I do.

Q.    Can you go down, please, to 1:12:18 a.m.

And you step in at -- so he posted that at 1:06 a.m. on December 28th, and you at 1:12:18, what do you say at 1:12:18?

A.    "Events will definitely be much more uniform/organized in the future, especially national events.  We don't want D.C. situations happening again.  We're putting a lot of time into getting this right.  One of those steps is this chapter right here" -- or "chapter here."  Sorry.

Q.    Can you tell the ladies and gentlemen of the jury, are you responding to the statement from BrotherHunter Jake Phillips about seek and destroy, or are you responding to something else?

A.    I remember this, so I can say, even though the replies have been removed on this, I did respond to this guy, and what I'm doing --

Q.    Hold on.  When you say "events will be much more uniform/organized in the future, especially national events," what does that mean?

A.    It means exactly that.  I mean, we're trying to organize and have like a national way of doing things.  That way, we can, again, protect our members and reduce violence, so it's not just chaos all the time.

Q.    So the next phrase, "we don't want D.C. situations happening again," what were you intending to say in that phrase?

A.    We don't want our guys getting stabbed.  We don't want any guys put in harm's way.  We don't want any guys getting in any trouble.

Q.    So the next phrase, "we're putting a lot of time into getting this right" and "one of those steps is this chapter here," what did you mean by that?

A.    It means we spent a lot of time talking about ways we can reduce any chances of us getting stabbed.  I think we brought up stab-proof vests, some of the guys brought up different ways we can march and how we can be out in the open a little bit more so we don't -- things of that nature.

Q.    And the chapter that you're talking about is -- what chapter are you talking about?

A.    The MoSD.

Q.    You talked about more uniform and organized.  Is that a part of the -- is it or is it not a part of the ten-man teams,

the vetted teams that you were bringing in?

A.   Going off that, we didn't want people to show up at an event in Texas and show up at an event in Philly and it be just completely different.  We wanted guys who went to these kind of events often to be uniform with it.  We wanted it to be the same going everywhere, same safety protocols in place, things of that nature.

Q.   Is it or is it not -- let me just ask you a follow-up question.

Are you -- we saw videos of Bertino on December 12 being very aggressive; is that correct?

A.   Yes.

Q.   Are there Proud Boys that tend to behave in that fashion?

A.   There's -- it happens.  I don't support it.  It seems like he's the aggressor, and that's exactly the type of behavior we were trying to prevent.  Ironically, I know he was in a leaders chat and everything, but that's the kind of behavior we wanted to rein in.

Q.   Okay.  There were chats or statements you made in some chats about how "we should have held the Capitol" or "we didn't do enough."

Do you recall those?

A.   Yeah, I do.

Q.   Can you explain those?

A.   Okay.  So I left the Capitol around 3:30 and went out and

just got drunk with my friends and everything.  The proceedings were suspended at some point.  So during the legal process, there's a lot of senators and House of Representatives members who said they were going to object to the electors and everything.  And after the riot happened, portion, when I woke up the next day, it came out that a lot of these senators turned their back on Trump, and they revoked their intended objections. And at that point, they blamed what happened at the Capitol for why they did it.

Yeah, I was hung over.  My anxiety was high.  I didn't eat yet.  I'm stressed.  I went to the chats, and I vented a little bit.  I said a bunch of shoulda, coulda, woulda crap, and that's all it was, shoulda, coulda, woulda.

At about 2:30, when I got done eating, I chilled out.  I relaxed.  And that's when I said to everybody about how look, we got to prepare for a Biden presidency, because this is what's happening.

Q.   So you referred to it as a lot of crap.  How would you describe statements you made at different times on these chat groups that sound pretty aggressive?

A.   Like I said, I woke up around 10:00.  I think I put something on Parler, went back to sleep, woke up again at 11:00 and just kind of hopped in a few of the chats where I knew people that I know.  And some people were like oh, hey, yeah, the senators are pulling their objections back, and they're

saying F Trump and everything.  And I said like, man, we should have held the Capitol.  And what I meant is essentially stayed there, and I meant -- and when I mean that, "stay there," is the fact that Democrats, when they show up somewhere, they -- I definitely respect Democrats for this, because when they show up to a protest, they will pitch a tent and stay.  They will stay in a park and let their voice be heard basically.

And when that crowd was down there at the Capitol, those senators, they were still objecting.  They were still planning on objecting.  And when people started leaving, that's when they started turning on Trump.

So the way it looked -- go ahead.

Q.   So you think it was when they started leaving and not when the violence occurred that they started turning on Trump?  Is that what you're saying?

A.   What's that?

Q.   So you say when people started leaving, that's when the senators turned on Trump.  What I'm asking you is, is that your assessment today, that the reason they turned on Trump is because people started leaving, or was it because of the violence and destruction of property?

MR. KENERSON:  Objection; relevance as to his assessment today as to why people turned.

THE COURT:  Overruled.

THE WITNESS:  I'm sorry.  I don't understand the

question.

BY MS. HERNANDEZ:

Q.   So what is your assessment today of how what happened at the Capitol on January 6, the violence and destruction of property, how that affected the votes of the congressmen?

A.   Like I said, that did have an effect on what they did. They were mad about it, and they blamed Trump for it.  And I mean, I guess you could say rightfully so.  The people who committed violence, like I said earlier, they undermined the legal process that Trump was trying to put in place.

Q.   Again, on January 6, you did not commit any violence; correct?

MR. KENERSON:  Objection; asked and answered.

THE WITNESS:  Sustained.

MS. HERNANDEZ:  Would you please play Government Exhibit 602-1.

BY MS. HERNANDEZ:

Q.   Do you recall posting this on November 6?

A.   Yeah.

(Video played.)

BY MS. HERNANDEZ:

Q.   That was the kind of thing you were posting and consuming in November, around the time of the election?

A.   Yes.

Q.   Can we have the following 602s, please, 602-2.

COURTROOM DEPUTY:  602-2 has not been ID'ed.

MS. HERNANDEZ:  Okay, 602-3?

BY MS. HERNANDEZ:

Q.   Is this another one of your posts in November, around the election?

A.   Yes.

Q.   What is your comment at the bottom?

A.   "Yep, sure is.  Can't wait for the lawsuits.  Stop the steal.  Preserve the vote.  Trump 2020."

Q.   So the lawsuits were the lawsuits that you understood were being filed on behalf of Donald Trump?

A.   That is correct, yes.

Q.   Can we play 602-17, please, the beginning of it.

(Video played.)

BY MS. HERNANDEZ:

Q.   You posted this -- did you create this video?

A.   I did not create this video, no.

Q.   When did you post this?  Do you remember?

A.   Some time in November.

Q.   And what was your understanding of what had happened that day?

A.   My understanding of what happened here was this woman took this flag off -- the American flag off somebody and swiped a knife at somebody's face and apparently cut the bridge of their nose.  And then somebody came over and knocked her out, yeah,

basically.  Proud Boys in particular were pretty uptight about knives at the time.  So --

Q.    Were you present when this happened?

A.    No, I was not.

Q.    Your view of the lady who had stolen the flag and swiped it, do you know who she had swiped at?

A.    No, I don't know who she swiped it at.  I wasn't here.  I was in St. Louis when this happened.

Q.    I'm sorry.  You were where?

A.    I was in St. Louis when this happened.  Any recollection of my experience on this would be secondhand.

Q.    Is what you are saying that you can't remember, not that it's secondhand?

A.    Right.

Q.    So your understanding was that this lady had a knife in her hand?

A.    She did, and she swiped it.

Q.    And these gentlemen came -- some of these men came around and knocked her out; is that correct?

A.    Right.

Q.    Was it your intent to promote violence or no?

A.    No.  It was actually showing it.  The only reason why she was knocked out was because she had a knife, and somebody stopped the threat.  She was attempting to use it.

Q.    Can you put up 602 -- we'll just leave it at that.

Again, you personally have never used violence at any rally; is that correct?

MR. KENERSON:  Objection; asked and answered.

THE COURT:  Overruled.

THE WITNESS:  No.

MS. HERNANDEZ:  I'm sorry, Your Honor.  With the Court's indulgence.

Your Honor, could we have a sidebar.

(Bench conference.)

MS. HERNANDEZ:  Your Honor, if the Court is going to allow the government to play the excluded video, I want to get into doxxing and Mr. Rehl having a brick thrown through his window and being fired.  If not, I will stay away from that.  I would like to do that before I rest.

THE COURT:  Ms. Hernandez, I'm not going to preview what my rulings will be on what they can do on cross, number 1.

Number 2, I've got to say, having reviewed some of this over the lunch, it is -- I was stunned insofar as the -- well, the doxxing, is this the incident that was two years before this or some other incident?

MS. HERNANDEZ:  It's the incident that somebody threw a brick through his front door and almost killed his wife, yes, that incident.  And he was also fired from his job as a result of the doxxing.

THE COURT:  I don't see what the delta is between --

when you're done, I'm going to hear from the government on the issue of the other video.  I've got to say the videos are quite similar --

MS. HERNANDEZ:  You mean the video with the music in the background?

THE COURT:  My point is this.  I'm not trying to suggest that I'm going to admit it.  What I am trying to say is it's hard for me to understand how one video means that you have to do this doxxing stuff and the other video means you don't.

In other words, if you want to use the doxxing stuff as to why he circulated that video, then fine.  I don't see how the door --

MS. HERNANDEZ:  So the Court found the original video unduly prejudicial.  So that's why -- the Court found it unduly prejudicial.  I agreed that it was unduly prejudicial.  So if that's going to come in, I want to -- I will wait until redirect and see if the Court admits it.

THE COURT:  My point is just this:  Either video -- both videos show an antipathy toward Antifa, or however you want to put it, quite obviously, and if you want to blunt the video already talked about, that's already in evidence, okay, but I guess I don't see --

MS. HERNANDEZ:  I'd point to the Court's own ruling.  Pretrial, it found one to be unduly prejudicial and the other one not to be.

THE COURT:  No question.  And I stand by that ruling.
My point, I guess, is just that I don't see --

MS. HERNANDEZ:  That's the only reason.  One is unduly
prejudicial.  But I will wait until redirect if it comes in,
Your Honor.

(End of bench conference.)

MS. HERNANDEZ:  If we could play Government
Exhibit 115.

(Video played.)

BY MS. HERNANDEZ:

Q.   Mr. Rehl, this is a video from inside the Capitol.  And can
you tell the ladies and gentlemen of the jury what time this is?

A.   2:53:24.

Q.   Do you see yourself in this video?

A.   Yes.

Q.   Can you circle it, please.

A.   (Complied.)

Q.   Okay.  Thank you.

(Video played.)

BY MS. HERNANDEZ:

Q.   There are police officers down here; is that correct?

A.   Yes, that's what it looks like.

Q.   Did any of these officers ask you to not come into the
building?

A.   No, none of them did.

(Video played.)

BY MS. HERNANDEZ:

Q.   Do you recognize anybody else entering the door at that moment?

A.   Yes, I do.

Q.   Can you circle it and tell us who?

A.   It looks like --

Q.   Hold on.  Who is that?

A.   -- Freedom.

Q.   Freedom Vy?  That's the gentleman from your -- the Philadelphia chapter?

A.   Yes.

Q.   Okay.

A.   Isaiah Giddings.

Q.   Okay.  Both of them are wearing red hats?

A.   Isaiah is wearing a camo hat.

Q.   I'm sorry.  Isaiah is wearing -- can you point to Isaiah again?

A.   (Complied.)

Q.   Okay.  Thank you.  Keep on going, please.

A.   That's Finley, and that is Brian, and that is -- sorry, one, two, three, Finley, Freedom, and Brian.

Q.   Okay.  Thank you.  Keep on going.

(Video playing.)

BY MS. HERNANDEZ:

Q.   And other than those people you've pointed to, do you know whether any of these -- was Mr. Biggs in this group?

A.   No.

Q.   Mr. Nordean?

A.   No.

Q.   Mr. Tarrio?

A.   No.

Q.   Mr. Pezzola?

A.   No.

Q.   Do you know any of these other people?

A.   No, I do not.

Q.   Mr. Donohoe was not in that group either?

A.   I don't see him.

Q.   So at this point, your understanding was that Vice President Mike Pence was not in the building?  Is that what you testified to?

A.   Correct.  I had received a text message probably ten minutes prior from a friend of mine saying that he was evacuated.

Q.   Okay.  And as far as you knew, no Congresspersons were in the Capitol at that time?

A.   Correct.  I was -- yeah.

Q.   And what did that mean to you?

A.   Well, it meant to me at the time -- I didn't know exactly why it stopped.  Obviously, going in there, you could see a

18041

little bit, if you put two and two together, had something to do with it.  But when I went in, people were getting let in at the time, and that's ultimately why I decided to go in.

Q.  And do you know how long total time you were inside the Capitol?

A.  I think exactly 20 minutes.

Q.  Do you know what is happening at that point, from your recollection, what's being chanted or not?

A.  People were chanting all kinds of different things.  I mean, it's hard to tell what they're doing here exactly.  But inside, outside, people were just chanting things all day.

Q.  Were you leading any of these chants?

A.  No, I didn't lead any of these chants.

Q.  I ask the government to play Government Exhibit 116X.

(Video played.)

        BY MS. HERNANDEZ:

Q.  So when you see yourself -- I think that's the little circle following you.

    Can you back it up and start again, Ms. Rhode, please.

    (Video played.)

        BY MS. HERNANDEZ:

Q.  Mr. Rehl, do you know what you're doing there?

A.  Yes.  I'm looking for a bathroom.

Q.  Is that why you were jiggling that door?

A.  Yeah, I wasn't sure if there was a bathroom.  I was trying

to find a bathroom.

Q.    Go ahead, please.

(Video playing.)

BY MS. HERNANDEZ:

Q.    Did you eventually find a bathroom?

A.    I did.  I walked up to a hallway shortly after this, and there was one at the end of the hallway.

Q.    Thank you.  So after you left the Capitol -- after you left the U.S. Capitol building, what did you do?

A.    So I left about -- let me see.  One of the first things I tried to do was, we went -- I think we left around 3:30, and I think I headed down -- down to the closest street, tried catching an Uber, unsuccessful.  So ultimately, I ended up walking all the way back to the hotel.

Q.    And where was the hotel located, if you know?

A.    It was The Darcy.  I don't know exactly how far that is from the Capitol, but I know we got lost on our way there, and it took us a while to get back.

Q.    So when you're saying "we," are you talking about Mr. Giddings, Mr. Healion, and Mr. Freedom?

A.    Yes.

Q.    I'm sorry.  It's Mr. Vy.  Freedom is his first name.

A.    Correct.

Q.    And from that walk back -- after you left the Capitol, again, did you attack any police officers at any time?

A.    No.

Q.    Did you destroy any property at any time?

A.    No.

Q.    Let me ask you a few more questions.  Did you on January 6 oppose by -- use any force to oppose the authority of the government of the United States?

MR. KENERSON:  Objection; legal conclusion.

THE COURT:  Sustained.

MS. HERNANDEZ:  Your Honor, those are the --

BY MS. HERNANDEZ:

Q.    Did you use any force on January 6?

A.    No, I did not.

Q.    Did you conspire or agree with any of these gentlemen to use any force on January 6?

A.    No.

Q.    And when I say "any of these gentlemen," I'm talking about Mr. Biggs?

A.    I understand.

Q.    Mr. Pezzola?

A.    No.

Q.    Mr. Nordean?

A.    No.

Q.    Mr. Tarrio?

A.    No.

Q.    Mr. Donohoe?

A.    No.

Q.    Mr. Bertino?

A.    No.

Q.    Your intent on January 6 in being present at the Capitol was what?

A.    My intent?  Was just to participate in a protest and let my voice be heard.

Q.    On January 6, did you act corruptly?

MR. KENERSON:  Objection; legal conclusion.

THE COURT:  Sustained.

MS. HERNANDEZ:  I'm sorry, Your Honor.  Could we be heard?

(Bench conference.)

MS. HERNANDEZ:  I think he's entitled to deny the elements of the offense.  He's been charged with these things. I'm just reading from the indictment.  I think he's on the witness stand to defend himself.  He's entitled, as I understand the law, to say "I didn't do these things."

I don't know how else --

THE COURT:  You can ask him questions that get at the meaning of "corruptly."

MS. HERNANDEZ:  I don't know what the meaning is at this point, Your Honor.

THE COURT:  So I think it is a legal conclusion about whether he acted corruptly.  If you want to ask him facts that

might either suggest he acted corruptly or did not act corruptly, you may do that.

MS. HERNANDEZ:  Again, I don't know exactly what facts to ask him that get to that point at this point in time.  It may be after tomorrow or the day after, the Court will --

THE COURT:  No, we all know the general definition, and then the question of whether there's another aspect to the definition.  There are questions you could ask related to all of that if you would like, factual questions.

So that's the difference.  So I'm going to sustain the objection.

(End of bench conference.)

BY MS. HERNANDEZ:

Q.   On January 6, did you stand to gain any benefit personally?

A.   Personally?  No, no.

Q.   Did anybody pay you money to be there -- let me strike that.

Did anybody offer you a bribe to be present that day?

A.   Bribe?  No.

Q.   Did you -- did President Trump offer you a bribe to do whatever it was you did on January 6?

A.   I didn't do anything but walk around all day.  He didn't have any part in that either.

Q.   I'm sorry.  You have to repeat that.

A.   He didn't have any part in that either.  I don't know

Donald Trump.  I don't know anybody in his immediate administration.

Q.   So you weren't paid any money by Mr. Trump or anybody else in his campaign; is that what you're saying?

A.   That's what I'm saying, that's right.

Q.   So your conduct had nothing to do with any bribe or payment made to you by Mr. Trump?

A.   That's correct.

Q.   And did you agree with Mr. Biggs to accept any bribes on behalf of Mr. Trump?

A.   Did I -- no, I did not.

Q.   Did you agree with Mr. Nordean to accept any bribes or anything -- any bribes from Mr. Trump?

A.   No.

Q.   Did you agree with Mr. Tarrio to receive any bribes on behalf of Mr. Trump?

A.   No.

Q.   On January 6, did you intend to influence -- to obstruct the proceedings that day?

A.   None whatsoever.

Q.   Did you intend to impede the proceedings from going forward?

A.   No.

Q.   Did you intend to influence the proceedings?

A.   Influence, no.

Q.    You didn't intend to influence the proceedings?

A.    It depends what you're asking me.  Yeah, we hoped that the legal process would play out in favor of Trump.

Q.    Okay.

A.    But it needed to play out, and that's the thing.  It needed to play out.

Q.    So were you there -- I thought you said you were there to make your voices heard.

A.    Correct.

Q.    Okay.  Did you, again, gain any benefit, financial benefit by your presence at the Capitol on January 6?

            MR. KENERSON:  Objection; asked and answered.

            MS. HERNANDEZ:  We're in Count 3, Your Honor.

            THE COURT:  It's the same question, though, isn't it?  I'll overrule the objection.

      You may answer the question, sir.

            THE WITNESS:  Are you asking me if I gained any financial benefit for being there?

            BY MS. HERNANDEZ:

Q.    Yes.

A.    I mean -- no.  I mean -- specifically, no; specifically, no.

Q.    Okay.  And did you intend to obstruct an official proceeding that day?

A.    I specifically did not go anywhere in that building until,

like, I knew that they were out and gone.

Q.    So your understanding was that once Pence left and you believed that the senators and congressmen were out, the proceeding was over?

A.    That's what I view it as.  Because the Capitol building is a public building, the police were letting people in, I thought it was fair game to go in.

Q.    Okay.  Did you -- and did you agree -- I can ask you person by person.  Did you agree with Mr. Biggs to obstruct, influence, or impede any official proceeding that day?

A.    No.

Q.    With Mr. Nordean?

A.    No.

Q.    With Mr. Pezzola?

A.    No.

Q.    With Mr. Tarrio?

A.    No.

Q.    Did you enter into an agreement or conspiracy to use force on January 6?

A.    No, I did not.

Q.    To intimidate and threaten any person on January 6?

A.    No.

Q.    Did you enter into an agreement with anybody to prevent by force any member of the U.S. Congress from discharging his duties -- his or her duties?

A.    No.

Q.    Did you enter into an agreement with anyone to prevent by force any law enforcement officer from discharging his or her duties on January 6?

A.    No.

Q.    Did you enter into an agreement to intimidate and threaten any person on January 6?

A.    No, I did not.

Q.    Did you enter into any agreement to intimidate and threaten any member of Congress on January 6?

A.    No.

Q.    Did you enter into any agreement to use force to prevent any member of Congress from discharging his or her duties on January 6?

MR. KENERSON:  Asked and answered.

MS. HERNANDEZ:  I'm going through the elements, Your Honor.

THE COURT:  It's been asked and answered, so sustained.

BY MS. HERNANDEZ:

Q.    Did you enter into any agreement to prevent by force any member of Congress from leaving the place where their duties were to be carried out?

A.    No.

Q.    Did you enter into an agreement to -- by intimidation and

threats to -- to leave the place where their duties as officers was required to be performed?

A.    No.

Q.    Did you enter into any agreement to -- by intimidation and threats to prevent any law enforcement officer to leave the place where their duties were required to be performed?

A.    No.

Q.    Did you attempt to obstruct any law enforcement officer on January 6 from carrying out their official duties?

A.    No, I did not.

Q.    Did you attempt to impede any law enforcement officer from carrying out his or her official duties on January 6?

A.    No.

Q.    Did you commit or attempt to commit any act to interfere with any law enforcement officer in carrying out the performance of their official duties on January 6?

A.    No.

Q.    On January 6, did you injure any property of the United States?

A.    No, I did not.

Q.    Did you depredate -- I think that's a fancy word for destroy -- any property of the United States?

A.    No.

Q.    Did you do -- did you willfully seek to injure any property of the United States?

A.    No, I did not.

Q.    Did you willfully seek to commit depredation against any property of the United States?

A.    No.

Q.    In particular, did you seek to injure a black metal fence on January 6?

A.    No.

Q.    Did you attempt to cause any damage in any amount to a fence -- did you willfully seek to damage a black metal fence in an amount greater than $1,000 on January 6?

MR. KENERSON:  Objection; foundation to any value. Also, asked and answered for the other part.

THE COURT:  Overruled.

THE WITNESS:  No.

BY MS. HERNANDEZ:

Q.    On January 6, did you willfully injure any depredation of a window?

A.    No.

Q.    In particular, a window adjacent to the Senate Wing Door on January 6?

A.    No, I did not.

Q.    Did you willfully injure any window, causing damage in the amount of more than $1,000?

A.    No.

Q.    Did you willfully commit any depredation against any window

at the U.S. Capitol?

A. No.

Q. Did you willfully commit any depredation, causing damage to any window at the U.S. Capitol?

A. No.

Q. On January 6, with the intent to commit a felony -- I'm sorry.

On January 6, did you throw a water bottle at any law enforcement officer?

A. None, no.

Q. Did you do -- did you assist anyone in throwing a water bottle at a law enforcement officer?

A. No.

Q. Did you aid and abet anyone in throwing a water bottle --

MR. KENERSON: Objection; legal conclusion.

THE COURT: Sustained.

BY MS. HERNANDEZ:

Q. Did you aid anyone in throwing a water bottle at a law enforcement officer?

A. No.

Q. Did you abet anyone in throwing a water bottle at a law enforcement officer?

A. No, I did not.

Q. Did you enter any agreement to throw a water bottle at a law enforcement officer?

A.    No.

Q.    Going back to all these questions about the water bottle, did you do anything in connection to the throwing of a water bottle at law enforcement with the intent to commit a felony?

A.    No.

Q.    Did you, with the intent to commit a felony, use force to assault any law enforcement officer or employee of the U.S. Capitol?

A.    No.

Q.    Or any officer or employee of the U.S. Capitol?

A.    No.

Q.    With force, did you assist any officer or employee of the U.S. Capitol or any other branch of the government on January 6?

A.    No, I did not.

Q.    Did you forcibly oppose any officer or employee of the United States and any branch of the U.S. government on January 6?

A.    No.

Q.    Did you impede any officer or employee of the United States government or any branch of the U.S. government on January 6?

A.    No.

Q.    Did you oppose by force any officer or employee of the United States or any branch of the United States government on January 6?

A.    No.

Q.   Did you, again, forcibly or by force intimidate any officer or and employee of the United States and any branch of the United States government?

A.   No.

Q.   Did you interfere with any officer or employee of the United States and any branch of the United States government on January 6?

A.   No.

Q.   And all those acts, did you do any of those with the intent to commit a felony, that is, obstruction of an official proceeding?

A.   Absolutely not.

Q.   On January 6, with the intent to commit a felony, that is, obstruction of an official proceeding, did you forcibly assault any officer or employee of the United States or any branch of the United States government?

A.   No.

MR. KENERSON:  Asked and answered.

MS. HERNANDEZ:  We're in a different --

(Bench conference.)

THE COURT:  Ms. Hernandez, if it's the same question, I don't care that it pertains to a different count.  You've asked it, he's answered it.  That's why I've sustained the objection.  This is -- it doesn't matter --

MS. HERNANDEZ:  I think he's entitled on the stand to

deny every charge against him.  I don't know how else to do it. A lot of them appear to be duplicative.  It is the charges against him, and the government is going to stand there and ask the jury to find him guilty of each and every one of these -- he's entitled to tell the jury he didn't do them.

THE COURT:  You're entitled to ask him factual questions about what he did and did not do.  And I'm -- I've sustained a few objections to these when they've veered into legal conclusions, but I am going to sustain.  It doesn't matter that it's Count 2 and Count 5 and it's the same question.  If he's asked the question factually and you ask him the same question again, it is no defense to the objection "asked and answered" if it has to do with a different count.

MS. HERNANDEZ:  Again, I believe the government is -- using the same terminology, is going to ask the defendants to ask the jury to find him guilty of each of these things.  I don't know how else for him to deny his culpability except by going through each of them.

THE COURT:  It's amazing that I agree with you, although I have never -- let's just put it this way:  I'm going to sustain an objection to asked and answered if the exact same question was asked and it was answered.

MS. HERNANDEZ:  So I -- I assert a Sixth Amendment right to do this.

THE COURT:  To ask multiple questions on the same

question again?

MS. HERNANDEZ:  On each count.

THE COURT:  Well, that's fine.  You can assert that, but I'm going to sustain that objection.

MS. HERNANDEZ:  Thank you.

(End of bench conference.)

BY MS. HERNANDEZ:

Q.   On January 6, did you make physical contact with any officer or employee of the United States and of any branch of the United States government?

A.   No, I did not.

Q.   Did you make physical contact with any officer/employee while such person was engaged in and on account of the performance of official duties?

A.   No.

Q.   Did you make physical contact with any officer/employee with the intent to obstruct an official proceeding?

A.   No.

Q.   As to each of these that I've asked you, did you take any action to conspire with anyone to do any of those things?

A.   No.

Q.   Did you take any action to aid any person to commit any of those charges?

A.   No.

Q.   Did you abet any person to do any of those things?

A.    No.

MS. HERNANDEZ:  With the Court's indulgence.

BY MS. HERNANDEZ:

Q.    Did you ever reach an implicit understanding with any other person to do any of these things that I've just asked you?

A.    No, I did not.

Q.    On January 6, did you use any force against any person?

A.    No.

Q.    Did you destroy any property?

A.    No.

MR. KENERSON:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  No.

MS. HERNANDEZ:  Thank you, Mr. Rehl.

THE COURT:  Ladies and gentlemen, we're going to take our afternoon break for the court reporter.

So we will have Ms. Harris bring you to the jury room.

(Jury exited courtroom.)

THE COURT:  All right.  Everyone may be seated. Mr. Rehl, you can either stay there or return to your seat, whatever you would like.

We will take our ten-minute break.

When we come back, I will hear from -- well, now, if the government will provide the materials, and I will hear from you on the issues the government has teed up.  I expect we have

enough time -- I'll hear from you on that, but I would expect even so, the government would have enough ground to cover that you wouldn't even need to get into anything you've teed up for me.

But we will take our ten-minute break and come back.

(Recess taken from 3:22 p.m. to 3:36 p.m.)

(Jury not present.)

COURTROOM DEPUTY:  We are back on the record in Criminal Matter 21-175, United States of America versus Ethan Nordean, et al.

THE COURT:  All right.  Let me ask -- Mr. Kenerson, are you going to be handling the cross?

MR. KENERSON:  Yes.

THE COURT:  Let me ask you this question:  I prefer to just bring the jury in and begin rather than burn time hearing from you on this point now.  But that only makes sense if you think you can -- or let's put it this way:  That only makes sense if you think your cross is going to bleed into our next trial day.

MR. JAUREGUI:  Your Honor, I have a direct I would like to do of Mr. Rehl.  He implicated my client multiple times during his testimony.

THE COURT:  How did he do that?

MR. JAUREGUI:  He testified about my client multiple time.  I would like to direct him.

THE COURT:  What did he --

MR. JAUREGUI:  It was direct.  I'm not saying it was adverse to my client.  But he did talk about my client and a lot of interactions that had to do with my client.  So I would like to direct him.

THE COURT:  What's the government's position on that?

MR. KENERSON:  I don't recall the trial procedures making a distinction between a defendant who testifies as a witness and not.  I candidly have not researched the issue.  I am looking to my co-counsel to see that they have.  I don't see that they have.

I would ask, I suppose, whether Ms. Hernandez has an objection.

THE COURT:  All right.  Well, I appreciate you raising this now so we can address it rather than launching into all the rest.

The trial procedures order did not, I do not believe, as you say, make any distinction between a witness and a witness defendant.  But what it did say, as I recall, is something along -- either what it says or what I had articulated to you and/or what I had intended was that that was a procedure that would be in place to, how do I put it, for efficiency purposes, if this was a witness that the party would have called later in their case.

Now, in this case, obviously, that doesn't apply in the

same way as it would to another witness.  So I'm not so sure it operates in the same way.

MR. JAUREGUI:  Judge, what I would argue is, once he took the stand, I have the right to question him and to conduct a direct, no different than any other witness.  If this would have been a civil case, I would have been able to call him, and I would have been able to direct him and ask questions.

This is a criminal case.  And Your Honor is, of course, correct, but I could not have called him if he had taken the Fifth.  But now that he has decided to testify and there are facts in evidence that have to do with my client, I have to vigorously defend my client and vigorously bring out facts that are beneficial to my client's case.  And I think I have the absolute right under the Sixth Amendment to ask him questions.

Since he hasn't said anything specifically adverse, I cannot lead him, but I would submit to Your Honor that I can do a direct of him.

THE COURT:  Well, while we're perhaps waiting on the government's considered -- or considered as best as possible view, Ms. Hernandez, what's your view?

MS. HERNANDEZ:  I think they can examine him.  We all have some similar interests.  I expect that they're not going to attack him.  But I'll object if there's a problem.  But I believe we're all charged with conspiracies, and we all have the same basic interest of acquittal.  I have no objection.

THE COURT:  You have no objection?

MS. HERNANDEZ:  I reserve the right on a question by question to object.

THE COURT:  Of course.

Mr. Pattis?

MR. PATTIS:  We support the application.  We do not intend to call this witness.  It never would have occurred me to place a co-defendant on a witness list, but having testified, I believe he's fair game.

Having said that, we are not going to question him.

THE COURT:  Understood.

What's the government's -- has the government had time to formulate a position?

MR. KENERSON:  I think our position is that since he's waived his Fifth, he's open to co-counsel calling him.  So that's our position.

We would note, obviously, there was a lot of Ms. Hernandez's questioning that, in our view, could have crossed the line to leading.  We did not object to it.  We did object sometimes.  I think we will be making very strong leading objections to any leading question by Mr. Tarrio's counsel.

THE COURT:  Sure.  Fair enough.

All right.  I have every party unified on this front.  I think unless I detected something -- unless I had a reason to think otherwise, I'm going to permit it.  And so we may as

well -- I guess I may as well ask the question now.  Does any other defendant seek to direct or at this point, as far as you know, to cross Mr. Rehl?

MS. HERNANDEZ:  Mr. Smith had wanted me to ask some questions, which I hesitated because they involved videos, and as the Court has -- I think we can all agree that's not my forte.  Maybe we can all agree I have no forte, but videos is definitely not my forte.

So I was just suggesting if he wanted those questions asked, he could do it.

MR. SMITH:  We're happy to allow Mr. Jauregui to ask questions.  If there are any questions that he did not cover that we think would need to be covered, we would chime in promptly.  But right now, we don't think we will be.

THE COURT:  Okay.  All right.  So we will bring in the jury, and we will proceed that way.

Ms. Harris?  Thank you.

While Ms. Harris is going, let me just ask Mr. Kenerson, I don't -- how long do you expect your questions to last, Mr. Jauregui?

MR. JAUREGUI:  I think the rest of the day, Judge.

THE COURT:  The rest of the day?

MR. JAUREGUI:  I think so, Your Honor, depending on how much -- if the government is going to be objecting to every question, it would take longer.  If they give me the same

courtesy they gave Ms. Hernandez, it will go quicker.

THE COURT:  All right.  We will proceed.

(Jury entered courtroom.)

THE COURT:  All right.  Everyone may be seated.

Now we will have some direct examination of the witness by counsel for Mr. Tarrio.

MR. JAUREGUI:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. JAUREGUI:

Q.   Good afternoon, Mr. Rehl.

A.   Good afternoon, sir.

Q.   Sir, have you ever testified in a trial before?

A.   I have.

Q.   Okay.  What kind of trial?

A.   It was a criminal trial, bench.

MR. KENERSON:  Objection; relevance.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.   Have you ever taken any moot court classes --

MR. KENERSON:  Objection; relevance.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.   When did you first meet Enrique, Mr. Rehl?

A.   I first met him, I want to say, some time in 2019.  I'm not exactly sure which came first.  It was either at a Trump event

up in Hershey, Pennsylvania, or the July 4th event in D.C.  I'm not sure which was -- timing is kind of off in my head.  So one of those two.

Q.   Okay.  And are you guys friends?

A.   We're friendly.  Like I say, I'm friends with him, yeah.

Q.   But you're not besties or best friends or anything like that?

A.   I mean, I don't call him up, and we don't talk for three hours on the phone like I do with some of the people I've brought here.  But certainly, I'm friendly with him for sure, and I would consider him a friend.

Q.   What kind of leader would you think Enrique is?  How would you describe him as a leader?

A.   I mean, he tends to -- I think he tends to put a lot of other people first.  He's dedicated.  He loves his position.  I mean, as chairman, I've never seen anybody work as much as he did, to be honest with you.  He's always picking up his phone. He's, like, that type.

Q.   Okay.  Did he try for everybody in the Proud Boys to get along and not fight?

          MR. KENERSON:  Leading.

          THE COURT:  Sustained.

          BY MR. JAUREGUI:

Q.   How would you describe his actions in getting the Proud Boys to relate to one another?

A.    I mean, it's a constant battle.  There's so many different people all across the country at so many different mind sets.  Some people are more agreeable than others, and some people like to get in chats, drink, and argue.  There's always something.

Q.    Are the chapters in the different parts of the country different from one another, or are they uniform?

A.    No, they're completely different.  Every chapter is autonomous.  Like I said, there's various states that -- some states have three, four chapters alone.  For example, my Philly chapter, there was three other chapters in PA.  We didn't talk to one another at one point.  Eventually we did, but at one point, we didn't want to speak to each other at all.  So we ran things completely differently.

And that's just in the state of Pennsylvania.  So imagine how different it is all over the country.

Q.    Have you heard the term "herding cats" throughout this trial?

A.    Yeah, I've heard that quite a bit.

Q.    What does that mean in the Proud Boys, "like herding cats"?

A.    It means basically trying to get everybody on the same page.  I like to say it's -- getting Proud Boys on the same page is also like trying to keep -- get a bunch of crazed monkeys on the same page.  You've got a situation of maybe like ten all tossing a ball around, and next thing you know, one picks up some dirt and throws it at the other one, and it's (sound

effect).  That's basically what it is.

Q.    Now, was Enrique on the Telegram chats all the time?

A.    No, not all the time.

Q.    Okay.  Was he an active participant in the chats, or was he a more laid back --

A.    More laid back.  I mean, you would have to personally tag him most of the time to get his attention.  Sometimes, he popped in to chats and talked with people here and there.  He was in even more chats than I was.

Q.    Now that you mention that, how many chats in total do you think you were in?

A.    Me?

Q.    Yes.

A.    I would say at least 75 chats myself.

Q.    And on average, 75 chats, how many members on average per chat?

A.    On average, like I said, it depends on -- it depends on what chat.  One of the Philly chats, there's 60.  One of the regional chats, there's like almost 200.  I want to say one of the -- some of the national chats had a lot of numbers in it.

      And yeah, so I had myself over at least 18 chats that were 100 or more.  So that's just me, and I don't know as many people as Enrique does.  So he's in way more chats.

Q.    And on average, just a ballpark figure, how many messages would you approximate you would receive a day?

A.    Thousands.  I've been in the president's chat, for example. I'd be hanging out drinking beers, BS'ing with some of the guys across the country.  I'd go to sleep at 2:00 a.m. sometimes, wake up at 7:00 a.m., and there's 800 missed messages, unread messages.

Q.    Would you ever read all of those messages?

A.    No.  Sometimes, like, if a situation occurred that everyone nationally knew about, I might catch up with the gossip and see what's going on.  Proud Boys is a lot of gossiping.  A lot.  I like to be in tune with that sometimes.  So --

Q.    Okay.  Now, did -- if you know, did Enrique believe in absolute free speech?

A.    Absolute free speech?

          MR. KENERSON:  Objection; speculation.

          THE COURT:  He can answer if he knows.

          THE WITNESS:  I mean, it's a tenet of ours, is free speech, and there's certain people who take the -- you know, free speech to absolution.  It's actually a type of free speech. So yes, that's something that he's practiced and supported.

          BY MR. JAUREGUI:

Q.    Was it his job to either reject or rebuke any kind of speech on these chats?

A.    No.  Same thing with me.

      There's no -- I mean, if you're in there and you see somebody say something -- he's been in the chat before.  He's

seen somebody say something. And he's said, well, you know, that's stupid or whatever, just like I have.

But it's not his job and his duty, and he doesn't, of course, just like I don't, have the time to be in every single chat and telling every single person I agree or disagree or whatever with them, you know.

Q. I think you said they were grown ass men; right?

A. Yes; correct.

Q. Do the Proud Boys try and out-insult each other, try and out-offend each other?

A. Absolutely. That's one of the things in the chats. Especially the later in the night it gets, guys start drinking. They get a little more edgy. That's the term. It's edgy, how edgy can a guy be and push the limits of, you know, each other's, like, tolerance, basically.

Q. And that's accepted in the group?

A. Oh, yeah, it's accepted. It's practiced all the time, every day.

Q. Now, have you been to marches, protests with Enrique in the past?

A. Yes.

Q. Does Enrique say outrageous things to get media attention?

MR. KENERSON: Objection; foundation.

THE COURT: Sustained.

MR. JAUREGUI: Okay.

BY MR. JAUREGUI:

Q.   When you've been in these rallies, protests, and activities with Enrique before, have you ever had an opportunity to observe him?

A.   I have.

Q.   And have you had an opportunity to interact with him and interact with other people and interact with the media?

A.   Yes.

Q.   And based on what you've seen, what you've heard, what you know, does Enrique say outrageous things to the media?

A.   He does.  It's called trolling, and he does do that.  He does that on Parler.  He's done it with the media.

Q.   Could you please explain to the members of the jury what trolling is.

A.   Trolling is basically something you say, whether -- you basically push the limits or say outrageous things.  If you were to say something outrageous on social media, you're doing so so that way you can generate likes, clicks, or shares.  You're trying to generate attention.

Social media, the thing is that they're all powered by algorithms, and these algorithms, they need to have some sort of engagement in order for you to get more attention to your page.

So sometimes, some guys, if their page isn't getting much engagement, sometimes some of the things -- they will say something outrageous.  And there will be a lot of people who

will come on that post and say "I don't agree with you" or talk a bunch of trash basically. That will actually help the algorithm and help people see that page and that post. That's beneficial a lot of times, because when you post something like that, they go to your page, Who is this guy? Let me go to their page, and they say, Oh, he's only trolling, he doesn't actually mean this anyway.

Q. From what you've known and observed, would Enrique do these trolling things online before a major event?

A. Oh, yeah.

Q. And once the event would come, would then Enrique pull back once at the physical event?

MR. KENERSON: Objection; leading.

THE COURT: Sustained.

BY MR. JAUREGUI:

Q. You've already testified that there's a trolling technique that Enrique does with social media?

A. Yes.

Q. Okay. Once the event, the actual physical event would happen and you guys would be there on the ground, what would Enrique do at that point?

A. Enrique, before even that, like while posting something, trolling -- I mean, he's always working with law enforcement behind the scenes. If he's organizing an event, he's in touch with -- like I said, the same set of people I was in touch with,

you know, making sure they know where we're supposed to be marching, where we're going to be, things like that.

At the same time, you're promoting the event by posting something outrageous online.

Q.   And you just said something interesting.  You said that you as well.  Would you contact law enforcement before your events?

A.   Always.

Q.   Why would you do that?  If you could explain that to the jury.

A.   Because law enforcement helps reduce violence as well.  Last thing you want to do is be on the wrong side.

Q.   And from what you experienced, saw, heard, and the interactions that you had, did Enrique always cooperate with law enforcement during these events?

A.   To my knowledge, when I worked with him, like December 12th and January 6th, he specifically told us -- Enrique.  I'm sorry -- that he was in touch with law enforcement and they knew everything that was planned.

Q.   Now, we've talked about him courting media attention.  In many of these activities and protests, was part of the function to go out and get your pictures taken by the media and get video recorded by the media?

MR. KENERSON:  Object to leading.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.    What was the purpose of these events, these marches and protests?

MR. KENERSON:  Objection; foundation.

THE COURT:  Based on the testimony on direct, overruled.

THE WITNESS:  So it depends on what the march was, what the event was.  Certain ones were piggybacking off some protests that were occurring in the city at the time.

Other times, if it was just us -- a lot of times, we wanted to raise awareness to show people that we can throw a rally and be peaceful.  Part of that is image.  We wanted to put a positive image, because we do have a bad image.  And a lot of times, we try to show that we're not always as bad as people say we are.  Sometimes these marches were for that reason.

BY MR. JAUREGUI:

Q.    Do you feel that the Proud Boys image was distorted by the media?

A.    I think it was distorted --

MR. KENERSON:  Objection.

THE COURT:  I'm sorry.  What was the objection?

MR. KENERSON:  Relevance.

THE COURT:  Overruled.

THE WITNESS:  I think it was distorted, a lot of it.  From an outsider looking in, I would say an outsider looking in wouldn't understand our culture and why we jerk around with each

other and say the things back and forth to each other.  So an outsider looking in might think we're not good people.  But to us, it's because they're not a part of a fraternity and they don't understand what it's like.

Q.   Besides protests, marches, and rallies, did you guys also engage in charitable events?

MR. KENERSON:  Objection; relevance.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.   To become a fourth-degree Proud Boy, can you become a fourth degree by doing charitable events?

A.   Yes.

MR. KENERSON:  Objection; cumulative, relevance.

THE COURT:  Overruled.

THE WITNESS:  Yes, you can.

BY MR. JAUREGUI:

Q.   Can you please explain that to the jury.  How do you become a fourth degree by doing charitable events?

A.   Like I said, one of the ways is to do something extraordinary for the club.  One of the things to do -- one of the extraordinary things is doing charity work.

Enrique, for example, did --

MR. KENERSON:  Objection; hearsay, foundation.

MR. JAUREGUI:  Judge, I would ask that you please allow him to answer the question.

THE COURT:  Does he --

MR. JAUREGUI:  It's not hearsay.

MR. KENERSON:  I move to strike as nonresponsive.

THE COURT:  I don't know whether it is or is not.  So why don't you just ask another question.  If you want to elicit something, we will see if there's an objection to it.

MR. JAUREGUI:  Sure.

THE COURT:  The answer was becoming a narrative anyway.

MR. JAUREGUI:  No problem, Judge.  I will fix it up.

BY MR. JAUREGUI:

Q.   You just said that Enrique, for example, became a fourth degree through charity.  Can you please explain that to the jury without telling the jury what Enrique told you.

MR. KENERSON:  Objection; foundation.

THE COURT:  Sustained as to foundation.

BY MR. JAUREGUI:

Q.   Okay.  Do you know how Enrique became a fourth-degree Proud Boy?

A.   Yes.

Q.   Could you please explain to the members of the jury how he became a fourth-degree Proud Boy?

MR. KENERSON:  Object to foundation, in the alternative, hearsay, depending upon how he knows.

THE COURT:  Sustained.

Ask him how he knows.

BY MR. JAUREGUI:

Q.    How do you know Enrique became a fourth-degree Proud Boy?

A.    Through a charity.  He told me.

MR. KENERSON:  Object to hearsay; move to strike.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.    Were you in many marches with Enrique?

A.    I was in a couple.  I wouldn't say many.

Q.    Could you please tell us the dates of those.

A.    Yes.  So there's December 12th.  Like I said, there was the Hershey event.  That wasn't really a march.  It was more just a Trump rally.  And we did march around the city a little bit on January -- on July 4th.  It wasn't like an actually organized march or anything.  We kind of just rolled out in one area as a group and rolled back to Harry's as a group at one point.

Q.    Did Enrique in any of these marches ever march you into danger?

A.    No, he did not.  It was something that he strived, to make sure that didn't happen for any of his guys.

Q.    Why do you say that?

MR. KENERSON:  Object to foundation, to the very end, move to strike.

THE COURT:  Overruled.

BY MR. JAUREGUI:

Q.    Could you please explain to the members of the jury why you think that.

A.    Well, first of all, as the chairman, he's considered the guy that everybody looks at, and the last thing he ever wants to do is --

MR. KENERSON:  Objection; speculation to some other person's --

DEFENSE COUNSEL:  Objection --

THE COURT:  No, no, no.  First of all, counsel who has nothing to do with this witness can leave it to the able counsel involved.

It's a narrative answer.  The question was why you think -- well, I'm going to sustain the objection.

Ask the next question.

MR. KENERSON:  May we go to the phones briefly.

(Bench conference.)

MR. KENERSON:  Your Honor, I would just like to register an objection and ask the Court to make a ruling that Mr. Jauregui cannot elicit essentially information that goes to Mr. Tarrio's state of mind from this witness, which has happened a number of times, and a number of times, sometimes it has been elicited, sometimes it has been on narratives, and we've had to be ready to jump in.

This witness cannot speak to Mr. Tarrio's intent or state of mind.

THE COURT:  Mr. Jauregui, I think that's a good point. Now, I gave you a little bit of leeway in rulings, because I think to some degree, given their closeness or what he's observed, when we're talking about intent, you know, like I've ruled in a lot of cases, there are times when someone can, based on what they've observed and all the rest, speak at least to some degree to what someone was intending.  But on the other hand, Mr. Kenerson has a good point, that in general, they can't.

So, I mean --

MR. JAUREGUI:  Judge, Your Honor, they're basically trying to shut down the direct.  Every other question is an objection.

THE COURT:  No, no, they're allowed to shut down the direct when the direct is violating the Rules of Evidence and eliciting testimony that has no foundation.  Right?

MR. JAUREGUI:  Judge, I would respectfully disagree with Mr. Kenerson.

I simply asked him, when he was on marches with Mr. Tarrio, if Mr. Tarrio would march him into danger.  That is an observable fact.  That is not state of mind.

THE COURT:  There was no objection to that question.

MR. JAUREGUI:  They did object to that question.

THE COURT:  I don't think he did, and I wouldn't have sustained it.

18078

Let's just stick to facts, and we will be fine.

(End of bench conference.)

BY MR. JAUREGUI:

Q.   Mr. Rehl, did Mr. Tarrio ever march you into danger?

A.   No.

Q.   Did Mr. Tarrio ever march you away from danger?

A.   I don't understand.  What do you mean?

Q.   Did he ever march you away from Antifa, for example?

A.   Oh, yes.

Q.   Did you and the Proud Boys, or actually you, more specifically, did you respect other people's right to protest?

A.   Absolutely.

Q.   For example, do you think BLM has the absolute right to protest?

A.   I do.

MR. KENERSON:  Objection; relevance.

THE COURT:  Overruled.

BY MR. JAUREGUI:

Q.   I'm sorry.  Does BLM have a right to protest?

A.   Yes, they do.

Q.   Does any group in opposition to Proud Boys, in your opinion, have the right to protest?

A.   Yes, they do.

Q.   Now, let me ask you about your feelings towards law enforcement.  Okay?

A.   Yeah.

Q.   At some point, did your feelings towards law enforcement change?

A.   No, they did not.

Q.   Did Enrique's feelings towards law enforcement change?

        MR. KENERSON:  Objection.

        THE COURT:  Sustained.

        BY MR. JAUREGUI:

Q.   Okay.  The times that you were around Enrique, did he dislike law enforcement?

A.   No.  He worked with them.

Q.   Okay.  Did he ever insult law enforcement?

A.   No.

Q.   Okay.  That you saw, did he ever call to defund the police or anything like that?

A.   I never heard anything like that.

Q.   Did he ever disrespect a law enforcement officer in front of you?

A.   Not in front of me, no.

Q.   Did he ever hit or insult a law enforcement officer in front of you?

A.   No.

Q.   From the actions you've seen of Enrique, did he try and protect law enforcement?

A.   From what I've seen, yes.

Q.    Now, how about your specific feelings about law enforcement, Mr. Rehl?  Do you respect law enforcement?

A.    I do respect law enforcement.

Q.    Okay.  Now, I'm going to show you Government Exhibit 514-21.  This is a message from you, November 18, 2020.

A.    Yes, it is.

Q.    Could you please read to the members of the jury this message that you sent at 2:347:47.

A.    "Real shit.  Just don't cooperate with cops.  They aren't our friends.  They want to be, but they aren't allowed.  They will take any of your statements and give it to the Soros paid-for DA, which is a whole different ballgame."

Q.    Could you explain what you meant by that to the jury?

A.    Yes.  I was explaining a metaphorical way that cops are not allowed to be our friends.  They have a job to do, number 1, and if you're doing anything that could be considered illegal in any sort of way, whether it's speeding, anything, then they will take your statement, and that's that.  You'll face the consequences.

      So, I mean --

Q.    Were you calling for violence against the police with --

A.    No.  I think I made that clear.  I just said "don't cooperate."  I didn't say "go attack cops" or anything like that.

Q.    I'm going to show you another one of your messages.

A.    Okay.

Q.    This one is 514-22, also on November 18th.

A.    Correct.

Q.    Could you please explain 2:39:26 to the members of the jury.

A.    Yes.  It says, "They may or may not be sad, but when their boss creates charges and tells them they have to arrest you because you gave a statement relating to standing up for yourself over why you did something, they'll still arrest you to keep their job.  At the end of the day, that's what we gotta be aware of.  Don't talk to the police.  They may be our friends, but they have to keep their job, too.  So at the same time, they aren't."

Q.    Okay. And are you calling for violence against the police in those messages?

A.    No.  I'm just saying be aware.

Q.    What about 2:41:25?

A.    "As I said, I don't personally talk to them, but I get your point.  I don't trust them either.  All they are doing is stacking files on anyone who talks to them."

      That's in reference to the FBI.

Q.    And do you believe that?

A.    Kinda sorta.  I mean, I had an issue with the FBI prior to that.  I filed a report, and they never followed through with it.

MR. KENERSON:  Objection; relevance.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.   Would getting into senseless fights help or hurt the Proud Boys in the media?

MR. KENERSON:  Objection; leading, relevance.

THE COURT:  Overruled.

BY MR. JAUREGUI:

Q.   The question is, would getting into senseless fights on the street help or hurt the Proud Boys in the media?

A.   It would hurt very badly.  The media waits for an opportunity for Proud Boys to do anything wrong, and they blast it all over the news everywhere.

Q.   Thank you.

You testified earlier with Ms. Hernandez that on July 4 Enrique was, I guess, initiating some men into the first degree of the Proud Boys?

A.   Yes.

Q.   And it was done on the street?

A.   Yes, it was.

Q.   What's the exact procedure just to become a first degree? Do they just have to say "I'm a proud western chauvinist, and I don't apologize for creating the modern world"?  Is that it?

A.   Yes, that's correct.  And it's usually done by a Proud Boy who's a second degree or higher.

18083

Q.   Is that it?

A.   Yeah, that's it.  It's pretty cut and dry.

Q.   And this was outside, in the presence of women and children and family?

A.   Yes.  Enrique would do that a lot.  A lot of times, he would do first degrees, but he did -- on July 4th.  Sorry.  He would just -- the whole crowd there would be ordained as a first degree, basically, in a sense.

Q.   Okay.  And that was on July 4th?

A.   July 4th he's done it, yeah.

Q.   Was law enforcement there present on July 4th?

A.   Yes, they were.

Q.   And did you see Enrique speaking to law enforcement on that day?

A.   I did, yes, all throughout the day.

Q.   All throughout the day?

A.   Yes.

Q.   Let's talk about the Ministry of Self-Defense.  Who created that?

A.   Enrique created that.

Q.   That was created in response to what?  What event happened that caused that creation?

        MR. KENERSON:  Objection; cumulative.

        THE COURT:  Overruled.

        THE WITNESS:  The stabbing that happened on the 12th.

BY MR. JAUREGUI:

Q.    And multiple members were stabbed on the 12th?

A.    Multiple members were stabbed on the 12th, yeah.  Even someone prior to that was stabbed, and another --

Q.    Are you talking about Enrique?

A.    Yes, he was also a part of a stabbing event also prior to that.

Q.    The members who were chosen for the MoSD, what were the characteristics that you guys wanted for the MoSD?

MR. KENERSON:  Objection.  "You guys"?

MR. JAUREGUI:  My apologies.

BY MR. JAUREGUI:

Q.    Mr. Rehl, when you were looking for men for the MoSD, Ministry of Self-Defense, what characteristics were you looking for in those men?

MR. KENERSON:  Objection; cumulative.

THE COURT:  I'm going to overrule that objection.

THE WITNESS:  I was looking for men that I could trust, who I could supervise, and who wouldn't be a problem.

BY MR. JAUREGUI:

Q.    When you say "a problem," can you explain to the jury, what's a problem with these men?  What would "be a problem" be?

A.    A problem would be someone who has too much to drink and decides they want to go walk around at nighttime looking for trouble.  That's not what we wanted.  We didn't want people

looking for trouble.  We wanted to go to our protests.  If we needed to protect ourselves, we would, but there was not supposed to be anything aggressive.  There was not supposed to be going out of the way looking for that kind of a situation.

Q.    Now, you were in one of the top leadership positions in the MoSD?

A.    Yes.

Q.    Okay.  Which was your part exactly, if you can explain that to the jury.

A.    So I was operations, which was -- which basically, we would do march routes or -- for what I did, I handled the radios.  I got everyone who was in individual chapters to get on their own radio frequencies so they can track their own guys, and I got the guys who were in charge of the marching.  Like I said prior about the accordion issue, those guys are all on their own frequencies as well.  So --

Q.    Okay.  And you talked about the accordion issue.  Is that how to march so that you don't run into each other?  How does that work?

A.    The Proud Boys, the age is very vast.  We have guys who are all age groups, all backgrounds, all finance levels.  Some of the guys with lower finance standards or maybe a little bit older, they would fall behind a lot.  That's what made the accordion thing happen.  That's why the march was a group stretch, because guys were just walking slow.  We had to stop

and let them catch up.  Otherwise, we would lose them.

When we lose them, some of these guys, that's when problems might happen.  They might get ambushed by Antifa or something. That's the kind of thing we're trying to avoid when we do these marches.

Q.   Did you use the radio to communicate from the front of the group to the back of the group?

A.   Yes.  That's it.

Q.   Did you use those radios on January 6?

A.   Yes.

Q.   And they were working on January 6?

A.   During the march, yes.

Q.   Okay.  Was there some kind of super-secret plan for the MoSD that we in court are not aware of?

MR. KENERSON:  Object to leading and argumentative.

THE COURT:  Sustained as to leading.

MR. JAUREGUI:  Sure.

BY MR. JAUREGUI:

Q.   The Ministry of Self-Defense, you've described what it's for today; correct?

A.   Yes.

Q.   Was there another nefarious, secret reason for the MoSD?

A.   No.  If there was any other reason, I wouldn't have joined it.  I joined it specifically -- I agreed to take a leadership position because I thought it was going to be beneficial.  I

didn't want to see my guys getting stabbed.  I didn't want my guys getting in trouble either.  And I thought it was a great opportunity to help at least try and get as much of the issue under control as possible.

Q.   Now, you've seen these videos that have been played by the government of meetings with you guys.  The MoSD brief, for example.

Do you remember that video?

A.   I do, yes.

Q.   In that video, you guys discussed what the purpose of the MoSD is, and you have all kinds of inappropriate conversations.

Do you remember that video?

A.   I do, yes.

Q.   Were you guys speaking some kind of special code there that only prosecutors understand about conspiracies --

MR. KENERSON:  Objection to leading and argumentative.

THE COURT:  Sustained as to argumentative.

BY MR. JAUREGUI:

Q.   Were you speaking in a special code, or did the words actually mean what you said?

A.   They meant what we said.  It was a private chat.  If we're not telling the very guys that we are recruiting for this the truth, then, I mean, what the hell.  Like, these are the guys we were bringing in, and we were telling these guys exactly what we expect of them.

So there's no code that you can talk about, like, don't do this, we don't want guys doing this, we don't want guys getting stabbed, this is how we prevent that.

Q. Are you sure you weren't recruiting an army to come here to the Capitol, to come here on January 6?

MR. KENERSON: Objection to relevance, cumulative, 403, and argumentative.

THE COURT: I will sustain it as argumentative.

BY MR. JAUREGUI:

Q. Were you looking for a fighting force for January 6?

A. No, I was not.

Q. Okay. Let me show you Government Exhibit 501-56. I think you went over it yesterday with Ms. Hernandez.

Do you see that exhibit there, Mr. Rehl?

A. Yes, I do.

Q. On the bottom, at 7:14:21 -- this exhibit is from January 3rd; am I right?

A. Yes.

Q. Could you please read for the members of the jury 7:14:21.

A. "Is @NobleLead still doing a speech? Where is that? These are the things that are holding up my thought process for a moment. Other than that, the Capitol is a good start."

Q. Could you please explain to the ladies and gentlemen of the jury what you meant by that message.

A. Yeah. We had received -- like I said, we received a

message from Tarrio.  At the time he got wind that he was probably going to be getting arrested for the vandalism.  I wasn't exactly sure if he was still going to be giving a speech.  I knew the speech was going to be going on at the Capitol.  Like I said, there was supposed to be stages set up there.  And the whole thing of him getting arrested was kind of like a monkey-wrench in the whole thing, and I didn't know where we were on that.

Q.   And this exhibit, it's not the end of the chat string back and forth, is it?  There's things that come after this.

A.    Absolutely.  There's a lot more that comes after that.

MR. JAUREGUI:  Judge, if I might approach the witness, I'm going to show a Cellebrite report.

THE COURT:  If you show it to the government, sure.

MR. KENERSON:  I'm going to object.

(Bench conference.)

MR. KENERSON:  The Court requires 36 hours' notice on exhibits for witnesses.  We weren't informed, one, that Mr. Jauregui planned to call the witness at all, but certainly, we were not provided notice of any exhibits they planned to use with him.  So we would object.

THE COURT:  Mr. Jauregui, even before this had come up, I was thinking about this.  You planned to do a direct.  You have a direct all lined up.  Everyone agrees you can do it.  But you didn't comply with the pretrial order.

MR. JAUREGUI:  Judge, this is the government's own exhibit of an exhibit that's already in evidence.  The only difference is that this is the actual Cellebrite report.  I'm only using this to bring in the voice notes that come with this specific exhibit.  There are three voice notes.  The government can't possibly claim prejudice of their own exhibit, having it already been introduced and having Ms. Hernandez already talked about this yesterday.

MR. KENERSON:  If these are the voice notes that are -- sorry.  My understanding from what Mr. Jauregui showed me and from his question was that he's going to go beyond what's on the screen.  If that's the case, it is not what was already admitted, and it was not what was provided to us.  If he's playing the voice notes there on the screen, they're already admitted, and he can do that.

THE COURT:  Mr. Jauregui?

MR. JAUREGUI:  Judge, what I'm bringing up is the voice notes in response to this exhibit that has already been introduced in evidence.

THE COURT:  But what you want to do is not in evidence; correct?

MR. JAUREGUI:  The voice notes?

THE COURT:  Right.  The voice notes or the -- whatever you're doing is something that's not in evidence; correct?

MR. JAUREGUI:  Judge, the exhibit in evidence is from

this Cellebrite extraction.

THE COURT:  I understand.  Cellebrite extractions can be very large.  My question to you is, is the -- is what you're attempting to do here, the voice notes you're attempting to elicit, are they in evidence already?

MR. JAUREGUI:  Honestly, I can't remember.  We've been here over four months.  I can't remember if they are or not.

THE COURT:  Mr. Kenerson, are they in evidence?

MR. KENERSON:  It does not seem like it.

MR. JAUREGUI:  Your Honor, if I may proffer what it is.

THE COURT:  It doesn't matter what it is.  I'm going to ask you to move on, because the government -- this is very clear:  When you're going to call a witness on direct, we have pretrial orders, and you can't tell me that you either provided notice of this -- I mean, maybe if it were in evidence I could see not objecting.  I could see not enforcing the rule as harshly.

But this is not something that's in evidence already.  You didn't -- you decided to do it the way you're doing it and not let everyone know you were going to do a direct until the last minute.  That's fine.  If the pretrial procedures weren't followed, we should move forward.

MR. JAUREGUI:  Judge, I didn't even know I was going to have to get into it until Ms. Hernandez got into it.

THE COURT:  Mr. Jauregui, I can tell by the way you're proceeding here, it's perfectly fine, but this isn't something you scrambled to put together over lunch.

MS. HERNANDEZ:  Was the extraction in already?  I thought the entire extraction was introduced earlier.

THE COURT:  We'll come back to it if someone wants to clarify this.  But I'm going to ask you to move on for now.

(End of bench conference.)

BY MR. JAUREGUI:

Q.   There are other messages that come after this exhibit; is that right, Mr. Rehl?

A.   Yes.

Q.   Actually, there are three voice messages that Enrique sends you.

MR. KENERSON:  Objection; leading.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.   Does Enrique send you three different voicemails after this message?

A.   He does send me messages, yes.

Q.   And the general gist --

MR. KENERSON:  Objection; hearsay.

MR. JAUREGUI:  Judge, sidebar.

(Bench conference.)

MR. JAUREGUI:  This is ridiculous.  Okay?  I'm not

being allowed to finish my question.  They did the same thing last time I was doing a witness.  When we've tried to object in the middle of a question, they object and scream "decorum and "let me finish my question."  They do it all the time.  I should be allowed to finish my question.

THE COURT:  Mr. Jauregui, I'm going to police this as I see fit.  Do you understand me?

MR. JAUREGUI:  I understand, and the government can do whatever they want --

THE COURT:  No, no, no.  Mr. Jauregui, turn around and look at me, and don't ever do that again.  Okay?  I have to police what's going on regardless of who the person is, but I have to look at what they're attempting to do.  Okay?

And what you're attempting to do now is circumvent the pretrial order and circumvent the orders of hearsay to get things into evidence that you didn't provide notice for and the Rules of Evidence don't permit.

So I don't know what you want me to do, but when the entire line of questioning is something that -- again, I have a pretrial order for a reason.  And so -- let me get at this.

Mr. Kenerson, what's the objection to the -- I understand your objection on admitting documents.  I'm going to -- I mean, I didn't have a pretrial order in place for my health.  But what's the question as to the question of -- is it a hearsay objection for him to --

MR. KENERSON:  I believe what Mr. Jauregui had just started asking was "was the gist of those messages," and that's why I objected.  So he's attempting to elicit essentially the content of messages sent by his client to Zach Rehl.

That's, number 1, hearsay, and he was also leading in the way he was doing it.

THE COURT:  All right.  What's your response -- okay.

Putting aside leading, which it was leading, what's your response to the hearsay?

MR. JAUREGUI:  Judge, I didn't ask him what was the content of the thing.  I asked him, What was -- did you receive three voice mails.  He said yes.  And I asked him, was it your understanding that he was going to speak at some stage in the future, which is in the exhibit to begin with.

THE COURT:  If you just ask him was it your understanding, I mean, I don't see how that's hearsay.

Was it your understanding at that time that he -- Mr. Jauregui, was it your understanding at that time, ask him that question.  There's no objection to that.

MR. JAUREGUI:  Okay, Your Honor.  I will ask him that. Thank you.

(End of bench conference.)

BY MR. JAUREGUI:

Q.   Mr. Rehl, what was your understanding after the voice notes as to whether Enrique was going to speak on January 6?

A.    My understanding whether he was going to?

Q.    Yes.

A.    It was still somewhat up in the air at that point.  We didn't even know if he was actually going to get arrested or not.  If he did get arrested, we thought it was just going to be quick, you know.  It was a vandalism charge.  We didn't think he was going to be held for any amount of time whatsoever.

Q.    And if he didn't get arrested, what was his plan on January 6?

        MR. KENERSON:  Objection; foundation.

        THE COURT:  Sir, you can answer the question if you know.

        THE WITNESS:  Yeah.  So he was supposed to be giving speeches, at least one that I know of.

        BY MR. JAUREGUI:

Q.    Okay.  Thank you.  And after the speech, what was the understanding of what you and the Proud Boys were going to do on January 6?

A.    We were going to march around like we always do.  Like was the purpose with MoSD and working with Enrique in the past, he tries everything in his power to --

        MR. KENERSON:  Objection; nonresponsive, move to strike, and was going into another person's --

        THE COURT:  Sustained.

        BY MR. JAUREGUI:

Q.    So you want to -- Enrique was going to give a speech, and you guys were going to do a march at the rally?

A.    We were going to do a march, correct.  We would go march, and mostly -- probably where we met at honestly is probably where we would have went, and then everybody would have dispersed from there.

Q.    Okay.  Did you speak to Enrique after he was arrested on the 4th?

A.    After?

Q.    Yes.

A.    Not outside the chats, no.

Q.    Did you speak to him on the 5th?

A.    No, no.  Only in the chat I spoke to him at all.

Q.    Did you get to speak to him on the 6th?  Did you have any phone conversations with Enrique on the 6th of January?

A.    None.

Q.    Do you know if Enrique invited Mr. Pezzola into the MoSD?

A.    My understanding, he did not, no.

Q.    Did you ever see Enrique invite Mr. Pezzola to the Boots on the Ground?

A.    No, did he not.

Q.    Do you remember who invited Mr. Pezzola to Boots on the Ground?

A.    I didn't know who Pezzola was at the time, and after the fact, I mean, I never bothered to look.

Q.    You've heard a lot of testimony throughout this trial about this famous 1776 document; correct?

A.    I've heard a lot about it, yes.

Q.    Do you know who created the 1776 document?

A.    I mean, no, I don't.  I heard things in this courtroom. Outside of that, I never seen the document before in my life until court.

Q.    Did you ever receive the 1776 document in a message, in a chat, in an e-mail, anything like that?

A.    Never.

Q.    Did you ever read or possess the document in any way?

A.    No, I did not.

Q.    Was that document ever discussed in any chat whatsoever?

A.    Not in any chat I paid attention to, and if it was, I didn't see it.

Q.    Okay.  On January 6, were you acting as a part of some kind of plot or plan with the 1776 document?

A.    No.  Again, I didn't know what it was.  I had never heard of it, never seen it.  So --

Q.    Did Enrique ever talk to you about the 1776 document?

        MR. KENERSON:  Objection; cumulative, asked and answered.

        THE COURT:  Overruled.

        THE WITNESS:  If he would have spoke about it, it would have been in the chats.  It would have been in there, and

we would be reading about it right now.

BY MR. JAUREGUI:

Q.   Okay.  And did he ever call you, did he ever send you a direct message or e-mail about the 1776 document?

A.   No, never.

Q.   Was it ever discussed in any of these videos, the MoSD brief, any of these kind of meetings?  Was the 1776 document ever discussed?

A.   No, it was never discussed.

Q.   Now, you didn't seem to be very active in these Telegram chats.  Why was that?

A.   I was more occupied with my own chapter.  I'm in one of the bigger chapters in the country.  My hands are full with that. Not only that, but like I said earlier, I'm in a ton of different chats.  So I kind of -- when I pick my phone up, I kind of look at what chats do I feel like hopping in.  It's kind of like what flavor of potato chip you feel like eating at the time, you know.  Every chat is different, in a sense.

Q.   And I think we discussed the dunk tank video.  What is that?

A.   That was basically a video where the presidents got a chance to grill him, in a sense, over what the MoSD was about. Because a lot of people throughout the country didn't want any rallying at all happening because of the stabbings.  Enrique was trying to say look, there's a solution.

MR. KENERSON:  Objection as to what Enrique is trying to say.

THE COURT:  Overruled -- sustained as to what he was trying to say.

BY MR. JAUREGUI:

Q.   What is the general gist of the meeting, without telling us what Enrique said, of the dunk tank video?

A.   Like I said, it was for Enrique to be questioned by the presidents throughout the country, and they were raising their issues, and it was giving him an opportunity to put their concerns to rest.

Q.   Okay.  And in that dunk tank video, did you guys discuss what was going to happen on January 6?

A.   It didn't really hit on that at all.  Somebody might have asked about it here or there, but yeah.

Q.   Was it more generally about what would happen at future events?

A.   It -- it was about what the MoSD was supposed to be, what the purpose of it was.

Q.   What was the date of that dunk tank meeting or video?

A.   I don't remember the exact date, but I know it was before -- it was before the 30th, when the actual MoSD video that we seen here happened.  So --

Q.   Okay.  And just to backtrack a little bit, the purpose of MoSD was not to do an event on January 6.  It was to do any

18100

future event; is that correct?

MR. KENERSON:  Objection; leading.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.   What was the purpose of the MoSD as to future meetings or future rallies or marches?

A.   To have the same uniform national blueprint, essentially, like I said earlier, with safety protocols and just -- just a proper way to do things in order to ensure the safety of all our members.

Q.   Was one of the things discussed in the MoSD was not wearing colors on January 6, or was that discussed later?

A.   Not wearing colors?  That announcement came prior to January 6, to not wear them, yes.

Q.   Can you please explain to the members of the jury why you guys did not want to wear colors on January 6?

A.   Yeah, so there's a couple of reasons why.  There wasn't one specific.  But the main one was right before January 6, there was an event going on in Georgia, and I believe Enrique showed up to it.

MR. KENERSON:  Object to foundation, and hearsay, depending on foundation.

THE COURT:  Sustained as to -- overruled for now.

BY MR. JAUREGUI:

Q.   You can continue, Mr. Rehl.

A.   Okay.  So he showed up to an event in Georgia, and the Georgia chapter didn't want him there.  And they made it loud and clear that they didn't want any Proud Boys there --

MR. KENERSON:  Same objection; hearsay and foundation.

THE COURT:  Overruled, because it's -- overruled.

THE WITNESS:  So yes, they didn't want Proud Boys there.  It actually ended up being the same objection that the guy from -- the president in D.C. brought up.  After seeing the Georgia guys, he said, yeah, I don't want to deal with Proud Boys events in my city either, so can you guys not show up.

And we're kind of like, well, D.C. is the capital of the country, a lot of protests happen there.  So we kind of negotiated, and we agreed not to wear colors.

Q.   Have you seen that MoSD application?  It's like a Google form.

A.   I have, yes.

Q.   One of the questions there on that Google form is that if the member "agrees to always act in self-defense and never initiate a confrontation."

Do you remember that?

A.   I do, yes.

Q.   And it has other things, you know.  You won't get drunk, you won't use drugs during a rally.

Do you remember that?

A.   Yes.

Q.    Do those words mean what they say, or is that some kind of secret code in that application?

A.    No, it's exactly what it says.  This application was put together to be as -- in black and white as possible so there was no confusion.  That's what the whole "fit in or F off" was about.  If you didn't like these terms, then F off.

Q.    Now, from what you know and what you observed, you said that Enrique's plan on January 6 was to go and speak at some stage before the march; am I right?

A.    Yes.  Not before the march, but give or take.  It never came to fruition.

Q.    And it never came to fruition because he was arrested; correct?

A.    Yes.

Q.    Once Enrique was arrested, was he taken off the whole January 6 -- was he giving any direction whatsoever for January 6?

A.    No.  I mean, he told us that he wasn't even allowed in the city anymore.  So after that, yeah, he was completely off the table.  So --

Q.    Was he in charge?  Was he the leader?  Did he have anything to do with what happened on January 6?

A.    No.

        MR. KENERSON:  Objection; leading and a legal conclusion.

THE COURT:  Overruled.

THE WITNESS:  No.  He didn't have any contact with --
at least me.  I know that.  He wasn't telling me what to do.
That's for sure.

BY MR. JAUREGUI:

Q.   Now, like you just said, after his arrest and after he's
taken out, he's out of commission.  Is a plan formulated at that
point by you guys, by the Proud Boys?

A.   Not anything that was, like I said, agreed upon.  There was
an expectation to have the march, because that's what we always
show up and do.  Everywhere we go, there's always a march, and
usually, a march leads to some sort of speech somewhere.  And
then sometimes, we march back and then disperse, or we disperse
at the area where the speeches are.  So --

Q.   Was that the totality of your understanding of what was
going to happen on January 6?

A.   Oh, yeah.  That's literally all I expected to happen.

Q.   Did you have a different kind of agreement as to what was
going to happen on January 6, you and the Proud Boys, the men
here charged with these crimes?

A.   No, none whatsoever.

Q.   Did you have any kind of other type of objective between
you and the men here on trial as to what was going to happen on
January 6 besides what you've already said?

MR. KENERSON:  Asked and answered.

THE COURT:  Overruled.

THE WITNESS:  No, I did not, none.

BY MR. JAUREGUI:

Q.   And did you have any type of understanding with the men on trial here about what was going to happen on January 6 besides what you've already told the members of the jury?

A.   No, none.

Q.   Now, you did hear the testimony of Bertino and Greene in this trial?

A.   Yes, I heard it.

Q.   Okay.  And you heard them say that they understood that there was some kind of metaphorical objective?

MR. KENERSON:  Objection; leading and argumentative and misstates.

THE COURT:  Sustained as to leading.

BY MR. JAUREGUI:

Q.   Did you hear the testimony of Greene in this case?

A.   Yes, I did.

Q.   And do you remember what he said when he testified?

MR. KENERSON:  Objection; relevance.

THE COURT:  Well, so far, overruled.

BY MR. JAUREGUI:

Q.   Do you remember what he said as to what he thought you guys were going to do on January 6?

A.   Hmm, Greene?

Q.    Yes.

A.    That was one of the early ones.

Q.    If you don't remember --

A.    Yeah, I don't remember.

Q.    Do you remember when Bertino testified?

A.    Yes, I do.

Q.    Bertino was real short on specifics.  Do you remember that?

            MR. KENERSON:  Objection; counsel testifying.

            THE COURT:  Sustained.

            BY MR. JAUREGUI:

Q.    Did Bertino testify with any details or specifics?

            MR. KENERSON:  Objection; relevance to what this witness thinks about that.

            THE COURT:  Sustained.

            BY MR. JAUREGUI:

Q.    Do you agree with Bertino's testimony?

            MR. KENERSON:  Objection; relevance.

            THE COURT:  It's so broad.

            MR. JAUREGUI:  I'll narrow it down.

            THE COURT:  I'm going to sustain the objection.

            BY MR. JAUREGUI:

Q.    Bertino understood there was some sort of metaphorical objective for January 6?

            MR. KENERSON:  Objection; leading and argumentative.

            THE COURT:  Sustained as to leading.

BY MR. JAUREGUI:

Q.   Do you share Bertino's objective about January 6?

A.   No.  I don't know how he came up with it.

Q.   Okay.  Do you know how he came up with it?

MR. KENERSON:  Objection; asked and answered.

THE COURT:  Overruled.

BY MR. JAUREGUI:

Q.   Do you know how he came up with that metaphorical objective?

MR. KENERSON:  Objection; relevance.

THE COURT:  He can answer the question.

BY MR. JAUREGUI:

Q.   Do you know?

A.   Honestly, no, I don't know how he came up with that.  I thought it was ridiculous, to be quite honest.  He said things like --

MR. KENERSON:  Objection; nonresponsive.

THE COURT:  Sustained; sustained.

BY MR. JAUREGUI:

Q.   Okay.  Did you have an implicit understanding as to what you were going to do on January 6 with these men here on trial?

A.   No, none.

Q.   Let me show you Government Exhibit 509-24.  If I could direct your attention to 9:27:48.

Do you see the message from NobleBeard the Immortal?

A.    I do, yes.

Q.    And who is NobleBeard the Immortal?

A.    That was Bertino.

Q.    Can you please tell the members of the jury what Bertino said in this message.

A.    "So if Enrique has a better idea, he needs to say it soon." And then he tags NobleLead.  So that way, he actually gets a notification for it.

Q.    And did NobleLead ever respond to that?

A.    No, he never responded to that.

Q.    Because at that point, he was out of commission?

A.    Yeah, and I don't know what he was doing that day, either.

Q.    Do you know Kenny Lizardo?

A.    I do, yes.

Q.    Who is Kenny Lizardo, if you could please tell the members of the jury.

A.    Kenny Lizardo was a Proud Boy.  He was from the Boston chapter.  I had the opportunity to meet him quite a few times. He actually expressed interest in joining the Philly chapter because he was planning on moving down to the area at some point, but he never did.

Q.    I'm going to show you what's already been marked as Government Exhibit 490A at the 1:05 time stamp.  If we could publish that, please.

      Is this gentleman here Kenny Lizardo?

A.    Yes, it is.

Q.    What is he doing here in this video?

            MR. KENERSON:  Objection; foundation.

            THE COURT:  Sustained as to foundation.

            BY MR. JAUREGUI:

Q.    Have you seen this video before, Mr. Rehl?

A.    I have.

Q.    How many times have you seen this video?

A.    A couple of times.  Not a lot.

Q.    Do you know who this gentleman is who is encircled with the red circle?

A.    That is Kenny Lizardo.

Q.    Who is this gentleman here to the left?

A.    That's Enrique Tarrio.

Q.    Do you know the location these guys are at right now?

A.    Directly in front of what building?  No.  I know this to be Kenny Lizardo picking up Enrique from the courthouse or jail or whatever.

Q.    Is Kenny Lizardo picking up Enrique from the jail at this point?

            MR. KENERSON:  Objection; leading.

            THE COURT:  Sustained.

            BY MR. JAUREGUI:

Q.    What is Kenny Lizardo doing now?

            MR. KENERSON:  Objection; foundation.

THE COURT: Sustained.

BY MR. JAUREGUI:

Q. Let's move backwards.

MR. KENERSON: Your Honor, can we go to the phones?

THE COURT: Sure.

(Bench conference.)

MR. KENERSON: This witness was not present for any of this, which is the basis of the government's foundation objection. He testified he knows Kenny Lizardo. This is all in evidence already. I don't know what relevance this witness can add to a scene he was not at.

THE COURT: Mr. Jauregui?

MR. JAUREGUI: Your Honor, if we were to follow the government's logic, none of the FBI agents would be able to testify in this case because they were not present for any of the videos that were filmed.

Nicole Miller came in here and testified for days about CCTV that she was not there for, she was not present, did not see herself. She simply viewed the video and then testified about it.

Mr. Rehl has seen this video multiple times. He can do the same thing Nicole Miller is doing and testify to the video he's seeing.

THE COURT: What is he going to say other than he was walking down the street?

MR. JAUREGUI:  He's going to say that Kenny Lizardo picked up my client from the jail.

THE COURT:  Well, does he -- I mean, the tricky part is the picking up from the jail is not captured in this video the way the testimony from, for example, an agent who just testifies, well, I see this person moving from here to there on video.  He can't say -- how can he say he's picking him up from the jail?  He can say they're walking down the street outside the -- down the street near the courthouse.

MR. JAUREGUI:  Judge, he's seen the testimony.  He's seen this video in open court.  Everybody knows he's picking him up from jail.  He's heard the testimony from the witnesses.

THE COURT:  That's just something he's heard in court.  It's not reflected in the video.

MR. JAUREGUI:  It doesn't have to be reflected in the video.  He has personal knowledge that Mr. Lizardo is picking him up from the jail.  It's no different than Nicole Miller testifying that she's seen a bunch of surveillance videos and that she knows after watching the videos that that person is Biggs, that person is Pezzola.

THE COURT:  Right.  That's what he can say, it's Kenny Lizardo, and he can say they're walking down the street.  I don't think he can say anything else.  He doesn't have any other knowledge.  He can literally regurgitate what is on the video just the way the agents did, but that's all he can do.

MR. KENERSON:  If it's just regurgitating what's on the video, we would interpose a 403 and cumulative objection. That is already in evidence.  There's no need to go over this again with this witness who has no personal knowledge of it.

MR. JAUREGUI:  Objection.  The government has put up the same video over and over and over ad nauseam, the same video with different agents.  So it's definitely not cumulative.  I'm trying to establish a link between a CHS and my client.

THE COURT:  You've established the link.  That's in evidence, and Lizardo's status is in evidence and all the rest. He has no personal knowledge of this, and all he would be able to say is they're walking down the street near the courthouse.

I'm going to ask you to move on.  I think the government is right on this one.

(End of bench conference.)

BY MR. JAUREGUI:

Q.   Mr. Rehl, you said that Mr. Lizardo was trying to become a member of your chapter?

A.   Yes.

Q.   How do you know that?

A.   He told me directly.

Q.   And did he speak to you at great length?

A.   Great length?  We hung out, and I don't remember where I met him, where we were.  But like I said, I did have him saved in my phone as "Kenny Lizardo, planning to move to

Philadelphia," something along those lines.  I like to put details in case I don't ever meet them again.

Q.   At the time did you know he was a confidential human source for the FBI?

A.   At the time, I did not, no.

Q.   At this time let me show you Government Exhibit 490F at the 3:28 time stamp.

MR. KENERSON:  Same objection.

THE COURT:  Let's go to the phones just briefly.

(Bench conference.)

THE COURT:  I don't think he can narrate this, but if you want to ask him who the people are, I think that's fine.

MR. JAUREGUI:  That's what I was going to do, Judge. Thank you.

(End of bench conference.)

BY MR. JAUREGUI:

Q.   Let me show you this government exhibit, Mr. Rehl.  Let me just play it.

(Video playing.)

BY MR. JAUREGUI:

Q.   Do you recognize this gentleman driving?

A.   Yes, I do.

Q.   Could you please tell the members of the jury who this guy is?

A.   It's Kenny Lizardo.

Q.    Do you see who is here in the back seat?

A.    That's probably a bad angle.  There you go.  Enrique Tarrio.

Q.    Okay.  Do you have any personal knowledge as to when this video was filmed?

A.    Yes.  I'm aware this video is after he got picked up --

MR. KENERSON:  Objection; foundation.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.    At the time you didn't know that -- I think you said at the time you didn't know that Kenny Lizardo was reporting yours and Enrique's activities to the FBI; correct?

MR. KENERSON:  Objection; misstates.

MR. JAUREGUI:  Withdrawn.

BY MR. JAUREGUI:

Q.    Did you know that he was an FBI informant at the time?

A.    No, I did not.

Q.    If we could pull that down, Ms. Harris.  Thank you.

Let me show you again Exhibit 509-24.  And could you please read your message at 9:40:46 to the members of the jury.

A.    "What were some of the objectives agreed on anyway."

Q.    Okay.  Why did you write that message?

A.    Because we didn't really discuss anything.  It's January 5.  It's 9:50 or 9:40 or whatever.  I'm in D.C. now, and we didn't coordinate anything.  We didn't know, like, where we were going

to be marching to, if we were still planning to go to any stages or not. I had no idea what was going on.

Q. Let's fast forward to January 6, now that we've established that. I'm going to be playing Nordean 301. Time stamp is 52:11 to 54:06.

(Video played.)

BY MR. JAUREGUI:

Q. Could you please tell the members of the jury what we are looking at here in this screenshot.

A. Yes. This is the meetup spot that we told all of our members to meet us all at. And I don't know exactly if -- I'm pretty sure I was there late. So it was probably a little after 10:00.

Q. And how did that message go out? How did people know to meet at the Washington Monument?

A. So, one person created the message, and everyone else forwarded it. So one person created the message, and then you could forward that same message from one group to another. When it's forwarded by a different person, it will look like it's posted by the person. But it's actually, there's only one person who posted the original one.

It's hard to explain, but it can go through multiple different chats. Like I said, the same message will stay intact.

Q. Besides meeting at the Washington Monument, was there any

other agreement for that morning?

A.    No, there was none.

Q.    Okay.  Besides meeting at the Washington Monument, was there any other understanding for that morning on January 6?

A.    No, none.

Q.    Okay.  Was there -- besides meeting at the Washington Monument through that message you sent, was there any kind of plan besides meeting at the Washington Monument that day?

A.    No, not at all.

Q.    Sorry to do this to you, but was there an objective besides meeting at the Washington Monument on January 6?

A.    No.  Like I said, it was completely unorganized.

(Video played.)

        BY MR. JAUREGUI:

Q.    I want you to please listen to what is said.  Okay?

A.    Okay.

(Video played.)

        BY MR. JAUREGUI:

Q.    Was that you?

A.    Yes.

Q.    What did you say there?

A.    "Make sure there is no press around."

Q.    Would you explain to the members of the jury why you would say that?

A.    As I explained earlier about doxxing, we go to great

lengths to try to prevent doxxing.  The media would show up at various events and say hey, we're at a Proud Boys event here with X Proud Boys or whatever.  Some of us like me, I am a little bit more known guy in the Philly area.  So I'm not particularly worried about being doxxed anymore.  I should emphasize that, "anymore."

But other guys who still have their jobs, they don't feel the same way.  They don't want to get doxxed.  So we try to keep the press away from recording our group of people and who we're with.

Q.   I heard "keep your eyes wired for any kind of weird behavior."

What does that mean?

A.   Anyone who seems like they might be trying to eye up our group.  When we're walking, we've been ambushed in the past before by large groups of people, and we've been attacked.  That's one of those things that we like to try to prevent.

Q.   Okay.  Let me play another one.

(Video played.)

BY MR. JAUREGUI:

Q.   Did you hear "we're going to look good.  We're going to do a meet and greet.  Nice slow steady place"?  Please explain to the members of the jury what that means.

A.   Like I said earlier, we try to go out and meet people, shaking hands, letting people actually know who we are, and

that's one of the purposes of these kind of marches, is so that we can actually get down there and meet people and show people that we are not as bad as we are made out to be in many cases.

(Video played.)

BY MR. JAUREGUI:

Q.   Why is it important to develop the front line?

A.   Just to -- keeping guys in line so like the middle doesn't get too fat and extended out.  It's just a little bit of order, because you don't want just a blob of people walking around through town.

Q.   Let me show you another part of the video.  This is time stamp 1:15:01.

(Video played.)

BY MR. JAUREGUI:

Q.   Do you see yourself here on the right?

A.   Yes, I do.

Q.   Who is this gentleman here in the middle?

A.   That is Joe Biggs.

Q.   During this time that you're marching from the Washington Monument, are any kind of secret agreements being discussed?

A.   No, none.  We're just literally walking most of the time.

Q.   Any kind of secret understanding or plan being discussed?

A.   No, none.

Q.   Okay.  Did you develop an implicit understanding while you were walking in the front there with the other leaders?

A.   No.

Q.   You sure?

A.   100 percent, yeah.

(Video played.)

BY MR. JAUREGUI:

Q.   Has anything changed from the moment you were at the Washington Monument until the point here that you're marching?

A.   No, except for the fact that we started chanting things.

Q.   Let me go on to time stamp 1:18:04.

(Video played.)

BY MR. JAUREGUI:

Q.   Do you see the screenshot here?

A.   I do.

Q.   Is this you in the baseball cap?

A.   That is correct, yes.

Q.   Why did you guys stop here?

A.   Specifically -- most of the times we stopped, we stopped because we were letting people catch up from the back.  So right here, I imagine it was that, give guys a couple-minute break, let them catch up, and that's pretty much it, yeah.

Q.   I'm going to play a little bit.

(Video played.)

BY MR. JAUREGUI:

Q.   Did you hear Mr. Nordean say "we're going to go to the Capitol and make a presence"?

A.   Yes, I do.

Q.   Could you please explain to the members of the jury what that means.

MR. KENERSON:   Objection; speculation, foundation.

THE COURT:   Sustained.

BY MR. JAUREGUI:

Q.   You were there during the rally and the march; correct?

A.   The Washington Monument, I was there.

Q.   So you were there from the very beginning of the march at the Washington Monument to the point here where you're stopped?

A.   Yes.

Q.   And we saw in the previous section of the video you were marching towards the front of the group; would that be fair?

A.   Yes.

Q.   Okay.  And you've already testified that there was no plan, agreement, objective.

MR. KENERSON:   Objection; leading.

THE COURT:   I mean, overruled for now.  Overruled.

BY MR. JAUREGUI:

Q.   Those four or five magic words I've already told you, you've already said none of those existed; right?

A.   Yes.

Q.   As you're standing there, I don't know, a few feet from Mr. Nordean, are you hearing the words coming out of his mouth?

A.   On the megaphone?  Absolutely.  It was loud and clear.

Q.    Those words are being amplified over the megaphone into your left ear; is that correct?

A.    Yes.

Q.    Those words that he's using, coming out of his mouth, do you think what he's saying is what's really going to happen, is true?

MR. KENERSON:  Objection; speculation.

THE COURT:  Overruled.

THE WITNESS:  Absolutely.  That's what I was hoping would happen.

BY MR. JAUREGUI:

Q.    He's not talking in some kind of a secret code?

A.    No.

Q.    No kind of Proud Boy secret handshake type of language?

MR. KENERSON:  Objection; leading, argumentative.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.    Is Mr. Nordean speaking in Minecraft here with the megaphone?

A.    Now, see, honestly, what was going on, what he said made complete sense.

MR. KENERSON:  Objection; nonresponsive.

MS. HERNANDEZ:  Objection.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.    What was your understanding of what was going to happen after having the presence be known at the Capitol?

A.    We were going to turn around and go back to the main rally.

Q.    I'm going to play a little more.

(Video played.)

BY MR. JAUREGUI:

Q.    Okay.  Do you hear him say "every chance you get, meet and greet, make yourself look good"?

A.    Yes.

Q.    Can you explain to the members of the jury what that means?

A.    Again, like I said earlier --

MR. KENERSON:  Speculation.

THE COURT:  What's the objection?

MR. KENERSON:  Speculation as to what Mr. Nordean meant.

THE COURT:  I'm going to sustain as to foundation.

You can ask him whether he had an understanding.

BY MR. JAUREGUI:

Q.    In the previous rallies you've attended and in the rallies that you yourself have conducted, what does the term "meet and greet" mean?

A.    Meet and greet means exactly what it sounds like, to meet people -- people who come for the event, get your name out there, yourself out there.  Let them know how good of a person you are, you know, what kind of a person you are.  Shake hands,

things of that nature, you know.  Like they would say in the military, not show your ass.

Q.   And looking good, what does that mean?

A.   Exactly what it says, looking good.  Don't make the organization look bad.  That's the one thing we always strive to get the guys not to do.  Don't make us look bad.

Q.   And meeting and greeting and looking good, is that consistent with storming the Capitol?

A.   No, not at all.

Q.   Would storming the Capitol work against looking good?

A.   Yeah, I would say so, absolutely.

Q.   I'm going to press play here.

(Video played.)

BY MR. JAUREGUI:

Q.   Now that you've seen the video, I see some American flags here off to the side.

Do you see those flags?

A.   I do, yes.

Q.   Okay.  Now, the main group seems to be void of flags.

Would that be fair and accurate?

A.   Possibly, yeah.  I see a guy dressed up in a flag, it looks like, right over here.

Q.   Over here, yes.

A.   It's not on a pole, though.

Q.   Very well.  Have you ever heard of the term "tools" in the

Proud Boys?

MR. KENERSON:  Objection.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.   Let me take you to 1:19:22.

(Video played.)

BY MR. JAUREGUI:

Q.   And is this you here?

A.   Yes, it is.

Q.   And you guys are chanting "Fuck Antifa"?

A.   Yes.

(Video played.)

BY MR. JAUREGUI:

Q.   From the last video I showed you when you guys were stopped to this marching that's happening right now, has there been any kind of change as to a plan, agreement, understanding, whether it's implicit or not, or an objective to storm the Capitol?

A.    No, none.  We heard what Nordean said on the megaphone, and we just started walking.

Q.   Okay.  Now I'm at time stamp 1:39:34 till 1:39:43.

(Video played.)

BY MR. JAUREGUI:

Q.   Do you know who all these people are that follow you guys throughout the march?

A.   They're, from my understanding, media.

Q.    And were you guys followed from the Washington Monument the whole time by different members of the media?

A.    Oh, yeah, yeah.  They were all over the place.

Q.    Was Nick Quested with you throughout the whole march?

A.    From what I remember, yes, I remember seeing him throughout the whole march.

Q.    And do you know a lady by the name of Amy Harris?

A.    I do, yes.

Q.    Who is Amy Harris?

A.    She was just on the screen.  She's a photographer that I know of.

Q.    Let me press play again.

(Video played.)

        BY MR. JAUREGUI:

Q.    Actually, I think I passed her.  Is this Amy Harris here?

A.    Yes, that's her.

Q.    And what does Amy Harris do for a living?

A.    She's a photographer.

Q.    And was she with you throughout the whole march as well?

A.    Yes.  I remember she was front and center with us the whole entire time.

Q.    It's tough to do a conspiracy with the media following your every footstep --

        MR. KENERSON:  Objection.

        THE COURT:  Sustained.

BY MR. JAUREGUI:

Q. Was the media embedded with you guys on January 6?

A. I mean, they were all over the place. Like I said, front, side, back. Everywhere we walked, the media was there.

Q. They were recording on film or video?

A. Yes, live-streaming, everything.

Q. I'm showing you now time stamp 1:41:08.

(Video played.)

BY MR. JAUREGUI:

Q. Is this you?

A. Yes, it's me.

Q. Taking off your cap to pray?

A. Yes, that's correct.

Q. And actually, is that a member of the media I circled there with a camera and a microphone?

A. Yes. And it looks like he's recording.

Q. And am I circling Amy Harris here?

MR. KENERSON: Objection; cumulative, waste of time.

THE COURT: Overruled.

BY MR. JAUREGUI:

Q. The media is even actually in your prayer there; would that be fair?

A. Yes. They were all over. I see four of them, actually.

Q. Okay.

(Video played.)

BY MR. JAUREGUI:

Q.   From what I heard in the prayer, it says "softening the hearts" --

MR. KENERSON:  Objection.

THE COURT:  Sustained.

BY MR. JAUREGUI:

Q.   Were you all praying for a successful storming of the Capitol there?

MR. KENERSON:  Objection.

THE COURT:  Sustained.

Counsel, move on.

BY MR. JAUREGUI:

Q.   This is time stamp 2:00:33.

Now, Mr. Rehl, is this another stop for the media to take photos?

A.   That was a spot where they did.  That was actually, I believe, protests going on in that spot, too.  So there was extra media in that area as well.

Q.   Do you know what protest was happening in that spot?

A.   One of them was a prayer, a church group, and the other one -- I forget what the other one was, but yeah, there's two different separate groups right there at the time.

Q.   Okay.  Time stamp 2:28:58.

(Video played.)

BY MR. JAUREGUI:

Q.   Do you know where you're marching now?

A.   What street?  No.  Like I say, I'm not too familiar with D.C.  So exactly where I'm at, I couldn't say.

Q.   Do you know if this is after the last scene at 2:00:33?

A.   Yes, it is.

Q.   Let me just play a little bit.

(Video played.)

        BY MR. JAUREGUI:

Q.   Did you see a hand gesture toward this gentleman here?

A.   I didn't.  Could you replay that?  I wasn't looking at him.

(Video played.)

        BY MR. JAUREGUI:

Q.   Did you see him do like this hand-waving gesture and do like a movement with his hands?

A.   I did, yes.

Q.   Could you explain to the members of the jury, why did he do that?

        MR. KENERSON:  Objection; speculation, why he did that.

        THE COURT:  Sustained.

        BY MR. JAUREGUI:

Q.   Do you see this gentleman here on the left?

A.   Yes.

Q.   Was this gentleman too close to the marching group?

A.   Yes, he was.

Q.   And at that point, when he's about to get run over from the marching group, did Mr. Nordean do a hand gesture toward him?

A.   He did, yes.

Q.   And was that hand gesture symbolizing you need to give us some space?

A.   Exactly what it was.  He's basically practicing --

MR. KENERSON:  Objection; move to strike.

THE COURT:  Sustained.  The answer will be struck.

BY MR. JAUREGUI:

Q.   Have you been in marches like this before for Proud Boys?

A.   Yes.

Q.   Can a large group of Proud Boys stop on a dime?

A.   No, they can't.

Q.   What happens if somebody gets in front of a marching group of men that can't stop on a dime?

A.   They can get run over.  This is an older gentleman, and nobody wants to do that to an older gentleman.

Q.   Thank you.

(Video played.)

BY MR. JAUREGUI:

Q.   What is half-step?

A.   Half-step means walk a little bit slower than you were just going.

Q.   Why is it called out?

A.   I mean, it's a military jargon, but it's something that

commanders, while marching large groups of people around, have said, to double-step, speed up, half-step, slow down.

That's all.  A lot of military guys.

(Video played.)

BY MR. JAUREGUI:

Q.   Do you hear that sound (sound effect) and did you see Mr. Nordean with his fist up in the air?

A.   Yes.

Q.   From being at previous rallies and marches and having conducted them yourself, what does that mean?

A.   It means stop.

Q.   Okay.

(Video played.)

BY MR. JAUREGUI:

Q.   After this scene, do you guys eventually get hungry and go eat?

A.   Yes; that's correct.

Q.   Where do you guys go?

A.   So exactly the route, I couldn't tell you, but we end up -- Nordean is looking for a bathroom.  We found a Port-a-John.  And across the street from the Port-a-Johns were some lunch trucks, and we ended up staying there.

Q.   I want to play a little more video for you.

(Video played.)

BY MR. JAUREGUI:

Q.   Do you know if this is where the food trucks were, on the corner here?

A.   It appears to be.

Q.   Okay.

(Video played.)

THE COURT:  Mr. Jauregui, is this a good stopping place?

MR. JAUREGUI:  Sure, Judge.

THE COURT:  Ladies and gentlemen, we're going to break for the end of the day.  As you know, we're not sitting tomorrow -- or you're not sitting tomorrow or the next day.  So we will see you Monday morning.

We will give you some -- we'll reach out to you about what time.  There may be some -- we're not sure what time we will begin with you all on Monday, but Ms. Harris or someone from the jury office will reach out to you.

Again, please avoid all media coverage of this case and January 6 generally.  Please do not do any independent investigation.  And of course, do not discuss the case with anyone, including your fellow jurors.

We'll see you on Monday.  Have a good weekend.  Thank you for your service, as always.

(Jury exited courtroom.)

THE COURT:  You all may be seated.

Mr. Smith, I understand you want to waive Mr. Nordean's

presence for tomorrow.  Is that correct?

All right.  Mr. Nordean, I understand you would like to not be transported here tomorrow and you would agree that we would proceed to deal with some legal issues outside your presence.

Do you agree to that, sir?

DEFENDANT NORDEAN:  I do, Your Honor.

MR. METCALF:  Mr. Pezzola would ask for the same thing, Your Honor.

THE COURT:  Mr. Pezzola, do you agree again that we will be dealing with jury instructions and other legal matters outside your presence tomorrow?  Do you agree to not be present tomorrow?

DEFENDANT PEZZOLA:  Yes, sir, I do.

MS. HERNANDEZ:  Your Honor, I haven't spoken to Mr. Rehl.

THE COURT:  I will give you one moment to do so.

MR. PATTIS:  I just wanted to remind the Court about Mr. Biggs' need to be out tomorrow.

THE COURT:  Oh, that is tomorrow?  Yes, we've already talked about that.  Good luck on that, Mr. Biggs.

MS. HERNANDEZ:  Mr. Rehl will come to court tomorrow.

THE COURT:  Very well.  All right.

I think, given how today has gone so unexpectedly, I am concerned that we're going to have unexpected issues pop up tomorrow, perhaps, that I haven't been aware of.  So I would

like to begin at 9:00 rather than 9:30, just because -- to be sure we get through all we want to get through, given the unexpected nature of this afternoon's testimony.

Anything the parties want to raise before we break for the evening?

All right.  I will see you all at 9:00 tomorrow.

(Proceedings adjourned at 5:25 p.m.)

CERTIFICATE OF OFFICIAL COURT REPORTER


        I, Sara A. Wick, certify that the foregoing is a

correct transcript from the record of proceedings in the

above-entitled matter.



/s/ Sara A. Wick                    April 13, 2023

SIGNATURE OF COURT REPORTER         DATE

## $

**$1,000** [2] - 18051:10, 18051:23

## /

**/s** [1] - 18133:8

## 0

**06511** [1] - 18010:6

## 1

**1** [3] - 18036:16, 18080:15, 18094:5
**100** [2] - 18066:22, 18118:3
**10010** [1] - 18009:23
**10016** [1] - 18010:17
**1014** [1] - 18010:13
**10:00** [2] - 18031:21, 18114:13
**11201** [1] - 18009:20
**1123** [1] - 18009:22
**115** [1] - 18038:8
**116X** [1] - 18041:14
**11:00** [1] - 18031:22
**12** [2] - 18009:7, 18030:10
**12th** [5] - 18071:15, 18075:11, 18083:25, 18084:2, 18084:3
**13** [1] - 18133:8
**1301** [1] - 18009:17
**1420** [1] - 18010:3
**153rd** [1] - 18010:10
**1776** [7] - 18097:2, 18097:4, 18097:8, 18097:17, 18097:20, 18098:4, 18098:7
**18** [2] - 18066:21, 18080:5
**18016** [1] - 18011:4
**18063** [1] - 18011:4
**18th** [1] - 18081:2
**1:05** [1] - 18107:23
**1:06** [2] - 18028:5, 18028:13
**1:12:18** [3] - 18028:12, 18028:14
**1:15:01** [1] - 18117:12
**1:18:04** [1] - 18118:9
**1:19:22** [1] - 18123:5
**1:39:34** [1] - 18123:20
**1:39:43** [1] - 18123:20
**1:41:08** [1] - 18125:7
**1:50** [1] - 18009:7

## 2

**2** [2] - 18036:17, 18055:10
**20** [1] - 18041:6
**200** [1] - 18066:19
**20001** [1] - 18010:22
**20005** [2] - 18009:18, 18010:3
**2019** [1] - 18063:24
**202-354-3284** [1] - 18010:23
**2020** [2] - 18034:9, 18080:5
**2021** [1] - 18013:17
**2023** [2] - 18009:7, 18133:8
**20579** [1] - 18009:15
**20777** [1] - 18010:8
**209** [1] - 18010:11
**21-175** [2] - 18012:5, 18058:9
**21-cr-175** [1] - 18009:3
**271** [1] - 18009:20
**28th** [1] - 18028:14
**2:00** [1] - 18067:3
**2:00:33** [2] - 18126:13, 18127:4
**2:28:58** [1] - 18126:23
**2:30** [1] - 18031:14
**2:347:47** [1] - 18080:8
**2:39:26** [1] - 18081:4
**2:41:25** [1] - 18081:17
**2:53:24** [1] - 18038:13

## 3

**3** [1] - 18047:13
**301** [1] - 18114:4
**30th** [1] - 18099:22
**33012** [1] - 18010:14
**33014** [1] - 18010:11
**333** [1] - 18010:21
**36** [1] - 18089:17
**383** [1] - 18010:5
**3:22** [1] - 18058:6
**3:28** [1] - 18112:7
**3:30** [2] - 18030:25, 18042:11
**3:36** [1] - 18058:6
**3rd** [1] - 18088:17

## 4

**4** [1] - 18082:15
**400A** [1] - 18020:7
**400D** [3] - 18016:12, 18016:16, 18020:18
**403** [2] - 18088:7,

18111:2
**4704-B** [1] - 18010:22
**490A** [1] - 18107:23
**490F** [1] - 18112:6
**49th** [1] - 18010:13
**4th** [7] - 18064:1, 18075:14, 18083:6, 18083:9, 18083:10, 18083:11, 18096:8

## 5

**5** [2] - 18055:10, 18113:23
**501-56** [1] - 18088:12
**503-10** [1] - 18027:24
**509-24** [2] - 18106:23, 18113:19
**514-21** [1] - 18080:5
**514-22** [1] - 18081:2
**52:11** [1] - 18114:4
**54:06** [1] - 18114:5
**5:25** [1] - 18132:7
**5th** [1] - 18096:12

## 6

**6** [72] - 18014:25, 18025:15, 18026:10, 18026:21, 18027:9, 18033:4, 18033:11, 18033:18, 18043:4, 18043:11, 18043:14, 18044:4, 18044:8, 18045:14, 18045:21, 18046:18, 18047:11, 18048:19, 18048:21, 18049:4, 18049:7, 18049:10, 18049:14, 18050:9, 18050:12, 18050:16, 18050:18, 18051:6, 18051:10, 18051:16, 18051:20, 18052:6, 18052:8, 18053:13, 18053:17, 18053:20, 18053:24, 18054:7, 18054:13, 18056:8, 18057:7, 18086:9, 18086:11, 18088:5, 18088:10, 18094:25, 18095:9, 18095:18, 18097:16, 18099:13, 18099:25, 18100:12, 18100:14, 18100:16, 18100:18, 18102:8, 18102:16, 18102:17, 18102:22, 18103:16, 18103:19, 18103:24, 18104:5, 18104:24, 18105:23,

18106:2, 18106:21, 18114:3, 18115:4, 18115:11, 18125:2, 18130:18
**60** [1] - 18066:18
**601** [1] - 18009:14
**602** [1] - 18035:25
**602-1** [1] - 18033:16
**602-17** [1] - 18034:13
**602-2** [2] - 18033:25, 18034:1
**602-3** [1] - 18034:2
**602-52** [1] - 18024:19
**602s** [1] - 18033:25
**6175** [1] - 18010:10
**6:18** [1] - 18025:15
**6:20:58** [1] - 18025:16
**6th** [3] - 18071:16, 18096:14, 18096:15

## 7

**700** [1] - 18009:17
**7166** [1] - 18010:8
**75** [2] - 18066:14, 18066:15
**7:00** [1] - 18067:4
**7:14:21** [2] - 18088:16, 18088:19

## 8

**800** [1] - 18067:4

## 9

**909** [1] - 18009:23
**99** [1] - 18010:16
**9:00** [2] - 18132:1, 18132:6
**9:27:48** [1] - 18106:24
**9:30** [4] - 18012:14, 18013:5, 18132:1
**9:40** [1] - 18113:24
**9:40:46** [1] - 18113:20
**9:50** [1] - 18113:24

## A

**a.m** [4] - 18028:12, 18028:13, 18067:3, 18067:4
**abet** [3] - 18052:14, 18052:21, 18056:25
**ability** [2] - 18021:8, 18021:12
**able** [8] - 18012:19, 18015:21, 18015:22, 18060:6, 18060:7, 18076:10, 18109:14,

18111:11
**above-entitled** [1] - 18133:5
**absolute** [4] - 18060:14, 18067:12, 18067:13, 18078:13
**absolutely** [11] - 18021:7, 18022:22, 18026:22, 18027:5, 18054:12, 18068:11, 18078:12, 18089:11, 18119:25, 18120:9, 18122:11
**absolution** [1] - 18067:18
**accept** [2] - 18046:9, 18046:12
**accepted** [2] - 18068:16, 18068:17
**accomplished** [1] - 18024:23
**accordion** [3] - 18085:15, 18085:17, 18085:24
**account** [1] - 18056:13
**accurate** [1] - 18122:20
**acquittal** [1] - 18060:25
**act** [4] - 18044:8, 18045:1, 18050:14, 18101:18
**acted** [2] - 18044:25, 18045:1
**acting** [1] - 18097:16
**action** [2] - 18056:20, 18056:22
**actions** [2] - 18064:24, 18079:23
**active** [2] - 18066:4, 18098:10
**activities** [3] - 18069:2, 18071:20, 18113:12
**activity** [1] - 18026:17
**acts** [1] - 18054:9
**actual** [3] - 18070:19, 18090:3, 18099:22
**ad** [1] - 18111:6
**add** [1] - 18109:11
**address** [3] - 18012:15, 18059:15
**adjacent** [1] - 18051:19
**adjourned** [1] - 18132:7
**administration** [1] - 18046:2
**admit** [1] - 18037:7

**admits** [1] - 18037:17
**admitted** [2] - 18090:13, 18090:15
**admitting** [1] - 18093:22
**adverse** [2] - 18059:3, 18060:15
**affected** [1] - 18033:5
**AFTERNOON** [1] - 18009:10
**afternoon** [5] - 18016:10, 18016:11, 18057:16, 18063:10, 18063:11
**afternoon's** [1] - 18132:3
**afterwards** [1] - 18017:14
**age** [2] - 18085:20, 18085:21
**agent** [1] - 18110:5
**agents** [3] - 18109:14, 18110:25, 18111:7
**aggressive** [3] - 18030:11, 18031:20, 18085:3
**aggressor** [1] - 18030:15
**ago** [1] - 18013:14
**agree** [19] - 18015:25, 18016:1, 18026:17, 18043:13, 18046:9, 18046:12, 18046:15, 18048:8, 18048:9, 18055:19, 18062:6, 18062:7, 18068:5, 18070:1, 18105:16, 18131:3, 18131:5, 18131:9, 18131:11
**agreeable** [1] - 18065:3
**agreed** [5] - 18037:15, 18086:24, 18101:13, 18103:9, 18113:21
**agreement** [14] - 18048:18, 18048:23, 18049:2, 18049:6, 18049:9, 18049:12, 18049:21, 18049:25, 18050:4, 18052:24, 18103:18, 18115:1, 18119:16, 18123:16
**agreements** [1] - 18117:20
**agrees** [2] - 18089:24, 18101:18
**ahead** [2] - 18032:12, 18042:2
**aid** [3] - 18052:14, 18052:18, 18056:22

**aided** [1] - 18010:25
**air** [2] - 18095:3, 18129:7
**al** [2] - 18012:6, 18058:10
**algorithm** [1] - 18070:3
**algorithms** [2] - 18069:21
**aligned** [1] - 18025:6
**alleged** [1] - 18014:1
**allow** [3] - 18036:11, 18062:11, 18073:25
**allowed** [6] - 18077:14, 18080:10, 18080:15, 18093:1, 18093:5, 18102:18
**almost** [2] - 18036:22, 18066:19
**alone** [1] - 18065:9
**alternative** [1] - 18074:24
**amazing** [1] - 18055:19
**ambushed** [2] - 18086:3, 18116:15
**Amendment** [2] - 18055:23, 18060:14
**America** [3] - 18012:5, 18025:20, 18058:9
**AMERICA** [1] - 18009:3
**American** [2] - 18034:23, 18122:15
**Americans** [1] - 18025:1
**amount** [4] - 18051:8, 18051:10, 18051:23, 18095:7
**amplified** [1] - 18120:1
**Amy** [5] - 18124:7, 18124:9, 18124:15, 18124:17, 18125:17
**angle** [1] - 18113:2
**announcement** [1] - 18100:13
**answer** [11] - 18022:14, 18022:19, 18047:16, 18067:15, 18073:25, 18074:8, 18076:12, 18095:11, 18106:11, 18128:8
**answered** [15] - 18033:13, 18036:3, 18047:12, 18049:15, 18049:18, 18051:12, 18054:18, 18054:23, 18055:13, 18055:21, 18055:22, 18057:11,

18097:22, 18103:25, 18106:5
**Antifa** [4] - 18037:19, 18078:8, 18086:3, 18123:10
**antipathy** [1] - 18037:19
**anxiety** [1] - 18031:10
**anyway** [3] - 18070:7, 18074:9, 18113:21
**apologies** [1] - 18084:11
**apologize** [1] - 18082:23
**appear** [1] - 18055:2
**APPEARANCES** [2] - 18009:12, 18010:1
**application** [4] - 18061:6, 18101:14, 18102:2, 18102:3
**apply** [1] - 18059:25
**appreciate** [1] - 18059:14
**approach** [1] - 18089:12
**approximate** [1] - 18066:25
**April** [2] - 18009:7, 18133:8
**area** [8] - 18023:16, 18024:7, 18024:16, 18075:15, 18103:14, 18107:20, 18116:4, 18126:18
**argue** [3] - 18015:22, 18060:3, 18065:4
**argued** [2] - 18014:23, 18015:6
**argument** [2] - 18014:25, 18015:3
**argumentative** [8] - 18086:15, 18087:16, 18087:17, 18088:7, 18088:8, 18104:13, 18105:24, 18120:15
**arguments** [1] - 18014:22
**army** [1] - 18088:4
**arrest** [3] - 18081:7, 18081:9, 18103:6
**arrested** [8] - 18089:2, 18089:6, 18095:4, 18095:5, 18095:8, 18096:7, 18102:12, 18102:15
**articulated** [1] - 18059:20
**aside** [1] - 18094:8
**aspect** [2] - 18015:16, 18045:7

**ass** [2] - 18068:7, 18122:2
**assault** [2] - 18053:7, 18054:14
**assaulted** [1] - 18027:14
**assert** [2] - 18055:23, 18056:3
**assessment** [3] - 18032:19, 18032:23, 18033:3
**assist** [2] - 18052:11, 18053:12
**assistance** [1] - 18020:17
**attack** [8] - 18021:19, 18022:2, 18022:6, 18022:21, 18022:22, 18042:25, 18060:23, 18080:23
**attacked** [1] - 18116:16
**attacking** [1] - 18023:1
**attempt** [4] - 18050:8, 18050:11, 18050:14, 18051:8
**attempting** [6] - 18035:24, 18091:4, 18093:13, 18093:14, 18094:3
**attended** [1] - 18121:19
**attention** [7] - 18066:7, 18068:22, 18069:19, 18069:22, 18071:19, 18097:14, 18106:24
**Attorney's** [2] - 18009:14, 18009:19
**attracts** [1] - 18023:21
**AUSA** [3] - 18009:13, 18009:13, 18009:19
**authority** [1] - 18043:5
**autonomous** [1] - 18065:8
**available** [1] - 18015:3
**Avenue** [3] - 18009:17, 18010:16, 18010:21
**average** [4] - 18066:15, 18066:17, 18066:24
**avoid** [2] - 18086:4, 18130:17
**aware** [5] - 18081:11, 18081:16, 18086:14, 18113:6, 18131:25
**awareness** [1] - 18072:10

**B**

**background** [1] - 18037:5
**backgrounds** [1] - 18085:21
**backtrack** [1] - 18099:24
**backwards** [1] - 18109:3
**bad** [6] - 18072:12, 18072:13, 18113:2, 18117:3, 18122:5, 18122:6
**badly** [1] - 18082:11
**ball** [1] - 18065:24
**ballgame** [1] - 18080:12
**ballpark** [1] - 18066:24
**barriers** [1] - 18024:15
**baseball** [1] - 18118:14
**based** [3] - 18069:9, 18072:4, 18077:5
**basic** [1] - 18060:25
**basis** [2] - 18014:2, 18109:8
**bathroom** [5] - 18041:23, 18041:25, 18042:1, 18042:5, 18129:20
**battle** [1] - 18065:1
**beating** [1] - 18026:15
**became** [4] - 18074:12, 18074:18, 18074:22, 18075:3
**become** [5] - 18073:10, 18073:17, 18082:21, 18111:17
**becoming** [1] - 18074:8
**beers** [1] - 18067:2
**BEFORE** [2] - 18009:1, 18009:10
**begin** [4] - 18058:15, 18094:14, 18130:15, 18132:1
**beginning** [2] - 18034:13, 18119:9
**behalf** [3] - 18034:11, 18046:10, 18046:16
**behave** [1] - 18030:13
**behavior** [3] - 18030:15, 18030:17, 18116:12
**behind** [13] - 18017:9, 18017:13, 18017:22, 18017:23, 18017:24, 18018:1, 18019:6,

18136

18019:8, 18019:9, 18019:10, 18019:22, 18070:24, 18085:23
**Bench** [8] - 18036:9, 18044:13, 18054:20, 18076:16, 18089:16, 18092:24, 18109:6, 18112:10
**bench** [9] - 18038:6, 18045:12, 18056:6, 18063:15, 18078:2, 18092:8, 18094:22, 18111:15, 18112:15
**beneficial** [3] - 18060:13, 18070:4, 18086:25
**benefit** [4] - 18045:14, 18047:10, 18047:18
**Bertino** [9] - 18030:10, 18044:2, 18104:8, 18105:5, 18105:7, 18105:11, 18105:22, 18107:3, 18107:4
**Bertino's** [2] - 18105:16, 18106:2
**best** [2] - 18060:19, 18064:6
**besties** [1] - 18064:6
**better** [2] - 18019:12, 18107:6
**between** [6] - 18019:19, 18036:25, 18059:8, 18059:18, 18103:22, 18111:8
**beyond** [1] - 18090:11
**Biden** [1] - 18031:16
**big** [1] - 18027:16
**bigger** [1] - 18098:13
**Biggs** [9] - 18010:2, 18023:3, 18040:2, 18043:17, 18046:9, 18048:9, 18110:20, 18117:18, 18131:20
**BIGGS** [1] - 18009:6
**Biggs'** [1] - 18131:18
**bit** [16] - 18017:17, 18023:25, 18027:25, 18029:19, 18031:12, 18041:1, 18065:18, 18075:13, 18077:2, 18085:22, 18099:24, 18116:4, 18117:8, 18118:21, 18127:6, 18128:22
**black** [5] - 18021:17, 18023:13, 18051:5, 18051:9, 18102:4
**blah** [3] - 18013:19, 18013:20

**blamed** [2] - 18031:8, 18033:7
**blast** [1] - 18082:12
**bleed** [1] - 18058:18
**BLM** [2] - 18078:13, 18078:19
**blob** [1] - 18117:9
**blueprint** [1] - 18100:7
**blunt** [1] - 18037:20
**Boots** [2] - 18096:19, 18096:22
**boss** [1] - 18081:7
**Boston** [1] - 18107:17
**bothered** [1] - 18096:25
**bottle** [8] - 18052:8, 18052:12, 18052:14, 18052:18, 18052:21, 18052:24, 18053:2, 18053:4
**bottom** [2] - 18034:7, 18088:16
**Boy** [7] - 18073:10, 18074:19, 18074:22, 18075:3, 18082:24, 18107:17, 18120:14
**Boys** [29] - 18021:18, 18021:21, 18030:13, 18035:1, 18064:19, 18064:25, 18065:19, 18065:21, 18067:9, 18068:9, 18072:16, 18078:10, 18078:21, 18082:5, 18082:10, 18082:12, 18082:17, 18085:20, 18095:17, 18101:3, 18101:6, 18101:10, 18103:8, 18103:19, 18116:2, 18116:3, 18123:1, 18128:10, 18128:12
**branch** [8] - 18053:13, 18053:16, 18053:20, 18053:23, 18054:2, 18054:6, 18054:15, 18056:9
**break** [6] - 18057:16, 18057:22, 18058:5, 18118:19, 18130:9, 18132:4
**Brian** [2] - 18039:21, 18039:22
**bribe** [4] - 18045:18, 18045:19, 18045:20, 18046:6
**bribes** [4] - 18046:9, 18046:12, 18046:13, 18046:15
**brick** [2] - 18036:12, 18036:22

**bridge** [1] - 18034:24
**brief** [2] - 18087:6, 18098:7
**briefly** [2] - 18076:15, 18112:9
**bring** [7] - 18013:11, 18016:2, 18057:17, 18058:15, 18060:12, 18062:15, 18090:4
**bringing** [3] - 18030:1, 18087:24, 18090:17
**broad** [1] - 18105:18
**Broadway** [1] - 18009:22
**Brooklyn** [1] - 18009:20
**BrotherHunter** [2] - 18028:5, 18028:21
**brought** [6] - 18014:24, 18014:25, 18029:17, 18029:18, 18064:10, 18101:8
**BS'ing** [1] - 18067:2
**building** [7] - 18038:24, 18040:15, 18042:9, 18047:25, 18048:5, 18048:6, 18108:16
**bulk** [1] - 18014:19
**bunch** [5] - 18023:11, 18031:12, 18065:22, 18070:2, 18110:18
**burn** [1] - 18058:15
**BY** [124] - 18016:9, 18016:17, 18017:2, 18017:19, 18018:12, 18019:4, 18019:17, 18020:9, 18020:20, 18021:22, 18022:1, 18022:4, 18022:16, 18033:2, 18033:17, 18033:21, 18034:3, 18034:15, 18038:10, 18038:20, 18039:2, 18039:25, 18041:16, 18041:21, 18042:4, 18043:10, 18045:13, 18047:19, 18049:20, 18051:15, 18052:17, 18056:7, 18057:3, 18063:9, 18063:18, 18063:22, 18064:23, 18067:20, 18069:1, 18070:15, 18071:25, 18072:15, 18073:9, 18073:16, 18074:11, 18074:17, 18075:2, 18075:7, 18075:25, 18078:3, 18078:18, 18079:8, 18082:3,

18082:8, 18084:1, 18084:12, 18084:20, 18086:18, 18087:18, 18088:9, 18092:9, 18094:23, 18095:15, 18095:25, 18098:2, 18099:5, 18100:4, 18100:24, 18103:5, 18104:3, 18104:16, 18104:22, 18105:10, 18105:15, 18105:21, 18106:1, 18106:7, 18106:12, 18106:19, 18108:5, 18108:23, 18109:2, 18111:16, 18112:16, 18112:20, 18113:9, 18113:15, 18114:7, 18115:14, 18115:18, 18116:20, 18117:5, 18117:14, 18118:5, 18118:11, 18118:23, 18119:6, 18119:19, 18120:11, 18120:17, 18120:25, 18121:6, 18121:18, 18122:14, 18123:4, 18123:7, 18123:13, 18123:22, 18124:14, 18125:1, 18125:9, 18125:20, 18126:1, 18126:6, 18126:12, 18126:25, 18127:8, 18127:12, 18127:21, 18128:9, 18128:20, 18129:5, 18129:14, 18129:25

## C

**Cadman** [1] - 18009:20
**camera** [1] - 18125:15
**camo** [1] - 18039:16
**camp** [1] - 18023:22
**campaign** [1] - 18046:4
**candidly** [1] - 18059:9
**cannot** [3] - 18060:16, 18076:19, 18076:24
**cap** [2] - 18118:14, 18125:12
**capital** [1] - 18101:11
**Capitol** [46] - 18013:23, 18016:19, 18017:16, 18017:25, 18018:2, 18019:13, 18019:24, 18021:19, 18022:2, 18022:6, 18022:21, 18022:23, 18023:1, 18024:1,

18024:4, 18025:8, 18030:20, 18030:25, 18031:8, 18032:2, 18032:8, 18033:4, 18038:11, 18040:21, 18041:5, 18042:8, 18042:9, 18042:17, 18042:24, 18044:4, 18047:11, 18048:5, 18052:1, 18052:4, 18053:8, 18053:10, 18053:13, 18088:5, 18088:22, 18089:4, 18118:25, 18121:2, 18122:8, 18122:10, 18123:17, 18126:8
**captured** [1] - 18110:4
**capturing** [1] - 18021:4
**care** [1] - 18054:22
**CARMEN** [1] - 18010:7
**carried** [1] - 18049:23
**carrying** [3] - 18050:9, 18050:12, 18050:15
**case** [12] - 18013:17, 18059:24, 18059:25, 18060:6, 18060:8, 18060:13, 18090:12, 18104:17, 18109:15, 18112:2, 18130:17, 18130:19
**Case** [1] - 18009:3
**cases** [3] - 18014:11, 18077:5, 18117:3
**catch** [4] - 18067:8, 18086:1, 18118:18, 18118:20
**catching** [1] - 18042:13
**cats** [2] - 18065:16, 18065:19
**caused** [1] - 18083:22
**causing** [2] - 18051:22, 18052:3
**CCTV** [1] - 18109:18
**Cellebrite** [4] - 18089:13, 18090:3, 18091:1, 18091:2
**center** [1] - 18124:20
**certain** [2] - 18067:17, 18072:7
**certainly** [2] - 18064:10, 18089:19
**CERTIFICATE** [1] - 18133:1
**certify** [1] - 18133:3
**chairman** [2] - 18064:16, 18076:3
**challenging** [1] -

18015:15

chance [2] - 18098:22, 18121:7

chances [1] - 18029:17

change [3] - 18079:3, 18079:5, 18123:16

changed [1] - 18118:6

chanted [1] - 18041:8

chanting [4] - 18041:9, 18041:11, 18118:8, 18123:10

chants [2] - 18041:12, 18041:13

chaos [1] - 18029:7

chapter [13] - 18028:18, 18028:19, 18029:14, 18029:21, 18029:22, 18039:11, 18065:7, 18065:10, 18098:12, 18101:2, 18107:18, 18107:19, 18111:18

chapters [5] - 18065:5, 18065:9, 18065:10, 18085:12, 18098:13

characteristics [2] - 18084:9, 18084:14

charge [4] - 18055:1, 18085:14, 18095:6, 18102:21

charged [7] - 18013:16, 18013:25, 18015:12, 18027:14, 18044:15, 18060:24, 18103:20

charges [3] - 18055:2, 18056:23, 18081:7

charging [4] - 18014:1, 18014:11, 18015:14, 18015:15

charitable [3] - 18073:6, 18073:11, 18073:18

charity [3] - 18073:21, 18074:13, 18075:4

chat [15] - 18028:2, 18030:17, 18031:19, 18066:16, 18066:18, 18067:1, 18067:25, 18068:5, 18087:21, 18089:9, 18096:13, 18097:9, 18097:13, 18097:14, 18098:18

chats [25] - 18030:19, 18030:20, 18031:11, 18031:23, 18065:4, 18066:2, 18066:4, 18066:8, 18066:9,

18066:10, 18066:14, 18066:15, 18066:18, 18066:19, 18066:20, 18066:21, 18066:23, 18067:22, 18068:11, 18096:11, 18097:25, 18098:11, 18098:15, 18098:16, 18114:23

chauvinist [1] - 18082:22

cheap [2] - 18017:6, 18017:7

children [1] - 18083:3

chilled [1] - 18031:14

chime [1] - 18062:13

chip [1] - 18098:17

chosen [1] - 18084:8

CHS [1] - 18111:8

church [1] - 18126:20

circle [4] - 18038:16, 18039:6, 18041:18, 18108:11

circled [1] - 18125:14

circling [1] - 18125:17

circulated [1] - 18037:11

circumvent [2] - 18093:14, 18093:15

city [4] - 18072:8, 18075:13, 18101:10, 18102:19

civil [2] - 18013:16, 18060:6

claim [1] - 18090:6

clarify [2] - 18021:15, 18092:7

classes [1] - 18063:19

clear [5] - 18020:3, 18080:22, 18091:14, 18101:3, 18119:25

clearly [1] - 18020:12

clicks [1] - 18069:18

client [10] - 18058:21, 18058:24, 18059:3, 18059:4, 18060:11, 18060:12, 18094:4, 18110:2, 18111:8

client's [1] - 18060:13

close [3] - 18013:6, 18020:6, 18127:24

closeness [1] - 18077:3

closer [3] - 18017:15, 18017:20, 18018:1

closest [4] - 18017:8, 18019:11, 18020:15, 18042:12

closings [1] - 18013:10

club [1] - 18073:20

co [3] - 18059:10, 18061:8, 18061:15

co-counsel [2] - 18059:10, 18061:15

co-defendant [1] - 18061:8

code [5] - 18087:14, 18087:19, 18088:1, 18102:2, 18120:12

collided [1] - 18023:14

colors [4] - 18100:12, 18100:13, 18100:16, 18101:13

COLUMBIA [1] - 18009:1

coming [2] - 18119:24, 18120:4

commanders [1] - 18129:1

comment [1] - 18034:7

commission [2] - 18103:7, 18107:11

commit [12] - 18033:11, 18050:14, 18051:2, 18051:25, 18052:3, 18052:6, 18053:4, 18053:6, 18054:10, 18054:13, 18056:22

committed [1] - 18033:9

communicate [1] - 18086:6

comparing [1] - 18019:19

complete [1] - 18120:21

completely [5] - 18030:4, 18065:7, 18065:13, 18102:19, 18115:12

complied [2] - 18038:17, 18039:19

comply [1] - 18089:25

compound [1] - 18021:20

computer [1] - 18010:25

computer-aided [1] - 18010:25

concede [1] - 18014:10

concerned [1] - 18131:24

concerns [1] - 18099:11

concerts [1] - 18024:10

conclusion [5] - 18043:7, 18044:9, 18044:24, 18052:15, 18102:25

conclusions [1] - 18055:9

conduct [2] - 18046:6, 18060:4

conducted [2] - 18121:20, 18129:10

conference [16] - 18036:9, 18038:6, 18044:13, 18045:12, 18054:20, 18056:6, 18076:16, 18078:2, 18089:16, 18092:8, 18092:24, 18094:22, 18109:6, 18111:15, 18112:10, 18112:15

confidential [1] - 18112:3

confrontation [1] - 18101:19

confusion [1] - 18102:5

Congress [4] - 18048:24, 18049:10, 18049:13, 18049:22

congressmen [2] - 18033:5, 18048:3

Congresspersons [1] - 18040:20

Connecticut [1] - 18010:6

connection [2] - 18025:17, 18053:3

CONOR [1] - 18009:16

consequences [1] - 18080:19

consider [1] - 18064:11

considered [4] - 18060:19, 18076:3, 18080:16

consistent [1] - 18122:8

conspiracies [2] - 18060:24, 18087:15

conspiracy [2] - 18048:18, 18124:22

conspire [2] - 18043:13, 18056:20

constant [1] - 18065:1

Constitution [1] - 18010:21

consuming [1] - 18033:22

contact [5] - 18056:8, 18056:12, 18056:16, 18071:6, 18103:2

content [2] - 18094:4, 18094:11

continue [3] - 18013:12, 18016:6, 18100:25

Continued [1] - 18016:8

continued [1] - 18009:25

CONTINUED [1] - 18010:1

Continued).. [1] - 18011:4

continues [1] - 18019:10

control [1] - 18087:4

conversations [3] - 18023:7, 18087:11, 18096:15

cooperate [3] - 18071:13, 18080:9, 18080:23

coordinate [1] - 18113:25

cops [5] - 18026:15, 18027:14, 18080:9, 18080:14, 18080:23

corner [1] - 18130:2

correct [37] - 18016:19, 18020:23, 18023:8, 18025:2, 18026:21, 18027:7, 18028:3, 18030:11, 18033:12, 18034:12, 18035:19, 18036:2, 18038:21, 18040:17, 18040:22, 18042:23, 18046:8, 18047:9, 18060:9, 18068:8, 18081:3, 18082:24, 18086:20, 18090:21, 18090:24, 18096:3, 18097:2, 18100:1, 18102:13, 18113:12, 18118:15, 18119:7, 18120:2, 18125:13, 18129:17, 18131:1, 18133:4

corruptly [5] - 18044:8, 18044:21, 18044:25, 18045:1, 18045:2

coulda [2] - 18031:12, 18031:13

COUNSEL [1] - 18076:8

counsel [9] - 18016:13, 18059:10, 18061:15, 18061:21, 18063:6, 18076:9,

18076:10, 18105:8, 18126:11

**Count** [3] - 18047:13, 18055:10

**count** [3] - 18054:22, 18055:13, 18056:2

**country** [8] - 18065:2, 18065:5, 18065:15, 18067:3, 18098:13, 18098:23, 18099:9, 18101:12

**couple** [5] - 18014:5, 18075:9, 18100:17, 18108:9, 18118:19

**couple-minute** [1] - 18118:19

**course** [5] - 18015:6, 18060:8, 18061:4, 18068:4, 18130:19

**COURT** [157] - 18009:1, 18012:10, 18012:13, 18012:21, 18013:4, 18014:5, 18015:2, 18015:5, 18015:17, 18015:23, 18016:5, 18016:13, 18022:3, 18022:8, 18022:13, 18032:24, 18036:4, 18036:15, 18036:25, 18037:6, 18037:18, 18038:1, 18043:8, 18044:10, 18044:20, 18044:24, 18045:6, 18047:14, 18049:18, 18051:13, 18052:16, 18054:21, 18055:6, 18055:19, 18055:25, 18056:3, 18057:12, 18057:15, 18057:19, 18058:11, 18058:14, 18058:23, 18059:1, 18059:6, 18059:14, 18060:18, 18061:1, 18061:4, 18061:11, 18061:22, 18062:15, 18062:22, 18063:2, 18063:4, 18063:17, 18063:21, 18064:22, 18067:15, 18068:24, 18070:14, 18071:24, 18072:4, 18072:20, 18072:22, 18073:8, 18073:14, 18074:1, 18074:4, 18074:8, 18074:16, 18074:25, 18075:6, 18075:24, 18076:9, 18077:1, 18077:14, 18077:22, 18077:24, 18078:17, 18079:7,

18082:2, 18082:7, 18083:24, 18084:17, 18086:16, 18087:17, 18088:8, 18089:14, 18089:22, 18090:16, 18090:20, 18090:23, 18091:2, 18091:8, 18091:12, 18092:1, 18092:6, 18092:16, 18093:6, 18093:10, 18094:7, 18094:15, 18095:11, 18095:24, 18097:23, 18099:3, 18100:3, 18100:23, 18101:5, 18103:1, 18104:1, 18104:15, 18104:21, 18105:9, 18105:14, 18105:18, 18105:20, 18105:25, 18106:6, 18106:11, 18106:18, 18108:4, 18108:22, 18109:1, 18109:5, 18109:12, 18109:24, 18110:3, 18110:13, 18110:21, 18111:9, 18112:9, 18112:11, 18113:8, 18119:5, 18119:18, 18120:8, 18120:16, 18120:24, 18121:13, 18121:16, 18123:3, 18124:25, 18125:19, 18126:5, 18126:10, 18127:20, 18128:8, 18130:6, 18130:9, 18130:24, 18131:9, 18131:16, 18131:19, 18131:22, 18133:1, 18133:9

**Court** [11] - 18010:21, 18013:18, 18036:10, 18037:13, 18037:14, 18037:17, 18045:5, 18062:6, 18076:18, 18089:17, 18131:17

**court** [8] - 18012:2, 18057:16, 18063:19, 18086:14, 18097:7, 18110:11, 18110:13, 18131:21

**Court's** [3] - 18036:7, 18037:23, 18057:2

**courtesy** [1] - 18063:1

**courthouse** [3] - 18108:17, 18110:9, 18111:12

**courting** [1] - 18071:19

**COURTROOM** [3] - 18012:4, 18034:1,

18058:8

**courtroom** [5] - 18016:4, 18057:18, 18063:3, 18097:5, 18130:23

**cover** [2] - 18058:2, 18062:12

**coverage** [1] - 18130:17

**covered** [1] - 18062:13

**crap** [2] - 18031:12, 18031:18

**crazed** [1] - 18065:22

**create** [2] - 18034:16, 18034:17

**created** [6] - 18083:18, 18083:20, 18083:21, 18097:4, 18114:16, 18114:17

**creates** [1] - 18081:7

**creating** [1] - 18082:23

**creation** [1] - 18083:22

**crimes** [1] - 18103:20

**criminal** [2] - 18060:8, 18063:15

**Criminal** [2] - 18012:5, 18058:9

**cross** [5] - 18022:22, 18036:16, 18058:12, 18058:18, 18062:3

**crossed** [1] - 18061:19

**crossing** [1] - 18024:5

**crowd** [8] - 18023:10, 18023:14, 18023:15, 18024:6, 18025:5, 18025:6, 18032:8, 18083:7

**crowds** [2] - 18023:21, 18025:9

**CRR** [1] - 18010:21

**cuff** [1] - 18023:25

**culpability** [1] - 18055:17

**culture** [1] - 18072:25

**cumulative** [8] - 18073:13, 18083:23, 18084:16, 18088:6, 18097:21, 18111:2, 18111:7, 18125:18

**cut** [2] - 18034:24, 18083:2

## D

**D.C** [14] - 18009:6, 18009:15, 18009:18,

18010:3, 18010:22, 18013:15, 18014:24, 18028:16, 18029:8, 18064:1, 18101:8, 18101:11, 18113:24, 18127:3

**DA** [1] - 18080:12

**damage** [4] - 18051:8, 18051:9, 18051:22, 18052:3

**danger** [4] - 18075:18, 18077:20, 18078:4, 18078:6

**Darcy** [1] - 18042:16

**DATE** [1] - 18133:9

**date** [3] - 18025:14, 18099:20, 18099:21

**dates** [1] - 18075:10

**David** [2] - 18009:22, 18016:16

**days** [2] - 18026:22, 18109:17

**deal** [3] - 18012:8, 18101:9, 18131:4

**dealing** [2] - 18012:10, 18131:10

**December** [5] - 18013:17, 18028:14, 18030:10, 18071:15, 18075:11

**decided** [3] - 18041:3, 18060:10, 18091:20

**decides** [1] - 18084:24

**decision** [2] - 18014:1, 18015:16

**decisions** [2] - 18014:11, 18015:14

**decorum** [1] - 18093:3

**dedicated** [1] - 18064:15

**defend** [2] - 18044:17, 18060:12

**Defendant** [5] - 18009:21, 18010:2, 18010:7, 18010:9, 18010:15

**defendant** [5] - 18015:11, 18059:8, 18059:19, 18061:8, 18062:2

**DEFENDANT** [2] - 18131:6, 18131:13

**Defendants** [1] - 18009:8

**defendants** [1] - 18055:15

**Defense** [4] - 18028:2, 18083:18, 18084:14, 18086:19

**defense** [3] -

18012:18, 18055:12, 18101:18

**DEFENSE** [1] - 18076:8

**definitely** [4] - 18028:15, 18032:5, 18062:8, 18111:7

**definition** [2] - 18045:6, 18045:8

**defund** [1] - 18079:14

**degree** [13] - 18073:10, 18073:11, 18073:18, 18074:13, 18074:18, 18074:22, 18075:3, 18077:3, 18077:7, 18082:16, 18082:21, 18082:25, 18083:8

**degrees** [1] - 18083:6

**delta** [1] - 18036:25

**Democrats** [2] - 18032:4, 18032:5

**deny** [3] - 18044:14, 18055:1, 18055:17

**Department** [1] - 18009:16

**depredate** [1] - 18050:21

**depredation** [4] - 18051:2, 18051:16, 18051:25, 18052:3

**DEPUTY** [3] - 18012:4, 18034:1, 18058:8

**describe** [3] - 18031:19, 18064:13, 18064:24

**described** [3] - 18023:9, 18024:22, 18086:19

**describing** [2] - 18017:21, 18023:13

**designed** [4] - 18017:7, 18019:11, 18020:5, 18020:15

**destroy** [4] - 18028:22, 18043:2, 18050:22, 18057:9

**destroying** [2] - 18026:16, 18028:8

**destruction** [2] - 18032:21, 18033:4

**details** [2] - 18105:11, 18112:2

**detected** [1] - 18061:24

**develop** [2] - 18117:6, 18117:24

**difference** [2] - 18045:10, 18090:3

**different** [29] -

18013:18, 18021:2, 18021:5, 18023:11, 18029:18, 18030:4, 18031:19, 18041:9, 18054:19, 18054:22, 18055:13, 18060:5, 18065:1, 18065:2, 18065:5, 18065:6, 18065:7, 18065:15, 18080:12, 18092:18, 18098:15, 18098:18, 18103:18, 18110:17, 18111:7, 18114:19, 18114:23, 18124:2, 18126:22

**differently** [1] - 18065:13

**dime** [2] - 18128:12, 18128:15

**direct** [20] - 18016:6, 18058:20, 18058:25, 18059:2, 18059:5, 18060:5, 18060:7, 18060:17, 18062:2, 18063:5, 18072:4, 18077:12, 18077:15, 18089:23, 18089:24, 18091:14, 18091:21, 18098:4, 18106:24

**Direct** [2] - 18011:4, 18011:4

**DIRECT** [2] - 18016:8, 18063:8

**direction** [2] - 18017:23, 18102:16

**directly** [2] - 18108:16, 18111:21

**dirt** [1] - 18065:25

**disagree** [2] - 18068:5, 18077:17

**discharging** [3] - 18048:24, 18049:3, 18049:13

**discuss** [4] - 18014:8, 18099:12, 18113:23, 18130:19

**discussed** [10] - 18087:10, 18097:13, 18098:6, 18098:8, 18098:9, 18098:19, 18100:11, 18100:12, 18117:20, 18117:22

**disgrace** [1] - 18027:11

**dislike** [1] - 18079:10

**disperse** [2] - 18103:13

**dispersed** [1] - 18096:6

**disrespect** [1] -

18079:17

**disrupted** [1] - 18027:13

**distinction** [2] - 18059:8, 18059:18

**distorted** [3] - 18072:16, 18072:18, 18072:23

**DISTRICT** [3] - 18009:1, 18009:1, 18009:11

**document** [10] - 18097:2, 18097:4, 18097:6, 18097:8, 18097:11, 18097:13, 18097:17, 18097:20, 18098:4, 18098:7

**documents** [1] - 18093:22

**DOMINIC** [1] - 18009:7

**Donald** [4] - 18024:13, 18027:4, 18034:11, 18046:1

**done** [6] - 18031:14, 18037:1, 18069:12, 18082:19, 18082:24, 18083:10

**Donohoe** [2] - 18040:12, 18043:25

**Door** [1] - 18051:19

**door** [4] - 18036:22, 18037:12, 18039:3, 18041:24

**double** [1] - 18129:2

**double-step** [1] - 18129:2

**down** [21] - 18025:13, 18025:15, 18027:16, 18028:4, 18028:12, 18032:8, 18038:21, 18042:12, 18077:12, 18077:14, 18105:19, 18107:20, 18109:25, 18110:8, 18110:9, 18110:22, 18111:12, 18113:18, 18117:2, 18129:2

**downplay** [1] - 18024:3

**doxxed** [2] - 18116:5, 18116:8

**doxxing** [7] - 18036:12, 18036:19, 18036:24, 18037:9, 18037:10, 18115:25, 18116:1

**dressed** [1] - 18122:21

**drink** [2] - 18065:4,

18084:23

**drinking** [2] - 18067:2, 18068:12

**driving** [2] - 18020:3, 18112:21

**dropping** [1] - 18014:7

**drugs** [1] - 18101:23

**drunk** [2] - 18031:1, 18101:22

**dry** [1] - 18083:2

**dunk** [4] - 18098:19, 18099:7, 18099:12, 18099:20

**duplicative** [1] - 18055:2

**during** [7] - 18031:2, 18058:22, 18071:14, 18086:12, 18101:23, 18117:19, 18119:7

**duties** [11] - 18048:25, 18049:4, 18049:13, 18049:22, 18050:1, 18050:6, 18050:9, 18050:12, 18050:16, 18056:14

**duty** [1] - 18068:3

## E

**e-mail** [2] - 18097:9, 18098:4

**ear** [1] - 18120:2

**early** [1] - 18105:2

**ears** [1] - 18012:21

**East** [1] - 18009:20

**eat** [2] - 18031:10, 18129:16

**eating** [2] - 18031:14, 18098:17

**edgy** [3] - 18068:13, 18068:14

**effect** [3] - 18017:25, 18033:6, 18129:6

**effect)** [2] - 18017:10, 18066:1

**efficiency** [1] - 18059:22

**either** [15] - 18013:22, 18037:18, 18040:12, 18045:1, 18045:23, 18045:25, 18057:20, 18059:20, 18063:25, 18067:21, 18081:19, 18087:2, 18091:15, 18101:10, 18107:12

**election** [2] - 18033:23, 18034:5

**electors** [1] - 18031:4

**elements** [2] -

18044:15, 18049:16

**elicit** [4] - 18074:5, 18076:19, 18091:5, 18094:3

**elicited** [1] - 18076:22

**eliciting** [1] - 18077:16

**embedded** [1] - 18125:2

**emphasize** [1] - 18116:6

**employee** [10] - 18053:7, 18053:10, 18053:12, 18053:15, 18053:19, 18053:22, 18054:2, 18054:5, 18054:15, 18056:9

**encircled** [1] - 18108:10

**encourage** [2] - 18014:8, 18015:19

**end** [11] - 18027:20, 18042:7, 18045:12, 18056:6, 18075:22, 18078:2, 18081:10, 18089:9, 18112:15, 18129:19, 18130:10

**End** [4] - 18038:6, 18092:8, 18094:22, 18111:15

**ended** [3] - 18042:13, 18101:7, 18129:22

**enforcement** [30] - 18049:3, 18050:5, 18050:8, 18050:11, 18050:15, 18052:9, 18052:12, 18052:19, 18052:22, 18052:25, 18053:4, 18053:7, 18070:23, 18071:6, 18071:10, 18071:14, 18071:17, 18078:25, 18079:2, 18079:5, 18079:10, 18079:12, 18079:17, 18079:20, 18079:24, 18080:2, 18080:3, 18083:11, 18083:13

**enforcing** [1] - 18091:17

**engage** [1] - 18073:6

**engaged** [1] - 18056:13

**engagement** [2] - 18069:22, 18069:24

**ENRIQUE** [1] - 18009:6

**Enrique** [51] - 18063:23, 18064:12, 18066:2, 18066:23,

18067:11, 18068:19, 18068:22, 18069:3, 18069:10, 18070:8, 18070:11, 18070:17, 18070:21, 18070:22, 18071:13, 18071:16, 18073:22, 18074:12, 18074:14, 18074:18, 18075:3, 18075:8, 18075:17, 18079:9, 18079:23, 18082:16, 18083:5, 18083:13, 18083:20, 18084:5, 18092:13, 18092:18, 18094:25, 18095:20, 18096:1, 18096:7, 18096:15, 18096:17, 18096:19, 18097:20, 18098:24, 18099:1, 18099:7, 18099:8, 18100:19, 18102:15, 18107:6, 18108:14, 18108:17, 18108:19, 18113:2

**Enrique's** [3] - 18079:5, 18102:8, 18113:12

**ensure** [1] - 18100:9

**enter** [10] - 18048:18, 18048:23, 18049:2, 18049:6, 18049:9, 18049:12, 18049:21, 18049:25, 18050:4, 18052:24

**entered** [3] - 18013:23, 18016:4, 18063:3

**entering** [1] - 18039:3

**entertain** [1] - 18014:21

**entire** [3] - 18092:5, 18093:18, 18124:21

**entitled** [6] - 18044:14, 18044:17, 18054:25, 18055:5, 18055:6, 18133:5

**ERIK** [1] - 18009:13

**especially** [4] - 18022:10, 18028:16, 18029:2, 18068:12

**ESQ** [8] - 18009:16, 18009:21, 18010:2, 18010:4, 18010:7, 18010:9, 18010:12, 18010:15

**essentially** [4] - 18032:2, 18076:19, 18094:3, 18100:7

**establish** [1] - 18111:8

**established** [2] - 18111:9, 18114:3
**et** [2] - 18012:6, 18058:10
**ETHAN** [1] - 18009:6
**Ethan** [2] - 18012:5, 18058:9
**evacuated** [1] - 18040:19
**evening** [1] - 18132:5
**event** [22] - 18023:24, 18030:3, 18063:25, 18064:1, 18070:9, 18070:11, 18070:12, 18070:19, 18070:24, 18071:3, 18072:7, 18075:12, 18083:21, 18084:6, 18099:25, 18100:1, 18100:19, 18101:1, 18116:2, 18121:23
**events** [16] - 18023:21, 18023:23, 18028:15, 18028:16, 18029:1, 18029:2, 18030:5, 18071:6, 18071:14, 18072:1, 18073:6, 18073:11, 18073:18, 18099:17, 18101:10, 18116:2
**eventually** [3] - 18042:5, 18065:11, 18129:15
**everywhere** [4] - 18030:6, 18082:13, 18103:11, 18125:4
**evidence** [17] - 18015:22, 18037:21, 18060:11, 18090:2, 18090:19, 18090:21, 18090:24, 18090:25, 18091:5, 18091:8, 18091:16, 18091:19, 18093:16, 18109:10, 18111:3, 18111:10
**Evidence** [2] - 18077:15, 18093:17
**exact** [3] - 18055:21, 18082:21, 18099:21
**exactly** [19] - 18025:4, 18029:4, 18030:15, 18040:24, 18041:6, 18041:10, 18042:16, 18045:3, 18063:25, 18085:8, 18087:24, 18089:3, 18102:3, 18114:11, 18121:22, 18122:4, 18127:3, 18128:6, 18129:19
**Examination** [1] -

18011:4
**examination** [2] - 18016:6, 18063:5
**EXAMINATION** [2] - 18016:8, 18063:8
**Examination.............** . [1] - 18011:4
**examine** [1] - 18060:21
**example** [10] - 18017:9, 18020:2, 18065:9, 18067:1, 18073:22, 18074:12, 18078:8, 18078:13, 18087:7, 18110:5
**except** [2] - 18055:17, 18118:8
**excluded** [2] - 18014:20, 18036:11
**excluding** [1] - 18015:13
**exhibit** [12] - 18088:14, 18088:16, 18089:9, 18090:2, 18090:5, 18090:6, 18090:18, 18090:25, 18092:10, 18094:14, 18112:17
**Exhibit** [12] - 18016:12, 18016:16, 18024:19, 18033:16, 18038:8, 18041:14, 18080:4, 18088:12, 18106:23, 18107:23, 18112:6, 18113:19
**exhibits** [2] - 18089:18, 18089:20
**existed** [1] - 18119:21
**exited** [2] - 18057:18, 18130:23
**expect** [5] - 18057:25, 18058:1, 18060:22, 18062:19, 18087:25
**expectation** [2] - 18013:8, 18103:10
**expected** [2] - 18023:25, 18103:17
**experience** [1] - 18035:11
**experienced** [1] - 18071:12
**explain** [19] - 18030:24, 18069:13, 18071:8, 18073:17, 18074:13, 18074:21, 18076:1, 18080:13, 18081:4, 18084:21, 18085:8, 18088:23, 18100:15, 18114:22, 18115:23, 18116:22,

18119:2, 18121:10, 18127:16
**explained** [2] - 18024:25, 18115:25
**explaining** [2] - 18024:20, 18080:14
**expressed** [1] - 18107:19
**extended** [1] - 18117:8
**extent** [2] - 18014:13, 18020:24
**extra** [1] - 18126:18
**extraction** [3] - 18091:1, 18092:4, 18092:5
**extractions** [1] - 18091:2
**extraordinary** [2] - 18073:20, 18073:21
**eye** [1] - 18116:14
**eyes** [2] - 18021:6, 18116:11

## F

**face** [3] - 18020:14, 18034:24, 18080:18
**facing** [1] - 18017:22
**fact** [7] - 18015:8, 18023:24, 18024:15, 18032:4, 18077:21, 18096:25, 18118:8
**facts** [8] - 18013:25, 18014:14, 18015:9, 18044:25, 18045:3, 18060:11, 18060:12, 18078:1
**factual** [5] - 18014:2, 18015:23, 18015:25, 18045:9, 18055:6
**factually** [2] - 18015:6, 18055:11
**fair** [6] - 18048:7, 18061:9, 18061:22, 18119:13, 18122:20, 18125:22
**fall** [1] - 18085:23
**familiar** [1] - 18127:2
**family** [1] - 18083:4
**famous** [1] - 18097:2
**fancy** [1] - 18050:21
**far** [4] - 18040:20, 18042:16, 18062:2, 18104:21
**fashion** [1] - 18030:13
**fast** [1] - 18114:3
**fat** [1] - 18117:8
**favor** [1] - 18047:3
**FBI** [6] - 18081:21,

18081:23, 18109:14, 18112:4, 18113:12, 18113:16
**fear** [2] - 18025:21, 18026:7
**fears** [3] - 18025:21, 18026:11, 18026:13
**feelings** [5] - 18013:3, 18078:24, 18079:2, 18079:5, 18080:1
**feet** [1] - 18119:23
**fellow** [1] - 18130:20
**felony** [5] - 18052:6, 18053:4, 18053:6, 18054:10, 18054:13
**fence** [4] - 18021:18, 18051:5, 18051:9
**few** [5] - 18031:23, 18043:4, 18055:8, 18107:18, 18119:23
**Fifth** [2] - 18060:10, 18061:15
**fight** [2] - 18025:20, 18064:20
**fighting** [4] - 18014:24, 18015:1, 18015:10, 18088:10
**fights** [2] - 18082:4, 18082:9
**figure** [1] - 18066:24
**filed** [4] - 18013:14, 18015:4, 18034:11, 18081:24
**files** [2] - 18014:4, 18081:20
**film** [1] - 18125:5
**filmed** [2] - 18109:16, 18113:5
**finance** [2] - 18085:21, 18085:22
**financial** [2] - 18047:10, 18047:18
**fine** [6] - 18037:11, 18056:3, 18078:1, 18091:22, 18092:2, 18112:12
**finish** [3] - 18093:1, 18093:4, 18093:5
**Finley** [3] - 18013:24, 18039:21, 18039:22
**fired** [2] - 18036:13, 18036:23
**First** [2] - 18010:6, 18016:15
**first** [16] - 18014:15, 18017:5, 18018:20, 18042:10, 18042:22, 18063:23, 18063:24, 18063:25, 18064:15, 18076:3, 18076:9,

18082:16, 18082:21, 18083:6, 18083:7
**fist** [1] - 18129:7
**fit** [2] - 18093:7, 18102:5
**five** [1] - 18119:20
**fix** [1] - 18074:10
**flag** [4] - 18034:23, 18035:5, 18122:21
**flags** [4] - 18025:1, 18122:15, 18122:17, 18122:19
**flavor** [1] - 18098:17
**Floor** [2] - 18010:6, 18010:16
**Florida** [2] - 18010:11, 18010:14
**folks** [1] - 18015:10
**follow** [3] - 18030:8, 18109:13, 18123:23
**follow-up** [1] - 18030:8
**followed** [3] - 18081:24, 18091:23, 18124:1
**following** [3] - 18033:25, 18041:18, 18124:22
**food** [1] - 18130:1
**footstep** [1] - 18124:23
**FOR** [1] - 18009:1
**force** [17] - 18014:24, 18015:1, 18015:10, 18043:5, 18043:11, 18043:14, 18048:18, 18048:24, 18049:3, 18049:12, 18049:21, 18053:6, 18053:12, 18053:22, 18054:1, 18057:7, 18088:10
**forcibly** [3] - 18053:15, 18054:1, 18054:14
**foregoing** [1] - 18133:3
**forget** [2] - 18025:19, 18126:21
**form** [2] - 18101:15, 18101:17
**formulate** [1] - 18061:13
**formulated** [1] - 18103:7
**forte** [3] - 18062:7, 18062:8
**forth** [2] - 18073:1, 18089:10
**forward** [5] - 18019:9, 18046:22, 18091:23,

18114:3, 18114:18

**forwarded** [2] - 18114:17, 18114:19

**foundation** [20] - 18051:11, 18068:23, 18072:3, 18073:23, 18074:15, 18074:16, 18074:23, 18075:22, 18077:16, 18095:10, 18100:21, 18100:22, 18101:4, 18108:3, 18108:4, 18108:25, 18109:8, 18113:7, 18119:4, 18121:16

**four** [4] - 18065:9, 18091:7, 18119:20, 18125:23

**fourth** [7] - 18073:10, 18073:11, 18073:18, 18074:12, 18074:18, 18074:22, 18075:3

**fourth-degree** [4] - 18073:10, 18074:18, 18074:22, 18075:3

**fraternity** [1] - 18073:3

**free** [5] - 18067:12, 18067:13, 18067:16, 18067:18

**Freedom** [4] - 18039:9, 18039:10, 18039:22, 18042:22

**freedom** [2] - 18025:21, 18042:20

**frequencies** [2] - 18085:13, 18085:16

**Friday** [2] - 18012:16, 18013:9

**friend** [2] - 18040:18, 18064:11

**friendly** [2] - 18064:5, 18064:10

**friends** [7] - 18031:1, 18064:4, 18064:5, 18064:6, 18080:10, 18080:15, 18081:11

**front** [17] - 18024:8, 18024:9, 18024:11, 18024:14, 18036:22, 18061:23, 18079:17, 18079:19, 18079:21, 18086:6, 18108:16, 18117:6, 18117:25, 18119:13, 18124:20, 18125:3, 18128:14

**fruition** [2] - 18102:11, 18102:12

**Fuck** [1] - 18123:10

**fucking** [1] - 18020:4

**full** [1] - 18098:13

**function** [2] -

18027:25, 18071:20

**future** [7] - 18028:16, 18029:2, 18094:14, 18099:16, 18100:1, 18100:5, 18100:6

## G

**gain** [2] - 18045:14, 18047:10

**gained** [1] - 18047:17

**game** [2] - 18048:7, 18061:9

**general** [4] - 18045:6, 18077:8, 18092:21, 18099:6

**generally** [2] - 18099:16, 18130:18

**generate** [2] - 18069:18, 18069:19

**gentleman** [13] - 18018:4, 18021:16, 18039:10, 18107:25, 18108:10, 18108:13, 18112:21, 18117:17, 18127:9, 18127:22, 18127:24, 18128:16, 18128:17

**gentlemen** [11] - 18013:15, 18015:21, 18016:11, 18028:20, 18035:18, 18038:12, 18043:13, 18043:16, 18057:15, 18088:23, 18130:9

**Georgia** [4] - 18100:19, 18101:1, 18101:2, 18101:9

**gesture** [4] - 18127:9, 18127:13, 18128:2, 18128:4

**giant** [1] - 18027:17

**Giddings** [2] - 18039:14, 18042:20

**gist** [3] - 18092:21, 18094:2, 18099:6

**given** [3] - 18077:3, 18131:23, 18132:2

**God's** [1] - 18012:21

**Google** [2] - 18101:14, 18101:17

**gossip** [1] - 18067:8

**gossiping** [1] - 18067:9

**gotta** [1] - 18081:10

**Government** [12] - 18016:12, 18016:16, 18024:19, 18027:24, 18033:15, 18038:7, 18041:14, 18080:4,

18088:12, 18106:23, 18107:23, 18112:6

**government** [39] - 18014:9, 18014:16, 18014:23, 18015:6, 18015:7, 18015:12, 18015:24, 18025:21, 18025:22, 18026:11, 18026:13, 18036:11, 18037:1, 18041:14, 18043:6, 18053:13, 18053:16, 18053:20, 18053:23, 18054:3, 18054:6, 18054:16, 18055:3, 18055:14, 18056:10, 18057:24, 18057:25, 18058:2, 18061:12, 18062:24, 18087:6, 18089:14, 18090:5, 18091:13, 18093:8, 18111:5, 18111:13, 18112:17

**government's** [6] - 18059:6, 18060:19, 18061:12, 18090:1, 18109:8, 18109:14

**granted** [1] - 18015:13

**granting** [1] - 18013:19

**great** [4] - 18087:2, 18111:22, 18111:23, 18115:25

**greater** [1] - 18051:10

**Greene** [3] - 18104:8, 18104:17, 18104:25

**greet** [4] - 18116:22, 18121:8, 18121:21, 18121:22

**greeting** [1] - 18122:7

**grew** [1] - 18012:25

**grill** [1] - 18098:22

**ground** [2] - 18058:2, 18070:20

**Ground** [2] - 18096:20, 18096:23

**group** [20] - 18028:2, 18040:2, 18040:12, 18068:16, 18075:16, 18078:21, 18085:24, 18086:7, 18114:18, 18116:9, 18116:15, 18119:13, 18122:19, 18126:20, 18127:24, 18128:2, 18128:12, 18128:14

**groups** [5] - 18031:20, 18085:21, 18116:16, 18126:22, 18129:1

**grown** [1] - 18068:7

**guess** [5] - 18033:8,

18037:22, 18038:2, 18062:1, 18082:16

**guilty** [2] - 18055:4, 18055:16

**guy** [21] - 18017:9, 18017:11, 18018:1, 18018:15, 18018:16, 18018:19, 18019:6, 18019:7, 18019:18, 18019:20, 18021:17, 18023:13, 18028:24, 18068:14, 18070:5, 18076:4, 18101:8, 18112:23, 18116:4, 18122:21

**guys** [52] - 18029:10, 18029:11, 18029:18, 18030:4, 18064:4, 18067:2, 18068:12, 18069:23, 18070:20, 18073:5, 18075:20, 18084:9, 18084:10, 18085:13, 18085:14, 18085:15, 18085:20, 18085:22, 18085:25, 18086:2, 18087:1, 18087:2, 18087:6, 18087:10, 18087:14, 18087:22, 18087:23, 18087:24, 18088:2, 18096:2, 18099:12, 18100:16, 18101:9, 18101:10, 18103:8, 18104:23, 18108:15, 18116:7, 18117:7, 18118:16, 18118:19, 18122:6, 18123:10, 18123:14, 18123:23, 18124:1, 18125:2, 18129:3, 18129:15, 18129:18

## H

**half** [4] - 18026:19, 18128:21, 18128:22, 18129:2

**half-step** [3] - 18128:21, 18128:22, 18129:2

**hallway** [2] - 18042:6, 18042:7

**hand** [7] - 18018:24, 18035:16, 18077:8, 18127:9, 18127:13, 18128:2, 18128:4

**hand-waving** [1] - 18127:13

**handled** [1] - 18085:11

**handling** [1] - 18058:12

**hands** [4] - 18098:13, 18116:25, 18121:25, 18127:14

**handshake** [1] - 18120:14

**hanging** [1] - 18067:2

**happy** [1] - 18062:11

**hard** [3] - 18037:8, 18041:10, 18114:22

**harm's** [1] - 18029:11

**Harris** [11] - 18016:2, 18057:17, 18062:17, 18062:18, 18113:18, 18124:7, 18124:9, 18124:15, 18124:17, 18125:17, 18130:15

**Harry's** [1] - 18075:16

**harshly** [1] - 18091:18

**HASSAN** [1] - 18010:9

**Hassan** [1] - 18010:10

**hat** [2] - 18021:17, 18039:16

**hats** [1] - 18039:15

**Haven** [1] - 18010:6

**head** [3] - 18021:5, 18021:13, 18064:2

**headed** [1] - 18042:12

**heads** [1] - 18012:18

**healion** [1] - 18042:20

**health** [1] - 18093:23

**hear** [14] - 18016:13, 18017:14, 18017:24, 18020:12, 18037:1, 18057:23, 18057:24, 18058:1, 18104:8, 18104:17, 18116:21, 18118:24, 18121:7, 18129:6

**heard** [25] - 18017:23, 18017:25, 18020:3, 18020:4, 18032:7, 18044:7, 18044:12, 18047:8, 18065:16, 18065:18, 18069:9, 18071:12, 18079:16, 18097:1, 18097:3, 18097:5, 18097:18, 18104:10, 18104:11, 18110:12, 18110:13, 18116:11, 18122:25, 18123:18, 18126:2

**hearing** [2] - 18058:15, 18119:24

**hearsay** [12] - 18073:23, 18074:2, 18074:24, 18075:5, 18092:22, 18093:15, 18093:24, 18094:5,

18142

18094:9, 18094:16, 18100:21, 18101:4
**hearts** [1] - 18126:3
**held** [3] - 18030:20, 18032:2, 18095:7
**hell** [1] - 18087:23
**help** [5] - 18070:2, 18070:3, 18082:4, 18082:10, 18087:3
**helps** [1] - 18071:10
**herding** [2] - 18065:16, 18065:19
**hernandez** [1] - 18036:15
**HERNANDEZ** [74] - 18010:7, 18012:25, 18013:13, 18014:22, 18015:3, 18015:15, 18015:20, 18016:7, 18016:9, 18016:14, 18016:17, 18017:2, 18017:19, 18018:12, 18019:4, 18019:17, 18020:9, 18020:20, 18021:22, 18022:1, 18022:4, 18022:16, 18033:2, 18033:15, 18033:17, 18033:21, 18034:2, 18034:3, 18034:15, 18036:6, 18036:10, 18036:21, 18037:4, 18037:13, 18037:23, 18038:3, 18038:7, 18038:10, 18038:20, 18039:2, 18039:25, 18041:16, 18041:21, 18042:4, 18043:9, 18043:10, 18044:11, 18044:14, 18044:22, 18045:3, 18045:13, 18047:13, 18047:19, 18049:16, 18049:20, 18051:15, 18052:17, 18054:19, 18054:25, 18055:14, 18055:23, 18056:2, 18056:5, 18056:7, 18057:2, 18057:3, 18057:14, 18060:21, 18061:2, 18062:4, 18092:4, 18120:23, 18131:14, 18131:21
**Hernandez** [11] - 18012:23, 18016:6, 18022:15, 18054:21, 18059:12, 18060:20, 18063:1, 18082:15, 18088:13, 18090:7, 18091:25
**Hernandez's** [1] -

18061:18
**herself** [1] - 18109:19
**Hershey** [2] - 18064:1, 18075:12
**hesitated** [1] - 18062:5
**Hialeah** [1] - 18010:14
**high** [1] - 18031:10
**higher** [1] - 18082:25
**Highland** [1] - 18010:8
**himself** [1] - 18044:17
**historic** [1] - 18025:11
**historical** [1] - 18025:19
**history** [1] - 18025:7
**hit** [2] - 18079:20, 18099:14
**hmm** [1] - 18104:25
**hold** [5] - 18017:11, 18018:3, 18019:7, 18029:1, 18039:8
**holding** [1] - 18088:21
**Hollow** [1] - 18010:8
**honest** [2] - 18064:17, 18106:15
**honestly** [4] - 18091:6, 18096:4, 18106:14, 18120:20
**Honor** [27] - 18012:7, 18012:8, 18013:13, 18016:7, 18036:6, 18036:8, 18036:10, 18038:5, 18043:9, 18044:11, 18044:23, 18047:13, 18049:17, 18058:20, 18060:8, 18060:16, 18062:23, 18063:7, 18076:17, 18077:11, 18091:10, 18094:20, 18109:4, 18109:13, 18131:6, 18131:8, 18131:14
**HONORABLE** [1] - 18009:10
**hoped** [1] - 18047:2
**hoping** [1] - 18120:9
**hopped** [1] - 18031:23
**hopping** [1] - 18098:16
**hotel** [2] - 18042:14, 18042:15
**hours** [4] - 18012:9, 18023:22, 18024:12, 18064:9
**hours'** [1] - 18089:17
**House** [1] - 18031:3
**huge** [2] - 18024:6, 18025:9
**HULL** [1] - 18010:2
**Hull** [1] - 18010:2

**human** [1] - 18112:3
**hung** [2] - 18031:10, 18111:23
**hungry** [1] - 18129:15
**hurt** [4] - 18013:2, 18082:4, 18082:10, 18082:11

**I**

**ID'ed** [1] - 18034:1
**idea** [3] - 18015:18, 18107:6, 18114:2
**II** [1] - 18010:15
**illegal** [1] - 18080:16
**image** [4] - 18072:11, 18072:12, 18072:16
**imagine** [2] - 18065:14, 18118:19
**immediate** [1] - 18046:1
**Immortal** [2] - 18106:25, 18107:2
**immunity** [1] - 18013:19
**impede** [4] - 18046:21, 18048:10, 18050:11, 18053:19
**implicated** [1] - 18058:21
**implicit** [4] - 18057:4, 18106:20, 18117:24, 18123:17
**important** [1] - 18117:6
**inappropriate** [1] - 18087:11
**incident** [4] - 18036:19, 18036:20, 18036:21, 18036:23
**including** [2] - 18013:19, 18130:20
**indeed** [1] - 18025:19
**independent** [1] - 18130:18
**indicate** [1] - 18014:13
**indictment** [1] - 18044:16
**individual** [1] - 18085:12
**indulgence** [2] - 18036:7, 18057:2
**influence** [5] - 18046:18, 18046:24, 18046:25, 18047:1, 18048:9
**informant** [1] - 18113:16
**information** [5] -

18016:22, 18017:4, 18026:20, 18026:24, 18076:19
**informed** [1] - 18089:18
**initial** [1] - 18016:15
**initiate** [1] - 18101:19
**initiating** [1] - 18082:16
**injure** [5] - 18050:18, 18050:24, 18051:5, 18051:16, 18051:22
**inside** [3] - 18038:11, 18041:4, 18041:11
**insofar** [1] - 18036:18
**instructions** [4] - 18012:11, 18013:7, 18013:10, 18131:10
**insult** [3] - 18068:9, 18079:12, 18079:20
**intact** [1] - 18114:24
**intend** [7] - 18026:11, 18046:18, 18046:21, 18046:24, 18047:1, 18047:23, 18061:7
**intended** [2] - 18031:7, 18059:21
**intending** [2] - 18029:9, 18077:7
**intent** [18] - 18021:19, 18022:2, 18022:5, 18022:9, 18022:17, 18022:20, 18026:12, 18035:21, 18044:4, 18044:6, 18052:6, 18053:4, 18053:6, 18054:9, 18054:13, 18056:17, 18076:24, 18077:4
**interact** [3] - 18069:6, 18069:7
**interactions** [2] - 18059:4, 18071:13
**interest** [2] - 18060:25, 18107:19
**interesting** [1] - 18071:5
**interests** [1] - 18060:22
**interfere** [2] - 18050:14, 18054:5
**interpose** [1] - 18111:2
**intimidate** [4] - 18048:21, 18049:6, 18049:9, 18054:1
**intimidation** [2] - 18049:25, 18050:4
**introduce** [2] - 18013:22, 18014:2

**introduced** [3] - 18090:7, 18090:19, 18092:5
**investigation** [1] - 18130:19
**invite** [1] - 18096:19
**invited** [2] - 18096:17, 18096:22
**involved** [2] - 18062:5, 18076:11
**iPhone** [5] - 18017:5, 18017:6, 18019:11, 18020:5, 18020:15
**ironically** [1] - 18030:16
**Isaiah** [4] - 18039:14, 18039:16, 18039:17
**issue** [7] - 18013:13, 18037:2, 18059:9, 18081:23, 18085:15, 18085:17, 18087:3
**issues** [5] - 18012:8, 18057:25, 18099:10, 18131:4, 18131:24
**itself** [1] - 18022:21
**IV** [1] - 18010:2

**J**

**jail** [7] - 18108:17, 18108:19, 18110:2, 18110:4, 18110:8, 18110:12, 18110:17
**Jake** [2] - 18028:5, 18028:21
**January** [76] - 18014:25, 18025:15, 18026:10, 18026:21, 18027:9, 18033:4, 18033:11, 18043:4, 18043:11, 18043:14, 18044:4, 18044:8, 18045:14, 18045:21, 18046:18, 18047:11, 18048:19, 18048:21, 18049:4, 18049:7, 18049:10, 18049:14, 18050:9, 18050:12, 18050:16, 18050:18, 18051:6, 18051:10, 18051:16, 18051:20, 18052:6, 18052:8, 18053:13, 18053:17, 18053:20, 18053:24, 18054:7, 18054:13, 18056:8, 18057:7, 18071:16, 18075:14, 18086:9, 18086:11, 18088:5, 18088:10, 18088:17, 18094:25,

18095:9, 18095:18, 18096:15, 18097:16, 18099:13, 18099:25, 18100:12, 18100:14, 18100:16, 18100:18, 18102:8, 18102:16, 18102:17, 18102:22, 18103:16, 18103:19, 18103:24, 18104:5, 18104:24, 18105:23, 18106:2, 18106:21, 18113:23, 18114:3, 18115:4, 18115:11, 18125:2, 18130:18

jargon [1] - 18128:25
JASON [1] - 18009:13
JAUREGUI [132] - 18010:12, 18058:20, 18058:24, 18059:2, 18060:3, 18062:21, 18062:23, 18063:7, 18063:9, 18063:18, 18063:22, 18064:23, 18067:20, 18068:25, 18069:1, 18070:15, 18071:25, 18072:15, 18073:9, 18073:16, 18073:24, 18074:2, 18074:7, 18074:10, 18074:11, 18074:17, 18075:2, 18075:7, 18075:25, 18077:11, 18077:17, 18077:23, 18078:3, 18078:18, 18079:8, 18082:3, 18082:8, 18084:1, 18084:11, 18084:12, 18084:20, 18086:17, 18086:18, 18087:18, 18088:9, 18089:12, 18090:1, 18090:17, 18090:22, 18090:25, 18091:6, 18091:10, 18091:24, 18092:9, 18092:17, 18092:23, 18092:25, 18093:8, 18094:10, 18094:20, 18094:23, 18095:15, 18095:25, 18098:2, 18099:5, 18100:4, 18100:24, 18103:5, 18104:3, 18104:16, 18104:22, 18105:10, 18105:15, 18105:19, 18105:21, 18106:1, 18106:7, 18106:12, 18106:19, 18108:5, 18108:23, 18109:2, 18109:13, 18110:1, 18110:10, 18110:15, 18111:5, 18111:16,

18112:13, 18112:16, 18112:20, 18113:9, 18113:14, 18113:15, 18114:7, 18115:14, 18115:18, 18116:20, 18117:5, 18117:14, 18118:5, 18118:11, 18118:23, 18119:6, 18119:19, 18120:11, 18120:17, 18120:25, 18121:6, 18121:18, 18122:14, 18123:4, 18123:7, 18123:13, 18123:22, 18124:14, 18125:1, 18125:9, 18125:20, 18126:1, 18126:6, 18126:12, 18126:25, 18127:8, 18127:12, 18127:21, 18128:9, 18128:20, 18129:5, 18129:14, 18129:25, 18130:8

Jauregui [16] - 18010:13, 18062:11, 18062:20, 18076:19, 18077:1, 18089:19, 18089:22, 18090:10, 18090:16, 18092:1, 18093:6, 18093:10, 18094:1, 18094:18, 18109:12, 18130:6
Jefferson [1] - 18025:24
jerk [1] - 18072:25
jiggling [1] - 18041:24
job [8] - 18026:5, 18026:6, 18036:23, 18067:21, 18068:3, 18080:15, 18081:10, 18081:12
jobs [1] - 18116:7
Joe [1] - 18117:18
John [1] - 18129:20
JOHN [1] - 18010:2
Johns [1] - 18129:21
Johnson [1] - 18021:17
joined [2] - 18086:23, 18086:24
joining [1] - 18107:19
JOSEPH [1] - 18009:6
judge [9] - 18060:3, 18073:24, 18077:11, 18077:17, 18089:12, 18090:1, 18090:25, 18094:10, 18110:10
JUDGE [1] - 18009:11
Judge [7] - 18062:21, 18074:10, 18090:17, 18091:24, 18092:23,

18112:13, 18130:8
July [7] - 18064:1, 18075:14, 18082:15, 18083:6, 18083:9, 18083:10, 18083:11
jump [1] - 18076:23
June [1] - 18026:10
jurors [1] - 18130:20
JURY [1] - 18009:10
jury [46] - 18012:8, 18012:10, 18013:6, 18013:11, 18014:8, 18015:7, 18015:22, 18016:2, 18016:4, 18016:22, 18028:20, 18038:12, 18055:4, 18055:5, 18055:16, 18057:17, 18058:15, 18062:16, 18069:13, 18071:9, 18073:17, 18074:13, 18074:14, 18074:21, 18076:1, 18080:7, 18080:13, 18081:5, 18084:21, 18085:9, 18088:19, 18088:24, 18100:15, 18104:6, 18107:4, 18107:16, 18112:23, 18113:20, 18114:8, 18115:23, 18116:23, 18119:2, 18121:10, 18127:16, 18130:16, 18131:10
Jury [5] - 18012:3, 18057:18, 18058:7, 18063:3, 18130:23
jury-related [1] - 18012:8
Justice [1] - 18009:16

### K

keep [9] - 18012:23, 18025:20, 18039:20, 18039:23, 18065:22, 18081:10, 18081:12, 18116:8, 18116:11
keeping [1] - 18117:7
KELLY [1] - 18009:10
Kenerson [6] - 18058:11, 18062:18, 18077:8, 18077:18, 18091:8, 18093:21
KENERSON [98] - 18009:13, 18021:20, 18021:25, 18022:7, 18022:11, 18032:22, 18033:13, 18036:3, 18043:7, 18044:9, 18047:12, 18049:15,

18051:11, 18052:15, 18054:18, 18057:11, 18058:13, 18059:7, 18061:14, 18063:16, 18063:20, 18064:21, 18067:14, 18068:23, 18070:13, 18071:23, 18072:3, 18072:19, 18072:21, 18073:7, 18073:13, 18073:23, 18074:3, 18074:15, 18074:23, 18075:5, 18075:22, 18076:6, 18076:15, 18076:17, 18078:16, 18079:6, 18082:1, 18082:6, 18083:23, 18084:10, 18084:16, 18086:15, 18087:16, 18088:6, 18089:15, 18089:17, 18090:9, 18091:9, 18092:15, 18092:22, 18094:1, 18095:10, 18095:22, 18097:21, 18099:1, 18100:2, 18100:21, 18101:4, 18102:24, 18103:25, 18104:13, 18104:20, 18105:8, 18105:12, 18105:17, 18105:24, 18106:5, 18106:10, 18106:17, 18108:3, 18108:21, 18108:25, 18109:4, 18109:7, 18111:1, 18112:8, 18113:7, 18113:13, 18119:4, 18119:17, 18120:7, 18120:15, 18120:22, 18121:12, 18121:14, 18123:2, 18124:24, 18125:18, 18126:4, 18126:9, 18127:18, 18128:7
Kenny [14] - 18107:13, 18107:15, 18107:17, 18107:25, 18108:12, 18108:17, 18108:19, 18108:24, 18109:9, 18110:1, 18110:21, 18111:25, 18112:25, 18113:11
killed [1] - 18036:22
kind [35] - 18023:24, 18030:4, 18030:17, 18031:23, 18033:22, 18063:14, 18064:2, 18064:12, 18067:21, 18075:15, 18085:4, 18086:4, 18086:13, 18087:14, 18089:6, 18097:16, 18098:7,

18098:15, 18098:16, 18101:11, 18101:12, 18102:1, 18103:18, 18103:22, 18104:12, 18115:7, 18116:11, 18117:1, 18117:20, 18117:22, 18120:12, 18120:14, 18121:25, 18123:16
kinda [1] - 18081:23
kinds [2] - 18041:9, 18087:11
knife [3] - 18034:24, 18035:15, 18035:23
knives [1] - 18035:2
knocked [3] - 18034:25, 18035:19, 18035:23
knocking [1] - 18021:18
knowledge [6] - 18071:15, 18110:16, 18110:24, 18111:4, 18111:11, 18113:4
known [3] - 18070:8, 18116:4, 18121:2
knows [8] - 18017:6, 18023:19, 18067:15, 18074:24, 18075:1, 18109:9, 18110:11, 18110:19

### L

ladies [6] - 18016:11, 18028:20, 18038:12, 18057:15, 18088:23, 18130:9
lady [3] - 18035:5, 18035:15, 18124:7
laid [2] - 18066:5, 18066:6
Lakes [1] - 18010:11
language [1] - 18120:14
large [5] - 18023:21, 18091:3, 18116:16, 18128:12, 18129:1
last [11] - 18016:15, 18025:16, 18025:23, 18026:9, 18062:19, 18071:11, 18076:4, 18091:21, 18093:2, 18123:14, 18127:4
late [1] - 18114:12
launching [1] - 18059:15
Law [2] - 18010:10, 18010:13
law [31] - 18044:18,

18049:3, 18050:5, 18050:8, 18050:11, 18050:15, 18052:8, 18052:12, 18052:18, 18052:21, 18052:25, 18053:4, 18053:7, 18070:23, 18071:6, 18071:10, 18071:13, 18071:17, 18078:24, 18079:2, 18079:5, 18079:10, 18079:12, 18079:17, 18079:20, 18079:24, 18080:1, 18080:2, 18080:3, 18083:11, 18083:13

**lawsuits** [3] - 18034:8, 18034:10

**lead** [2] - 18041:13, 18060:16

**leader** [3] - 18064:12, 18064:13, 18102:21

**leaders** [2] - 18030:16, 18117:25

**leadership** [2] - 18085:5, 18086:24

**leading** [26] - 18021:25, 18022:3, 18041:12, 18061:19, 18061:20, 18061:21, 18064:21, 18070:13, 18071:23, 18082:6, 18086:15, 18086:16, 18087:16, 18092:15, 18094:5, 18094:8, 18100:2, 18102:24, 18104:13, 18104:15, 18105:24, 18105:25, 18108:21, 18119:17, 18120:15

**leads** [1] - 18103:12

**least** [8] - 18014:10, 18026:9, 18066:14, 18066:21, 18077:6, 18087:3, 18095:14, 18103:3

**leave** [4] - 18035:25, 18050:1, 18050:5, 18076:10

**leaving** [5] - 18032:10, 18032:13, 18032:17, 18032:20, 18049:22

**leeway** [1] - 18077:2

**left** [11] - 18027:21, 18030:25, 18042:8, 18042:10, 18042:11, 18042:24, 18048:2, 18108:13, 18120:2, 18127:22

**legal** [12] - 18027:13, 18031:2, 18033:10,

18043:7, 18044:9, 18044:24, 18047:3, 18052:15, 18055:9, 18102:24, 18131:4, 18131:10

**length** [2] - 18111:22, 18111:23

**lengths** [1] - 18116:1

**letting** [3] - 18048:6, 18116:25, 18118:18

**levels** [1] - 18085:21

**life** [1] - 18097:6

**limits** [2] - 18068:14, 18069:16

**line** [6] - 18023:23, 18026:5, 18061:19, 18093:19, 18117:6, 18117:7

**lined** [1] - 18089:24

**lines** [1] - 18112:1

**link** [2] - 18111:8, 18111:9

**list** [1] - 18061:8

**listen** [2] - 18018:18, 18115:15

**literally** [4] - 18015:12, 18103:17, 18110:24, 18117:21

**litigate** [1] - 18014:11

**live** [2] - 18025:20, 18125:6

**live-streaming** [1] - 18125:6

**livelihood** [1] - 18026:8

**living** [1] - 18124:17

**Lizardo** [16] - 18107:13, 18107:15, 18107:17, 18107:25, 18108:12, 18108:17, 18108:19, 18108:24, 18109:9, 18110:1, 18110:16, 18110:22, 18111:17, 18111:25, 18112:25, 18113:11

**Lizardo's** [1] - 18111:10

**LLC** [1] - 18010:5

**located** [1] - 18042:15

**location** [1] - 18108:15

**logic** [1] - 18109:14

**look** [17] - 18015:7, 18015:17, 18017:5, 18021:8, 18021:12, 18021:13, 18031:15, 18093:11, 18093:13, 18096:25, 18098:16, 18098:25, 18114:19, 18116:21, 18121:8,

18122:5, 18122:6

**looked** [3] - 18025:12, 18027:16, 18032:12

**looking** [19] - 18041:23, 18059:10, 18072:24, 18073:2, 18084:13, 18084:14, 18084:18, 18084:24, 18085:1, 18085:4, 18088:10, 18114:9, 18122:3, 18122:4, 18122:7, 18122:10, 18127:10, 18129:20

**looks** [6] - 18025:18, 18038:22, 18039:7, 18076:4, 18122:21, 18125:16

**lose** [2] - 18086:1, 18086:2

**lost** [1] - 18042:17

**loud** [3] - 18020:3, 18101:2, 18119:25

**louder** [2] - 18019:23, 18020:1

**loudness** [1] - 18019:19

**Louis** [2] - 18035:8, 18035:10

**loves** [1] - 18064:15

**lower** [2] - 18020:18, 18085:22

**luck** [1] - 18131:20

**lunch** [5] - 18012:20, 18024:20, 18036:18, 18092:3, 18129:21

## M

**mad** [1] - 18033:7

**magic** [1] - 18119:20

**mail** [2] - 18097:9, 18098:4

**mails** [1] - 18094:12

**main** [4] - 18028:2, 18100:18, 18121:3, 18122:19

**major** [1] - 18070:9

**Mall** [1] - 18025:10

**man** [4] - 18019:14, 18019:22, 18029:25, 18032:1

**managed** [1] - 18013:2

**march** [30] - 18029:19, 18072:6, 18075:12, 18075:13, 18075:15, 18075:17, 18077:20, 18078:4, 18078:6, 18078:8, 18085:11, 18085:18, 18085:24,

18086:12, 18095:19, 18096:2, 18096:3, 18102:9, 18102:10, 18103:10, 18103:11, 18103:12, 18103:13, 18119:7, 18119:9, 18123:24, 18124:4, 18124:6, 18124:19

**marches** [12] - 18068:19, 18072:1, 18072:14, 18073:5, 18075:8, 18075:17, 18077:19, 18086:5, 18100:6, 18117:1, 18128:10, 18129:9

**marching** [12] - 18071:2, 18085:14, 18114:1, 18117:19, 18118:7, 18119:13, 18123:15, 18127:1, 18127:24, 18128:2, 18128:14, 18129:1

**marked** [1] - 18107:22

**Maryland** [1] - 18010:8

**materials** [1] - 18057:24

**matter** [5] - 18013:16, 18054:24, 18055:9, 18091:12, 18133:5

**Matter** [2] - 18012:5, 18058:9

**matters** [1] - 18131:10

**MCCULLOUGH** [1] - 18009:13

**McGuire** [1] - 18010:2

**mean** [42] - 18017:5, 18029:3, 18029:4, 18029:15, 18032:3, 18033:8, 18037:4, 18040:23, 18041:10, 18047:21, 18064:8, 18064:14, 18064:16, 18065:1, 18065:19, 18066:6, 18067:16, 18067:24, 18070:7, 18070:23, 18077:10, 18078:7, 18080:20, 18081:23, 18087:20, 18087:23, 18091:16, 18093:22, 18094:16, 18096:25, 18097:5, 18102:1, 18102:18, 18110:3, 18116:13, 18119:18, 18121:21, 18122:3, 18125:3, 18128:25, 18129:10

**meaning** [2] - 18044:21, 18044:22

**means** [12] - 18026:3,

18029:4, 18029:16, 18037:8, 18037:9, 18065:20, 18116:23, 18119:3, 18121:10, 18121:22, 18128:22, 18129:11

**meant** [7] - 18032:2, 18032:3, 18040:24, 18080:13, 18087:21, 18088:24, 18121:15

**media** [25] - 18068:22, 18069:7, 18069:10, 18069:12, 18069:17, 18069:20, 18070:17, 18071:19, 18071:21, 18071:22, 18072:17, 18082:5, 18082:10, 18082:11, 18116:1, 18123:25, 18124:2, 18124:22, 18125:2, 18125:4, 18125:14, 18125:21, 18126:14, 18126:18, 18130:17

**meet** [12] - 18063:23, 18107:18, 18112:2, 18114:11, 18114:15, 18116:22, 18116:24, 18117:2, 18121:7, 18121:20, 18121:22

**meeting** [9] - 18012:9, 18099:6, 18099:20, 18114:25, 18115:3, 18115:6, 18115:8, 18115:11, 18122:7

**meetings** [3] - 18087:6, 18098:7, 18100:5

**meetup** [1] - 18114:10

**megaphone** [5] - 18023:13, 18119:25, 18120:1, 18120:19, 18123:18

**member** [7] - 18048:24, 18049:10, 18049:13, 18049:22, 18101:18, 18111:18, 18125:14

**members** [27] - 18029:6, 18031:3, 18066:15, 18069:13, 18074:21, 18076:1, 18080:7, 18081:4, 18084:2, 18084:3, 18084:8, 18088:19, 18100:10, 18100:15, 18104:6, 18107:4, 18107:15, 18112:23, 18113:20, 18114:8, 18114:11, 18115:23, 18116:23, 18119:2,

18121:10, 18124:2, 18127:16

**men** [14] - 18013:23, 18035:18, 18068:7, 18082:16, 18084:13, 18084:15, 18084:18, 18084:22, 18103:19, 18103:23, 18104:4, 18106:21, 18128:15

**mention** [1] - 18066:10

**mentioning** [1] - 18016:19

**message** [21] - 18024:21, 18024:22, 18028:1, 18040:17, 18080:5, 18080:8, 18088:24, 18089:1, 18092:19, 18097:8, 18098:4, 18106:25, 18107:5, 18113:20, 18113:22, 18114:14, 18114:16, 18114:17, 18114:18, 18114:23, 18115:7

**messages** [11] - 18066:24, 18067:4, 18067:5, 18067:6, 18080:25, 18081:15, 18092:10, 18092:13, 18092:20, 18094:2, 18094:4

**met** [4] - 18028:7, 18063:24, 18096:4, 18111:24

**metal** [2] - 18051:5, 18051:9

**metaphorical** [5] - 18025:25, 18080:14, 18104:12, 18105:22, 18106:8

**metaphorically** [2] - 18026:1, 18026:2

**METCALF** [4] - 18010:15, 18012:19, 18012:23, 18131:7

**Metcalf** [4] - 18010:15, 18012:22, 18013:3

**Miami** [1] - 18010:11

**microphone** [2] - 18021:11, 18125:15

**middle** [4] - 18014:7, 18093:3, 18117:7, 18117:17

**might** [11] - 18014:10, 18014:15, 18014:16, 18045:1, 18067:8, 18073:2, 18086:3, 18089:12, 18099:14, 18116:14

**Mike** [1] - 18040:15

**military** [3] - 18122:2, 18128:25, 18129:3

**Miller** [3] - 18109:17, 18109:22, 18110:17

**mind** [6] - 18022:22, 18024:5, 18065:2, 18076:20, 18076:25, 18077:21

**mine** [1] - 18040:18

**Minecraft** [1] - 18120:18

**Ministry** [4] - 18028:1, 18083:18, 18084:14, 18086:19

**Mink** [1] - 18010:8

**minute** [6] - 18022:25, 18024:21, 18057:22, 18058:5, 18091:22, 18118:19

**minutes** [2] - 18040:18, 18041:6

**misdemeanor** [2] - 18013:16, 18013:25

**missed** [1] - 18067:4

**missions** [1] - 18028:9

**misstates** [2] - 18104:14, 18113:13

**modern** [1] - 18082:23

**moment** [4] - 18039:4, 18088:22, 18118:6, 18131:16

**Monday** [3] - 18130:12, 18130:15, 18130:21

**money** [2] - 18045:16, 18046:3

**monkey** [1] - 18089:7

**monkey-wrench** [1] - 18089:7

**monkeys** [1] - 18065:22

**months** [2] - 18013:14, 18091:7

**Monument** [13] - 18025:6, 18025:9, 18114:15, 18114:25, 18115:3, 18115:7, 18115:8, 18115:11, 18117:20, 18118:7, 18119:8, 18119:10, 18124:1

**MOORE** [1] - 18009:19

**moot** [1] - 18063:19

**morning** [4] - 18012:14, 18115:1, 18115:4, 18130:12

**MoSD** [21] - 18028:1, 18028:2, 18029:23,

18084:8, 18084:9, 18084:13, 18085:6, 18086:14, 18086:22, 18087:6, 18087:11, 18095:20, 18096:17, 18098:6, 18098:22, 18099:18, 18099:22, 18099:25, 18100:5, 18100:11, 18101:14

**most** [3] - 18066:7, 18117:21, 18118:17

**mostly** [1] - 18096:4

**motion** [2] - 18013:14, 18015:12

**motions** [1] - 18015:4

**motorcades** [1] - 18020:3

**mouth** [3] - 18012:21, 18119:24, 18120:4

**move** [14] - 18019:9, 18022:11, 18074:3, 18075:5, 18075:23, 18091:13, 18091:23, 18092:7, 18095:22, 18109:3, 18111:13, 18111:25, 18126:11, 18128:7

**movement** [1] - 18127:14

**moving** [2] - 18107:20, 18110:6

**MR** [237] - 18012:7, 18012:12, 18012:19, 18012:23, 18013:2, 18021:20, 18021:25, 18022:7, 18022:11, 18032:22, 18033:13, 18036:3, 18043:7, 18044:9, 18047:12, 18049:15, 18051:11, 18052:15, 18054:18, 18057:11, 18058:13, 18058:20, 18058:24, 18059:2, 18059:7, 18060:3, 18061:6, 18061:14, 18062:11, 18062:21, 18062:23, 18063:7, 18063:9, 18063:16, 18063:18, 18063:20, 18063:22, 18064:21, 18064:23, 18067:14, 18067:20, 18068:23, 18068:25, 18069:1, 18070:13, 18070:15, 18071:23, 18071:25, 18072:3, 18072:15, 18072:19, 18072:21, 18073:7, 18073:9, 18073:13, 18073:16, 18073:23,

18073:24, 18074:2, 18074:3, 18074:7, 18074:10, 18074:11, 18074:15, 18074:17, 18074:23, 18075:2, 18075:5, 18075:7, 18075:22, 18075:25, 18076:6, 18076:15, 18076:17, 18077:11, 18077:17, 18077:23, 18078:3, 18078:16, 18078:18, 18079:6, 18079:8, 18082:1, 18082:3, 18082:6, 18082:8, 18083:23, 18084:1, 18084:10, 18084:11, 18084:12, 18084:16, 18084:20, 18086:15, 18086:17, 18086:18, 18087:16, 18087:18, 18088:6, 18088:9, 18089:12, 18089:15, 18089:17, 18090:1, 18090:9, 18090:17, 18090:22, 18090:25, 18091:6, 18091:9, 18091:10, 18091:24, 18092:9, 18092:15, 18092:17, 18092:22, 18092:23, 18092:25, 18093:8, 18094:1, 18094:10, 18094:20, 18094:23, 18095:10, 18095:15, 18095:22, 18095:25, 18097:21, 18098:2, 18099:1, 18099:5, 18100:2, 18100:4, 18100:21, 18100:24, 18101:4, 18102:24, 18103:5, 18103:25, 18104:3, 18104:13, 18104:16, 18104:20, 18104:22, 18105:8, 18105:10, 18105:12, 18105:15, 18105:17, 18105:19, 18105:21, 18105:24, 18106:1, 18106:5, 18106:7, 18106:10, 18106:12, 18106:17, 18106:19, 18108:3, 18108:5, 18108:21, 18108:23, 18108:25, 18109:2, 18109:4, 18109:7, 18109:13, 18110:1, 18110:10, 18110:15, 18111:1, 18111:5, 18111:16, 18112:8, 18112:13, 18112:16, 18112:20, 18113:7,

18113:9, 18113:13, 18113:14, 18113:15, 18114:7, 18115:14, 18115:18, 18116:20, 18117:5, 18117:14, 18118:5, 18118:11, 18118:23, 18119:4, 18119:6, 18119:17, 18119:19, 18120:7, 18120:11, 18120:15, 18120:17, 18120:22, 18120:25, 18121:6, 18121:12, 18121:14, 18121:18, 18122:14, 18123:2, 18123:4, 18123:7, 18123:13, 18123:22, 18124:14, 18124:24, 18125:1, 18125:9, 18125:18, 18125:20, 18126:1, 18126:4, 18126:6, 18126:9, 18126:12, 18126:25, 18127:8, 18127:12, 18127:18, 18127:21, 18128:7, 18128:9, 18128:20, 18129:5, 18129:14, 18129:25, 18130:8, 18131:7, 18131:17

**MS** [73] - 18012:25, 18013:13, 18014:22, 18015:3, 18015:15, 18015:20, 18016:7, 18016:9, 18016:14, 18016:17, 18017:2, 18017:19, 18018:12, 18019:4, 18019:17, 18020:9, 18020:20, 18021:22, 18022:1, 18022:4, 18022:16, 18033:2, 18033:15, 18033:17, 18033:21, 18034:2, 18034:3, 18034:15, 18036:6, 18036:10, 18036:21, 18037:4, 18037:13, 18037:23, 18038:3, 18038:7, 18038:10, 18038:20, 18039:2, 18039:25, 18041:16, 18041:21, 18042:4, 18043:9, 18043:10, 18044:11, 18044:14, 18044:22, 18045:3, 18045:13, 18047:13, 18047:19, 18049:16, 18049:20, 18051:15, 18052:17, 18054:19, 18054:25, 18055:14, 18055:23, 18056:2, 18056:5, 18056:7,

18057:2, 18057:3, 18057:14, 18060:21, 18061:2, 18062:4, 18092:4, 18120:23, 18131:14, 18131:21

**MULROE** [1] - 18009:16

**multiple** [14] - 18013:18, 18021:8, 18021:13, 18023:19, 18025:4, 18025:5, 18055:25, 18058:21, 18058:24, 18084:2, 18084:3, 18109:21, 18114:22

**music** [1] - 18037:4

## N

**NADIA** [1] - 18009:19

**name** [4] - 18016:15, 18042:22, 18121:23, 18124:7

**narrate** [1] - 18112:11

**narrative** [2] - 18074:8, 18076:12

**narratives** [1] - 18076:22

**narrow** [1] - 18105:19

**national** [5] - 18028:16, 18029:2, 18029:5, 18066:20, 18100:7

**nationally** [1] - 18067:8

**nature** [4] - 18029:20, 18030:7, 18122:1, 18132:3

**nauseam** [1] - 18111:6

**NAYIB** [1] - 18010:9

**Nayib** [1] - 18010:10

**near** [2] - 18110:9, 18111:12

**need** [10] - 18012:15, 18013:7, 18018:16, 18021:10, 18058:3, 18062:13, 18069:21, 18111:3, 18128:4, 18131:18

**needed** [3] - 18047:5, 18085:2

**needs** [1] - 18107:6

**nefarious** [1] - 18086:22

**negotiated** [1] - 18101:13

**never** [20] - 18022:22, 18025:19, 18036:1, 18055:20, 18061:7, 18064:16, 18079:16,

18081:24, 18096:25, 18097:6, 18097:10, 18097:18, 18097:19, 18098:5, 18098:9, 18101:18, 18102:10, 18102:12, 18107:10, 18107:21

**New** [8] - 18009:17, 18009:20, 18009:23, 18010:6, 18010:17, 18012:25

**news** [1] - 18082:13

**next** [8] - 18020:14, 18029:8, 18029:13, 18031:6, 18058:18, 18065:24, 18076:14, 18130:11

**nice** [1] - 18116:22

**NICHOLAS** [1] - 18009:21

**Nick** [1] - 18124:4

**Nicole** [3] - 18109:17, 18109:22, 18110:17

**night** [1] - 18068:12

**nighttime** [1] - 18084:24

**NobleBeard** [2] - 18106:25, 18107:2

**NobleLead** [3] - 18088:20, 18107:7, 18107:9

**nobody** [1] - 18128:17

**none** [17] - 18015:5, 18026:17, 18038:25, 18046:20, 18052:10, 18096:16, 18103:21, 18104:2, 18104:7, 18106:22, 18109:14, 18115:2, 18115:5, 18117:21, 18117:23, 18119:21, 18123:18

**nonresponsive** [5] - 18022:12, 18074:3, 18095:22, 18106:17, 18120:22

**NORDEAN** [2] - 18009:6, 18131:6

**Nordean** [18] - 18009:21, 18012:6, 18022:25, 18040:4, 18043:21, 18046:12, 18048:12, 18058:10, 18114:4, 18118:24, 18119:24, 18120:18, 18121:14, 18123:18, 18128:2, 18129:7, 18129:20, 18131:2

**Nordean's** [1] - 18130:25

**normal** [1] - 18023:10

**NORMAN** [1] - 18010:4

**Northwest** [4] - 18009:14, 18009:17, 18010:3, 18010:21

**nose** [1] - 18034:25

**note** [1] - 18061:17

**notes** [9] - 18090:4, 18090:5, 18090:9, 18090:14, 18090:18, 18090:22, 18090:23, 18091:4, 18094:24

**nothing** [5] - 18015:9, 18015:11, 18027:17, 18046:6, 18076:10

**notice** [4] - 18089:17, 18089:20, 18091:16, 18093:16

**notification** [1] - 18107:8

**November** [6] - 18033:18, 18033:23, 18034:4, 18034:19, 18080:5, 18081:2

**number** [6] - 18036:16, 18036:17, 18076:21, 18080:15, 18094:5

**Number** [1] - 18009:3

**numbers** [1] - 18066:20

**NW** [1] - 18010:10

## O

**Object** [1] - 18074:23

**object** [16] - 18022:11, 18031:4, 18060:23, 18061:3, 18061:19, 18061:20, 18071:23, 18075:5, 18075:22, 18077:23, 18086:15, 18089:15, 18089:21, 18093:2, 18093:3, 18100:21

**objected** [1] - 18094:3

**objecting** [4] - 18032:9, 18032:10, 18062:24, 18091:17

**objection** [99] - 18015:13, 18021:20, 18021:25, 18022:7, 18022:8, 18022:13, 18032:22, 18033:13, 18036:3, 18043:7, 18044:9, 18045:11, 18047:12, 18047:15, 18051:11, 18052:15, 18054:24, 18055:12, 18055:21, 18056:4,

18059:13, 18060:25, 18061:1, 18063:16, 18063:20, 18067:14, 18068:23, 18070:13, 18072:3, 18072:19, 18072:20, 18073:7, 18073:13, 18073:23, 18074:6, 18074:15, 18076:6, 18076:8, 18076:13, 18076:18, 18077:13, 18077:22, 18078:16, 18079:6, 18082:1, 18082:6, 18083:23, 18084:10, 18084:16, 18084:17, 18087:16, 18088:6, 18092:15, 18092:22, 18093:21, 18093:22, 18093:25, 18094:19, 18095:10, 18095:22, 18097:21, 18099:1, 18100:2, 18101:4, 18101:7, 18102:24, 18104:13, 18104:20, 18105:8, 18105:12, 18105:17, 18105:20, 18105:24, 18106:5, 18106:10, 18106:17, 18108:3, 18108:21, 18108:25, 18109:9, 18111:2, 18111:5, 18112:8, 18113:7, 18113:13, 18119:4, 18119:17, 18120:7, 18120:15, 18120:22, 18120:23, 18121:13, 18123:2, 18124:24, 18125:18, 18126:4, 18126:9, 18127:18, 18128:7

**objections** [4] - 18031:7, 18031:25, 18055:8, 18061:21

**objective** [8] - 18103:22, 18104:12, 18105:23, 18106:2, 18106:9, 18115:10, 18119:16, 18123:17

**objectives** [1] - 18113:21

**observable** [1] - 18077:21

**observe** [1] - 18069:3

**observed** [5] - 18017:9, 18070:8, 18077:4, 18077:6, 18102:7

**obstruct** [5] - 18046:18, 18047:23, 18048:9, 18050:8,

18056:17

**obstruction** [2] - 18054:10, 18054:14

**obviously** [4] - 18037:20, 18040:25, 18059:25, 18061:17

**occupied** [1] - 18098:12

**occurred** [3] - 18032:14, 18061:7, 18067:7

**occurring** [1] - 18072:8

**OF** [5] - 18009:1, 18009:3, 18009:10, 18133:1, 18133:9

**offend** [1] - 18068:10

**offense** [1] - 18044:15

**offer** [2] - 18045:18, 18045:20

**office** [3] - 18026:4, 18026:6, 18130:16

**Office** [2] - 18009:14, 18009:19

**officer** [22] - 18049:3, 18050:5, 18050:8, 18050:11, 18050:15, 18052:9, 18052:12, 18052:19, 18052:22, 18052:25, 18053:7, 18053:10, 18053:12, 18053:15, 18053:19, 18053:22, 18054:1, 18054:5, 18054:15, 18056:9, 18079:17, 18079:20

**officer/employee** [2] - 18056:12, 18056:16

**officers** [4] - 18038:21, 18038:23, 18042:25, 18050:1

**Offices** [1] - 18010:10

**OFFICIAL** [1] - 18133:1

**Official** [1] - 18010:21

**official** [9] - 18047:23, 18048:10, 18050:9, 18050:12, 18050:16, 18054:10, 18054:14, 18056:14, 18056:17

**often** [1] - 18030:5

**older** [3] - 18085:23, 18128:16, 18128:17

**once** [8] - 18021:9, 18023:12, 18048:2, 18060:3, 18070:11, 18070:12, 18070:19, 18102:15

**one** [57] - 18013:1, 18017:8, 18017:13,

18023:25, 18028:18, 18029:14, 18034:4, 18037:8, 18037:24, 18037:25, 18038:3, 18039:22, 18042:7, 18042:10, 18055:4, 18064:2, 18064:25, 18065:6, 18065:11, 18065:24, 18065:25, 18066:18, 18066:19, 18068:11, 18073:19, 18073:20, 18075:15, 18075:16, 18080:25, 18081:2, 18085:5, 18089:18, 18095:14, 18098:12, 18100:11, 18100:17, 18100:18, 18101:17, 18105:2, 18111:14, 18114:16, 18114:17, 18114:18, 18114:20, 18114:21, 18116:17, 18116:18, 18117:1, 18122:5, 18126:20, 18126:21, 18131:16

**ones** [2] - 18072:7, 18105:2

**online** [2] - 18070:9, 18071:4

**open** [3] - 18029:19, 18061:15, 18110:11

**opening** [1] - 18014:23

**operates** [1] - 18060:2

**operations** [1] - 18085:10

**opinion** [3] - 18019:22, 18027:8, 18078:22

**opportunity** [6] - 18069:3, 18069:6, 18082:12, 18087:3, 18099:10, 18107:18

**oppose** [4] - 18043:5, 18053:15, 18053:22

**opposition** [1] - 18078:21

**Orange** [1] - 18010:5

**ordained** [1] - 18083:7

**order** [9] - 18012:2, 18059:17, 18069:22, 18089:25, 18093:15, 18093:20, 18093:23, 18100:9, 18117:8

**orders** [2] - 18091:15, 18093:15

**ordinary** [1] - 18027:18

**organization** [1] - 18122:5

**organize** [1] - 18029:4

**organized** [2] - 18029:24, 18075:14

**organizing** [1] - 18070:24

**original** [2] - 18037:13, 18114:21

**otherwise** [3] - 18013:22, 18061:25, 18086:1

**ourselves** [1] - 18085:2

**out-insult** [1] - 18068:9

**out-offend** [1] - 18068:10

**outrageous** [6] - 18068:22, 18069:10, 18069:16, 18069:17, 18069:25, 18071:4

**outside** [7] - 18041:11, 18083:3, 18096:11, 18097:6, 18110:8, 18131:4, 18131:11

**outsider** [3] - 18072:24, 18073:2

**overnight** [1] - 18024:13

**overrule** [3] - 18022:8, 18047:15, 18084:17

**overruled** [24] - 18032:24, 18036:4, 18051:13, 18057:12, 18072:5, 18072:22, 18073:14, 18075:24, 18078:17, 18082:7, 18083:24, 18097:23, 18099:3, 18100:23, 18101:5, 18103:1, 18104:1, 18104:21, 18106:6, 18119:18, 18120:8, 18125:19

**own** [7] - 18037:23, 18085:12, 18085:13, 18085:15, 18090:1, 18090:6, 18098:12

## P

**P.A** [2] - 18010:10, 18010:13

**P.C** [1] - 18010:15

**p.m** [5] - 18009:7, 18025:15, 18058:6, 18132:7

**PA** [1] - 18065:10

**page** [8] - 18065:21, 18065:23, 18069:22, 18069:23, 18070:3,

18070:5, 18070:6

**paid** [3] - 18046:3, 18080:12, 18097:14

**paid-for** [1] - 18080:12

**park** [1] - 18032:7

**Park** [1] - 18010:16

**Parler** [2] - 18031:22, 18069:12

**part** [14] - 18015:7, 18029:25, 18045:23, 18045:25, 18051:12, 18071:20, 18072:11, 18073:3, 18084:6, 18085:8, 18097:16, 18110:3, 18117:11

**participant** [1] - 18066:4

**participate** [1] - 18044:6

**particular** [5] - 18024:20, 18028:1, 18035:1, 18051:5, 18051:19

**particularly** [2] - 18021:17, 18116:5

**parties** [2] - 18012:17, 18132:4

**parts** [1] - 18065:5

**party** [2] - 18059:23, 18061:23

**passed** [1] - 18124:15

**past** [4] - 18013:21, 18068:20, 18095:20, 18116:15

**patriotism** [2] - 18025:12, 18025:18

**PATTIS** [4] - 18010:4, 18013:2, 18061:6, 18131:17

**Pattis** [2] - 18010:5, 18061:5

**pay** [1] - 18045:16

**paycheck** [1] - 18026:7

**payment** [1] - 18046:6

**PC** [1] - 18010:2

**peace** [1] - 18013:4

**peaceful** [1] - 18072:11

**Pence** [2] - 18040:15, 18048:2

**pending** [1] - 18013:15

**Pennsylvania** [2] - 18064:1, 18065:14

**people** [64] - 18021:9, 18021:14, 18023:20, 18023:21, 18023:22, 18024:6, 18024:9, 18024:11, 18024:12,

18024:15, 18025:7, 18025:9, 18025:21, 18026:4, 18026:12, 18026:13, 18027:2, 18030:2, 18031:24, 18032:10, 18032:17, 18032:20, 18032:23, 18033:8, 18040:1, 18040:10, 18041:2, 18041:9, 18041:11, 18048:6, 18064:9, 18064:15, 18065:2, 18065:3, 18066:8, 18066:22, 18067:17, 18069:7, 18069:25, 18070:3, 18070:25, 18072:10, 18072:13, 18073:2, 18084:25, 18098:23, 18112:12, 18114:14, 18116:9, 18116:16, 18116:24, 18116:25, 18117:2, 18117:9, 18118:18, 18121:23, 18123:23, 18129:1

**people's** [1] - 18078:11

**per** [1] - 18066:15

**percent** [1] - 18118:3

**perfectly** [1] - 18092:2

**performance** [2] - 18050:15, 18056:14

**performed** [2] - 18050:2, 18050:6

**perhaps** [2] - 18060:18, 18131:25

**permit** [2] - 18061:25, 18093:17

**person** [29] - 18017:15, 18017:20, 18017:21, 18018:20, 18018:21, 18019:5, 18019:12, 18028:5, 18048:8, 18048:9, 18048:21, 18049:7, 18056:13, 18056:22, 18056:25, 18057:5, 18057:7, 18068:5, 18093:12, 18110:6, 18110:19, 18110:20, 18114:16, 18114:17, 18114:19, 18114:20, 18114:21, 18121:24, 18121:25

**person's** [2] - 18076:7, 18095:23

**personal** [4] - 18110:16, 18111:4, 18111:11, 18113:4

**personally** [8] -

18021:18, 18021:23, 18036:1, 18045:14, 18045:15, 18066:6, 18081:18

**pertains** [1] - 18054:22

**Pezzola** [12] - 18010:15, 18023:6, 18040:8, 18043:19, 18048:14, 18096:17, 18096:19, 18096:22, 18096:24, 18110:20, 18131:7, 18131:9

**PEZZOLA** [2] - 18009:7, 18131:13

**phase** [1] - 18024:16

**Philadelphia** [3] - 18013:24, 18039:11, 18112:1

**Phillips** [2] - 18028:6, 18028:21

**Philly** [5] - 18030:3, 18065:9, 18066:18, 18107:19, 18116:4

**phone** [12] - 18017:8, 18020:14, 18020:22, 18021:4, 18021:8, 18021:12, 18064:9, 18064:17, 18096:15, 18098:15, 18111:25

**phones** [4] - 18017:6, 18076:15, 18109:4, 18112:9

**photograph** [1] - 18025:17

**photographer** [2] - 18124:10, 18124:18

**photos** [1] - 18126:15

**phrase** [4] - 18026:12, 18029:8, 18029:9, 18029:13

**physical** [5] - 18056:8, 18056:12, 18056:16, 18070:12, 18070:19

**pick** [5] - 18017:8, 18019:11, 18020:5, 18020:15, 18098:15

**picked** [2] - 18110:2, 18113:6

**picking** [10] - 18019:12, 18019:23, 18064:17, 18108:17, 18108:19, 18110:4, 18110:7, 18110:11, 18110:16

**picks** [1] - 18065:24

**pictures** [3] - 18025:5, 18025:6, 18071:21

**piggybacking** [1] - 18072:7

**pitch** [1] - 18032:6
**place** [13] - 18018:3, 18030:6, 18033:10, 18049:22, 18050:1, 18050:6, 18059:22, 18061:8, 18093:23, 18116:22, 18124:3, 18125:3, 18130:7
**Plaintiff** [1] - 18009:4
**plan** [9] - 18086:13, 18095:8, 18097:17, 18102:8, 18103:7, 18115:8, 18117:22, 18119:15, 18123:16
**planned** [4] - 18071:18, 18089:19, 18089:20, 18089:23
**planning** [4] - 18032:9, 18107:20, 18111:25, 18114:1
**play** [22] - 18016:12, 18016:21, 18016:25, 18017:17, 18019:15, 18020:7, 18033:15, 18034:13, 18036:11, 18038:7, 18041:14, 18047:3, 18047:5, 18047:6, 18112:18, 18116:18, 18118:21, 18121:4, 18122:12, 18124:12, 18127:6, 18129:23
**played** [40] - 18017:1, 18017:18, 18018:11, 18019:2, 18019:16, 18020:8, 18020:19, 18033:20, 18034:14, 18038:9, 18038:19, 18039:1, 18041:15, 18041:20, 18087:5, 18114:6, 18115:13, 18115:17, 18116:19, 18117:4, 18117:13, 18118:4, 18118:10, 18118:22, 18121:5, 18122:13, 18123:6, 18123:12, 18123:21, 18124:13, 18125:8, 18125:25, 18126:24, 18127:7, 18127:11, 18128:19, 18129:4, 18129:13, 18129:24, 18130:5
**playing** [7] - 18018:15, 18018:18, 18039:24, 18042:3, 18090:14, 18112:19, 18114:4
**Plaza** [1] - 18009:20
**PLLC** [1] - 18009:22
**plot** [1] - 18097:17

**point** [44] - 18013:21, 18017:13, 18017:21, 18018:6, 18018:15, 18018:16, 18018:20, 18018:23, 18021:16, 18021:23, 18022:5, 18022:10, 18022:20, 18022:24, 18031:2, 18031:8, 18037:6, 18037:18, 18037:23, 18038:2, 18039:17, 18040:14, 18041:7, 18044:23, 18045:4, 18058:16, 18062:2, 18065:11, 18065:12, 18070:21, 18075:16, 18077:1, 18077:8, 18079:2, 18081:19, 18095:3, 18103:8, 18107:11, 18107:21, 18108:20, 18118:7, 18119:10, 18128:1
**pointed** [1] - 18040:1
**pole** [1] - 18122:24
**police** [9] - 18038:21, 18042:25, 18048:6, 18079:14, 18080:21, 18081:11, 18081:14, 18093:6, 18093:12
**politicians** [1] - 18027:6
**pop** [1] - 18131:24
**popped** [1] - 18066:7
**Port** [2] - 18129:20, 18129:21
**Port-a-John** [1] - 18129:20
**Port-a-Johns** [1] - 18129:21
**portion** [2] - 18014:9, 18031:5
**position** [6] - 18059:6, 18061:13, 18061:14, 18061:16, 18064:15, 18086:25
**positions** [1] - 18085:5
**positive** [1] - 18072:12
**possess** [1] - 18097:11
**possible** [3] - 18060:19, 18087:4, 18102:4
**possibly** [2] - 18090:6, 18122:21
**post** [4] - 18034:18, 18070:1, 18070:3, 18070:4
**posted** [4] - 18028:13, 18034:16, 18114:20,

18114:21
**posting** [4] - 18033:18, 18033:22, 18070:22, 18071:3
**posts** [1] - 18034:4
**potato** [1] - 18098:17
**potential** [1] - 18014:9
**power** [1] - 18095:21
**powered** [1] - 18069:20
**practiced** [2] - 18067:19, 18068:17
**practicing** [1] - 18128:6
**pray** [1] - 18125:12
**prayer** [3] - 18125:21, 18126:2, 18126:20
**praying** [1] - 18126:7
**prefer** [1] - 18058:14
**prejudice** [1] - 18090:6
**prejudicial** [5] - 18037:14, 18037:15, 18037:24, 18038:4
**prepare** [2] - 18013:9, 18031:16
**presence** [7] - 18047:11, 18083:3, 18118:25, 18121:2, 18131:1, 18131:4, 18131:11
**present** [10] - 18012:3, 18035:3, 18044:4, 18045:18, 18058:7, 18083:11, 18109:7, 18109:15, 18109:18, 18131:11
**preserve** [1] - 18034:9
**presidency** [1] - 18031:16
**president** [2] - 18024:8, 18101:8
**President** [2] - 18040:15, 18045:20
**president's** [1] - 18067:1
**presidents** [2] - 18098:21, 18099:9
**press** [4] - 18115:22, 18116:9, 18122:12, 18124:12
**pretrial** [8] - 18015:4, 18037:24, 18089:25, 18091:15, 18091:22, 18093:15, 18093:20, 18093:23
**pretty** [5] - 18031:20, 18035:1, 18083:2, 18114:12, 18118:20
**prevent** [9] -

18030:16, 18048:23, 18049:2, 18049:12, 18049:21, 18050:5, 18088:3, 18116:1, 18116:17
**preview** [1] - 18036:15
**previous** [3] - 18119:12, 18121:19, 18129:9
**private** [1] - 18087:21
**problem** [7] - 18060:23, 18074:10, 18084:19, 18084:21, 18084:22, 18084:23
**problems** [1] - 18086:2
**procedure** [2] - 18059:21, 18082:21
**procedures** [3] - 18059:7, 18059:17, 18091:22
**proceed** [3] - 18062:16, 18063:2, 18131:4
**proceeding** [7] - 18047:24, 18048:4, 18048:10, 18054:11, 18054:14, 18056:17, 18092:2
**Proceedings** [2] - 18010:24, 18132:7
**proceedings** [7] - 18012:7, 18031:1, 18046:19, 18046:21, 18046:24, 18047:1, 18133:4
**process** [5] - 18027:13, 18031:2, 18033:10, 18047:3, 18088:21
**produced** [1] - 18010:25
**proffer** [1] - 18091:10
**promised** [1] - 18015:7
**promote** [1] - 18035:21
**promoting** [1] - 18071:3
**promptly** [1] - 18062:14
**proof** [1] - 18029:18
**proper** [1] - 18100:9
**property** [9] - 18026:16, 18032:21, 18033:5, 18043:2, 18050:18, 18050:22, 18050:24, 18051:3, 18057:9
**prosecutors** [1] -

18087:15
**protect** [3] - 18029:6, 18079:24, 18085:2
**protest** [10] - 18025:8, 18027:17, 18027:21, 18032:6, 18044:6, 18078:11, 18078:14, 18078:19, 18078:22, 18126:19
**protesting** [3] - 18025:1, 18026:14, 18026:17
**protests** [13] - 18024:10, 18027:18, 18027:19, 18068:19, 18069:2, 18071:20, 18072:2, 18072:8, 18073:5, 18085:1, 18101:12, 18126:17
**protocols** [2] - 18030:6, 18100:8
**Proud** [36] - 18021:18, 18021:21, 18030:13, 18035:1, 18064:19, 18064:24, 18065:19, 18065:21, 18067:9, 18068:9, 18072:16, 18073:10, 18074:18, 18074:22, 18075:3, 18078:10, 18078:21, 18082:4, 18082:10, 18082:12, 18082:17, 18082:24, 18085:20, 18095:17, 18101:3, 18101:6, 18101:9, 18103:8, 18103:19, 18107:17, 18116:2, 18116:3, 18120:14, 18123:1, 18128:10, 18128:12
**proud** [3] - 18024:22, 18024:25, 18082:22
**provide** [4] - 18016:22, 18017:4, 18057:24, 18093:16
**provided** [3] - 18089:20, 18090:13, 18091:15
**public** [1] - 18048:6
**publish** [1] - 18107:24
**pull** [4] - 18024:19, 18027:23, 18070:11, 18113:18
**pulling** [1] - 18031:25
**purpose** [6] - 18072:1, 18087:10, 18095:20, 18099:19, 18099:24, 18100:5
**purposes** [2] - 18059:22, 18117:1

**push** [3] - 18024:15, 18068:14, 18069:16
**put** [16] - 18029:11, 18031:21, 18033:10, 18035:25, 18037:20, 18041:1, 18055:20, 18058:17, 18059:22, 18064:14, 18072:11, 18092:3, 18099:10, 18102:3, 18111:5, 18112:1
**putting** [3] - 18028:17, 18029:13, 18094:8

## Q

**Quested** [1] - 18124:4
**questioned** [1] - 18099:8
**questioning** [2] - 18061:18, 18093:19
**questions** [15] - 18043:4, 18044:20, 18045:8, 18045:9, 18053:2, 18055:7, 18055:25, 18060:7, 18060:14, 18062:5, 18062:9, 18062:12, 18062:19, 18101:17
**quick** [1] - 18095:6
**quicker** [1] - 18063:1
**quite** [5] - 18037:2, 18037:20, 18065:18, 18106:15, 18107:18

## R

**radio** [2] - 18085:13, 18086:6
**radios** [2] - 18085:11, 18086:9
**raise** [3] - 18018:23, 18072:10, 18132:4
**raising** [3] - 18014:10, 18059:14, 18099:9
**rallies** [8] - 18023:19, 18023:21, 18069:2, 18073:5, 18100:6, 18121:19, 18129:9
**rally** [7] - 18036:2, 18072:10, 18075:13, 18096:2, 18101:23, 18119:7, 18121:3
**rallying** [1] - 18098:24
**ran** [1] - 18065:12
**random** [1] - 18024:1
**rather** [4] - 18014:1, 18058:15, 18059:15, 18132:1
**reach** [3] - 18057:4,

18130:13, 18130:16
**reaching** [2] - 18021:7, 18021:13
**reactions** [1] - 18014:5
**read** [5] - 18067:6, 18080:7, 18088:19, 18097:11, 18113:20
**reading** [2] - 18044:16, 18098:1
**ready** [1] - 18076:23
**real** [2] - 18080:9, 18105:7
**really** [6] - 18023:25, 18024:16, 18075:12, 18099:14, 18113:23, 18120:5
**reason** [12] - 18013:11, 18013:12, 18017:7, 18027:12, 18032:19, 18035:22, 18038:3, 18061:24, 18072:14, 18086:22, 18086:23, 18093:20
**reasons** [1] - 18100:17
**rebuke** [1] - 18067:21
**receive** [5] - 18026:7, 18046:15, 18066:25, 18094:11, 18097:8
**received** [3] - 18040:17, 18088:25
**Recess** [1] - 18058:6
**recognize** [2] - 18039:3, 18112:21
**recollection** [3] - 18017:3, 18035:10, 18041:8
**record** [3] - 18012:4, 18058:8, 18133:4
**recorded** [2] - 18010:24, 18071:22
**recording** [3] - 18116:9, 18125:5, 18125:16
**recruiting** [2] - 18087:22, 18088:4
**red** [2] - 18039:15, 18108:11
**redirect** [2] - 18037:16, 18038:4
**reduce** [3] - 18029:6, 18029:17, 18071:10
**reference** [1] - 18081:21
**referred** [1] - 18031:18
**reflected** [2] - 18110:14, 18110:15
**refute** [1] - 18014:25
**refuting** [1] - 18015:6

**regardless** [1] - 18093:12
**regional** [1] - 18066:19
**register** [1] - 18076:18
**regurgitate** [1] - 18110:24
**regurgitating** [1] - 18111:1
**REHL** [2] - 18009:6, 18011:4
**Rehl** [31] - 18010:7, 18013:15, 18013:23, 18014:24, 18016:10, 18016:14, 18016:18, 18036:12, 18038:11, 18041:22, 18057:14, 18057:20, 18058:21, 18062:3, 18063:10, 18063:23, 18078:4, 18080:2, 18084:13, 18088:14, 18092:11, 18094:4, 18094:24, 18100:25, 18108:6, 18109:21, 18111:17, 18112:17, 18126:14, 18131:15, 18131:21
**rein** [1] - 18030:18
**reject** [1] - 18067:21
**relate** [1] - 18064:25
**related** [3] - 18012:8, 18023:12, 18045:8
**relating** [1] - 18081:8
**relaxed** [1] - 18031:15
**relevance** [16] - 18014:12, 18032:22, 18063:16, 18063:20, 18072:21, 18073:7, 18073:13, 18078:16, 18082:1, 18082:6, 18088:6, 18104:20, 18105:12, 18105:17, 18106:10, 18109:10
**relief** [2] - 18013:18, 18013:19
**remaining** [1] - 18013:9
**remember** [21] - 18028:23, 18034:18, 18035:12, 18087:8, 18087:12, 18091:6, 18091:7, 18096:22, 18099:21, 18101:20, 18101:24, 18104:19, 18104:23, 18105:3, 18105:4, 18105:5, 18105:7, 18111:23, 18124:5, 18124:20
**remind** [1] - 18131:17
**removed** [1] -

18028:24
**repeat** [1] - 18045:24
**replay** [1] - 18127:10
**replies** [1] - 18028:23
**report** [3] - 18081:24, 18089:13, 18090:3
**reporter** [1] - 18057:16
**REPORTER** [2] - 18133:1, 18133:9
**Reporter** [1] - 18010:21
**reporting** [1] - 18113:11
**Representatives** [1] - 18031:3
**requests** [1] - 18013:21
**required** [2] - 18050:2, 18050:6
**requires** [1] - 18089:17
**researched** [1] - 18059:9
**reserve** [1] - 18061:2
**respect** [5] - 18013:14, 18032:5, 18078:11, 18080:2, 18080:3
**respectfully** [1] - 18077:17
**respond** [2] - 18028:24, 18107:9
**responded** [1] - 18107:10
**responding** [2] - 18028:21, 18028:22
**response** [4] - 18083:21, 18090:18, 18094:7, 18094:9
**rest** [8] - 18015:11, 18036:14, 18059:16, 18062:21, 18062:22, 18077:6, 18099:11, 18111:10
**result** [1] - 18036:23
**resume** [1] - 18016:3
**return** [1] - 18057:20
**reviewed** [2] - 18026:24, 18036:17
**revoked** [1] - 18031:7
**Rhode** [5] - 18016:15, 18016:16, 18020:17, 18027:23, 18041:19
**ridiculous** [2] - 18092:25, 18106:15
**rightfully** [2] - 18027:15, 18033:8
**riot** [1] - 18031:5
**Road** [1] - 18010:8

**rolled** [2] - 18075:15, 18075:16
**Room** [1] - 18010:22
**room** [1] - 18057:17
**route** [1] - 18129:19
**routes** [1] - 18085:11
**rowdy** [2] - 18023:10, 18023:14
**rows** [2] - 18021:9, 18021:13
**RPR** [1] - 18010:21
**rule** [1] - 18091:17
**ruled** [1] - 18077:5
**Rules** [2] - 18077:15, 18093:17
**ruling** [3] - 18037:23, 18038:1, 18076:18
**rulings** [2] - 18036:16, 18077:2
**run** [3] - 18085:18, 18128:1, 18128:16
**rush** [1] - 18024:6

## S

**SABINO** [1] - 18010:12
**sad** [1] - 18081:6
**safety** [3] - 18030:6, 18100:8, 18100:9
**SARA** [1] - 18010:21
**Sara** [2] - 18133:3, 18133:8
**saved** [1] - 18111:24
**saw** [5] - 18020:22, 18030:10, 18071:12, 18079:14, 18119:12
**scenario** [1] - 18023:24
**scene** [5] - 18023:9, 18024:5, 18109:11, 18127:4, 18129:15
**scenes** [1] - 18070:24
**scrambled** [1] - 18092:3
**scream** [1] - 18093:3
**screaming** [4] - 18017:10, 18017:14, 18019:6, 18019:20
**screen** [5] - 18017:12, 18017:21, 18090:12, 18090:14, 18124:10
**screenshot** [2] - 18114:9, 18118:12
**scuffles** [1] - 18027:17
**seat** [2] - 18057:20, 18113:1
**seated** [4] - 18016:5, 18057:19, 18063:4, 18130:24

**second** [2] - 18018:3, 18082:25
**secondhand** [2] - 18035:11, 18035:13
**secret** [7] - 18086:13, 18086:22, 18102:2, 18117:20, 18117:22, 18120:12, 18120:14
**section** [1] - 18119:12
**see** [60] - 18012:17, 18015:21, 18016:21, 18017:20, 18018:4, 18018:13, 18018:23, 18019:25, 18021:6, 18024:3, 18024:8, 18024:13, 18025:8, 18025:9, 18025:14, 18028:10, 18036:25, 18037:11, 18037:17, 18037:22, 18038:2, 18038:14, 18040:13, 18040:25, 18041:17, 18042:10, 18059:10, 18067:8, 18067:24, 18070:3, 18074:6, 18083:13, 18087:1, 18088:14, 18091:17, 18093:7, 18094:16, 18096:19, 18097:15, 18106:25, 18109:19, 18110:6, 18113:1, 18117:15, 18118:12, 18120:20, 18122:15, 18122:17, 18122:21, 18125:23, 18127:9, 18127:13, 18127:22, 18129:6, 18130:12, 18130:21, 18132:6
**seeing** [4] - 18026:23, 18101:8, 18109:23, 18124:5
**seek** [6] - 18028:22, 18050:24, 18051:2, 18051:5, 18051:9, 18062:2
**seeking** [1] - 18028:8
**seeking-and-destroying** [1] - 18028:8
**seem** [2] - 18091:9, 18098:10
**Self** [4] - 18028:2, 18083:18, 18084:14, 18086:19
**self** [1] - 18101:18
**Self-Defense** [4] - 18028:2, 18083:18, 18084:14, 18086:19
**self-defense** [1] - 18101:18

**Senate** [1] - 18051:19
**senators** [6] - 18031:3, 18031:6, 18031:25, 18032:9, 18032:18, 18048:3
**send** [3] - 18092:18, 18092:20, 18098:3
**sends** [1] - 18092:13
**sense** [9] - 18012:9, 18012:17, 18012:19, 18058:16, 18058:18, 18083:8, 18098:18, 18098:22, 18120:21
**senseless** [2] - 18082:4, 18082:9
**sent** [3] - 18080:8, 18094:4, 18115:7
**sentence** [3] - 18025:16, 18025:23, 18026:9
**separate** [1] - 18126:22
**service** [1] - 18130:22
**SESSION** [1] - 18009:10
**set** [3] - 18023:16, 18070:25, 18089:5
**sets** [1] - 18065:2
**severance** [1] - 18013:19
**shake** [1] - 18121:25
**shaking** [1] - 18116:25
**share** [1] - 18106:2
**shares** [1] - 18069:18
**shit** [1] - 18080:9
**short** [1] - 18105:7
**shorthand** [1] - 18010:24
**shortly** [1] - 18042:6
**shot** [1] - 18020:2
**shoulda** [2] - 18031:12, 18031:13
**shoulders** [1] - 18021:8
**shouting** [4] - 18018:19, 18019:10, 18019:22
**show** [23] - 18030:2, 18030:3, 18032:4, 18032:5, 18037:19, 18072:10, 18072:13, 18080:4, 18080:25, 18088:12, 18089:13, 18089:14, 18101:10, 18103:11, 18106:23, 18107:22, 18112:6, 18112:17, 18113:19, 18116:1, 18117:2, 18117:11, 18122:2

**showed** [4] - 18090:10, 18100:19, 18101:1, 18123:14
**showing** [2] - 18035:22, 18125:7
**shut** [2] - 18077:12, 18077:14
**side** [3] - 18071:11, 18122:16, 18125:4
**sidebar** [2] - 18036:8, 18092:23
**SIGNATURE** [1] - 18133:9
**similar** [2] - 18037:3, 18060:22
**simply** [2] - 18077:19, 18109:19
**single** [2] - 18068:4, 18068:5
**sit** [2] - 18026:19, 18027:8
**sitting** [3] - 18013:17, 18130:10, 18130:11
**situation** [4] - 18014:7, 18065:23, 18067:7, 18085:4
**situations** [2] - 18028:17, 18029:8
**Sixth** [3] - 18010:16, 18055:23, 18060:14
**sleep** [2] - 18031:22, 18067:3
**slow** [3] - 18085:25, 18116:22, 18129:2
**slower** [1] - 18128:22
**slowly** [1] - 18021:10
**SMITH** [4] - 18009:21, 18012:7, 18012:12, 18062:11
**Smith** [4] - 18009:22, 18010:5, 18062:4, 18130:25
**social** [3] - 18069:17, 18069:20, 18070:17
**softening** [1] - 18126:2
**solution** [1] - 18098:25
**someone** [6] - 18077:5, 18077:7, 18084:4, 18084:23, 18092:6, 18130:15
**sometimes** [13] - 18024:13, 18027:19, 18061:20, 18066:7, 18067:3, 18067:7, 18067:10, 18069:23, 18069:24, 18072:14, 18076:21, 18076:22, 18103:13

**somewhat** [1] - 18095:3
**somewhere** [4] - 18023:15, 18023:16, 18032:4, 18103:12
**soon** [1] - 18107:6
**Soros** [1] - 18080:11
**sorry** [22] - 18016:12, 18016:14, 18020:17, 18020:25, 18025:13, 18026:10, 18028:19, 18032:25, 18035:9, 18036:6, 18039:17, 18039:21, 18042:22, 18044:11, 18045:24, 18052:7, 18071:17, 18072:20, 18078:19, 18083:6, 18090:10, 18115:10
**sort** [6] - 18014:13, 18027:11, 18069:21, 18080:17, 18103:12, 18105:22
**sorta** [1] - 18081:23
**sound** [8] - 18014:19, 18017:10, 18017:15, 18017:24, 18031:20, 18065:25, 18129:6
**sounds** [5] - 18014:19, 18015:23, 18017:8, 18018:1, 18121:22
**source** [1] - 18112:3
**space** [1] - 18128:5
**speaking** [4] - 18083:13, 18087:14, 18087:19, 18120:18
**special** [2] - 18087:14, 18087:19
**specific** [3] - 18080:1, 18090:5, 18100:18
**specifically** [10] - 18014:24, 18026:14, 18047:21, 18047:25, 18060:15, 18071:16, 18078:11, 18086:24, 18118:17
**specifics** [2] - 18105:7, 18105:11
**speculation** [7] - 18067:14, 18076:6, 18119:4, 18120:7, 18121:12, 18121:14, 18127:18
**speech** [12] - 18067:12, 18067:13, 18067:17, 18067:18, 18067:22, 18088:20, 18089:3, 18089:4, 18095:16, 18096:1,

18103:12
**speeches** [3] - 18023:22, 18095:14, 18103:14
**speed** [1] - 18129:2
**speeding** [1] - 18080:17
**spend** [1] - 18014:6
**spent** [1] - 18029:16
**spin** [1] - 18018:7
**spoken** [1] - 18131:14
**spot** [4] - 18114:10, 18126:16, 18126:17, 18126:19
**St** [2] - 18035:8, 18035:10
**stab** [1] - 18029:18
**stab-proof** [1] - 18029:18
**stabbed** [7] - 18029:10, 18029:17, 18084:2, 18084:3, 18084:4, 18087:1, 18088:3
**stabbing** [2] - 18083:25, 18084:6
**stabbings** [1] - 18098:24
**stacking** [1] - 18081:20
**stage** [2] - 18094:13, 18102:9
**stages** [4] - 18023:16, 18024:7, 18089:5, 18114:1
**stamp** [9] - 18107:23, 18112:7, 18114:4, 18117:12, 18118:9, 18123:20, 18125:7, 18126:13, 18126:23
**stand** [6] - 18038:1, 18044:17, 18045:14, 18054:25, 18055:3, 18060:4
**standards** [1] - 18085:22
**standing** [4] - 18019:8, 18019:9, 18081:8, 18119:23
**start** [6] - 18013:6, 18018:10, 18019:1, 18041:19, 18068:12, 18088:22
**started** [10] - 18026:22, 18032:10, 18032:11, 18032:13, 18032:14, 18032:17, 18032:20, 18094:2, 18118:8, 18123:19
**state** [4] - 18065:14,

18076:20, 18076:24, 18077:21

**statement** [7] - 18014:23, 18019:20, 18019:24, 18026:11, 18028:21, 18080:18, 18081:8

**statements** [8] - 18014:3, 18019:20, 18027:2, 18027:4, 18030:19, 18031:19, 18080:11

**STATES** [3] - 18009:1, 18009:3, 18009:11

**states** [2] - 18065:8, 18065:9

**States** [24] - 18009:13, 18009:14, 18009:16, 18009:19, 18012:5, 18025:7, 18043:6, 18050:19, 18050:22, 18050:25, 18051:3, 18053:16, 18053:19, 18053:23, 18054:2, 18054:3, 18054:6, 18054:15, 18054:16, 18056:9, 18056:10, 18058:9

**station** [1] - 18014:16

**status** [1] - 18111:10

**stay** [6] - 18032:3, 18032:6, 18036:13, 18057:20, 18114:23

**stayed** [1] - 18032:2

**staying** [1] - 18129:22

**steady** [1] - 18116:22

**steal** [1] - 18034:9

**stenotype** [1] - 18010:24

**step** [6] - 18013:4, 18028:13, 18128:21, 18128:22, 18129:2

**steps** [2] - 18028:18, 18029:14

**STEVEN** [1] - 18010:15

**stick** [1] - 18078:1

**still** [10] - 18017:14, 18019:9, 18032:9, 18081:9, 18088:20, 18089:3, 18095:3, 18114:1, 18116:7

**stipulation** [3] - 18013:22, 18014:14, 18015:24

**stolen** [1] - 18035:5

**stop** [10] - 18014:15, 18018:14, 18019:3, 18034:8, 18085:25, 18118:16, 18126:14,

18128:12, 18128:15, 18129:11

**stopped** [6] - 18035:24, 18040:25, 18118:17, 18119:10, 18123:14

**stopping** [1] - 18130:6

**storm** [6] - 18017:15, 18017:25, 18018:1, 18019:13, 18019:24, 18123:17

**storming** [4] - 18016:19, 18122:8, 18122:10, 18126:7

**streaming** [1] - 18125:6

**Street** [5] - 18009:14, 18010:3, 18010:5, 18010:10, 18010:13

**street** [10] - 18042:12, 18082:10, 18082:19, 18109:25, 18110:8, 18110:9, 18110:22, 18111:12, 18127:2, 18129:21

**stressed** [1] - 18031:11

**stretch** [1] - 18085:25

**strike** [8] - 18022:11, 18022:14, 18045:16, 18074:3, 18075:5, 18075:23, 18095:23, 18128:7

**string** [1] - 18089:9

**strive** [1] - 18122:5

**strived** [1] - 18075:19

**strong** [1] - 18061:20

**struck** [1] - 18128:8

**stuff** [3] - 18023:10, 18037:9, 18037:10

**stunned** [1] - 18036:18

**stupid** [1] - 18068:2

**submit** [1] - 18060:16

**successful** [1] - 18126:7

**suggest** [2] - 18037:7, 18045:1

**suggesting** [1] - 18062:9

**Suite** [3] - 18009:17, 18009:23, 18010:11

**super** [1] - 18086:13

**super-secret** [1] - 18086:13

**supervise** [1] - 18084:19

**support** [2] - 18030:14, 18061:6

**supported** [1] -

18067:19

**suppose** [1] - 18059:12

**supposed** [7] - 18023:16, 18071:1, 18085:3, 18089:5, 18095:13, 18099:18

**surveillance** [1] - 18110:18

**suspended** [1] - 18031:2

**sustain** [8] - 18045:10, 18055:9, 18055:21, 18056:4, 18076:13, 18088:8, 18105:20, 18121:16

**sustained** [47] - 18022:3, 18033:14, 18043:8, 18044:10, 18049:19, 18052:16, 18054:23, 18055:8, 18063:17, 18063:21, 18064:22, 18068:24, 18070:14, 18071:24, 18073:8, 18074:16, 18074:25, 18075:6, 18077:25, 18079:7, 18082:2, 18086:16, 18087:17, 18092:16, 18095:24, 18099:3, 18100:3, 18100:23, 18104:15, 18105:9, 18105:14, 18105:25, 18106:18, 18108:4, 18108:22, 18109:1, 18113:8, 18119:5, 18120:16, 18120:24, 18123:3, 18124:25, 18126:5, 18126:10, 18127:20, 18128:8

**swiped** [5] - 18034:23, 18035:5, 18035:6, 18035:7, 18035:17

**sworn** [2] - 18014:3

**symbolizing** [1] - 18128:4

# T

**table** [1] - 18102:20

**tag** [1] - 18066:6

**tags** [1] - 18107:7

**talks** [1] - 18081:20

**tank** [4] - 18098:19, 18099:7, 18099:12, 18099:20

**taped** [1] - 18020:22

**TARRIO** [1] - 18009:6

**Tarrio** [13] - 18010:9, 18040:6, 18043:23,

18046:15, 18048:16, 18063:6, 18077:19, 18077:20, 18078:4, 18078:6, 18089:1, 18108:14, 18113:3

**Tarrio's** [3] - 18061:21, 18076:20, 18076:24

**teams** [2] - 18029:25, 18030:1

**technique** [1] - 18070:16

**technology** [1] - 18017:7

**teed** [2] - 18057:25, 18058:3

**Telegram** [2] - 18066:2, 18098:10

**ten** [5] - 18029:25, 18040:17, 18057:22, 18058:5, 18065:23

**ten-man** [1] - 18029:25

**ten-minute** [2] - 18057:22, 18058:5

**tend** [1] - 18030:13

**tends** [2] - 18064:14

**tenet** [1] - 18067:16

**tent** [1] - 18032:6

**term** [4] - 18065:16, 18068:13, 18121:20, 18122:25

**terminology** [1] - 18055:15

**terms** [1] - 18102:6

**terrible** [1] - 18026:6

**testified** [15] - 18016:18, 18020:21, 18023:7, 18040:16, 18058:24, 18061:8, 18063:12, 18070:16, 18082:15, 18104:19, 18105:5, 18109:9, 18109:17, 18109:19, 18119:15

**testifies** [2] - 18059:8, 18110:6

**testify** [4] - 18060:10, 18105:11, 18109:15, 18109:22

**testifying** [2] - 18105:8, 18110:18

**testimony** [13] - 18013:9, 18019:18, 18058:22, 18072:4, 18077:16, 18097:1, 18104:8, 18104:17, 18105:16, 18110:5, 18110:10, 18110:12, 18132:3

**TESTIMONY** [1] - 18011:3

**Texas** [1] - 18030:3

**text** [1] - 18040:17

**THE** [177] - 18009:1, 18009:1, 18009:10, 18012:10, 18012:13, 18012:21, 18013:4, 18014:5, 18015:2, 18015:5, 18015:17, 18015:23, 18016:5, 18016:13, 18019:3, 18022:3, 18022:8, 18022:9, 18022:13, 18032:24, 18032:25, 18033:14, 18036:4, 18036:5, 18036:15, 18036:25, 18037:6, 18037:18, 18038:1, 18043:8, 18044:10, 18044:20, 18044:24, 18045:6, 18047:14, 18047:17, 18049:18, 18051:13, 18051:14, 18052:16, 18054:21, 18055:6, 18055:19, 18055:25, 18056:3, 18057:12, 18057:13, 18057:15, 18057:19, 18058:11, 18058:14, 18058:23, 18059:1, 18059:6, 18059:14, 18060:18, 18061:1, 18061:4, 18061:11, 18061:22, 18062:15, 18062:22, 18063:2, 18063:4, 18063:17, 18063:21, 18064:22, 18067:15, 18067:16, 18068:24, 18070:14, 18071:24, 18072:4, 18072:6, 18072:20, 18072:22, 18072:23, 18073:8, 18073:14, 18073:15, 18074:1, 18074:4, 18074:8, 18074:16, 18074:25, 18075:6, 18075:24, 18076:9, 18077:1, 18077:14, 18077:22, 18077:24, 18078:17, 18079:7, 18082:2, 18082:7, 18083:24, 18083:25, 18084:17, 18084:18, 18086:16, 18087:17, 18088:8, 18089:14, 18089:22, 18090:16, 18090:20, 18090:23, 18091:2, 18091:8, 18091:12, 18092:1, 18092:6,

18092:16, 18093:6, 18093:10, 18094:7, 18094:15, 18095:11, 18095:13, 18095:24, 18097:23, 18097:24, 18099:3, 18100:3, 18100:23, 18101:5, 18101:6, 18103:1, 18103:2, 18104:1, 18104:2, 18104:15, 18104:21, 18105:9, 18105:14, 18105:18, 18105:20, 18105:25, 18106:6, 18106:11, 18106:18, 18108:4, 18108:22, 18109:1, 18109:5, 18109:12, 18109:24, 18110:3, 18110:13, 18110:21, 18111:9, 18112:9, 18112:11, 18113:8, 18119:5, 18119:18, 18120:8, 18120:9, 18120:16, 18120:24, 18121:13, 18121:16, 18123:3, 18124:25, 18125:19, 18126:5, 18126:10, 18127:20, 18128:8, 18130:6, 18130:9, 18130:24, 18131:9, 18131:16, 18131:19, 18131:22

**they've** [2] - 18055:8, 18077:6

**thinking** [2] - 18012:13, 18089:23

**thinks** [1] - 18105:13

**Thomas** [1] - 18025:24

**thoughts** [1] - 18023:11

**thousands** [1] - 18067:1

**threat** [1] - 18035:24

**threaten** [3] - 18048:21, 18049:6, 18049:9

**threats** [2] - 18050:1, 18050:5

**three** [9] - 18013:23, 18039:22, 18064:8, 18065:9, 18065:10, 18090:5, 18092:13, 18092:18, 18094:12

**threw** [1] - 18036:21

**throughout** [12] - 18025:5, 18025:7, 18065:16, 18083:15, 18083:16, 18097:1, 18098:23, 18099:9,

18123:24, 18124:4, 18124:5, 18124:19

**throw** [3] - 18052:8, 18052:24, 18072:10

**throwing** [5] - 18052:11, 18052:14, 18052:18, 18052:21, 18053:3

**thrown** [1] - 18036:12

**throws** [1] - 18065:25

**Thursday** [1] - 18013:8

**timing** [1] - 18064:2

**TIMOTHY** [1] - 18009:10

**today** [11] - 18024:23, 18025:18, 18026:19, 18027:8, 18027:23, 18027:25, 18032:19, 18032:23, 18033:3, 18086:20, 18131:23

**together** [3] - 18041:1, 18092:3, 18102:4

**tolerance** [1] - 18068:15

**tomorrow** [14] - 18012:7, 18012:20, 18045:5, 18130:11, 18131:1, 18131:3, 18131:11, 18131:12, 18131:18, 18131:19, 18131:21, 18131:25, 18132:6

**ton** [1] - 18098:14

**took** [5] - 18025:4, 18025:5, 18034:22, 18042:18, 18060:4

**tools** [1] - 18122:25

**top** [1] - 18085:5

**tossing** [1] - 18065:24

**total** [2] - 18041:4, 18066:10

**totality** [1] - 18103:15

**touch** [3] - 18070:24, 18070:25, 18071:17

**tough** [1] - 18124:22

**toward** [3] - 18037:19, 18127:9, 18128:2

**towards** [4] - 18078:24, 18079:2, 18079:5, 18119:13

**town** [1] - 18117:10

**track** [1] - 18085:13

**tracking** [1] - 18018:22

**train** [1] - 18014:16

**Transcript** [1] - 18010:25

**transcript** [1] - 18133:4

**TRANSCRIPT** [1] - 18009:10

**transcription** [1] - 18010:25

**transported** [1] - 18131:3

**trash** [1] - 18070:2

**trial** [13] - 18014:20, 18058:19, 18059:7, 18059:17, 18063:12, 18063:14, 18063:15, 18065:17, 18097:1, 18103:23, 18104:5, 18104:9, 18106:21

**TRIAL** [1] - 18009:10

**tricky** [1] - 18110:3

**tried** [3] - 18042:11, 18042:12, 18093:2

**tries** [1] - 18095:21

**trolling** [7] - 18069:11, 18069:14, 18069:15, 18070:6, 18070:9, 18070:16, 18070:23

**trouble** [4] - 18029:12, 18084:25, 18085:1, 18087:2

**trucks** [2] - 18129:21, 18130:1

**true** [2] - 18015:5, 18120:6

**Trump** [27] - 18020:4, 18023:19, 18023:20, 18023:25, 18024:13, 18027:4, 18027:12, 18031:7, 18032:1, 18032:11, 18032:14, 18032:18, 18032:19, 18033:7, 18033:10, 18034:9, 18034:11, 18045:20, 18046:1, 18046:3, 18046:7, 18046:10, 18046:13, 18046:16, 18047:3, 18063:25, 18075:13

**trust** [2] - 18081:19, 18084:19

**truth** [1] - 18087:23

**try** [11] - 18024:7, 18064:19, 18068:9, 18072:13, 18079:23, 18087:3, 18116:1, 18116:8, 18116:17, 18116:24

**trying** [19] - 18024:3, 18024:15, 18029:4, 18030:16, 18033:10, 18037:6, 18037:7, 18041:25, 18065:20, 18065:22, 18069:19, 18077:12, 18086:4,

18098:25, 18099:1, 18099:4, 18111:8, 18111:17, 18116:14

**tune** [1] - 18067:10

**turn** [2] - 18093:10, 18121:3

**turned** [5] - 18016:14, 18031:6, 18032:18, 18032:19, 18032:23

**turning** [2] - 18032:11, 18032:14

**two** [10] - 18013:14, 18019:19, 18021:2, 18026:19, 18036:19, 18039:22, 18041:1, 18064:3, 18126:21

**type** [7] - 18028:8, 18030:15, 18064:18, 18067:18, 18103:22, 18104:4, 18120:14

**tyranny** [1] - 18025:22

## U

**U.S** [12] - 18021:19, 18022:6, 18022:21, 18042:9, 18048:24, 18052:1, 18052:4, 18053:7, 18053:10, 18053:13, 18053:16, 18053:20

**Uber** [1] - 18042:13

**ultimately** [4] - 18027:10, 18027:11, 18041:3, 18042:13

**under** [2] - 18060:14, 18087:4

**undermined** [1] - 18033:9

**understood** [5] - 18023:9, 18034:10, 18061:11, 18104:11, 18105:22

**unduly** [5] - 18037:14, 18037:15, 18037:24, 18038:3

**unexpected** [3] - 18024:2, 18131:24, 18132:3

**unexpectedly** [1] - 18131:23

**unfolded** [1] - 18027:10

**unified** [1] - 18061:23

**uniform** [4] - 18029:24, 18030:5, 18065:6, 18100:7

**uniform/organized** [2] - 18028:15, 18029:2

**UNITED** [3] - 18009:1,

18009:3, 18009:11

**United** [24] - 18009:13, 18009:14, 18009:16, 18009:19, 18012:5, 18025:7, 18043:6, 18050:18, 18050:22, 18050:25, 18051:3, 18053:16, 18053:19, 18053:23, 18054:2, 18054:3, 18054:6, 18054:15, 18054:16, 18056:9, 18056:10, 18058:9

**unless** [2] - 18061:24

**unorganized** [1] - 18115:12

**unread** [1] - 18067:4

**unsuccessful** [1] - 18042:13

**up** [77] - 18012:25, 18013:8, 18017:8, 18019:11, 18019:12, 18019:23, 18020:5, 18020:15, 18023:17, 18024:16, 18024:19, 18025:14, 18025:20, 18026:15, 18027:24, 18029:17, 18029:18, 18030:2, 18030:3, 18030:8, 18031:6, 18031:21, 18031:22, 18032:4, 18032:5, 18035:25, 18041:19, 18042:6, 18042:13, 18057:25, 18058:3, 18064:1, 18064:8, 18064:17, 18065:24, 18067:4, 18067:8, 18074:10, 18081:8, 18086:1, 18088:21, 18089:5, 18089:23, 18089:24, 18090:17, 18095:3, 18098:15, 18100:20, 18101:1, 18101:7, 18101:8, 18101:10, 18103:11, 18106:3, 18106:4, 18106:8, 18106:14, 18108:17, 18108:19, 18110:2, 18110:4, 18110:7, 18110:12, 18110:17, 18111:5, 18113:6, 18116:1, 18116:14, 18118:18, 18118:20, 18122:21, 18129:2, 18129:7, 18129:19, 18129:22, 18131:24

**uptight** [1] - 18035:1

## V

**value** [1] - 18051:11
**vandalism** [2] - 18089:2, 18095:6
**various** [2] - 18065:8, 18116:2
**vast** [1] - 18085:20
**veered** [1] - 18055:8
**vented** [1] - 18031:11
**versus** [3] - 18012:5, 18020:22, 18058:9
**vests** [1] - 18029:18
**vetted** [1] - 18030:1
**Vice** [1] - 18040:14
**video** [59] - 18015:20, 18016:22, 18018:3, 18018:6, 18018:8, 18018:14, 18018:23, 18019:7, 18020:2, 18021:4, 18022:24, 18025:13, 18034:16, 18034:17, 18036:11, 18037:2, 18037:4, 18037:8, 18037:9, 18037:11, 18037:13, 18037:18, 18037:20, 18038:11, 18038:14, 18039:1, 18071:21, 18087:8, 18087:10, 18087:12, 18098:19, 18098:21, 18099:7, 18099:12, 18099:20, 18099:22, 18108:2, 18108:6, 18108:8, 18109:19, 18109:21, 18109:22, 18110:4, 18110:7, 18110:11, 18110:14, 18110:16, 18110:24, 18111:2, 18111:6, 18113:5, 18113:6, 18117:11, 18119:12, 18122:15, 18123:14, 18125:5, 18129:23
**Video** [41] - 18017:1, 18017:18, 18018:11, 18019:2, 18019:16, 18020:8, 18020:19, 18033:20, 18034:14, 18038:9, 18038:19, 18039:24, 18041:15, 18041:20, 18042:3, 18112:19, 18114:6, 18115:13, 18115:17, 18116:19, 18117:4, 18117:13, 18118:4, 18118:10, 18118:22, 18121:5, 18122:13, 18123:6, 18123:12,

18123:21, 18124:13, 18125:8, 18125:25, 18126:24, 18127:7, 18127:11, 18128:19, 18129:4, 18129:13, 18129:24, 18130:5
**videos** [11] - 18026:25, 18030:10, 18037:2, 18037:19, 18062:5, 18062:7, 18087:5, 18098:6, 18109:16, 18110:18, 18110:19
**view** [5] - 18035:5, 18048:5, 18060:20, 18061:18
**viewed** [1] - 18109:19
**viewpoint** [1] - 18021:5
**vigorously** [2] - 18060:12
**violating** [1] - 18077:15
**violence** [12] - 18027:10, 18029:6, 18032:14, 18032:21, 18033:4, 18033:9, 18033:11, 18035:21, 18036:1, 18071:10, 18080:21, 18081:14
**voice** [19] - 18016:18, 18016:23, 18019:12, 18020:1, 18020:3, 18020:10, 18032:7, 18044:7, 18090:4, 18090:5, 18090:9, 18090:14, 18090:18, 18090:22, 18090:23, 18091:4, 18092:13, 18094:12, 18094:24
**voicemails** [1] - 18092:18
**voices** [1] - 18047:8
**void** [1] - 18122:19
**volume** [1] - 18020:18
**vote** [3] - 18026:4, 18026:6, 18034:9
**votes** [1] - 18033:5
**vs** [1] - 18009:5
**Vy** [2] - 18039:10, 18042:22

## W

**wait** [6] - 18023:22, 18023:23, 18024:12, 18034:8, 18037:16, 18038:4
**waiting** [3] - 18014:8, 18018:13, 18060:18

**waits** [1] - 18082:11
**waive** [1] - 18130:25
**waived** [1] - 18061:15
**wake** [1] - 18067:4
**walk** [4] - 18042:24, 18045:22, 18084:24, 18128:22
**walked** [2] - 18042:6, 18125:4
**walking** [11] - 18042:14, 18085:25, 18109:25, 18110:8, 18110:22, 18111:12, 18116:15, 18117:9, 18117:21, 18117:25, 18123:19
**wants** [3] - 18076:4, 18092:6, 18128:17
**Washington** [19] - 18009:6, 18009:15, 18009:18, 18010:3, 18010:22, 18025:6, 18025:8, 18025:10, 18114:15, 18114:25, 18115:3, 18115:6, 18115:8, 18115:11, 18117:19, 18118:7, 18119:8, 18119:10, 18124:1
**waste** [1] - 18125:18
**watching** [1] - 18110:19
**water** [8] - 18052:8, 18052:11, 18052:14, 18052:18, 18052:21, 18052:24, 18053:2, 18053:3
**waving** [1] - 18127:13
**ways** [4] - 18015:6, 18029:16, 18029:18, 18073:19
**wear** [3] - 18100:14, 18100:16, 18101:13
**wearing** [5] - 18039:15, 18039:16, 18039:17, 18100:11, 18100:13
**weekend** [1] - 18130:21
**weird** [1] - 18116:11
**West** [1] - 18010:13
**western** [1] - 18082:22
**whatsoever** [5] - 18046:20, 18095:7, 18097:13, 18102:16, 18103:21
**white** [1] - 18102:4
**whole** [11] - 18080:12, 18083:7, 18089:6, 18089:7, 18102:5,

18102:15, 18124:2, 18124:4, 18124:6, 18124:19, 18124:20
**Wick** [2] - 18133:3, 18133:8
**WICK** [1] - 18010:21
**wife** [1] - 18036:22
**willfully** [7] - 18050:24, 18051:2, 18051:9, 18051:16, 18051:22, 18051:25, 18052:3
**wind** [1] - 18089:1
**window** [6] - 18036:13, 18051:17, 18051:19, 18051:22, 18051:25, 18052:4
**Wing** [1] - 18051:19
**wired** [1] - 18116:11
**withdrawn** [1] - 18113:14
**witness** [21] - 18044:17, 18059:9, 18059:18, 18059:23, 18060:1, 18060:5, 18061:7, 18061:8, 18063:5, 18076:10, 18076:20, 18076:24, 18089:12, 18089:19, 18091:14, 18093:2, 18105:13, 18109:7, 18109:10, 18111:4
**WITNESS** [20] - 18019:3, 18022:9, 18032:25, 18033:14, 18036:5, 18047:17, 18051:14, 18057:13, 18067:16, 18072:6, 18072:23, 18073:15, 18083:25, 18084:18, 18095:13, 18097:24, 18101:6, 18103:2, 18104:2, 18120:9
**witnesses** [2] - 18089:18, 18110:12
**woke** [3] - 18031:5, 18031:21, 18031:22
**woman** [1] - 18034:22
**women** [1] - 18083:3
**word** [1] - 18050:21
**words** [9] - 18019:18, 18028:2, 18037:10, 18087:19, 18102:1, 18119:20, 18119:24, 18120:1, 18120:4
**world** [1] - 18082:23
**worried** [1] - 18116:5
**woulda** [2] - 18031:12, 18031:13
**wrap** [1] - 18013:8

**wrench** [1] - 18089:7
**write** [1] - 18113:22
**writing** [1] - 18026:12
**wrote** [1] - 18026:10

## Y

**years** [2] - 18026:19, 18036:19
**yelled** [1] - 18017:4
**yesterday** [2] - 18088:13, 18090:8
**York** [7] - 18009:17, 18009:20, 18009:23, 18010:17, 18012:25
**yourself** [9] - 18022:19, 18038:14, 18041:17, 18081:9, 18117:15, 18121:8, 18121:20, 18121:24, 18129:10

## Z

**Zach** [1] - 18094:4
**ZACHARY** [2] - 18009:6, 18011:4